UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WRESTLEREUNION, LLC,
 a Florida limited liability
 corporation,

      Plaintiff,

v.                             Case No.

                                 INJUNCTIVE RELIEF SOUGHT
                                 __JURY TRIAL DEMANDED__
LIVE NATION, INC.,
 a foreign corporation,

      Defendant.
_____/

## COMPLAINT FOR DAMAGES

      Plaintiff WrestleReunion, LLC sues Defendant Live Nation, Inc., demands trial by jury and alleges:

### JURISDICTION AND VENUE

1.      This is a civil action for damages.

2.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), as the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states.

3.      Venue lies in the Middle District of Florida pursuant to 28 U.S.C. § 1391(a)(2), as a substantial part of the events or omissions giving rise to the claims occurred within this judicial district.

4.      The case or controversy is appropriately heard in the Tampa Division of the Middle District of Florida pursuant to Middle District Local Rule 1.02(c), as the Tampa Division

encompasses the counties having the greatest nexus with the causes of action and claims of the Plaintiff.

## PARTIES

5.      Plaintiff WrestleReunion, LLC (WrestleReunion) is a Florida limited liability company.

6.      Defendant Live Nation, Inc. is a foreign corporation incorporated in Delaware, which has a principal place of business in California.  Live Nation, Inc. is the entity formerly known as CCE Spinco, Inc., which was the operation known as Clear Channel Entertainment, a division of Clear  Channel Communications, Inc., spunoff by Clear Channel Communications, Inc. in 2005.

## FACTUAL ALLEGATIONS

7.      All conditions precedent to the maintenance of this action have occurred.

8.      Professional wrestling is a multibillion dollar sports-entertainment industry.  The current industry leader is World Wrestling Entertainment, Inc., which generated in excess of $400 million in revenue in fiscal year 2006.

9.      In its infancy, professional wrestling was dominated by numerous promoters who arranged for live spectator events.  Professional wrestlers were paid to perform from the proceeds of the paid attendance by spectators.  Professional wrestling developed into geographic circuits, and the professional wrestlers would travel from town to town, performing for various promoters.

10.     For a period, there were as many as 26 different territories within the United States. Each territory rotated the wrestlers, but only the top talent stayed in one territory for more

2

than one year at a time.

11.     With the advent of radio and television, professional wrestling developed a wider audience and professional wrestlers were exposed to greater numbers of spectators, albeit geographically limited.

12.     Once cable television became widely available, the revenue generated by professional wrestling exploded.  Regional tours and promoters were consolidated and professional wrestling was no longer limited by regional broadcasting rights.

13.     For most of the existence of professional wrestling, professional wrestlers were independent contractors.  Cable television created wrestling superstars with worldwide audiences and worldwide fan bases.

14.     Through consolidation, however, regional professional wrestling television formats diminished in popularity and  profitability.  Yet, there exists a market for fans of legendary professional wrestling superstars.

15.     In June 2004, Sal Corrente launched WrestleReunion, LLC -- a concept to promote touring reunions of legendary superstars of the world of professional wrestling.  Mr. Corrente had over twenty years in the business of professional wrestling, managing talent and working as a paid referee for wrestling matches.  In developing the WrestleReunion concept, Mr. Corrente brought in several key advisors:

        a.     Rob Russen started in the music industry and moved into wrestling several decades ago.  Mr. Russen created the National Wrestling Federation, a unique concept packaging and selling wrestling shows in alliance with Verne Gagne, a legendary promoter and founder of the American Wrestling Alliance.  In 1989, Mr. Russen created IWA Championship Wrestling.

3

Television networks paid Mr. Russen to produce and sell wrestling shows. Eventually, media mogul Ted Turner, who owned World Championship Wrestling (WCW), asked Mr. Russen to replace Gordon Solie, the legendary broadcaster who built his career at Championship Wrestling of Florida before heading the broadcasting of WCW.

   b. Jimmy Hart, known in professional wrestling as "The Mouth of the South," is a professional wrestling manager, executive, composer, and musician. He worked in the World Wrestling Federation, World Championship Wrestling, the Continental Wrestling Association, Memphis Wrestling, United States Wrestling Association, X Wrestling Federation, WrestleXpress, and Total Nonstop Action Wrestling. Mr. Hart is perhaps best known for managing Hulk Hogan, Bret Hart, Jerry "The King" Lawler, Ted DiBiase, and The Honky Tonk Man.

