```
1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                     TAMPA DIVISION

3

4                                        COPY
5
     WRESTLEREUNION, LLC,
6
             Plaintiff,
7
     vs.                            Case No.
8                                   8:07-CV-2093-T-27-MSS

9

     LIVE NATION TELEVISION
10   HOLDINGS, INC.,

11           Defendant.
     _____/
12

13

14       DEPONENT:        Rob L. Russen

15
         DATE:            December 11, 2008
16
         PLACE:           Greenberg Traurig
17                        625 E. Twiggs Street
                          Suite 100
18                        Tampa, FL 33602

19
         TAKEN:           Pursuant to Notice by
20                        Counsel for Defendant

21       TIME:            Began:   10:30 a.m.
                          Ended:    4:21 p.m.
22
         REPORTED BY:     PHILIP RYAN, RPR
23                        Notary Public
                          State of Florida at Large
24

25
```

```
 1      APPEARANCES:

 2      RYAN C. RODEMS, ESQUIRE
        Barker, Rodems & Cook
 3      400 North Ashley Drive
        Suite 2100
 4      Tampa, FL 33602
        (813) 489-1001
 5
                 Attorney for Plaintiff
 6
        GREGORY W. HERBERT, ESQUIRE
 7      Greenberg, Traurig, P.A.
        450 S. Orange Avenue
 8      Suite 650
        Orlando, FL 32801
 9      (407) 420-1000

10               Attorney for Defendant

11
        ALSO PRESENT:
12               Mr. Attanasio, Sal Corrente

13               * * * * * *
                    INDEX
14
                                           PAGE
15      EXAMINATION:
                    EXHIBIT INDEX
16
                                           MAR
17      Exhibit
         11                                212
18
         12    Document Bates number       226
19             WrestleReunion 00397-001 through
               006.
20

21

22

23

24

25
```

```
 1      The Deponent herein,

 2                    ROB L. RUSSEN,

 3      being first duly sworn to tell the truth, the

 4      whole truth, and nothing but the truth, was

 5      examined and testified as follows:

 6                    EXAMINATION

 7      BY MR. HERBERT:

 8          Q.    Hi, Mr. Russen.  My name is Greg

 9      Herbert.  I represent the defendant in this

10      case.  Why don't we have you state your full

11      legal name and business address for the record.

12          A.    Rob L. Russen, R-U-S-S-E-N, 19 Fayette

13      Drive, Ocean Ridge, Florida 33435.

14          Q.    Okay.  And I think you've heard the

15      recitation of the ground rules a couple of

16      times.  So is there anything you're your unclear

17      about?

18          A.    Not a thing.

19          Q.    Okay.  I realize there's one that I

20      forgot to mention yesterday, but it will come to

21      me, I think.

22          On your address, I notice that your address

23      is the same address as Mr. Corrente's currently?

24          A.    Correct.

25          Q.    All right.  So you and Mr. Corrente
```

1     live together?

2          A.     We're roommates.

3          Q.     And is that a single family house, is

4     that a condo, is it an apartment?

5          A.     It's a single family house.

6          Q.     Okay.  And how long have you resided

7     there?

8          A.     Since February.

9          Q.     Okay.  And where did you reside before

10    that?

11         A.     Sarasota, Florida.

12         Q.     Okay.  For how long, approximately?

13         A.     Nineteen years.

14         Q.     Okay.  Why did you move from Sarasota

15    to Ocean Ridge?

16         A.     The condo I was renting was sold out

17    from under me, and I had to relocate, so I

18    decided to come over there.

19         Q.     So, in Sarasota, you were renting a

20    condo?

21         A.     Uh-huh.

22         Q.     And are you paying rent to

23    Mr. Corrente in Ocean Ridge?

24         A.     No.

25         Q.     You are paying rent to a landlord?

1          A.    No.

2          Q.    Okay.  Who owns the house where you

3    are living in now?

4          A.    Sal Corrente.

5          Q.    You are staying there rent-free?

6          A.    Correct.

7          Q.    Okay.  Let's see.  Are you currently

8    employed?

9          A.    No.

10         Q.    Okay.  Do you -- and this might be a

11   tough question.  I am not asking a legal

12   definition.  Do you know today, do you

13   technically have any official or unofficial

14   position with the plaintiff in this case

15   WrestleReunion, LLC?

16         A.    From a business point of view?

17         Q.    Yeah.

18         A.    No.

19         Q.    Okay.  You are not an employee?

20         A.    No.

21         Q.    You're not an officer?

22         A.    No.

23         Q.    Not a director?

24         A.    No.

25         Q.    You're not an agent, formally

1     speaking?

2          A.    No.

3          Q.    You don't have to the power to bind it

4     in a contract, or anything like that?

5          A.    Correct.

6          Q.    Okay.  Let me ask you, back during

7     2005, generally the year of the operative events

8     that we are talking about here, at that time,

9     did you, personally, have the power to bind

10    WrestleReunion, LLC, to a contract?

11         A.    No.

12         Q.    Okay.  Was Mr. Corrente the only

13    person who had that power, to your knowledge?

14         A.    Yes.

15         Q.    Okay.  At any time was -- ever, either

16    before 2005 or since then, do you know has there

17    been anybody else, other than Mr. Corrente, who

18    had the power to bind the plaintiff corporation

19    to a contract?

20         A.    No.

21         Q.    Okay.  Let me ask you, can you list

22    for me all the e-mail addresses that you

23    currently use today?

24         A.    Today?

25         Q.    Yes.

1      A.      RobRussen08@AOL.com and robrussen in

2   all small characters @yahoo.com.

3      Q.      Okay.  robrussen@yahoo.com?

4      A.      Uh-huh.

5      Q.      That's a yes?

6      A.      Yes.

7      Q.      You forgot one of the rules.

8   Already.  All right.  And did you use both of

9   those e-mail addresses in 2005?

10      A.      Neither.

11      Q.      Okay.  When did you start using the

12   RobRussen08@aol.com e-mail address, roughly

13   speaking?

14      A.      February 2008.

15      Q.      Okay.  That was roughly when you

16   moved?

17      A.      Uh-huh, yes.

18      Q.      There you go again.  Okay.

19      Was that because you got a new computer, or

20   some other reason?

21      A.      Just AOL closed my account.

22      Q.      Was it for non-payment?

23      A.      It's a free account.

24      Q.      Okay.  And how about the

25   robrussen@yahoo.com?  When did you start using

1    that one?

2        A.    I would estimate somewhere around

3    2006.

4        Q.    So do you know did you use the

5    robrussen@yahoo.com e-mail account in connection

6    with any WrestleReunion business?

7        A.    Not that I remember.

8        Q.    Okay.  Let's go back to for

9    WrestleReunion-related business -- let me back

10   up.

11       Today, do you, do you currently have an IM

12   screen name that you use?

13       A.    Same as my AOL name.

14       Q.    Okay.

15       A.    RobRussen 08.

16       Q.    Any other IM names or screen names

17   that you currently use?

18       A.    On Yahoo! It's Rob Russen.  You use

19   the screen name.

20       Q.    Sure.  I guess anything different than

21   those.

22       A.    GoldMedia08 for my public relations

23   work.

24       Q.    Would that be Goldmedia08?

25       A.    @AOL.

```
1          Q.    @AOL.com.  Is Gold Media a company
2     that you're affiliated with now?
3          A.    Sole proprietorship.
4          Q.    Okay.  So it's not formally
5     incorporated anywhere?
6          A.    Correct.
7          Q.    Is it an active business?  Does it do
8     any business?
9          A.    Some.  Not full-time.
10         Q.    When was the last time it did any
11    business that resulted in, say, money changing
12    hands?
13         A.    September.
14         Q.    Okay.  What kind of business was that?
15         A.    That was press.  We were sending out
16    press releases.
17         Q.    For whom?
18         A.    Gold's Gym.
19         Q.    So is that a company that is solely
20    affiliated with Gold's Gym --
21         A.    No.
22         Q.    -- or has it other clients?
23         A.    Yes.
24         Q.    Okay.  So the Gold Media isn't the
25    Gold, trademark of Gold's Gym?
```

1      A.    Correct.

2           Q.    That's a name you came up with on your

3      own?

4      A.    Yes.

5           Q.    How long has Gold Media been around?

6      A.    Just since July of this year.

7           Q.    July of '08.  And so it's done some

8      business sort in the Summer, early Fall of '08

9      and that's really all it's done?

10          A.    I did some non-profit e-mail.  It's

11     designed to do, create e-mail press releases,

12     and to distribute them through electronic

13     e-mails.  I did some for non-profit

14     organizations in November, for an organization

15     of indigent Americans.

16          Q.    Okay.  And what's the name of the

17     organization?

18          A.    Red Hawk Acres.  Indigenous not

19     indigent.  I'm sorry wrong word.

20          Q.    Indigenous.  They are, like, native

21     Americans?

22          A.    Correct.

23          Q.    Not to get personal or anything

24     personal, you can tell me it's not none of my

25     business.  Do you have native American ancestry?

1          A.    No, I do not.  Just friends.

2          Q.    Friends.  Somebody connected with that

3     organization?

4          A.    Correct.  Very sympathetic to their

5     cause.

6          Q.    So Gold Media is, generally can be

7     characterized as an Internet marketing

8     organization?

9          A.    Marketing and public relations.

10         Q.    Okay.  Okay.  So just to make sure

11    we've covered everything, other than the

12    RobRussen08@AOL.com, Rob Russen@Yahoo.com

13    goldmedia08@AOL.com, any other e-mail addresses

14    or IM screen names that you're currently using

15    let's say within the last month or two?

16         A.    No.

17         Q.    Okay.  Let's go back to, you know, the

18    time that WrestleReunion was an active business,

19    let's say generally Summer of 2004 until, you

20    know, early 2006.  Can you tell me as well as

21    you recall, what e-mail addresses you used at

22    that time, in connection with WrestleReunion's

23    business?

24         A.    RobLRussen@AOL.com.

25         Q.    That was the AOL account that was

1    recently closed?

2        A.    Yeah.   There might have also been just

3    RobRussen@AOL.com.  Not sure about that.

4        Q.    Okay.  Any others?

5        A.    Just the Rob Russen@yahoo.

6        Q.    Okay.  So RobRussen@Yahoo you were

7    using --

8        A.    Uh-huh.

9        Q.    -- in this connection?

10       A.    Oh, no, no.  It wasn't even open back

11    then.  Just the RobRussen@AOL.

12       Q.    I saw something in the documents,

13    related to Double R. Marketing, I think it was

14    called.

15       A.    That is a previous version of Gold

16    Media.

17       Q.    Was it also a sole proprietorship?

18       A.    Yes.

19       Q.    Okay.  It was never formally

20    incorporated with a state, as a corporation, or

21    LLC, or anything?

22       A.    No.

23       Q.    Okay.  And did I have the name right?

24    Is it Double R.?

25       A.    Double R. the word Double R.

1     Marketing.

2          Q.    Is Double, space, R.?

3          A.    Yes.

4          Q.    Okay.  Capital R.?

5          A.    Yes.

6          Q.    All right.  And so as a sole

7     proprietor, did Double R. Marketing generate any

8     revenue for you?

9          A.    Yes.

10         Q.    And that revenue, I assume, would have

11    been recorded on your personal tax returns?

12         A.    Yes.

13         Q.    There were never any tax returns of

14    any kind that were filed separately for Double

15    R. Marketing?

16         A.    Correct.

17         Q.    And I assume you don't intend to file

18    any for Gold Media, since it's a sole

19    proprietorship.

20         A.    Correct.

21         Q.    When was the Double R. Marketing

22    formed, roughly?

23         A.    Hum, to the best of my knowledge,

24    around 1996.

25         Q.    And is Double R. Marketing, can you

1    tell me generally what it does?  I assume it is

2    a marketing and public relations organization?

3         A.    Press releases, and bulk e-mail

4    blasts.

5         Q.    You had to be concerned about the

6    Canned Spam Act, I assume?

7         A.    Yeah.

8         Q.    So the bulk e-mail blast is generally

9    categorized as Internet marketing?

10        A.    Internet distribution of press

11   releases to opt-in lists.

12        Q.    To make sure you comply with the

13   Canned Spam Act.

14        A.    Correct.

15        Q.    Okay.  And Double R. Marketing, at the

16   time it was formed in 1996, was it formed for

17   any particular client or clients at that time,

18   or was it generally all your business

19   activities?

20        A.    It's my initials.

21        Q.    Okay.  I'm sorry.  Was it formed for a

22   particular purpose or entity to do their

23   marketing, or was it --

24        A.    It's a way of blowing my own horn

25   without letting them know it's me doing it.

1      Q.     Okay.  Just to help promote your own
2   business ventures?
3      A.     And activities that I was involved in;
4   correct.
5      Q.     So Double R. Marketing was involved in
6   the marketing efforts for WrestleReunion, to
7   some extent?
8      A.     Yes.
9      Q.     Okay.  Can you give me some more
10   detail, or quantify that a little bit?  I
11   thought I saw a few documents that mentioned
12   that.  So I'm trying to get an idea of how much
13   activity Double R. Marketing did for
14   WrestleReunion.
15      A.     Just about every press release that
16   was created was sent out through Double R.
17   Marketing.
18      Q.     Okay.  That's what I was wondering.
19   That was Internet distribution of the press
20   releases?
21      A.     Yes.
22      Q.     Okay.  Did Double R. Marketing
23   distribute or release the press releases for
24   WrestleReunion in any other form, other through
25   the Internet?

1          A.      Perhaps an occasional fax.

2          Q.      Okay.  Any hard copies or?

3          A.      Not that I recall.

4          Q.      Okay.  Okay.  To help narrow it down a

5     little bit, were there any other marketing

6     organizations that, you know, you were

7     personally or primarily involved in, that did

8     any type of marketing for WrestleReunion?

9          A.      That I was involved in?

10         Q.      Yeah.

11         A.      Other than, perhaps, a recommendation

12    to another company?

13         Q.      Yeah.  Like non-outside vendors, but a

14    company that you had an interest, or company

15    that you were running.  Double R.:  That was

16    your company; right?

17         A.      Correct.

18         Q.      It was a sole proprietorship.  So I

19    assume it didn't have any employees?

20         A.      Correct.

21         Q.      Okay.  And really it was, it was you.

22    It was a one-man company.

23         A.      Correct.

24         Q.      So I guess what I'm getting at is, is

25    Double R. Marketing the primary marketing entity

1       for WrestleReunion, or were there, was there

2       another one?

3           A.      You like to use the word "marketing."

4       Double R. Marketing was a public relations

5       company.

6           Q.      Okay.

7           A.      Marketing, to me, includes

8       advertising, radio, television, and all those

9       other parts of marketing a product or service.

10          Q.      Okay.

11          A.      Public relations is only a small

12      portion of that.

