1      Q.    Okay.  Do you know, roughly, how much?

2      A.    No, I do not.

3      Q.    All right.  Looking at this Exhibit

4  number 10, in the income section, the only thing

5  I see listed in the income section in this

6  Exhibit 10 for each of the events appear to be

7  ticket sales in some form or another.  Some of

8  them are multiday passes, or tickets for a

9  particular event within the event.  But you

10  mentioned some sponsorship revenue, I think, for

11  cigars, and now you mentioned some advertising

12  revenue for advertising in the program.  Do you

13  know why that revenue isn't reflected in this

14  Exhibit 10?

15      A.    No, I do not.

16      Q.    Okay.  I'm sorry if I asked you this.

17  Do you have any rough idea as to whether that

18  amount was more or less than $5,000?

19      A.    Total, or per show?

20      Q.    Yeah, total or whatever way you

21  remember it.  If you break it down per show,

22  that's fine.

23      A.    I don't recall what it was, but I'm

24  sure it's reflected on my data sheets.

25      Q.    Okay.  And do you have a recollection

1      was the total more or less than 5,000?

2          A.     I don't know.

3          Q.     It wasn't more than $50,000 total?

4          A.     Definitely not.

5          Q.     Okay.  Other than the cigars that you

6      mentioned, were there any other sponsorship

7      arrangements that you know, that resulted in

8      actual dollars being paid to WrestleReunion?

9          A.     I consider every vendor a sponsor.

10         Q.     Okay.

11         A.     And there were other advertisements in

12     the program books.  They were sponsors?

13         Q.     Let me ask about that.  I actually

14     have never seen any program books either, I

15     don't believe.  I've seen some promotional

16     sheets or press releases, I believe.  I don't

17     think I've seen a program book.  For

18     WrestleReunion 1, was an actual program book

19     prepared?

20         A.     Kind of looks like the last two pages

21     of what I saw in here pretty much looked like

22     the program we distributed.  Listed the

23     activities and breakdown, the time, and the

24     place, and the hours, and who was involved.

25         Q.     Your version is different than mine.

1          A.     This.

2          Q.     Does yours like this on the first

3     page?  Yeah, I think it does.  Can I look at

4     that one?

5          A.     I created this document on --

6          Q.     This is the last two pages of Exhibit

7     number 10, that's a program book.  At the top, I

8     see there is some handwritten notation that says

9     WrestleReunion 2 program.

10         A.     That's wrong.  No, that's Valley

11    Forge.  So, yes, that's correct.

12         Q.     Okay.  So these two pages constitute

13    the program book for WrestleReunion 2?

14         A.     There were more pages.  There were

15    some inserts.

16         Q.     Okay.  These are the pages that you

17    created?

18         A.     Yes.  I believe the actual program

19    book for WrestleReunion 2 was a full-sized

20    letter, same kind of thing you get at a Bucs

21    game.  I think they just took this information,

22    and transferred it to the actual book.  This is

23    more the format for WrestleReunion 1, even

24    though it does say 2.

25         Q.     Okay.  Well, the event that's

1      referenced in the last two pages appears to be

2      --

3          A.   2.

4          Q.   -- the event 2, the talent.

5          A.   And the schedule.

6          Q.   Right.

7          A.   That doesn't have the ads.

8          Q.   Okay.  Do you recall how big was the

9      program book for WrestleReunion 2?  How many

10     pages, roughly?  I mean six pages?  Eight pages?

11         A.   They go in increments of four.  1 to

12     16 pages would be my best guess.

13         Q.   Okay.  And is your understanding that

14     some of the advertising in that program book was

15     actually paid for, dollar paid for, not a

16     trade-in paid for?

17         A.   Correct.

18         Q.   How about for WrestleReunion 1?  About

19     how big was the program book?

20         A.   Eight pages, I guess.

21         Q.   Was there some actual dollar paid

22     advertisement in that program book?

23         A.   Some.

24         Q.   Okay.  Do you remember any of the

25     bigger advertisers?

1       A.      No, I don't, but I do know, I do

2   remember there were people who specifically

3   wanted the back page, as with any program book,

4   or any newspaper.  The back page and the inside

5   covers all have more value than ads placed

6   within the content of the thing.

7       Q.      Okay.  Do you remember any specific

8   advertiser at all?

9       A.      No, I do not.

10      Q.      Okay.  Who was in charge of procuring

11  advertisement in the program book?

12      A.      Sal or I.

13      Q.      Okay.  Do you remember if you actually

14  did procure some advertisement for those books?

15      A.      Yes.

16      Q.      Okay.  Do you remember for which

17  event, or all three, or?

18      A.      The first two.  We didn't have a book

19  for 3.

20      Q.      Okay.  All right.  I'll probably be

21  sending a follow-up request for program books.

22  I assume that whatever you had was turned over

23  to counsel.  You still had program books in your

24  possession?  Do you still have them now in your

25  possession?

1      A.    No, I do not.  And I don't know that I

2  turned them over to counsel either.

3      Q.    Okay.  I'll send him a follow-up

4  request, and we'll deal with it.

5      Do you know if -- who was it who, let's say

6  once your relationship with Clear Channel

7  soured, who would have been the person who

8  primarily kept most of the paper or hard copy

9  documents related to WrestleReunion?

10      A.    Me.

11      Q.    Okay.

12      A.    Can you give me an official date when

13  it soured?

14      Q.    I'm just saying when the dispute

15  arose, when you knew it wasn't going to go

16  forward with them?

17      A.    You know what?  We didn't know

18  officially until New York.  We had a meeting

19  October 27th, in which we were assured it was

20  going forward.

21      Q.    So with the paper files, I mean did

22  you ever throw away or destroy any of the paper

23  files --

24      A.    No.

25      Q.    -- related to WrestleReunion?

1          A.    No.

2          Q.    And so copies of all the materials in

3     your paper files, do you still have that in your

4     home, the originals, I guess, or you still have

5     the file?

6          A.    They are either in the home in Ocean

7     Ridge, or in a storage shed in Sarasota.

8          Q.    Okay.  And have you provided copies of

9     the hard copy paper materials to counsel for

10    WrestleReunion?

11         A.    Of what?

12         Q.    Of the paper, your paper files related

13    to WrestleReunion.

14         A.    Primarily the paper files in existence

15    are copies of the talent contracts.  Everything

16    else that was generated originally on the

17    computer, I did not necessarily keep hard copies

18    of, but I retained the computer file, which I

19    have provided to counsel.

20         Q.    Okay.  And I understand you provided

21    everything on your, that you had on your

22    computer.

23         A.    Correct.

24         Q.    Computer form, and electronic form --

25         A.    Correct.

1       Q.    -- is a little easier to download and
2    put it on a disc.  What I'm getting at is -- and
3    I'm not suggesting that you had to do this.  I'm
4    just asking if you did -- did you ever go back
5    and dig through your paper file, in order to
6    gather material in connection with, you know,
7    any, responding to any request for this lawsuit
8    at any time?
9       A.    Yes.
10      Q.    Okay.
11      A.    I personally took all the paperwork
12   that we had, in three different binders, went to
13   a Kinko's type place and manually generated
14   copies.  Two additional sets.  One for counsel,
15   one for you, I presume, or one for me, one for
16   Sal, one for counsel.
17      Q.    Okay.  Do you remember if the copies
18   or duplicates of the program books were in that
19   file, when you did that?
20      A.    I doubt that they were.  These were
21   actual documents, as opposed to brochures,
22   posters like the one we gave you yesterday, that
23   sort of thing.
24      Q.    They are more like business files, or
25   --

1      A.    Yes.

2      Q.    -- records, business records?

3      A.    Yes.

4      Q.    Okay.  So as far as any types of

5   receipts, let's say credit receipts, or any

6   other receipts for any of the expenses related

7   to WrestleReunion, would you generally have been

8   the person who would have maintained a file of

9   any receipts --

10      A.    No.

11      Q.    -- or expenses?

12      Okay.  Who would, if anybody?  Was there

13   anybody who receipts were forwarded to?

14      A.    Forwarded to?  I think they were kept

15   by the person who initiated the transaction,

16   which would either be Sal or Tony.

17      Q.    And then how was it conveyed to you

18   for your sort of expense ledger?

19      A.    Verbal.

20      Q.    Okay.  Okay.  So, generally, you

21   didn't actually see the receipt.  They told you

22   what they spent, and you put that down?

23      A.    Correct.

24      Q.    Okay.  Did WrestleReunion reimburse

25   personally Mr. Attanasio or Mr. Corrente for

1    expenses that they, let's say, charged on their

2    own personal credit card?

3        A.    I personally have no idea.

4        Q.    Okay.  You didn't have check-writing

5    authority for the company?

6        A.    Correct.

7        Q.    Okay.  Were you ever personally

8    reimbursed for expenses that you incurred or

9    charged on your own credit card?

10       A.    Yes.

11       Q.    And how were you reimbursed?  In what

12   form?  Was it cash, or was it a check, or was

13   it --

14       A.    Usually cash.

15       Q.    Okay.

16       A.    More often than not, when it was known

17   that there would be an expense involved, a

18   credit card or cash would be available to cover

19   it up-front.

20       Q.    Okay.  Was there a company credit

21   card, a WrestleReunion credit card, or was it

22   Mr. Corrente's individual credit card number

23   that was used for expenses?

24       A.    I don't know who it was, or what form

25   it was in, to tell you the truth.  I don't

1      recall.

2            Q.    Okay.

3            A.    I didn't have a WrestleReunion credit

4      card.

5            Q.    Okay.  You didn't hear Mr. Corrente,

6      or Mr. Attanasio, or anybody else say that they

7      were using the WrestleReunion credit card at any

8      time?

9            A.    No

10           Q.    Okay.  When we were talking about the

11     section 5.2 of the business plan, in addition to

12     these five general categories listed in that

13     first sentence 5.2, I believe you also mentioned

14     two other potential sources of revenue.  One

15     being the talent agent, a talent agency that

16     WrestleReunion contemplated forming at some

17     point in the future.

18           A.    Correct.

19           Q.    And, just for the record, no talent

20     agency was ever formed; correct?

21           A.    No.

22           Q.    And the other form you mentioned, I

23     don't think I have it right.  I wrote down ring

24     fee.  I think you called it something else.

25           A.    Site fee.

1        Q.   Am I correct that no site fees were

2    generated and paid to WrestleReunion, the

3    company?

4        A.   Correct.

5        Q.   Okay.  Let's go to section 6.12, which

6    is on the next page.  The last section of

7    section 6.2 Says quote, and I'm sorry, it's,

8    yeah, the last sentence of section 6.2 says

9    quote:

10       "Thus an investment of $350,000 brings a

11   return of $420,000, plus the first right of

12   refusal to participate in future events".

13       Did you write that your on your own, or is

14   that something that was borrowed from another

15   existing business plan or document?

16       A.   No, I did it on my own.

17       Q.   Were you the only person who came up

18   with those numbers that are there?

19       A.   Yes.

20       Q.   Okay.  And do you know if anybody

21   relied on those?  Well, you've already said

22   nobody saw it except you, and me, and

23   Mr. Corrente, to your knowledge.  So I assume

24   you don't know of anybody relying on those

25   numbers that were put forth in that sentence.

1        A.    Correct.

2        Q.    What did you base those numbers on,

3    and how did you come up with them?

4        A.    They were just a working example, with

5    a reasonable interest rate, if and when we

6    should ever get to a point of wanting to pursue

7    investors.

8        Q.    Okay.  Let me ask you, do you know --

9        A.    Looks, to me, to be 20 percent.

10        Q.    Over what period of time?

11        A.    Doesn't say -- or does it?

12        Q.    No.  That's why I'm asking you.

13        A.    It doesn't say.

14        Q.    Okay.  Do you know if anybody from

15    WrestleReunion ever showed any type of document

16    to Mr. Attanasio, in order to seek his

17    investment?

18        A.    I do not know personally.

19        Q.    You personally weren't involved, in

20    any way, in procuring the investment from

21    Mr. Attanasio?

22        A.    Correct.

23        Q.    Okay.  Were you personal friends with

24    Mr. Attanasio before WrestleReunion?

25        A.    Never met him until Tampa.  He's a

1     good guy.

2          Q.     I'm sure.  Do you, since the

3     WrestleReunion event, have you personally had

4     any other business dealings with -- let's start

5     with Mr. Attanasio, outside of WrestleReunion?

6          A.     No.

7          Q.     Okay.  And how about Mr. Corrente?

8          A.     Since WrestleReunion?

9          Q.     Yeah, I am saying aside from the

10    WrestleReunion project, have you had any other

11    ventures, business dealings?

12         A.     Since then?

13         Q.     Yes.  Starting from whenever you, you

14    know, first got involved.  I guess you said it

15    was in September of 2004.

16         A.     That's for the WrestleReunion.  I have

17    known him a lot longer than that.

18         Q.     Since that time, did you have any

19    projects with him, other than WrestleReunion?

20         A.     Yes, I sold him a half interest in IWA

21    Championship Wrestling.

22         Q.     Okay.  When was that?

23         A.     This year.

24         Q.     2008?

25         A.     Yes.

1          Q.    All right.  Were there documents that
2    reflected that transaction, or was it an oral
3    transaction?
4          A.    I wrote up an agreement.
5          Q.    Okay.  And did you both sign it?
6          A.    Yes.
7          Q.    Anybody else sign it?
8          A.    No.
9          Q.    Okay.  And I'm sorry.  IWA
10   Championship?
11         A.    Championship Wrestling.
12         Q.    Is that an organization that you
13   formed?
14         A.    Yes.
15         Q.    Okay.  So do you own the other half?
16         A.    Yes, I do.
17         Q.    Okay.  Are you, other than the sale
18   you made to Mr. Corrente, are you currently
19   realizing any revenue from, let's just call it
20   IWA, if that's okay with you?
21         A.    No.
22         Q.    Okay.  What, if anything, does IWA do
23   now?
24         A.    There had been a series of DVD's
25   released, and there is some interest from the

1       WWE in purchasing the library.

2            Q.    Okay.   What's the -- let's get into

3       that a little bit.   WWE expressed interest in a

4       transaction with IWA?

5            A.    With me.

6            Q.    Okay.

7            A.    For the IWA library.

8            Q.    Okay.   And other than you and

9       Mr. Corrente, are there any other owners of IWA

10      currently?

11           A.    No.

12           Q.    Okay.   Approximately what month this

13      year was that half interest sale consummated?

14           A.    February.

15           Q.    So about the time that you moved in

16      with Mr. Corrente?

17           A.    Correct.

18           Q.    When was it that WWE expressed

19      interest in that library?

20           A.    It's been an ongoing back and forth

21      for about two years.

22           Q.    So that interest that WWE expressed,

23      the first time they expressed it was after

24      WrestleReunion had sort of come to an end, or

25      was it while WrestleReunion was still --

1        A.    I believe it was sometime in the

2    Summer of 2006.

3        Q.    Okay.  And the content o the IWA --

4    prior to selling the half interest to

5    Mr. Corrente, were you the sole owner of IWA?

6        A.    Correct.

7        Q.    All right.

8        A.    In the beginning, when it was formed

9    in 1989, I had a partner named Wally Karbo.

10       Q.    Did you buy him out at some point?

11       A.    He died.  Wally was the founder of the

12   AWA, with Verne Gagne.  That's the only

13   participant that's ever been involved.

