1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION



WRESTLEREUNION, LLC,

    Plaintiff,

v.

                CASE NO.:   8:07-CV-2093-T027-MSS

LIVE NATION
TELEVISION HOLDINGS,
INC.,

    Defendant.

_____/


DEPOSITION OF:        SAL CORRENTE

DATE:              APRIL 22, 2009

TIME:              11:38 a.m. - 6:15 p.m.

PLACE:            625 East Twiggs Street
                     Suite 100
                     Tampa, Florida

TAKEN:            Pursuant to Notice

REPORTED BY:        Deborah G. Carver
                     Notary Public
                     State of Florida at Large

```
 1   APPEARANCES:

 2

 3           RYAN CHRISTOPHER RODEMS, ESQUIRE
             BARKER RODEMS & COOK, P.A.
             400 North Ashley Drive
 4           Suite 2100
             Tampa, Florida 33602
 5           (813) 489-1001
             Rodems@barkerrodemsandcook.com
 6           Attorney for Plaintiff

 7

 8
             GREGORY W. HERBERT, ESQUIRE
 9           GREENBERT TRAURIG, P.A.
             450 South Orange Avenue
10           Suite 650
             Orlando, Florida 32801
11           (407) 420-1000
             Herbertg@gtlaw.com
12           Attorney for Defendant

13

14   ALSO PRESENT:   SAL CORRENTE
                      ANTHONY ATTANASIO
15

16

17

18

19

20

21

22

23

24

25
```

I N D E X

Examinations                                                    Page

  BY MR. HERBERT                                                  4



                        E X H I B I T S
            No.          Description                             Page

Exhibit 22 - Invoice                                             5
Exhibit 23 - Document 2/6/08, Live Nation to                    10
WrestleReunion
Exhibit 24 - Appearance agreement                               13
Exhibit 25 - Appearance agreement                               15
Exhibit 26 - Fish Eye estimate                                  16
Exhibit 27 - E-mail 8/27/04 Corrente to Russen                  19
and Page
Exhibit 28 - Rules and regulations                              22
Exhibit 29 - Press release draft                                25
Exhibit 30 - Press release                                      26
Exhibit 31 - Press release                                      32
Exhibit 32 - Invoice for security                               40
Exhibit 33 - IM chat printout                                   62
Exhibit 34 - Lease agreement Spartanburg                        66
Memorial Auditorium
Exhibit 35 - Letter Sterling to Coplin                          80




CERTIFICATE OF OATH                                             88
CERTIFICATE OF REPORTER                                         89
SIGNATURE PAGE                                                  90

SAL CORRENTE,

1

2    was called as a witness and, being duly sworn

3    by the Notary, was examined and deposed as

4    follows:

5                        EXAMINATION

6  BY MR. HERBERT:

7        Q.        Okay.  Good afternoon, Mr. Corrente.  You

8  know who I am by now I'm sure.

9        A.        I'm quite familiar with you, yes.

10       Q.        Okay.  And you understand you're still

11 under oath, right?

12       A.        I was just sworn back in.

13       Q.        Okay.  Just do that for the record.

14       A.        All right.

15       Q.        I'll ask you briefly, I think we talked a

16 little bit at your earlier deposition about whether or

17 not WrestleReunion had ever ordered some DVDs from

18 Clear Channel and whether or not they had ever paid for

19 them.  Since I asked you that last time, has your

20 memory been refreshed at all?  Do you recall anything

21 about that?

22       A.        No.  I would stand on my previous answer.

23       Q.        Well, let me just show you this document.

24 Why don't we go ahead and mark this.  We're up to --

25                 MR. RODEMS:  21, if I'm not -- no.  No.

1    No.   I may be wrong about that.

2          MR. HERBERT:  Off the record.

3          (Off the record)

4          (Exhibit 22 - Invoice)

5          MR. HERBERT:  All right.  For the record

6    what I marked as Exhibit 22 is a document entitled

7    invoice.  It's on Clear Channel Entertainment

8    letterhead.  It appears to be issued to

9    WrestleReunion LLC dated August 31st, 2005.  And,

10   counsel, here's a copy.

11         MR. RODEMS:  Off the record for just a

12   second.

13         (Off the Record)

14         MR. RODEMS:  We can go back on.

15   Q.     Take a look at Exhibit Number 22 and I

16   ask you if you've seen that document before?

17   A.     I don't recall seeing it before.

18   Q.     It looks like it's an invoice to your

19   company, WrestleReunion, for almost $10,000 for certain

20   DVDs that were shipped to WrestleReunion.  Do you

21   recall if WrestleReunion ordered the DVDs that are

22   reflected on this Exhibit 22?

23   A.     Any and all DVDs that were produced,

24   other than a couple of -- I can't think of the word I'm

25   looking for, I don't want to say complimentary copies

1    because it's not -- maybe promotional copies or

2    whatever that I might have had in my possession at some

3    other time were given to Clear -- were for Highspots,

4    and Highspots has them.  I don't have anything.

5          **Q.     Okay.  I know they have them but, I mean,**

6    **it wasn't Highspots who -- Highspots ordered some and**

7    **Highspots paid for those, right?  But this is a**

8    **different batch that WrestleReunion itself ordered and**

9    **never paid for.  Isn't that right?**

10          A.     Greg, do you have a purchase order for me

11    for this stuff?

12          **Q.     There's an e-mail where you're requesting**

13    **it and you're asking about how we bill it, wholesale or**

14    **otherwise.  And, you know, I could try to dig that up.**

15          A.     Okay.  I mean, there's no need.  If you

16    say there's something like that, I'll say okay.  The

17    bottom line is, whatever was brought was then given to

18    Highspots from WrestleReunion 2, right?  Given to

19    Highspots.  They have them.  I don't have them.  I have

20    received no payment from Highspots for them.  I would

21    assume that Highspots would pay Clear Channel or give

22    the DVDs back if -- whatever he has.

23          **Q.     You never asked for them back from**

24    **Highspots, right?**

25          A.     No.

1       Q.      Okay.  Have you spoken about this with

2   Mr. Bocciccio?  I mean, recently?

3       A.      I -- I knew he was going to find out what

4   he had in stock but, no, I didn't have any major

5   discussion with him about it.

6       Q.      Okay.

7       A.      But, no, I didn't have any major

8   discussions with him about it.

9       Q.      All right.  Well --

10      A.      But it's not -- I'm not concerned

11  about -- well, like I said, I'm really just seeing the

12  bill now for the first time.

13      Q.      Mr. Bocciccio testified that those were

14  not -- those DVDs were not for him.  That you --

15  WrestleReunion ordered those DVDs and that he doesn't

16  know why you asked him to take them back to North

17  Carolina with him.  Does that refresh your recollection

18  at all?

19              MR. RODEMS:  Objection to form.

20      A.      No, it doesn't refresh my memory.  The

21  bottom line is this -- how many does it say was here?

22      Q.      240 of each of the four shootings.

23      A.      And how much did he have of the -- of

24  the -- of his initial order?

25      Q.      He still has plenty left.  His original

1    **order was --**

2        A.        Of his initial order.

3        Q.        **-- 1,000.   His initial order was 1,000.**

4        A.        So, basically the same thing.   240 or

5    250, when you say a thousand, that's what you mean,

6    right?

7        Q.        **He ordered 250 of each.   Your company**

8    **ordered 240 of each.**

9        A.        Okay.   And you're telling me that he

10   indicated to you, because I see no sales records of his

11   company, he indicated to you that he has not sold 250

12   of any of these DVDs?

13       Q.        **No.   No.   No.   Oh, of these --**

14       A.        Of these titles --

15       Q.        **Yes.   As far as the ones reflected in**

16   **this Exhibit Number 22, he has those in a separate box**

17   **in a warehouse.   He's never offered those for sale**

18   **because his understanding is you ordered those and**

19   **those are yours.**

20       A.        Let me ask you a question.   Did he give

21   you sales figures on what he has sold?

22       Q.        **Yes.**

23       A.        Okay.   And you're telling me, and I would

24   assume the breakdown is approximately the same without

25   seeing it, 250 of each.   So, you're telling me that he

1    sold less than 250 of each one of those DVDs is what

2    you're telling me?  Because otherwise it would have to

3    come out of this, right?

4         Q.     No.  He never offered this number for

5    sale is what he testified.  He ordered a thousand

6    total.  He sold out of Kevin Nash and he sold out of

7    Bruno Sammartino?

8         A.     So, if we went to his web site right now,

9    those -- those titles would not be offered for sale?

10   And I don't know if they would be or not.  I'm asking

11   you.

12        Q.     I believe that's what his testimony was,

13   that his understanding was those are your DVDs and you

14   asked him to take them back and said you would get them

15   later and you never did.

16        A.     No, that would not -- that would

17   absolutely not be my understanding.

18        Q.     I think there might be an exhibit from

19   the Highspots deposition that addresses this, so I'm

20   just going to look through those exhibits briefly to

21   see if there is one.  All right.

22               So, just as you sit here today is it your

23   understanding that WrestleReunion ordered DVDs to be

24   paid for by WrestleReunion from Clear Channel or not?

25        A.     Greg, as I indicated to you, I will stand

1   on my previous answer.  You've submitted -- you've

2   shown me an invoice here.  I assume it was mailed to

3   me.  You don't show anything that shows it was mailed

4   to me, but I assume that it was.  As I think you're

5   aware, I travel most of the time.  Mail is -- mail

6   quite honestly just piles up.

7        Q.    **You don't check your bills?**

8        A.    Very rarely do I check anything that goes

9   to the house, because my personal bills are all sent to

10  a bill paying service.

11       Q.    **What bill paying service is that?**

12       A.    It's called Pay Trust.

13       Q.    **That's an Internet bill paying service?**

14       A.    Correct.

15       Q.    **Let's just mark this as 23.**

16            **(Exhibit 23 - Document 2/6/08, Live**

17       **Nation to WrestleReunion)**

18            MR. HERBERT:  For the record what's been

19       marked as Exhibit 23 is a document dated February

20       6th, 2008.  It's on Live Nation's letterhead.

21       Appears to be addressed to WrestleReunion LLC and

22       to Mr. Corrente's e-mail address.

23       Q.    **Take a look at Exhibit 23 and let me know**

24  **if you recognize that.**

25       A.    I don't have a very -- well, e-mail

1    address is obviously not right.  It says, Sal,

2    B-G-C-H-R and that's not my e-mail address.

3    Normally I -- I don't know.  But even if I had seen it,

4    it says that it's -- this is not a request for payment.

5    Okay.

6        Q.      This is -- they're asking confirmation of

7    a receivable from WrestleReunion for $9,552.  Do you

8    recall Clear Channel or Live Nation ever asking you to

9    confirm that you owed them $9,552?

10       A.      No.

11       Q.      What I want to do is back up a little bit

12   to the --

13       A.      I would assume this would all be simple.

14   You tell me the DVDs are all in a box.  Highspots could

15   send them back or they could start selling them.  I

16   mean, I think that it's -- quite honestly, you tell me

17   the boxes are sitting there full of DVDs.  I've never

18   one time heard from Highspots saying, hey, what do you

19   want do with these?

20           MR. RODEMS:  Mr. Corrente, let me remind

21       you that when there's not a question on the table,

22       you're not required to volunteer things.  And I'm

23       going to move to strike the last answer as being

24       not only not responsive but not requested.

25       Q.      But did you ever ask Mr. Bocciccio of

1    Highspots to do anything with those DVDs that he took

2    back to North Carolina after WrestleReunion 2?

