UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WRESTLEREUNION, LLC,

      Plaintiff,

v.                                   CASE No: 8:07-cv-2093-JDW-MAP

LIVE NATION TELEVISION
HOLDINGS, INC.

      Defendant.
_____/

## ORDER

**BEFORE THE COURT** are Defendant's Motion for Summary Judgment (Dkt. 38) and Defendant's Motion to Strike Declaration of Rob Russen (Dkt. 63). Plaintiff has responded in opposition to the motions (Dkts. 71, 65), and Defendant filed a reply with respect to its motion for summary judgment (Dkt. 75). For the reasons that follow, Defendant's motion for summary judgment (Dkt. 38) is **DENIED**, and the motion to strike (Dkt. 63) is **DENIED** as moot.

### *Background*

Plaintiff, WrestleReunion LLC, was formed in November 2004 to coordinate and stage fan conventions featuring former professional wrestling stars and legends. (Corrente Dep. 12/10/08 168:16-171:20). The WrestleReunion conventions included live matches, question and answer sessions, in-person interviews, and autograph opportunities. (Corrente Dep. 12/10/08 170:3-21). By late 2004, WrestleReunion had signed multiple contracts, committing to pay fees and expenses for the venue, talent, transportation, lodging, marketing, and promotions for the first event, which was scheduled for January 28-30, 2005. (Corrente Dep. 12/10/08 193:19-198:2; 4/22/09 27:1-29:19).

1

Less than a month before the first event, WrestleReunion and Clear Channel Entertainment Television ("CCETV"), a division of Defendant Live Nation Television Holdings, Inc., entered discussions for a potential arrangement to tape, produce, and market the audio-visual footage of the conventions. (Corrente Dep. 4/22/09 40:13-19).

On January 21, 2005, one week before the first event, CCETV and WrestleReunion executed an "Outline of Terms." (Dkt. 38-3; Def.'s Mot. Ex. B, hereinafter, "Outline of Terms"). The four page document referred to itself as a "proposal" and stated it was "intended to outline the principal terms upon which CCETV would go forward to fund the production and completion of the Program(s) we've discussed distributing based upon your intended live event schedule." (Outline of Terms, Introduction). It listed the "substantive deal points" but noted, "[a] long form agreement to be negotiated in good faith would follow thereafter," which would include "[s]tandard mutual warranties and representations, indemnifications, materials required for delivery, accountings, packaging, etc. and other standard contractual terms." (Outline of Terms, Introduction, ¶ 13). However, the Outline of Terms lacked any provision stating that the parties did not intend to be bound prior to the execution of a long form agreement.

There is no evidence that the parties exchanged drafts of the long form agreement or entered any subsequent formal contract. Sal Corrente, who executed the Outline of Terms on behalf of the Plaintiff, believed it represented the parties' entire agreement. (Corrente Dep. 12/9/08 68:20-23). Steve Sterling, a senior vice president of CCETV who prepared the Outline of Terms and sent the document to WrestleReunion, testified that he wanted a "very short agreement" to acknowledge the parties' responsibilities, and CCETV would not have proceeded to film the WrestleReunion events if Plaintiff had not executed the document. (Sterling Dep. 75:25-77:11). Joseph Townley, who

executed the Outline of Terms for CCETV, testified it "shows that we both have an understanding of the agreement and to move forward." (Townley Dep. 18:9-19).

Substantively, the Outline of Terms granted CCETV the exclusive right to distribute "Program(s)" produced from audio-visual footage of the WrestleReunion events. (Outline of Terms ¶¶ 1, 2). It set forth CCETV's obligation to produce the programs, as well as the material the programs were to contain:

> The Program(s) will be derived from the CCETV audio-visual productions from a series of live events entitled "WrestleReunion" comprised substantially of living legends of the wrestling world as well as competitive events and other special events and appearances pursuant to a pre-determined schedule created by [WrestleReunion] and provided to CCETV well in advance of the event date(s), CCETV shall produce the Program(s) to include wrestling competitions, personality profile coverage, exclusive interviews, behind the scenes footage, and "on-the-road" documentary coverage to be mutually determined by the parties. The Program(s) will be comprised substantially of the scheduled events and personality documentary coverage material, totaling not less than 90 minutes for national and international television distribution and not less than 120 minutes (90 mins, live event and/or competition, 30 mins. documentary/personality profile material) for worldwide TV and home video distribution. The Program(s) will typically be shot in High Definition video and will conform to top quality broadcast and home video production standards, and will be in multi-track format.

