**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**WRESTLEREUNION, LLC,**

       **Plaintiff,**

**v.**                                   **Case No. 8:07-cv-2093-T27-MAP**

**LIVE NATION TELEVISION**        **JURY TRIAL DEMANDED**
**HOLDINGS, INC.,**

       **Defendant.**
_____/

**PLAINTIFF'S MOTION IN LIMINE**

Plaintiff WrestleReunion, LLC moves the Court for an Order that the following

information not be mentioned in the presence of the jury, elicited from witnesses or attempted to

be offered in evidence:

1.       <u>Whether Rob Russen filed income tax returns</u>.  Mr. Russen is not an owner of

WrestleReunion, LLC, and whether he filed income tax returns is not relevant to whether the

parties entered into a contract, whether it was breached, and if so, the amount of damages

sustained by Plaintiff.  <u>Wiggins v. Clementon Police Dept.</u>, 2009 WL 2382240, 5 (D.N.J.)

(D.N.J. July 30, 2009)("Defendant's alleged failure to report income on his tax returns for his

work as a locksmith over the last 10 years is not relevant to whether Defendant violated

Plaintiff's civil rights. Further, Defendant has not voluntarily injected issues regarding his income

into the case.").  There has been no determination that Mr. Russen was even required to file

income tax returns.  Even if relevant, any comment, testimony or evidence on whether Mr.

Russen filed income tax returns would be more prejudicial than probative.

2.       <u>Whether WrestleReunion, LLC issued a W-2 or 1099 to Rob Russen or comments</u>

to the effect that Mr. Russen was paid "under the table" or in "cash."  This is also not relevant to whether the parties entered into a contract, whether it was breached, and if so, the amount of damages sustained by Plaintiff.  This issue is not relevant, and if relevant, it would be more prejudicial than probative.  Defendant claims that discussing these issues is necessary because of the Plaintiff's claim for damages, but the fact of the issuance of a W-2 or 1099 is not relevant.  Mr. Russen or Mr. Corrente can testify about payments made to Mr. Russen, but to suggest that a W-2 or 1099 was not prepared could lead to speculation of improper conduct.

   3. <u>Whether, after the dispute between the parties arose, Plaintiff made any settlement offers or Defendant offered to give the videotapes of WrestleReunion events to Plaintiff to market on its own; or whether Plaintiff declined such an offer.</u>  Defendant asked Mr. Corrente during deposition certain questions relating to offers to compromise.  Under Fed.R.Evid. 408, compromise and offers to compromise are not admissible.  Settlement discussions are not relevant, and if relevant, would be more prejudicial than probative.  During the conference on this motion, Defendant contended that while Plaintiff is not permitted to offer evidence of settlement discussions, Defendant is free to do so.  Yet, Fed.R.Evid. 408 prohibits "any party" from offering information to prove the "invalidity of . . .  a claim," which is exactly the reason Defendant suggested it intended to offer the information.  Defendant argued it was proof that Plaintiff did not mitigate its damages.

   4. <u>The Court's rulings on pretrial motions or the pleadings.</u>  Defendant has listed as an exhibit the Plaintiff's amended complaint.  The pleadings are merged in the pretrial statement, and therefore, the pleadings or resolutions of pleadings occurring before the pretrial statement are not relevant, and if relevant, would be more prejudicial than probative.  Thus, questions related

to whether Plaintiff filed claims for fraud, violation of the Florida Deceptive and Unfair Trades

Practices Act or whether Mr. Corrente believed it had been defrauded are inappropriate.

    5.    <u>E-mails or documents bearing the name of Plaintiff's counsel</u>.  For example, in

the pretrial statement, Defendant listed as exhibit 104, "AA0111 - AA0112 - Email from

Anthony Attanasio to Ryan Rodems dated 1/5/09 at 9:28 p.m."  In responding to a subpoena, Mr.

Attanasio forwarded e-mails to "Ryan C. Rodems."  What Mr. Attanasio forwarded was actually

an e-mail from <u>"RobLRussen@aol.com"</u> to various people on May 18, 2008.  The information as

to when the e-mail was forwarded to "Ryan C. Rodems" is irrelevant and may cause confusion.

All similar exhibits should have forwarding information redacted to avoid confusion.   Defendant

agreed to redact this information, but Defendant has not shown Plaintiff its exhibits as of this

date, and Plaintiff seeks to make it clear that it is not waiving its right to demand redaction.

    6.    <u>Opinions regarding the credibility of Colin Bowman, Sal Corrente or Rob Russen</u>.

Defendant's experts have issued reports containing comments on these witnesses' credibility.

<u>U.S. v. Beasley</u>,  72 F.3d 1518, 1528 (11th Cir. 1996)("Absent unusual circumstances, expert

medical testimony concerning the truthfulness or credibility of a witness is inadmissible. Expert

medical testimony concerning the truthfulness or credibility of a witness is generally

inadmissible because it invades the jury's province to make credibility determinations.").[1]

---

    [1] <u>See</u> <u>also</u> <u>United States v. Binder</u>, 739 F.2d 595, 602 (9th Cir. 1985)(holding that expert witness testimony was impermissible when it "in effect . . . impermissibly . . . asks [the jury] to accept the expert's determination that these particular witnesses were truthful"), <u>overruled on other grounds</u>, <u>United States v. Morales</u>, 108 F.3d 1031 (9th Cir. 1997); <u>United States v. Barnard</u>, 490 F.2d 907, 1912-13 (9th Cir. 1973) (trial court properly excluded psychiatric and psychological testimony as to credibility of co-defendant); <u>U.S. v. Awakard</u>, 597 F.2d 67, 670 (9th Cir. 1979)("[U]nder Federal Rule of Evidence 608A, that rules strictly limits opinion evidence on witness credibility to 'character or truthfulness or untruthfulness.'"); <u>Caban v. State</u>, 9 So.3d 50, 53 (Fla. 5th DCA 2009)("An expert may properly explain his opinion on an issue in

Defendant has expressed an intent to offer Mr. Bischoff's testimony that Mr. Bowman's testimony as to his experience at WCW was not truthful.

