1                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                         TAMPA DIVISION

3      WRESTLEREUNION, LLC,

4          Plaintiff,

5              vs.           CASE NO. 8:07-CV-2093-T-27MAP
                             31 AUGUST 2009
6                            TAMPA, FLORIDA
                             PAGES 1 - 276
7                            VOLUME I

8      LIVE NATION TELEVISION
       HOLDINGS, INC.,
9
           Defendant.
10
       _____/
11
                TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12          BEFORE THE HONORABLE JAMES D. WHITTEMORE
                 UNITED STATES DISTRICT JUDGE
13
       APPEARANCES:
14
       For the Plaintiff:   **Ryan Christopher Rodems**
15                          Barker, Rodems & Cook, PA
                            Suite 2100
16                          400 N. Ashley Drive
                            Tampa, Florida 33602
17
                            **Chris A. Barker**
18                          Barker, Rodems & Cook, PA
                            Suite 2100
19                          400 N. Ashley Drive
                            Tampa, Florida 33602
20
       Also present:        Sal Corrente
21

22

23

24
        Proceedings recorded and transcribed by
25     computer-aided stenography.

```
 1    For the Defendant:      Gregory W. Herbert
                              Greenberg Traurig, LLP
 2                            450 S. Orange Avenue
                              Suite 650
 3                            Post Office Box 4923
                              Orlando, Florida 32802-4923
 4
                              Dawn Giebler-Millner
 5                            Greenberg Traurig, LLP
                              450 S. Orange Avenue
 6                            Suite 650
                              Post Office Box 4923
 7                            Orlando, Florida 32802-4923

 8                            Richard A. Munisteri
                              Paula Castro
 9                            Allie Cleary
                              Brandon Redman
10                            Matthew Brown

11    Court Reporter:         Linda Starr, RPR
                              Official Court Reporter
12                            801 N. Florida Avenue
                              Suite 13B
13                            Tampa, Florida 33602

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                              I N D E X

3      Witness                                Page Number

4      **Bruno Sammartino**

5      Direct Examination by Mr. Rodems......      240
       Cross Examination by Ms. Millner......      264
6      Redirect Examination by Mr. Rodems....      272

7

                               EXHIBITS
8
       Plaintiff's Exhibit Number 72.........      246
9      Plaintiff's Exhibit Number 81.........      247
       Plaintiff's Exhibit Number 51, 52, 57.      259
10     Plaintiff's Exhibit Number 80.........      259
       Plaintiff's Exhibit Number 71.........      263
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          COURTROOM SECURITY OFFICER:  All rise.  This

 2    Honorable Court is in session, The Honorable James

 3    D. Whittemore presiding.

 4          Please be seated.

 5          THE COURT:  Good morning.  We are ready for

 6    trial in the matter of Wrestlereunion versus Live

 7    Nation Television Holdings.  Let's get the

 8    appearances, please.  For the plaintiff?

 9          MR. RODEMS:  Good morning, Your Honor.  Ryan

10    Christopher Rodems and Chris A. Barker here on

11    behalf of the plaintiff, along with Mr. Sal

12    Corrente, the owner of Wrestlereunion, LLC.

13          THE COURT:  Good morning.  And for the

14    defense?

15          MR. HERBERT:  Good morning, Your Honor.

16    Gregory Herbert.  And here with me is my colleague,

17    Dawn Millner, and Mr. Richard A. Munisteri, vice

18    president of Live Nation Worldwide, Inc.

19          I also have with me my paralegal, Paula

20    Castro, legal assistant, Allie Cleary, and a

21    paralegal clerk, Mr. Brandon Redman.

22          THE COURT:  All right.  Good morning.  Before

23    we convened, I invited counsel into chambers to

24    announce a ruling on -- at least a partial ruling on

25    one of the motions, the defendant's *Daubert* motion
```

1    directed toward Colin Bowman who was proffered as an

2    expert on behalf of the plaintiff.

3        I have determined and distributed to counsel

4    through written order that Mr. Bowman is not

5    qualified after applying the *Daubert* analysis to

6    testify with respect to the reasonableness of the

7    defendant's efforts to market and distribute

8    programs from the Wrestlereunion footage, the

9    reasonableness of the defendant's efforts to edit

10   the footage to produce a product for marketing and

11   distribution and what damages were caused by the

12   defendant's alleged failure to use reasonable

13   efforts either to market and distribute or edit,

14   essentially the causation.

15       I have determined that the witness is

16   minimally qualified based on his accounting

17   experience and his profit and loss experience in the

18   staging and promoting of events to testify, assuming

19   methodology which is reliable, with respect to lost

20   profits.

21       I have not determined whether or not his

22   methodology is reliable, which is a second prong in

23   *Daubert*.  I have expressed reservations and concerns

24   about that to counsel, and I did discuss with

25   counsel, assuming that his methodology is reliable,

1      the manner in which hypothetical questions might be

2      posed to Mr. Bowman concerning revenue sources so

3      that he could then crunch the numbers, so to speak,

4      and make the projections that the plaintiff needs to

5      make on damages.

6              But I've made it very clear that Mr. Bowman is

7      not to express opinions on causation, and I'll leave

8      that to counsel to counsel him to marshal his

9      testimony accordingly.

10             We will try to address methodology this

11     afternoon after the jury is excused.  I have not yet

12     ruled on the admissibility of Dr. Durham's

13     testimony.  Obviously, if Mr. Bowman is not

14     testifying, then that becomes moot.

15             And I've also cautioned counsel not to comment

16     on the subject of any matter which is the subject of

17     any motion in limine during the opening statements.

18     I will try to address those as soon as we can, once

19     we have the jury in hand.

20             With that, any additional housekeeping

21     matters?

22             MR. RODEMS:  No, Your Honor.

23             THE COURT:  All right.

24             MR. HERBERT:  No, Your Honor.

25             THE COURT:  I understand the defendant will be

1      invoking the rule at some point.  Just by way of

2      explanation, if and when that's done, that means you

3      should monitor your witnesses to ensure that none of

4      them inadvertently are exposed to testimony.  Please

5      caution them not to discuss the case with any other

6      witnesses.  Of course, that doesn't preclude counsel

7      from discussing testimony or prospective testimony

8      with witnesses.

9           And if you have an expert that you wish to sit

10     in on a portion of the proceedings, make sure that

11     you seek that authority from the Court.  I will

12     grant it, assuming it's reasonable.

13          What I intend to do with respect to the jury

14     to give them some idea what the case is about is in

15     a very generic way explain this is a lawsuit

16     involving a claim of breach of contract.  And I will

17     paraphrase the dispute from the pretrial statement,

18     but I'm not going to get into the facts, I'm not

19     going to get into specifics.  I will leave that to

20     you in your opening statements.

21          I'll also tell them the case is expected to

22     conclude and be in their hands by the end of the

23     week so that they can enjoy the lengthy holiday

24     weekend.

25          As the jury comes in, you don't need to stand.

1    If you'll look at the jury box, first row left to

2    right would be your first seven jurors; and then

3    eight, nine, 10, 11, 12, 13 in the second row; 14 on

4    up.  How many are we bringing in, Anne?

5        COURTROOM DEPUTY CLERK:  Eighteen, Your Honor.

6        THE COURT:  We have 18 jurors coming in.  We

7    hope to have eight remaining.  We have to have six.

8    So I will give them a fairly comprehensive

9    introductory voir dire and then allow you to ask any

10    follow-up questions.

11        Be sure that you read your witness list to the

12    jury at some point so that by chance they hear a

13    name that they may recognize they can share that

14    with you.  And be sure to introduce everybody with

15    you in the courtroom so that they're not guessing

16    who people are.

17        They're very observant.  They'll want to know

18    who the people are in the courtroom assisting you,

19    and they should know.

20        All right.  Bring the first juror in, please.

21        COURTROOM SECURITY OFFICER:  Juror 107.

22        COURTROOM DEPUTY CLERK:  Juror 107, Sara

23    Horning Szabla.  Is that correct?

24        JUROR:  That is correct.

25        COURTROOM DEPUTY CLERK:  S-z-a-b-l-a.  Please

```
 1        come forward.  Sit on that first seat down there,

 2        front row.

 3                COURTROOM SECURITY OFFICER:  Juror 120.

 4                COURTROOM DEPUTY CLERK:  Juror 120, Beth Ann

 5        Wahl.  Is that correct?

 6                JUROR:  Yes, ma'am.

 7                COURTROOM DEPUTY CLERK:  Thank you.  W-a-h-l.

 8                COURTROOM SECURITY OFFICER:  Juror 187.

 9                COURTROOM DEPUTY CLERK:  Juror 187, Cynthia

10        Cofer, C-o-f-e-r.

11                COURTROOM SECURITY OFFICER:  Juror 87.

12                COURTROOM DEPUTY CLERK:  Juror 87, Janette

13        Wilhite, W-i-l-h-i-t-e.

14                COURTROOM SECURITY OFFICER:  Juror 194.

15                COURTROOM DEPUTY CLERK:  Juror 194, Joan

16        Jacobazzi?

17                JUROR:  Jacobazzi.

18                COURTROOM DEPUTY CLERK:  Jacobazzi, thank you.

19        J-a-c-o-b-a-z-z-i.

20                COURTROOM SECURITY OFFICER:  Juror 23.

21                COURTROOM DEPUTY CLERK:  Juror 23, Samantha

22        Catanese, C-a-t-a-n-e-s-e.

23                COURTROOM SECURITY OFFICER:  Juror 16.

24                COURTROOM DEPUTY CLERK:  Juror 16, Mark

25        Karydis.  Is that correct, sir?
```

```
1              JUROR:  Yes.

2              COURTROOM DEPUTY CLERK:  Thank you.

3         K-a-r-y-d-i-s.

4              COURTROOM SECURITY OFFICER:  Juror 138.

5              COURTROOM DEPUTY CLERK:  Juror 138, Annie

6         Scott, S-c-o-t-t.

7              COURTROOM SECURITY OFFICER:  Juror 145.

8              COURTROOM DEPUTY CLERK:  Juror 145, Larry Jack

9         Smith, Jr.

10             COURTROOM SECURITY OFFICER:  Juror 32.

11             COURTROOM DEPUTY CLERK:  Juror 32, Michael

12        Pence, P-e-n-c-e.

13             COURTROOM SECURITY OFFICER:  Juror 104.

14             COURTROOM DEPUTY CLERK:  Juror 104, Todd

15        Watson Sandhoff?

16             JUROR:  Yes.

17             COURTROOM DEPUTY CLERK:  Thank you.

18        S-a-n-d-h-o-f-f.

19             COURTROOM SECURITY OFFICER:  Juror 142.

20             COURTROOM DEPUTY CLERK:  Juror 142, Simon

21        Stover, S-t-o-v-e-r.

22             COURTROOM SECURITY OFFICER:  Juror 161.

23             COURTROOM DEPUTY CLERK:  Juror 161, Thomas

24        Rinehart, R-i-n-e-h-a-r-t.

25             COURTROOM SECURITY OFFICER:  Juror 62.
```

```
 1              COURTROOM DEPUTY CLERK:   Juror 26, Jeffrey

 2    Furr, F-u-r-r.

 3              COURTROOM SECURITY OFFICER:   Juror 22.

 4              COURTROOM DEPUTY CLERK:   Juror 22, Althea

 5    Pennington, P-e-n-n-i-n-g-t-o-n.

 6              COURTROOM SECURITY OFFICER:   Juror 105.

 7              COURTROOM DEPUTY CLERK:   Juror 105, Donna

 8    Carter, C-a-r-t-e-r.

 9              COURTROOM SECURITY OFFICER:   Juror 89.

10              COURTROOM DEPUTY CLERK:   Jury 89, H. Hall

11    Katzenbach, III, K-a-t-z-e-n-b-a-c-h.

12              COURTROOM SECURITY OFFICER:   Juror seven.

13              COURTROOM DEPUTY CLERK:   Juror seven, John

14    Kurant, K-u-r-a-n-t.

15              Your Honor, that completes the seating of 18

16    prospective jurors.

17              THE COURT:  Thank you, madam clerk.  Good

18    morning, ladies and gentlemen.  Welcome to Courtroom

19    13B.  Only in government buildings, you know, we

20    have 13 floors.  I say that with a smile.  That way

21    you can easily remember where you are, if you are

22    selected as a juror in this case.

23              We know that jury service never comes at a

24    convenient time, and you had other things planned

25    for today and this week.  And we understand that
```

1    you'll be temporarily inconvenienced if selected.

2    And we will try to move this case as efficiently

3    along as we can, because it is your time that we

4    have asked you to give to us.

5         Some of you may have served as jurors before.

6    Let me just see a show of hands.  Anybody?  All

7    right.  Three of you.  Well, you have an advantage.

8    You've been through at least part of a trial if not

9    all of a trial.

10        The rest of you, this is a new experience for

11   you.  You know a little bit about trials, I'm sure,

12   from watching television or watching movies or

13   reading internet accounts or newspaper accounts of

14   trials.  But it's been my experience, having done

15   this for a lot more years than you would imagine,

16   that none of us gets a complete picture of a trial

17   by reading newspaper clips or listening to 20

18   seconds on the nightly news.

19        We've all listened to reports of the results

20   of a trial, and most of us have said at one time or

21   another, how did that jury do that.  Well, unless

22   you sat in that courtroom with those jurors every

23   single day and listened to every single word of

24   every witness, and you went back and listened in on

25   the deliberations, there's no way for us to know.

1     And that's something that -- it's interesting and

2     perhaps entertaining to discuss and debate, but I

3     think most of us understand that those six citizens

4     or those 12 citizens did what they believed the law

5     required them to do in that particular case.

6          If selected as a juror, you will serve as a

7     judge, a judge of the facts.  And with that come

8     certain responsibilities.  Think of yourselves as

9     judges like me.  I might be wearing the robe.  I

10    represent the judge of the law, of course.  But you

11    will decide the facts.

12         And as jurors, you have certain

13    responsibilities.  You must be judge-like in your

14    actions, meaning you can't lean over and say what

15    about that to your fellow juror.  You can't go to

16    lunch and deliberate the case.  You have to listen,

17    pay attention, follow the law as I explain it to

18    you, whether you agree with the law or not, and

19    bring back a verdict which speaks the truth.  Your

20    only interest is to bring back a verdict which

21    speaks the truth, based on the facts as you find

22    them and the law that I instruct you on.

23         You'll not be able to go home and Google

24    anything and do research on the internet.  You're

25    not going to be able to blog about this case or

1    twitter or any other of the things that I'm hearing

2    about.  If you don't like that, with a smile on my

3    face I say, too bad, because that's the rule.  You

4    are a judge.  You will be judge-like in your

5    participation in this case.

6        The parties have a right to rely on that so

7    that whatever your verdict is, they may disagree

8    with it, they may be happy with it, they may not be

9    happy with it, but certainly they won't able to

10   criticize you because you've done something that the

11   law doesn't allow you to do.

12       Think of yourselves as perhaps having a

13   dispute scheduled for a hearing in front of me this

14   morning with your neighbor.  And as we start the

15   trial, if I look at your neighbor's lawyer, hey,

16   Fred, how you doing, good to see you, you might

17   begin to start questioning whether I'm the right

18   judge for this case, because there's an appearance

19   of an inappropriate relationship.

20       And it may be that the only reason I said that

21   is because Fred tried a case with me last week and I

22   spent five days with him; or it may be that he and I

23   are golfing buddies.  And if that were the case, I

24   should not preside over that matter.  I'll let

25   another judge sit in on it.  Or if you see me at

1     lunch with one of the parties, you'd have some

2     reason to doubt my partiality or impartiality.

3          These are common sense things, but things that

4     are important to the integrity of the process.  So

5     when I say you can't blog and you can't twitter and

6     you can't Google, you can't do any research, there

7     are reasons for that.  Your decision must be based

8     on the law that I give to you and the facts as you

9     find them from the testimony and evidence presented

10    in this courtroom.

11         The lawyers are trained in the presentation of

12    evidence, and they will provide you with the

13    information you need to make a reasoned decision on

14    the facts.  And we don't need help from outside

15    sources.  The rules of evidence protect the process

16    so that you will be considering only trustworthy

17    evidence in the case.

18         Outside sources are not necessarily

19    trustworthy.  For example, what you read in the

20    newspaper is not necessarily trustworthy.  It might

21    be accurate, but it might not be.  Bottom line is

22    you can't rely on it if you're going to make an

23    important decision.  But the rules of evidence

24    protect that, and that's what we'll be applying in

25    this case.

 1              Our case is a civil case, not a criminal

 2       matter.  We'll be explaining that to you in more

 3       detail in a few moments.  We expect it to last

 4       through this week.  We expect it to be in your hands

 5       by the end of the week.  So if you are selected, you

 6       can plan on being here through Friday.  However long

 7       your deliberations take, of course, is up to you.  I

 8       don't have any control over that.  But once we get

 9       it in your hands, you will be making the decision in

10       the case.

11              You'll be allowed to take notes during the

12       trial.  We have certain procedures that apply,

13       however.  You leave your notes here at the end of

14       the day and they're kept in my chambers to preserve

15       the integrity of those notes.  Don't put your names

16       on them, of course; just maybe your juror number so

17       that they can't be easily identified.  And after

18       your verdict is announced, your notes will be

19       shredded in my chambers.

20              That's our standard procedure to, again,

21       preserve the process, your deliberative process so

22       that your private thoughts and notations are never

23       revealed publicly.  That's an important component of

24       the jury system.

25              You should be free to bring back a verdict

1    that speaks the truth, whatever it may be, without

2    fear that you'll be ridiculed or criticized or

3    challenged after the fact.  And one of the ways that

4    we protect that process is to preserve what you talk

5    about in that jury room.  You're not required to

6    take notes.  But if you choose to take notes,

7    understand those are the procedures that we will

8    follow.

9         You are bound to know somebody involved in

10   this case, whether it's me or the court clerk or the

11   court reporter, one of the lawyers, one of the

12   parties, one of the witnesses, and we need to know

13   that.  The parties want six jurors who can decide

14   this case based on the facts and the law and not on

15   who they know.

16        So if your neighbor walked in, took the oath

17   and testified, you'd be a little uncomfortable, as

18   would he or she.  So we kind of need to know those

19   things.  We'll be asking you some questions about

20   whether you're familiar with the parties, the

21   lawyers, the witnesses.  Please volunteer if you

22   are.

23        Even if a name sounds familiar, it's better to

24   ask who that is so that you're not in an awkward

25   situation in the middle of trial that might result

1      in either your excusal or perhaps even a mistrial

2      because we have less than six jurors.

3           We have to have six jurors in a civil case.

4      If we end up with eight, all eight of you will

5      deliberate.  So if you're left in the box, you will

6      deliberate.  We won't have any alternates in this

7      case.  In a criminal case it's a little different

8      but, again, this is a civil dispute between the

9      parties.

10          At this time I'm going to formally call the

11     case for trial and have the attorneys introduce

12     themselves and their respective clients and those

13     with them in the courtroom.  This is the matter of

14     Wrestlereunion, LLC, versus Live Nation Television

15     Holdings, Inc., Case Number 07:CV-2093.  For the

16     plaintiff?

17          MR. RODEMS:  Good morning, Your Honor.  Ryan

18     Christopher Rodems here on behalf of the plaintiff,

19     Wrestlereunion, LLC.  And with me today is my

20     co-counsel and partner, Chris A. Barker, and

21     Sal Corrente, who is the owner of Wrestlereunion,

22     LLC.

23          THE COURT:  Thank you, sir.  And for the

24     defense?

25          MR. HERBERT:  Good morning, Your Honor.

1    Gregory Herbert.  And with me is my partner, Dawn

2    Millner, and vice president of Live Nation

3    Worldwide, Inc., Mr. Richard A. Munisteri.  I also

4    have Ms. Paula Castro, a paralegal in our firm,

5    Ms. Allie Cleary and Mr. Brandon Redman, a paralegal

6    clerk.

7        THE COURT:  All right.  Thank you.  As I said

8    before, this is a civil action involving a dispute

9    between the parties which we will ask you to resolve

10   by your verdict.  It's a contractual dispute,

11   essentially.  The plaintiff has brought this lawsuit

12   alleging that the defendant breached a contract or

13   agreements that the plaintiff alleges that the

14   parties agreed to.

15       Essentially, it involves a claim arising from

16   a time period in roughly 2004/2005.  The plaintiff

17   alleges that it formed -- it was formed to stage

18   wrestling fan conventions and that it entered into

19   agreements with the defendant, a company named Clear

20   Channel Entertainment Television related to these

21   Wrestlereunion events.

22       Clear Channel Entertainment Television later

23   changed its name to Live Nation Television Holdings,

24   Inc., which is the name of the defendant in this

25   case.  And you'll hear from time to time that the

1      parties refer to the defendant as Live Nation as a

2      shortened version of its name.

3              In 2005, Wrestlereunion staged two fan

4      conventions and one wrestling only event.

5      Wrestlereunion alleges that Live Nation breached

6      certain agreements between them by failing to use

7      reasonable efforts to market and distribute the

8      video productions from these wrestling events.

9              Live Nation denies that it breached any such

10     contract or contracts and denies that it caused

11     Wrestlereunion any damages.  In this case, the

12     plaintiff claims as a result of the alleged breach

13     that it suffered damages, what we call lost profits.

14     The defendant denies that.

15             So you'll be asked to determine, for example,

16     whether there was an agreement between the parties

17     and, if so, whether it was breached by the defendant

18     and, if so, what damages, if any, it caused to the

19     plaintiff.

20             I will read you the law that you must follow

21     in reaching your verdict at the end of the case.

22     And you are sworn to follow that law, whether you

23     agree with it or not.  As I am sworn to follow the

24     law, and that's what you expect of me; likewise, as

25     jurors, you are sworn to follow the law.

1          In this case, like in any case, you'll be

2     asked to decide whether to believe certain

3     witnesses.  The credibility of witnesses is

4     something inherently for the jury to determine.  I

5     cannot participate in any way in your factual

6     determinations.

7          Those of you selected will go back to the jury

8     room at the end of the case after you've heard the

9     final arguments from the attorneys and my

10    instructions on the law and you'll decide the facts,

11    including, among other things, who to believe or who

12    said what or who didn't say what.

13         I think it will be an interesting case for

14    you.  Are any of you wrestling aficionados?  No?

15    Any of you watched any live wrestling events?  I see

16    one nod of the head.  We'll ask you some questions

17    about that.

18         How about on television, have you ever watched

19    wrestling on TV?  This is professional wrestling,

20    what we're talking about.  Have you heard of Hulk

21    Hogan?  He's been in the news, professional

22    wrestler.  He may or may not come up.  I don't know.

23    But we need to know, the lawyers should know,

24    whether you are particularly familiar with

25    wrestling, professional wrestling and what

1    experiences you've had, if any, in video production,

2    marketing, that kind of thing in not only the

3    television arena but internet, pay-per-view, that

4    kind of thing.  Has anybody had any experience in

5    that broad field?  No?

6        All right.  How about accountants?  Anybody on

7    the jury a CPA or an accountant, or has been in the

8    past?  Or maybe you do that as part of your job?

9    No.  Any lawyers on the jury?  No.

10        All right.  Well, these are the kinds of

11    questions we're going to be asking you.  We've just

12    started what we call the voir dire, a French term

13    loosely translated meaning to speak the truth.  It's

14    the process of any trial that jurors don't like,

15    because we're going to be asking you some personal

16    questions about your backgrounds, life experiences.

17    It's an important process, however, so that the

18    parties understand who you are and they are

19    comfortable, as you are, with being a juror in this

20    case.

21        Both sides are entitled to six of you who have

22    no agendas or preconceived notions about the case,

23    who'll listen to the evidence, follow the law and

24    bring back a verdict that speaks the truth.  So

25    these questions are all designed to get you thinking

1    about your life experiences and whether you may have

2    strong feelings about certain subjects that may come

3    up.  It's okay to have strong feelings.  We're

4    Americans, after all.  But it's not okay as a judge

5    to let those strong feelings interfere with your

6    decision making.

7        Think of me again.  If you had a dispute in

8    front of me and you knew that I was -- that I took a

9    very strong stand on certain subjects, you would

10   have some reason to believe I could not be an

11   impartial judge.  So it's okay to have those strong

12   feelings, but it's not okay to let them interfere

13   with your decision making.

14       You'll be asked whether you can put those

15   strong feelings aside.  For example, you may not

16   like lawyers.  It's okay.  We have thick skins.

17   Kind of a -- as I tell young lawyers all the time,

18   people love to hate us and hate to love us.  But

19   lawyers serve an important role, particularly in the

20   courtroom in presenting the evidence so that you can

21   apply the law to the evidence as you find it to be.

22       They are trained in the presentation of

23   testimony and documents.  And they should assist you

24   in understanding the facts and the law applicable to

25   the facts.  They're advocates, they're not

1    witnesses.  What they say is not binding on you.

2    But what they have to say is important.  It should

3    assist you in understanding the case.

4        From time to time a lawyer might stand and

5    make an objection or make a motion to me.  And I

6    have to make those rulings.  That's not something

7    you have to do.  The lawyers are trained in the

8    rules of evidence and they have a duty to their

9    clients to make objections and to file motions that

10   they believe should be made.

11       If they don't object or they don't make a

12   motion, they'll waive any right to seek review of

13   that ruling or that claimed error on appeal, so they

14   have a duty to make those objections.  You are never

15   to be prejudiced for or against either side by the

16   number of objections or the manner in which they're

17   made.

18       There will be objections from time to time.

19   And most of the time I will either overrule or deny

20   the objections.  You've seen that on TV or in the

21   movies.  If a lawyer objects to something and I

22   sustain the objection, that means I agree with the

23   lawyer, and whatever has been asked of the witness

24   will not be answered.  If I overrule the objection,

25   I disagree with the lawyer, and the witness will be

1         permitted to answer the question.

2              The lawyers can genuinely disagree on the

3         applicability of the rules of evidence.  That's why

4         I'm here, to kind of referee that process.  But they

5         certainly can differ and disagree on how those rules

6         apply to the evidence.  So understand that that's

7         part of the process.  It's, again, intended to

8         ensure that you receive only trustworthy evidence in

9         the case.

10             You've met our courtroom security officer.  He

11        will assist you as the trial progresses.  If a

12        problem arises, let him know.  He'll bring it to my

13        attention.

14             Anne Ohle, in front of me to your left, is our

15        deputy clerk.  She's in charge of marking the

16        evidence as it's received.  She's also handling my

17        calendar, scheduling hearings, rescheduling

18        hearings, that type of thing.  She'll be busy

19        throughout the case on those important

20        responsibilities to my docket.

21             Over to my left, your right, is Linda Starr

22        who is our court reporter.  She's taking everything

23        down in kind of a shorthand version.  And I don't

24        know if we've got the realtime working or not.  Yes,

25        we do.  She laughs because we have all kinds of

1    technical problems.  But I can read that to help me

2    make a ruling.  But if you were to look at it, it

3    would be difficult to read.  It's kind of like

4    reading something that's half English and half

5    Spanish and you don't speak Spanish.  You can get

6    the gist of it, but you're not going to know

7    everything that's there, or vice versa.

8         We don't have the resources to have a

9    transcript for everything for you, so I ask that you

10   pay attention, listen carefully, take notes.  Her

11   role is to make sure we have everything on the

12   record.  But it's certainly not available to us as a

13   finished product.

14        We'll take breaks from time to time.  I don't

15   want you to be uncomfortable.  Usually we'll start

16   at 9:00 and typically take a break at 10:30, 20 till

17   11:00, somewhere in there.  But if you become

18   uncomfortable, please raise your hand.  We'll be

19   happy to take a break to accommodate you.  And

20   that goes for the parties and counsel, as well.

21        The jury room is right through this door.

22   Some of you can't see it.  But it's across the hall.

23   There are facilities in there.  We will typically

24   end the day at 4:00 so you can get out of town

25   before the traffic starts, unless we've got a

1    witness from out of town on the stand.  And if that

2    happens, I'll give you a heads-up.

3         We'll take a lunch break typically at 12:00

4    for about an hour and 15 minutes.  That should give

5    you adequate time to go get a sandwich or something.

6    You're free to bring some food in with you.  You can

7    keep it in the jury room.  There's a refrigerator,

8    small one, cold water container.  And there's a

9    microwave, I think.

10        COURTROOM DEPUTY CLERK:  Yes, sir.

11        THE COURT:  Yes.  So if you don't like to go

12   out for lunch, bring your lunch, that's fine.  It

13   will be safe in there.

14        You can't bring cellphones.  Sorry.  Too bad.

15   I'm being facetious, of course.  Cellphones are an

16   important part of all of us now, almost like a third

17   appendage.  But we do have certain security concerns

18   with cellphones.  And I can only tell you that I've

19   seen the proof, and it's troubling, to say the

20   least.

21        So rather than worry about all of that, I'll

22   ask that you leave your cellphones in your car,

23   secure.  You'll have time to go make calls during

24   the day if you need to, check your e-mail, that kind

25   of thing.  Lawyers don't bring their cellphones in

1     here without an order from me.  And they certainly

2     won't be in the courtroom.  They'll be outside.

3          I've had a witness actually answer the phone

4     on the stand once.  It happened once.  Never

5     happened again.  And all the lawyers and I sat there

6     with our mouths open.  I guess it was an important

7     call.

8          All right.  We'll start with -- and if I

9     mispronounce your name, bear with me.  With a name

10    like Whittemore, I'm not as sensitive as some might

11    be.  We will do our best.  Correct us.  Some of you

12    have challenging surnames, so help us along.

13         Ms. Szabala; is that right?  You don't have to

14    stand.  Please be seated.  But use the mic there so

15    we can hear you.

16         JUROR 107:  It's Szabla.

17         THE COURT:  Szabla.  Just like it's spelled.

18    Thank you.  Tell us a little bit about yourself.

19    Don't give us the names of any children.  But if

20    they are adults and out there working, let us know

21    what they do for a living.  You can just use your

22    jury sheet and kind of summarize it for us.

23         JUROR 107:  Okay.  I've been in St. Petersburg

24    six years; Florida as well, six years.  I work in

25    health care administration at a Medicare/Medicaid

```
 1        HMO locally.  I'm married.  I have a nine-month-old.
 2        And no military service and I've never been on a
 3        jury.
 4             THE COURT:  You have somebody watching the
 5        nine-month-old for you?
 6             JUROR 107:  Daycare.
 7             THE COURT:  Okay.  So everything is okay if
 8        you get out of here by 4:00 every day?
 9             JUROR 107:  Yes.
10             THE COURT:  If the jury is out deliberating in
11        its deliberation beyond the normal workday, can you
12        make arrangements in that event?
13             JUROR 107:  Yes.
14             THE COURT:  Okay.  Thank you.  Ms. Wahl, good
15        morning.
16             JUROR 120:  Good morning.  I've been in
17        Florida for 48 years; 45 -- 43 of it in the
18        Clearwater area.  I am currently unemployed.  I'm
19        single.  I don't have any children.  No previous
20        military service.
21             THE COURT:  No prior jury service?
22             JUROR 120:  No prior jury service.
23             THE COURT:  What kind of work have you done in
24        the past?
25             JUROR 120:  I've been in telecommunications
```

1    and commercial property management, real estate.

2        THE COURT:  All right.  In the

3    telecommunications field, that's very broad.  What

4    field specifically?

5        JUROR 120:  Well, I started at -- years ago at

6    Paradigm in Clearwater, and with the acquisitions

7    and mergers, I was with AT&T, Lucent Technologies,

8    Avaya.

9        THE COURT:  Mostly telephones, that kind of

10    thing?

11        JUROR 120:  Yes.

12        THE COURT:  Nothing in the television or

13    internet?

14        JUROR 120:  No.

15        THE COURT:  Okay.  Thank you.

16        JUROR 120:  Okay.

17        THE COURT:  Ms. Cofer, good morning.

18        JUROR 187:  Good morning.  I'm from Frost

19    Proof.  Lived there for 21 years.  Been in Florida

20    for 40 years.  I've been married for 21 years.  I

21    have an older son who's 20 who's a professional bull

22    rider.

23        My occupation is a registered nurse in the

24    field of oncology for the last 21 years.  I don't

25    have any military service and I've never served on a

1        jury.

2              THE COURT:  Has your son ever been involved in

3        promotions, staging, or is he a competitor?

4              JUROR 187:  He's a competitor.

5              THE COURT:  All right.  Thank you.

6        Ms. Wilhite, good morning.

7              JUROR 87:  Good morning.  My name's Janette

8        Wilhite.  I live in Hernando Beach, Florida.  I've

9        been up there now for about 11 years.  I've lived in

10       the State of Florida for about 26 years.  I have

11       worked as a rasion therapist for 15 years, and about

12       five years ago went into the family business.  We

13       have a maintenance facility, which is construction,

14       remodeling of restaurants, things like that.

15             Let's see.  I am married.  I have four

16       children.  My oldest son is -- my stepson, he's 23.

17       He works in the family business, also, and just

18       graduated in December from USF, so newly into the

19       business.

20             My oldest daughter graduated in December,

21       also, from USF.  She is currently working in the

22       business and has a cultural anthropology degree and

23       is trying to get into a nonprofit organization at

24       this time.  She also has blessed me with a beautiful

25       two-year-old granddaughter.

1           The next child is 22 years old.  And she

2       graduated last month from the University of South

3       Florida.  And she currently is looking for a job in

4       marketing.  And she graduated with a finance and

5       marketing major.

6           And my youngest son is my stepson who is 19.

7       And he is currently at community college getting

8       ready to apply for University of South Florida.  And

9       he, also, is a business major.

10          No previous experience in the military or

11      service.  I was called to jury duty about 11 years

12      ago but was dismissed when the case was actually

13      resolved.

14          THE COURT:  How far along in the case did you

15      get?

16          JUROR 87:  Actually, just to the front door.

17          THE COURT:  All right.  It happens.  Thank

18      you.  Ms. Jacobazzi, good morning.

19          JUROR 194:  Good morning.  I live in Spring

20      Hill, Florida.  I've been there seven years and

21      seven years in Florida.  I'm a retail merchandiser

22      for Proctor and Gamble; been there about nine years.

23      I'm widowed.  I have two children living in Chicago.

24      My son's a construction worker and my daughter is a

25      housewife.  I've never been in the service and never

1        been to jury service.

2            THE COURT:  As a retail merchandiser, do you

3        go out and market products for Proctor and Gamble?

4            JUROR 194:  Right.

5            THE COURT:  Is that mostly in the print media

6        or television or both?

7            JUROR 194:  Both.

8            THE COURT:  So you've had some experience in

9        marketing.  How about the distribution of those

10       products?  Or do you just make the introduction and

11       someone else takes care of distribution?

12           JUROR 194:  Basically the introduction.

13           THE COURT:  Okay.  How long have you been

14       doing that?

15           JUROR 194:  Pardon me?

16           THE COURT:  How long have you been doing that?

17           JUROR 194:  Nine years.

18           THE COURT:  All right.  Thank you.

19       Ms. Catanese, good morning.

20           JUROR 23:  Good morning.  I have lived in

21       Florida for 13 years in Palm Harbor.  I am currently

22       unemployed, a recent graduate from University of

23       Central Florida in Orlando.  I am single.  I have

24       never been in the military or have had any previous

25       jury service.

1              THE COURT:  What was your major?

2              JUROR 23:  It was communications.

3              THE COURT:  All right.  You are familiar with

4     Clear Channel, then.

5              JUROR 23:  A little bit.

6              THE COURT:  Okay.  Thank you.  Mr. Karydis, is

7     that right?

8              JUROR 16:  Yes, that's right.

9              THE COURT:  Good morning.

10             JUROR 16:  I live in Florida in Tampa since

11    ten years ago that we moved from Canada.  My

12    background is civil engineering.  Presently I'm a

13    licensed real estate broker and mortgage broker.

14    I'm married.  I have two sons from my first

15    marriage.  One is in California, and he's in the

16    printing business.  The other one is here, and he's

17    one of the managers in a health store.

18             I didn't go to the military because when I was

19    in Greece, where is my origin, we had -- there is a

20    law that prohibits or allows you to pay a fee and

21    not to present yourself in the Army, so that's what

22    my father did then.

23             THE COURT:  No prior jury service?

24             JUROR 16:  No.  That's the first time.

25             THE COURT:  All right.  Thank you.

1          JUROR 16:  Thank you.

2          THE COURT:  If you'll pass the mic back to

3    Ms. Scott.  Good morning.

4          JUROR 138:  Good morning.  My name is Annie

5    Scott.  And I live in Dade City, Florida.  I've been

6    living in Florida for like 20 years now.  I am a

7    certified nurse's assistant.  I'm single.  I have

8    four children, all of whom attend middle school and

9    two in high school.

10         I have never been in the military.  And I was

11   issued something to appear for jury duty, which I

12   did attend, but I was dismissed as soon as I made it

13   through the door so --

14         THE COURT:  All right.  Did the case get

15   resolved or something or --

16         JUROR 138:  I don't know.  It was just --

17   everybody who was left was dismissed.

