```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                          TAMPA DIVISION


 3       WRESTLEREUNION, LLC,


 4           Plaintiff,


 5               vs.          CASE NO. 8:07-CV-2093-T-27MAP
                              1 SEPTEMBER 2009
 6                            TAMPA, FLORIDA
                              PAGES 1 - 350
 7                            VOLUME II


 8       LIVE NATION TELEVISION
         HOLDINGS, INC.,
 9
             Defendant.
10
         _____/
11
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12             BEFORE THE HONORABLE JAMES D. WHITTEMORE
                     UNITED STATES DISTRICT JUDGE
13
         APPEARANCES:
14
         For the Plaintiff:   Ryan Christopher Rodems
15                            Barker, Rodems & Cook, PA
                              Suite 2100
16                            400 N. Ashley Drive
                              Tampa, Florida 33602
17
                              Chris A. Barker
18                            Barker, Rodems & Cook, PA
                              Suite 2100
19                            400 N. Ashley Drive
                              Tampa, Florida 33602
20
         Also present:        Sal Corrente
21

22

23

24
          Proceedings recorded and transcribed by
25       computer-aided stenography.
```

Linda Starr, Official Court Reporter, 813-301-5252

```
 1     For the Defendant:       Gregory W. Herbert
                                Greenberg Traurig, LLP
 2                              450 S. Orange Avenue
                                Suite 650
 3                              Post Office Box 4923
                                Orlando, Florida 32802-4923
 4
                                Dawn Giebler-Millner
 5                              Greenberg Traurig, LLP
                                450 S. Orange Avenue
 6                              Suite 650
                                Post Office Box 4923
 7                              Orlando, Florida 32802-4923

 8                              Richard A. Munisteri
                                Paula Castro
 9                              Matthew Brown

10     Court Reporter:          Linda Starr, RPR
                                Official Court Reporter
11                              801 N. Florida Avenue
                                Suite 13B
12                              Tampa, Florida 33602

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                         I N D E X

2    Witness                               Page Number

3    Colin Bowman

4    Direct Examination by Mr. Rodems.......    4

5    Jimmy Hart

6    Direct Examination by Mr. Rodems.......   53
     Cross Examination by Ms. Millner.......  124
7    Direct Examination by Mr. Rodems.......  168

8    Joe Townley by deposition..............  178

9    John Gallarello by Deposition..........  181

10   Robert L. Russen

11   Direct Examination by Mr. Rodems.......  202
     Cross Examination by Ms. Millner.......  266
12
                         EXHIBITS
13
     Plaintiff's Exhibit Number 1...........   47
14   Plaintiff's Exhibit Numbers 14, 15, 16,
        17 and 18...........................   47
15   Plaintiff's Exhibit Numbers 20 - 30....   47
     Plaintiff's Exhibit Numbers 32, 34, 48,
16      89 through 91, 93 through 95, 97
        through 99, 101, 103, 105, 107, 108,
17      113 through 119, 130, 134, 137, 138,
        140, 144 through 149 and 155, 158....   51
18   Plaintiff's Exhibit Number 9...........   66
     Plaintiff's Exhibit Number 157.........   80
19   Plaintiff's Exhibit Number 12..........   84
     Plaintiff's Exhibit Number 3...........  119
20   Defendant's Exhibit Number 6-73........  132
     Defendant's Exhibit Number 34..........  135
21   Defendant's Exhibit Number 52..........  141
     Defendant's Exhibit Number 4...........  149
22   Defendant's Exhibit Number 110.........  159
     Plaintiff's Exhibit Number 136.........  236
23   Plaintiff's Exhibit Number 104.........  245
     Plaintiff's Exhibit Numbers 142, 143...  252
24   Plaintiff's Exhibit Number 11..........  262
     Plaintiff's Exhibit Number 10..........  263
25   Plaintiff's Exhibit Number 110.........  286
     Defendant's Exhibit Number 159.........  290
```

1              COURTROOM SECURITY OFFICER:  All rise.  This

2    Honorable Court is now in session, The Honorable

3    James D. Whittemore presiding.

4              Please be seated.

5              THE COURT:  Good morning.

6              MR. HERBERT:  Good morning.

7              THE COURT:  Mr. Bowman is on the stand.  This

8    is a continuation of the *Daubert* hearing.  He

9    remains under oath.

10             How would you like to proceed?

11             MR. RODEMS:  May I inquire, Your Honor?

12             THE COURT:  Yes, sir.

13             MR. RODEMS:  Oh, Your Honor, the rule of

14   sequestration is still in effect; correct?

15             THE COURT:  We're not in front of a jury right

16   now.

17             MR. RODEMS:  Yes, sir.

18                      DIRECT EXAMINATION

19   BY MR. RODEMS:

20   Q     Mr. Bowman, under the holding in *W. W. Gay*

21   *Mechanical Contractor, Inc. versus Wharfside,* a

22   Florida Supreme Court case, quote, a business can

23   recover lost --

24             THE COURT:  All right.  Wait, wait, wait.

25   What are you doing?

 1          MR. RODEMS:  Laying a found --

 2          THE COURT:  Ask him questions.

 3          MR. RODEMS:  Laying the foundation for the

 4     question.

 5          THE COURT:  Ask him questions about his

 6     methodology.

 7          MR. RODEMS:  All right.

 8     BY MR. RODEMS:

 9     Q      How would you describe the methodology you

10     used to project net lost profits for Wrestlereunion?

11     A      I -- sorry.  I used the same methodology as I

12     would have used to produce any business plan that I

13     previously made, any business plan anyone would have

14     come and asked me for today.  My methodology seems

15     to also have matched the methodology used by the

16     defendant's expert witnesses, as well.

17     Q      Okay.  If you had been commissioned by

18     Wrestlereunion at the beginning, at the moment it

19     signed a contract with Clear Channel to perform a

20     study to obtain commercial financing for the

21     project, would you have used any different

22     methodology than you used?

23     A      None whatsoever.

24     Q      Okay.  You calculated lost profits for a

25     variety of different types of revenues; correct?

```
 1    A       Yes, I did.

 2    Q       Conventions?

 3    A       Yes.

 4    Q       Live events?

 5    A       Yes.

 6    Q       TV?

 7    A       Yes.

 8    Q       Pay-per-view?

 9    A       Yes.

10    Q       DVD?

11    A       Yes.

12    Q       Etcetera.  Okay.  To illustrate your

13    methodology, I wanted to pick one revenue category

14    and focus on that.  Let's -- let's talk about the

15    fan conventions.

16    A       Okay.

17    Q       Okay.  Mr. Bowman, in your Rule 26 report,

18    your supplemental report, did you project net lost

19    profits that you determined had occurred from

20    Wrestlereunion not moving forward in 2006, 2007,

21    2008 and 2009?

22    A       Yes, I did.

23    Q       Okay.  Would you explain the process you

24    followed.

25    A       Okay.  I examined the information presented to
```

1    me from Wrestlereunion about their costs and their

2    performance, all the spreadsheets they -- they

3    provided to me.  I looked at their model and saw

4    that they were already evolving their model from one

5    price down to the next -- oh --

6    Q       Please continue.

7    A       Okay.  From one price down to the next price.

8    I then looked around at other convention models that

9    were out there.

10   Q       Let me stop you there.

11   A       All right.

12   Q       All right.  Did you look at the data that was

13   available from Wrestlereunion about the attendance

14   that it had at the first two Wrestlereunion

15   conventions?

16   A       Yes, I did.

17   Q       Did you look at the data regarding the

18   expenses that had been incurred?

19   A       Yes, I did.

20   Q       Did you look at the data regarding the ticket

21   price that had been charged?

22   A       Yes, I did.

23   Q       Okay.  What else did you look at?

24   A       I looked at the expenses that they -- they

25   gave.  I looked at other conventions that were

1    taking place.  I looked at conventions I had

2    attended and been a part of setting up.  And I came

3    to my conclusions of what the pricing and attendance

4    should be going forward.

5    Q      Okay.  Do you have in front of you the

6    exhibits?  If you could look at Exhibit Number 117,

7    please.

8    A      Oh, okay.  I have it.

9    Q      Okay.  What do you notice about the attendance

10   change between Wrestlereunion I and II?

11   A      It almost doubled.

12   Q      Okay.  What was the maximum ticket price for

13   Wrestlereunion I?

14   A      That's not on this sheet.  I -- can I refer to

15   my --

16   Q      Yes, sir.

17   A      Sorry.  $249, I believe.

18   Q      Okay.  And what was the maximum ticket price

19   for Wrestlereunion II?

20   A      $149.

21   Q      Okay.  What did the change in attendance from

22   Wrestlereunion I to Wrestlereunion II and the change

23   in ticket price from Wrestlereunion I to

24   Wrestlereunion II show you?

25   A      Well, it indicated that people were more

1    likely to attend if they had the lower price and

2    also if they had an ala carte menu to choose from as

3    opposed to just having to buy one ticket for

4    everything, that if they were given a choice whether

5    they wanted to attend the show, attend the

6    convention, you know, the price reduction was

7    important.

8    Q      Okay.  So for Wrestlereunion II, there were

9    different events that fans could attend and buy a

10   ticket just for that event?

11   A      That's correct.

12   Q      For example, Bruno's dinner?

13   A      That's right.

14   Q      Okay.  And then there was a Mick Foley comedy

15   show?

16   A      Yes.

17          MR. HERBERT:  Objection, Your Honor.  This is

18   all leading questions.

19          THE COURT:  It's all what?

20          MR. HERBERT:  It's leading.

21          THE COURT:  Counsel, come on.  We're not in

22   front of a jury.  I'll assess the credibility of the

23   witness.  If he's been leading him through it, then

24   he won't have as much credibility.  You don't need

25   to object.

1     BY MR. RODEMS:

2     Q      Did you project attendance in your

3     calculations for Wrestlereunion conventions for 2006

4     to 2009?

5     A      Yes, I did.

6     Q      Okay.  Now, of course, Wrestlereunion did not

7     hold fan conventions during those years; correct?

8     A      No, sir.

9     Q      Okay.  So did you have to project attendance?

10    A      Yes.

11    Q      Ticket prices?

12    A      Yes.

13    Q      Expenses?

14    A      Yes.

15    Q      Okay.  Describe the method you used to arrive

16    at those projections.

17    A      First of all, I looked back at conventions I

18    had attended and how much money the people were

19    charged and what the attendances were.  I then

20    looked through various wrestling documents and

21    looked at other conventions that were there and what

22    the pricing was and the attendance.

23           I re-examined Wrestlereunion's model, which

24    was very intimate settings that they wanted.  I used

25    my experience at autograph conventions to see how

1    many people you could feasibly keep happy for a

2    price.  Bear in mind that everyone would want to

3    continue there and meet the wrestlers, but if you

4    just let 10,000 people in there, charge them a

5    hundred dollars or so, they're not all going to get

6    to meet the wrestlers and it's going to be chaos.

7         And then I examined Wrestlereunion's expenses

8    which I find to be in line.  I felt they could do

9    more by organized meetings with hotels.  I felt they

10   could get more back from hotels, probably get the

11   meeting rooms for free.  But just for the basis of

12   this business plan, I used the models that most

13   suited.

14   Q     Did you have any data that you relied on from

15   fan conventions that occurred during these years,

16   2006, 2007?

17   A     Yes, I did.

18   Q     What conventions were those?

19   A     There was NWA Fanfests in Charlotte.  And

20   there was also -- TNA were doing fan interactions

21   whereby the day before the show, they would allow

22   fans to -- to pay money to attend and get autographs

23   from wrestlers.

24   Q     Were these other conventions nearly identical

25   to Wrestlereunion?

```
 1     A       Not -- no.  They didn't have the volume, they

 2     weren't set up with the talent.  They were -- you

 3     know, they were smaller in scale.

 4     Q       Okay.  Did the sources of data you used give

 5     you any information regarding ticket prices --

 6     A       Yes.

 7     Q       -- that other conventions charged?

 8     A       Yes.  I got ticket prices.

 9     Q       Did the data you have show what the attendance

10     was at various other conventions?

11     A       Yes, it did.

12     Q       Did the data you have show the talent that

13     appeared at those conventions?

14     A       Yes.

15     Q       Did you factor that information into your

16     projections for Wrestlereunion?

17     A       Yes, I did.

18     Q       Okay.  Now, how many people did you project

19     would attend Wrestlereunion fan conventions during

20     this time period of 2006 to 2009?

21     A       I felt a thousand people over the two-day

22     period would be a -- you know, that would be what

23     they could expect.

24     Q       Okay.  Did you -- how did you reach that

25     conclusion?
```

 1    A      Based on the evidence that I could find in

 2    Observers Powerslam magazines, internet forums and

 3    my own experience.

 4    Q      And those sources of data told you what?  Or

 5    what was in those sources of data, I should say.

 6    A      That a thousand people would be a reasonable

 7    expectation at a particular price point.

 8    Q      Well, what was actually in those sources of

 9    data that you used to reach that conclusion?

10    A      Oh, it had attendance figures -- yeah.  There

11    was attendance figures, there was price points,

12    there was the autographs, there was who was

13    appearing.  You know, it gave a full rundown of each

14    of these events.

15    Q      Now, in calculating your projected net lost

16    profits, did you determine what you believed the

17    reasonable expenses would be associated with staging

18    the fan conventions?

19    A      Yes, sir.

20    Q      And how did you go about reaching that

21    conclusion?

22    A      I used Wrestlereunion's numbers and I also

23    checked them out on other similar costs that I have

24    seen related to the cost of hiring talent, hotels,

25    travel.

1     Q       And in projecting future conventions, did you

2     take into account the talent that had appeared at

3     Wrestlereunion I and II?

4     A       Yes.

5     Q       Okay.  Did you factor into your projections

6     competition in the marketplace?

7     A       Yes, I did.

8     Q       How did you do that?

9     A       I looked at who was out there, if anyone was

10    running conventions that would -- you know, that

11    were nationally, you know, everywhere and pointing

12    out.  But most of the conventions that were out

13    there were just regional, they weren't necessarily

14    happening at the same time period.  You know, it's

15    not like there's big conventions for wrestling every

16    single month.  There is opportunities to, you know --

17    Q       Now, the TNA convention, did that focus solely

18    on the TNA roster?

19    A       Yes, it did.

20    Q       And the NWA convention that you talked about,

21    did that focus on the wrestlers that wrestled in the

22    NWA?

23    A       Yes.  Occasionally they would bring in, you

24    know, people that had a loose affiliation but, yes,

25    it did.

1    Q      How about the talent that appeared at

2    Wrestlereunion?  Was it as restricted as TNA or NWA?

3    A      No.  It was talent from everywhere.

4    Q      Okay.  Why did you in your projections cap

5    attendance at the fan conventions at a thousand

6    fans?

7    A      I wanted to -- if it had been my convention, I

8    would have wanted all those fans to have a really

9    good appearance, go off and tell everyone how great

10   it was and that they got to meet the wrestlers and

11   be intimate with them as opposed to all the other

12   reports I read on other conventions where people

13   were just jammed in like cattle, move along, move

14   along.  You had no time to shake hands or speak to

15   people.  I've experienced those conventions.

16   They're not pleasurable and you would never go back

17   to them.

18   Q      Did you talk to Mr. Corrente about what his

19   vision was for Wrestlereunion?

20   A      Yes, I did.

21   Q      Okay.  Did his vision for attendance match

22   what you've just testified to?

23   A      Yes.  He wanted to keep things intimate.  He

24   wanted fans to get time with the wrestlers and he

25   wanted to keep it, you know, a small field.

1    Q      Did you reach a conclusion that if the price

2    per ticket was decreased, attendance would increase?

3    A      Yes.

4    Q      And what did you base that on?

5    A      I based it on the fact that a thousand people

6    were happy to pay 49.95 and then take their choice

7    as to whether they paid $10 for a photograph or $15

8    for an autograph with particular wrestlers.

9           It didn't seem to me that back in 2006 people

10   were going to pay $249 or $149 and be told exactly

11   what to do.  That being said, nowadays -- and I

12   just, you know, attended a convention a few weeks

13   ago, and it was $155, and you didn't get the choice.

14          And they had -- you know, over 600 people paid

15   that money and waited a long time for autographs.

16   So it was a -- you know, perhaps they were ahead of

17   their time but, you know, the -- the model

18   definitely needed to evolve downwards and I think

19   they showed that they were moving that model

20   downwards.

21   Q      All right.  Did --

22          THE COURT:  Mr. Rodems, let me suggest that

23   you move into the revenue aspect of his

24   calculations.  I think the expense projections --

25   you've satisfied me that he has at least applied the

1    appropriate methodology and comparison.  I'm more

2    interested in his expense -- I mean, his revenue

3    projections.

4          MR. RODEMS:  Yes, sir.

5    BY MR. RODEMS:

6    Q    Mr. Bowman, if you could talk about how you

7    projected revenue for the conventions in 2006, 2007,

8    2008 and 2009.

9    A    Okay.  Well, basically, I never -- even though

10   Wrestlereunion had shown that it was going in the

11   right direction with the reduction of the price

12   equalling the -- the level of attendance, I never

13   actually changed my projection of the attendees

14   throughout the whole projection until 2009 when I

15   suggested that it spins off and becomes a licensed

16   property.

17         I kept the thousand at 49.95, knowing that

18   with television, DVD, pay-per-view, the interest in

19   Wrestlereunion was just going to keep getting

20   stronger.  And if you can keep your audience to a

21   very limited quantity, the demand will grow.  So if

22   you know there's only a thousand tickets to be had

23   for something and you miss out on that one, then

24   you're going to be keener to get to the next one.

25   Q    Okay.  But did you factor into your

1    calculations the same methodology that you would

2    have used if you had been going to a financing

3    company and saying, we're planning to put on this

4    Wrestlereunion event and here's what we project for

5    attendance?

6    A      Oh, absolutely.  I would have -- you know, the

7    good thing about the legends and professional

8    wrestling in the United States is you just have to

9    look at how many territories, how many, you know,

10   large companies, independents there were back from

11   the fifties, sixties, seventies and eighties.  And

12   you can take this convention on the road and with

13   the right, you know, publicity and the right mix of

14   talent, you can easily get 1000 people to come to

15   your show to meet their heros, and meet their heros

16   close up and personal.

17          When the WWE does its Fan Access Tours and

18   just sends along Jimmy Hart and Hillbilly Jim,

19   sometimes they're getting in excess of 10,000 to

20   12,000 people showing up just to see some of the

21   legends from the past.

22   Q      So did you factor into account not only the

23   reputation of the talent but the enhancement of the

24   Wrestlereunion name by its affiliation with Clear

25   Channel?

1     A     Yes.  Wrestlereunion, with Clear Channel

2     backing it, with the access that all gives and the

3     exposure of the -- you know, the DVD sales, the TV

4     shows, the pay-per-views, it becomes a very, you

5     know, desirable property.  People want to attend.

6     Q     Did you factor into your evaluations of the

7     attendance and the ticket price and the projections

8     of revenue things like the promotional opportunities

9     that were afforded or would have been afforded to

10    Wrestlereunion by its affiliation with Clear

11    Channel, such as billboards?

12    A     Yes.  I believe that by being an affiliate of

13    Clear Channel and part of that -- that family, your

14    advertising rates, you're only paying one-seventh of

15    what the general, you know, public would be paying.

16    Q     What are you basing that on?

17    A     In amongst the documents some e-mails going

18    backwards and forwards where they tell Mr. Corrente

19    that you could have a billboard for one-seventh the

20    price, which is the Clear Channel family rate.

21    Q     Okay.  And so ultimately you made projections

22    on how many people would attend and you capped your

23    attendance at 1000?

24    A     Yes, I did.

25    Q     Okay.  And if we look at the attendance at

1      Wrestlereunion I, there were 240 VIP tickets sold at

2      $249; correct?   Exhibit 117 if you look under

3      income.

4      A       Yes, sir.

5      Q       Okay.  And then if we look at Wrestlereunion

6      II, which is the next page --

7      A       Um-hum.

8      Q       -- 495 VIP tickets at $149?

9      A       That's correct.

10     Q       Okay.  So the trend was an increase in

11     attendance at Wrestlereunion?

12     A       Yes.

13     Q       Okay.  Now, were you in a position to evaluate

14     Wrestlereunion on a before or after basis, in other

15     words, looking at the profitability of

16     Wrestlereunion before dealing with Clear Channel and

17     the profitability of Wrestlereunion after dealing

18     with Clear Channel?

19     A       No.

20     Q       Why not?

21     A       Because there was no before.  There was never

22     a Wrestlereunion before the Clear Channel deal.

23     Q       And there was no after?

24     A       No.

25     Q       Okay.  So in other words, there was nothing to

1    compare Wrestlereunion to in 2006, 2007 because no

2    events took place?

3    A       That's correct.

4    Q       Okay.  Did you find a company putting on fan

5    conventions that was nearly identical to

6    Wrestlereunion?

7    A       No, not -- not to the level.

8    Q       Okay.  Was the TNA fan convention closely

9    comparable?

10   A       No, because it was basically just a

11   self-promotional tool for TNA to help boost their

12   attendance the next day at the pay-per-view which

13   was, you know, free attendance.  But they used this

14   as a method of saying, hey, we're doing a

15   pay-per-view in town and come along and for 49.95

16   each you can meet the wrestlers.

17   Q       And did -- based on your observation of the

18   talent involved at TNA, did it compare favorably to

19   the talent quality at Wrestlereunion?

20   A       No, it did not.

21   Q       Okay.  Did you look at WWE type of fan

22   conventions or fan interactions?

23   A       Just looked at the size of them and the scale,

24   but they didn't do anything with the -- you know,

25   the -- it wasn't this kind of event.

 1    Q      In other words, was it closely comparable to

 2    Wrestlereunion?

 3    A      No, it was not.

 4    Q      Okay.  And did you look to see if Ring of

 5    Honor, for example, did any type of fan conventions?

 6    A      No.  I mean, they were barely putting 160

 7    people in seats at pay-per-views.

 8    Q      Okay.  Did you read the depositions of Eric

 9    Bischoff and William Behrens?

10    A      Yes, I did.

11    Q      They were the defendant's experts?

12    A      Yes, they were.

13    Q      Was there some discussion in Mr. Bischoff's

14    deposition about a business plan he had put together

15    to start a new wrestling organization?

16    A      Yes, there was.  But it didn't seem to me that

17    he actually did the business plan.  But from what he

18    was saying was in there and what was considered, it

19    was a very similar business plan to mine.

20    Q      Similar in terms of data or similar in terms

21    of what was conducted to reach the business plan

22    concluded?

23    A      He looked at the revenue streams, they looked

24    at live events, they looked at pay-per-view, they

25    looked at DVD sales, they looked at TV programming,

 1    you know, advertising.  Of course, they didn't look

 2    at conventions and things like that because that

 3    wasn't their model.

 4    Q     But in looking at the available data,

 5    Mr. Bischoff and whoever assisted him with that

 6    report then projected expenses and revenues that

 7    would be associated to show what the potential

 8    profit was?

 9    A     Yes, they did.

10    Q     Okay.  And did Mr. Behrens testify about --

11          THE COURT:  Mr. Rodems, either this man stands

12    on his own qualifications and methodology or he

13    doesn't.  His critique of the other experts is not

14    helping you.

15          MR. RODEMS:  Well --

16          THE COURT:  I want to know what methodology he

17    used to project revenue stream, what assumptions he

18    made, what sources of information he considered and

19    how he applied the yardstick method.  Plain and

20    simple.

21          MR. RODEMS:  Yes, sir.  What I'm trying to

22    offer is that the methodology he used was recognized

23    by other experts and the standard on reliability --

24          THE COURT:  He hasn't told me what methodology

25    he used yet, other than the expense projections of

1    putting on the show.  That's not the issue.  The

2    issue is the projected income from pay-per-view,

3    television and DVD sales.

4          MR. RODEMS:  Okay.

5          THE COURT:  Internet, training camps,

6    merchandise, licensing.

7          MR. RODEMS:  Yes, sir.

8    BY MR. RODEMS:

9    Q     Tell us how you projected revenue for DVD

10   sales.

11   A     The first thing I looked at when I was looking

12   at the DVD sales was Clear Channel's projections as

13   to what they anticipated they would sell from

14   Wrestlereunion I.  And the figure they came up with

15   was 60,000 copies over the lifetime of the DVD.

16         That sounded high to me based on just my own

17   experience of the XWF where I had anecdotal, you

18   know, maybe it sold 20,000, 24,000.  I then looked

19   at other DVDs that were out on the market being

20   sold.  I discovered that Ring of Honor, which didn't

21   have anywhere near the talent level of

22   Wrestlereunion but had many DVDs out on the market,

23   had only sold a maximum of 10,000 copies.

24         I then looked at other WWE titles which

25   featured some of the stars that Wrestlereunion had,

1    and they had 80,000 to, you know, over 100,000

2    sales.

3           THE COURT:  I'm sorry.  Would you identify for

4    me who you're referring to, what events.

5           THE WITNESS:  There was The Greatest Stars of

6    the Eighties, The Greatest Wrestling Managers.  They

7    had, you know, Dusty Rhodes, Jimmy Hart, Bob the

8    Brain Hennan, Sherry Martell.

9           THE COURT:  When was this convention put on?

10          THE WITNESS:  No, it wasn't a convention, Your

11   Honor, this was DVDs.

12          THE COURT:  Just DVDs by themselves?

13          THE WITNESS:  Yes.

14          THE COURT:  Unrelated to a videotaped

15   convention?

16          THE WITNESS:  No.

17   BY MR. RODEMS:

18   Q     Well, the DVD sales were of wrestling matches?

19   A     Yes, they were.

20   Q     And wrestling matches took place at the

21   Wrestlereunion fan conventions?

22   A     Yes, they did.

23   Q     And wrestling matches took place at the Davie

24   show; correct?

25   A     Yes, sir.

1    Q      And the talent that you used in projecting

2    revenue for Wrestlereunion, you compared that to

3    DVDs of these same people currently in the

4    marketplace?

5    A      Yes.  That's -- that's what I did.

6    Q      And you looked at levels of sales of those?

7    A      Yes.  But I didn't use those sales levels in

8    my projection because even with Clear Channel

9    backing, I still felt those sales were -- were too

10   high.  I came to the conclusion that 38,000 sales

11   would be a reasonable figure over the five-year

12   period based on the growth of the Wrestlereunion

13   brand.

14          And, also, the price points that I picked,

15   whereas instead of charging 19.95, I dropped the

16   price down to -- let me just -- I dropped the prices

17   down to 12.99, which I felt was a good price for the

18   product that was going to be produced, seeings how

19   it had already been seen on pay-per-view.

20   Q      Let me just stop you there.  You didn't just

21   pull this number 12.99 out of the sky; did you?

22   A      No, I did not.

23   Q      How did you reach a conclusion of 12.99?

24   A      I looked at the prices of other DVDs in the

25   market, older ECW, older legends material that was

1    out there, and the prices it was charging, and

2    that's the prices I came up.

3          THE COURT:  Where did you come up with the

4    38,000 figure?

5          THE WITNESS:  Well --

6          THE COURT:  And the defendant had projected

7    60,000.  You believed that to be too high based on

8    you're market research; correct?

9          THE WITNESS:  Yes, I did.

10         THE COURT:  Ring of Honor sold only 10,000.

11   You considered that to be lower than what you

12   thought was reasonable?

13         THE WITNESS:  I considered that to be lower

14   based on the level of talent on other Ring of

15   Honor -- yeah, on the -- the Ring of Honor DVDs.

16   BY MR. RODEMS:

17   Q     How did the Ring of Honor talent compare to

18   the talent of Wrestlereunion?

19         THE COURT:  I accept what he's saying.  I'm

20   just trying to go through the process.  How did you

21   get to the 38,000?

22         THE WITNESS:  Okay, Your Honor.

23         THE COURT:  That just goes to his weight,

24   Mr. Rodems.  I'm really more interested in how he

25   got to a specific number.

1          MR. RODEMS:  Yes, sir.

2          THE COURT:  I mean, was it average or did you

3    just look at three or four events?  And I'm not

4    trying to put words in your mouth, I'm trying to

5    understand what your thought process was.

6          THE WITNESS:  Okay.  Hold on.  Let me just get

7    to my -- okay.  I actually wrote here on the

8    business plan, and this was based again with my

9    knowledge of the XWF DVD sales.  It was my belief

10   that Wrestlereunion as an event would shift a total

11   of 25,000 copies for a show with no TV but backed up

12   by Clear Channel's distribution plan.

13         If the -- and most of the -- and the way I

14   projected it as a revenue stream was instead of just

15   saying 25,000 sold in the first month, which isn't

16   going to happen, I started off with 10,000, 5,000,

17   1,000 because most of the sales on new DVDs occur in

18   the -- you know, the first month of sale and then it

19   gradually decreases 40 to 60 percent.  It drops

20   down.

21         And then as the catalog grows and as, you know

22   people, new fans come along and discover

23   Wrestlereunion and they want to go back, you can

24   have a solid, you know, business selling backorder

25   DVDs, which is why, for example, WWE ships X amount

1    of millions of copies a year because it has this

2    back catalog to draw on.  So that's --

3    BY MR. RODEMS:

4    Q     The projections that you've just gone over,

5    did you have data sources that showed you that that

6    was a reasonable assumption?

7    A     I had my sources.  I knew that what the XWF

8    had done, and there are no data for smaller -- you

9    know, it's all anecdotal --

10   Q     Okay.

11   A     -- when it's the smaller titles, unless you're

12   selling huge, big titles like the -- you know, like

13   movies and things.  Also, if you look at the

14   billboard charts, they have a breakdown into sports,

15   and frequently at least 18 of the top 20 are

16   wrestling titles.

17   Q     Okay.  While -- and those 18 titles would be

18   WWE?

19   A     Yes.

20   Q     Okay.  Now, while there cannot be a direct

21   comparison because of the size differential between

22   Wrestlereunion and WWE, percentage-wise in terms of

23   more sales at the beginning and then tailing off but

24   resulting in a steady sale, do you find that that is

25   true with DVD sales of other wrestling products in

1        the marketplace based on your research?

2        A        I find that to be true of all DVD products in

3        the marketplace.

4        Q        Okay.  So the number 38,000 was less than

5        Clear Channel had projected?

6        A        Yes, it was.

7        Q        It was more than Ring of Honor anecdotally

8        sold?

9        A        Well, it's more than they anecdotally sold,

10       but the problem is there hasn't been five years of

11       Ring of Honor.

12       Q        I see.

13       A        So I don't know how many more copies they will

14       sell over the period of that time.

15       Q        Okay.

16       A        Like ECW had DVDs out while they were alive

17       and those DVDs are still selling today.  But there's

18       nobody, you know, to keep a -- you know, a check on

19       how well they're doing.

20       Q        Did you look for all available sources of data

21       that would help you project DVD sales?

22       A        Yes, I did.

23       Q        Okay.  And why is it that you didn't just

24       accept 60,000 or 58,000 or whatever it was that

25       Clear Channel had projected?

1    A      Because I wouldn't feel comfortable sitting

2    here saying that I believe 60,000 sales could be

3    achieved.

4    Q      And you based that -- your discomfort level

5    was based on what, though?

6    A      It was based on the fact that there was no

7    data out there to suggest that 60,000 copies could

8    be sold on a wrestling product with, you know, no

9    television at the time.  There was just -- I didn't

10   have any data to support that.

11   Q      Okay.  And did you look at the depositions to

12   see where Clear Channel got their information to

13   make this projection?

14   A      From what I could see, they looked -- from

15   what -- I can't remember the exact wording, but it

16   was said that, hey, the WWE are out there making

17   millions and millions of dollars, we should be able

18   to -- to get some of that.

19   Q      Is that the format that you used in projecting

20   yours?

21   A      No.

22   Q      You also projected revenue that would be

23   derived from pay-per-view.

24   A      Yes, I did.

25   Q      Okay.  First of all, are your pay-per-view

1     projections based on live pay-per-view events?

2     A     Yes, they are.

3     Q     Okay.  And are some pay-per-view events in

4     wrestling not shown live?

5     A     They are, yeah.

6     Q     Okay.  And if I went to InDemand or to On

7     Demand or whatever, Direct TV today, are there

8     programs that can be purchased that have -- sporting

9     events that have already occurred?

10    A     Yes.

11    Q     And is that true for wrestling?

12    A     Yes, it is.

13    Q     Okay.  Did you have data available to you to

14    support your projection of revenues for

15    pay-per-views?

16    A     Yes, I did.

17    Q     Okay.  Would you talk for a moment about how

18    you reached your conclusions, your projections of

19    sales volume and price point for pay-per-view.

20    A     Okay.  I started off in discussions with the

21    Sports Integrated -- he's a pay per -- he places

22    pay-per-view content.  And I asked him about the

23    event like Wrestlereunion, told him the talent level

24    on it, what could I expect if I had no TV and I was

25    just going out to be a one off event.  He said from

1    his experience --

2          THE COURT:  Who is this, now?

3          THE WITNESS:  Doug Jacobs at Integrated

4    Sports.

5    BY MR. RODEMS:

6    Q      And what is Integrated Sports?

7    A      Integrated Sports position TV programming onto

8    pay-per-view.  They will act as an agent.  If you

9    are not a big enough company that you have a direct

10   way into InDemand or any of the pay-per-view

11   providers, you can go through various -- they're

12   like agents.

13   Q      Now, did you become aware in doing your

14   calculations that Mike Graham had a Championship

15   Wrestling from Florida, Incorporated footage from

16   the sixties and seventies and earlier, even, being

17   shown on InDemand?

18   A      Yes.

19   Q      Okay.  And, obviously, that was old footage,

20   not something that recently had happened.

21   A      No.  That's correct.

22   Q      Okay.  Did you also have data available to you

23   about what pay-per-view sales were for various

24   wrestling events?

25   A      Yes, I did.

1    Q    Okay.  What were those sources of data?

2    A    Well, obviously, the WWE are the only publicly

3    traded company and so their pay-per-view records are

4    actual matter of public record so you can find out

5    how many buys their shows did.  Everyone else is

6    cagey, but there is a publication called The

7    Wrestling Observer which has been in existence since

8    before 1987, and it is regarded as the wrestling

9    information source.  He does a lot of financial and

10   statistical analysis of the whole business.  He does

11   that quarterly.  He'll review the financial results.

12   He also will publish all the pay-per-view data and

13   how that compares with what's happening on

14   television.

15   Q    What companies are currently out there

16   offering wrestling programming on pay-per-view?

17   A    Currently WWE, TNA, Ring of Honor.  I think

18   Dragon's Gate USA is just about to come out on

19   pay-per-view.  And, yeah, that's --

20   Q    Okay.  Was there information available through

21   this Wrestling Observer on WWE, TNA and Ring of

22   Honor?

23   A    Yes, there was.

24   Q    Okay.  And were you able to assess the talent

25   that these companies put on the pay-per-views?

1    A      Yes, I was.

2    Q      Were you able to consider that in light of the

3    talent that Wrestlereunion had?

4    A      Yes.

5    Q      Okay.  And do you believe that the talent that

6    Wrestlereunion had had more public awareness than,

7    for example, TNA?

8    A      Yes, it does.

9    Q      Okay.  And how about Ring of Honor?  Who is,

10   perhaps, the biggest star on Ring of Honor today?

11   A      Maybe Austin Aries or Nigel McGuinness.

12   They're not very well known.

13   Q      They're not in the WWE Hall of Fame?

14   A      No.

15   Q      Okay.  What data were you able to derive on

16   pay-per-view sales for some of these entities such

17   as TNA and Ring of Honor?

18   A      They -- well, historically I started back in

19   2005 and I looked at TNA's business model which was

20   originally to produce weekly pay-per-view without

21   television.  The television -- the pay-per-view was

22   -- the pay-per-view was going to be their

23   television, basically.  They were going to do weekly

24   episodic programming at which they hoped they would

25   hit a hundred thousand buys at 9.95 a week.  That

1    was their business model.

2    Q     Let me stop you there.  TNA did not have a

3    weekly cable television show?

4    A     No.

5    Q     They did not have a weekly broadcast show?

6    A     They didn't have any kind of show.

7    Q     Instead, for televised revenue, they offered

8    their program on pay-per-view only?

9    A     That's correct.

10   Q     And they charged 9.95 per week?

11   A     That's right.

12   Q     Okay.  Were they able to make sales doing

13   that?

14   A     They were able to make sales.  Unfortunately,

15   they didn't have a marketing -- you know, they

16   didn't have a great marketing plan or any kind of

17   backing.  It was just two gentlemen and their money,

18   and they were misled but, you know, they were able

19   to achieve --

20         THE COURT:  What do you mean, they were

21   misled?  Where do you get this kind of information?

22         THE WITNESS:  It's common knowledge, Your

23   Honor.  It turned into a court case.  The gentlemen

24   providing --

25         THE COURT:  All right.

1    BY MR. RODEMS:

2    Q      Were you able to derive data on what the

3    pay-per-view sales were for other companies besides

4    Wrestlereunion?

5    A      Yes, I was.

6    Q      Okay.  And did you make projections of what

7    you thought the pay-per-view buy level would be for

8    Wrestlereunion?

9    A      Yes, I did.

10   Q      And how did you reach a conclusion as to the

11   amount?

12   A      Well, I actually assumed that Wrestlereunion

13   and Clear Channel had, you know, acted in their

14   contract, everything was fine.

15   Q      Okay.

16   A      There was a TV deal in place.  And I looked at

17   the statistical data and historical data that showed

18   how much of a percentage of a viewing TV audience

19   were likely to buy pay-per-view.

20   Q      And where did you get those sources of data?

21   A      From Nielsen ratings, from The Observer

22   ratings, whatever I could find that had ratings for

23   television shows.  And then I took the buy rates for

24   the pay-per-views and I did the calculation and came

25   up with the percentages.  And then took the median

1    and then tested it and several other years.  And I

2    could have gone much higher but, I didn't, I stuck

3    at the low number.

4    Q      Okay.  And how many pay-per-view purchases

5    were you projecting in the years 2006, 2007, 2008,

6    2009?

7    A      In 2006 for the first pay-per-view I projected

8    25,000.  And then in May 2006, I believe that's when

9    the TV -- and then the TV was going to kick in with

10   the ratings.  And from the amount of viewership, I

11   took my percentage and that's what I predicted the

12   pay-per-view buy rates to be.

13   Q      Okay.  By way of comparison, how many -- and

14   by the way, you weren't projecting pay-per-view

15   revenue on a weekly basis like TNA?

16   A      No.  There was only going to be four

17   pay-per-views a year.

18   Q      Okay.

19   A      Experience tells me that if you saturate the

20   market, you may generate more income but you're

21   losing the oomph factor and you're also -- you're

22   taking away the -- you know, pay-per-view should be

23   special.  And if you have 12 of them a year, they're

24   not special.

25   Q      And WWE, for instance, how many pay-per-view

1      events does it do a year?

2      A       Twelve.

3      Q       Okay.  WCW?

4      A       Did 12.

5      Q       Okay.  What -- just for comparison purposes,

6      what is the average buy rate for a WWE pay-per-view

7      event?

8      A       With the exception of WrestleMania, the buys

9      are between 200,000 and 300,000.

10     Q       Okay.  And you did not think that that level

11     would be fair to approximate to Wrestlereunion?

12     A       No.

13     Q       Why is that?

14     A       Because they -- they wouldn't be -- without

15     getting a television deal on a big cable network and

16     having that exposure, you can't generate that kind

17     of viewership to get that pay-per-view buy rate.

18             THE COURT:  Was that figure for an annual --

19     that 200,000 to 300,000 an annual --

20             THE WITNESS:  No.  That's -- each pay-per-view

21     does between 200,000 and 300,000 buys.

22             THE COURT:  For 12 events a year?

23             THE WITNESS:  Yes.

24             THE COURT:  Is that per event?

25             THE WITNESS:  Yes.  WrestleMania does between

1    900,000 and a million.

2    BY MR. RODEMS:

3    Q      Now, did you also factor that in with

4    Wrestlereunion pay-per-view that it would not just

5    be a one-time-only but would be available on demand

6    for fans?

7    A      Yes, I did.

8    Q      Okay.

9    A      You -- you don't -- you know, you stick with

10   your figure and that's how it, you know, gets

11   generated.  Maybe they don't watch it first run,

12   maybe they'll watch it second run, third run as word

13   of mouth spreads.

14   Q      Okay.  If you go on the cable -- your cable

15   company now or Verizon or Direct TV, can you buy

16   wrestling programs on demand or at any time you

17   wish?

18   A      Yeah.  I mean, I can buy SummerSlam or I can

19   buy the Best of Mr. Perfect or whatever happens to

20   be airing.  They're not necessarily live, they've

21   already happened but they're there for a price, you

22   know, 9.95 or 19.95.

23   Q      Now, you testified that you were not able to

24   use the before and after and you testified that

25   there was no comparable company to Wrestlereunion.

1    Because of that, did you -- how did you -- did you

2    tailor your methodology to the circumstances?

3    A    Yes, I did.  I looked -- obviously

4    Wrestlereunion wasn't WWE.  It wasn't TNA, although

5    TNA had similar aspects that could have been copied

6    in as much as they set the -- they were the first

7    company that considered doing their television show

8    as a pay-per-view.  They also were one of the first

9    companies that paid to be on television.  And then

10   finally they did actually get picked up by Spike TV

11   on the cable network.  So it took a long time but

12   they -- you know, they had a model that could

13   certainly have been followed.

14        The only comparable television channel that

15   had actually been in existence for a long time that

16   used legends when it needed it and I could track was

17   Memphis Television -- Memphis Wrestling Television

18   in Memphis, which is a -- you know, local wrestling

19   promotion that has -- when it's producing fresh

20   television, manages to do good ratings in its

21   region.

22   Q    Okay.  For all of your projections of revenue

23   and expenses, did you have sources of data that you

24   relied on to reach your conclusions?

25   A    Yes, I did.

1    Q      Was there anything that was just based on

2    speculation or guess?

3    A      No.

4          THE COURT:  Well, you made -- you identified a

5    couple of assumptions a moment ago, of course, that

6    the parties followed through with their agreement

7    and that there was a TV deal in place.

8          Did you make other assumptions in applying the

9    data that you located to this particular lost profit

10   calculation?

11         THE WITNESS:  By assumptions, do you mean that

12   there was something in place that is in place or --

13         THE COURT:  Well, you've identified data

14   sources with very specific numbers.  You've

15   considered those.

16         THE WITNESS:  Yes.

17         THE COURT:  And you've adjusted, depending on

18   the different -- different level of talent or the

19   nature of those particular productions.  But have

20   you made any other assumptions in arriving at your

21   bottom line conclusion?

22         THE WITNESS:  No.  Everything was based on --

23   on facts and figures that I could find in the

24   marketplace.

25         THE COURT:  Well, implicit in your analysis,

1      however, there are assumptions based on the size of

2      the Wrestlereunion venture; correct?

3               THE WITNESS:  Yeah.

4               THE COURT:  Smaller in stature, if you will.

5               THE WITNESS:  Yeah.

6               THE COURT:  Number of events lesser than WWE.

7               THE WITNESS:  Yes.

8               THE COURT:  So those are the assumptions I'm

9      talking about.

10              THE WITNESS:  Okay.

11              THE COURT:  So you've assumed certain things

12     as this contract was performed over the next five

13     years based on the difference in the ventures.

14              THE WITNESS:  Yes, I have.

15              THE COURT:  WWE, TNA and this one; right?

16              THE WITNESS:  Yes.

17              THE COURT:  All right.  It's five minutes till

18     9:00, gentlemen, ladies.  Let's give you guys a

19     break.  What's your plan, Mr. -- we'll resume this

20     hearing, of course, at the next available

21     opportunity.  But in terms of presenting witnesses

22     today, Mr. Rodems?

23              MR. RODEMS:  Yes, sir, Your Honor.  We have

24     Mr. Corrente, Mr. Russen, Mr. Attanasio and Jimmy

25     Hart.  And as soon as the Court's ready to begin,

1        we'll be calling Jimmy Hart.

2            THE COURT:  All right.  Well, let's start --

3            MS. MILLNER:  Your Honor, if I could say

4        something before the jury gets in, a couple of

5        things.  First of all, Mr. Hart is a -- known as the

6        Mouth of the South.  He's another talent who is

7        going to be appearing.  Because he's the Mouth of

8        the South, he likes to talk.  I've read his

9        deposition.  He's quite narrative, he's quite

10       unresponsive and I'm concerned about having to

11       object over and over.

12           THE COURT:  Well, then, you object when the

13       time comes, counsel.  We're not going to

14       editorialize every time we have an opportunity.

15       We're trying a case.  We've got a jury in there

16       waiting.  If you have an objection, you make the

17       objection at that time.  I'll control the witnesses

18       and the presentation of evidence.

19           MS. MILLNER:  One more thing, Your Honor.  I

20       believe one of our jurors is staying at the hotel

21       with us along with the witnesses for the plaintiff.

22       And I was wondering if the judge would inquire of

23       the witnesses if they've had any contact with any

24       party or witness.

25           THE COURT:  No, unless you have a reason to

1    believe that has occurred.  I'm not going to ask

2    abstract questions.

3         MS. MILLNER:  Okay.  Thank you, Your Honor.

4         THE COURT:  Obviously, you guys should

5    instruct your witnesses to avoid any jurors so that

6    both sides --

7         MR. RODEMS:  I'll state on the record that, of

8    course, I've done that.  I did that about only 900

9    times through this case.

10         THE COURT:  All right.  Nine o'clock be back

11    in your seats.

12         Thank you, Mr. Bowman.

13         COURTROOM SECURITY OFFICER:  All rise.

14         (Recess was taken at 8:56 until 9:04 AM.)

15         (Back on the record.)

16         COURTROOM SECURITY OFFICER:  All rise.  This

17    Honorable Court is again in session.

18         Please be seated.

19         THE COURT:  All right.  We're going to target

20    10:30 for our morning break, so adjust your

21    presentation accordingly, if you will, please.

22         Bring the jury in.

23         MR. RODEMS:  One question, Your Honor.  Is

24    there any likelihood that we're going to take up

25    this issue at lunch, because --

```
 1              THE COURT:  Bring the jury in, please.
 2              MR. RODEMS:  -- we'd like to know if we should
 3       keep Mr. Bowman here all day or --
 4              THE COURT:  Well, I have to give the staff a
 5       lunch break, so it really depends on where you are.
 6       So just have him on maybe telephonic standby.
 7              MR. RODEMS:  At the break if there's any
 8       direction we can certainly do that.  But, I mean, he
 9       is close.  I mean, he's within a five-minute walk.
10              THE COURT:  Okay.
11              COURTROOM SECURITY OFFICER:  Please rise for
12       the jury.
13                  (Jury in at 9:05 AM.)
14              COURTROOM SECURITY OFFICER:  Please be seated.
15              THE COURT:  Good morning.  I hope all of you
16       enjoyed the traffic like I did this morning.  I
17       don't know what was going on.  Last night there was
18       a car fire on the interstate, but I think you guys
19       probably escaped that or missed it.  I hope you made
20       it out before.
21              We are ready to proceed.  Call your next
22       witness.
23              MR. RODEMS:  Your Honor, at this point we'd
24       like to move some exhibits into evidence.
25              THE COURT:  All right.
```

1          MR. RODEMS:  Your Honor, plaintiff wishes to

2     offer Exhibit 1.

3          THE COURT:  If there's no objection, I'll just

4     assume there's not.

5          MS. MILLNER:  Yes, Your Honor.

6          THE COURT:  If there's an objection, just let

7     me know.  Plaintiff's 1 is received.

8          (Whereupon, Plaintiff's Exhibit Number 1 is

9     received into evidence.)

10         MR. RODEMS:  14, 15, 16, 17 and 18.  Your

11    Honor, may I give just a range because we have quite

12    a few of them, or would you like me to read them off

13    one by one?

14         THE COURT:  Let's get them admitted on the

15    record.  14, 15, 16, 17 and 18 are received.

16         (Whereupon, Plaintiff's Exhibit Numbers 14,

17    15, 16, 17 and 18 are received into evidence.)

18         MR. RODEMS:  Yes, sir.  Exhibits 20 through

19    30.

20         THE COURT:  And, again, unless I hear an

21    objection, I'll assume there's not any.

22         MS. MILLNER:  Yes, Your Honor.

23         THE COURT:  Plaintiff's 20 through 30 are now

24    received.

25         (Whereupon, Plaintiff's Exhibit Numbers 20

1       through 30 are received into evidence.)

2              MR. RODEMS:  32, 34, 48, 89 through 91, 93

3       through 95, 97 through 99, 101, 103, 105, 107, 108,

4       113 through 119, 130, 134, 137, 138, 140, 144

5       through 149, 155, Exhibits 2 through 4.

6              MS. MILLNER:  I object to two through four,

7       Your Honor.

8              THE COURT:  All right.  We'll reserve on that,

9       then.

10             MR. RODEMS:  31.

11             MS. MILLNER:  Objection.

12             THE COURT:  All right.  Reserve.

13             MR. RODEMS:  35 through 41.

14             MS. MILLNER:  Objection, Your Honor.

15             THE COURT:  All right.  We'll reserve on

16      those.

17             MR. RODEMS:  43 through 47.

18             MS. MILLNER:  Objection.

19             THE COURT:  All right.  We'll reserve on

20      those.

21             MR. RODEMS:  48.

22             MS. MILLNER:  Objection, Your Honor.

23             THE COURT:  All right.  We'll reserve on that

24      one.

25             MR. RODEMS:  92.

```
 1              MS. MILLNER:  Objection, Your Honor.

 2              MR. RODEMS:  96.

 3              MS. MILLNER:  Objection.

 4              THE COURT:  We'll reserve on those two.

 5              MR. RODEMS:  100.

 6              MS. MILLNER:  Objection, Your Honor.

 7              THE COURT:  All right.

 8              MR. RODEMS:  104.

 9              MS. MILLNER:  Objection.

10              MR. RODEMS:  106.

11              MS. MILLNER:  Objection, Your Honor.

12              THE COURT:  All right.

13              MR. RODEMS:  109 through 112.

14              MS. MILLNER:  Objection, Your Honor.

15              MR. RODEMS:  120 through 124.

16              MS. MILLNER:  Objection.

17              MR. RODEMS:  126.

18              MS. MILLNER:  Objection.

19              MR. RODEMS:  127 through 129.

20              MS. MILLNER:  Objection, Your Honor.

21              MR. RODEMS:  131 through 133.

22              MS. MILLNER:  Objection, Your Honor.

23              MR. RODEMS:  135.

24              MS. MILLNER:  Objection, Your Honor.

25              MR. RODEMS:  136.
```

1          MS. MILLNER:  Objection.

2          MR. RODEMS:  139.

3          MS. MILLNER:  Objection.

4          THE COURT:  Those that are objected to,

5     counsel, I'll ask you to just lay a foundation if

6     you can with witnesses rather than go through this

7     exercise.  Those that are not objected to, let's get

8     in the record.

9          MR. RODEMS:  May we approach, Your Honor?

10          THE COURT:  No, sir.  Just do what I'm asking

11     you to do, please.

12          MR. RODEMS:  Have we been through 141 through

13     143?  It would be the next ones.

14          THE COURT:  We had 40, 44 through 49 so, no.

15     What was it, 141?

16          MR. RODEMS:  Through 143.

17          MS. MILLNER:  Objection, Your Honor.

18          MR. RODEMS:  150.

19          MS. MILLNER:  Objection.

20          MR. RODEMS:  153.

21          MS. MILLNER:  Objection.

22          THE COURT:  All right.  Look, I just asked you

23     to go to those that are not objected to.

24          MR. RODEMS:  Well, I'm not sure if these are

25     going to be withdrawn or not, Your Honor.  I have

1    two more.  157.

2              MS. MILLNER:  Objection.

3              MR. RODEMS:  158.

4              MS. MILLNER:  I haven't seen that one.  It

5    wasn't on your list.  No objection to 158, Your

6    Honor.

7              THE COURT:  All right.  That's received.  Did

8    you say 150, 155, 157 or 156, 157?

9              MR. RODEMS:  150, 153.

10             THE COURT:  I'm sorry.  I just didn't get that

11   one.  Thank you.  That was objected to.

12             MR. RODEMS:  Yes, sir.

13             MS. MILLNER:  And 155 is in, Your Honor.

14             THE COURT:  All right.  The exhibits that were

15   not objected to, 32, 34, 48, 89 through 91, 93

16   through 95, 97 through 99, 101, 103, 105, 107, 108,

17   113 through 119, 130, 134, 137, 138, 140, 144

18   through 149 and 155 are received, as is 158.

19             (Whereupon, Plaintiff's Exhibit Number 32, 34,

20   48, 89 through 91, 93 through 95, 97 through 99,

21   101, 103, 105, 107, 108, 113 through 119, 130, 134,

22   137, 138, 140, 144 through 149 and 155 and 158 are

23   received into evidence.)

24             MR. RODEMS:  And, Your Honor, there were also

25   no objections to one.

1             THE COURT:  I've already admitted those.

2             MR. RODEMS:  Oh, yes, sir.  Okay.  May we

3       proceed?

4             THE COURT:  Yes, sir.

5             MR. RODEMS:  Plaintiff calls Jimmy Hart.

6             THE COURT:  While the witness is coming in,

7       members of the jury, that exercise may seem a bit

8       tedious to you, but it's necessary that these

9       exhibits be actually admitted in the record, on the

10      record.  And that's through counsel's cooperative

11      efforts that we have these admitted now without the

12      necessity of moving them into evidence as each

13      exhibit is displayed to a witness.  Those that are

14      objected to, I'll take up as they are presented.

15            Come forward and be sworn, please.

16            COURTROOM DEPUTY CLERK:  Please raise your

17      right hand.

18            (Witness complied.)

19            COURTROOM DEPUTY CLERK:  Do you swear or

20      affirm the testimony that you give in this case will

21      be the truth, the whole truth and nothing but the

22      truth?

23            THE WITNESS:  I do.

24            COURTROOM DEPUTY CLERK:  Please be seated.

25            (Witness complied.)

1              COURTROOM DEPUTY CLERK:   Please state your

2       name and spell your last name for the record.

3              THE WITNESS:   Jimmy Ray Hart, H-a-r-t.

4              COURTROOM DEPUTY CLERK:   Thank you.

5                      DIRECT EXAMINATION

6       BY MR. RODEMS:

7       Q      Mr. Hart, if you could just lean back and lean

8       your microphone up a little bit.   Thank you.

9              Good morning.

10      A      Good morning.

11      Q      Where do you live?

12      A      Tampa, Florida.

13      Q      And how long have you lived in Tampa?

14      A      About 17 years.

15      Q      Who do you currently work for?

16      A      WWE, World Wrestling Entertainment.

17      Q      What is it that you do for WWE?

18      A      Kind of the ambassador to the legends program.

19      They have us out doing autograph sessions.   We go

20      overseas.   We just -- we were over in Baghdad this

21      past year and Afghanistan.   My son's in the 82nd

22      Airborne, so I was kind of glad I got to go there.

23      But we did an autograph session this past week with

24      Hacksaw Jim Duggan for the state fair for Time

25      Warner.

1        And then I was in Philly on Sunday for two

2   contest winners for one of the local shows they had

3   there.  But just kind of odds and ends of doing

4   publicity.

5   Q    Now, how long have you been affiliated with

6   the WWE?

7   A    Well, the first run was 10 years, WrestleMania

8   1 through WrestleMania 10.  Then Hulk Hogan and I

9   left and we went with WCW and we were there for five

10  years.  And then when Vince started the -- the

11  legends program, the hall of fame stuff that you see

12  every year before WrestleMania on the USA Network,

13  we came back for them so I've been with them ever

14  since.

15  Q    How long have you been in the professional

16  wrestling business?

17  A    About 29 years.

18  Q    Okay.  Would you describe how you got your

19  start in the professional wrestling business.

20  A    Well, I went to school with Jerry the King

21  Lawler, who is one of the commentators for WWE now,

22  but a professional wrestler.  We started in Memphis.

23  I was part of a rock group first called The Gentrys.

24  I was part of a rock group in Memphis first at

25  Treadwell High School where Jerry Lawler went, so we

1    had a million seller record back then called Keep on

2    Dancing.

3         So I was in music, Lawler was in wrestling.

4    But he was cutting a wrestling album, so that's how

5    I kind of jumped in with them.  And I spent five

6    years there with Jerry Lawler.

7    Q    What did you do with Mr. Lawler?

8    A    Well, I was kind of the bad guy manager back

9    then.  I -- you know, the uphills and baby face,

10   good guy, bad guy.  So I was -- I kind of -- the bad

11   guy, part of him being the good guy, so I'm trying

12   to explain it the right way for everybody.

13        So we did that, and then put angles together,

14   you know, the matches together for the two sides to

15   fight each other.  And did publicity for them, too.

16   Ran some of the towns.  Also pulled the ring when

17   you had to with the midget wrestlers sometimes when

18   there was nobody to take the midgets to the town.

19        So we did a little bit of everything, you

20   know, put programs together, did music for them back

21   then.  And that's when I got the call from WWE, from

22   Vince McMahon to -- they saw the tapes in Memphis

23   and that led me to WrestleMania 1 through 10.

24   Q    So your start with professional wrestling was

25   Memphis Wrestling?

1       A       Yes, sir.

2       Q       Okay.  And you were at one time Mr. Lawler's

3       manager?

4       A       Yes, sir.

5       Q       Now, did you actually manage his affairs or is

6       that more of an onsite talent position?

7       A       It was an on camera role.  I mean, we were

8       great friends and did a lot of business stuff

9       together outside the ring.  I'm probably talking too

10      fast, aren't I.  They warned me about that.  I'm

11      sorry if I am.

12              They -- but we were friends always but,

13      really, just more of a business type situation.  But

14      sometimes in the wrestling business, when you see a

15      manager -- like, I really didn't manage Hulk Hogan,

16      even though we were friends of the Hart Foundation,

17      you know, it's just kind of a title that you get.

18      Q       Okay.  How long have you been associated with

19      Hulk Hogan?  When did you start working with him?

20      A       Back early in the Memphis days when he was

21      Terry Boulder, when he first started.  We met

22      originally back then.  And then we kind of renewed

23      our acquaintance when I went to -- did the first

24      WrestleMania.

25      Q       When was the first WrestleMania?

1      A      I want to say '84, '85, I believe.  I'm not

2      really sure on that.

3      Q      Okay.  What areas have you had involvement in

4      the professional wrestling business only as talent?

5      A      No.  Well, I've done music.  For WCW with Eric

6      Bischoff, he gave me an opportunity when I -- when

7      we joined -- after Hulk and I left WWE, we did a

8      show called Thunder in Paradise.  While we were

9      doing that show, Eric and WCW were filming TV at

10     Disney.  And that's where we were filming our TV

11     show back then, the Thunder in Paradise shows.

12             So Eric got with Hulk and got with me and when

13     we got through doing the show, we were hired by WCW

14     to -- to work with them.  So we were there about

15     five years.

16     Q      What is WCW?

17     A      World Championship Wrestling.  Vince owns it

18     now.  He bought it out.  But it was Ted Turner.  Ted

19     Turner owned World Championship Wrestling.

20     Q      Who's Vince?

21     A      Vince McMahon.

22     Q      Okay.  And what is Mr. McMahon's position

23     today?

24     A      He's -- he's the man.  He's, I guess, the

25     owner of World Wrestling Entertainment.  Used to be

1    the WWF.

2    Q      Okay.  And WCW was broadcast on television?

3    A      Yes, sir.  And to answer your question a while

4    ago, I did music for them.  Also I worked as a

5    talent -- on air talent.  But I also got to work on

6    the booking committee, too, about putting some of

7    the angles or story lines together.  So I did that.

8    And then Eric gave me the Saturday night show on

9    TBS, which was the 6:05 Show, which has been around

10   forever.  So I had -- was -- did that for about six

11   months before the company was finally closed down

12   and then, of course, Vince bought it.

13   Q      Okay.  What was -- what does that mean, the

14   6:05 show?

15   A      That's the time it was on.  Like no matter

16   what -- wherever you lived in the country, if you

17   were able to pick up TBS out of Atlanta, Georgia,

18   that was kind of religion in wrestling back then.

19   That was like clockwork.  It would always -- 6:05

20   is when it would come on.

21   Q      Okay.  And what was your role with the 6:05

22   Show during the time that you were talking about?

23   A      Well, Eric turned it over to me and I got to

24   book the talent on it.  I got to work with some

25   other people and put the story lines together.  I

1    didn't try to manage too much on that because

2    sometimes it's kind of hard if you're managing and

3    trying to write the show and make sure the talent

4    was doing what they were supposed to do, too.    I

5    might have gone out one time on each show but after

6    being around all these years, I felt like I didn't

7    have to, you know.   People knew who you were,

8    anyhow.

9    Q      Okay.   And there came a point when the WCW was

10   shut down?

11   A      Yes, sir.

12   Q      What happened?

13   A      I think AOL came in and I think they didn't

14   really care for wrestling that much.    That's kind of

15   the drift that we heard, you know.    And so it

16   just -- that was basically it, you know.

17   Q      Okay.   And what -- did you end your career in

18   professional wrestling then?

19   A      Oh, no, sir.   I -- I got with Hulk.   Hulk and

20   I did some stuff together.   We did a couple of his

21   movie projects.   We worked with him off and on.   And

22   later on we -- we really worked for Hulk.   You know,

23   his daughter Brooke and everything else, had her

24   musical career.

25             And then we put a show together called the

1    XWF, which was out of Universal Studios.  When I was

2    doing the WCW stuff, I met a lady named Pam Warren

3    that kind of was in charge of a lot of the stuff at

4    WCW -- excuse me, at Universal.

5        And so we had some money backers that came in

6    that wanted to put a wrestling show together with

7    Kevin Harrington who has the NBC show now about

8    where people go out and if you've got a gadget or

9    something, they can see if you've got a good enough

10   deal to run a project like that.  So he backed us

11   along with another money baker, and we put a show

12   together called the XWF.

13   Q    Was that intended to be a continuing, touring

14   wrestling organization?

15   A    Well, what we did, we cut five -- well, seven

16   episodic adventures, really.  And we wanted to

17   really go door knocking with it and have a chance to

18   see if we could get it on TV.

19   Q    What do you mean, door knocking?

20   A    Well, you know, once you put your pilot tape

21   together, get all your picture work together of all

22   your stars, then you set up your appointments to go

23   to Fox, NBC, CBS or whoever it might be, and then

24   see if they like the product enough and the talent

25   that you have on it to see if you can get a TV deal

1      off of it.

2      Q       Okay.  And what years did you do this?

3      A       Oh, that's a very good question.  I don't want

4      to lie to you and tell you the wrong years so I'll

5      have to look back on that.

6      Q       More than five years ago?

7      A       Oh, gosh, yes, sir.

8      Q       Okay.  And when did you resume your

9      affiliation with the WWE?

10     A       Well, what happened was after the XWF we did a

11     couple of other little projects and then there's a

12     show called Total Nonstop Action Wresting.  They

13     call it TNA but I like to call it Total Nonstop

14     Action Wrestling.

15             So back when I was in Memphis, I worked for

16     Jerry Lawler and a gentleman by the name of Jerry

17     Jarrett.  They really owned the company.  So I had

18     that affiliation with Jerry Jarrett and his son,

19     Jeff.  So they had put this other company together.

20     So they asked would I like to come and work for them

21     doing publicity, on air talent.  And so that's what

22     I did.

23             When I was there about two months, they said,

24     we've got to get out of Nashville.  Do you still

25     have your contacts at Universal?  Well, I did

1    because when we did our WCW show there, I had them

2    and then when we did our XWF show there.

3           So what I did, I met with Pam Warren, met with

4    them.  So they came up to Universal and started

5    filming all their shows.  And they still film them

6    there now.  So I worked with them.  Yes, sir, they

7    still film their shows out of there.

8           And so I started doing publicity for them,

9    working for them, helping them get crowds into

10   the -- into the building.  And all of a sudden I was

11   there about a year and then I got a call from WWE

12   back again.  And they said, Jimmy, how would you

13   like to be inducted into the hall of fame?  So I

14   went, sure, I'd love it.

15   Q     Well, let me come back to that in a moment.

16   With the TNA filming --

17   A     Yes, sir.

18   Q     Did they do that in a studio?

19   A     Yes, sir.

20   Q     And how many people did they typically have at

21   those tapings?

22   A     Well, we'd try to get anywhere from 600 to

23   800, if we could.  We -- it -- even though it was

24   kind of free, it was kind of hard, you know.  It was

25   free for everybody to get in.  But it was in the

 1    theme park, so at least you had a good influx of

 2    people coming in and out.

 3         So basically we'd go out and talk with the

 4    people, and being recognizable, you know, they'd get

 5    autographs and we'd tell them about what kind of

 6    show they were going to have.  And, you know, we

 7    were able to get the people into the building like

 8    that.

 9    Q    Okay.  And now let's talk about -- what is the

10    WWE Hall of Fame?

11    A    Well, the WWE Hall of Fame, it's just kind of

12    a conglomeration of all the wrestlers that really

13    through the years have worked for them.  And some of

14    us that are lucky enough to get in, I guess, are the

15    ones that had TV exposure.  I guess the fans kind of

16    related to you a little bit more than some of the

17    others.  I kind of look at it like that.

18         But I know I was honored to get the ring and

19    to be able to go into it in 2005.  I went in there

20    with Hulk Hogan, Rowdy Roddy Piper, the Iron

21    Sheik --

22         COURT REPORTER:  I'm sorry.  Please repeat

23    that.

24         THE WITNESS:  Oh, I'm sorry, ma'am.  The Iron

25    Sheik, yes, ma'am, Nikolai Volkov, Paul Orndorff

1    Horton, Sr., and also myself and Hulk.

2    BY MR. RODEMS:

3    Q     Let me ask you to take a look at Exhibit

4    Number 9.  Do you have a book in front of you?

5          MR. RODEMS:  May I approach the witness, Your

6    Honor?

7          THE COURT:  Yes, sir.

8    BY MR. RODEMS:

9    Q     If you need to look through, just look at the

10   tab.

11   A     Oh, okay.  Thank you.

12   Q     Mr. Hart, do you see that?

13   A     It says Hall of Fame.

14   Q     Yes, sir.

15   A     Yeah.

16   Q     Have you ever -- this is a photocopy; correct?

17   A     Yes, sir.

18   Q     Okay.  Have you ever seen this before?

19   A     I saw the year that we went in, 2005.  This --

20   I think this has got 2009.  I've been at all the

21   hall of fame ceremonies.

22         MR. RODEMS:  May I approach and show the

23   witness the original, Your Honor?

24         THE COURT:  Yes, sir.

25         THE WITNESS:  Oh, that's a souvenir program

1    book.

2    BY MR. RODEMS:

3    Q      Oh, okay.

4    A      Yeah.

5    Q      Do you recognize the original of exhibit

6    number --

7    A      Oh, yes, sir.

8    Q      And what is that?

9    A      It's the hall of fame program.  Each year on

10   the Saturday night before the pay-per-views that the

11   WWE has, the WrestleManias, they have a hall of fame

12   night.  And this is one of the programs of people

13   from the past that have been inducted in and the

14   people that are going to be inducted in that night.

15   Q      Okay.  Does that program contain a current

16   listing as of 2009?

17   A      Yes, sir.  I think I've seen this before.

18   Yep.

19   Q      Okay.  Well, in fact, didn't you give me that

20   exhibit, Mr. Hart?

21   A      Yes, sir, I sure did.

22   Q      Okay.

23          MR. RODEMS:  Your Honor, I'd move Exhibit

24   Number 9 into evidence.

25          MS. MILLNER:  Objection, relevance.

1           THE COURT:  I'll allow it in for background.

2     Exhibit 9 is received.

3           (Whereupon, Plaintiff's Exhibit Number 9 was

4     received into evidence.)

5     BY MR. RODEMS:

6     Q      Mr. Hart, what year did you make the WWE Hall

7     of Fame?

8     A      2005.

9     Q      Okay.  And let me ask you about some wrestlers

10    who appeared at Wrestlereunion.

11    A      Yes, sir.

12    Q      I want to ask you if they were in the hall of

13    fame.  Was Ricky the Dragon Steamboat at

14    Wrestlereunion?

15    A      Yes, sir.

16    Q      Was he in the WWE Hall of Fame?

17    A      Yes, sir.

18    Q      Jimmy Valiant?

19    A      Yes.

20    Q      Was he at Wrestlereunion?

21    A      Yes, sir.

22    Q      Was he in the hall of fame?

23    A      Yes, sir.

24    Q      Rowdy Roddy Piper?

25    A      Yes, sir.  He went in the year 2005 that I

```
1     went in.

2     Q     Okay.  So he was your fellow inductee?

3     A     Hall of famer.

4     Q     Okay.  Tito Santana?

5     A     Yes, sir.

6     Q     Was he at Wrestlereunion?

7     A     Yes, sir.

8     Q     And was he in the WWE Hall of Fame?

9     A     Yes, sir.

10    Q     How about Jimmy Superfly Snuka?

11    A     Yes, sir.

12    Q     Okay.  And do you know Jimmy Superfly Snuka?

13    A     Oh, yes, sir.  I know all the guys you just

14    mentioned.

15    Q     Okay.  Who are the Wild Samoans?

16    A     They were a great tag team a little bit before

17    my time before I got to New York.  But they were

18    still up there my first year.  They were managed by

19    Lou Albano.

20    Q     And are they members of the WWE Hall of Fame?

21    A     Yes, sir.

22    Q     And did they appear at Wrestlereunion?

23    A     Yes, sir.

24    Q     Do you know the Funk brothers?

25    A     Yes, sir.  Terry and Dory.  Used to manage
```

1      them.

2      Q      You did?

3      A      Yes, sir.

4      Q      And when was that and what organization?

5      A      WWE.

6      Q      And are they in the hall of fame?

7      A      Yes, sir.

8      Q      As a tag team?

9      A      Yes, sir.

10     Q      And did they appear at Wrestlereunion?

11     A      Yes, sir.

12     Q      Okay.  Jack Brisco, is he in the WWE Hall of

13     Fame?

14     A      Yes, sir.

15     Q      Did he wrestle in the Tampa area?

16     A      Oh, yes, sir.

17     Q      Okay.  And do you know Brett the Hitman Hart?

18     A      Yes, sir.  I managed him in WWE, too.

19     Q      And was he at Wrestlereunion?

20     A      Yes, sir.

21     Q      And, of course, you were at Wrestlereunion?

22     A      Yes, sir.

23     Q      Did you get a chance to meet up with Mr. Hart,

24     not your -- he's not your relative; is he?

25     A      No, sir, he's not.  A lot of people think they

1      are.  But the tag team was called the Hart

2      Foundation.  But it just happened to be that Brett

3      Hart had the same name I had and Jim Knight Hart was

4      married to his sister.  So it kind of made sense

5      with the Hart Foundation.

6      Q      Okay.  Bob Horton, Jr., did he appear at

7      Wrestlereunion?

8      A      Yes, sir.  And he was in the 2005 hall of fame

9      with me.

10     Q      Okay.  And who is Nick Bockwinkel?

11     A      Nick Bockwinkel was one of the biggest names

12     in wrestling out of Minnesota at the time.  But,

13     also, he was -- he was in the WWE, but I used to

14     manage him in the early days of Memphis, too, before

15     we went to New York.

16     Q      And he's in the WWE Hall of Fame?

17     A      You know what?  I don't want to say he is

18     because for some reason he might be but it doesn't

19     ring a bell.

20     Q      Okay.  He was at Wrestlereunion?

21     A      Yes, sir.

22     Q      How about Don Morocco, do you remember him?

23     A      Yes, sir.

24     Q      Okay.  And is he in the WWE Hall of Fame?

25     A      Yes, sir, he is.

1    Q      And was he at Wrestlereunion?

2    A      Yes, sir.

3    Q      And how about Harley Race?

4    A      Harley Race, definitely.    Harley Race is in

5    the hall of fame.

6    Q      And what -- and he was at Wrestlereunion?

7    A      Yes, sir.

8    Q      And what organization did Mr. Harley Race

9    spend most of his career in?

10   A      Well, he was the NWA champion for so many

11   years, which was before -- the territories used to

12   be kind of different.    Like Florida had Florida

13   Championship Wrestling, they had Memphis Wrestling,

14   they had Georgia Championship Wrestling, just to

15   mention a few.

16          And then Harley Race kind of went to all these

17   cities around back in the day with the NWA because

18   when the territories were kind of up and down,

19   sometimes you'd bring a champion to fight one of

20   your local stars.    Like Harley Race might come in to

21   fight Dusty Rhodes if it was here in -- in Florida,

22   or maybe Rick Flare if it was up in Charlotte or

23   maybe Jerry Lawler if it was in Memphis.

24   Q      Okay.    And was Greg the Hammer Valentine at

25   Wrestlereunion?

1     A      Yes, sir.

2     Q      And is he in the WWE Hall of Fame?

3     A      Yes, sir.  And I managed him and I inducted

4     him in 2004 into the hall of fame.

5     Q      And, in fact, did Mr. Valentine wrestle at

6     Wrestlereunion?

7     A      Yes, sir.

8     Q      Okay.  Now, part of your role at

9     Wrestlereunion involved being an announcer?

10    A      Yes, sir.  I did the commentating and then

11    also I managed Greg, too.

12    Q      Okay.  So at one point you stepped out --

13    A      Yes, sir.

14    Q      -- behind the microphone and went into the

15    full Jimmy Hart Mouth of the South persona --

16    A      Yes.

17    Q      -- managing Greg the Hammer Valentine?

18    A      Yes, sir.

19    Q      Okay.  And let me ask you about this name.  Do

20    you know the American Dream Dusty Rhodes?

21    A      Yes, sir.

22    Q      Okay.  And was he at Wrestlereunion?

23    A      Yes, sir.

24    Q      And is he in the WWE Hall of Fame?

25    A      Yes, sir.

1      Q      Is he still involved in the wrestling business

2      today?

3      A      Yes, sir.

4             COURT REPORTER:  Mr. Rodems, please slow down.

5             MR. RODEMS:  I'm so sorry.

6             THE WITNESS:  I'm sorry.  Me?

7             MR. RODEMS:  No.

8             THE WITNESS:  Just to let you -- I'm trying to

9      hold back so much because my whole personality is

10     weird and I know I was warned about being low

11     profile so I am.  So I really feel out of character,

12     I'm telling you.  It's like, woo.  For some reason I

13     feel so nervous and I don't know what I'm being

14     nervous about but it's just not me.  But I'm sorry.

15     The question was -- oh, yeah.  As a matter of fact,

16     he was on the WWE Raw Show last night.

17     BY MR. RODEMS:

18     Q      Who was?

19     A      Dusty Rhodes.

20     Q      What is the Raw Show?

21     A      Raw is -- Vince has several -- Vince McMahon

22     has several programs for the WWE.  They have Monday

23     Night Raw.  They have a show on Sci Fi which is the

24     Tuesday night show which is called ECW.  Then on

25     Wednesday night, they're on WGN the Super Station

1    with a show.  I think it's called WGNA America or

2    something like that.  Then they have the show on

3    Friday night which is SmackDown.  And then I think

4    Saturday they have kind of reruns of all of it and

5    then they're on Telemundo, too.

6    Q      Mr. Hart, could you look at Exhibit Number

7    157.

8           MR. RODEMS:  May I approach the witness, Your

9    Honor?

10          THE WITNESS:  Here it is.  I think I found it.

11          MR. RODEMS:  Your Honor, at this time I'd move

12    Plaintiff'S Exhibit 157 in as an admission of party

13    opponent.

14          MS. MILLNER:  Objection, Your Honor.  There's

15    been no foundation for this document.

16          THE COURT:  Lay a foundation, please.

17    BY MR. RODEMS:

18    Q      Mr. Hart, I want you to read through this

19    document.

20    A      Yes, sir.

21    Q      Okay.  You were at Wrestlereunion; correct?

22    A      Yes, sir.

23    Q      Okay.  And you know what SmackDown is;

24    correct?

25    A      Yes, sir.

1      Q      Okay.

2             MR. RODEMS:  Your Honor, I'd move this into

3      evidence as Plaintiff's Exhibit 157.

4             MS. MILLNER:  Objection, Your Honor.  Still no

5      foundation.

6             THE COURT:  Lay some foundation, please,

7      Mr. Rodems.

8             MR. RODEMS:  Your Honor, may we approach?

9             THE COURT:  Yes.  Come forward.

10            (At sidebar, on the record.)

11            MR. RODEMS:  Your Honor, Exhibit 157 is a

12     statement by Steve Sterling in the course and scope

13     of his employment and it's admissible as an

14     admission of a party.

15            THE COURT:  You have to lay a foundation.  You

16     can't just put a document in front of a witness and

17     ask him about it.

18            MR. RODEMS:  Well, yes, sir.  With all due

19     respect, as an admission it's admissible.

20            THE COURT:  On its face it's a piece of paper.

21     Someone has to identify it as something.

22            MR. RODEMS:  It's been identified by the

23     defendant.  It's authentic by their Bates stamped.

24     They produced it in discovery.  There's no issue of

25     authenticity and there's no issue of hearsay because

```
 1        it's an admission of a party opponent.

 2              THE COURT:  Response.

 3              MS. MILLNER:  Your Honor, you can't just throw

 4        documents that this witness has never seen and have

 5        him speculate about the document.  It's completely

 6        inappropriate.

 7              MR. RODEMS:  I'm not asking him to speculate

 8        about the document, Your Honor.

 9              THE COURT:  The objection is sustained.  Lay a

10        foundation for a document that's going into evidence

11        through some manner.  An admission is admissible, of

12        course, assuming a foundation.  But just a piece of

13        paper doesn't establish -- it's not

14        self-authenticating.

15              MR. RODEMS:  Well, Your Honor, I have some

16        authority on this issue that says that an

17        admission --

18              THE COURT:  An e-mail?

19              MR. RODEMS:  Yes, sir.

20              THE COURT:  Well, give me the authority.

21              MR. RODEMS:  Yes, sir.  Let me go get the

22        authority.

23               (Brief pause.)

24              MR. RODEMS:  Your Honor --

25              THE COURT:  Give me the case, the name of the
```

1    case and let me read it.

2        MR. RODEMS:  The name of the case is *Metro*

3    *Goldwyn Mayer Studios versus Grokster*,

4    G-r-o-k-s-t-e-r, 454 F. Supp. 2d, which says that

5    authentication can be established by production.

6    There's no question about Mr. Sterling's role, and

7    it comes in as an admission.

8        THE COURT:  Here's the problem.  In this case,

9    as it says, authentication can be accomplished by

10   judicial admission such as stipulation or production

11   of the items at issue in response to a discovery

12   request.  Has that been done?

13       MR. RODEMS:  Yes, sir.  The -- the document is

14   Bates stamped numbered by the defendant.  They

15   produced this in discovery.

16       THE COURT:  What's your response to that?

17       MS. MILLNER:  Your Honor, I'm -- I'm new to

18   the case.  I'm not going to dispute that.  If

19   Mr. Rodems says it was produced by us, it was

20   produced by us.  The concern I have is if he wants

21   to use this witness -- this document with a person

22   who received it or who wrote it and these people are

23   coming in to testify here, that's completely

24   appropriate.

25           To have someone who hasn't even seen the

1    document, he's not -- just start speculating about

2    the document is completely inappropriate.  He --

3    Mr. Townley is going to testify, Mr. Sterling is

4    going to testify.  Mr. Rodems can talk to them about

5    what the document says.

6         THE COURT:  What are you going to ask him

7    about it?

8         MR. RODEMS:  In this document he says that

9    what they have for Wrestlereunion was similar in

10   look and feel of SmackDown.  Mr. Hart is familiar

11   with SmackDown.  I want to ask him if he believes

12   that Wrestlereunion and Smackdown were similar in

13   look and feel.  Now, Your Honor --

14        MS. MILLNER:  Why is that even relevant?

15        THE COURT:  If you jump in again I'm going to

16   sanction you.

17        MS. MILLNER:  Sorry.

18        THE COURT:  Okay.  You'll have an opportunity

19   to respond, but don't just volunteer things.  It

20   distracting and it's not orderly.  Thank you.

21   You're going to call Mr. Sterling at some point?

22        MS. MILLNER:  Yes, Your Honor.

23        THE COURT:  I'm looking at Mr. Rodems in terms

24   of laying a foundation.

25        MR. RODEMS:  I have -- I have Mr. Sterling by

1    deposition.  I don't have him --

2         THE COURT:  Did he identify this e-mail in his

3    deposition?

4         MR. RODEMS:  Yeah, I believe, but I'm not

5    positive on that.  I mean, we talked about a lot of

6    e-mails.  But the assumption was always that they

7    produced this in deposition.  He clearly testified

8    that -- what the scope of his authority was, so it

9    comes in as an admission.

10         THE COURT:  All right.

11         MR. RODEMS:  There is no --

12         THE COURT:  I'm going to overrule the

13    objection.  It seems to be authenticated by the

14    defendant producing it in discovery.  The more

15    traditional way, of course, would be to have a

16    witness who received it identify it or who authored

17    it identify it.  But it seems to me the authenticity

18    objection is overruled by virtue of it being

19    presented in discovery.

20         If you're just putting it in so that he can

21    describe the differences between the two events,

22    that's one thing.  But I certainly hope you're not

23    going to ask him for opinions about whether the

24    defendant's statements are reliable, truthful,

25    credible or --

 1              MR. RODEMS:  No, sir.  And I was -- and I

 2      might add -- I might add that virtually all of the

 3      exhibits that were contested before fall into the

 4      same pattern as this, an admission by a party

 5      opponent.  And most of the ones that they stip --

 6              THE COURT:  I have to take up any objections

 7      that Ms. Millner has, if she makes them.

 8              MR. RODEMS:  Yes, sir.

 9              THE COURT:  In light of that case and what it

10      says, if this is a document produced by the

11      defendant as a document within its custody and

12      control and possession, it's authenticated.

13              Now, I don't know the content of these

14      documents.  Whether you get into hearsay within

15      hearsay, I don't know.  It's not hearsay because

16      it's essentially an admission or a statement by a

17      party opponent.

18              MS. MILLNER:  Your Honor, I would agree with

19      Mr. Rodems, a lot of the objections I had were

20      documents I believe would get into evidence with the

21      proper foundation by having a person who actually

22      was involved with either the receiving end or

23      writing, you know, creating end of the document

24      testify about it.  My concern is that he's going to

25      start questioning witnesses about their

1      interpretation of documents.

2           THE COURT:  Well, he can't do that.  You know

3      that, Mr. Rodems.

4           MR. RODEMS:  Yes, sir, of course.

5           THE COURT:  If they didn't author the

6      document, of course, if you're just laying it for

7      foundation for another question, that would be

8      appropriate.

9           Now, if you do present additional documents to

10     this or any other witness under the same authority,

11     alert Ms. Millner so that she can either object or

12     not.  That case says what it says.

13          MS. MILLNER:  Can I take a look at the case?

14          THE COURT:  Sure.  Give her a copy.

15          MS. MILLNER:  Thank you, Your Honor.

16          THE COURT:  That was headnote number one I was

17     reading from.

18          MR. RODEMS:  Did I give you my exhibit book,

19     Your Honor?

20          THE COURT:  No.

21          MR. RODEMS:  Okay.  I took it back.

22          (End of sidebar discussion.)

23          THE COURT:  Thank you, counsel.  You may

24     proceed.  Plaintiff's Exhibit 157 will be received.

25          (Whereupon, Plaintiff's Exhibit Number 157 was

1    received into evidence.)

2          MR. RODEMS:  May I publish, Your Honor?

3          THE COURT:  Yes, sir.

4    BY MR. RODEMS:

5    Q    Mr. Hart, where we left off, you were talking

6    about SmackDown.

7    A    Yes, sir.

8    Q    Okay.  And you're familiar with SmackDown?

9    A    Yes, sir.

10   Q    Okay.  And you also attended Wrestlereunion?

11   A    Yes, sir.

12   Q    Okay.  Is the look and feel of Wrestlereunion

13   similar to SmackDown?

14         MS. MILLNER:  Objection, Your Honor.  Opinion

15   testimony and relevance.

16         THE COURT:  Legal objection, please.

17         MS. MILLNER:  Opinion testimony and relevance.

18         THE COURT:  Lay a foundation for his

19   comparison, please.

20   BY MR. RODEMS:

21   Q    Mr. Hart, did Wrestlereunion have wrestling

22   events, matches?

23   A    Yes, sir.

24   Q    And were they televised?  I'm sorry.  Were

25   they -- excuse me, were they videotaped?

1    A       Yes, sir.

2    Q       Okay.  And while you were -- you were working

3    as an announcer?

4    A       Commentator.

5    Q       Commentator?

6    A       Yes, sir.

7    Q       Okay.  And not for the first one but for the

8    second and third Wrestlereunion events, did you have

9    monitors that you could watch?

10   A       Not on the first one we didn't have a monitor.

11   Q       Okay.  But on the second and the third one?

12   A       Yes, sir.

13   Q       Okay.  So you were able to watch the action of

14   Wrestlereunion as it was being videotaped?

15   A       Yes, sir.

16   Q       How did that compare to what you see on

17   SmackDown?

18   A       Whew.  Well, it -- both the shows are so

19   different.  You know, you got -- the show we were

20   doing was legends, of course, you know.

21   Q       Well, not necessarily the talent, but the look

22   and feel of it.

23   A       Well, SmackDown's done in these elaborate

24   buildings, of course, you know, 10, 15, 20,000

25   people.  We wasn't trying to get that look.  We had

1       the -- we were trying to get the legends feel.  I

2       say we.  I mean, I was working for them.  But they

3       were trying to get the legends feel where it was up

4       close and personal.

5              You know, we had autograph tables.  SmackDown

6       didn't.  They were able to -- the fans were able to

7       come and really sit across the table like I am now

8       and get an autograph from every wrestler, maybe talk

9       about one of your favorite stories and stuff, you

10      know.

11             We didn't have giant pyro like you see up

12      there because what we were trying to shoot, you

13      know, we didn't need the pyro, you know.  Of course,

14      we had music.  SmackDown has music.  It was just --

15      it's hard to compare both of them together because

16      ours was just a different type feel.  It wasn't

17      meant to be in elaborate buildings and do that.

18      This was something that was for the legends and

19      people that followed these programs through the

20      years.

21      Q      Well, how about the action in the ring?  How

22      did the action in the ring compare to SmackDown?

23      A      Well, the action in our ring was adaptable for

24      the angles that these guys do.  It's hard to explain

25      this without talking about angles and stuff.  What

1        it means to program is if two guys -- like watching

2        Days of Our Lives has a continuing story week after

3        week, you know, where you watch TV and do it.

4              On our stuff the people that, say, follow

5        Terry Funk or Dusty Rhodes through all those years

6        knew about the great feuds that they had.  So those

7        matches were set up to simulate that and to be part

8        of that.

9    Q        In fact, were you the commentator for the

10       Dusty Rhodes/Terry Funk match at Wrestlereunion III?

11   A        Yes, sir.

12   Q        Okay.  Would it be helpful to assist you in

13       illustrating your point if we took a look at some of

14       the footage from that?

15   A        That would be great.

16             MR. RODEMS:  Your Honor, we would move into

17       evidence at this point Plaintiff's Exhibit 12 which

18       is the footage from that match.

19             MS. MILLNER:  No objection, Your Honor.

20             THE COURT:  Exhibit 12 will be received.

21             (Whereupon, Plaintiff's Exhibit Number 12 is

22       received into evidence.)

23             MR. RODEMS:  Your Honor, may we publish?

24             THE COURT:  Yes, sir.

25             MR. RODEMS:  Okay.  Your Honor, if we could

1    have the -- bless you, sir -- the video screen

2    adjusted to our computer.

3           COURTROOM DEPUTY CLERK:  It's on.

4           THE COURT:  Hang on just a second.  Let's get

5    the video up.  Is the screen on, Anne?

6           COURTROOM DEPUTY CLERK:  Yes, sir.

7           (Brief pause.)

8           (DVD playing.)

9           MR. RODEMS:  Thank you, Your Honor.  We're

10   finished with the overhead.

11   BY MR. RODEMS:

12   Q     Mr. Hart, we saw chairs, we saw blood, we saw

13   the action spilling out of the ring.  Is this an

14   example of what you observed throughout the

15   Wrestlereunion match programs?

16   A     Well, this was vintage Florida Championship

17   Wrestling because everybody in that program that you

18   saw from Graham to Funk to Dusty to Tully Blanchard,

19   through the years, they've always had a program

20   together.  That's why that match was put together

21   like that.

22          I don't think that was really the finished

23   product, though, because -- I'd like to see the

24   finished product if you've got it because we

25   would've probably come out way before that, you

1    know.  And it wouldn't have the timelines in there,

2    either, which is the numbers up there because that

3    would've never gone to air like that.  And we were

4    too long on the camera part, so that should've been

5    edited out toward the end of it.

6    Q      Do you have some experience in doing that, the

7    editing?

8    A      Yes.  I don't really like to do it that much,

9    but we've been on several projects that we go do it.

10   Usually we have somebody with us that we can tell

11   them what we'd like to have done, you know.

12   Q      Let me take you back now for a moment.  When

13   you first heard about Wrestlereunion, how did you

14   become involved?

15   A      Well, I was in Memphis with Corey Maclin who,

16   by the way -- which makes it kind of funny, I guess,

17   he has a local show there which is on Clear Channel,

18   one of the affiliates down there.  So they still

19   have the -- he still has some shows on --

20         MS. MILLNER:  Objection, Your Honor,

21   narrative.

22         THE COURT:  Just answer the question, please,

23   and then you can explain.

24   BY MR. RODEMS:

25   Q      You were telling us --

 1    A       What did I do?  Did I --

 2            THE COURT:  Ask the question, please.

 3            MR. RODEMS:  Yes, sir.

 4    BY MR. RODEMS:

 5    Q       Mr. Hart, you were telling us how you became

 6    involved with Wrestlereunion.

 7    A       Yes, sir.  Sal Corrente came down to -- I was

 8    doing a TV show with Corey Maclin, which is a local

 9    TV show there with Jerry the King Lawler.  And Sal

10    came down and he had talked to me after the show

11    about -- I'm sorry.

12    Q       I apologize for interrupting.  Did you know

13    Mr. Corrente at that time?

14    A       You know, I heard about him and I heard about

15    the show Wrestlereunion but I hadn't been contacted

16    at the time to be on that.

17    Q       Okay.

18    A       And Diamond Dallas Page had called me ahead of

19    time and said, look, Sal Corrente is going to come

20    to Memphis.  He wants to talk to you about being on

21    the show.  You ought to do it, said, I think you

22    could be a big help to the show.  And I said, okay,

23    well, I'll talk with him.

24            So when he came down and he told me what he

25    was planning on doing, at first I thought 80 or 90

1       of the biggest names in wrestling from our era?

2       Whew, if you pull this off, this is going to be a

3       miracle, you know.  But, you know, I went ahead and

4       did it.  And that was really the first time I had

5       really heard about it.

6       Q       Did you learn about some of the people that

7       were going to be involved?

8       A       Yes, sir.  He told me the list he had which,

9       when I heard the list, I thought, it's really the

10      who's who of wrestling, you know, if you're a

11      wrestling fan and grew up watching wresting your

12      whole life, you know.

13      Q       And so you agreed to appear at Wrestlereunion

14      I?

15      A       Yes, sir.

16      Q       Okay.  And were you -- well, tell us about

17      when you arrived at Wrestlereunion.  First of all,

18      where was it held at?

19      A       It was here in Tampa, Florida.  What a rib it

20      was.  I thought Sal was laughing when he goes, yeah,

21      park by the truck.

22              MS. MILLNER:  Objection, Your Honor,

23      narrative.

24              THE COURT:  Overruled.

25      BY MR. RODEMS:

1    Q      Okay.   Park by what truck?

2    A      Well, usually when you pull up to the

3    wrestling matches, unless it's like a small,

4    independent show that's not going to be filmed, like

5    even for the WWE, you always -- when the limo brings

6    you up there or town car or unless you're driving

7    your own car, you always go around to the back, you

8    always look for all the trucks and the equipment

9    trucks and everything else with the -- you know,

10   that carries the sets and carries -- the buses that

11   carries some of the production crew.   And also the

12   trucks that do all the taping and everything for it.

13          So he said, just park by the trucks.   So I

14   kept going around there looking and I couldn't find

15   a truck.   So when I went in, I said, Sal, what

16   truck?   He goes, well, they didn't have a truck.   So

17   I went over for that.   And that was the first.   You

18   know, I walked in and they sent me upstairs to do

19   the interviews.

20   Q      Who sent you upstairs?

21   A      Sal.   He met me downstairs.   And he said,

22   look, he said, will you go upstairs and start the

23   interviews?   He says, Eric's going to be up there,

24   who works for Clear Channel.

25   Q      Eric who?

 1      A       Eric -- I think his name is Poland or Paulen,

 2      I believe.

 3      Q       Okay.

 4      A       So he asked me to go up there, so I met with

 5      him.  And you know, he was a great big fan of

 6      wrestling in general, really, after talking to him

 7      for awhile.  So I went up and I got miked up and we

 8      sat on the couch and, you know, he asked me, you

 9      know, a lot of questions about wrestling for I guess

10      a couple of hours and --

11      Q       So let me make sure I have this straight.  You

12      -- your first role at Wrestlereunion was to sit down

13      and do an interview with Eric Paulen?

14      A       Yes, sir, because we hadn't started the taping

15      for that night yet.

16      Q       What was going to be taped that night?

17      A       The matches.  And I was going to do the

18      commentating on that.

19      Q       Okay.  So you did an interview on videotape?

20      A       Yes, sir.

21      Q       With Mr. Paulen asking you questions?

22      A       Yes, sir.

23      Q       Okay.  And how long did that last?

24      A       That was -- I was probably in there a couple

25      of hours.  But I went ahead and stayed up there,

1      too, because seeing some of the guys that we had

2      wrestled with through the years that we don't really

3      have a lot of chance to see them, I just stayed on

4      up there and Jimmy Cornett came in and some

5      different wrestlers, so I listened to their

6      interviews, too, while we were up there.

7      Q      Who is Jimmy Cornett?

8      A      Jimmy Cornett is a manager that started in

9      Memphis back when I started.  And later on he went

10     to WCW and then a brief time for the WWE, and he

11     works for Total Nonstop Action Wrestling now.

12     Q      Okay.  After you finished your interview, did

13     you have any other role?  Did you do anything else?

14     A      No.  We just stayed up there for awhile, and

15     then Eric suggested us go downstairs.  He goes,

16     let's go look at the setup.  And I said, okay, fine,

17     so I went downstairs with him.

18     Q      Setup for what?

19     A      Well, the setup for the show that night.

20     Q      The wrestling matches?

21     A      Yes, sir.

22     Q      Okay.  And were you going to have a role with

23     the wrestling matches?

24     A      You know what?  I don't think I managed on

25     that first show.  Only my role was -- was just to do

1      the commentating that night with Lance Russell and,

2      you know, that's, you know, what we did.

3      Q      Okay.  So you went downstairs to take a look

4      at what was available?

5      A      Yes, sir.

6      Q      Okay.  And tell us about that.

7      A      Well, we walked downstairs.  And the first

8      thing I noticed -- I tried not to step on anybody's

9      toes because it wasn't my show or anything else.

10     But I mentioned to Eric, I said, Eric, I said --

11             MS. MILLNER:  Objection, Your Honor,

12     narrative.

13             THE COURT:  Overruled.

14             MS. MILLNER:  And hearsay.

15             THE COURT:  Overruled.  Go ahead.

16             THE WITNESS:  Okay.  So I said, Eric, I said,

17     you know, I hate to say this but, you know, where is

18     our sound system?  I don't see it in the room

19     anywhere.  And we called the guy who ran the

20     building over, and the guy goes, it's up there.  It

21     was like the little sound system up here like this

22     but smaller.  And I said, but where is the mic?  And

23     he goes, it's over there, and he pointed.  And it

24     was like a mic on this on a podium.

25             And I went, whew, I don't think this is going

1      to work.  And Eric goes, oh, my god, this is not

2      going to work.  And so we -- really, thanks to him,

3      we jumped real quick, and I guess one of the guys on

4      the crew they had hired to work down here for them

5      ran a sound company.  So about three hours before

6      the show, this guy was able to go in and bring a

7      sound system in.

8      BY MR. RODEMS:

9      Q      Okay.  And so after you noticed there was no

10     PA system, what was the next thing that happened?

11     A      Well, the next thing I asked him, I said,

12     where are you going to set your rigging for your

13     lights and stuff, you know?  And that turned out to

14     be kind of a problem, too.  I think they finally had

15     to go get a ladder from the back and do a camera

16     shoot up on a ladder.

17            MS. MILLNER:  Objection, Your Honor.  None of

18     this -- this is not relevant.

19            THE COURT:  Overruled.  Go ahead, sir.

20            THE WITNESS:  Okay.  So they went and got a

21     ladder.  So we set the ladder up so the camera guy

22     could have enough angle to shoot the matches.  And

23     then we -- the last thing we mentioned --

24     BY MR. RODEMS:

25     Q      Let me stop you there.

1    A      I'm sorry.

2    Q      How many videotaped wrestling events have you

3    been at throughout your career?

4    A      Well, I've been pretty lucky.  I started in

5    Memphis, but that was local TV where everything was

6    really filmed inside the studio at Channel Five

7    Wrestling and then, of course --

8    Q      Just the approximate number.

9    A      Oh, man.  Well, 52 weeks a year for 10 years

10   for Vince and five years, 52 weeks a year,

11   wrestling, we don't strike, so we go 52 weeks so

12   it's every week, so it's a lot.

13   Q      Did you ever see another videotape event where

14   the cameraman filming the action in the ring was

15   standing on a big orange stepladder?

16   A      Well, you know, not that I really recall.

17   But, you know, I'm not always out in the arena

18   watching stuff that's happening, either, so I just

19   happened -- this is just something that happened to

20   take place because when Eric came down, he asked me.

21   And like I wouldn't want to step on nobody's toes,

22   but I was just trying to help as much as I could to

23   make sure the show went off as good as we could, not

24   only for Wrestlereunion and Sal and them but for

25   Clear Channel, too.

1       Q       Did you notice any other problems?

2       A       Well, the only thing I had mentioned to them,

3       I said, did we have any music for the show.  And

4       that was a major problem, too, because if you

5       watch -- the only way you can really do music is do

6       the matches without them and you can put them in in

7       pre-tapes later on, you know, when you go into the

8       studio you can dub everything in.  But you don't

9       really get the feel sometimes of people going into

10      the ring with the music.

11              Music is so much a part of wrestling now, you

12      know, even the smaller shows.  And even when you

13      watch ESPN now with all the old classic matches

14      that's on ESPN now, they even have the music in with

15      it, too.  So we didn't have any music.

16      Q       So what did you do about that?

17      A       Well, I sit down with Eric and I said, look,

18      Eric, I ain't trying to push our songs or make any

19      extra bucks on this.  But, I said, you know, we did

20      do a lot of hits for WWE and WCW.  And Eric was

21      aware of it.  And I think he -- I don't know who he

22      talked to, but he made a phone call.

23              I guess he -- he wasn't in front of me when he

24      did it.  He said he had to go back to make a call.

25      And so I don't know if he called anybody for Clear

1    Channel or who he called.  But he came back to me

2    and said, look, he said, do you have any of your

3    incidental music, since we did all the stuff for

4    WCW.

5         And over at Morris Sound, I called my guy who

6    does our music, the guy who writes the stuff with

7    me.  And I called him and I said, look, I know it

8    ain't a lot of money, but I think they're going to

9    give us 250 a song to -- to play some of our music

10   tonight.  Have we got anything that we haven't used

11   before?  But the back end of it, we'll give them

12   publishing, Clear Channel, but they'll give us our

13   riders.  But I said, I just feel if this ever gets

14   on the air or DVDs come out of this, I said, we can

15   make some really good money from this.

16        And so he agreed to it.  He came over

17   immediately.  We sit down with Eric and Eric went

18   over -- he listened to all the songs we had and kind

19   of compared them for Dusty Rhodes or Terry Funk or

20   whoever he wanted to come out with, and then we

21   labeled them one, two, three, four, because we were

22   in such a hurry to do it because then it was about

23   an hour and a half before the show.  So we labeled

24   everything.

25        And then later on, he had some girl, I forget

1     her name now, that worked for Clear Channel that got

2     ahold of us for all the paperwork stuff on it.  So

3     we got it to them and then -- but basically that's

4     how that worked.

5     Q     So you had music for the show.  Did you have

6     music for the Midnight Express, too?

7     A     No, sir.  What we did for that, we were

8     familiar that the Midnight Express was going to be

9     on it, so we had to go come back later and do a song

10    for them.  They played the original version going

11    out.

12    Q     Who did?

13    A     Eric and them played the original version of

14    the Midnight Express from an album that Cornett had.

15    But he knew -- he made a mark of it on some

16    paperwork because we both talked about it because I

17    said, you don't have copyright on that.  But we

18    could kind of do a sound alike, which is -- a sound

19    alike is, say, if you take a Van Halen song and you

20    don't really -- it's not Van Halen, but if you get

21    the right guitar sound and everything else, it can

22    sound like maybe Van Halen did it.

23          So then later on we sent them a Midnight

24    Express sound alike song that Eric had marked on his

25    stuff that they could put in, you know, take that

1       one out and put that in so --

2       Q       Now, let's get to the actual matches.  Were

3       you doing the commentating?

4       A       Yes, sir.

5       Q       Any problems with that?

6       A       Well, the only thing that really hurt us on

7       that first show was -- I'll use this right here, if

8       I may.  This is like a monitor when you go -- I'm

9       sorry, I get away from the mic -- but usually when

10      you watch Raw, SmackDown or anything, if anybody

11      does watch wrestling, you'll see Jerry Lawler and

12      all the guys that do -- Jim Ross and them, they'll

13      have monitors on their table because if you sit and

14      watch a match like this, it might be a tag match.

15      You might have two guys in the corner fighting, but

16      somebody does a drop kick.

17             Well, on your commentary, if you go, what a

18      drop kick that was, but if the camera's really

19      picking up the two guys fighting in the corner, you

20      really calls attention to the people at home going,

21      oh, my god, I wish I'd saw the drop kick.  I missed

22      that shot.

23             So that's why whatever the -- the cameras are

24      shooting you put on that monitor so the only thing

25      you call is what you see.  That way you don't mess

1    the camera guys up, you don't mess the truck up

2    or -- or tell the people something that they're not

3    seeing and maybe calls attention to a bad shot or

4    something.

5    Q      So at Wrestlereunion I, there were no monitors

6    made available for the announcers?

7    A      No, sir.

8    Q      Now, we saw the footage.  That was from

9    Wrestlereunion III in Davie; correct?

10   A      Yes, sir.

11   Q      Okay.  And at one point you can hear the

12   announcers saying, where is Terry Funk, where is

13   Terry Funk, and the next thing the camera cuts to

14   the parking lot and it's either you or Joey Stiles

15   saying, oh, there's Terry Funk in the parking lot.

16          Is -- were you at that time to your

17   recollection looking at the monitor to follow the

18   action?

19   A      You know --

20          MS. MILLNER:  Objection, Your Honor, leading.

21          THE COURT:  Overruled.  Go ahead.

22          THE WITNESS:  But, see, here's the thing.

23   That wasn't edited.  So whatever we said on our

24   voice, they can come back and whatever we said, if

25   we're going, oh, my gosh, where is Terry Funk, then

1    they can shoot to that.  Or they don't have to shoot

2    to it, they can do everything -- anything you want

3    once Clear Channel takes it back and can splice and

4    dice and put sounds, you know, crowd noises or

5    whatever in to it, whatever they want to do, you

6    know.

7         So they have the privilege -- since this is

8    not edited, I'd like to see the edited piece if I

9    could, though, because they might have done that.

10   BY MR. RODEMS:

11   Q     I'm sorry.  I don't have that available.

12   A     Well.

13   Q     Now, let's talk about the Wrestlereunion I.

14   Did -- to your knowledge did -- did the talent all

15   appear?

16   A     Yes, sir.  You know, but, see, that really

17   wasn't my part of it.  I got a list at night on it,

18   but everything I had on my list that was going to be

19   the matches.  Some of them we rearranged a little

20   bit.  I think Clear Channel had got with Sal and

21   even though Sal was in charge of the talent and the

22   structure of the matches and the programs and the

23   angles on it, still, I think he got with Eric

24   because I think out of everybody, Eric was the one

25   with the kind of knowledge of the wrestling, I felt

1    like, you know, just from being in the business so

2    many years.

3    Q      Now --

4    A      But let me say, everybody was great to work

5    with.  Steve was good work to work with.  I only saw

6    Mr. Townley, I think, once or twice and at that

7    meeting, I think.  But everybody was okay.  They

8    were cool.

9    Q      We'll come back to that in a minute.  Now, at

10   Wrestlereunion, you didn't just have legends, you

11   had some younger guys, too?

12   A      Yes, sir.  We had some of the younger stars.

13   I think what happened, too, I think Clear Channel

14   had asked could we mix in a few younger stars

15   because from just not being but in a couple of

16   meetings, not all of them because I don't know what

17   Sal and all them talked about or agreed to or

18   whatever, but they wanted to mix in some of the

19   future stars they felt like that were going to be --

20   well, Sal felt like were going to be future stars.

21   Q      Well, let me ask you about a couple of them.

22   C. M. Punk and Matt Hardy, did they -- this was in

23   2005 at Wrestlereunion?

24   A      Yes, sir.

25   Q      Are they still in wrestling today?

1    A    Oh, yes, sir.

2    Q    What is C. M. Punk doing today, what

3    operation?

4    A    Main event on SmackDown.  Matter of fact, I

5    think he's the main event coming up this week.  He's

6    one of the champions.  He's had a major push.  Been

7    a good kid, too.  Doesn't drink, doesn't smoke or

8    anything.  I love him.  He's great.  Did some

9    personal appearances with him last week.

10   Q    And Matt Hardy, is he on SmackDown?

11   A    Matt Hardy, one half of a tag team called the

12   Hardy Boys.  Just -- he's had a real good push, too,

13   he really has.

14   Q    You were at SummerSlam this year?

15   A    Yes, sir.

16   Q    What is SummerSlam?

17   A    SummerSlam's what they have each -- each month

18   WWE has a pay-per-view.  But the two biggest ones

19   are always Summerslam each year and then

20   WrestleMania, of course.  And so SummerSlam, we were

21   outdoors this year.  Well, last year we were at

22   Venice Beach outdoors.  This year we're in Los

23   Angeles.

24        And each year I do the fan access, which is at

25   the stable center.  We set our -- it's almost like

1        Wrestlereunion, really.  You set your tables up and

2        different stars come and we autograph the -- for the

3        fans and, you know, autograph the books and T-shirts

4        or whatever they bring up.  And we have the little

5        mats that they can come and get autographs and take

6        pictures and everything with.

7    Q        Was there a wrestler by the name of MVP that

8        wrestled at Summerslam?

9    A        Oh, yes, sir.

10   Q        And was he also at Wrestlereunion?

11   A        Yes, sir.

12   Q        Okay.

13   A        I believe he was in Davie Boy.  I think that's

14       the town he was in at Wrestlereunion.

15   Q        Okay.  And --

16   A        Not Davie Boy, Davie, Florida.

17   Q        Yes, sir.

18   A        Davie Boy's a wrestler.  Excuse me.

19   Q        And Jeff Jarrett, did he appear at

20       Wrestlereunion?

21   A        You know what?  I'll be honest with you, I

22       think he did but I'm not really sure if he did.  I

23       think he might have autographed or something.

24   Q        Okay.  Mr. Hart, in your career, have you

25       promoted and staged life wrestling events?

1    A      Yes, sir.

2    Q      Okay.  How was the Wrestlereunion fan

3    convention in terms of the operational side that you

4    observed?

5           MS. MILLNER:  Objection, Your Honor.  Calling

6    for expert opinion.

7           THE COURT:  Overruled.  Go ahead.

8           THE WITNESS:  Okay.  Well, you know, I thought

9    it was -- there were no fights, nobody got beat up

10   so I thought it was great.  Everybody -- all the

11   fans came by the tables and got their autographs.

12          And the one thing I know Sal and Mr. Russen

13   had talked to the wrestlers about is -- not that

14   they wouldn't, anyhow, but, you know, sometimes

15   people have different personalities.  And so they

16   said, you know, let's make it really a good thing

17   for the fans, because Clear Channel was going to be

18   taping part of the one-on-ones with the wrestlers

19   because that's what everybody felt was going to be

20   so unique about this is the wrestling was angles

21   from the past.

22          But also at that time, I don't believe a lot

23   of people had ever gone out -- I know I hadn't seen

24   any -- of people really going and having a

25   one-on-one with the wrestlers.  But you could really

1    tape that one-on-one with the fans asking them

2    their -- from their heart questions they wanted to

3    ask the Dusty Rhodes or whoever might be out there.

4         So I know we wanted to make sure that was

5    filmed.  So I know they like told the wrestlers,

6    please, watch your language.  Not that you really

7    have to, but it's always good to say that in any

8    kind of business.  Watch your language.  Be, you

9    know, good to the fans and, you know, everybody did.

10   BY MR. RODEMS:

11   Q     All right.  Now, let's move forward to

12   Wrestlereunion II.  You appeared at Wrestlereunion

13   II?

14   A     Yes, sir.

15   Q     Okay.  Did they have a production truck?

16   A     Yes, sir.

17   Q     Did they have monitors?

18   A     Yes, sir.

19   Q     Okay.  Did they have orange ladders for

20   filming?

21   A     No, no orange ladders.  But Eric's really

22   good.  I mean, after that first show, you know --

23   you know, everything that was there, Eric -- they

24   had.

25   Q     It got fixed?

1        A        Yes, sir.

2        Q        Okay.  After Wrestlereunion II, did you meet

3    with Steve Sterling?

4        A        I was invited up to one of the rooms up there.

5    I think they had like a double little suite up there

6    where I think they were making the payoffs to the

7    guys and everything.  And they introduced me to

8    Steve Sterling.  I think that's the first time I met

9    him because Eric was really our contact before.

10            But I was sitting on the couch and he came in

11    and sit next to me.

12        Q        Did you have a chance to talk to him?

13        A        Oh, gosh, yeah, about 30 minutes.  It was

14    great.

15        Q        What did you guys talk about?

16        A        He asked me -- we talked about the -- you

17    know, my career and everything else.  And he was a

18    fan, of course.  And he asked me what I thought

19    about tonight and everything.  And I said, I loved

20    it.  I said, it was a hundred percent improvement.

21    I said -- I said, we got great shots -- because I

22    didn't know if he knew it or not -- I said, we got

23    great shots of what everybody wanted -- because I

24    went out there myself before the show of getting

25    autographs and all the tables going around, which we

1    did for the first show, too, but I think we had a

2    better concept for the second one -- got all that

3    done.

4        I said -- I said, the one thing I'm excited

5    about and I'm so glad they let us do it, you know,

6    Mick Foley was one of the biggest names in

7    wrestling, still is, but, you know, he had had a

8    number one selling Christmas book and regular book,

9    Have a Nice Day, which was on the number one best

10   seller mart.  He -- I didn't know he did comedy

11   until that night.  But we filmed a comedy special,

12   Clear Channel did, on him.  And we had a separate

13   part of the building and I had fun being part of

14   that.  So we got to film him coming up there, Eric

15   and us did with a -- just like it was on Saturday

16   Night live.  And so we did that.

17       And then we also -- I told him we also filmed

18   the Q and A session with Bruno and had a banquet

19   with Bruno where the fans got to come and eat with

20   him and have a great thing with him.  And so we got

21   all that stuff footage.  And Mr. Sterling was

22   excited about that, too, because it was something

23   nobody else was really doing at the time to go in

24   with our classic footage, too.

25   Q    Did he have any -- did he express to you any

1    concerns with Wrestlereunion at that point?

2    A      No.  He said -- I mean, he didn't to me.  Now,

3    he might have with somebody else.  But to me, you

4    know, he thought everything was good and we talked

5    about -- he said, you know, do you think there's

6    anything we can add?

7          I said, look, I said, what you see is not --

8    you know, it's just matches right now.  But, I said,

9    once you put the -- the sound in and, you know, the

10   sweetener and do all the stuff -- it's wrestling

11   terms -- and do all this to it, I said, and the

12   white editing, I haven't seen all the camera shots,

13   you know, but I think if we get the right camera

14   shots in -- and matter of fact, I even told him

15   then, I said, anything y'all need me to do, I'm

16   there for.

17         But -- and, also, he told me, too, he said, by

18   the way, he said, Eric told me the music was good,

19   and I said, thank you.  Because I was excited about

20   being part of Clear Channel, doing music with them

21   because it's a major company.

22   Q      Did you and him discuss the demo tape?

23   A      The only thing we mentioned on that, we talked

24   about getting some footage that we could really put

25   together to put really a sizzle out there that --

1    that once they went door knocking with this or

2    whatever they were planning on doing, I didn't have

3    privilege to knowing where they were going to knock

4    on doors to do it.

5        But he talked about putting a good minute or

6    maybe a three-minute piece together with action and

7    some of the footage of the fans.  Also, I told him,

8    too, something special we did.  We were able to --

9    some of the fans that were lined around the building

10   to get in for that show, we took a camera crew and

11   got some great footage of them coming in, you know,

12   and did some interviews with them about why they

13   were at Wrestlereunion, you know, so --

14   Q     Did he -- did Mr. Sterling say anything to you

15   about he thought the crowd was too small?

16   A     No, sir, he didn't say anything.

17   Q     Did he have any complaints about the venue at

18   all?

19   A     No, sir.  He didn't say anything on that,

20   either.  I mean, everything was great.  I mean, I

21   left with the impression that everybody was fine

22   with it.

23   Q     Okay.  What about Wrestlereunion III?  We saw

24   the footage earlier.  So you attended that and you

25   did the commentating for that?

1      A      Yes, sir.

2      Q      Okay.  Now, Wrestlereunion III, the requisite

3      show, was sometime around the middle of September of

4      2005.  Do you recall going to New York City with

5      Mr. Corrente in October of 2005?

6      A      Yes, sir.

7      Q      Okay.  How did that come about?

8      A      Well, Sal had called me.  And he goes -- you

9      know, he had been trying to get ahold of

10     Mr. Sterling and couldn't get phone calls back or

11     anything else.  I said, look, Sal, why don't you --

12             MS. MILLNER:  Objection, Your Honor, hearsay.

13             THE COURT:  Well, try not to repeat what he

14     told you.  Just as a result of the conversation,

15     what did you guys do.

16             THE WITNESS:  I'm sorry.

17             THE COURT:  Sustained.

18             THE WITNESS:  Okay.  I'm sorry.  Okay.  We

19     went up there.  He asked me would I love to come

20     with him, and he said, I'll pay your way, and I

21     said, I'm in.  So we went up there and --

22     BY MR. RODEMS:

23     Q      Who was there with you in New York City?

24     A      Just me, Tony and Sal.

25     Q      And Tony is who?

1      A       Sal's partner in Wrestlereunion.

2      Q       Okay.  And where was the meeting at?

3      A       In New York.

4      Q       Where at in New York?

5      A       At the Clear Channel building.

6      Q       Okay.

7      A       Where their offices were.

8      Q       And who all attended the meeting from Clear

9      Channel?

10     A       I think two ladies, but I forget their name.

11     I got to be honest with you.  But Eric was there, I

12     think Steve was there, Joe Townley.  I think -- is

13     that how you pronounce his last name, Townley or

14     Tally?  He was there.  And that's who we met with.

15     Q       What do you recall about your meeting -- had

16     you met Mr. Townley before?

17     A       You know, for some reason, I never did.  But

18     he told me -- he said, Jimmy, you don't know this

19     but I was interested in the XWL project.  And I

20     went, what?  He goes, yeah, he said, when it came to

21     me, he said -- matter of fact, he said he spent some

22     of his own money doing it.

23             He said, I researched that, he said, that was

24     one of the main reasons that I was interested when

25     they came to me with this project was because I saw

1    the footage, saw everything y'all did and I liked it

2    very much, you know.

3          But I never knew that.  That's the first time

4    I ever knew that is when he told me that.

5    Q     Okay.  And how long did the meeting last?

6    A     I think we might have been there for maybe an

7    hour, maybe, you know, maybe an hour and a half.

8    But it seemed to go pretty quick but, I mean,

9    everything was great.

10   Q     Who -- did Mr. Sterling speak during the

11   meeting?

12   A     Yes, sir.  They -- we asked him, is there

13   anything that we can do.  You know, Sal even said,

14   if we need to do any editing or everything, he said,

15   we'll pay Jimmy to stay up here and do it.  I said,

16   I'll do it for nothing, you know, I said, whatever

17   y'all need to get this out, to get it going,

18   whatever you want I'm here for.

19   Q     Did they take you up on your offer to help

20   with the editing?

21   A     No, sir.

22   Q     Okay.  Well, what was the -- what did -- what

23   did Mr. Sterling say during the meeting that you

24   recall?

25   A     Well, Mr. -- I think Mr. Tally did a lot of

1    the talking.  And there was another lady but I

2    forget her name but she was -- I think did

3    overseas -- the promotions for overseas and stuff.

4    And I don't know, I think she had some kind of --

5    either she was going or had been, one way or

6    another.

7          But we had asked them for any kind of

8    promotional material.  And she brought a promotional

9    thing out, and I guess she'd just came back from

10   over there, really, about some kind of conference

11   they had over in France or somewhere.  I forget what

12   it's called.

13         But she had -- she gave us some promotional

14   material that they had been knocking on some doors.

15   Evidently they must have had some bites because --

16   some offers, I'm sorry, some offers for the show

17   over there because she had said that she had some

18   interest there over there for that, you know.

19   Q     Did she have a demo reel that she took with

20   her?

21   A     I didn't see a demo reel.  She had a picture.

22   Q     Did -- was there a discussion?  She had a

23   picture?

24   A     Yes, sir.  She had a picture of a brochure,

25   she had like a little brochure.  I think it was like

1     a one page thing or something.  But it had a mask on

2     it.  I remember that.  That's all it had on there.

3     But I didn't see a demo reel.  But we asked them

4     about a demo reel and then -- I'm sorry.

5            MR. RODEMS:  Your Honor, may I publish a

6     portion of Exhibit 158?

7            THE COURT:  Yes, sir.

8            MS. MILLNER:  That's not 158, Chris.

9            MR. RODEMS:  It's part of 158.

10           MS. MILLNER:  It's just this one page.

11    BY MR. RODEMS:

12    Q      Is this the photo you saw?

13    A      Yes, sir, but it was in color.

14    Q      Okay.

15    A      They had a color one.

16    Q      Was there any -- was there any discussion

17    about a demo reel?

18    A      No, but there was discussion on that picture.

19    Q      Okay.  What was that?

20    A      The only thing I said, I said, you know, I

21    just said, if I may say something, I said, I think

22    that instead of the one picture of a guy in a

23    mask --

24           MS. MILLNER:  Objection, Your Honor, improper

25    expert opinion.

 1          THE COURT:  Overruled.  Go ahead, sir.

 2          THE WITNESS:  Okay.  I said, just one

 3     suggestion, I said, the mask is okay but, I said --

 4     and I remember names on it.  I think it might have

 5     been Bruno, Diamond, I don't know, maybe Kevin Nash

 6     or somebody but -- maybe Brett Hart, I don't know.

 7     But I said, if you'll take the pictures of the

 8     people you had under that because they're big names

 9     in wrestling, I think a collage might look better

10     because unless somebody is a friend of the Assassin,

11     a fan of the Assassin, they might not know what

12     we're really trying to do, you know.

13          And she -- she agreed, though.  She was great.

14     She said, you know, that's not a bad point.  Maybe

15     we will put a collage together of the names, because

16     we had some of the biggest names in wrestling on it

17     and still are, you know.

18     BY MR. RODEMS:

19     Q     Was there -- was there any time that they

20     showed you anything, any footage of anything?

21     A     No, sir.  I don't remember seeing anything.

22     But they went out -- we talked about putting some

23     action stuff together with some of the fan stuff.

24     And a gentleman left and went and she -- I don't

25     know if it was Mr. Townley who said it or Eric or

1    whatever.  And he said, go get a thing we just shot

2    on Motley Crue and let's look at it and see if

3    that's similar to what you want.

4         And it was great.  I mean, I loved what they

5    showed of the Motley Crue thing.  I said, buddy, if

6    we could do anywhere half of that, I said, we've got

7    a home run because it was Motley Crue playing and

8    fans, you know, and everything.

9    Q    But they didn't have anything from

10   Wrestlereunion to show you?

11   A    No, sir.  I didn't see anything.

12   Q    What was the -- how did the meeting end?

13   What -- was there an understanding of what was going

14   to be done?

15   A    To me I thought it ended great, you know.  I

16   thought everybody was happy.  Everybody hugged and,

17   you know, I thought we felt like everybody was on

18   the right page, you know, of where we needed to go

19   and, you know, we sit down, said, you know, I just

20   feel like when we did this, I said, I really feel in

21   my heart that wrestling is hotter now than it's ever

22   been.  I said -- Vince had just left Spike TV on

23   Thursday and Total Nonstop Action Wrestling picked

24   up their slot.  They wasn't on Sci Fi back then, now

25   Vince is on Sci -- who'd ever heard of wrestling

1    being on Sci Fi, but those numbers are good.

2         So -- and we went through the whole thing what

3    I said earlier, not to re-track to go over this.

4    But I said, we've got wrestling on Mondays,

5    Tuesdays -- we didn't have it on Wednesdays until

6    just recently -- Thursdays, Saturdays and Sundays

7    and Telemundo, so -- and they all agreed that now's

8    the time to strike.

9    Q    Did anybody from Clear Channel say, we're not

10   going to go forward on this project?

11   A    No, sir.

12   Q    Did anybody say there were problems with the

13   audio or video from Wrestlereunion I and that's why

14   they hadn't gotten that to the marketplace?

15   A    No, sir.

16   Q    Did anybody say that there were problems with

17   the venues?

18   A    Nobody ever told me that.  I always figured if

19   they didn't like the venues, they would have

20   probably gone to Sal and said, let's don't do number

21   two and do number three, you know.

22   Q    Well, I'm just talking about in that meeting

23   was there any discussion about --

24   A    Oh, no, sir.  Oh, god, no.

25   Q    Was there any discussion that the crowd size

1      wasn't sufficient?

2      A      No, sir.

3      Q      Okay.

4             MR. RODEMS:  Your Honor, at this time

5      plaintiff would move Plaintiff's Exhibit Number 3

6      into evidence.

7             THE COURT:  Any objection?

8             MS. MILLNER:  Hold on a minute.  Objection,

9      Your Honor.

10            THE COURT:  Grounds, please.

11            MS. MILLNER:  Your Honor, this is a sworn --

12     it's an interrogatory response from --

13            THE COURT:  Legal objection, please.

14            MS. MILLNER:  Relevance, foundation.

15            THE COURT:  Lay a foundation, then.

16     BY MR. RODEMS:

17     Q      Mr. Hart, were you at the meeting on October

18     27th, 2005?

19     A      Yes, sir.

20     Q      Okay.  Did Mr. Sterling make any negative

21     statements about Wrestlereunion?

22     A      No, sir.

23            MR. RODEMS:  Your Honor, I would move Exhibit

24     3 into evidence.

25            THE COURT:  Being an answer to an

1      interrogatory?

2              MR. RODEMS:  Yes, sir.

3              THE COURT:  And who signed?

4              MR. RODEMS:  Steve Sterling on behalf of the

5      defendant.

6              THE COURT:  The objection is overruled.

7      Exhibit 3 is received.

8              (Whereupon, Plaintiff's Exhibit Number 3 was

9      received into evidence.)

10             MR. RODEMS:  May I publish?

11             THE COURT:  Yes, sir.

12             MS. MILLNER:  Your Honor, if he's going to

13     move this in, he should move the entire answer in,

14     not just a portion of the answer in.

15             THE COURT:  All right.  Let's talk our morning

16     recess please, 15 minutes.

17             COURTROOM SECURITY OFFICER:  Rise for the

18     jury.

19             (Jury out at 10:29 AM.)

20             COURTROOM SECURITY OFFICER:  Please be seated.

21             THE COURT:  Let me say this one more time.  An

22     unsolicited comment by an attorney will result in

23     sanctions.  If you have an objection, you make an

24     objection.  You don't stand up and make a statement

25     in front of the jury insinuating that counsel is not

1    putting everything in that should be in.  There's a

2    manner of making an objection to bring that to my

3    attention, or you may put it in in your case.  Do

4    you have any questions about this procedure?

5         MS. MILLNER:  No, Your Honor.

6         THE COURT:  Is it any different from any other

7    case you've tried?

8         MS. MILLNER:  No, Your Honor.

9         THE COURT:  Do any other judges let you just

10   jump in and say, so, in response to an argument from

11   opposing counsel?

12        MS. MILLNER:  Your Honor, I apologize.  I

13   didn't realize --

14        THE COURT:  Do any other judges allow you to

15   do that?

16        MS. MILLNER:  No, Your Honor.

17        THE COURT:  Then I will expect you and every

18   lawyer in this room to conduct themselves in the

19   manner in which civility and professionalism

20   dictate.  I will not tolerate it.  If you have an

21   objection, please make it.

22        MS. MILLNER:  My objection is that he should

23   move the entire response to the interrogatory in,

24   not just a partial response.

25        THE COURT:  All right.  I can't control or

1      dictate to the plaintiff the manner in which he

2      presents his evidence.  If the response is out of

3      context, that's one thing.  And you may certainly do

4      that in cross-examination, although this witness is

5      not cross-examined on this particular document.

6           I see that it's highlighted.  Mr. Rodems, is

7      that the tail end of a lengthy response?

8           MR. RODEMS:  Yes, Your Honor.

9           THE COURT:  Is there any reason you shouldn't

10     put the entire response to make it compete?

11          MR. RODEMS:  Your Honor, if the Court is

12     ruling that the -- under the rule of completeness

13     the entire thing should be put in, we have no

14     objection to that.

15          THE COURT:  Well, why don't we do that, and

16     then you certainly may highlight the portion that

17     you believe is relevant.

18          MR. RODEMS:  Yes, sir.

19          THE COURT:  It's 10:32.  We're on our second

20     witness.  Move it along.

21          MR. RODEMS:  Yes, sir.  That actually is the

22     final question with Mr. Hart.

23          THE COURT:  Well, I don't know how Mr. Hart is

24     going to comment on an interrogatory answer, so --

25     and you're not asking him to, in fairness.

1          MR. RODEMS:  No, sir.

2          THE COURT:  If your purpose is to impeach

3    something that another witness said or didn't say,

4    then I think you should probably do that through

5    Mr. Sterling, not this witness.  The objection was

6    overruled because under the case -- well, not under

7    that case but under the simple rules of evidence, a

8    sworn answer of a party opponent is admissible, but

9    it has to be done in a sequence that's meaningful to

10   the jury.  This witness is not being impeached.

11         All right.  Take a comfort break.  We'll

12   resume at 10:45, please.  Everybody be ready to go,

13   including Mr. Hart.  Be mindful there may be jurors

14   out in the hallway, so everybody try to refrain from

15   any contact with them.

16         (Recess was taken at 10:32 until 10:50 AM.)

17         (Back on the record.)

18         COURTROOM SECURITY OFFICER:  All rise.  This

19   Honorable Court is again in session.

20         Please be seated.

21         THE COURT:  Are we ready?

22         MR. RODEMS:  Yes, sir.

23         THE COURT:  Bring the jury in, please.  Are

24   you finished with Mr. Hart?

25         MR. RODEMS:  I have two more questions.

1                    THE COURT:  All right.

2                    COURTROOM SECURITY OFFICER:  Please rise for

3       the jury.

4                    (Jury in at 10:50 AM.)

5                    COURTROOM SECURITY OFFICER:  Please be seated.

6                    THE COURT:  You may proceed.

7                    MR. RODEMS:  Thank you, Your Honor.

8       <u>BY MR. RODEMS:</u>

9       Q     Mr. Hart, after the meeting in New York in

10      October of 2005, did you ever hear from anyone at

11      Clear Channel again about the Wrestlereunion

12      project?

13      A     No, sir.

14      Q     You're here today under subpoena?

15      A     Yes, sir.

16      Q     Okay.  You got paid 40 dollars and five

17      dollars for mileage?

18      A     Yes, sir, 45 bucks.

19      Q     Okay.  Do you have a financial interest in

20      Wrestlereunion at all?

21      A     No, sir, not at all.  But I would like to know

22      where my 43 songs went from my music.  But I don't

23      know who's responsible for that so --

24                   MR. RODEMS:  Thank you, Your Honor.  No

25      further questions.

1          THE COURT:  Cross-examination, Ms. Millner?

2          MS. MILLNER:  Thank you, Your Honor.

3                     CROSS-EXAMINATION

4     BY MS. MILLNER:

5     Q     Good morning, Mr. Hart.

6     A     Hello.

7     Q     I'm Dawn Millner.  We've not formally met

8     before we met in the hallway.

9     A     Yes, ma'am.

10    Q     How are you?

11    A     Fine.

12    Q     Okay.  Mr. Hart, am I correct that you have

13    never reviewed the contract between my client, Clear

14    Channel Entertainment Television, and

15    Wrestlereunion?

16    A     No, never.

17    Q     So you don't know what the plaintiff's

18    responsibilities were under that contract nor do you

19    know what the defendant's responsibilities were

20    under that contract; correct?

21    A     No, ma'am.

22    Q     All right.  And you do know, however, that the

23    plaintiff was the promoter of these Wrestlereunion

24    live events; correct?

25    A     Yes, sir.

1      Q       And you've promoted events before; correct?

2      A       Yes, ma'am.

3      Q       And you've been to many wrestling events

4      throughout your career; is that right?

5      A       Yes, ma'am.

6      Q       You would agree with me that promoters are

7      responsible for the most part in the -- what is --

8      what happens and how -- the staging of the live

9      events; correct?

10     A       Are you asking me to tell you what happens

11     or --

12     Q       Would you agree with me that promoters are

13     generally responsible for the staging of the live

14     events; correct?

15     A       For the -- the things I promoted I was -- for

16     the talent, paying the talent, you know, publicity

17     if you're the only person involved in on it.

18     Q       Publicity, venue?

19     A       Getting the -- getting them there, you know,

20     renting the video, getting the insurance so somebody

21     don't get hurt in the ring or anything, in case they

22     do.  Mostly for the fans, too.  A lot of people

23     think the insurance is for the wrestlers.  It's

24     really for the fans, too.

25     Q       All right.  Generally or quite simply the

1    promoter is the person in charge of the live event;

2    correct?

3    A       You -- are you talking about being taped or

4    you talking about just the live event, just --

5    Q       The live event.

6    A       What we just talked about, yes, ma'am.

7    Q       All right.  And you knew that Clear Channel

8    was not in any way the promoter of this live event;

9    correct?

10   A       Yes, ma'am.

11   Q       All right.  And am I also correct that you

12   have not reviewed, except for the few minutes of

13   footage that we just saw together, the footage that

14   was taken by Clear Channel Entertainment of the

15   Wrestlereunion events?

16   A       No, ma'am.  The only thing I saw from --

17   Mr. Herbert showed me a little piece of footage in

18   the office the other day of just an un -- no music,

19   unedited version of us at I think it might have been

20   Davie with no sound -- well, I had open mics on with

21   one camera shoot of just some footage right after we

22   saw WrestleMania 25 footage.  That's the only thing

23   I've ever seen.

24   Q       You saw a few minutes of footage taken over

25   the course of, what is it, about seven days of

1      Wrestlereunion events; fair enough?

2      A       Yes, ma'am.  About five minutes of it

3      unedited.

4      Q       All right.  And you have never seen the

5      promotional trailer that Clear Channel put together

6      for Wrestlereunion; is that right?

7      A       No, ma'am.

8      Q       Is that not right?

9      A       Oh, no, no.  You're right.  I haven't seen it.

10     Q       All right.  And am I also correct that you

11     have not reviewed any of the financial documents to

12     determine whether or not any of the three

13     Wrestlereunion events were a financial success?

14     A       No, ma'am.  I haven't seen any of those.

15     Q       So you don't know whether Wrestlereunion made

16     money on those events or lost money on those events;

17     correct?

18     A       No, ma'am.

19     Q       That's not correct?

20     A       Yes, ma'am, you're right.  I'm sorry.  I

21     thought no meant I didn't.

22     Q       You talked about your first introduction to

23     Wrestlereunion.  And if I understand that, you first

24     received a call from -- is it Diamond Dallas Page?

25     A       Yes, sir.

1      Q      All right.  And you would agree with me that

2      that was sometime in the fall of 2004; correct?

3      A      It was maybe a month before the show.

4      Q      Well, you actually signed a contract to appear

5      in Wrestlereunion I on November 28th, 2004; isn't

6      that right?

7      A      You know what?  I've got to be honest with

8      you.  I don't know when I signed it, it's been so

9      many years here.

10     Q      Do you have an exhibit folder up there?  I

11     think we might be able to refresh your recollection.

12     A      Yes, ma'am.

13     Q      Could you go to Defendant's Exhibit 6-38.

14            MS. MILLNER:  Your Honor, may I approach?

15            THE WITNESS:  What page is that on?

16     BY MS. MILLNER:

17     Q      I'm going to give you a hand.

18     A      I think here's 38 over here, ma'am.

19     Q      I've got it right here.

20            (Brief pause.)

21     BY MS. MILLNER:

22     Q      You know what?  I'm going to -- we'll come

23     back to this.

24     A      Yes, ma'am.

25     Q      All right.  And at the time you understood,

1      this is when you signed your contract, that

2      Wrestlereunion had lined up dozens of legends of the

3      wrestling world; correct?

4      A      Yes, ma'am.

5      Q      And you knew that Clear Channel had not yet

6      entered the picture; correct?

7      A      I hadn't heard of Clear Channel being part of

8      it back then.

9      Q      All right.  Mr. Corrente didn't mention that

10     Clear Channel was going to appear at and film,

11     rather, the Wrestlereunion events when you first

12     signed up; correct?

13     A      Yes, ma'am.  You're right.  I didn't know

14     that.

15     Q      All right.  So as far as you knew,

16     Mr. Corrente was going forward and proceeding with

17     putting on a live wrestling fan convention with

18     dozens and dozens of big wrestling stars from the

19     past; correct?

20     A      Yes, ma'am.

21     Q      All right.  And that's all before Clear

22     Channel entered the picture; correct?

23     A      Yes, ma'am.

24     Q      All right.  And while I realize you hadn't

25     yet -- you haven't reviewed the financials, you

1    would agree with me that lining up dozens and dozens

2    of famous wrestling stars cost some money; correct?

3    A    Yes, ma'am.

4    Q    And Mr. Corrente had, therefore, made a large,

5    from what you gathered, financial commitment into

6    putting Wrestlereunion I on prior to Clear Channel

7    entering the picture; correct?

8    A    Yes, ma'am.  I mean, we got that much talent.

9    Q    Now, we have located the contract.

10   MS. MILLNER:  Your Honor, may I approach?

11   THE COURT:  Yes, ma'am.

12   MS. MILLNER:  It's -- I had the numbers

13   reverted.  It's not 37 but 73.

14   BY MS. MILLNER:

15   Q    Mr. Hart, does that refresh your recollection

16   as to when you signed the contract to appear at

17   Wrestlereunion I?

18   A    Yes, ma'am.

19   Q    All right.  And when is that?

20   A    Let me look on here and see.  It looks -- it

21   says the 20th day of November 2004.

22   Q    And you would have been contacted some weeks

23   prior to that; correct?  Oh, no, not yet, it's not

24   admitted.

25   A    You know, the thing -- the only thing I can

1    say is I know he came to Memphis when I was on

2    that -- doing the TV down there with Cory, talked to

3    us about it.  And date-wise, whatever it says here.

4    It's my signature so I --

5          MS. MILLNER:  Move to admit, Your Honor.

6          THE COURT:  73?

7          MS. MILLNER:  6-73.

8          MR. RODEMS:  Your Honor, may we approach?

9          THE COURT:  Yes, sir.

10         (At sidebar, on the record.)

11         MR. RODEMS:  Your Honor, I don't have an

12   objection.  My only concern is that some of these

13   talent agreements do have dates of birth and Social

14   Security numbers.

15         MR. HERBERT:  It's redacted on the one that --

16         MR. RODEMS:  My copy does have the Social

17   Security numbers.

18         THE COURT:  Let's just make sure any of the

19   exhibits you put in will be redacted, and I'll

20   explain that to the jury in case it's obvious.  Now,

21   this is defendant's 6-73?

22         MS. MILLNER:  Correct.

23         THE COURT:  Not plaintiff's?

24         MS. MILLNER:  Correct.

25         THE COURT:  All right.

1           MR. RODEMS:  Thank you.

2           MS. MILLNER:  Thank you, Your Honor.

3           (End of sidebar discussion.)

4           THE COURT:  Members of the jury, Defendant's

5    Exhibit 6-73 is admitted.  There was no objection

6    but there was a concern because some of these

7    exhibits in their original form include Social

8    Security numbers and certain other identifying

9    information.  And by rules and statute, actually,

10   that type of information needs to be redacted.

11          So if you see an exhibit with an obvious

12   redaction of a Social Security number or birth date,

13   that's why.  It's not that anything is being

14   concealed from you.  So that was a concern that was

15   expressed and we have an agreement those things will

16   be redacted before these exhibits are actually put

17   into evidence.

18          MS. MILLNER:  Thank you, Your Honor.

19          (Defendant's Exhibit Number 6-73 was received

20   into evidence.)

21   BY MS. MILLNER:

22   Q    All right.  Now, Mr. Hart, you talked about

23   the fact that in addition to yourself, there were

24   many, many legends of the wrestling world at the

25   Wrestlereunion events; correct?

1      A      Yes, ma'am.

2      Q      And would you agree with me that -- and let's

3      just start with Wrestlereunion I, the event that

4      took place here in Tampa; okay?

5      A      Yes, ma'am.

6      Q      All right.  There were many legends of

7      wrestling at Wrestlereunion I; correct?

8      A      Yes, ma'am.

9      Q      And you would agree with me that there were

10     approximately 300 people who appeared or who

11     attended, rather, this event and bought tickets to

12     the event.

13     A      Nobody ever told me how many came or didn't

14     come.

15     Q      All right.  It was not a full auditorium;

16     correct?

17     A      The way they had the camera angles lined up

18     from the shot they did on the ladder, I'm sure they

19     had it fixed where it could be full enough.  I mean,

20     where I was, we didn't have no monitor, but it

21     looked okay to me.  I don't know what the -- I'd

22     have to know how much the hall holds first to let

23     you know how many people would fill it up.  I mean,

24     200 people might fill it up, I don't know.

25     Q      All right.

1    A      I know we signed a lot of autographs.  I'll

2    tell you that.

3    Q      Okay.  So you don't know whether or not the

4    event was sold out or not?

5    A      No, ma'am.  I'm just saying it looked -- the

6    way it looked, it looked full.  Now, I don't know if

7    people got in free to make it look that way or how

8    many people paid or whatever.  I don't have access

9    to that information.

10   Q      Al right.  If the evidence has shown that

11   there's 300 tickets sold, you would have nothing to

12   dispute that?

13   A      Oh, no, ma'am.  If you said 300 sold, that's

14   what you say.

15   Q      All right.  And you would agree that --

16   assuming that 300 is the number, you would agree

17   that that's a relatively small amount of the ticket

18   sales; correct?

19   A      Well, to me it doesn't sound like it's 10,000

20   people.  But, of course, the building didn't hold

21   10,000 people, either.

22   Q      Were you aware, sir, that actually they had

23   planned Wrestlereunion I for a larger venue and

24   because of the small amount of ticket sales, they

25   moved it into a smaller venue?

1    A       No, ma'am.  Nobody ever told me that.

2    Q       Okay.  And you're aware, certainly, that

3    Wrestlereunion I was heavily promoted by

4    Mr. Corrente and the Wrestlereunion folks; correct?

5    A       I know I did some radio interviews for the

6    Orlando station for The Morning Show and also Bubba

7    the Love Sponge Show, too.

8    Q       All right.  And they also issued press

9    releases describing this event; correct?

10   A       I'm sure they did.  I didn't actually read

11   them and see them but --

12        MS. MILLNER:  Your Honor, at this time I'm

13   moving an un-objected to exhibit into evidence,

14   Defendant's Exhibit 34.

15        THE COURT:  34 is received.

16        (Whereupon, Defendant's Exhibit Number 34 is

17   received into evidence.)

18        MS. MILLNER:  I'm going to approach the

19   witness and -- actually, could we just put it up on

20   the screen.  Can you, Mr. Brown, focus on the list

21   of names there.

22   BY MS. MILLNER:

23   Q    Now, first let's go to the top.  All right.

24   You agree with me that this appears to be a press

25   release dated August 2004 for the Wrestlereunion

1    event held in Tampa on the 28th through the 30th?

2    A       Yes, ma'am.

3    Q       All right.  And let's go to the list of names.

4    And you went through on direct examination, sir, the

5    various names.  I've got to admit I'm not familiar

6    with wrestling like you are, but you would agree

7    with me that there's a long list of names contained

8    in this press release of what you would consider to

9    be highly recognized and famous wrestling people?

10   A       Yes, ma'am.

11   Q       All right.  For example, there's Kevin Nash

12   there, Diamond Dallas Page; correct?

13   A       Yes, ma'am.  Kamala the Ugandan Giant, Bobby

14   The Brain Hennan, yes, ma'am, everybody.

15   Q       Okay.  All right.  So Wrestlereunion was

16   promoting and advertising and letting the public

17   know that these folks, these legends of wrestling

18   were going to be in attendance at this event;

19   correct?

20   A       Yes, ma'am.

21   Q       All right.

22           MS. MILLNER:  And, Mr. Brown, can we go to the

23   second page, please, and the third paragraph down.

24   If you can highlight, Mr. Brown, where it starts

25   saying only 1200 elite tickets.  All right.

1    BY MS. MILLNER:

2    Q      And you see where it says there that according

3    to this press release, Wrestlereunion's looking to

4    sell 1200 elite VIP tickets for the three-day event;

5    correct?

6    A      Yes, ma'am.

7    Q      And they were also selling -- and if we could

8    scroll down beyond the list.  Right.  Single day

9    admission tickets were also available.  Do you see

10   that there?

11   A      Yes, ma'am.

12   Q      And there were two-day admission tickets

13   available, as well; correct?

14   A      Yes, ma'am.

15   Q      All right.  So they were -- according to this

16   press release, Wrestlereunion was looking to sell

17   1200 elite tickets and then some other undetermined

18   number of single-day tickets and two-day admission

19   tickets; correct?

20   A      Yes, ma'am.

21   Q      All right.  And so if the 300 ticket sale

22   number is correct, you would agree that they came

23   nowhere near their projected sales revenue -- sales

24   numbers; correct?

25   A      Yes, ma'am.

1    Q      Okay.  And this is despite the fact that they

2    heavily advertised and let the public know that

3    these large -- this large number of wrestling

4    legends would be in attendance; correct?

5    A      Yes, ma'am.

6    Q      All right.  Now, when you were at the

7    Wrestlereunion event number one, you talked on

8    direct about some issues that you saw and were

9    concerned about; correct?

10   A      Yes, ma'am.

11   Q      All right.  For example, you talked about the

12   fact that there was no mic and no sound system

13   and -- or PA system; correct?

14   A      Sound system and the proper head gear and

15   stuff for us to do the commentating.

16   Q      Do you know whether or not that was Clear

17   Channel's responsibility to provide that equipment

18   or the promoter of that event, Wrestlereunion?

19   A      Well, going back to the question you asked

20   before about promoting and everything, when we did

21   our promotion, as far as independent --

22   Q      Sir, what I'm asking is do you know whether or

23   not pursuant to the agreement between Clear Channel

24   and the plaintiff who was to provide that equipment?

25   A      Usually the -- well, whoever you do it for,

1      the production company would be the ones to bring --

2      the production company, I mean, whoever the

3      production company was, which in this case would be

4      Clear Channel.  It could have been Time Warner or

5      anybody else.

6      Q      But you don't know what the arrangements were

7      between the plaintiff and Clear Channel?

8      A      Oh, no, ma'am.  I didn't read the contract.  I

9      mean, they could have been responsible for

10     everything.  So could Clear Channel.  I don't know.

11     Q      Right.  And then you mentioned the fact that

12     there was no music there; correct?

13     A      Yes, ma'am.

14     Q      All right.  And you came to the rescue to --

15     and brought some music so there would be music at

16     the event; correct?

17     A      The right place at the right time.  I don't

18     think I was the Big Lone Ranger here but --

19     Q      And, again, you don't know whether or not it

20     was the plaintiff or Clear Channel who was

21     responsible for providing music at that event; do

22     you?

23     A      Not really.  But if I may say, usually -- or

24     should I don't say usually.  Okay.

25     Q      I want to know --

1    A      Yes or no.  Okay.  No, ma'am, I don't.

2    Q      And, in fact, Clear Channel paid you

3    ultimately to use the music at the Wrestlereunion I

4    that you provided; correct?

5    A      Yes, ma'am.  The first part of the -- the

6    first songs we -- they sent us a check for that.

7    And then on our second show, Eric had me bring 12

8    more songs which we never got paid for and then the

9    third show I think we brought eight or nine more

10   which we never got paid for so --

11   Q      The first show you received $2500 for the

12   songs that you brought; correct?

13   A      Yes, ma'am.  And also all of that hinged on

14   these tapes coming out to make the extra money

15   because we would have never sold the songs that

16   cheap, but these guys were in a bind.  Everybody

17   was, you know.

18   Q      You received $1500 to appear at the event;

19   correct?

20   A      Yes, ma'am.

21   Q      And $2500 from Clear Channel to provide the

22   music; is that right?

23   A      Yes, ma'am.

24          MS. MILLNER:  At this time, Your Honor, I'd

25   like to move a stipulated exhibit into evidence,

1      Defendant's Exhibit 52.

2            THE COURT:  Defendant's Exhibit 52 is

3      received.

4            (Whereupon, Defendant's Exhibit Number 52 was

5      received into evidence.)

6            MS. MILLNER:  Mr. Brown, can we put 52 up.

7      BY MS. MILLNER:

8      Q      And you would agree with me that this is a

9      invoice showing that you were -- received $2500 for

10     the rights for the music you provided for

11     Wrestlereunion I; correct?

12     A      Yes, ma'am.

13     Q      It's called a music clearance agreement;

14     correct?

15     A      Yes, ma'am.

16     Q      And essentially you -- the jury's heard the

17     word, clearance rights.  And essentially you would

18     agree that clearance rights are that when an owner

19     of a piece of intellectual property such as music or

20     what have you gives another person -- or licenses

21     another person the rights to use that particular

22     piece of intellectual property, in this case music;

23     correct?

24     A      Yes, ma'am.  Clear Channel was going to be the

25     publisher and we were going to be the writer, but

1    usually the publisher has the dictation over

2    what's -- you know, what they want to do with it.

3    Q       And you can see that this agreement was signed

4    or at least it's dated here May 17th, 2005; correct?

5    A       Yes, ma'am.

6    Q       All right.  Do you know when it was ultimately

7    signed?

8    A       No, ma'am.  What happened -- what happened,

9    they sent us the first one, but then the lady that

10   worked for them, I don't know her name, Howard Helm

11   who does all the music with me, everything was sent

12   to him.  Whatever was signed by them, I don't see a

13   signature up there on it, so they went through

14   everything on it because I was on the road doing the

15   other stuff.  And he was in contact back and forth

16   with some lady up there but I'm not sure who she

17   was.

18   Q       Your representative, Mr. Helm, and Clear

19   Channel's legal department --

20   A       Talked back and forth.

21   Q       And there were some revisions back and forth,

22   but ultimately an agreement was signed sometime

23   after May 17th, 2005; correct?

24   A       Yes, ma'am.  I'm sure it was.

25   Q       So Clear Channel would not have been in a

1    position, therefore, to release any footage from

2    Wrestlereunion I until certainly after the May --

3    after your license agreement was signed; correct?

4    A     Well, really, they could have done what they

5    wanted to because Eric and them, we gave them a

6    verbal agreement to do what we wanted.  So, you

7    know, I'm not saying they should do it or not.  But

8    they didn't, anyhow, so I guess it didn't matter.

9    Q     But technically they did not have your right

10   to release those videos with that music until after

11   you signed this document; correct?

12   A     If we really wanted to stick them to it,

13   you're absolutely right.

14   Q     And you understand companies such as Clear

15   Channel are kind of -- they're sensitive about that.

16   They want to make sure they have everything lined up

17   before they release items; correct?

18   A     And they should be.  That's why I asked what

19   happened to the other songs.

20   Q     All right.  Now, you talked a lot about some

21   of these other wrestling organizations that you've

22   been involved in.

23   A     Yes, ma'am.

24   Q     You're currently with, I believe you said,

25   WWE; correct?

Hart - Direct

1    A     Yes, ma'am.

2    Q     And that's the 600 pound elephant in the room,

3    that's the big dog in this industry; correct?

4    A     If you're going to do wrestling the way it is

5    now, that's how you do it.

6    Q     There's really no second place, or it's a

7    distant second, I guess I should say, in the

8    wrestling industry.  There's WWE, and the number

9    two, whoever that is, is a very distant second;

10   correct?

11   A     Yes, ma'am.  That's why Wrestlereunion was

12   different.

13   Q     And -- but WWE -- and you'd agree that WWE is

14   far and away the most successful wrestling

15   organization around; correct?

16   A     Yes, ma'am.

17   Q     All right.  You'd also agree that there are

18   many other wrestling organizations that have failed?

19   A     Oh, god, probably tons of them that we don't

20   even know about that really tried to come out.  We

21   had two ourselves, the XWL which didn't have a

22   chance to get off the ground because our talent, you

23   know, had left, we didn't have signed.  But it was

24   still different than what we were trying to do with

25   Wrestlereunion or what we were trying to do with

1      Vince.  It would have been financial suicide to run

2      against the WWE and do it that way.

3      Q      Well, wrestling --

4      A      And the World Wrestling Legends, too, another

5      show we had which was still different but --

6      Q      Okay.  Well, let's -- we'll take it one at a

7      time.

8      A      Okay.

9      Q      Okay.

10     A      Sorry.

11     Q      That's okay.  You would agree with me that the

12     wrestling industry is a risky business; isn't it,

13     sir?

14     A      That, too.  I think any kind of promotion you

15     go in when you're first starting out, you're

16     probably going to lose money on anything unless

17     you're Donald Trump.

18     Q      Well, even if you're not first starting out,

19     many wrestling organizations that have tried and

20     tried and tried for long periods of time have

21     ultimately gone bust and gone out of business; is

22     that correct?

23     A      Yes, sir.  I know on the first WrestleMania

24     with Vince, I was lucky enough to be on the first

25     one.  I know that was a nail-biter for him, because

1    back then it was in Madison Square Garden but only

2    in pay-per-views in the theaters.  That's how it

3    started out.

4    Q      All right.  And you personally have been

5    involved in wrestling organizations that have

6    failed; correct?

7    A      World Wrestling Legends and the XWF.

8    Q      All right.  The XWF organization, that failed,

9    and World Wrestling Legends, that was the -- is that

10   the 6:05 show that you talked about?

11   A      Yes, ma'am.  The 6:05 reunion from -- that we

12   shot up in the Hard Rock.

13   Q      And that was put on by WWL; correct?

14   A      Well, it was called World Wrestling Legends.

15   A company called Mirapulous out or Orlando where

16   y'all are from is the ones who -- it's the kind of a

17   company who went in to buy different companies, the

18   way I heard it, that was going out of business.  But

19   we were the first one they wanted to kind of try

20   something new in.

21   Q      All right.  Maybe I'm getting carried away

22   with my acronyms.

23   A      Sorry.

24   Q      But with -- regardless, it was -- it was the

25   World Wrestling Legends --

Hart - Direct

1    A      Legends.  That's just a name we called it.

2    Yes, ma'am.

3    Q      Fair enough.  6.05, The Reunion Tour; correct?

4    A      Tour meaning one show.  Yeah.

5    Q      Okay.  Reunion show.

6    A      That's all we wanted to do was one.

7    Q      And that turned out to be a financial failure;

8    correct?

9    A      Well, it turned out that when we -- the plan

10   we had to do it because the company we were with

11   didn't get the money to us on time to rent the Hard

12   Rock, we couldn't book our talent.  So when we

13   couldn't book our talent, we missed our pay-per-view

14   timeline which had to be done at a later date.  So

15   with all that happening, yes, you're absolutely

16   right.

17   Q      And TNA, that's another wrestling

18   organization; correct?

19   A      Yes, ma'am.

20   Q      And, actually, TNA has been around for quite a

21   while; correct?

22   A      Yes, ma'am.  I think a multi billionaire,

23   really, runs it out of Texas.  I think they had a

24   big oil company up there.

25   Q      Would you agree that TNA is probably maybe

1      number two behind -- distantly behind WWE?

2      A      Yes, ma'am.

3      Q      All right.  And TNA has lost tens of millions

4      of dollars over the years; hasn't it?

5      A      I think they have.  Personally I haven't seen

6      their records but, I mean, just from what you read

7      on different things like that.  But then when you

8      talk to Dixie Carter -- and they just signed a

9      three-year deal -- see, here's where we go back to

10     he said she said.  They just signed a three-year

11     deal on Spike TV.  So I thought to myself, if they

12     just signed a three-year deal and they're losing all

13     this money, why would Spike TV sign a three-year

14     deal with them this past week?  Isn't that crazy?

15     Q      As far as you know, TNA, Total Nonstop

16     Action --

17     A      Yes, ma'am.

18     Q      -- has been losing tens of millions of dollars

19     over the years; correct?

20     A      Well, that's what you hear.  I mean, I ain't

21     saying they are or not so --

22     Q      Now, you've talked on direct about some of

23     these other WWE wrestling shows that you've been

24     involved in.

25     A      Yes, ma'am.

1    Q       For example, the WrestleMania show.  Do you

2    recall that?

3    A       Yes, ma'am.

4    Q       And you would agree WrestleMania is --

5    A       The greatest.  Yes, ma'am.

6    Q       All right.  And you've been to the

7    WrestleMania shows?

8    A       Been on them, been to them.  Yes, ma'am.

9    Q       You appeared in the WrestleMania 25th

10   anniversary tour; is that right?

11   A       Yes, ma'am.

12   Q       All right.  You've seen the DVD with

13   Mr. Herbert in deposition?

14   A       Oh, yes, ma'am, we saw it.  Sure did.

15   Q       All right.

16           MS. MILLNER:  At this time, Your Honor, I'd

17   like to move into evidence Exhibit Number 4 which is

18   the WrestleMania DVD.

19           THE COURT:  That's Defendant's 4?

20           MS. MILLNER:  Yes, Your Honor.

21           THE COURT:  Defendant's 4 is received.

22           (Whereupon, Defendant's Exhibit Number 4 was

23   received into evidence.)

24           MS. MILLNER:  Mr. Brown, I don't want to show

25   too much of this.  I want to just give the jury a

1    sense of comparison.

2    BY MS. MILLNER:

3    Q       Now, do you recall when the 25th anniversary

4    of WrestleMania was -- was -- was staged or was --

5    A       It was in Houston, Texas.

6    Q       Do you know when?

7    A       Last year.

8    Q       Okay.

9    A       I want to say, maybe April 3rd or 4th, but I'm

10   not sure.

11           MR. BROWN:  Just any part of it?

12           MS. MILLNER:  Yeah, just the beginning,

13   whatever.

14           THE WITNESS:  That's Chris Jerico.

15   BY MS. MILLNER:

16   Q       Now -- okay.  And now, first of all, this is a

17   much, much bigger venue than Wrestlereunion;

18   correct?

19   A       Well, they wasn't meant to be the same, were

20   they?  I think that's why Clear Channel picked them

21   up is to make it different.

22   Q       All right.  And the talent they have here were

23   the -- for the most part, the current stars in the

24   wrestling world; correct?

25   A       Yeah.  And I think if you show a little

 1    further, you're going to see two people that were on

 2    Wrestlereunion that he was talking about, C. M. Punk

 3    and also -- and there's Piper.  Piper was on

 4    Wrestlereunion.

 5    Q      Okay.  And you would agree with me that the

 6    production of this show, you can't compare it to

 7    what was done for Wrestlereunion; correct?

 8    A      You can't compare anybody in the world to

 9    what -- what -- to what WWE does.  But once again,

10    if I may say, which is a -- when I signed up for it,

11    I said, we'll never be able to copy what Vince --

12    and the whole thing was we were not trying to.

13          We're trying to bring a part of the past back,

14    the way the crowds were, the way the audience was,

15    and give people a chance to go and sign autographs

16    and talk to the wrestlers and do stuff.  That's why

17    I thought Wrestlereunion was different, which it was

18    different.

19    Q      Well, I bring it up because Mr. Rodems brought

20    WrestleMania up with you on direct so I wanted to

21    compare the two shows.

22    A      I don't remember what the question was on the

23    WrestleMania thing he said now.

24    Q      He also talked about SmackDown.  Do you recall

25    that?

1     A       Tremendous show.  Yes, ma'am.  Awesome.

2     Q       Again, it's more -- it's more similar to what

3     we see with WrestleMania than what we had saw with

4     Wrestlereunion; is that correct?

5     A       Oh, yes, ma'am.

6     Q       All right.  And the crowds and the fans,

7     rather, and the marketplace responded, you would

8     agree, to WrestleMania; correct?

9     A       Yes, ma'am.  There was 26 years of it.

10    Q       Tens of thousands looks like in the audience;

11    correct?

12    A       Yes, 26 years of it building this product.

13    Yes, ma'am.

14    Q       300 in the Wrestlereunion audience?

15    A       Yes, ma'am.  But can I say something, if I

16    may?  I never knew that anybody watched wrestling to

17    watch the crowd.  I thought they watched it to watch

18    the wrestlers.

19    Q       Right.  But the people who put on the

20    wrestling show, the promoters such as Mr. Corrente,

21    put it on to make money; correct?

22    A       I hope he did.

23    Q       And the -- likewise, Mr. Rodems talked to you

24    about UPN SmackDown.  Again, that's, like I said, a

25    much bigger venue, much bigger audience than what we

1       saw at Wrestlereunion?

2       A       Oh, my gosh.  Yeah.

3       Q       Can't compare the two?

4       A       Yeah, but the buildings were different.

5       Q       Now, you talked on direct about the fact that

6       there was -- or about a meeting I guess you had with

7       some Clear Channel folks in October of 2005;

8       correct?

9       A       Was that the one in New York or was it the one

10      with Mr. Sterling at Valley Forge?

11      Q       Well, actually, you know what?  Let's talk

12      about that first.

13      A       Oh, great.

14      Q       For the most part, you -- your dealings with

15      the folks at Cheer -- Clear Channel has been very

16      positive; correct?

17      A       Yes, ma'am.  I always believe if somebody

18      tells you something, that's what they intend to do.

19      Q       Mr. Paulen, for example, he was at the

20      Wrestlereunion events and he was a wresting fan;

21      correct?

22      A       Great.  And loved it to death.  I mean --

23      Q       He was passionate about the Wrestlereunion

24      project; correct?

25      A       Yes, ma'am.

1    Q      All right.  And he tried his best and did

2    everything he could to make it a successful show;

3    correct?

4    A      I think he did, because I remember talking to

5    him -- if I may say this, if it's okay.  I remember

6    talking to him and I said, how did you get involved

7    with these guys?  Did they call you?  And he says,

8    no, we called them.  I saw the internet and, I said,

9    we called the guys for Wrestlereunion because they

10   were going to put this show on.  And said, oh, I

11   never knew how it really happened.

12   Q      And Mr. Sterling who you met, as well, was

13   also passionate about this project; correct?

14   A      He really -- I thought he was.  I mean, he was

15   great.  He sit and talked to me for 30 minutes up in

16   the room and loved everything he saw.  I mean, did

17   you see anything that you want us to do, anything

18   else different?  I'll try.  I mean, it's not my

19   show, but I'll help.  He loved it.

20   Q      And as passionate as you are and as

21   Mr. Corrente is and as the Clear Channel folks are

22   about Wrestlereunion, the reality is that they

23   have -- none of you and none of the folks at Clear

24   Channel or at Wrestlereunion have control over how

25   the marketplace will accept an entertainment product

1    such as Wrestlereunion; correct?

2    A      No.  I think once you go into it, you shoot

3    it, you put it out there for sale, you get it on TV.

4    And then the -- that's how the people respond from

5    there.  If Vince would have never put his product

6    out, you wouldn't have had 25,000 people at this

7    show.  But you've got to see it to know it's there

8    for people to buy it or to look at it, don't you?

9    Q      Before you can do that, though, you need to

10   find someone that's willing to distribute it for

11   you; correct?

12   A      If that's what you're going to do with it.  A

13   lot of the people just have the house shows and

14   don't film anything and just have house shows

15   because they're wrestling fans, you know.

16   Q      But what Clear Channel was trying to do was

17   trying to find someone out there to distribute the

18   Wrestlereunion footage and put it on TV or make it

19   into videos, etcetera; correct?

20   A      Well, what I heard, and I'm not saying it's

21   true or not, just what I heard through the grapevine

22   through -- this is through Eric, really, so I guess

23   it is the truth, he worked for Clear Channel, I

24   think A&E had originally approached them first about

25   getting with Vince to get a lot of the legends that

1        you saw at Wrestlereunion.

2              So when they did that, I guess Vince and them

3        didn't want to do it.  So I guess he was on the

4        internet and saw on the big website about the show

5        called Wrestlereunion that had eighty of the biggest

6        names on there, like you said.  So I think that's

7        how Clear Channel called these guys down here about

8        them jumping in bed with them to kind of put this

9        project on.

10       Q      Okay.  And what Clear Channel was also trying

11       to market -- in addition to what the A&E project

12       was, Clear Channel is also trying -- and if you

13       don't know, that's fine.

14       A      Yes, ma'am.

15       Q      Trying to market this footage to turn it into

16       either a pay-per-view piece or an InDemand piece or

17       videos, other separate media in addition to the A&E

18       project; correct?

19       A      Yes, ma'am.  They said they wanted to do a

20       documentary, number one, and then they wanted to

21       have the matches.  They wanted to put different

22       tapes out in different areas.  Say, if Florida

23       Championship Wrestling was hot with some of the

24       stars, that was going to be a separate set down

25       here.  If it was going to be Georgia Championship

1    Wrestling, then they would have put some of those

2    stars because of one good thing with the editing

3    facilities that Clear Channel I know probably have,

4    you know, they could have gone and chopped this tape

5    up any way they wanted to and probably had, excuse

6    me, 30 DVDs out of this, we shot so much footage.

7         And then I think they wanted -- this is just

8    hearsay, just what they told me.  I'm just -- what

9    I'm listening from Steve.  Then the Comedy Central

10   thing, they wanted to try to maybe talk to them

11   about the comedy show, too, so it was wrestling but

12   other stuff besides the wrestling, too.

13   Q    Clear Channel had some big ideas for this

14   Wrestlereunion project; didn't it?

15   A    They sounded like they did when I talked to

16   them.

17   Q    Right.  And they seemed enthusiastic and

18   hopeful for the Wrestlereunion project; isn't that

19   right?

20   A    After every show they came to us, can we do

21   anything different and, you know, what little I

22   could contribute, they seemed very happy with it.

23   Q    All right.  And you don't know what the

24   response was from the various media outlets that

25   Clear Channel approached in order to try and market

1       and distribute the footage from the Wrestlereunion

2       events; do you, sir?

3       A       No, ma'am.  I just saw that one picture of the

4       mask wrestler.  And I suggested them putting more

5       people on it with a bigger name, that might help.

6       And then they -- that one lady, I don't know her

7       name, forgive me, but she said that she had had a

8       good response from some of the market overseas.  She

9       didn't tell me she had 30 stations, 10 stations, 15.

10      I don't know the money stuff because it wasn't my

11      show, you know.

12      Q       And she certainly didn't tell you they had any

13      signed deals, anyone ready to start distributing;

14      did she?

15      A       I don't see how she could if she didn't have a

16      tape to promote.

17      Q       Well, do you know what she showed these folks

18      out in France when she took this project to them?

19      A       The only thing she showed us was the mask

20      wrestler, Mr. X or Mr. Unknown or whoever he was.

21      Q       Well, let's look at that.

22              MS. MILLNER:  And I'd like to move in the

23      colored version of that brochure, Your Honor.  It's

24      Defendant's Exhibit 110.  And if we can go to the

25      sixth page of that.

1                   THE COURT:  Any objection?

2                   MS. MILLNER:  Oh, is there an objection?

3                   MR. RODEMS:  No, Your Honor.

4                   THE COURT:  110 is received.

5                   (Whereupon, Defendant's Exhibit Number 110 was

6         received into evidence.)

7         BY MS. MILLNER:

8         Q      All right.  Now, this is -- this was a part of

9         a booklet, am I correct, that the Clear Channel

10        folks provided to you in New York and -- when you

11        had that meeting in October 2005; correct?

12        A      I just saw that one page, ma'am.

13        Q      Okay.

14        A      Because I suggested to her, I said, I think

15        the workout girls look bigger than the wrestler, was

16        more -- had more of a thing than the wrestler with

17        just that one thing and the smaller pictures.

18        That's why we suggested to take those other guys and

19        make a collage out of it and make it bigger like he

20        did the girls, you know.

21        Q      Well, they -- he also has -- or on a brochure

22        they have some big names, Bruno Sammartino, Diamond

23        Dallas Page, Kevin Nash and Windy Richter, they're

24        famous names in the wrestling industry; correct?

25        A      Yes, ma'am.  I feel like they are, yes, ma'am.

1    Q      All right.  And this woman you spoke with,

2    this is Ms. McDonald, Kate McDonald; correct?  Does

3    that ring a bell at all?

4    A      No, ma'am.

5    Q      All right.  What you understood, though,

6    however, was that Ms. McDonald went to Europe to see

7    if there would be distributors at a certain

8    conference interested in marketing Wrestlereunion

9    footage; correct?

10   A      Yes, ma'am.  And she did sound -- I have to

11   say this about her, too.  She was cool.  She did

12   sound excited about it.  Evidently she had some

13   bites on it.  And I think she was the one, too, that

14   talked that maybe we can get a better reel together,

15   or some reel, I guess they might have had one but I

16   never saw it, and that's when they went in and got

17   the Motley Crue video and we went, this is it, this

18   is what we need.

19   Q      Okay.  And like I said, you don't know what

20   ultimately the folks that Ms. McDonald approached at

21   this conference in France in October 2005 ultimately

22   decided to do, whether they wanted to proceed with

23   Wrestlereunion or pass on Wrestlereunion; do you?

24   A      No.  The only thing I got out of it, after our

25   meeting I guess they were going to proceed with it

1    because they were going to tell us if we were going

2    to continue on or not and everybody hugged everybody

3    and said we're in so --

4    Q      Well, I realize you --

5    A      -- I took it for granted that was it.

6    Q      Okay.  I'm sorry.  Well, I realize you don't

7    know all the details.  Is it fair to say that at

8    this meeting in October of 2005 you certainly

9    were -- got the impression based on your

10   conversations with Clear Channel that they had

11   already approached many, many other potential buyers

12   for this footage; correct?

13   A      I'm just saying what she said.  When we left

14   the building, I was under the impression, I said,

15   you know what?  I think this might be bigger than

16   what we think.  They go, why?  And I say, because if

17   they didn't like what we did on these three shows,

18   they would have pulled the plug, baby, instead of

19   hugging us and telling us we're going to make

20   another video and do it.

21          So I figured they just didn't want to talk in

22   front of me because I didn't own Wrestlereunion.  So

23   I felt like I was a stepchild left out so I just

24   didn't say much more about it.

25   Q      All right.  But in any event, ultimately you

1      don't know what the ultimate response was from any

2      of these distributors --

3      A      No, ma'am.

4      Q      -- or potential buyers; correct?

5      A      No, ma'am.  No, ma'am, I don't.  No, ma'am.

6      Q      Okay.  And am I correct, sir, that the

7      Wrestlereunion events that you attended, and you

8      attended all three; correct?

9      A      Yes, ma'am.

10     Q      All right.  There were no scripts at those

11     events; correct?

12     A      There was a lineup on what we had.

13     Q      You had a list of names and who was fighting

14     who.  But there was no scripts; correct?

15     A      Yes, ma'am.  What it was is when you have the

16     talent like they have up there, like in the old days

17     so people will know I'll try to explain it, we got

18     to kind of ad lib our interviews.  In other words,

19     if the promoter said, look, tonight you're going to

20     be fighting Dory Funk, and make sure you plug the

21     town, make sure you plug what time it's going to be,

22     and that's how we did it, so we got to ad lib.

23            Now everybody has scripts, which is -- but if

24     we had brought a script to this generation that we

25     have on there, they would've gone, whew, are you

1        kidding me?

2        Q       Well, you would agree with me that it's much

3        easier to film an event when the producers have

4        scripts so they know what's coming next; correct?

5        A       Well, we did have.  We had the lineup of what

6        was coming on and I'm sure there was a meeting,

7        because I know I was on one of them with Eric and

8        then when we sit down together on the lineup of who

9        was coming out first, who was coming out second.

10              And the reason I say that, if I may, is

11       because I had to sit down with him on the music.

12       And so we got with Sal, who's coming out first,

13       who's coming out second, who's going to win the

14       match because then we had to have the song ready to

15       be played up.  So by us having that, I just

16       automatically thought that if they've got this much

17       information, I'm sure they've got something else to

18       tell them, you know, what's going on, too.

19              And then we did pre-tapes in the back, too,

20       that were going to be spliced into the show, too, so

21       Eric was a part of that, too.

22       Q       All right.  Do you know how much money Clear

23       Channel spent on trying to film these Wrestlereunion

24       shows?

25       A       No, ma'am.

1    Q      Would you agree it probably was in the

2    hundreds of thousands of dollars?

3           MR. RODEMS:  Objection, Your Honor.  Calls for

4    speculation.

5           MS. MILLNER:  All right.  Withdrawn, Your

6    Honor.

7           THE COURT:  It's been withdrawn.

8           MS. MILLNER:  Yes.  It's been withdrawn.

9    BY MS. MILLNER:

10   Q      Do you have any way of determining how much

11   Clear Channel would have spent on these productions?

12   A      You know, I can probably make a wild guess.

13   The first one it probably didn't cost them too much

14   because they didn't have a truck and the other stuff

15   that you had to probably go get.  But if you brought

16   a truck out and -- well, they owned their own trucks

17   so that's in with the company.  I know that we got a

18   truck for our XWF shows --

19   Q      Sir, I just --

20   A      -- that cost us 30,000 or $35,000.  I don't

21   know what they charged for theirs.

22   Q      And there was --

23          COURT REPORTER:  I'm sorry.  I didn't hear

24   your question.

25   BY MS. MILLNER:

1      Q      There was a truck at the second event;

2      correct?

3      A      Yes, ma'am.

4      Q      All right.  And you don't know whether or not

5      the contract required Clear Channel to bring a truck

6      out to the event; do you, sir?

7      A      Well, being in the business this long --

8      Q      Sir, you haven't reviewed the contract so you

9      wouldn't know; correct?

10             THE COURT:  You've got to let the man answer

11     the question so the court reporter can get the

12     answer down before you ask the next question.

13             THE WITNESS:  Thank you.  I'm sorry.

14             THE COURT:  Let's back up, ask the question

15     and let's get an answer, please.

16     BY MS. MILLNER:

17     Q      Please finish your answer.

18     A      Yes, ma'am.

19             THE COURT:  Well, let's get the question back.

20     BY MS. MILLNER:

21     Q      You don't know what the contract between -- or

22     you don't know if the contract between Clear Channel

23     and plaintiff required Clear Channel to bring a

24     truck; do you, sir?

25             THE COURT:  Yes or no.

Hart - Direct

1    A       No, ma'am, I don't.

2    Q       Thank you.  Now, sir, you are aware -- or are

3    you aware that, in fact, Clear Channel did release

4    four shoot videos of Mr. Sammartino, Mr. Nash,

5    Ms. Richter and Diamond Dallas Page into the

6    marketplace?

7    A       I didn't see them but I heard it.  But I

8    couldn't believe they put them out without the

9    footage from Wrestlereunion in them because what

10   does a shoot interview mean for somebody for two

11   hours without having the footage that you needed

12   from Wrestlereunion to put in it to make it really

13   worthwhile.

14   Q       All right.  You never saw those shoot

15   interviews?

16   A       No, ma'am.

17   Q       All right.  And, therefore, you can't judge

18   the quality of those interviews; correct?

19   A       No, ma'am.

20   Q       And you don't know what the response was to

21   those shoot interviews in the marketplace; do you?

22   A       No, ma'am.

23   Q       Oh, by the way, you mentioned about A&E and

24   that Mr. Paulen was talking about A&E's interest in,

25   perhaps, doing something with wrestling on their

1    channel; correct?

2    A      Yeah, this is just hearsay.  But when we were

3    talking, he had told me how it came about for them

4    to get with Sal and Wrestlereunion was Vince turned

5    them down, he was on the internet, he saw this

6    promotion down in Florida at the Doubletree Hotel

7    and he goes, you know what?  Let's call these guys.

8    And that's -- that's the only thing I know on it.

9    Q      Mr. Corrente and other folks from

10   Wrestlereunion were around during these

11   conversations you were having with Mr. Paulen?

12   A      No, ma'am.  I was just talking, me and Eric,

13   we were together most of the time down there because

14   I was trying to help him on whatever he needed.

15   Q      It certainly didn't seem to you, at least,

16   that Mr. Paulen from Clear Channel was trying to

17   keep this A&E project secret from anyone; correct?

18   He was freely discussing it with you; isn't that

19   right?

20   A      Nobody -- I didn't know if he was trying to

21   tell anybody else about it.  I just happened to ask

22   him the question.  He didn't go into detail and tell

23   me how much money it was costing or nothing.  But he

24   just told me that's -- I just asked how they came

25   about, and that's what he told me.

1    Q        He didn't ask --

2    A        I thought maybe Eric -- I thought maybe Sal

3    had called them, but he says, no, we called -- Clear

4    Channel called these guys.  I said, oh, okay.

5    Q        Mr. Paulen didn't ask you to keep the A&E

6    project secret from Wrestlereunion or secret from

7    anyone else; correct?

8    A        He didn't say nothing about it.

9    Q        As far as you could tell, there was no concern

10   on Mr. Paulen's part about keeping the A&E

11   affiliation or the A&E project, I should say, from

12   the folks at Wrestlereunion; correct?

13   A        I don't know if he told anybody else.  I'm

14   sure he must have told the Wrestlereunion people who

15   ran that because of how they wanted to make the

16   phone call.  But he didn't go through a lot of stuff

17   with me going, shhh, be quiet, don't tell anybody

18   so --

19   Q        Thank you.  No further questions.

20   A        Thank you, ma'am.

21            THE COURT:  Any redirect?

22            MR. RODEMS:  Yes, Your Honor.  Thank you.

23                     REDIRECT EXAMINATION

24   BY MR. RODEMS:

25   Q        Mr. Hart, did Mr. Sterling at any time tell

1    you that Clear Channel was holding back distribution

2    of Wrestlereunion until they got Mr. McMahon signed

3    and in the can?

4    A      No.  Nobody ever told me nothing.

5    Q      Okay.  And, by the way, regardless of whether

6    you saw the contract or not and whether it required

7    a production truck, were you surprised when you

8    showed up at Wrestlereunion I and didn't see one?

9    A      Well, I think after they told me that Clear

10   Channel was going to be involved, I know by working

11   with Time Warner and Comcast and all them, usually

12   if you're going to film anything, whether it's a

13   boxing match or anything, you've got a truck out

14   there, you've got a -- the lights are there, you've

15   got -- I mean, the promotion company, you know,

16   furnishes the -- the promoter has the talent, the

17   ring, the building, insurance, pays for the travel.

18        If you hire a company to do this, whether it's

19   Comcast or whoever, they bring in everything else

20   you need.  If not, then, why don't the promoter just

21   rent everything and do it yourself and own

22   everything?

23   Q      Terry Funk and Dusty Rhodes, do they need a

24   script in your estimation to renew their feud that's

25   been going on for 30 or 40 years?

1    A       Oh, please.  Are you kidding me?  I wouldn't

2    have even gone to them and mentioned that.

3    Q       Even with WWE, not every single moment of a

4    wrestling match is scripted; is it?

5    A       Well, you know what?  You -- you -- in our day

6    everything was done behind the stage, you know, you

7    kind of talked it over.  But now a lot of the guys

8    do rehearse their matches and do it -- sometimes

9    they go out, you know, go awry and different things

10   happen and people do get hurt and, you know, some

11   serious injuries sometimes, but it's not

12   intentionally.

13   Q       Now, who is that wrestler in the mask, that

14   picture?

15   A       I -- the way it looked with no name, it could

16   have been Mr. -- could have been The Assassins,

17   maybe a group called The Interns from years ago

18   so -- I mean, I don't know who the wrestler per se

19   was under.  I know the real Assassins, Jodie

20   Hamilton and -- I forget his other partner's name

21   from Atlanta, Georgia.  I don't think that was them.

22   Q       But whoever -- there's no masked wrestler, The

23   Assassin, or anybody that's as big as, say, Bruno

24   Sammartino; is there?

25   A       The biggest masked wrestler out there now is

1    Ray Mysterio.

2    Q     Well, he wasn't at Wrestlereunion; was he?

3    A     No, of course, he wasn't.  But I'm just

4    saying, if you're talking about -- the most

5    recognizable mask is a Ray Mysterio mask which are

6    more colorful and more -- you know, it's just

7    different.

8    Q     Who is the most recognizable person at

9    Wrestlereunion?  It's not the mask person; is it?

10   A     No.  Jimmy Hart.  No, I'm just kidding.  I'm

11   kidding on that.  Please don't let the guys hear me,

12   they'll kill me.  But you know what?  For me I've

13   always been a Dusty Rhodes fan.

14   Q     Okay.

15   A     If it was somebody that lived up in Pittsburgh

16   that migrated down here, it's Bruno Sammartino, you

17   know.  It just goes to show you, you know, who likes

18   who.

19   Q     Now, you were involved in trying to sell XWF;

20   right?

21   A     I wish I could have been involved trying to be

22   part of our team that went to TV stations to promote

23   this.  We had a 30-second and a minute or -- 30

24   second and a minute and a half action shots that we

25   took from our first show because we were up doing

1    the editing for the other shows because we did seven

2    episodic adventures on it.

3         But we took the highlights of our top stars,

4    we had pictures done and and, also, we went to NATPE

5    conventions which is in Las -- Las Vegas each year.

6    And we set a big ring up, we had a big booth, I

7    mean, we had everything out there for it.

8         And I think we -- I don't have the details in

9    front of me so I'm trying to be honest as I can up

10   here with the hand on the Bible, but I think we had

11   about 14 foreign countries that wanted it at the

12   time.  But they wanted 52 episodes and we only had

13   eight episodic adventures at the time, you know.

14   Q     But you did have a demo tape?

15   A     Oh, god, yeah.  It's hard to sell something if

16   you don't see it.

17   Q     All right.  Now, the design for Wrestlereunion

18   was a maximum of a thousand fans or so; wasn't it?

19   A     I'm sorry.  What, now?

20   Q     The design of Wrestlereunion was to have a

21   maximum of a thousand fans or so at the convention.

22   A     I never -- and I'm just being honest with you.

23   I never got with Sal to see how many people they

24   were expecting.  That was kind of news to me.  I

25   never saw that press thing a while ago.  I don't

1      know if it was out in USA paper or where it went out

2      to that she showed me.

3           But I didn't know -- first of all, you'd have

4      to look at the -- I'd have to see the capacity of

5      what the hotel holds and what the fire department or

6      fire marshal will let you bring in to set seats up

7      where they were.  I don't know if it was 300, 500 or

8      800, you know.  I just presumed that Clear Channel,

9      being a major company, would come down, look at the

10     event, know where you're going to shoot it.  When

11     it's at the Doubletree, I guess they realized it

12     wasn't Madison Square Garden.

13          So I -- I just automatically think -- I guess

14     being with WWE and WCW for all those years you

15     automatically think that when somebody agrees to do

16     something, you know -- you send somebody down ahead

17     of time to realize what kind of event it's going to

18     be and how many it's going to hold and what you get

19     out of it.

20     Q     But the point of Wrestlereunion was nostalgia;

21     right?

22     A     Yes, sir.

23     Q     Going back to the sixties and seventies?

24     A     Yes, sir.

25     Q     Going back to the time in wrestling before WWE

1    dominated the market and had one company leading

2    everything; right?

3    A      Oh, yes, sir.  There was no intention, just

4    from talking to Sal and Tony, that they could ever

5    even think they were going to compete against Total

6    Nonstop Action Wrestling, TNA, or compete against

7    WWE.  That's why it was done different and that's

8    why they brought all the nostalgia names in it

9    except for some of the younger talent, too.

10   Q      Going back to Championship Wrestling from

11   Florida, Georgia Championship Wrestling, the show

12   out of Memphis, how many people came to those TV

13   tapings, usually?

14   A      Of over TV tapings, if we had 40 or 50 in the

15   audience at the time, if you look at Georgia

16   Championship Wrestling or any of them, we did them

17   in the studio where the TVs were done.  And maybe

18   Memphis might have had 30, if you look at the old

19   tapes.  But that's what we had because, you know,

20   it's good to get an audience response.

21          But we've always felt like in Memphis if you

22   had three rows of people that were just cheering and

23   the cameras shot them, that's all we really needed.

24   Like I said, I thought people were trying to

25   watching the wrestling, not the audience.

1    Q      You were at WCW when it went bust; right?

2    A      Yes, sir.

3    Q      Who was the head of WCW when it went bust?

4    A      Eric Bischoff was the one in charge of our

5    company at the time.

6    Q      Now, do you recall the time after

7    Wrestlereunion I when you were trying to get

8    information about your rights clearance for your

9    music when you were trying to get paid?

10   A      For Clear Channel?

11   Q      Yes.

12   A      We -- I'd spoke to Eric and I said -- and you

13   know what?  Truthfully, whether I had a contract or

14   not, they could have used it.  I know people in life

15   go, oh, they would have sued us but, you know.

16   Q      Let me ask you this.  During the period of

17   months after, she showed you a contract --

18   Ms. Gilbert showed you a contract --

19   A      Yes, sir.

20   Q      -- around May 17th of 2005.  Isn't it true

21   after Wrestlereunion I that you constantly called

22   Mr. Corrente and said, when is Clear Channel going

23   to get me a contract, when is Clear Channel going to

24   get me my money?

25   A      Yes, sir, I did.  But it wasn't -- I just got

1     to be honest, though, it wasn't every day going,

2     Sal, if you don't get me my money I'm going to beat

3     you, you know, it was not that type thing.  It was

4     just, you know -- well, what happened, my partner

5     who makes a living out of doing the music and stuff

6     and I get side projects for us to do it, he was the

7     one that questioned me.  So, in turn, I had to call

8     Sal and then I'd have to put him back off again

9     saying, they're getting to it.

10          Eric -- I talked to Eric and -- I forget there

11    was a lady, I think she kind of had blond or reddish

12    hair that was in charge of our music thing, I'm not

13    sure, because Eric picked it all out with me for all

14    the shows.

15    Q     Now, let me ask you this.  Mr. Corrente paid

16    you to appear at Wrestlereunion?

17    A     Yes, sir.

18    Q     Okay.  And ultimately you got paid for your

19    songs by Clear Channel?

20    A     Yes, sir.

21    Q     Okay.  And by the way, isn't it -- are you

22    aware that the ticket price for Wrestlereunion for

23    the VIP was almost $300 per person?

24    A     I do now.  I didn't know what it was when we

25    were doing the show.

1      Q      Okay.

2             MR. RODEMS:  Thank you, Your Honor.  No

3      further questions.

4             THE COURT:  Thank you, sir.  You may step

5      down.  Please watch your step as you exit the

6      witness box.

7             THE WITNESS:  Oh, me?

8             THE COURT:  Yes, sir.

9             Call your next witness, please.

10            MR. RODEMS:  Let's see.  Where's my -- we're

11     going to go with Joe Townley.  Your Honor, at this

12     time we have the deposition testimony of a witness

13     to read.

14            THE COURT:  Name of the witness, please.

15            MR. RODEMS:  Joe Townley.

16            THE COURT:  Spell the last name for the

17     record.

18            MR. RODEMS:  T-o-w-n-l-e-y.

19            THE COURT:  How would you propose -- is

20     someone going to be the witness?

21            MR. RODEMS:  Yes, sir.  Mr. Barker will assume

22     the witness stand.

23            THE COURT:  All right.  Members of the jury,

24     the testimony of Mr. Townley will now be read to

25     you.  You are to receive and consider this testimony

1    as if the witness were here live testifying.  This

2    is an accepted manner of presenting testimony of a

3    witness who might otherwise not be available.

4          And, gentlemen, just be sure to read slower

5    than normal so the court reporter can keep up,

6    please.

7          MR. RODEMS:  Yes, sir.  May I proceed, Your

8    Honor?

9          THE COURT:  Go ahead.

10          MR. RODEMS:  Page three.

11          (The deposition designations of Joe Townley

12    were read as follows:)

13    Q     Please state your name and address for the

14    record.

15    A     Joseph Townley.  120 Montgomery Circle, New

16    Rochelle, New York, 10804.

17    Q     Mr. Townley, you were at one time the

18    president of Clear Channel Entertainment Television?

19    A     Correct.

20    Q     And when did that employment cease?

21    A     December 20, 2006.

22    Q     Is it possible that it was 2005?

23    A     It is possible it was 2005.

24    Q     How would you characterize the end of your

25    employment?  Was it voluntary?

1    A       Involuntary.  Somewhat voluntary.  I took a

2    buyout.  I could have remained.

3    Q       As president of Clear Channel Entertainment

4    Television, what was the scope of your

5    responsibilities?

6    A       To oversee the day-to-day business and the

7    division as far as managing it and creating new

8    revenue opportunities.

9           MR. RODEMS:  Page seven, line five.

10   Q       Do you have experience in -- and I will use

11   the phrase, quote, "technical side of things",

12   closed quote?  And what I'm referring to there is,

13   you know, filming, editing, that type of thing.

14   A       I don't have -- I'm exposed to it in my

15   business but it's not my craft.

16          MR. RODEMS:   Page 15.

17   Q       Eventually there was an outline of terms,

18   documents that was signed by someone from

19   Wrestlereunion, LLC, yourself and also Mr. Sterling?

20   A       Correct.

21   Q       Who would have been responsible for preparing

22   for Clear Channel Entertainment Television the

23   outline of terms that was ultimately signed by you,

24   someone from Wrestlereunion and Mr. Sterling?

25   A       On that particular deal it would have been

1    Steve Sterling.

2    Q    Would you have had any role in developing that

3    outline of terms?

4    A    I would have had input, yes.

5    Q    What type of input would you have had?

6    A    The terms.

7    Q    Let me show you what was attached to the

8    deposition as Exhibit 1 but has been admitted in the

9    case as Exhibit 1.   I'm showing you the last page of

10   the outline of terms.   The first question, is that

11   your signature on the document?

12   A    Yes.

13   Q    What was the purpose in having this document

14   drafted and signed by Mr. Sterling, yourself and

15   Mr. Corrente?

16   A    This would traditionally be the parameters and

17   the terms of the deal to move forward with the

18   project.

19   Q    Why would you want this to be put together and

20   signed?

21   A    So we would -- to me this shows that we both

22   have an understanding of the agreement to move

23   forward.

24        MR. RODEMS:   Page 21.

25   Q    Prior to the Wrestlereunion project, did you

1    ever have any experience in your career working in

2    the wrestling industry?

3    A        No.

4    Q        Any other wrestling projects that you can

5    recall?

6    A        No.

7        MR. RODEMS:  That's the conclusion of the

8    plaintiff's designations, Your Honor.

9        THE COURT:  Do you have any portions you'd

10   like to read, Ms. Millner, at this time?

11       MS. MILLNER:  No, Your Honor.

12       THE COURT:  All right.  Thank you, sir.  Call

13   your next witness, please.

14       MR. RODEMS:  Your Honor, we have the

15   deposition of Johnny Gallarello to read, which is

16   similar in length.

17       THE COURT:  Would you spell his last name for

18   the record, please.

19       MR. RODEMS:  Yes, sir.  That's

20   G-a-l-l-a-r-e-l-l-o.

21       THE COURT:  And, again, members of the jury,

22   you are to receive and consider this testimony as if

23   the witness were here live testifying.

24       MR. RODEMS:  May I proceed, Your Honor?

25       THE COURT:  Yes, sir.

1              MR. RODEMS:  Page three.

2              (The deposition designations of John A.

3       Gallarello were read as follows:)

4       Q       Please state your name.

5       A       John A. Gallarello.

6       Q       Were you at one time either employed by or

7       affiliated with Clear Channel Entertainment

8       Television?

9       A       Yes.

10      Q       And were you actually an employee of Clear

11      Channel?

12      A       I was a contracted employee.

13      Q       At the end of the year were you given a 1099

14      or a W2?

15      A       1099.

16      Q       What is your vocation?  What is it that you do

17      for a living?

18      A       I basically deal with TV, DVD and digital

19      media rights and -- production-wise.  So I basically

20      take the final assets which would be like the mixed

21      edited master's audio, all those elements, and I

22      will create the DVDs.  Well, I will facilitate

23      having the DVDs made, the manufacturing, the art

24      work and all that stuff.

25      Q       Did you have any involvement with videotaping

1    the live events in Tampa, in Valley Forge and Davie?

2    A    No.

3    Q    Did you attend any of the Wrestlereunion live

4    events in Tampa, Valley Forge or Davie?

5    A    No.

6    Q    Did you have any involvement in trying to sell

7    the final product to interested parties to create

8    revenue for Clear Channel Entertainment Television?

9    A    I was involved, yes.

10   Q    What was your involvement in that?

11   A    Well, after the shows were -- the events --

12   sorry if I say shows.  I work a lot with music.

13   Q    Yes, sir.

14   A    After the events were shot and edited, I

15   helped facilitate, create the DVDs and the art work.

16   And when people would go out to, say, a broadcaster

17   or a prospective distributor, I would facilitate

18   making dubs and stuff like that and giving them to

19   the people, the person who was going to send out

20   whatever to whomever.

21   Q    Okay.  Would you have had a direct role in

22   trying to negotiate deals with people who may be

23   interested in buying the programming?

24   A    No.

25   Q    What, then, was your involvement with the

Gallarello

1    Wrestlereunion project, in your own words?

2    A    Well, for lack of a better word, I made the

3    DVDs, I hired the authoring facilities.  Authoring

4    is the way you make the DVDs because you have to

5    write scripting for them.  I will do the quality

6    control.  I will make sure the menus are made, pass

7    them on for approvals and forward them to

8    Wrestlereunion people, Sal and the gang.

9         I worked with the manufacturers in what

10   packaging we were going to put it in, and I would

11   ship them to whoever we needed to ship them to in

12   order -- the quantity we needed to order and stuff

13   like that.  So I facilitated more the after the fact

14   stuff.

15   Q    The end product of what you did, were you

16   satisfied with the result?

17   A    Yes.

18   Q    Do you think that the product that you

19   prepared for Clear Channel Entertainment Television

20   was of the highest quality that was available?

21   A    Yes.

22   Q    How much interaction did you have with Sal

23   Corrente?

24   A    During the project I would say that it was

25   pretty steady.  I would have to go through Sal and

Gallarello

1    his partners for approvals and to get the elements.

2    Q      And who did you understand his partners to be?

3    A      You know, it was Sal and the other gentleman

4    who's totally escaping my mind right now.

5    Q      Did you ever meet or talk with an individual

6    by the name of Jimmy Hart?

7    A      Oh, yes, Jimmy Hart.

8    Q      What about Rob Russen?

9    A      I remember meeting Sal, I remember Jimmy Hart.

10   I can't remember if I met Rob Russen.  The name Rob

11   Russen -- the name is familiar.  Yes, I have spoken

12   to all of them on the phone.  I definitely met Sal

13   several times and met Jimmy Hart.

14   Q      Did you have any problems or issues in dealing

15   with any of the Wrestlereunion individuals?

16   A      Not that I can recall.

17   Q      Did you have any role at all in the

18   videotaping of any of the events or the --

19   A      No.

20   Q      How about the editing of the videotaping of

21   the events?

22   A      I was not involved.  They were -- the editing

23   was done on our floor at 220 West 42nd Street.

24   There was a dog leg, a part of the building that had

25   editing facilities where Eric and the guys were

1    editing.  I would pop in and look at it.

2    Q      From that perspective, then, what was your

3    impression of the Wrestlereunion project?

4    A      Well, with the Wrestlereunion project, I

5    actually grew up watching a lot of those wrestlers.

6    And my thought was, well, it's actually great to see

7    these wrestlers wrestle again.  You know, now it's

8    like a cage match.

9          It was the good old days, Jimmy Snuka and, you

10   know, Hulk Hogan and George Animal Steal eating the

11   thing of the thing back when I was a little kid.  So

12   I think it was nice and nostalgic, nice and

13   nostalgic piece.

14   Q      Was there anything about the quality of what

15   you observed that --

16   A      The quality?

17   Q      -- that caused you any concern?

18   A      I don't think it caused me any concern.  I

19   think they shot it at -- you know, at HD at the

20   highest level at the events.

21   Q      And was the quality that you observed

22   something that you found to be --

23   A      On the video?

24   Q      Yes.

25   A      It passed all the standard technical things,

1      yes.  Yes, it was broadcast standard and all of

2      that.

3      Q      Was there anything about your interaction with

4      the Wrestlereunion folks that you would describe as

5      negative in any way?

6      A      Not that I recall, no.

7      Q      Was there anything about the Wrestlereunion

8      project that you would describe as negative?

9      A      The Wrestlereunion project that I would

10     describe as negative?  For the most part, no.  I

11     think for what the Wrestlereunion project was, you

12     know, it was a nice -- what I believe was a very

13     nice niche little thing.

14     Q      Did you ever have any discussions with Steve

15     Sterling about the Wrestlereunion project?

16     A      Yes.  Because I worked for Steve, I reported

17     in to Steve Sterling.

18     Q      And did he ever share with you what his

19     impression of the project was?

20     A      Not that I recall.  I mean, for the most part,

21     I worked for Steve when I was back in Eagle Rock

22     Entertainment and he, you know, always gives like

23     110 percent for every project, no matter how big,

24     small or large it is.

25     Q      Did Mr. Sterling ever talk with you about

1    Mr. Sterling's efforts to sell the Wrestlereunion

2    project?

3    A    Well, yes.  Because when he would say --

4    whenever he would initiate through either a

5    distributor or whoever, that would be in whatever

6    form that would be.  So whether it was TV or

7    distribution or VOD or whatever it would be, I would

8    facilitate getting like a screener ready or a copy

9    or forward him like a brief or, hey, this will be

10   ready in a week or so.  I would just have to keep

11   them up to date, them being the whole company.

12   Q    Did Mr. Sterling tell you the specific

13   entities that he was dealing with in trying to sell

14   the Wrestlereunion project?

15   A    The only specific one I remember would be

16   Image.

17        MR. RODEMS:  Page 21, please.

18   Q    Do you recall Mr. Sterling saying anything to

19   you about the Wrestlereunion project that was

20   negative in tone?

21   A    You know, I really don't even remember -- I

22   don't think so.  It's not in Steve's nature to be

23   negative about any project.

24   Q    Do you recall Mr. Sterling talking with you

25   about why the project didn't sell?

1       A       Well, I think it's -- I mean, every project

2       kind of lives and dies with distribution.  Maybe

3       that's a little too dramatic, but distributors at

4       the time go hot and cold, hot and cold, hot and

5       cold.  It's just really reading, you know, the

6       temperatures of their distributors.

7       Q       I appreciate that.  That being said, do you

8       recall anything specific that Mr. Sterling said

9       about the Wrestlereunion project and his efforts to

10      sell it?

11      A       No.  I think he thought -- and this doesn't

12      mean to belittle the project at all, but I think he

13      thought that it was a great little entity.  That's

14      not meaning it was like a small little nothing, a

15      great little entity, Wrestlereunion.

16      Q       Do you recall being at any meetings with

17      Mr. Sterling, Mr. Townley, Sal Corrente and Jimmy

18      Hart?

19      A       I was at a meeting with Sal, Jimmy Hart,

20      Steve.  I don't know if Joe was there.  Maybe Joe

21      was there.  Probably.  He could be.

22      Q       Do you recall approximately when that was?

23      A       I remember Jimmy Hart coming onboard later in

24      the game, I would say.  I don't recall that, when it

25      was.

1    Q      Do you recall what was discussed at that

2    meeting?

3    A      I can remember it was something like a regroup

4    meeting, like a regroup meeting, like, what could we

5    do.  I think we had a couple of, you know, like

6    Image was hot and cold and how can we kind of move

7    the project along and not let -- just not let it

8    just sit there.

9    Q      Do you recall what the sentiment was at the

10   end of the meeting as to whether the project was

11   going to go forward or not?

12   A      I think the outcome of that meeting, we were

13   going to push ahead on it, like work on some stuff.

14   I can't really remember exactly.

15         MR. RODEMS:  Thank you.

16         THE COURT:  Are there any portions that you'd

17   like to publish?

18         MS. MILLNER:  Yes, Your Honor.  I don't know

19   if --

20         MR. BARKER:  I'll be happy to.  Give me the

21   designations.

22   Q      Good morning, Mr. Gallarello.

23   A      Good morning.

24         MS. MILLNER:  Page eight, line 13.

25   Q      Once you had done the authoring and the

1    quality control, gotten the approval, the art work

2    or whatever it was that you did, and turned it over

3    to the folks at Clear Channel Entertainment

4    Television, what did they do with it; do you know?

5    A    Well, the end goal was to reach a distribution

6    deal.

7    Q    So they were using these things that you

8    produced to go out and sell it into the marketplace?

9    A    Correct.  Prior to me making it, prior to me

10    authoring and during authoring and after I authored.

11        MS. MILLNER:  Page 27, line 25.

12    Q    Do you remember having some involvement with

13    making a trailer for the Wrestlereunion project?

14    A    Yes.

15    Q    Do you remember anything about having a

16    problem with the intellectual property rights as to

17    certain photos in the trailer?

18    A    Yes.  I received a disc with photo elements

19    and some of the photo elements we used to create the

20    art work.

21    Q    Who did you receive it from?

22    A    I got it from Sal.

23    Q    Sal Corrente?

24    A    Yes.  And so creating the art work and then we

25    made a trailer, trailer sizzle reel, to make a --

1    you know, to send out to people to basically tease

2    them and get them interested in the property.  And I

3    hired Bill Young Productions out of Texas who were

4    great.  They make every concert spot you ever watch

5    on television.

6    Q      That's a company, Bill Young Productions?

7    A      Yes.  And they're in Texas.  And we made a

8    great trailer.  And instead of just doing all the

9    great wrestle moves which can get a little stagnant

10   if you're making a trailer -- if you're watching a

11   trailer like basically the same stuff, we threw in

12   the wrestlers, images of the wrestlers that were

13   there because there was also a lot of -- a lot of

14   DVDs were slated to be really interview DVDs.

15         So there was like these shoot interviews so it

16   would be a little misleading if it were all just

17   wrestling.  So he used these images, but unbeknownst

18   to us we didn't know we couldn't use those images

19   after we made the trailer.

20   Q      How did you find out?

21   A      Well, I showed the trailer to Sal.  They loved

22   it and they asked where we got the images.  And we

23   couldn't use them I think basically because Vince

24   McMahon and the WWE owns like all the rights to the

25   likeness and names of wrestlers and stuff like that.

1          So, obviously, I think they questioned where I

2     got the images and they actually sent me the disc

3     with the images, which could have been just an

4     oversight on their end.  But normally how projects

5     work is I will receive clear and approved assets,

6     images and video and audio, whatever it is, and then

7     I create it from that.

8     Q      Did you understand that that was

9     Wrestlereunion's responsibility to clear the rights

10    to whatever they gave Clear Channel to use?

11    A      That was my understanding.  Still to this day

12    I don't think I saw a contract generally how the

13    deals would work or the deals that I always worked

14    on was one entity, the entity that we would normally

15    engage with would deliver everything cleared to us.

16    Even if we shot it, they would say, yes, you have

17    the right to shoot this because they own the

18    intellectual property.  They have all the rights

19    that they need to.

20    Q      So the trailer or the sizzle reel, that was a

21    tool that Clear Channel was going to use to help

22    market this project?

23    A      Yeah.  It would have been a great thing to put

24    online to get the buzz out and put in stores.  You

25    could use it for retail and stuff like that.

1    Q       And the end result was you weren't able to use

2    the trailer that you worked on and made because of

3    the rights issue?

4    A       Correct.

5    Q       Let me show you some e-mails that appear to

6    relate to that.  And I'll identify them for the

7    record.

8            The first --

9            MS. MILLNER:  I don't know if we want to move

10   these into evidence at this point or not.

11   Q       The first one is a sort of chain of e-mails

12   that appears to start with an e-mail from what I

13   believe is Sal's e-mail addressed to you,

14   Mr. Gallarello, dated November 1st, 2005 at 11:24

15   PM.  And the end e-mail chain ultimately looks like

16   it's an e-mail from Mr. Steve Sterling to you,

17   Mr. Gallarello, dated November 2nd, 2005 at 10:35

18   AM.

19           I want to draw your attention to -- it is

20   actually the middle of an e-mail in that chain,

21   which is an e-mail from you back to Mr. Corrente

22   dated November 2nd, 2005 at 9:29 AM.  And it says

23   here in your e-mail to Sal.  Let me go back.

24           The original e-mail from Sal to you at 11:24

25   PM on November 1st is asking you, is there any

1    update on the one-minute promo piece?  Is it

2    already in production?  And then you responded to

3    him, and it appears that you were asking him, when

4    will I get the photos of the wrestlers?  It actually

5    says the wrestlers, but it looks like you left off

6    an R there.

7    A      I can be one of the world's worst spellers.

8    Q      When will I get the photos of the -- is it

9    supposed to be wrestlers you feel we should feature

10   in the promo, signed Johnny.

11          Is that -- is this an e-mail that you sent to

12   Sal asking him to send you photos for the trailer or

13   sizzle reel?

14   A      Yeah.

15   Q      And do you remember if Sal sent you the photos

16   in response to this request?

17   A      I remember getting either a -- I think it was

18   like a CDR.

19   Q      What is a CDR?

20   A      It's a writable CD so you can burn images or

21   audio to it.  I think it was a CDR of images.

22   Q      And you got that from Sal Corrente, you

23   believe?

24   A      Correct.  I got it from, yes, Sal or someone

25   in the Wrestlereunion camp, but most likely Sal.  I

1    must say when we asked for something, they did --

2    they would get it.

3    Q       Let me jump ahead.  There is a chain of

4    e-mails, the e-mail at the bottom it looks like from

5    Sal to you, Mr. Gallarello, and to Ms. McDonald, and

6    it is dated December 10th, 2005 at 11:46 AM.  And

7    then the last e-mail chain appears to be from Sal to

8    you and Ms. McDonald the following day, December

9    12th, 2005, at 4:38 AM.

10            I'll put little checkmarks in the areas I want

11    to draw your attention to.  If you would like to

12    read through those, just tell me.  And if you

13    recognize these documents and what we're talking

14    about, take your time and look through these and let

15    me know if you recall these communications.

16    A       This is an e-mail where I -- obviously I sent

17    him the trailer.

18    Q       Mr. Corrente?

19    A       Yes.  That's the video.  And he's basically

20    saying, I want you to be aware that you folks used

21    still photos that we do not have the rights to use.

22    If that is not an issue based on how you use them,

23    so be it.  But I do not want either of us to have a

24    problem with WWE.

25            So basically, obviously, the images I asked

1    for, obviously when I asked them for images, I had

2    gotten images that they didn't have the rights to

3    use, and I sent them the audio as they wanted.  It

4    was obviously right around Christmas.  Everything

5    shut down.  That's kind of standard in the industry.

6    So I basically said we would redo the trailer but we

7    would have to wait until the new year.  Also would

8    have been more cost effective.

9         MS. MILLNER:  Thank you.  That concludes our

10   cross designations.

11        THE COURT:  Any redirect?

12        MR. RODEMS:  I have just a few lines, Your

13   Honor.  Page 44, line 16.

14   Q    This matter with you getting the discs and

15   using the still photos that apparently there was no

16   clearance for, how did you remedy that situation?

17   A    I believe we just took all the images out of

18   one version of the trailer or promo and probably

19   tightened it up a bit.

20        MR. RODEMS:  Thank you.

21        THE COURT:  All right.  We will break for

22   lunch at this time and we'll resume at 1:25 by the

23   courtroom clock.

24        COURTROOM SECURITY OFFICER:  Please rise for

25   the jury.

1              (Jury out at 12:07 PM.)

2              COURTROOM SECURITY OFFICER:  Please be seated.

3              THE COURT:  Let me ask, Mr. Rodems, in terms

4      of your schedule, when would you expect to be

5      calling Mr. Bowman, assuming he testifies?

6              MR. RODEMS:  That would be tomorrow morning,

7      Your Honor.

8              THE COURT:  Well, would he be your last

9      witness?

10             MR. RODEMS:  At this point it appears that he

11     might be.  Obviously --

12             THE COURT:  Well, what I'm trying to do is

13     schedule in some time this afternoon, then, when we

14     can try to complete that *Daubert* inquiry.  I don't

15     think we need that much time but --

16             MR. RODEMS:  Whatever you ask for, Your Honor,

17     we'll --

18             THE COURT:  Well, I'd like you to -- if you

19     could finish everything up until him.  I don't know

20     if you can or not.  But we can't overwork Ms. Starr.

21     So if we use another hour and a half for a *Daubert*,

22     we've got to cut into our trial time somehow.  Give

23     that some thought and we can discuss it when we

24     come back for lunch.

25             MR. RODEMS:  Do you have -- Your Honor, do you

1    have a suggestion of how you'd like to divide up the

2    rest of the day so I can prepare?

3         THE COURT:  Just put on whatever evidence you

4    can to move it along.

5         MR. RODEMS:  Will we be going until 4 o'clock

6    today, Your Honor?

7         THE COURT:  I would.  But what I'm looking at,

8    depending on how far you get in your case, maybe we

9    could end a little early and take up the *Daubert*

10   issue.

11        MR. RODEMS:  Yes, sir.

12        THE COURT:  We need to send the jury home at

13   4:00, no matter what, just because that's what I

14   told them our schedule would be.  We pushed it a

15   little bit last night.  But I think we need to stay

16   on the same schedule for their purposes.

17        MR. RODEMS:  Yes, sir.  I'll consult with

18   Mr. Barker and opposing counsel.

19        THE COURT:  All right.  We'll see you after

20   lunch.

21        COURTROOM SECURITY OFFICER:  All rise.

22        (Recess was taken at 12:09 until 1:34 PM.)

23        (Back on the record.)

24        COURTROOM SECURITY OFFICER:  All rise.  This

25   Honorable Court is again in session.

1          Please be seated.

2          THE COURT:  Sorry.  I've got a couple of

3     things bubbling back there.  Juror Wilhite reported

4     to the court security officer that when she rode

5     down in the elevator or I guess rode up in the

6     elevator -- there's a young lady that monitors

7     trials.  She's taking some paralegal courses out at

8     Polk Community College or Hillsborough Community

9     College, and she's been monitoring proceedings for,

10    oh, gosh, six or eight, nine months.

11         Apparently she said, "that wrestling case is

12    really interesting," and that was it.  So

13    Ms. Wilhite dutifully reported it to the court

14    security officer.  In the absence of a motion, I

15    will simply remind the jurors that -- not to allow

16    the case to be discussed in their presence, and if

17    something like that does happen, report it and I'll

18    acknowledge to Ms. Wilhite that she did the right

19    thing.

20         MS. MILLNER:  Thank you, Judge.

21         THE COURT:  All right.  Is that acceptable

22    with everybody?  I don't think the young lady did

23    anything inappropriate.  It's just she's not nearly

24    as sensitive about it.  She may not have recognized

25    the juror, although she's bearing a badge.

1                Okay.  Are we ready?

2                MR. RODEMS:  Yes, sir.

3                THE COURT:  Bring the jury in, please.  It's

4     not like she was wrong.  It is interesting.

5                COURTROOM SECURITY OFFICER:  Please rise for

6     the jury.

7                (Jury in at 1:36 PM.)

8                COURTROOM SECURITY OFFICER:  Please be seated.

9                THE COURT:  Thank you.  Sorry, I had a couple

10    things in chambers I'm working on.

11               Let me also just again remind you, you are not

12    to allow the case to be discussed in your presence

13    and to avoid contact with anybody.

14               Ms. Wilhite, I think you reported just an

15    innocent comment in the elevator by an observer.

16    You did the right thing.  Thank you.  She's not

17    involved in the case at all.  She's just an

18    observer.  So thank you.

19               You are ready to proceed.

20               MR. RODEMS:  Yes, Your Honor.  Plaintiff calls

21    Rob Russen.

22               THE COURT:  We have a lot of people who come

23    in from time to time, particularly students from the

24    University of Tampa, Polk Community College,

25    Hillsborough County, that monitor trials as a part

1      of their course requirements.  And I've become

2      familiar with them because they're in here all the

3      time.  We find out who they are and I'm happy to

4      have them.

5           We have many law students and interns that

6      come in, as well.  And you might see some suits back

7      in the back, young, fresh faces.  Those are law

8      students, typically, and I'll spend time with them

9      at the end of the day, if I have an opportunity to.

10          COURTROOM DEPUTY CLERK:  Please raise your

11     right hand.

12          (Witness complied.)

13          COURTROOM DEPUTY CLERK:  Do you swear or

14     affirm the testimony that you give in this case will

15     be the truth, the whole truth and nothing but the

16     truth?

17          THE WITNESS:  I do.

18          COURTROOM DEPUTY CLERK:  Please be seated.

19          (Witness complied.)

20          COURTROOM DEPUTY CLERK:  Please state your

21     name and spell your last name for the record.

22          THE WITNESS:  Rob Russen, R-u-s-s-e-n.

23          COURTROOM DEPUTY CLERK:  Thank you.

24          MR. RODEMS:  May I proceed, Your Honor?

25          THE COURT:  Yes, sir.

1                    DIRECT EXAMINATION

2      BY MR. RODEMS:

3      Q       Mr. Russen, if you could sit back so that

4      you're not speaking directly into the microphone.

5      A       Okay.

6      Q       Thank you, sir.  Mr. Russen, where do you

7      live?

8      A       Ocean Ridge, Florida.

9      Q       All right.  And how long have you lived there?

10     A       About 18 months.

11     Q       And who do you live there at Ocean Ridge with?

12     A       Sal Corrente.

13     Q       Okay.  In 2005 you were involved in the

14     Wrestlereunion project?

15     A       Correct.

16     Q       Okay.  Were you living at Mr. Russen's house

17     at that time?

18     A       Mr. Corrente's house?  No, I was living --

19     Q       Freudian slip.  Mr. Corrente's house.

20     A       No.  I was living in Sarasota, Florida.

21     Q       Okay.  How long have you known Mr. Corrente?

22     A       Oh, 24 years.

23     Q       Okay.  I'd like to first ask you some

24     questions about your background and your experience

25     in the wrestling industry, and then we'll go into

1        your role with Wrestlereunion and the rest of this

2        case.

3             When did you get your start in the

4        entertainment industry?

5        A      1966.

6        Q      And what area of the entertainment industry

7        were you involved in?

8        A      I was a rock and roll musician.

9        Q      All right.  Well, did you have a name that

10       you --

11       A      I had a band named Negative Space and another

12       band named Snow, both of them became legendary

13       underground rock bands.

14       Q      All right.  And how long did you stay in the

15       musical side of the entertainment business?

16       A      Until about 1986.

17       Q      Okay.  What other areas of the entertainment

18       field have you been involved in?

19       A      Boxing, wrestling, some theater, production of

20       shows in Las Vegas.

21       Q      What did you do in the boxing industry?

22       A      Managed and promoted.  I've had fighters fight

23       for the heavyweight championship of the world.

24       Q      Who did you manage and promote?

25       A      Smoking Bird Cooper, Oliver McCall, Tony

1          Tucker, Greg Page.  I specialized in heavyweights.

2      Q      Did you ever have any dealings with Don King

3      Productions?

4      A      Many.

5      Q      Okay.  At what point of your career did you

6      become involved in the wrestling industry?

7      A      About the same time.

8      Q      Okay.  What was your first job in the

9      wrestling industry?

10     A      Promoter.

11     Q      Would you tell us what that means, a promoter?

12     A      In the world of professional wrestling, the

13     promoter is the one who organizes the entire event,

14     becomes licensed and bonded through the State

15     Athletic Commission, rents the facility, generally

16     hires the talent, the ring, endures all the expenses

17     of bringing them in, hotel rooms, ground

18     transportation, often food and sustenance while

19     they're in town; generally, everything involved in

20     creating a live event.

21     Q      And how many times in your career have you

22     promoted live wrestling events?

23     A      In excess of a hundred.

24     Q      In the United States?

25     A      Worldwide.

1    Q        Okay.  Where outside the United States?

2    A        Australia, I've sent tours to Europe, to South

3    Africa, to Canada.

4    Q        Who is the first person that you worked for in

5    the professional wrestling industry?

6    A        Well, I worked for myself, but I was inducted

7    or tutored into the business by a gentleman named

8    Gorilla Monsoon from the WWE, and another gentleman

9    named Pretty Boy Larry Sharp.  In order to get into

10   the wrestling business, which is basically a closed

11   fraternity, you need to be invited in by someone

12   who's already there.  It's not an open door society.

13   Q        Okay.  And Gorilla Monsoon --

14   A        Yes.

15   Q        Was that Mr. Monsoon's real name?

16   A        Robert Marella.

17   Q        Okay.  With Mr. Gorilla Monsoon and I believe

18   you said Larry Sharp?

19   A        Pretty Boy Larry Sharp.

20   Q        Yes, sir.  What was your involvement?  How did

21   they get you involved in the business?

22   A        They taught me the ropes of what was involved

23   in being the promoter and they also had resources to

24   the talent, former WWF stars at the time.  And Larry

25   Sharp ran a pro wrestling school called the Monster

1     Factory, which developed characters like Bam Bam

2     Bigalo who went on to become superstars in the

3     wrestling business.

4     Q      Now, at some point did you work for Verne

5     Gagne and the AWA?

6     A      Yes.  After I started my own organization,

7     around 1987 I ran into Verne Gagne at the

8     International Association of Fairs and Expositions

9     in Las Vegas, which is where all the fairs go for

10    their annual buying convention for the upcoming

11    season.  Both Verne Gagne and my group had an

12    exhibition booth there, and Gagne approached me and

13    asked me if I'd come to work for him.

14    Q      And did you go to work for him?

15    A      Yes, I did.  I was vice president for sales

16    and marketing for the AWA.

17    Q      What years?

18    A      '88 -- '87, '88 and part of '89.

19    Q      At that time was wrestling still regional or

20    territorial?

21    A      Yes.  It was just breaking down the barriers.

22    Traditionally, wrestling had been done territorial.

23    Different promoters had different geographic areas

24    of the country, and they respected the boundaries of

25    each other until Vince McMahon decided to heck with

1    that, the whole world was his and he got the jump on

2    everybody else.

3    Q    What areas of the United States did the AWA

4    cover?

5    A    Minneapolis to Chicago, sometimes down working

6    with Jarrett in Memphis.  They had a national

7    television contract with a weekly show on ESPN.

8    Q    Okay.  And we'll come back to that in a

9    moment.  But you said -- you mentioned that you

10   formed your own organization?

11   A    On two different occasions I did that.  Prior

12   to the AWA, I had a group called the NWF, the

13   National Wrestling Federation.  And then in my last

14   days at the AWA, I was approached by a legendary

15   promoter named Wally Carbo who had started the AWA

16   for Verne Gagne.  And he asked me if I would

17   entertain the idea of starting a new group since he

18   felt the AWA was in demise, and we formed the IWA,

19   the International Wrestling Association in 1989.

20   Q    International?

21   A    Yes.

22   Q    Okay.  All right.  And where did the IWA

23   operate?

24   A    Started in Minneapolis, then relocated in May

25   of '89 to Sarasota, Florida.

1    Q       Okay.  Did the IWA have televised wrestling?

2    A       Yes, we did.

3    Q       On what stations?

4    A       Comcast, Sports Channel America, Sunshine

5    Network, Direct TV.

6    Q       For the IWA, did you stage and promote live

7    events?

8    A       Yes, I did.

9    Q       For the IWA, did you sell the broadcast rights

10   for the television broadcasts?

11   A       I both sold them and did barter deals.  Yes.

12   Q       And how did you do so?

13   A       Made presentations of footage that had been

14   created into both a demo tape, a half hour

15   television program and an hour television program.

16   About that time cable greatly expanded.  All of a

17   sudden there were more than 200 cable channels and a

18   big demand for programming, especially in the half

19   hour format.

20           But I took the entire package, including -- I

21   would take a superstar wrestler like Sergeant

22   Slaughter with me to the presentations, and they

23   would have everything there in front of them where

24   they could choose whether they wanted the half hour

25   or the hour program.  And our programming was

1    designed to be family entertainment as opposed to

2    what is known as hard core.

3    Q       Okay.  And did you successfully sell the

4    television programs?

5    A       Yes, I did.

6    Q       Now, have you and Mr. Corrente worked together

7    in the professional wrestling industry prior to

8    Wrestlereunion?

9    A       Yes, we did.

10   Q       Okay.  When is the first time that you and

11   Mr. Corrente worked together?

12   A       Mid to late eighties.  Sal had been working --

13   Mr. Corrente had been working with a group of

14   wrestlers known as the Wild Samoans who were

15   four-time WWF tag team champions.  They had their

16   own training camp similar to what Pretty Boy Larry

17   Sharp had, developing talent for the WWF.  And

18   that's where he got his tutelage, upbringing in that

19   outstanding atmosphere.

20         And I came in touch with him when I -- a

21   wrestler named Kamala fell out of the tour I was

22   sending to Europe.  And Sal -- Mr. Corrente called

23   me and told me he could help me fill that position.

24   And he did get the Wild Samoan to accept Kamala's

25   spot, and from that point on Sal and I had --

1    Mr. Corrente and I had regular contact.  He became

2    my booker for the IWA and --

3    Q     What does a booker do?

4    A     The booker is the most important part of any

5    wrestling organization.  He's the judge of the

6    talent, he organizes the matches, he sets the story

7    lines or the feuds and establishes the finishes.

8          One of the things that a promoter needs is to

9    have the crowd go away happy or go away wanting to

10   come back and see it again.  Every show we ever did,

11   the audiences were thrilled.  Mr. Corrente is a

12   great booker.

13   Q     I suppose sometimes they might go away mad?

14   A     Go away mad wanting to come back and see the

15   rematch, yes.  There's a great deal of psychology

16   involved.

17   Q     What was your role when you and Mr. Corrente

18   worked together?

19   A     Fortunately it freed me up to concentrate on

20   the business ends of marketing and promoting the

21   shows.

22   Q     Okay.  And I understand -- did you and

23   Mr. Corrente have a tour that toured the country of

24   Australia?

25   A     Yes, we did.

1    Q      What year?

2    A      1991, 1992.

3    Q      Would you describe that tour for us.

4    A      It was the first time that professional

5    wrestling had been in Australia in more than 20

6    years.  We worked in a major venue.  The facility

7    held more than 3000 people.  We filled it twice a

8    day, six days a week, and literally brought

9    wrestling back to life in the country of Australia.

10   Q      Did you go to different cities in Australia?

11   A      No.  We were at an amusement park called

12   Australia's Wonderland.  We traveled throughout

13   Australia for promotional purposes.  We did a lot of

14   television while we were there and we had major

15   stars on the tour who had been seen on television

16   from WWE TV down there.

17   Q      Now, how many wrestlers toured with you?

18   A      Approximately 20.

19   Q      Logistically speaking, which was more

20   difficult, the Australia tour or any of the

21   Wrestlereunion events?

22   A      Wrestlereunion.

23   Q      Okay.  And why is that?

24   A      It was a massive, massive event from the very

25   beginning designed to be the biggest and best of its

1    type ever, more than three or four times bigger than

2    anything that had ever been done before.

3    Q     Okay.  How many televised boxing or wrestling

4    events have you been associated with in your career?

5    A     In excess of a hundred.

6    Q     Have you been involved with the technical side

7    of videotaping professional wrestling or

8    professional boxing?

9    A     Yes, I have.

10   Q     How so?

11   A     I've been the producer and associate producer

12   for programming for ESPN, USA Sports Channel

13   America, Comcast.

14   Q     I apologize.  Do you have experience in

15   editing?

16   A     Yes, I do.

17   Q     Okay.  Now, when you -- when do you first

18   recall hearing about the concept of Wrestlereunion?

19   A     June of '04.

20   Q     Who came up with the name?

21   A     Mr. Corrente.

22   Q     How did you hear about the concept?

23   A     During a phone conversation.

24   Q     Okay.  How would you describe the concept of

25   Wrestlereunion?

1      A       Wrestlereunion was designed from the beginning

2      to be the biggest and best pro wrestling fan

3      experience possible, featuring the stars of the

4      past, the present and the future.

5      Q       Did Mr. Corrente ask you to become involved?

6      A       Yes, he did.

7      Q       And did you agree to become involved?

8      A       Yes, I did.

9      Q       And I believe you said this was in the summer

10     of 2004?

11     A       Yes.

12     Q       Okay.  From the point at which Mr. Corrente

13     first approached you and talked about this idea to

14     the point where it became a reality, what was done

15     to bring Wrestlereunion to reality?

16     A       Initially the selection of the city and the

17     location.  We came to Tampa in September to meet at

18     the Doubletree to do a site survey to make sure they

19     had logistically everything that we would need in

20     the way of a ballroom, exhibit rooms, hotel

21     accommodations, convenience to the airport.  So we

22     selected and signed the contract for the Doubletree

23     in September of '04.

24     Q       Before I forget, there was one more point

25     about your background I wanted to discuss.  Did

1      there come a point where you were asked by the WCW

2      to become involved in Florida promotions?

3      A      I moved to Sarasota in May of 1989.  About

4      that time I had been contacted by Gordon Solie,

5      Dusty Rhodes, Steven Kern and Mike Graham to come

6      meet with them at the Florida Championship Wrestling

7      office here in Tampa.  They asked me if I would do

8      the same thing for them, sales and marketing, that I

9      had done for the AWA.

10             But during that meeting, Gordon Solie made me

11     aware that he was having health issues, and that WCW

12     was looking to have someone replace him as the

13     Florida promoter for WCW and that he recommended I

14     take his place.

15             When Jim Heard from WCW called me, I told him

16     I would be honored to accept such a position,

17     providing it was with Gordon Solie's blessing, and

18     Gordon did give the approval and I did become the

19     Florida WCW promoter.

20     Q      Okay.  Now, Mr. Solie was more prominently

21     known for his announcer duties?

22     A      Yes.  I don't know that many people realized

23     that he was also the promoter for WCW in Florida,

24     Georgia and Louisiana.

25     Q      And you didn't replace Mr. Solie as the

1    announcer, though?

2    A      No one could replace Gordon Solie as an

3    announcer.

4    Q      Okay.  Why did you and Mr. Corrente decide to

5    have Wrestlereunion, the first one, in Tampa?

6    A      One of the original concepts -- one of the

7    original parts of our concept was to have regional

8    promotions for a year.  And we decided since both of

9    us resided in Florida, and since Florida has such a

10   rich pro wrestling history, that we would do -- we

11   would launch the first event with a theme to pay

12   homage and respect to Florida Championship Wrestling

13   which goes back to the 1950s, at least, and used to

14   be run on a weekly basis throughout the state.

15   Q      Let's talk about the venue for the first

16   Wrestlereunion.  You mentioned the Doubletree.  It

17   was actually the grand ballroom --

18   A      Correct.

19   Q      -- of the Westshore Doubletree?

20   A      Yes.

21   Q      Okay.  Do you recall where wrestling was held

22   in Tampa during the seventies and eighties on

23   Tuesday nights?

24   A      Yes.

25   Q      Where was that?

1    A      Just a couple miles away.

2    Q      Okay.  And what was it about the grand

3    ballroom at the Westshore Doubletree that you

4    thought would make it a good venue?

5    A      It was intimately sized.  Originally, we were

6    told the room could hold 1200 people.  But when you

7    put the ring in the center of the room and allowed

8    for aisles, that knocked out 200 seats.  So it had

9    the ideal number of available seats of a thousand

10   that we were looking for.

11          The facility had been used, to my knowledge,

12   for boxing and wrestling promotions in the past,

13   including for promoters like Freddy Trakus, One

14   Punch Boxing in Florida -- in Tampa, and Don King

15   Promotions have done televised events from that

16   facility.

17   Q      On what channels?

18   A      USA and ESPN.

19   Q      Okay.  Did you and Mr. Corrente visit the

20   grand ballroom before signing a contract?

21   A      Yes, we did.

22   Q      Was there an understanding or an idea about

23   how many fans maximum would be allowed to

24   participate in Wrestlereunion?

25   A      The number of a thousand was intentionally

1     designed to fit our needs.

2     Q       And why is that?

3     A       Previous experience in similar type

4     conventions dictated to us that the biggest concern

5     that fans had or the biggest complaint that they had

6     were that there would be too many fans to allow the

7     fans to stand in line, meet and great, get

8     autographs and pictures with their favorite

9     wrestler.

10          We wanted to minimize that so that everybody

11    that came in would get that opportunity.  In fact,

12    those that bought the premiere ticket package

13    received a signed, autographed picture from every

14    wrestler that was there as part of their entrance to

15    the event.

16    Q       And this -- the first Wrestlereunion was

17    scheduled to happen over one day or multiple days?

18    A       A full weekend, January 29th, 30th and 31st,

19    2005.

20    Q       Was there any -- what was the thinking in

21    having it at a hotel instead of maybe the Tampa

22    Convention Center or something like that?

23    A       Again, it was meant to be an intimate

24    atmosphere to provide the ultimate fan experience.

25    Q       Were you and Mr. Corrente, as part of your

1    arrangements with the wrestlers who would appear,

2    having to put them up in hotel rooms?

3    A       Everyone from out of town required a hotel

4    room.  Yes.

5    Q       And were you able to put them all up at the

6    Doubletree?

7    A       Yes.

8    Q       Okay.  Did you arrange for radio coverage of

9    this event?

10   A       Yes, I did.  A gentleman named Shannon Rose

11   who works for ESPN contacted me and asked me if we

12   would be willing to let them be co-hosts of the

13   event in exchange for promotional consideration.  So

14   they created a terrific commercial and they did a

15   live broadcast all weekend long from the Doubletree.

16   Q       And did Wrestlereunion launch a website?

17   A       Yes, we did.

18   Q       What was the address for it?

19   A       WWW.Wrestlereunion.com.

20   Q       What was the purpose of having the website?

21   A       To constantly update the fans on the talent

22   lineup and changes in the events that were going to

23   be held in January.

24   Q       When did Wrestlereunion begin to sign talent

25   to appear?

1    A      I imagine some of the top stars started

2    signing as soon as October.

3    Q      Okay.  What was the strategy or the plan for

4    signing talent with the first Wrestlereunion?

5    A      To bring in legitimate legends against their

6    foremost opponents to allow the fans to see a

7    continuation of a feud that had become legendary, to

8    bring in the best of the local Florida Championship

9    Wrestling talent, and to bring in some of the stars

10   or talent that we considered would be future --

11   stars of the future.

12   Q      All right.  And who is Bill Apter, A-p-t-e-r?

13   A      Mr. Apter is a legendary wrestling

14   photographer who also hosts online wrestling sites

15   that keep fans aware of what's going on in different

16   phases of the wrestling business all around the

17   world.  He's a marvelously talented personality who

18   often hosts such events.

19          So we approached Mr. Apter to ask him -- and

20   another friend of mine that I started in the

21   business, Diamond Dallas Page, if they would be the

22   co-presenters.  I was listed as the promoter.  They

23   were co-presenters because of their name and

24   reputation.

25   Q      Who was primarily responsible for the

1       day-to-day planning of Wrestlereunion?

2       A       I was.

3       Q       Okay.  And who was primarily responsible for

4       signing the talent?

5       A       Mr. Corrente.

6       Q       Okay.  And why was Mr. Corrente in charge of

7       that?

8       A       That's his forte, his expertise, he loves it.

9       He has a great reputation with the talent.  And as I

10      had said, he has been working with me as a booker

11      for 20 years.

12      Q       Was Wrestlereunion always anticipated to be a

13      fan convention with a wrestling show?

14      A       Yes, it was.

15      Q       Now, when Mr. Corrente shared his vision of

16      Wrestlereunion, was there some thought or

17      understanding of what would need to be done to

18      establish the name, Wrestlereunion?

19      A       Yes.

20      Q       And what was that?

21      A       From the beginning, the concept was that to

22      come out of the gates sort of like a grand opening

23      of the biggest and best pro wrestling fan convention

24      ever.

25      Q       Okay.

1    A       So whereas in the past the top conventions

2    would have 15 to 20 stars, our initial goal was 60,

3    three times as many as anybody else ever had.  It

4    turned out to be 94.

5    Q       Did you from the beginning have an

6    understanding of how revenue could be generated from

7    Wrestlereunion fan conventions?

8    A       Yes.  We discussed that in great detail and

9    determined there were approximately seven different

10   sources of revenue.

11   Q       What were they?

12   A       Well, we would have the live gate for the

13   intimate fan experience.  We planned on putting it

14   on live pay-per-view, then delayed pay-per-view on

15   multiple replays, domestic and international

16   television, licensing of everything from DVDs to the

17   dolls that you may have seen in stores for the last

18   20 years, posters, pictures, music CDs.

19   Q       Have these sources of revenues been earned in

20   other wrestling promotions you had been involved

21   with?

22   A       Yes, they have.

23   Q       Okay.  Now, did you expect from the get-go

24   that you'd be able to sell dolls and posters and

25   pictures?

1      A        We expected it to take time to develop the

2      licensing process, which is why it was so important

3      to come out of the gate so strong to develop the

4      brand identity.

5      Q        When were the earliest discussions with any

6      entity to videotape the event for purposes of

7      deriving revenue from videotape or for DVD sales and

8      pay-per-view?

9      A        Approximately November or December of '04.

10     Q        And what company were there discussions with?

11     A        InDemand.

12     Q        Okay.  And -- well, that was for the actual

13     broadcasting part?

14     A        Yes.

15     Q        Okay.  Let me take you a step back.

16     A        You mean the production part?

17     Q        Who would -- yes, sir.  Maybe I wasn't

18     precise.  I apologize.

19     A        Originally I sent out some feelers to local

20     production companies, and then Mr. Corrente told me

21     about Highspots and their capabilities and that a

22     deal had been agreed upon with Michael from

23     Highspots to do the production.

24     Q        Okay.  Did Mr. Corrente handle the negotiation

25     of the deal with Highspots?

1    A      Yes, he did.

2    Q      Okay.   It was your understanding that a deal

3    was reached where Highspots would come in and

4    videotape the events?

5    A      Yes.

6    Q      Let's go back now to InDemand.   Were there

7    discussions by you to have this event on

8    pay-per-view through InDemand?

9    A      Yes, there were.

10   Q      Okay.   How did you -- well, tell us about

11   that.

12   A      Mike Graham from Florida Championship

13   Wrestling became a vital source of information and

14   contact putting together the event.   At that time

15   Florida Championship Wrestling had a deal with

16   InDemand where their vault, as they call it, or

17   their library of classic matches recorded in their

18   Sportatorium were being filed once a month on tape

19   delay, on InDemand on multiple occasions.   Between

20   five and seven times a month it would air, and then

21   each month they would put on another program from

22   their vault.   Nothing new, no new footage, just

23   their historic library.

24   Q      Okay.   So with that information, what did you

25   do?

1    A    He gave me the contact information at

2    InDemand.  I gave her a call.  I'm sorry, I don't

3    remember her name at this time.  She was very

4    receptive based on the success they had had with

5    Florida Championship Wrestling, and the only

6    stipulation was they wanted to see the quality of

7    the product before fully committing to putting it on

8    the air.

9    Q    Okay.  Did you have an understanding at that

10   time of the quality of the material that Highspots

11   was putting out?

12   A    Not only had I seen DVDs that they had

13   produced, I had gone to events where they did

14   production, so I saw it from the very beginning of

15   the creation of the products through the end.  And,

16   yes, I have.

17   Q    Okay.  And did you have a belief at that time

18   that the Wrestlereunion footage that Highspots would

19   be taking would be of a quality level sufficient to

20   be on InDemand?

21   A    Absolutely.

22   Q    Okay.  Did you anticipate marketing

23   Wrestlereunion to other television broadcasters?

24   A    Yes, I did.

25   Q    Who would that have been?

1    A      I would have gone to Comcast, which is the

2    number two cable company in the country.  And I have

3    contacts with international syndicators, as well,

4    that I would have pursued.

5    Q      Was Wrestlereunion designed from day one to

6    only derive revenue from ticket sales to the live

7    event?

8    A      No.

9    Q      Okay.  Was Wrestlereunion from the beginning

10   planned as a one-time event?

11   A      No.

12   Q      What were the plans for Wrestlereunion?

13   A      We started out planning quarterly events each

14   year with the understanding that we were capable of

15   producing more if the demand was there.

16   Q      Was there any discussion about the viability

17   of international touring with Wrestlereunion?

18   A      Yes.

19   Q      Why did you think that international touring

20   with Wrestlereunion would work?

21   A      During the course of selling the tickets to

22   the first show, we had fans come in from 39 states

23   and eight foreign countries.  And there was much

24   interest in Japan and Australia and England to bring

25   Wrestlereunion there.

1    Q      Okay.  Was Wrestlereunion designed to attract

2    15,000, 25,000 people like WrestleMania?

3    A      No.

4    Q      Is WrestleMania -- you're familiar with

5    WrestleMania?

6    A      Yes.

7    Q      Is that a fan convention?

8    A      No.

9    Q      Is there anything comparable about

10   Wrestlereunion fan convention and WrestleMania other

11   than the fact that you planned a wrestling show at

12   Wrestlereunion and they have wrestling at

13   WrestleMania?

14   A      The only comparable thing is that we tapped

15   into the WWE Hall of Fame as much as possible to

16   bring in the legends that have become famous in the

17   past and were recognized as the greatest wrestlers

18   they ever had by being in their hall of fame, and I

19   believe we used as many as 18 of their stars from

20   the hall of fame in our events.

21   Q      Back when you were running the IWA, you had

22   televised wrestling?

23   A      Yes.

24   Q      How important to the -- well, in addition to

25   the televised wrestling, did you also have wrestling

1      events where there was no TV taping, just house

2      shows, if you will?

3      A      Yes.

4      Q      Okay.  How important to the promotion of the

5      house shows was the television show?

6      A      Critically essential.

7      Q      Why do you say that?

8      A      Wrestling is designed by nature to give the

9      viewing public on television a teaser.  It sets up

10     the feuds, it establishes the stars and it creates

11     the demand for the public to buy a ticket to come

12     see the culmination of the feud.

13            Televised wrestling, with the exception of

14     pay-per-view, never gives the completion to the feud

15     on the weekly programming.  You have to pay for

16     that.  You pay for it either at the gate or on the

17     pay-per-view.  But that's the whole design, the

18     psychology behind televised production of wrestling.

19     Q      Now, was it expensive to sign the talent for

20     Wrestlereunion, secure the grand ballroom, make the

21     travel arrangements for the talent?

22     A      More expensive than any other independent

23     wrestling promotion ever.

24     Q      Okay.  Was Mr. Corrente supposed to have a

25     partner in Wrestlereunion?

1    A    Yes, he did.

2    Q    And who was that?

3    A    Tony Hunter.

4    Q    And what happened to Mr. Hunter?

5    A    Hunter showed up at the Doubletree in

6    September, gung ho, ready to go and then just up and

7    disappeared.  I believe he had some marital

8    problems, something.  We never did get a formal

9    explanation about what happened.

10    Q    Did there reach a point in the planning

11    process where you became worried about the financial

12    side of Wrestlereunion?

13    A    Yes.

14    Q    When was that?

15    A    I honestly don't recall the exact date, but I

16    remember the memo that I wrote that was called

17    reality check.  Is that the one we're speaking of?

18    Q    Yes, sir.

19    A    I don't remember the exact date.

20    Q    Okay.  What were your concerns at that time?

21    A    I was concerned that Mr. Corrente was taking

22    on such a large financial burden by himself with the

23    fallout of his partner that it could be a serious

24    problem.  I felt that we had booked enough talent to

25    fulfill the obligations to the fans, but I was

1    subsequently advised why it was worthy of going

2    forward.

3    Q     And what was that?

4    A     The appearance of Mr. Attanasio who came

5    onboard as a financial backer to more than fill the

6    void that Mr. Hunter had left.

7    Q     Tony Attanasio?

8    A     Yes.

9    Q     He came on to assist Mr. Corrente?

10   A     Correct.

11   Q     Financially?

12   A     Yes.

13   Q     Okay.  Did anything else change to ease your

14   concerns?

15   A     Yes.

16   Q     What was that?

17   A     The involvement of Clear Channel.

18   Q     Why did that ease your concerns?

19   A     Well, Clear Channel's reputation speaks for

20   itself.  It's a huge, tremendously successful

21   company with resources throughout the entire media

22   industry.  And I'll paraphrase it to something that

23   happens in boxing.  If you bring along a fighter

24   doing local events and local stuff and local, local,

25   local, and then all of a sudden Don King knocks on

1      your door, he gets your attention.

2      Q      When is the first time that you heard from

3      anyone at Clear Channel Entertainment Television

4      about Wrestlereunion?

5      A      Approximately December 27th, 2004.

6      Q      And who did you hear from?

7      A      I heard from Bill Apter that Eric Paulen had

8      called him interested in coming to Tampa to film

9      some of the interviews for a biography series they

10     were working on for the A&E network.  Apter knows --

11     you know, Apter was not an official representative

12     of Wrestlereunion, so he called me.  I returned the

13     call to Mr. Paulen.

14          We had a wonderful conversation.  He got all

15     excited.  I suggested during the course of the

16     conversation, look, if you're coming to Tampa, if

17     you're bringing all of this equipment to film

18     interviews, why not shoot the whole thing?  You're

19     here, anyhow.  It's not going to cost you any extra

20     money to do that.

21          He said, well, I'd have to get approval from

22     his boss, who was Steve Sterling, vice president of

23     Clear Channel.  And he said, you can expect a call

24     from Mr. Sterling.

25     Q      And did you get a call from Mr. Sterling?

1    A        New Year's Eve late in the afternoon of '04 I

2    was driving across Alligator alley and Mr. Sterling

3    called me.

4    Q        Now, how many weeks was this before the

5    Wrestlereunion event?

6    A        Four weeks and two days.

7    Q        Okay.  Tell us about that conversation that

8    you had while you were on Alligator Alley.  Where

9    was Mr. Sterling calling you from?

10   A        Times Square in New York where they were

11   setting up to broadcast I believe on the internet

12   the New Year's Eve celebration of the dropping of

13   the ball.

14   Q        And what was the discussion?

15   A        First I was amazed that under the

16   circumstances of setting up to shoot such a big

17   event he would take the time to call me at that

18   point in time.  But he had advised me that he had

19   spoken to Eric Paulen, that he understood that the

20   baby boom generation was very much turned off by pro

21   wrestling of that time in 2005, and that the concept

22   Wrestlereunion had created would bring out the baby

23   boomers who would bring their wives, their kids,

24   their grandkids to meet the superstars from when dad

25   was in his youth and following professional

1    wrestling.

2         And Mr. Sterling was doing a marvelous job on

3    selling me on what a great concept that

4    Wrestlereunion was.  In fact, the quote I'll never

5    forget, he said, Rob, you've created something here

6    that's going to live long after you're gone.

7    Q     How long did your conversation with

8    Mr. Sterling last that day?

9    A     In excess of a half hour.

10   Q     Okay.  What's the next thing that happened

11   after that?

12   A     I had Mr. Corrente call Mr. Sterling to verify

13   that I wasn't dreaming.

14   Q     Okay.

15   A     And he did.

16   Q     And from that point forward, what happened

17   with Clear Channel Entertainment Television?

18   A     An agreement was verbally made and then we

19   were told that it was going to be passed on to their

20   legal department and then sent to us to be signed.

21   Q     You have in front of you there, Mr. Russen,

22   some exhibits.  If I could ask you to turn to

23   Exhibit 136, please.

24   A     Okay.

25   Q     Do you recognize Exhibit 136?

1    A       I sure do.

2    Q       Okay.  What is it?

3    A       It's the agreement for Clear Channel to become

4    our production partner in the Wrestlereunion events.

5    Q       All right.

6            MR. RODEMS:  Your Honor, I would move Exhibit

7    136 into evidence, Plaintiff's Exhibit 136.

8            MS. MILLNER:  Objection, Your Honor.  May I

9    approach?

10           THE COURT:  Yes, ma'am.

11           (At sidebar, on the record.)

12           MS. MILLNER:  Judge, the agreement's already

13   in evidence as signed.  This is an unsigned draft

14   agreement.  I just don't know why it should go into

15   evidence when we have the signed agreement that

16   we're here on.

17           THE COURT:  Response?

18           MR. RODEMS:  Your Honor, this is actually an

19   expression of interest.  If you'll look at the first

20   page, it's dated January 7th.  The actual contract

21   was signed on January 21st.  The point of offering

22   this is to show that before they got to the

23   contract, there was actually a time where they

24   sent -- where they referred to in a less formal way

25   an expression of interest and it was only after this

1    was reviewed that the parties agreed to go forward.

2         Now, the reason that this is relevant is that

3    there has been a contention in this case up until

4    Mr. Herbert's opening statement that the parties

5    didn't have a contract.  He stated in his opening

6    statement that there was a contract.

7         But to the extent that that issue hasn't been

8    flushed out in evidence, I believe this is relevant

9    to talk about the interaction between the parties

10   that led to the ultimate agreement.

11        THE COURT:  This is a preliminary

12   correspondence to the signed agreement?

13        MR. RODEMS:  Yes, sir.

14        MS. MILLNER:  Your Honor, first of all,

15   speaking to the first issue, I think that it's fine

16   if you want to say on January 7th -- I just don't

17   want the jury to get confused about having these,

18   because they look very similar, two contracts in

19   evidence, one that's signed, one that's unsigned.

20        The second issue of this is that the contract

21   has been decided by Your Honor in a summary judgment

22   ruling.  It's the law of the case and --

23        THE COURT:  Well, no, I didn't decide.  I said

24   there -- whether or not all the material terms are

25   agreed to is a question for the jury, paraphrasing,

1    of course.  And there's no dispute they had this

2    agreement.  The question is whether it was the final

3    document and you guys challenged that; didn't you?

4         MS. MILLNER:  We did, Your Honor.  My

5    recollection of the order and, again, I'm new to the

6    case, is that Your Honor found that there was a

7    binding contract.  Now, I obviously don't want to

8    quibble with it.

9         THE COURT:  In any event, I think this is

10   relevant.  But establish for the jury's benefit that

11   this wasn't the final agreement, simply the

12   preliminary correspondence.

13        MR. RODEMS:  Yes, sir.

14        THE COURT:  I think it's relevant just to show

15   how the agreement came about.

16        MR. RODEMS:  Yes, sir.

17        THE COURT:  So I'll overrule the objection.

18        MS. MILLNER:  All right.  Thank you.

19        (End of sidebar discussion.)

20        THE COURT:  All right.  Exhibit 136 will be

21   received.

22        MR. RODEMS:  Thank you.

23        (Whereupon, Plaintiff's Exhibit Number 136 was

24   received into evidence.)

25        MR. RODEMS:  Your Honor, may I publish?

1          THE COURT:  Yes, sir.  Lay a little bit more

2     foundation before you do that, please.

3          MR. RODEMS:  Yes, sir.

4     BY MR. RODEMS:

5     Q    Mr. Russen, this document is dated January

6     7th, 2004?

7     A    Yes.

8     Q    Okay.  And the first line says, please find

9     below as discussed an expression of interest.  Do

10    you see that?

11    A    Yes, I do.

12    Q    Okay.  Was there a presentation to you of this

13    letter to see if the parties would be in a position

14    to carry forward and reach a full fledged agreement

15    on the relationship?

16    A    Yes.

17    Q    Okay.  So Exhibit 136 is not the final

18    contract between the parties, it was an expression

19    of interest that led to the final contract?

20    A    Correct.

21    Q    Okay.  What happened between January 7th of

22    2004 with this expression of interest and January

23    21st of 2000 -- well, actually, I apologize.  Let me

24    state -- the document does say January 7th, 2004;

25    correct?

1      A       Yes, it does.

2      Q       Okay.  Wrestlereunion occurred on January

3      28th --

4      A       29th, 30th and 31st.

5      Q       Of 2005.

6      A       This is in error.

7      Q       It's -- okay.  So it's a typographical error?

8      A       It should be 2005.

9      Q       Okay.  I think we all have that problem at the

10     beginning of the year, we can't --

11     A       Yes.

12     Q       Yes, sir.  Okay.  But in any event, what

13     happened between January 7th of 2005 when you

14     received this expression of interest and January

15     21st, 2005, which is the date that the contract was

16     signed between the parties?

17     A       Well, Wrestlereunion continued to go about the

18     day-to-day affairs of the organization, running the

19     events, selling tickets, making travel arrangements,

20     booking talent.  I'm not sure what happened on the

21     Clear Channel side except Mr. Sterling said the

22     contract was in the legal department.

23     Q       Okay.  Would you please turn to Exhibit 137.

24     A       (Witness complied.)

25     Q       Do you recognize Exhibit 137?

1    A      Yes, I do.

2    Q      What is it?

3    A      It's an e-mail from Mr. Sterling to myself.

4    Q      What's the date?

5    A      January 14th, 2005.

6    Q      All right.

7           MR. RODEMS:  Your Honor, this document has

8    already been received in evidence.  May I publish

9    it?

10          THE COURT:  Yes, sir.

11   BY MR. RODEMS:

12   Q      What was your purpose in writing this January

13   14th, 2005 e-mail to Mr. Sterling?  And this is your

14   e-mail -- let me --

15          MR. RODEMS:  May I withdraw the question, Your

16   Honor?

17          THE COURT:  Sure.

18   BY MR. RODEMS:

19   Q      Is this your e-mail address, Mr. Russen,

20   roblrussen@AOL.com?

21   A      It was at that time.

22   Q      Okay.  And did you send this e-mail to

23   Mr. Sterling on January 14th?

24   A      Yes, I did.

25   Q      Okay.  So this was a week after you received

1    the expression of interest?

2    A      Correct.

3    Q      All right.  And what was your purpose in

4    sending this to Mr. Sterling?

5    A      To confirm back to Mr. Sterling that I had

6    discussed their expression of interest with

7    Mr. Corrente and Mr. Hunter and we were in agreement

8    that we would like to proceed.

9    Q      Does this e-mail lead you to the conclusion

10   that Mr. Hunter was still involved in the project,

11   at least tangentially at this time?

12   A      Yes.

13   Q      And then Mr. Sterling responded back to you?

14   A      Eleven minutes later.

15   Q      Okay.  And his statement is, can we schedule a

16   conference call together soon and we can discuss any

17   other details from which we can originate a

18   signature ready document.

19   A      Correct.

20   Q      Was there ever a signature ready document that

21   was prepared?

22   A      Yes.

23   Q      Okay.  Would you look at Exhibit 1,

24   Mr. Russen.

25   A      Exhibit 1?

1    Q      Yes, sir.

2            MR. RODEMS:  Your Honor, Exhibit 1 is in

3    evidence.  May I publish it?

4            THE COURT:  Yes, sir.

5    BY MR. RODEMS:

6    Q      Do you see Mr. Corrente's signature on this

7    document, the last page?

8            THE COURT:  Just look at the monitor, sir, if

9    you'd like.

10           THE WITNESS:  Oh, thank you.  Yes, I do.

11   BY MR. RODEMS:

12   Q      Okay.  Do you recognize that signature?

13   A      Yes, I do.

14   Q      Okay.  And this document is dated January

15   21st, 2005?

16   A      Yes, it is.

17   Q      That's a week after you confirmed with

18   Mr. Sterling that you wished to have a signature

19   ready document?

20   A      Exactly one week.

21   Q      Now, earlier you had mentioned that you had

22   had some concerns about Wrestlereunion, and you had

23   issued a reality check memorandum.  Now with a

24   signed agreement with Clear Channel, did you have

25   any concerns?

1     A       None.

2     Q       At this point did you feel confident in Clear

3     Channel Entertainment Television?

4     A       Definitely.

5     Q       All right.  Let's talk about the first

6     Wrestlereunion.  How many legends appeared?

7     A       Ninety-four.

8     Q       How many legends were paid?

9     A       Ninety-four.

10    Q       What was your role during the actual

11    Wrestlereunion event?

12    A       To organize, schedule and execute every minute

13    of the day-to-day schedule.

14    Q       How was the attendance at the first

15    Wrestlereunion?

16    A       Smaller than expected, but very enthusiastic.

17    Q       Okay.  What took place on Friday and Saturday

18    morning and Saturday afternoon?

19    A       At Wrestlereunion?

20    Q       Yes, sir.

21    A       Friday evening we had question and answer

22    sessions.  Saturday morning we opened up the

23    ballroom to the exhibitors and scheduled talent on

24    three or four hour shifts to come down, meet and

25    greet the fans, sign autographs, pose for pictures.

1        And in between when we would take a break, we would

2        have more question and answer sessions where the

3        fans got to ask their favorite stars on a definitely

4        defined schedule any questions they may have had.

5        Q       Did ESPN radio cover the event?

6        A       Yes, they did.

7        Q       Were you pleased with the outcome of the

8        Wrestlereunion event?

9        A       Yes, I was.

10       Q       How were the matches?

11       A       Outstanding.

12       Q       Okay.  Was there any coverage by the media

13       after the Wrestlereunion events?

14       A       Before, during and after, yes.

15       Q       Who covered the Wrestlereunion events in the

16       media after?

17       A       Tampa Tribune, Miami Herald, ESPN, all of the

18       internet wrestling sites and the New York Times.

19       Q       What about the Wall Street Journal?

20       A       Excuse me, the Wall Street Journal.

21       Q       That's what you meant?

22       A       Yes.

23       Q       Okay.  If you could take a look at 104.  Do

24       you see that, Mr. Russen?

25       A       Yes, I do.

1    Q      What is Exhibit 104?

2    A      It's an e-mail from Mr. Sterling.

3    Q      How about at the bottom of the page?

4    A      Oh, it's an e-mail from me to Mr. Sterling

5    forwarding a copy of the Wall Street Journal

6    article.

7    Q      Okay.

8           MR. RODEMS:  I would move Exhibit Number 104

9    into evidence, Your Honor.

10          THE COURT:  Is there any objection?

11          MS. MILLNER:  Hearsay, Your Honor.

12          THE COURT:  What's the date, I'm sorry, sir,

13   of the e-mail?

14          THE WITNESS:  From me to Mr. Sterling was

15   February 3rd.

16          THE COURT:  Of '05?

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Did you say it attached an article

19   or just referred to an article?

20          THE WITNESS:  I believe I attached it by

21   scanning it and then attaching it to the e-mail.

22          THE COURT:  All right.  What's the objection?

23          MS. MILLNER:  Hearsay, Your Honor.  It

24   attaches the newspaper article.

25          THE COURT:  Is the article offered for the

1       truth of the matter?

2              MR. RODEMS:  No, Your Honor.  It's not offered

3       for the truth of the matter.  It's just offered to

4       prove that it was sent.

5              THE COURT:  I'll overrule the objection.

6       Exhibit 104 is received.

7              (Whereupon, Plaintiff's Exhibit Number 104

8       was received into evidence.)

9       BY MR. RODEMS:

10      Q      Now, let's talk about Clear Channel's

11      performance at Wrestlereunion.  Were there any

12      problems?

13      A      Yes.

14      Q      What were the problems?

15      A      Technical problems, equipment problems,

16      personnel problems.  Technically they did not bring

17      a truck, which is the ideal method of producing any

18      sort of live sporting event.

19      Q      Why was -- what was -- what would the truck

20      have enabled Clear Channel to do?

21      A      Live switching.

22      Q      What is live switching?

23      A      Where you take multiple cameras and edit them

24      live down to a master tape, while at the same time

25      still retaining the direct signal to a tape deck of

1          each individual channel.

2                  Live switching would give you -- well, it's

3          kind of like what you see when you watch any

4          baseball game or any sporting event where they

5          switch from one camera angle to another, as opposed

6          to having stationary cameras and doing all of the

7          editing later.

8          Q      And were there any issues relating to the

9          commentators that you're aware of?

10         A      It's critically important for commentators in

11         any live sporting event to have monitors so that

12         they can see what it is that the audience is seeing.

13         There were no monitors available for this shoot.

14         Q      Was there a PA system?

15         A      No.

16         Q      Okay.  How was the action in the ring actually

17         filmed?

18         A      Two -- two handheld cameras and a guy climbing

19         up a ladder.

20         Q      In all the times that you've previously been

21         involved with televised boxing, wrestling, has the

22         action in the ring ever been filmed from a ladder

23         before?

24         A      Never.  Especially when the ladder would be in

25         the camera view.  Normally, it's -- normally the

1    stationary cameras, and there are usually two, are

2    set up on scaffolding or hydraulic scaffolding at a

3    distance away from the ring where you could get a

4    wide angle shot where you could get the entire scene

5    in one camera without even having a camera operator

6    there.  You just let it run all the time.  Then you

7    cut it in half to have a secondary long angle shoot,

8    again, without requiring a cameraman to do that

9    that those shots would go to.

10           For example, if the referee would get in the

11    way of the handheld camera, they would automatically

12    switch to the remote camera, the distant camera on

13    the scaffolding to get the wide camera shot so that

14    the audience wouldn't miss any of the action.

15    Q       Did you see Mr. Sterling in Tampa at

16    Wrestlereunion I?

17    A       Very briefly.

18    Q       Was there an understanding that you had about

19    when the product from Wrestlereunion I would begin

20    making its way to the marketplace?

21    A       In two different forms there was.  One, he

22    promised us that we would receive a flow of revenue

23    from the product 90 days to six months down the

24    road.  Second, when he knew that we were going to be

25    doing a Wrestlereunion II or planned on doing a

1      Wrestlereunion II, subsequently to that time period,

2      not exactly in January, Mr. Sterling promised that

3      all of the product, the matches and all of the shoot

4      interviews would be available for sale at

5      Wrestlereunion II.

6      Q       Did that happen?

7      A       No.

8      Q       Did you, in fact, write to Mr. Sterling about

9      the issues that arose from the delays in getting the

10     product to the marketplace?

11     A       Yes.

12     Q       Would you take a look at Exhibit 140.

13     A       Okay.

14     Q       Do you recognize that?

15     A       Yes, I do.

16     Q       What is it?

17     A       It's an e-mail from me to Mr. Sterling with a

18     copy to Mr. Paulen and to Mr. Corrente.

19     Q       And what date is it?

20     A       March 7th.

21     Q       What year?  I'm sorry.

22     A       2005.

23     Q       Okay.  And what was the purpose in sending

24     this e-mail?

25     A       You know, as it says here, due to our delay in

1    meeting release dates, so it was to bring to their

2    attention that the delay in the release dates was

3    causing problems, including with our agreement to

4    Michael from Highspots about providing him with four

5    different shoot interviews at a specific period of

6    time for him to put on sale for release on the

7    internet.

8           MR. RODEMS:  Your Honor, I'd move Exhibit 140

9    into evidence.

10          MS. MILLNER:  It's in evidence.

11          THE COURT:  I think it's already in.

12          MR. RODEMS:  I apologize, Your Honor.

13          COURTROOM DEPUTY CLERK:  Yes, sir.

14          THE COURT:  It's in.

15          MR. RODEMS:  Yes, sir.  Thank you.

16   BY MR. RODEMS:

17   Q     Did you offer to help Clear Channel in terms

18   of potential buyers of the programming?

19   A     Yes.  We -- I even gave them some leads.

20   Q     Okay.  If you'd take a look at Exhibit 142.

21   A     Okay.

22   Q     Do you recognize that?

23   A     Yes, I do.

24   Q     What is that?

25   A     It's an e-mail to Mr. Corrente with copies to

1    Mr. Attanasio and to Mr. Sterling making them aware

2    of a smaller group of wrestling -- a promoter from

3    New England who had created some product that was

4    being released onto the market and on pay-per-view.

5    Q    What was the purpose of sending this e-mail?

6    A    To try to light a fire under their butt that

7    while they were doing -- while we were going

8    nowhere, other people were stepping forward and

9    getting their product out there.

10   Q    All right.  Can you take a look at Exhibit

11   143?

12   A    Um-hum.

13   Q    Do you recognize the bottom e-mail?

14   A    Yes, I do.

15   Q    And what is that?

16   A    It's an e-mail to Mr. Sterling.

17   Q    What date?

18   A    Dated March 22nd, 2005, making him aware of a

19   posting on Mr. Meltzer's wrestling website about

20   Spike TV.

21   Q    And what was your reason for sending this to

22   Mr. Sterling?

23   A    To try to direct him in that location.

24   Q    To Spike TV?

25   A    Spike TV to place Wrestlereunion product

1      there.

2      Q       And would you look at Exhibit 144.  This

3      appears to be e-mail from you to Mr. Sterling dated

4      July 19,2005.

5      A       Correct.

6      Q       What was the purpose in sending this?

7      A       Making him aware that we had been approached

8      with -- by a company interested in selling the DVDs.

9      Q       And that's dated July 19th, 2005?

10     A       Correct.

11     Q       Okay.  And if you would take a look at Exhibit

12     145.  The bottom e-mail appears to be an e-mail from

13     you to Johnny Gallarello dated July 15th, 2005?

14     A       Yes.

15     Q       What was the purpose of sending this e-mail?

16     A       To make him aware of a DVD distributor by the

17     name of Rich Durand.  His company was called the

18     Durand Group from Cleveland, Tennessee, who were

19     actively involved in placing wrestling product in

20     large chains like Wal-Marts.

21     Q       And if you'd take a look at Exhibit 146.  This

22     appears to be an e-mail from you to Johnny

23     Gallarello dated April 14th, 2005.

24     A       Yes.

25     Q       And what was the purpose in sending this

1       e-mail to Mr. Gallarello.

2       A       I was inquiring if he was putting together a

3       list of wrestling press to send out sample DVDs of

4       Wrestlereunion product to generate coverage in the

5       media of our product.

6               MR. RODEMS:  Your Honor, I would move Exhibits

7       143, 144, 145 and 146 into evidence.

8               THE COURT:  142 is not in.

9               MR. RODEMS:  Oh, I'm sorry, Your Honor.  I

10      omitted that one.  I meant to --

11              THE COURT:  Is there any objection?

12              MS. MILLNER:  No, Your Honor.  I thought they

13      were already in.

14              THE COURT:  No, those were excluded.  So

15      Exhibits 142, 143, 144, 145 and 146 are now

16      received.

17              (Whereupon, Plaintiff's Exhibit Numbers 142

18      and 143 are received into evidence.)

19              MR. RODEMS:  May I proceed, Your Honor?

20              THE COURT:  Actually, 144 and 145 were

21      received and 146.  Thank you.  But 142 and 143 were

22      not.  So they're all in now.

23              MR. RODEMS:  Yes, sir.

24              THE COURT:  Go ahead.

25              MR. RODEMS:  Thank you.

1       BY MR. RODEMS:

2       Q       If you look at Exhibit 147, it appears that

3       Wrestlereunion II was announced on April 11th, 2005.

4       A       Yes.

5       Q       Okay.  And who did you send this announcement

6       to?

7       A       Among the duties I did as general manager and

8       promoter of Wrestlereunion, I was publicist in many

9       regards.  And this went out to in excess of 500

10      media outlets, including all the wrestling websites

11      and sports departments of major newspapers all

12      around the country.

13      Q       Do you recall whose e-mail address was

14      eroc7@aol.com?

15      A       Eric Paulen.

16      Q       And who is Mr. Paulen?

17      A       He was the gentleman who was in charge of the

18      Wrestlereunion I production.

19      Q       Okay.

20              MR. RODEMS:  Your Honor, I'd move Exhibit 147

21      into evidence.

22              THE COURT:  It's in.

23              MR. RODEMS:  Oh, I'm sorry.  I apologize.

24              Your Honor, may I publish Exhibit 28, please,

25      sir?

1          THE COURT:  Yes, sir.

2     BY MR. RODEMS:

3     Q     Mr. Russen, this is Exhibit 28.  This is an

4     e-mail that was sent to you and to Mr. Corrente.

5     Have you seen this document before?

6     A     Yes.

7     Q     Okay.  Do you know if Mr. -- did you or

8     Mr. Corrente respond to this e-mail?

9     A     Yes.

10    Q     Okay.  Did Wrestlereunion agree with what was

11    stated in this e-mail from Mr. Sterling?

12    A     Yes, we did.

13    Q     This e-mail is to confirm that we are all

14    conducting ourselves within the agreed upon terms

15    and provisions of the agreement, and we would

16    appreciate your confirmation of same by e-mail as

17    soon as possible.

18    A     Yes.

19    Q     And that's dated August 23rd, 2005?

20    A     Correct.

21    Q     How many days before Wrestlereunion II was

22    that?

23    A     Less than a week.

24    Q     And Wrestlereunion II had been scheduled since

25    April 11th?

1    A    Correct.

2    Q    Were you under the impression that you were

3    going to have DVDs from Wrestlereunion I to sell at

4    Wrestlereunion II?

5    A    Based on Mr. Sterling's verbal commitment,

6    yes.

7    Q    What types of DVDs were you expecting to have?

8    A    Everything, wrestling matches and all of the

9    shoot interviews that had been done in Tampa.

10   Q    Did you receive any DVDs of Wrestlereunion I

11   to sell at Wrestlereunion II?

12   A    Just the four shoot interviews that had been

13   created as part of the agreement to appease

14   Highspots.

15   Q    Were you ever given any explanation for why

16   DVDs were not made available for Wrestlereunion II?

17   A    Not to this day, no.

18   Q    Did anyone at Clear Channel ever tell you at

19   any time that there were audio problems from

20   Wrestlereunion I?

21   A    No, they did not.

22   Q    Did anyone from Clear Channel Entertainment

23   Television ever describe any part of Wrestlereunion

24   I taping as a training wreck to you?

25   A    Quite the contrary.

1    Q       Did anyone tell you that the video footage

2    from Wrestlereunion was so poor that Clear Channel

3    had not made significant efforts to market it?

4    A       No, they did not.

5    Q       Let's talk about Wrestlereunion II.  Where was

6    it held?

7    A       At the Valley Forge Convention Center in King

8    of Prussia, Pennsylvania.

9    Q       And the dates were August 26th through 28th,

10   2005?

11   A       Yes.

12   Q       Okay.  Did Clear Channel tour the venue before

13   the event?

14   A       Yes, they did.  Eric Paulen, Dawn Olejar, a

15   light man and a sound man came down and did a

16   walk-through of the venue more than a month prior to

17   that.

18   Q       Okay.  And did you have any role with

19   Ms. Olejar at Wrestlereunion II?

20   A       I was there to coordinate anything and

21   everything she may need.

22   Q       Okay.  And what did you understand

23   Ms. Olejar's job to be for Clear Channel?

24   A       She was in charge of production of that event.

25   Q       And how did you feel that the event went?

1      A      I've seen the line feeds from that event.  It

2      was outstanding.

3      Q      Okay.  Okay.  Would you take a look at Exhibit

4      149, please.  This exhibit has been admitted in

5      evidence.  Mr. Russen, would you identify who --

6      what it is.

7      A      It's a copy of an e-mail from me to Dawn

8      Olejar with a copy, also, to Mr. Corrente.

9      Q      Okay.  And then there's also --

10     A      Dated August 9, 2005.

11     Q      Yes, sir.  I apologize for interrupting.

12     There's also an e-mail from Dawn Olejar to you dated

13     August 29th, 2005?

14     A      Correct.

15     Q      And that is after Wrestlereunion II was

16     completed?

17     A      Immediately after, yes.

18     Q      And would you read the first line, please.

19     A      Thanks so much for everything this weekend.

20     The shoot went great.

21     Q      Did you have a chance to talk with

22     Mr. Sterling at Wrestlereunion II?

23     A      Yes, I did.

24     Q      And do you recall him saying anything about

25     Wrestlereunion II?

1    A       I sure do.

2    Q       What did he say?

3    A       Following the event closing on Sunday, about

4    1 or 2 o'clock in the morning, we had a meeting with

5    Mr. Sterling, Mr. Corrente, Mr. Hart, myself and

6    Mr. Attanasio in Mr. Corrente's suite where

7    Mr. Sterling was thrilled with the event and how it

8    came out.  He had even brought his mother down to

9    view the event.

10          He promised us during that meeting that

11   everything was full steam ahead, that all product

12   from Wrestlereunion I and II would be in the stores,

13   in the stores for the holidays.  I questioned him.

14   I said, I used to be in the retail business.

15   Product for the holidays hits the stores in October.

16   He said, I understand that.  The product will be in

17   the stores for sale to the public for the holidays.

18   Q       Did he say anything to you at that point that

19   we're really disappointed in the venue?

20   A       Absolutely not.

21   Q       Did he say anything to you that the crowd was

22   too small?

23   A       No, he did not.

24   Q       Did he say to you anything that the

25   Wrestlereunion production of the event was not

1      acceptable in any way?

2      A      No, he did not.

3      Q      Did he say anything negative about

4      Wrestlereunion?

5      A      No, he did not.

6      Q      What was the next Wrestlereunion event after

7      Davie -- I'm sorry, after Wrestlereunion II?

8      A      It was Davie, Florida.

9      Q      Okay.  And that was a wrestling only show?

10     A      Yes.

11     Q      Okay.

12            MR. RODEMS:  Your Honor, may I approach?

13            THE COURT:  Yes, sir.

14            (At sidebar, on the record.)

15            MR. RODEMS:  I hate to be the troublemaker

16     here, but can we take the afternoon break?  I'm

17     close to being done but I'm not close enough that --

18            THE COURT:  Well, it's about that time,

19     actually.  Yeah, that's fine.

20            (End of sidebar discussion.)

21            THE COURT:  Why don't we take our afternoon

22     break.  I usually break about a quarter till 3:00,

23     and counsel was aware of that.  So let's take the

24     balance of the 15 minutes.  Let's try to resume at

25     3 o'clock, please.

1          COURTROOM SECURITY OFFICER:  Please rise for

2     the jury.

3          (Jury out at 2:47 PM.)

4          (Recess was taken at 2:47 until 3:06 PM.)

5          (Back on the record.)

6          COURTROOM SECURITY OFFICER:  All rise.  This

7     Honorable Court is again in session.  Please be

8     seated.

9          THE COURT:  Are you ready?

10         MR. RODEMS:  Yes, sir.

11         THE COURT:  Bring the jury in, please.

12         COURTROOM SECURITY OFFICER:  Please rise for

13    the jury.

14         (Jury in at 3:07 PM.)

15         COURTROOM SECURITY OFFICER:  Please be seated.

16         THE COURT:  You may resume direct examination.

17         MR. RODEMS:  Thank you, Your Honor.

18    BY MR. RODEMS:

19    Q     Mr. Russen, you worked for the AWA in 1987?

20    A     Yes.

21    Q     Okay.  Did the look and feel of Wrestlereunion

22    match up well with what the AWA was televising in

23    1987?

24    A     It was better.

25    Q     Okay.  Before trial you had a chance to watch

1     the DVD, in fact, you gave to me the DVD of the AWA

2     footage that's been marked as Exhibit 11?

3     A     Yes.

4     Q     Okay.  Were you ever at the AWA tapings?

5     A     Yes, I was.

6     Q     Okay.  Does the video of Exhibit 11 fairly and

7     accurately represent the scenes it depicts?

8     A     Yes, it does.

9           MR. RODEMS:  Your Honor, I'd like to play

10    about two minutes or three minutes from Exhibit

11    Number 11 and move it into evidence.

12          THE COURT:  Is there any objection to 11?

13          MS. MILLNER:  No, Your Honor.

14          THE COURT:  This was the AWA event?

15          THE WITNESS:  Yes, sir.

16          MR. RODEMS:  Yes, sir.

17          THE COURT:  All right.  Exhibit 11 is

18    received.

19          (Whereupon, Plaintiff's Exhibit Number 11 is

20    received into evidence.)

21    BY MR. RODEMS:

22    Q     As we're starting that, Mr. Russen, who is the

23    referee in this match?

24    A     Mr. Corrente.

25    Q     Okay.

1          (DVD playing.)

2     BY MR. RODEMS:

3     Q      Mr. Russen, do you recognize this gentleman?

4     A      Yes, I do.

5     Q      Who is that?

6     A      Dennis Condrey from the Midnight Express.

7     Q      And did he wrestle at the Wrestlereunion

8     event?

9     A      Yes, he did.

10         (DVD playing.)

11    BY MR. RODEMS:

12    Q      That's Mr. Corrente?

13    A      The one and only.

14    Q      Okay.  This footage is actually taken from

15    what station?

16    A      ESPN Classic.

17    Q      Okay.  Was ESPN Classic a potential buyer for

18    Wrestlereunion?

19    A      ESPN, ESPN II or ESPN Classic all would have

20    been potential sources.

21    Q      In 2005, were there any wrestling shows on HD

22    Net, to your knowledge?

23    A      No, there were not.

24    Q      How about today?

25    A      Yes, there is.

1    Q       What is on today?

2    A       Ring of Honor.

3    Q       Were the stars of Ring of Honor as well known

4    as Wrestlereunion?

5    A       They're not even on the same planet.

6    Q       All right.  Before today's testimony, did you

7    have a chance to look at Exhibit 10, which was the

8    Ring of Honor video?

9    A       Yes, I did.

10   Q       Okay.  And does it fairly and accurately

11   depict what is represented on the video?

12   A       Yes, it does.

13           MR. RODEMS:  Your Honor, I'd move Exhibit 10

14   into evidence.  And we'll play just a brief portion

15   of that, with the Court's permission.

16           THE COURT:  Any objection?

17           MS. MILLNER:  No objection.

18           THE COURT:  All right.  Exhibit 10 is

19   received.

20           (Whereupon, Plaintiff's Exhibit Number 10 was

21   received into evidence.)

22   BY MR. RODEMS:

23   Q       Were the crowd sizes at Ring of Honor events

24   as depicted on the video larger than for

25   Wrestlereunion?

1      A       Smaller.

2      Q       Okay.

3              (DVD playing.)

4      BY MR. RODEMS:

5      Q       What we've just seen is from Ring of Honor?

6      A       Yes.

7      Q       Currently on HD Net?

8      A       Yes.

9      Q       In 2005 was the USA Network showing wrestling?

10     A       It either was or it had just finished their

11     arrangement with the WWE.

12     Q       And now today?

13     A       No.

14     Q       USA --

15     A       Yes, yes.  Now they are.

16     Q       What are they showing today?

17     A       WWE.

18     Q       In 2005 was the Sci Fi Network showing

19     wrestling?

20     A       No.

21     Q       And today?

22     A       Yes.

23     Q       In 2005 was WGN out of Chicago showing

24     wrestling?

25     A       No.

1    Q        And how about today?

2    A        Yes.  WGN does have a -- like Ted Turner's

3    station, a long history of pro wrestling.  They used

4    to be one of Verne Gagne's stations.

5    Q        Do you know what one sheets are?  O-n-e, one

6    sheets?

7    A        Yes.

8    Q        What are they?

9    A        A small synopsis of an idea.

10   Q        Okay.  Have you ever tried to sell wrestling

11   programming by e-mailing out one sheets to potential

12   buyers?

13   A        That would be --

14            MS. MILLNER:  Objection, Your Honor,

15   relevance.

16            THE COURT:  Overruled.

17            THE WITNESS:  It would be a waste of time.

18   BY MR. RODEMS:

19   Q        Did you ever try to sell television wrestling

20   without a demo tape?

21   A        No.

22   Q        Did you offer to assist Clear Channel

23   Entertainment Television with finishing the editing

24   of the Wrestlereunion projects?

25   A        Yes, I did.

1    Q       Was that offer accepted?

2    A       No, it wasn't.

3    Q       What was the impact as you observed it on

4    Wrestlereunion of not getting any revenue from the

5    Clear Channel Entertainment Television contract?

6    A       It was devastating.

7    Q       In what way?

8    A       It took away anticipated, promised revenue

9    that would have been reinvested in future shows.

10   Q       Why didn't Wrestlereunion stage anymore events

11   after 2005?

12   A       Lack of funds.

13   Q       Thank you.

14           MR. RODEMS:   That's all I have, Your Honor.

15           THE COURT:   Cross-examination?

16           MS. MILLNER:   Yes, Your Honor.

17                        CROSS-EXAMINATION

18   BY MS. MILLNER:

19   Q       Good afternoon, Mr. Russen.

20   A       Good afternoon.

21   Q       First of all, let's just start with these two

22   videos we looked at.  The first one, just judging by

23   the differences of Mr. Corrente, that was about 20

24   years ago or so?

25   A       Yes.

1    Q      All right.  And that was put out by the AWA;

2    is that correct?

3    A      It was produced by Verne Gagne's AWA.  Yes.

4    Q      And that organization was -- went bankrupt,

5    it's out of business; correct?

6    A      It went out of business.  Vince McMahon now

7    owns it.

8    Q      It was a financial failure; correct?

9    A      Yes.

10   Q      And --

11   A      Not at that time, though.

12   Q      Now, the second one --

13   A      Not at that time.

14   Q      It eventually became a financial failure,

15   you'd agree with me there; correct?

16   A      In the nineties.

17   Q      And the video from the second one, the Ring of

18   Honor video that was put out by -- what's the name

19   of that organization; do you know?

20   A      Ring of Honor.

21   Q      All right.  And the Ring of Honor

22   organization, that one is in financial trouble, as

23   well; isn't it?

24   A      I don't know their internal workings very

25   well.  They've been around quite a while.

Russen - Cross

 1     Q        You haven't heard that they've been bouncing

 2     checks to promoters and talent all over the place?

 3     A        They are the promoters.

 4     Q        They've been bouncing checks to consultants, I

 5     meant to say, and talent?

 6     A        No.  I haven't heard that.

 7     Q        Okay.  Now, I want to -- before I get into

 8     some of the details, I want to clear up this whole

 9     issue about the quality of the -- the footage taken

10     by Clear Channel at all three events.

11             Am I to understand that you viewed the footage

12     and found it to not be of acceptable quality?

13     A        Of acceptable quality?

14     Q        Of good -- of high standard quality.

15     A        I found it to be high standard.  It's just not

16     fully edited.

17     Q        All right.  Because --

18     A        I never saw the finished product.

19     Q        Well, in fact, would you not agree with me

20     that the footage taken by Clear Channel at -- of the

21     Wrestlereunion, all three live events, was above

22     broadcast standards?

23     A        Equal to or above, yes.

24     Q        In fact, it was above broadcast standard;

25     correct?

1    A      Yes.

2    Q      All right.  So this whole issue about there --

3    the ladder being in the way or the lighting not good

4    or all sorts of other problems that you've

5    identified, that -- whatever those might have been,

6    at the end of the day the footage taken from all

7    three events was above broadcast standards; correct?

8    A      In my opinion, yes.

9    Q      Thank you.  And you're the only one from

10   Wrestlereunion who actually viewed that footage;

11   correct?  Mr. Corrente didn't view that footage?

12   A      Correct.

13   Q      Okay.

14         THE COURT:  Mr. Russen, could you just pull

15   that mic toward you a little bit, please.  It bends.

16   Thank you.

17   BY MS. MILLNER:

18   Q      So Wrestlereunion is not making any claims in

19   this lawsuit that the fact that there would -- that

20   there was not enough scaffolding at the shoot or the

21   personnel, there wasn't enough personnel or whatever

22   the various issues that you brought up on direct

23   examination, you're not claiming that that caused

24   you any damage in this lawsuit; correct?

25   A      In fact, it's Clear Channel who's claiming

1    that there were technical problems, production

2    problems.

3    Q      Clear Channel is not suing anyone in this

4    case.  I'm asking you if you'd agree with me that

5    Wrestlereunion, the plaintiff in this case, is not

6    seeking any damages associated with any issues that

7    may have taken place on the shoots of these three

8    live events.

9    A      I agree.

10   Q      All right.  Now, as I understand your

11   testimony, you've been a good friend of

12   Mr. Corrente's for about 24 years; correct?

13   A      Yes.

14   Q      You're currently -- Mr. Corrente, in fact, is

15   currently letting you stay in his home for free;

16   correct?

17   A      Yes.

18   Q      In fact, Mr. Corrente advanced some funds for

19   you so you could store your belongings in some sort

20   of mini storage facility; correct?

21   A      I'm not sure that's exactly the way it worked

22   out, but there were some funds involved when he

23   purchased half of the IWA.

24   Q      Okay.  And the IWA, that's the organization

25   that you had run that you just told the jury about;

1    right?

2    A        When I started with Wally Carbo, yes.

3    Q        And you built up this video library; correct?

4    A        Yes.

5    Q        And am I correct that you have sold the

6    video -- Mr. Corrente half interest in that

7    business; correct?

8    A        Yes.

9    Q        And Mr. Corrente paid $9000 for that half

10   interest in the IWA?

11   A        Yes.

12   Q        So you would agree with me that the value of

13   the IWA is $18,000?

14   A        No.

15   Q        Well, if half is $9000, the value would be

16   $18,000; correct?

17   A        Depends on who is establishing the value.

18   Vince --

19   Q        Well, you --

20   A        Vince McMahon has been involved in an

21   acquisition process for quite a period of time

22   buying significant independent wrestling

23   organization's libraries.  That library could be

24   worth $10,000 per episode to Vince McMahon.

25   Q        But you -- Vince McMahon didn't offer you

1       $10,000 per episode; did he?

2       A       They have expressed interest in the library.

3       Q       They offered you $7000; isn't that right?

4       A       Per episode.

5       Q       Seven thousand dollars for the entire library?

6       A       No.  I would never have entertained that

7       offer.

8       Q       Am I correct that Mr. -- well, you may not

9       have entertained it, but that's what he offered.

10      A       I don't recall.

11      Q       All right.  Am I correct that Mr. McMahon

12      offered you $250 per hour for that library?

13      A       That was one of the offers, yes.

14      Q       And do you know what that would have totaled

15      altogether?

16      A       Twenty-nine hours times 250.  I have a

17      calculator here, if you'll give me a moment.  Seven

18      thousand two hundred fifty dollars.

19      Q       Okay.  So you would agree with me, then -- I'm

20      glad I didn't have to find your page in the

21      deposition -- that -- going back to my original

22      question, that Mr. McMahon offered you $7000 for the

23      entire library; correct?

24      A       And I turned it down, yes.

25      Q       And you took Mr. Corrente's offer of $9000 for

1       half interest in the entire business?

2       A       Yes, I did.

3       Q       All right.   Now, as I understand it, you

4       started working full-time for Wrestlereunion in the

5       summer of 2004; is that right?

6       A       Yes.

7       Q       All right.   And you worked there full-time

8       until the day after, I believe, Wrestlereunion III,

9       which would be September 11th, 2005?

10      A       Yes.

11      Q       So just over a year; correct?

12      A       Yes.

13      Q       And you were the only employee at

14      Wrestlereunion; correct?

15      A       I didn't consider myself an employee.   An

16      independent contractor, publicist, but not an

17      employee.

18      Q       Mr. Corrente considered you an employee?

19      A       I don't know.   You'll have to ask him.

20              MR. RODEMS:   Objection, Your Honor, relevance.

21              THE COURT:   Overruled.

22      BY MS. MILLNER:

23      Q       And you're certainly the only person being

24      paid to do the day-to-day activities at

25      Wrestlereunion; correct?

1    A      I was given expenses.

2    Q      Well, you were actually given a salary; isn't

3    that right?

4    A      I don't consider it a salary.

5    Q      You were given a weekly salary of $400;

6    correct?

7           MR. RODEMS:  Objection, Your Honor,

8    repetitive, argumentative.

9           THE COURT:  Overruled.

10          THE WITNESS:  I was given $400.  It started

11   out at three.

12   BY MS. MILLNER:

13   Q      Three or four, you were given a

14   four-hundred-dollar weekly salary?

15   A      It started out at 300 and then it changed to

16   400.

17   Q      All right.  And you received that as a salary

18   on a weekly basis; correct?

19   A      I dispute it's a salary.

20   Q      A weekly fee, then, of $400?

21   A      Yeah, that will work.

22   Q      So you would have received altogether about

23   roughly $20,000 to $25,000 for your work on

24   Wrestlereunion; correct?

25   A      Excuse me.  If we took the average of 350

1        times 52 week, that would have been $18,200.

2        Q       Okay.  And that amount is not reflected on any

3        of the business records of Wrestlereunion; correct?

4        A       No.

5        Q       That's not correct?

6        A       Yes, it's not.  It's not.

7        Q       Okay.

8        A       Yes, it is not on the records.

9        Q       Okay.  And your company, Double R Marketing,

10       also did some marketing work for Wrestlereunion;

11       correct?

12       A       Yes.  That would be the publicity work.

13       Q       And it, for example, hired -- handled all the

14       publicity and promotion for Wrestlereunion I and

15       Wrestlereunion III; correct?

16       A       Yes.

17       Q       And Double R Marketing was paid for those

18       services; correct?

19       A       Not in addition to what I received, no.

20       Q       Okay.  So you're saying it would have been the

21       four -- included in the 400-hundred-dollar weekly

22       fee?

23       A       Yes.

24       Q       Do you remember having your deposition taken?

25       A       Yes.

1    Q      Do you remember being put under oath?

2    A      Yes.

3    Q      Do you remember being asked this question and

4    providing this answer, page 41.

5           "Question:  Okay.  I know that you told me

6    that the payments to you were all in cash, but I'm

7    not sure I asked you this.  The payments that would

8    have been made to Double R Marketing also would have

9    been made in cash?

10          Answer:  Cash or Western Union money orders in

11   case no one was around in the immediate area to do

12   it at that time."

13          Was that your testimony at your deposition?

14   A      It may have been my testimony but I

15   misunderstood the question.  I am Double R

16   Marketing.

17   Q      All right.  Regardless, no payments to Double

18   R Marketing are shown or reflected on any of the

19   business records of Wrestlereunion; correct?

20   A      There were no separate payments to Double R

21   Marketing.

22   Q      So there's no payments to you or Double R

23   Marketing shown on any of the Wrestlereunion

24   business records; correct?

25   A      Correct.

1    Q      All right.  And you were the person

2    responsible for maintaining the financial records of

3    Wrestlereunion; correct?

4    A      I kept the spreadsheets.  Yes.

5    Q      All right.  And you've seen the summary of the

6    expenses from the three events; correct?

7    A      Yes, I have.

8    Q      All right.

9           MS. MILLNER:  Can we bring up, Mr. Brown,

10   Plaintiff's Exhibit 117 that's in evidence.  Okay.

11   Could we get a --

12          THE WITNESS:  Thank you.

13   BY MS. MILLNER:

14   Q      All right.  You recognize this as the summary

15   of expenses for Wrestlereunion I in Tampa?

16   A      Yes.

17   Q      And you see there there's a listing of

18   expenses; correct?

19   A      Yes.

20   Q      And you agree with me that it shows that there

21   was, according to this record, $236,540 in expenses;

22   correct?

23   A      Correct.

24   Q      And nowhere on those expenses does it include

25   any amounts paid for you or Double R Marketing for

1        promotion or any other services; correct?

2        A       Correct.

3        Q       All right.  So you would agree with me that

4        the expenses for Wrestlereunion I are actually

5        higher than the $236,540 reflected on this document?

6        A       Yes.

7        Q       And, of course, then, the sales, the income on

8        the second part is 55,740; correct?

9        A       Correct.

10       Q       All right.  And that reflects about 310

11       tickets sold for that event?

12       A       Okay.

13       Q       And I believe you testified, in fact, put into

14       evidence some press releases that you had prepared

15       as the promoter and the PR person for this event;

16       correct?

17       A       Yes.

18       Q       And as I recall, you started promoting this

19       event in August of 2004?

20       A       August or September, yes.

21       Q       Okay.  And you were heavily promoting this

22       event; correct?

23       A       Not heavily.  It gradually built momentum as

24       each new wrestler was added.

25       Q       All right.

1   A      We didn't go flat out from the beginning.  It

2   built.

3   Q      But over time you were -- for the, what, about

4   five months, you were -- you were periodic -- or

5   not -- routinely issuing press releases, sending

6   messages on the internet, trying to generate

7   interest in the Wrestlereunion I event; correct?

8   A      Yes.

9   Q      All right.  I mean, you're not suggesting that

10  you didn't fulfill your responsibilities to provide

11  public relations and promotion to Wrestlereunion;

12  are you, sir?

13  A      No.

14  Q      You used your best efforts and did the best

15  job you could to promote Wrestlereunion I; correct?

16  A      Yes, I did.

17  Q      All right.  And despite that, you still did

18  not get the turnout you were looking for; isn't that

19  right?

20  A      Correct.

21  Q      All right.  Just like with the plaintiff's

22  claiming here that Clear Channel was unable to find

23  a distributor for its videotapes; correct?

24  A      No.  I think there's a difference.

25  Q      All right.  You would agree with me, though,

1      that no matter how hard one tries to market a

2      certain thing in the marketplace, it's not always

3      accepted; correct?

4      A      I can establish the effort that was put forth

5      in the press releases and the responses that that

6      got through the media.  I have yet to see any proof

7      or evidence that Clear Channel did what you're

8      insinuating.

9      Q      All right.  Well, we'll get into what Clear

10     Channel did or didn't do in a minute.  But I just

11     want to ask you a more general question --

12     A      Okay.

13     Q      -- at this point.  No matter how much effort

14     and time and money is put into promoting a certain

15     event or trying to sell a certain product,

16     ultimately it's the marketplace that determines the

17     success of that product or that event; correct?

18     A      This never got to the marketplace.

19     Q      That's not what I'm asking, though.  I'm

20     asking more general.  In general --

21     A      You asked about the marketplace.

22     Q      Would you agree with me, sir, that just

23     because someone tries very hard to advertise or

24     promote a certain product or certain event, it

25     doesn't necessarily mean that it will be successful

1      in the marketplace; correct?

2      A      There are no guarantees.

3      Q      No guarantees.  All right.  Now, while we're

4      looking at this exhibit, in addition to not

5      reflecting any payments for the PR services that you

6      provided, you also don't show any payments for, for

7      example, taxes on this document; correct?

8      A      Correct.

9      Q      And surely Wrestlereunion paid taxes, sales

10     taxes, at least, for this event; correct?

11     A      Correct.

12     Q      So that's missing.  How about insurance?

13     Certainly, Wrestlereunion had insurance; didn't it?

14     A      Yes, we did.

15     Q      All right.  And that figure is not shown

16     there, as well?

17     A      Might be in the miscellaneous.  Insurance is

18     not expensive.  It's called spectator liability

19     insurance.  It's not expensive.

20     Q      But you don't know whether or not --

21     A      I believe it was in the miscellaneous.

22     Q      All right.  And how about security?  You

23     didn't have -- you had security at this event;

24     didn't you?

25     A      A lot of it was volunteer T-shirt security

Russen - Cross

1       from other wrestlers who wanted to participate.  We

2       did have the required number of uniformed police,

3       and I believe that would also be in the

4       miscellaneous.

5       Q      Okay.  So regardless at least in terms of the

6       taxes and the moneys for PR and promotion, those are

7       not included.  So do you know how much higher the

8       expenses truly are than is reflected on this

9       document?

10      A      No, I do not.

11      Q      All right.  And -- and did you pay for any

12      promotional material -- promotional items such as

13      advertising?

14      A      The advertising we did on this event was

15      primarily the co-promotion by ESPN.  We did not

16      spend money for print media, radio or television

17      beyond the agreement with ESPN.

18      Q      Okay.  And did you do any sort of advertising

19      for Wrestlereunion II?

20      A      Did I do it in what way?  I created the TV

21      commercial.

22      Q      Did you do the -- you hired a separate PR

23      company for Wrestlereunion?

24      A      Yes, we did.

25      Q      And so your company only did Wrestlereunion I

Russell - Cross

1       promotion and Wrestlereunion III promotion; is that

2       right?

3       A       I did the general press releases for the

4       internet nationwide.  The PR firm that we hired from

5       Philadelphia, Mr. Ruben, had been the publicist for

6       the Philadelphia Flyers and the Philly's, and he did

7       the local stuff --

8       Q       Okay.

9       A       -- in the Philadelphia market.

10      Q       But he was the one who was picking the places

11      to place this PR and things of that nature?

12      A       Yes.  Yes.

13      Q       And so you would agree with me that you sold

14      more tickets for Wrestlereunion II than you did for

15      one and three; correct?

16      A       No.  Three sold more tickets than the other

17      two combined.

18      Q       But Wrestlereunion III only sold around 300

19      tickets; isn't that right?

20      A       That's not true.  That's not true.  I don't

21      know where you got that number, but that's not true.

22      Q       Okay.  It generated $22,000 in income?  We can

23      go to that.  Thanks.

24      A       Okay.

25      Q       And you're saying that the $22,000 in income

1       sold more tickets than Wrestlereunion I or II?

2       A       Give me a second here, please.  Ticket prices

3       for Wrestlereunion II because of -- Wrestlereunion

4       II, because it was only a live event, varied

5       anywhere from 15, 20, $25.  As an average ticket

6       price of $20, that ticket sale gross number

7       translates to 1115 tickets.

8       Q       Is that -- it's your testimony that there was

9       1000 people at Wrestlereunion III?

10      A       I think there were 1300 people there.

11      Q       Okay.

12      A       And I was there.

13      Q       Do you recall seeing the e-mail in evidence

14      where it estimates it at 300 people to 400 people

15      there?

16      A       No, I don't.  Could you show it to me?

17      Q       Yes.

18              (Brief pause.)

19      BY MS. MILLNER:

20      Q       Mr. Russen, this is Plaintiff's Exhibit 110

21      that Wrestlereunion's counsel put into evidence.  If

22      we can just go to the e-mail at the bottom there

23      where it says, actually, the crowd wasn't bad, 300

24      or 400, maybe.  Do you see that?

25      A       I don't believe Eric Paulen is a professional

1    promoter capable of making an estimate like that.

2    Q    The stands were empty at Wrestlereunion III;

3    weren't they, sir?

4    A    Have you seen the video?  No, they were not.

5        MS. MILLNER:  Can we see the video, Mr. Brown?

6        THE WITNESS:  Bear in mind, the building held

7    3500 seats.

8    BY MS. MILLNER:

9    Q    Okay.  And you think there was about 1300?

10   A    I think it was about a third full.

11   Q    Okay.  Let's take a look.

12       MS. MILLNER:  No.

13       THE WITNESS:  That's the wrong one.

14       MR. RODEMS:  Your Honor, may we approach?

15       THE COURT:  Yes, sir.

16       (At sidebar, on the record.)

17       MR. RODEMS:  Mr. Barker advised that 110 has

18   not been admitted into evidence yet.  It was just --

19       MS. MILLNER:  Oh, he told me it was.  I'm

20   sorry.

21       MR. RODEMS:  If I did, I apologize.

22       THE COURT:  Actually, it was objected to.  So

23   I don't think he put it in as part of his direct;

24   did he?

25           COURTROOM DEPUTY CLERK:  110?

1              THE COURT:  Yeah.

2              COURTROOM DEPUTY CLERK:  It's not in.

3              MS. MILLNER:  I'll obviously withdraw my

4      objection.

5              MR. RODEMS:  I just wanted to point that out.

6      I don't know what the procedure is at this point.

7              THE COURT:  Well, do you want to put it in?

8              MR. RODEMS:  Yes, sir.

9              THE COURT:  Well, I'll just announce that.

10             MR. RODEMS:  Yes, sir.

11             THE COURT:  That's fine.

12             (End of sidebar discussion.)

13             THE COURT:  Exhibit 110 is received in

14     evidence as a plaintiff's exhibit.

15             (Whereupon, Plaintiff's Exhibit Number 110

16     was received into evidence.)

17             MS. MILLNER:  All right.  So let me --

18     Mr. Brown, can we go to the video.

19     BY MS. MILLNER:

20     Q      Okay.  This is -- do you recognize this as the

21     venue for Wrestlereunion III; correct?

22     A      Um-hum.

23     Q      Okay.  There's the folks.  Do you see the

24     stands back there?

25     A      Well, I don't know if they were stands or if

1    those were the actual gates that the cows would come

2    out during a rodeo.

3    Q       Well, let's keep going.  Maybe you'll

4    recognize them as stands.

5          MS. MILLNER:  Okay.  All right.  Can we go

6    back, Mr. Brown, and take a look again a little

7    slower.

8          THE WITNESS:  I didn't even know we had an

9    overhead shot like that.  May I point something out?

10   BY MS. MILLNER:

11   Q       Um-hum.

12   A       If you just go back a little bit, you see

13   Jimmy Hart in the middle of the ring with a

14   microphone?

15   Q       Okay.

16   A       Right there.  Jimmy is never in the ring

17   during the course of when the matches are taking

18   place unless he's acting as a manager for one of the

19   people.  This is a case where he's in the ring prior

20   to the start of something, warming up the crowd, so

21   to speak, not necessarily when the full crowd is in

22   attendance.  Often he does that to allow the audio

23   people to get sound adjustments on the audio.

24   Q       All right.  So you would agree with me that

25   the crowd shown here is certainly not a crowd that

1       shows a full house of people; correct?

2       A       It does not show the full group of people who

3       were there.  You're only showing two angles.

4       Q       Okay.  And have you viewed the video?

5       A       I've seen the entire show.  Yes, I have.

6       Q       Okay.  Now, focusing back on the whole concept

7       of Wrestlereunion, as I understand the testimony,

8       you -- Mr. Corrente and you envisioned this to be an

9       intimate type of occasion; correct?

10      A       It was his vision.

11      Q       Well, Mr. Corrente wanted it to be an intimate

12      fan -- fan to wrestler occasion; correct?

13      A       Correct.

14      Q       All right.  And -- but you certainly always

15      intended on making money on the live ticket sales;

16      correct?

17      A       That was one of multiple sources of revenue.

18      Q       All right.  And you were very disappointed,

19      were you not, in the ticket sales from

20      Wrestlereunion I?

21      A       I don't know about very, but somewhat.

22      Q       All right.  Do you recall you -- I think you

23      referenced on direct the memo you wrote to

24      Mr. Corrente weeks before the event called the

25      reality check.  Do you recall that?

1    A       Yes, I do.

2    Q       All right.  I noticed we didn't look at that

3    document.

4            MS. MILLNER:  So, Your Honor, may I approach

5    the witness?

6            THE COURT:  Yes, ma'am.

7            MS. MILLNER:  Thank you.

8            THE WITNESS:  It wasn't that big.

9    BY MS. MILLNER:

10   Q       Mr. Russen, do you recognize exhibit --

11   Defendant's Exhibit 159?

12   A       Yes, I do.

13   Q       All right.  Is that the memo you wrote to

14   Mr. Corrente 21 days before the Wrestlereunion event

15   in -- which was held on January 28th, 2007, entitled

16   reality check?

17   A       Where do you see a date?  I'm just asking.

18   I'm not disputing it.

19   Q       Sure.  If you look at the first -- if you look

20   at the first paragraph of the memo, it tells you --

21   it tells Mr. Corrente you're writing it 21 days

22   before the event -- or second paragraph, I'm sorry.

23   A       Yes.

24   Q       All right.  So you would agree that this was

25   written around January 7th, 2005?

1    A      Yes.

2    Q      And this is a true and accurate copy of the

3    reality check memo you wrote to Mr. Corrente on that

4    date?

5    A      Yes, it is.

6    Q      All right.

7            MS. MILLNER:  Move to admit, Your Honor.

8            THE COURT:  Any objection?

9            MR. RODEMS:  No objection, Your Honor.

10           THE COURT:  All right.  The exhibit will be

11   received.

12           COURTROOM DEPUTY CLERK:  Your Honor, the

13   number?

14           MS. MILLNER:  159.

15           THE COURT:  Defendant's 159.

16           (Whereupon, Defendant's Exhibit Number 159

17   was received into evidence.)

18           MS. MILLNER:  Okay.  And if we can focus on

19   the second paragraph, Mr. Brown.

20   BY MS. MILLNER:

21   Q      Now, by the way, January 7th, that's the day

22   that you had received the expression of interest

23   from Clear Channel; correct?

24   A      That's the date on the document.  Yes.

25   Q      All right.  And I believe you testified on

1    direct that that's the day you received it.  Is that

2    inconsistent now with your memory?

3    A       No.  That sounds right.

4    Q       And you certainly had spoken to Clear Channel,

5    I believe you said, on New Year's Eve; correct?

6    A       Yes.  No deal had been signed yet.

7    Q       Right.  But you knew they were certainly

8    interested at that point; correct?

9    A       I'm interested in winning the lottery.

10   Q       Well, I mean, I believe you said on direct

11   that, in fact, it was Mr. Sterling that was selling

12   you on the concept of Wrestlereunion during that

13   call; correct?

14   A       Absolutely.

15   Q       So there's no doubt in your mind, at least on

16   that date, Clear Channel was very interested in

17   getting involved with Wrestlereunion; correct?

18   A       If we were to take Mr. Sterling's word, yes.

19   Q       All right.  And by the way, you certainly

20   didn't mention to Mr. Sterling, did you, that you

21   were having grave concerns about how the ticket

22   sales were going for Wrestlereunion; correct?

23   A       On New Year's Eve, I wasn't.

24   Q       What -- so you became concerned seven days

25   later when you wrote this memo?

1       A       Somewhere in between.

2       Q       All right.  So on New Year's Eve, you had no

3       concerns about the financial -- the possible

4       financial failure of Wrestlereunion I?  Is that your

5       testimony under oath?

6       A       Yes.

7       Q       All right.  And you didn't share any concerns

8       you had whatsoever with Mr. Sterling about

9       Wrestlereunion I during that call; correct?

10      A       I'm not sure I understand the relevance of

11      Mr. Sterling's involvement in the expenses of

12      Wrestlereunion's live event.  We weren't involved in

13      your expenses.  I don't know why it would have been

14      any concern to him, as long as it was going to

15      happen, and it did.

16      Q       All right.  When Mr. Sterling contacted you on

17      December 31st, 2004, to discuss his interest in --

18      or Clear Channel's interest in filming the events,

19      you did not say to him, just so you know, ticket

20      sales have been very disappointing and very sluggish

21      and we have grave concerns about the financial

22      success of this project; correct?

23      A       I did not say it and I don't consider it

24      relevant.

25      Q       And you -- and you didn't share any concerns

1    that you had with him on any subject matter

2    concerning -- about Wrestlereunion; correct?

3    A        Correct.

4    Q        All right.   Now, if we can go to the last

5    sentence in that second paragraph.   It reads --

6    well, actually, let's start with the full paragraph.

7    You state, you have done a wonderful job of

8    assembling the biggest and best convention ever.

9    There is no doubt about that whatsoever.   The

10   recognition of that is universal even among the most

11   critical members of the press.   But to this time, 21

12   days out, the fans have failed to respond in the

13   kind of numbers anticipated and needed to make the

14   event a success.

15          Isn't that how you felt about Wrestlereunion I

16   when you wrote this memo on January 7th?

17   A        I felt that way, yes, based on the fact that

18   Tony Hunter had pulled out and I was concerned

19   Corrente was on his own.

20   Q        Well, you were also concerned that the fans

21   had not responded as anticipated; correct?

22   A        We were a month out.   I was concerned, yes.

23   But we were a month out, and wrestling has a

24   traditional large walkup.   It depends on what else

25   is going on in the area at that time.   So there's no

1    way of gauging what the walkup may be, but it could

2    be as high as 40 percent.

3    Q    Okay.  Well, let's go to the next paragraph,

4    then.  And you actually state that, that there might

5    be -- there might be a change over the next three

6    weeks if the, quote, snowball effect Superstar Billy

7    Graham spoke of kicks in.  But that didn't happen,

8    did it, sir?

9    A    Bottom line, no, it did not.

10   Q    All right.  And you were surprised and

11   disappointed that after all the public relations,

12   all the publicity, all the great legends that you

13   had booked -- that Mr. Corrente had booked, that the

14   fans simply just weren't interested and didn't buy

15   tickets; correct?

16   A    I totally disagree that they were not

17   interested.

18   Q    Well, they didn't buy the tickets?

19   A    That's a difference.  Tickets were over $200.

20   Q    Well, not all the tickets were over $200,

21   though; correct?

22   A    Correct.

23   Q    There were tickets for I believe around $45;

24   correct?

25   A    Forty-five dollars?

1    Q      Well, let me double-check that.  Tickets were

2    at -- ranged from $59 to $299; isn't that right?

3    A      Yes.

4    Q      All right.  And the tickets at $59 didn't

5    sell, either, in the numbers you expected?

6    A      Correct.

7    Q      All right.  So, again, I'll repeat my

8    question.  After all the publicity, all the efforts

9    put in by yourself and Mr. Corrente, and all the

10   great names of talent that had been marketed and

11   promoted out in the marketplace, the fans simply

12   didn't respond by purchasing the tickets; correct?

13   A      Correct.

14   Q      All right.  Now, continuing on this exhibit.

15   You give some advice to Mr. Corrente; do you not?

16   A      Where are you looking, may I ask?

17   Q      Well, recommendations.  You see where it says,

18   my recommendation are as follows?

19   A      I do now, yes.

20   Q      All right.  Let's go to number one.  First, we

21   promised the fans 50 plus stars then upped it to 60.

22   We now have close to 90 booked.  I strongly

23   recommend we review the list and strip 25 to 30

24   names from it saving talent fees, transportation

25   costs and room charges totaling tens of thousands of

1    dollars, yet still providing the numbers of stars we

2    have committed to the fans who have bought tickets.

3    With less than 200 tickets sold, obviously none of

4    the names that would be eliminated could be

5    considered a, quote, draw or, quote, ticket seller.

6    Many have not even been announced and, therefore,

7    would not be missed by the fans.  In reality, some

8    of those names -- some of those names announced

9    should be cut because they are not producing sales

10   results.

11        Those are -- that's the advice you gave to

12   Mr. Corrente on January -- on or around January 7th,

13   2005 concerning Wrestlereunion I; correct?

14   A     Yes, with --

15   Q     All right.  And you would agree with me that

16   he didn't follow that advice; correct?

17   A     He explained to me again his commitment to the

18   fans to provide the biggest and best wrestling fan

19   convention ever, and that this was a brand

20   development grand opening kind of thing.  So we were

21   going to go with the commitment.  He's a man of

22   honor, dignity and was not going to back down on his

23   commitment to the fans or to the wrestlers.

24   Q     Well, actually, he not only stuck with the 90

25   wrestlers that he had booked on January 7th, but he

1    actually added four additional wrestlers; isn't that

2    true?

3    A     Yes.

4    Q     All right.   So instead of reducing the number,

5    as you suggested, he actually went up by four;

6    correct?

7    A     Yes.

8    Q     All right.   Now, advice number two actually

9    involved the venue; correct?

10   A     Yes.

11   Q     And it states -- and -- and by the way, am

12   I -- am I correct that Mr. Corrente didn't always

13   view this as going to be a small, intimate affair?

14   At one point he actually thought it would be a much

15   larger event; correct?

16   A     If you're referring to the high school

17   gymnasium as the alternate site, no.   That wasn't

18   why that that site was in consideration.

19   Q     Mr. Corrente had actually originally booked a

20   larger site to hold Wrestlereunion I; isn't that the

21   case?

22   A     No.

23   Q     All right.   Well, let's go to number two of

24   your memo.   With the smaller volume of tickets sold

25   to this point, I suggest we consider canceling the

1    high school gym and moving the show back into the

2    ballroom on Saturday night.  It is unlikely at this

3    time that we will sell more than 900 tickets, thus

4    making the ballroom adequate and sufficient to host

5    the live event.  This will save the cost of rental,

6    insurance and chair rentals.  Because the use of the

7    high school has not been announced, the fans in

8    attendance will know nothing of it and no

9    embarrassment will occur by having a room -- by

10   having a room less than half full for the event if

11   ticket sales don't drastically increase.

12           So, again, sir, am I not correct that at one

13   point not -- Mr. Corrente didn't view this as an

14   intimate, small, private affair but rather had

15   booked a much larger venue to hold Wrestlereunion I?

16   A       You are not correct.  The other venue was not

17   booked.  It was a high school right across the

18   street that had been scouted as a possible site if

19   ticket sales exceeded the capacity of the ballroom.

20   Q       Well, which is it, sir?  Were you looking to

21   hold this as a small, intimate affair with just a

22   handful of fans or were you actually looking to hold

23   this in a large gym -- high school gymnasium with

24   lots of fans?

25   A       A large high school gymnasium you're speaking

1    of holds 1500 seats.  That's not much of a

2    difference between a thousand.  If we wanted a large

3    venue, we would have used a football field.

4    Q      Well, certainly, the way you describe it in

5    this memo -- and by the way, you say -- you use the

6    word canceling the high school gym.  Whether you

7    call it booked or whatever terminology you want, at

8    one point Mr. Corrente had -- or made arrangements

9    for this larger high school gym to be the site of

10   Wrestlereunion I; correct?

11   A      Wrong.  Mr. Corrente was never there, never

12   did go scout the high school, never made a

13   commitment, never had an agreement drawn up, never

14   signed anything.

15   Q      But you're suggesting that he cancel the high

16   school gym, are you not, sir, in this memo?

17   A      Suggested canceling any plans of using it,

18   yes.

19   Q      Well, that's not what it says.

20   A      But it wasn't booked, it was never an option.

21   It was not booked.  You're making something up that

22   didn't happen.

23   Q      Regardless, whether it was booked or not, it

24   was at one point in consideration of Mr. -- let me

25   start over.

1              Regardless of whether it was booked or not,

2       Mr. Corrente had ideas, thoughts and plans to use

3       the high school gym as a -- as a site for the

4       Wrestlereunion I, but decided not to use that gym

5       because of the ticket sales; correct?

6       A       It was an option to use it if ticket sales

7       were such that we needed more space.

8       Q       Now -- now, here in this memo you're saying

9       900 -- you're looking to hopefully sell the 900

10      tickets for the Doubletree location; correct?

11      A       Yes.

12      Q       All right.  And you're telling the jury that

13      the high school gym held -- was it 1400, you said?

14      A       Fifteen.

15      Q       Fifteen hundred.  All right.  But you have

16      concerns that even if you sell the 900 tickets, that

17      the room would look like it's half full; am I not

18      correct?

19      A       What room?  Excuse me.  Let me read this.

20      Q       All right.  It's -- your hope is that you

21      might sell 900 tickets; do you see that?

22      A       Yes.

23      Q       And you believe that that -- that the

24      Doubletree location would certainly be an adequate

25      venue if you sold those 900 tickets; correct?

1    A       Yes.

2    Q       All right.   And then skipping down to the last

3    line, you say, because the use of the high school

4    gym has not been announced, the fans in attendance

5    will know nothing of it and no embarrassment will

6    occur of having a room less than half full for the

7    event if ticket sales don't dramatically increase.

8            So if the 900 tickets sold, as you're hoping

9    for in this memo, the high school gym would still

10   look like it was half full; isn't that right?

11   A       Two-thirds full.

12   Q       Do you consider having 1500 to 2000 fans an

13   intimate, small event?

14   A       Compared to the WCW shows I promoted in 15,000

15   or 20,000 seat arenas, yes.

16   Q       So when Mr. Corrente was talking about having

17   the Wrestlereunion I intimate affair, he was looking

18   at selling around 2000 tickets; correct?

19   A       No.

20   Q       So --

21   A       Wrestlereunion I --

22   Q       Correct.

23   A       -- capacity at the Doubletree was about a

24   thousand or 900.

25   Q       Okay.   For Wrestlereunion I, actually, the

1    capacity was a thousand at the Doubletree; correct?

2    A       Somewhere between 900 and a thousand,

3    depending on the space and the aisles that were

4    required by the fire marshal.

5    Q       All right.  But Mr. Corrente was hoping for a

6    much larger audience than that; isn't that the case?

7    A       Hoping?  No, that was not --

8    Q       Expecting.  Mr. Corrente was expecting --

9    A       No, he was not expecting more than that.

10   Q       All right.  So he was not expecting more than

11   that, but he still went ahead and -- or you still

12   went ahead and looked into arranging to have this

13   event held at a high school gymnasium that held 1500

14   people; is that your testimony under oath?

15   A       Yes, as plan B backup, if necessary.

16   Q       All right.  Now, the event at Valley Forge

17   Convention Center, that, too, did not sell the

18   number of tickets you were hoping for; correct?

19   A       Correct.

20   Q       All right.  And I believe you showed an e-mail

21   that was in evidence, it's Plaintiff's Exhibit, I

22   believe, 147.  Do we have plaintiff's exhibit -- all

23   right.  Do you have 147 in front of you?  It's the

24   press release in April of Wrestlereunion.

25   A       Can I do something with this?

1    Q      Sure.   Right there is fine.

2    A      147?

3    Q      Correct.

4    A      Okay.

5           MS. MILLNER:  Can we change it to the ELMO?

6           COURTROOM DEPUTY CLERK:  Yes.

7           MS. MILLNER:   Thanks.

8           THE COURT:  After you finish this line of

9    inquiry, we'll go ahead and break for the day.

10   BY MS. MILLNER:

11   Q      This is the e-mail that you showed the jury on

12   direct, the promotional PR piece that you sent out

13   in April 2005?

14   A      Yes.

15   Q      And you're advertising and promoting again

16   Wrestlereunion II; correct?

17   A      Correct.

18   Q      And it's at the Valley Forge Convention

19   Center; is that -- is that right?

20   A      Yes.

21   Q      And you would agree with me that Valley Forge

22   Convention Center is a larger venue than Doubletree?

23   A      Yes, it is.

24   Q      All right.  So again, you were hoping for a

25   much larger audience for Wrestlereunion II than the

1    disappointing results from Wrestlereunion I;

2    correct?

3    A      Yes.

4    Q      All right.  And you're sending these e-mails

5    to -- to Mr. Paylan (sic) at Clear Channel; is that

6    right?

7    A      Eric Paulen, yes.

8    Q      Eric Paulen.  I'm sorry.  And by the way, in

9    none of these e-mails or any e-mails that you sent

10   to Mr. Paulen are you complaining about any of the

11   production problems that you described for this jury

12   on direct examination, such as no headsets, no

13   monitors, no this, no that; correct?

14   A      Those complaints were made to him personally

15   in Valley Forge -- I mean, in -- in Tampa.

16   Q      All right.  You can't show this jury a single

17   written document where those complaints were aired

18   to anyone at Clear Channel; isn't that right?

19   A      Correct.

20   Q      And certainly when you're sending this e-mail

21   to him in April, you're not saying, well, you know,

22   we don't mind you having come out to Wrestlereunion

23   II, but there has to be some changes made, none of

24   that's taking please; correct?

25   A      With the understanding they were bringing a

1    truck this time.

2    Q       And you would agree that the contract that was

3    signed with Clear Channel does not specify what

4    equipment would be brought out to film these events;

5    correct?

6    A       No.  It was understood from Mr. Sterling's

7    initial concept that it would be high definition

8    equipment.

9    Q       The contract says that it would be filmed --

10   typically filmed in high def; correct?

11   A       Yes.

12   Q       But it does not say what equipment Clear

13   Channel would bring to film these events; correct?

14   A       Clear Channel was the production partner in

15   this deal.  It was their responsibility to bring in

16   the best equipment available.

17   Q       And you did not after -- after

18   Wrestlereunion I write -- ask them to either, A,

19   bring the equipment or modify the contract to

20   include provisions which set forth minimum equipment

21   that they would bring with them to film these

22   events; isn't that right?

23           MR. RODEMS:  Objection, Your Honor, compound.

24           THE COURT:  I'll let it stand.  Overruled.

25           THE WITNESS:  All communications did not need

1      to be in writing.  The night of the close of

2      Wrestlereunion I, we all went to dinner with the

3      production crew, and it was all discussed at that

4      dinner at the steak house right next to the

5      facility, the Doubletree.  So it was done directly

6      at the time with the people involved.

7      BY MS. MILLNER:

8      Q      And you never sought to modify the contract to

9      include those -- this understanding that you claim

10     you had?

11     A      No.

12     Q      And at the end of the day, the production of

13     Wrestlereunion I, II and III and the footage that

14     was shot was above broadcast standard and you were

15     satisfied with it; correct?

16            MR. RODEMS:  Objection, Your Honor,

17     cumulative.

18            THE COURT:  Sustained.  All right.  We'll

19     break for the afternoon.  Members of the jury, have

20     a safe evening.  We'll resume at 9:00 AM.

21            COURTROOM SECURITY OFFICER:  Please rise for

22     the jury.

23            (Jury out at 4:04 PM.)

24            THE COURT:  You can step down, sir.

25            (Recess was taken at 4:04 until 4:07 PM.)

1           (Back on the record.)

2           THE COURT:  Welcome back.

3           THE WITNESS:  Thank you, Your Honor.

4           THE COURT:  All right.  Mr. Bowman is back on

5      the stand.  You want to move that exhibit book.

6      It's probably a bit cumbersome laying there on the

7      corner.

8           Now, let's put a little surgical touch on this

9      hearing and see if we can wrap it up, please.  You

10     were making good progress right at the end of

11     hearing and then, of course, there'll be

12     cross-examination.

13          You covered methodology on the DVD projections

14     and the pay-per-view, I believe.  It would be

15     helpful to me, but I certainly don't want to limit

16     you, but if you could cover each of the revenue

17     streams that he has opinions on and have him

18     describe his methodology.

19          MR. RODEMS:  Yes, sir.  Are you ready?

20          THE COURT:  Yes, sir.

21          MR. RODEMS:  Okay.

22                 DIRECT EXAMINATION CONTINUED

23     BY MR. RODEMS:

24     Q    Mr. Bowman, let's turn to Exhibit 88 -- I'm

25     sorry, 87, and specifically the spreadsheets.

1          MR. RODEMS:  Your Honor, would you like a

2     color copy of this or do you have a color copy?

3          THE COURT:  I have one up here.

4          MR. RODEMS:  Yes, sir.

5          THE COURT:  That's what I looked at the other

6     day; isn't it?

7          MR. RODEMS:  Yes, sir.

8     BY MR. RODEMS:

9     Q     Mr. Bowman, would you tell me what the first

10    spreadsheet that you're looking at shows.

11    A     It's fiscal year beginning 2005.

12         THE COURT:  Pull the mic toward you a little

13    bit.  There you go.  Thank you.

14    BY MR. RODEMS:

15    Q     Okay.

16    A     Fiscal year 2005.

17    Q     Okay.  You have calculated revenue on this

18    chart for the categories lifted -- listed on the

19    left-hand side; correct?

20    A     That is correct.

21    Q     Okay.  And those include pay-per-view, TV,

22    DVD, conventions, conventions overseas, which is a

23    separate category; correct?

24    A     That is correct.

25    Q     Live events, internet, training facility,

1       licensing and merchandise?

2       A       That's correct.

3       Q       Okay.  While some of these may seem

4       self-explanatory, let me ask you, when you use

5       internet, what category of revenue are you referring

6       to?  Are you referring to revenue that would be

7       derived from selling videos over the internet?

8       A       No.  I am talking about revenue that can be

9       derived from the Wrestlereunion website.  The site

10      could have a paid section, which is standard in the

11      industry.  It can also sell advertising either

12      itself or through Google AdSense, Burst Media,

13      companies like that.  It could also have a major

14      sponsor whose ad would constantly appear on every

15      single page rather than being in rotation.

16      Q       Are you currently involved with internet

17      marketing of this type for any of your clients?

18      A       Yes.  I'm currently building websites for the

19      Florida Leisure Vacation Home Company.

20      Q       And will that company derive revenue from its

21      website similar to how you're contemplating for

22      Wrestlereunion?

23      A       Yes, it will.  In the same way that other

24      websites that I have owned and operated over the

25      years will and have done.

1    Q      Okay.  Now, with the Wrestlereunion website,

2    was that already in existence at the time in 2005

3    when the parties entered into the contract?

4    A      Yes, it was.

5    Q      Okay.  Was Wrestlereunion deriving revenue

6    from its website in 2005?

7    A      No.  They hadn't managed to monetize it at

8    that point.

9    Q      Okay.  Did you project revenue in calendar

10   years 2005 through 2009 for Wrestlereunion?

11   A      Yes, I did.

12   Q      By the way, all of your revenue projections

13   and expense projections, all of your lost profits

14   projections end in calendar year 2009; correct?

15   A      Correct.

16   Q      Would it be accurate to say, then, that the

17   data that you relied on for your calculations is

18   data that actually happened in most instances, not

19   projections of what you think might have occurred in

20   future years?

21   A      No.  Everything that I have worked with is

22   data that I have found pertinent to each of the

23   years up until current times.

24   Q      So in order to project, for example, the

25   internet revenue, you didn't make extrapolations

1    into what you think the internet would be in 2015?

2    A      No, I did not.

3    Q      You had actual data sources that you could go

4    to for what was going on throughout the time period

5    2005 through 2009?

6    A      Yes, sir.

7    Q      Is that true in all of your revenue

8    categories?

9    A      Yes.

10   Q      Okay.  You did not project any lost profits

11   beyond 2009 in your report; correct?

12   A      That is correct.

13   Q      Why not?

14   A      It just has to have a point where it has to

15   come to, you know, an end for the projection.  I

16   didn't envision Wrestlereunion just suddenly closing

17   down at the end of 2009.  Wrestlereunion, as my

18   model shows, would have carried on being a viable

19   company and, as has been shown by other wrestling

20   companies, the period from 2005 they've each shown

21   considerable growth and continue to grow, you know,

22   and expand overseas, as well.

23   Q      So you believe that by not carrying forward

24   revenue projections and lost profit projections

25   beyond 2009, your opinions are more reliable and

1    more certain because they were based on actual data?

2    A      Yes, they are.

3    Q      Okay.  Now, as far as the internet revenue,

4    how did you go about calculating for each one of the

5    years?

6    A      Basically I had a lot of experience with

7    wrestling internet projects dating back to my time

8    at WCW building the first World Championship

9    Wrestling website.  I also had lots of experience in

10   buying advertising for -- you know, to help promote

11   events that were taking place and know what the

12   costs are.

13          I have very good relationships with current

14   wrestling websites that gave pay sections, and I

15   used their data to calculate the figures.

16   Q      Does the amount of revenue that would be

17   derived from internet advertising depend on the

18   number of clicks or hits or however you want to

19   describe it, visits to a website in a proscribed

20   period?

21   A      Not in these methods because that would be far

22   too speculative.  This is achievable, actual paid

23   advertising.  And even though I haven't made use of

24   them myself, I have included an agency fee there

25   that Wrestlereunion could go to people that

1   specialize in providing web advertising much the

2   same way as TV advertising, any kind of advertising,

3   and the percentage there would go to them, so I've

4   shown an expense against that.

5   Q    Well, let me ask it this way.  When you have

6   bought internet advertising from websites, how did

7   you know that you were getting good value for your

8   buck?

9   A    Basically a lot of them have projections

10  showing how many unique visitors they have a month.

11  But the sites that I've tended to buy advertising

12  with are regarded as the industry leaders.

13  Q    Okay.  Did you -- how did you determine how

14  much revenue Wrestlereunion would be able to derive

15  from the internet?

16  A    As I say, I looked at the marketplace, I

17  looked at various websites, how they were deriving

18  their -- their income, and I took a modest -- some

19  websites had between 15 and 20 ads on there that

20  they were charging a thousand dollars a month for.

21  Q    Can you give us some examples of some sources

22  of data.

23  A    PWinsider.com, Onewrestling.com, wrestling --

24  I think it's Prowrestling.com.  I also looked at

25  sites like R. F. Video and -- and if I need, I can

1       go through my source book and find some more.

2       Q       Well, what is R. F. Video?

3       A       R. F. Video is a company that sells DVDs,

4       produces shoot videos and then also allows you to

5       download videos online for paying a fee.

6       Q       And that website is able to derive revenue

7       from advertising?

8       A       Yes, it is.

9       Q       Okay.  And can you give me some examples of

10      who would be buying this advertising slot on

11      R. F. Video's website?

12      A       Well, they're general -- I mean, the

13      advertisers are anybody that's in the -- you know,

14      might be promoting a wrestling show, might have a

15      wrestling show on TV.  But on PWinsider and other

16      sites, there's just such a wide range of -- you

17      know, you're seeing strange ads that you wouldn't,

18      you know, think would be there.  They could be for

19      Vonage, you know, telephone services, just things

20      that consumers in their demographic are obviously

21      looking to buy.

22      Q       And did you calculate per year an amount of

23      revenue that you felt would be reasonable for

24      Wrestlereunion from internet advertising?

25      A       Yes, I did.

1    Q      And for 2005 you have a total of how much?

2    A      $20,685.

3    Q      For 2005?  I'm showing 25,000.  Am I looking

4    in the wrong year?

5    A      Maybe I'm looking at the wrong --

6    Q      Oh, I'm sorry, I apologize.  It's 22,300?

7    A      It's -- no.  It's the 20,685 less Clear

8    Channel's entitled to their distribution fee, and

9    then they also get a 50 percent share on the

10   revenues.  So if you go across on that sheet, the

11   final figure is 7,757.

12   Q      You factored in agency fees of $7,000?

13   A      $4,200.

14   Q      I see.  Based on $1400 per month?

15   A      Yes.  That's correct.

16   Q      And there is an agency fee of 7,000?

17   A      No, the -- yeah.  The fee is 7,000 times the

18   20 percent.

19   Q      Okay.  What does the 7,000 represent?

20   A      The 5,000 and 2,000 in advertising and

21   sponsors above which may not necessarily have had to

22   go through the advertising agency, but I was being

23   prudent by putting everything -- you know, having a

24   cost applied to everything.

25   Q      Okay.  And so what makes up the $5,000 in

1    advertising and the $2,000 in sponsors in your

2    projections for 2005?

3    A        It's five banner ads at a thousand dollars

4    each for the month and one major sponsor whose

5    banner, instead of rotating as the pages go through,

6    they could be down the side, could be across the

7    top, you know, could be multilayered and they would

8    pay $2,000 to have that -- their ads permanently

9    displayed.

10   Q        And what sources of data did you rely on to

11   show that those projections were reasonable?

12   A        I have ordered advertising myself.  And I

13   looked at websites and saw that they had much more

14   advertising on it than -- than this.  And if you

15   have a product that has television exposure and DVD

16   exposure and pay-per-view exposure, lots more

17   advertisers are going to want to be associated with

18   you.

19   Q        And for each year from 2005 to 2009, did you

20   project earnings from the internet?

21   A        Let me just check.  I'm sure I did, but --

22   yes, I did.

23   Q        Okay.

24   A        And I used the same formula throughout.  I

25   didn't up it by any, even though there would be an

1      opportunity as more and more people found the

2      Wrestlereunion product and the branding became

3      stronger that the opportunities would grow.  But as

4      I say, I was just sticking with conservative, lowest

5      numbers.

6      Q      When you say you didn't up it any, can you

7      tell me what you meant by that.

8      A      Well, I didn't do any percentage increases.  I

9      didn't factor in any -- you know, as the company

10     grew, I didn't go, well, the TV grew by this much,

11     I'm going to factor in the internet will grow this

12     much, as well.  You know, I kept my projections

13     based on what I felt were sustainable numbers.

14     Q      Okay.  Do you think that that's a more

15     conservative number than going out and trying to

16     project an earnings rate or a growth rate, I should

17     say, in the revenues?

18     A      I think it's conservative, yes.

19     Q      Okay.

20     A      Advertising rates on the internet haven't come

21     down.  I've bought rates in 2005, I've bought rates

22     in 2007 and the ad rates have went up between 2005

23     and 2007.

24     Q      Let's talk about training facility.  What are

25     you referring to when you talk about a training

1      facility?

2      A      Well, it's -- more than ever nowadays it's

3      important to try and unearth new talent.  And when I

4      was at WCW, WCW had the Power Plant, which was a

5      facility where they trained existing wrestlers and

6      they also took in paying customers in the hopes of

7      unearthing a new -- new talent.

8             I then also spent some time with The Funking

9      Conservatory which was run by Dory Funk, Jr.  And,

10     again, basically it's a wrestling school.  They take

11     in customers, they teach them all the basics of pro

12     wrestling which could take six months, could take a

13     year.  They give them experience because they're

14     working with other wrestlers that may be slightly

15     higher up the -- the food chain, if you like, and

16     they're training them in everything from ring

17     demeanor, personality, how to dress, how to act.

18            And they also -- once a month they film shows,

19     charge a nominal rate for those shows.  They also

20     film them and they build a library, which they

21     either can show on the internet or, in the Funks'

22     case, they were putting out as informercials they

23     could derive advertising revenue.

24     Q      Can you tell me the wrestling organizations

25     that currently have training facilities associated

1       or attached with the companies.

2       A       The WWE have a training -- well, they have a

3       couple of training facilities.  TNA have a training

4       facility.  And then there are several training

5       facilities throughout the US.  The Samoans,

6       there's -- there's -- oh, like there's a big one in

7       California.  Rick Bassman has one.

8               They are -- you know, they're common

9       throughout the US.  And I was checking on their

10      numbers that they all have.  Some of them have 120,

11      150 people.  Some of them charge between 2,500 and

12      3000 for six months.  So I based my -- my figures on

13      what data I could find on the training facilities.

14      Q       What expenses are associated with a training

15      facility?

16      A       Well, the expenses are really the trainers and

17      the -- you know, the facility.  And the way a lot of

18      these training facilities work is they piggyback on

19      to a gym.  So they will have a room at the

20      gymnasium, they'll, you know, come to some

21      arrangement with the gym owner.  A lot of the time

22      it's -- I think you'll get free advertising on the

23      TV show.

24              Sometimes it's just as simple as having a big,

25      empty garage or warehouse.  In the UK, they

1    frequently had them just set up in -- anywhere you

2    could set up a ring and get some seats around it.

3    It's not a high tech operation.

4         The Funks used to do theirs in the gym, then

5    they moved into a shop front, set up their cameras

6    there.  And I think currently they rent, you know,

7    the Ice Palace, you know, once a month and they do a

8    hard, you know, one -- they do a hard one-week

9    course which they're charging the students $800 to

10   $1200 for that week intensive course.

11   Q     So in projecting revenues and projecting

12   expenses for the training center, what sources of

13   data did you rely on?

14   A     I relied on how much was being paid from the

15   Funking Conservatory and also the incomes that I

16   could see were being derived from three or four

17   other wrestling schools around the US.

18   Q     Okay.  When you talk about licensing, what are

19   you referring to for revenue sources for

20   Wrestlereunion in your report?

21   A     Well, the nice thing about Wrestlereunion is

22   it's core business is legends.  And the

23   Wrestlereunion name would be branded by it being on

24   TV, by it, you know, being around the country,

25   pay-per-view.

1          There will be other wrestling schools around

2    the US that -- you know, it's like a franchising

3    operation.  They would benefit greatly by being able

4    to have the Wrestlereunion name on there and to

5    perhaps, every couple of months, have a visit from a

6    trainer, you know, of the caliber of -- I'm not

7    saying Bruno Sammartino, but that's the name that

8    comes off my -- the top of my head.  You would

9    benefit from, you know, having one of the

10   Wrestlereunion talent being sent to your school.

11        This happened I remember up in Ohio.  Les

12   Thatcher had a wrestling school there and he would

13   bring in legends from the WWE like Ricky Steamboat

14   before, you know, and Hugh Morris.  They would come

15   in and they would do special seminars and he would

16   pay an appearance fee to bring those -- those people

17   in.

18   Q     Okay.  But let's stick with -- in your chart

19   on January 1st of 2005 when you refer to licensing,

20   what is the category of licensing?

21   A     Oh, it's to allow -- it's to sell the

22   Wrestlereunion name, license the Wrestlereunion name

23   to other training schools around the US that want to

24   increase the visibility of their school.

25   Q     So licensing has only to do with training or

1   it has to do with the entire Wrestlereunion name?

2   A      No.  This -- on this sheet here, this is just

3   licensing to do with Wrestlereunion training.

4   Q      Okay.

5   A      If we're looking at January 2008 -- I mean, if

6   we're looking at 2008.

7   Q      2008 or 2005?

8   A      Well, I was looking at the training school,

9   not the -- I don't think the training school started

10  in 2005.  Did it?

11  Q      Well, if you -- we're talking apples and

12  oranges now.

13  A      I'm sorry.

14  Q      If you would flip to the spreadsheet that

15  begins January 1st, 2005, because that lists the

16  different categories; correct?

17  A      Yes, it does.

18  Q      All right.  You have licensing; right?

19  A      Yes.  I'm sorry.  I was -- I thought we were

20  still on this training school and the licensing for

21  the training school.  I had turned to that page,

22  sir.

23  Q      That was my fault.  I apologize.

24  A      Okay.

25  Q      What do you mean when you have a revenue

1    category on the front spreadsheet the entire year as

2    a summary that says licensing?  What is licensing?

3    What are you referring to?

4    A      Licensing is all moneys that can be derived

5    from Wrestlereunion that doesn't actually involve

6    Wrestlereunion themselves spending the money to

7    produce the products.

8    Q      Give us the examples.

9    A      T-shirts, wrestling companies license their

10   wrestlers and their logos so that T-shirts can be

11   produced in bulk and sold in Wal-Mart and places

12   like that.  It doesn't just apply to wrestling.

13   It's -- if you go in Wal-Mart, you'll see Marvel

14   T-shirts, you'll see Indiana Jones T-shirts.

15   Basically they pay a license fee to Marvel or the

16   WWE or to whoever and produce the T-shirts based on

17   that.

18         It applies to novelties, you know.  That can

19   be anything like a pen with somebody's name on it,

20   you know, toys, action figures, publishing

21   magazines, fan clubs, you know, even music.  You

22   license the product, which means you never give away

23   the rights to it.  You just derive a -- it's a

24   rental fee, basically.

25   Q      And at some point you actually envisioned

1    Wrestlereunion being able to license the right to

2    put on a convention to somebody else who would put

3    the effort into the convention?

4    A      That's correct.

5    Q      When did you think that Wrestlereunion would

6    have reached a stage where that would have been

7    possible?

8    A      I'm just going to check.  Overseas in 2008 and

9    in the US I believe it's 2009.  Yes, 2009.

10   Q      Are you -- what sources of data did you rely

11   on to project licensing revenue for Wrestlereunion?

12   A      For all the products I referred to licensing

13   deals that I had been involved in and the percentage

14   that I had to pay for the licensing and also nominal

15   figures to acquire the license in the first place.

16   Q      Can you be more specific.  Give us a real

17   world example.

18   A      When I was publishing -- when I was getting

19   T-shirts for Roller Jam --

20          COURT REPORTER:  I'm sorry?

21          THE WITNESS:  Roller Jam.

22   BY MR. RODEMS:

23   Q      J-a-m?

24   A      Yeah.  The rights to buy the -- the rights to

25   do the T-shirts or to publish the magazines or the

1    calendars or whatever we were doing, we would pay

2    them a flat fee of $10,000.  And then we would give

3    up 18 percent of everything sold.

4    Q     Okay.  Well, let's pick calendar year 2007.  I

5    want to go to the first spreadsheet, which is

6    entitled Wrestlereunion pay-per-view.  Are you

7    there?

8    A     Yes, sir.

9    Q     Okay.  The -- you have projected pay-per-view

10   buys in the US for February of 2007 in the amount of

11   40,282; correct?

12   A     That's correct.

13   Q     How did you do that?  How did you come up with

14   that number?

15   A     Basically I worked out the correlation between

16   people watching television via cable and national

17   television, watching wrestling shows, and how many

18   of those viewers were actually buying pay-per-views.

19   I then worked out a median number which had been

20   pretty much taken care of for me by The Wrestling

21   Observer, but I still went through and I took all

22   the data myself and confirmed that it was accurate.

23         I then went back two and three years

24   beforehand and a few years into the future and saw

25   that the median was still good, and that's the

1       number I applied towards the buy rates.

2       Q       What median number are you referring to?

3       A       Do you know what number my report is?  I just

4       don't want to give wrong information.

5       Q       The report we're talking about is Exhibit 87.

6       The original report I believe is 86.

7       A       I believe the number -- I'm just checking.  I

8       believe it was 4.4.

9       Q       What does 4.4 represent?

10      A       It's 4.4 percent of the -- the viewing

11      audience watching wrestling on TV of the

12      Wrestlereunion product.

13      Q       Would what?  4.4 percent would do what?

14      A       4.4 percent of the audience that watches

15      Wrestlereunion on TV, the total audience, 4.4

16      percent of them are likely to buy the pay-per-view.

17      Q       And you based that on historical data?

18      A       I based that on studying the only companies

19      that were producing pay-per-views, WCW, WWE, TNA,

20      taking all their ratings of their mainline

21      television show and comparing that data to the buy

22      rates of the pay-per-views.

23      Q       Okay.  Now, on this particular sheet that

24      we're talking about, the pay-per-view expenses that

25      are listed totals $603,022 for February of '07; is

1        that correct?

2        A       That is correct.

3        Q       Okay.  That represents the amount of money

4        that would be paid after the service providing the

5        pay-per-view broadcasting was paid and after the

6        sales agent that procured the deal was paid;

7        correct?

8        A       No, sir.  The 603,000 is the actual figure

9        that they would take.  The 408 at the bottom is the

10       figure that would be left.

11       Q       Okay.  What expenses have you listed on this

12       sheet associated with putting on a pay-per-view

13       event?

14       A       On this sheet just the expenses, 50 percent to

15       the pay-per-view provider and 10 percent to the

16       agent.

17       Q       Okay.

18       A       The --

19       Q       There are actual costs with putting on the

20       pay-per-view event, the wrestlers, the facility.

21       Where do those show up on your report?

22       A       They show up on the actual --

23       Q       If you'll look at the Wrestlereunion

24       convention sheet, there's an asterisk at the bottom.

25       A       Yes, and I have that.  I'm just finding the

1        actual pages that are --

2        Q       Okay.

3        A       -- relevant.  I have the cost for that on the

4        Wrestlereunion live events spreadsheet.

5        Q       Okay.  So the convention or event that would

6        produce the pay-per-view revenue, where would we

7        find the expenses for that in your report?

8        A       You'll find -- you'll find three lots of

9        expenses attributed to the pay-per-view being

10       produced.

11       Q       Okay.

12       A       One is under the Wrestlereunion television,

13       one is under the Wrestlereunion convention and the

14       other is under Wrestlereunion live events.

15       Q       Okay.  And can you explain why the expenses

16       are split up into those three categories for staging

17       the event.

18       A       Yeah.  I think it's important that you look at

19       Wrestlereunion as the three separate components and

20       if -- and this is my business plan.  If you're going

21       to spin off to do house shows or you're going to do

22       television tapings on their own that aren't for

23       pay-per-view, it's important that you actually

24       understand each of the costs attributed to each of

25       the sections.

1          And so rather than having a pay-per-view that,

2    for example, cost -- you know, was generating

3    $100,000 showing a cost of 181,000, for example, and

4    then TV showing revenue of X amount of dollars but

5    no costs against it and a convention showing X

6    amount of dollars and no costs against that, that

7    doesn't seem realistic to me.  That's not how I've

8    been taught to do accounting.

9          So I used the figures as provided to me by

10   Wrestlereunion for each of the three separate

11   components.  So now they're in a position to take a

12   look and say, well, if I'm just going to do a

13   convention, it's going to generate this amount of

14   income and it's going to cost me this much money.

15   If I'm going to do TV tapings, it's going to cost me

16   this amount of money and I can make this, and the

17   pay-per-view the same.  You need a live event for

18   the pay-per-view but the pay-per-view income is

19   vast.

20   Q     So in other words, with one convention you're

21   going to derive revenue from multiple sources.  So

22   in order to fairly account for the expenses, those

23   expenses have to be divided up into the different

24   components?

25   A     That's correct.

1    Q      Okay.  So, for example, with a fan convention

2    where you're going to get a pay-per-view viewing out

3    of that, there will be a cost with bringing the

4    wrestlers into town, putting them up in hotels and

5    all of these expenses; correct?

6    A      Yes, that's right.

7    Q      Were those factored into your report

8    ultimately, those costs?

9    A      Yes.  All the costs are factored in.

10   Q      Okay.  So are you able to from your report

11   talk about what it would cost just to do a one-time

12   television taping without the fan convention being

13   attached to it?

14   A      Yes, if I go to that page.  I -- a standard

15   television taping would incur costs of $65,900.

16   Q      And what is made up of that $65,900?

17   A      Okay.  I'll have to look at the Wrestlereunion

18   expense sheet.

19   Q      Do you have that handy?

20   A      This is for TV tapings?

21   Q      Yes, sir.

22   A      Wrestlers, announcers, enhancement talent,

23   referees, airfares, wrestlers -- or airfares for the

24   wrestlers, hotel rooms, airfares for staff, hotel

25   rooms for staff, security, insurance, advertising

1    and sundry expenses.

2    Q    Staff doesn't mean employees, it means people

3    who are coming in and providing administrative

4    services on a per event basis?

5    A    No.  I believe that means like Mr. Corrente or

6    Mr.  Russen.

7    Q    Okay.  And as far as projecting the expenses

8    associated with these events, what sources of data

9    did you rely on for that?

10   A    I was provided with expense data from

11   Wrestlereunion, and I've also compared it to

12   expenses that I've incurred, and it's favorable.

13   Q    Okay.  Now, you're aware from looking at the

14   data that Wrestlereunion I involved an extraordinary

15   number of wrestlers, 94 wrestlers; correct?

16   A    That's correct.

17   Q    Okay.  Was the model for Wrestlereunion going

18   forward to have 94 wrestlers at each of the fan

19   conventions?

20   A    No, it wasn't.

21   Q    Why not?

22   A    It just wouldn't have been sustainable and,

23   also, would have been ultimately to the detriment of

24   the new model where you have X amount of wrestlers

25   and you're trying to get them so you can buy -- you

1    know, your customers getting their golden ticket, if

2    you like.

3    Q       What do you mean, new model?  What are you

4    referring to when you say new model?

5    A       Well, as they were revising their business

6    plan downwards to give people the ala carte menu,

7    there only becomes a certain amount of wrestlers

8    that you bring in.  And on their own projections,

9    they're reducing it down from, you know, the 94

10   gradually downwards.

11   Q       What was your understanding of the purpose of

12   having 94 wrestlers at the first Wrestlereunion?

13   A       It was the sizzle, the spark, the bang.

14   Nobody had ever been able to provide that many

15   wrestlers, you know, for this kind of convention and

16   it was a way of instantly establishing the

17   credibility of the Wrestlereunion brand.

18   Q       So going forward in years 2006, 2007, 2008,

19   2009, how many wrestlers was it anticipated would be

20   appearing at various Wrestlereunion events?

21   A       Approximately 50.

22   Q       Okay.  And so by reviewing the number of

23   wrestlers, you'd be able to reduce the immediate

24   talent cost but you'd also be able to reduce other

25   expenses?

1      A      That's correct.

2      Q      Such as?

3      A      Hotels, airfares.

4      Q      Okay.  Now, did you project revenue for

5      Wrestlereunion for scheduling what they refer to as

6      house shows?

7      A      Yes, I do.

8      Q      What -- what does that phrase mean in the

9      wrestling business, house show?

10     A      It means putting on a wrestling show that

11     doesn't have television.

12     Q      Okay.  What would be involved in staging and

13     promoting a house show?

14     A      Well, it's the same.  You need wrestlers,

15     announcers, referees, airfares, hotel, building,

16     security, insurance, advertising and, you know, some

17     sundry expenses.

18     Q      Now, these are things that you did in your

19     career?

20     A      Yes, they are.

21     Q      The -- calculating the expenses that would be

22     associated with a house show?

23     A      That's right.

24     Q      Okay.  In your career have you also projected

25     the revenue that could be derived from a house show?

1     A       Yes, I have.

2     Q       Okay.  So in performing for Wrestlereunion the

3     net lost profit projections on house shows, did your

4     methodology differ from the way you did things prior

5     to Wrestlereunion when you were doing it for the

6     shows that you were involved in promoting?

7     A       No, absolutely not.  In fact, I used the same

8     spreadsheets and calculations that I had used for

9     the XWF.

10    Q       Okay.  Would you explain to us how you

11    calculated the television net lost profits.

12    A       I'm just clearing up some mess here.  I tried

13    to find similar projects to Wrestlereunion that had

14    TV of a similar caliber.  And when I couldn't find

15    those, I then started to look at other wrestling

16    programming that fitted in with the regional

17    marketplace.

18            I decided that given the longevity and my

19    personal knowledge of it, that Memphis would be a

20    good model.  So I looked up the ratings that Memphis

21    Television was producing in 2005 and checked their

22    advertising rates, confirmed how they were actually

23    on television and came up with a viewership for that

24    Memphis area.

25            And I based the programming on the barter

1     system whereby Wrestlereunion would not charge the

2     local stations to air the television show; instead,

3     Wrestlereunion would provide the television show to

4     them for free in return for shared ad revenue where

5     the station would keep 12 minutes of the 60 minutes

6     of advertising to sell and Wrestlereunion could sell

7     the four -- the remaining four minutes, which would

8     be broken down usually as eight thirty-second spots

9     per week.

10    Q      Okay.  So in your study and experience, and

11    you talked with Corey Maclin; correct?

12    A      That is correct.

13    Q      He owns the Memphis show?

14    A      Yes, he does.

15    Q      Okay.  For each hour of his programming, 46

16    minutes are content?

17    A      44 minutes.

18    Q      I'm sorry.  And what are the other 16 minutes?

19    A      They're commercials.

20    Q      Okay.  How does Mr. Maclin work it with his

21    station in Memphis?

22    A      The same way as I just described.  They keep

23    12 minutes and he keeps four.

24    Q      Okay.  Are there other stations where this is

25    done and the wrestling promoter or show owner keeps

1    eight minutes and gives eight minutes to the

2    station?

3    A      Yes.  There's -- I believe Mr. Behrens's

4    company does a joint share on the UHF station that

5    it's on where it's a 50/50 share.  And then, of

6    course, there's the ultimate where the station pays

7    you every week to buy your -- you know, your

8    program.  That's what you ultimately would aim for.

9    Q      Hulk Hogan's Celebrity Wrestling program was

10   on Country Music Television?

11   A      That's correct.

12   Q      Okay.  And did they do the barter system for

13   that one?

14   A      No.  That was bought -- licensed, bought

15   outright.

16   Q      How much was paid per episode for that?

17   A      I've heard figures that range from between

18   600,000 to 800,000 per episode.

19   Q      Jimmy Hart was involved with that show?

20   A      That's correct.

21   Q      Did you get some data from him?

22   A      Yes, sir.

23   Q      What was Mr. Hart's data?

24   A      650,000 per show.

25   Q      Okay.  So did you assume that Wrestlereunion

1    would progress immediately to the point where a

2    station would buy Wrestlereunion outright for a

3    certain fee?

4    A      At no point throughout the whole projection to

5    2009 do I ever take Wrestlereunion to that stage.

6    Q      Your expectation was that Wrestlereunion on

7    local TV stations would always be the barter system?

8    A      On local TV stations and if it also got on the

9    PAX Network, now ION, which is part of my other

10   projection, that it would always be on the barter

11   system.  That's not to say that at somewhere along

12   the line they would not have been picked up by a

13   station.

14        There are numerous examples of companies that

15   were on barter system or were paying for their TV

16   time or even producing -- like TNA eventually went

17   to just produce its show on the internet for free

18   for people to see so that they could get picked up

19   by Spike Television.

20   Q      Well, let me stop you there.  Give us an

21   example of a company that progressed from the barter

22   system to being paid outright for its programming.

23   A      Well, TNA started on the -- well, they started

24   on the pay-per-view system.  When that wasn't

25   working out with them, they went on to Fox Sports

1   Net, and they kept three minutes of their

2   advertising as well as paying a fee for being on

3   there.  And eventually they were picked up by Spike

4   TV, and Spike TV bought their show outright on the

5   proviso that they could generate ratings that were

6   sustainable.

7         And just this, I think, past couple of weeks,

8   they've been signed for another three-year deal.

9   The money hasn't been disclosed.  But, you know,

10  there's speculation about how much they're getting

11  per week.

12  Q     All right.  Now, you're not comparing

13  Wrestlereunion to TNA; are you?

14  A     No, sir.

15  Q     But does the TNA model represent something of

16  a model that Wrestlereunion could have eventually

17  progressed to?

18  A     Wrestlereunion, in my opinion, with the level

19  of talent it had and with the backing of Clear

20  Channel behind it stood a better chance of getting

21  to where TNA is a lot quicker.

22        THE COURT:  All right.  We're getting into

23  some areas, I think, Mr. Rodems, that go beyond just

24  his methodology and revenue projections.  His

25  opinions about success and things, they have to be

1    expressed by way of assumption, not opinions.

2              THE WITNESS:  Oh, sorry.

3              THE COURT:  At least that's my perspective.

4              MR. RODEMS:  Yes, sir.

5    BY MR. RODEMS:

6    Q      In calculating the television revenue, you

7    used the barter system.  But how did you calculate

8    how much actual dollars would be earned for the

9    television program?  In other words, if the four

10   minutes were kept, how did you determine how much

11   money would be derived from those four minutes?

12   A      I had conversations with Mr. Maclin about how

13   much advertising revenue he was generating per 30

14   second spot.  I then tried to confirm that data, but

15   it was all that I had basically apart from other,

16   you know, analogical, you know, data as to how much

17   advertising was.

18              I then managed to get access to SRDS's figures

19   where they --

20   Q      What is SRDS?

21   A      They're a company that specializes in showing

22   you all of the television markets and how much the

23   average advertising will cost you per thousand

24   viewers at each of the different time periods.

25   Q      Across the United States?

1        A        Across the United States, yeah.

2        Q        Market by market?

3        A        Yes.

4        Q        Okay.  Did you factor into your calculations

5        the advertising rates available at various times

6        market by market across the television viewing

7        audiences that you felt Wrestlereunion would be able

8        to be placed in?

9        A        Yes, I did.  And as part of my report, I

10       discovered that the advertising rates could have

11       been achieved with a lower rating, so I adjusted --

12       you know, part of my supplemental report was to

13       adjust those ratings downward which, in turn, meant

14       everything went down at revenue pay-per-view buys,

15       you know.  It reduced Wrestlereunion's income when I

16       did that.

17       Q        When did this data become available to you?

18       A        I don't have an exact date, but it was

19       certainly after I posted my first report.

20       Q        Okay.  And did you factor in, for example, if

21       there is going to be a hour long television

22       wrestling show, there has to be wrestlers, a place

23       to tape it, the audio/video equipment, those types

24       of things?  Does your report reflect those costs in

25       staging a television taping?

1      A       Well, the supplemental report does.  But I'm

2      not clear -- I wasn't clear as to who would have the

3      liability of producing the television show because

4      it clearly states, you know, that Clear Channel were

5      in charge of producing the shows.

6            Now, I know that Mr. Maclin in Memphis and his

7      studio were on standby to help provide extra footage

8      or to use their studio to shoot extra wrestling

9      shows and wouldn't have been charging, you know, per

10     se for that because he would also be getting his,

11     you know, value for his show and some cross

12     promotion.

13           But when I came to do the supplemental report,

14     I did ad in a figure for renting a studio and

15     cameras and the equipment and everything, even

16     though I wasn't clear that that would have been

17     Wrestlereunion's obligation to do so.

18     Q       So point me to your supplemental report where

19     you're talking about the cost associated with the

20     television taping being borne by Wrestlereunion.  If

21     you look at the Wrestlereunion television page for

22     fiscal year January of 2007 --

23     A       Yeah.  Yes, I have that.

24     Q       What does it mean at the bottom where you have

25     TV taping costs, 65,900?

1     A       That's the cost of the talent to do the shows.

2     Q       What costs are associated in that number?

3     What makes up 65,900?

4     A       Wrestlers, announcers, enhancement talent,

5     referees, airfares, wrestlers -- airfares for the

6     wrestlers -- airfares for the wrestlers, hotel

7     rooms, airfares for staff, hotel room, security,

8     insurance, advertising and sundry expense.

9     Q       And in the wrestling industry, how many shows

10    are typically taped on one day?

11    A       It can be four, five shows.

12    Q       Okay.  Each one of those shows designed to be

13    44 minutes in length?

14    A       That's correct.

15    Q       Okay.  And did you factor into the costs of

16    television tapings the video production costs?  In

17    other words, the cameraman, the camera equipment,

18    the sound engineers, whatever it may be.

19    A       Well, I had a -- yes, I have.

20    Q       Okay.  Where is that reflected in your report?

21    A       It's where the -- I'm trying to find out where

22    it actually comes in.  It's under the Wrestlereunion

23    expenses.  The -- if you look only on the page of

24    2007, the 999,853.36?

25    Q       Yes, sir.

 1    A       It's part of that.

 2            MR. HERBERT:  What page are you referring to?

 3            MR. RODEMS:  Cover page for January.

 4            THE WITNESS:  I'm trying to find the breakdown

 5    for that, that number in this file.

 6    BY MR. RODEMS:

 7    Q       Let me ask you this.  What was your

 8    understanding under the contract of who would pay

 9    for the audio/visual production of events?

10    A       My understanding was that Clear Channel would.

11    Q       Okay.  And in exchange for that, what was your

12    understanding of what would happen with the revenue

13    that was derived?

14    A       Clear Channel would take their distribution

15    fees and they would also get 50 percent of the

16    profits.

17    Q       Would -- what would happen with any costs that

18    Clear Channel invested?

19    A       Clear Channel would get those back, as well.

20    Q       Off the top?

21    A       Yes.

22    Q       Okay.  If we look at your spreadsheet that

23    says January 1st of 2007, there's a column that

24    says, CCETV distribution.  We're looking at the

25    cover page that summarizes the totals?

1    A    Yes, sir.

2    Q    Okay.  The -- what is represented in the

3    column of CCETV distribution?

4    A    That is the 25 percent off of the -- from the

5    spreadsheets figure in the categories that Clear

6    Channel were to derive income from.

7    Q    Okay.  Was Clear Channel entitled under the

8    contract to charge a distribution fee for any

9    revenue derived?

10   A    No, sir.

11   Q    Okay.  Then why did you put down 25 percent?

12   A    They were entitled to charge for certain

13   categories.

14   Q    Okay.  All right.  So under the contract

15   between Clear Channel and Wrestlereunion, if revenue

16   was derived by Clear Channel's actions for

17   pay-per-view, was Clear Channel entitled under the

18   contract to a distribution fee?

19   A    It didn't just have to be under Clear

20   Channel's actions.

21   Q    Okay.

22   A    It was under any actions.

23   Q    Okay.  So if Wrestlereunion went out and

24   staged its own TV show and got it into the

25   marketplace, Clear Channel was entitled to a

1    distribution fee under the contract?

2    A    Yes, as I understand it.

3    Q    Okay.  And what was that percentage?

4    A    Twenty-five percent.

5    Q    Okay.  So did you deduct the distribution fee

6    from the gross amount of revenue generated?

7    A    Yes.

8    Q    And why is that?

9    A    Because that's what the terms said.

10   Q    Okay.  So for -- if we look at this chart for

11   pay-per-view, TV, DVD and training facility --

12   A    No, sir, internet.

13   Q    I'm sorry.  My vision is failing me.  You're

14   correct.  Okay.  You are showing a distribution fee

15   for all of those categories of revenue?

16   A    That's correct.

17   Q    Okay.  And then the next column you have Clear

18   Channel Entertainment Television production costs,

19   300,000; correct?

20   A    That's correct.

21   Q    And if we look at 2008, 2009, that number

22   remains the same.  What does that 300,000 number

23   represent?

24   A    It's $75,000 per show that Clear Channel have

25   put in as their cost.

1    Q      The hard production costs?

2    A      The hard production costs.  Yes, sir.

3    Q      And that information was derived from

4    deposition testimony?

5    A      Deposition testimony and I believe

6    spreadsheets.

7    Q      Okay.  Now, if you take the gross revenue and

8    you deduct the distribution fee and the Clear

9    Channel production costs, that is what you're

10   showing under the column called gross profit?

11   A      That's correct.

12   Q      And then what did you do with the gross profit

13   to show how much would be paid to Wrestlereunion?

14   A      Well, in general it was that it would be a 50

15   percent share between the two companies.  But in the

16   case of the TV where Wrestlereunion was to supply

17   the talent and everything on that side of things,

18   everything that was not technical was to be supplied

19   by Wrestlereunion, that would come off of

20   Wrestlereunion's side of it as well as -- you know,

21   that would be deducted from Wrestlereunion.

22   Q      Okay.  And so for the TV production costs

23   you've deducted 793,800.  I guess we're talking

24   about 2007?

25   A      Yes, sir.

1    Q      And attributed that as Wrestlereunion

2    production costs?

3    A      That's correct.

4    Q      What makes up that 790,800-dollar number?

5    A      That was the total costs that were attributed

6    to the TV tapings.  Wrestlereunion had to bore --

7    you know, bear that number themselves.

8    Q      So if we go to the Wrestlereunion television

9    spreadsheet, is there going to be something that

10   corresponds to that number?

11   A      Yes.  There is under expenses TV taping costs

12   right away across 790,800.

13   Q      So 65,900 per month for 12 months?

14   A      That's correct.

15   Q      Okay.  And then in the right-hand column under

16   Wrestlereunion, what is reflected in each of those

17   boxes?  For instance, pay-per-view has 462,022.

18   What does that represent?

19   A      That represents Wrestlereunion's 50 percent

20   share of the profits after everything has been

21   deducted.

22   Q      That would include the distribution fee being

23   deducted?

24   A      Yes.

25   Q      Clear Channel Entertainment Television's

1      production costs being deducted?

2      A      Yes.

3      Q      Any costs associated with generating

4      pay-per-view revenue being deducted such as what is

5      paid to the pay-per-view company and the agent that

6      procures the deal?

7      A      Yes.  Everything has been deducted.  This is

8      the final number for Wrestlereunion.

9      Q      And is that -- is the same format used with

10     each one of these revenue categories?

11     A      Yes, sir.

12     Q      Okay.  Now --

13             THE COURT:  Mr. Rodems, you're going to have

14     to conclude.  It's getting late and we've got a

15     court reporter who's been at it since shortly after

16     8:00 this morning, and it's 5:10.

17             MR. RODEMS:  Yes, sir.  Thank you.

18             THE COURT:  We'll resume at 8:00.  And you're

19     going to have to give some time to defense to cross

20     examine, or you're not going to have an expert

21     testifying.

22             MR. RODEMS:  Yes, sir.

23             THE COURT:  I've asked y'all to zero in on

24     some things.  We're getting into some very

25     generalized explanations that don't help me in

1    deciding the second prong of *Daubert*.  I'll see you

2    at 8:00 in the morning.

3            (Proceedings concluded at 5:11 PM.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                        C E R T I F I C A T E

3

4      STATE OF FLORIDA              )

5      COUNTY OF HILLSBOROUGH        )

6          I, Linda Starr, RPR, Official Court Reporter for

7      the United States District Court, Middle District,

8      Tampa Division,

9          DO HEREBY CERTIFY, that I was authorized to and

10     did, through use of Computer Aided Transcription,

11     report in machine shorthand the proceedings and

12     evidence in the above-styled cause, as stated in the

13     caption hereto, and that the foregoing pages,

14     numbered 1 through 350, inclusive, constitute a true

15     and correct transcription of my machine shorthand

16     report of said proceedings and evidence.

17         IN WITNESS WHEREOF, I have hereunto set my hand in

18     the City of Tampa, County of Hillsborough, State of

19     Florida, this 21st day of March 2010.

20

21

22           _____/s/ Linda Starr_____
             Linda Starr, RPR, Official Court Reporter
23

24

25