  16. WrestleReunion's concept was to bring the fans and superstars of professional wrestling together in a continuing series of events in convention centers or hotels. The emphasis, as the tour moved throughout the United States, would be on the legendary superstars who had wrestled in the circuits local to the event. For example, in Pennsylvania, Bruno Sammartino would be a key invitee. In Florida, dusty Rhodes would be a key invitee. Although the reunions would involve some wrestling matches, the format primarily involved the interaction between fans and professional wrestlers, including interviews, autograph sessions, photograph opportunities, and promotion of merchandise. Many of the professional wrestlers WrestleReunion, LLC solicited to appear were officially retired from competition.

  17. WrestleReunion, LLC's concept was to complement the promotions and events of World Wrestling Entertainment, Inc. and other industry leaders, not to directly compete.

4

18.     WrestleReunion, LLC's business model involved the renting of convention centers or hotel ballrooms, inviting and paying professional wrestlers to appear, and promoting and merchandising the events. Fans would pay an admission fee. Because the admission fees would be limited, WrestleReunion, LLC intended to videotape the reunions and sell or distribute the broadcast rights via television or internet pay per view or DVD.

19.     The first WrestleReunion was scheduled in Tampa, Florida on January 28-30, 2005. Mr. Corrente and his advisors began considering multimedia opportunities and began discussions with HighSpots.com, an internet market of professional wrestling DVDs and memorabilia. Additional WrestleReunions were contemplated.

20.     The WrestleReunion team had significant experience in wrestling promotions and generating publicity, and word quickly spread of the event in planning. One account of the first WrestleReunion was published by Media General, in an article entitled "'History' Will Be Made At Wrestle Reunion," by Ronald Jordan:

> WrestleReunion, the mega-wrestling event featuring nearly 80 of wrestling's most legendary stars from the 1960s, '70s and '80s, takes place this weekend at the Doubletree Hotel at Tampa International Airport. The three-day extravaganza, which runs Friday through Sunday and was orchestrated by wrestling historian Bill Apter and wrestler Diamond Dallas Page, will showcase such big names in the sport as "The American Dream" Dusty Rhodes, "Cowboy" Bill Watts, Bruno Sammartino, "Rowdy" Roddy Piper, Harley Race, "Superfly" Jimmy Snuka, Ted DiBiase, Dory Funk Jr., Paul Jones, Terry Funk, Jack Brisco, Barry Windham, Windi Richter, Sherri Martel, Kevin Sullivan and Ronnie Garvin.
>
> "This is going to be as big as Wrestlemania," Page said recently during a phone interview. "If you're a diehard wrestling fan, someone who grew up with Harley Race, Bruno Sammartino, Dusty, Ricky Steamboat, Jimmy Valiant, then this is the place to be. It's wrestling history!"  Friday's schedule will include an autograph session with such wrestlers as Rhodes, Tully Blanchard, Race, Mick Foley, Bob Orton Jr., Virgil, Snuka, Piper, Jenny Taylor and The Missing Link. There will also be two question and answer sessions: one with Ted DiBiase and Ricky Steamboat, the other with Diamond Dallas

5

Page and Jake "The Snake" Roberts.

Saturday will feature another autograph session, and question and answer sessions with legendary WWE (then WWF) champion Bruno Sammartino, Terry Funk, Kevin Von Erich, Rhodes and Foley. Jeff Jarrett will defend his NWA championship, and American's Most Wanted will take on Terry Funk and Dory Funk Jr. for the NWA tag team titles in two of more than a dozen matches scheduled for Saturday evening. The show gets under way at 7:30 p.m. Others on the card include Rocky Johnson, Jimmy Valiant, Kevin Sullivan, Mike Graham, The Masked Superstar, Sherri Martel, Peggy Lee Leather, Warlord, Bugsy McGraw, Exotic Adrian Street and Hack Myers. Sunday will feature more autograph and question and answer sessions.