13          Q.      Okay.   Fair enough.   So was there any

14      public relations entities that worked for

15      WrestleReunion?

16          A.      Larry Rubin.

17          Q.      Okay.   What was the name of his

18      company?

19          A.      Lawrence Rubin & Associates.

20          Q.      Where is that located or

21      headquartered?

22          A.      Somewhere in the Philadelphia area.

23          Q.      And who was it who introduced them, or

24      had the contact with Larry, or with his

25      organization?

1      A.   A friend of mine from the Philadelphia

2  area named Lloyd Zane Remick.  Recommended him

3  as formerly being involved with the Spectrum,

4  76ers, and the Fliers, as their publicist.

5      Q.   Okay.  So what role did Larry Rubin or

6  his company provide?  I understand Double R. did

7  the public relations.

8      A.   Primarily for 1 and 3.

9      Q.   Okay.

10     A.   Rubin did 2.

11     Q.   Okay.  And was that because

12  WrestleReunion 2 was held in the Philadelphia

13  area?

14     A.   Yes.  And they wanted to get maximum

15  exposure to the fans of that area.

16     Q.   Okay.

17     A.   From New York down to Baltimore.

18  Larry Rubin had a wide range of resources in

19  that area.

20     Q.   Sure.

21     A.   He was also able to place some media

22  buys.

23     Q.   Let me just, let me see if I can get

24  you to give me a list of all the activities that

25  Larry Rubin, or his company, did for you, and we

1    have already established that he did the public

2    relations work for WrestleReunion 2.  You said

3    he did media buys.  I'm sorry.  Let me make sure

4    I got it all straight.

5        Did Larry Rubin, or his company, do anything

6    with respect to WrestleReunion 1 or

7    WrestleReunion 3?

8        A.    No.

9        Q.    Okay.  So tell me everything he did

10   for WrestleReunion 2.  You already told me

11   public relations and media buys.  Can you

12   describe the other things he did?

13       A.    Set up interviews on radio,

14   television, and newspaper, with various stars

15   especially Bruno Sammartino.  Held press

16   conferences.

17       Q.    Okay.  So as far as the records

18   related to the -- and all these actives you

19   would consider marketing and publicity for

20   WrestleReunion 2; fair enough?

21       A.    The things that Larry Rubin did, yes.

22       Q.    Yeah.  As far as the records that

23   would reflect the activities that Larry Rubin or

24   his company did for WrestleReunion 2, do you

25   know, does -- do you, or does WrestleReunion

```
 1      still have those records around anywhere?
 2           A.     Whatever records I have, I copied onto
 3      a CD, and there was a stack of them that I gave
 4      to our attorney.
 5           Q.     Okay.
 6           A.     Sal's attorney.
 7           Q.     Okay.   Sure.
 8           A.     And I believe he passed them on to
 9      you.   I do presume, somewhere in there, there is
10      a Larry Rubin folder.
11           Q.     Okay.
12           A.     That would have been all that I have.
13           Q.     Okay.   And I didn't see that.   So --
14      and I think I got the CD, but maybe I will
15      follow that up with a specific request, but...
16           A.     You only got one CD?
17           Q.     Yeah, I'm not sure it was one or two.
18      No, I got more than one.
19           A.     Okay.
20           Q.     I got a lot of them.   I think we did
21      have trouble opening some of them, but I'll work
22      with Chris on trying to resolve those issues.
23           Do you recall roughly how much
24      WrestleReunion paid to Mr. Rubin, or his
25      company, for their services, in total?
```

1       A.    I would not have been involved in that

2  part of it.

3       Q.    Okay.  Who would have been on that?

4       A.    Sal Corrente would have made the deal.

5       Q.    Okay.  Would he be in charge of the

6  actual payment?

7       A.    Sal would, Anthony Attanasio, yes.

8  They handled the finances.

9       Q.    Okay.  And was it Sal, or was it

10  Mr. Attanasio?

11       A.    It wasn't me.  You will have to ask

12  them.

13       Q.    Okay.  That's one of the main

14  questions I wanted to ask, and maybe I meant to

15  ask Mr. Corrente this and didn't.  But who was

16  the primary person in charge of the expense

17  documents, the ledger the books, the bookkeeping

18  records of WrestleReunion, if you know?

19       A.    Me.

20       Q.    Okay.  Okay.  So can you give me a

21  little more detail on that?  What did you do, in

22  connection with the financial records for

23  WrestleReunion?

24       A.    I would keep a database of -- a very

25  simple database.  I'm not an accountant -- that

1        would simply state expenses, and sources of

2        income, as in ticket sales, or vendor sales.

3            Q.    Okay.  Was that in any type of

4        specialized software format?

5            A.    Excel.

6            Q.    Excel spreadsheet?

7            A.    Yes.

8            Q.    Let me ask you, we've marked this as

9        Exhibit 10, which appears to reflect some

10       expense and income information for the three

11       events.  Can you take a look at that, and tell

12       me if you created that?  That was previously

13       marked yesterday.

14              MR. RODEMS:  Oh, okay.

15              THE WITNESS:  I don't know that I did.

16          I, generally, did not summarize totals.  I

17          would keep a running log, at which the

18          bottom line would be what the bottom line

19          would be.  But I don't know that I would

20          list 94 wrestlers, 50 Wrestlers, 27

21          wrestlers, as a combined total, as opposed

22          to the individual names, and what they got

23          in a running tab.  And this also appears to

24          be a multi generation reproduction of the

25          logo, which I frequently did use, but it

1          would appear much clearer on the logo, if it

2          was from a document that I created as an

3          original.

4     BY MR. HERBERT:

5          Q.    Okay.

6          A.    So I don't know that this is a

7     document, or three documents that I personally

8     created.  It looks like a summary of the details

9     from the data sheets that I comprised.

10         Q.    Sure.  Do you know who created that

11    document?

12         A.    I have no idea.

13         Q.    Or those documents?

14         A.    No idea.

15         Q.    Okay.  Because so what you're telling

16    me, the records that you kept were generally on

17    an Excel spreadsheet, which this document

18    doesn't appear to --

19         A.    Correct.

20         Q.    -- come form an Excel spreadsheet?

21         A.    Was there a cover sheet with that,

22    that would identify who created it, who it was

23    sent to, what it was for?

24         Q.    I have no idea.

25         A.    Then I don't know.

1          Q.    Okay.  So these Excel spreadsheets
2     that you kept, reflecting the financial records
3     related to WrestleReunion, that was, as far as
4     you know, that was on the CD that you turned
5     over to counsel for the plaintiff?

6          A.    Correct.

7          Q.    Okay.  Let me ask you.  Just looking
8     at Exhibit number 10, do the, sort of the
9     summarized totals there on Exhibit 10, looking
10    at them, do they, as you sit here today, do they
11    seem like they are generally accurate, or in
12    keeping with your recollection of the records
13    that you kept, or do any of the, anything look
14    like it's pretty far off of what you remember?

15         A.    In my working with the data sheets,
16    I've rarely summarized totals.  The numbers that
17    I recognize on here as being familiar with,
18    would be the quantity or the number of
19    individuals involved, approximate air fares to
20    cover those people, hotels rooms, that sort of
21    thing.  Building rental.

22         I remember being involved in going through
23    the building, and seeing the document.  I
24    wouldn't know anything about sales tax, or, for
25    example, advertising, P.R. man.  I'm not that

1      intimately aware of the summary of these

2      totals.  I just kept a database somewhere else,

3      summarized that.

4           Q.    Okay.

5           A.    Into that form.

6           Q.    As far as the number of the wrestlers

7      at each event, do you know, as you sit here

8      today, if that number is generally accurate?

9           A.    Yes.

10          Q.    Okay.  And that's for each of the

11     events?

12          A.    Correct.

13          Q.    Okay.  So as far as the total expenses

14     for each event, you don't recall whether those

15     numbers are generally accurate, or whether they

16     are way off, or anything like that?

17          A.    Correct.

18          Q.    Okay.  And just another general

19     question about this.  If you don't recall, you

20     don't recall, but with WrestleReunion 2, the

21     publicity work that was done by Lawrence Rubin &

22     associates, by Larry Rubin or his company, the

23     figure in this Exhibit 10, the summary, there's

24     a line item that is entitled advertising P.R.

25     man, radio, TV, newspaper.

1          Do you see that there?

2          A.    Yes.

3          Q.    Okay.  And just, you see the total

4     figure is $28,000 and change?

5          A.    I see that.

6          Q.    All right.  Does that sound like

7     that's generally accurate, as far as the amount

8     that was paid to Larry Rubin & Associates, or

9     Lawrence Rubin & Associates?

10         A.    I would have no idea what Larry Rubin

11    got paid.  But because I don't see additional

12    breakdown on how the money was spent, I would

13    presume that also includes the actual money

14    spent for newspaper ads, radio ads, television

15    ads, not all to Larry Rubin.

16         Q.    Okay.  Not just for the services, but

17    for the actual media buys?

18         A.    Correct.

19         Q.    Okay.  And so since you didn't create

20    that document, I assume you don't know why

21    there's no entry for advertising and publicity

22    for WrestleReunion 1 or WrestleReunion 3?

23         A.    Correct.

24         Q.    Okay.  Let me ask you for the services

25    that your company, Double R. Marketing,

1    performed for WrestleReunion 1 and

2    WrestleReunion 3, did you or the company get

3    paid for those services?

4         A.    Yes.

5         Q.    Okay.  And was, I mean did you get

6    paid -- let me break it down.

7         You got paid as a W-2 employee of

8    WrestleReunion; right?

9         A.    What are you looking at up there?

10             MR. HERBERT:  I'm just thinking.  When

11        I think, I kind of look up there.  Nothing

12        is going to come down, falling.  Off the

13        record.

14                  (Off the record)

15   BY MR. HERBERT:

16        Q.    The testimony, if I remember

17   correctly, Mr. Corrente said that you were an

18   employee of WrestleReunion, LLC.

19        A.    I'm not sure what the definition of

20   what an employee is.  I provided services to

21   WrestleReunion.

22        Q.    Okay.  I mean do you remember if you

23   got a W-2, or did you get a 1099, or did you get

24   paid in cash?

25        A.    I got cash, and I also was entitled to

1       a percentage of the success of the organization.

2            Q.    Okay.  And that was 10 percent of the

3       profits was your understanding, or?

4            A.    Yes.

5            Q.    Okay.

6            A.    I didn't tell you that, but I'm

7       confirming it, yes.

8            Q.    I think Mr. Corrente testified to that

9       yesterday.  If there's something different,

10      please correct me.

11           A.    I wasn't in the room when that was

12      said, but...

13           Q.    Let me ask you, what were the, what

14      was the term of your pay?  How was your pay

15      determined?

16           A.    Weekly.

17           Q.    Okay.  And was it a set weekly fee for

18      the entire time of WrestleReunion or what?

19           A.    Yes.  A small weekly draw against the

20      10 percent.  Plus the 10 percent.

21           Q.    Okay.  Okay.  So let me -- was it

22      supposed to be salary, and then everything on

23      top of that, if there were any profits, you'd

24      get 10 percent of the profits on top of that, or

25      was it a salary that was deemed to be a draw

```
 1    against 10 percent of the profits?
 2         A.    I considered it a fee, as opposed to a
 3    salary, plus the profits, 10 percent of the
 4    profits.
 5         Q.    Okay.  So it wasn't, it wasn't
 6    necessarily a draw against the profits.
 7         A.    Correct.  It wasn't going to be
 8    deducted from the 10 percent.
 9         Q.    Okay.  And what was your weekly fee?
10         A.    $400.
11         Q.    Okay.  And when did you start
12    receiving that?  I'm just trying to get a time
13    frame when it started, when it ended, whether it
14    was continuous, if there were any breaks in that
15    particular period.
16         A.    I would recollect late Summer of '04.
17         Q.    Okay.  And when did it, when did those
18    payments end?
19         A.    The day after Davie.
20         Q.    Okay.  So that would be, like,
21    September 12th of 2005?
22         A.    Correct.
23         Q.    And the payments were always in cash,
24    or did you sometimes get some other form of
25    payment?
```

1       A.    Sometimes some wire transfers, when

2  no-one was physically around to present cash.

3       Q.    Okay.  Did you, typically, get paid on

4  a Friday or a particular day of the week?

5       A.    There was no established day.

6       Q.    Okay.  It varied?

7       A.    Uh-huh -- yes.

8       Q.    Okay.  Very good.

9      And when you got paid cash, generally it

10  was, was it Mr. Corrente handing you cash?

11      A.    Yes.

12      Q.    Okay.  And was there, were there any

13  receipts provided for those transactions, or any

14  record created?

15      A.    No.

16      Q.    Okay.  And I'm not sure if I asked you

17  this or not.  If I did, I apologize.  Do you

18  know, those, those payments, were they ever

19  reflected in either, let's say, in a 1099 of any

20  kind?  Do you know?

21      A.    No, I do not.

22      Q.    Okay.  As far as you know, they

23  weren't reflected in a 1099, or you have no

24  idea?

25      A.    I don't know.

1          Q.    Okay.  Let me ask you this:  Did you

2     have an arrangement with Sal, whereby you said,

3     you know, pay me under the table.  We're not

4     going to --

5              MR. RODEMS:  Object to the form.  I'm

6          going to instruct the witness not to answer

7          that question.  I'm not acting as

8          Mr. Russen's attorney, but I'm not going to

9          sit here and let him be asked questions that

10         border on asking him to admit that he's

11         committed a crime, or something along those

12         lines.  If there s a relevance to the pay

13         issues, I'm fine with it; but beyond that,

14         we're not going to go down this path.  I

15         will seek a ruling on this, if I need to.

16             MR. HERBERT:  Okay.  Well, maybe we

17         should do that.  Yeah, why don't we take a

18         break.

19         (Short break from 11:01 to 11:12 a.m.)

20             MR. HERBERT:  All right.  So we're back

21         on record.  There was discussion held off

22         the record.  I had a question pending

23         whether or not Mr. Russen or and

24         Mr. Corrente had an arrangement that his

25         payments would be quote unquote "under the

32

1 table," and I believe Mr. Rodems advised

2 Mr. Russen not to answer the question.

3 And --

4  MR. RODEMS:  Just so the that record is

5 clear, I am not representing Mr. Russen

6 individually, and I certainly do not have

7 the authority to direct a witness not to

8 answer a question, like I would, if he was

9 my client, and it was subject to some

10 privilege that gave me that right, but what

11 I will say is I spoke to Mr. Russen

12 privately, and on the record, I will say

13 that Mr. Russen certainly has the right to

14 seek legal counsel as to any questions that

15 may be asked today.