14       Q.    And after Wally died, did you inherit

15   or assume his other half interest?

16       A.    Correct.

17       Q.    What year was it that he died?

18       A.    '91, '90.

19       Q.    Okay.  So since '91 until February of

20   2008, you have been the sole owner of IWA?

21       A.    Correct.

22       Q.    And the first time that WWE expressed

23   any interest in the library was the Summer of

24   2006?

25       A.    First official contact, yes.

1   Q.  Okay. Was it the same gentlemen,

2 Mr. Hart and Mr. Ross, or somebody else?

3   A.  No. They have an actual in-house

4 procurement department. I don't remember the

5 name of the woman off the top of my head, but

6 that's her full-time job is to buy up

7 intellectual properties and video libraries.

8   Q.  Okay. Has WWE made an actual offer of

9 any kind, oral or written or?

10   A.  A couple of times, yes.

11   Q.  Okay. How many tapes are in this

12 library that WWE is interested in?

13   A.  29 hours of broadcast-quality

14 television wrestling.

15   Q.  Okay. When was it taped or filmed,

16 roughly. I mean what time period?

17   A.  '90, '91, '92.

18   Q.  And what talent or performers feature

19 in it? Who are the bigger names?

20   A.  The bigger names were many WWE former

21 stars. Chief Jules Strongbow, Hillbilly Cousin

22 Luke, Ivan Koloff, Junkyard Dog. Shall I keep

23 going? Wendi Richter. I've always -- I don't

24 mean to be wasting your time educating you.

25 I've always felt you must have marquee names to

1    attract interest of the television and the

2    fans.  Some people believe in generic

3    wrestling.  I believe in headliners.

4        Q.    A lot of the talent that was in this

5    IWA library from 1990 to '92 also performed at

6    the WrestleReunion event?

7        A.    Some, yes.

8        Q.    Okay.  And so has WWE actually made a

9    firm offer to purchase the library?

10       A.    Yes.

11       Q.    Did they offer to purchase it, or did

12   they just want to license it for temporary use,

13   or do they want to own it outright?

14       A.    They want to own it outright.

15       Q.    And are you currently contemplating

16   accepting the offer?

17       A.    I turned it down.

18       Q.    Okay.  How many times did they make

19   the offer?

20       A.    Twice.

21       Q.    Same amount, or increased the amount?

22       A.    Increased.

23       Q.    Okay.  You're waiting for a better

24   offer?

25       A.    Absolutely.

1          Q.    Okay.  Have any other offers from
2     anybody else?
3          A.    There's been a few probes, but nothing
4     that went to serious submission of a formal
5     offer.
6          Q.    Okay.  Did they offer not high enough,
7     in your estimation, in terms of the value of
8     content of the library?
9          A.    Correct.
10         Q.    Who taped the footage for that
11    library?
12         A.    Who taped it?
13         Q.    Yeah, who film it?  You said it was
14    television --
15         A.    I produced it.
16         Q.    You produced the audiovisual side of
17    it?
18         A.    Correct.
19         Q.    Did you also produce the live event
20    side of it?
21         A.    Correct.  And I hired the production
22    company to do it, and paid them to do it.
23         Q.    I mean who were they, if you remember?
24         A.    Florida Mobile Video out of Bradenton,
25    Florida.  Bill Kavis.

1          Q.    Okay.  What was the amount of the last

2     offer that WWE made?

3          A.    $250 per hour.

4          Q.    So that's about $7,500 total?

5          A.    Correct.  They are one digit short.

6          Q.    That's 7,499 or something like?

7          A.    They offered 250 per hour.  When we

8     get around 2,500, we can start talking.

9          Q.    They are ten times below what you want

10    for it?

11         A.    Uh-huh.

12              MR. RODEMS:  You want that part of the

13         deposition transcript?

14              THE WITNESS:  Doesn't matter to me.

15              MR. RODEMS:  Okay.

16              THE WITNESS:  Bring it on.

17              MR. HERBERT:  That's true.  If they

18         thought you were just bluffing, now you got

19         it down on the record.

20              MR. RODEMS:  You're under oath.

21              THE WITNESS:  I don't bluff.

22    BY MR. HERBERT:

23         Q.    Well, with WWE expressing interest in

24    this IWA library, with some of the same talent

25    that appeared at WrestleReunion, hadn't the

1    thought occurred to you of, you know, turning

2    the WrestleReunion footage into a library, and

3    possibly pitching it to WWE for sale, as a way

4    of making some return on this project?

5         A.    I have no right or authority to

6    represent WrestleReunion, in pursuing those

7    types of opportunities.

8         Q.    I understand that.

9         A.    Clear Channel has those rights.

10        Q.    I understand that.  But I'm saying did

11   you ever consider that possibility?

12        A.    I believe it is Vince McMahon's desire

13   to own all quality pro wrestling video libraries

14   to put onto his 24/7 network, and to eliminate

15   competition, and I think anyone who is in the

16   wrestling business, who has a video library of

17   any kind, is aware of that.

18        Q.    Okay.  And so, then, I take it from

19   that answer, that you have at least thought of

20   the possibility of entering into a deal with

21   WWE, for the WrestleReunion footage.

22        A.    No, I have not considered that.  I

23   don't have that authority.

24        Q.    Okay.  Have you ever discussed the

25   possibility with Mr. Corrente?

1        A.    No.

2        Q.    Okay.  How about Mr. Hart?

3        A.    No.

4        Q.    The footage in the IWA library, that

5   was shot '90, '92, I assume that's not filmed in

6   high definition; correct?

7        A.    Correct.

8        Q.    Okay.  You've seen, have you seen the,

9   at least some of the footage that was shot by

10   Clear Channel of the WrestleReunion event?

11        A.    Yes.

12        Q.    Okay.  Would you agree that the

13   technical quality of the footage shot by Clear

14   Channel, let's say at least the high definition

15   portions of it, are of an objectively higher

16   quality than the footage in the IWA library,

17   just on the technical level?

18        A.    All three events are above broadcast

19   standards.

20        Q.    Okay.

21             MR. RODEMS:  What was that last

22        phrase?

23             THE WITNESS:  All three events are

24        above broadcast standards.

25   BY MR. HERBERT:

1        Q.    In other words, suitable for broadcast

2   on television?

3        A.    Correct.

4        Q.    Okay.  Based on your experience in the

5   industry, do you have any idea or estimate, I

6   assume, what WWE might offer for the library of

7   footage that currently exists of the

8   WrestleReunion footage?

9        A.    I have no idea.

10        MR. RODEMS:  Can we take just a quick

11        break?

12        MR. HERBERT:  Yeah, sure.

13   (Short break from 1:49 p.m. To 2:06 p.m.)

14   BY MR. HERBERT:

15        Q.    Just to try to finish up the WWE

16   section here, other than WWE making these offers

17   to buy your IWA library, and the meetings that

18   you had with Mr. Hart and Mr. Ross in March of

19   2005, have you personally had any other

20   businesses dealings, talks, negotiations,

21   proposals, with WWE, since the beginning of your

22   involvement with WrestleReunion?

23        A.    No.

24        Q.    All right.  Let's go to the

25   complaint.  I promised you we were going to talk

1      about that.  It's on this, it's tabbed on the

2      yellow sticker, there.  Okay.  One thing I want

3      to -- turning to page I think it starts on page

4      3, description of you and your background starts

5      of page 3, paragraph 15A, and then I think it

6      continues onto page 4.  The top of page 4, it

7      says television networks paid Mr. Russen to

8      produce and sell wrestling shows.

9              MR. RODEMS:  For the record, can you

10             tell us which document you are referring

11             to?

12             MR. HERBERT:  I'm sorry.  This the

13             amended complaint filed in court on January

14             11, 2004.

15             MR. RODEMS:  Just for the record, doc.

16             four.

17             MR. HERBERT:  For the record docket

18             number 4.

19     BY MR. HERBERT:

20             Q.    Okay.  So that sentence there says,

21     "Television networks paid Mr. Russen to produce

22     and sell wrestling shows."  Very briefly, can

23     you list for me the television networks who paid

24     you to produce and sell wrestling shows?

25             A.    Sports Channel America.

```
 1          Q.    Are they still around?

 2          A.    No.

 3          Q.    Okay.

 4          A.    Comcast.

 5          Q.    Is Comcast still around?

 6          A.    Second biggest cable company in

 7   America.

 8          Q.    Are they still called Comcast?

 9          A.    Uh-huh.

10          Q.    Okay.

11          A.    Sunshine Network, Direct TV.

12          Q.    Okay.  When was the most recent deal

13   you had with one of those networks?

14          A.    Sunshine Network did replays in around

15   2003, 2004.

16          Q.    Okay.  And, obviously, all, other than

17   Sports Channel, Comcast, Sunshine, and Direct TV

18   are all still around and very active in the

19   cable TV market; correct?

20          A.    Correct.

21          Q.    Okay.  Did you ever approach Comcast,

22   Sunshine, or Direct TV about doing the

23   audiovisual production for WrestleReunion?

24          A.    They were on my drawing board of

25   target sources, prior to getting involved with
```

1    Clear Channel.  Following the Clear Channel

2    agreement, no, I did not.

3        Q.    Okay.  What about at the time that the

4    Highspots deal was entered into, as Mr. Corrente

5    testified earlier?  Rather than going with

6    Highspots, did you ever pitch the WrestleReunion

7    idea to Sunshine, Comcast, or Direct TV?

8        A.    No.

9        Q.    Did you ever suggest to Mr. Corrente

10   that he do that?

11       A.    No.

12       Q.    Okay.  Why not?

13       A.    Well, it was not formally discussed;

14   but, in my mind, we needed to have a product in

15   hand to take a demo tape to them to entice

16   interest from anyone.  So, whether it be

17   Highspots, or ABC, or Greg Herbert who does the

18   production, we need to have a demo tape and

19   footage in the can.

20       Q.    Okay.  What did you -- I want to ask

21   you about the Highspots deal.  Is your

22   understanding that WrestleReunion entered into a

23   formal agreement with Highspots, prior to the

24   Clear Channel deal?

25       A.    I was told that we were going to, they

1     were going to videotape the performance;

2     correct.

3          Q.     Okay.  So you weren't involved in

4     negotiating or --

5          A.     No.

6          Q.     -- entering into that deal; okay.

7          A.     No, I was not.

8          Q.     Okay.  What did you think of that

9     deal?

10         A.     I'm familiar with the company; I'm

11    familiar with the equipment that they have; I've

12    seen them set up and record other events, and

13    I've seen their finished product.  It's not high

14    definition, but it's damn good.

15         Q.     They are primarily an Internet channel

16    distributor; correct?

17         A.     That's the source from which they

18    distribute the product they create.  They are a

19    wrestling, a full-time, 24/7 wrestling company.

20         Q.     Okay.  So they distribute the

21    wrestling DVD's other than through the Internet?

22         A.     I don't know where their distribution

23    outlets are.  I don't know that.  I know they're

24    total wrestling from masks, boots, outfits,

25    rings.  Anything wrestling-related, they are

1    in.   That's all they do is wrestling.

2         Q.    Okay.  Maybe you can tell me a little

3    bit more about them.   The masks, boots, rings,

4    and everything.   Do they rent that equipment

5    out?  Do they sell it?

6         A.    They sell it.

7         Q.    They don't manufacture it themselves?

8         A.    I think they do.

9         Q.    Okay.

10        A.    They either manufacture it or

11   wholesale it.

12        Q.    I mean costumes, too?

13        A.    Yes.

14        Q.    Had you ever done any deals with

15   Highspots, prior to WrestleReunion?

16        A.    No formal deals.   There had been some

17   tentative discussion with them about repackaging

18   my IWA tapes.   But they wanted to go on straight

19   split on percentages of units sold.   I was

20   looking for cash.

21        Q.    Okay.  In other words, the deal that

22   Highspots proposed to you for the IWA library,

23   you would have only made money, based on if they

24   made money, and a split of revenues they

25   received?

1          A.      Correct.

2          Q.      Okay.  And that's same deal that

3     they've made with, generally, with

4     WrestleReunion; right?

5          A.      I don't know that first-hand.

6          Q.      Okay.  Was that your understanding

7     generally, though?

8          A.      From what I heard here, yes.

9          Q.      Okay.  So Mr. Corrente didn't consult

10    with you, prior to making the arrangement with

11    Highspots?

12         A.      He had no obligation to do that, so

13    no.

14         Q.      Okay.  Were you surprised when you

15    heard that he made that arrangement with

16    Highspots?

17         A.      Not at all.

18         Q.      I mean did you offer any input on

19    other possible distribution channels that he

20    might have wanted to pursue?

21         A.      No.

22         Q.      Okay.  At any point in the

23    WrestleReunion project, from beginning to end,

24    to today, let's say, did you ever contact

25    Sunshine -- is it Sunshine Network?

1          A.     Yes.

2          Q.     Sunshine Network?

3          A.     In Orlando.

4          Q.     Did you ever contact Sunshine Network

5     about any involvement in the WrestleReunion

6     project?

7          A.     As I said earlier, to approach any

8     network requires a demo package.  We had no

9     access to fully edited material that could be

10    submitted for their consideration; and,

11    secondly, in my mind, we had no rights to pursue

12    that.  We granted those rights to Clear Channel.

13         Q.     I understand.  I'm just asking did you

14    ever propose -- let's, the first part of your

15    answer was you didn't -- at some point you saw

16    the final package and edited and shoot

17    interviews, correct, the four of them?

18         A.     Shoot interviews would not work on

19    standard cable outlets or broadcast outlets

20    because of foul language.  If properly edited,

21    they would be ideal on A&E as biographies, but

22    they would have to beep out.  Because they'd

23    want it to be as natural as possible.  Because

24    the wrestlers expose their emotions, and there

25    is some language in there that would be not

1    suited for family viewing.

2         The matches themselves, I've seen never seen

3    the final edit on those.

4         Q.    You've seen the final edit on the

5    shoot interviews though.

6         A.    Four.

7         Q.    On the four shoot interviews that were

8    finalized; okay.  What did you think of those

9    shoot interviews?  Let's say the technical

10   aspects of them.

11        A.    They were great.  Why wasn't the rest

12   of the stuff released like that?  We could have

13   made some money.

14        Q.    I asked you about Sunshine.  Let me

15   ask you, Comcast, I mean would your answer be

16   the same that unless you had a final product,

17   non-shoot interview product, there wouldn't be

18   any point in pitching to Comcast?

19        A.    In my opinion, in my world of

20   experience, it's a mistake to go out

21   representing something you don't have rights to

22   represent.  You're going to -- credibility is

23   the world to me.  And saying someone I can get

24   this, when I don't have those rights, or the

25   people I'm working with don't have those rights,

1    would make you look real bad.

2        Q.    Okay.  Well, let me ask you --

3        A.    It's almost infringement of the

4    agreement.

5        Q.    I understand what you're saying.

6        Did you ever suggest to Clear Channel that

7    they approach, let's say, Sunshine Network?

8        A.    Clear Channel was not receptive to any

9    suggestions that we ever made.  They didn't want

10   to hear it.  They didn't want our help.

11       Q.    That's not true.  There's a guy named

12   Martin somebody, who you suggested that they

13   contact, and they contacted him; right?  I

14   forget his last name.