3         A.      No.

4         Q.      Do you have any reason to doubt his

5    testimony that he said somebody from WrestleReunion

6    told him, take these DVDs back and we will get back to

7    you and get them back from you at a later date?

8              MR. RODEMS:  Object to form.

9         A.      I have no idea who would have told him

10   that.

11        Q.      Okay.  Wasn't you?

12        A.      I don't recall that.

13        Q.      Different subject.  Documents that you

14   produced and are entitled personal appearance agreement

15   for a Dennis Condry and a Timothy Scott appear to be

16   dated January 14th, 2004.  Just take a quick look at

17   those and tell me if -- just if the date is correct on

18   those to the best of your knowledge?

19        A.      Well, that's Scott Hudson.

20        Q.      Oh, that's Timothy Scott Hudson is the

21   way the name is written.

22        A.      Yeah, to the best of my knowledge.  Well,

23   no, I would say --

24              MR. RODEMS:  I'm sorry.  Could you read

25         back the question please?

1    Q.     The only question is, do you know if
2  these -- both of these documents I showed you, and I'll
3  mark them in a second I guess, but there's a personal
4  appearance -- they appear to be a personal appearance
5  agreement between WrestleReunion and Timothy Scott
6  Hudson on one of them and the other one between
7  WrestleReunion and Dennis Condry.  And they both have a
8  date.  One has a date of January 10th, one has a date
9  of January 14th, both in 2004.  Dennis Condry is signed
10  by him.  Doesn't appear to be signed by anybody else.
11  And the Timothy Scott Hudson appears to be signed by
12  him and not by anybody else.
13           Just asking, do you know -- why don't we
14  just go through them one at a time.  January 10th,
15  let's just mark this one.  What are we up to, 24?
16               MR. RODEMS:  24, yeah.
17               (Exhibit 24 - Appearance agreement)
18    Q.     Take a look at what's been marked as
19  Exhibit 24.  And after you and your counsel have had a
20  chance to look at it, tell me if you recognize the
21  document.
22    A.     Yes, I recognize the document.
23    Q.     Okay.  What is Exhibit 24?
24    A.     It's an appearance agreement to appear at
25  WrestleReunion 1.

1    Q.    Okay.  For Mr. Scott Hudson?

2    A.    Yes.

3    Q.    And did he appear at WrestleReunion 1?

4    A.    Yes.

5    Q.    And did you prepare this document?

6    A.    Did I prepare it?  No.

7    Q.    Who prepared it?

8    A.    Rob Russen would have prepared it.

9    Q.    Okay.  And do you know, did Mr. Hudson

10   sign this on or about January 10th of 2004?

11   A.    I would say probably not.

12   Q.    Do you have any idea when he did sign it?

13   A.    I would say January 10th of 2005.

14   Q.    So you think that that is a typo?

15   A.    Yes, I do.

16   Q.    And is that from your personal memory

17   that -- of when you dealt with Mr. Hudson?

18   A.    Well, it's from just fact.  We developed

19   WrestleReunion, as we've already been on record

20   stating, in June of 2004.  It would be pretty silly to

21   think that we had an agreement signed six months before

22   I ever came up with the idea.  So, I mean, I'm just --

23   Q.    I was confused when I saw this.

24   A.    I understand and I don't blame you.  I'm

25   confused looking at it, but obviously when we sent it

1   to them it wasn't relevant to them either.

2       Q.      I'm sorry.  When you say, when we sent it

3   to them?

4       A.      Well, we sent one to Scott and we sent

5   one to Dennis.  They looked at it and they just, okay

6   and signed it.

7       Q.      And just for the record we'll take a look

8   at Exhibit Number 25.  And then let me know if you

9   recognize Exhibit 25.

10              (Exhibit 25 - Appearance agreement)

11              MR. RODEMS:  May I see Exhibit 24 please?

12              MR. HERBERT:  Oh, yeah.

13      A.      You want me to say yes, I recognize this

14  and I believe the date January 14th, 2004, is in error

15  and it should have been January 14th, 2005.

16      Q.      Okay.  And this one has the date January

17  14th on the first line and then also at the end.  And

18  both those dates are typos?

19      A.      Correct.

20      Q.      Okay.  There's a --

21      A.      To the best of my knowledge.

22      Q.      Sure.  And there's a fax line on this

23  that appears to be dated January 26th, 2005.  It's got

24  North Florida Surgery Center on it.  Do you know, were

25  you faxing something to or from the North Florida

1    Surgery Center?  Do recognize that name?

2         A.     No, I don't.

3         Q.     You never worked at a place like that?

4         A.     No.

5         Q.     As far as you know, did Mr. Condry ever

6    work in anyplace like that or it just might have been a

7    fax machine he was using?

8         A.     Right.  I don't know.

9         Q.     Anybody at all involved with

10   WrestleReunion have any connection to North Florida

11   Surgery Center?

12        A.     Not to my knowledge.

13        Q.     Does Mr. Condry live in North Florida?

14        A.     Not to my knowledge.

15        Q.     Where does he live or did he at the time?

16        A.     He's kind of a guy -- now, he may have

17   lived there at the time.  He's been in different

18   places.  He's kind of one of these guys who just

19   vanishes and reappears.  And I really don't know and I

20   haven't spoken to him in quite a while.

21        Q.     We've got a couple of those in the

22   wrestling world anyway, at least, huh?

23             MR. HERBERT:  Let's go ahead and mark

24        this as 26.

25             (Exhibit 26 - Fish Eye estimate)

1              MR. HERBERT:  And for the record what

2       I've marked as Exhibit Number 26 is a document

3       that appears to be on letterhead of a company

4       called Fish Eye Video Productions.  And it's

5       entitled Fish Eye estimate.

6       Q.       I'll show you Exhibit 26 and ask -- let

7  me ask you if you recognize that document?

8       A.       No, I do not.

9       Q.       Are you familiar with the company called

10  Fish Eye Video?

11      A.       No, I'm not.

12      Q.       Do you -- did Mr. Russen ever tell you

13  that he was getting estimates for television production

14  from other companies?

15      A.       Not that I recall.

16      Q.       Okay.  You see at the top where it says

17  preliminary budget for television production of quote

18  WrestleReunion.  It's the first entry there?

19      A.       Yeah, I see that.

20      Q.       I mean, did anybody ever talk to you

21  about getting an estimate from any company about -- for

22  television production?

23      A.       I have no knowledge of it.

24      Q.       And this is dated September 14th of 2004.

25  At that time were you the only person who was really

1   involved in the WrestleReunion concept or --

2       A.      No.  Rob Russen was involved.

3       Q.      So, do you think this is something that

4   might have -- that Rob Russen might have been involved

5   with?

6       A.      I couldn't -- I couldn't tell you.  I

7   have no knowledge of Fish Eye Productions or --

8       Q.      Okay.  Did you seek out any estimates of

9   any television production companies or film

10  companies --

11      A.      No.

12      Q.      -- in this time period?

13      A.      No.

14      Q.      Do you have any recollection that

15  Mr. Russen talking -- in this time period of fall of

16  2004, September 2004, do you have any recollection of

17  Mr. Russen talking to you about any estimates with any

18  television production companies?

19      A.      No.

20      Q.      Do you know -- at the time you had your

21  discussions with Mr. Bocciccio of Highspots about him

22  possibly filming WrestleReunion 1, did he talk to you

23  about trying to hire a local camera crew in the Tampa

24  area?

25      A.      No, I don't -- I don't recall that.

1     Q.      Did he indicate to you what equipment he

2   was going to use to film it if he was going to do it?

3     A.      No.

4     Q.      That didn't come up?  That wasn't your

5   concern, that was his --

6     A.      Right.

7     Q.      -- concern?  I'm just saying

8   Mr. Bocciccio I believe testified that he was going to

9   hire some local people if he was going to do it.  And

10  I'm curious if that jogs your recollection at all as to

11  whether or not he might have mentioned something about

12  this company or any other local AV or TV company in

13  anyway?

14          MR. RODEMS:  Object to form.

15     A.      Greg, I have no knowledge of Fish Eye

16  Productions or anyone else.  I just don't.

17     Q.      Okay.  I understand.  Are you aware of

18  Highspots making any efforts to hire or contract or

19  subcontract with any other --

20     A.      No.

21     Q.      -- equipment company of any kind?  Okay.

22          MR. HERBERT:  Let me just mark this as

23     27.

24          (Exhibit 27 - E-mail 8/27/04 Corrente to

25     Russen and Page)

1          MR. HERBERT:  For the record Exhibit 27

2     is a document.  Appears to be a copy of an e-mail

3     dated August 27th, 2004.  Appears to be from

4     Mr. Corrente to Mr. Russen and to Diamond Dallas

5     Page.

6     Q.      Do you recognize Exhibit 27?

7     A.      Well, I mean, I see it was sent from my

8  e-mail address.  Do I really recall this?  No.  But

9  obviously it was sent from my e-mail address.

10    Q.      Okay.  Who is Dontyell One?

11    A.      Oh, that's Don't Yell One.

12    Q.      Who is that?

13    A.      Bill Apter.

14    Q.      Okay.  Would you remember this NWA

15 legends event that's the subject of this e-mail that

16 happened in August of 2004 as you were -- well, let's

17 just leave it at that, in August of 2004 in

18 Fayetteville, North Carolina?

19    A.      Do I know it took place?  Yes.

20    Q.      Do you remember looking at that and

21 analyzing what its draw was, researching it?

22    A.      That would have -- I wouldn't consider

23 that I was researching that.  I would consider that's

24 just something in a daily surf of wrestling information

25 on the Internet that I would have come across.

Q.      Well, aren't you saying that old school,
meaning older wrestlers who were famous in an earlier
era still have popularity and can draw a crowd?  Isn't
that what you're saying?

A.      Could I see that a minute please?  Okay.
I don't believe that I said anything.  This is
something that I probably copied and pasted into an
e-mail as it was on the -- I don't think I said -- you
said old school.  I'm going to tell you that was some
sort of press release type of thing that I just copied
and sent out.

Q.      Okay.  Sure.  I understand.

A.      So, I was giving no opinion at all.

Q.      And this August of 2004 was around the
time you were formulating and starting to plan
WrestleReunion 1, correct?

A.      It was a little bit before that.

Q.      Well, it was at least in the conception
stage, right?

A.      Well, no.  We -- we start --
WrestleReunion -- came up with the idea for
WrestleReunion 1 around June.

Q.      And in this time period you were
trying -- you were in the process of planning and
implementing the plan, right?

1    A.      Yeah.

2    Q.      So, weren't you looking at the NWA

3    legends event for comparison purposes or to help with

4    marketing or other aspects of planning WrestleReunion

5    1?

6    A.      I have no recollection why I sent that

7    other than it was an information thing.  That's it.  I

8    don't have any recollection of sending it.  But

9    obviously I'm not --

10   Q.      Okay.

11           MR. HERBERT:  Let's mark this.

12           (Exhibit 28 - Rules and regulations)

13   Q.      What I've mark as Exhibit Number 28 is a

14   document produced by your counsel.  At the top it

15   reads, rules and regulations for NWA Wrestling Legends

16   Fan Fest.  Second page appears to be an

17   application/contract for exhibit space.  And ask you to

18   take a look at Exhibit 28 and let me know if you

19   recognize that.

20   A.      No, I don't.  I don't really recognize

21   it.  I mean, I agree with what you said it was but, no,

22   I don't recognize it.

23   Q.      Let me ask you, in about August of 2004

24   were you looking at the NWA Legends Fan Fest event for

25   any ideas or maybe to examine their contracts for

1    possible use or general research in connection with the

2    WrestleReunion project?

3         A.      I don't really recall that.

4         Q.      Okay.  Well --

5         A.      Their event is not like our event.

6         Q.      Well, it involves some legends of

7    wrestling, right?