(Outline of Terms ¶ 1). CCETV agreed to make an "'all-in' financial commitment in respect of the audio-visual planning, production and completion of the Program(s) in the budgeted amount not to exceed approximately $235,000." (Outline of Terms ¶ 6). As part of the production costs, CCETV agreed to be responsible for "[a]ll aspects of the audio-visual production," and it agreed to "edit the Program(s) as part of the production budget." (Outline of Terms ¶¶ 6(a)(i), 6(a)(ii)).

The Outline of Terms granted CCETV the "exclusive worldwide distribution rights to the

Program(s) in all forms of media" and ensured it the exclusive right "to secure worldwide television and home video distribution deals for the Program(s)." (Outline of Terms ¶¶ 2, 8). In exchange, CCETV agreed to split the revenue obtained from distributing the programs, after recouping its expenses and collecting various fees. (Outline of Terms ¶ 7). CCETV did not pay an initial licensing fee or any other consideration for the exclusive right to distribute programs of the WrestleReunion footage.

After entering the Outline of Terms, CCETV videotaped WrestleReunion I in Tampa, Florida on January 28-30, 2005. Before taping the second convention, Sterling sent an email to Corrente, which stated:

> . . . CCETV is underway to shoot and produce the WrestleReunion live event in Valley Forge as part of our agreed upon and signed Outline of Terms dated January 21st, 2005. All Terms and conditions are the same . . . This email is to confirm that we are all conducting ourselves within the agreed upon Terms and provisions of the agreement and we would appreciate your confirmation of same by email as soon as possible.

(Corrente Decl. ¶ 8; Pl.'s Opp. Ex. 1; Dkt. 71-2, p. 8). Corrente confirmed, "[w]e are operating under the terms of the original agreement." (Corrente Decl. ¶ 9; Pl.'s Opp. Ex. 1; Dkt. 71-2, p. 9). CCETV then videotaped WrestleReunion II, as well as the third and final WrestleReunion, which took place in Davie, Florida on September 10, 2005.

CCETV did not videotape every event that occurred at the WrestleReunion conventions, and it did not edit all of the footage it shot. (Corrente Decl. ¶ 7). WrestleReunion offered to assist with editing the footage, but CCETV declined. (Corrente Decl. ¶ 10). However, CCETV attempted to produce and market a WrestleReunion product for television or home video distribution. (Def.'s Resp. to Pl.'s Interrog. # 2). In late 2005, CCETV completed a promotional WrestleReunion video.

(Corrente Decl. ¶ 12). CCETV approached approximately fifteen different potential distributors or licensors of the WrestleReunion footage. (Def.'s Resp. to Pl.'s Interrog. # 2; Sterling Dep. 177:12-178:4, 185:17-25, 188:6-197:13, 200:3-203:6, 209:22-210:10). The only distribution outlet CCETV secured for any WrestleReunion program was Highspots.com, a wrestling-related online retailer. (Def.'s Resp. to Pl.'s Interrog. # 2). Highspots.com only ordered a small volume of DVDs packaged for home distribution, which contained four interviews. (*Id.*). It did not submit any additional orders. (*Id.*).

Plaintiff contends that Defendant did not videotape multiple events with commercial appeal, failed to edit a substantial amount of the footage it shot, was dilatory in producing a promotional video, and used deficient efforts to market and distribute programs derived from the WrestleReunion events. Plaintiff commenced this action for breach of contract, fraudulent inducement, and violation of the Florida Deceptive and Unfair Trade Practices Act. The only remaining cause of action is Plaintiff's breach of contract claim. Defendant has moved for summary judgment, arguing: (1) the Outline of Terms does not constitute an enforceable contract, (2) Plaintiff has not established a breach of the Outline of Terms, and (3) Plaintiff's damages are speculative and not recoverable.