7.   <u>Hearsay testimony by Defendant's experts</u>.  While the Court was clear that motions in limine on hearsay are not necessary, during the conference on this motion, Defendant revealed a plan to offer hearsay and refused to acknowledge it was not permitted.  Defendant stated that Mr. Bischoff will testify that he spoke to another person, Jim Ross, about Mr. Bowman's experience with the WCW, and that Mr. Bischoff will testify as to those out of court statements made by Jim Ross as evidence that Mr. Bowman's testimony is not believable. Apparently, Defendant believes that because Fed.R.Evid. 703 allows an expert to base an opinion on inadmissible information, Mr. Bischoff's status as an expert permits Defendant to use him as a conduit to admit any information even if not related to his opinion.  That is simply not correct. <u>U.S. v. Dukagjini</u>, 326 F.3d 45, 58 (2d Cir. 2003)("[W]e hold that an expert witness may rely on hearsay evidence while reliably applying expertise to that hearsay evidence, but may not rely on hearsay for any other aspect of his testimony. Such improper reliance violates Rule 703, the hearsay rule, and the Confrontation Clause."); <u>Garay v. Missouri Pacific R. Co.</u>, 65 F.Supp.2d 1202, 1206 (D.Kan.1999)("Rule 703 merely allows an expert to formulate and explain the basis of his opinion; it does not authorize a party to prove the truth of hearsay declarations by having

_____

controversy by outlining the claimed deficiencies in the opposing expert's methodology, so long as the expert does not attack the opposing expert's ability, credibility, reputation or competence."); <u>Mathis v. O'Reilly</u>, 400 So.2d 795, 796 (Fla. 5th DCA 1981), <u>rev. denied</u>, 412 So.2d 468 (Fla.1982)(same); <u>Carver v. Orange County</u>, 444 So.2d 452, 454 (Fla. 5th DCA 1983)(improper for a trial court to allow an expert witness to impeach credibility of an opposing expert by testifying as to his opinion of the opposing expert's ability); <u>Ecker v. National Roofing of Miami, Inc.</u>, 201 So.2d 586, 588 (Fla. 3d DCA 1967)("[P]roper sense of professional delicacy precludes [experts] from giving evidence as to the merits of each other."); <u>Network Publications, Inc. v. Bjorkman</u>,  756 So.2d 1028, 1030 (Fla. 5th DCA 2000)(same).

an expert echo the deposition testimony of individuals who witnessed the underlying events.").

In addition to the above-referenced matters, Plaintiff raises the following issues for ruling by the Court:

8.    <u>Ensuring the witnesses are advised of the Court's rulings</u>.  During the conference on this motion, Defendant's counsel suggested that he could not be certain of Mr. Bischoff's compliance with certain agreements including that Mr. Bischoff would not comment on witnesses' credibility.  Defendant's counsel made statements to the effect that Mr. Bischoff was strong willed.  This became clear from some of Mr. Bischoff's testimony:

> Q.    I guess, really, what it comes down to is whether we are going to have a problem with you giving me the source of your information or not.  If you are going to say to me, in response to every question, "There's my stack of documents, find my answer," that's not possible because I can't plug into what you were thinking when you made certain statements. That's going to be --

> A.    You can ask me a question.  If the attorney, the attorney, tells you that the documents have been provided, then they have been provided.  I don't have access to them, sitting here in front of me.  If you don't want to look through the documents that have been supplied to you, call the fuckin' judge.

(Exhibit "1", excerpt of Bischoff deposition, 183:14-184:3).

> Q.    Was there a point in 1987 where you and Mr. Russen got into a dispute because you were intercepting his telephone messages?

> A.    No.

> Q.    That didn't happen?

> A.    I think Mr. Russen is a liar if he testified to that.

> Q.    Okay.  You don't like Mr. Russen?

> A.    I think Mr. Russen is a liar and a thief. . . . I think everybody that lies is a thief.

(Exhibit "1", excerpt of Bischoff deposition, 266:5-267:4).  Plaintiff requests as part of the Order

that the respective counsel be charged with making the witnesses aware of the Court's rulings on

motions in limine.

       9.      <u>Whether impeachment of Mr. Bischoff with his testimony in U.S. v. Kaplan, Case</u>

<u>No. 1:99-CR-609, United States District Court, Northern District of Georgia shall be permitted</u>.