18         THE COURT:  Okay.  All right.  That was up in

19   Dade City?

20         JUROR 138:  Yes, sir.

21         THE COURT:  State courthouse?

22         JUROR 138:  Yes, sir.

23         THE COURT:  All right.  Thank you.

24         JUROR 138:  You're welcome.

25         THE COURT:  Mr. Smith, good morning.

```
 1              JUROR 145:  Good morning.  My name is Larry

 2     Smith.  I've lived in Florida for six years.  I live

 3     in Land O' Lakes, Florida right now.  I am married.

 4     I have a six-year-old son in kindergarten.  My wife

 5     is a housewife.

 6              I was in the United States military in the

 7     Navy for four years.  And I wasn't selected for a

 8     juror, but I was called in similar to this and sent

 9     home afterwards.

10              THE COURT:  I didn't catch what you did for a

11     living.

12              JUROR 145:  Oh, I'm sorry.  I'm an air

13     condition mechanic and I work for C. B. Richard

14     Ellis.

15              THE COURT:  All right.  Thank you.  Mr. Pence,

16     good morning.

17              JUROR 32:  Good morning.  My name is Mike

18     Pence.  I came up from Sarasota where I've lived the

19     last 12 years, working there as a letter carrier for

20     at least 20.  Previous to that I lived in the

21     Charlotte County area for another decade or so.

22              I'm single.  No children.  And I've not

23     previously served on a jury.

24              THE COURT:  Any military background?

25              JUROR 32:  No, sir.
```

```
 1                THE COURT:  All right.  Thank you.

 2      Mr. Sandhoff, good morning.

 3                JUROR 104:  I live in Lutes.  I've lived there

 4      for five years.  I've lived in Florida for 25.  I'm

 5      an insurance agent.  And my wife stays at home with

 6      the three kids, all under the age of eight.  And I

 7      haven't had any military service or jury service

 8      prior.

 9                THE COURT:  All right.  Thank you.

10      Mr. Stover, good morning.

11                JUROR 142:  Good morning, sir.  I live in New

12      Port Richey.  I've been there for 15 years.  I've

13      lived in Florida for 53 years off and on.  I am

14      retired, but my previous occupations are 21 years

15      United States Marine Corps, ten years State of

16      Florida senior management and ten years with Home

17      Shopping Network in senior management.

18                I am married.  My bride is a homemaker, 43

19      years.  My son who's 40 years old works for Don

20      Prudhomme on the Smokeless Tobacco Drag Racing Team.

21      He has been with them for 12 years.  My daughter is

22      a human resources manager in Raleigh, North Carolina

23      for the last ten years.

24                As I said, I spent 21 years in the United

25      States Marine Corps primarily as a helicopter pilot
```

1      but had many other duties, including nonlawyer

2      special court martial counsel, maintenance officer,

3      logistic officer, etcetera.

4           I've never served on a jury, but I've been

5      called about six times and I've been through voir

6      dire about that many times but was never accepted to

7      serve.

8           THE COURT:  Is there a magic question that you

9      get asked that you get off on?

10          JUROR 142:  It's all kinds of different

11     things, just -- the circumstances are what they are.

12          THE COURT:  All right.  With Home Shopping

13     Network, tell us a little bit about what your

14     responsibilities were.

15          JUROR 142:  Oh, I was primarily in customer

16     service.  I was a manager of seven teams and

17     customer service.  I wasn't involved in the

18     marketing aspect at all.

19          THE COURT:  All right.  People who would call

20     in to buy a product, for example, would be a

21     customer that maybe an issue arose?

22          JUROR 142:  Yes, sir.  Any kind of issues the

23     customers had with the product or questions about

24     different things, then we would handle those

25     situations for them.

```
 1              THE COURT:  How familiar are you with Clear

 2      Channel, if you are?

 3              JUROR 142:  That doesn't sound familiar to me.

 4      I left Home Shopping in, excuse me, 2002, so

 5      something may have occurred since then but --

 6              THE COURT:  All right.  Very good.  Thank you.

 7      Mr. Rinehart, good morning.

 8              JUROR 161:  Good morning.  I live in Largo,

 9      Florida.  I've been there for 29 years; been in

10      Florida for 33 years.  I'm a customer care manager

11      with Siemens Health Care.

12              I am currently single.  I do have one son, age

13      40, lives in New Jersey.  I believe he's a

14      carpenter.  No military experience.  Previous jury

15      service, I was called last month for Pinellas County

16      and went through voir dire and was excused and --

17              THE COURT:  Criminal case or a civil case?

18              JUROR 161:  It was a civil case.

19              THE COURT:  All right.

20              JUROR 161:  And previously on a criminal case

21      about five years ago, and served as an alternate.

22              THE COURT:  That was a disappointing moment,

23      I'm sure, when the judge said, sorry, sir, but you

24      can go home.

25              JUROR 161:  I would have liked to have seen it
```

1      through.

2          THE COURT:  All right.  That's a difficult

3      time.  I've experienced that over the years and --

4      but as I said, in a civil case, whoever we have left

5      are going to serve.  They're going to deliberate.

6      There are no alternates.

7          In a criminal case, you can only have a

8      specific number, whether it's six or 12, depends on

9      the case.  But if you're the 7th or the 13th, you're

10     the odd person out.  So thank you for sharing that

11     experience with us.  If you'll pass it back to

12     Mr. Furr.  Good morning, sir.

13         JUROR 62:  Good morning.  My name is Jeff

14     Furr.  I've been in Florida, St. Pete, for 32 years.

15     I am in engineering services.  I'm single, no

16     children, no jury duty service and no military.

17         THE COURT:  All right.  Thank you.  Are you by

18     any chance related to an attorney by the name of

19     Furr?

20         JUROR:  No, sir.

21         THE COURT 62:  All right.  Thank you.  Good

22     morning, Ms. Pennington.

23         JUROR 22:  Yes, sir.  My name is Althea

24     Pennington.  I live in Fort Meade, Florida, Polk

25     County, for 53 years, and my residence for about 38

1    years.  My occupation is working in the ES

2    department teaching behavioral kids.

3         And I'm widowed.  I have one child, 22 years

4    old going to Miami Dade College in Miami.  Never go

5    into the military service.  I serve on jury duty

6    three times in Polk County; two criminal cases and

7    one civil.

8         THE COURT:  Without telling us what the

9    verdicts were, did the jury reach a verdict in each

10   of those cases?

11        JUROR 22:  Yes, sir.

12        THE COURT:  All right.  In the criminal case,

13   you'll remember, and all of you are familiar with

14   this, the standard beyond a reasonable doubt.

15   You've probably heard that.

16        JUROR 22:  Yes, sir.  Yes, sir.

17        THE COURT:  That's the standard or burden of

18   proof a prosecutor has before a prosecutor can

19   satisfy a jury that the defendant is guilty.

20        JUROR 22:  Yes, sir.

21        THE COURT:  In a civil case, the burden of

22   proof is less, it's different.  The burden of proof

23   is on the plaintiff who's bringing the lawsuit to

24   prove by the greater weight of the evidence the

25   case.  You might recall the Lady of Justice who's

1      blindfolded and she's holding scales.

2              JUROR 22:  Yes.  Um-hum.

3              THE COURT:  That is representative of the

4      civil burden of proof.  Whoever tips the scales wins

5      in a civil case.  In a criminal case, it's a lot

6      different because someone can go to jail.

7              JUROR 22:  Yes.

8              THE COURT:  So there's a little difference

9      there.  Beyond a shadow of a doubt is a fiction in

10     Hollywood.  It means nothing in the law, just sounds

11     good.

12             So you remember the difference?  You've served

13     in civil and criminal.

14             JUROR 22:  Yes, sir.  Yes, sir.

15             THE COURT:  Okay.  Thank you.  Ms. Carter,

16     good morning.

17             JUROR 105:  Good morning.  My name is Donna

18     Carter.  And I live in Spring Hill, Florida.  I've

19     lived there 35 years.  I've lived in Florida 48

20     years.  I'm an administrative coordinator for Publix

21     Supermarkets.  I'm married, and my husband is a

22     carpenter.

23             I have two children.  I have a daughter 28

24     years old who's a graphic designer, and a

25     25-year-old son who's in management at Publix.  I've

1    never been in military service and I've never served

2    on a jury before.

3        THE COURT:  All right.  Thank you.

4    Mr. Katzenbach.

5        JUROR 89:  Yes, sir.  My name is Hall

6    Katzenbach.  I've been living in Tampa since 1986

7    and St. Pete.  We moved down from New Hampshire in

8    1984.  I've been working at Mac Dill Air Force Base

9    ever since.  I've work for -- I've worked at United

10   States Regimens Command, United States Special

11   Operations Command and, since 1987, United States

12   Central Command.

13       I am a contracts manager for one of the

14   directorates, United States Central Command.  I'm a

15   civil servant.  Never been in the military, per se,

16   as, you know, military, but -- force type, but I've

17   been working with the military my whole life,

18   basically.  As I said, I'm a contracts manager.  We

19   do acquisition contracts management for services and

20   commodities for one of the directorates at Centcom.

21       My wife works for Federal Contracts Research

22   and Development Center.  My sons, 25, he works

23   downtown here for one of the firms.  He's in the

24   finance compensation type of business.  My -- he's

25   25.  My daughter is 27.  She lives in Nashville.

1       She does something with a tile manufacturing company

2       or sells tiles, something like that.

3              I've served on one jury.  I believe it was a

4       criminal case.  Am I allowed to say what kind of

5       case it was?

6              THE COURT:  Yes.  Just don't tell us what the

7       verdict was.

8              JUROR 89:  It was a DUI type of case.

9              THE COURT:  Drinking and driving?

10             JUROR 89:  Yes.  And it did go to fruition.

11      There was a verdict and so it was finished.

12             THE COURT:  So you've been through the entire

13      process, as Ms. Pennington has, you've deliberated.

14             JUROR 89:  Yes, sir.  Yes, Your Honor.

15             THE COURT:  Was it a positive experience?

16             JUROR 89:  It was interesting.  I mean, I had

17      never done it before so --

18             THE COURT:  How about you, Ms. Pennington,

19      positive experience all three times?

20             JUROR 22:  Yes, sir.  Yes, sir.

21             THE COURT:  Not fun but positive.  Well, I say

22      that because the feedback I get from jurors over the

23      years is that it reinforces the importance of

24      citizens in our criminal and civil justice process.

25      Positive, meaning it really does mean something,

1        it's a good thing.

2              So if -- you know, if you ever have a jury

3        trial, you've got six seasoned citizens who will

4        give you a fair shot.  But it's not always pleasant.

5        Criminal cases, in particular, sometimes can be

6        heart wrenching if not tragic.  So we appreciate you

7        sharing that with us.

8              If you'll hand it to Mr. Kurant.  Good

9        morning, sir.

10             JUROR 7:  Good morning.  My name is John

11       Kurant.  I live in St. Petersburg, Florida.  I've

12       lived in the State of Florida 51 years.  I am a

13       produce manager at a health food store in St. Pete.

14             I am married.  My wife is an office manager

15       for a dental office.  We have one five-year-old boy.

16       US Navy, 1977 to '81.  Honorably discharged.  And I

17       was picked for jury duty but was not involved in the

18       case at all.

19             THE COURT:  All right.  Let me see from a show

20       of hands if any of you have ever been a party to a

21       civil lawsuit.  Now, I'm going to give you a broad

22       brush.  It can be landlord/tenant, it can be a

23       bad -- breach of contract, maybe for services

24       rendered but not paid for, maybe you've had a

25       foreclosure filed against you or you filed a

1    foreclosure, you've been in an automobile accident

2    and a lawsuit happened as a result of that.

3    Anything of that nature?  Anybody been in a civil

4    lawsuit?

5         All right.  We have four hands.  Let's pass

6    the mic down to the front row, please.  Mr. Karydis,

7    without telling us too much detail, were you the

8    plaintiff or the defendant in your case?

9         JUROR 16:  I was representing the landlord as

10   a property manager back in Canada.

11        THE COURT:  All right.

12        JUROR 16:  And it was the tenant who brought

13   the landlord to court.

14        THE COURT:  Okay.  Was that resolved by a

15   judge or jury?

16        JUROR 16:  In Canada they have what they call

17   a junior judge, which is usually a lawyer or

18   attorney who just finished.  And they appoint him on

19   that.  That's how the system was then.  I don't know

20   now.

21        THE COURT:  Kind of special master type of

22   person who resolves the dispute.

23        JUROR 16:  Yes.

24        THE COURT:  All right.  Anything about that

25   experience that would interfere with your ability to

1    be fair and impartial in this case?

2         JUROR 16:  I don't think so.

3         THE COURT:  All right.  Who else had their

4    hand up in the first row?  If you'll pass it down to

5    Ms. Cofer -- I'm sorry, Ms. Wilhite.

6         JUROR 87:  Couple of different things.  I was

7    a character witness for a -- I guess an automobile

8    accident that resulted in the death of a good

9    friend.  And then, also, my daughter was involved in

10   an accident and we brought suit against the other

11   individual that she was in the car with.

12        THE COURT:  All right.  Did either of those go

13   to trial?

14        JUROR 87:  The friend's did when I was a

15   character witness --

16        THE COURT:  Obviously.

17        JUROR 87:  -- for the friend, her children.  I

18   was a character witness for them.

19        THE COURT:  We call those before and after

20   witnesses.  Does that sound familiar?  You talk

21   about how she was in her life as a mother or friend?

22        JUROR 87:  Yes.

23        THE COURT:  And then, of course --

24        JUROR 87:  And how she related to the children

25   and such.

1            THE COURT:  All right.  It was a tragic

2     situation.  When you look back on that experience,

3     is there anything that's difficult or troubling to

4     the extent that you -- it would prevent you from

5     being fair and impartial in this case?

6            JUROR 87:  Not in that particular instance,

7     no.

8            THE COURT:  Okay.  You've been on the witness

9     stand in front of a jury.

10           JUROR 87:  Yes.

11           THE COURT:  Somewhat of a nervous experience?

12           JUROR 87:  Yes.

13           THE COURT:  Were you cross-examined by the

14    opposing lawyer?

15           JUROR 87:  Yes, I was.

16           THE COURT:  Anything unfair about that, that

17    you thought at the time?

18           JUROR 87:  No.  It was just a scary situation.

19    And I'm hoping that all my recollections of her life

20    and such were accurate.

21           THE COURT:  Okay.  And the other situation

22    with your daughter, that was resolved before suit or

23    before a trial?

24           JUROR 87:  Yes, it was.

25           THE COURT:  All right.  Anything about that

1       experience that was troubling?

2               JUROR 87:  Just a long process and a lot of

3       pain for her that I went through with her.

4               THE COURT:  Did you have your deposition taken

5       in either of those two cases?

6               JUROR 87:  Both of them.

7               THE COURT:  All right.

8               JUROR 87:  And then it was also -- I had

9       another one.

10              THE COURT:  You had another one, a third one?

11              JUROR 87:  I was also giving a deposition when

12      I was working at H. Lee Moffitt Cancer Center and an

13      incident happened that I obviously saw and was

14      involved with.

15              THE COURT:  You were a witness?

16              JUROR 87:  Yes.

17              THE COURT:  You were examined and

18      cross-examined during your deposition?

19              JUROR 87:  Yes I was.

20              THE COURT:  Now, a deposition, for those of

21      you who may not know, is a situation where the

22      lawyers have the opportunity to take a witness, like

23      Ms. Wilhite, and she's under oath and they ask her

24      questions about what she saw, what she experienced,

25      what she didn't see.  And it's part of what we call

1      the discovery process, investigation, so that when

2      witnesses are actually called in front of a jury,

3      the lawyers know pretty much what the witness is

4      going to say, and it facilitates the presentation of

5      evidence.  But it's an accepted process in all --

6      most all jurisdictions in civil cases, not all

7      criminal cases.  But you didn't find anything

8      particularly displeasing about that process?

9           JUROR 87:  No, not at all.

10          THE COURT:  All right.  Thank you.  Who else

11     on the back row?  Ms. Scott, civil or criminal

12     matter?

13          JUROR 138:  I was involved in an automobile

14     accident, which it was resolved before it went to

15     trial or anything.

16          THE COURT:  Were you injured?

17          JUROR 138:  Yes, sir.

18          THE COURT:  So you would have been the

19     plaintiff or complaining party?

20          JUROR 138:  Yes, sir.

21          THE COURT:  Anything about that process that

22     leaves you with an inability to be fair and

23     impartial in this case?

24          JUROR 138:  No, sir.

25          THE COURT:  The lawsuit was filed but it was

1      settled before a trial; right?

2              JUROR 138:  Yes, sir.

3              THE COURT:  Okay.  Anybody else?  Yes, sir.

4              JUROR 104:  Just currently a defendant.  I

5      have a civil lawsuit with a medical issue.

6              THE COURT:  All right.  Mr. Sandhoff; right?

7              JUROR 104:  It's pending.  Yeah.

8              THE COURT:  Are you represented by an

9      attorney?

10             JUROR 104:  No.

11             THE COURT:  You're representing yourself.

12     When is your next court date?

13             JUROR 104:  It hasn't even been set yet.

14             THE COURT:  Okay.  So you've gotten some

15     papers and --

16             JUROR 104:  I was served on the 4th of July.

17             THE COURT:  Share with us briefly what you

18     felt when you got handed those papers on July 4th.

19             JUROR 104:  They knew I was home, you know.

20             THE COURT:  Were you expecting it?

21             JUROR 104:  Kind of, yeah.  Yeah.  I had kind

22     of gone back and forth with the hospital over some

23     medical bills.

24             THE COURT:  This is a civil dispute over

25     money, essentially.

1          JUROR 104:  Um-hum.

2          THE COURT:  It hasn't been resolved yet.

3          JUROR 104:  Correct.

4          THE COURT:  Have you gone to mediation?

5          JUROR 104:  No, not yet.

6          THE COURT:  Can you put that experience aside

7     and listen to the evidence and testimony and follow

8     the law that I present to you in resolving this

9     case, if you're selected?

10          JUROR 104:  I think so.  Yes.

11          THE COURT:  Well, the question, obviously,

12    would be whether you might feel a tendency to favor

13    the defendant who's been sued in this case.  Well,

14    I've been there, done that, know how you feel.

15    That's a normal reaction.  But the question is,

16    understanding that you're going to feel that way,

17    perhaps, can you put that aside and be fair to the

18    plaintiff?

19          JUROR 104:  I'm pretty sure that I can do

20    that.

21          THE COURT:  Without regards to the merits of

22    that dispute.  If the hospital is legitimately owed

23    money and you just don't want to pay them, for

24    whatever reason, you would understand they would

25    have a right --

1              JUROR 104:  Absolutely.

2              THE COURT:  Likewise, if you don't owe the

3       money or they overcharged you, you would have a

4       right to win; right?

5              JUROR 104:  Right, right.

6              THE COURT:  And you expect a judge to resolve

7       that, I assume?

8              JUROR 104:  I hope so, yeah.

9              THE COURT:  All right.  Thank you.  Who else?

10      Anybody else on this row, the back row?  Yes, ma'am.

11             JUROR:  I had to go to court because my

12      husband was out of work and we fell behind on a

13      credit card so that was solved in mediation and

14      everything and he's back to work, so everything is

15      okay.

16             THE COURT:  You got one of those what we call

17      dunning letters, nasty letters.

18             JUROR:  Yeah.  Yeah.

19             THE COURT:  Did he actually get sued?

20             JUROR:  Yeah.  He had to go to court.  Yes,

21      sir.

22             THE COURT:  Okay.  That experience is not

23      uncommon in this day and age, for a lot of reasons.

24      The economy is, has some people have said, tanked

25      out, so to speak, and a lot of people have lost

1        their jobs, fell behind.  It's a common experience.

2             That being said, can you put that experience

3        aside and be fair to the plaintiffs in this case?

4             JUROR:  Yes, sir, I think I can.  I'm certain

5        I can.

6             THE COURT:  Only because your husband's been

7        on the receiving end of the lawsuit.

8             JUROR:  Right.

9             THE COURT:  All right.  Anybody else?  Some of

10       you have shared with us you've been witnesses or a

11       witness and you've had your deposition taken.

12       Anybody else have their sworn testimony taken in

13       front of a judge or a jury or in a deposition

14       setting?  I had a feeling as a -- in your military

15       experience.  Was that back in the Marine Corps?

16            JUROR 142:  No, sir.  It was -- after I

17       retired from Home Shopping, I was served with a

18       notice to be deposed on a case involving an employee

19       that we had there.

20            THE COURT:  All right.  Some workplace

21       incident?

22            JUROR 142:  Yes, sir.

23            THE COURT:  Were you a witness or just someone

24       they thought might know something?

25            JUROR 142:  Well, I was the person's manager

1       at the time.

2              THE COURT:  So that person probably brought a

3       suit against Home Shopping Network?

4              JUROR 142:  Yes, sir.

5              THE COURT:  And you were an important witness.

6              JUROR 142:  Well, I was a witness.

7              THE COURT:  You had your deposition taken?

8              JUROR 142:  Yes, sir.

9              THE COURT:  Anything about that process that

10      you felt was unfair?

11             JUROR 142:  Absolutely not.

12             THE COURT:  Did it get resolved before trial?

13             JUROR 142:  I guess so because they've never

14      called me back since then so --

15             THE COURT:  How long ago was that?

16             JUROR 142:  Four years ago.

17             THE COURT:  It probably has been.  All right.

18      Anybody else?  Yes, sir.  Back behind you,

19      Mr. Katzenbach?

20             JUROR 89:  Yes, sir.  I had to fill out a

21      deposition or something like it.  It was an

22      investigation on a contractor and so I filled it out

23      and sent it back to the investigating officer and

24      didn't really hear anything back from that.  This

25      was over the last six months or so.

1              THE COURT:  So you wrote down your version of

2       what occurred or didn't occur under penalty of

3       perjury, that kind of thing?

4              JUROR 89:  Yes, sir.

5              THE COURT:  That's probably an accepted

6       military investigative process, unlike a civil

7       lawsuit.  But anything unfair or fair about that?

8              JUROR 89:  No.  It seemed straightforward.

9              THE COURT:  Okay.  Who else?  Anybody else?

10             JUROR 7:  I don't know if this pertains.  I

11      gave a deposition.  I was in an automobile accident

12      probably 20 years ago and I had to give a deposition

13      to lawyers.  And it was resolved before court,

14      before it went to court.

15             THE COURT:  Were you treated appropriately by

16      the lawyers?

17             JUROR 7:  Yes, sir.

18             THE COURT:  All right.  Any bad feelings about

19      that experience?

20             JUROR 7:  Not at all.

21             THE COURT:  Mr. Karydis?

22             JUROR 16:  Yes.  I forgot to mention that I

23      had to go to the small claim court with a client who

24      wasn't paying the full amount of the commission, and

25      it was resolved after mediation.

 1          THE COURT:  Okay.  So you were bringing the

 2    complaint?

 3          JUROR 16:  Yes, sir.

 4          THE COURT:  And it got resolved?

 5          JUROR 16:  Yes.

 6          THE COURT:  Do you feel any partiality for or

 7    against the plaintiff in this case?

 8          JUROR 16:  Not really.

 9          THE COURT:  All right.  Thank you.

10          JUROR 16:  Thank you.

11          THE COURT:  Have any of you -- one more,

12    Ms. Wilhite, will this be number four?

13          JUROR 87:  I'm sorry.  This probably is a

14    little bit important.  Currently, it's been going on

15    for about four years, 2005, our business is being

16    sued in the State of New York for a worker who fell

17    on the job.  So ourselves and another company are in

18    that lawsuit actively right now, too.

19          THE COURT:  That's a workers' compensation

20    matter?

21          JUROR 87:  No.  Because in the State of New

22    York, I guess, you can't sue your employer.  So they

23    went to the general contractor and they're suing us

24    and also the company that we were working for, which

25    is a very large client.  I don't know if you want me

```
 1       to mention who that is or not.

 2              THE COURT:  It doesn't matter, really.

 3              JUROR 87:  Okay.

 4              THE COURT:  But my point is in this question,

 5       that's a troubling experience for you, I'm sure.

 6       It's a family-owned business; right?

 7              JUROR 87:  Yes, it is.

 8              THE COURT:  You're having to spend money on

 9       lawyers?

10              JUROR 87:  Lots of money.

11              THE COURT:  You're probably resentful of that.

12              JUROR 87:  A little.

13              THE COURT:  All right.  Will you hold that

14       against the plaintiff in this case who has brought a

15       lawsuit that they believe is appropriately brought?

16              JUROR 87:  No, I would not.

17              THE COURT:  You'll give him a fair shake as

18       well as the defendant?

19              JUROR 87:  Absolutely.

20              THE COURT:  Thank you.  Anybody else?  I

21       haven't asked you about divorces, on purpose.  But

22       that's a civil dispute and it's a lawsuit, and

23       they're not pleasant.  Even uncontested divorces can

24       suddenly blow up.  How many of you have been through

25       a dissolution of marriage proceeding?  All right.
```

1          About five of you.

2               Any of you have such a bad experience that you

3     can't stand to hear me or these lawyers talk?  You

4     know what I'm saying.  The lawyers were difficult,

5     the judge was difficult, it wasn't fair, I've heard

6     it all.  Anybody?  We don't really want to pry into

7     those affairs.  But if you've had an experience that

8     was problematic, we'd need to know.

9               The last question I have.  Have any of you

10    ever served or been interviewed as an expert in your

11    particular field of vocation or education?  We had a

12    mechanical engineer somewhere.  Who was that?

13    Somebody was an engineer.  Mr. Furr?

14         JUROR 62:  Engineering services.

15         THE COURT:  That's right.  But you've never

16    been asked to be an expert in a particular matter?

17         JUROR 62:  No.  I'm not an expert.

18         THE COURT:  As jurors, you will be asked to

19    calmly, fairly and dispassionately consider all of

20    the evidence in the case and, from that evidence and

21    from the law which I instruct you on, reach your

22    verdict.  You are not to be swayed in the

23    performance of your duty by prejudice, by sympathy

24    or any other sentiment for or against either side.

25               Remember, in essence, you are judges.  And

1       your role is simply to seek the truth.  Is there any

2       reason that any of you can think of at this point in

3       time that you cannot be a fair and impartial juror

4       in this case?

5            All right.  I will now turn the floor over.

6       Mr. Rodems, if you're got some follow-up questions,

7       feel free to inquire.

8            MR. RODEMS:  Thank you, Your Honor.

9            THE COURT:  Please give them your close

10      attention.

11           MR. RODEMS:  Thank you, Your Honor.  Well,

12      good morning.  Again, my name is Chris Rodems.  And

13      my partner, Chris Barker, and Sal Corrente,

14      Mr. Corrente owns Wrestlereunion LLC.  Let me just

15      start with this question.  How many of you have

16      watched wrestling on TV?  Okay.  All right.  How

17      many people have ever been to a live wrestling

18      event?  Okay.  We've got one.

19           Mr. Stover, you mentioned that you worked for

20      the Home Shopping Network.  Do you by any chance

21      recognize me?

22           JUROR 142:  No, sir, I do not.

23           MR. RODEMS:  My last name is spelled

24      R-o-d-e-m-s.  I have been counsel for Home Shopping

25      Network in the past.  Is it possible during the case

1    that you testified that I was counsel for the Home

2    Shopping Network?

3         JUROR 142:  You don't look like the attorney

4    that was there.

5         MR. RODEMS:  Okay.  All right.  How many --

6    how many folks have ever owned your own business?

7    Okay.  Is it Ms. --

8         JUROR 87:  Wilhite.

9         MR. RODEMS:  Ms. Wilhite.  Thank you.  What

10   did you say the nature of your business was again?

11        JUROR 87:  It's a facility maintenance

12   business, going in and remodeling, repairing,

13   specializing mostly in restaurants, but also some

14   retail.

15        MR. RODEMS:  Okay.  So who is it that your

16   company works with?  Who pays your company, for

17   example?

18        JUROR 87:  Hard Rock Cafe, Darden Restaurants,

19   Macaroni Grill type, P. F. Chang's.

20        MR. RODEMS:  And when your company does work

21   for Hard Rock, P. F. Chang's, those companies, do

22   you have a contract?

23        JUROR 87:  Yes, we do.

24        MR. RODEMS:  Okay.  Does your business prepare

25   the contract or has it usually been the practice

1    that the party you're doing business with prepares

2    the contract?

3         JUROR 87:  The party that we're doing business

4    with prepares the contract and then we also prepare

5    contracts for our subcontractors.

6         MR. RODEMS:  Okay.  Okay.  And do you have any

7    experience in helping put together the contracts?

8         JUROR 87:  No.

9         MR. RODEMS:  Okay.  Have you ever seen the

10   contracts?

11        JUROR 87:  Yes.

12        MR. RODEMS:  Does -- did somebody from your

13   business sign the contract?

14        JUROR 87:  Yes.

15        MR. RODEMS:  Who normally does that?

16        JUROR 87:  My husband.

17        MR. RODEMS:  Okay.  And does the contract

18   usually spell out what the parties are going to do?

19        JUROR 87:  Yes, it does.

20        MR. RODEMS:  And does it spell out how quickly

21   the work is supposed to be done to give a timeframe,

22   like you will do X, Y and Z within three months or

23   six months?

24        JUROR 87:  I do not know.

25        MR. RODEMS:  Okay.  Does the contract -- the

1    contracts you've seen, do they spell out how much

2    your family company is going to be paid?

3         JUROR 87:  Absolutely.

4         MR. RODEMS:  Okay.  Okay.  And have you ever

5    had a situation where there was a dispute over a

6    contract and you had to have a resolution with the

7    company that presented you with it?

8         JUROR 87:  Not that I'm aware of in the past

9    five years.

10        MR. RODEMS:  Okay.  All right.  Let me give

11   you all some names of some people that may be

12   testifying in this case, just so we can see if any

13   of you know any of them.  Joseph Townley, anybody

14   recognize that name?  Okay.  Steve Sterling, anybody

15   recognize that name?  If you do, if you'll just

16   raise your hand.  Dawn Olejar?  Eric Paulen?  John

17   Gallarello?  Steven Stern.  Anthony Attanasio?  Rob

18   Russen?  Jimmy Hart?  Colin Bowman?  Oh, I'm sorry.

19        JUROR 145:  Jimmy Hart, I think I've heard of

20   him.  Did he used to be a manager for wrestling?

21        MR. RODEMS:  Yes, sir.  Used to be a manager

22   for --

23        JUROR 145:  I don't know him.  I just know his

24   name.

25        MR. RODEMS:  Have you ever seen him on TV?

1              JUROR 145:  (Inaudible.)

2              COURT REPORTER:  I'm sorry.  I didn't hear his

3        answer.

4              MR. RODEMS:  That's what he goes by.

5              THE COURT:  The court reporter couldn't hear

6        the answer.  Could you pass the mic back, whoever

7        has it.  Thank you.

8              JUROR 145:  Sorry.  I'm familiar with the name

9        Jimmy Hart from TV.  I don't know him personal --

10       personally.

11             MR. RODEMS:  You were telling us what his

12       nickname was.

13             JUROR 145:  Mouth of the South.

14             MR. RODEMS:  Okay.  All right.  Has anybody

15       else heard of Jimmy, Mouth of the South, Hart?

16       Okay.  Anybody ever heard of Hulk Hogan?  All right.

17       Anybody ever seen a wrestling match with Hulk Hogan?

18       Ever seen his manager standing outside the ring with

19       a bullhorn shouting instructions at him?

20             Okay.  Anybody remember about 20, 25 years ago

21       the comedian Andy Kauffman?  Anybody remember when

22       he had his big dispute with Jerry the King Lawler,

23       the wrestler, and he would get on Saturday Night

24       Live and he would wrestle women and -- Mr. Kauffman

25       would, and then eventually Jerry the King Lawler and

1    him had a dispute and a very public brouhaha?  Does

2    anybody remember that one?  Okay.  Well, you might

3    remember Jimmy Hart from that.  Well -- and, sir,

4    your name again was?

5         JUROR 145:  Larry Smith.

6         MR. RODEMS:  Yes, sir, Mr. Smith.  The fact

7    that Mr. Hart will be a witness in this case, would

8    that -- for the plaintiff, that is, for

9    Wrestlereunion, would that in any way sway your

10   opinion or cause you any concern?

11        JUROR 145:  No, sir.

12        MR. RODEMS:  Okay.  Anybody ever heard of

13   Dusty Rhodes?  Okay.  Anybody ever watch the old

14   wrestle show on Channel 44, used to come on Saturday

15   nights with Gordon Sulie?  Okay.  You're --

16   Mr. Stover, you're saying yes.  Did you used to

17   watch it regularly?

18        JUROR 142:  That was a long time ago.  I

19   couldn't -- I didn't -- I don't watch television

20   regularly, anyway.  But I don't really know how to

21   answer that.  I was just aware of it and I had seen

22   the program.

23        MR. RODEMS:  Do you remember his signature

24   signoff at the end of the show, so long from the

25   sunshine state?

```
1              JUROR 142:  As a matter of fact, I was passing

2      through night before last and it was right at the

3      end of the show and there he was, same thing.

4              MR. RODEMS:  Okay.  All right.  Professional

5      wrestling is not everybody's cup of tea.  Granted.

6      Pro football is not everybody's cup of tea.  Neither

7      is chess or tiddlywinks or anything else.  Is there

8      anyone sitting here today that goes, if this is

9      going to be a case about wrestling and live

10     wrestling and televised wrestling and who should

11     have done what to whom wrestling and all these

12     things, I just would not be interested and I could

13     not be fair because that's just something that I

14     have no interest in?  Ma'am, how do you feel about

15     that?  And you are Ms. Catanese?

16             JUROR 23:  Yes.  I think wrestling is just not

17     my interest at all.  I don't really -- I would never

18     watch it.  I don't like it.  I -- it's just not my

19     thing.

20             MR. RODEMS:  Okay.  Okay.  There's going to be

21     quite a bit of testimony in this case about three

22     wrestling events that happened in 2005 and what the

23     relationship was supposed to be between the parties.

24     It's our contention that we had a contract with

25     Clear Channel Entertainment Television to videotape
```

1     these events and then edit it and distribute it into

2     the marketplace, and that we put on the three events

3     but they didn't do their job.  But, of necessity,

4     there's going to be perhaps some footage of the

5     wrestling, there's going to be quite a bit of

6     discussion.  There's going to be some testimony by

7     at least one of the wrestlers.

8         Do you feel that because of your perhaps

9     disinterest or distaste for wrestling that you would

10    not be in a position to be impartial and fair and

11    give your undivided attention?

12        JUROR 23:  Yes.  I do believe so.  I -- I just

13    don't even agree with wrestling in general so --

14        MR. RODEMS:  Okay.  Well, thank you for

15    stating that.  Is there anybody else that feels the

16    same way?  Yes, ma'am.  Your name.

17        JUROR 194:  I just don't care about wrestling

18    at all.  I'd rather not ever watch it or hear about

19    it.

20        MR. RODEMS:  Okay.  And you are Ms. --

21        JUROR 194:  Joan Jacobazzi.

22        MR. RODEMS:  Ms. Jacobazzi.  Okay.  All right.

23    Do you think you could sit through this trial and be

24    fair?

25        JUROR 194:  Not really.

1          MR. RODEMS:  Okay.  Well, thank you for being

2     honest about that.  And I know that we had a hand on

3     the back row.  Yes, sir.  Your name?

4          JUROR 62:  Jeff Furr.

5          MR. RODEMS:  Yes, sir.  Mr. Furr.

6          JUROR 62:  I just think wrestling is a

7     complete hoax.  I know it's just for entertainment

8     purposes, but I don't see it as an entertainment.

9          MR. RODEMS:  Okay.  Okay.  You've never been

10    to a live wrestling event?

11         JUROR 62:  No way.

12         MR. RODEMS:  Have you ever watched it on TV?

13         JUROR 62:  No.

14         MR. RODEMS:  Okay.  Is there anything that you

15    do for entertainment that involves something that's

16    maybe not a true sporting contest but is staged,

17    such as movies, plays, anything like that?

18         JUROR 62:  I watch movies.

19         MR. RODEMS:  Okay.  All right.  Do you

20    understand when you watch a movie that the -- most

21    of the time the movies aren't real, even the

22    biographies have, you know, a literary license to

23    them?

24         JUROR 62:  Right.  It's pure entertainment.

25         MR. RODEMS:  Okay.  Do you find that your

1          dislike for wrestling is so pronounced that you

2          don't think -- that you think you would be unable to

3          give your undivided attention this week and be fair

4          to my client and also to Live Nation?

5                    JUROR 62:  Possible.

6                    MR. RODEMS:  Okay.  Well, we won't get much of

7          a chance after this moment to find out about that.

8          So can you tell me -- when you say possibly, what

9          kinds of things would influence whether you'd be

10         able to be fair?  It would be awful if during the

11         middle of the week you suddenly realized, oh, my

12         gosh, I should have spoken up more clearly and said,

13         I can't do this.  Is there anything that you can

14         share with us about your feelings about wrestling

15         that would help us understand exactly how strong

16         your -- your feelings are about wrestling and

17         whether it would be fair for you to be a member of

18         this jury?

19                    JUROR 62:  Not really.

20                    MR. RODEMS:  Okay.  All right.  How many

21         people have seen wrestling believe that everything

22         you see on TV is real?  Anybody?  Okay.  How many of

23         you believe that every single bit of it is staged?