21.     Several months before the first WrestleReunion, Eric Paulen, a producer of

documentaries and affiliated with Clear Channel Communications, Inc., contacted Bill Apter, a

legendary wrestling journalist hired to be one of the hosts of the first WrestleReunion event.

a.     Mr. Paulen was working on a documentary for Arts & Entertainment

(A&E) television network on professional wrestlers, tentatively entitled "The Thirty Greatest of

All Time." Professional wrestling documentaries had been highly successful on A&E. In fact,

the network's highest rated program of all times was a documentary on "Andre the Giant," a

professional wrestler.

b.     Mr. Paulen wanted access to certain superstars, and asked if he could

interview them during the WrestleReunion.

22.     Mr. Apter provided Mr. Paulen's contact information to Mr. Corrente, who asked

Mr. Russen to contact Mr. Paulen to see what interest Clear Channel Communications, Inc. may

have in WrestleReunion.   Eventually, it was learned that Clear Channel Entertainment

Television (CCETV) was a division of Clear Channel Entertainment, which was owned by clear

Channel Communications, Inc.

23.    Although Mr. Corrente did not favor allowing Mr. Paulen to videotape WrestleReunion events for the documentary, he was interested in exploring a relationship with CCETV.

24.    Thus, Mr. Paulen introduced Mr. Corrente and his team to Steve Sterling. Mr. Sterling was a Senior Vice President with CCETV, and was considered an expert in DVD distribution and in securing music rights to TV specials. Mr. Sterling's role with CCETV was overseeing development and worldwide distribution of music and entertainment properties. Joe Townley was the President of CCETV.

25.    In late 2004, around the time that CCETV's discussions with WrestleReunion, LLC were ongoing, Bruce Eskowitz, President of Clear Channel Entertainment Properties, made the following announcement:

> Clear Channel Entertainment Television (CCETV) announced today its international initiatives for the distribution of its CCE originated TV programming and home video programs. These initiatives will be headed by Joe Townley, President of CCETV and Steve Sterling, Senior Vice President, CCETV working directly with a wide range of CCE's content driven Divisions as well as the company's unique marketing resources.

> The announcement was made today by Bruce Eskowitz, President of Clear Channel Entertainment Properties. The Company's international distribution strategy intends to capitalize on all media rights opportunities resulting from the more than 32,000 events CCE produces and promotes annually, as well as further servicing the objectives of artists, managers, labels and other live event creators. The company has also included a global television distribution strategy on rights for all Clear Channel Entertainment and Clear Channel Entertainment Television originated productions.

> The division will be working directly as both a program licensor and a supplier to specialty third party distribution partners in addition to serving other international distribution channels. CCETV will also be overseeing the global strategy for distribution of Clear Channel Entertainment TV's home video properties.

> Since the division's inception in 1999, CCETV has been distributing a broad range of its sports event programming output internationally. The new strategy for its global TV and

7

home video distribution initiatives builds on the success the company has already established in this area and reflects a major new expansion in applying CCE's resources and relationships toward entertainment content as well. Prestigious properties such as the US Open Tennis Championships and the Boston Marathon are among the number of programs distributed worldwide under the direction of Dennis Spencer, Managing Director, International, CCETV.

Mr. Eskowitz states, "This move, headed by Joe Townley and Steve Sterling, will draw on the multi-faceted assets of CCE worldwide, and follows a plan to which we are now focused on and committed to -- providing event producers, artists, labels and programmers greater value in content."

Sterling and Spencer are looking toward locking down a number of International distribution deals at the upcoming 2005 NATPE and MIP-TV Conventions, where CCETV will be placing its output of upcoming properties, including the wide range of content genres produced by the Company. This includes live music events, Broadway or West End shows, touring shows, family entertainment shows, arts & cultural exhibitions as well as specialized sports and motor sports events. Joe Townley continues, "We are excited to bring our diverse range of production values and programming expertise to TV buyers and DVD distributors worldwide. This marks an exciting time for both Clear Channel Entertainment and CCETV in creating opportunities for our content worldwide."