16  So in terms of me instructing

17 Mr. Russen not to answer, that was a

18 prophylactic measure so that I would do what

19 I thought was appropriate under the

20 circumstances.  Now, back on the record,

21 obviously, if Mr. Russen declines to answer

22 any questions, as I have explained to him

23 off the record, the normal process is for

24 anything that, of this type that needs to be

25 addressed, would be presented to the Court,

1    and if the Court determines that the

2    question should have been answered, then the

3    witness can be required to appear at a later

4    date following the Court's ruling, to answer

5    whatever questions the Court deems should

6    have been answered.  And I think that covers

7    everything that I wanted to say on the

8    record, and I guess we will move forward,

9    Mr. Herbert, with whatever it is that you

10   have.

11        MR. HERBERT:  And, Chris, I think you

12   agree with me that another possibility is

13   that the Court could direct that the

14   deposition would be reconvened at

15   Mr. Russen's expense, if the Court deems he

16   should have answered the question.  It may

17   or may not.

18        MR. RODEMS:  Well, I am not in a

19   position to give an opinion on that one way

20   or the other, because I haven't studied the

21   exact circumstances that we are under.  But

22   I will say that, generally speaking, if

23   there's been a violation of the discovery

24   rules, that there are occasions, Mr. Russen,

25   that you should be aware of, where the Court

1        does have the authority to order whoever is

2        responsible for the discovery violations, to

3        pay the other side's fees and costs under

4        certain circumstances.  Whether this fits

5        under that situation, I can't say.  All I

6        can say is that in my experience, when a

7        witness is asked a question, the answer of

8        which could tend to potentially subject him

9        to criminal liability, anyone who

10.       understands the Fifth Amendment to the

11       United States Constitution, or the body of

12       law that goes with that, would be wise to

13       get legal advice before they answered

14       questions in that realm.

15            And that's as much as I really can

16       offer at this point, without digging myself

17       into a hole that I shouldn't need to dig

18       myself into.

19            MR. HERBERT:  I'm going to go ahead and

20       just ask the questions.  Mr. Russen can

21       answer, can decline to answer, can state if

22       he wants to get his own counsel, and we can

23       reconvene with his own counsel.

24            MR. RODEMS:  Before you do that,

25       Mr. Russen, is there anything that you would

```
 1            like to do, or ask at this point, as we go

 2            forward, so that you're comfortable that you

 3            understand what's going on, what your rights

 4            are, or what needs to be addressed?

 5                 THE WITNESS:  No.

 6                 MR. RODEMS:  Okay.  Then we will move

 7            forward.

 8                 MR. HERBERT:  So there is a question

 9            pending on the record, and I will restate

10            it.

11       BY MR. HERBERT:

12            Q.    The question is did you, Mr. Russen,

13       and Mr. Corrente have any arrangement that these

14       $400 weekly cash payments to you, for the

15       services that you provided to the plaintiff,

16       WrestleReunion, that those payments would be

17       quote unquote "under the table."

18            A.    There was no formal arrangement like

19       that.

20            Q.    Okay.  Was there an informal

21       arrangement?

22            A.    It was just done.  Whether he was

23       paying me personally, or paying me to go through

24       my company, was never discussed.

25            Q.    Okay.  Well, did you discuss whether
```

1      or not you would report those payments as income

2      on your tax returns?

3           A.    No.

4           Q.    Okay.  Did you report those payments

5      as income on your tax returns?

6           A.    I don't recall.

7           Q.    Okay.  But that would be reflected in

8      your tax returns, I would assume?

9           A.    Yes.

10          Q.    Okay.  You've filed tax returns for

11     2005, 2006?

12          A.    I think so.

13          Q.    Okay.  You don't remember?

14          A.    I don't remember.

15          Q.    Okay.  Were there any records that

16     were kept at all, that reflected these payments

17     from WrestleReunion, LLC, to you or to your

18     company?

19          A.    No.

20          Q.    So as far as you know, no records of

21     any kind?

22          A.    Correct.

23          Q.    So on the ledger that you were

24     maintaining for WrestleReunion, LLC, you did not

25     keep a record of those payments to you on that

1    ledger?

2         A.    Correct.

3         Q.    Okay.  So if we wanted to determine

4    the exact amount of the payments that were made

5    to you or your company, for the services that

6    you provided to the plaintiff, WrestleReunion,

7    LLC, there's really no accurate way of

8    determining that now?

9         A.    Other than partial memory.  It didn't

10   start at $400.  It went I think, I believe it

11   started at $300; and somewhere along the line,

12   as the activities got more demanding of my time,

13   it was raised to $400.  But I don't recall when

14   that was, nor do I recall the total amount that

15   was paid over the period of time.

16        Q.    Okay.  And so I guess what I'm getting

17   at, is there any other way to accurately figure

18   that out, other than probing your memory and

19   Mr. Corrente's memory, that you are aware of?

20        A.    Calculating 3 to $400 a week, times

21   the number of weeks involved between August and

22   September 13th, probably would be the closest,

23   that I could possibly imagine.  There's nothing

24   in writing.

25        Q.    Okay.  And aside from in writing,

1     there's nothing in a computer database?

2          A.     Correct.

3          Q.     I mean so you had an arrangement with

4     Mr. Corrente that you wouldn't put that payment

5     in the ledger that you were keeping?

6          A.     There was no arrangement.  It was just

7     done that way.

8          Q.     Okay.  It was understood between the

9     two of you?

10         A.     It was just done that way.  Perhaps I

11    chose not to list it.  I don't recall.

12         Q.     Well, did -- the talent or performers,

13    who performed at the WrestleReunions were,

14    apparently, all issued 1099's that were produced

15    to me just recently.  Did you have any

16    involvement in the preparation or issuance of

17    the 1099's?

18         A.     Yes.

19         Q.     Okay.  What was your involvement in

20    that?

21         A.     I generated them.

22         Q.     Okay.

23         A.     Using an Internet company.  I provided

24    the information, and then they issued the

25    1099's.

```
 1        Q.    Okay.  It was an Internet bookkeeping
 2   company?
 3        A.    Some sort of, something like that,
 4   yes.
 5        Q.    Tax, bookkeeping, accounting company?
 6        A.    Correct.
 7        Q.    Do you remember the name of that
 8   company?
 9        A.    Green something.
10        Q.    Okay.  And you had to pay that company
11   for their services, I would assume?
12        A.    Mr. Corrente did.
13        Q.    Okay.
14        A.    WrestleReunion.
15        Q.    WrestleReunion did.  And so the
16   payments to that company might be reflected also
17   in the financial records of the company that you
18   maintained, as an expense to WrestleReunion?
19        A.    That I maintained?  Probably not.
20        Q.    Okay.  That were maintained by the
21   company.
22        A.    If I recall, and it is a vague
23   recollection, a credit card payment was made.
24        Q.    Okay.  And that, maybe that was from
25   Mr. Corrente's personal credit card, or you
```

 1    don't recall?

 2         A.    It wasn't mine.

 3         Q.    Okay.   That's the most important

 4    thing.   All right.

 5         So who decided that the talent would be

 6    issued 1099's, but that you would not?

 7         A.    The talent was all under contract.   We

 8    had paperwork designating how much each person

 9    received.   I was not under contract.

10         Q.    Okay.   But I mean contract means that

11    you had a set defined amount --

12         A.    Correct.

13         Q.    -- for the payment for the talent.

14    And, you know, at the end the year, there was a

15    set amount that you were paid for your services,

16    correct, at the end of 2005?

17         A.    Correct.

18         Q.    Okay.   So my question is who was it

19    who made the decision to issue the 1099's?   Was

20    that Mr. Corrente, for the talent?

21         A.    Yes.

22         Q.    Okay.   So did he make a decision not

23    to have a 1099 issued for you, for the money

24    that was paid to you?

25         A.    That was my decision.

1       Q.    Okay.  Was anybody else, besides you

2    and Mr. Corrente, involved in the decision as to

3    whom should be issued a 1099?

4       A.    No.

5       Q.    Okay.  And I might have asked this,

6    but -- and apologize if I did -- Double R.

7    Marketing:  Was that the only company that you

8    were associated with, that was involved in

9    WrestleReunion, or were there some other

10   entities.  I know you've been involved in quite

11   a few entities over your career.  Were there any

12   other companies?

13      A.    No other.

14      Q.    Okay.  All right.  So from -- for the

15   services that you provided, any of the payments

16   would have been made either to you or to Double

17   R. Marketing?

18      A.    Correct.

19      Q.    Okay.  And I know that you told me the

20   payments to you were all in cash, and I'm not

21   sure if I asked you.  The payments that would

22   have been made to Double R. Marketing also would

23   have been paid in cash?

24      A.    Cash or Western Union money orders, in

25   case no-one was around in the immediate area to

1    do it at that time.

2        Q.    Okay.   That's one thing I wanted to

3    clear up.   I believe before, you said wire

4    transfers.

5        A.    I meant Western Union.

6        Q.    So not a bank wire transfer.

7        A.    Correct.

8        Q.    Because if it were a bank wire

9    transfer, there clearly would be, the bank

10   records would reflect the payments that were

11   made?

12       A.    Correct.

13       Q.    Okay.   Was it only Western Union, or

14   did you ever use any other company, if you

15   know?  Another telegram, telegraph company?

16       A.    In my mind, it was always Western

17   Union.   It wasn't that often.

18       Q.    Okay.   Who do you bank with today?

19       A.    Today, I don't.

20       Q.    Okay.   You don't have a bank account?

21       A.    No, I don't.

22       Q.    When was the last time you had one?

23       A.    Hum, probably 2006.

24       Q.    Okay.   And where did you maintain that

25   bank account?   Which bank?

1      A.     I used to work for Bank of America, so

2  it was with Bank of America.   Century Bank.

3  Those are the last two that I recall that I had

4  an account with.

5      Q.     Did you have the Bank of America

6  account, while you were providing services for

7  WrestleReunion?

8      A.     I believe so.

9      Q.     Okay.   Did you have the Century Bank

10  account at any time while you were providing

11  services for WrestleReunion?

12      A.     I believe so.

13      Q.     Were those, was your home branch or

14  the main branch of those banks, both of them in

15  Sarasota?

16      A.     Yes.

17      Q.     And did you ever get any payments,

18  wire transfers sent, or deposited by check, into

19  either of those accounts, for any of the money

20  that was paid to you for your WrestleReunion

21  services?

22      A.     No.

23      Q.     Okay.   And just so I'm clear, those

24  are the only two accounts you recall having in

25  2005 also?

1        A.    That's all I recall.

2        Q.    Okay.  Okay.  Let me ask you this:  If

3    I wanted to try to find receipts for the actual

4    tickets that were purchased for each of the

5    WrestleReunion events, where would those be

6    located, or where would they reside?

7        A.    Tickets purchased in advance were

8    purchased through Pay Pal.

9        Q.    Okay.

10       A.    And I'm sure you could get a record

11   from Pay Pal.  Also on the database that I kept

12   was every purchase of a Pay Pal ticket.  As it

13   would come in, Sal would forward it to me to

14   keep a record of.

15       Q.    Did you use Pay Pal for all three

16   WrestleReunion events?

17       A.    Yes.

18       Q.    Okay.  Were all advance ticket sales

19   done through Pay Pal for all three events, to

20   the best of your recollection?

21       A.    Occasionally, if someone who did not

22   have a Pay Pal account, they would pay by check.

23       Q.    Okay.  And the checks would be made

24   payable to WrestleReunion?

25       A.    Correct.

1       Q.    Okay.  And as far as you know, they

2    would be deposited in the WrestleReunion bank

3    account?

4       A.    As far as I know.

5       Q.    Okay.  You weren't a signatory on the

6    WrestleReunion bank account?

7       A.    No, I was not.

8       Q.    As far as you know, Mr. Corrente was

9    the only signatory on that account, or was

10   Mr. Attanasio, or somebody else, a signatory, to

11   your knowledge?

12      A.    I don't have any knowledge of that.

13      Q.    Okay.

14      A.    I do have reason to believe

15   Mr. Attanasio was not.

16      Q.    Okay.  Why do you say that?

17      A.    He didn't come on board until January.

18      Q.    Okay.  And he never mentioned to you

19   that he was dealing with any of the money for

20   the bank account?

21      A.    Never heard any conversation in that

22   regard.

23      Q.    You never heard of anybody else having

24   access to the bank account?

25      A.    No.

1          Q.     Okay.  All right.  So, advance ticket

2     sales were Pay Pal purchases, or, occasionally,

3     some checks.  How about the, you know, the sales

4     I guess other than the advance sales would be

5     the sales of the day of the event, or days of

6     the event.

7          A.     Uh-huh.

8          Q.     What form did those payments take?

9          A.     Cash or credit card.

10         Q.     Okay.  And did WrestleReunion keep

11    receipts of each ticket sale, you know, as best

12    as they could, generally speaking, to your

13    knowledge?

14         A.     I wasn't involved in the day of the

15    point of sale, but I do believe they did.

16         Q.     Okay.  Who was in charge of, let's

17    say, maintaining the records for the ticket

18    sales for the day of sale events?  I mean the

19    day of sale sales, I guess.

20         A.     I don't know.

21         Q.     Okay.

22         A.     I was running the event itself inside,

23    coordinating all the activities, so I didn't

24    have time to mess with that.

25         Q.     All right.  Did the company hire

1    ticket takers for each event?

2         A.    I don't know.

3         Q.    Okay.  Did you see people there,

4    taking tickets?

5         A.    There were a lot of people helping

6    out.  Whether they were hired or volunteers, I

7    don't know.

8         Q.    Okay.  I mean if there was one person

9    who was supposed to be in charge of managing the

10   ticket takers, the money at the gate was a

11   pretty important source of revenue for

12   WrestleReunion; fair enough?

13        A.    For any event, yes.

14        Q.    So who was it, to your knowledge, who

15   had primarily responsibility for, you know,

16   keeping track of the money at the gate?

17        A.    Bear in mind, I wasn't, at that point

18   in the event, I was deep into the heart of

19   what was going on inside.  The occasional

20   time I was outside, there was a gentleman

21   named Ray Courts and his wife who were out

22   there, helping out, and Tony was there a lot

23   of the time.

24        Q.    I guess what I'm getting at is was

25   there one person, was it you, or Mr. Corrente,

1    or somebody else, who, you know, really had

2    their responsibility, the management and the,

3    you know, you might say internal control over

4    the ticket sales, making sure every guest pays,

5    making sure you've got a receipt for it, making

6    sure people aren't letting their friends in

7    free.  Was there anybody who had that primary

8    responsibility or did it vary from person to

9    person?

10        A.    Mr. Corrente and I were hands-on

11   involved in co-operating with Clear Channel, to

12   provide them with all of the contact they needed

13   with talent for the things they wanted to tape,

14   coordinating the activity of the all the fans

15   coming into the convention itself.  We were a

16   two-man crew doing that.