15       A.    I suggested they contacted someone?

16       Q.    WrestleReunion suggested it to him.

17       A.    Martin?  All I'm telling you is from

18   my first-hand experience, I know it's been

19   offered that Jimmy and I go to New York, help

20   them do the editing, help them do the packaging,

21   help them put the music on it, to create the

22   best possible product, and they did not accept

23   the invitation.

24       Q.    In fact, weren't there quite a few

25   problems with the music that was used during the

1    programs, regarding the rights to the music?

2        A.    No.

3        Q.    Okay.  Wasn't there music that was

4    used at WrestleReunion 1, in connection with The

5    Midnight Express.  The Midnight Express theme

6    music was played at WrestleReunion 1 that was

7    taped Clear Channel, and nobody cleared the

8    rights to that music before the tape was made?

9        A.    Does one problem constitute quite a

10    few?

11        Q.    I've got five others to go over.

12        A.    It would have been Clear Channel's

13    responsibility to do that clearing of their

14    videotaped product, as they have done for every

15    other concert video:  Motley Crew, Mariah Carey,

16    or whatever.  You've got to get clearance rights

17    before you can release that product.  But they

18    have people there who do clearance work.

19        Q.    You're saying that it's your

20    understanding that it was Clear Channel's

21    responsibility to make sure that all of the

22    intellectual property rights for the event that

23    you put on were cleared, prior to distributing

24    it?

25        A.    Other than what we were able to give

1    them ourselves, based on Jimmy Hart's wonderful

2    category of wrestling music, which we helped set

3    up that deal, and they negotiated, and they paid

4    him for the first one.  I think they still owe

5    him money for the other two.

6        Q.   Let's back up a second.  You heard

7    Mr. Corrente testify that clearing the rights

8    for whatever was going to be taped was the

9    responsibility of WrestleReunion.  Did you hear

10   Mr. Corrente testify to that?

11       A.   I believe, yes.

12       Q.   Okay.  Isn't that your understanding

13   of the way the letter --

14       A.   At that time, I thought he was talking

15   about the performance rights of the talent.  If

16   you're talking about the music rights now,

17   that's a totally different category.

18       Q.   You don't believe that was covered in

19   the IP rights provision of the Outline of Terms?

20       A.   I believe I was there, present,

21   involved in discussions when The Midnight

22   Express's music was involved and Eric Paulen

23   indicated that we would take out their theme

24   song, and insert one of Jimmy's, or completely

25   eliminate the song, prior to their appearance in

1    the ring.  It wasn't a problem at the event

2    itself, and this is the first time that I've

3    heard that it's been a problem since.

4        Q.    All right.  But to back up to my

5    earlier question, you have read through the

6    Outline of Terms that's attached as Exhibit 1 to

7    the amended complaint in this case; correct?

8        A.    Yes.

9        Q.    All right.  And isn't it your

10   understanding that in the section regarding

11   clearances, that WrestleReunion, as the

12   promoter, is responsible for all releases,

13   clearances, consents, and/or releases from all

14   third parties including, without limitation,

15   talents agents, or other necessary parties for

16   any material of any kind used in the programs?

17       A.    In my definition, from running live

18   events, that would include all talent-related

19   releases.

20       Q.    All right.  So --

21       A.    Music is a production-related, a

22   technical production-related part of this

23   agreement.  And just as Clear Channel was

24   responsible to get the cameras, and the crew,

25   and whatever, lights, they wanted music on it.

162

1    We didn't need music to wrestle.  They wanted it

2    for production value of the technical product.

3    So you tell me:  Whose responsibility was that?

4        Q.    Well, I guess what I'm wondering is

5    you're saying that your understanding of the

6    rights clearance issue is that WrestleReunion

7    was responsible for the talent, and the talent

8    releases, and then music was solely the

9    responsibility of Clear Channel.

10       A.    Yes.

11       Q.    But nobody from Clear Channel ever

12   told you that, did they?

13       A.    They never told us they wanted music

14   until the afternoon of the first show.  And,

15   fortunately, Jimmy Hart was there with a great

16   library available to provide them with what they

17   asked for.

18       Q.    Okay.  But my question was you're not

19   asserting that Mr. Sterling, or Mr. Paulen, or

20   Mr. Townley or Mr. Olejar ever said to you don't

21   worry about the music.  Clear Channel will take

22   all the responsibility for all the rights to the

23   music.  That's our job.  Along those lines?

24       A.    They asked us get the music.  They

25   didn't say get it cleared.  Provide us with

1     music.  They needed it at their instruction.  We

2     don't need -- we don't need music to wrestle.

3          Q.    Your point is they said get the

4     music.  And your understanding of the Outline of

5     Terms was that it was their responsibility to

6     get the music cleared, not WrestleReunion's?

7          A.    In actuality, performance provides a

8     track record of precedent.  They asked to get

9     the music.  We introduced them to Jimmy Hart.

10    Jimmy Hart brought in the music.  They made a

11    deal with Jimmy Hart.  Whose responsibility was

12    it?

13         Q.    All right.  The Midnight Express theme

14    music:  Who brought that music to the event?

15         A.    Midnight Express.

16         Q.    Okay.  So that's something separate

17    and distinct from Jimmy Hart's music, that was

18    used in connection with these events; correct?

19         A.    Didn't have to be used.

20         Q.    I know.  But there are two different

21    music issues that we are talking about here,

22    that, for the purpose of the record, we are

23    separating.  There was Jimmy Hart's music, which

24    there was a separate deal entered into, and The

25    Midnight Express music was something that

1   somebody else owned the copyright to, not

2   Mr. Hart.

3        A.   Correct.

4        Q.   Okay.  And Mr. Hart's music also you

5   know that Clear Channel had a lot of back and

6   forth with WrestleReunion, regarding clearance

7   for all of the songs that were provided by

8   Mr. Hart.  You are generally familiar with that?

9        A.   A lot of back and forth?

10       Q.   Well, tell me what you know about that

11  part.

12       A.   I know Eric Paulen said we need

13  music.  Jimmy Hart offered make his music

14  available, and it was done.  It was our job.  We

15  got them their music.  They made their deal with

16  Jimmy.  Simple as that.

17       Q.   All right.  Now, how about, speaking

18  of the rights issues, you are aware that WWE

19  claimed that Matt Hardy was under contract with

20  WWE and was not authorized to perform for

21  WrestleReunion; correct?

22       A.   I am aware that Matt Hardy signed our

23  agreement, prior to re-signing with WWE.  WWE

24  has a long precedent of honoring previous

25  contracts, and allowing their talent to fulfill

1    their contracts, and they granted him permission

2    to be there and perform, and he did.

3        Q.    Okay.  But understand that, initially,

4    they made a claim that he wasn't allowed to

5    perform?

6        A.    Not initially.  Initially, when he

7    signed the contract was months before the event.

8        Q.    Who was more involved in the whole

9    issue of rights clearance?  Was that you or that

10   Mr. Corrente, or somebody else in connection, on

11   behalf of WrestleReunion?

12       A.    As it pertains to talent?

13       Q.    Well, as it pertains to anything.

14       A.    Mr. Corrente.

15       Q.    Okay.  Did you review the rights

16   clearance provision of the Outline of Terms,

17   prior to Mr. Corrente signing it on

18   WrestleReunion behalf?

19       A.    Briefly, yes.

20       Q.    You reviewed the Outline of Terms just

21   briefly, prior to Mr. Corrente signing on

22   WrestleReunion's behalf?

23       A.    Yes.

24       Q.    Did you recall the discussion about

25   the different options of the, one option being

1       some up-front guarantee money, and a 35/65

2       split, and the other option being no up-front

3       money, but a 50/50 split of net proceeds?

4           A.    I think I was on a three-way

5       conversation with Steve Sterling, when this was

6       discussed.

7           Q.    It was Steve Sterling, Mr. Corrente,

8       and you?

9           A.    Correct.

10          Q.    Did you review that proposal, the

11      written proposal for the 65/35 split?

12          A.    If I did, it was very briefly.

13      Because Steve Sterling strongly recommended that

14      we don't accept that version.

15          Q.    Okay.  You've got a lot of experience

16      in the entertainment industry, generally dealing

17      with the split, and the net, and up-front money

18      versus back-end money; correct?

19          A.    Correct.

20          Q.    Did you advise Mr. Corrente on what to

21      do, in terms of making a choice between those

22      two options that were presented by Clear

23      Channel?

24          A.    I don't believe I did, no.  It was his

25      decision to make, based on the conversations we

1    were having, and the advice he was receiving

2    from Steve Sterling, in the process of

3    developing our working relationship with him,

4    which had been all positive and all strong up to

5    that point in time.

6         Q.   I understand.  But in terms of

7    advising on the split, versus money up front or

8    money on the back-end, net, versus the up-front

9    guarantee, you had more experience, in terms of

10   negotiating those deals, than Mr. Corrente; fair

11   enough?

12        A.   Correct.

13        Q.   And just so I'm clear, as far as the

14   Outline of Terms, and what it means, and what it

15   doesn't mean, I understand Mr. Corrente appeared

16   as the corporate rep for WrestleReunion.  You

17   are not currently authorized to officially state

18   what the position of WrestleReunion is with

19   regard to the Outline of Terms, or anything

20   else; is that correct?  I mean I'm asking what

21   your understanding is about things, but you are

22   not here to give me --

23        A.   I have an opinion.  It wouldn't be an

24   official WrestleReunion authorized --

25        Q.   Position?

1          A.      Position; correct.

2          Q.      Okay.  Let me ask you this:  For the

3    first WrestleReunion event that was held in

4    Tampa, you've seen Exhibit 10, and the first

5    page of Exhibit 10 appears to indicate that the

6    expenses were $236,000 plus and the income was

7    $55,000 plus.  So based on that document, it

8    looks like expenses exceeded income by about

9    $180,000.  Is that consistent with your

10   recollection of the ultimate expenses and income

11   for WrestleReunion 1, as a live event?

12         A.      I know it lost money.  I don't have a

13   solid recollection of the amount because I

14   wasn't paying it out.

15         Q.      Okay.  And you heard Mr. Corrente

16   testify that it was WrestleReunion's job, or

17   responsibility, to draw a crowd for the live

18   event, WrestleReunion 1, clearly.  Fair enough?

19         A.      It was Mr. Corrente's responsibility

20   to produce a live event.  Specifically to draw a

21   crowd?  I don't remember seeing those words in

22   anything.

23         Q.      Well, I mean WrestleReunion was the

24   promoter of the live event.

25         A.      Correct.

1        Q.    And the promoter is the one

2    responsible for trying to sell tickets to the

3    live event generally; fair enough?

4        A.    There are, and I don't mean to educate

5    you as such.

6        Q.    That's fine.  Feel free.  You

7    obviously know more about it than I do.

8        A.    There are television produced events

9    wherein the crowds are very small, and they're

10   actually paid to be there.  Are you aware of the

11   kind of money that television networks pay per

12   hour for programing these days?

13       Q.    My question is, I think you think I'm

14   going in a different direction.

15       A.    Clarify it for me.

16       Q.    What I'm getting at is WrestleReunion,

17   as a live event, the first one lost money.

18   We've established that; fair enough?

19       A.    I think we expected to.

20       Q.    Okay.  And the second one also lost

21   money as a live event?

22       A.    Less money.

23       Q.    Okay.  And, again, about $150,000?

24       A.    Great event, though.  We did our job.

25       Q.    All right.  My question was, though,

1    that it lost about $150,000; correct?

2         A.    Did we complain about that?

3         Q.    That's not my question.

4         A.    Okay.

5         Q.    My question is you understand that its

6    expenses exceeded its income by about $150,000;

7    correct?

8         A.    That's what it says, yes.

9         Q.    Do you have any reason to dispute

10   this?

11        A.    No, but I have no reason to be able to

12   confirm it either.

13        Q.    And the WrestleReunion 3 lost

14   somewhere upwards of $20,000; correct?

15        A.    That's what the paper says.

16        Q.    Okay.  Let me ask you, for

17   WrestleReunion 1, it's not your opinion that

18   Clear Channel did anything to cause

19   WrestleReunion 1 to lose money as a live event,

20   is it?

21        A.    I'm not claiming that they did.  I'm

22   claiming they did not live up to their end of

23   the product.  We did our job.  We produced a

24   show.  They did not produce the product.

25        Q.    I'm saying as far as the failure to

1      make money as a live event for WrestleReunion 1,

2      2 and 3, you're not claiming that Clear Channel

3      is responsible for that failure to make money as

4      a live event.

5           A.     I'm claiming Steve Sterling told us,

6      and I know it's not that writing, but there are

7      witnesses to everything Steve Sterling said.  We

8      would have a stream of revenue starting 90 days

9      after WrestleReunion 1, based on them producing,

10     editing, packaging, and distributing tapes.

11     pay-per-view revenue, domestic television, and

12     international television revenue.

13          Q.     All right.  Did he say that before

14     Mr. Corrente executed Exhibit 1?

15          A.     After.

16          Q.     All right.  So after the parties had

17     already signed the Outline of Terms, you're

18     saying Mr. Sterling made a representation about

19     a stream of revenue that would come to both of

20     the parties, correct, since it was a 50/50

21     split.

22          A.     He did make representations prior to

23     it as well.  He made them New Years 2004, while

24     he was set up at Times Square to film the

25     festivities.  He called me, as I was driving

```
 1       across Alligator Alley.  During the course of
 2       that conversation, his exacts words were Rob,
 3       you guys have tapped into a vein here of fans
 4       who are disenchanted with the status of current
 5       professional wrestling.  Dad will bring his
 6       wife, his mom, his kids, his grandkids, to see
 7       the stars who were the stars of his era.  What
 8       you've done will last long after you're gone.
 9           Q.   Is that a promise of actual intended
10       fact that you, personally, relied on, in
11       advising WrestleReunion to go with Clear Channel
12       as opposed to somebody else?
13           A.   Let's put it this way:  He called me;
14       I didn't call him.  They wanted the product.
15       Those were the inducements, the commitment, the
16       excitement that Clear Channel had at that point
17       in time, on which Sal agreed to go forward with
18       the relationship.  He made those same
19       representations to Sal.
20           Q.   Let me do this.  Let me ask you to
21       list for me, just so we get it clear on the
22       record, as many of the promises that you claim
23       that Mr. Sterling made that he ultimately didn't
24       keep.  Take your time.  Think about it.  I just
25       want to make sure.
```

1       A.    Oh, it's easy.  The first thing he did

2   make, and did do, he filmed the events.

3       Q.    I'm sorry?

4       A.    The first thing that he did do was

5   that he filmed all the events.  The failures

6   begin that they did not edit, did not package --

7       Q.    I wanted to ask specifically about,

8   not failures generally.  I want to talk about

9   specific promises.  There's some e-mail chat

10  where you talk about Mr. Sterling making all

11  these promises that he broke, basically, is what

12  you're saying.  What I want to do is try to

13  break it down.

14      A.    You don't want to include the

15  commitments made in the agreement?

16      Q.    Agreement or otherwise.

17      A.    Let's do both.  Let's start with from

18  the day the bell rang; okay?  We're at the

19  event, Tampa, Florida.

20      Q.    What I want to be clear is I want to

21  start with the first promise that you're

22  claiming that he made and broke.

23      A.    This event will live on long after

24  you're gone.  I planned on living a long time.