8         A.      Correct.

9         Q.      And it's -- it has a Fan Fest component,

10   meaning autograph signing, question and answer session,

11   right?

12        A.      Correct.

13        Q.      So at least those things are similar to

14   the WrestleReunion event, right?

15        A.      Correct.

16        Q.      What do you deem to be the differences

17   between the NWA Wrestling Legends Fan Fest event and

18   your event and WrestleReunion?

19        A.      Well, besides the number of participants,

20   and I'm not an expert on their event, but I know that

21   no one came close to the number of participants we had.

22   Ours was based around -- based around wrestling

23   matches.

24        Q.      You personally had never been the head of

25   any wrestling event that had an expense budget of more

1    than $500,000 before WrestleReunion 1, right?

2        A.    Correct.

3        Q.    Okay.  And same question but knocking it

4    down to $200,000.  You had never headed up any

5    wrestling event where more than $200,000 was spent,

6    right?

7        A.    Well, in many cases I guess I wouldn't

8    even know the answer to that.

9        Q.    And that would be because you weren't in

10   charge of the money or anything like that?

11       A.    Right.  I would just be in charge of

12   producing the actual show.  So, I can't answer one way

13   or the other.

14       Q.    Well, what's the highest dollar amount

15   that you personally promoted where you were in charge

16   of the whole thing?

17       A.    Well, I would say these events.

18       Q.    Okay.  But I mean other than

19   WrestleReunion what's the next --

20       A.    I don't really know.

21       Q.    So, it's fair to say that you hadn't done

22   anything of this size or scope prior to WrestleReunion?

23       A.    No.  Well, in what role?

24       Q.    Being the head of it?

25       A.    Correct.

1        Q.        Being in charge of it.  I mean, your

2    position is that really nobody had done anything like

3    WrestleReunion before WrestleReunion came along, right?

4        A.        Correct.

5        Q.        And so there's no other company that

6    you've been involved with that would be, prior to

7    WrestleReunion, that would be an accurate -- that could

8    provide an accurate comparison financially for how it

9    did as compared to how WrestleReunion did that you've

10    been in charge of, any other event that you've been in

11    charge of?  And I could rephrase that if you want.  It

12    was a little jumbled.  Do you see what I'm getting at?

13            There's no other event that you were in

14    charge of that we can look at and say, well, Sal's

15    track record with being in charge of these events did

16    this well with this event and this is how

17    WrestleReunion did, and that's a fair or -- a fair

18    comparison to look at those two?

19        A.        Correct.

20            MR. HERBERT:  Let me go ahead and mark

21        this as 29.

22            (Exhibit 29 - Press release draft)

23            MR. HERBERT:  What I've marked as Exhibit

24        29 is a document that was produced by plaintiff's

25        counsel.  It appears to be an e-mail from Mr.

1          Corrente to Rob Russen and Mr. Apter dated August

2          24th, 2004.  I hand it to your counsel.

3          A.     All right.

4          Q.     **Okay.  Do you recognize Exhibit 29?**

5          A.     No.

6          Q.     **Isn't that a draft press release for the**

7 **WrestleReunion event?**

8          A.     It looks like that, yes.

9          Q.     **At the top it says revised but not yet --**

10 **not ready to post yet and then there's a little**

11 **handwritten notation there.  Is that your handwriting?**

12          A.     No.

13          Q.     **Okay.  Do you know when it was that**

14 **Wrestl eReunion first started issuing press releases**

15 **roughly?**

16          A.     No.

17          Q.     **But around August of 2004 sound about**

18 **right?**

19          A.     I don't know.

20          Q.     **Let's take a look at Exhibit Number 30.**

21          **(Exhibit 30 - Press release)**

22          MR. HERBERT:  A similar document for the

23          record, it was produced by plaintiff's counsel.

24          The date -- it says for immediate release.  The

25          date is August 29th, 2004.

1       Q.     I'll hand it to your counsel.  Do you

2  recognize Exhibit 30?

3       A.     No.

4       Q.     Was Rodney Pipers the first individual

5  who you -- WrestleReunion signed up -- first talent

6  that was signed up by WrestleReunion for WrestleReunion

7  one?

8       A.     I don't know.

9       Q.     Okay.  Well, do you remember that you

10  signed up -- you started signing up talent the first

11  time in about September 2004?

12       A.     I'm not sure of the exact date.  I mean,

13  obviously it was sometime after June of 2004.

14       Q.     And I'm not asking exact date.  I'm

15  asking if the documents that you provided there

16  appears -- appears from those documents that the

17  personal appearance agreements for Roddy Piper, Terry

18  Thunk, Jenny Taylor, Kamala, Sir Oliver Humperdink and

19  Victoria Richter were all dated in September of 2004.

20  Does that sound like those are the correct dates that

21  you signed that talent for WrestleReunion 1?

22       A.     I remember signing Kamala at the very

23  beginning.  That's -- that's what I recall.

24       Q.     That's because you had kind of a close

25  relationship with him?

1    A.    Yeah.  Yeah.

2    Q.    All right.  Because this press release

3    which is dated August 29th, 2004, lists quite a bit of

4    talent there.  And I guess my question is, do you know

5    if you actually had everybody listed on this press

6    release signed up for WrestleReunion at the time that

7    this press release was issued?

8    A.    I don't know that the press release was

9    ever issued.  I don't know that.  I've never seen it

10   before and -- I mean, I certainly recognize what it

11   says but I don't have any idea that it was ever issued.

12   Q.    Who was in charge of issuing press

13   releases for WrestleReunion?

14   A.    Well, I mean, the people there is me or

15   Rob Russen.  I didn't issue that and I -- and I don't

16   know that he issued that.  That doesn't mean something

17   wasn't drawn up, but there's a difference between

18   drawing it up and issuing it.

19   Q.    Well, do you have any recollection when

20   it was you first started actually -- when it was that

21   WrestleReunion first started actually issuing press

22   releases?

23   A.    No, sir, I don't.

24   Q.    Do you have any idea when it is you

25   actually signed or made a reservation for the hotel

1    ballroom?  This Exhibit 30, which is dated August 29th,

2    2004 makes reference to specific dates and to the hotel

3    where WrestleReunion 1 was held.  Do you know if you

4    had the hotel room booked by August of 2004?

5        A.      No, sir, I don't recall.

6        Q.      Looking at Exhibit 30, are the statements

7    in that generally accurate?

8        A.      Yeah, I mean, for the most part.  They're

9    certainly not 100 percent.

10        Q.      Was there anything in particular that

11    jumps out at you as something that either -- that

12    changed since the time that document was written?

13        A.      Well, just some of the -- you know, some

14    of the matches.  Like it says in one there was just a

15    tag team match and it really became an eight man tag

16    team match.

17        Q.      So the card changed a little bit?

18        A.      Yeah, just a little bit but the location

19    and all that is all accurate stuff.

20        Q.      On Number 29 it indicates that B. Bryan

21    Blair is going to be at WrestleReunion 1 but --

22        A.      All right.

23        Q.      But did Mr. Blair perform at

24    WrestleReunion 1?

25        A.      Define perform.

1      Q.      Was he there?

2      A.      Yes.

3      Q.      Did he appear in the ring?

4      A.      No.

5      Q.      Did he wrestle at all?

6      A.      No.

7      Q.      Okay.  What did he do at WrestleReunion

8  1?

9      A.      Sign autographs.

10      Q.      Okay.  Was he paid to do that?

11      A.      Yes.

12      Q.      Was that all he was paid to do was sign

13  autographs?

14      A.      Well, yes, sir.

15      Q.      Okay.  He didn't engage in a Q and A

16  session?

17      A.      Not to my recollection.

18      Q.      Was he enthusiastic about joining the

19  event or was he hesitant?

20      A.      To come sign autographs?

21      Q.      Yeah, to be part of WrestleReunion?

22      A.      Yeah.  No, he's fine.  We have a long

23  relationship.

24      Q.      You personally know Mr. Blair?

25      A.      Absolutely.

```
1        Q.       How did you first meet him?

2        A.       When I was a kid in New York and started

3   attending the matches, he was wrestling up there.

4        Q.       He was wrestling up in New York?

5        A.       Um-hum.

6        Q.       That's a yes?

7        A.       I'm sorry.  Yes.

8        Q.       All right.  You consider yourself a

9   personal friend?

10       A.       Absolutely.

11       Q.       When did you first approach him about

12  appearing at WrestleReunion?

13       A.       I don't recall.

14       Q.       You're still friendly with him today?

15       A.       I haven't spoken to him in a while but I

16  still -- you know.

17       Q.       You still consider him a friend?

18       A.       Oh, absolutely.

19       Q.       Did he appear at any of the other

20  WrestleReunion events?

21       A.       No.

22       Q.       Did you ask him to or did anybody from

23  WrestleReunion ask him to?

24       A.       I don't -- I don't believe so.

25       Q.       Was Mr. -- did Mr. Apter -- was he
```

1    involved in issuance of press releases in the fall of

2    2004?

3         A.    Not that I recall.

4         Q.    Do you recall at anytime whether

5    Mr. Apter was in charge of or had a role with respect

6    to press releases for WrestleReunion?

7         A.    No.  Bill was -- Bill was never in charge

8    of anything.

9         Q.    Did he ever have authority to issue a

10   press release for WrestleReunion?

11        A.    No.

12        Q.    Okay.

13             MR. HERBERT:  Just mark this as 31.  For

14        the record a document produced by your counsel.

15        It's got a WrestleReunion type logo at the top and

16        it says -- it's identified as a press release for

17        immediate release.

18             (Exhibit 31 - Press release)

19        Q.    Let me show you Exhibit 31.

20        A.    Okay.

21        Q.    Do you recognize Exhibit 31?

22        A.    No, sir, I don't.

23        Q.    Do you know who would have prepared that

24   press release?

25        A.    No, I don't.

1      Q.    Were you and Rob Russen the only two

2  people who were involved in issuing press releases for

3  WrestleReunion 1 prior to the event?

4      A.    Yes.

5      Q.    I'm going to ask you about the e-mail.

6  On Exhibit Number 29 that is your e-mail address,

7  right?  Is that a shortened form of it?

8      A.    That's it.

9      Q.    Okay.  And do you know if this e-mail

10 would have been sent from your work laptop or some

11 other place?

12     A.    Can't be sure.  Don't remember sending

13 it.

14     Q.    Do you remember in August of 2004 were

15 you using your work laptop for WrestleReunion business?

16     A.    I don't -- I don't recall.

17     Q.    Okay.  You were employed by ABC Financial

18 in August of 2004, right?

19     A.    Right.

20     Q.    And you had a laptop at that time

21 generally for your business?

22     A.    Correct.

23     Q.    And that time period -- your laptop --

24 you currently use a laptop for your business ABC

25 Financial, right?

1    A.    Yes.

2    Q.    Do you have -- is your laptop -- do you

3  have to enter a password to get access to get on to the

4  laptop?

5    A.    You certainly -- you certainly do now.  I

6  can only speculate as to what was going on with it in

7  August 2004.

8    Q.    At some point in the past there wasn't a

9  password, then at some point password protection was

10  implemented by the company to get access to your

11  laptop?

12    MR. RODEMS:  Object to form.

13    A.    Yes.  Again, I don't have clear

14  recollection of these things.

15    Q.    You don't remember when but sometime --

16  today if you want to open up your laptop and do work,

17  you need to enter your password, right?