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a

whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Jackson v. BellSouth Telecommc'ns*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

### *Discussion*

1. *The Outline of Terms*

    a. *Whether the parties intended the Outline of Terms to be binding*

Defendant argues that the Outline of Terms is not a binding contract but a preliminary proposal or unenforceable "agreement to agree." Plaintiff contends that, notwithstanding the reference to a subsequent contract, the document contained all essential terms, and the parties intended it to be a binding agreement. The documentary and objective evidence raise a genuine issue of material fact as to whether the parties intended to be bound by the Outline of Terms.

Where parties do not intend to be bound by their preliminary negotiation of terms prior to the execution of a formal written contract, there will be no enforceable agreement "unless and until

6

the written contract is in fact executed." *Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 436 (11th Cir. 1995) (applying Florida law); *see Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (applying New York law).[1] However, the contemplation of a subsequent formal agreement "does not denote that they did not intend to be bound immediately by their oral or written negotiations." *Lifecare Int'l, Inc.*, 68 F.3d at 436; *Bed Bath & Beyond, Inc. v. Ibex Constr., LLC*, 860 N.Y.S.2d 107, 109 (N.Y. App. Div. 2008) (holding "letter of intent" was binding even though it called for execution of a more formal contract). Where "the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them," it will be an enforceable contract. *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 408 (Fla. 1974); *see Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 93 N.Y.2d 584, 590 (1999). The agreement "do[es] not have to deal with every contingency," and uncertainty as to "nonessential or small terms" will not preclude a finding of a binding agreement. *Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985); *Williams v. Ingram*, 605 So. 2d 890, 893 (Fla. 1st DCA 1992); *Express Indus. & Terminal Corp.*, 93 N.Y.2d at 590 ("[N]ot all terms of a contract need be fixed with absolute certainty."). However, "[w]here essential terms of an agreement remain open, and subject to future negotiation, there can be no enforceable contract." *Dows v. Nike, Inc.*, 846 So. 2d 595, 602 (Fla. 4th DCA 2003).

---

[1] In its motion, Defendant argued that its standard "long form agreements" are governed by New York law. The parties never entered the long form agreement, and the choice of law provisions that generally appear in Defendant's contracts have no bearing on this action. Defendant agreed, however, to "assume that New York or Florida law governs this dispute," positing that the relevant law of both states is similar. In response to Plaintiff's argument that the contract was made in Florida and governed by Florida law, Defendant filed a reply brief, arguing that the dispute should be decided under New York law because the contract was "made" in New York. Although the parties dispute the applicable law, the issue need not be resolved at this stage, because the result is the same under the law of either state.

The relevant inquiry, therefore, is whether the parties agreed to all essential terms and intended to be bound by the Outline of Terms, or whether there were other essential terms that the parties intended to negotiate. *See Blackhawk Heating & Plumbing Co.*, 302 So. 2d at 408; *Adjustrite Sys., Inc. v. GAB Business Servs., Inc.*, 145 F.3d 543, 548-49 (2d Cir. 1998) (applying New York law). "To discern that intent a court must look to the words and deeds of the parties which constitute objective signs in a given set of circumstances." *Adjustrite Sys., Inc.*, 145 F.3d at 548-49 (quotations and alterations omitted). Courts applying New York law consider four factors to ascertain whether a preliminary agreement was intended to be binding in the absence of an executed formal contract: "(1) whether there is an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Brown*, 420 F.3d at 154. Although Florida law does not require application of this four-part test, these factors are nonetheless relevant considerations in determining whether the parties intended to be bound by their initial writing.

As to the first factor, the Outline of Terms lacks an express reservation of the right not to be bound, and it fails to state that the parties did not intend to be bound prior to executing the long form agreement. Even though the Outline of Terms refers to itself as a "proposal" and references a subsequent formal agreement, there is nonetheless some indication that the parties intended it to be binding. It requires a signature by a "duly authorized person," contains a representation and warranty that the signatory is "duly authorized to enter into and sign this agreement," and the parties "Acknowledged and Agreed" to the terms.

The second factor weighs in favor of the Plaintiff. Plaintiff conducted three WrestleReunion events and granted CCETV the exclusive right to videotape each event, constituting significant

8

partial performance of its contractual obligations. Moreover, following its entry into the agreement, CCETV spent several hundred thousand dollars to videotape, produce, and market footage of the events, manifesting its intent to be bound by the Outline of Terms. *See Bed Bath & Beyond, Inc.*, 860 N.Y.S.2d at 109.