Mr. Bischoff's qualifications as an expert includes his experience as head of WCW (World

Championship Wrestling), owned by Turner Broadcasting System, Inc. in the 1990s.  Plaintiff is

prepared to call two witnesses that can testify to several incidents when, due to Mr. Bischoff's

alcohol intoxication, he could not remember making business decisions for WCW.  During his

deposition, however, Mr. Bischoff denied ever drinking too much and blacking out while he was

the head of WCW.  Yet, in the <u>U.S. v. Kaplan</u> case, Mr. Bischoff testified to the following which

occurred on March 21, 1999, while he was still head of WCW[2]:

> Q.    NOW, I WANT TO DIRECT YOUR ATTENTION TO A PARTICULAR VISIT
>       ON MARCH 21ST, 1999.  DO YOU RECALL BEING IN THE CLUB AT OR
>       AROUND THAT DATE?
> A.    YES.
>
>              *     *     *
>
> Q.    DID YOU HAVE ANYTHING TO DRINK THAT NIGHT?
>
> A.    YES.
>
> Q.    ABOUT APPROXIMATELY HOW MANY DRINKS HAD YOU HAD THAT
>       NIGHT?
>
> A.    THREE OR FOUR BEERS PERHAPS BEFORE WE LEFT, AND ANYWHERE
>       FROM TEN TO 16 ONCE I GOT THERE.
>
> Q.    AND WHEN YOU SAY BEFORE YOU LEFT, YOU'RE TALKING ABOUT
>       BEFORE YOU LEFT FOR THE CLUB?

---

[2]  The actual transcript is in all CAPS.

A.     CORRECT.

                        *      *      *

Q.     AND DOES THERE COME A TIME WHEN YOU HAVE A DISCUSSION
       WITH FREDERIQUE ABOUT LEAVING THE CLUB WITH YOU?

A.     YES.

Q.     PLEASE TELL THE JURY ABOUT THAT DISCUSSION.

A.     IT'S SOMEWHAT VAGUE.  IT HAPPENED LATER IN THE EVENING AND
       I DON'T RECALL THE SPECIFIC LANGUAGE, BUT THERE WAS A LOT
       OF INNUENDO AND SUGGESTION ABOUT PERHAPS LEAVING THE
       CLUB, CONTINUING THE PARTY SOMEWHERE OUTSIDE OF THE
       CLUB, SOMETHING ALONG THOSE LINES.

Q.     AND APPROXIMATELY WHAT TIME ARE WE TALKING ABOUT THAT
       THAT  HAPPENS, JUST APPROXIMATELY?

A.     11:30, PERHAPS 12:00, I'M NOT REALLY SURE.

Q.     DOES THERE COME A TIME WHERE YOU ACTUALLY THEN DO LEAVE
       THE CLUB WITH FREDERIQUE?

A.     YES.

Q.     AND WHO IS WITH YOU?

A.     MY WIFE.

Q.     AND HOW DO YOU LEAVE THE CLUB?

A.     IN OUR CAR.

Q.     AND PRIOR TO LEAVING THE CLUB DO YOU HAVE ANY KIND OF
       DISCUSSION WITH MR. KAPLAN ABOUT THE FACT YOU'RE TAKING
       ONE OF THE DANCERS WITH YOU?

A.     I HAVE A VAGUE RECOLLECTION OF IT.  I THINK I WANTED TO
       CONFIRM WITH HIM THAT IF SHE, INDEED, LEFT, THAT SHE WASN'T
       GOING TO BE FIRED OR RECEIVE SOME PENALTY FOR LEAVING.

                          7

Q. AND DID YOU GET THAT CONFIRMATION FROM HIM THAT THAT WAS THE CASE, THAT THERE WOULDN'T BE A PENALTY?

A. I ASSUMED IT WAS.  IT WAS -- IT WAS A RESPONSE THAT WAS IN THE AFFIRMATIVE, BUT I DON'T RECALL EXACTLY WHAT HE SAID.

Q. AND WHEN YOU SAY "THE AFFIRMATIVE," THAT IT WAS OKAY TO LEAVE?

A. YES.

Q. AND SO THEN YOU DO LEAVE WITH FREDERIQUE?

A. YES.

Q. AND WHERE DO THE THREE OF YOU GO AFTER YOU LEAVE THE GOLD CLUB?

A. TO A HOTEL.

Q. DO YOU RECALL THE HOTEL?

A. NO, I DON'T.

Q. AND SO IT'S STILL THE THREE OF YOU AT THE HOTEL?

A. YES.

Q. AND DID YOU GET A ROOM AT THE HOTEL?

A. YES.

Q. AND WHEN YOU GOT INTO THE ROOM, WAS THERE ANY SEXUAL ACTIVITY THAT OCCURRED?

A. YES.

Q. AND WHO WAS THE SEXUAL ACTIVITY BETWEEN?

A. THAT IS A BIT OF A BLUR.  BY THAT TIME IN THE EVENING, I MEAN I DON'T EVEN REMEMBER DRIVING TO THE HOTEL, SO AT THAT POINT IT WAS A BIT OF A BLUR.

(Exhibit "2", Transcript of Proceedings Before the Honorable Willis B. Hunt, Jr., United States

District Judge, U.S. v. Kaplan, Case No. 1:99-CR-609, Testimony of Eric Bischoff, 9197:16-

9200:15).

A witness's credibility can be attacked by showing the capacity to observe was impaired.

U.S. v. Lindstrom, 698 F.2d 1154, 1162 (11th Cir. 1983)(citing Weinstein's Evidence ¶ 607[4]

(1981) for the rule that "[t]he credibility of a witness can always be attacked by showing that his

capacity to observe, remember or narrate is impaired.  Consequently, the witness' capacity at the

time of the event, as well as at the time of trial, are significant.").