24         Okay.

25                    Has anybody ever watched professional

1    football?  Okay.  When you watch football -- has

2    anybody watched it on television?  Okay.  And has

3    anybody been over to, say, for instance, Raymond

4    James Stadium and watched either college or

5    professional football there?

6        Okay.  Now, when you sit in your living room

7    and you watch it, of course, it doesn't cost you

8    anything unless you get that Direct TV package and

9    you have to pay for the extra money or something

10    like that.  But generally when you watch televised

11    football, it doesn't cost you anything; right?  But

12    when you go to the game you, of course, pay a ticket

13    price.  Does anybody have an understanding of how an

14    NFL team makes its money?  Is it just off the live

15    gate, or do they get money from the advertising?

16    Okay.

17        Wrestlereunion scheduled three events in 2005,

18    and they charged admission prices for the fans that

19    attended.  But their business plan from the

20    beginning was to derive revenue from selling DVDs of

21    the events.  Now, does anybody think that that's a

22    bad business model to be in?  Okay.

23        Has anyone within the last year bought a new

24    television?  Yes, ma'am.  On the front row, what is

25    your name?

1                    JUROR 187:  Cynthia Cofer.

2              MR. RODEMS:  Okay.  All right.  I don't want

3      to get too personal but I want to find out what your

4      experience was.  How did you go about buying a new

5      TV?

6                    JUROR 187:  I bought it for Christmas for my

7      husband.  It's a 57-inch flat screen.  And I didn't

8      have any problems.

9              MR. RODEMS:  Where did you buy it from?

10                   JUROR 187:  Actually from Badcock Furniture

11     Store.

12             MR. RODEMS:  All right.  And how did you find

13     that particular model?

14                   JUROR 187:  Just went in the store looking.

15             MR. RODEMS:  Okay.

16                   JUROR 187:  And the salesperson --

17             MR. RODEMS:  Did you buy the first one you

18     saw?

19                   JUROR 187:  No.  I looked at several different

20     sizes and different brands.

21             MR. RODEMS:  Okay.  Was it important to you

22     when you were buying the TV to see the different

23     features it had?

24                   JUROR 187:  Yes.

25             MR. RODEMS:  You said it was a 57-inch?

1              JUROR 187:  Um-hum.

2         MR. RODEMS:  Did you buy one that gets high

3     definition?

4              JUROR 187:  Right.

5         MR. RODEMS:  Are there still ones on the

6     market that don't have high definition?

7              JUROR 187:  I think so.

8         MR. RODEMS:  Okay.  How did you decide that

9     that was the right one?

10             JUROR 187:  Well, it was between that and the

11    plasma.  And my youngest son plays video games on

12    it, and the plasma screen, according to the

13    salesman, freezes up when you play video games.  So

14    we went with just the regular high definition.

15        MR. RODEMS:  Okay.  So when the salesperson

16    sold you the TV, he a had model there to show you?

17             JUROR 187:  Right.

18        MR. RODEMS:  Okay.  He didn't show you a

19    picture of it?

20             JUROR 187:  No.

21        MR. RODEMS:  Would you have ever just bought

22    it by looking on the internet?

23             JUROR 187:  No.

24        MR. RODEMS:  Would it have been -- did the

25    salesperson show you the features?

1              JUROR 187:  Right.

2              MR. RODEMS:  Would it have been effective for

3       you if all he did was show you a picture of the TV?

4              JUROR 187:  No.

5              MR. RODEMS:  Would it have been effective for

6       you if all he did was send you an e-mail?

7              JUROR 187:  No.

8              MR. RODEMS:  Okay.  All right.  Show of hands,

9       has anyone here on the jury ever brought a car

10      without taking a test drive?  Mr. Stover.  You're

11      the only one.  And in hindsight or not, was that a

12      mistake?

13             JUROR 142:  No, sir.

14             MR. RODEMS:  Okay.  What kind of car did you

15      buy without taking a test drive?

16             JUROR 142:  It's a Ford product.

17             MR. RODEMS:  What kind of product?

18             JUROR 142:  Ranger truck, pickup truck.

19             MR. RODEMS:  Okay.  And was it brand new?

20             JUROR 142:  Yes, sir.

21             MR. RODEMS:  Had you ever driven a Ford Ranger

22      truck before?

23             JUROR 142:  Yes.

24             MR. RODEMS:  Okay.  So before you brought the

25      Ford Ranger, you had at least driven a similar one

1        at sometime in the past?

2            JUROR 142:  That's correct.

3            MR. RODEMS:  Would you have bought a Ford

4        Ranger without a test drive if you had never driven

5        one in the past?

6            JUROR 142:  Yes.

7            MR. RODEMS:  Okay.  What is it about the Ford

8        Ranger that gave you the comfort of knowing you

9        could buy it without test driving it?

10           JUROR 142:  Test drive to me doesn't do

11       anything except see how you feel in the seat and

12       how -- whether you can see properly for yourself.

13       Whether it performs or not is not an issue on a test

14       drive.

15           MR. RODEMS:  Okay.  Okay.  But was that

16       important to you that the seat be comfortable?

17           JUROR 142:  Sure.

18           MR. RODEMS:  Okay.  Okay.  Were you satisfied

19       before you ever bought the Ford Ranger that the seat

20       would be comfortable because of your past

21       experience?

22           JUROR 142:  My past experience with Ford

23       products.

24           MR. RODEMS:  All right.  How many people here

25       have ever been to the Strawberry Festival; anybody?

1        Oh, quite a few.  Oh, good.  Okay.  Anybody ever go

2        to a concert at the Strawberry Festival?  All right.

3        I've got two of you here.  I'm sorry, ma'am.  You'll

4        have to forgive me.  I got the list this morning and

5        I'm not one of those people that can instantly --

6              JUROR 187:  Cynthia Cofer.

7              MR. RODEMS:  Thank you, Ms. Cofer.  What

8        concerts did you see at the Strawberry Festival?

9              JUROR 187:  I've only been to one, Erin Tippen

10       concert a few years back.

11             MR. RODEMS:  Okay.  All right.  Do you

12       consider yourself a country music fan?

13             JUROR 187:  No.  My husband is.

14             MR. RODEMS:  Okay.  Prefer old country or new

15       country?

16             JUROR 187:  He prefers new country.

17             MR. RODEMS:  Okay.  Anybody else consider

18       themselves a country music fan on the jury?  All

19       right.  Just a show of hands, old country or new

20       country?  Who prefers old country?  Both?  Okay.

21       Mr. Stover, who is it that -- who would you consider

22       old country?

23             JUROR 142:  Merle Haggard.

24             MR. RODEMS:  Willie Nelson?

25             JUROR 142:  Yes.

1              MR. RODEMS:  Waylon Jennings?

2              JUROR 142:  Absolutely.

3              MR. RODEMS:  Okay.  Would you be interested in

4       going to a concert if you found out that all three

5       of those were going to appear at the same time?

6              JUROR 142:  No.

7              MR. RODEMS:  No?  Why not?

8              JUROR 142:  I'm too old.  I can't handle the

9       crowds anymore.

10             MR. RODEMS:  So it wouldn't matter who they

11      brought?

12             JUROR 142:  No.

13             MR. RODEMS:  Okay.  Would you -- if you found

14      out that the three of them were going to appear and

15      they were going to issue a DVD, would you be

16      interested in buying the DVD and putting it on your

17      DVD player?

18             JUROR 142:  No.

19             MR. RODEMS:  If they did an album and they did

20      a CD?

21             JUROR 142:  No.

22             MR. RODEMS:  No?

23             JUROR 142:  I don't have time.  I don't know

24      where people find time to -- when they TIVO and do

25      all this other stuff.  If they don't have time to

1        watch it or do it then, where do they find the time

2        to do it later?  I just -- I don't understand that.

3              MR. RODEMS:  Somehow or another at some point

4        in your life you must have been exposed to them

5        because you know who they are.

6              JUROR 142:  Oh, yes.

7              MR. RODEMS:  How did you hear about them?

8              JUROR 142:  Oh, I've seen them on TV.

9              MR. RODEMS:  On the radio?

10             JUROR 142:  On the radio.  Listen to them on

11       the radio.

12             MR. RODEMS:  Okay.

13             JUROR 142:  Back when I was much younger I had

14       a lot of records.

15             MR. RODEMS:  Okay.  All right.  Anybody ever

16       been to the grand opening of a business, a new

17       store, new restaurant?  Nobody?  Yeah?  Ma'am, you

18       are Ms. Wahl?

19             JUROR 120:  Yes.

20             MR. RODEMS:  Tell us, what grand openings have

21       you been to?

22             JUROR 120:  Well, I was in property

23       management, so like a Best Buy or something like

24       that, went there for the grand opening week to make

25       sure everything was going okay and if --

1          MR. RODEMS:  What did you notice about the

2     grand opening?  What was different about the normal

3     business day?  Did they have food, did they have

4     celebrity appearances?

5          JUROR 120:  Things to get your attention and a

6     lot of people around to talk with you and, yeah,

7     that.

8          MR. RODEMS:  What do you think the purpose of

9     doing all that was?

10         JUROR 120:  Just to get the attention from the

11    public, let people know they're open and people come

12    in the store, walk around and tell their friends

13    about what a great store it is and the layout and

14    different things.

15         MR. RODEMS:  Establish the name?

16         JUROR 120:  Yes, exactly.

17         MR. RODEMS:  Okay.  Do you think that they

18    made back that very same day all the extra money

19    they spent getting that grand opening feel?

20         JUROR 120:  I don't believe so.

21         MR. RODEMS:  Okay.  All right.

22         JUROR 120:  Yeah.

23         MR. RODEMS:  Anybody ever had a door to door

24    salesman knock on their door?  All right.  Anybody

25    actually had a door to door salesman knock on their

1      door selling vacuum cleaners?  Yes.  All right.

2      Mr. Stover, I remember your name because we've

3      talked so much.  I'm going to ask you this question.

4      When the knock-knock-knock happened and you opened

5      the door and whoever was there to sell you a vacuum

6      cleaner, did they have a vacuum cleaner with them?

7              JUROR 142:  Yes.

8              MR. RODEMS:  Okay.  Did they offer to

9      demonstrate it for you?

10             JUROR 142:  Oh, yes.

11             MR. RODEMS:  Okay.  Did you allow them to

12     demonstrate it for you?

13             JUROR 142:  No.

14             MR. RODEMS:  Is that because you already had a

15     vacuum cleaner?

16             JUROR 142:  Yes.

17             MR. RODEMS:  All right.  Well, let me ask you

18     this.  What if they had knocked on the door and

19     said, I'm here to sell you a vacuum cleaner but all

20     I've got is a picture of it; would that have

21     impressed you?

22             JUROR 142:  No.

23             MR. RODEMS:  Okay.  What if they knocked on

24     your door and said, I don't have a working model but

25     I've got a boxful of pieces?

1           JUROR 142:  Absolutely not.

2           MR. RODEMS:  And believe me, sir, when I put

3      this together and plug it in, it's going to vacuum

4      like there's no tomorrow.  Could I have gotten in

5      your door if I came there and knocked on it with

6      that boxful of vacuum cleaner pieces?

7           JUROR 142:  No.

8           MR. RODEMS:  All right.  Okay.  I know I

9      haven't gotten to all of you.  I haven't been able

10     to ask every one of you questions.  I hope you'll

11     understand that I'm not meaning to leave anybody

12     out, but our time is limited.  I want to respect all

13     of that.

14          We're going to put our case on as quickly as

15     possible.  We believe we have about five witnesses

16     that will be testifying and we have some deposition

17     testimony to read.  We have a lot of exhibits to

18     admit.  We're going to try to admit them all at the

19     same time so we can streamline the process.

20          I thank you all for coming down today and

21     we'll do everything we can to bring this case to you

22     as soon as possible.  Thank you very much.  Thank

23     you, Your Honor.

24          THE COURT:  Thank you, Mr. Rodems.  Sorry.  I

25     didn't have my mic on.  Thank you, Mr. Rodems.

1          Ms. Millner?

2              MS. MILLNER:  Thank you, Your Honor.  Good

3      morning.  Before I get started on questioning, I

4      want to ask if any of you recognize the names of any

5      of these folks who might be witnesses.  I know

6      Mr. Rodems went through some of them.  I want to

7      identify some additional ones.  Colin Bowman, does

8      anyone know him, Mr. Bowman?  How about Eric

9      Bischoff, anyone hear of him?  Okay.  Steven Durham,

10     recognize that name?  Mr. Behrens, Bill Behrens,

11     William Behrens ring a bell?  Okay.

12             All right.  Ms. Wahl, I believe I -- you

13     raised your hand when the judge asked if anyone was

14     a wrestling fan in here, or maybe I thought I saw

15     you raise your hand.

16             JUROR 120:  I'm familiar with wrestling.  I'm

17     familiar with wrestling, yes, Hulk Hogan.  I kind of

18     was following him for awhile but --

19             MS. MILLNER:  Following his career as a

20     wrestler?

21             JUROR 120:  Yeah.

22             MS. MILLNER:  Have you ever been to one of his

23     matches or events?

24             JUROR 120:  No.

25             MS. MILLNER:  Never been to a wrestling event

1      at all?

2              JUROR 120:  No.

3              MS. MILLNER:  Do you periodically watch it on

4      TV?

5              JUROR 120:  TV, just hear about what goes on.

6              MS. MILLNER:  How often do you watch wrestling

7      on TV?

8              JUROR 120:  Not often.

9              MS. MILLNER:  So it's not something you --

10             COURT REPORTER:  Counsel, get closer to the

11     microphone, please.

12             MS. MILLNER:  Sorry.  It's not something you

13     typically try and schedule time for?

14             JUROR 120:  No.

15             MS. MILLNER:  All right.  Are any of -- you

16     don't have children, do you, ma'am?

17             JUROR 120:  No.

18             MS. MILLNER:  Okay.  Do you happen to know any

19     professional wrestlers?

20             JUROR 120:  Not personally.  Know of them like

21     Hulk Hogan but, no, I don't know anybody personally.

22     No.

23             MS. MILLNER:  Do you know any professional

24     athletes at all?

25             JUROR 120:  No.

1            MS. MILLNER:  All right.  Ms. Cofer, I was

2       getting to you.  Your son.

3            JUROR 187:  My son.

4            MS. MILLNER:  Your son's a bull rider?

5            JUROR 187:  Yes.

6            MS. MILLNER:  I'm not sure if I've ever met a

7       professional bull rider before.  How long has he

8       been a bull rider?

9            JUROR 187:  Since he was 16.

10           MS. MILLNER:  Okay.  Is that a tough business?

11           JUROR 187:  Yes, it is.

12           MS. MILLNER:  Is it tough to make a living in?

13           JUROR 187:  Yes, it is.

14           MS. MILLNER:  Is it -- does he put on -- does

15      he promote any bull riding events?

16           JUROR 187:  No, he doesn't.  He's just a

17      competitor.

18           MS. MILLNER:  All right.  And has he been

19      successful in this industry?

20           JUROR 187:  Fairly well.

21           MS. MILLNER:  All right.  Has he ever to your

22      knowledge been in -- been to a bull riding event

23      that was not accepted -- or involved in a bull

24      riding circuit that was not accepted by the market

25      place, just didn't do well?

1              JUROR 187:  No.  No.

2              MS. MILLNER:  All right.  Do you agree with me

3        that bull riding events and other types of spectator

4        sporting events is a risky business?

5              JUROR 187:  Yes, it is.

6              MS. MILLNER:  Okay.  There may be some

7        professional wrestlers that testify in this case.

8        Jimmy Hart, you heard Mr. Rodems mention.  Would the

9        fact that there would be professional athletes

10       coming to court in any way influence you in this

11       case, given your son is a professional athlete?

12             JUROR 187:  Not at all.

13             MS. MILLNER:  Mr. Stover, I believe your son

14       is also a professional athlete or professional race

15       car driver; correct?

16             JUROR 142:  Well, he's not the driver.  He's a

17       mechanic on the top field dragster team.

18             MS. MILLNER:  Okay.  And is there any -- have

19       you been to any of these events?

20             JUROR 142:  Oh, absolutely.

21             MS. MILLNER:  All right.  Is it successful,

22       these events?

23             JUROR 142:  I would say so, yes.

24             MS. MILLNER:  All right.  Have you ever --

25       rather have you ever been to an event that your son

1    was involved in that just was not very well attended

2    at all?

3          JUROR 142:  No, I don't think so.

4          MS. MILLNER:  Okay.  Do you agree with me that

5    professional racing is a risky business, tough to

6    make a living in?

7          JUROR 142:  I would say so.

8          MS. MILLNER:  Yeah.  A lot of people dream

9    about being a professional race car driver or on the

10   pit crew like your son, but it just doesn't work out

11   for them.  Have you ever heard of that happening?

12         JUROR 142:  Oh, yes.

13         MS. MILLNER:  All right.  You also, I

14   understand, are involved in Home Shopping Network;

15   is that right?

16         JUROR 142:  I was for about ten years.

17         MS. MILLNER:  And as I understand it, that is

18   a network that sells products on television; is that

19   right?

20         JUROR 142:  That's correct.

21         MS. MILLNER:  And do you select the products

22   that get featured on the shows?

23         JUROR 142:  No way.  I was not involved in any

24   of that.  I was on the service end over in the

25   service center and not involved in any marketing,

1    purchasing, decision making in any kind of sense

2    that way.

3         MS. MILLNER:  Did you watch the programming

4    from time to time?

5         JUROR 142:  Oh, we had to.  It was on the

6    screen in front of us at work.

7         MS. MILLNER:  Have you ever had a product that

8    came to market that you just thought was definitely

9    going to sell well?

10         JUROR 142:  Can I take the fifth?  Obviously,

11    there were some products that didn't do very well.

12         MS. MILLNER:  Right.  But have you ever seen a

13    product come through that, in your mind, was going

14    to be a hit, was going to sell well, be successful

15    yet did not do as well as you expected?

16         JUROR 142:  No.  I'm -- it was -- where we

17    were and what we were doing, it was hard to get

18    involved with any of the products.  And even looking

19    at something I would say, well, I wouldn't buy that

20    because it would be something I wasn't interested

21    in.  But sometimes we had products that I went

22    investigated to see whether or not I'd be interested

23    in it.

24         MS. MILLNER:  Would you agree with me that it

25    was impossible to predict how a product would

1      actually be accepted by the marketplace?

2           JUROR 142:  From an individual standpoint,

3      yes.

4           MS. MILLNER:  Okay.  Sometimes products that

5      seem like they're going to do well, in fact, don't

6      do well and sometimes products that seem that, at

7      least to you, nobody would want, actually sell quite

8      well; hasn't that happened?

9           JUROR 142:  Oh, sure.  Obviously, I don't -- I

10     don't know, I wasn't in the decision-making process,

11     but I don't think that the company would air a

12     product that they didn't think was probably going to

13     do well.

14          MS. MILLNER:  And not all the products the

15     company aired, in fact, sold; is that correct?

16          JUROR 142:  That's correct.

17          MS. MILLNER:  Does everyone here agree that it

18     is the marketplace that determines the success of a

19     product?  Does anyone disagree with that?  Ma'am,

20     Ms. Wilhite, do you?

21          JUROR 87:  I disagree with, excuse me, just

22     marketing.  I think it's also the product that needs

23     to sell.

24          MS. MILLNER:  In what way?

25          JUROR 87:  If I wanted a cleaning supply to

1          take the soap scum off my tub and I bought the

2          product because the marketing said it was wonderful

3          and it didn't work, I wouldn't buy it again.

4              MS. MILLNER:   Right.   Okay.   So the quality of

5          the product --

6              JUROR 87:   Absolutely.

7              MS. MILLNER:   -- has something to do with it.

8          Right.   But do you agree, though, that no matter how

9          much marketing effort you put into products and how

10         much sales promotions are put in, sometimes the

11         marketplace just won't accept the product, for

12         whatever reason?

13             JUROR 87:   I think branding is a very

14         important part of it.   But it's also the product and

15         the quality of what's going to happen after that

16         that continues to sell it.   Yes.

17             MS. MILLER:   Has anyone here ever had a job

18         which involves selecting products or services to

19         introduce to the marketplace?   Anyone?   Mr. Karydis?

20             JUROR 16:   Yes, ma'am.

21             MS. MILLNER:   My understanding is you're a

22         real estate broker; is that right?

23             JUROR 16:   Yes.

24             MS. MILLNER:   Are you involved in the sales of

25         any real estate?

1              JUROR 16:  Yes.

2              MS. MILLNER:  So your -- houses or commercial

3        properties?

4              JUROR 16:  Houses mainly and some commercial.

5              MS. MILLNER:  Have you ever had any customers

6        or clients who required that you give them a

7        guarantee that a house would sell?

8              JUROR 16:  Actually, all of them, but you

9        cannot guarantee that.

10             MS. MILLNER:  Why not?

11             JUROR 16:  Because you do your job, but it

12       depends from the market, it depends from the client.

13             MS. MILLNER:  Have you ever had a situation

14       where in your mind a house had everything that the

15       market would want but for whatever reason it didn't

16       sell?

17             JUROR 16:  Not really.  Mainly it's because of

18       the client, the seller who usually insists in either

19       overpricing or because they believe that their house

20       is the only one in the market which is worth it.  So

21       mainly that's the reason.

22             MS. MILLNER:  Competitors in the marketplace

23       can affect whether or not a good product or a good

24       house, in your case, sells; isn't that right?

25             JUROR 16:  Yes.

1          MS. MILLNER:  All right.  Have you ever had

2     any disputes with any of your clients that you

3     listed homes for?

4          JUROR 16:  What kind of dispute?

5          MS. MILLNER:  Any kind of dispute where they

6     felt you weren't doing a good enough job marketing

7     their property.

8          JUROR 16:  Sometimes, yes.  Not that I'm not

9     doing my job, but because I was insisting to bring

10    the price down.

11         MS. MILLNER:  Go ahead.

12         JUROR 16:  But it depends, I believe, from the

13    individual how you can convince your client or not

14    and what kind of arguments you're going to bring to

15    the table.

16         MS. MILLNER:  Do you ever have situations

17    where the clients believe they may know more about

18    selling houses than you do?

19         JUROR 16:  Not really.

20         MS. MILLNER:  All right.  You were the

21    professional in the real estate -- in that

22    relationship with your client; isn't that right?

23         JUROR 16:  Yes.

24         MS. MILLNER:  All right.  Anyone else ever --

25    or anyone on the jury ever enlist the help of a

1     professional to sell an asset for them, whether it's

2     a house or something else?  Yes, Ms. Szabala.

3            JUROR 107:  I've sold a home, I mean.

4            MS. MILLNER:  And how was that experience for

5     you?

6            JUROR 107:  Easy.

7            MS. MILLNER:  It was easy.  You're lucky.  You

8     must have been sold it a while ago.

9            JUROR 107:  I did.

10           MS. MILLNER:  And did you enlist the help of a

11    real estate professional?

12           JUROR 107:  I did.

13           MS. MILLNER:  And did you rely on that person

14    to -- and that person's expertise to -- to market

15    the property?

16           JUROR 107:  Yes.  I took her guidance and felt

17    good about it.

18           MS. MILLNER:  Okay.  So you didn't feel you

19    knew more than she did about it?

20           JUROR 107:  No.  She was an expert.

21           MS. MILLNER:  She was the expert.  Even though

22    you've lived in house your whole life?

23           JUROR 107:  Sure.

24           MS. MILLNER:  All right.  Anyone else?  Yes,

25    Mr. Stover.

1              JUROR 142:  Well, bought and sold 15 homes.

2              MS. MILLNER:  15 homes.  That you've all lived

3       in?

4              JUROR 142:  Um-hum.

5              MS. MILLNER:  My.  Is that from moving around

6       in the military?

7              JUROR 142:  Well, believe it or not, I've

8       moved more times since I've been out of the military

9       than I did in but, yes.

10             MS. MILLNER:  And did you enlist the

11      assistance of a real estate professional?

12             JUROR 142:  In each case.

13             MS. MILLER:  All right.  And did you rely on

14      their expertise?

15             JUROR 142:  Yes.

16             MS. MILLNER:  All right.  Did you ever list a

17      home -- one of your 15 homes that just didn't sell

18      or took quite a long time to sell?

19             JUROR 142:  Yes.

20             MS. MILLNER:  How often has that happened?

21             JUROR 142:  Three times.

22             MS. MILLER:  All right.  And did you blame the

23      real estate broker or professional for that

24      difficulty that you had in selling the home?

25             JUROR 142:  Once.

```
1              MS. MILLNER:  Why so?

2              JUROR 142:  Well, they just didn't seem like

3     they were interested.

4              MS. MILLNER:  How come?

5              JUROR 142:  Well, in two years they showed the

6     home once.  And every time we contacted them about

7     open houses and other things that people seemed to

8     do to try to get their homes sold, these people

9     didn't want to be interested.  And when I tried to

10    get out of the contract, it took me nine months

11    so --

12             MS. MILLNER:  The other two occasions that the

13    home had difficulty selling, did you blame the real

14    estate professional for that?

15             JUROR 142:  No.

16             MS. MILLNER:  Why not?

17             JUROR 142:  They seemed to be doing their job.

18    We had a lot of showings.  People -- they were

19    giving us a lot of advice about what we needed to do

20    to make the home appear better and things like that,

21    and they were very active and seemed to be very

22    interested in trying to sell the home.

23             MS. MILLNER:  So just because the house had

24    difficulty selling or didn't sell, you understood

25    that was just a product of the marketplace?
```

1          JUROR 142:  That's correct.

2          MS. MILLNER:  All right.  Anyone else?  Yes,

3     Mr. Katzenbach.

4          JUROR 89:  I've bought and sold five

5     properties.

6          MS. MILLNER:  Okay.  And did you have any

7     difficulty with that process, or any of those

8     processes?

9          JUROR 89:  It was more dependent on the market

10     at the times.

11          MS. MILLER:  Okay.

12          JUROR 89:  When things were booming, it was

13     pretty simple.  Other times it would take a little

14     longer.

15          MS. MILLNER:  Right.  Sometimes properties or

16     assets on the marketplace, just for whatever reason

17     just can't be --

18          JUROR 89:  They weren't moving fast.  Right.

19          MS. MILLNER:  All right.  Anyone else?  Yes,

20     Mr. Pence, is it?

21          JUROR 32:  Mr. Pence.  Yes.  I sold a home in

22     Charlotte County when I moved up to Sarasota County.

23          MS. MILLNER:  Any difficulty with that

24     process?

25          JUROR 32:  Yes.

1          MS. MILLNER:   How so?

2          JUROR 32:   Well, it was in an unattractive

3     neighborhood.   That was one difficulty.   I also was

4     unhappy with one real estate agent who seemed to use

5     my listing to advertise her other listings more than

6     to help sell my own home.

7          MS. MILLNER:   And did the home eventually

8     sell?

9          JUROR 32:   Eventually.

10         MS. MILLNER:   All right.   Do you believe it

11    was the real estate agent's lack of interest for

12    lack of better terms in your property that led to

13    the difficulty that you had in selling the product

14    or the home?

15         JUROR 32:   In part.   It was a bad match for

16    this agency and this type of home.

17         MS. MILLNER:   All right.   Any other

18    experiences?

19         JUROR 32:   That's all.

20         MS. MILLNER:   All right.   Anything about

21    that -- that experience that will cause you to feel

22    more sympathetic for, for example, the plaintiff,

23    who in this case claims that the wrestling product

24    that he created did not receive the right -- enough

25    attention from Clear Channel in their efforts to

1    market the DVDs and videos that they took of that

2    event or those events?

3         JUROR 32:  No, I don't think so.  The only

4    thing it cost me was to interview more agents next

5    time I had something to sell.

6         MS. MILLER:  All right.  Just so you all

7    understand, as the judge has told you, the plaintiff

8    here produced and promoted three live wrestling

9    events which we videoed -- we being Clear Channel

10   Entertainment, and attempted to sell and market

11   those footage -- that video footage to distributors,

12   which we couldn't find anyone in the marketplace who

13   was interested in purchasing that footage.

14        Given y'all -- since several of you have had

15   experiences in difficulties with selling products in

16   the marketplace, does any of you feel that those

17   experiences will negatively impact you or persuade

18   you one way or the other if you were asked to serve

19   as a juror in this case?  Anyone?

20        All right.  Is anyone here in -- or anyone in

21   anyone's immediately family in the entertainment

22   business?  Any aspiring, budding actors or

23   actresses?  Ms. Wilhite?

24        JUROR 87:  My daughter is in her final

25   interview for one of the Lightning girls.

```
 1              MS. MILLNER:  Lightning girls is --
 2              JUROR 87:  They don't call them cheerleaders.
 3       I guess they're more of a promoter, going out and
 4       trying to get the crowd going.  So tomorrow is her
 5       final interview.  She's not totally in there yet.
 6              THE COURT:  The hockey team, Lightning.
 7              JUROR 87:  Correct.
 8              MS. MILLNER:  And is there -- like I said, the
 9       fact that there may be some professional athletes,
10       not cheerleaders but professional athletes that come
11       in the courtroom and testify or at least you'll hear
12       about some names of professional wrestlers, will
13       that impact you one way or the other, given your
14       daughter's association with professional sports?
15              JUROR 87:  No, not at all.
16              MS. MILLNER:  All right.  Is anyone here
17       involved in amateur wrestling?  We've talked about
18       professional wrestling.  How about amateur
19       wrestling?  Oh, Ms. Cofer.
20              JUROR 187:  I don't know if it qualifies, but
21       my youngest son is a high school wrestler.
22              MS. MILLNER:  All right.  And does he aspire
23       to be a professional wrestler one day?
24              JUROR 187:  No.  He aspires to be a Marine.
25              MS. MILLNER:  Oh, okay.  Anything about that
```

1    that may influence you one way or the other, cause

2    you, perhaps, to feel more sympathetic towards the

3    plaintiffs who are in the wrestling field?

4         JUROR 187:  No.

5         MS. MILLNER:  All right.  I believe when

6    Mr. Rodems asked who's been to a live wrestling

7    event, it was only Mr. Stover who raised his hand.

8    I just wanted to make sure that I didn't miss

9    anyone.  Is there anyone else who has ever been to a

10   live wrestling event other than Mr. Stover?  Okay.

11        Mr. Stover, how many live wrestling events

12   have you been to?

13        JUROR 142:  One.

14        MS. MILLNER:  And what was that event?

15        JUROR 142:  I don't remember.  I was 12 years

16   old.  I do remember that I didn't like the

17   experience.  That's the reason I remember it.

18        MS. MILLNER:  What about the experience did

19   you not like?

20        JUROR 142:  I have a hard time with people who

21   either through entertainment or otherwise like to

22   hurt each other.

23        MS. MILLNER:  Okay.

24        JUROR 142:  I really do.

25        MS. MILLNER:  Do you recall what wrestlers you

1      had seen?

2            JUROR 142:  No.  It was at the Coliseum in

3      Miami, and there was -- one of the events a guy

4      wrestled a bear.

5            MS. MILLNER:  Oh, my.

6            JUROR 142:  And another event I do remember

7      that the guy used an old soda bottle cap and pressed

8      it into the guy's forehead, and that's the bad

9      experience that I remember.

10           MS. MILLNER:  Does anyone else -- and no one

11     else has been to a live wrestling event?  Is there

12     anyone on the jury who periodically watches

13     wrestling on television?  Oh, Ms. Szabla.

14           JUROR 107:  I don't watch, but when I was

15     younger my brother was an avid fan so as a kid

16     through teenager, you know, I saw it plenty.  I

17     didn't have a feeling either way.  But if it was his

18     choice and he was older, he usually got to choose

19     what we watched so --

20           MS. MILLNER:  And do you recall who his

21     favorite wrestlers were?

22           JUROR 107:  Not necessarily.  I always heard

23     like Hulk Hogan.  I've heard the nicknames, but I'm

24     not even sure I'd know who they represented.  But it

25     was more just the drama of it.

1          MS. MILLNER:  Okay.  Did you enjoy it at all

2     or didn't care about it?

3          JUROR 107:  Oh, I think passive, like you

4     might think it was entertaining here and there.  But

5     I didn't have strong feelings either way.  I usually

6     wanted to watch something else.

7          MS. MILLNER:  Now that you have control of the

8     remote, do you watch wrestling at all?

9          JUROR 107:  No.

10          MS. MILLNER:  Okay.  Anyone else either by

11     choice or being forced to like Ms. Szabla

12     periodically watch wrestling?  Anyone here have any

13     immediate family members who are wrestling fans?

14     Ah, okay.  Let's start with Ms. Scott since we're --

15          JUROR 138:  My mom is.

16          MS. MILLNER:  And do you watch wrestling with

17     her?

18          JUROR 138:  No.

19          MS. MILLNER:  Do you like wrestling?

20          JUROR 138:  No.

21          MS. MILLNER:  Okay.  Do you and your mom

22     discuss wrestling at all?

23          JUROR 138:  No.

24          MS. MILLNER:  Do you know who her favorite

25     wrestler is?

```
 1              JUROR 138:  No.

 2              MS. MILLNER:  All right.  I saw some other

 3      hands.  I don't -- Ms. Carter.

 4              JUROR 105:  Hi.  Yes.  My brother-in-law

 5      watches it all the time and he lives with us, so,

 6      yeah.  He watches it.  And I, like, if he's in the

 7      front room watching it and I'll like watch it, you

 8      know.  It will catch my eye and stuff.  But I don't

 9      really care for it that much.

10              MS. MILLNER:  Okay.  So you don't have an

11      opinion one way or the other about wrestling?

12              JUROR 105:  No.

13              MS. MILLNER:  Any others?  Mr. Kurant?

14              JUROR 7:  Yes.  My brother-in-laws used to

15      watch it religiously, but I never got into it at

16      all.

17              MS. MILLNER:  Okay.  Anybody else?  Well, for

18      those of you who do have close family members who

19      enjoy wrestling or are avid fans, does that fact or

20      will that fact in any way affect your ability to

21      serve as impartial jurors in this case?

22              We asked all of you if you knew any of the

23      potential witnesses.  Do any of you know each other?

24      All right.  Mr. Smith, can you get the microphone.

25      I understand you recognized the name Jimmy Mouth of
```

1       the South Hart.

2               JUROR 145:  Yes, ma'am.

3               MS. MILLNER:  How do you recognize his name?

4               JUROR 145:  I've watched wrestling growing up,

5       but I haven't watched it in years.

6               MS. MILLNER:  Okay.  Why did you stop

7       watching?

8               JUROR 145:  More into football and other

9       sports now.

10              MS. MILLNER:  Okay.

11              JUROR 145:  And fishing and golfing so I don't

12      spend much time in front of the TV.

13              MS. MILLNER:  Are any of you involved in any

14      either promoting or participating in any amateur

15      sporting events at all?  Mr. Rinehart?

16              JUROR 161:  Yes, I do sailing and tennis.

17              MS. MILLNER:  You play or you --

18              JUROR 161:  I play.

19              MS. MILLNER:  Did you compete in any kind of

20      sport as an amateur?

21              JUROR 161:  Both.

22              MS. MILLNER:  Is it something that you've ever

23      rose to the level of being a professional in?

24              JUROR 161:  Not professional.  But the team

25      I'm playing on is going to go to the nationals in

1     Indian Wells this October.

2          MS. MILLNER:  Okay.  And -- well,

3     congratulations.  Any -- have you ever been involved

4     in promoting any of those sporting events at all?

5          JUROR 161:  No.

6          MS. MILLNER:  Do you have promoters for any of

7     those events?

8          JUROR 161:  No.

9          MS. MILLNER:  Have any of you ever promoted

10    any type of entertainment event or sporting event at

11    all?  Have any of you had any immediate family

12    members who's promoted any sporting event?  Okay.

13         Have -- do all of you watch TV?  All right.

14    Any of you ever have a favorite show that you just

15    thought was the greatest show on earth but for some

16    reason no one else seemed to think so and was

17    canceled?  Has that ever happened?  No?

18         Do you agree that -- anyone here disagree that

19    the entertainment business is a risky business?  All

20    right.

21         As you know, the plaintiff has brought a

22    breach of contract action.  I know you don't know a

23    lot about the facts of this case yet.  Does -- but I

24    want to ask you, does the fact that the plaintiff

25    has managed to get to this point and gotten to try

1     the case, do any of you believe that that fact alone

2     means that the plaintiff's case must have merit?

3     Does anyone think that the fact it's made it through

4     the litigation process and made it to trial that

5     there must be merit to the plaintiff's case?  Anyone

6     think that at all?

7             Ms. Wahl, you look a little puzzled.

8             JUROR 120:  (Inaudible).

9             COURT REPORTER:  I'm sorry.  I didn't hear her

10     comment.

11             THE COURT:  Pass the mic.

12             JUROR 120:  This is the way you have to

13     resolve things sometimes.  It takes -- goes to this

14     point, so I don't -- yeah, I'm not sure that -- I

15     mean, I'm not sure how to answer that, actually.  I

16     was just thinking about it.