26.    To Mr. Corrente and his advisors, the interest of CCETV was intriguing. While

HighSpots.com offered a ready-made market and well-known portal for wrestling fans, CCETV

had vastly superior capabilities. CCETV was a division of Clear Channel Entertainment, self-

described in 2004:

Clear Channel Entertainment, a leading producer and marketer of live entertainment events is a subsidiary of Clear Channel (NYSE: CCU), a global leader in the away-from-home advertising industry. Clear Channel Entertainment currently owns, operates and/or exclusively books approximately 130 live entertainment venues, including nearly 100 in North America and more than 30 in Europe. In 2003, 69 million people attended approximately 32,000 events promoted and/or produced by the company, including live music events; Broadway, West End and touring theatrical shows; family entertainment shows; museum exhibitions, and specialized sports and motor sports events. In addition, the company's independently operated athlete representation business, SFX, provides management, marketing and financial consulting services to many of the worlds top professional athletes. Clear Channel Entertainment also provides marketing services through LIVE Channel, a company dedicated to creating and executing live events for companies seeking brand promotion. Clear Channel Entertainment operates

throughout North America, Europe, and Australia.

27.     Sterling and CCETV President Joe Townley discussed videotaping the
WrestleReunions on High Definition equipment and then distributing them in pay-per-view and
DVD formats -- exactly as envisioned by Mr. Corrente and his advisors -- using the same
resources described by Eskowitz.

28.     Sterling and his cohorts advised that CCETV would need to obtain significant
footage at multiple events, which coincided with the business model conceived by Mr. Corrente
and his advisors.  In fact, Sterling and his cohorts asked for "a library of product" that could be
produced into a thirteen or twenty-six week series for television syndication.

29.     Sterling told Mr. Corrente and his advisors that "WrestleReunion was a concept
that would live on long after all of us were gone."

30.     Sterling portrayed himself as a visionary in the sports-entertainment marketing
industry, and he promised the "money would start coming in within three to six months."

31.     Based on a series of discussions with CCETV, WrestleReunion, LLC ceased
pursuing broadcast or distribution discussions with HighSpots.com.

32.     On December 20, 2005, the Master Separation and Distribution Agreement
Between Clear Channel Communications, Inc. and CCE Spinco, Inc. (MSDA) went into effect.

33.     Subsequently, CCE Spinco, Inc. became known as Live Nation, Inc.

34.     Under the MSDA, Defendant is liable for all contracts, obligations, acts or
omissions of Clear Channel Entertainment, including all alleged herein.

## COUNT I
## BREACH OF CONTRACT

35.     Plaintiff realleges and incorporates by reference paragraphs 1-34.

36.     On January 21, 2005, Plaintiff and Clear Channel Entertainment Television, a
division of Clear Channel Entertainment, a subsidiary of Clear Channel Communications, Inc.
entered into a contract, and the performance of the contract was to occur in Hillsborough County,
Florida.  A true and correct copy of the contract is attached hereto as Exhibit "1".

37.     Defendant or its predecessor, or both, breached the contract by:

        a.      Failing to properly produce and videotape all of the WrestleReunions
events.

                i.      At the first WrestleReunion event held in Tampa, Florida, the
CCETV crew arrived without a production truck and without enough video cameras to record all
aspects of the event.

                ii.     Because CCETV demanded and received exclusive coverage,
Plaintiff advised HighSpots.com not to bring any of its equipment.  As a result of Defendant's
production failures, Plaintiff lost approximately nine hours worth of footage, including the
question and answer sessions with Ricky "The Dragon" Steamboat, Ted DiBiase, Diamond Dallas
Page, Jake "The Snake" Roberts, Jim Cornette, Stan Lane, Bobby Eaton, Dennis Condrey, Bill
Watt, Dusty Rhodes, Kevin Von Erich, Terry Funk, Steve Williams and Bruno Sammartino.

                iii.    Defendant failed to provide the event announcers with headsets or
monitors, compromising communications.  In fact, the announcers had to rely on hand signals to
call the matches, diminishing the ability of Lance Russell, Jimmy Hart and Joey Styles to do "play

10

by play."