17        Somewhere along the line, I'm fairly

18   confident to say he would have assigned someone

19   to take care of those activities.  But, it

20   wasn't me, and I don't know who it was.

21        Q.    That's what I was getting at.  I

22   assume that task was delegated, and I'm

23   wondering, you know who --

24        A.    I don't know.

25        Q.    Okay.  Let me ask you, the Excel

1    spreadsheet that you maintained:  Do you recall

2    was it, was it one spreadsheet that you

3    maintained for all three events, or did you have

4    a different one, a different spreadsheet for

5    each event?

6         A.    Different spreadsheet for each event.

7         Q.    Okay.  Did you have one spreadsheet

8    that sort of totaled everything up for all three

9    events?

10        A.    No.

11        Q.    Other than you, was there anybody else

12   who inputted data or numbers onto that

13   spreadsheet, that you're aware of?

14        A.    Tangibly on that computer?

15        Q.    Yeah.

16        A.    No.  People provided me with the

17   information, which I entered, but no-one else

18   did the entering onto the database.

19        Q.    Okay.  As far as you know, nobody else

20   had access to that database, or to the

21   spreadsheets themselves?

22        A.    Well, I would send a copy of it to

23   Mr. Corrente, and, perhaps, to Tony.  But that

24   would be it.  Wouldn't go any further than that.

25        Q.    And that was for their review, or for

1    their information?

2         A.    Yes.

3         Q.    Okay.

4         A.    When asked.  It didn't happen that

5    often.

6         Q.    Sure.  I guess what I'm getting at is

7    whenever you did that, to your knowledge,

8    neither Mr. Corrente nor Mr. Attanasio actually

9    physically inputted any, made any changes, or

10   altered it, or added anything to it, took

11   anything away from the entries that were in the

12   spreadsheet?

13        A.    I think it was generally understood

14   that the database I had held was the official

15   one.  And if they saw that, and wanted to make

16   any changes, they would let me know, and then I

17   would go in and change it.

18        Q.    Exactly what I was asking.  Okay.

19        Let me ask you, if I didn't at the

20   beginning, have you ever been deposed before?

21        A.    Yes.

22        Q.    Okay.  I saw in an e-mail that you

23   mentioned that you had a lot of legal

24   experience.  You've been deposed multiple times

25   or once?

1      A.    Multiple times.

2      Q.    Okay.  How many times, best you can

3  recall?

4      A.    At least a half dozen.

5      Q.    Okay.  Can you briefly summarize for

6  me what the different cases were, that you were

7  deposed in, what they were about?

8      A.    The first one was when I was, maybe,

9  18, involved in a car crash accident, where I

10  was the victim.

11      Q.    Did you get a recovery in that case?

12      A.    No.

13      Q.    Okay.

14      A.    I've been sued by the state of Elvis

15  Presley.

16      Q.    Is it IMG that represents him or?

17      A.    Now, but not back then.  They sued me

18  for unfair competition, and it's not my fault he

19  died.

20      Q.    They were suing you over using some --

21      A.    I owned something called the Big El

22  Show.  So it was the estate of Elvis Presley

23  versus Rob Russen, doing business as the Big El

24  Show.  It made legal precedent.  You can look it

25  up in the books.

```
 1          Q.    Did you deal with Mark Grosler in that
 2    case?
 3          A.    On the other side?
 4          Q.    Yes.  CMG World-Wide is now the entity
 5    that owns the rights to the Elvis Estate.
 6          A.    This was 1976 or '77.
 7          Q.    Okay.
 8          A.    I've been sued by Don King.
 9          Q.    Let me back up and ask you.  On the
10    Big El case, did that go to trial?
11          A.    No.  It settled before it went to
12    court.
13          Q.    So do you know -- when you say it made
14    it into the Court records.
15          A.    Year
16          Q.    Okay.  Do you know how that happened,
17    if it didn't go to trial?  Was there a summary
18    judgment motion, was it some type of appeal?
19          A.    We both agreed to drop it.
20          Q.    In other words, it made it into the
21    press, then?  It was reported in the press?
22          A.    Oh, yes.
23          Q.    Okay.  And you were the defendant in
24    that case?
25          A.    I'm that Rob Russen.
```

1        Q.     Okay.  And they were suing you,

2     claiming that you had improperly used Elvis's

3     rights of publicity, the rights of publicity to

4     the estate?

5        A.     Name, likeness, and image.

6        Q.     Okay.  Is the settlement confidential?

7        A.     I'm not sure I ever saw a copy of it,

8     but I believe it's available on line.

9        Q.     Okay.  What were the terms of

10    settlement, generally?

11       A.     I stopped doing the show.

12       Q.     Okay.  You didn't pay any money to the

13    estate?

14       A.     No.

15       Q.     Okay.  Who was your counsel in that

16    case?

17       A.     Jim Greenberg.  In Camden, New Jersey.

18       Q.     Okay.  What year was that case filed?

19       A.     '76, '77.

20       Q.     Okay.  That's right.  We are going way

21    back.  Okay.

22           When was the next time after that, that you

23    were deposed?

24       A.     2002.  Don King.

25       Q.     What was that case about?

1         A.    He stole one of my fighters.  Smoking

2    Bert Cooper.

3         Q.    That's a boxer?

4         A.    Correct.

5         Q.    He was under contract with you?

6         A.    Correct.

7         Q.    And what?  Mr. King, or his company,

8    lured him away, and signed him up with his

9    organization?

10        A.    Correct.

11        Q.    Okay.  And so you or your company sued

12   Don King, or his company?

13        A.    Correct.

14        Q.    All right.  What was the name of your

15   company at that time?

16        A.    Warrior Sports.

17        Q.    Did that case go to trial?

18        A.    Actually, the lawsuit was done through

19   Rick Parker Presents.  He was the promoter who

20   had Bert under contract.  I was Bert's manager.

21        Q.    So, I'm sorry.  Rick Parker Presents?

22        A.    Presents.

23        Q.    That would have been the plaintiff in

24   that case?

25        A.    Correct.

1      Q.    You personally wasn't a plaintiff in

2   the case?

3      A.    I was Vice-President of Rick Parker

4   Presents.

5      Q.    Okay.  And so it was Rick Parker

6   Presents, versus was that Don King promotions?

7      A.    Don King Promotions?  Don King, yes

8   that's what it's called.

9      Q.    That case was filed in 2002, or was

10   resolved in 2002?

11      A.    Probably both.

12      Q.    Okay.  Resolved quickly?

13      A.    Yes.

14      Q.    Who was your counsel in that case?

15      A.    Hum, Russell Carmichael was one out of

16   Media, Pennsylvania.  He worked in association

17   with a gentleman named Pat English, who was a

18   representative for Main Events, Incorporated.

19      Q.    What was Main Events, Incorporated's

20   role in the case?

21      A.    We had signed an agreement with Main

22   Events.

23      Q.    For the fighter?

24      A.    Correct.

25      Q.    What was, did that case settle,

 1    resolve, dismissed?

 2         A.    Somehow, it ended.

 3         Q.    What was --

 4         A.    It never went to court.  We did one

 5    fight for Don King, then we went back and forth

 6    for Main Events.  They worked it out between

 7    them.

 8         Q.    No money changed hands, as far as you

 9    know?

10         A.    King gave Rick Parker $50,000 cash, at

11    a meeting, to pretty much agree to let the fight

12    go on for him, with the presumption it would

13    continue after that.  He literally kidnapped a

14    fighter.  He called me up and said Bert Cooper

15    is retired.  He will never fight again unless he

16    fights for me, and you have no way of getting in

17    touch with him.

18         Q.    So did you have a signed, written

19    contract with Mr. Cooper?

20         A.    Yes, I did.

21         Q.    Okay.  And did you personally receive

22    any settlement payments out of that case?

23         A.    No.

24         Q.    Your deposition was taken in that case?

25         A.    Yes.

1          Q.     Okay.  Do you remember the name of Don

2     King Promotions' counsel?

3          A.     I think his last is Cohen.  He's

4     in-house attorney.

5          Q.     Okay.  That case was filed in New York

6     or in Pennsylvania?

7          A.     North Jersey, I believe.  North

8     Jersey.

9          Q.     Okay.  Before -- I'm going to ask you

10    about the other depos, but let me ask you, I

11    wanted to talk about whatever type of business

12    activities you're involved in right now, and I

13    understand you're not formally employed with any

14    company, and you're formally an independent

15    contractor with any company.

16         A.     I'm retired.

17         Q.     And Gold Media isn't really generating

18    revenue for you?

19         A.     Yes.

20         Q.     Are you currently performing services

21    for any other entities at all now, or in the

22    last couple of months?

23         A.     Other than the Red Hawk Acres thing I

24    was telling you about, no.

25         Q.     Okay.  And I heard mention at the

1    break you are working on a book?

2         A.    Book's done.

3         Q.    Okay.  And you're in the process of

4    editing it, attempting to get it published, or

5    are you going to self-publish it?

6         A.    It will be released January 27th.

7         Q.    Do you have a publisher?

8         A.    Yes.

9         Q.    Who is the publisher?

10        A.    Brian, Brian --- wait a minute.  Might

11   have it down on my card.  You have a link there.

12        Q.    The link Rasslin Riot on Line on

13   line.

14        A.    Correct.

15        Q.    www.rasslinriotonline.com.

16        And the name of book, is "8, 9, 10 You're

17   Out."  Okay.  Do you have any advance sales of

18   the book?

19        A.    No, not yet.

20        Q.    Are they a traditional brick and

21   mortar publisher, or are they generally an

22   Internet publisher?

23        A.    Internet.

24        Q.    Okay.  All right.  Let's go back to

25   depositions.  All right.  The last one you told

1    me about was the Don King lawsuit in 2002.  So

2    what was the next one after that?

3         A.    Main Events versus Don King.

4         Q.    I'm sorry, you know what?  I lost my

5    train of thought earlier.  Before I forget it

6    again, let me ask you, in the course of your

7    career, have you gone by any aliases, or

8    nicknames, or, AKA's of any kind?

9         A.    No.

10        Q.    You're probably the only one in the

11   business who hasn't.  I would think with a name

12   like Russen nobody called you Rasslin Rob

13   Russen, or anything like that?

14        A.    No.  I'm not famous for my sense of

15   humor, so they don't do that.

16        Q.    All right.  Are you famous for your

17   lack of your sense of humor?

18        A.    Pretty much.

19        Q.    Being a boxing promoter, that probably

20   comes in handy.

21        Okay.  So the next lawsuit was Main Events

22   versus who?

23        A.    Don King.

24        Q.    Another one with your buddy Don.  And

25   were you affiliated with Main Events, or were

1   you were involved in that lawsuit?

2       A.     They were suing on behalf of Bert

3   Cooper.

4       Q.     Again, with him.  Separate incident?

5       A.     Correct.  When we were with Don King

6   we had fought Evander Holyfield for the

7   heavyweight championship of the world.  Right

8   after that, Don King stole Bert Cooper.  We did

9   one fight for Don King, then Main Events sued,

10  and we got Cooper back.

11      Q.     When you say "we," what are you

12  referring to?

13      A.     Rick Parker Presents.

14      Q.     Okay.  And you were the Vice-President

15  of Rick Parker Presents?

16      A.     Yes.

17      Q.     Okay.

18      A.     Then Cooper fought Michael Moore for

19  the WBL heavyweight championship of the world

20  Ring Magazine's  fight of the year, and...

21      Q.     Okay.  So in that second lawsuit, Main

22  Events versus Don King, generally, we will call

23  it, you also had your deposition taken?

24      A.     By Pat English and Don King's lawyer.

25      Q.     What year was that?

1           A.    2002.

2           Q.    Back to back.  All right.

3           That case ultimately settled, or was

4     resolved?

5           A.    I don't know how it was resolved, but

6     the fights continued, and we continued to

7     perform for Main Events for a while.

8           Q.    And was counsel for Rick Parker

9     Presents was the same counsel as the earlier

10    case?

11          A.    Pat English.

12          Q.    Pat English and Russell Carmichael?

13          A.    Yes.  Carmichael was Bert Cooper's

14    personal lawyer.

15          Q.    Pat English actually represented Rick

16    Parker Presents?

17          A.    And Main Events.

18          Q.    Okay.

19          A.    He's the most famous boxing attorney.

20          Q.    Okay.  Is he based in the Philly area

21    or?

22          A.    North Jersey.

23          Q.    Okay.  And when was the next time you

24    had your deposition taken?

25          A.    That's probably it.

1         Q.    Okay.  And --

2         A.    Now.

3         Q.    So we've got this covered, have you

4    ever been a witness at a trial?  Have you ever

5    appeared in trial, in a witness box, and given

6    testimony?

7         A.    I believe that's what I would have

8    been considered in those.

9         Q.    I'm sorry.  I mean in court?

10        A.    In court?

11        Q.    Not a deposition.  In trial.  In

12   court.

13        A.    No.  Nothing ever made it to court.

14        Q.    Okay.  Anything in a formal

15   arbitration proceeding, where there was like a

16   panel, or arbitrators, or an arbitrator?

17        A.    No.

18        Q.    And how about, aside from this

19   business, in your personal life, have you ever

20   been involved as a, aside from that personal

21   injury accident you told me about, as the victim

22   of a crime?

23        A.    No.

24        Q.    I mean that led to a legal

25   proceeding.

    1          A.    No.

    2          Q.    Okay.  Or as witness in a criminal

    3      proceeding.

    4          A.    No.

    5          Q.    A formal witness.  Okay.  And, as you

    6      know, everybody gets asked this:  Have you

    7      yourself ever been convicted of a crime?

    8          A.    No.

    9          Q.    All right.  You never filed for

   10      bankruptcy yourself?

   11          A.    Yes.

   12          Q.    Okay.  You, personally?

   13          A.    Yes.

   14          Q.    Okay.  What year did you file for

   15      bankruptcy?

   16          A.    '76 or '78.

   17          Q.    Okay.  Was that the only time?

   18          A.    Yes.

   19          Q.    Any entities, or businesses, or

   20      companies that you were affiliated with ever

   21      file for bankruptcy?

   22          A.    No.

   23          Q.    Okay.  Were you ever involved in a

   24      divorce or marital dissolution proceeding?

   25          A.    Oh, yes.

```
 1          Q.    How many?

 2          A.    Two divorces.

 3          Q.    Okay.  What years did they take place?

 4          A.    '86 and '96.  I seem to do it every

 5     ten years.

 6          Q.    The last divorce, I assume, took place

 7     here in Florida, was done through the Florida

 8     courts?

 9          A.    Minnesota.

10          Q.    Okay.  You were living in Minnesota at

11     the time?

12          A.    She was.

13          Q.    And you are not currently married now?

14          A.    No.

15          Q.    And how old are you, Mr. Russen?

16          A.    Sixty-two.

17          Q.    Okay.  And do you have any children?

18          A.    Four.

19          Q.    Roughly, tell me what their ages are.

20          A.    34, 31, 22, 16.

21          Q.    Do any of your children work with you

22     in any of your business-related ventures?

23          A.    No.

24          Q.    Okay.  Have they ever at any time?

25          A.    My second oldest son has been a
```

1    referee for my IWA Championship Wrestling.