25  You will have revenue stream coming in from

```
 1    WrestleReunion 1 within 90 days.  We will
 2    have --
 3         Q.   Okay.  The first one is it will live
 4    on long after you're gone.  The second one, you
 5    meaning WrestleReunion?
 6         A.   Correct.
 7         Q.   What I want to do with each one, and I
 8    don't want to interrupt your train of thought,
 9    to avoid having to go back.  If you can give me
10    time, place, date, roughly?
11         A.   New Years Eve 2004, driving across
12    Alligator Alley at 4:15 in the afternoon.  Is
13    that specific enough for you?
14         Q.   The first one about the event living
15    on is December 31st, 2004?
16         A.   Correct.
17         Q.   Okay.  And your car, his car?
18         A.   My car.  He was in Times Square, New
19    York.
20         Q.   Okay.
21         A.   That's where he told me he was.
22         Q.   Okay.  It was a cell phone call?
23         A.   Could have been in Reno, Nevada, for
24    all I know.
25         Q.   Got you.
```

```
 1          Okay.  And that's the first one.  The event
 2    will live on long after you're gone.  The second
 3    one was?
 4          A.    Sometime in early February, following
 5    the initial taping in Tampa.
 6          Q.    February of '05?
 7          A.    Correct.
 8          Q.    Okay.  That was in-person, on the
 9    phone?
10          A.    Three-way phone conversation, I
11    believe, with Sal.
12          Q.    You, Sal, and Mr. Sterling?
13          A.    Sterling.
14          Q.    And what did he, what was the promise
15    that he made?
16          A.    You will have a stream of revenue from
17    WrestleReunion 1 within 90 days.
18          Q.    Okay.  And so you and Mr. Corrente
19    were the only witnesses to that statement?
20          A.    To the best of my knowledge, yes.
21          Q.    You were the only ones on the call?
22          A.    Yes.
23          Q.    As far as the first statement about it
24    living on long after you're gone, was it you and
25    Mr. Sterling?
```

1      A.   At that time, but he subsequently

2   repeated the same conversation, same words to

3   Sal.

4      Q.   All right.  That's two.  What was the

5   next one, if any?

6      A.   Approximately March or April, after he

7   brought Johnny gala-gala-galaga on board.  I

8   don't know how to spell his name.

9      Q.   It's Gallarello, G-A-L-L-A-R-E-L-L-O.

10     A.   Him, too.  All of the product from

11  WrestleReunion 1 will be edited and available

12  for sale at WrestleReunion 2.

13     Q.   So all of the footage taken at

14  WrestleReunion 1 is what he was referring to?

15     A.   Live matches, and shoot interviews;

16  correct.

17     Q.   Footage taped at WrestleReunion 1 will

18  be available?

19     A.   Correct, for sale at WrestleReunion 2.

20     Q.   Okay.  And he made that statement to

21  you on the phone, in person, e-mail?

22     A.   On the phone.

23     Q.   Okay.  And were you and he the only

24  two people on the phone call?

25     A.   More often than not.  The great

1     majority of the time all conversations would

2     have been three-way with Sal.  I don't know that

3     after the initial few conversations, I ever had

4     solo, one-on-one conversations with Sterling.

5          Q.    Okay.  Do you recall that conversation

6     in March or April of '05, whether that was a

7     three-way call or just a two-way call?

8          A.    I'm assuming it was a three-way call.

9          Q.    All right.  And how is it that he

10    broke that promise?  Some of the footage was

11    available for sale at WrestleReunion 2; right?

12         ·  A.    Well, yeah.  Four shoot interviews;

13    but, if I may.

14         Q.    Sure, sure.

15         A.    There's one single product, and this

16    is where I think Clear Channel really dropped

17    the ball, that was of most interest to the fans

18    themselves, were the live matches.  To this day,

19    I've never seen the final edit of those live

20    matches.  To my knowledge, they've never been

21    edited, packaged, and available for sale to

22    anyone.

23         So when you have the most -- it's like

24    showing the previews to the Super Bowl, and not

25    showing the game.  It makes no sense.

1        Q.    But you concede, don't you, that the

2   decision of what to market to, to attempt to

3   distribute was within Clear Channel's

4   discretion, and that was their job and

5   responsibility, under the Outline of Terms, and

6   not WrestleReunion's?

7        A.    That being the case, other than the

8   four shoot interviews, which they were required

9   to produce for Highspots, they did nothing.  Is

10  that their discretion to film it and do

11  nothing?

12       Q.    All right.  Well, you heard, you sat

13  through all of the, or most of the testimony

14  from the Clear Channel witnesses last week;

15  right?

16       A.    Correct.

17       Q.    And you heard them testify about the

18  different entities they attempted to market this

19  product to, by either sending the shoot

20  interviews, or descriptions of the event;

21  correct?  Of the, of all the footage in the

22  project?

23       A.    I heard their very lame, you can put

24  those letters in capital letters, efforts.

25  That's not what you need to secure contracts

1   with television networks, DVD companies, in this

2   day and age.  A one sheet is not going to work.

3       Q.    And that's in your opinion; correct?

4       A.    My, well track record opinion of

5   having placed programing on national television.

6       Q.    But let me back up.  Okay.  We got, so

7   far, we've got three promises we're dealing

8   with.

9       A.    Okay.  We've got more.

10      Q.    What is the next one?

11      A.    The final day of the Valley Forge

12  event, in Sal Corrente's suite, in front of

13  Jimmy Hart, Sal Corrente, Tony, and myself,

14  Steve Sterling promised, first said the event

15  was great, looked great.  All the product will

16  be in the stores in time for the holidays.  This

17  is the end of August.  Most stores start

18  stocking their holiday inventory in November.

19  That was his time frame, his commitment to us.

20      Q.    So this was after --

21      A.    Of course he didn't say what year,

22  huh?

23      Q.    This was at the hotel room; correct?

24      A.    Correct.  In Valley Forge.

25      Q.    Was late at night, after

```
 1    WrestleReunion 2?

 2         A.   Correct.

 3         Q.   The people who were present when that

 4    statement was made was Steve Sterling, yourself?

 5         A.   He was sitting right next to Jimmy

 6    Hart on the couch, myself, Sal, and Tony.

 7         Q.   Okay.

 8         A.   We didn't twist his arm.

 9         Q.   Okay.  And what else?  Any others?

10         A.   The meeting in October 27th, Thursday

11    October 27th, in Clear Channel's office in New

12    York with Jimmy Hart, Sal, and Tony present, as

13    well as Eric, Dawn, Townley, Sternly, and

14    Johnny.

15         Q.   When you say Sternly, you mean Steve

16    Stern?

17         A.   No.  Well Stern may have been there,

18    but Sterling was there.

19         Q.   Was Johnny Gallarello there was well?

20         A.   Yes.

21         Q.   What was the promise?

22         A.   At the end of the meeting, Townley

23    stood up, shook everybody's hand, gave them a

24    big hug.  We are all behind you.  We are going

25    forward.  We are going to make this work.
```

1       Q.      That was Mr. Townley who said that?

2       A.      President of the division.

3       Q.      That wasn't Mr. Sterling who said that

4    then?

5       A.      Sorry.   I thought we were talking

6    Clear Channel.

7       Q.      I am.   I want all of them from

8    anybody.

9       A.      Okay.

10      Q.      That was, Mr. Townley said --

11      A.      Sterling was there.

12      Q.      Townley said we're going forward?

13      A.      Fully committed.   We're going to make

14   this work.   Hugs, kisses, shake hands, rah, rah,

15   rah.

16      Q.      And your sworn testimony is that you

17   took that to be a binding commitment upon which

18   WrestleReunion is entitled to sue Clear Channel

19   for not making it work?

20      A.      Yes.

21      Q.      Okay.   That was not just an

22   aspirational or hopeful statement about possible

23   success of this project as a TV --

24      A.      Mr. Townley did not say we're going to

25   possibly do this.   Mr. Sterling did not say

```
 1    we're possibly going to get your product into
 2    the stores.  Mr. Sterling did not say we're not
 3    going to possibly provide you with a stream of
 4    revenue.  These were, in my many states, verbals
 5    are the same as written agreements.  I don't
 6    know about New York, or Florida, or Valley Forge
 7    or whatever.  Varies state to state.
 8         Q.    But you never made a promise in
 9    exchange for these promises at these times?
10         A.    We promised to produce the live events
11    and spent whatever money was necessary to do
12    that.  Put on a world class event that received
13    critical review.  We did our job.
14         Q.    None of these alleged promises that
15    you talk about are listed in the Outline of
16    Terms that is Exhibit 1 to the amended
17    complaint; correct?
18         A.    Promise to produce, edit, and
19    distribute are in that complaint.
20         Q.    I'm not talking about the complaint.
21    I'm talking about the Outline of Terms.
22         A.    I believe the promise to produce, edit
23    and distribute are in there.
24         Q.    This event will live on long after
25    you're gone.  That's nowhere in the signed
```

1   document, Exhibit 1?

2       A.   No, no, no.

3       Q.   Okay.  And the WrestleReunion will

4   receive a stream of revenue within 90 days.

5   That is not set forth anywhere in that Exhibit 1

6   to the amended complaint, is it?

7       A.   No.

8       Q.   And all product taped at

9   WrestleReunion 1 will be available for sale at

10  WrestleReunion 2.  That statement or promise is

11  also not listed in Exhibit 1 to the amended the

12  complaint, is it?

13      A.   Those statements all happened after

14  these, this document was generated and signed.

15      Q.   Okay.  So the answer to my question is

16  no?  It doesn't appear in Exhibit 1 to the

17  amended complaint?

18      A.   No.

19      Q.   And the statement all product will be

20  in the stores by the holidays also does not

21  appear in Exhibit 1 to the amended complaint;

22  correct?

23      A.   What is a reasonable amount of time

24  for product to be into stores?

25      Q.   I'm just asking a specific question,

1    and I want a specific answer.

2       A.   No.

3       Q.   The statement we're fully committed to

4    this.  We're going to make it work.  That's not

5    listed in Exhibit 1 to the amended complaint;

6    correct?

7       A.   No.  We didn't want 15 years to do it.

8       Q.   All right.  And you never had any

9    other signed document between WrestleReunion and

10   Clear Channel, did you?

11      A.   Not that I'm aware of.

12      Q.   And, in fact, the only representation

13   specifically listed in this Exhibit 1 to the

14   amended complaint is that you, being

15   WrestleReunion, warrant and represent that you

16   were duly authorized to enter into and sign this

17   agreement for the purposes described herein, in

18   the paragraph entitled representation?

19      A.   Right.  I didn't sign it.  Yes, that's

20   what it says.

21      Q.   Here is what I want to ask you.  Is

22   your understanding that your lawsuit,

23   WrestleReunion's lawsuit against Clear Channel

24   contains one count for breach of contract.  The

25   amended complaint says that the alleged contract

1       is Exhibit 1 to the amended complaint.  So is

2       your understanding that WrestleReunion is suing

3       Clear Channel for its failure to comply with the

4       terms of Exhibit 1 to the amended complaint, or

5       its failure to live up to these promises that

6       individuals from Clear Channel made verbally,

7       after the execution of Exhibit 1 to the amended

8       complaint?

9            A.    Both.

10           Q.    Okay.  Again, you're not stating the

11      official position of WrestleReunion 1, of

12      WrestleReunion because you are not authorized to

13      do that; correct?

14           A.    Correct.

15           Q.    Okay.  This event will live on long

16      after you're gone.  Well, let's back up.

17           As someone with a huge wealth of experience

18      in the entertainment industry, don't you think

19      it's a fair statement to say that nobody can

20      guarantee the success or the failure of an

21      entertainment venture?

22           A.    Not totally accurate.  When you're

23      dealing with an established entity, whether it

24      be Andre the Giant, Elvis Presley, or Clear

25      Channel, when you've got HBO, Clear Channel,

1    Showtime, getting behind a project that they

2    truly believe in, there's no such thing as a

3    1,000 percent guarantee, but that's as good as

4    money in the bank.

5         Q.    But if they spend $10 million and they

6    only realize $9 million, it's not a financial

7    success, is it?

8         A.    They didn't pursue all possible

9    sources of revenue.  The limited, lame-assed

10   things that Sterling said in New York were

11   laughable, as far as effort on their part.  And

12   then they told us they had -- Townley said we

13   have 25 other projects going on.  Should we have

14   been put at the bottom of barrel, and ignored,

15   when Paul MacCartney, or somebody else was

16   given, pushed priority?  I mean it was never

17   said to us you're going to be the last thing we

18   do, the minimum amount of effort that we're

19   going to do, but we're not going to finish

20   editing your product to make it possible to try

21   to get a deal.

22        Q.    Did they ever tell you that they

23   pushed WrestleReunion to the bottom of barrel of

24   all the other products?

25        A.    Pretty much that's what they were

1   saying in that deposition in New York.

2        Q.    Did you see the list of numbers of

3   different Clear Channel employees or contractors

4   who worked on the WrestleReunion project?

5        A.    I didn't see the number of hours that

6   those individuals put into the project.

7        Q.    Did you see, have you had a chance to

8   review the two boxes of e-mails, approximating

9   over 7,000 pages of documents, that were sent to

10  or from people at Clear Channel, or people at

11  WrestleReunion, about attempting to make this

12  project a success?  You saw those documents,

13  didn't you?

14            MR. RODEMS:  Object to the form.

15            THE WITNESS:  No, I did not.

16  BY MR. HERBERT:

17       Q.    No, you weren't shown those documents?

18       A.    And I didn't see the videotapes that

19  they were supposed to provide either.

20       Q.    You saw the shoot interviews; right?

21       A.    I didn't see the 220 tapes that you

22  said that they had.  I came to the area to see

23  them.

24       Q.    The -- your opinion or understanding

25  that Clear Channel placed WrestleReunion at the

1    bottom of barrel is based on your opinion on

2    whatever interaction you had with them

3    personally; right?

4        A.    My opinion is based on what Townley

5    said in depositions last week.

6        Q.    You were familiar with Clear Channel

7    at the time you, at the time Exhibit 1 to the

8    amended complaint was signed; right?  You're

9    familiar with them, the company, Clear Channel

10   Entertainment Television; right?

11       A.    Sure.

12       Q.    I mean you, probably, were more

13   familiar with them, and their business, than

14   anybody else affiliated with WrestleReunion;

15   fair enough?

16            MR. RODEMS:  Object to the form.

17            THE WITNESS:  Yes.

18   BY MR. HERBERT:

19       Q.    And you, being familiar with them, and

20   with all of your vast experience in the

21   entertainment industry, would have known that

22   WrestleReunion certainly was not going to be the

23   only project that they were going to be working

24   on for calendar year 2005.

25       A.    Never had a thought along those lines,

1    nor was it a concern.

2         Q.    And you also knew that they would

3    certainly have several other projects, multiple

4    other projects going on at the same time; fair

5    enough?

6         A.    Yes.

7         Q.    Okay.  And you also knew that Clear

8    Channel Entertainment Television did not

9    distribute its own product that it took an

10   ownership interest in.

11        A.    No, I did not know that.

12        Q.    Did you research that before Exhibit 1

13   to the amended complaint was signed?

14        A.    No, I did not.

15        Q.    Did you ask Mr. Corrente to research

16   that, or do due diligence on that?

17        A.    They told us they were going to

18   distribute it.  I didn't care how.

19        Q.    Let me ask you this:  Other than

20   Highspots, WrestleReunion didn't have any other

21   offers for anybody else to tape, edit, produce,

22   and try to distribute this project, did they?