18    A.    Yes, sir.

19    Q.    But at some point in the past you recall

20  that that wasn't the case?

21    A.    Well, I didn't say that.  I said I don't

22  recall but today absolutely, yes.

23    Q.    And how about today, who else besides you

24  has access to your work e-mail?  And I'm limiting just

25  to your work e-mail.

1          MR. RODEMS:   Object to form.

2      A.      When you say access, can you define

3  access?

4      Q.      **Yeah.  Who else can go into your work**

5  **e-mail and access or see your e-mails?**

6      A.      My assumption is that I really don't know

7  but it's probably a list of people very long at ABC

8  Financial.

9      Q.      **Okay.  Those would be the management of**

10 **the company?**

11     A.      Well, I wouldn't say.  I would say -- I

12 mean, it's a fairly large tech department there.  And I

13 would assume whoever inhouse tech support, IT

14 specialist, I mean, all of them must, but I'm really

15 talking about something I don't know.  But I could not

16 imagine that they don't have complete control to go

17 after whatever they want.

18     Q.      **Okay.  And you've had a situation where**

19 **your laptop has frozen up or you've had trouble getting**

20 **access to your e-mail and you've had the IT people help**

21 **you fix the problem on your laptop?  Laptop ever lock**

22 **up on you, freeze up on you?**

23     A.      When my laptop starts going bad that's --

24 as a general rule of thumb, that's when it's -- over

25 the years, that's when it's been replaced.

1    Q.     Okay.  Well, let me ask you this.  In

2  your current job now do you have a secretary or

3  assistant?

4    A.     No, sir.

5    Q.     Have you ever in your job for ABC

6  Financial?

7    A.     Yeah.  Yeah.  Timeframe I wouldn't

8  remember.

9    Q.     At anytime, well, from summer of 2004

10 until today?

11   A.     Yeah.  Sometime in between that but I

12 really don't know -- remember when.  I would tell you

13 that it would not be in 2004.

14   Q.     Do you have -- whoever your secretary was

15 in that timeframe, did she or he have access to your

16 e-mails?  My secretary has access to my e-mails.

17   A.     Not to my knowledge.

18   Q.     And how about personal e-mails that you

19 sent on your laptop today, you still use the same

20 e-mail address?

21   A.     This e-mail address here?

22   Q.     Yes.

23   A.     Yes, sir.

24   Q.     And that's through AOL?

25   A.     Yes, sir.

1    Q.    And so you access that through the
2    Internet?
3    A.    Yes, sir.
4    Q.    And that e-mail account, I'm assuming
5    that is password protected?
6    A.    Yes, sir.
7    Q.    Does anybody else have access to that AOL
8    e-mail account other than you?
9    A.    Not to my knowledge.
10    Q.    Anybody else know the password?
11    A.    Not to my knowledge.
12    Q.    Did you ever authorize anybody to get
13    access to that AOL e-mail account?
14    A.    I would never even consider that.
15    Q.    Okay.  Let me just take a real quick look
16    at this document.  It has a WrestleReunion logo that
17    looks familiar and back on Exhibit Number 31 it's got a
18    different little logo thing.  Let me just ask you on
19    this other document not 31, did you design that logo?
20    A.    No.
21    Q.    Do you know who did?
22    A.    I don't recall.
23    Q.    Okay.
24    A.    I just --
25    Q.    Is Rob Russen more likely to be the logo

1    person or do you have any recollection?

2         A.     He's more likely than me, because I

3    wouldn't have the capabilities of doing anything like

4    that.

5         Q.     You're not a real big computer graphics

6    guy?

7         A.     Oh, heavens, no.  I can't draw a straight

8    line with a ruler and a pencil.

9         Q.     That's pretty bad.

10        A.     Yeah, I know.

11        Q.     Let me ask you this.  There's an e-mail

12   address on this document.  I don't think I need to mark

13   it.  I don't recognize -- it appears to be an e-mail

14   from you CC to T 35 UNC.  Is that somebody in North

15   Carolina by any chance?

16        A.     I'm sure it is.

17        Q.     Do you recognize this e-mail address?

18   This looks like it's sent on New Year's Eve 2004.  Does

19   that e-mail address look familiar to you?

20        A.     Yeah, looks familiar to me.  I'm not sure

21   exactly whose it is.

22        Q.     Okay.  Let me ask you, I believe

23   Mr. Attanasio testified that at WrestleReunion 1 there

24   was somebody who you had brought down from North

25   Carolina who was -- had some responsibility with regard

1    to the money, keeping track of the money?

2        A.    Correct.

3        Q.    **Who was that?**

4        A.    Well, there was Richard Jarvis and that's

5    certainly not his e-mail address.  You know, but all he

6    really did was -- when you say responsibility, I

7    mean --

8        Q.    **Yeah, what did he do?**

9        A.    He just had everybody, you know,

10   everything was prearranged for him.  All he did was --

11   I mean, let's face it, 95 people is a lot of people.

12   Somebody needed to deal with it.  It's not something

13   that's going to be dealt with in 15 minutes, and

14   obviously people have other responsibilities so he

15   dealt with that.

16       Q.    **I'm sorry.  He dealt with what?**

17       A.    Just getting everybody what they had

18   coming to them.

19       Q.    **Keeping track that people got paid what**

20   **they were promised or whatever, the talent?**

21       A.    Correct.  Correct.

22       Q.    **Okay.  Okay.  Now WrestleReunion 1,**

23   **WrestleReunion paid for its own security cost, right?**

24       A.    Yeah.  I believe we had some police there

25   and --

```
 1              MR. HERBERT:  All right.  Let me mark

 2       this real quick.  What number are we up to, 32 by

 3       any chance?  Does that sound right to you?

 4              (Exhibit 32 - Invoice for security)

 5              MR. RODEMS:  Number 31 was the last one.

 6              MR. HERBERT:  All right.  We'll mark this

 7       as 32.  What I marked as Exhibit 23 for the record

 8       is --

 9              MR. RODEMS:  I'm getting to the point I'd

10       like to go to the bathroom.  Is that all right?

11              MR. HERBERT:  Sure.  Take a break.

12              (The deposition was in recess.)

13       Q.      Okay.  Just -- I want to ask you some

14   questions to help me understand the timing of certain

15   events.  My understanding is that the very first time

16   that Clear Channel -- that you ever heard about Clear

17   Channel having any interest in this WrestleReunion

18   project was on New Year's Eve 2004.  Is that correct?

19       A.      Yes.  Yes, that sounds correct.

20       Q.      Okay.  And that was Rob Russen called you

21   is how you first found out about it?

22       A.      No, sir.

23       Q.      Who called you?

24       A.      Bill Apter.

25       Q.      Okay.  And Bill Apter told you that he
```

1   had just spoken with Eric Collin?

2       A.      When you say called, I don't recollect

3   that he called.  In some way, shape or form he

4   contacted me.

5       Q.      But you recall it was on New Year's Eve?

6       A.      Yes, that's my recollection, yes.

7       Q.      Were you doing anything special that New

8   Year's Eve that would make you remember?

9       A.      No.  Obviously based on our previous

10  conversation I don't really get involved in a lot of

11  special stuff on those kind of days.  I don't really do

12  anything.

13      Q.      Sometimes there's a good game on?

14      A.      Yeah, and maybe I was watching television

15  but most years I don't even make it to see the ball.

16      Q.      But no question that before December 31st

17  of 2004 you had never heard of Clear Channel being

18  interested in WrestleReunion project?

19      A.      No, sir.

20      Q.      And part of that time you hadn't heard of

21  any other, let's say, television companies being

22  interested in WrestleReunion, had you?

23      A.      Not that I recall.

24      Q.      And the arrangement that you had with

25  Highspots before Clear Channel ever came into the

1    picture was that Highspots was going to film

2    WrestleReunion 1 and then try to sell DVDs through its

3    web site and that was it, right?

4         A.        I wouldn't want to limit the scope.    I

5    mean, obviously their main source of selling would be

6    the web site but certainly like anybody else we would

7    be open to entertain anything.    I mean, we certainly

8    knew what we were putting together was something very

9    special and unique, but if you're asking was it my

10   understanding the web site would be certainly the main

11   source, yes.

12        Q.        Okay.  Well, I guess that's what I'm

13   getting at.  You had -- you had some kind of

14   arrangement with Highspots.  And did that arrangement

15   encompass anything else other than them going to Tampa,

16   filming the event, and then making DVDs and trying to

17   sell DVDs over their web site?

18        A.        Nothing -- nothing firm.

19        Q.        I'm sorry.  Nothing firm?

20        A.        Right.

21        Q.        Okay.  Or nothing specific?

22        A.        Correct.

23        Q.        So, maybe it was maybe open-ended that

24   there might be some other possible sources of

25   revenue --

1      A.      Sure.

2      Q.      -- that they may be involved in, but

3  there were no firm discussions about that?

4      A.      Right.  I just don't want my testimony to

5  be was they were allowed to sell it on their web site

6  and that was it, because it would not be that.

7      Q.      Well, I mean, you didn't have a written

8  agreement.  You had a general understanding with them.

9      A.      Right.

10      Q.      And it was generally admitted to that but

11  there were some open possibilities?

12      A.      Correct.

13      Q.      But you didn't have any specific

14  arrangement deal or understanding as to any other

15  sources of revenues with Highspots?

16      A.      Correct.

17      Q.      The money that you put into

18  WrestleReunion 1, your personal money, what was the

19  source of that money?

20      A.      Just, I mean, dollars that I had, I mean,

21  I was making -- making money.

22      Q.      It was based on your income from your job

23  at ABC Financial?

24      A.      Well, certainly that was a large part of

25  it but, I mean, you know, without -- I don't have a

1    very distinct and clear, you know, record in my mind.

2    I don't -- I just don't have that.  But, I mean,

3    obviously that would be part of it.

4         Q.     I mean, did you -- had you -- I guess

5    what I'm getting at is all the money that you put into

6    WrestleReunion 1, it was roughly $100,000 of your own

7    money went into WrestleReunion 1?

8         A.     Correct.

9         Q.     That was all your own money, not money

10   that you borrowed from anybody else?

11        A.     Yeah, I would -- I would say it was my

12   money.

13        Q.     Okay.  Had you borrowed any money from

14   any friends or family shortly before WrestleReunion 1,

15   any large sums of money, I mean, over, you know, couple

16   thousand dollars or something?

17        A.     I didn't borrow any of -- I didn't borrow

18   any of the money for WrestleReunion -- for

19   WrestleReunion.

20        Q.     Okay.  You might have borrowed some money

21   but it wasn't for WrestleReunion?

22        A.     That's right.

23        Q.     All right.  And then I understand from

24   Mr. Attanasio's testimony that you asked Mr. Jennings

25   for a loan for WrestleReunion or some type of

1    contribution or participation or investment for

2    WrestleReunion?

3         A.    Yeah, I guess so.  I don't have good

4    recollection of that.  I'm not disputing it, but I

5    don't have good recollection of it.

6         Q.    You don't remember calling him and asking

7    him if he wanted to get involved in this project?

8         A.    You know, vaguely.

9         Q.    Okay.

10        A.    Vaguely.  It was not a loan.  He's not a

11   friend of mine.  He's, you know -- so, it's not -- it's

12   not something that I really kept in my head.  Like I

13   said, I'm not disputing that the call was made.  I just

14   do not have a very clear recollection.

15        Q.    Well, do you remember him proposing he

16   take 50 percent ownership in WrestleReunion?