In considering the third factor, the mere existence of open terms does not preclude enforceability as a contract. *See Express Indus. & Terminal Corp.*, 93 N.Y.2d at 590. As discussed, the key issue is whether the parties agreed on all of the essential terms. *Adjustrite Sys., Inc.*, 145 F.3d at 550-51 (analyzing whether open terms were essential). "[W]hat constitutes an essential term of a contract will vary widely according to the nature and complexity of each transaction and must be evaluated on a case specific basis." *ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053, 1056 (Fla. 5th DCA 2007). The document itself is ambiguous as to this. It states that it includes the "substantive deal points" and outlines the "principal terms." However, it also references an agreement to continue negotiating a "long form agreement," which would include "[s]tandard mutual warranties and representations, indemnifications, materials required for delivery, accountings, packaging, etc. and other standard contractual terms." The face of the document does not reveal whether these omitted terms were essential to the parties' agreement, and Defendant has not submitted any evidence that they were essential. Defendant argues that the document does not address the subject of losses or the parties' rights or responsibilities if it was not able to procure revenue-producing deals. Notwithstanding, Defendant failed to present any evidence that the parties intended to continue negotiating these terms or considered them essential to the agreement.

In contrast, there is evidence that the parties did not intend to continue negotiating additional "essential" terms. Sterling wanted a "very short agreement," without which, CCETV would not have videotaped the events. Sterling's email before the second WrestleReunion event confirmed that the

parties were still operating under the Outline of Terms and the terms had not changed. Moreover, Defendant has not offered any evidence that the parties continued negotiating their arrangement after executing the Outline of Terms.

Despite arguing for the application of New York law, Defendant has not submitted any evidence as to the fourth factor: the form of writing that is customary for this type of transaction. That the document references a long form agreement, or even that Defendant typically uses such an agreement, is immaterial. There is no evidence that Defendant sent the long form agreement to Plaintiff or that the parties exchanged drafts, and there is evidence that Defendant intended for the parties to conduct their relationship in accordance with the Outline of Terms. Accordingly, Defendant has failed to show that a document such as the Outline of Terms is not customary for this type of contract.

Weighing the four factors under New York law, there is a genuine issue of material fact as to whether the parties intended to be bound by the Outline of Terms in the absence of executing the long form agreement. Likewise, under Florida law, there is a genuine issue of material fact as to whether the parties agreed on all essential terms and intended to the Outline of Terms to be binding, or whether there were other essential terms they intended to negotiate. Accordingly, whether the Outline of Terms constitutes an enforceable contract cannot be resolved on Defendant's motion for summary judgment.

b. *Whether the Outline of Terms obligated CCETV to perform*

Defendant argues the "primary reason" the Outline of Terms should not be deemed a binding contract is that it does not obligate CCETV to perform. (Def.'s Mot. at 12). Defendant argues it was only required to pay revenue in the event it procured distribution deals, and the Outline of Terms "contains no provision obligating Defendant to attempt to market." (Def.'s Mot at 15). In essence,

Defendant argues that it did not bind itself to do anything. Plaintiff, citing the seminal case *Wood v. Lucy, Lady Duff-Gordon*, 222 N.Y. 88, 90-91 (1917) (Cardozo, J.), argues that because the Outline of Terms granted exclusive distribution rights to CCETV, it contained an implied duty to use reasonable efforts to market and distribute the programs.

Here, as in *Wood*, CCETV was granted an exclusive right to distribute the footage of the WrestleReunion events. *See Wood*, 222 N.Y. at 90. Plaintiff would receive a portion of the profits but only if CCETV's efforts resulted in any revenues. *See id.* at 91. Without an implied duty to use reasonable efforts, CCETV would have the exclusive right to distribute without any corresponding obligation to do so. *See id.* at 90-91. Defendant argues there was consideration for the obligation, because it invested approximately $359,000 to create and produce marketable programming, even though the Outline of Terms committed it to spend only $235,000. CCETV's financial commitment, however, was specifically limited to "the audio-visual planning, production and completion of the Program(s) in the budgeted amount not to exceed approximately $235,000." (Outline of Terms ¶ 6). It had nothing to do with CCETV's subsequent distribution of the programs. In essence, if CCETV did not make any distribution efforts after developing the programs, Plaintiff would not receive anything in exchange for granting CCETV the exclusive right to distribute programs derived from the WrestleReunion events.