> The importance of credibility of witnesses to the trial of cases cannot be overstated, and this is especially true with respect to expert witnesses. The rules of evidence provide frequent reminders of the importance of credibility issues in trials. Rule 611(b) defines the scope of cross-examination to include the subject matter of testimony developed during direct examination, as well as matters affecting the credibility of the witness. . . .
>
> The final method of impeachment recognized at common law, but not expressly adopted by the Federal Rules of Evidence, is impeachment by demonstrating a defect in a witness' ability to perceive, remember or communicate.  In this regard, "[a] witness' credibility may always be attacked by showing that his or her capacity to observe, remember or narrate is impaired... at the time of the event, as well as at the time of trial." Weinstein Treatise, at § 607.05[1]; Wright and Gold Treatise, at § 6097; Graham Treatise, at § 607.4 ("The capacity and actuality of a witness' perception, his ability to record and remember sense impressions, and his ability to comprehend questions and narrate are relevant to an assessment of the weight to be given a witness' testimony."); Mueller and Kirkpatrick Treatise, at § 6.35 ("Limits or defects in sensory or mental capabilities bear both on the likelihood that a witness accurately perceived the events or occurrences he describes and the accuracy or completeness of his testimony."); McCormick Treatise, at § 49.  This form of impeachment usually is accomplished through examination of the witness, but, since defects in a witness' capacity are not considered collateral, they may be proven by extrinsic evidence as well.

Behler v. Hanlon, 199 F.R.D. 553, 557-58 (D.Md. 2001).

While impeaching a witness's ability to remember events is appropriate, and impeaching

by prior inconsistent statements is also appropriate, the sordid and salacious details attenuating

Mr. Bischoff's contradictory testimony in the U.S. v. Kaplan case are inseparable.  Thus, Plaintiff requests guidance from the Court on this issue.

WHEREFORE, Plaintiff moves this Court for an Order that the aforementioned issues identified in paragraphs 1-7  not be mentioned in the jury's presence, or through the offering of evidence or eliciting of testimony, directing counsel to advise their witnesses of the Court's rulings, and offering guidance on the issues raised in paragraph 9.

DATED this 21st day of August, 2009.

**s/ Ryan Christopher Rodems**
RYAN CHRISTOPHER RODEMS, ESQUIRE
Florida Bar No.  947652
Trial Counsel for Plaintiff
BARKER, RODEMS & COOK, P.A.
400 North Ashley Drive, Suite 2100
Tampa, Florida   33602
Telephone:  (813) 489-1001
Fax:  (813) 489-1008
E-mail: rodems@barkerrodemsandcook.com

## CERTIFICATION OF EFFORT TO RESOLVE WITHOUT COURT ACTION

Before filing the instant motion, I certify that I spoke to opposing counsel, and the motion details the agreements and disagreements, and despite the conference, the issues require resolution by the Court.

**s/ Ryan Christopher Rodems**
RYAN CHRISTOPHER RODEMS, ESQUIRE

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2009, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a copy by electronic mail to

Gregory W. Herbert, Esquire, Greenberg Traurig, P.A., 450 S. Orange Ave., 6th Floor, Orlando,

FL 32801, HERBERTG@gtlaw.com, Attorneys for Defendant.

**s/ Ryan Christopher Rodems**
RYAN CHRISTOPHER RODEMS, ESQUIRE

CONFIDENTIAL

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

WRESTLERUNION, LLC, a Florida )
limited liability corporation, )
                               )
        Plaintiff,             )
                               )
VS.                            ) Case No.
                               ) 8:07-cv-2093-T27-MSS
LIVE NATION TELEVISION         )
HOLDINGS, INC., a foreign      )
corporation,                   )
                               )
                               )
        Defendant.             )
                               )
_____    )

COPY

        Deposition of ERIC BISCHOFF, taken on

behalf of Plaintiff, at Greenberg Traurig, 2450

Colorado Avenue, 400 East, Santa Monica, California,

beginning at 10:12 a.m. and ending at 4:36 p.m., on

July 20, 2009, before GRACE CHUNG, CSR No. 6246, RMR,

CRR, CLR.



EXHIBIT

1

ERIC BISCHOFF - 7/20/2009

```
 1
 2                    ERIC BISCHOFF,
 3         having been first duly sworn or affirmed, was
 4              examined and testified as follows:
 5
 6                       EXAMINATION
 7    BY MR. RODEMS:
 8         Q.    Would you tell us your full legal name,
 9    please?
10         A.    Eric Aaron Bischoff.
11         Q.    Is that A-A-R-O-N?
12         A.    Yes.
13         Q.    What's your current business address?
14         A.    It is P.O. Box 4543, Cave Creek, Arizona
15    85327.
16         Q.    Do you have a physical office that you work
17    out of?
18         A.    That's 100 Universal City Plaza, Rock
19    Hudson Building, Suite F, Universal City, California.
20         Q.    How about a business telephone number?
21         A.    310-467-6895.
22         Q.    Rather than put things like your home
23    address, Social Security number, date of birth on the
24    record, which we avoid doing, what I would like to do
25    is ask the witness if you would be willing to provide
```