17             MS. MILLNER:  Well --

18             JUROR 120:  Why do you think -- why do you

19     question my --

20             MS. MILLNER:  Oh, you just looked puzzled.

21             JUROR 120:  No.  I'm thinking about that,

22     though, what it would take to get to this point.  I

23     don't understand the legal system a lot.  I mean,

24     I'm learning a lot today, in fact.  But there must

25     be a reason that it couldn't be solved outside of

1        the court system so --

2            MS. MILLNER:  And my question is do you

3        believe that the mere fact that the plaintiff has

4        gotten to this point and gotten to try the case,

5        does that fact alone in your mind mean that there

6        must be some merit to his -- or the -- it's a

7        corporation, its claim?

8            JUROR 120:  No.

9            MS. MILLNER:  No?  Anyone think that?  I know

10       some of you have been involved in litigation, and I

11       don't want to get into the details of that.  But has

12       anyone brought a suit or brought a claim that

13       never -- that either was dismissed or somehow thrown

14       out of court before you got to trial?  Anyone?  How

15       about a close or immediate family member; has that

16       happened to any immediate family members?

17           Are any of you involved in careers that

18       involve sales, other than some of the real estate

19       brokers?  Okay.  Mr. Kurant?

20           JUROR 7:  I sell produce.

21           MS. MILLNER:  Oh, okay.

22           JUROR 7:  If that relates at all.

23           MS. MILLNER:  Has anyone ever been asked to

24       put together a sales plan or a marketing plan?

25       Okay.  Mr. Sandhoff?

1         JUROR 104:  Very, very briefly.  I mean, it

2     was just something for the business that I worked

3     for.  And I'm in insurance so it was basically to

4     market our company to the insurance companies we

5     would write for.

6         MS. MILLNER:  Okay.  And was that marketing

7     plan used?

8         JUROR 104:  Only to get the appointments and

9     the contracts.  I mean, as far as I know it was

10    basically filed with our paperwork somewhere.

11        MS. MILLNER:  Okay.  And did you actually go

12    and make the pitch for your company?

13        JUROR 104:  Generally they came to see us but,

14    yeah, I mean, it was us discussing, trying to get

15    the appointment.  Sure.

16        MS. MILLNER:  And every time you did the pitch

17    or tried to get the business, did it come in the

18    door or sometimes it just didn't work out?

19        JUROR 104:  Generally it was our decision,

20    either yes or no.

21        MS. MILLNER:  It was policyholders or --

22        JUROR 104:  I'm sorry?

23        MS. MILLNER:  Was it you were pitching to

24    policyholders?

25        JUROR 104:  No.  Pitching to actual insurance

1        companies to allow us to write the business.

2              MS. MILLNER:  Okay.  Ms. Szabla?

3              JUROR 107:  I had an experience where I was

4        the subject matter expert for a product.

5              MS. MILLNER:  What do you mean by that?

6              JUROR 107:  So it was a coding.  I worked

7        for -- it was Edex, which was a transcription

8        service, and we had a coding product so we sold to

9        hospitals.  And the details of the product were

10       pretty technical.  And so somebody else ran the

11       sales call, but when they had questions specifically

12       about the product, I was called in.

13             MS. MILLNER:  Okay.  And so you were more on

14       the technical side of it?  Were you involved in the

15       sales effort at all?

16             JUROR 107:  A little bit.  Just, you know,

17       sometimes I would talk about who had used the

18       product, if they were on a list that we could

19       discuss that, maybe, things you could do with the

20       product.  You know, there was always a little bit of

21       a sales efforts to it but it was really what could

22       the product do, what could it not do.

23             MS. MILLNER:  Did you ever -- or were -- let

24       me start over.  Did each time you tried to sell the

25       product or were involved in a sales effort, did the

 1      customer buy it?

 2              JUROR 107:  No.

 3              MS. MILLNER:  Have any of you ever made any

 4      investments in something that you just lost a lot of

 5      money in?  Ms. Wilhite, is that how you pronounce

 6      it?

 7              JUROR 87:  Yes.  Janette Wilhite.

 8              MS. MILLNER:  Yes.  Tell me about that.

 9              JUROR 87:  A company business.  We started

10      residential repairs down in the Ft. Myers area

11      unfortunately at the end of the boom for real

12      estate.  And, yes, we lost quite a bit of money on

13      that.

14              MS. MILLNER:  Okay.  And so was it a result of

15      the marketplace that you lost that money in?

16              JUROR 87:  Absolutely.

17              MS. MILLNER:  At some point did it become

18      clear to you that it just didn't make sense to

19      continue to invest money into that business?

20              JUROR 87:  Very clear.

21              MS. MILLNER:  Okay.  And what did you do at

22      that point?

23              JUROR 87:  Closed the doors.

24              MS. MILLNER:  Stopped spending money?

25              JUROR 87:  Yes.

```
 1        MS. MILLNER:  Did you ever hear the

 2   expression, don't throw good money after bad?

 3        JUROR 87:  Yes, I have.

 4        MS. MILLNER:  Has anyone else on the jury

 5   heard that expression?  Does anyone disagree with

 6   that?  Anyone else make an investment where they've

 7   lot money in?  Has anyone -- oh, okay.

 8   Mr. Katzenbach?

 9        JUROR 89:  401K.  I guess it's still a 401K.

10        MS. MILLNER:  Other than our dwindling 401Ks,

11   any other investments in any type of -- something

12   that's not a stock or anything of that nature?

13   Anyone here ever have any failed businesses that

14   they opened?  How about in the immediate family --

15   other than -- of course, other than Ms. Wilhite.

16   Anybody have any immediate family members who have

17   lost a lot of money in investments?  Mr. Sandhoff?

18        JUROR 104:  I had a brother who put quite a

19   bit of money into a business that all of a sudden

20   the laws changed and it was nothing he could do

21   about it, just could no longer offer the service.

22        MS. MILLNER:  Okay.  And did he then stop

23   investing in the business at that point?

24        JUROR 104:  Yeah.

25        MS. MILLNER:  Okay.  Seem like a sound
```

1    business decision to you for him to do that?

2         JUROR 104:  Oh, yeah.

3         MS. MILLNER:  Anyone else?  I know some of you

4    have been on juries.  Has anyone here been involved

5    in any type of mediation or arbitration?

6    Mr. Karydis?

7         JUROR 16:  Yes.  Yes.  As I mentioned before,

8    I had to bring the client to court, small claim

9    court.

10        MS. MILLNER:  The Canadian action?

11        JUROR 16:  Sorry?

12        MS. MILLNER:  The Canadian action with the

13   landlord?

14        JUROR 16:  No.  That was here.

15        MS. MILLNER:  Oh, okay.

16        JUROR 16:  Because he didn't want to pay the

17   full amount of the commission.

18        MS. MILLNER:  All right.  Okay.

19        JUROR 16:  But we ended up by arranging that

20   through mediation.

21        MS. MILLNER:  So you were a party in that

22   dispute; is that right?

23        JUROR 16:  I was the one who brought the

24   client to court.

25        MS. MILLNER:  You were owed the commission?

1                JUROR 16:  Yes.

2            MS. MILLNER:  All right.  Anything about that

3       process that would influence you one way or the

4       other?

5                JUROR 16:  I don't think so.

6            MS. MILLNER:  Okay.  I know that you don't

7       know all the facts of the case, but it's becoming

8       clear, I'm sure, to you at this point that this is a

9       matter involving professional wrestling, Clear

10      Channel Entertainment and Live Nation and their

11      efforts to distribute the video footage for these

12      events.

13           Is there anything that -- and this is very

14      broad -- is there anything that we should know about

15      your backgrounds, about your opinions that could

16      influence your ability to serve as an impartial

17      juror on this case that you have not disclosed?

18      Mr. Smith?

19           JUROR 145:  Yes.  I've heard being on radio

20      and through friends, Live Nation, do they also do

21      concerts?  I've heard a lot of negative things about

22      Live Nation and Clear Channel.

23           MS. MILLNER:  And those -- I don't want you to

24      say what those are, but does -- do you think that

25      would influence you?  In other words, given the fact

1       that Live Nation and Clear Channel is on the other

2       side of the -- on the other side of the case that

3       you'd, perhaps, have more sympathy and believe the

4       plaintiff's side of the case than Live Nation and

5       Clear Channel's position?

6              JUROR 145:  Well, like I said, a lot of

7       negative things.  And, you know, I don't know

8       firsthand.  However, the people that -- that I do

9       know that were involved in some things, they weren't

10      pleased with so I'd say, yeah, I'd probably be

11      biased.

12             MS. MILLNER:  Okay.  Well, thank you for that.

13      Anyone else?  Has anyone here had any business

14      dealings whatsoever with Clear Channel Entertainment

15      or Live Nation?  Anybody buy tickets, for example,

16      online through the Live Nation website?

17      Ms. Wilhite, anything about that experience that

18      will influence you one way or the other in this

19      case?

20             JUROR 87:  No, not at all.

21             MS. MILLNER:  Was the process acceptable and

22      satisfactory?

23             JUROR 87:  Yes.

24             MS. MILLNER:  Anyone else?  Okay.  In our

25      system of justice, because the plaintiff has the

1    burden of proof, the plaintiff gets to always go

2    first.  They get to go first in their opening

3    statement, they get to put their case on first, and

4    we have to wait, as the defendants, until after the

5    plaintiff puts their case on to present our side of

6    the story.

7        Does everyone here agree that there's always

8    two sides of a story?  Anyone disagree with that?

9        Are you able to wait until we get to tell our

10   side of the story as the defendant before reaching

11   any judgments or forming any opinions in this case?

12   Is there anyone who thinks they won't be able to do

13   that?

14       Do each of you promise that you will hold your

15   opinions and not make -- come to a decision in this

16   case until after you've heard all the evidence?

17   Thank you very much.

18       THE COURT:  Thank you, Ms. Millner.  The

19   attorneys will review their notes and then meet with

20   me up here at what we call sidebar.  Did you have

21   something else?

22       MS. MILLNER:  Yeah.  I forgot a few witnesses

23   who I wanted to give the names.

24       THE COURT:  Yes, please.  Thank you.

25       MS. MILLNER:  Victoria Richter?  James

1       Morrison?  Bruno Sammartino, anyone know him?

2            JUROR:  Old timer, old time wrestler.

3            MS. MILLNER:  All right.  Anyone else know

4       Mr. Sammartino?  Are you a fan of Mr. Sammartino?

5            JUROR:  I used to watch him years ago, yeah.

6            MS. MILLNER:  If he comes and testifies, do

7       you think you'd be more inclined to believe

8       Mr. Sammartino because of his status?

9            JUROR:  No.  No.

10           MS. MILLNER:  All right.  Jerry Jarrett?

11      Corey Maclin?  Derek Burgan?  Michael Bochicchio?

12      Any of those names?  No?  Thank you very much.

13           THE COURT:  As I was going to say, the lawyers

14      and I will meet up here at what we call sidebar,

15      real technical term, over to my side.  We're going

16      to be going through this process of jury selection.

17           The lawyers have a predetermined number of

18      excuses, what we call preemptory challenges.  They

19      can exercise those for pretty much any reason other

20      than your race, your gender, your ethnic heritage or

21      your religion.  It may be your life experience, some

22      of the expressions or opinions you've shared with

23      us, your thoughts.

24           Ultimately, it's intended to provide that the

25      remaining six to eight of you are here, ready to go.

1    And they may have to look at you to put a name with

2    a face, so forgive them for that.  It's difficult to

3    take a group of 18 people and suddenly remember

4    everyone.  So when we finish that process, I'll

5    excuse those of you who have not been selected and

6    the remaining jurors we'll swear in and then we'll

7    take our lunch break.

8        During these bench conferences, which will

9    happen from time to time during the course of the

10   trial, you will generally know what we're talking

11   about but not the specifics.  And you'll not be able

12   to hear the lawyers so that they are free to make

13   their arguments to me without fear that those

14   arguments might influence you.

15       Remember, your decision must be based on the

16   evidence presented and the law that I give you and

17   not what the lawyers argue to me during the course

18   of the trial.

19       I said earlier that I will not participate in

20   your fact finding, and I want to reiterate that.

21   You should never infer from anything I say or do

22   during the trial that I have a position on the

23   merits of the case.

24       The decision in this case is yours.  You

25   cannot make a mistake.  If an error is made, it's my

1    error.  I can't change your decision, neither can an

2    appellate court.  The only time that happens is when

3    I allow an error to take place in the trial which,

4    knock on proverbial wood, I won't let happen.

5    That's how the process works.

6         Are you guys ready?  All right.  Come forward,

7    please.

8         (At sidebar, on the record.)

9         MR. RODEMS:  Your Honor, I was going to ask --

10   I was going to ask two minutes to use the restroom.

11   We haven't had a chance to talk to Mr. Corrente.  Is

12   that all right?

13        THE COURT:  All right.  Two minutes in the

14   bathroom ends up being ten minutes when you've got

15   18 jurors.

16        MR. RODEMS:  I hear what you're saying.

17        THE COURT:  So do you need a break?

18        MR. RODEMS:  Okay.  No, sir.  If that's the

19   case, then, I just need two to three minutes to talk

20   to Mr. Corrente.

21        THE COURT:  All right.  That's why I was

22   looking at you guys to see if you were ready to go.

23   You want to confer with your clients for a few more

24   minutes?

25        MR. RODEMS:  That's why I was trying to get

1      your attention about that, but I understand what

2      you're saying.

3              THE COURT:  That's fine.  Go ahead.

4              MR. RODEMS:  Thank you.

5              (End of sidebar discussion.)

6              THE COURT:  Does anybody need a bathroom

7      break, a short one?  Bathroom, restroom.  Yes.  We

8      have a couple hands.  Anybody who needs a short

9      break -- if you need a short break, go ahead.  The

10     jury room is right through here.

11             (Recess was taken at 11:41 until 11:50 AM.)

12             (At sidebar, on the record.)

13             MS. MILLNER:  Judge, before we get started,

14     can I just get a lay of the ground rules.

15             THE COURT:  No.  Let me run this thing.

16             (Courthouse emergency system recording

17     interrupts trial.)

18             THE COURT:  Just sit here and breathe the

19     smoke or something.  This could be anything from a

20     water break, I mean, a leak, seriously, a security

21     issue.  It's not uncommon.  But that recording won't

22     stop until somebody pushes a button so we're going

23     to be at ease.

24             (Brief pause.)

25             (Back on the record.)

1              THE COURT:  Challenges for cause first for

2    the plaintiff and the defendant.  After we exhaust

3    those, we will then turn to the first eight jurors.

4    Those would be your jury if there are no

5    preemptories exercised.  And as a preemptory

6    challenge is exercised, the next juror would take

7    that last seat.

8              You may back strike.  Once you both say

9    they're acceptable, you have a jury.  First of all,

10   for the plaintiff on the very first page, jurors one

11   through nine.  Any challenges for cause?

12             MR. RODEMS:  Five and six, Your Honor.

13             THE COURT:  Let's take them one at a time.

14             MR. RODEMS:  Yes, sir.  Five.

15             THE COURT:  Ms. Jacobazzi?

16             MR. RODEMS:  Yes, sir.

17             THE COURT:  Grounds, please?

18             MR. RODEMS:  She stated she could not be fair,

19   given the nature of the case.  She doesn't like

20   wrestling.  I asked her over and over again, tried

21   to give her an out, but she clearly said she

22   couldn't be fair.

23             THE COURT:  Ms. Millner?

24             MS. MILLNER:  I agree, Your Honor.

25             THE COURT:  I'll grant that.  Do you have a

1      second challenge on that page?

2              MR. RODEMS:  Number six, Your Honor.

3              THE COURT:  Catanese.

4              MR. RODEMS:  For the same reasons.

5              MS. MILLNER:  I agree, Your Honor.

6              THE COURT:  I'll grant that.  Anybody else on

7      that page for the plaintiff?

8              MR. RODEMS:  No, Your Honor.

9              THE COURT:  All right.  How about for the

10     defense on that page?

11             MS. MILLNER:  Yes, Your Honor.  Mr. Smith,

12     juror number nine.

13             THE COURT:  Grounds, please.

14             MS. MILLNER:  Mr. Smith testified --

15     testified, or stated that he has negative opinions

16     about Live Nation, he has negative opinions about

17     Clear Channel.  He said that he -- he said that

18     because of these negative opinions, that he'd be

19     more prone to accept the plaintiff's side of the

20     case without knowing any of the evidence and that he

21     didn't -- and he said specifically that he was

22     biassed against the defendants.

23             THE COURT:  Mr. Rodems?

24             MR. RODEMS:  We do not disagree.

25             THE COURT:  I'll grant that.  Second page, any

1    challenges for cause from the plaintiff?

2         MR. RODEMS:  Yes, sir, number 14, Mr. Furr.

3         THE COURT:  Grounds, please.

4         MR. RODEMS:  Basically the same thing.  He

5    thinks wrestling is hoax.  He could not be fair,

6    just really had no interest in hearing the case.

7         THE COURT:  Ms. Millner?

8         MS. MILLNER:  I have to disagree with that

9    one.  Mr. Furr, while he said he didn't like

10   wrestling, he did say he would able to be a fair

11   juror and serve as a juror on this case, is my

12   recollection of what he said.

13        I would agree as with Ms. Jacobazzi and Ms.

14   Catanese.  They were clearly not able to serve as

15   impartial jurors.  But Mr. Furr did say at the end

16   of the day that he would be a fair juror, even

17   though he doesn't care for wrestling.

18        THE COURT:  He used the word possibly in

19   describing whether he could be fair or could not be

20   fair.  He definitely referred to wrestling as a

21   hoax.  But when you pressed him for a specific

22   reason, he couldn't give you one.  He was a little

23   bit ambivalent.  I think there's a reasonable doubt

24   on that and I'm going to grant the challenge.  There

25   is a reasonable doubt about his ability to be fair.

1              Any other challenges on that page for the

2       plaintiff?

3              MR. RODEMS:  No, Your Honor.

4              THE COURT:  How about from the defense?

5              MS. MILLNER:  No, Your Honor.

6              THE COURT:  All right.  So right now if there

7       were no preemptories, you have one, two, three,

8       four, seven, eight, nine -- I'm sorry, seven, eight,

9       10 and 11 would be your eight jurors.  Let me have a

10      preemptory challenge from the plaintiff, please.

11             MR. RODEMS:  Yes.  Number seven, Your Honor.

12             THE COURT:  That would then mean that Juror

13      Number 12 would be in that last seat.

14             Ms. Millner, for the defense.

15             MS. MILLNER:  Yes.  Juror Number 2, Ms. Wahl.

16             THE COURT:  That would put Mr. Rinehart into

17      the eighth seat.  For the plaintiff?

18             MR. RODEMS:  Number eight, Your Honor.

19             THE COURT:  Ms. Scott; is that right?

20             MR. RODEMS:  Yes, sir.

21             THE COURT:  All right.  That would put Juror

22      Pennington into the eighth seat.  What says the

23      defense?

24             MS. MILLNER:  Mr. Pence, number ten.

25             THE COURT:  That would put Donna Carter into

1        the eighth seat.

2              MS. MILLNER:  I'm sorry.  What was that?

3              THE COURT:  Carter.  What says the plaintiff?

4              COURTROOM DEPUTY CLERK:  I'm sorry, Judge.

5        What was the last --

6              THE COURT:  Pence, P-e-n-c-e.

7              MR. RODEMS:  We'd like to strike number 12,

8        Mr. Stover.

9              THE COURT:  That would place Mr. Katzenbach,

10       Juror 17, into the eighth chair.  What says the

11       defense?

12             MS. MILLNER:  Number 16, Ms. Carter.

13             THE COURT:  You've exhausted your

14       preemptories.  That puts Mr. Kurant, Juror Number 18

15       into the eighth seat.

16             MS. MILLNER:  Thank you, Your Honor.

17             THE COURT:  All right.  Thank you.

18             MR. RODEMS:  Thank you, Judge.

19             (End of sidebar discussion.)

20             THE COURT:  I will read the names of eight of

21       you who will stay with us.  The remaining jurors are

22       excused.  Please watch your step as you exit the

23       jury box.  I am advised that another judge is

24       picking a juror this afternoon, so please check in

25       on the third floor with the jury commissioners and

1     then, of course, you'll be able to go to lunch.

2     Just let them know you are available.  I don't know

3     when that process will start, probably either at

4     1:00 or 1:30, but ask that before you leave the

5     courthouse.  And I want to thank you for

6     participating here this morning.

7          The following jurors will remain with us:

8     Number 1, Sara Szabla; Number 3, Cynthia Cofer;

9     Number 4, Janette Wilhite; Number 11, Todd Sandhoff;

10    Number 13, Thomas Rinehart; Number 15, Althea

11    Pennington; Number 17, Hall Katzenbach; and Number

12    18, John Kurant.  The remaining jurors are excused.

13    Thank you.

14         (Brief pause.)

15         THE COURT:  Ms. Cofer, if you'll slide down

16    one, Ms. Wilhite, slide down one and, Mr. Sandhoff,

17    take the fourth chair.  Mr. Rinehart, if you'll

18    slide down.  We need four in the front and four in

19    the next row.  So we need Mr. Rinehart up in the top

20    corner and then Ms. Pennington, Katzenbach and

21    Kurant.

22         All right.  Those are kind of your assigned

23    seats.  That way y'all have the same vantage point.

24    That box in the middle of the courtroom, does that

25    interfere with your ability to see the witness,

1      Ms. Szabla?

2              JUROR 107:  I think I'll be okay.

3              THE COURT:  Okay.  Just let me know.  We want

4      you to be able to see and hear everything.  If we

5      can assist any of you in your video or audio

6      enhancement, let us know.

7              Madam Clerk, if you'll please swear the jury.

8              COURTROOM DEPUTY CLERK:  Please stand and

9      raise your right hand.  Do each of you swear or

10     affirm that you will well and truly try the case now

11     before the Court and render a true verdict according

12     to the law, evidence and instruction of this Court?

13             JURORS:  I do.

14             THE COURT:  Thank you.  We've going to recess

15     for lunch.  I just want to give you a couple of

16     cautions.  Please don't discuss the case among

17     yourselves or allow it to be discussed in your

18     presence.

19             If you happen to run into one of the

20     attorneys, they're going to ignore you.  Don't think

21     they're being rude.  They are avoiding the

22     appearance of any inappropriate communication.

23     Likewise, if you happen to run into any of the staff

24     or parties, they're not going to say hello to you.

25     And don't think they're being rude.

1          There may be people out there waiting to

2      testify as witnesses and they don't know who you

3      are.  So just use your common sense.  Keep your

4      distance.  Wear your jury badge when you're moving

5      about the courthouse.

6          You've already acquainted yourselves with the

7      jury room.  That's where you will go when you come

8      back from lunch.  So when you walk out of this

9      courtroom, like you do when you walk out of the

10     front doors, you're facing toward the Gulf of

11     Mexico.  Those of you who are not from Tampa, that's

12     just to orient you.  So when you get off the

13     elevator, you go to the right to our courtroom and

14     our jury room.  You'll figure it out after a day,

15     I'm sure.

16         Lunch.  You can go to lunch with whoever you

17     want other than the lawyers and the parties and the

18     witnesses, of course.  Without recommending any

19     particular place, let me give you some ideas.

20     Florida Avenue is the road right in front of the

21     courthouse.  It's a one-way street.  Be careful.

22         So if you stay on this side of Florida and go

23     all the way south about three blocks, you'll pass

24     the old courthouse, and there's a Catholic Church

25     with a somewhat unique copper roof.  Right past that

1        is a little place called Secret Garden which has

2        sandwiches and a salad bar.

3            If you go one block out of the courthouse

4        across Florida Avenue, you'll come to Franklin

5        Street.  Everything is south of Franklin Street.

6        You'll see TECO Plaza on the right.  That has a

7        lunchroom with hot and cold food.  Across the street

8        is a little Asian-Thai type restaurant.

9            And as you go down Franklin Street -- it's not

10       a pedestrian mall, it used to be, so there are cars

11       from time to time, so be careful -- there's a series

12       of fast food restaurants all the way down to a

13       Quizno's on the left.  That's about as far as you

14       want to go.  There is nothing north.  So if you head

15       north, you're going to see the interstate, there's

16       no restaurants that way.

17           We will return at 1:30 by the courtroom clock.

18       The attorneys and I have to go over a few

19       preliminary matters and at that time the attorneys

20       will give their opening statements to you.  So we'll

21       see you back at 1:30.  Just go right back to the

22       jury room when you're finished with lunch.

23           COURTROOM SECURITY OFFICER:  Please rise for

24       the jurors.

25           (Jury out at 12:04 PM.)

1          COURTROOM SECURITY OFFICER:  Please be seated.

2          THE COURT:  Thank you, counsel.  I thought

3     that was a very efficient voir dire.  Let's see you

4     back at 1:15 and we'll knock out a few of these

5     motions in limine.  Be prepared to give me your

6     brief argument.  We can go through them pretty

7     quickly.  I think I've read through them.

8          Anything else?  Just be careful about jurors,

9     everybody.  You know, let them clear the floor

10    before you get in the elevator with one of them and

11    get embarrassed.  It can be awkward.

12         You can leave everything on the tables.  We

13    don't have any other hearings scheduled so it's all

14    going to be locked up while we're at break.  1:15.

15    All right.

16         (Recess was taken at 12:05 until 1:20 PM.)

17         (Back on the record.)

18         COURTROOM SECURITY OFFICER:  All rise.  This

19    Honorable Court is again in session.

20         Please be seated.

21         THE COURT:  All right.  Docket 100 is

22    plaintiff's motion in limine.  The first issue is

23    whether Mr. Russen filed income tax returns.  Is

24    there any objection to the motion?

25         MR. HERBERT:  Yes, Your Honor.

1          THE COURT:   What's the relevance?

2          MR. HERBERT:   The relevance relates to

3     damages.   One of the key questions in the case is

4     how much in expenses the plaintiff filed.   And as to

5     Mr. Russen in particular filing his tax returns,

6     that is not necessarily an issue.   But it is

7     intertwined with the -- the second motion relates to

8     1099s and whether or not the plaintiff corporation

9     ever issued a 1099 to Mr. Russen.

10          The plaintiff issued 1099s to all of the

11    talent and the 1099s are exhibits that are going to

12    be submitted in our case and those 1099s reflect

13    what the expenses were for the plaintiff which show

14    whether they made or lost money as --

15          THE COURT:   Are you able to establish those

16    expenses without reference to whether 1099s were

17    issued?

18          MR. HERBERT:   Well, I think the issue is that

19    at one point Mr. Russen was claimed to be an

20    employee of the company.   If he was an employee of

21    the company, then, obviously, employment taxes

22    should have been --

23          THE COURT:   Well, that's my question.   Are you

24    able to establish the expenses without reference to

25    the issuance of a 1099?

1          MR. HERBERT:  Yes.

2          THE COURT:  All right.  Then that's what you

3     need to do.  The filing of tax returns and 1099s, I

4     don't see any relevance or probative value of that.

5     If you can establish it otherwise through some

6     evidence that he was paid as an expense, but whether

7     he's paid under the table or in cash with innuendos

8     rising from that --

9          MR. HERBERT:  I understand.

10          THE COURT:  What probative value does that

11     have, assuming you can establish that he received

12     compensation in some amount?

13          MR. HERBERT:  And Mr. Russen was also -- he

14     had involvement in the financials of the company in

15     terms of ensuring that all of the expenses were

16     accounted for.  He kept spreadsheets.  But, yet,

17     apparently the expenses related to his own

18     employment status were not properly maintained.

19          It also goes to the point of the overall, you

20     know, disorganization and improper business

21     practices of the plaintiff which contributed to

22     their losses, and they're trying to blame us for all

23     of their losses when, in fact --

24          THE COURT:  Mr. Rodems, your response?  It's

25     your motion.

1          MR. RODEMS:  Yes, sir.  Judge, the issue of

2     whether Mr. Russen filed tax returns or whether a

3     1099 was issued to him has nothing to do with

4     whether the defendant breached -- whether the

5     defendants -- whether there was a contract, whether

6     the defendant breached and what the damages are.  It

7     simply doesn't.

8          They want to offer it for one reason only, and

9     that is to make us look bad.  This issue about,

10    well, it shows the disorganization of the

11    plaintiff's business, that's not the issue in this

12    case.  The issue in this case is not the plaintiff's

13    disorganization.

14         THE COURT:  You put in your motion that you

15    believed that they can -- the defendant can

16    establish the expenses vis-à-vis salary,

17    compensation to Mr. Russen through other evidence?

18         MR. RODEMS:  Yes, sir.  They asked him during

19    deposition and he told them what he was paid.

20         THE COURT:  There's no documentation of that,

21    I take it.

22         MR. RODEMS:  No.  And there's -- there's

23    really a large question as to whether Mr. Corrente

24    at the time that he was giving him some money felt

25    like he was giving it to him from Wrestlereunion or

1          if he was giving it to him from his own personal

2          bank account and whether it was solely related to

3          what he was doing for Wrestlereunion or was it

4          related to --

5                   COURT REPORTER:  Counsel, please slow down.

6                   MR. RODEMS:  I'm sorry.

7                   THE COURT:  Take a breath.  Okay.  As to

8          paragraphs one and two of the plaintiff's motion, I

9          will grant the motion, finding there is no probative

10         value as to whether or not income tax returns or

11         1099s were filed or issued, on the understanding

12         that the defendant will be able to establish the

13         compensation through other evidence.  That goes more

14         toward character and bad character than anything

15         else, and it's not relevant.

16                  Number three has to do with some type of

17         discussion which the plaintiff is concerned may have

18         been a settlement offer.  Mr. Rodems, what are we

19         talking about?

20                  MR. RODEMS:  Yes, sir.  After it became

21         obvious that Clear Channel was not going to fulfill

22         its obligations, Mr. Corrente sought the advice of a

23         person he thought was an attorney, Mr. Sam Coplin,

24         to assist him in settling his claims against the

25         company.

1           As part of that discussion, apparently at one

2    point, one of Clear Channel's vice presidents,

3    Mr. Sterling, made some comment about, why don't we

4    just give you the tapes back, and they'd like to

5    offer that into evidence.  We believe that that was

6    part of a settlement discussion and we believe under

7    Rule 408 that should be kept out.

8           And more than anything, the contract required

9    Clear Channel to do the marketing, to do the

10   editing, and they didn't do it.  So for them to say,

11   hey, why don't we just abdicate our responsibility

12   under the contract and give it back to you is --

13   and, therefore, that's somehow pertinent to the

14   issues in the case, the bottom line is that that was

15   their duty.

16          And for them to try to get out of their duty

17   by saying, well, we offered to give you the tapes

18   back so now you have some mitigation of damages duty

19   to take our breach and do what you can with these

20   tapes, that's just highly inappropriate, especially

21   in the nature of a settlement discussion, Your

22   Honor.

23          THE COURT:  Mr. Gregory?

24          MR. HERBERT:  Yes.  Your Honor, the evidence

25   of the offer to revert the --

1          THE COURT:  Herbert, I'm sorry.  I don't know

2     why I said Gregory.  Mr. Herbert.

3          MR. HERBERT:  That's fine.  You can call me

4     whatever you want, Your Honor.  It's actually -- it

5     goes to the heart of the case because the heart of

6     the case is, as the plaintiff has cited in its

7     rulings and in its proposed jury instructions, that

8     the nature of the alleged duty on the part of Clear

9     Channel does not arise from the express words of the

10    contract itself.  It only arises from the implied

11    duty which is based solely on the exclusive nature

12    of the rights that we got under that contract.

13         The contract does say we get exclusive rights.

14    That's one of the reasons we lost summary judgment,

15    because the Court found that an applied duty arises

16    from the exclusive rights.

17         In some point in its -- in the party's

18    transactions, we offered to revert the rights to

19    them.  That's what it was.  Mr. Sterling said, we'll

20    give you this stuff back, you know.  We are your

21    exclusive broker.  If you think we're not doing a

22    good job, you can have it back.  Go to another

23    company.  See if they can sell this stuff.  The

24    plaintiff denied all offers to -- to -- to revert

25    the rights.

1          And what it was, it was a business

2     negotiation.  Mr. Coplin is actually a talent agent,

3     he's a music agent.  He knew Mr. Sterling.  He was

4     negotiating -- he was attempting to renegotiate the

5     contract.  The e-mails and the documents clearly

6     state that Mr. Sterling says -- and he clearly says

7     this, listen, if you're -- you know, if you want to

8     talk about getting the rights back and renegotiating

9     this, we still need to get recouped.  We'll -- we'll

10     change the terms.  If you make any money off of

11     this, you recoup our cost and then we'll take ten

12     percent off.  We'll reduce the percentage that we've

13     got.  But he said, if you're -- you know, if you're

14     going to be talking about litigation, I'm going to

15     turn this over to lawyers.  That's not what we're

16     talking here.

17          Our argument on that is that once they offered

18     to revert the rights, once they offered to let the

19     plaintiff go shop this with somebody else, their

20     implied duty, if such an implied duty exists, was

21     terminated.

22          THE COURT:  Was there already a dispute

23     between the parties that had arisen?

24          MR. HERBERT:  Well, I mean, there have been

25     disputes from day one about minor things and --

     1          THE COURT:  I'm not talking about that.  I'm

     2     talking about the responsibilities of the defendant

     3     pursuant to the agreement.

     4          MR. HERBERT:  Well, there's a dispute on -- a

     5     running dispute that the plaintiff claimed that the

     6     defendant, you know, wasn't shopping this

     7     aggressively enough.  But there were no -- there

     8     were no threatened lawsuits, there were no claims,

     9     there were no cease and desist letters that --

    10          THE COURT:  What was the defendant going to

    11     get in return if the plaintiff accepted the tapes?

    12          MR. HERBERT:  It was going to alter the terms

    13     of the contract.  They would get to recoup their

    14     costs, which they -- you know, it looked at that

    15     point like they weren't going to recoup anything.

    16     And instead of taking a 50/50 percent split, they

    17     were willing to agree to a ten percent split and

    18     they would only get ten percent on top of it.

    19          And the second reason, Your Honor, if I could

    20     turn to that that's in our motion is specifically

    21     under Rule 11, it's 408(b), what it says is that,

    22     you know, a settlement offer, even if this were a

    23     settlement offer, which, you know, we maintain that

    24     it's not, if it were, settlement offers are only --

    25     not admissible to prove -- establish liability,

1      generally speaking.  Under 408(b), there's an

2      exception to that rule that says -- it explicitly

3      allows offers of compromise to be introduced to

4      negate a contention of undue delay.

5           And that's exactly what we're dealing with

6      here.  They're saying, you took too long to make the

7      demo tape, you took too long to get an offer, you

8      were too slow in editing this thing.  And they said,

9      you can have it back, take it back.

10          THE COURT:  Have you got a case on that?

11          MR. HERBERT:  Yes, I do, Your Honor.  The case

12     that's cited in our opposition to the plaintiff's

13     motion is an Eleventh Circuit case from 1989.

14     It's -- I'm sorry?

15          THE COURT:  Go ahead.

16          MR. HERBERT:  Okay.  It's the *Intercorp, Inc.*

17     *versus Pennzoil Company*, 877 F.2d 1524.  In that

18     case they said the good faith obligation -- there

19     actually isn't a case in the Eleventh Circuit that

20     discusses the exclusive -- the duty arising from an

21     exclusive relationship.  That says that the good

22     faith obligation arose from the exclusive dealings.

23          And then as far as the 408(b), the case that

24     supports that is an Eighth Circuit case cited in our

25     brief which is the *Freidus versus First National*

1      *Bank of Council Bluffs*.  That's 928 F.2d 793.  There

2      they permitted introduction of a settlement letter

3      to rebut a claim that the bank had unduly delayed in

4      getting its consent to a sale of some property.

5           THE COURT:  All right.  I'm going to at this

6      juncture provisionally grant this motion.  I want to

7      read that case.  I understand the exception that's

8      being offered.  But rather than delve into that and

9      perhaps have something in the record that may or may

10     not be admissible, try to avoid that during opening

11     statements.

12          MR. HERBERT:  And, Your Honor, could I just

13     please add one more brief point.

14          THE COURT:  No.  The Court's ruling on

15     pretrial motions or the pleadings, does anyone

16     suggest that any of that is relevant?

17          MR. HERBERT:  The only reason that it could

18     come out, Your Honor, is if the -- the plaintiff

19     has -- has -- in the course of preparing the

20     pretrial statement, the plaintiff has tried to say

21     that there were multiple contracts.  And the --

22          THE COURT:  Well, how is this going to come

23     out in front of the jury, though?

24          MR. HERBERT:  Well, there's another part of

25     it, too, Your Honor.  If the plaintiff were to claim

1    that they were somehow defrauded, the first

2    complaint that was filed by the plaintiff included

3    two counts -- three counts, one for fraudulent

4    misrepresentation and one for deceptive and unfair

5    practices.

6        THE COURT:  But the Court's rulings on

7    pretrial motions or the pleadings are not going to

8    be presented to the jury; correct?

9        MR. HERBERT:  Correct.

10       THE COURT:  My rulings.

11       MR. HERBERT:  The ruling is not.

12       THE COURT:  All right.  So the motion is

13   granted.  Now, if the concern is evidence to support

14   counts which have been dismissed, obviously there

15   should be no evidence or testimony, Mr. Rodems, on

16   that.  I trust that you would not have any dispute

17   with that.