        iv.     The lack of equipment on the front end also made the editing of the first event much more time consuming and challenging to accomplish.

        v.     At the WrestleReunion 3 event in Davie, Florida, CCETV failed to bring High Definition video equipment, despite Sterling's previous assertion that taping in High Definition would help to make the product significantly more valuable.

        b.     Failing to market and distribute the events.

        i.     Two days' worth of interviews that were filmed by CCETV for an A&E documentary are missing.

        ii.     Defendant or its predecessor is in possession of a comedy show recorded at a WrestleReunion event with Mick Foley, a best selling author and current superstar, but made no efforts to market or distribute this program.

        iii.     Although four "shoot interviews" were released through HighSpots.com, they were delayed.   Despite that they had a Clear Channel and WrestleReunion logo on them, there was no marketing or press release surrounding the release.

        iv.     The wrestling matches from the WrestleReunion events, the feature product, was not marketed or distributed.

        v.     Defendant's predecessors denied Plaintiff authorization for a press release to announce the relationship with Clear Channel.  Defendant's predecessors continually promised a formal press release but never issued one.

        38.     As a result of Defendant's breach, Plaintiff has suffered damages, including loss of revenue, incurred expenses, loss of profits and loss of business opportunities.

WHEREFORE, Plaintiff demands judgment for damages, trial by jury, interest, costs, and such further and equitable relief as this Court deems appropriate.

## COUNT II
## FRAUDULENT INDUCEMENT

39.     Plaintiff realleges and incorporates by reference paragraphs 1-34.

40.     At all material times, Defendant's predecessor, Clear Channel Entertainment, authorized Steve Sterling and Joe Townley to represent to Plaintiff that CCETV intended to produce and distribute WrestleReunion events, including the WrestleReunion event scheduled in Tampa, Florida in late January 2005.

41.     Plaintiff relied on these statements, which were false when made or made with reckless disregard for the truth.

42.     Defendant's agents knowingly made these false representations to induce Plaintiff into signing the contract.

43.     At the time these statements were made, on information and belief, Sterling and Townley were aware that CCETV's parent company intended to spin off or dissolve CCETV, thereby making it impossible for CCETV to produce and distribute WrestleReunion events.

44.     In reliance on the representations, Plaintiff was induced into executing the contract, attached as Exhibit "1".

45.     Had Plaintiff known the truth, it would not have entered into the contract.

46.     Furthermore, during subsequent conversations after the initial WrestleReunion events, Sterling and Townley reiterated that CCETV fully intended to fulfill its contractual obligations.

47.    These statements were false when made or made with reckless disregard for the truth and were made to induce Plaintiff to take certain actions.

48.    In reliance on Defendant's statements, WrestleReunion scheduled additional live events.

49.    Had Plaintiff known the truth, it either would not have scheduled additional live expenses or would have otherwise changed its course of conduct to limit exposure to losses.

50.    As a result of Defendant's fraudulent inducement, Plaintiff has suffered damages, including but not limited to loss of revenue, expenses scheduling events that Defendant's predecessor failed to videotape or distribute viewing rights.

WHEREFORE, Plaintiff demands judgment for damages and punitive damages in its favor, trial by jury, interest, costs, and such further and equitable relief as this Court deems appropriate.

## COUNT III
### VIOLATION OF SECTION 501.204(1), FLORIDA STATUTES

51.    Plaintiff realleges paragraphs 1-34.

52.    Defendant or its predecessor engaged in unfair methods of competition, unconscionable acts or practices, or unfair or deceptive acts or practices in the conduct of trade or commerce, in violation of section 501.204(1), Florida Statutes.

53.    Under section 501.211(1) and (2), Florida Statutes, Plaintiff is entitled to a declaratory judgment that Defendant's acts or practices violates the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), and enjoinment of further violations by Defendant, as well as actual damages, plus attorney's fees and court costs as provided in section 501.2105, Florida

Statutes.

54.    As a direct and proximate result of Defendant's actions, Plaintiff has suffered damages to his business and reputation, incurred expenses, lost income, and these damages are continuing.