2        Q.    How many years ago was the last time

3    he did that?

4        A.    The last time he did that was probably

5    '92, '93, when we went to Australia.

6        Q.    Okay.  That's it, as far as your kids

7    being involved with your business?

8        A.    Correct.

9        Q.    Okay.  I want to ask you a little bit

10   about the complaint that was filed by the

11   plaintiff in this case.  And the only copy I

12   have is flagged there; okay.  So let me just

13   give that to you now.  But before I do that, I

14   want to ask you a couple of questions not

15   directly related to the complaint.  I just want

16   to get them out of the way.

17       Was it your understanding that

18   WrestleReunion ever sought or intended to be

19   bought out by WWE?

20       A.    Sought or intended to be?

21       Q.    Yeah, to your understanding.

22       A.    No.

23       Q.    Okay.  I mean was that ever part of

24   its goal was to ultimately be, you know, a

25   possible goal to be acquired by WWE?

1        A.     Not a goal, but we certainly were

2    aware that McMahon was going through an

3    acquisition phase, trying to buy out all of his

4    potential competition, all video libraries, and

5    all talent that he could use.

6        Q.     All right.  So it was a possibility

7    that you anticipated or considered might occur?

8        A.     Anyone in the business would be aware

9    that would be a possibility.

10       Q.     Okay.  But is it your understanding

11   that the primary goal was for WrestleReunion to

12   succeed on its on, regardless of whether, you

13   know, WWE might have an interest in buying it,

14   or taking an interest in it?

15       A.     Absolutely.

16       Q.     Okay.  And I assume it was intended to

17   succeed as a live event on its own, whether or

18   not, you know, it was going to be broadcast on

19   TV?

20       A.     From the very beginning, the concept

21   was a multifaceted concept.  A live event was

22   just part of that.

23       Q.     Okay.  I can't find the document.  I

24   doubt I'm going to find it by the end of the

25   day.  Let me ask you about it, so I don't

1   forget, and that is at some point, in the Summer

2   of 2005, I believe, there was testimony that you

3   had a meeting with some representatives of WWE.

4       Do you recall the meeting?

5   A.   Yes, I do.

6   Q.   Okay.  Generally speaking, what the

7   was the purpose of the meeting?

8   A.   They contacted me in February or March

9   of 2005, based on them becoming aware of the

10  reputation, and success, and media buzz about

11  WrestleReunion, to see if I would be interested

12  in doing a similar type promotion or event with

13  their Hall of Fame, since it was, basically, the

14  same sort of characters we were using.

15  Q.   Representatives from WWE contacted you

16  in February or March of 2005?

17  A.   Correct.

18  Q.   Who was it who first contacted you?

19  A.   Jim Ross.

20  Q.   That's Jim Roth, R-O-T-H?

21  A.   R-O-S-S.

22  Q.   What was his position with WWE?

23  A.   At that time, I believe he was

24  Vice-President in charge of talent.

25  Q.   Okay.  He was the first person from

```
 1       WWE to contact you regarding this?

 2            A.    Correct.

 3            Q.    Okay.  Did anybody else from WWE

 4       contact you regarding the subject?

 5            A.    Bret Hart.  Not the Wrestler.

 6            Q.    What was Mr. Hart's position with WWE

 7       at the time?

 8            A.    I have no idea.

 9            Q.    Was he senior to Mr. Ross or

10       subordinate to him, or on the same level, as far

11       as you know?

12            A.    Might have been on the same level in a

13       different division, perhaps a division relating

14       to the Hall of Fame.

15            Q.    So what did Mr. Ross say to you, in

16       that first contact?

17            A.    Wanted to know if I felt there would

18       be a market to mobilize what, up to that point

19       in time, had been, basically, a non-active

20       division of the company.  If I thought money

21       could be made by taking it on the road.

22            Q.    Non-active division of WWE?

23            A.    Correct.

24            Q.    And it's the Hall of Fame?

25            A.    Correct.
```

1    Q.    And that generally involved the older

2    Wrestlers, who weren't really active anymore,

3    or?

4    A.    Some of them still worked for the

5    company in other capacities other than

6    wrestlers, but certainly they were not, in

7    general, wrestling on --

8    Q.    Regular --

9    A.    -- current shows, current events.

10   Q.    Okay.  So what was your reaction, when

11   Mr. Ross first contacted you about that?

12   A.    I was flattered.

13   Q.    And he had contacted you about hiring

14   you personally to be involved that potential

15   venture for WWE?

16   A.    Yes, but I never, from the beginning,

17   I made it clear that if I was to be involved, so

18   was Sal Corrente.

19   Q.    Okay.  That's what I was kind of

20   getting at.  Was he calling you personally,

21   saying Rob, we know you.  We like you.  We would

22   like to talk to you about making an offer to you

23   or your company, or was he saying we would like

24   to talk to you about a deal between WWE and

25   WrestleReunion, the company?

1          A.    Me personally.

2          Q.    Okay.

3          A.    But it was a package deal, in my mind,

4     from the very moment they brought it up.   I

5     didn't bring it to Sal's attention immediately.

6     I wanted to find out all that they had to offer,

7     and then pass on the information.

8          Q.    Okay.   So I imagine it started, Jim

9     Ross called you.   It was his phone call?

10         A.    Yes.   Perhaps started with an exchange

11    of e-mails, and then a phone call.

12         Q.    Okay.   Do you know if those e-mails

13    were turned over to your counsel, or to counsel

14    for the plaintiff in this case?

15         A.    They had nothing to do with

16    WrestleReunion, so I'm pretty sure they would

17    not have been.

18         Q.    Okay.   And it had nothing to do with

19    WrestleReunion because it related to you

20    individually, or your --

21         A.    Correct.

22         Q.    -- company.   And your company at that

23    time we are talking about, that was Double R.

24    Marketing?

25         A.    Well, they were looking to deal with

1    me personally.

2        Q.    They know the people, not the company?

3        A.    Right.  I have a well-established

4    reputation within the industry.

5        Q.    Sure.  All right.  So e-mails, then a

6    phone call to or from Mr. Ross was the next

7    step.  What was the next step in the progress of

8    those --

9        A.    Jim told me I would be hearing from

10   Bret Hart.  Bret Hart called, requested to have

11   a meeting in Sarasota, and they came down and

12   met me at the Hilton Hotel, bought me lunch.

13       Q.    Okay.  Mr. Hart and Mr. Ross?

14       A.    Yes.

15       Q.    When was that?

16       A.    March of '05.

17       Q.    Okay.

18       A.    As best as I can recall.

19       Q.    Okay.  Did they expand upon the idea

20   of what they wanted you to do, in connection

21   with the Hall of Fame division of WWE, at that

22   lunch?

23       A.    Yes.

24       Q.    What did they tell you?

25       A.    They asked my input on -- they had

1    representatives at WrestleReunion in Tampa.  So

2    they had first-hand knowledge of the layout, how

3    it was run, who was involved, and how responsive

4    the fans were.  They asked if I felt if there

5    would be a similar market throughout the

6    country.  WrestleReunion 1 was formed with the

7    idea of the theme of being a tribute to Florida

8    Championship wrestling.  Because Tampa was the

9    home base of that organization.  It had not

10   really received a lot of accolades over the

11   years, but we wanted to sort of pick spots in

12   the country where there were territories that

13   helped contribute to the success of professional

14   wrestling over the years, and we started with

15   Tampa.

16        We had a relationship with Mike Graham.

17   Previously I had worked with Mark Graham, Steve

18   Cohen, Gordon Solie and Dusty, with the Florida

19   championship office, selling events for them.

20   So we had a very good working relationship, and

21   they all cooperated in putting together the best

22   efforts to honor their organization, as part of

23   WrestleReunion.  WWE wondered if that same

24   concept would work country-wide.  Because in the

25   past, wrestling had been run by territories, and

1    each territory was protected.  They may have

2    shared talent as it moved around and used up

3    their usefulness, but each territory was sacred,

4    and WWE kind of broke that mold when junior took

5    over.  He said the world is my territory.  Screw

6    everybody else.  And so they wondered if they

7    could go to places like St. Louis, and Atlanta,

8    and California, and Minneapolis, and I assured

9    them that they could.

10    We discussed the size of the venues that

11    would be involved, the type of turnout, whether

12    they should have a live wrestling event because

13    a lot of their guys were older-older, unable to

14    Wrestle.  Whether they should include some of

15    the young talent on the show, whether they

16    should include girls on the show, whether it

17    should be videotaped.  Then they went back.

18    Bret Hart put a bunch of numbers down into a

19    projection, told me that he sent me a copy of

20    that, said because it's now a corporation, not

21    just Vince calling the shots, it would have to

22    go through corporate approval, and they would

23    get back to me.

24    Q.   Did, I mean did they give you a copy

25    of a document at that lunch?

1        A.    Not at that lunch.  Subsequently, he

2   e-mailed me the projections.

3        Q.    Okay.  So, at that lunch, maybe they

4   took some notes, or wrote some things down?

5        A.    Oh, yes.

6        Q.    What you guys were talking about?

7        A.    Bret did.

8        Q.    Okay.  And that was Bret Hart who

9   e-mailed you the projections that were --

10       A.    Correct.

11       Q.    -- the end product of those

12   discussions?

13       A.    And he also asked me if I would be

14   interested in being a promoter for them, and I

15   told him no.

16       Q.    Okay.  How long after that March 2005

17   lunch, did that next communication take place?

18       A.    Maximum two weeks.

19       Q.    Okay.  And that was when you got the

20   e-mail with the projections on it?

21       A.    Correct.

22       Q.    And what was your reaction to the

23   projections?

24       A.    I told him he was underpaying his

25   talent, and I thought that was wrong.

1         Q.    Do you know if those projections that

2    he had, was that a firm plan that WWE had to

3    actually launch, or, you know, promote this Hall

4    of Fame project that he had talked to you about,

5    or was it purely a hypothetical, theoretical

6    proposal?

7         A.    I don't think the word "firm" applies;

8    however, both of them made it clear that WWE

9    corporate is interested in making money from any

10   of their various divisions that can be

11   profitable for them, and they would have to

12   submit the paperwork to the board, or to the

13   Board of Directors for their approval to

14   continue.

15        Q.    Okay.  So it was a preliminary, or for

16   consideration?

17        A.    Correct.

18        Q.    At that time.

19        A.    Yes.

20        Q.    Okay.

21        A.    Well, given thought.  Jim Ross was

22   passionate about it, and he assured me Vince

23   was, too.

24        Q.    So what was your next communication

25   with WWE, after you got those projections?

1      A.    Wow!  Probably a phone call a week, or

2  within a week after I received them, and then

3  several months went by, and I was told someone

4  else was now handling the project.  We exchanged

5  a couple of e-mails.  I don't remember that

6  person's name, and, until recently, three months

7  ago or so, someone contacted me and told me that

8  Vince is still interested, but it's not a top

9  priority.  It's on the back burner, and sooner

10  or later they'll get around to it.

11      Q.    Who was the person who contacted you

12  three months ago?

13      A.    I can't remember.  It might have been

14  Bret by e-mail.

15      Q.    But it was somebody from WWE?

16      A.    Oh, yes.

17      Q.    All right.  Just to back up, at the

18  lunch, there are only three of you present:

19  You, Mr. Ross, and Mr. Hart?

20      A.    Correct.

21      Q.    Okay.  Was that the only meeting that

22  you had with the WWE reps regarding this

23  subject?

24      A.    Yes.

25      Q.    Okay.  So you got these projections,

1    you gave them some input on what they were

2    paying talent.  Did you comment or get input on

3    other items in that?

4         A.    Cities, the size of facilities.  I

5    suggested they make it into a fan-friendly,

6    interactive type event, like the National

7    Football League, does prior to, you know,

8    they've all these video games and things that

9    they've licensed.  If they were to set them up,

10   have the manufacturers come in as vendors, and

11   set up the booths, and let the fans participate,

12   it could really be a true family type event.

13   That's what I was recommending.

14        Q.    And did they did, did they like your

15   suggestions?

16        A.    Loved it.

17        Q.    Did they ever modify the proposal,

18   you, know to incorporate your suggestions?

19        A.    Don't know.

20        Q.    So, I take it WWE has never gone

21   forward with that proposal?

22        A.    Correct.

23        Q.    Okay.

24        A.    Though I, you know, occasionally hear

25   things that they are doing with the Hall of

1 Fame, but it's not full-fledged fan

2 conventions.

3  Q. Okay.  But then, let me just, to get

4 my dates and everything straight, I thought the

5 e-mail that I saw, referenced a meeting sometime

6 in the June time frame.  June of 2005.

7  A. Could be.  I don't think it was that

8 late.

9  Q. Okay.

10  A. I could be wrong.

11  Q. At some point, you sent an e-mail to

12 Eric Paulen, telling him about, and correct me

13 if I'm wrong, but from what I recall, this is

14 the e-mail I can't find.  I probably could dig

15 it up, if I spent a lot of time.  I recall an

16 e-mail from you to Mr. Paulen, generally telling

17 him about some type of offer or proposal, which

18 I took to be the WWE meeting or projections.

19 Did you mention this meeting, or this these

20 conversations with WWE to Mr. Paulen at some

21 point?

22  A. Not that I remember.  It doesn't seem

23 to be anything I would think he would be

24 involved in, other than we were cordial.  I knew

25 if we came across any activities that might be

1    beneficial to our relationship, WrestleReunion's

2    relationship with Clear Channel, and further

3    enhancing their interest in professional

4    wrestling, I was free to submit it to him, but I

5    would be well aware that he couldn't have any

6    involvement with the WWE, so I can't imagine why

7    I would say that.

8         I may have, but I don't -- other than

9    exchanging what's going on kind of information,

10   it wasn't certainly a formal business proposal

11   because it never came down to that.

12        Q.   I mean do you remember telling

13   Mr. Paulen, you know, don't mention this to Sal

14   for now, or something along those lines?

15        A.   Are you talking about the WWE Hall of

16   Fame, or are you talking about the ECW

17   pay-per-view reunion event?

18        Q.   Yeah, that's, I'm saying, I don't know

19   what the e-mail referred to.  That's what I'm

20   getting at.