23        A.    Clear Channel came to us.  We didn't

24   pursue them.

25        Q.    I understand that.  That wasn't my

1    question.

2         A.    Highspots was a deal already in place.

3         Q.    I understand that, and my question was

4    other than Highspots, there wasn't anybody else

5    knocking on your door, dying to film this thing,

6    was there?

7         A.    Well, dying to film it?  We didn't

8    have to pursue.  When you already had one and

9    then a better one comes along, that's all you

10   need.

11        Q.    You didn't even have, Clear Channel,

12   any expression of interest until the middle of

13   December, less than, you know, about a month

14   before the first event, after it was already

15   totally fully planned.

16        A.    The response was already in the bag.

17        Q.    Right.  I'm saying other than

18   Highspots.

19        A.    Up to then, you only need one.

20        Q.    Let me ask you.

21        A.    We weren't going up for bid.

22        Q.    Did you negotiate with anybody else to

23   film this event, other than Highspots?

24        A.    We didn't need to.

25        Q.    So the answer is no?

1        A.    Correct.

2        Q.    Nobody else approached you, and you

3    didn't approach anybody else, other than

4    Highspots, before Clear Channel came along.

5        A.    Correct.

6        Q.    Okay.  And you were going to go

7    forward with the event, with or without Clear

8    Channel; fair enough?

9        A.    Correct.

10       Q.    And the success or failure of

11   WrestleReunion as a live event is

12   WrestleReunion's responsibility.  They are not

13   trying to blame that on Clear Channel; correct?

14       A.    Correct.

15            MR. HERBERT:  I am going to take a

16       break now.  It's almost 3 o'clock.

17            MR. RODEMS:  Okay.

18            (Short break from 2.53 to 3:27 p.m.)

19   BY MR. HERBERT:

20       Q.    All right.  Back on the record.  All

21   right.  Mr. Russen, I believe you said that

22   WrestleReunion did not plan to make money on the

23   first event, WrestleReunion 1; is that correct?

24       A.    At the live gate.

25       Q.    Okay.  Did you plan to lose money on

1    the first event?

2        A.    We planned on having multiple sources

3    of revenue adding up to a profitable event.

4        Q.    And the business plan makes incredible

5    predictions that there was millions of dollars

6    you were going to make; correct?

7        A.    Uh-huh.

8        Q.    Let me ask you this:  Did you have

9    input in the scheduling of the WrestleReunion

10   events, or was that solely Mr. Corrente?

11       A.    Scheduling as in the date of the

12   event, or what happened during the course of

13   that day?

14       Q.    Yeah, I mean the dates at which the

15   events were held?

16       A.    No, I did not.

17       Q.    Okay.  Well, do you know why that

18   WrestleReunion 1 was scheduled in January, and

19   then more than about a full seven or eight

20   months later, WrestleReunion 2 and

21   WrestleReunion 3 were scheduled almost back to

22   back, within two weeks of each other?

23       A.    It's my understanding, especially on

24   3, Steve Sterling insisted he needed more

25   wrestling footage for the library.  We had an

1    abundance of interview footage.  We didn't have

2    an equal amount of wrestling footage.  And for a

3    television series, normally you would need 13

4    weeks' worth of programming.  So, yes, we had

5    more than 13 weeks of the interviews, but not 13

6    weeks' worth of wrestling.

7         Q.    All right.  So you're saying that

8    Mr. Sterling had some input in the timing of

9    when the events were held?

10        A.    And the number of events.  I mean I

11   know Sal came out and asked him how many do you

12   need, you know?  We will provide you with

13   whatever you need.

14        Q.    I guess what I'm getting at is it

15   seems to me, not being somebody in the industry,

16   that if you want to try to maximize your live

17   gate, that you might want to spread these events

18   out a little bit, rather than --

19        A.    Not necessarily true.  We were in

20   different parts of the country.  If you want to

21   maximize your live gate, you get your stuff on

22   television.  Because the wrestling business is

23   the like the TV ministry business:  You go on

24   TV, you beg them to send you money, with

25   religion.  With wrestling, you go on TV, you

1      entice them with angles, you never give them a

2      complete finish.  That's part of the program so

3      that they don't buy a ticket to come out and see

4      it live, or buy your pay-per-view.  It's all a

5      matter of brainwashing the public.

6          Q.    But since by the time of

7      WrestleReunion 2, you didn't really know when or

8      if this was going to make it to TV, it would

9      seem that you might want to, you know, have a

10     little gap in the time, since some of the fans

11     in the Philly area might also be fans that would

12     drive down to South Florida to see an event like

13     that?

14         A.    Remember we were talking about themes

15     and territories?  The Philadelphia show was

16     designed to promote the area's history in ECW.

17         Q.    The circuit?

18         A.    The territory that they were born in,

19     raised in, where the most avid fans were from.

20     Tampa was for Florida Championship Wrestling;

21     Atlanta, WCW, Minneapolis would be for the AWW.

22     So they are not the same fans.

23         Q.    Right.  But you would take customers,

24     regardless where they come from.  If you've got

25     people driving down from Canada, you would be

1    glad to take the money.

2         A.    We had them flying in from Korea,

3    yeah.

4         Q.    That's what I mean.  The point is for

5    those customers who were the market, the target

6    isn't just the local regional market.  It

7    wouldn't seem to make sense to spread events out

8    so that, you know, somebody in Philly isn't

9    necessarily going to buy a ticket to an event in

10   Philly and spend the same kind of money for an

11   event in South Florida two weeks later.

12        Well, I guess let me ask you this:  What I'm

13   saying is it would seem to me that it would be

14   either you, or Mr. Corrente, who decided when

15   the different WrestleReunion events would take

16   place.

17        A.    It was Sal.

18        Q.    So, in terms of making the decision as

19   to the timing of the events, I mean just so

20   we're clear, Mr. Sterling didn't really have any

21   input as to the scheduling of the events, and

22   how far to space them out from each other?

23        A.    He just applied pressure.  He needed

24   more wrestling footage.

25        Q.    Okay.

1        A.    No, it doesn't make sense why the

2    footage that we had was not shown on Clear

3    Channel Television's stations.

4        Q.    But by the time of the third, before

5    the third event took place, you had already

6    heard that Clear Channel didn't even want to

7    film a third event; right?

8        A.    The week of that event, we heard

9    Townley wanted to cancel.

10       Q.    Okay.  So you're saying before that,

11   Sterling was pushing you to get more match

12   footage?

13       A.    In Valley Forge, two weeks before,

14   Sterling said we'll see you in Davie.  Didn't

15   say don't go to Davie.  Don't shoot Davie.  We

16   won't be there.

17       Q.    I understand what you're saying.  What

18   I'm saying, him saying we'll see you in Davie in

19   two weeks, and saying we need more footage so

20   you'd better be in Davie in two weeks are two

21   different things.  Did he urge you to go to the

22   next show very quickly after that second?

23       A.    Frankly, he had that conversation with

24   Sal.

25       Q.    Okay.  3 was already scheduled by the

1     time 2 took place anyway; right?

2          A.    Yes.

3          Q.    Let me ask you, it's fair enough to

4     say that even if Clear Channel had completed all

5     of the shooting of every single second of all

6     three of the WrestleReunion events, all of the

7     editing, all of the authoring, all of the

8     finalization and packaging of every second of

9     footage from all three events, there's no

10    guarantee at all, in the entertainment industry,

11    that they could have made a dime, selling that

12    footage to anybody; fair enough?

13         A.    Not with the effort they put in.

14         Q.    Well, even with any amount of effort,

15    there is no guarantee in the entertainment

16    industry, that even if they had done all that,

17    that revenue would have been realized.  Let's

18    just say even to Clear Channel.  Let's forget

19    about the net, and the distribution fee, and the

20    recoupment of the other costs.

21         A.    Greg, the whole secret is you got to

22    put the product out for people to buy it.  We

23    did our job, creating world class events, the

24    fans loved it, got critical acclaim, and it

25    ended there.  I wish you or someone else could

 1    explain to us why that happened.  But that's not

 2    why we're here today, but that's what frustrates

 3    us.  We could have done that once a month, every

 4    month, till hell froze over.

 5         Q.    Let me ask you, your -- the A&E

 6    project that was discussed between A&E and Clear

 7    Channel, at the time that Clear Channel first

 8    contacted WrestleReunion, I take it, from some

 9    documents that I see, that your personal belief

10    or understanding was that A&E and Clear Channel

11    had a firm deal, by which A&E was paying Clear

12    Channel money to film a wrestling-related event,

13    at least as of July 2007?

14         MR. RODEMS:  Object to the form.

15    BY MR. HERBERT:

16         Q.    I mean --

17         A.    In the original contact from Eric

18    Paulen, who contacted Bill Apter, who gave him

19    my number, and Eric called me.  His introductory

20    statement was we have a contract to produce

21    biographies for A&E, on the top ten Wrestlers of

22    all time.  So it was based on his representation

23    that they had a deal.  Now, normally, that means

24    you're getting paid for that deal.  They don't

25    work as a non-profit organization.

1        Q.    So Eric Paulen told you that Clear

2   Channel had a contract with A&E?  He told you

3   personally, or somebody else?

4        A.    Told me.

5        Q.    Okay.  He didn't tell you anything of

6   the terms of that contract; right?

7        A.    No.  And it wasn't really a Clear

8   Channel -- he was still functioning under what

9   was that name Blue, whatever, Blue Sky.

10  Whatever the original Sterns company was called

11  was the separate production division that Eric

12  was producing documentaries for television

13  under.  Of course, that's under Clear Channel's

14  umbrella, but it was under the name of whatever

15  that company was called.

16       Q.    Okay.  But did he say that Clear

17  Channel had a deal, or did he say Clear Channel

18  had a contract with A&E, if you remember?

19       A.    A deal is a deal.  In the music

20  business, the sports business, you got a deal

21  whether it's a hand shake, or contract, you're

22  doing something together, you're going forward,

23  you're spending money, you're producing product

24  or events.

25       Q.    All right.  But other than -- so Eric

1    Paulen never told you, at any time, that A&E had

2    actually committed or given any money to Clear

3    Channel; right?

4        A.    Had a commitment to the point that

5    they were supposed to film a documentary on the

6    top ten wrestlers of all time.  He was aware

7    that we had several names that could qualify to

8    be on that list, and he asked permission to come

9    down to tape interviews with our wrestlers for

10   that project.

11       Does it makes sense that it, Clear Channel,

12   would spend money out of pocket to do that, if

13   they didn't have a deal?

14       Q.    Okay.  So that's based on your

15   assumption that Clear Channel wouldn't do that,

16   unless they were being paid money.

17       A.    They wouldn't come and film our event

18   without a deal or agreement.

19       Q.    The point is you don't have any

20   personal knowledge about whether or not Clear

21   Channel had a formal contract with A&E, or

22   whether or not Clear Channel ever got a dime

23   from A&E; fair enough?

24       A.    I was told they had a deal.  Whatever

25   that meant.

1    Q.    You don't have personal, first-hand
2    knowledge --
3    A.    Of course not.
4    Q.    -- about whether there was a contract,
5    or whether money was exchanged?
6    A.    No.
7    Q.    Then, still, in July, in July of 2007,
8    you had been chatting with Eric Paulen in an
9    Internet, in an IM message bored or a chat room
10   of some sort; right?
11   A.    Yes.
12   Q.    And let me ask you this:  When was the
13   last time you had any communications whatsoever
14   with Mr. Paulen?
15   A.    Last week, in New York.
16   Q.    Okay.  After that, have you had any?
17   A.    You mean before that?
18   Q.    No, I mean after that.
19   A.    Since then?
20   Q.    Yeah.
21   A.    No.
22   Q.    Okay.  He mentioned that he had some
23   communications with somebody from connected with
24   WrestleReunion around the time he got the
25   subpoena, which would have been a few weeks

1    ago.

2        Did you communicate with Mr. Paulen, let's

3    say, I guess it would have been late November,

4    early December?

5            MR. RODEMS:  Object to the form.

6            THE WITNESS:  No.

7    BY MR. HERBERT:

8        Q.    Do you know who he was communicating

9    from WrestleReunion?

10       A.    You mean this year; right?

11       Q.    Yeah, I'm talking it would be November

12   of this year.

13       A.    My e-mail address changed, as we

14   discussed earlier, when I moved, and I never

15   forwarded that information to him.  So we had no

16   way of maintaining communication, or no need to.

17       Q.    Okay.  I guess let's take a look at

18   this.  This is what was previously marked as

19   defendant's Exhibit 2.  Here is an extra copy,

20   if you want it?

21           MR. RODEMS:  Thanks.

22   BY MR. HERBERT:

23       Q.    Just what I want to get into is on the

24   second page of defendant's Exhibit 2, there's

25   the printout of the IM chat that you had with

```
 1    Mr. Paulen; correct?  Mr. Paulen's IM address or

 2    e-mail address is Erock7.

 3         A.   Yes.

 4         Q.   And yours is the Rob L. Russen;

 5    correct?

 6         A.   Correct.

 7         Q.   And in the second page here --

 8              MR. RODEMS:  Just for the record, since

 9         that is a separate transcript, I had made an

10         objection to the use of this document at the

11         time it was initially presented and put into

12         the deposition.  I just want to make clear,

13         since this is a separate transcript, but

14         it's been presented as the defendant's

15         Exhibit 2, that I want to renew those

16         objections.

17              MR. HERBERT:  Okay.

18    BY MR. HERBERT:

19         Q.   On the second page, in about the

20    middle of the page, you say here that, the

21    sentence begins with, "But we have the ability

22    to research and come up with the going rate for

23    HD production."

24         Do you see that?

25         A.   About third of the way down, yeah.
```

1        Q.    Yeah.  And, then, in the letter part

2    the sentence you say, "And besides, they had

3    already received a bunch of money for A&E to do

4    the show they wanted, that you and I first

5    talked about."

6        You wrote that language there; right?

7        A.    Yes.

8        Q.    Okay.  And the "they" you're referring

9    to is Clear Channel?

10       A.    Yes.

11       Q.    Okay.  And so there, you're asserting

12   that Clear Channel already received a bunch

13   money for A&E to do the A&E show; right?

14       A.    Yes.

15       Q.    And, in fact, you had no idea at all

16   whether Clear Channel had received a dime.  That

17   was your assumption, based on Eric Paulen

18   telling you there was a deal.

19            MR. RODEMS:  Object to the form.

20   BY MR. HERBERT:

21       Q.    Fair enough?  Is that based on

22   anything else, other than Eric Paulen telling

23   you that there was a deal?

24       A.    No, nothing else but that.

25       Q.    Okay.  And there, in fact, he even

1     asks they actually received the money from A&E?

2     Right.  He asks you that in response to your

3     statement?

4          A.    Yes, he did.

5          Q.    And then you say quote, "The

6     production budget should have been billed to

7     A&E, or deducted from those monies not billed to

8     WrestleReunion"; right?

9          A.    Correct.

10         Q.    And that's based on the assumption

11    that there was a production budget of some

12    project between and A&E and Clear Channel;

13    right?

14         A.    Correct.

15         Q.    Based on your assumption that there

16    was a production budget; right?

17         A.    Right.

18         Q.    So isn't it true that, in part, this

19    lawsuit is based on your assumption that Clear

20    Channel had a deal with A&E, had received money

21    from A&E, and could have charged some of the

22    expenses that it incurred, in connection with

23    WrestleReunion, to the budget on the deal it had

24    with A&E?