17        A.    I mean, you know, in hearing it I'll say,

18   okay.  But, again, the conversation is not clear in my

19   mind at all, but I'm not -- I'm not here to dispute

20   that that was --

21        Q.    Fair enough.  Okay.  So, just so I have

22   this straight, it seems to me that the only people --

23   is it correct that the only people that you ever asked

24   for any money for financing in connection with

25   WrestleReunion 1 was Mr. Attanasio and Mr. Jennings and

1    nobody else?  Or was there somebody else?

2         A.      To the best of my -- to the best of my

3    recollection that's it.

4         Q.      And you never -- and I think we

5    established earlier in your depo last time that you

6    never -- you never went to any bank or lending

7    institution for financing for WrestleReunion?

8         A.      Correct.

9         Q.      And I guess my next question, I don't

10   think I asked you this at the last depo, is why was it

11   that you never sought any external financing other than

12   through Mr. Attanasio?

13        A.      I guess if I came to a point where I felt

14   it was needed, then I would have done it.

15        Q.      You didn't think it was needed after

16   WrestleReunion 3?

17        A.      Well, to do what after WrestleReunion 3?

18        Q.      Well --

19        A.      WrestleReunion 3 everybody was paid,

20   right?

21        Q.      But you said -- for another live event.

22   I mean, you took some steps to schedule something in

23   March of 2006 and that never went -- never came to be,

24   right?

25        A.      No.  To put on another event, no.

1    Q.    Well, did you ever consider trying to get

2    outside financing?

3    A.    Let me say everything is, you know,

4    probably considered in a businessman's head but I don't

5    pursue it.  You know, I might come up with 500 ideas in

6    a day but just sitting in this chair, and if I never

7    get out of the chair --

8    Q.    Was part of the reason why you didn't

9    pursue any outside financing because each of the

10   WrestleReunion events had lost money and you were

11   significantly in a hole after WrestleReunion 3?

12   A.    No, sir.

13   Q.    Okay.  Well, is there another -- some

14   other reason that you recall?

15   A.    I didn't feel the need.

16   Q.    Okay.  You didn't want to put on a

17   WrestleReunion 4?

18   A.    There was -- excuse me for saying so, but

19   I think you have two different questions on the table.

20   Q.    Well, I'm just -- you didn't have a need

21   to get financing.  Did you want to -- you took some

22   steps to plan a fourth event, right?

23   A.    Correct.

24   Q.    And it never ultimately happened, right?

25   A.    Correct.

1      Q.      And was part of the reason money?

2      A.      No.  The reason was that Clear Channel

3   never responded to our request to come and film.

4      Q.      Okay.  So if Clear Channel wasn't going

5   to film it, you didn't want to hold an event?

6      A.      At that particular time, correct.  It

7   wasn't, I mean, the whole purpose of putting these big

8   shows together was to get them on film for whatever

9   media purpose.

10     Q.      Okay.  Let me back up and ask you, Clear

11   Channel paid -- I'm sorry.  At WrestleReunion 1

12   WrestleReunion itself paid for security and for

13   catering, feeding the talent and the WrestleReunion

14   staff that was there, correct?

15     A.      I did?  I told you that?

16     Q.      No.  I'm asking you.  You paid for

17   security -- WrestleReunion paid for security, right?

18     A.      Yeah, we did pay for security but as far

19   as catering, I don't believe I paid for any catering.

20     Q.      You didn't pay to feed the talent that

21   you had come for the event?

22     A.      No, sir.

23     Q.      Okay.  That was all on their own nickel?

24     A.      Sure.

25     Q.      What about the WrestleReunion people who

1    were there, wasn't that charged to WrestleReunion?

2        A.        Yeah.  We may have paid for some lunch

3    for some people.  I don't have a direct recollection.

4    I'm not saying we did not.  I'm saying I don't recall.

5    That type of thing is not a -- is not a major thing for

6    us.

7        Q.        Okay.  The talent that came down, the 100

8    plus wrestlers, they didn't expect to be --

9        A.        No, absolutely not.

10            MR. RODEMS:  Excuse me.  Let me just

11        remind you, Mr. Corrente, to get the best record

12        we need to try to not talk over each other.

13        A.        She's being so nice.

14        Q.        Yeah.  Try to let me finish before you

15    start answering.

16        A.        Okay.  I don't recollect.  If the venue

17    had a security requirement, we would have -- and we

18    were obligated to something, then we would have

19    certainly have fulfilled our obligation or I would

20    assume we would have had a problem with the venue.

21        Q.        Okay.  Do you remember whether or not

22    WrestleReunion itself specifically paid for security or

23    crowd control at WrestleReunion 2?

24        A.        No, sir, I do not.

25        Q.        You recall that Clear Channel paid for

1  security and crowd control at WrestleReunion 3, don't

2  you?

3      A.      No, sir.

4      Q.      You don't recall that?

5      A.      No, sir.

6      Q.      All right.  Well, you wouldn't -- you

7  don't dispute it, do you?

8      A.      I guess I do because I have no knowledge

9  of it.  I have no -- who did they -- who did they pay?

10     Q.      Okay.  Well, I'll get you an invoice in a

11  second.

12     A.      Okay.

13     Q.      They never -- they never talked to you

14  about the fact that they had to pay for security at

15  WrestleReunion 3?

16     A.      When would they have discussed that?

17     Q.      At the event when there was no security

18  there.

19     A.      I don't -- so what you're suggesting is

20  like at five or six o'clock at night somebody decided

21  there's no security and they ran out and got somebody?

22  I mean, I'm not -- I really truthfully have no idea

23  where this is coming from.

24     Q.      How about catering for all the folks that

25  were there at WrestleReunion 3?  You're aware that

1  **Clear Channel paid for that, aren't you?**

2       A.      I'm aware that there was Clear Channel

3  catering there.  We certainly didn't ask them to bring

4  it or require it.  I mean, let me say this so you have

5  a general understanding.  Wrestlers do not get meal

6  allowance on anything that I'm aware of that goes on

7  domestically.  They could be for overseas events, there

8  could be meal allowance.

9            None of those wrestlers were coming there

10 expecting to be fed, none of them.  That's for sure.

11 And I had no expectation of catering.  It was certainly

12 not discussed or anything like that.  If there was

13 catering there, they brought it, but they didn't bring

14 it at our request.

15      **Q.      Okay.  Well, that helped feed**

16 **WrestleReunion staff people, didn't it?**

17      A.      Again, we didn't request that.  If

18 somebody said, do you want catering, I would say

19 absolutely not.  It's not something that's normally

20 provided.

21      **Q.      All right.  What about security?**

22 **WrestleReunion paid for security at WrestleReunion 1**

23 **but Clear Channel paid for it at WrestleReunion 3,**

24 **didn't they?**

25            MR. RODEMS:  Object to the form.

1     A.        Whatever --

2     Q.        **Let me find the document.**

3     A.        Okay.  That's fine.

4     Q.        **All right.  It's going to take me a**

5     **little while because I got all kinds of binders.**

6              MR. RODEMS:  Here or in the other room?

7              MR. HERBERT:  In the other room.  I'll go

8     in there.

9              MR. RODEMS:  All right.  I need to make a

10    copy.

11              (The deposition was in recess.)

12    Q.        **I just pulled some documents out of the**

13    **court file.  I'm just going to show them to you since**

14    **they're already in the court file and we don't need to**

15    **remark them as an exhibit.**

16              **The first one is Exhibit A, Exhibit A to**

17    **a motion that I filed with the court on March 24th of**

18    **this year.  And just ask you to take a look at --**

19              MR. HERBERT:  For the record it's on the

20    letterhead of Accurate Event Services dated

21    September 7th, 2005.  And it appears to be an

22    invoice to Clear Channel Entertainment Television

23    for security guards.

24    Q.        **Ask you to take a look at that document**

25    **and let me know if you've ever seen that document**

1   before or not.

2          A.      No, I haven't seen it at all.

3          Q.      But you're aware that Clear Channel paid

4   for the security guards for WrestleReunion 3?

5          A.      I'm only aware of it because you're now

6   showing me this.  I wasn't -- you say that was a bill

7   paid, then okay.  Great.  But I had no knowledge of it.

8          Q.      You saw that there was security there at

9   the event, didn't you?

10         A.      Be the last thing on my mind.  I'm trying

11  to put on a performance.

12         Q.      Well, you're in charge of this, right?

13         A.      Yeah.

14         Q.      You wanted to make sure there was

15  security there, right?

16         A.      Anything that I would have worried about

17  would have been something that would have been mandated

18  by the building.

19         Q.      Let me back up and ask you.  No question

20  that under the outline of terms that you signed and

21  Clear Channel signed, Clear Channel was not obligated

22  to provide security for any of these live events under

23  that document, right?

24         A.      Correct.

25         Q.      Okay.  So, if they did this, they did

1    this out of the goodness of their own heart for

2    whatever reasons they had, and that was not required

3    under the contract under the outlined terms?

4                MR. RODEMS:   Object.

5         A.      I would say they were not obligated to

6    pay for security.

7         Q.      And they weren't obligated to paid for

8    catering either, correct?

9         A.      Absolutely.

10        Q.      I'm sorry.   That's absolutely that they

11   weren't obligated?

12        A.      Absolutely they weren't obligated.

13        Q.      That was a were not or weren't?

14        A.      Absolutely they were not obligated and

15   they were also not asked.

16        Q.      Okay.  So, under -- let's see.   There's

17   also another invoice in this same Exhibit A to Bob's

18   Barricades.   There's a receipt for $600 to Bob's

19   Barricades and right after that there is an invoice

20   from Bob's Barricades to Clear Channel for rental of

21   barricade equipment.   Do you see that document there,

22   an invoice?

23        A.      Yeah.

24        Q.      Okay.   And you had barricades there at

25   the WrestleReunion 3 event, right?

1    A.    I don't recall.

2    Q.    Well, if Clear Channel testifies that

3    they paid for Bob's Barricades for barricades at

4    WrestleReunion 3, you don't have any basis for

5    disputing that, right?

6              MR. RODEMS:  Object to the form.

7    Q.    You weren't worried about the barricades?

8    A.    No.

9    Q.    Well, barricades are important in a

10   wrestling event, aren't they, with a lot of things

11   going back and forth between the audience and the crowd

12   and things around the ring and that sort of thing?

13             MR. RODEMS:  Object to the form.

14   A.    Some people could consider them

15   important.

16   Q.    Well, do you?

17   A.    I have been on tons of events with no

18   barricades.  So do I consider them critical?  No.

19   Q.    All right.  Well, again, no question

20   that in no way, shape or form was it Clear Channel's

21   obligation to pay for barricades at WrestleReunion

22   three.  Fair enough?

23   A.    Fair enough.

24   Q.    Do you remember them ordering a bunch of

25   pizzas at WrestleReunion 3?

1    A.    There was catering there.  Do I remember

2    what it was?  No.

3    Q.    So, for Clear Channel to have gone ahead

4    and pay for the security and the barricades and the

5    catering, was a showing in good faith and cooperation

6    with WrestleReunion.  Isn't that fair to say?

7    MR. RODEMS:  Object to form.

8    A.    No.

9    Q.    Okay.  When you asked Mr. Attanasio to

10   loan money to WrestleReunion, the first time you asked

11   him what was the amount you asked him to loan?

12   A.    I don't recall.

13   Q.    Okay.  But you recall that it was just

14   about two weeks or so before WrestleReunion 1?

15   A.    That's fair.

16   Q.    What did WrestleReunion need the money

17   for?

18   A.    I don't recall.

19   Q.    You don't recall if you asked him for

20   $100,000 loan?