Arguing that the duty to use reasonable efforts should not be implied in this case, Defendant cites *WirelessMD, Inc. v. Healthcare.com Corp.*, 610 S.E.2d 352 (Ga. App. 2005) and *Arlaine & Gina Rockey, Inc. v. Cordis Corp.*, No. 02-22555-CIV, 2004 WL 5504978 (S.D. Fla. Jan. 5, 2004). However, both cases involved consideration that was separate from any revenue that would have been generated by the defendant's distribution efforts. *See also, e.g., Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 166-69 (3d Cir. 2001) (collecting cases and noting implied duty to use

reasonable efforts does not exist where additional consideration, such as license fee or minimum royalty payment, is given for exclusive right). In *WirelessMD*, the plaintiff forgave defendant's $3 million debt in exchange for the exclusive right to sell certain software. *WirelessMD, Inc.*, 610 S.E.2d at 354, 356. In *Arlaine*, the defendant made a substantial advance royalty payment in exchange for the exclusive license agreement. *Arlaine & Gina Rockey, Inc.*, 2004 WL 5504978, at 49. *Arlaine* is further distinguishable in that, unlike here, there was no express provision requiring the defendant to develop the product to be licensed. *See id.* Where the only consideration a party stands to receive in exchange for an exclusive distribution right is a portion of the revenue generated from the exercise of that right, there is necessarily a duty to use reasonable efforts. *Wood*, 222 N.Y. at 90-91; *Emerson Radio Corp.*, 253 F.3d at 168. Accordingly, to the extent Plaintiff proves at trial that a binding agreement exists, the Outline of Terms obligated CCETV to use reasonable efforts to distribute the programs.

2.  *Breach*

Defendant argues it is entitled to summary judgment because WrestleReunion cannot establish the breach of any express contractual term. In responding to the motion, Plaintiff does not identify any specific provision in the Outline of Terms. Instead, it contends, without reference to the contractual terms, that Defendant breached the parties' agreement by: (1) failing to videotape, (2) failing to edit, and (3) failing to distribute the WrestleReunion events.

"Contract interpretation begins with a review of the plain language of the agreement because the contract language is the best evidence of the parties' intent at the time of the execution of the contract." *Taylor v. Taylor*, 1 So. 3d 348, 350 (Fla. 1st DCA 2009); *see Innophos, Inc. v. Rhodia, S.A.*, 10 N.Y.3d 25, 29 (2008). "[W]hen parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms." *Vermont Teddy Bear Co., Inc.*

v. *538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) (quotations and alterations omitted); *see Andersen Windows, Inc. v. Hochberg*, 997 So. 2d 1212, 1214 (Fla. 3d DCA 2008). Courts cannot, by construction, rewrite the clear and unambiguous terms of a voluntary contract. *Brooks v. Green*, 993 So. 2d 58, 61 (Fla. 1st DCA 2008).

As its first argument for breach, Plaintiff asserts that CCETV failed to videotape multiple events with commercial appeal. However, it does not identify any contractual term that imposed this duty. The parties' express agreement simply required CCETV to produce the programs "to include wrestling competitions, personality profile coverage, exclusive interviews, behind the scenes footage, and 'on-the-road' documentary coverage." (Outline of Terms ¶ 1). It did not require the programs to include every event with commercial appeal. The provision that required the programs to be "comprised substantially" of the scheduled events and personality documentary simply restricted the content of the programs to these items. (Outline of Terms ¶ 1). Nothing required CCETV to videotape every event, or even every event with commercial appeal.

Plaintiff also asserts that CCETV breached its duty to videotape due to poor quality audio production. In support, Plaintiff relies on two pieces of email correspondence attached to its motion. Plaintiff has not authenticated either of these documents. One of the individuals, Darren Chiappetta, is not identified in the body of the email correspondence. Plaintiff has not presented any evidence to identify him, his authority to speak or act on behalf of CCETV, or his qualification to offer an opinion on the quality of the audio production. In short, Plaintiff has not presented admissible evidence and it cannot rely on these emails in opposing Defendant's motion for summary judgment. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1249 (11th Cir. 2007) (inadmissable evidence cannot be used to avoid summary judgment); *Home Depot U.S.A., Inc. v. U.S. Fire Ins. Co.*, 299 F. App'x 892, 895 (11th Cir. 2008) (failure to offer evidence sufficient to support finding of authenticity

rendered evidence submitted in opposition to summary judgment inadmissible).