### ERIC BISCHOFF - 7/20/2009

```
1        rely on one document as opposed to another document,

2        and you want him to look at something, then I think,

3        you know, maybe at that point, you know -- anyway, I

4        think we are done with this conversation, you know.

5        The documents have been produced.  So...

6                THE WITNESS:  You guys are still fighting

7        about it?  Call the judge.  Call me when you are done.

8                MR. RODEMS:  I'm not sure how many judges

9        we will reach on the East Coast at 5:30 at night,

10       but --

11               THE WITNESS:  Try it.  There is always

12       hope.

13       BY MR. RODEMS:

14          Q.   I guess, really, what it comes down to is

15       whether we are going to have a problem with you giving

16       me the source of your information or not.  If you are

17       going to say to me, in response to every question,

18       "There's my stack of documents, find my answer,"

19       that's not possible because I can't plug in to what

20       you were thinking when you made certain statements.

21       That's going to be --

22          A.   You can ask me a question.  If the

23       attorney, the attorney, tells you that the documents

24       have been provided, then they have been provided.  I

25       don't have access to them, sitting here in front of
```

3ebfa557-4e9e-4ea9-9449-e49b784a21f6

**ERIC BISCHOFF - 7/20/2009**

1    me.  If you don't want to look through the documents

2    that have been supplied to you, call the fuckin'

3    judge.

4         Q.   Do you have any particular judge you would

5    like me to call?

6         A.   I'm not in that business.

7         Q.   Okay.

8         A.   Call whoever you would like.

9         Q.   Okay.  All right.  Your obligation,

10   Mr. Bischoff, was to come to the deposition and to

11   bring the documents.

12        A.   They are there.

13        Q.   Okay.  Now, is there a document that you

14   were given by MR. HERBERT or his law firm that

15   outlined the terms of your retention?

16        A.   Yes.

17        Q.   Okay.  Have you brought that with you

18   today?

19        A.   It was brought by the attorney.

20        Q.   Okay.  May I see it?

21        A.   It's right there.

22        Q.   Which one?

23        A.   You may look for it.

24        Q.   There is a stack here that is probably, I

25   would say, at least 500 pages.

**ERIC BISCHOFF - 7/20/2009**

1     Q.    What do you know about Mr. Russen's

2  background in the professional wrestling industry?

3     A.    A pretty good feel for his history.  Known

4  him since 1987.

5     Q.    Was there a point in 1987 where you and

6  Mr. Russen got into a dispute because you were

7  intercepting his telephone messages?

8     A.    No.

9     Q.    That didn't happen?

10     A.    I think Mr. Russen is a liar if he

11  testified to that.

12     Q.    Okay.  You don't like Mr. Russen?

13     A.    I think Mr. Russen is a liar and a thief.

14     Q.    Okay.  Why do you say that?

15     A.    It's my general impression and experience

16  working with him for the last -- having worked with

17  him back in 1987.

18     Q.    And what happened in 1987 that gave you

19  that opinion of the Mr. Russen?

20     A.    I think there were a number of things that

21  happened involving Mr. Russen and another individual

22  who he worked closely with by the name of Dale Gagner

23  who, just in general, operated in a very loose and

24  unprofessional manner.  Gave me my overall impression.

25     Q.    All right.  "Thief" is a pretty strong

ERIC BISCHOFF - 7/20/2009

```
 1      word; you would agree?
 2          A.   Sure.
 3          Q.   All right.
 4          A.   I think everybody that lies is a thief.
 5          Q.   Okay.  So liar and thief are the same?
 6          A.   I think in many cases they are.
 7          Q.   So what did Mr. Russen steal?  Anything
 8      that you are aware of?
 9          A.   I think in general my impression of him is
10     - that he is a liar and, therefore, a thief.
11          Q.   Okay.  What did Mr. Russen lie about?
12          A.   I think Mr. Russen has lied and misled
13      anybody in this testimony who has believed that he was
14      somehow associated with Verne Gagne in any way other
15      than in a peripheral capacity for a short period of
16      time.  And even more so, that he had any extensive or
17      formal relationship with Turner Broadcasting.
18          Q.   Do you know what Mr. Russen did for Turner
19      Broadcasting?
20          A.   I don't believe he did anything for Turner
21      Broadcasting.  I don't believe he was a W-2 employee
22      for Turner Broadcasting.
23          Q.   Well, what is that belief based on?
24          A.   My experience -- fundamental experience
25      with the WCW organization and its history.
```

3ebfa557-4e9e-4ea9-9449-e40b784a21f6

Page 279

**ERIC BISCHOFF - 7/20/2009**

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | Were there ever occasions, while you were |
| 3 | | the head of WCW, where you drank too much and you |
| 4 | | blacked out? |
| 5 | A. | No. |
| 6 | Q. | Never? |
| 7 | A. | No. |
| 8 | Q. | What about your testimony in the Gold Club |
| 9 | | case? |
| 10 | A. | What was it? |
| 11 | Q. | Do you remember that? |
| 12 | A. | I don't remember the testimony.  Do you |
| 13 | | want to give it to me? |
| 14 | | If you've got an issue, buddy, bring it up, |
| 15 | | or I'm done. |
| 16 | | MR. HERBERT:  Okay.  Mr. Rodems, |
| 17 | | unfortunately, just flung a document across the table |
| 18 | | to land in front of Mr. Bischoff. |
| 19 | | THE WITNESS:  As a matter of fact, your |
| 20 | | seven hours are up. |
| 21 | | MR. HERBERT:  That is unprofessional. |
| 22 | | MR. RODEMS:  No, I didn't mean for it to |
| 23 | | slide across the -- |
| 24 | | THE WITNESS:  Your seven hours are up.  The |
| 25 | | next time you throw something at me, be very careful. |