18       MR. RODEMS:  No, sir.

19       THE COURT:  All right.  So I'll grant that.

20   And you should counsel your witnesses and clients,

21   of course, accordingly.

22       E-mails or documents bearing the name of the

23   plaintiff's counsel.

24       MR. HERBERT:  That's agreed, Your Honor.

25       THE COURT:  That's agreed to.  Okay.  Thank

1      you.  Opinions regarding the credibility of

2      Mr. Bowman, Mr. Corrente or Mr. Russen.  Who has

3      these opinions, Mr. Bisham, is that right?

4      Bischoff?

5            MR. RODEMS:  Mr. Bischoff, Your Honor, and

6      Mr. Behrens to a large degree, as well.

7            THE COURT:  Are they going to express opinions

8      on another witness's credibility?

9            MR. HERBERT:  No, Your Honor.  What I

10     think that the issue comes up is they might be

11     talking about the experience or background of

12     Mr. Bowman.  Today's ruling might vitiate that.  But

13     Mr. Bowman in his report and Mr. Russen in his

14     declaration he filed say certain things about their

15     experience in the industry.

16           And they apparently both intend to offer

17     opinions based on certain experiences.  And

18     Mr. Behren's and Mr. Bischoff both worked at the

19     companies that they claim to be working with, so

20     it's just a factual issue that might come up in the

21     course of their expert testimony.

22           THE COURT:  Well, but he's not going to

23     express an opinion about Mr. Bowman's credibility.

24           MR. HERBERT:  Not about credibility.

25           THE COURT:  He might take issues with

1      conclusions or opinions expressed, but not address

2      the witness's credibility or experience or

3      qualifications; correct?

4          MR. HERBERT:  Well, he would address the

5      experience and qualifications.

6          THE COURT:  Under what authority?

7          MR. HERBERT:  If that's the basis for

8      Mr. Bowman's opinions --

9          THE COURT:  Under what authority?

10         MR. HERBERT:  I think it's just goes to the --

11         THE COURT:  There's no case that says that is

12     my point.  He may have opinions -- and I saw him

13     chuckling in the courtroom the other day.  I think

14     that was Mr. Bischoff; wasn't it?

15         MR. HERBERT:  No.  The other day we had

16     Mr. Behrens here.

17         THE COURT:  Behrens, then.  Okay.  That's

18     inappropriate and it shouldn't happen.

19         MR. HERBERT:  I didn't see that.  I would have

20     counseled him.

21         THE COURT:  Well, you wouldn't have seen it.

22     But you need to caution these experts.  They're not

23     going to be able to assail the qualifications and

24     credibility of an opposing expert.  They may

25     certainly take issue with conclusions or reasons,

1    but as long as they don't delve into the credibility

2    issues.  And you need to discuss that with them and

3    make sure their understanding is consistent with the

4    Court's ruling.  I think that was also something

5    either suggested or requested by the plaintiff; is

6    that not right, Mr. Rodems?

7         MR. RODEMS:  Yes, Your Honor.

8         THE COURT:  And that goes both ways.  I mean,

9    nobody's expert is going to start throwing stones at

10   the other expert in the guise of differing in their

11   opinions or their analysis or conclusions.

12        MR. RODEMS:  Yes, sir.  Of course.  And, of

13   course, we will instruct the witnesses before

14   anybody takes the stand as to what the Court's

15   rulings are.

16        THE COURT:  Hearsay testimony, I don't know

17   that you need a ruling on this, guys.  An expert may

18   base his on her opinion on what would otherwise be

19   inadmissible hearsay in accordance with the rules,

20   but it's got to be data or facts or information that

21   would be relied on by an expert.  So do we have a

22   concern about Mr. Bischoff getting into matters that

23   are not factual or customary type of information,

24   Mr. Rodems?

25        MR. RODEMS:  Yes, sir.  Talking with

1       Mr. Herbert before the case, he told me that

2       Mr. Bischoff would say that he spoke to Jim Ross

3       about Mr. Bowman's experience with WCW, and that

4       Mr. Bischoff will testify as to those out-of-court

5       statements.

6           And we -- you know, I heard your admonition

7       that we don't need to file motions in limine on

8       hearsay, but when we couldn't agree on that issue, I

9       thought I'd better bring it to the Court's attention

10      because whether Mr. Bischoff spoke to Mr. Ross about

11      Mr. Bowman's credentials or not, the bottom line is

12      that that's not a matter of expert testimony.

13          An expert can certainly rely on hearsay to

14      render an expert opinion, but it's not a -- it's not

15      a vehicle -- putting on an expert is not a vehicle

16      to have the expert say anything he wants based on

17      hearsay.  And saying I talked to Jim Ross and Jim

18      Ross said Colin Bowman didn't do X, Y and Z at WCW

19      would be highly inappropriate.

20          THE COURT:  Response.

21          MR. HERBERT:  Your Honor, it was -- actually,

22      it was Mr. Behrens who had the conversation with Jim

23      Ross at WCW, and it went to the issue of whether or

24      not the WWE copied the plaintiff's idea for a

25      wrestling legends event.  As part of Mr. Behrens'

1     research, he spoke with a colleague in the industry

2     which -- and he's familiar, who is one of the high

3     ranking people at WCW, and he asked him about --

4     there was a meeting between somebody from WWE and

5     the plaintiff, and whether or not, you know, the WWE

6     got any ideas or learned anything or took anything

7     away from that.

8         And he learned in that investigation that, in

9     fact, they did not.  And as he suspected, he

10    confirmed that with the people involved in the --

11    you know, in the conversation.  So that's part of

12    his background and investigation as an expert on

13    that issue.

14        THE COURT:  What issue does that go to?

15        MR. HERBERT:  I'm sorry?

16        THE COURT:  What issue does that go to in his

17    testimony?

18        MR. HERBERT:  It goes to the issue of whether

19    or not -- Mr. Bowman in his report, one of the

20    critical bases of his projections is that due to our

21    delay, WWE copied the plaintiff and came out with

22    this legends --

23        THE COURT:  He's not going to be testifying

24    about any of that.

25        MR. HERBERT:  Okay.  Then it shouldn't come

1    up.

2            THE COURT:  Okay.

3            MR. HERBERT:  But I think the fact witnesses

4    might testify to that.

5            THE COURT:  Based on my ruling.

6            MR. HERBERT:  Sure.  I know Mr. Bowman might

7    not say that, but I believe, in fact, Mr. Russen,

8    who is a fact witness, might make that same

9    allegation.

10           THE COURT:  Well, suffice it to say that Rule

11   703 is what guides both sides with respect to these

12   experts and the basis for their respective opinions,

13   and that's how I'm going to call it.  And it's not a

14   vehicle for bringing in rank hearsay that's not of

15   the type reasonably relied upon by experts in a

16   particular field.

17           So to the extent the motion seeks to prevent

18   these experts from -- whether it's Behrens or

19   Bischoff -- from simply recounting hearsay evidence

20   that's not of the type that they would reasonably

21   rely upon, then I have to grant the motion.

22           Now, if you get into an area that's gray, then

23   I can only suggest that you seek leave at sidebar

24   and let us discuss it and we'll go from there.

25           MR. HERBERT:  Certainly, Your Honor.

1          THE COURT:  So I'll grant on that basis.

2     Ensuring eyewitnesses are advised of the Court's

3     rulings, that is a responsibility I'm placing on the

4     lawyers.  And I'd better not hear any profanity in

5     any of these witnesses like I'm reading right now,

6     particularly experts.  Calling people liars and --

7     that's just not appropriate.  I assume that was the

8     heat of the moment, deposition testimony.

9          MR. HERBERT:  Yes, Your Honor.  Mr. Bischoff

10    will be advised early as to the Court's rulings

11    regarding decorum.

12         THE COURT:  It doesn't offend me, but it's

13    inappropriate.  Okay.  Number nine on page six, the

14    prior testimony in the Kaplan case, you want to

15    bring this in, Mr. Rodems?

16         MR. RODEMS:  Judge --

17         THE COURT:  I mean, it's kind of a reverse of

18    a motion in limine.

19         MR. RODEMS:  Well, it is.  It's kind of asking

20    for the Court, look, I don't want to get myself into

21    hot water if there's no need to so --

22         THE COURT:  It looks pretty hot to me.

23         MR. RODEMS:  It is pretty hot, but the bottom

24    line is, is that Mr. --

25         THE COURT:  Hot water, that is.

1          MR. RODEMS:  Hot water.  Yes, sir.

2     Mr. Bischoff as an expert is going to establish

3     himself by all of his actions while at WCW.  During

4     that time at WCW, we have two witnesses on the

5     witness list who can testify that Mr. Bischoff was

6     routinely intoxicated to the point where he couldn't

7     remember business deals he made.

8          So if he's going to testify that he was this

9     extremely successful executive with WCW, and there

10    is a question as to his ability to remember certain

11    things that happened or there are explanations for

12    his failure because he was ultimately fired by WCW

13    for incompetence, and he comes in and testifies to

14    the contrary of what he testified in the Kaplan

15    case, we're simply saying that, unfortunately, as

16    un -- unpleasant as the testimony was in the Kaplan

17    case, he testified in that case that he was

18    intoxicated to the point of, you know, not

19    remembering things during the time that he was head

20    of WCW.

21         THE COURT:  Okay.  I'm going to give you some

22    guidance.  Number one, if a foundation is

23    established that a witness may not be able to

24    accurately relate events about which the witness is

25    testifying because of the influence of alcohol or

1    other substances, or some mental impairment, that is

2    appropriate to bring out.  There's a jury

3    instruction on point.  But, certainly, that does not

4    mean you denigrate a witness by raising collateral

5    matters about sexual escapades and events happening

6    in a club.

7        I presume what you're talking about is

8    something that may be relevant to his decision

9    making about a matter that he may be testifying

10   about.  You'll have to lay a foundation.  But the

11   rest of this stuff is clearly outside the bounds of

12   relevance.

13       You are correct that a witness's credibility

14   can be attacked by showing capacity to observe, was

15   impaired at the time, but that's where you start.

16   And if that's not -- a foundation is not

17   established, then the rest of this is just

18   collateral attempts to impeach his character, and I

19   would caution you against that.

20       MR. RODEMS:  Your Honor, I would be -- may I

21   suggest that in the event that I feel it's necessary

22   to delve into something like this, I ask for a

23   sidebar so that we --

24       THE COURT:  Well, that goes without saying on

25   all these rulings.  Yes, sir.

```
 1              All right.  The rest of the motions, there are

 2      several, some of which we might have touched on, but

 3      let's keep it -- in terms of opening statements,

 4      let's avoid these subject matters and we'll take

 5      them up as time permits.  I think you've agreed on

 6      Mr. Russen's health.  Is that not correct?

 7              MR. RODEMS:  Yes, sir.

 8              THE COURT:  It's not an issue that's relevant.

 9      Is that right, Mr. Herbert?

10              MR. HERBERT:  Yes.

11              THE COURT:  All right.  I'll grant that.

12      That's Docket 101.  Will he be testifying?

13              MR. RODEMS:  Yes, sir.

14              THE COURT:  All right.  Is he able to testify

15      comfortably and --

16              MR. RODEMS:  This is Mr. Russen here, Your

17      Honor.

18              THE COURT:  All right.  Very well.  If -- I'm

19      just looking at some of these.  I think we're okay.

20      You know who can express opinions and who can't, and

21      when lay opinions are admissible and when they're

22      not.  We'll take them up.  I'm just giving you

23      guidance.  Matters about someone's personal life,

24      unless it's relevant is rarely coming in.  I think

25      we've already talked about that.  That's the
```

1      defendant's motion 104.

2           And revenue streams not contemplated by the

3      parties, I'm sensing there might be a substantive

4      issue here about plaintiff's theory of the case.

5      Let me just ask Mr. Rodems in guidance, this is

6      Docket 105, not the motion so much, but as I

7      understood the pleadings, you have attached to the

8      complaint an exhibit which you contend and I believe

9      your client contends was the operating agreement

10     between the parties.

11          MR. RODEMS:  Yes, sir.

12          THE COURT:  Do you contend there were other

13     agreements outside that particular document that are

14     going to come up?

15          MR. RODEMS:  Yes, sir.

16          THE COURT:  Are you contending there was a

17     breach or breaches of any of these other agreements,

18     or is it just explanatory as to the -- how the

19     parties operated?

20          MR. RODEMS:  Really just explanatory as to how

21     the parties operated.

22          THE COURT:  Well, if there's no contention

23     that those other agreements were breached, does that

24     address your concerns?

25          MR. HERBERT:  I'm sorry, Your Honor.  I'm not

1       sure if I followed the logic there.

2           THE COURT:  Well, you've been litigating this

3       case for three years, I haven't so --

4           MR. HERBERT:  We've got one contract for two

5       years.

6           THE COURT:  One contract.

7           MR. HERBERT:  Yeah.  It's attached to the

8       complaint and that's a judicial admission in the

9       complaint.  And the witness, Mr. Corrente, the

10      corporate rep said everything is in that document.

11      That's what the contract -- that's what we're suing

12      on.  That's all I've ever heard from day one.  The

13      first time I heard about these other contracts was

14      in preparing a pretrial statement.

15          THE COURT:  Well, he's saying agreements.

16      Mr. Rodems?

17          MR. RODEMS:  Yes, sir.  Before Wrestlereunion

18      II, about four days before or three days before,

19      Mr. Sterling sent an e-mail to Mr. Corrente and

20      said, hey, as you know, we're getting ready to put

21      on Wrestlereunion II.  We want to reiterate that all

22      the terms and conditions are going to be the same.

23      We're able to keep the budget for the second event

24      the same as the first event, even though we're

25      bringing in fancier equipment.

1          I'm paraphrasing now, Your Honor.  I'm sorry

2     I'm going too fast.  But in any event, at the

3     conclusion of the e-mail, Mr. Sterling said I want

4     you to confirm by e-mail that we're in agreement,

5     which Mr. Corrente did.

6          The point is, is that prior to Wrestlereunion

7     II, Mr. Sterling felt uncertain enough about the

8     relationship between the parties that he wished to

9     confirm with Mr. Corrente that the original terms

10    would apply.  So whether it's wrapping the second

11    event into the first contract or whether it creates

12    a completely separate agreement, you know, that's --

13    that's calling, you know, a 12 pack half a case.

14    You know, it's the same thing.

15         He specifically -- Mr. Sterling specifically

16    wanted to ensure that they were operating under --

17         THE COURT:  I understand.  We addressed this

18    in the summary judgment.  I don't see that being a

19    problem.  What's the concern that you have?

20         MR. HERBERT:  I just thought it might confuse

21    the jury if we're going to hear about two separate

22    contracts.  If the argument is just that they

23    confirmed that they're operating under the original

24    agreement and it's one contract, I mean --

25         THE COURT:  Well, as I found in the summary

1          judgment order, you know, the material terms of the

2          agreement is a matter for the jury, and the parties

3          are able to present evidence, obviously, explaining

4          how the parties acted and interacted.  But the

5          agreement the plaintiff is relying on is the one

6          attached to the complaint.  So we're in agreement on

7          that.  All right.  Are y'all ready for openings?

8                    MR. RODEMS:  Yes, sir.

9                    MR. HERBERT:  Yes, sir.

10                   THE COURT:  Bring the jury in, please.

11                   MR. HERBERT:  Your Honor, is the -- I'm sorry.

12         Just a technical question.  Is that all set up,

13         Matt?

14                   MR. BROWN:  We've just got to test the audio.

15         That's it.

16                   COURTROOM DEPUTY CLERK:  The audio is on.

17                   MR. BROWN:  Okay.  I didn't want it to blast.

18                   THE COURT:  Give it a run-through real quick.

19         Is that all right with everybody?  Watch those

20         jurors.  If they're doing this or this, go ahead and

21         adjust it.  If it's too loud for them they'll let

22         you know.

23                   MR. BROWN:  Okay.

24                   COURTROOM SECURITY OFFICER:  Rise for the

25         jury.

 1              (Jury in at 1:48 PM.)

 2              COURTROOM SECURITY OFFICER:  Please be seated.

 3              THE COURT:  Well, that didn't work very well.

 4    We're trying to get the lights comfortable.  They're

 5    halogen.  If we don't turn them down, you guys will

 6    cook in that jury box.  There they are.

 7              If you become uncomfortable, let us know.

 8    Mine are dimmed down to the point where I can barely

 9    see up here because they're like a heat lamp.

10              All right.  We are ready at this time for

11    opening statements, during which the attorneys will

12    describe for you what they believe the evidence will

13    show and how the evidence will relate to the

14    contentions of the parties.

15              Remember that what the lawyers say is not

16    evidence, but they are advocates.  They have

17    discovered the case.  They understand what's coming,

18    what's not coming, so they should be able to assist

19    you in understanding what the case is about.

20              You should give careful attention to the

21    testimony and the evidence during the course of the

22    trial because we do not have the facilities to

23    provide you with transcripts.  You should not form

24    or express any opinion about the case one way or the

25    other until you've heard all of the evidence, the

1       attorneys' final arguments and my closing

2       instructions at the end of the case.

3            You may not discuss this case among yourselves

4       or with anyone else or allow it to be discussed in

5       your presence.  That is the one rule which I think

6       is very difficult for jurors to follow.  It's very

7       hard to go back in that jury room during a break and

8       not kind of share some thoughts.  Please don't.

9       You're judges.  Maintain your judicial appearance as

10      well as compliance with the rules.

11           If something does happen in the hallway and

12      you are inadvertently exposed to a comment, you are

13      duty-bound to bring it to my attention through the

14      court security officer so we can deal with it at

15      that time and perhaps avoid any embarrassment or

16      interruption of the trial at a later time.

17           There may or may not be press attention in

18      this case.  Reporters roam about the courthouse

19      freely.  They are free to come in and out of trials

20      whenever they wish to.  Sometimes they're just

21      looking for a story to write.  Please don't be

22      distracted by people coming in and out of the

23      courtroom.  Pay attention to the witnesses and the

24      attorneys.

25           If there are media accounts of this trial or

1    any other trial, you should avoid being exposed to

2    those so that you're not exposed inadvertently to a

3    comment by a judge or someone else.  That's not

4    evidence.  Remember, the case must be decided based

5    on the evidence presented in the courtroom and not

6    what you hear from outside sources.

7        For example, when you go back home or back to

8    work, if you choose to after we are in session, it's

9    okay to tell those loved ones or family members or

10   coworkers that you're a juror and I'm the judge.

11   But beyond that, mum's the word.

12       If you were to happen to mention a lawyer's

13   name or the name of a party, it might result in a

14   response that's inadvertent that might somehow

15   influence your decision making.  Remember, you're a

16   judge.  Just like I don't go home and discuss my

17   cases with my wife, you cannot do the same.

18       In a civil case, the plaintiff has the burden

19   of proof, so the plaintiff will go first.  They'll

20   call the first witnesses, they'll give the first

21   opening statement.  And after the plaintiff rests,

22   meaning it -- the plaintiff has concluded its case,

23   the defendant will then be calling witnesses,

24   presenting evidence.

25       The witnesses will be subject to

1        cross-examination by the parties.  They will be

2        testifying under oath.  You will assess credibility,

3        as I said earlier.  There may be witnesses who

4        testify by way of deposition which will be read to

5        you by the attorneys.

6             That is an acceptable way of presenting

7        testimony for a witness who's not available, or

8        perhaps the witness's an actual party to the case,

9        and that testimony can obviously be received.  But

10       typically it's because the witness is not otherwise

11       available to be here live.  And you must consider

12       and receive that testimony just as if the witness

13       were here live testifying.

14            As the lawyers present their opening

15       statements to you, this is not a time for them to

16       argue the case.  It's simply a time for them to

17       acquaint you with the case and their respective

18       contentions.  Please give them your close attention,

19       but remember they're not witnesses, they're

20       advocates.  They may disagree on what the facts are.

21       That's where you come into play.  You will resolve

22       the factual disputes between the parties.

23            You have your note pads.  A couple words of

24       advice and some instructions.  Don't put your name

25       on your note pads.  Just maybe put your juror number

1        so that you can retrieve it when you come back into

2        the courtroom.

3            I suggest that you keep track of the day of

4        the week, maybe before lunch, after lunch.  It will

5        help you remember the sequence of the witnesses.  I

6        would suggest you write the witness's name down,

7        even if you don't take notes on that particular

8        witness's testimony because it helps you remember

9        the sequence of the testimony.

10            You will have all of the exhibits in the jury

11       room for your review, but you won't have an exhibit

12       list, per se.  So if there's a particular exhibit

13       that you'd like to look at more closely while

14       deliberating, make a note of the exhibit number.

15            You'll hear Plaintiff's Exhibit Number 1 or

16       Defendant's Exhibit Number 3, for example.  That's a

17       numerical identification for that exhibit once it's

18       received in evidence.  It will have an exhibit tag

19       on it and you'll be able to clearly see Plaintiff's

20       Exhibit 1 or Defendant's Exhibit 2.

21            If you are good at note taking or you have

22       taken shorthand in your past, please don't try to

23       write everything down.  You will miss evidence.

24       What you see in a courtroom can be as important as

25       what you hear.  You will be asked to assess

1    credibility, which means you watch people testify,

2    how they testify, and if you're busy doodling or

3    taking copious notes, you're going to miss important

4    testimony.

5         Some of you may not have taken notes since

6    junior high or high school.  Some of you may take

7    them every day as part of your work.  It doesn't

8    matter.  You're not required to take notes.  But if

9    you choose to take notes, they should be used only

10   to refresh your personal recollection of the

11   testimony and the evidence, and they should never

12   serve as a substitute for your fellow jurors'

13   memories of the evidence.

14        With that, Mr. Rodems, you may address the

15   jury.

16        MR. RODEMS:  May it please the Court.  The

17   case you are about to hear is just one more in a

18   long line of stories about corporate greed and

19   incompetence; how a giant, publicly-traded company,

20   Clear Channel Entertainment Television, Inc.,

21   crushed the dreams of a simple man, Sal Corrente,

22   who believed that in life all that is necessary for

23   one's word is a handshake.

24        Instead, Clear Channel Entertainment

25   Television lied to him, used him, deceived him and,

1    through shear corporate incompetence, nearly ruined

2    him.  During all of that time, Mr. Corrente was at

3    the mercy of this company.

4         Today in this courtroom, Clear Channel

5    Entertainment Television and Mr. Corrente and

6    Wrestlereunion, LLC are equal in the eyes of the

7    law.  You as a jury will be empowered to correct

8    this injustice that I'm about to tell you about.

9         Good afternoon, ladies and gentlemen.  My name

10   is Chris Rodems.  With me is Chris Barker, my

11   partner and co-counsel, and Mr. Corrente.

12        In 2004 Mr. Corrente had a dream, a vision.

13   What if he could stage the greatest fan convention

14   in the history of professional wrestling?  What if

15   he could bring together in one room all the legends

16   that made professional wrestling what it is today,

17   the superstars, who, in the 1960s and 70s formed the

18   foundation that led to professional wrestling today

19   being dominated by the WWE, a company that generates

20   revenue in an amount of in excess of $500 million a

21   year?

22        Mr. Corrente called his concept

23   Wrestlereunion.  Now, Mr. Corrente had been involved

24   in the professional wrestling business for over 20

25   years.  He had worked with many wrestlers, many

1      promoters, made contacts in the business.  He

2      managed wrestlers who today are in the WWE Hall of

3      Fame.

4           He brought in Mr. Russen, Rob Russen.  He'll

5      testify in this case.  Mr. Russen also has over 20

6      years experience in the wrestling business,

7      including the staging and promoting of live events,

8      and Mr. Russen also was responsible in the eighties

9      and nineties for selling televised wrestling to

10     major cable companies including Comcast, Sports

11     Channel America, The Sunshine Network here in

12     Florida, as well as InDemand and through Direct TV.

13          Mr. Corrente envisioned that Wrestlereunion

14     would be a weekend event, not just a day.  He also

15     envisioned bringing in 40 to 50 to 60 legends of the

16     professional wrestling business, not just five or

17     ten like some other fan conventions had done.  And

18     instead of allowing thousands of fan to walk through

19     the gate, what he would do is limit it to 1000 fans,

20     that way giving the fans a meaningful opportunity to

21     interact with the legends that they grew up

22     watching.

23          But to really make it special, he decided what

24     he would do is he would bring some of these

25     wrestlers back and give the fans what they really

1    wanted to see, one more chance to see these

2    wrestlers, these legends, these people that they had

3    grown up watching wrestle one more time, settling

4    old feuds in the ring.

5        So the fan convention was not just going to be

6    a meet and greet opportunity over a three-day

7    weekend with question and answer sessions and

8    interviews, but they were going to have real

9    wrestling matches.

10       Mr. Russen loved the idea.  They began talking

11   about where they should hold this event.  They knew

12   that Florida was a hotbed of wrestling, especially

13   Mr. Russen.  You see, in the 1990s when Gordon Solie

14   became ill, Mr. Russen was asked to take over

15   Mr. Solie's duties, not as the announcer for

16   Championship Wrestling from Florida for WCW, but as

17   the Florida promoter.  That was the other function

18   that Mr. Solie had, was to promote in the state of

19   Florida.

20       So Mr. Russen took over and promoted in the

21   state, so he understood the state of Florida and the

22   importance of wrestling in the state of Florida.

23   Now, together Mr. Corrente and Mr. Russen agreed

24   that not only should Florida be the location, but

25   Tampa, Tampa should be the place for the first

1       Wrestlereunion.

2              They began exploring venues and found an ideal

3       one, the grand ballroom of the Westshore Doubletree

4       Hotel on West Cyprus Street here in Tampa.  That was

5       only a few miles away from the Fort Homer Hesterly

6       Armory where every Tuesday night for years wrestling

7       was staged and promoted live right here in Tampa and

8       the fans could go to that armory and watch people

9       like Dusty Rhodes and Terry Funk have their battles.

10             But the other reason that the grand ballroom

11      in the Doubletree Hotel was important is because

12      this was going to be a three-day event, so the

13      wrestlers and the fans could both stay at the hotel.

14      But even more important, the grand ballroom at the

15      Westshore Doubletree had been the site of televised

16      boxing that was on ESPN and USA Network, including

17      By Don King Productions.  So this room would have

18      the set-up for TV.

19             Now, why was that important?  Because

20      Mr. Corrente knew that to stage the Wrestlereunion

21      events, he could make money not just from the live

22      gate, not just from the live attendance, but from

23      videotaping the events and packaging them and

24      selling them.

25             Now, Mr. Corrente knew a gentleman from North

1     Carolina named Michael Bochicchio who you'll hear

2     testimony from in this case.  Mr. Bochicchio has a

3     company called Highspots.com.  It's a wrestling

4     site.  It's an internet site where you can go online

5     and you can purchase anything you can dream of in

6     the professional wrestling world; masks, replica

7     championship belts, T-shirts, old magazines, DVDs.

8          Mr. Bochicchio offered one other service.  He

9     had the capability to come to town and film the

10    event and then edit it, and with the edited version,

11    put it for sale on his website, but also giving it

12    to Mr. Corrente and Mr. Russen who would then in

13    turn also be able to market it on their own.

14         So when Mr. Corrente talked to him about it,

15    the idea was -- and this was done on a handshake,

16    50/50.  Mr. Bochicchio would bring his equipment in

17    and come and film the events, and then whatever

18    revenue he derived, he would split it with

19    Mr. Corrente 50/50.

20         Now, Mr. Russen, for his part, began talks

21    with InDemand, a pay-per-view company.  He was

22    introduced to them by a man by the name of Mike

23    Graham whose father, Eddie Graham, was one of the

24    legends in Florida.  When Eddie Graham passed away,

25    he gave his rights to Florida Championship Wrestling

1    to Mike Graham who, from time to time, put the

2    championship wrestling from Florida on InDemand for

3    pay-per-view.  So through that contact, Mr. Russen

4    began looking at the opportunity to get

5    Wrestlereunion on pay-per-view InDemand.

6        Now, the first Wrestlereunion was scheduled on

7    January 28th through the 30th of 2005.  So now they

8    had the place, they had the town, they had the hotel

9    and they were beginning talks to do all of the other

10    things.  The next thing was signing the talent.  And

11    this was Mr. Corrente's forte.  From years in the

12    industry, he knew people who knew other people and

13    people who could vouch for him.  So he began signing

14    one superstar after another.

15        He signed Bruno Sammartino who is the

16    Worldwide Wrestling Federation champion, which is

17    the northeastern United States at the time, for

18    seven years who sold out Madison Square Garden 40 or

19    50 times.  Mr. Sammartino will testify in this case.

20    He's a true legend of the business.

21        Of the 63 living legends who are in the WWE

22    Hall of Fame, 19 of them were signed to appear at

23    Wrestlereunion, including legends such as Ricky the

24    Dragon Steamboat, Jimmy Valiant, Rowdy Roddy Piper,

25    Tito Santana, Jimmy Superflfy Snuka.

1           These names may not mean much to people who

2      don't know something about the wrestling world, but

3      for those who do know something about the wrestling

4      world, it was an incredible lineup of superstars.

5      And perhaps the biggest name that Mr. Corrente

6      signed in this area was the American Dream, Dusty

7      Rhodes, signed him to appear.

8           Now, Mr. Corrente launched Wrestlereunion

9      .com, a website touting the Wrestlereunion events.

10     And each time Mr. Corrente signed a new superstar,

11     he would update the website so that people could see

12     who was going to be there.  And as the names kept

13     adding up and kept adding up, people started to take

14     notice, and the publicity caught the attention of

15     Clear Channel Entertainment Television.

16          On December 27th, 2004, Eric Paulen -- that's

17     Eric Paulen, a producer with Clear Channel

18     Entertainment Television sent an e-mail to a man by

19     the name of Bill Apter, who was an advisor to

20     Wrestlereunion.  Mr. Paulen introduced himself as a

21     television producer at Clear Channel Entertainment

22     Television, said they were an award-winning company,

23     said he had found out about Wrestlereunion by

24     looking at their website, doing some internet

25     research for a biography that Clear Channel was

1    trying to do with the A&E Network on the top ten

2    wrestling personalities of all time.

3         Now, this biography is going to be a feature

4    throughout this case.  But just remember at this

5    point that Mr. Paulen called Mr. Apter, Clear

6    Channel television called Wrestlereunion.

7         Mr. Apter, in turn said, you need to speak to

8    Rob Russen, and so Mr. Paulen did.  And they had a

9    conversation, and during that conversation

10   Mr. Russen and Mr. Paulen talked about not only

11   would Clear Channel Entertainment Television be

12   interested in coming down to get some footage for

13   its A&E biography, but would Clear Channel be

14   interested in filming the entire event and then

15   placing the product into the market.  And Mr. Paulen

16   said, that's exactly what we do.

17        Now, after that conversation Mr. Paulen wrote

18   an e-mail to the Clear Channel Entertainment

19   Television senior vice president, Steve Sterling, on

20   December 28th, 2004.  What I'm going to show you is

21   Exhibit 133 which will be offered into evidence in

22   this case.

23        Your Honor, would it be possible if we could

24   dim the lights?

25        THE COURT:  That's about as good as you can

1        get.

2                MR. RODEMS:   Okay.   Thank you.

3                THE COURT:   You can probably enlarge that.

4        You can just hit that button.

5                MR. RODEMS:   This is what Eric Paulen said to

6        Steve Sterling.   In doing some research for a

7        possible A&E wrestling documentary, I came across a

8        website called Wrestlereunion .com.   They're staging

9        a huge convention, live wrestling event with some of

10       the most famous names in the history of wrestling.

11               And as you'll see, the e-mail goes on and on

12       to talk about Mr. Paulen's conversation with

13       Mr. Russen and whether Clear Channel would be

14       interested in producing the live event as something

15       that could be repackaged as a DVD and/or

16       pay-per-view special.

17               He says, there's a very big market for it.

18       They have the talent and announcers in place.   I

19       believe he said to me that there would not be any

20       rights fees, only that they would be our partner in

21       creating/selling this DVD.   I think this could be

22       really lucrative.   They plan to do four events this

23       year -- now, this is 2005 -- and I believe at least

24       four next year.   But the event is on January 28th,

25       29 and 30.

1              And in response to that, Mr. Sterling said,

2       Hi, Eric, thanks so much for this.  It definitely

3       sounds like it has the makings of an opportunity

4       there.  Would love to figure out how we can make it

5       all work into something with TV/DVD rights.

6              Mr. Sterling then called Mr. Russen on New

7       Year's Eve in 2004 himself, Mr. Sterling did, and

8       they had a discussion.  And Mr. Sterling was very

9       excited about the prospect.  He likened it to the

10      Seniors Tour for Golf or the Champions Tour for

11      Golf.  And he said to him, this Wrestlereunion has

12      the makings of something great, and it's going to be

13      here long after we're both gone.

14             Now, Mr. Russen and Mr. Corrente were

15      thrilled.  Before Clear Channel expressed any

16      interest in involvement, they were going to have to

17      take and go and market all these videotapes.  Now,

18      Clear Channel had this area of expertise, Clear

19      Channel Communications.

20             It's one of the largest media conglomerates in

21      the world, thousands of billboards across the United

22      States, hundreds of radio stations, television

23      stations in 40 -- 40 television stations in 25

24      markets.  This represented a tremendous opportunity.

25      And Clear Channel wanted Wrestlereunion.  Clear

1    Channel came to them.

2         Now, what Mr. Russen and Mr. Corrente didn't

3    know at the time is that even before Clear Channel

4    ever proposed a contract to them, Clear Channel

5    started dealing behind their back.  I show you

6    Exhibit 122, which will also be offered into

7    evidence.  This is on January 14th of 2005.  And

8    this is at a time before Clear Channel had offered a

9    contract to Wrestlereunion.

10        It's an e-mail from Mr. Sterling to Eric

11   Paulen.  Eric, just heard from Joe.  Joe is Joe

12   Townley, the president of Clear Channel

13   Entertainment Television.  Just heard from Joe that

14   he had received a message from A&E.  It's a go on

15   the wrestling show for them.  Please keep that as

16   low profile for the moment with any of the

17   Wrestlereunion folks.  Let's talk about it -- let's

18   talk when you can.

19        They wanted to keep this low profile from the

20   Wrestlereunion folks.  This is just the first of

21   many deceptions.  On January 21st, 2005,

22   Mr. Sterling sent an e-mail and a contract to

23   Wrestlereunion.

24        COURT REPORTER:  I'm sorry, counsel.  Please

25   slow down.

1          MR. RODEMS:  Thank you.  I apologize.  On

2     January 21st, 2005, Mr. Sterling sent a contract to

3     Wrestlereunion.  He sent an e-mail with it.  It

4     said:  Gentlemen, as discussed today, attached are

5     the outline of terms we've been negotiating in two

6     versions as noted above.  Please review them and let

7     us know which way you want to go on it.  Based on

8     our conversations, we have mobilized personnel

9     facilities to undertake the production and create a

10    multi-camera shoot at the event.  Very much looking

11    forward to receiving a signed copy of the agreement

12    Monday, as we will need to make the final

13    commitments to all the manpower and equipment by the

14    end of the day to ensure the quality coverage of the

15    event.

16         Now, it's clear why they wanted this signed

17    contract.  They had the commitment from A&E, they

18    needed access to the legends that Wrestlereunion

19    had.

20         Now, meanwhile, you'll remember that

21    Mr. Corrente had a handshake deal with

22    Mr. Bochicchio to do the filming and editing.  But

23    when Mr. Bochicchio heard about Clear Channel, he

24    said, Sal, if you've got a chance to go with Clear

25    Channel, you go with them.  And so that's what

1    happened.  The only thing that Mr. Bochicchio wanted

2    was the opportunity to sell the finished product,

3    which was arranged.

4        So Mr. Corrente signed the contract that

5    Mr. Sterling sent to him on January 21st and sent it

6    back by facsimile that day.  Now, I'm going to show

7    you the contract and, as you'll see, the quality of

8    the print is very difficult to read because this was

9    actually faxed several times, so we have a clean

10   copy that we'll show you when we get to the terms of

11   it.

12       But I do want to show you the last page where

13   you can see that it says, acknowledged and agreed

14   for CCETV, Joe Townley, president.  For

15   Wrestlereunion, Sal Corrente, principal, January

16   21st, 2005, January 27th, 2005.  Now, a clearer copy

17   we'll have as Exhibit 2.

18       First thing I'd like to show you is the first

19   page, but let me tell you this first.  Why am I

20   going to go through in a moment and tell you all of

21   the features of this contract?  There's a very

22   important reason.  It's Clear Channel Entertainment

23   Television's position that there was no contract

24   between the parties.  So in order for us to have an

25   understanding of what the parties did agree to, I'm

1    going to now go through the document that we contend

2    is the contract.

3        First of all, this document that I'm showing

4    you was written by Clear Channel Entertainment

5    Television by Mr. Sterling with the assistance of

6    counsel, the attorney for Clear Channel

7    Entertainment Television.  The first thing I would

8    point out is it says, subject to mutual approval and

9    signature.  Then it says, this letter is intended to

10   outline the principal terms upon which CCETV would

11   go forward to fund the production and completion of

12   the programs we've discussed.