WHEREFORE, Plaintiff demands a declaration that Defendant's actions violated the FDUTPA, a permanent injunction enjoining Defendant from further violations, trial by jury, judgment for damages, attorneys' fees, interest and costs and for such other and further relief as the Court deems appropriate.

DATED this 14 day of November, 2007.

RYAN CHRISTOPHER RODEMS, ESQUIRE
Florida Bar No. 947652
Trial Counsel for Plaintiff
BARKER, RODEMS & COOK, P.A.
400 North Ashley Drive, Suite 2100
Tampa, Florida  33602
Telephone:  (813) 489-1001
Fax:  (813) 489-1008
E-mail: rodems@barkerrodemsandcook.com

*Clear Channel Entertainment Television*

220 West 42nd Street, 9th Floor
New York, NY 10036
Ph: (917) 421-5207
Fx: (917) 421-5239

January 21st, 2005

To: Rob Russen,
   WrestleReunion LLC
cc: Sal Corrente

Re: "WrestleReunion" worldwide TV/DVD production & distribution rights. This proposal is
based upon CCETV funding all production and completion costs with a 50%-30% revenue share.

*Subject to Mutual Approval & Signature.*

Dear Rob:

Please find below, as discussed, an *Outline of Terms* from Clear Channel Entertainment
Television ("CCETV") for the rights to a series of audio-visual Programs featuring
"WrestleReunion" as the live event ("Program(s)"). This letter is intended to outline the principal
terms upon which CCETV would go forward to fund the production and completion of the
Program(s) we've discussed distributing based upon your intended live event schedule. You shall
be referred to in the proposal as "Promoter." I have added the estimate for our production funding
and completion of the first Program. Once you have had an opportunity to review this letter, if
you are in agreement with it, I would appreciate your having a duly authorized person sign and
return copies to us as indicated below. A long form agreement to be negotiated in good faith
would follow thereafter.

The following are the substantive deal points we would like to formalize with you now:

1. The Program(s): The Program(s) will be derived from the CCETV audio-visual productions
from a series of live events entitled "WrestleReunion" comprised substantially of living legends

♯ 389235

EXHIBIT

1

of the wrestling world as well as competitive events and other special events and appearances pursuant to a pre-determined schedule created by Promoter and provided to CCBTV well in advance of the event dates(s). CCBTV shall produce the Program(s) to include wrestling competitions, personality profile coverage, exclusive interviews, behind the scenes footage, and "on-the-road" documentary coverage to be mutually determined by the parties. The Program(s) will be comprised substantially of the scheduled events and personality documentary coverage material, totaling not less than 90 minutes for national and international distribution, and not less than 120 minutes (90 mins. live event and/or competition, 30 mins. documentary/personality profile material) for worldwide TV and home video distribution. The Program(s) will typically be shot in High Definition video and will conform to top quality broadcast and home video production standards, and will be in a multi-track format. The Program(s) will also meet the technical content requirements of the distribution outlet(s) intended for licensing agreements in the Territory.

2.  **Rights:** CCBTV will have the exclusive worldwide distribution rights to the Program(s) in all forms of media which will include, without limitation, broadcast rights for national and international distribution (which will include, but not be limited to, free and pay terrestrial, digital, cable and satellite television, pay-per-view, video-on-demand, and all other forms and fields of television distribution now known or hereafter developed); all forms and formats of home video, both linear and non-linear, now known or hereafter developed, including, without limitation, VHS and DVD rights; radio distribution rights; theatrical and non-theatrical distribution rights; Broadband/Internet rights for web casts and downloading; and the right to exploit the Program(s) during the term in any other format(s) now known or hereafter developed.

3.  **Clearances:** Promoter shall be responsible for and will exercise his best efforts in negotiating and securing all releases, clearances, consents and/or releases from all third parties, including, without limitation, Talent's agents or other necessary parties. If any materials of any kind used in the Program(s) are controlled by Talent or Promoter, then such materials will be provided to CCBTV for use in the Program(s) at no additional cost to the CCBTV Program budget(s).

4.  **Territory:** The World.

5.  **Term:** Fifteen (15) years from the U.S. release date of the Program.