21        A.   I was what I consider General Manager

22   of WrestleReunion.  Part of my responsibility is

23   to be gatekeeper.  Just as you have a secretary

24   to field off all unimportant calls so that your

25   time can be put to maximum use, I would do that

 1     on behalf of Sal, who was up to his elbows in

 2     alligators with his full-time job, and

 3     negotiating with the Wrestlers, and making air

 4     fare arrangements.  Until something was formal

 5     enough to bring to his attention, I couldn't

 6     bring him any speculation, but Eric would love

 7     to jump on something, and bring it to our

 8     attention, as though it was the next coming of

 9     Jesus Christ.  Calm him down, let's see what's

10     going to work out.

11          Shane Douglas had put together an ECW

12     pay-per-view event, involving the original cast

13     members from the hard core wrestling group ECW.

14          Q.    Shane who?

15          A.    Douglas.

16          Q.    Is he with ECW?

17          A.    He's with TNA now, but he was one of

18     their champions.

19          Q.    Okay.

20          A.    And one of the owners of that

21     pay-per-view event.  I don't recall whether the

22     event had happened yet, and they had it in the

23     can, or whether they were still looking to find

24     someone to do something with it, but Shane was

25     on our WrestleReunion 2 show.  I have a long

1    relationship with Shane, not a real close

2    relationship, and I believe Eric asked me to

3    inquire what was happening with that ECW

4    pay-per-view event, and the possibility of a DVD

5    release of that.

6        So it was a very preliminary type

7    situation.  It was far too early to bring to

8    anyone else's attention, until I found out the

9    details of what commitments Shane and ECW may

10   have had at that time, and I'm not even sure

11   whether Vince had or had not purchased ECW at

12   that time.  Whether Shane was doing this prior

13   to Vince owning the name, I'm not sure.

14       Q.   Okay.  That's one thing I wanted to

15   get at.  This, this, whatever it was, a

16   potential proposal, potential pay-per-view event

17   we're talking about; right?

18       A.   Pay-per-view and DVD.

19       Q.   And it was for what, at the time, you

20   deemed to be an ECW sponsored event or?

21       A.   Well, it was called an ECW reunion.

22   It was held at their original facility in

23   Philadelphia, with as many of the original stars

24   as they could possibly have, who were not

25   currently under contract to Vince.

1          Q.    Okay.  I mean were any of them

2     currently under contract to WrestleReunion at

3     the time of this proposal, or?

4          A.    WrestleReunion contracted talent on a

5     per-event basis.

6          Q.    Okay.

7          A.    Not on an annual contract.

8          Q.    Okay.  And just so I'm sure, you

9     weren't sure if, at that time, in the Summer of

10    2005, if ECW was formally a part of the WWE

11    empire or not?

12         A.    I was confused.  I did not know, and

13    they were going forward with the event as though

14    they were separate and legally entitled to do

15    it.

16         Q.    Okay.  And you mentioned that you

17    understood that Eric Paulen or Clear Channel

18    couldn't be involved with the WWE.  Why do you

19    say that?

20         A.    They do all their own stuff in-house.

21         Q.    Okay.  All right.  So going back to

22    some, now that I have it straight, two totally

23    separate things:  The meeting with Mr. Hart and

24    Mr. Ross, and then this other potential --

25         A.    Absolutely.

1      Q.     -- ECW reunion.

2      A.     Correct.

3      Q.     Let's go back to the meeting with

4  Mr. Ross and Mr. Hart, and the projections or

5  proposals that they discussed with you.

6  Wasn't -- it sounds to me like that this is

7  something that WWE was planning on doing, that

8  would fairly directly compete with

9  WrestleReunion, wouldn't it?

10     A.     Not really.  They had their own

11 well-established brand.  They function up here.

12 Everybody else is down here.

13     Q.     They are the gold standard?

14     A.     There is no number two in the

15 business.  There has not been for a long time.

16 It was not WrestleReunion's goal, from day one,

17 to compete with the WWE, but to find our own

18 niche somewhere in between.  Yes, we used many

19 former WWE stars, and that was part of my

20 discussion with the guys from WWE.  You guys

21 made them.  We're glad that you let them go, and

22 we're going to put them to use and work, so they

23 can make money as often as we can because,

24 frankly, they need the money.  You've abandoned

25 these guys.  You've thrown them and kicked them

1      to the curb.  They're out there, broken down,

2      broke, and you're ignoring them, when they do

3      have market value, and they do have pride, and

4      they do deserve to be recognized.  What good is

5      it to put them in the Hall of Fame and then

6      ignore them?

7          Q.    And they're not making any money.

8          A.    And you've got Liberace, and you've

9      got Mike Tyson in there, but you don't have

10     Bruno Sammartino, you don't have Wendi Richter.

11     Your Hall of Fame is a joke.

12         Q.    All right.  So you thought that

13     WrestleReunion wasn't competing with WWE, even

14     if they did the Hall of Fame thing, because it's

15     a totally different brand, and a totally

16     different consumer perception of the --

17         A.    Absolutely.  Totally different.

18         Q.    Did you think that having those

19     discussions with WWE might trigger WWE to seek

20     to get back under contract some of the

21     WrestleReunion talent?

22         A.    That was always a possibility.

23         Q.    Okay.  Was that a concern for you,

24     when you were having the meeting with the

25     Mr. Hart and Mr. Ross?

1          A.     No.    There is a wealth of talent out

2     there, and we had planned on going into

3     geographic territories, as I discussed.    We

4     started in Tampa.    Our next target date was

5     Atlanta, where WCW was from.    I used to be a

6     promoter for WCW.    I took Gordon Solie's place

7     with WCW.    So we're going into target markets

8     with well-established regional territories that

9     would be totally irrelevant of WWE.    We were

10    very flexible in that regard.    We had a large

11    talent pool.

12         Q.     I understand you might have been

13    flexible, but it's true, isn't it, that WWE

14    might not have been so flexible, and if they

15    wanted to put all of your talent under contract

16    with them at, you know, a dollar figure slightly

17    more than what WrestleReunion was able to pay

18    them, that they could have potentially shut

19    WrestleReunion's business down?

20         A.     Only with talent that they had had an

21    association with.    There were AWA, NWA, WCW,

22    WCCW, a multitude of organizations and

23    geographic locations around the country, all

24    with their own legendary talent base.    The Von

25    Erichs, for example.

1          Q.    Let me see if I've got it straight.

2     What you're saying is there are some other

3     people that had contracts with these other

4     organizations that would have prevented them

5     from contracting with WWE anyway.

6          A.    No.   They had no previous involvement

7     with the WWE.

8          Q.    All right.   Let me ask.   I'm sorry to

9     interrupt.   I'm trying to get this straight.

10    You know this world a lot better than I do.   I'm

11    just asking some specific questions because --

12         A.    Go for it.

13         Q.    What I'm asking is in the professional

14    wrestling world, regardless of where all these

15    other wrestlers came from, what region they came

16    from, what organization they were with, if they

17    weren't under contract with WWE, generally

18    speaking, don't most of them want to be?

19         A.    My meeting with Jim Hart -- Jim Russ,

20    and Bret Hart, was to activate their Hall of

21    Fame.   To be in their Hall of Fame, you have to

22    have an association with them and been

23    considered one of their elite stars to qualify

24    to be in the Hall of Fame.

25         These people had never been involved with

1    them before.  They had no history.  So,

2    technically, they wouldn't be eligible to be

3    members of that organization.

4         Q.    All right.  But -- and just so I'm

5    clear, I understand there's -- some of the

6    talent that WrestleReunion contracted with for

7    the three events wasn't anywhere near the elite

8    level of the long-term elite, big-name

9    wrestlers, but some of the talent was in that

10   level; fair enough?

11        A.    Yeah, yes.

12        Q.    So as to WrestleReunion's, the biggest

13   stars, the biggest names that they contracted

14   with, didn't, weren't you concerned that WWE

15   might attempt to steal them away from you?

16        A.    Our motto at WrestleReunion was

17   featuring stars of the present, the legends of

18   the present, past, and future.  People we used

19   on that show, who were newcomers at that time,

20   have since on gone on to become WWE champions.

21   Just as Don King said to me:  You make 'em, I'll

22   take 'em.

23        We understand that WWE had that power, but

24   we also understand in the world of professional

25   wrestling, there's no shortage of talent, there

 1     is shortage of opportunity.  We were providing

 2     that opportunity.  We turned down just as many

 3     people that showed up for WrestleReunion 1,

 4     wrestlers, who actually booked onto it.  We

 5     could have had two or three times that many

 6     people attend.

 7          Q.   Right.  But you didn't want people who

 8     weren't going to sell any tickets, or be a draw,

 9     right, generally speaking?

10          A.   We wanted legends from that geographic

11     territory, primarily.

12          Q.   All right.  I mean the goal was to

13     make money; right?  I mean it wasn't to give

14     work to out of work talent?

15          A.   No, no.  The goal was make money from

16     multiple forces of revenue.

17          Q.   Okay.  Let me just to follow up with

18     this WWE line of questions here.  I mean, in

19     fact, WWE did compete with WrestleReunion in

20     2005, by releasing a series of legends or Hall

21     of Fame DVD's, by sort of taking a more

22     aggressive release, with respect to their older

23     Hall of Fame type Wrestlers.

24          A.   I don't consider that competing

25     because our company, Clear Channel

```
 1    Entertainment, never released our product.

 2         Q.    But I mean did they put product out in

 3    the market, in the legends Hall of Fame

 4    category, at the same time that WrestleReunion

 5    was promoting its live event?

 6         A.    Subsequently.  Not necessarily at the

 7    same time.  Subsequently, they put out a Road

 8    Warriors DVD; they put out a Jake the Snake and

 9    Bret Hart, but these were legitimate legends,

10    Hall of Famers from their own organization.

11    They make a lot of money, which is part of our

12    point of reference in our market projections,

13    with the subsidiary income, other than the live

14    gates at the WWE.

15         Vince once bragged to Carlos Colon, in the

16    Summer of 2006, I make a million dollars a day

17    without getting out of bed, from his

18    merchandise.

19         Q.    Speaking of merchandise, part of the

20    business plan for WrestleReunion was to sell

21    merchandise at the live event.

22         A.    Sell it or license it.

23         Q.    Right.  No merchandise sales ever took

24    place; correct?

25         A.    We licensed --
```

1      Q.    Aside from some T-shirts?

2      A.    T-shirt vendor.

3      Q.    WrestleReunion never saw any revenue

4    from those T-shirt sales; right?

5      A.    No.

6      Q.    Other than the T-shirts, no other

7    memorabilia or merchandise resulted in any

8    revenue for WrestleReunion, as far as you know?

9      A.    That was the birth of the development

10   of the brand.  You have to start some place.

11     Q.    But the answer is no, to the

12   question.  No revenue?

13     A.    The answer is no.

14     Q.    You know who Colin Bowman is, I

15   assume?

16     A.    Colin Bowman?

17     Q.    Yes.

18     A.    Yes.

19     Q.    Who is he?

20     A.    He's from Great Britain.  He's a

21   former WCW employee, in charge of -- working

22   with their publication division, and a very

23   bright and talented young man.

24     Q.    Okay.  I assume you have -- have you

25   seen this report that he wrote, called, or

1    whatever document that he wrote called

2    WrestleReunion:   What should have been?

3         A.    I believe I saw it once.

4         Q.    Okay.  Do you know if Mr. Bowman was

5    paid to write this?

6         A.    I do not know.

7         Q.    Okay.  You are you personal friends

8    with Mr. Bowman?

9         A.    No, I am not.

10        Q.    Do you know if Mr. Corrente is?

11        A.    No, I do not.

12        Q.    Do you know if he's, has a close

13   association with anybody contacted with the

14   WrestleReunion?

15        A.    I believe he's worked with Jimmy Hart.

16        Q.    Okay.  Do you know if Mr. Hart asked

17   him to write this document?

18        A.    I don't know.

19        Q.    Okay.  All right.  So just to make the

20   record clear, you don't know how or why

21   Mr. Bowman wrote this document, how it came

22   about?

23        A.    Correct.

24        Q.    In the document here, he just says

25   that WWE dug deep into their own archives, and

1      released WWE Legends:   Greatest Wrestling Stars

2      of the 80's on June 14th, 2005.

3            Does that sound correct to you?

4            A.     Sounds like six months after

5      WrestleReunion 1.

6            Q.     Okay.  And two months before

7      WrestleReunion 2; right?

8            A.     Correct.

9            Q.     And then it says, it talks about some

10     other DVD's.  I think you mentioned some of

11     them.  It says in the wake of the success of

12     WrestleReunion, the WWE went into overdrive with

13     the legends concept.  Their Hall of Fame was

14     given more coverage than ever before.  There was

15     a slew of nostalgic DVD releases, including

16     triumph and tragedy of world class.  Do you know

17     when that DVD was released?

18           A.     I have no idea.

19           Q.     Then there's another one named quote:

20     "The American Dream -- the Dusty Rhodes story,

21     20 years too soon."  I'm not sure if that's all

22     the -- the American Dream -- the Dusty Rhodes

23     story is, probably, one title.

24           Do you know when that was released?

25           A.     I have not idea.

1     Q.    In relation to when you were involved
2    with WrestleReunion, was it released at the same
3    time, or do you know?

4     A.    I don't follow WWE's activities.

5     Q.    You are generally aware if WWE is
6    making a media blitz into a different niche, or
7    a segment of market, with all of your experience
8    in the industry, you're going to generally be
9    aware of that; right?

10     A.    Not at this stage of my life.

11     Q.    While you were working for
12    WrestleReunion in 2005?

13     A.    I didn't follow what they were doing.

14     Q.    All right.  Earlier, I thought you
15    testified that WWE released all these Hall of
16    Fame, or nostalgia, or legend DVD's after
17    WrestleReunion.  That's what I'm trying to get.
18    Do you recall was it after, was it during, was
19    it during part, after?

20     A.    To my knowledge, only because I've
21    seen two of them, that's how I know.  The two I
22    saw, the Road Warriors and the Jake the Snake,
23    were after we did Tampa.

24     Q.    After you did Tampa, but before you
25    did Valley Forge?

1      A.     Yes.

2      Q.     And then --

3      A.     That was supposed to hurt us, that

4    they released those DVD's?  Should have

5    encouraged Clear Channel.

6      Q.     Weren't you worried about, you were

7    having meetings with WWE, giving them advice and

8    input, you know, how to target this market in

9    the Summer, that you guys are in business, doing

10   this, trying to attract the live audience, they

11   come up with a barrage of DVD's in the same

12   market?

13     A.     And this is a fact:  If they put out a

14   release of Jake the Snake Roberts, and Bret

15   Hart, and then they appear on our show, that

16   helps us, and that's exactly what happened.

17   They are out there, plugging these top ten

18   Billboard Charted DVD rentals, and sales.  And

19   Jake and Snake, and they are doing, they just --

20   Bret Hart had just finished that, and came to us

21   at Valley Forge, all that pub, and all that

22   publicity helped us.