25              MR. RODEMS:  Object to the form.

```
 1                THE WITNESS:  Not at all.  Not at all.
 2          The lawsuit is based on the fact that
 3          WrestleReunion did our job in producing
 4          world-class live events, and Clear Channel
 5          failed to do their job.
 6   BY MR. HERBERT:
 7          Q.    All right.  But you're asserting here
 8   that, you know, Clear Channel probably didn't
 9   lose much money because they had another budget
10   they could have charged these WrestleReunion
11   event expenses to; right?
12          A.    No, no.
13          Q.    All right.  Let me ask you, you heard
14   the testimony from Mr. Sterling and Mr. Townley,
15   that whatever proposal there was from A&E, fell
16   through completely, when Vince McMahon refused
17   to authorize any of the WWE footage for that A&E
18   project; right?
19          A.    That's what they said.  I don't have
20   any reason to believe they said the truth.
21          Q.    All right.  But do you have any reason
22   to believe they didn't tell the truth?
23          A.    Yeah, because they lied about other
24   things in the deposition.
25          Q.    Just let me ask you.  Did you follow
```

1      up with anybody at WWE about that you?  Did you

2      do any independent research?  Do you have any

3      evidence or documents to show that's not

4      correct?

5           A.    It would be privileged information

6      that they would not discuss with me.

7           Q.    Okay.  So the answer is no, you have

8      no documentary evidence --

9           A.    Correct.

10          Q.    -- or information to rebut that?

11          A.    Correct.

12          Q.    All right.  While we are on the topic

13     of your assertion that Clear Channel witnesses

14     lied at the deposition, committed perjury.

15          MR. RODEMS:  Object to the form.  He

16          didn't say perjury.

17     BY MR. HERBERT:

18          Q.    You said they lied under oath.  You

19     knew they were under oath; right?

20          A.    (The witness nodded.)

21          Q.    That's yes?

22          A.    Yes.

23          Q.    List for me all of the lies that

24     you're aware that any witness from Clear Channel

25     told at their deposition?

1          A.      As soon as I get a copy of their

2     deposition, I'll be glad to do that for you.

3     But right now, off the top of my head, there

4     seemed to be inconsistent memory of the

5     obligations and meetings that he had with us, in

6     Valley Forge.   What was said, done, and promised

7     in the October 27th meeting.   They had what I

8     call convenient amnesia.

9          Q.      There were several things they didn't

10    recollect, is what you are saying, that you

11    believe they actually did recall?

12         A.      That we have witnesses that they said

13    it's not my word or one-on-one.   There are four

14    or five witnesses to every lie they gave.

15         Q.      But what you're saying is, generally,

16    they had convenient amnesia.   They said they

17    didn't recollect some statements they made.

18         A.      Sterling couldn't even remember the

19    meeting.

20         Q.      It's kind of like you not recollecting

21    whether you had an arrangement with Mr. Corrente

22    about whether you were going to be paid under

23    the table.

24              MR. RODEMS:   Object to the form.

25    BY MR. HERBERT:

```
 1          Q.    Fair enough?
 2                MR. RODEMS:   And I'm going to instruct
 3          the witness not to answer because that is
 4          harassing; okay?  And we can get an order on
 5          that.  We're not going to compare something
 6          that he said earlier to something that
 7          Townley did, and ask him to draw some sort
 8          of analogy or compare.
 9    BY MR. HERBERT:
10          Q.    Fair enough.  What I'm saying is a
11    failure to recollect -- you're saying that they
12    didn't recollect something, and that that was
13    untrue, because you know what they recollect or
14    don't recollect.
15          A.    I'm saying that the commitments that
16    they made, the statements that they made, the
17    meetings that took place, there are multiple
18    witnesses to verify it.
19          Q.    Let me give you number 1 for the
20    record.  This is Defendant's Exhibit number 1.
21    Take a look at Exhibit number 1, and --
22                MR. RODEMS:   Same objection.  I raised
23          this earlier in the previous deposition.
24                MR. HERBERT:   Sure.  No problem.
25    BY MR. HERBERT:
```

1        Q.    All I want to ask you about here is in

2    this, this is an e-mail, this is printout of IM

3    chats that you had with Mr. Paulen and

4    Mr. Corrente, on or about July 1st, 2007, at

5    1:25 p.m.; correct?

6        A.    Correct.

7        Q.    And in this chat, you state, about

8    eight lines down or so, to Eric, you say quote,

9    "As you have been thinking, we finally procured

10   a lawyer to go after CC in Federal court."

11       Let me ask you, prior to this chat, did --

12   you spoke with Mr. Paulen about getting a lawyer

13   to sue Clear Channel?

14       A.    Yes.

15       Q.    Were those discussions in an IM chat,

16   or telephone, e-mail, or what form did they

17   take?

18       A.    More often than not, we IM chatted, as

19   opposed to telephone calls.

20       Q.    Let me ask you.  I assume you are the

21   person who printed out these, defendant's

22   Exhibit 1 and Exhibit 2?

23       A.    Correct.

24       Q.    All right.  And I assume you printed

25   it out because you thought that some of the

1   things in there might be helpful for the case?

2        A.   Correct.

3        Q.   So I assume also there's a lot of IM

4   chats that you've had, let's say with

5   Mr. Paulen, that you never printed out?

6        A.   Correct.

7        Q.   Do you have any way of accessing any

8   of the IM chat that you had?  Did you save it in

9   any form?

10       A.   No, I did not.

11       Q.   All right.  Let me ask you.  Down here

12  near the bottom, second line from the bottom of

13  the first page of Defendant's Exhibit 1,

14  Mr. Paulen says quote:  "You know I'm with you

15  on this.  I will help in any way I can."  Close

16  quote.

17       Other than chatting with you, tell me again

18  how was it that Mr. Paulen helped you out in

19  pursuing this lawsuit?

20       A.   He didn't do anything preceding the

21  lawsuit to help us out, and what he was

22  referring to there was, is I had previously made

23  him aware that if there was a lawsuit, he would,

24  in all likelihood, be called as a witness.  And

25  all I asked him to do, in that instance, is to

1    tell the truth.

2         Q.    And did -- elsewhere here he says he's

3    glad that you're filing this lawsuit against

4    Clear Channel.  It's the fourth line up from the

5    end of Exhibit 1.

6         Do you see that?

7         A.    "I'm glad you're doing this."

8    Correct.

9         Q.    Did he tell you why he was glad that

10   WrestleReunion was suing Clear Channel?

11        A.    He's aware that, in his opinion, Clear

12   Channel did us wrong, and he knows the effect

13   that that had on our company.

14        Q.    Okay.  Did he mention to you that he

15   was also bitter because he got fired shortly

16   before the Christmas holidays in 2005?

17        A.    At some point in time, he expressed

18   his unhappiness with the way that came about.

19        Q.    Did he tell you that he thought that

20   other people should have been fired, and not

21   him?

22        A.    No.

23        Q.    All right.  I'm just about through.

24   Okay.  Let's go to -- I'll hand you, let's mark

25   it for the record.  This will be an extra copy

1    of this.  You know what?  let's just mark that.

2    Let's go off the record.  Let's take this out.

3         (Whereupon, Exhibit 11 was marked for

4    identification)

5         Take a look at Exhibit J and tell me, if you

6    -- I'm sorry.  Not exhibit J.  Exhibit 11.  And

7    tell me is that a document that you wrote?

8         A.    It appears to be, yes.

9         Q.    Okay.  And at the bottom, it says Rob;

10   right?

11        A.    Correct.

12        Q.    Okay.  This is called a reality

13   check.  Is this a document that you sent or gave

14   to Mr. Corrente about three weeks prior to

15   WrestleReunion 1?

16        A.    Doesn't have a date on it.

17        Q.    Well, if you look at the middle of the

18   second paragraph there, it says, "But to this

19   time, 21 days out, the fans have failed to

20   respond in the kind of numbers anticipated and

21   needed to make the event a success."

22        A.    That would be January '05.

23        Q.    Okay.  In the first paragraph there, I

24   mean this isn't particularly addressed to

25   anybody on its face, but this was something you

1        were writing to Mr. Corrente; correct?

2              A.     Probably.

3              Q.     Well, I mean --

4              A.     It's not addressed specifically to

5        him.

6              Q.     You gave it to him, didn't you?

7              A.     Did I?  I don't know.

8              Q.     Who else would have this been written

9        to, other than Mr. Corrente?

10             A.     It could have been me just thinking

11       out loud.  I mean it's not sent as an e-mail.

12       There is no --

13             Q.     You don't remember whether or not you

14       gave this to, or sent it to Mr. Corrente?

15             A.     No.  On the days leading up to

16       WrestleReunion 1, I didn't see Sal until the

17       week of the show.

18             Q.     Let me ask you:  Did he follow any of

19       your advice, the many different pieces of advice

20       that you make in this reality check document?

21             A.     Let me read it again.  Number two.  We

22       did move the event from the high school gym into

23       the ballroom.  So, yes, they did follow that

24       advice.

25             Q.     So Mr. Corrente heeded your suggestion

1      regarding that?

2            A.     Correct.

3            Q.     Okay.  Anything else?

4            A.     No.

5            Q.     Okay.  So the fact that they heeded

6      your advice on that, does that refresh your

7      recollection that you did show this document to

8      Mr. Corrente?

9            A.     I presume I did.  That would be the

10     only person who, even though I said "guys," I

11     can't think of anyone else I would show it to.

12           Q.     That reminds me.  Let me back up and

13     ask you.  We talked about the business plan.  We

14     talked about it evolved from a draft that only

15     referenced -- not only, but I mean that

16     referenced Tony Hunter, and then a subsequent

17     draft that referenced and inputted Clear Channel

18     Entertainment and its, you know, what it brought

19     to the table; right?

20           A.     Right.

21           Q.     Okay.  Clarify for me what was Tony

22     Hunter supposed to do before Clear Channel came

23     to the picture?  What was the idea or concept

24     that Tony Hunter was to contribute or bring to

25     the table of this project?

```
 1          A.    He was a 50 percent partner in the
 2    project, and would have been responsible for 50
 3    percent of the costs involved in doing it.
 4          Q.    Okay.   Do you know did he pay money
 5    for that 50 percent interest?
 6          A.    I don't know.
 7          Q.    Okay.   That was a deal between
 8    Mr. Hunter and Mr. Corrente?
 9          A.    Correct.
10          Q.    Okay.   You don't have any knowledge at
11    all whether any money changed hands in that
12    deal?
13          A.    None at all.
14          Q.    But that deal went by the wayside at
15    some point?
16          A.    Hunter disappeared.
17          Q.    Okay.   Mr. Hunter.   Okay.
18          Did he say that he wanted out of the
19    project, or he just took off, and nobody could
20    find him?
21          A.    Just took off.
22          Q.    You don't know where he is today?
23          A.    Have no clue.
24          Q.    Haven't heard hide nor hair of him?
25          A.    Not a word.
```

```
 1        Q.    And as far as you know, Mr. Corrente

 2   doesn't know where he is either?

 3        A.    I don't think anybody knows where he

 4   is.

 5        Q.    Okay.  Did, before Mr. Attanasio came

 6   along, do you know if anybody offered to, let's

 7   say, take Mr. Hunter's place as a 50 percent

 8   partner, 50 percent interest in the project?

 9        A.    Greg, I wasn't involved in that end of

10   the business.

11        Q.    Okay.  Let me ask you.  Did

12   Mr. Corrente ever ask you to become a 50 percent

13   partner in the project?

14        A.    No.

15        Q.    Did he ever ask you to invest money in

16   the project at all?

17        A.    No.

18        Q.    Okay.  All right.  Going back to the

19   reality check recommendation, damage control

20   minimize expenses document, that is Exhibit 11,

21   in the second sentence there, you say, "You may

22   not want to hear what I'm about to say, but you

23   absolutely need to hear it", and the word "need"

24   is underlined and bolded.

25        Did you feel that this was all very valuable
```

1    advice that you, that Mr. Corrente really needed

2    to heed, in order to minimize expenses for

3    WrestleReunion 1?

4        A.    I felt it was my obligation to bring

5    it to his attention.  How he handled it, is

6    totally his decision.

7        Q.    Whether it says, "I need to encourage

8    you to put your egos aside, is that only a

9    reference to Mr. Corrente and his ego, or

10   somebody else also?

11       A.    It could have been the entire crew of

12   those represented in fronting the organization.

13   It could have been me, Sal, Bill Apter, Diamond

14   Dallas Page, anyone representing the product.

15   It was just...

16       Q.    Okay.  You are not sure now who

17   exactly you were referring to?

18       A.    No, and it doesn't say.

19       Q.    In the second paragraph, the last

20   sentence there, you say that:  "But to this

21   time, 21 days out, the fans have failed to

22   respond in the kind of numbers anticipated and

23   needed to make the event a success."

24       What kind of numbers did WrestleReunion

25   anticipate were needed to make the event a

1      success?

2          A.      Because I was not involved in setting

3      the pricing structure on it, I don't really

4      know.   I just know that traditionally, in

5      wrestling, particularly in the South, in

6      Florida, one can anticipate a walk-up of up to

7      90 percent as being standard and normal.

8          So, as far as the answer to your question, I

9      was not involved in the financing end of it at

10     all to specifically know what their projections

11     were.

12         Q.      Okay.   Well, if you go down to

13     numbered paragraph 2, down at the bottom of this

14     first page here there it says, second sentence

15     of that paragraphs says, "It is unlikely, at

16     this time, that we will sell more than 900

17     tickets."

18         So at this time that you wrote this, you had

19     an idea about how many advance tickets had been

20     sold?

21         A.      Yes.

22         Q.      Okay.   Do you recall, roughly, what

23     that was?

24         A.      I seem to remember seeing in here

25     somewhere the number 200.

1      Q.    Okay.  And the first paragraph, it

2    says, "With less than 200 tickets sold."

3      A.    Right.

4      Q.    Obviously, none of the names that

5    would be eliminated could be considered a quote

6    "draw," or quote "ticket seller," close quote;

7    correct?

8      A.    Correct.  But bearing that traditional

9    formula, the 90 percent walk-up.  Still in the

10    ball game there.

11      Q.    But, in reality, the number of tickets

12    sold, according to Exhibit 10, for the first,

13    event was somewhere around 615?

14      A.    Correct.

15      Q.    So, in the third paragraph of this

16    document, also you say, the second sentence of

17    that paragraph says, "But even if it does.  "It"

18    is referring to a snow ball effect kicking in.

19    Even if it does, we are so, SO-OO overbooked and

20    overextended, that it is time we put our egos

21    aside, and let our intelligence take over to see

22    what we can do to produce what has been

23    promised, without overproducing to the point of

24    no return."

25      Let me ask you, looking at the summary of

1    the expenses, and the income for WrestleReunion

2    1, would you say that your fear of overproducing

3    and overbooking WrestleReunion 1, actually

4    occurred?

5        A.    As far as the live gate portion of it,

6    perhaps, yes.

7        Q.    Okay.   And the primary recommendation

8    in numbered paragraph one that you made, appears

9    to be to reduce the number of talent that was

10   booked for the event.   You say there that we now

11   have close to 90 booked.   So Mr. Corrente did

12   not take your recommendation to drop the number

13   of booked talent down to about 50 or 60.