21   A.    In that first conversation, no, I don't

22   recall.  I don't recall a specific amount.

23   Q.    Well, you never guaranteed Mr. Attanasio

24   that he was going to make a lot of money off of that

25   investment, did you?

1    A.    I am sure that I would have shared with

2    him Mr. Sterling's guarantees of WrestleReunion making

3    money.

4    Q.    **I'm only asking about your guarantees.**

5    **So, did you guarantee Mr. Attanasio that he was going**

6    **to make money off of that?**

7    A.    Based on input I got from Clear Channel,

8    I'm sure that I did.

9    Q.    **You guaranteed him a return on that**

10   **investment?**

11   A.    I was guaranteed a return on the

12   investment.

13   Q.    **When were you guaranteed a return on the**

14   **investment?**

15   A.    In conversations with Mr. Sterling.

16   Q.    **He personally guaranteed that this**

17   **wrestling entertainment venture was going to make**

18   **money?**

19   A.    Absolutely.

20   Q.    **That's your sworn testimony?**

21   A.    Absolutely.

22   Q.    **He guaranteed it?**

23   A.    Well, when you say personally now, let's

24   be clear what you mean by personally.  Do you mean did

25   it come out of his mouth or out of his personal

1    pocketbook?

2        Q.      He said to you, I guarantee you this

3    project's going to make money?

4        A.      He said, money will start coming in

5    within 90 days, no more than six months and

6    WrestleReunion will be making money long after you and

7    I are gone.

8        Q.      That wasn't my question.  My question was

9    did he say to you, I guarantee you that this project's

10   going to make money?

11       A.      I told what you he said.

12       Q.      So, then he didn't use the word

13   guarantee?  Did he or didn't he?

14       A.      I don't believe my statement contains the

15   word guarantee.

16       Q.      So, he didn't use the word guarantee?

17              MR. RODEMS:  Object to the form.

18       A.      He did not use the word guarantee his

19   statement.

20       Q.      You interpreted it as guarantee?

21       A.      I'll continue to interpret it as

22   guarantee.

23       Q.      You understand after all your years in

24   the wrestling business that any wrestling related

25   entertainment venture is risky, don't you?

1    A.      What I understood was I was dealing with

2  one of the largest companies in the world and why would

3  somebody make statements like that unless that's what

4  they meant, somebody who's a major executive in a

5  company like that.

6    Q.      **With your experience in the wrestling**

7  **world have you ever, aside from this venture, had the**

8  **ability to guarantee anybody that one of your wrestling**

9  **ventures was going to make money?**

10    A.      Well, my ventures are not like this

11  venture.

12    Q.      **All entertainment projects are inherently**

13  **risky, aren't there?**

14    A.      I was dealing with an executive named

15  Steve Sterling.

16    Q.      **That wasn't my question.**

17    A.      I don't know that all ventures are risky.

18    Q.      **No one can predict market demand for a**

19  **work of entertainment, can they?**

20    A.      I can't speak to anybody else.  All I can

21  speak to is myself.

22    Q.      **You heard of a movie called Blair Witch**

23  **Project?**

24    A.      Yeah.  I have not seen it.

25    Q.      **You understand that made a lot of money**

1    with very little money being spent on it?

2         A.    I have a vague understanding of that.

3         Q.    You heard about movies where hundreds of

4    millions of dollars were spent and they lost money?

5         A.    Sure.

6         Q.    Isn't that the nature of the

7    entertainment business, that you can't really

8    accurately predict consumer demand for an entertainment

9    product?

10        A.    But I have no understanding of what

11   anyone involved in any of those projects, the good ones

12   and the bad ones was told.  I do know what I was told.

13        Q.    That's not my question.  My question is

14   generally speaking wouldn't you agree with me that no

15   one can really accurately predict what the demand for

16   an entertainment product is going to be?

17             MR. RODEMS:  Object to form.

18        A.    Again, I can only speak for myself.

19        Q.    Anybody else other than Mr. Russen have

20   any other interest in the outcome of this litigation?

21        A.    No.

22        Q.    So, as we sit here today WrestleReunion

23   is not interested in taking back possession of the 250

24   plus tapes of footage of the WrestleReunion events,

25   correct?

1              MR. RODEMS:  Object to form.

2        Q.      **Correct?**

3        A.      I guess, can you be more specific in your

4   question?

5        Q.      **Do you want the footage back now or not?**

6   **Does WrestleReunion want the footage back now or not?**

7              MR. RODEMS:  Let me stop.  I think it's

8        highly inappropriate to ask my clients questions

9        about what obviously -- points relating to a

10       concept of settlement.  Discovery is -- it's not

11       appropriate in discovery.

12             MR. HERBERT:  It is appropriate.  It

13       might be admissible in trial but it is

14       appropriate.

15             MR. RODEMS:  Well, I tell you what.

16             MR. HERBERT:  But it's not settlement

17       anyway.  I'm not asking about settlement.

18       Q.      **I'm asking the reason that the plaintiff,**

19   **WrestleReunion, does not have any interest in taking**

20   **back the footage and the content that was created by**

21   **Clear Channel is because you think that would damage**

22   **your case in this court, isn't that correct?**

23             MR. RODEMS:  Object to form.

24       A.      If I took possession of the video, I

25   think that would damage my case?

1       Q.     If they gave it back to you, you agreed

2   to take it back and go try to market it yourself -- you

3   could market it, right?

4              MR. RODEMS:  Object to form.

5       A.     I -- I don't know that.

6       Q.     But you have no desire to take that

7   footage back, right?  You made no demand on it for it,

8   right?

9       A.     Four years after the fact, no.  I have no

10   desire right now to four years later go out and try to

11   start marketing something that's been I guess sitting

12   on a shelf somewhere.

13       Q.     The market demand for that product is

14   much lower now than it was in 2005.  Fair enough?

15       A.     I haven't measured the market demand.

16       Q.     Isn't that your general understanding

17   based on your experience in the wrestling business?

18       A.     Again, I have not measured the market

19   demand.

20       Q.     I didn't ask you if you measured it.  I'm

21   asking you if you have a general understanding.

22       A.     I'm telling you I don't know.

23              MR. HERBERT:  Let me just go ahead and

24      mark this.

25             (Exhibit 33 - IM chat printout)

1        MR. HERBERT:   What I've marked as Exhibit
2     Number 33 is Bates number WrestleReunion 000311.
3     Q.       Is this the document you produced?  I
4  think we talked about it in other depositions.  Take a
5  look at -- take a look at Exhibit Number 33 and let me
6  ask you if you recognize that document.
7     A.       Sure.
8     Q.       That's a printout of some instant
9  messaging chat that you had with Eric Collin?
10    A.       Correct.
11    Q.       And this section up here I've highlighted
12 says Mr. Colin is claiming you were late for meetings
13 and never watched rough cuts and said if you cared, you
14 should have been diligent, right?
15    A.       That's what he said.
16    Q.       Do you remember having this IM
17 conversation with him?
18    A.       Yeah.  And it's -- if you're going to ask
19 me what day, no, I do not.
20    Q.       You responded that you have people who
21 did that stuff for you because you were busy writing
22 off copy.  That was your response?
23    A.       Correct.
24    Q.       Who was supposed to be watching the rough
25 cuts of the matches?

1  A.  Rob Russen would have.

2  Q.  **Do you know if he did that?**

3  A.  Yes.

4  Q.  **Okay.  Did you ever watch the rough cuts**

5 **of any of the matches yourself?**

6  A.  Did I see a few seconds here or there?

7 Probably so.  Did I actually sit down and watch them?

8 No.

9  Q.  **Okay.  So, you delegated that**

10 **responsibility to Mr. Russen?**

11  A.  Right.

12  Q.  **And Mr. Russen was supposed to get back**

13 **with Clear Channel with any comments or suggestions**

14 **regarding the rough cuts?**

15  A.  That's not my knowledge.  My

16 understanding is, yes, it was provided, but I don't

17 know that they were looking for us to get back to them

18 with anything.  The agreement I believe states that no

19 matter what we say, they can do whatever they want.

20 So, I don't know that they were waiting on us.

21  Q.  **Do you have any understanding of why**

22 **Mr. Colin is complaining about --**

23  A.  Yes.

24  Q.  **-- not watching the rough cuts?**

25  A.  Sure.  Because Eric is a person who

1   believes that because it was my company, that I need to

2   be involved in every single, solitary detail and if I'm

3   not there, nothing's happening.  And obviously that's

4   not realistic.  It certainly isn't the way it goes in a

5   company that I know of, that one human being has to

6   touch every single, solitary thing.  But in Eric's

7   world that's what he believes.

8        Q.     I think I have -- I'm sorry one more.

9   Let's go ahead and mark this.

10              MR. HERBERT:  After going through all

11       that I messed up.  Just for the record we need

12       correct the last exhibit I was referring to, needs

13       to be renumbered Exhibit 33, because the prior

14       document was numbered 32.

15       Q.     So, I'm going to change it from Exhibit

16   32 to Exhibit 33 and ask the witness the printout of

17   the IM chat we were just talking about is now marked as

18   Exhibit 33, correct?

19       A.     Correct.  Did I see Exhibit 32?  Do I

20   need to see it?  I don't even know if I did.

21       Q.     Yes, take a look at it.  This appears to

22   be an invoice for security for WrestleReunion 1, but if

23   that's something different, let me know.

24       A.     City of Tampa, yeah.  I would say I don't

25   really remember seeing this but, yeah, I would say that

1    that's what that is.

2        Q.      You did need to have security for

3    WrestleReunion 1, right?   That many people and you're

4    in a public hotel room?

5        A.      Again, my concern in anything like this

6    would be meeting the criteria of the building

7    requirements.   Some buildings have requirements for

8    stuff like that, others do not.

9        Q.      Do you remember if the Double Tree Hotel

10   required security?

11       A.      No, I don't, but I would say being that I

12   went and got it and paid for it, that I probably met

13   their requirements.

14       Q.      And how was this paid?   That's Exhibit

15   32.

16       A.      I don't know.

17       Q.      Can you tell from looking at that or not?

18       A.      No, sir, I cannot.

19       Q.      Okay.

20               (Exhibit 34 - Lease agreement Spartanburg

21       Memorial Auditorium)

22       Q.      Take a look at Exhibit 34 and tell me if

23   you recognize that document?

24       A.      Yes.

25       Q.      What is it?   I'm sorry, just show it to

1    Chris.

2                    MR. RODEMS:    Okay.

3         Q.      And what is it?

4         A.      It's a lease agreement with the

5    Spartanburg Memorial auditorium.

6         Q.      And you signed that --

7         A.      I don't know.  I'll look.  I guess so.

8    Could we take a break?

9         Q.      Well, I guess I asked you if you signed

10   the document.  That was my last question that was out

11   there.

12        A.      I understand.  I'm asking if we could

13   take a break.

14        Q.      If I could just get an answer to that

15   question first before we take a break.  Is that your

16   signature on the last page of the document?

17        A.      Doesn't look like my signature.

18        Q.      Do you know who signed that?

19        A.      No.

20        Q.      Did you authorize somebody else to sign

21   this document for you?

22        A.      I don't recall.  All I can tell you is it

23   doesn't look like my signature.

24        Q.      Do you still need to take a break?

25        A.      I don't know.  I guess if -- ultimately

1    all I can say is that doesn't look like my signature.

2        Q.        Okay.  Well, you remember having

3    discussions or negotiations about leasing the

4    Spartanburg Memorial Auditorium?

5        A.        Yes, I do.

6        Q.        Do you remember if you ever entered into

7    a deal or WrestleReunion ever entered into a deal with

8    them?