Even if the emails were admissible, they would not support Plaintiff's claim of contractual breach. The agreement required the programs produced by CCETV to "conform to top quality broadcast and home video production standards." (Outline of Terms ¶ 1). The emails, however, only relate to the raw audio footage of the live events and the author stated that in the editing process, he was "able to get around it a lot of the time." (Pl.'s Opp. Ex. 1; Dkt. 71-2, p. 11). The author also stated, "I don't remember that there were that many audio issues, if there are, we'll have to figure out a way to do that." (Pl.'s Opp. Ex. 1; Dkt. 71-2, p. 12). Plaintiff has not presented evidence that the final programs produced by CCETV did not conform to the standards identified in the Outline of Terms.

As a second ground of breach, WrestleReunion contends that CCETV breached its duty to edit, based on the alleged failure to edit and produce "a majority" of the footage taken at the events, a delay in editing the footage, CCETV's rejection of Plaintiff's offer to assist with the editing, and its delay in cutting a video promotional. Again, Plaintiff does not identify a specific contractual term that was breached. The only provision that references "editing" required the programs to be edited as part of the production budget. (Outline of Terms ¶ 6). Assuming the obligation to edit falls within CCETV's contractual duty to produce one or more programs, the Outline of Terms simply required the programs to include certain items. Just as the agreement did not require CCETV to videotape every event, it did not require CCETV to edit all, or even a majority, of the footage that it shot. Because CCETV had no duty to edit a specific amount of footage, it had no duty to complete all of the editing within a particular time frame. Moreover the contract did not require CCETV to allow WrestleReunion to edit the footage. To the contrary, all aspects of the audio-visual production were the responsibility of CCETV. (Outline of Terms ¶ 6(a)(i)). Further, Plaintiff has not identified

anything in the contract that obligated CCETV to prepare a video promotional. Plaintiff has not shown that CCETV breached a contractual duty to edit. However, to the extent these editing deficiencies resulted in the failure to comply with the contractual duty to produce one or more programs, Plaintiff has raised a genuine issue of material fact.[2]

For its third and final ground of breach, WrestleReunion asserts that CCETV failed to market or distribute programs produced from footage of the events. Plaintiff does not rely on any particular contractual provision but argues that the Outline of Terms required CCETV to use reasonable efforts to distribute the programs. As discussed, because the Outline of Terms granted CCETV exclusive distribution rights to programs derived from footage of the WrestleReunion events, and because Plaintiff received nothing without CCETV's efforts, the contract contained an implied duty to use reasonable efforts to distribute the programs CCETV produced. *See Wood*, 222 N.Y. at 90-91; *Emerson Radio Corp.*, 253 F.3d at 168.

Defendant argues there can be no implied duty to use reasonable efforts, because the covenant of good faith and fair dealing must relate to the performance of express contractual term. However, the duty to use reasonable efforts, which is implied in agreements granting exclusive licensing or distribution rights, is not the same as the implied covenant of good faith and fair dealing that is "part of every contract." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1291

---

[2] The Outline of Terms required CCETV to make a "financial commitment in respect of the audio-visual planning, production and completion of the Program(s) in the budgeted amount not to exceed approximately $235,000." (Outline of Terms ¶ 6). In its interrogatory responses, CCETV averred that it "has spent in excess of $359,000 for taping, producing, and marketing WrestleReunion events and interviews." (Def.'s Resp. to Pl.'s Interrog. # 2). However, CCETV has not provided evidence to demonstrate what portion of the total it spent on planning, production, and completion of the programs, which was covered by the financial commitment, and what portion it spent on marketing, which was not covered. Accordingly, there is a genuine issue of material fact as to whether CCETV has exhausted its financial commitment to produce and complete the programs.