3ebfa557-4e9e-4ea9-9449-e49b784a21f6

**ERIC BISCHOFF - 7/20/2009**

1

2          I, GRACE CHUNG, RMR, CRR, CSR No. 6246, a

3   Certified Shorthand Reporter in and for the County of

4   Los Angeles, the State of California, do hereby

5   certify:

6          That, prior to being examined, the witness

7   named in the foregoing deposition was by me duly sworn

8   to testify the truth, the whole truth, and nothing but

9   the truth;

10          That said deposition was taken down by me

11   in shorthand at the time and place therein named, and

12   thereafter reduced to typewriting by computer-aided

13   transcription under my direction.

14          Before completion of the deposition, review

15   of the transcript was requested;

16          I further certify that I am not interested

17   in the event of the action.

18          In witness whereof, I have hereunto

19   subscribed my name.

20   Dated:   July 20, 2009

21          GRACE CHUNG, CSR NO. 6246
           RMR, CRR, CLR
22          Depo Dynamics
           703 W. Clady Dr.
23          Spring, Texas 77386
           (888) 494-3370 Office
24          (800) 978-1344 Fax

25

3ebfa557-4e9e-4ea9-9449-e49b784a21f6

72401gc.txt

9098

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,      )
                               )
            PLAINTIFF,         )
                               )
      VS.                      )      DOCKET NUMBER
                               )      1:99-CR-609
STEVEN KAPLAN, NORBERT CALDER, )
                               )
ROY CICOLA, LARRY GLEIT,       )
REGINALD BURNEY, JACKLYN       )      ATLANTA, GEORGIA
BUSH, MICHAEL DILEONARDO,      )      JULY 24, 2001
                               )
            DEFENDANTS.        )
                               )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE WILLIS B. HUNT, JR.,
UNITED STATES DISTRICT JUDGE

APPEARANCES:
FOR THE PLAINTIFF:                   ART LEACH,
                                     GLENN BAKER,
                                     ASST. U.S. ATTORNEYS
                                     ATLANTA, GEORGIA

FOR THE DEFENDANTS:                  STEVE SADOW,
                                     CRAIG GILLEN,
                                     ERIC FRANZ,
                                     DONALD SAMUEL,
                                     NICK LOTITO,
                                     DWIGHT THOMAS,
                                     BRUCE MORRIS,
                                     BRUCE HARVEY,
                                     ATTORNEYS AT LAW

COURT REPORTER:                      NANCY SMITH-WELLS,
                                     OFFICIAL COURT REPORTER
                                     1794 U.S. COURTHOUSE
                                     75 SPRING STREET
      VOLUME 44                      ATLANTA, GA 30303
                                     (404) 215-1456