13       It then contains 14 enumerated paragraphs,

14   each one of these paragraphs talking about another

15   part of the agreement.  The first paragraph talks

16   about the programs; the second paragraph talks about

17   the rights that Clear Channel would have, which

18   included worldwide -- exclusive worldwide

19   distribution rights for the programs, which

20   consisted of the live wrestling events that

21   Wrestlereunion was going to put on; it talks about

22   clearances, it talks about the territory that this

23   would cover, the length, the term would be 15 years.

24   It talks about what amount of money that Clear

25   Channel would invest and what it would be for, what

1          they would do, production costs.

2              It goes on to talk about the distribution fees

3      and royalty rates.  It talks about how the revenue

4      would be split.  It talks about the fact that Clear

5      Channel would have the exclusive rights.  It even

6      talks about the fact that Wrestlereunion would

7      ensure the promoter and talent wrestler availability

8      for promotional appearances.  Makes sense.  If

9      they're going to go out and promote this product,

10     who better to have promote it than people like Bruno

11     Sammartino and the American Dream, Dusty Rhodes and

12     other people who have been involved in the project.

13             And we get to the 14th paragraph, and Clear

14     Channel chose to insert this paragraph.  You warrant

15     and represent that you are the duly authorized party

16     to enter into and sign this agreement for the

17     purposes described herein.  And then it says, if

18     this meets with your approval, please indicate so by

19     your signature below and return one signature copy

20     via the number above and two original signature

21     copies to my attention at the address above.  And it

22     says that they'll sign it and return it to you.  And

23     then, of course, it does have the part where it says

24     acknowledged and agreed, acknowledged and agreed.

25             But throughout this case, the defendant will

1    take a position that that's not a contract.  Even

2    though when deposed, Mr. Townley said, why would you

3    want this -- when asked, why would you want this to

4    be put together and signed?  He said, so we'd both

5    have an understanding of the agreement.

6        Denial of the fact of this contract, that is,

7    in fact, a contract, is just another in a long line

8    of dishonest and untrue statements by Clear Channel

9    Entertainment Television that you will hear during

10   this case.  The only problem is most of them did not

11   become known to Wrestlereunion until it was too

12   late.

13       Now, let's turn to the first Wrestlereunion.

14   On January 28th, 2005, the first Wrestlereunion

15   event began in the grand ballroom of the Westshore

16   Doubletree.  Ninety-four wrestlers turned out.  The

17   number was amazing.  No one expected such a large

18   turnout.  No fan convention had ever in the history

19   of professional wrestling assembled so much talent

20   in one room.

21       Now, the reason to have that many people at

22   the first Wrestlereunion was to establish the

23   Wrestlereunion name.  Just like a grand opening, you

24   want to make that name, you want to -- you want to

25   catch the world by the -- by storm.  You want to --

1    you want to make this event so memorable that people

2    will be talking about it five years later.

3         Wrestlereunion wanted to create a buzz and,

4    boy, did they.  Not only did 19 of the 63 living

5    legends of the WWE Hall of Fame turn out, but there

6    were also stars who had recently been on the WWE or

7    who had been on another major wrestling company,

8    TNA, which stands for Total Nonstop Action.  It's

9    another wrestling company.  The event was a critical

10   success.

11        In fact, several days after, the Wall Street

12   Journal published an article on Wrestlereunion.  The

13   wrestling websites were abuzz.  There are many

14   internet websites that cover the wrestling world.

15   They were all talking about the assembly of talent,

16   the time that the fans had.

17        Wrestlereunion's website in the month after

18   Wrestlereunion had a million hits.  People came from

19   around the world and the United States to see this

20   through ice storms, the week of the Super Bowl, to

21   see this event.  Everything Wrestlereunion promised

22   the fans and Clear Channel Entertainment Television

23   about staging this event, it delivered on.

24        Unfortunately, the same was not true for Clear

25   Channel Entertainment Television.  Clear Channel

1          Entertainment Television showed up without a

2     production truck to videotape this sporting event,

3     this in-the-ring action, they showed up without a

4     production truck.  They did not have monitors and

5     headsets for the announcers, the announcers who were

6     going to call the action just like you see on TV.

7     No headsets and no monitors.  In fact, one of the

8     people will tell you they had to actually squeeze

9     each other's legs under the table when it was time

10    for each of the announcers to talk so that they

11    didn't talk over one another.

12         Clear Channel Entertainment Television didn't

13    even bring a PA system, a public address system for

14    the event.  They didn't even bring scaffolding for

15    the camera that was filming the wrestling event.

16    I'm not making this up.

17         When it came time to film the event, Clear

18    Channel's cameraman put out a big giant orange

19    ladder that was so tall they had to remove ceiling

20    tiles from the roof to fit it in, and then the

21    cameraman would climb up the ladder and would film

22    the action in the ring.  And when his tape ran out,

23    he'd claim down the ladder and go get a new tape.

24    Now, Clear Channel was supposed to be this

25    professional company, and they show up totally

1    unprepared.

2        Now, obviously, any footage from the side of

3    the ring opposite the orange ladder couldn't even be

4    used because you can't sell to the audience a

5    cameraman on top of a big orange ladder.  It's not

6    the way any of the major wrestling televisors like

7    WWE or TNA did things.  They just simply -- Clear

8    Channel just simply showed up unprepared and

9    unready.

10       They missed opportunities to film key events,

11   key, marketable events because they brought -- they

12   didn't bring enough people and they didn't bring

13   enough equipment.

14       Months later when Clear Channel's editing

15   staff finally began editing the footage from it,

16   they described the problems created by their own

17   incompetence as a train wreck, talking about the

18   audio that they had taken at Wrestlereunion I.

19       One Clear Channel Entertainment Television

20   employee complained that the audio technician was so

21   bad he must have failed AV training in high school.

22   That's not all.  Mr. Sterling, the vice president

23   who was in charge of this project ultimately at

24   Clear Channel told Mr. Corrente that Clear Channel

25   was going to quickly get the Wrestlereunion product

1          to the market.  Mr. Corrente trusted him.  What

2          Mr. Corrente did not know back then but knows today,

3          and it's one of the reasons that we're in this

4          lawsuit -- (inaudible)

5               COURT REPORTER:  I'm sorry.  You need to stay

6          close to the mic.  I can't hear you.

7               MR. RODEMS:  I apologize.  After the first

8          Wrestlereunion event, Clear Channel Entertainment

9          Television held up distribution because they were

10         trying to get Vince McMahon, who is the chairman of

11         WWE, to agree to be interviewed for their A&E

12         biography.  So they put Wrestlereunion on hold or

13         kept the distribution plan low key while they were

14         trying to get Mr. Vince McMahon involved.

15              This is Exhibit 123 which we'll offer into

16         evidence, as well.  This is an e-mail from Steve

17         Sterling to Joe Townley.  Remember, Mr. Sterling is

18         the vice president, Joe Townley is the president.

19         He asks him:  What do you think the timing might be

20         for getting this in the bag regarding the WWE Vince

21         interview?  As discussed, I just want to be able to

22         keep the Wrestlereunion distribution plan low key

23         until Vince is in the can for the A&E show.  After

24         that, we will be able to get the TV deals pitched,

25         and I believe we will get one as well as go wide

1    with DVD distributions for the rest of it.

2    Obviously, many of the best outlets distributions

3    are the ones who already handle WWE.  So we need to

4    keep the timing straight.  As soon as Vince is shot,

5    we will get some profile for this stuff pretty

6    quickly, I believe.

7          In other words, let's don't get it out on the

8    market because Vince might find out, then he won't

9    give us the interview.  Now, Clear Channel

10   Entertainment Television never told Mr. Corrente

11   that they were going to put his project on the slow

12   plan so that they could get Vince McMahon involved

13   in the WWE.  But that's not the end of it, either.

14         In the months after the first Wrestlereunion

15   event, Mr. Corrente is receiving and forwarding

16   e-mails to Mr. Sterling from fans asking for DVDs

17   from the Wrestlereunion event.  Mr. Sterling --

18   Mr. Corrente will tell you that at one point

19   Mr. Sterling got so annoyed with him because he kept

20   sending these e-mails that he said, stop sending

21   them.  We get it.

22         But as Mr. Sterling's e-mails later showed, he

23   didn't get it at all.  Mr. Sterling had no idea that

24   of all the things that they shot, the wrestling

25   matches were the key products.  The wrestling

1    matches were the most valuable products they had.

2    He thought the interviews were.

3        In fact, he sent an e-mail on March 7th to

4    Eric Paulen, and this will be Exhibit 41 which we'll

5    offer into evidence.  He said, I have not heard from

6    anyone that they were getting preorders for the

7    DVDs.  I thought they told us it was all about the

8    shoot interviews.  In other words, he didn't really

9    understand that the matches were the important

10    thing.

11        This is just one example.  What Mr. Corrente

12    found out after this lawsuit was filed is that

13    Mr. Sterling is not the only one who doesn't

14    understand what's going on, is disorganized, Clear

15    Channel was completely disorganized.  No one knew

16    who was doing what and they had no cohesive

17    marketing plan to bring Wrestlereunion into the

18    market.  Now, that's not my words, they're theirs.

19        I show you Exhibit 41.  This is March 7th,

20    2005.  It's a month and a half after Wrestlereunion.

21    Can I see some footage as soon as possible so I'll

22    know what we're sending them because the

23    Wrestlereunion folks have been saying, can we see

24    something.  And Eric Paulen says, yeah, we should

25    send them this rough cut.  It will be a way to

1      pacify them showing that we actually have

2      accomplished something.  So they knew that there was

3      a problem.

4          But as I mentioned, Clear Channel had no

5      marketing plan.  They didn't understand what this

6      wrestling product was and they didn't understand how

7      to market it.  On March 21st, 2005, first of several

8      e-mails from Mr. Sterling to his team:  We need to

9      meet and strategize all the places we could

10     distribute this stuff.  DVDs, of course, TV, sure,

11     web downloads, etcetera.  That's March 21st.

12         Two months later, Mr. Sterling is writing to

13     his team again.  He still doesn't understand what's

14     going on, he doesn't have an overall lineup of the

15     matches.  Then he comes out and he says it.  The

16     original approach is that we would come out of the

17     first event and have an entire product line in this

18     genre from one production outing and ride on the

19     coattails of the A&E telecast while being clear of

20     any WWE turbulence by then.

21         Then he goes on to say, getting prepared to

22     sell and distribute the TV and DVD product from our

23     newly made catalog is all the more important if

24     there's any chance that the A&E WWE project is not

25     happening at all or in the timeframe originally

1    intended.  We need to demonstrate how we can

2    capitalize on this content.

3        Then he goes on to say, if we need to have a

4    good old fashioned product program development head

5    bang to get it all fully defined and outlined, let's

6    do it real soon.

7        Now, this is almost six months after

8    Wrestlereunion and this is also almost two months

9    after he previously said we need to figure out where

10   we can sell this.

11       Three months later, Mr. Sterling writes

12   virtually the same e-mail.  We're now into September

13   12th of 2005.  This is an e-mail again from

14   Mr. Sterling to Mr. Townley.  It says, I think it

15   would be good if we could schedule a working and all

16   players program and marketing meeting.

17       Then he goes on to say, what we are lacking,

18   and I can certainly take some of a lead on this if

19   necessary, is an overall plan for putting this stuff

20   together in a through line of a programming package

21   which for both TV and DVD can be looked at as a

22   series of programs which can be programmed for TV as

23   a series and can be distributed on DVD as a product

24   line.

25       Here we are almost three quarters of a year

1     after Wrestlereunion and they're still trying to

2     figure out how they're going to market this.   This

3     is not what they told Mr. Corrente up front.

4          But Mr. Sterling is not the only one without a

5     plan here.   I show you Exhibit 129 which we'll offer

6     into evidence.   This is an e-mail from June 1st,

7     2005, from Eric Paulen to Johnny Gallarello.

8     Mr. Paulen was in charge of Wrestlereunion I for

9     Clear Channel.   He was the one that was supposed to

10    make sure that everything was done correct.   This is

11    what he says.   Who is cutting these Wrestlereunion

12    matches?   There are 14 of them and not one has been

13    cut.

14         So here we are six months after the event,

15    they haven't even started the editing yet.   You

16    can't sell a product that's not edited.   You can't

17    go out into the marketplace and draw interest with

18    something you haven't even finished yet.

19         Now, during this time Mr. Corrente is planning

20    Wrestlereunion II.   And he wants permission to

21    announce the relationship between Clear Channel

22    Entertainment Television and Wrestlereunion, because

23    having a media conglomerate like Clear Channel

24    involved would only enhance the profile of

25    Wrestlereunion.   And he asks for permission.

1          And to let you know what was still going on in

2     the minds of Clear Channel, they're still worried

3     about WWE.  In fact, Mr. Corrente sends an e-mail to

4     Johnny Gallarello.  Johnny, at this point are we

5     free to make an official announcement about our

6     partnership on the DVDs?  We may as well get the

7     word out, but I want your company's blessing on

8     that.  Mr. Corrente would never act without

9     permission from them.

10         The response from Eric Paulen to Steve

11    Sterling who received a copy of this e-mail is, does

12    it even matter at this point what WWE thinks and/or

13    knows?  Because the A&E biography at this point was

14    all but dead.

15         So at this point as Mr. Corrente is scheduling

16    Wrestlereunion II, footage from Wrestlereunion I is

17    languishing on the shelf, unfinished, unedited and

18    unsold.  Mr. Corrente will tell you when he's

19    scheduling Wrestlereunion II, he had no idea things

20    were this bad.  He had no idea that they didn't know

21    who was supposed to be doing the editing.  He had no

22    idea that they didn't have a marketing plan.  But

23    from the beginning, Mr. Sterling is telling

24    Mr. Corrente, we need a library of footage.  We need

25    more matches, and that's why in April of 2005,

1    Mr. Corrente announced the second Wrestlereunion in

2    Valley Forge, Pennsylvania for August 26th through

3    28th.

4         Now, this time Mr. Corrente had more lead time

5    in his relationship with Clear Channel, so he

6    invites them to tour the facility, the Valley Forge

7    Convention Center, and Clear Channel does.  They

8    come down and they tour the facility and they

9    approve it.

10        Something curious happens.  Literally four

11   days before the second Wrestlereunion, Mr. Sterling

12   sends an e-mail to Mr. Corrente.  Now, this contract

13   that they'll tell you wasn't a contract,

14   Mr. Sterling wanted to make sure that this

15   non-contract would apply to Wrestlereunion II, so he

16   sends this e-mail.  August 23rd, 2005 to

17   Mr. Corrente and Mr. Russen.  As you both well know

18   and have been part of, CCETV is underway to shoot

19   and produce the Wrestlereunion live event in Valley

20   Forge as part of our agreed upon and signed outline

21   of terms, dated January 21st, 2005.

22        He goes on to say, as you also know, we're

23   bringing in a full scale, live-to-tape high

24   definition mobile unit and crew.  They knew the

25   first time they dropped the ball.  So the next time

1    with Wrestlereunion II, they're going to make sure

2    they bring in the proper equipment.

3        But he wanted to make sure that Mr. Corrente

4    understood that they were still going to be able to

5    keep their per event budget of 235,000, even though

6    they were bringing in this bigger crew and this more

7    specialized equipment, because of the economy and

8    the lead time that they had to make things work.

9        But what Mr. Sterling asked Mr. Corrente to

10   do, he says, this e-mail is to confirm that we are

11   all conducting ourselves within the agreed upon

12   terms and provisions of the agreement, and we would

13   appreciate your confirmation of same by e-mail as

14   soon as possible.

15       So they wanted Mr. Corrente to agree that the

16   terms of the original agreement applied also to the

17   second Wrestlereunion event which, of course,

18   Mr. Corrente agreed to.  The point is is as early as

19   August 23rd of 2005, they're asking him to agree

20   that the agreement applies.  But in this case

21   they're going to tell you, oh, there was no

22   agreement.

23       Now, let's talk about Wrestlereunion II.  The

24   work that Mr. Corrente and his team had put into

25   Wrestlereunion I had paid off.  The Wrestlereunion

1    II was on August 26th through 28th 2005 in Valley

2    Forge, Pennsylvania, and more than twice the number

3    of fans showed up at the second event.

4    Wrestlereunion II featured a tribute dinner to Bruno

5    Sammartino, who I mentioned earlier was one of the

6    greatest champions in the history of the Worldwide

7    Wrestling Federation, which is today known as the

8    WWE.  And they also had a comedy show for Mick Foley

9    who is also one of the most beloved wrestlers in the

10   history of the sport and who today is still involved

11   with TNA.

12        After the event, Mr. Sterling met with

13   Mr. Corrente and Jimmy Hart and Rob Russen and

14   others and he told them how happy he was and how

15   well things had gone.  And I'll show you these

16   comments in a moment because they're very important

17   to the case.

18        But behind the scenes and unknown to

19   Wrestlereunion, Clear Channel was in turmoil.  We're

20   now talking about late August of 2005.  Clear

21   Channel was in the middle of a corporate spinoff.

22   They were going to take the business unit that was

23   Clear Channel Entertainment Television and spin it

24   off.

25        Mr. Sterling testified in deposition that was

1    a traumatic time.  He was afraid he was going to

2    lose his job, so was everyone else.  Joe Townley

3    went into full scale self-preservation mode.  He was

4    the president of Clear Channel.  He was concerned

5    about what was going to happen to him.

6        So when Wrestlereunion III, which was a

7    wrestling only show was announced in July, Clear

8    Channel agreed to come and videotape it.  Literally

9    a week before the event, Mr. Townley writes an

10   e-mail after he finds out that Clear Channel is

11   having problems finding the proper equipment, and

12   this is what he says.  Joe Townley to Dawn Olejar

13   and Steve Sterling.  I did not realize we had a

14   third wrestling shoot coming up.  Do we really need

15   to shoot this one?  Have we done a P&L -- which

16   stands for profit and loss -- on this project?  Do

17   we not have enough of this material going out to the

18   market now?

19       This is how far removed Mr. Townley was.  They

20   didn't have any of the wrestling matches going out

21   to the market.  In fact, of everything that they had

22   shot, they had finished four interviews and put

23   those out on the market to Highspots, the internet

24   again that does no marketing whatsoever.  All they

25   had done was ship them to them.  So there was no

1    marketing whatsoever, no distribution.

2         Now, Mr. Townley pulls the plug and says,

3    we're not going to cover Wrestlereunion III.  Now,

4    Mr. Corrente is irate about this.  He says, wait a

5    second.  We have a contract.  You agreed to do it.

6    I've already scheduled it down there.  I've put a

7    lot of money into this.  So Mr. Townley backs off

8    and says, okay, we will cover -- we will cover the

9    event, and the event gets covered.

10        Now, the third Wrestlereunion event was held

11   in Davie, Florida, at a historic site, the Davie

12   Rodeo.  This is a site of many of the greatest

13   matches in the history of South Florida.  The event

14   featured Dusty Rhodes and Terry Funk, two of the

15   most popular and well-known wrestlers in the state

16   of Florida, revising their feud.

17        It was a match filled with so much drama that

18   before it even began, Terry Funk was outside the

19   ring screaming at everyone, refusing to wrestle in

20   the match, scared the Clear Channel production

21   people to death.  It was exactly the drama they were

22   looking for, and it was a classic match.  Now after

23   Wrestlereunion III, Mr. Sterling had his library of

24   footage.

25        But after Wrestlereunion III, Mr. Corrente is

1    hearing nothing from Clear Channel Entertainment

2    Television.  E-mails and telephone calls for updates

3    are going unreturned.  Mr. Corrente didn't know it,

4    but the spinoff had panicked everyone.  Everyone was

5    in full scale crisis mode.  Within two months, Joe

6    Townley is going to be eliminated; same thing for

7    Eric Paulen, positions eliminated.

8         In fact, during this trial you're going to

9    learn that every single Clear Channel Entertainment

10   Television employee involved with this project no

11   longer works there.  They're all gone.  Clear

12   Channel Entertainment Television was a mess, but not

13   just because of the spinoff, they began to realize

14   they had serious problems when they started to

15   finally edit Wrestlereunion I with the audio and

16   video.

17        Exhibit 44.  We'll offer this into evidence,

18   too.  This is an e-mail from Eric Paulen to a man by

19   the name of Darren Chiopetta who is helping to edit.

20   And this is what it says:  Wrestlereunion I was a

21   train wreck.  No interviews.  Tease was a minute and

22   change promo I did for them.  It's average at best.

23   And it goes on to say from Mr. Chiopetta to

24   Mr. Paulen:  EP, I've gotten through the first four

25   matches and here are my thoughts so far.  Audio is a

1      nightmare.  I didn't realize it at the time, but

2      apparently the kid never faded the music.  I'm able

3      to get around it a lot of the time, but this guy

4      probably flunked AV training in high school.

5      Possibility of omitting matches?  The Koloff/Denuci

6      match is a train wreck.

7           Exhibit 92.  Clear Channel Entertainment

8      Television had a lady by the name of Kate McDonald

9      who was responsible for international marketing.

10     Around August 30th, August 29th, she's asking when

11     do you think we'll have some footage that we'll be

12     able to send out to broadcasters to take a look at?

13     Here it is six months after Wrestlereunion and they

14     have nothing to send to broadcasters?  How do you

15     market a television program when you don't even have

16     any footage to send?

17          And here was the response from Dawn Olejar who

18     is responsible for Wrestlereunion II.  I'll have the

19     line cut available which may or may not be suitable

20     to send out.  It's pretty rough and needs some work.

21     I'll get you a copy.

22          And Ms. McDonald responds:  Thanks.  Yeah, I

23     don't think I'll be sending anything out.  We'd just

24     like to see it.

25          Now, what did the problem with the audio and

1      the video mean?  Here's an e-mail from Ms. McDonald

2      dated October 27th, 2005, and this date is important

3      because this is a date in which Clear Channel

4      Entertainment Television finally agreed to meet with

5      the Wrestlereunion team in New York City at their --

6      at the Clear Channel headquarters.

7           And as they were trying to figure out what

8      they were going to tell these guys about the audio

9      and video problems, about all the problems with

10     delays, about all the problems with not having

11     footage together, this is what Ms. McDonald says:

12     Please be reminded that we have not pushed this

13     series before MIPCOM -- now, MIPCOM is a convention,

14     an international convention where programming is

15     sold -- due to the quality of the original footage.

16     As you're fully aware, we only get one chance to

17     make an impact on buyers so we've wanted to wait

18     until the new footage is ready for us to send out

19     with the hope that it's an improvement on the last.

20          Now, Clear Channel Entertainment Television

21     was responsible for the quality of the footage.

22     They were responsible for the quality of the audio.

23     Wrestlereunion was to stage the events, bring the

24     ring, bring the wrestlers, put the matches on.

25     Clear Channel Entertainment Television was

1        responsible for capturing it on video.

2             And here's what she says:  Our one concern is

3        how we inform the Wrestlereunion guys why we've not

4        started pushing it before now.  Please advise.  Now,

5        this e-mail was sent at 9:19 AM on October 27th,

6        2005, literally an hour before the meeting with the

7        Wrestlereunion team at headquarters in New York

8        City.

9             So let's talk about this meeting.  At the

10       October 27th, 2005 meeting, Mr. Corrente attended.

11       He took his business partner, Tony Attanasio and he

12       took Jimmy Hart.  And the purpose of the meeting was

13       to find out where things stood.  They weren't

14       getting calls back, nothing was being told to them.

15       They had been promised months earlier that things

16       would be hitting the market.  Nothing was being

17       done.

18            So they go into this meeting.  Now, why did

19       Mr. Corrente bring Mr. Hart?  Mr. Hart is a legend

20       in the business, you'll come to find out when he

21       testifies.  But he also is extremely talented in the

22       production side of things.  He once produced a 6:05

23       event for the WCW, which is a weekend television

24       show.  He knew a lot about how to sell it.  They

25       brought him up there so that Clear Channel could see

1      that they had somebody on their team that had really

2      good ideas about marketing.

3          It's obvious at this point that Clear Channel

4      wasn't getting things to market.  Mr. Corrente felt

5      that if he could send up even on his own nickel

6      Mr. Russen and Mr. Hart to help with the editing and

7      to help with the marketing, anything to get this

8      product to the marketplace.  So during this meeting

9      Mr. Corrente reiterated, if there's anything we can

10     do, if you'd like help with the editing, if you'd

11     like help with the selling, say what you need and

12     we'll provide it.

13          The team from Clear Channel, Mr. Townley,

14     Mr. Sterling, Ms. Olejar, Mr. Paulen, Mr. Gallarello

15     and Ms. McDonald who was wanting advice on how they

16     were going to tell them they hadn't been able to

17     sell anything, they were all there.  No one from

18     Clear Channel Entertainment Television mentioned

19     that the audio from Wrestlereunion I was a train

20     wreck.  No one mentioned that Wrestlereunion had not

21     been pushed because of the video problems.  No one

22     mentioned that Clear Channel was in turmoil because

23     of all the layoffs that were coming up and the

24     spinoff.  Instead, they continued the deception.

25          The most shocking thing they did was they

1    presented Wrestlereunion with an explanation of how

2    much they had spent on Wrestlereunion.  But as the

3    evidence will show, Clear Channel Entertainment

4    Television created two sets of numbers; one to show

5    Wrestlereunion and another one for internal use.

6          Here's an e-mail from Dawn Olejar to Joe

7    Townley dated October 25th, 2005, two days before

8    this meeting, and this is what she says.  Page one.

9    Final budget is what we will show at the meeting on

10   Thursday.  Page two actuals is for internal use

11   only.

12         If you look at these documents, you will see

13   that what they prepared is this.  This is the page

14   one that they showed to Wrestlereunion.  They said,

15   well, we've got $602,000 in this.  And here's the

16   actual expense that they used internally, 295,000.

17         Now, they didn't tell Wrestlereunion they were

18   keeping two sets of numbers, and they offered them

19   no explanation for this.  They wanted to impress

20   upon Wrestlereunion that they had done all of this

21   work and they had taken all this activity when, in

22   reality, they didn't have a marketing plan, they had

23   been holding up distribution, they had problems with

24   the audio and video and they had no explanation for

25   them.

1          But that wasn't the worst of the deceptions at

2     the meeting.  They told the Wrestlereunion people,

3     we are a hundred percent behind this project.  We

4     are ready to go.  They loved Jimmy Hart.  They loved

5     his presentation.  Big things were right around the

6     corner.

7          So the Wrestlereunion team left the meeting

8     thinking that things were going to turn around.  In

9     fact -- and we'll come back to this in a moment --

10    they promised them they were going to get a demo

11    together really soon, a demo tape to show the

12    Wrestlereunion product to the broadcasters.

13         They'd been selling this product, they said,

14    for the last ten months without even a demo tape,

15    but now they're going to really get it together and

16    they were really going to get it out in the

17    marketplace.

18         But in deposition, Mr. Sterling testified he

19    was not hard selling Wrestlereunion.  The company

20    was going through the trauma of the spinoff and he

21    was afraid of losing his job.  About a month later

22    when Mr. Townley and Mr. Paulen were let go, no one

23    even told Wrestlereunion.

24         From that point forward, Wrestlereunion was

25    ignored and that's why this lawsuit was filed.

1    Clear Channel Entertainment Television promised it

2    would videotape the events using top quality people

3    and top quality equipment.  They didn't.  Clear

4    Channel Entertainment Television said they had

5    experience editing and selling TV programming.

6    They'd had no experience with wrestling.  And they

7    were more or less using Wrestlereunion to try to get

8    the A&E biography done.  When that failed, they had

9    no backup plan.

10        Now, when we filed this lawsuit, we asked for

11   documents relating to marketing of this product, and

12   what we learned was fairly shocking.  Clear Channel

13   entertainment put virtually no marketing efforts

14   into this product other than to send out a few

15   e-mails.  Clear Channel told them that they had been

16   diligently trying to sell this product, but as we

17   found out, there wasn't even a demo tape finished

18   until November 30th, 2005, a month after the meeting

19   in New York.

20        Now, even Mr. Sterling understood the

21   importance of the demo tape in trying to sell this

22   product.  When Mr. -- when Mr. Corrente finally got

23   frustrated and asked for some copy of the footage so

24   they could do some things on their own, this is what

25   Mr. Sterling said about the importance of the demo.

1     This is November 30th, 2005, a month after the

2     meeting.  Sal, can you hold up for just a -- hold up

3     here for a little longer.  As discussed in our

4     meeting, our number one first objective is to get a

5     kick ass presentation tape for TV, DVD, media

6     outlets, not make a live promotional spot.  We are

7     needing to get the media property rolled out as soon

8     as possible.

9          The date is November 30th, 2005.  This is a

10    full ten months after Wrestlereunion.  He's telling

11    him that the demo tape was so important.  Why wasn't

12    that the first thing done?  Why wasn't that done

13    when they were trying to market it to people?

14         So how were they selling it?  Believe it or

15    not, they were sending out e-mails with one sheets.

16    One sheet is a picture.  It would have a picture of

17    Bruno Sammartino on it.  It would have a picture of

18    somebody else from Wrestlereunion on it.  And they

19    would say to these various video people, hey, would

20    you be interested in this?  Kind of like the door to

21    door vacuum cleaner salesman that comes and knocks

22    on your door and doesn't even have the vacuum

23    cleaner with him.

24         Not only did they not finish the demo tape,

25    they missed numerous opportunities to market.  Let

1    me give you just one example.  In 2005 Clear Channel

2    Entertainment Television said they pitched to HD

3    Net, which is a cable company that features nothing

4    but high definition programming.  At that time HD

5    Net had no wrestling.  Mr. Sterling told us that HD

6    Net wasn't interested.  Who could be surprised?

7    They had no demo tape to show them.

8        Today HD Net features wrestling.  It's called

9    Ring of Honor.  It's an organization with talent

10   that nobody's heard of.  But what you'll see, and we

11   have a clip of the Ring of Honor to show you for

12   comparison purposes -- what you'll see is that the

13   feature of Ring of Honor in a lot of ways is similar

14   to the -- to how Wrestlereunion was supposed to

15   look.

16       Remember, Wrestlereunion was a reunion of

17   legends.  It wasn't supposed to look like WWE.  It

18   was supposed to look like old time classic

19   wrestling, the kind that you would have seen on

20   Channel 44, the kind where they put the emphasis on

21   what was going on in the ring, not pyro techniques

22   and music and rock groups, but the guys coming out

23   fighting each other, spilling out of the ring, doing

24   all of the things that people loved about wrestling.

25       HD Net found Ring of Honor.  It could have

1        just as easily found Wrestlereunion, had it been

2        marketed properly.   Clear Channel Entertainment

3        Television's sister company had 40 television

4        stations in 25 markets.   They didn't even make one

5        call to any of those stations to say, hey, can we

6        get Wrestlereunion on?

7              Now, these local broadcasters are dying for

8        programming.   If you go and you look on the TV today

9        you will see infomercials all the time because TV

10       programers have time available that they will sell.

11       They could have gone to their own sister company

12       stations and literally given them the product.   No

13       effort was done.

14             You'll not see any efforts to market to the

15       following companies:   PAX, Spike TV, CW, My Network

16       TV, G Four, Fox Sports, MTV, Bravo, E, Fox Reality,

17       ESPN.   ESPN Classic today shows AWA wrestling from

18       the eighties.   We're going to show you a clip.

19       Mr. Corrente is actually the referee in the 1980 AWA

20       footage that we're going to show you.   But there's a

21       station that shows classic wrestling on it today.

22             And why did they not market to any of these

23       people?   The bottom line is they never finished

24       editing the product, they never got it into the

25       marketplace because they never had a final finished

1    product.

2        Now, Wrestlereunion's future was staked to

3    Clear Channel performing its obligations under the

4    contract, that is, deriving revenue from the DVD

5    sales and whatever other revenue could have been

6    earned from pay-per-views or television.  Remember,

7    it wasn't just a live event, and Clear Channel knew

8    this.

9        But they'll stand up here and they'll tell you

10   in this trial that, well, Wrestlereunion lost a lot

11   of money staging the live events.  Well, sure.  They

12   put money into these events and they expected, based

13   on Clear Channel's promises, to get money back.

14   They never got the money back.

15       And it about ruined Mr. Corrente.  He put his

16   life savings into Wrestlereunion.  It's taken him

17   years to just get his head above water.  The

18   evidence will show Wrestlereunion suffered

19   substantial damages, which begs the question.  If

20   this was so potentially profitable, why didn't Clear

21   Channel get it sold?

22       The answer lies in the documents.  It was not

23   that Clear Channel didn't want to get it sold.  Of

24   course, they did.  It's just that they were

25   incompetent.  They didn't have people who had any

1    familiarity with editing wrestling or selling

2    wrestling and they turned down every effort to try

3    to help them.

4        Now, they had some problems going on inhouse.

5    But they had a duty to comply with the contract and

6    get it edited and distributed in the marketplace and

7    they didn't do it.  Now, incompetence is one thing.

8    There's evidence in this case of (inaudible) --

9        COURT REPORTER:  I'm sorry, evidence of what?

10        MR. RODEMS:  Outright lying.  Let me show you

11    what's been marked as Exhibit 3.  This is what is

12    known as an interrogatory answer.  This is a

13    statement made by Mr. Sterling under oath, and I'll

14    show you in a moment the part where the notary has

15    notarized it.

16        And this is what was said by Mr. Sterling on

17    September 17th of 2008, after this lawsuit was

18    filed:  Despite defendant's best efforts to tape a

19    high quality production, the product defendant did

20    shoot was not marketable due to the visibly low

21    attendance, inappropriate venue and generally all

22    around poor production value of the event.

23    Defendant attended two subsequent live

24    Wrestlereunion events, one in Valley Forge,

25    Pennsylvania and one in Davie, Florida, and both

1    were of poor quality, had low attendance, were held

2    in low end and/or inappropriate venues, were

3    improperly staffed, and in general displayed gross

4    unprofessional and incompetent event planning on the

5    part of the plaintiff.

6        And as you can see below, that's notarized.

7    That's sworn to under oath.  Now, the first thing

8    that comes to mind is they went to the first

9    Wrestlereunion event.  If it was that bad, why did

10   they go to number two and number three?  But what's

11   more shocking is to look at Mr. Sterling's words

12   before the lawsuit was filed.

13       After the first Wrestlereunion, January 31st,

14   2005, Mr. Sterling responding to Mr. Corrente:  Sal,

15   just got back in the office.  Eric gave me a good

16   report late yesterday and it all sounds great.

17   April 11th of 2005, Mr. Sterling to Mr. Paulen,

18   after they started looking at some of the clips of

19   the wrestling.  The individual clips are great.

20   Should I assume the roughness of the ins and outs

21   are due to giving you some edit room to get in and

22   out with an effect of some sort?

23       Mr. Paulen on March 21st of 2005, writing to a

24   man by the name of Diamond Dallas Page who was

25   instrumental in Wrestlereunion.  Mr. Paulen says:

1    I'm in the middle of a bunch of things, mostly

2    looking at the Wrestlereunion matches.  They look

3    great.

4        Exhibit 35, Mr. Sterling writing to Johnny

5    Gallarello all the way through to Joe Townley, July

6    21st of 2005, six months after Wrestlereunion.  No

7    question that the thing we are most short of is more

8    actual wrestling.  Every TV, DVD outlet I am talking

9    to wants to know how much wrestling there will be.

10   I would want to have a better determination of the

11   revenue opportunities around all this before we can

12   commit.

13       After Wrestlereunion II, this is what

14   Mr. Sterling said, August 31st, 2005.  First he gets

15   an e-mail from Mr. Paulen.  Steve, just a note to

16   see how it went with Anthony, with Sal Corrente,

17   Anthony Attanasio, the business partner and Jimmy on

18   Saturday night.  That's Jimmy Hart.  Show went very

19   well.  Looked great.

20       Mr. Sterling's response:  The show did go well

21   and looked great.  Thanks.  Our meeting broke up at

22   2:30 AM and Jimmy really had a lot to contribute.

23   We all agree that the focus is now to be on making

24   this a media property.  August 31st, 2005, before

25   the lawsuit was filed.

1            Here's the e-mail that Mr. Sterling sent

2      during the middle of Wrestlereunion II to

3      Mr. Townley, August 27th, 2005:  Update.  Seems a

4      bit clunky at times.  Six hundred plus crowd and

5      should be a thousand plus.  But the wrestlers and

6      the combinations really are impressive.  Pre-tapes

7      were over the top.  Looks and sounds just like the

8      good old days.  Crowd sound effects sweetening will

9      get it all up to the next level and cover up any

10     other shortcomings, as talent energy is high.

11           This is what Ms. Olejar said to Mr. Russen

12     after the event.  She was in charge of the actual

13     technical production.  Hi, Rob.  Thanks so much for

14     everything this weekend.  The shoot went great.