6.  **Financial Commitment:** CCBTV will make an overall "all-in" financial commitment in respect of the audio-visual planning, production, production and completion of the Program(s) in the budgeted amount not to exceed approximately $235,000. Production and completion funding for the Programs(s) shall be allocated as follows:

    a.  **Costs:**

        (i)  **Production Costs:** CCBTV will produce the Program(s) and shall provide and directly manage a minimum recoupable production budget which will be financed, paid and disbursed by CCBTV. The final budget will be determined solely by CCBTV after production planning and post production completion for the Program(s) has been established. All aspects of the audio-visual production will be the responsibility of Clear Channel Entertainment Television in consultation with the Promoter.

        (ii)  **Other Costs:** All materials provided by Talent/Wrestlers on-site, including video footage, photos, mementos, and any other audio or visual materials that are owned or controlled

2                             389235

by the Promoter and/or Talent/Wrestlers shall be provided for use in the Program(s) at no additional cost to the budget. CCETV shall edit the Program(s) as part of the production budget. CCETV shall not be responsible for any unapproved overages incurred by Promoter.

7. Distribution Fees/Royalty Rates: CCETV will retain a 25% distribution fee for all broadcast/television/on-line licenses plus reimbursement for actual out-of-pocket distribution expenses. The net thereafter (and Promoter royalty if any) will be applied towards CCETV recoupment. After recoupment of all CCETV expenses including the Guarantee, the following will apply:

    (a) With respect to broadcast/television/online net license revenues, there will be a 50%-50% between the parties;
    (b) On home video product, with respect to Promoter's royalty, in lieu of royalty CCETV and Promoter shall share net revenues 50%-50% between the parties ("all-in");
    (c) CCETV will apply a Free Goods allowance for actual free goods of up to 5%;
    (d) CCETV will apply a packaging deduction of 10%;
    (e) With respect to sales by third parties, after deducting distribution expenses, the split of net proceeds will be 50%-50% between the parties;
    (f) Mechanical rates in North America will be capped at the lower of $1.25 per unit or 8 cents per song for full-priced lines, and the lesser of $.75 US per unit sold or 5 cents per musical composition for lower-priced lines. Mechanical rates for rest of world will be per standard territory agreements currently in existence.

8. Exclusivity: CCETV rights to secure worldwide television and home video distribution deals for the Program(s) in all forms will be exclusive.

9. Delivery of Approved Masters: Any materials delivered by CCETV to Promoter shall be approved by Promoter no later than four (4) days after delivery to Promoter by Clear Channel Entertainment Television.

10. Approvals: Approvals will not be unreasonably withheld or delayed, and in no instance will a failure to approve be cause for missing a delivery deadline for distribution of the Program(s).

11. Insurance: CCETV will secure appropriate production and/or E&O insurance coverage as part of the production budget and will name Promoter as an additional insured. Promoter will provide insurance as is customary for live events and will name CCETV as an additional insured.

12. Promoter & Talent/Wrestler Availability/Promotional Appearances: Subject to prior professional commitments, Promoter & Talent(s)/Wrestler(s) will make himself/herself/themselves available for promotional appearances to support the premiere release of the Program, as well as the in-store release of the home video product.

13. Other: Standard mutual warranties and representations, indemnifications, materials required for delivery, accountings, packaging, etc. and other standard contractual terms to be negotiated in good faith by the parties as set forth in a long form Agreement.

14. Representations: You warrant and represent that you are the duly authorized party to enter into and sign this agreement for the purposes described herein.

3

If this meets with your approval, please indicate so by your signature below and return one signature copy via fax to the number above and two original signature copies to my attention at the address above. We will sign and return one fully executed copy to you for your records. If you have any further comment, please get back to me at your earliest convenience with any such questions or comments that you may have. CCBTV looks forward to getting this project under way very soon.

Best regards,

Steve Sterling,
Senior Vice President

Acknowledged and Agreed:

For CCBTV                                    For WrestleReunion L.C.:

Joe Townley, President                       Sal Anthony Corrente, Principal

1/27/05                                      1/21/05
Date:                                        Date:

P.S. My cell number is: 713-478-8838

cc: Joe Townley, Lee Chalkin, Eric Paulan