23     Q.     Okay.  Fair enough.  So, then, your

24   meeting or communications with WWE, you thought,

25   might actually help generate revenues for

1     WrestleReunion?

2          A.     No.  It had nothing to do with it.

3          Q.     All right.  Well, I forgot.  I

4     believed earlier you said the reason -- when did

5     you first tell Mr. Corrente about your meetings

6     and communications with Mr. Ross and Mr. Hart?

7          A.     Probably not until June or so.

8          Q.     Okay.  And what was the reason that

9     you waited until then?

10          A.     We needed to find out if they were

11     going to come forward with a solid proposal that

12     I could then bring to his attention for future

13     consideration.

14          Q.     Okay.  And how was it, in June, that

15     you found out that they were or were not?

16          A.     Just due to the lack of activity on

17     their part, I presumed nothing further was going

18     to happen.

19          Q.     Okay.  After a couple of months had

20     passed from the meetings, you figured it was

21     dead, and it was okay to talk to Mr. Corrente

22     about it?

23          A.     I just wanted to make him aware of it.

24          Q.     And then I know you said that about

25     three months ago, somebody from WWE contacted

1    you about the same proposal that you had

2    discussed with them back in 2005?

3         A.    Yes.

4         Q.    It was generally the same idea, same

5    proposal?

6         A.    Said the idea is still alive.  It's on

7    the back burner.

8         Q.    And I assume that's the last time that

9    you have spoken with WWE about that concept?

10        A.    Yes, that concept.

11        Q.    Or communicated with them?

12        A.    Yes.

13        Q.    Let me ask you are you aware of, at

14   any time, whether WWE ever made any proposals or

15   overtures towards WrestleReunion, at any time,

16   about taking an interest, or buying it out, or

17   investing in it?

18        A.    I'm not aware of that.

19        Q.    Okay.  Do you know if anybody at

20   WrestleReunion ever made such an overture to WWE

21   at any time?

22        A.    I'm not aware of that.

23        Q.    Was there a decision made not to do

24   that?  I mean was it discussed maybe we should

25   talk to WWE about this?

1    A.    We were going full-force ahead with

2   WrestleReunion and our relationship with Clear

3   Channel.

4    Q.    Sure.

5    A.    We were focused on that.

6    Q.    Okay.  And I guess what I'm getting at

7   is after, you know, you ended up in a dispute

8   with Clear Channel, and the relationship with

9   Clear Channel had soured, ultimately resulting

10  in why we're here today, at some point, when the

11  relationship between WrestleReunion and Clear

12  Channel was either dead, or in serious

13  disrepair, it would seem to me that somebody

14  would think of the idea of going to WWE and

15  seeing if they maybe wanted to buy the footage,

16  or they wanted any piece of anything that you

17  had created.

18    Was that ever discussed?

19    A.    Mr. Herbert, I don't see a piece of

20  what we created, when we had no control over

21  what was created.  We did not have access to the

22  videotapes, which is what they might have wanted

23  to buy.  We could have run live events, but

24  they've got their own Hall of Fame, so --

25    Q.    Let me ask --

1      A.      -- where do you see there to be a

2   common interest?

3      Q.      Did anybody from WrestleReunion ask

4   Clear Channel for all of the videotapes, or the

5   footage back?

6      A.      I don't know.

7      Q.      Do you recall a discussions with

8   Mr. Coplin, who, at one point, represented

9   WrestleReunion as either a manager, or agent, or

10  attorney.   I'm not sure.   Maybe you can tell

11  me.   You do know what Mr. Coplin's role with

12  WrestleReunion was?

13     A.      I don't like Mr. Coplin.   I have no

14  contact with him.

15     Q.      Okay.   He's, generally, a talent --

16     A.      I know who he is.   I don't like him.

17     Q.      What is his primary business?   An

18  manager, agent?

19     A.      Asshole.

20     Q.      Okay.   I mean let's say that's his

21  unofficial role.

22          MR. RODEMS:   Do you have the correct

23       spelling of that title?   Because it sounded

24       like you said something.

25          THE WITNESS:   He's an advisor to many

1           people, and he talks a lot.  Kind of reminds

2           me of Steve Sterling.

3       BY MR. HERBERT:

4           Q.    Who was -- I mean is he a talent

5       promoter, or talent agent, or talent manager, do

6       you know?  Does he hold himself out to be that?

7           A.    I wouldn't use the word promoter, but,

8       perhaps, the other two words would apply in his

9       own fictitious representation of who and what he

10      is.

11          Q.    He thinks of himself as an agent, or

12      manager?

13          A.    Someone special.

14          Q.    Okay.

15          A.    Just ask him.

16          Q.    So I assume it was not your idea to

17      engage Mr. Coplin for WrestleReunion?

18          A.    Correct.

19          Q.    Okay.  Was it Mr. Corrente's idea?

20          A.    I don't know.

21          Q.    Were you involved at all in the

22      discussions between, you know, WrestleReunion

23      and Mr. Coplin, and Clear Channel?

24          A.    No.

25          Q.    In attempting to -- okay.

1       A.     No.

2       Q.     Did anybody make you aware, at some

3    point that Clear Channel communicated to

4    Mr. Coplin that WrestleReunion can have all of

5    the content back, as long as Clear Channel

6    recoups its investment?

7       A.     I have no idea what they talked about.

8       Q.     Okay.  You had never had any

9    discussions with Mr. Corrente, or with anybody,

10   about those negotiations, discussions.

11      A.     I wouldn't want to hear what Sam

12   Coplin had to say.

13      Q.     And I guess anybody knew that?

14      A.     And it had no bearing on me.  I'm not

15   an owner of the company.

16      Q.     Okay.  I mean just as somebody who was

17   pretty intimately involved in the company, it

18   would seem that Mr. Corrente might have

19   mentioned it to you at some point.  You're

20   testifying he never did?

21      A.     He knows my feelings about Sam Coplin.

22      Q.     That may be the reason he didn't bring

23   it up?

24      A.     Very possibly may well be.

25      Q.     Okay.  All right.  So just so the

1    record is clear, you are not aware, at any time,

2    of anybody affiliated with WrestleReunion,

3    discussing the possibility of going to WWE and

4    involving them in whatever was left of

5    WrestleReunion?

6         A.    Correct.

7         Q.    Okay.  Let me ask you about, sticking

8    on with the WWE topic, the first WrestleReunion

9    event, WrestleReunion 1, here in Tampa, on

10   January, late January of 2005, was held on the

11   same weekend as a pay-per-view release by WWE?

12        A.    Correct.

13        Q.    And that was also a legends or a Hall

14   of Fame type release or nostalgia release?

15        A.    No.  It's an annual event they do

16   every year.  I don't remember the name of it,

17   but it was also held on the West Coast, so it

18   wasn't in any immediate competition to us.

19        Q.    As a live event, it wasn't in any

20   immediate competition to you?

21        A.    As an event.  Period.  Ours was a

22   three-day period.  That was one day pay-per-view

23   on their part.

24        Q.    Okay.  But it's possible that a lot

25   your fan base maybe stayed home and watched the

1    pay-per-view, instead of coming to

2    WrestleReunion one; fair enough?

3         A.    How many million people are there in

4    this country?  We only needed, you know?  Their

5    pay-per-view, they do so many pay-per-views,

6    they do one a month.  It's no longer special.

7         Q.    Let me ask you, I guess, what I'm

8    getting at is was that an intentional decision

9    on the part of WrestleReunion 1, to open the

10   first event the same weekend as a WWE DVD

11   listing?

12        A.    Absolutely not.

13        Q.    Okay.

14        A.    Had no part in the decision-making at

15   all.

16        Q.    I assume that the WrestleReunion 1

17   event here was booked long before anybody knew

18   that the WWE pay-per-view release was going to

19   be released that weekend.

20        A.    Correct.

21        Q.    Okay.  Do you know when the venue was

22   first booked for WrestleReunion 1?

23        A.    I believe Sal and I met at the

24   Doubletree to walk through the facility, in

25   September '05, '04.

```
 1        Q.    Okay.  And it would have been booked
 2   then, or that would have been you looked at it,
 3   and then booked it shortly after that?
 4        A.    Contracts were issued shortly after
 5   that.  I don't know exactly when they were
 6   signed because I didn't sign them.
 7        Q.    Okay.  Now, earlier, I believed you
 8   described yourself as the General Manager for
 9   WrestleReunion.  Is that what you generally
10   called yourself?
11        A.    The press referred to me as both
12   promoter, because that name was frequently
13   floated as the up-front promoter, and/or General
14   Manager.
15        Q.    Okay.  I'm trying to get a break down
16   of your role, or your title, or, you know, what
17   you're referred to, in relation to
18   WrestleReunion, as compared to Mr. Corrente.
19   Maybe you can just tell me what they were, were
20   they interchangeable, or let me ask a specific
21   question on that.  I know that yesterday
22   Mr. Corrente mentioned that he was referred to
23   as a booker for some earlier events.  With the
24   WrestleReunion, was he more of the, did he
25   fulfill more of the booker function and you
```

1    fulfilled more of the General Manager, promoter

2    functions, or what was the arrangement?

3         A.    It was his decision to use my name as

4    the promoter of the event, and that I run the

5    day-to-day activities of what was involved in

6    producing the event.

7         Q.    Okay.  And what was, did you consider

8    yourself to be the promoter of WrestleReunion?

9         A.    No.

10        Q.    Who did you consider to be the

11   promoter?

12        A.    Sal Corrente.

13        Q.    Okay.  And what did you consider

14   yourself to be?

15        A.    General Manager.

16        Q.    Okay.  Who filled the booker role?

17        A.    Sal Corrente.

18        Q.    Okay.  So you would refer to, or

19   classify Mr. Corrente as the owner, and the

20   promoter, and the booker for WrestleReunion?

21        A.    Yes.

22        Q.    Okay.  Anything else, any other?

23        A.    All things talent-related.

24        Q.    Can you summarize for me, generally,

25   your duties and responsibilities as General

1    Manager of WrestleReunion?  I understand you
2    said the day-to-day events were your
3    responsibility.  I'm sorry.  The day-to-day
4    activities were your responsibility.  Can you
5    break it down into categories of responsibility?
6         A.    All things involved in running the
7    day-to-day activities of a business, from
8    fielding phone calls, answering e-mails, sending
9    out press releases, creating press releases,
10   contacting some talent on behalf of the
11   organization, and maintaining a database of
12   information of what we were doing, what we were
13   spending.  We were, basically, a two-man,
14   two-man band.
15        Q.    Okay.  And, then, aside from
16   Mr. Corrente and you, in terms of level of
17   involvement, who would have been the person who
18   was the next most involved in WrestleReunion, if
19   there was such a person.  You guys were a
20   two-man show.  Maybe some other person had the
21   next highest level of responsibility.
22        A.    From what period of time?
23        Q.    The whole period of time.
24        A.    From June of '04 till September of
25   '05?

1      Q.      Yeah.

2      A.      From the day-to-day activity point of

3      view, the finance point of view, the talent

4      point of view?

5      Q.      I guess I mean everything.  Obviously,

6      you and Mr. Corrente were the two people who

7      were the most heavily involved in the

8      organization.

9      A.      There were no-one else even close, in

10     the amount of time and effort put into it.

11     Q.      Okay.

12     A.      Tony was very involved in the

13     financial end, starting in January.  We had

14     several volunteers who participated in helping

15     to run the day, the actual day of the event,

16     including coordination of the talent, getting

17     them from backstage to ring side.  We had people

18     doing leg work, running to the airport, picking

19     people up, taking them back, the ticket sale

20     people, and security.  But that was all for that

21     day.  They were not involved in the months and

22     weeks and days of activity, leading up to that

23     day.

24     Q.      Sure, sure.  How about Mr. Attanasio?

25     Was he involved in the financial aspect of it,

1    for all three of the events, or was it only

2    primarily with one particular period of time or

3    event?

4         A.    1 and 2.

5         Q.    Okay.  And can you generally describe

6    for me what Mr. Attanasio's involvement in the

7    financial aspect of WrestleReunion was for one

8    and 2?

9         A.    I can't get into specifics.  I wasn't

10   involved in it.

11        Q.    Okay.  You are not aware of what he

12   was doing.  I mean you said he was involved in

13   the financial side of it.

14        A.    He was the financial backer.

15        Q.    Okay.  Meaning the investor?

16        A.    Yes.

17        Q.    Okay.  All right.  And before we get

18   to the complaint, yesterday we asked

19   Mr. Corrente a lot of questions about this

20   WrestleReunion business plan, which I think has

21   been marked as an Exhibit, number 7.  And you

22   can take your time, as much time as you want, to

23   look through, and I will go ahead and ask you

24   the question now.  You might be ready to answer

25   it.  If you want -- that's fine, if you want to

1    take your time.

2        A.    Go ahead.  Figure it out as we go.

3        Q.    Did you write that document?

4        A.    Yes, I did.

5        Q.    Were you the only one that was

6    involved in its preparation?

7        A.    Other than submitting it for any

8    suggested changes, or for review, prior to

9    finalizing it, yes.

10        Q.    All right.  Who did you submit it for

11    review to?

12        A.    Only to Sal Corrente.

13        Q.    Okay.  Did he have any comments, or

14    input, or changes?

15        A.    I'm sure there were a few, but I don't

16    recall what they were.

17        Q.    Okay.  Nothing major, that you recall?

18        A.    We had previous discussions before

19    starting to create the document, as to what our

20    objectives were, what we wanted to express, how

21    we wanted to say it, that sort of thing.  So I

22    knew what his desires were, in creating the

23    document, and I just submitted it for his review

24    along the way.

25        Q.    All right.  And did he approve it?

1          A.     I believe he did.

2          Q.     Okay.  As far as you can tell, is this

3     the form that he approved it?  This is the final

4     version?  I mean this is what was produced to

5     me.

6          A.     If I recall, and I'm a little vague on

7     it, this was done in two stages, and amended in

8     this final copy version, yes.

9          Q.     Okay.  Do you remember what was the

10    difference between the two stages?

11         A.     In the initial stage, Tony Hunter was

12    involved, and Clear Channel wasn't.  In the

13    second stage, Clear Channel and their high

14    definition equipment and Tony were.

15         Q.     Okay.  So there's one version of the

16    document that references Tony Hunter and his

17    potential involvement, and doesn't mention Clear

18    Channel.  And this version does mention Clear

19    Channel in high-def and all that.

20         A.     I believe Tony Hunter's name may even

21    appear in this.  This is the final version.

22    There weren't two separate versions.  There was

23    one that evolved into this.

24         Q.     I see.  There was a working version.

25    At one point, it didn't have mention of Clear

1  Channel, and at one point it did?

2      A.    And I made a mistake of leaving Tony

3  Hunter's name in here.

4      Q.    Okay.  So do you recall when it was

5  that you drafted the first, or the version that,

6  the working version that didn't include Clear

7  Channel Entertainment.  I'm sorry.  Strike

8  that.  Let me ask a better question.