14   Instead the ultimate number went up to 94;

15   right?

16       A.    Correct.

17       Q.    And you recommend cutting some of them

18   because, as it says in the last sentence of

19   paragraph 1, that the folks that are not, the

20   talent that's not producing any sales results

21   should be cut from the event, as a way to

22   potentially save expenses, and maximize return

23   on the gate; fair enough?

24       A.    With the understanding that to do so

25   would damage credibility, and for the brand

1    identification and development, for the

2    relationship development with Clear Channel.

3    The last thing in the world we would want to do

4    is damage credibility.

5        Q.    If this was around the first week of

6    January, this was still two weeks before you had

7    executed the Outline of Terms with Clear

8    Channel; right?

9        A.    Yes.

10       Q.    And, again, in the second to the last

11   paragraph of this document, you say that, not

12   only haven't the fans responded as anticipated,

13   but the sponsors and vendors have not

14   responded.   What was the anticipation of the

15   sponsorship and the vendor participation at the

16   time you wrote this?

17       A.    Just that it should have been higher.

18   But that was, you know, bearing in mind this was

19   also coming off the holiday season, and it's

20   very difficult for many businesses to get

21   anything done during the holiday season.   So

22   there was still time for this to turn around.

23       Q.    Let me ask you:   Was the anticipation

24   more along the lines of what you wrote in the

25   business plan of live attendance, an average

```
 1    live attendance of 1,200 fans for each event?
 2         A.    Yeah, yes.
 3         Q.    So the end result was about half of
 4    that for the first event; right?
 5         A.    Correct.
 6         Q.    And, again, the other, like the
 7    sponsorship anticipation or the vendor
 8    participation, what was anticipated, at the time
 9    you wrote this, were the numbers, roughly
10    speaking, that were set forth in your business
11    plan?
12         A.    It was my expectations, reading it,
13    yes.
14         Q.    Okay.  Here, you, your final
15    recommendation seems to be that the project step
16    back, reevaluate the original plan, and make
17    adjustments as needed, to fulfill the commitment
18    to the fans, save face with the public, and give
19    yourselves a shot at recouping revenue on the
20    back side.
21         But Mr. Corrente, in fact, did not scale
22    back the first event; correct?
23         A.    It wasn't really an option.  It might
24    have been my suggestion, but he had talent under
25    contract.  He would have had to pay anyhow.
```

1    He's a man of his word.  When he gives a

2    commitment, he stands behind it.

3        Q.    Well, you weren't suggesting that he

4    breach a contract with any of the talent in this

5    document; right?  There's lot of talent that

6    wasn't even paid; right?

7        A.    No, all talent was paid.

8        Q.    We have an account here with somebody

9    who got zero dollars on his contract, I think.

10       A.    Who is that?

11       Q.    What's his name.  Here.  Joseph Heard?

12       A.    Oh, it's a kid.

13       Q.    Okay.  Some people got paid $100,

14   $150?

15       A.    Yes.

16       Q.    And some people that, bringing them

17   there, and putting them up in a hotel room

18   probably cost more than the talent fee; right?

19   Timothy Scott.

20       A.    We did use a lot of hotel rooms.

21   That's Ron Bass's kid, for the record, if you

22   want to mark that?

23       Q.    Okay.  No.

24       A.    And Clear Channel needed to have his

25   signature.

```
 1        Q.    How about Timothy Scott?  Who is he?
 2        A.    Tim Scott?
 3        Q.    Yes.
 4        A.    Tim Scott.  I don't know.  Who is he?
 5        Q.    I don't know.  He's listed.  We've got
 6     a talent contract form that was produced to me.
 7        A.    Does it have ring name on it?
 8        Q.    No.  It's got zero dollars for him,
 9     too.  Mark Nulty?
10        A.    Mark was the ring announcer
11        Q.    Mickey J.?
12        A.    Mark did a tradeoff.  He got a booth.
13     Mr. J. was a referee.  He wanted to work for
14     free, just to be part of it -- or a low amount
15     of money.
16        Q.    Donald Haviland, a/k/a Hank Meyers?
17        A.    Local guy, ECW guy.
18        Q.    Joyce Grable?
19        A.    Old time leading legend.
20        Q.    You weren't the only one who strongly
21     advised Mr. Corrente to scale down the first
22     event; right?
23        A.    I wouldn't know who the others would
24     be.
25        Q.    You know who Jim Cornet is; right?
```

1      A.    Yes.

2      Q.    You are aware that Mr. Cornet also

3    sent Sal a long document, urgently suggesting

4    that he scale down significantly the

5    WrestleReunion 1?

6      A.    Did he send a copy to me?  I don't

7    recall.

8      Q.    Okay.  You don't recall ever --

9      A.    No.

10     Q.    Okay.  Do you recall any input at all

11   from Mr. Cornet?

12     A.    No.

13     Q.    Mr. Cornet is a wrestling manager;

14   right?

15     A.    And he was at the show.

16     Q.    Okay.  And he didn't talk to you at

17   all about his thoughts about the card, or the

18   program plan?

19     A.    I never had a conversation with Jim

20   Cornet.  Ever.  About anything

21     Q.    Okay.  Let's go ahead mark this.  We

22   are up to 12?  I'm sorry not that -- let's mark

23   another one.  You got one there.  Off the

24   record.

25               (off the record)

```
 1          And, for the record, let's get 11.  For the
 2     record, let me just note that Exhibit number 11
 3     is Bates numbered WR-000640-001 and -002.
 4     Exhibit number 12 is -- Exhibit number 12 Bates
 5     numbered WrestleReunion 00397-001 through 006.
 6     And there is a fax line at the, upside down at
 7     the bottom of the first page of the document,
 8     that indicates a date of December 12th, 2004, it
 9     appears to be.
10          (Whereupon, Exhibit 12 was marked for
11     identification)
12          So, Exhibit number 12, you've never seen
13     that document before?
14     A.    No.
15     Q.    Okay.
16          MR. RODEMS:  Object to Exhibit 12, on
17          the grounds of hearsay and authenticity.
18          Also, the witness said he didn't see it
19          before.
20          MR. HERBERT:  Sure.  I'm just asking
21          him.
22     BY MR. HERBERT:
23     Q.    You never heard anything about
24     Mr. Cornet offering suggestions about the
25     program for WrestleReunion 1?
```

```
 1        A.    No.

 2        Q.    Okay.

 3              MR. HERBERT:  All right.  I think I'm

 4        -- let me just ask you this.  Along the same

 5        lines.

 6   BY MR. HERBERT:

 7        Q.    Along the same lines, I asked you

 8   about Colin Bowman earlier.  And I think you

 9   have no idea how Colin Bowman came to write the

10   lengthy document entitled, "WrestleReunion:

11   What should have been"; right?

12        A.    I'd only met the gentleman once.

13        Q.    You never read this document?

14        A.    No.

15        Q.    Okay.  And you know nothing about how

16   it came about?

17        A.    Nothing.

18              MR. HERBERT:  All right.  We might be

19        done.  Let me just take five minutes to go

20        through all my notes and everything, and

21        let's see if I have any, last minute

22        follow-up.

23              (Short break from 4:09 to 4:19 p.m.)

24   BY MR. HERBERT:

25        Q.    Let me ask you, was a WrestleReunion 4
```

1    ever planned, to your knowledge?

2        A.    Yes.

3        Q.    Okay.  Did it -- it didn't take place

4    though; right?

5        A.    Correct.

6        Q.    Okay.  It didn't take place because

7    WrestleReunion, as a company, ran out of money?

8        A.    No.  Because Clear Channel said they

9    weren't going to be there.

10       Q.    Okay.  Who was it who made the final

11   decision not to go forward with the

12   WrestleReunion 4?

13       A.    Sal Corrente.

14       Q.    Okay.  Did you have input into that

15   decision?

16       A.    No.

17       Q.    All right.  Did WrestleReunion or

18   anybody on WrestleReunion's behalf ever seek or

19   attempt to get financing, or loan from any banks

20   or lending institutions, let's say at any time,

21   that you are aware of?

22       A.    I'm not aware of any of the finances

23   involved in WrestleReunion.

24       Q.    Okay.  Okay.  All right.  So you are

25   saying that you personally blame Clear Channel

1       100 percent for WrestleReunion's inability to

2       put on another event after WrestleReunion 3.

3               MR. RODEMS:  Object to the form.

4               THE WITNESS:  I'll even expand upon

5           that, if you will allow me.  They didn't

6           live up to any of their obligations under

7           the contract, except to film.  They never

8           got the product to market.  We did our job;

9           they did not.

10      BY MR. HERBERT:

11          Q.   All right.  So the failure to produce

12      any more events, it was all Clear Channel's

13      fault?

14          A.   The stream of revenue anticipated from

15      those sources was never there because Clear

16      Channel failed; correct.

17              MR. HERBERT:  Okay.  I think that's it.

18              MR. RODEMS:  All right.  Mr. Russen, if

19          this deposition is transcribed, you have the

20          right to read or waive.  You heard, you

21          heard the speech last week, when we took

22          depositions in New York.  That right is

23          yours.  If you do wish to read, then when

24          it's transcribed, the court reporter will

25          contact you and make arrangements for you to

1    read.  Obviously, if we can submit it to you

2    electronically to avoid you having to come

3    back to Tampa for it, we'll do that.  It's

4    your choice; and if you do wish to read the

5    deposition, you just need to notify the

6    court reporter orally.  He'll put it on the

7    record, and then provide him with contact

8    information.

9         THE WITNESS:  Yes, I would like an

10   electronic copy.

11                  *  *  *  *  *  *

12        THEREUPON, the taking of the deposition was

13   concluded at 4:21 p.m.

14                  *  *  *  *  *  *

15

16                    **STIPULATION**

17        It was thereupon stipulated and agreed by

18   and between counsel present for the respective

19   parties and the deponent that the reading and

20   signing of this deposition by the deponent is

21   not waived.

22                  *  *  *  *  *

23

24

25

```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3

 4

 5
        WRESTLEREUNION, LLC,
 6
                    Plaintiff,
 7
        vs.                              Case No.
 8                                       8:07-CV-2093-T-27-MSS

 9
        LIVE NATION TELEVISION
10      HOLDINGS, INC.,

11                  Defendant.
        _____/
12

13                  DEPONENT SIGNATURE PAGE

14
                    I HAVE READ THE FOREGOING TRANSCRIPTION
15      OF MY DEPOSITION, PAGES 3 THROUGH 231, TAKEN ON
        DECEMBER 11, 2008, AND HEREBY SUBSCRIBE TO THE
16      FOREGOING DEPOSITION, SAID SUBSCRIPTION TO
        INCLUDE ANY CORRECTIONS AND/OR AMENDMENTS
17      HERETO.

18

19      _____

20      ROB L. RUSSEN

21
                    WITNESS MY HAND AND OFFICIAL SEAL THIS
22      _____ DAY OF _____, 2009

23

24

25      _____
        Notary Public
        State of Florida at Large
```

1
                          ERRATA SHEET
             WRESTLEREUNION VS. LIVE NATION 12/11/08
2
        PAGE        LINE        CORRECTED TO READ AS FOLLOWS:
3

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      _____

21      _____

22      _____

23

24      ROB L. RUSSEN

25

1                          CERTIFICATE OF OATH

2

3       STATE OF FLORIDA

4       COUNTY OF HILLSBOROUGH

5

6                    I, the undersigned authority,

7       certify that ROB L. RUSSEN, personally appeared

8       before me and was duly sworn by me.

9                    WITNESS my hand and official

10      seal, this 12th day of January 2009.

11

12

13                          _Philip Ryan._

14      ------------------------------------
        PHILIP RYAN, RPR
        NOTARY PUBLIC - STATE OF FLORIDA
15

16

17                                    PHILIP RYAN
                                      MY COMMISSION # DD 561631
                                      EXPIRES: June 28, 2010
18                                    Bonded Thru Notary Public Underwriters

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF REPORTER

 2     STATE OF FLORIDA

 3     COUNTY OF HILLSBOROUGH

 4                    I, PHILIP RYAN, RPR, certify That I

 5     was authorized to and did stenographically

 6     report the foregoing deposition; and that the

 7     foregoing transcript is a true record of the

 8     testimony given by the witness.

 9                    I further certify that I am not a

10     relative, employee, attorney, or counsel of any

11     of the parties, nor am I a relative or employee

12     of any of the parties' attorneys or counsel

13     connected with the action, nor am I financially

14     interested in the action.

15

16                    DATED this 12th day of January

17     2009.