9        A.        Well, I mean -- I mean, we certainly

10   talked about an event and were going forward with --

11   you know, at a certain time we were planning on going

12   forward with an event.  Like I said, that doesn't look

13   like my signature.

14       Q.        Well, this required a $1,500 fee.  Do you

15   know if WrestleReunion paid the $1,500 reservation fee?

16       A.        I don't recall.  Is there anything on

17   there that shows it marked paid?

18       Q.        No.  There's just looks like somebody

19   negotiated there was a $1,500 fee and then there was

20   some other extra charge they were trying to charge a

21   company and that got scratched out and initialed.  I

22   don't know.  Is that your signature on the --

23   initialing there on the first page of Exhibit 34?

24       A.        Quite honestly, it doesn't look like it,

25   no.

Q.       Do you remember if you ever had to pay
the cancellation fee or forfeit the deposit for this
auditorium?

A.       No.  I don't have an exact -- I don't
have an exact recollection.

Q.       Well, in January of 2006, is that the
timeframe that WrestleReunion was negotiating, trying
to reserve a hall for another WrestleReunion event?

A.       I would say yes to that.

Q.       Was this supposed to be WrestleReunion 4
or some other event?

A.       No.  It wasn't supposed to be
WrestleReunion 4.  I mean, people I think sometimes
just start saying things because we had a one.  It
wasn't going to be anything like WrestleReunion 1 or
WrestleReunion 2.  It was going to be at a certain -- a
certain point we were just looking to build a library.

Q.       Why did you need a hall?  Was it going to
be a fan fest type thing?

A.       No.  That's the point, it was not.

Q.       Why did you want to reserve this
Spartanburg Memorial Auditorium in January of '06?

A.       The name is probably a lot more
impressive than the building.  This is a very old
building with a lot of wrestling nostalgia going back

1    to the '60s if not earlier than that.  This is not -- I

2    understand why you might be thinking that this is like

3    this building downtown here or something, but, no, it's

4    not.

5        Q.       I know Spartanburg is not a very big

6    town.

7        A.       Right.

8        Q.       I'm just asking you what was the event

9    that you were planning?

10       A.       Oh, it was going to be wrestling matches,

11   but it wasn't going to be a fan fest or convention.

12       Q.       And it wasn't going to be named

13   WrestleReunion 4 or be part of the WrestleReunion

14   concept?

15       A.       Well, the WrestleReunion -- I don't even

16   know quite honestly if we called WrestleReunion -- what

17   everyone's been referring to as WrestleReunion 3, I

18   don't know that we ever called it WrestleReunion 3.

19   The WrestleReunion company was doing it and I think

20   that everybody -- because we had WrestleReunion 1 and

21   WrestleReunion 2, a full-blown WrestleReunion concept,

22   I feel like everybody involved just made the next event

23   three.  But I don't know that there's anything that

24   says we put out.  I don't recall that.

25       Q.       You called it legends collide or

1  something like that?

2       A.      Yeah.  So, we never called it.  So I

3  don't know.  In my mind this would not have been called

4  WrestleReunion 4.  That would have never been my

5  intention.  WrestleReunion 3 would have been something

6  like WrestleReunion 1 or WrestleReunion 2.

7       Q.      Okay.  But this wasn't going to be

8  WrestleReunion 3 either then?

9       A.      That's right.

10      Q.      This was going to be a small scale event?

11      A.      That's right.  In comparison to the other

12 events, yes.

13      Q.      This was going to be a few matches or --

14      A.      Yeah.  I mean, you know, who knows, seven

15 matches, six matches, probably not five matches.

16 Probably anywhere from six to eight matches something

17 along those lines.

18      Q.      Okay.  But this event was canceled,

19 right?

20      A.      Yes.

21      Q.      Okay.  Did you personally cancel it?

22      A.      Yes.

23      Q.      Okay.  And what was the reason that you

24 canceled it?

25      A.      I already indicated to you.  Clear

1   Channel never responded to come and film.

2        Q.      You asked them to come film this specific

3   event that's reflected in Exhibit 34?

4        A.      Yes.

5        Q.      And just do you recognize that

6   handwriting where your name is written here at the end

7   of the document?

8        A.      No, sir, I don't.

9        Q.      At anytime did you ever authorize anybody

10  to sign your name?

11       A.      I don't recall.

12       Q.      Okay.  You might have authorized somebody

13  at some point?

14       A.      Right.  I'm not saying I did not.  I'm

15  telling you I don't recall, but I do know is that's not

16  my signature.

17       Q.      And this reminds me, I do need to ask you

18  something about one of the documents that came up at

19  Mr. Attanasio's deposition.  Let me ask you why was it

20  that you gave Mr. Attanasio the checkbook for

21  WrestleReunion bank account?

22       A.      As I indicated many times, I travel most

23  of the year.  He's stationary.  Pretty much everything

24  else involved with WrestleReunion can be handle over

25  the phone, but carrying a checkbook around the country

1   on a daily basis for the business just didn't make

2   sense to me.

3        Q.      Just for convenience?

4        A.      Right.

5        Q.      It had nothing to do with the fact that

6   he was at such a high level of monetary commitment at

7   that point that you said here, you handle the

8   checkbook?

9        A.      No.

10       Q.      Okay.

11       A.      No, it had nothing to do with that.

12       Q.      Let me ask you this.  In Exhibit number

13  18 which was an exhibit to Mr. Attanasio's deposition

14  it looks like in October of 2005, more than a month

15  after the third WrestleReunion event, what we've been

16  calling WrestleReunion 3, and continuing into late

17  November 2005 WrestleReunion was paying Sam Complin,

18  paid him a total of $9,000.  Do you recall the payments

19  to Mr. Complin?

20       A.      Yes.

21       Q.      And do you recall Mr. Complin negotiating

22  with Clear Channel for an arrangement whereby

23  WrestleReunion would get all the rights to the footage

24  taken at all the WrestleReunion events in exchange for

25  some type of split?

1          MR. RODEMS:  Object to form.

2     A.     What I know is Sam Complin telling me

3  that he was having discussions back and forth with

4  Sam -- with Steve Sterling.  I never received any other

5  confirmation of that, for very long time.  There was no

6  real paperwork.  There was no conversation with Steve

7  Sterling.  There was no e-mails from Steve Sterling,

8  saying, hey, spoke to Sam today we're trying to work,

9  nothing.

10          So, what I know is what Sam told me.  The

11  specifics of what they spoke about, I really don't

12  recall.  Do I know that he said he was going back and

13  the forth with Steve Sterling?  Yes.  That I do know.

14     Q.     **I mean, do you recall telling Mr. Complin**

15  **to reject the offer to give WrestleReunion back all the**

16  **rights to the footage?**

17     A.     Well --

18          MR. RODEMS:  Object to form.

19     A.     If what you're asking me is the same

20  thing I think you tried ask me a little while ago,

21  would I --

22     Q.     **No, it's different.  Did you instruct**

23  **Mr. Complin to reject such an offer to return all the**

24  **rights to WrestleReunion?**

25     A.     I will say this.  I don't even know that

1    I got a phone call of some kind, certainly got nothing

2    in writing saying this is an offer from -- to say, just

3    take these tapes and go away.  I don't recall that.

4        **Q.      The offer was take the tapes, you have**

5    **the rights and Clear Channel gets recouped and after**

6    **that, 10 percent.  You don't recall any offer like**

7    **that?**

8             MR. RODEMS:  Object to form.

9        A.      Specifically, no.  Am I telling you it

10   didn't happen?  No.  I'm not saying that.  I'm saying I

11   don't recall but that doesn't mean -- that doesn't mean

12   it didn't happen.

13       **Q.      You heard -- at Mr. Russen's deposition,**

14   **you heard his opinion of Mr. Complin, right?  He called**

15   **him a bad word, right?  Do you remember that?**

16       A.      Well, he certainly was not kind.  Do I

17   remember what he called him?  No.

18       **Q.      He called him an, A-S-S-H-O-L-E?**

19       A.      Okay.  Well, that's probably right.

20       **Q.      Do you share that opinion?**

21             MR. RODEMS:  Object to the form.

22       A.      No.

23       **Q.      Do you know why was Mr. Russen so upset**

24   **at Mr. Complin?**

25       A.      A completely unrelated issue to anything

1    to do with WrestleReunion.

2         Q.      Some dispute they had on another

3    wrestling related project?

4         A.      Right.  Which I had no involvement in and

5    that's where that anger really comes from.

6         Q.      Okay.  But let me ask you this.  At some

7    point did you contemplate filing any type of claim or

8    litigation against Mr. Complin?

9              MR. RODEMS:  Object to form.  I'm going

10             to instruct him not to answer.  You need to

11             understand something, that there was a period of

12             time at which Mr. Complin gave the impression he

13             was an attorney at law.  Now, I know we've produce

14             some things that have gone back and forth with

15             Mr. Complin.  Some of the things I think because

16             they were sent to third parties would not

17             necessarily be restricted by the attorney/client

18             privilege.

19             But there's a level of communications

20             between the principals at WrestleReunion and

21             Mr. Complin that I -- you know, if this was a

22             mistake on their part -- I've never got to the

23             bottom of what Mr. Complin is or is not.

24             MR. HERBERT:  I haven't either.

25             MR. RODEMS:  So, with that caveat, I'm

1    not sure how much further I can go because I do

2    believe there's probably some case law that says

3    if the client is under the belief that someone is

4    an attorney and they share things with them and

5    get legal advice, then they find out later they're

6    not, they may not have a bar license or whatever,

7    the privilege may or may not apply.

8         MR. HERBERT:  But is that -- why don't I

9    establish that record, if that's the case then.

10        Q.    Did you believe that Mr. Complin was

11   acting as an attorney on behalf of WrestleReunion?

12        A.    Absolutely, unequivocally.

13        Q.    He also is an agent in the entertainment

14   industry.  You're aware of that?

15        A.    Yes.  Yes, I am.

16        Q.    At some point it sounded like from what

17   Mr. Attanasio said that he was acting more in an agent

18   capacity for WrestleReunion?

19        A.    What I can say is, Sam is kind of --

20   maybe the word eccentric is a valid word.  But I can

21   tell you this; in no way, shape, or form would our

22   company entered into any arrangement with Sam Complin

23   if we did not believe that he was an attorney period.

24   We would not have done it.  No way.  No how.  Hum-mm.

25        There's a thousand people out there,

1    maybe 10,000 maybe 100,000 that are going to tell you

2    they're going to do this and do that.   To me, somebody

3    who's an attorney is -- should be credible.

4        Q.      I understand.   So, you were acting on the

5    belief that Sam Complin was representing the company?

6        A.      For a very long time.

7        Q.      No problem.   Just let me ask you this;

8    there's a document that I can either spend a while and

9    dig up or I can have one of my colleagues pull from the

10   production and show it to me, and it discusses this

11   offer of returning the rights to you, whatever you

12   sell, we Clear Channel get recouped, and then we'll

13   agree to take only 10 percent.

14       A.      Somebody sent that to me?

15       Q.      I think it was sent to Mr. Complin from

16   Steve Sterling communications to Mr. Complin and I'm

17   just wondering if you've ever seen that communication

18   from Clear Channel?

19       A.      Not that I recall, but obviously if you

20   want to show it to me, I'll be glad to look at it.

21       Q.      Okay.   And I guess you don't have any

22   recollection about that offer being made as an offer

23   from Clear Channel to someone you deem to be your

24   lawyer and I'm not asking about your communications

25   with him, just do you have a recollection of that offer

1  or rejecting that offer?