(11th Cir. 2001); *511 West 232nd Owners Corp. v. Jennifer Realty Co.*, 98 N.Y.2d 144, 153 (2002). The covenant of good faith and fair dealing "is designed to protect the contracting parties' reasonable expectations." *Cox v. CSX Intermodal, Inc.*, 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999); *511 West 232nd Owners Corp.*, 98 N.Y.2d at 153. The implied duty to use reasonable efforts when granted an exclusive distribution right provides mutuality to an otherwise illusory promise. *Wood*, 222 N.Y. at 90-91. Moreover, in this case, the implied duty to use reasonable efforts does not override any express contractual terms but attaches to CCETV's performance of its exclusive right to distribute programs derived from the WrestleReunion footage.

CCETV argues that matters related to distribution were left entirely to its discretion. (Def.'s Mot. at 16). However, the Outline of Terms does not contain any provision leaving the marketing or distribution efforts to CCETV's discretion. In the absence of a term defining the extent of its duties to market and distribute the programs, CCETV had a duty to use reasonable efforts. *See, e.g., Bloor v. Falstaff Brewing Corp.*, 601 F.2d 609, 614 (2d Cir. 1979) (Due to royalty provision, "[e]ven without the best efforts clause [defendant] would have been bound to make a good faith effort to see that substantial sales of [plaintiff's] products were made.").

The inquiry, therefore, is whether CCETV used reasonable efforts to distribute the programs it produced from the WrestleReunion footage. CCETV presented evidence that it approached fifteen different potential distributors or licensors of the footage. Whether these efforts were reasonable under the circumstances is an issue of fact to be determined after the presentation of evidence at trial. Sterling testified that CCETV stopped "hard selling it," even though he did not completely cease attempting to distribute the programs. (Sterling Dep. 228:15-229:8). CCETV declined Corrente's offer to make wrestlers available to work with CCETV or meet with potential buyers. (Corrente Dep. ¶ 11). CCETV did not prepare a promotional video or trailer for the WrestleReunion programs

until late 2005, even though the first event took place in January 2005. (Corrente Dep. ¶ 12). Further, there is evidence that CCETV did not place the WrestleReunion programs on its own television stations. (Russen Dep. 196:1-3). At a minimum, when viewed in the light most favorable to Plaintiff, there is evidence from which a reasonable fact-finder could conclude that CCETV did not use reasonable efforts to distribute the programs. Accordingly, summary judgment is not proper on the issue of whether CCETV breached the Outline of Terms.

3.  *Damages*

Defendant asserts that Plaintiff's damages are speculative and incapable of proof or measurement with any reasonable degree of certainty. In response, Plaintiff raises three arguments: first, it is entitled to recover its actual expenses, second, its lost profits may be demonstrated by Defendant's prelitigation projections, and third, the expert report of Colin Bowman is based on a standard from which WrestleReunion's loss of revenue may be determined with reasonable certainty.

A party suing for breach of contract may recover its "expectation interest," that is, the profits it would have received had the other party performed, or alternatively, may recover its "reliance interest," that is, the actual out-of-pocket expenditures made in reliance on the other party's performance. *Amoco Oil Co. v. Gomez*, 379 F.3d 1266, 1277 (11th Cir. 2004) (citing *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So. 2d 853, 856 (Fla. 4th DCA 1972)); *see Bausch & Lomb Inc. v. Bressler*, 977 F.2d 720, 728-29 (2d Cir. 1992) (applying New York law). Even if its lost profits are speculative and uncertain, WrestleReunion may elect to recover the expenditures it made in reliance on CCETV's performance. *See Amoco Oil Co.*, 379 F.3d at 1277. CCETV argues that WrestleReunion had already incurred multiple obligations for WrestleReunion I before it entered the Outline of Terms. However, Corrente averred that Plaintiff planned, staged, and incurred expenses for WrestleReunion II and III based on its contract with CCETV. (Corrente Decl. ¶ 15). Had that

agreement not been in place, it would have based these expenditures on its earnings from the WrestleReunion I live event. (*Id.*). Plaintiff has raised a genuine issue of material fact as to the actual expenses it incurred in reliance on the Outline of Terms.