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

9099

PRODUCED BY COMPUTER.
                        Page 1



EXHIBIT
2

72401gc.txt

1  Q.  MS. PELNIS, MR. BURNEY DIDN'T DO ANYTHING TO EMBARRASS YOU TO

2  COVER UP FOR HIM BEFORE THE GRAND JURY, DID HE?

3  A.  NO.

4  Q.  MR. BURNEY DIDN'T DO ANYTHING TO PERSUADE YOU TO COVER UP FOR

5  HIM IN THE GRAND JURY?

6  A.  NO, SIR.

7  Q.  AND THE SAME ANSWER WOULD BE FOR MR. HAKIM HILLIARD; CORRECT?

8  A.  YES.

9          THE COURT:  ANYTHING ELSE?

10         MR. LEACH:  ASK THAT SHE BE EXCUSED.  THANK YOU.

11         THE COURT:  THANK YOU.

12         MR. BAKER:  THE GOVERNMENT CALLS ERIC BISCHOFF.

13         THE CLERK:  WILL YOU RAISE YOUR RIGHT HAND?

14         DO YOU SOLEMNLY SWEAR THE TESTIMONY YOU GIVE IN THE CASE

15 NOW BEFORE THE COURT TO BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING

16 BUT THE TRUTH SO HELP YOU GOD?

17         THE WITNESS:  I DO.

18         THE COURT:  HAVE A SEAT RIGHT THERE.  GO RIGHT AHEAD,

19 MR. BAKER.

20

21                          --- -- --

22

23                     ERIC BISCHOFF,

24 CALLED AS A WITNESS BY THE UNITED STATES, AFTER HAVING FIRST BEEN

25 DULY SWORN, TESTIFIED AS FOLLOWS:

                                                            9194

1                    DIRECT EXAMINATION

2

3  BY MR. BAKER:

                    Page 84

72401gc.txt

4  Q.  GOOD MORNING, SIR.

5  A.  GOOD MORNING.

6  Q.  WILL YOU PLEASE STATE YOUR NAME FOR THE RECORD?

7  A.  ERIC BISCHOFF.

8  Q.  AND IF YOU COULD JUST SPELL YOUR LAST NAME FOR THE COURT

9  REPORTER?

10  A.  B-I-S-C-H-O-F-F.

11  Q.  MR. BISCHOFF, WHERE DO YOU CURRENTLY LIVE?

12  A.  CURRENT ADDRESS IS --

13  Q.  NOT THE ADDRESS, JUST THE CITY WOULD BE FINE.

14  A.  PHOENIX, ARIZONA.

15  Q.  AND PRIOR TO THAT DID YOU LIVE IN ATLANTA?

16  A.  YES, I DID.

17  Q.  WHAT WAS THE PERIOD OF TIME YOU LIVED IN ATLANTA?

18  A.  FROM ABOUT 1992 TO ABOUT A YEAR AGO.

19  Q.  HOW WERE YOU EMPLOYED WHEN YOU LIVED IN ATLANTA?

20  A.  I WORKED FOR WORLD CHAMPIONSHIP WRESTLING.

21  Q.  AND WHAT IS THE LATEST POSITION PRIOR TO YOUR LEAVING THAT YOU

22  HAD WHILE YOU WORKED THERE?

23  A.  PRESIDENT OF THE WCW.

24  Q.  DURING YOUR TIME THAT YOU LIVED IN ATLANTA DID YOU HAVE

25  OCCASION TO GO TO THE GOLD CLUB?

9195

1  A.  YES.

2  Q.  WHEN WAS THE FIRST TIME THAT YOU WENT TO THE GOLD CLUB AS BEST

3  THAT YOU CAN RECALL YEAR-WISE WOULD IT BE?

4  A.  PERHAPS SOMETIME IN 1993.

5  Q.  AND HOW MANY TIMES -- DID YOU REGULARLY VISIT OR HOW MANY

6  TIMES A YEAR WOULD YOU SAY YOU WENT TO THE GOLD CLUB

7  APPROXIMATELY?

Page 85

72401gc.txt

8  A.  I COULDN'T REALLY SAY.  I WASN'T THERE ON A REGULAR BASIS.  I

9  DON'T REALLY KNOW.

10  Q.  WAS IT MORE LIKE TWO OR THREE TIMES A YEAR OR MORE OFTEN?

11  A.  MAYBE TWO OR THREE TIMES A YEAR, SOMETIMES MAYBE MORE OFTEN,

12  SOMETIMES LESS.

13  Q.  DID THERE COME A TIME WHERE YOU MET THE DEFENDANT, STEVEN

14  KAPLAN?

15  A.  YES.

16  Q.  DO YOU RECALL WHEN YOU FIRST MET HIM?

17  A.  IT WAS SOMETIME PERHAPS IN '98.

18  Q.  AND WHERE WAS IT THAT YOU MET HIM?  WAS IT AT THE GOLD CLUB?

19  A.  YES.

20  Q.  AND WAS IT -- WERE YOU IN A ROOM AT THE TIME OR WHERE WERE YOU

21  IN THE CLUB WHEN YOU FIRST MET MR. KAPLAN?

22  A.  I DON'T RECALL WHERE I WAS IN THE CLUB WHEN I FIRST MET HIM.

23  Q.  AT THE POINT YOU MET HIM, DID -- WAS HE AWARE OF YOUR POSITION

24  AT THE WRESTLING, WCW?

25  A.  I ASSUME SO.  I DON'T KNOW THAT FOR A FACT.  I THINK HE WAS.

9196

1  Q.  DID YOU EVER DISCUSS WRESTLING WITH MR. KAPLAN?

2  A.  YES.

3  Q.  NOW, I WANT TO DIRECT YOUR ATTENTION TO A PARTICULAR VISIT ON

4  MARCH 21ST, 1999.  DO YOU RECALL BEING IN THE CLUB AT OR AROUND

5  THAT DATE?

6  A.  YES.

7  Q.  AND WERE YOU AWARE AT THAT TIME THAT THE F.B.I. HAD CONDUCTED

8  A SEARCH OF THE PREMISES JUST A DAY OR TWO PRIOR TO THAT?

9  A.  YES.

10  Q.  HOW WERE YOU AWARE OF THAT?

11  A.  THROUGH THE MEDIA.