15           After Wrestlereunion III, again, before Mr.

16     Sterling wrote that e-mail -- or that interrogatory

17     answer under oath, Mr. Paulen attended

18     Wrestlereunion III, Mr. Sterling did not.  This is

19     how he described it:  All is good here.  Wild,

20     crazy, fun show that ended with Terry Funk going

21     crazy outside the ring, outside the arena.  Fun

22     stuff.  A lot of blood and ridiculous things.  This

23     is professional wrestling.  It sometimes does get

24     bloody.  Including Joey Styles pretending to pass

25     out after Terry Funk threw a chair at him and hit

1      him in the head.  He scared the audio guy to death.

2      And what does Mr. Sterling write?  Boy, that sounds

3      terrible?  It's not going to work, inappropriate

4      venue?  No.  Sounds like it should look good for TV

5      and DVD then.

6          He asked him about crowd.  Mr. Sterling did.

7      This is on September 11th.  Sounds like it should

8      look good for TV and DVD, then.  How many people in

9      the crowd?  Actually, the crowd wasn't bad, 300 or

10     400, maybe.  And what does Mr. Sterling say?  That's

11     not very good?  No.  He says, that's not too bad, is

12     it?  Was it an enthusiastic crowd playing their

13     part?  Mr. Paulen:  The crowd was pretty

14     enthusiastic.

15         Three days before the meeting on October 27th,

16     2005, on October 24th, this is what Mr. Sterling

17     says.  Does he say this is never going to sell,

18     inappropriate venue, low production quality?  No.

19     He says, there is some TV interest bubbling up now.

20     We really need to mimic the kinds of stuff -- the

21     kinds of TV stuff people and programmers have seen.

22     Then he says, I was watching SmackDown on UPN over

23     the weekend.

24         Now, SmackDown is the WWE television program

25     of its wrestling.  And what does he say?  I was

1    watching it over the weekend, and I'm not so sure we

2    are too far off from all of that.  Steve -- to Steve

3    Stern, sound effects, crowds, ambience ring sounds

4    were a huge part of the whole thing, and camera

5    cuts, edits on almost every single hit or move.  We

6    must have enough coverage to get this similar look

7    and feel.  Yes, I know the wrestlers are years or

8    even decades apart, but that's what we have.

9         They're selling this product to their clients.

10   This is what he tells -- this is what Mr. Sterling

11   tells Johnny Gallarello.  Does he tell him, look,

12   tell the truth, this is a problem, we don't have

13   good attendance, the footage isn't that good?  No.

14   Johnny, if -- this is Mr. Sterling on November 2nd

15   of 2005.  If BYP is doing the piece or whoever,

16   please make sure it is all about the superlatives of

17   this property and the uniqueness of it.

18        Before the lawsuit was filed when he's talking

19   to the people at Clear Channel, the shoot went

20   great, the tapes were over the top, looks like

21   SmackDown.  After the lawsuit gets filed, now all of

22   a sudden, the story changes.

23        Clear Channel Entertainment Television used

24   deception in dealing with Wrestlereunion, the World

25   Wrestling Entertainment, Vince McMahon, by not

1    telling him what was going on and trying to get him

2    into the interview.  They used deception in dealing

3    with its customer.  They're telling us today that it

4    wasn't marketable and now they're selling it to

5    their customers.  And now they use deception in the

6    court system by saying one thing under oath after

7    this lawsuit was filed, after saying five to ten

8    different things when -- when the case was not filed

9    and they were still trying to sell the product.

10        But in a few moments they're going to stand up

11    here and they're going to tell you that

12    Wrestlereunion lost money on the live events, when

13    they know -- they know that Wrestlereunion was

14    supposed to break even and make a profit by getting

15    the money that they were supposed to produce from

16    doing their job under the contract.  That was the

17    whole point of entering into a contract.  They'll

18    tell you a contract is not a contract.  They'll

19    probably tell you there's a good reason to have two

20    sets of numbers.

21        Now, we respect that you all have given up

22    your time to be here this week.  And we understand

23    that you have other things that you would be doing

24    if you weren't here in trial.  We're going to try to

25    respect that time.  We're going to try to put the

1      witnesses on as quickly as possible and get the case

2      to you as soon as possible.

3           But Mr. Corrente has been waiting four years

4      for his day in court.  And at the end of this trial,

5      we're going to ask you to return a verdict in favor

6      of Wrestlereunion, LLC and against Clear Channel

7      Entertainment Television.  Justice demands it.

8      Thank you.

9           THE COURT:  Thank you, Mr. Rodems.

10     Mr. Herbert?

11          MR. HERBERT:  Your Honor, pardon me.  But I

12     really could use a short break, if that's okay.

13          THE COURT:  Need a quick break members of the

14     jury?  Let's just take a couple minutes.

15          MR. HERBERT:  Thank you, Your Honor.

16          COURTROOM SECURITY OFFICER:  Please rise for

17     the jury.

18          (Jury out at 3:03 PM.)

19          (Recess was taken at 3:03 until 3:08 PM.)

20          (Back on the record.)

21          THE COURT:  All right.  Are we ready?  Bring

22     them in.

23          COURTROOM SECURITY OFFICER:  Please rise for

24     the jury.

25          (Jury in at 3:08 PM.)

```
 1              COURTROOM SECURITY OFFICER:  Please be seated.

 2              THE COURT:  Mr. Herbert?

 3              MR. HERBERT:  Thank you, Your Honor.

 4              THE COURT:  You may address the jury.

 5              MR. HERBERT:  As we know, you have all heard

 6     the saying, at some point you've just got to stop

 7     throwing good money after bad.  And that's exactly

 8     what this case is about.

 9              Now, the three things about this case that I

10     would like you to remember that we believe the

11     evidence will show when I'm done with my

12     presentation are the following.  First, the

13     plaintiff in this case, Wrestlereunion, was

14     responsible for all aspects of the live event.

15     Under the contract that the parties executed,

16     there's no question and the plaintiff has admitted

17     this, that they are the promoter of the event, they

18     have responsibility for the live event.  That's

19     their job.

20              My client, Clear Channel's job, was just to

21     come in, film it and try to sell it to somebody who

22     might be interested in buying it.  Number two, my

23     client, Clear Channel, spent and lost over $350,000

24     trying to sell the product that the plaintiff

25     created.
```

1          They had almost everybody in their company,

2     which was a small division of about 18 people,

3     working on this project over the course of a year.

4     They created 254 videotapes, which you'll see in

5     evidence and which we'll show you some clips from

6     later.  The product didn't sell.

7          Number three, the plaintiff's live event

8     business failed.  It failed as a live event because

9     of a lack of interest in the market and for no other

10    reason.  Put simply, the market has spoken and the

11    market said, no, thanks.

12         Now, my name is Greg Herbert.  And I'm very

13    proud to represent Live Nation Worldwide, Inc.,

14    which is the name of the company now.  At the time

15    that this part of the company that was involved in

16    these transactions was a small division named Clear

17    Channel Entertainment Television.  That division had

18    about 18 people in it, and it was a small part of a

19    bunch of related companies.  They were not the same

20    company.  We need to be very clear about that.  They

21    are not the company that owned the billboards and

22    the radio stations and the television stations.

23         And one thing that's very important to

24    remember is that Clear Channel Entertainment

25    Television, which is the entity that signed the

1      contract in this case, as you saw Mr. Rodems put the

2      contract up there, that's the name of the entity,

3      they were the defendant in the case; actually, they

4      had never ever published or broadcast anything on

5      the Clear Channel television station, that was not

6      this deal, they were not able to do that.  That deal

7      didn't make sense.  We'll get into that more later.

8          Now, the story of this case actually begins --

9      everything took place in just about one calendar

10     year.  The year was 2005.  So it's -- it's a --

11     unlike other cases where you've got many years of

12     facts and events, here it's a little bit easier to

13     conceptualize because you've got one calendar year

14     where really all the events that you're going to be

15     hearing about took place.  And it all started with a

16     phone call which we heard a little bit about on New

17     Year's Eve, New Year's Eve 2004, the day before the

18     year in which the events took place.

19         Now, Mr. Steve Sterling, who you heard a

20     little bit about, he was a vice president of Clear

21     Channel Entertainment Television.  He was in Times

22     Square in New York and he was working on a project,

23     an interesting project, the first live webcast of

24     the ball drop in Times Square.  He was urged by one

25     of his producers, Eric Paulen, who was working on a

1    project for A&E about -- who was doing research in

2    the field and found out about the plaintiff company,

3    Wrestlereunion.

4         Now, Mr. Paulen thought that these two

5    projects might fit in perfectly well and they might

6    complement each other and help Clear Channel get

7    something out on the market and help them with the

8    A&E project.  So Mr. Paulen urged Mr. Sterling to

9    call these guys, call the plaintiffs, talk to them.

10   This looks like it would be a good chance for us to

11   get some footage.  And it's very clear that the

12   plaintiff in this case knew from the very beginning

13   that that was the reason that Clear Channel was

14   interested in this project.

15        What happened was that Mr. Sterling made that

16   phone call from Times Square in New York City to

17   Mr. Russen who was actually driving across Alligator

18   Alley in South Florida.  And in that phone call,

19   that was when Mr. Russen first began to sell the

20   idea of Wrestlereunion to Clear Channel.

21        Now, Mr. Sterling had been in the

22   entertainment business for more than 30 years.  And

23   he knew that you can never tell what might sell and

24   what might not.  When it comes to entertainment,

25   nobody knows.  You know, the Blair Woods Project, a

1    bunch of kids ran out in the woods and they made a

2    million dollars.  You know, big movies like Ishtar,

3    people spend tens or hundreds of millions on and

4    nobody goes to see them.

5       What he looked for when deciding whether or

6    not to invest in an entertainment opportunity is

7    passion.  And he found passion in Mr. Corrente and

8    Mr. Russen.  They were passionate about their

9    project.  Their project was a series of touring

10   wrestling fan conventions.  It was clearly intended

11   to be a long term series of conventions that would

12   be a viable business on its own.  And Mr. Russen

13   talked to Mr. Sterling.

14      They first talked about the A&E idea.  Maybe

15   Clear Channel could come down there.  All of these

16   wrestlers were all in one place.  They're all going

17   to be right here in Tampa.  Can we come down and

18   just shoot some interviews and get some of that

19   footage and use it for an A&E?  And we can even pay

20   you a fee for that, if you like.

21      What happened, though, is Mr. Russen talked

22   Steve Sterling into being the audio visual

23   production company for these series of

24   Wrestlereunion events.  He basically told him that,

25   you know, we're having a series of the greatest

1        wrestling fan conventions in the history of the

2        world.  They're going to be multiple events, they're

3        going to be in this city, that city and that city,

4        why don't you tape that and try to sell that and

5        then maybe we can split the profits.

6            What Mr. Russen didn't tell Mr. Sterling in

7        that call -- and that call, again, was on New Year's

8        Eve and then the contract was signed, as we'll see,

9        one day before the first Wrestlereunion event.

10       That's when Mr. Townley, who is Mr. Sterling's boss,

11       signed the contract on January the 7th, 2005, the

12       day before the event.

13           Just a few weeks prior to that, what

14       Mr. Russen didn't tell Mr. Sterling in that phone

15       call was that Mr. Russen had very serious concerns

16       about the viability of this business.  In fact, he

17       wrote a memo to Mr. Corrente.  He felt so strongly

18       about it, he put it down in writing in a long memo,

19       not a phone call, not just a personal meeting, and

20       he called that memo, reality check.

21           The reality check was that Mr. Corrente and

22       Mr. Russen had been pursuing their dream for at

23       least the past seven months.  Mr. Corrente said in

24       his deposition that he came up with the idea in the

25       summer of 2004.  So the timing of the contract is

1          very important because for those seven months,

2          Mr. Corrente and Mr. Russen had planned this event,

3          had spent a lot of money on this event, had booked

4          the talent, dozens and dozens of wrestlers at a very

5          high cost, they put a deposit down, they got the

6          venue, had the event in place, they hyped it on the

7          internet, a million hits a month.

8               But what happened?  What was the market's

9          reaction to the dream, the idea, that Mr. Corrente

10         had and Mr. Russen had?  The ultimate reaction in

11         the market, we will see, is a number I want you to

12         remember, 310.  310 tickets were sold at the first

13         Wrestlereunion event.  That's it.  The feedback from

14         the sponsors -- they had dreamed that maybe they

15         would have sponsors sponsoring this thing, it would

16         be all over the world.  There was no feedback from

17         the sponsors.  They had maybe $3000 in sponsorship

18         revenue the first event.

19              Mr. Corrente -- I'm sorry, Mr. Russen in that

20         reality check memo just a few weeks before the first

21         Wrestlereunion event basically told Sal exactly what

22         I said when I opened my statement here.  He said,

23         you've got to stop throwing good money after bad.

24         You're spending way too much money, you've got too

25         much talent.  Your expenses are too high.

1           The expenses for that first event were at

2     least $236,000.  $236,000 spent and how much money

3     was taken in?  About $50,000.  So the plaintiff lost

4     $180,000 on that first event.  There were 94

5     wrestlers, but only 310 ticket-paying customers.

6     That works out to three customers for every

7     wrestler.

8           But Mr. Russen didn't mention any of that in

9     the call.  Basically Mr. Sterling looked for

10     passion, he found passion.  He believed in this

11     business.  He believed it could succeed.  And that's

12     what you saw in those e-mails.  He shared this

13     vision that Wrestlereunion could actually make a

14     viable product that could do something on the

15     marketplace.

16           Now, the contract wasn't signed until the day

17     before.  And that's important because Mr. Corrente

18     wants to complain about the resources for the first

19     event.  The truth is Mr. Corrente was ecstatic that

20     a company like Clear Channel was going to come in,

21     so much so that he canceled his other arrangement

22     with this small internet video retailer named

23     Highspots.

24           Now, Highspots is important to remember.

25     There was an arrangement in place between the

1    plaintiff and a small video retailer named

2    Highspots.  But that was only to sell DVDs to an

3    internet website.

4        It was clear that the plan, the business plan

5    for the plaintiff in this case was to attempt to

6    make money as a live event.  They thought that once

7    they held the Super Bowl of Wrestling Legends

8    Conventions in Tampa in January of '05, there would

9    be so much buzz that we heard about, so much that

10   the fans were dying to see, so many people would

11   come, word would get out that their company's name

12   and brand would be enough to carry them, you know,

13   to make them the next WWE.

14       It just didn't happen, despite the best

15   efforts of the plaintiff and despite the best

16   efforts of Clear Channel.  I've got to get a little

17   water.  I apologize.

18       (Brief pause.)

19       MR. HERBERT:  Actually, what I'd like to do is

20   put up my time line.  Could I put an easel up in the

21   courtroom, Your Honor?

22       THE COURT:  There's one over here.

23       MR. HERBERT:  I'll get it.  Thank you.  Your

24   Honor, is that an acceptable location for that?

25   Sorry.  Do I need a body mic?

1        Okay.  And what I've prepared here is a

2    timeline that will show -- the three Wrestlereunion

3    events are highlighted in red and they're sort of

4    the markers for -- this is generally the calendar

5    year 2005 with just a little more activity in 2006.

6        As we know, the first Wrestlereunion was held

7    on January 28th, 2005.  The contract was signed the

8    day before.  And what happened?  My client, Clear

9    Channel, rushed down to Tampa for the first event

10   and tried their hardest to film it.  They did the

11   best they could.

12       Both parties at that time were very happy with

13   everything.  They were unable to get as much

14   equipment as they would have liked because the Super

15   Bowl -- because Mr. Corrente planned this event the

16   weekend before the Super Bowl, and they couldn't get

17   all the equipment they would have liked to make it

18   ideal.  But they worked their hardest, and you'll

19   hear Mr. Corrente and Mr. Sterling and everybody

20   from both sides felt they did their best.  It was a

21   little bit on the fly.  They worked hard.  Everybody

22   thought that they had done a good job.

23       And then what we heard from Mr. Rodems was

24   that essentially Clear Channel sat on this thing.

25   They didn't market it.  They were stalling.  They

1    had conflicts with WWE and the A&E project was more

2    important to them.

3         Well, what does this timeline show?  The day

4    after the first Wrestlereunion event -- it was

5    completed on January 30th.  The next day my client,

6    Clear Channel, pitched this project to InDemand.

7    InDemand was the largest pay-per-view company in the

8    country at the time.

9         And the very next day after that, InDemand

10   wrote back and raised an issue about a conflict,

11   potential conflict with WWE and the rights to this

12   project.

13        Now, I'm not going to go through every single

14   instance here.  You've been patient enough with us

15   already.  But what you can see is that as this year

16   progressed on, Clear Channel made determined and

17   multiple efforts to attempt to sell this project.

18   And if you think about it, it only makes sense.

19        By the end of the year they had spent

20   $359,000.  There's no dispute about that.  What --

21   what incentive would they have to sit on this?

22   Under the contract, they don't get paid a dime

23   unless this thing sells.  And unless it sells up to

24   a certain point, they get recouped first.

25        There was no guarantee in the contract that

1      the plaintiff is going to get anything.  There is no

2      deadline in that contract.  There is no deadline

3      whatsoever for anything to take place except the

4      15-year term.  We had the rights to the footage, the

5      254 videos that you're going to see in boxes.  We

6      have those rights.  We had them for 15 years.

7      Mr. Corrente did not ask for and it never ended up

8      in the contract that we had any deadline to perform

9      anything.

10          On top of that, there's nothing in the

11     contract that says how we have to market.  You'll

12     hear from Mr. Corrente as he said in his deposition,

13     he was relying on us to use our expertise and our

14     contacts.  Why did Mr. Corrente want to ditch the

15     deal with the small internet retailer Highspots and

16     instead go with a company like Clear Channel?

17     Because of their contacts, because of their history

18     with the entertainment industry, because of their

19     expertise, because they know how to sell these

20     things.  They have relationships and they have sold

21     them before.  And you'll hear from Mr. Sterling and

22     from Mr. Townley that that's the way you sell a

23     project like this.

24          This deal was intended primarily to be a DVD

25     deal.  You go to the people who have bought from you

1     before.  That's why they wanted to use Clear

2     Channel.  That's what Clear Channel did, you'll see.

3     They pitched it to foreign channels in Japan.  They

4     pitched it to the merchandisers.  These are DVD

5     distributors.  Image Entertainment, Ventura

6     Distribution, multiple, multiple contacts.  You take

7     a given month and you can see how many different

8     ways they attempted to sell this project.

9          They took it to France.  They took it to

10    Cannes, France in October of 2005.  They had

11    brochures.  They had personal meetings with more

12    than 40 different potential buyers at that

13    conference.  Despite all this effort, despite 17

14    people working on this project, despite $359,000

15    being spent on it, despite Clear Channel having

16    every incentive to try to make some of its money

17    back, the market said, no, thanks.

18          Can I just leave this here for now?

19          (Brief pause.)

20          MR. HERBERT:  I want to take a look at the

21    contract itself which Mr. Rodems discussed.  And I

22    don't want to bore you with going into the details.

23    We've got a relatively cleaner copy here.  But

24    there's just a few brief things I'd like to point

25    out.  I apologize.  I'm sorry.

1          Now, since this was a letter agreement, it had

2     a re line or a subject line which summarized what

3     the key -- what the primary purpose of this contract

4     was.  And what it says -- what is the subject of

5     this contract?  It's worldwide TV -- TV and DVD

6     production and distribution rights.

7          And how did the finances work?  If anything

8     was going to be sold, ultimately after Clear Channel

9     was recouped the money that it spent, in this case

10    $359,000, the parties would split any proceeds with

11    a 50/50 percent revenue share.

12         Now, that's important because one thing to

13    keep in mind is what this case is not about.  This

14    is not a case in which the plaintiff paid a dime to

15    Clear Channel.  They're not looking for a refund.

16    They're not saying, we paid you this money, we paid

17    you to go out and market this and we want our money

18    back because you didn't live up to what we paid you

19    for.

20         This is more closely akin to a situation in

21    which you have a realtor selling your house.  The --

22    you don't pay the realtor anything.  The realtor

23    makes something if you make money.  The realtor has

24    every incentive to sell your house.  If you don't

25    like that realtor, you can hire another realtor.

1        The plaintiff never chose to do that.  Despite all

2     their complaints, they never went with anybody else.

3          Now, I wanted to look at another -- the first

4     page of the contract in the first paragraph, it

5     generally summarizes what are the -- what are the

6     primary roles of the two parties.  And you can see

7     there about the fourth or fifth line down, you know,

8     the plaintiff in this case, Wrestlereunion, is

9     referred to as the promoter.  So the plaintiff is

10    the promoter.  As I mentioned, they are

11    responsible -- solely responsible for the live

12    events.

13          In the entertainment world, companies like

14    Clear Channel at the time would do things that were

15    made-for-TV events in which the production was set

16    for TV.  This was not a made-for-TV event.  This was

17    an existing live event for which the plaintiff had

18    all the responsibilities for the technical aspects

19    of staging the live event.  And Clear Channel came

20    in to film it and to try to sell it, ultimately.

21          And then if you -- also if you look at what is

22    Clear Channel's primary role in this case.  And it's

23    something to be careful about.  Clear Channel was

24    the producer.  Now, they were the producer of the

25    audio/visual productions.  So the audio/visual side

1        of it, when we talk about production, the plaintiff

2        was the producer and the promoter of the live event;

3        Clear Channel was the producer of the audio/visual

4        component, which ultimately ended up in the 254

5        videotapes that it created.

6            So, again, with all of the hype, as Mr. Rodems

7        said, with all of the people who are dying to see

8        this, with the internet abuzz, what was the end

9        result of the business?  310 tickets were sold and

10       $180,000 was lost.

11           Now, Clear Channel had no idea how -- what bad

12       financial shape the plaintiff was in.  At that point

13       the plaintiff had also borrowed money from a friend

14       of his to try to help keep his company afloat.

15       Nonetheless, Clear Channel continued with the

16       project, and they went on to film Wrestlereunion II.

17       And, you know, the plaintiff's dream was to build

18       this brand, to build this hype and to play off of

19       the success of the first Wrestlereunion event, and

20       they expected that the second one would just be a

21       financial bonanza.

22           But what happened at the second Wrestlereunion

23       event?  Wrestlereunion II, if you -- let's look at

24       the number of tickets that were sold.  As Mr. Rodems

25       said, it was about twice the number of the tickets.

1       So we've got 659 tickets sold only.  The total

2       expenses are $243,000 and the total income is

3       $93,000.  I'm not a math major, but that's about

4       $150,000 in the hole.

5            So at this point.  The plaintiff,

6       Wrestlereunion, is now $333,000 in debt.  Clear

7       Channel is making repeated efforts to market the

8       product.  The market is not responding.  At that

9       point Mr. Attanasio did something that Clear Channel

10      didn't do in this case.  Mr. Attanasio, the

11      long-time friend of Mr. Corrente who was essentially

12      financing the company, he decided to stop throwing

13      good money after bad, and he pulled out of this

14      project.  He was not willing to incur the risk of

15      yet another financial disaster of an event that

16      would just continue to lose money.

17           Clear Channel, however -- Clear Channel wanted

18      to pull out of the events, they wanted to stop

19      throwing good money after bad.  But after

20      discussions with Mr. Corrente, they decided to stick

21      with him.  They agreed to film the third

22      Wrestlereunion, which was held in Davie, Florida in

23      these rodeo grounds.

24           And both sides agreed that they were going to

25      spend a lot less money at that point.  The plaintiff

1    scaled down his expenses substantially, you can see.

2    Instead of spending over $200,000 per show, he spent

3    only $45,000.  The number of wrestlers was reduced

4    dramatically.  It was only a wrestling match show.

5    It wasn't a fan convention.

6         But again, how did the market respond to this?

7    You know, in this case they only lost $23,000.  So

8    at this point they're up to about $350,000 in

9    losses.  And, somewhat coincidentally, that's about

10   the same amount of money that my client lost on this

11   deal.

12        So at that point Clear Channel was -- was well

13   over its financial commitment.  In that contract, as

14   you will see, it had an overall, all in financial

15   maximum, not a minimum, not what it had to spend,

16   but what its overall commitment was -- if we can get

17   the contract back up again, Mr. Brown, and put us on

18   the next page.  Its overall, all in financial

19   commitment is not to exceed $235,000.  So in other

20   words, the overall, all in financial commitment not

21   to exceed approximately $235,000 and, yet, they

22   spent $359,000.

23        As I said, Mr. Sterling bought into this

24   project.  He believed in this project.  He shared

25   the vision that Sal Corrente and Rob Russen had.  He

1    had every incentive for it to succeed.  The company

2    had every incentive for it to succeed.  The market

3    did not respond in the way everybody wanted it to.

4         Now, I want to show you a few clips of some --

5    of the video footage at some point.  But before I do

6    that, I want to address a couple other points that

7    came up in the plaintiff's opening.

8         Now, there's no question that there was a

9    contract entered into between the parties.  That's a

10   red herring.  The only question is, did Clear

11   Channel breach the contract.  And just so you're

12   clear, the question is not did they breach an

13   express term.  There's no term in that contract that

14   the plaintiff will be able to point to and say, this

15   contract says X and we didn't do X.

16        What they're arguing is that because we had

17   the exclusive rights, we had an implied duty to go

18   out and market this thing and to try to make money

19   off of it.  We did that.  Our agreement is we did

20   not breach this contract.  As all of the efforts

21   that are reflected in that timeline show, the amount

22   of money that we spent, the end product that we

23   created, our position is we more than -- we used

24   more than reasonable efforts to attempt to make

25   money off of this product, which we had every

1        incentive to do.

2              And the only other question is did whatever we

3     do cause the plaintiff any damages.  And the key

4     thing to remember here is the plaintiff had planned

5     his business for almost eight months before we ever

6     came along.  It was going forward with

7     Wrestlereunion I with or without Clear Channel.  It

8     had spent the money.  It had made the announcements.

9     It wasn't going to embarrass itself and cancel the

10    show.  They didn't even have a signed contract from

11    us until the day before the event.

12             So they're really not arguing that we took any

13    money out of their pocket.  What they're arguing is

14    that you didn't make us all this extra money that we

15    would have had if you had done your job.  That's the

16    key point to remember.

17             Now, Mr. Rodems spent a good deal of time

18    talking about the quality of the footage and he took

19    some internal e-mails from our employees, some of

20    whom will be here to explain what they really meant

21    and some of them who won't.  It's very clear that

22    Clear Channel would be able to tell you that when

23    they talk about the reason they had difficulty

24    marketing this product due to the quality of the

25    footage, they're talking about the content of the

1    live event.  And I'm going to show you some of the

2    video.  You'll notice Mr. Rodems didn't show you any

3    of the video.  This video is what this case is all

4    about.  We've got, you know, a video of the events

5    themselves.  There's no better evidence as to the

6    quality of the events than the videos themselves.

7        Talking about the audio being a train wreck,

8    one thing that is very clear under the contract is

9    that the plaintiff had the obligation to clear all

10   rights to any of the content.  They had to clear the

11   music rights, they had to clear the rights to any

12   photographs, they had to clear the rights to any of

13   the character's names.  In fact, there were several

14   instances where rights conflict issues came up.

15       Actually, as you can see in the very first

16   response from InDemand, the pay-per-view provider,

17   in response to the e-mail sent by Mr. Sterling the

18   day after the event -- oops, here we go -- InDemand

19   wrote back and stated that they were concerned about

20   rights conflicts with WWE, which is the big dog in

21   the wrestling, and TNA, which was the number two

22   company in the industry.

23       There were rights conflicts with music that

24   was played at the live events.  There's lots of

25   evidence relating to that.  It took a long time to

1    clear it.  And in getting the trailer done, which

2    Mr. Rodems talked about, photos that were provided

3    by Mr. Corrente had not been cleared.  He provided

4    photos to use in the trailer, and we'll show you the

5    trailer her in a minute.  They were not cleared.

6    After Mr. Corrente reviewed the trailer, he said,

7    this is WWE's property, you cannot use this.  We've

8    got to fix this.  This is a problem.

9          This is yet another reason for part of the

10    delay involved and part of the reason that Clear

11    Channel had difficulty getting this sold in the

12    marketplace.

13          All right.  So let's take a look at some of

14    the videos from the events.  Now, as I said, we've

15    got 254 videotapes.  Y'all have been very patient.

16    I would not begin to want to bore you with a long

17    section.  I've tried to cut this down to just three

18    minutes, some samples from all three of the events.

19    I will briefly discuss or identify which event some

20    of these clips came from.

21          I need to give you a warning, though, that

22    viewer discretion is advised.  I assume that when

23    you all heard that this was a wrestling case, you

24    figured that you might see some things that are not

25    things that you normally watch on TV.  Some of the

1    footage is a bit crude.  Some of it is a little

2    profane.  There is a scene with some blood for just

3    a few seconds.  So I want -- it's important to watch

4    this video because that's what this case is really

5    about.  I just want to give you fair warning as to

6    what you might see.

7         Okay.  We can go ahead.  Can we dim the

8    lights, Your Honor?

9         (DVD playing.)

10         MR. HERBERT:  We can stop.  That's footage

11   from a match from Wrestlereunion I which was held in

12   the hotel room.  And that's Dory Funk, I believe it

13   is, one of the purported legends of wrestling,

14   wrestling against a team called America's Most

15   Wanted.

16         I think the next clip is also a clip from

17   Wrestlereunion I here in Tampa.  I think it's a

18   wrestler named Gary Royal versus another wrestler

19   named Marty Jannetty.  We can go ahead and continue.

20         (DVD playing.)

21         MR. HERBERT:  Hold the tape there.  This is

22   another match from the first Wrestlereunion.  The

23   gentleman in the red pants is -- his stage name is

24   Abdullah the Butcher.  I believe that's Dustin

25   Rhodes, son of Dusty Rhodes, who is in the match

1      with him.  Go ahead and play it.

2           (DVD playing.)

3           MR. HERBERT:  Stop it right there.  All right.

4      Now, this is some footage from the second

5      Wrestlereunion which was held in Valley Forge,

6      Pennsylvania right outside of Philadelphia.  And the

7      venue, obviously, is a better venue here.  This

8      was -- took place in August of 2005.  Clear Channel

9      had time to work with the plaintiff, they were able

10     to promote this more, so there's more people in the

11     crowd.  But, again, the footage and the concept is

12     still the same.  This is what's called a chain

13     match, I believe.  So go ahead and run this.

14          (DVD playing.)

15          MR. HERBERT:  Okay.  Stop right there.  Now,

16     another part of the first Wrestlereunion and the

17     second Wrestlereunion were these Q and A sessions.

18     Now, the plaintiff has complained that Clear Channel

19     didn't film every single one of the Q and A

20     sessions.  They were not obligated to film every

21     single thing at the event.  They filmed a lot and

22     they still couldn't sell it.

23          This is a Q and A session from a wrestler

24     whose name is -- stage name is the Blue Meanie.  And

25     this is at the convention center in Valley Forge,

1    Pennsylvania.  This is just a few seconds of this.

2         (DVD playing.)

3         MR. HERBERT:  Stop that right there.  Now,

4    we're moving on to the third Wrestlereunion which

5    was held in the rodeo grounds in Davie, Florida.

6    And this is going to be a match between that

7    wrestler who we just saw, the Blue Meanie, and

8    another wrestler named Kamala the Ugandan Giant, who

9    is one of the first wrestlers that Mr. Corrente

10   signed up very early, long before Clear Channel ever

11   came into picture.  All right.  Let's go ahead and

12   run the clip.

13        (DVD playing.)

14        MR. HERBERT:  Okay.  And you'll have plenty of

15   time to watch these DVDs if you are so inclined once

16   you retire in this case.  I'm not intending to pick

17   out clips.  I tried to be somewhat representative.

18   This is a very, very small portion of it.  I'm not

19   going to bore you with a lot.  Take your time, watch

20   as much of this footage as you want to draw your own

21   conclusions.

22        What I did want to show you was the -- from

23   that raw footage, Clear Channel did ultimately make

24   a promo trailer.  They did send the promo trailer

25   out.  You'll hear the evidence in the case.  What

1        Mr. Rodems said was not evidence.  He's interpreting

2        e-mails between people and documents between people.

3        I want you to keep an open mind, hear from the

4        witnesses themselves what they did to market this

5        product.

6              They sent screeners out.  They sent clips out.

7        They sent this demo out.  And this was -- with what

8        they had to work with, this was the demo they came

9        up with which ultimately they were only allowed to

10       use with their clients because of the rights

11       problems generated by the photographs that were

12       supplied by Mr. Corrente.  Let's go ahead and show

13       the promo.

14             (DVD playing.)

15             MR. HERBERT:  And one final point I wanted to

16       make about the video footage and the end product.

17       Mr. Rodems mentioned these shoot interviews.  Just

18       so you know, you're going to hear the term "shoot

19       interviews", and you might hear the term "a shoot

20       versus a work."  A work is essentially, you know, a

21       story.  A lot of wrestling is story and story line

22       driven.  And when they are in character, that's a

23       work.

24             A shoot interview is supposed to be the

25       real -- the real dope, the inside story.  The

1        wrestlers sit down with a cameraman, they tell their

2        story, they talk about their career, they talk about

3        their life, they talk about what they really

4        experienced in the wrestling industry or in their

5        personal life.

6            Shoot interviews were taken at the first

7        Wrestlereunion event.  And the shoot interviews were

8        a very important part of this project.  In fact,

9        Mr. Corrente had to pay extra to some of the

10       wrestlers for them to be willing to sit down and

11       give a shoot interview.  Some of the wrestlers

12       performed, some of them just signed autographs, some

13       of them performed, signed autographs, and some of

14       them agreed to do shoot interviews.

15           And in that preliminary deal that Mr. Corrente

16       had with Highspots in North Carolina, it's important

17       to note he testified and he'll tell you in his

18       deposition that he felt that that was the one thing

19       that was clear that he had to produce.  He testified

20       that in his arrangement with Mr. Corrente, this is

21       the deal that the plaintiff had, you know, an oral

22       deal before Clear Channel came along that they claim

23       they would have made a lot of money off of it, you

24       know, if we hadn't come along.  That deal, he

25       discussed it with Mr. Corrente.  Mr. Corrente said,

1     you know, I paid extra for these shoot interviews.

2     Those are the things that need to get done.

3          Mr. Bochicchio is the gentleman from

4     Highspots.  He will tell you that the arrangement

5     that I had was that I would try to film as much as I

6     could from Wrestlereunion I, and then I would sit

7     down with Mr. Corrente and we would decide what was

8     marketable, what I could sell, how I could edit it,

9     what we could do, but that the shoot interviews were

10    actually something that he knew he had to put out on

11    the marketplace.

12         Clear Channel put the shoot interviews on the

13    marketplace.  The shoot interviews -- there were

14    four of them.  There was Diamond Dallas Page, who

15    you might have heard of, Windy Richter, Kevin Nash

16    and Bruno Sammartino.  Those four shoot interviews

17    were packaged, they were finalized, they had labels

18    on them, they were shrunk-wrapped, they were created

19    and, in fact, the plaintiff themselves purchased

20    $10,000 worth of those shoot interviews, which they

21    never paid us for.

22         Those shoot interviews were delivered to

23    Wrestlereunion II.  They were supposed to be the hot

24    item to be sold at some of the booths at

25    Wrestlereunion II.  And they were sold through

1    Highspots' internet website.   They did not sell well

2    at all.   Highspots -- Michael Bochicchio at

3    Highspots actually only ordered 1000 of them at a

4    cost of $10,000.   He ordered 250 of each.   He didn't

5    even sell out of two of the wrestlers shoot

6    interviews and he never reordered again.

7         Highspots and Mr. Bochicchio were supposed to

8    be the deal, the one deal that the plaintiff had in

9    place that was going to carry this business

10   financially that was going to take off.   That is how

11   Mr. Russen and Mr. Corrente represented it to

12   Mr. Sterling when they got Mr. Sterling to buy into

13   this deal.   That was a key sign that there was no

14   market interest.

15        If Highspots.com, which sells only wrestling

16   related stuff on its website, couldn't even sell

17   these shoot interviews which was something that was

18   required under the deal to produce that he had with

19   them, then how in the world was anybody going to

20   sell this anywhere else?   And if you look at the

21   timeline, they were sold right at Wrestlereunion II

22   in August of 2005.

23        So that's, you know, about halfway through

24   this marketing process Clear Channel learns that

25   even those things are not going to be sold, there's

1    no market interest in the shoot interviews,

2    extremely declining market interest in the live

3    events, fewer and fewer people attending, no

4    attraction from the marketplace.

5        So in the end with no market interest, Joe

6    Townley of Clear Channel finally decides, like

7    Mr. Attanasio had decided long before him, that he

8    was going to stop throwing good money after bad on

9    this project.  And perhaps at that point he started

10   to wonder what would have happened -- and it's an

11   important question for you to ask -- what would have

12   happened if Steve Sterling had never made that phone

13   could on New Year's Eve in 2004.

14       On behalf of my client, Clear Channel, and my

15   colleague, Dawn Millner, I want to thank you for

16   your willingness to serve as jurors and thank you

17   for your time this afternoon.

18       THE COURT:  Thank you.  Do you have a short

19   witness, Mr. Rodems?

20       MR. RODEMS:  Yes, Your Honor.  Plaintiff would

21   call Bruno Sammartino.

22       COURTROOM DEPUTY CLERK:  Please raise your

23   right hand.

24       (Witness complied.)