9      Do you recall when it was that Mr. Corrente

10  first asked you to start drafting a business

11  plan?

12      A.    About the time he incorporated.

13      Q.    All right.  He incorporated in

14  November --

15      A.    Correct.

16      Q.    -- 2004.  So it wasn't before that, at

17  the time you were scouting the events in

18  September, or?

19      A.    Not that I can recall.  There wouldn't

20  have been a need for it then.

21      Q.    Well, what did he tell you was the

22  need for it?

23      A.    That he wanted to have it as part of

24  the business plan for the working corporation.

25      Q.    Okay.  So your understanding was that

1    it wasn't until the company was formally

2    incorporated that it really made sense to do up

3    a business plan?

4         A.    Correct.

5         Q.    Okay.  Did you ever show this Exhibit

6    7 to any banks, or financial institutions of any

7    kind?

8         A.    Did I?

9         Q.    Yeah.

10        A.    No.

11        Q.    Do you know if anybody on

12   WrestleReunion's behalf did?

13        A.    I have no idea.

14        Q.    Okay.  As far as you know, it was not

15   shown to any banks or financial institutions?  I

16   mean nobody had ever told you that?

17        A.    Correct.

18        Q.    Okay.  Do you know if it was ever

19   shown to any potential investors?

20        A.    I have no idea.  I do not know.

21        Q.    Okay.  Did you ever show this to

22   Mr. Attanasio?

23        A.    Did I?

24        Q.    Yeah.

25        A.    No.

1    Q.    Do you know if Mr. Corrente did?

2    A.    I don't know.

3    Q.    Okay.  Other than, other than you or

4  Mr. Corrente, would there have been anybody else

5  who would have been authorized to show the

6  business plan to anybody, that you know of?

7    A.    Not that I know of.

8    Q.    Was there anybody who was like a

9  finance guy, or a stockbroker type guy, or

10  anybody along those lines, that you are aware

11  of, you know, engaged to do anything with the

12  business plan?

13    A.    No.

14    Q.    Okay.  Were there any, any discussions

15  about hiring somebody like that?

16    A.    No.

17    Q.    All right.  So can you tell me

18  anybody, other than yourself and Mr. Corrente,

19  that you know of, who has reviewed the business

20  plan, or to whom WrestleReunion showed it?

21    A.    Greg Herbert.

22    Q.    What about your lawyers?  You've got

23  Mr. Rodems here.

24    A.    The both of you.

25    Q.    Okay.  And that's it, as far as your

1 knowledge?

2  A. Correct.

3  Q. Okay.  You have drafted business plans

4 prior to this one, I take it?

5  A. A couple.

6  Q. Okay.  Who did you draft before, what

7 entities?

8  A. IWA Championship Wrestling.  And

9 Warrior Sports.  Though they were never

10 finalized, or put to use for any purpose.  Just

11 practiced doing one.

12  Q. Okay.  About what time frame,

13 year-wise, did you draft for IWA Championship

14 Wrestling?

15  A. 1989.

16  Q. Okay.  And how about for Warrior

17 Sports?

18  A. 1996.

19  Q. Okay.  Probably a stretch, but by any

20 chance, did you use the one that you had drafted

21 for Warrior Sports as a template or a starting

22 point for this one?

23  A. No.

24  Q. All right.  Did you use some other

25 document that you got from somewhere, as a

114

1    starting point or a template for this?

2        A.    Yeah.  WWE's.

3        Q.    Okay.  Did you get that off the

4    Internet or?

5        A.    Correct.

6        Q.    All right.  So, then, the sort of the

7    format of it, or the heading, like the 1.1

8    objectives, 1.2 mission, those were the headings

9    taken from the WWE business plan?

10       A.    That's the template I used; correct.

11       Q.    Okay.  How about the numbers that are

12   in there, the financial projections:  Were those

13   based, in part, on the WWE financial projections

14   in their business plan?

15       A.    After doing extensive research on the

16   Internet, other organizations involved in

17   professional wrestling, it was determined that

18   they were, as you said, the gold standard, and

19   Sal and I had conversed about what realistic

20   expectations we could put together, as to what

21   our company, with our experience, and the talent

22   pool we had available could possibly achieve.

23   We concluded that it could be a realistic

24   expectation to generate somewhere between 5 and

25   10 percent of the numbers that the WWE was

1   doing.  Not half, not 60 percent, not 2/3rds.  5

2   to 10 percent.  That's what these numbers are

3   based on.

4        Q.    Okay.  So what I want to ask you is,

5   it sounds like -- I want to ask you what was all

6   the source materials that you used to come with

7   these numbers.  What you are telling me so far

8   is your prior background and experience,

9   Mr. Corrente's prior background and experience,

10  Internet research on the wrestling industry, in

11  general.

12       A.    At this time.

13       Q.    Or at the time it was drafted.

14       A.    I started in professional wrestling

15  1976, 32 years ago.

16       Q.    Do you remember what websites or

17  resources you reviewed, to come up with these

18  numbers that are here?

19       A.    Just did a Google search.

20       Q.    Do you remember what you found as a

21  result of that search?

22       A.    No, I do not.

23       Q.    These numbers, is it pretty much a

24  straight 5 to 10 percent of WWE's numbers on

25  their business plan?

 1          A.    It is exactly that.

 2          Q.    Okay.  All right.  So, let's, turning

 3     to section 6.0, which is the financial

 4     projections.

 5          A.    Right.

 6          Q.    Let's back up, and go to section 5.2,

 7     the sales forecast.

 8          A.    Okay.

 9          Q.    It says there quote:  "There are

10     multiple sources and layers of potential revenue

11     for each WrestleReunion event, ranging from --

12     and I am going to insert numbers here.  1.

13     Admissions at the live gate.  2.  The

14     souvenirs.  3.  Concessions sold there.  4.

15     Sponsorship programs.  5.  Advertising in the

16     program book.

17          Is that what you considered to be the five

18     potential sources or layers of revenue for

19     WrestleReunion?

20          A.    If you continue reading on the back,

21     end, there will be the events will be

22     videotaped, to be made available on delayed

23     pay-per-view, distributed for both domestic and

24     international television, and each event would

25     be packaged in a series of DVD's that will be

```
 1    marketed, sold world-wide.

 2         Q.    Sure.  What I meant to ask you was for

 3    the live event side of it, those five different

 4    sources of revenue, are those the five sources

 5    revenue that you thought would be available to

 6    WrestleReunion, as a live event?

 7         A.    At that time.  There were other

 8    sources, including sold events, where we would,

 9    like boxing, get a fee, a site fee to bring the

10    event there, and promote the event from this

11    casino, or that casino, the way boxing does.

12         Q.    That was a potential source of

13    revenue?

14         A.    Correct.

15         Q.    You didn't mention that in the

16    business plan.

17         A.    No, not in this particular time.

18         Q.    Were there others you were going to

19    mention?  I didn't mean to cut you off there.

20         A.    Were planning on forming a talent

21    agency to represent and book out wrestling

22    talent that was not under contract to WWE.

23    There's a huge, every weekend, celebrity

24    autograph signing sessions and conventions going

25    on around the country, where they come in for
```

1    two or three hours at a time, sign, leave, and

2    it's a substantial source of revenue for old

3    movie stars, actors, wrestlers, and celebrities

4    of any sort, and we had a unique entree to the

5    talent.  And with the reputation that we had, it

6    would have been very easy for us to do that, and

7    have it as an ongoing entity, as Steve Sterling

8    said, for long after you're gone.

9        Q.   All right.  But you ultimately didn't

10   do that for the 3 WrestleReunion events that

11   were put on; correct?

12       A.   No, we did not.

13       Q.   And as far as these four of five

14   sources of revenues, the only source of revenue

15   that WrestleReunion ever realized, in reality,

16   were ticket sales admissions at the live gate.

17   The first source listed there; correct?

18       A.   Due to restrictions of our ability to

19   pursue the others; correct.  We assigned those

20   rights to Clear Channel.

21       Q.   We're talking about one is admissions

22   at the live gate?

23       A.   Correct.

24       Q.   Now, WrestleReunion clearly made some

25   revenues that flowed from ticket sales.

1      Admission of live gate can be shortened into

2      ticket sales.

3           A.   Correct.

4           Q.   And the second avenue there, I guess

5      second source or layer -- let me back up and ask

6      you.

7           This language, the first section 5.2.  Was

8      that something copied out of a, cut and pasted

9      and copied out of the WWE business plan, or is

10     that something you came up with on your own?

11          A.   I came up with that on my own.

12          Q.   Okay.  So the second source of revenue

13     listed there was the souvenirs.  WrestleReunion

14     never realized any revenue from any souvenirs;

15     correct?

16          A.   Correct.

17          Q.   And then the next one is concessions

18     sold there.  I don't recall, but I seem to

19     recall WrestleReunion didn't receive any actual

20     dollar revenue for any concessions or vendors at

21     the live event; is that correct?

22          A.   In these venues, the house retained

23     concession rights.

24          Q.   Okay.  So this business plan

25     envisioned a separate type of venue than what

1        WrestleReunion was actually staged in?

2            A.      Ultimately, or negotiating those

3     rights into the rental agreement for each new

4     facility.   I mean the WWE goes to do a show in a

5     building, they pay 30 to 35 percent of their

6     concessions and souvenir rights to the house, as

7     a percentage, for allowing them to sell their

8     stuff inside the house.   It's even higher, if

9     the house provides the staff to do that.

10          Those are all things that are negotiable

11    with each building, and based upon your needs to

12    do that.

13          We envisioned there are companies who would

14    license the dolls, and T-shirts, and posters, of

15    either licensing them out and retaining our

16    licensee or percentage of sales, and eliminating

17    the vendors that were WrestleReunion, selling

18    other people's products, like the WWE does, so

19    it's just our staff selling our licensed

20    material, but you have to establish the brand to

21    do that.

22          Q.      Okay.   And tell me if I'm wrong, but

23    this concession sold there, I think generally

24    was referred to yesterday, or in prior

25    testimony, as vendor revenue?

1          A.    Concessions, in my term, is food and

2     beverage.

3          Q.    Okay.

4          A.    And the house had the rights to do

5     that, and they set up a hot dog stand and sold

6     some sodas, and sandwiches, and, perhaps, some

7     beer, and they kept all percentages of that.

8     Had we been the WWE, we could have demanded a

9     percent of that, of the parking.

10         Q.    Sure.   Because it's such a big draw,

11    the house is going to make so much money off of

12    it?

13         A.    Correct.

14         Q.    They're willing to negotiate a

15    percentage?

16         A.    Exactly.

17         Q.    But then WrestleReunion, the three

18    live events that were held, never generated any

19    revenues based on concessions sold at the

20    venues; correct?

21         A.    Correct.

22         Q.    Okay.   And then the next source there

23    is sponsorship package, as a potential source or

24    layer of revenue.   WrestleReunion never

25    generated any revenues for sponsorship packages;

1    correct?

2        A.    There were some ads in the program

3    books.

4        Q.    Okay.  I'm talking about paid dollar

5    sponsorship.

6        A.    There were paid ads in the program

7    book.

8        Q.    Okay.  I think that's the next one

9    there.  I think we're talking two different

10   things.  The first one --

11       A.    Sponsorship.

12       Q.    Sponsors for the event itself is what

13   I assume that refers to?

14       A.    We did tradeout sponsorships on the

15   first few events, with radio stations,

16   publications, who helped advertise and promote

17   our event in their town, in exchange for

18   promotional consideration.  We gave them some

19   tickets to give away.  We let them set up --

20   ESPN is a good example -- at our event.  They

21   did live broadcasts  from there, they

22   interviewed the stars, they cut their own great

23   commercial for the event, and played it on heavy

24   rotation for a couple of weeks leading up to the

25   event.

1      I mean as big as Clear Channel is, it's

2   certainly a plus on your side to have ESPN

3   involved in your promotion of an event, as a

4   presenter of the event as well.

5      Q.    Sure.  I guess my question was just, I

6   understand there were some tradeouts where

7   WrestleReunion traded something of value, in

8   order to get some sponsorship.

9      A.    Correct.  Had we, let me add last

10   thoughts on that subject.  Had we had a time

11   frame in which our product was going to be on

12   television, then our sponsors would know their

13   banner, their ad, their whatever it may be,

14   would be seen in these markets, at this time, on

15   this date, and there would have been a

16   substantial value to that.  Because our product

17   was never committed to television, we didn't

18   have that benefit to offer to our sponsors, but

19   it was something we had every reason to believe

20   would be there for the future, as a steady

21   source of income.

22      Q.    Okay.  And my question is, though,

23   that other than tradeouts, WrestleReunion never

24   received any actual dollars paid revenue from

25   any sponsors at any time, correct, that you're

1    aware of?

2       A.    I partially consider the vendors part

3    of the sponsorship package because the vendor,

4    someone created an official WrestleReunion

5    cigar.  He paid us for that.  He paid us for the

6    booth to set up to sell that.  Is that not

7    revenue?  Is he not a sponsor?

8       Q.    Well, let's separate out vendors.  I

9    mean you tell me.  You wrote this.  You consider

10    that to be a sponsorship package?

11       A.    Yes.

12       Q.    Okay.

13       A.    Because in the vendor agreement, it

14    said what it was they were getting for the

15    dollars they were giving to us.

16       Q.    Okay.  So other than the cigars, are

17    there any other examples where WrestleReunion

18    got paid actual dollars for any form of

19    sponsorship or sponsorship package?

20       A.    Every vendor table was a source of

21    revenue.

22       Q.    Okay.  Do you know --

23       A.    I consider every vendor a sponsor of

24    the event, a participating sponsor.

25       Q.    Okay.  Do you know roughly what the

1   total dollar amount that the vendors paid to

2   WrestleReunion?

3       A.    I don't know off the top of my head,

4   but I'm sure it shows up on the data sheet.

5       Q.    Let's just see.

6           MR. RODEMS:  Let me know when would be

7       a good place to take a break.

8           MR. HERBERT:  Right now is fine.

9           (Short break from 1:02 to 1:23 p.m.)

10  BY MR. HERBERT:

11      Q.    The primary objective of

12  WrestleReunion was to produce and promote the

13  world's biggest and best pro wrestling fan

14  conventions; correct?

15      A.    Correct.

16      Q.    Okay.  And the -- okay.  Going back to

17  the sources of revenue.  I think we left off,

18  the last one listed here in section 5.2, which

19  is on my page 8.  I'm not sure.  Your version

20  may be a different, but it's section 5.2 where

21  it's talking about is advertising in the program

22  book.  Do you know if WrestleReunion ever

23  realized actually any dollar revenue for

24  advertising in any program books?

25      A.    Yes, we did.