18

19

20

21

22     PHILIP RYAN, RPR

23

24

25
```

Reality Check

Recommendation – Damage Control

Minimize Expenses

Reality checks are never pretty … never nice. You may not <u>want</u> to hear what I am about to say but you absolutely <u>need</u> to hear it. As your friend, advisor and someone who truly cares about you as individuals I need to encourage you to put your egos aside and to stop avoiding the obvious. Instead, we need to recognize the obvious and make plans accordingly.

You have done a wonderful job of assembling the biggest and best convention ever. There is no doubt about that whatsoever. The recognition of that is universal even among the most critical members of the press. But, to this time, 21 days out, the fans have failed to respond in the kind of numbers anticipated and needed to make the event a success.

True, this may all change over the next three weeks if the "snowball" effect Superstar Billy Graham spoke of kicks in. But, even if it does, we are so-oo over booked and over extended that it is time we put our egos aside and let our intelligence take over to see what we can do to produce what has been promised without "over-producing" to the point of no return.

My recommendations are as follows, based on facts, figures, experience and knowledge:

1. We promised the fans 50+ stars then up'd it to 60. We now have close to 90 booked. I strongly recommend we review the list and strip 25 to 30 names from it saving talent fees, transportation costs and room charges totaling tens of thousands of dollars yet still providing the number of stars we committed to the fans who have bought tickets. With less than 200 tickets sold, obviously none of the names that would be eliminated could be considered a "draw" or "ticket seller". Many have not even been announced and, therefore, would not be missed by the fans. In reality, even some of those announced, should be cut because they are not producing sales results.

2. With the smaller volume of tickets sold to this point, I suggest we consider canceling the high school gym and moving the show back into the ballroom on Saturday night. It is unlikely, at this time, that we will sell more than 900 tickets. Thus making the ballroom adequate and sufficient to host the live event. This will save the cost of the rental, insurance and chair rentals. Because the use of the high school has not been announced the fans in attendance will know nothing of it and no embarrassment will occur of having a room less than half full for the event if ticket sales don't dramatically increase.



EXHIBIT

11

12/11/08

PENGAD 800-631-6989

WR-000640_0001

3. Focus on making the best of what we've got with a scaled down roster.  There are still plenty of names involved to qualify this as the biggest and best event without the downside of going forward with the complete list of those now booked.

Not only have the fans not responded as anticipated but sponsors and vendors have also not responded.  Thus anticipated revenues from those sources is not there to be used for such things as advertising and promotion.

Intelligent protocol would now dictate that we step back, re-evaluate the original plan and make adjustments as needed to fulfill the commitments to the fans, save face with the public and give ourselves a shot at recouping revenue on the back side.  I truly believe the recommendations contained herein give us the best chance to do that.

Rob

*561-423-8418*



EXHIBIT

12

12/11/08

TO: SAL
FROM: JC
RE: WRESTLEREUNION

Sal,

First off I apologize for being out of pocket recently but the final
construction/move-in of my house has taken priority over everything
else, as due to the horrible weather we have had here all year, it
is way over budget and way behind schedule, and the actual moving/
unpacking process has been insane because of the weather and a 1000
other details in the finishing of this project that has taken over
a year from the initial planning stage.

I am putting my feelings down on paper because there are too many
things to successfully go over on the phone if i HAD the time, and
to make sure there are no misunderstandings. I would love for this
thing to succeed if only to get to see all these people again, but
to be honest, and without knowing all the details of who exactly is
booked to be there yet despite asking you for the information sev-
eral times, this is shaping up to be a disaster, at least in present-
ation. I don't know what your advance, if any, is because you haven't
told me that either, but the people there will hate wrestling by the
time this thing is over. You haven't booked a wrestling WEEKEND,
you've booked a wrestling WEEK. You haven't booked a <u>show</u>, you've
booked  TWO shows, and I STILL don't know how many more major names
will be there just to sign autographs and not work the house show,
because you didn't send me the list I asked for, but you did mention
Kevin Nash, I remember hearing you talk about Steamboat, Superstar
Graham, etc., so I know there are other HUGE names to be involved.
You also had me book Tom Prichard, but he is nowhere on the info you
sent me either. Are the people doing Q&A's also signing other days,
are there people just there to sign, etc? You need a signing schedule.
From what you sent me, here are my feelings, positive and negative.
Please remember I personally like most all these guys, the only per-
son I personally DISLIKE is Nash, but for business I will wholeheart-
edly agree that he belongs as a mainstream draw since he is a name.

Q & A's FRIDAY NITE  HOSTED BY BILL APTER
6:00-7:30    DIBIASE & STEAMBOAT
7:30-9:00    DALLAS PAGE & BILLY GRAHAM
9:00-10:30   MICK FOLEY & KEVIN VON ERICH
10:30-12:00  DUSTY RHODES & TERRY FUNK

Sal, six straight hours of Q&A's with no potty or food breaks will
be mindnumbing and people will walk out before your strongest session,
with Dusty & Terry. I love Bill Apter but no one wants to see six
hours of him, or anyone else. Your pairings are good except for Cac-
tus and Von Erich, who have nothing in common and since Mick is prob-
ably the biggest present day star of the whole shebang, he should
have a session by himself because Kevin will be ignored. These Q&A's
should be spread out over the weekend so that people enjoy them and

specifically target the ones they want to see most. Depending on the building setup, you could still have autographs or meet & greets going on at the same time with some of the "lesser" stars who will be there all weekend, to give people alternatives. Fans will be pissed if they have to sit there six hours straight, or go to the bathroom and miss the "moment of the night" accidentally, or starve or need water, and you've also given away a lot of the meat of your product in one night.

Have an early-bird registration/ orientation from 3-6PM Friday with some of the guys there, not the major names, and have people there to hand the fans schedules, help with hotel check-in, hand out coupons for drinks at the bar or raffle tickets for merchandise drawings. WELCOME the people who paid money and came to your show. Give them autographs with those talents 8:30-10:00 plus a couple more guys, (which also serves as a potty break & refreshment time for some), then come back at 10:00 with a "TEXAS BARBECUE" with Rhodes and Funk which would be entertaining late night fare, and it ends when it ends. Split it up and let Aper host one and Joey Styles the other.

SATURDAY AUTOGRAPHS 10:00-1:00 and 2:00-5:00

I don't know who else you have booked besides the folks on the house show, so I can't do a comprehensive schedule, but with the amount of people you have, I would suggest 2 hour sessions because you need to alternate the talent to get everybody out there but still not have a mess. Fans will have chances for lunch & bathroom with autograph sesssions all day, but 6-7 hours of just signing will get boring even to the hardcores. Throw a Q&A in the middle to spice it up, such as autographs 10:00-12:00, Q & A 12:00-1:00, break 1:00-2:00, autographs 2:00-4:00 and 4:00-6:00. Your dealer tables I assume will be open all the time. If your Q&A goes over an hour fans won't mind as they have a lunch break after and can return to signings late if they have to. Remember a well-organized signing can process about 200 people per hour, and not everyone will want to stand in line for EVERYBODY. Perhaps this one hour Q&A would be the spot for Bruno, since he is a true legend, doesn't do these often, doesn't talk smart and deserves a lone spotlight. Maybe have Billy Graham come onstage at the end for a handshake after their famous Title match 26 years ago, which would be a great finish, a great "photo op" and get pub in all th mags here and Japan, and have the "feel good" moment before the break. Get the place cleared by 6:00 so fans have an hour and a half to eat dinner before the show.

The card for the show is what concerns me the most. It will be simply IMPOSSIBLE to have FOURTEEN matches in any reasonable amount of time. You have 7:30-11:00 scheduled and I guarantee you this card as it is booked will last until 1:00AM. Everybody on it will want to do their shit one more time, no matter who they are, you have not allowed for promos, intermission, entrances, etc. There are too many people who don't belong on an event of this type. The stars the fans want to see will either have their time cut down, or worse, take it anyway, and

WR-000397_0002

half the crowd will be gone or worn out before your main events. Many of these legends deserve individual entrances. Some of them should do promos (i.e., in Florida, don't you think people will want to hear Terry Funk, Roddy Piper, Dusty, etc. promo before they work?)

Let's examine the card piece by piece from a BUSINESS standpoint exactly as you listed it for me:

MARTY JANETTY VS. GARY ROYAL
GEORGE SOUTH VS. MISSING LINK          > SCRATCH ALL THIS SHIT
LANNY POFFO VS. ADAM WINDSOR

Right off if I paid $250 to come to this thing I'm pissed. These matches don't belong on a legends show. I like George and Gary and I know they are your friends but nobody remembers them outside Charlotte and even if the diehards do, they will not be happy with them taking time from Piper, Funks, Dusty etc. Your analogy about me using Kenny Bolin in OVW does not hold water as I run a training territory with weekly shows in the same town, not high priced once-in-a-lifetime legends events, and I don't PAY Kenny. Nobody wanted to see Lanny Poffo 15 years ago, Link is nearing 70 and is a marginal name, Adam Windsor even I couldn't pick out of a police lineup as he is just a student of Dory's that Marti thinks is cute, and Janetty can still go and would be better used in another match if he is to work, but he won't sell you enough tickets on his own to justify a payoff in this environment.

MASKED SUPERSTAR VS. GRAPPLER MASK VS. MASK

Nothing wrong with this match, but why mask vs. mask? That's a blowoff match of a long program, and the people there will already know Grappler is Len Denton. Bill Eadie would be better known in Florida as Demolition, but regardless, since Len is already (I assume) doing the job, why pop his mask as well?

NWA TITLE JARRETT VS. TULLY w/JJ DILLON

Fine here, good match & workers, Florida tie-in, names everyone knows, just be careful they don't go too long to show they can.

NWA TAG TITLE TERRY & DORY FUNK VS. KONNAN & ROAD DOG

Well the NWA TAG TITLE aspect is out after latest TNA PPV, but it might be for the best. The Funks going after the NWA Tag Title was a selling point I see where you're going with, but due to politics they couldn't win it, and that would be a downer as folks will want to see the Funks over. Brian is a great opponent for the Funks, but Konnan is a total style clash with anyone not Mexican, you have whole family on the card, why not team him with Steve and have a better match where I'm sure the Armstrongs would not think twice about putting the Funks over? How about a brief promo duel Terry vs. Brian?

WENDI RICHTER, BAMBI, MALIA HOSAKA & JENNY TAYLOR VS  SHERRI MARTEL,
PEGGY LEE & BLONDAGE--                                        (cont)

(4)

Once again, right off the bat Jenny Taylor and whoever Blondage are don't belong on a legends show since nobody knows who the fuck they are. You can't MAKE stars on a one-off show of this type, you have two major stars here, Sherri and Wendi, and the two girls who we know can still go are Bambi and Peggy. Make a tag match, 6 minutes, and put the faces over. This leaves Malia Hosaka the odd girl, I like her and she was good last time I saw her over 10 years ago, but she was never a __major__ name.

AJ STYLES VS. CHRISTOPHER DANIELS

Even though neither are legends per se, this is your in-ring match of the night, and if they keep to 10-12 minutes will tear the house down and not take away from the legends. Put this on before inter-mission so the people can rest.

ROCKY JOHNSON, JIMMY VALIANT AND RODDY PIPER VS. BUDDY ROSE, DEBEERS AND BOB ORTON w/SHERRI

THIS is a legends match, all the faces need seperate entrances, there should be a promo from Piper (maybe Valiant as well) and should go on early so their age/physical limitations are not upstaged already or people worn out by lots of other matches. Even with 8-10 minutes bell to bell at most, this will be a 20 minute segment easily no matter what is called beforehand.

LANE, EATON, CONDREY, CORNETTE VS. FANTASTICS & ROCK & ROLL w/HEENAN NO TIME LIMIT, NO DQ, NO COUNTOUT

As I said, this match is fine, first time ever all 4 Midnights on same team, first time R&R and Fants team up, Bobby and I did good for ROH, but where did no time, DQ, COR come from? We will have the same match regardless, it just clutters up things with all these stips. Faces need separate intros, people may want to see brief promos from me and Heenan, we can all still do enough to do our 10-12 min-utes and I can drop the fall. Why not put Tom Prichard in our corner to offset Bobby, have the Heavenly Bodies together as well and take up no extra time.

STEEL CAGE REF CACTUS JACK DUSTY RHODES & MIKE GRAHAM VS. KEVIN SULLIVAN & CM PUNK w/HARLEY RACE

Jesus Christ--Why a cage? It won't sell any tickets, it will limit the match, it will take forever to set up, and it will make Harley useless as a manager in a cage match can't do anything. Dusty in Tampa is your main selling point--he and Mike Graham have history, and Kevin Sullivan opposing him is perfect. Where does CM Punk fit? He's a good guy but he will be a spare prick at the wedding in this company. No one but ROH fans will know him and he will be lost with these other guys styles. Put Punk in a 3 way with Styles & Daniels if you want to use him cause he'll be lost here. You need someone in that spot that fits and can drop the fall--Ron Bass, Windham, Kamala, somebody. And as I said, this wastes Harley completely.



HACKSAW DUGGAN VS. KIMALA

Duggan is over with the fans, Kimala is a great guy but probably past his peak of popularity, and this match won't be pretty. Put Kimala in the tagmatch with Sullivan where it would mean something and either let Duggan do a promo or a quick feel-good squash so it doesn't leave the fans with a downer if these guys can't still go to hold up the people's memories.

BATTLE ROYAL FOR IWA CHAMPIONSHIP (MORE NAMES TO BE ADDED)

Bugsy McGraw
Adrian Street
Virgil
Warlord
Hack Myers
Shane Douglas
Bullet Bob, Brad & Steve Armstrong
The Thunderfoots

FOR THE LOVE OF GOD, SAL! On an already overloaded card, a Battle Royal for the fictitious championship of a nonexistent promotion that nobody will come back to defend featuring 60 year old Bugsy McGraw, 60 plus year old cancer survivor Adrian Street ( an old, great friend of mine), Virgil, a professional sidekick and shitty worker who's never drawn a dime on his own, The Warlord who is a graet guy and was the shits 20 years ago, Hack Myers, who had a cult following in ECW and has never done anything on any other stage, the Thunderfoots (WHAT???) and Bullet, Brad and Steve. Bullet's always in shape, Brad had a serious leg injury and I don't know how he's doing, and I already suggested putting Steve, the only athlete still in his prime in the Funk match. And Shane, who I understand has had multiple injuries. Even without the others to be added, this could be a town killer. Scratch this whole thing and just intro Bugsy, Adrian, to the crowd so they can get a round of applause as they were big in Florida, and see next match---

BARRY WINDHAM & MIKE ROTUNDA VS. RON BASS & SOMEONE (UP IN THE AIR)

If you put Kimala with Sullivan, and Steve Armstrong with BG James vs. Funks, and scratch the Battle Royal, you still have the following poeople that mean something--Bullet, Brad, Windham, Rotunda, Shane Douglas, Ron Bass, and if you really stretch, Konnan. I suggest a 6 man with Bullet, Brad & Windham (faces) vs. Rotunda, Bass & Shane (heels) to make the best of this, and have Konnan do a run-in that backfires in the Funks vs. Armstrongs match to give Brian & steve an out to drop the fall.

WITH THESE CHANGES which you probably won't make, you STILL have 9 or 10 matches, and even if you scratch the cage stip and do one 10 minute intermission (the cage alone will take 20 minutes to set up if God is on your side, with promos and entrances you'll be lucky to be



out of there between 11:00 and 11:30 PM. By the time folks grab a bite, or a drink, or just unwind, nobody, fans OR wrestlers, will be in bed before 12:30~1:00AM.

Which brings us to SUNDAY MORNING--You have scheduled me, Lane, Eaton, Condrey, Bill Watts and Bruno Sammartino for a Q&A from 8 TO 11 AM--not even our immediate families would want to get up at 7AM or earlier on Sunday morning to grab a quick bagel and be in a seat by 8 to hear us say anything. As we discussed, Bruno should have his own spotlight. Watts of course has history with us--but examine this. MY Q&A in Charlotte drew 600 or more at 10PM--The Midnight Reunion in Philly drew 750 for the show and 250 for the afternoon Q&A--my deal with Heenan in ROH drew 750--Bill Watts NEVER does these things and is a MAJOR name with a lot to say, and you give us the death slot of the whole weekend, followed by me and the Midnights doing autographs 11:30 to 2:00PM AND 3:00 to 6:00PM that day? By the end of Sunday, Bobby, Stan, Dennis and I won't want to ever see EACH OTHER again, much less the fans wanting to see us!

We can certainly do an autograph session on Saturday and promote a Q&A on Sunday AFTERNOON. Have a Sunday "brunch" from 10AM-NOON with some of the guys in the hotel restaurant, for people who want to get up early. Have the MX & Watts Q&A at Noon and we can all follow up with autographs again after--Nash and others can also do autographs in the afternoon, along with maybe drawings for door prizes to finish up the day by 5-6PM so everyone can get the hell out of there.

I don't mean to be so critical, Sal, but this deal has a chance to be a memorable and successful, enjoyable time for wrestlers and fans alike, or as it is scheduled now, has the opportunity to be the great clusterfuck of all time. Additionally, with all the expenses, hotel, payroll, advertising, etc., how can you make any money on this thing with all the marginal and non-existent "names" cluttering up the proceedings and their trans? And if it IS profitable, you could make thousands more by not having all these people booked that won't sell one single ticket. Where is the ring & crew coming from? Who are your referees? Who's ring announcer? PA & sound staff? Security for autograph sessions to keep the lines orderly & moving? Ticket sellers & support help? Local publicity in Florida? Are you pumping the Japanese market? The people need to know a firm schedule of what & who they'll see for the amount they're paying, and wasting time promoting the Thunderfoots and the "IWA Championship" will just make people tune out your real selling points. I would love to see these people but I don't want to make a 1500 mile round trip drive for a disaster of epic proportions. My phones will FINALLY be hooked up 12/13 or 14 (my electricians forgot to tie wiring in old part of house to new part) and I will be glad to discuss this with you then. As for the promo you asked for I have no idea what a "windows media player format" IS, and I don't yet know what I am promoing as you see from the last 6 pages. Please read this and we'll talk tomorrow or Tuesday.

Charles!
JC