2      A.      No.  I have to say, no, I don't.  Again,

3  I'm not saying it didn't happen.  I'm saying I don't

4  recollect it.

5      Q.      Okay.  Do you believe that -- did

6  Mr. Complin ever make any demands to Clear Channel on

7  behalf of WrestleReunion?

8      A.      Based on again nothing that I have in

9  writing anywhere but based on his stories to me, yes.

10     Q.      What was the demand that Mr. Complin on

11  behalf of WrestleReunion made to Clear Channel?

12     A.      My understanding was -- and, again, I say

13  my understanding --

14     Q.      Sure that's all I'm asking.

15     A.      Okay.  Is that in various conversations

16  back and forth which, you know, that these guys had,

17  which I was never privileged to any of them, never

18  participated in any of them, they had come to an

19  agreement that -- I mean, I guess this is -- I'm

20  okay --

21     Q.      The facts of whatever was said between

22  Mr. Complin and Mr. Sterling would not be privileged.

23  If there was any agreement reached between them -- you

24  know, you don't have tell me he told you.  What's your

25  understanding of that.  It sounds like there was an

1    arrangement or agreement that was discussed and what is

2    your knowledge about that?  Tell me what he told you.

3                   MR. RODEMS:  Let me do this, let me --

4          before he answers the question that I'm still

5          uncertain about, because if it -- under certain

6          circumstances it may or may not be privileged, may

7          I have a moment to talk with him about it?

8                   MR. HERBERT:  Sure.  Why don't we take a

9          break and let me see if I can find the thing.

10                  (The deposition was in recess.)

11                  MR. RODEMS:  Back on the record.

12         Regarding the issue of privilege with Sam Complin

13         and whether Sal's knowledge of an offer came

14         directly from Sam or not, what we would suggest is

15         a limited waiver of the attorney/client privilege

16         on this particular issue so that you can get the

17         information that you need and if that's

18         acceptable, we'll proceed in that manner.

19                  MR. HERBERT:  Yes, that's fine.  Thanks.

20                  (Exhibit 35 - Letter Sterling to Coplin)

21         Q.     And just for the record purposes let me

22    identify this document I just handed you.  I marked it

23    as Exhibit Number 35.  It looks like it's some type of

24    document from Steve Sterling at Live Nation to Sam

25    Complin.  And it mentions some type of deal construct

1    regarding the return of the rights to WrestleReunion

2    and recoupment and return after that.  Did you have a

3    chance to look at that document?

4         A.     Yes, I did.

5         Q.     Give counsel a chance to look at it.

6         MR. RODEMS:  Okay.  And obviously the

7    inquiry regarding settlement matters, you know, I

8    made my objection previously on -- you know, on

9    this and I'd like a continuing objection on this.

10        MR. HERBERT:  No problem.

11        MR. RODEMS:  Okay.

12        MR. HERBERT:  It's maybe not admissible,

13    but our position is it's not privileged.

14        MR. RODEMS:  I'm sorry, just one second

15    on this.

16        (The deposition was in recess.)

17        MR. HERBERT:  Okay.  Back on.

18        Q.     You need a second?

19        A.     Yes.

20        (Off the Record.)

21        THE WITNESS:  Okay.

22        MR. HERBERT:  Back on the record.

23        Q.     So, Exhibit Number 35 I guess you've

24    never seen that document before?

25        A.     No, sir.

1      Q.      Okay.  And just for the record it says

2   here appears to be from Steve Sterling to Sam Complin

3   opens talking about preparation for their call that

4   looks like they're going to have and in it Mr. Sterling

5   appears to say that, "My suggestion is intended to be a

6   simple one which would allow Sal and his partners to go

7   forward with the property while giving us an

8   opportunity to recoup our investment.  Therefore, I'm

9   interested in exploring if there is a deal construct we

10  could possible agree that Live Nation (formerly Clear

11  Channel Entertainment Television Holdings) media rights

12  to this property could come back to Sal's entity for

13  WrestleReunion with the provision that Live Nation is

14  to be recouped from gross sales.  We would be looking

15  to get a return on our investment and I suggest that we

16  either look at a 10 percent return above our actual

17  out-of-pocket expenses, after which a total reversion

18  of our rights occurs to WrestleReunion or,

19  alternatively, perhaps a three percent ongoing

20  participation in perpetuity."

21          And it says, "As you and I have discussed

22  there is an opportunity here for Sal and his group and

23  I am confident that you and I can find a way to work

24  something out to the mutual benefit of everyone."

25          Just reading that language in Exhibit 35

1    does that refresh your recollection about discussions

2    that your company had with Clear Channel about

3    regaining the rights to the footage of the

4    WrestleReunion events?

5         A.    No, sir, it does not.

6         Q.    Okay.  Do you recall, you know, ever

7    rejecting any offer along these lines that's reflected

8    in Exhibit 35?

9         A.    No, sir.

10        Q.    But do you recall making a demand for a

11   large sum of money about the same time as these

12   discussions with taking place?

13        A.    I don't see a time on there.  I don't

14   know when, so I can't speak to that.  It's not dated or

15   anything.

16        Q.    I have an e-mail and I think the timing

17   of this is in the spring of 2000 -- hold on a second

18   actually.  Let me correct myself.  In the spring of

19   2006, would have been around the time that you were

20   involved in the WWL 6:05, The Reunion project?

21        A.    I don't remember that.

22        Q.    Okay.  You don't remember making a demand

23   on Clear Channel for a large amount of money in the

24   spring of 2006?

25        A.    I'm sorry.  I was addressing this.

1    Q.      I know.  Now I'm asking a different

2  question.

3    A.      Oh, my understanding of the situation,

4  hopefully to cut to the chase, is that Sam and Steve

5  came to an agreement that Clear Channel was going to

6  pay us $2 million and we were going to take our tapes

7  back with the $2 million.

8    Q.      Sam Complin told you that?

9    A.      Yes, sir.

10    Q.      Okay.  Did Sam Complin ever tell you that

11  he told Steve Sterling that you were crazy?

12    A.      Well, no.  But why would somebody -- if

13  they did that, why would they turn around and --

14    Q.      Did he ever call you crazy?

15    A.      No.

16    Q.      Did he ever tell you that you were wildly

17  unrealistic in what you were looking for?

18    A.      Absolutely not.

19    Q.      So, your testimony is that Sam Complin

20  told you that he had some type of a deal with Steve

21  Sterling for Clear Channel to pay your company $2

22  million?

23    A.      Correct.

24    Q.      And you rejected that offer?

25    A.      No, sir.

1     Q.      Did you accept that offer?

2     A.      Yeah, and take our tapes back.

3     Q.      So, you were willing to enter into that

4  type of offer and it never came about?

5     A.      At the time we said okay.  Let's just,

6  you know, move -- accept that and move on.  But, no, it

7  never came about.

8     Q.      Why not?

9     A.      I have no idea if -- I wish I knew.  I

10  wish I knew.

11     Q.      Did you ever -- have you ever heard that

12  out of Steve Sterling's mouth in your life?

13     A.      Well, keep in mind there's not a lot of

14  opportunity to speak -- I spoke to Steve Sterling -- to

15  the best of my recollection my last time speaking to

16  Steve Sterling was October of 2005.  So, anything

17  that -- speaking to him would have been after that.  I

18  mean, any of this conversation would have been after

19  that I believe.  So, no, I'm not saying I said I heard

20  it out of his mouth.  I'm saying I heard it out of Sam

21  Complin's mouth.

22     Q.      And Mr. Complin is the only one you heard

23  it from?

24     A.      Correct.

25     Q.      Nobody from Clear Channel?

1    A.    No, sir.

2    Q.    All right.  And if Steve Sterling were to

3  testify that's absolutely false, the only basis you

4  have to dispute that is what Mr. Complin told you,

5  correct?

6              MR. RODEMS:  Object to form.

7    A.    Correct.

8    Q.    You don't have a document to that effect?

9    A.    No, sir.

10   Q.    And let me look at the documents.  I'm

11  supposed to have one sent to me.  Let me go print it

12  out.

13             MR. RODEMS:  Off the record.

14             (Off the Record.)

15             MR. HERBERT:  I think we're done.  Do you

16        have any cross, Chris?  No further questions.

17             MR. RODEMS:  I don't wish to do cross

18        examination at the time.  It's 6:05, I'm not

19        saying I do have any.  I'm not saying I don't.  I

20        just don't wish to consult, go over it.  I guess

21        what I would say is I'll just table it for tonight

22        and if something changes, I'll let you know.

23             MR. HERBERT:  Sure.  Depending on what

24        documents might come as a result of the ABC

25        subpoena, I want to reserve the right to follow up

1    with that if necessary.

2           MR. RODEMS:   Let's cross that bridge.

3    Obviously we got some work to do on that issue and

4    I appreciate your professionalism and all that.

5    Let's get to that point when we do.

6           If it's ordered, we'll read.

7           (Whereupon, the taking of the deposition

8    was concluded at 6:05 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF OATH


STATE OF FLORIDA
COUNTY OF HILLSBOROUGH



        I, DEBORAH G. CARVER, PROFESSIONAL REPORTER, the undersigned authority, hereby certify that the witness was duly sworn by me.


        WITNESS my hand and official seal this ___7___ day of ___May___ at Tampa, Florida.


                    _____
                    DEBORAH G. CARVER
                    Notary Public, State of Florida at Large
                    My Commission No. DD384608
                    Expires:  March 16, 2009


NOTARY PUBLIC
STATE OF FLORIDA
DEBORAH G. CARVER
MY COMMISSION # DD 384608
EXPIRES: March 16, 2009
Bonded Thru Budget Notary Services

CERTIFICATE OF REPORTER


STATE OF FLORIDA
COUNTY OF HILLSBOROUGH


     I, DEBORAH G. CARVER, Professional Reporter, do hereby certify that I was authorized to and did stenographically report the foregoing deposition; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

     I FURTHER CERTIFY that I am neither an attorney nor counsel for the parties to this cause nor a relative or employee of any attorney or party connected with this litigation, nor am I financially interested in the outcome of this action.

     DATED THIS 7 day of May, 2009

     DEBORAH G. CARVER

```
 1                      SIGNATURE PAGE
               WRESTLEREUNION V. LIVE NATION
 2               NO.: 8:07-CV-2093-T027-MSS
 3
                   DEPOSITION CORRECTIONS
 4                      SAL CORRENTE
                      APRIL 23, 2009
 5
    PAGE LINE READS   SHOULD READ  REASON FOR CHANGE
 6

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____
19
20          Subject to the above corrections, if any,
    my testimony reads as given by me in the foregoing
21  examination under oath.
22
            SIGNED at this _____ day of
23  _____, 2009.
24
25          _____
                SAL CORRENTE
```

MAY 5, 2009

RYAN CHRISTOPHER RODEMS, ESQUIRE
BARKER RODEMS & COOK, P.A.
400 North Ashley Drive, Suite 2100
Tampa, Florida 33602

RE: WRESTLEREUNION V. LIVE NATION

Dear Mr. Rodems:

Please have the witness note any amendments or corrections on the errata sheet, with the reason for the change, and sign it. Once that has been completed, return it to COUNSEL OF RECORD.

The Rules of Civil Procedure provide 30 days from receipt of this letter to exercise the right to read and sign. Failure to do so will constitute waiver of that right to read and sign.

Our office is open Monday through Friday, 8:30 a.m. to 5:30 p.m. If you have any questions, please do not hesitate to contact us. Thank you for your attention to this matter.

Sincerely,

Deborah G. Carver
Notary Public, State of Florida

Cc: All counsel