Alternatively, Plaintiff may elect to recover its lost profits. A business without a "track record," such as WrestleReunion, may recover lost profits where: "(1) the defendant's action caused the damage and (2) there is some standard by which the amount of damages may be adequately determined." *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989); *Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (1986). In addition, Plaintiff must establish that "the particular damages were fairly within the contemplation of the parties to the contract at the time it was made." *Kenford Co., Inc.*, 67 N.Y.2d at 261; *see Frenz Enters., Inc. v. Port Everglades*, 746 So. 2d 498, 504 (Fla. 4th DCA 1999).

Under the Outline of Terms, Plaintiff stood to receive a portion of the profits from CCETV's distribution of the programs. (Outline of Terms ¶ 7). Any breach of CCETV's obligation to use reasonable efforts to distribute the programs caused Plaintiff to lose these expected profits. In addition, the Outline of Terms contemplated that revenue would be received from CCETV's distribution of the programs and it would be divided with WrestleReunion, indicating that lost distribution revenues were fairly within the parties' contemplation.

To be recoverable, lost profits cannot be speculative and must be established with a reasonable degree of certainty. WrestleReunion relies, in part, on CCETV's August 8, 2005 projected profit-and-loss statement related to DVD sales of the WrestleReunion programs. (Pl.'s Opp. Ex. 1; Dkt. 71-2, p. 27-29). The statement, "created to determine whether [the] project would be profitable or not," demonstrated a specific projected amount of profits to be paid to WrestleReunion. (Olejar Dep. 30:21-31:2). "A plaintiff may use the defendant's prelitigation

projections of sales or profits in establishing damages of lost sales or profits." *Pharmacy, Inc. v. American Pharm. Partners, Inc.*, 511 F. Supp. 2d 324, 334 (E.D.N.Y. 2007). CCETV argues that Plaintiff did not rely on the projections in deciding to enter the Outline of Terms, because the document was created after the parties entered the contract. However, this is immaterial to the key inquiry, which is whether the document provides a standard from which the loss of revenue can be determined with reasonable certainty. Here, Defendant's pre-dispute "projections were no mere 'interested guess' prepared with an eye on litigation. Instead, they were the product of deliberation by experienced businessmen charting their future course." *Autowest, Inc. v. Peugot, Inc.*, 434 F.2d 556, 566 (2d Cir. 1970), *quoted in Super Valu Stores, Inc. v. Peterson*, 506 So. 2d 317, 330 (Ala. 1987).

Defendant argues that Plaintiff's expert, Bowman, did not rely on the profit and loss statement and it represents a small fraction of total lost profit damages Plaintiff is seeking. However, whether Plaintiff's expert "actually relied on these projections is irrelevant to the instant motion which is premised on the alleged absence of evidence to support" WrestleReunion's lost profit damages. *See Pharmacy, Inc.*, 511 F. Supp. 2d at 334 n.10. Here, even though Defendant's projections do not set forth all of the lost profit damages Plaintiff is seeking, there is at least some evidence to support a claim for lost profits.

Accordingly, Plaintiff's third argument, that Bowman's expert report sets forth an appropriate standard for calculating WrestleReunion's lost profits, need not be addressed to resolve Defendant's motion for summary judgment. Defendant has moved to exclude Bowman's testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), based in part on the argument that Bowman applies a standard that is unreliable and speculative. (Dkt. 66). Whether Bowman's testimony and expert report provide sufficient evidence for the recovery of lost profits will be

addressed in a separate order on Defendant's *Daubert* motion. In any event, CCETV's own projection of DVD sales provides a sufficient basis on which Plaintiff may calculate its lost profits. CCETV has not sustained its burden of showing there is insufficient evidence to support a claim for lost profits, and therefore, summary judgment is not proper.

4.  *Motion to Strike Russen Declaration*

Defendant filed a motion to strike the Declaration of Rob Russen, which Plaintiff submitted in opposition to Defendant's motion for summary judgment. (Dkt. 63). Plaintiff has raised genuine issues of material fact precluding summary judgment, even without the Russen Declaration. Accordingly, the motion to strike is moot.

## *Conclusion*

Based on the foregoing, it is **ORDERED** that Defendant's Motion for Summary Judgment (Dkt. 38) is **DENIED**. Defendant's Motion to Strike the Declaration of Rob Russen (Dkt. 63) is **DENIED** as moot.

**DONE AND ORDERED** in chambers this 10th day of August, 2009.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record