Page 86

72401gc.txt

16  Q.  DID YOU HAVE ANYTHING TO DRINK THAT NIGHT?

17  A.  YES.

18  Q.  ABOUT APPROXIMATELY HOW MANY DRINKS HAD YOU HAD THAT NIGHT?

19  A.  THREE OR FOUR BEERS PERHAPS BEFORE WE LEFT, AND ANYWHERE FROM

20  TEN TO 16 ONCE I GOT THERE.

21  Q.  AND WHEN YOU SAY BEFORE YOU LEFT, YOU'RE TALKING ABOUT BEFORE

22  YOU LEFT FOR THE CLUB?

23  A.  CORRECT.

24  Q.  NOW, DOES THERE COME A TIME -- WELL, DO YOU SEE MR. KAPLAN

25  THAT NIGHT?

9198

1  A.  YES.

2  Q.  AND DOES THERE COME A TIME WHEN YOU MEET A DANCER NAMED

3  FREDERIQUE THAT NIGHT?

4  A.  YES.

5  Q.  WHERE IS IT THAT YOU MEET FREDERIQUE?

6  A.  IN ONE OF THE GOLD ROOMS, I BELIEVE.

7  Q.  WAS IT IN THAT GOLD ROOM YOU JUST TALKED ABOUT?

8  A.  YES.

9  Q.  AND WHERE IS IT THAT YOU SEE MR. KAPLAN THAT NIGHT?

10  A.  I SAW MR. KAPLAN EARLY IN THE EVENING, BEFORE WE WENT UP TO

11  THE GOLD ROOM.  MY WIFE AND I WERE JUST SITTING THERE, HAVING A

12  DRINK, AND I TALKED TO HIM THEN.

13  Q.  AND DO YOU SEE HIM AT A LATER POINT AS WELL?

14  A.  OFF AND ON THROUGHOUT THAT NIGHT, YES.

15  Q.  AND DOES THERE COME A TIME WHEN YOU HAVE A DISCUSSION WITH

16  FREDERIQUE ABOUT LEAVING THE CLUB WITH YOU?

17  A.  YES.

18  Q.  PLEASE TELL THE JURY ABOUT THAT DISCUSSION.

19  A.  IT'S SOMEWHAT VAGUE.  IT HAPPENED LATER IN THE EVENING AND I

Page 88

72401gc.txt

20  DON'T RECALL THE SPECIFIC LANGUAGE, BUT THERE WAS A LOT OF
21  INNUENDO AND SUGGESTION ABOUT PERHAPS LEAVING THE CLUB, CONTINUING
22  THE PARTY SOMEWHERE OUTSIDE OF THE CLUB, SOMETHING ALONG THOSE
23  LINES.
24  Q.  AND APPROXIMATELY WHAT TIME ARE WE TALKING ABOUT THAT THAT
25  HAPPENS, JUST APPROXIMATELY?

9199

1  A.  11:30, PERHAPS 12:00, I'M NOT REALLY SURE.
2  Q.  DOES THERE COME A TIME WHERE YOU ACTUALLY THEN DO LEAVE THE
3  CLUB WITH FREDERIQUE?
4  A.  YES.
5  Q.  AND WHO IS WITH YOU?
6  A.  MY WIFE.
7  Q.  AND HOW DO YOU LEAVE THE CLUB?
8  A.  IN OUR CAR.
9  Q.  AND PRIOR TO LEAVING THE CLUB DO YOU HAVE ANY KIND OF
10  DISCUSSION WITH MR. KAPLAN ABOUT THE FACT YOU'RE TAKING ONE OF THE
11  DANCERS WITH YOU?
12  A.  I HAVE A VAGUE RECOLLECTION OF IT.  I THINK I WANTED TO
13  CONFIRM WITH HIM THAT IF SHE, INDEED, LEFT, THAT SHE WASN'T GOING
14  TO BE FIRED OR RECEIVE SOME PENALTY FOR LEAVING.
15  Q.  AND DID YOU GET THAT CONFIRMATION FROM HIM THAT THAT WAS THE
16  CASE, THAT THERE WOULDN'T BE A PENALTY?
17  A.  I ASSUMED IT WAS.  IT WAS -- IT WAS A RESPONSE THAT WAS IN THE
18  AFFIRMATIVE, BUT I DON'T RECALL EXACTLY WHAT HE SAID.
19  Q.  AND WHEN YOU SAY "THE AFFIRMATIVE," THAT IT WAS OKAY TO LEAVE?
20  A.  YES.
21  Q.  AND SO THEN YOU DO LEAVE WITH FREDERIQUE?
22  A.  YES.
23  Q.  AND WHERE DO THE THREE OF YOU GO AFTER YOU LEAVE THE GOLD
Page 89

72401gc.txt

24   CLUB?

25   A.   TO A HOTEL.

9200

1    Q.   DO YOU RECALL THE HOTEL?

2    A.   NO, I DON'T.

3    Q.   AND SO IT'S STILL THE THREE OF YOU AT THE HOTEL?

4    A.   YES.

5    Q.   AND DID YOU GET A ROOM AT THE HOTEL?

6    A.   YES.

7    Q.   AND WHEN YOU GOT INTO THE ROOM, WAS THERE ANY SEXUAL ACTIVITY

8    THAT OCCURRED?

9    A.   YES.

10   Q.   AND WHO WAS THE SEXUAL ACTIVITY BETWEEN?

11   A.   THAT IS A BIT OF A BLUR.  BY THAT TIME IN THE EVENING, I MEAN

12   I DON'T EVEN REMEMBER DRIVING TO THE HOTEL, SO AT THAT POINT IT

13   WAS A BIT OF A BLUR.  I THINK IT WAS BETWEEN MY WIFE AND

14   FREDERIQUE, PERHAPS A LITTLE BIT BETWEEN FREDERIQUE AND MYSELF,

15   AND THERE WAS SEXUAL ACTIVITY BETWEEN MYSELF AND MY WIFE.

16   Q.   DO YOU RECALL IF THERE WAS ANY INTERCOURSE?

17   A.   NO.

18   Q.   NOW, HOW LONG WOULD YOU SAY YOU'RE AT THE HOTEL?

19   A.   AN HOUR OR LESS.

20   Q.   AND WHAT HAPPENED AFTER YOU LEFT THE HOTEL?

21   A.   WE DROVE BACK TO THE GOLD CLUB AND DROPPED OFF FREDERIQUE AND

22   THEN CONTINUED HOME.

23   Q.   AND WHO WAS DRIVING THE CAR BACK TO THE GOLD CLUB?

24   A.   MY WIFE.

25   Q.   AND DID EITHER YOU OR YOUR WIFE MAKE ANY PAYMENT TO FREDERIQUE

9201

Page 90