25       COURTROOM DEPUTY CLERK:  Do you swear or

```
1    affirm the testimony that you give in this case will

2    be the truth, the whole truth and nothing but the

3    truth, so help you God?

4              THE WITNESS:  I do.

5              COURTROOM DEPUTY CLERK:  Please be seated.

6              (Witness complied.)

7              COURTROOM DEPUTY CLERK:  Please state your

8    name and spell your last name for the record.

9              THE WITNESS:  The name is Bruno Sammartino.

10   Sammartino spelled, S-a-m-m-a-r-t-i-n-o.

11             MR. RODEMS:  May I proceed, Your Honor?

12             THE COURT:  Yes, sir.

13             MR. RODEMS:  Your Honor, if I may, we would

14   need to have the output converted to our side of the

15   table so we can go over some of the exhibits,

16   please.

17             THE COURT:  Are you ready?

18             MR. RODEMS:  Okay.  Thank you, Your Honor.

19                        DIRECT EXAMINATION

20   BY MR. RODEMS:

21   Q    Okay.  Good afternoon, Mr. Sammartino.

22   A    Good afternoon.

23   Q    Where do you live?

24   A    I live in Pittsburgh, Pennsylvania.

25   Q    All right, sir.  And how long have lived
```

1       there?

2       A       I came to this country in 1950 and that became

3       my residence.  I've been there ever since.

4       Q       And how old are you, Mr. Sammartino?

5       A       How old am I?

6       Q       Yes, sir.

7       A       I will be 74 next month.

8       Q       Okay.  And you moved to the United States from

9       Italy?

10      A       Yes.

11      Q       And in -- when was that, again?

12      A       1950.

13      Q       Okay.  Let me show you -- oh, I'm sorry.

14              MS. MILLNER:  Judge, at this point -- I meant

15      to do this after opening.  I want to invoke the rule

16      of sequestration.

17              THE COURT:  It's been invoked.

18              MR. RODEMS:  May I proceed, Your Honor?

19              THE COURT:  Yes, sir.

20              MR. RODEMS:  Thank you.

21      BY MR. RODEMS:

22      Q       Mr. Sammartino, when did you develop an

23      interest in wrestling?

24      A       When I first came from -- I was -- during the

25      Second World War as a child when the Nazis occupied

1      our areas, we hid in the mountains for about 14

2      months.  And I became very sick, almost died with

3      rheumatic fever.  So that when finally we got a

4      chance to come to America, it was because of a very

5      sickly situation that I was in.

6           They started me out -- my doctor advised me to

7      start doing dieting and exercising properly.  And

8      along the way, I got involved into weight training

9      and wrestling, amateur wrestling.  And so as the

10     years progressed and I gained in size and strength,

11     I started competing in both olympic lifting, power

12     lifting and amateur wrestling.  And I did that until

13     1959.

14          In '59 I was approached by -- actually both

15     football -- Pittsburgh Steelers.  I was 275 pounds

16     at the time and they offered me a tryout with the

17     Steelers.  But the wrestling promoters approached me

18     and made me a much better offer than football did,

19     and that's how I got started in 1959.

20          MR. RODEMS:  Your Honor, may I approach the

21     witness for a moment?

22          THE COURT:  Yes, sir.

23     BY MR. RODEMS:

24     Q    When did you begin your professional wrestling

25     career?

1    A       1959.

2    Q       Okay.  Tell us, how long did you actively

3    wrestle?

4    A       I wrestled from 1959 through 2002.  And then I

5    did a few exhibitions in 2005 and '06 because of my

6    son that was in the business.  But 2002 I actually

7    ended my career.

8    Q       And what was the organization known as the

9    Worldwide Wrestling Federation?

10   A       Well, the Worldwide Wrestling Federation, yes.

11   Q       What was that?

12   A       What was that?

13   Q       Yes, sir.

14   A       It was the -- that particular wrestling

15   organization which covered mostly the northeast.

16   And the promoter was not the present McMahon but the

17   Vince McMahon, Sr., and a guy named Toots Mondt.

18   They were the promoters.

19   Q       Did you wrestle in the Worldwide Wrestling

20   Federation?

21   A       I wrestled all over, but I did more for them

22   than anyplace else.

23   Q       And how long did you wrestle for the Worldwide

24   Wrestling Federation?

25   A       Oh, off and on for most of my career.  But

1    although, like I say, I did wrestle for just about

2    every other promotion.  But they were the ones that

3    I did the most wrestling for.

4    Q       Were you ever the WWWF heavyweight champion of

5    the world?

6    A       For 12 years I was.

7    Q       Okay.  Had anyone ever served a longer tenure

8    as heavyweight champion?

9    A       No.

10   Q       Okay.  Did you ever headline Madison Square

11   Garden?

12   A       I believe 211 times.

13   Q       And did you ever sell out Madison Square

14   Garden?

15   A       I believe I've been credited with 187.

16   Q       Okay.  Back in the 1960s, was there one

17   company that dominated wrestling then like the WWE

18   does today?

19   A       Well, the two -- there were many different

20   territories, you know, that were known as different

21   territories, different promotions.  But the two main

22   ones was the National Wrestling Alliance that came

23   out of St. Louis and then, of course, the WWWF

24   became -- NWA was number one at first, and then the

25   WWWF got bigger and bigger, and then I would dare to

1       say that they were the number one.

2       Q       Okay.  Let me, Mr. Sammartino --

3               MR. RODEMS:  May I approach, Your Honor?

4               THE COURT:  Yes, sir.

5               MR. RODEMS:  Thank you.

6       BY MR. RODEMS:

7       Q    Mr. Sammartino, you have a book in front of

8       you, and I'd like to show you an exhibit.  I'll have

9       you look at it and identify it, and then if it's

10      admitted into evidence, we'll have a look at it up

11      on the screen.

12              I'm showing you what's been marked as

13      Plaintiff's Exhibit Number 72 -- I'm sorry, yes,

14      sir, Plaintiff's Exhibit Number 72.  Do you

15      recognize that?

16      A       Well, yes.

17      Q       What is that?

18      A       Well, that's me posing with my championship

19      belt.

20      Q       All right.

21              MR. RODEMS:  Your Honor, I would move Exhibit

22      Number 72 into evidence.

23              MS. MILLNER:  No objection, Your Honor.

24              THE COURT:  I'm sorry.  I didn't hear you.

25              MS. MILLNER:  No objection.

1          THE COURT:  72 is received.

2          (Whereupon, Plaintiff's Exhibit Number 72 was

3    received into evidence.)

4          MR. RODEMS:  May we publish it, Your Honor?

5          THE COURT:  Yes, sir.  Go right ahead.

6    BY MR. RODEMS:

7    Q     All right.  Mr. Sammartino, approximately how

8    old are you in this picture?

9    A     I'd be guessing, but I would say around 30,

10   32.

11   Q     Okay.  And is this the WWWF championship belt?

12   A     Yes, it is.

13   Q     Okay.

14   A     Well, it's one of many.  There were about

15   three different kinds that I had.  Actually, one of

16   them was stolen and -- but that -- that's just one

17   of them.  You could see pictures that would show a

18   different one.

19   Q     Let me ask you if you could thumb through and

20   look at Exhibit Number 81.  If you'll just pull the

21   tab that says 81 on it and look to that one.

22   A     Yes.

23   Q     Do you recognize that person?

24   A     Ivan Koloff.

25   Q     Okay.

1              MR. RODEMS:  Can we move Exhibit Number 81

2       into evidence, Your Honor?

3              THE COURT:  Any objection?

4              MS. MILLNER:  No objection, Your Honor.

5              THE COURT:  81 is received.

6              (Whereupon, Plaintiff's Exhibit Number 81 was

7       received into evidence.)

8       BY MR. RODEMS:

9       Q      All right.  Mr. Sammartino, did you have a

10      match with Mr. Koloff in 1971?

11      A      Well, yeah, in Madison -- well, I wrestled him

12      many times.  But you're talking about the one in

13      Madison Square Garden?

14      Q      Yes, sir.

15      A      Yes, sir.

16      Q      Okay.  What happened during that match?

17      A      I lost my title.

18      Q      Okay.  How did the crowd react to that?

19      A      That was the shocker, the one that shocked the

20      world, the wrestling world, that is, because they

21      were afraid that they were going to be a riot

22      because I had been champion at that time for eight

23      years.  When I said 12 years, it was eight years and

24      then another four later.

25              And it shocked everybody because they expected

1    a riot, really.  And, in fact, a silence came where

2    you could have heard a pin drop and people were so

3    shocked that they -- there was total silence.

4           In fact, when I walked to the dressing room,

5    people were -- which made me feel terrible, they

6    were actually crying and telling me that I was still

7    the best as far as they were concerned and that they

8    loved me and all that kind of stuff.  It was very

9    touching.

10   Q     The fans were very passionate about wrestling?

11   A     Tremendously so.  Back in those days they

12   were, anyway.

13   Q     Okay.  How many states have you wrestled in in

14   your career?

15   A     How many states?

16   Q     Yes, sir.  How many in the United States here?

17   A     Gosh, I think it would be easier for me to

18   tell you what states I did not wrestle in.  I

19   wrestled everywhere.

20   Q     All right.  And how many foreign countries did

21   you wrestle in?

22   A     Oh, my god.  I did, what, 18 or 20 tours of

23   Japan alone.  I did about a dozen tours in

24   Australia, a number of tours in South America, South

25   Africa.  I've been in Europe.  I mean, you know,

1    wrestling is worldwide.

2    Q     Now, at a point in 2004, did Vince McMahon ask

3    you to participate in a DVD release about your

4    career?

5          MS. MILLNER:  Objection, Your Honor.  I just

6    don't see the relevance of any of this.

7          THE COURT:  Overruled.  It's background, I

8    take it?

9          MR. RODEMS:  Yes, sir.

10         THE COURT:  Go ahead.

11         THE WITNESS:  Did Vince McMahon ask to make a

12   DVD in 1984, is that --

13   BY MR. RODEMS:

14   Q     In 2004 did he ask you to participate in

15   something related to WWE 24/7 Classics?

16   A     Oh, for the 24/7 Classic, but that wasn't in

17   '84.

18   Q     No, sir, 2004.  I'm sorry.

19   A     Oh, 2004.  There was talk about it, but I had

20   left the McMahons.  McMahon contacted me and --

21   after his dad had passed on in 1984 to come back to

22   do some color commentating for him.  But I saw

23   drastic changes addressing -- that was going through

24   and I just didn't care for it, didn't like it, so I

25   got out.

1       And when I got out, which was a few years

2    later because I had a contract, I -- I refused to

3    have any participation with that.  What you're

4    talking about, they wanted me to come into their

5    Hall of Fame and other things.  They were going to

6    make a DVD and sell it worldwide and that, but I

7    turned that down.  I have not had anything to do

8    with them since I -- since I left, since I left the

9    organization.

10   Q     Okay.  Let's talk about Wrestlereunion.

11   First, do you know the man over there at the table

12   with the glasses on?

13   A     Sal Corrente.  Yes, I do.

14   Q     Okay.  How long have you known Mr. Corrente?

15   A     I've known Mr. Corrente probably -- oh, wow,

16   let me think here.  I don't know, maybe 20, 25

17   years.

18   Q     And how did you meet him; in the business?

19   A     Yeah.  He was refereeing and I guess I think

20   at one point maybe running some smaller shows, I

21   think.  But he was, you know, known for his

22   refereeing skills.

23   Q     Okay.  Did Mr. Corrente ask you to appear at

24   Wrestlereunion I which was scheduled on January 28th

25   through 30th, 2005?

1    A       Yes, he did.

2    Q       And did you agree to appear?

3    A       Yes.

4    Q       Okay.  And why did you agree to appear?

5    A       Well, for one thing, it -- when -- when he

6    explained it to me, because I asked questions,

7    obviously, and he told me about what

8    Wrestlereunion I was going to be all about.  It

9    sounded enormously spectacular because he was going

10   to bring in not only people from my -- my peers

11   from, you know, that -- that long ago and even

12   before, but also some of the more modern guys.

13           And I thought that that would be something

14   that had never been done before and it was going to

15   be something that I thought after the first one got

16   enough publicity out of it, that I thought it would

17   be something that would become a yearly thing and

18   grow within each year.

19   Q       And had you appeared at other fan conventions?

20   A       Yes, I have.

21   Q       How did what Mr. Corrente have planned for

22   Wrestlereunion compare to other fan conventions that

23   you had been involved in?

24   A       Well, the other ones -- I've been in some

25   where they may have had -- a lot of them where I was

1    the only one who appeared, and there were some that

2    may have been three or four and there were some that

3    maybe 15 or 20.  I don't think I've ever been in any

4    that had much more than that.

5    Q     And then with Wrestlereunion, what was your

6    understanding about that one?

7    A     Well, if I remember correctly, I think there

8    were about 90 wrestlers that appeared on that one.

9    Q     Did you have any concerns when you heard about

10   the talent lineup?

11   A     Did I have concern?

12   Q     Did you have any concerns?

13   A     Well, yeah.  I told Sal that with that many

14   and coming from different parts of the country, I

15   thought that, you know, that the cost was going to

16   be pretty -- pretty extensive because, you know, you

17   have to fly people in from different parts of the

18   country, you put them up for the hotels and what

19   have you, and then there were some finance

20   agreements, I'm sure.  And, you know, one would have

21   to do some, you know, impressive business to --

22   to -- to be successful.

23   Q     Did you learn about anything that eased your

24   concerns?

25   A     Did I what?

1    Q      Did you learn about anything that eased your

2    concerns?

3    A      Yeah.  When -- because I kept talking to Sal

4    about it, and he hadn't told me too much.  But

5    then --

6           MS. MILLNER:  Objection, Your Honor.  We're

7    getting into quite a bit of hearsay.

8           THE COURT:  Well, don't repeat what anybody

9    told you.  Just as a result of whatever discussions,

10   what were your concerns or how were they eased.

11   Sustained.

12          THE WITNESS:  When I learned that -- that

13   Clear Channel, as I was told, was very, very

14   interested, that they approached Sal Corrente and

15   partners into coming into this thing.  When they

16   said that they were going to do DVDs, my

17   understanding was that they were going to be DVDs

18   done of different events that took place at this

19   thing.  And, of course, being as powerful as they

20   are, that they were going to distribute these DVDs.

21          Of course, I don't know if it meant throughout

22   United States, Canada or worldwide.  That part I

23   don't know.  But there was -- they were so vague at

24   what they did that I believed myself that with that

25   kind of strength behind it that that's where the

1    success would come.  Not the only financial success

2    because the show itself would not -- could not, I

3    didn't think, produce financial success because it

4    was too -- too big of an expense thing, but I

5    thought that with the -- with their promotion of the

6    DVDs and whatever, then what would happen --

7            MS. MILLNER:  Your Honor, I'm sorry to object

8    again, but we're getting into opinion testimony.

9            THE COURT:  Give me a legal basis, please.

10           MS. MILLNER:  Opinion testimony, improper

11   opinion testimony.

12           THE COURT:  I'm going to sustain.  Ask another

13   question, please.

14           MS. MILLNER:  Move to strike, Your Honor.

15           THE COURT:  Denied.

16   BY MR. RODEMS:

17   Q    Mr. Sammartino, in your career did you own a

18   professional wrestling company?

19   A    Yes.  I created a company called Spectator

20   Sports from 1966 through 1974.

21   Q    And was your -- did you have a television

22   program for your wrestling company?

23   A    Yes.  We called it Studio Wrestling on NBC

24   affiliate in Pittsburgh, and we had live -- live

25   television.  Yes.

1     Q      On a weekly basis?

2     A      Weekly basis, every Saturday.

3     Q      What was the importance of the television show

4     to your wrestling promotion, if any?

5     A      Well, we promoted to the tri-state area of

6     Western Pennsylvania, Ohio and West Virginia.  And

7     the TV, of course, whatever talent you brought,

8     you're -- naturally you showed them on television

9     and -- weekly and to develop a name and reputation

10    for them.

11           So then you took them to the big civic arena

12    in Pittsburgh, which holds about 19,000.  You went

13    to Ohio, you went to West Virginia, they have good

14    size arenas, and that's how you expected to do

15    business through the advertising of the television

16    that we had.  The people came to the TV.  They

17    didn't even pay.  The idea was -- was strictly for

18    promotional purposes and that's what worked -- you

19    know, that's what worked for us.

20    Q      Did -- how many people averaged your TV

21    audience that didn't pay for the taping?

22    A      Well --

23           MS. MILLNER:  Objection, Your Honor.  This

24    entire line of questioning is not relevant.

25           THE COURT:  Give me legal grounds or I'm

1      not --

2             MS. MILLNER:  Not relevant.

3             THE COURT:  -- going to allow you to stand up

4      again, please.

5             MS. MILLNER:  Not relevant.

6             THE COURT:  Sustained.

7      BY MR. RODEMS:

8      Q     Mr. Sammartino, in your career have you

9      encountered promoters who did not live up to their

10     promises to you in terms of payment?

11            MS. MILLNER:  Objection, Your Honor,

12     relevance.

13            THE COURT:  Sustained.

14     BY MR. RODEMS:

15     Q     Did -- when you appeared at Wrestlereunion I,

16     did Mr. Corrente pay you what he promised you?

17     A     Absolutely.

18     Q     And did he provide hotel accommodations for

19     you?

20     A     Absolutely.

21     Q     And did he provide your travel arrangements

22     for you?

23     A     Yes, he did.

24     Q     Okay.  At that first Wrestlereunion, what did

25     you do?  What was your role?

1      A       Well, I did a question and answer thing, you

2      know, photo sessions, autograph signings, things

3      like that.

4      Q       And let's talk about Wrestlereunion II in

5      Valley Forge.

6      A       Um-hum.

7      Q       Did Mr. Corrente have something special

8      planned for you at the Wrestlereunion II?

9      A       Well, they had the wrestling showing that

10     night.  I did a variety of different things as far

11     as questions and answers, as far as autograph

12     sessions, this and that.

13             But I also -- in 1980, a fellow named Larry

14     Zabisco and I had a -- kind of a feud, and we sold

15     out every arena, including Shea Stadium.  And so

16     there was a 25 year, I believe -- no, it was --

17     anyway, Zabisco was going to be there.  And there

18     was a -- somewhat of a -- you might call it

19     confrontation in the ring that night that kind of

20     created some excitement.  But that's -- that was it

21     as far as that.

22     Q       The night before did you have a tribute

23     dinner?

24     A       Yes.  They had a dinner for me and there was a

25     lot of guests and it was a very wonderful affair,

SanMartino - Direct

1    which was, yeah, I believe it was all filmed.

2    Q      Okay.  Let me ask you to take a look at

3    Exhibit 51.

4           MR. RODEMS:  Your Honor, may I approach the

5    witness?

6           THE COURT:  Yes, sir.

7    BY MR. RODEMS:

8    Q      Do you recognize -- what is Exhibit 51?

9    A      Well, there's a picture of -- if I recognize

10   the gentleman, is this Diamond Dallas Page?  I can't

11   see who this -- let's see, the other fellow.

12   Q      Do you recognize this person?

13   A      Yeah.  That's me at ringside.

14   Q      Okay.  And if you would take a look at Exhibit

15   Number 52.

16   A      Yes.  That's me raising Diamond Dallas Page's

17   hand in victory.

18   Q      Okay.  And if you'd take a look at Exhibit 57.

19   A      Right.  Well, that's me into it with Larry

20   Zabisco.

21   Q      Okay.  And 72 we've already talked about.  Let

22   me just quickly show you Exhibit 80.  And that's

23   your picture in Exhibit 80?

24   A      Yeah.

25   Q      And Exhibit 81 -- oh, wait a minute.

1    A        No.

2    Q        I had one more, I thought, you and Kevin Nash.

3    Okay.  Let me return those.

4            MR. RODEMS:  Your Honor, I would move

5    Plaintiff's Exhibits 51, 52 and 57 into evidence.

6            THE COURT:  Is there any objection?

7            MS. MILLNER:  No.  No objection, Your Honor.

8            THE COURT:  All right.  51, 52 and 57 are now

9    received.

10            (Whereupon, Plaintiff's Exhibit Numbers 51, 52

11    and 57 were received into evidence.)

12            MR. RODEMS:  May we publish those quickly,

13    Your Honor?

14            THE COURT:  Yes, sir.  And then we'll break

15    for the afternoon.

16            MR. RODEMS:  Your Honor, I'd like to move

17    Exhibit 80 into evidence, as well, Your Honor.

18            THE COURT:  Any objection?

19            MS. MILLNER:  No objection, Your Honor.

20            THE COURT:  All right.  80 is received.  Thank

21    you.

22            (Whereupon, Plaintiff's Exhibit Number 80 was

23    received into evidence.)

24            MR. RODEMS:  And if we could publish those.

25    That's Exhibit 51.

1    BY MR. RODEMS:

2    Q      And Mr. Sammartino, is this from the

3    Wrestlereunion at Valley Forge?

4    A      Yes, it is.

5    Q      Okay.  Do you remember what the theme or

6    scheme was for this match, that Mr. Page is

7    wrestling Mr. Zabisco and then --

8    A      What the theme of it was?

9    Q      Well, did it -- at the end of the match did

10   you and Mr. Zabisco have five minutes together?

11   A      Five minutes?

12   Q      In the ring.

13   A      I don't know if it was five minutes.  But,

14   yeah, we had a -- we had a few minutes in the ring,

15   yeah.

16   Q      And that's you holding up Diamond Dallas

17   Page's hand?

18   A      That's correct.  I think he wrestled Larry

19   Zabisco that night.  That's what it was.  It's been

20   a good while ago.  That's why -- yeah.  That's why I

21   was at ringside observing the match with him and

22   Dallas Page.

23   Q      And what's going on in this picture,

24   Mr. Sammartino?

25   A      I forget what -- Zabisco came out and did

Sammartino - Direct

 1    something himself.  I don't remember exactly what

 2    was said or done and called me an old man or

 3    whatever.  Anyway, I went in the ring and one thing

 4    led to another and we exchanged some punches.

 5    Q     All right.

 6          MR. RODEMS:  Your Honor, may we approach

 7    sidebar quickly?

 8          THE COURT:  All right.

 9          (At sidebar, on the record.)

10          MR. RODEMS:  I know we're approaching the end

11    of the day.  I know you promised to let everybody

12    out.  I've got about five questions left for

13    Mr. Sammartino and he has a plane this evening at

14    7:00.  If you want him to come back tomorrow, he'll

15    be there.

16          THE COURT:  Well, if you hadn't taken an hour

17    and ten minutes to give an opening, we'd have time

18    to get him in.  How much cross have you got?

19          MS. MILLNER:  I'm going to have about ten

20    minutes of cross, Your Honor.

21          THE COURT:  Well, that's going to take us well

22    over the time limit.

23          MR. RODEMS:  All right.  Very good.  Whatever

24    you say, Judge.

25          THE COURT:  Let me see if the jury can give 20

Sammartino - Direct

1    minutes.  Do you think you can both finish in 20?

2              MR. RODEMS:  I'll be done in five.

3              MS. MILLNER:  I'll be done in 10 minutes, 15

4    at the max.

5              THE COURT:  Okay.

6              (End of sidebar discussion.)

7              THE COURT:  Members of the jury, to

8    accommodate the witness's flight which is this

9    afternoon, if we can take 20 more minutes, we'll

10   finish up his testimony and he can catch his flight.

11   So we're going to allow a little latitude in our

12   first day.  Go ahead, sir.

13             MR. RODEMS:  Thank you.

14   BY MR. RODEMS:

15   Q     Mr. Sammartino, have you been paid anything to

16   testify here today?

17   A     Absolutely not.

18   Q     Okay.  And can you quickly look at page --

19   Exhibit Number 71.

20   A     Yes.

21   Q     Do you recognize yourself in that picture?

22   A     Yes.

23   Q     Do you recognize the other gentleman?

24   A     I think it's Brad Hart.

25   Q     Okay.

1          MR. RODEMS:  Your Honor, we don't need to

2     publish this, but I'd move 71 into evidence.

3          MS. MILLNER:  No objection.

4          THE COURT:  71 is received.  Thank you.

5          (Whereupon, Plaintiff's Exhibit Number 71 is

6     received into evidence.)

7     BY MR. RODEMS:

8     Q     Mr. Sammartino, did anyone ever advise you

9     that you might be called upon to help promote

10    Wrestlereunion events once the DVDs were in the

11    marketplace?

12    A     I think the only thing I was ever asked was if

13    and when -- when these things were going to be out,

14    maybe if I -- I would do some promotional stuff when

15    asked upon in maybe some different cities or

16    whatever.  That's I believe the extent that I can

17    remember that I was asked.

18    Q     And were you willing to help with that?

19    A     Oh, yes.  Absolutely, I was.

20    Q     Did anyone at any time from Clear Channel

21    Entertainment Television ever call you and ask you

22    to help promote your shoot interview or anything

23    with Wrestlereunion?

24    A     People from Clear Channel?

25    Q     Yes, sir.

1    A       No, no.  I never spoke to anybody from Clear

2    Channel.

3    Q       Okay.

4            MR. RODEMS:  That's all I have, Your Honor.

5            THE COURT:  Cross-examination.  Ms. Millner?

6                        CROSS-EXAMINATION

7    BY MS. MILLNER:

8    Q       Good afternoon, Mr. Sammartino.  My name is

9    Dawn Millner.  I represent Clear Channel

10   Entertainment, now known as Live Nation.  We've not

11   met before; have we, sir?

12   A       Good afternoon.  No, we have not met.

13   Q       We've never spoke before; correct?

14   A       No, ma'am.

15   Q       As I understand it, the plaintiff has flown

16   you down from Pittsburgh to come testify before the

17   jury here today; correct?

18   A       That's correct.

19   Q       All right.  And am I correct, sir, that you've

20   never read the agreement between Clear Channel

21   Entertainment and the plaintiff in this case; isn't

22   that right?

23   A       The agreement of that night?

24   Q       The contract.

25   A       No.  As I was leaving, Sal Corrente gave me to

1      sign it and I asked him what it was, and he

2      basically told me what it was.

3      Q      No, no, sir.  I'm talking about the contract

4      between Clear Channel and the plaintiff.

5      A      No, no.  I never saw the contract, no.

6      Q      You never read it, you don't know what it

7      says?

8      A      No, I don't.

9      Q      All right.  And you don't know what the

10     financial arrangements was between the parties;

11     isn't that right?

12     A      That's correct.

13             MR. RODEMS:  Objection, Your Honor,

14     repetitive.

15             THE COURT:  Overruled.

16     BY MS. MILLNER:

17     Q      And you don't know what effort Clear Channel

18     Entertainment took to market the videos -- the video

19     footage that was taken at the event -- at the events

20     you were at; isn't that right?

21     A      That I didn't know what?

22     Q      You didn't know and you don't know what

23     marketing efforts Clear Channel Entertainment took

24     to market the video footage that was taken at the

25     events that you participated in?

1    A      No.  My understanding was that there was none.

2    Q      You don't know that, sir, you have not

3    reviewed any --

4    A      Well, I never saw any DVDs of any kind that

5    ever came out from them.

6    Q      Did you ever see the DVD that was put on the

7    market of your shoot interview?

8    A      Yes.  You mean of that -- of Wrestlereunion?

9    You're speaking of Wrestlereunion now?

10   Q      Correct.

11   A      No.  I did not see that.

12   Q      You never saw the shoot interview that was put

13   on the market by Clear Channel of your shoot

14   interview; isn't that --

15   A      No, I didn't see it.

16   Q      All right.  And do you know how well that

17   shoot interview sold in the market?

18   A      No, I have no idea.

19   Q      All right.  Do you know what efforts Clear

20   Channel took to market any of the footage that was

21   taken of any of the Wrestlereunion events?

22   A      No, I don't.

23   Q      All right.  So you don't know anything about

24   that?

25   A      Not as far as what they did.

1          MR. RODEMS:  Objection, Your Honor.

2    Repetitive.

3          MS. MILLNER:  I'll withdraw.

4    <u>BY MS. MILLNER:</u>

5    Q     And you would agree with me that there were

6    film crews at both the Wrestlereunion I and

7    Wrestlereunion II events; correct?

8    A     That there were films produced?

9    Q     Film crews were there; correct?

10   A     Yeah.  The crew -- yeah.  I remember in --

11   yes, in Philadelphia, yeah.  But they were -- the

12   things were being filmed, yeah.

13   Q     Okay.  And you never saw any of that footage;

14   correct?

15   A     No, I did not.

16   Q     So you can't comment on the quality of that

17   footage; isn't that right?

18   A     No, I can't.

19   Q     And you've never had any dealings with Clear

20   Channel about this project; isn't that right?

21   A     Absolutely right.

22   Q     And are you aware, sir, that the

23   Wrestlereunion events that were put on and staged by

24   the plaintiff, Mr. Corrente, were financial

25   failures?

1            MR. RODEMS:  Object to the form, Your Honor.

2            THE WITNESS:  I don't know that.  I mean, I

3    never knew --

4            THE COURT:  Wait, sir.  Just a moment.  When

5    there's an objection, I have to rule on it.  I'm

6    sorry.  What was the objection?

7            MR. RODEMS:  Objection, vague.

8            THE COURT:  Let's rephrase it, please.

9            MS. MILLNER:  All right.

10   BY MS. MILLNER:

11   Q     Sir, do you know whether or not -- or rather

12   how much revenue was produced?  Let's just start

13   with Wrestlereunion I.  You were at Wrestlereunion

14   I; correct?

15   A     Yes.

16   Q     All right.  You would agree with me that that

17   was not a sellout crowd; correct?

18   A     Well, you know what?  Honestly, I couldn't

19   tell you what the crowd was because they had us so

20   busy going from one room to another for different

21   things.  I never -- I have no idea how many people

22   were there.  It looked like it was crowded

23   everywhere we went, but I couldn't tell you the

24   number of people, no.

25   Q     All right.  And you don't know how much

1    revenue was produced from that event; do you, sir?

2    A      No, I do not know.  No, nobody ever told me.

3    Q      And you don't know how much was spent on that

4    event; correct?

5    A      No, I don't know.

6    Q      And now let's go to Wrestlereunion II.  You

7    would agree with me that that was not a sellout

8    crowd, either; correct, sir?

9    A      Well, if you say so.  But all I know as an

10   individual participating in everything it was a

11   large crowd.  And everywhere that I participated in,

12   it was full.  It was crowded.

13          Now, I don't know how many people it would

14   hold and how many people were there.  I really have

15   no idea of that.

16   Q      So you don't know whether or not either of

17   those events were sellouts; is that fair?

18   A      That's correct.  I don't know.

19   Q      You've talked to this jury about your

20   wrestling career that dates back to 1959; correct?

21   A      '59, yes.

22   Q      All right.  And I believe you said that you

23   had sold out Madison Square Garden and Shea Stadium

24   at some point in your career; correct?

25   A      Yes.

1      Q       You would agree with me that these events, the

2      Wrestlereunion events, are on a much smaller scale

3      than those were; correct?

4      A       Much smaller scale?

5      Q       Correct.

6      A       I don't know how to compare the two, really.

7      It's two different things.  They're completely

8      different.

9      Q       And you were selling out Madison Square Garden

10     and Shea Stadium in the seventies and early

11     eighties; isn't that right?

12     A       From 1963 on up.

13     Q       To --

14     A       To 1982.

15     Q       Okay.  Since 1982 have you sold out, to your

16     knowledge, any event?

17     A       Have I sold out any events?

18     Q       Yes, sir.

19     A       Well, one time -- a couple times when Vince

20     McMahon, Jr. asked me to put on the tights because

21     Boston or someplace was lagging and he thought that

22     fans still wanted to see me, I did go and I did sell

23     out.  I sold out Boston and Pittsburgh and

24     Philadelphia and Madison Square Garden again.  I

25     did.

1    Q      Okay.  And do you know, then, why the

2    Wrestlereunion event wouldn't have sold out?  Do you

3    know what went wrong with these events?

4    A      I don't know that anything went wrong.  You

5    can't make the comparison between those events.

6    They were so totally different.  Madison Square

7    Garden was, you know, promoted, the matches to so

8    and so.  These were Wrestlereunion with just

9    different wrestlers coming in for interviews, for

10   autograph signings.  It wasn't a card advertisement

11   of any magnitude, you know, like the Garden.

12   Q      Is it fair to say that you don't know what

13   promotional efforts were undertaken to promote the

14   Wrestlereunion events; isn't that right?

15   A      No.  I wasn't part of that, no.  I was merely

16   a participant who came in and did what I was

17   supposed to do.

18   Q      You came in, you did your thing and you left;

19   correct?

20   A      Yeah.  After a couple days of participation, I

21   left, yeah.

22   Q      Didn't look at any of the footage and didn't

23   get involved with any of the marketing efforts of

24   the footage after that?

25   A      No.  Right.

1    Q        Thank you, sir.

2             THE COURT:  Any redirect?

3                        REDIRECT EXAMINATION

4    BY MR. RODEMS:

5    Q        Mr. Sammartino, were you aware that for the

6    fans that's were attending at Wrestlereunion that

7    they were paying as much as $299 for tickets for the

8    three-day event?

9    A        You know what?  That may sound familiar but --

10   yeah, but I'm not sure.

11   Q        Okay.  And then tickets for events in the

12   sixties and seventies for like Madison Square

13   Garden, did they charge $299 for those?

14   A        No.  In my day, especially in the sixties, I

15   don't know, you're talking about maybe $15 or

16   something if I remember correctly, you know.  No,

17   no, no.  The prices were way different.

18   Q        Compared to other fan conventions you

19   attended, did you notice any problems with the way

20   the Wrestlereunion team with Mr. Corrente and his

21   associates ran it, any problems that you noticed?

22   A        No.  No.  Honestly, he did a great

23   professional job.  Everything was very smooth.

24   Everything was first class all the way.

25   Q        Thank you, sir.

1          THE COURT:  Thank you, sir.  May step down.

2     Please watch your step as you exit.

3          Members of the jury, we will recess for the

4     afternoon and begin at 9:00 AM in the morning.

5     Thank you.

6          COURTROOM SECURITY OFFICER:  Please rise for

7     the jury.

8          (Jury out at 4:30 PM.)

9          MR. RODEMS:  Your Honor, is Mr. Sammartino

10    released?

11         THE COURT:  Yes, sir.  He's free to go.  Any

12    objection?

13         MS. MILLNER:  No, no objection.

14         THE COURT:  All right.  Yes, sir.  He's free

15    to go.  Have a safe flight.

16         (Brief pause.)

17         THE COURT:  All right.  A couple of things.

18    If you have an objection, please just give me legal

19    grounds.  I don't need a sentence or a polite --

20    just object.  Pull that mic down closer to you next

21    time, Ms. Millner, so you don't wreck your back

22    trying to lean over.  It moves around quite easily.

23         We are at the end of the day.  If we convene

24    the methodology hearing at 8:00 in the morning, do

25    you think we can accomplish most of the presentation

1    before we start with the jury at 9:00?

2         MR. RODEMS:  Yes, Your Honor.

3         MR. HERBERT:  Well, it would be an evidentiary

4    hearing, Your Honor, or argument?

5         THE COURT:  It's whatever you want to present.

6         MR. HERBERT:  Okay.

7         THE COURT:  You filed your briefs.  We've had

8    his deposition.  So I would hope it would simply be

9    supplemental to what I do already have, very focused

10   much like we did Friday.  Tell me what methodology

11   you used, what were the sources, how did you come

12   about those sources, you know, just focus.

13        MR. HERBERT:  I believe we can accomplish it,

14   Your Honor.  It's a lot of methodology in there and,

15   you know, many, many pages in those reports, as you

16   saw.

17        THE COURT:  But you're forgetting that you are

18   not talking to the jury.  I'm the judge.  We've

19   reviewed all this stuff, so get right to it.  I'm

20   the judge.  Of course, I'm the judge.  You're

21   talking to a judge.  Okay?  I'm three or four steps

22   ahead of you so you don't need to mince or go

23   through all the minutia.  Just ask him very direct

24   questions.  Can Mr. --

25        MR. HERBERT:  Bowman?

1            THE COURT?   Bowman be here tomorrow morning?

2            MR. RODEMS:   Yes, sir.  If you want him here,

3        he'll be here.

4            THE COURT:   Well, I think we can make use of

5        that hour before we get the jury, give you guys a

6        few minutes before the jury comes in.  So we'll plan

7        on about 50 minutes.  Keep in mind this young lady

8        has to take everything down so we can't run her

9        ragged or else we won't have a court reporter.

10           Okay.  We'll see you then in 8 o'clock in the

11       morning.  You can leave everything in the courtroom,

12       if you'd like to.  We'll be in recess.  Thank you.

13           MR. HERBERT:   Thank you.

14           COURTROOM SECURITY OFFICER:  All rise.

15            (Proceedings concluded at 4:30 PM.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3      STATE OF FLORIDA            )

4      COUNTY OF HILLSBOROUGH     )

5         I, Linda Starr, RPR, Official Court Reporter for

6      the United States District Court, Middle District,

7      Tampa Division,

8         DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 276, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16        IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 21st day of March 2010.

19

20

21            _____/s/ Linda Starr_____
              Linda Starr, RPR, Official Court Reporter
22

23

24

25