1                   UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
2                        TAMPA DIVISION

3      WRESTLEREUNION, LLC,

4          Plaintiff,

5            vs.              CASE NO. 8:07-CV-2093-T-27MAP
                             2 SEPTEMBER 2009
6                            TAMPA, FLORIDA
                             PAGES 1 - 370
7                            VOLUME III

8      LIVE NATION TELEVISION
       HOLDINGS, INC.,
9
           Defendant.
10
       _____/
11
                   TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12          BEFORE THE HONORABLE JAMES D. WHITTEMORE
                   UNITED STATES DISTRICT JUDGE
13
       APPEARANCES:
14
       For the Plaintiff:   **Ryan Christopher Rodems**
15                          Barker, Rodems & Cook, PA
                           Suite 2100
16                          400 N. Ashley Drive
                           Tampa, Florida 33602
17
                           **Chris A. Barker**
18                          Barker, Rodems & Cook, PA
                           Suite 2100
19                          400 N. Ashley Drive
                           Tampa, Florida 33602
20
       Also present:       Sal Corrente
21

22

23

24      Proceedings recorded and transcribed by
       computer-aided stenography.
25

```
 1     For the Defendant:       Gregory W. Herbert
                                Greenberg Traurig, LLP
 2                              450 S. Orange Avenue
                                Suite 650
 3                              Post Office Box 4923
                                Orlando, Florida 32802-4923
 4
                                Dawn Giebler-Millner
 5                              Greenberg Traurig, LLP
                                450 S. Orange Avenue
 6                              Suite 650
                                Post Office Box 4923
 7                              Orlando, Florida 32802-4923

 8                              Richard A. Munisteri
                                Paula Castro
 9                              Matthew Brown

10     Court Reporter:          Linda Starr, RPR
                                Official Court Reporter
11                              801 N. Florida Avenue
                                Suite 13B
12                              Tampa, Florida 33602

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                               I N D E X

2       Witness                                    Page Number

3       **Colin Bowman**

4       Cross Examination by Mr. Herbert.....        6

5       **Robert L. Russen**

6       Cross Examination by Ms. Millner.....       45
        Redirect Examination by Mr. Rodems...      78
7
        **Eric Paulen** (By deposition)..........      100
8       **Steve Sterling** (By deposition).......      137
        **Michael Bochicchio** (By deposition)...      148
9       **Dawn** (By deposition)..........       170

10      **Anthony Attanasio**

11      Direct Examination by Mr. Barker.....      193
        Cross Examination by Ms. Millner.....      197
12      Redirect Examination by Mr. Barker...      215

13      **Sal Corrente**

14      Direct Examination by Mr. Rodems.....      217

15      Colin Bowman

16      Cross Examination (Continued)........      320
        Redirect Examination by Mr. Rodems...      342
17

18

19

20

21

22

23

24

25

```
 1                              EXHIBITS

 2        Defendant's Exhibit Number 91........      56
          Defendant's Exhibit Number 44........      70
 3        Defendant's Exhibit Number 134.......      76
          Plaintiff's Exhibit Number 123.......      85
 4        Plaintiff's Exhibit Number 121.......      87
          Plaintiff's Exhibit Number 92........      90
 5        Plaintiff's Exhibit Numbers 2, 3, 4,
             31, 35, 36, 37, 38, 39, 40, 41,
 6           43, 44, 45, 46, 47, 49, 92, 96,
             100, 104, 106, 109, 110, 111, 112,
 7           120, 121, 122, 123, 124, 126, 127,
             128, 129, 131, 132, 133, 135, 136,
 8           141, 142, 143, 150, 153 and 157...     192
          Plaintiff's Exhibit Number 11........     274
 9        Plaintiff's Exhibit Number 62........     277
          Plaintiff's Exhibit Numbers 50, 53,
10           54, 55, 56, 58, 59, 60, 61, 63,
             64 and 65.........................     279
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1              COURTROOM SECURITY OFFICER:  All rise.  This

 2      Honorable Court is in session, The Honorable James

 3      D. Whittemore presiding.

 4              Please be seated.

 5              THE COURT:  Good morning.  Traffic got me a

 6      little bit this morning.  Ready to go?

 7              MR. RODEMS:  Yes, sir.

 8              THE COURT:  Let's see if we can wrap it up,

 9      Mr. Rodems.

10              MR. RODEMS:  Yes, sir.  I was going to

11      suggest, Your Honor, if there was a specific topic

12      or question or issue you'd like me to go into;

13      otherwise, I'll tender to Mr. Herbert.

14              THE COURT:  Well, it's your burden.  I think

15      I've explained my concerns, but if you're ready to

16      let him cross, that's fine.

17              MR. RODEMS:  Yes, sir.

18              THE COURT:  Mr. Herbert?

19              MR. HERBERT:  Your Honor, is it okay if I stay

20      at my table here?

21              THE COURT:  Sure.  Just make sure you use the

22      mic.

23              MR. HERBERT:  Yes, sir.

24

25

1                          CROSS-EXAMINATION

2      BY MR. HERBERT:

3      Q      Good morning, Mr. Bowman.

4      A      Good morning.

5      Q      I wanted to talk a little bit about how you

6      determined what were and what were not comparable

7      businesses for purposes of using the yardstick

8      methodology that you contend you employed.

9             Now, just so we're clear, the WWE is not an

10     appropriate comparable for the plaintiff in this

11     case; correct?

12     A      No, it is not.

13     Q      Okay.  The WWE is not by any means a start-up

14     organization; fair enough?

15     A      It's not start-up, no.

16     Q      In fact, it's probably the opposite of a

17     start-up; right?

18     A      Yes.

19     Q      Okay.  It's got 30 years of brand equity,

20     goodwill, name recognition, fan base, loyal

21     customers and following; right?

22     A      It is what everyone in the wrestling industry

23     aspires to be.

24     Q      And it's got tens or even hundreds of millions

25     of dollars in financial backing over the years that

1      it's employed; correct?

2      A      Yes.

3      Q      And it's got long term exclusive contracts

4      with its talent; doesn't it?

5      A      Yes, it does.

6      Q      Okay.  And those long term exclusive contracts

7      with the talent are what enable it to license

8      merchandise with the talent's characters or name or

9      likeness on it; right?

10     A      That's correct.

11     Q      And those long term exclusive contracts with

12     the big name talent are very expensive, much more

13     expensive than the personal appearance agreements

14     that the plaintiff signed with its talent in this

15     case; correct?

16     A      Correct.

17     Q      And you would agree with me that TNA also is

18     not an appropriate comparable for the plaintiff in

19     this case; right?

20     A      It's not a comparable, but its model is --

21     exactly shows how a wrestling company can be started

22     from absolutely nothing and get on to TV and start

23     progressing the way of the WWE.

24     Q      And lose tens of millions of dollars over

25     several years?

1    A       But I believe just recently they have struck a

2    deal now that has put them towards profitability.

3    Q       All right.  But you didn't discuss their

4    actual profits and losses in your reports, though;

5    did you?

6    A       No, I did not.

7    Q       And you are --

8            COURT REPORTER:  I'm sorry.  I didn't

9    understand the question.

10           THE COURT:  You need to slow down.  I didn't

11   even understand the question.

12           MR. HERBERT:  I'm sorry.

13           THE COURT:  Repeat the question, please.

14   BY MR. HERBERT:

15   Q       The question was, but you didn't specifically

16   refer to or cite any of TNA's actual profits or

17   losses in its history; correct?

18   A       No, I did not.

19   Q       All right.  And TNA also is not a start-up

20   company; correct?

21   A       It was in 2002.

22   Q       So the answer to my question is, no, it's not

23   a start-up today; correct?

24   A       No, it's not a start-up today.

25   Q       And, in fact, it's also the opposite of a

1      start-up now; isn't it?

2      A       Yes, it is.

3      Q       And, in fact, it has spent tens of millions of

4      dollars in attempting to develop its brand,

5      goodwill, name recognition and a fan base; correct?

6      A       That is what is widely acknowledged.  There is

7      no real data out there.  They did not declare their

8      figures, but that is the industry consensus.

9      Q       And you don't have any reason to doubt that?

10     A       Not -- no, sir.

11     Q       And if you did use TNA as a comparable to WWE,

12     isn't it true that you would have had to project

13     losses for the plaintiff in this case because TNA

14     lost tens of millions of dollars over the first five

15     years of its existence?

16     A       Yes.  If I -- yes, if I used them as a

17     comparable.

18     Q       I wanted to turn to another -- another general

19     assumption that underlies a lot of your reports is

20     that, at least with respect to the television

21     advertising revenue, a lot of the projections that

22     you calculate for television advertising revenue is

23     based on the assumption that the plaintiff -- or

24     that the defendant in this case, Clear Channel,

25     could have and should have put the plaintiff's show

 1    on its 25 television stations that its affiliated

 2    company owns in 25 small markets across the United

 3    States; correct?

 4    A    That's correct.

 5    Q    Okay.  Now, what I wanted to talk about is

 6    some other wrestling related organizations that

 7    possibly could be used as comparables and whether or

 8    not you considered them or cited to them in reports.

 9         Let's start with the XWF which you were

10    involved with.  Now, that also featured a lot of the

11    same talent that plaintiff's organization featured;

12    correct?

13    A    Correct.

14    Q    Actually, dozens of the wrestlers that were in

15    the plaintiff's shows were also in the XWF talent

16    roster; correct?

17    A    That's correct.

18    Q    And one of the themes of the XWF was stars of

19    the past, present and future; correct?

20    A    Correct.

21    Q    And that was one of the same themes for the

22    plaintiff in this case; correct?

23    A    That is correct.

24    Q    And the XWF had strong financial backing, at

25    least in the beginning; correct?

```
1      A      It did.

2      Q      And the XWF, like the plaintiff, attempted to

3      get a TV and a pay-per-view deal; correct?

4      A      Correct.

5      Q      But, now, you did not use the XWF as a

6      comparable in projecting revenues in most of the

7      categories that you projected in your report;

8      correct?

9      A      No, I did not, because the XWF did not have

10     significant backing from a large media conglomerate

11     like a Clear Channel that has radio stations,

12     television stations, live event buildings.  It has

13     everything that you would need to jump into to

14     become a successful wrestling organization.

15            The only wrestling organization that ever came

16     close to touching WWE's success was World

17     Championship Wrestling.  And the reason World

18     Championship Wrestling was successful was because it

19     was owned by the Turner organization which had

20     television and was able to place the show

21     strategically to gain ratings.

22     Q      Okay.  So part of the reason that you did not

23     use the XWF as a comparable in employing the

24     yardstick methodology was, again, based on the

25     assumption that the defendant could have and should
```

1    have put this show on its affiliated company's

2    television stations in 25 small markets in the

3    United States?

4    A        Yes, sir.  It could have offered it to the 25

5    stations, it could have put it on -- test marketed

6    it.  There's numerous ways that they could have

7    brought this product to the market, even if they

8    just wanted to test the market.

9    Q        Okay.  Now, let's talk a little bit about the

10   NWA Legends events.  There was one in August of '04.

11   You're familiar with those; right?

12   A        Well, yes, sir.

13   Q        Now, the NWA Legends events also featured some

14   of the same talent that is on the plaintiff's roster

15   of talent; correct?

16   A        That's correct.

17   Q        And the NWA Legends events also had a fan

18   convention component; correct?

19   A        That's correct.

20   Q        And the NWA Legends events also had live

21   wrestling matches; correct?

22   A        That's right.

23   Q        Okay.  But you did not refer to or cite or

24   research any profit or loss for the NWA Legends

25   events in coming to your projections; correct?

1     A      None of these events were produced with the

2     purposes that Wrestlereunion and Clear Channel had

3     talked about with the shows being filmed,

4     distributed on DVD, trying to get television,

5     pay-per-view.  These were regional fan conventions

6     of a much smaller status.

7     Q      Okay.  So the answer to my question is no, you

8     did not refer to or cite any data from the NWA

9     Legends events in coming to your projections?

10    A      I did not consider them comparable.

11    Q      And how about an entity named Wrestling

12    Reunion that also was a fan convention event that

13    started in 2005 and continued to 2008, the same time

14    period that your projections go out in part;

15    correct?

16    A      Yes, sir.

17    Q      And Wrestling Reunion is also a fan convention

18    that features legends of wrestling; correct?

19    A      It is a fan convention that features legends

20    of wrestling, but it also is being filmed and

21    produced for pay-per-view and television

22    distribution.

23    Q      All right.

24           THE COURT:  Let me make sure the court

25    reporter is following you.  We're talking about a

1    different entity than the plaintiff here, it's

2    Wrestling Reunion as opposed to Wrestlereunion;

3    correct?

4          MR. HERBERT:  Correct.

5          THE COURT:  Mr. Witness?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  I just want to make sure that

8    Linda gets that.  Thank you.

9    BY MR. HERBERT:

10   Q     Okay.  But you did not use Wrestling Reunion

11   as a comparable in coming to your projections;

12   correct?

13   A     That's correct.

14   Q     And how about Memphis Memories?  That is also

15   a legends based wrestling fan convention event;

16   correct?

17   A     I considered Memphis and Memphis house shows,

18   particularly the ones pertaining to the legends

19   purely because of the audiences that they were

20   drawing and the amount of money that they were, you

21   know, charging for attendances.  And also being able

22   to have access to Jimmy Hart who was involved in

23   those shows, I'm able to derive information.

24         That's why I didn't put 8,000 people attending

25   Wrestlereunion shows as appeared at -- you know,

1      Memphis Memories, I can't remember if it was 8,000

2      or 10,000 people there, but I certainly didn't

3      project those kinds of numbers at any point in my

4      projections.

5      Q      And you -- you didn't use any of the financial

6      data from the success or failure of Memphis Memories

7      in coming to your projections; correct?

8      A      No, sir.

9      Q      And how about the Heroes of Wrestling which

10     took place in 1999?  You're familiar with that

11     event; correct?

12     A      Yes, I am.

13     Q      And that was also a wrestling event that

14     featured legends of wrestling; right?

15     A      That was the one off pay-per-view.

16     Q      Okay.  Similar to WWL; right?

17     A      Right.  Yes, sir.

18     Q      All right.  And you didn't use WWL in -- as a

19     comparable in coming to any of your calculations,

20     either; right?

21     A      I used the WWL to help in the computations of

22     the expense portion of the Wrestlereunion project.

23     Q      The WWL lost over $150,000; right?

24     A      That's correct.  But as far as the production

25     costs and everything I had control of, I had access

1   to know how much is reasonable to be charged to

2   produce and put on a show on pay-per-view and have

3   it edited and ready to go to DVD.

4   Q     But you didn't use the pay-per-view buy

5   numbers for WWL in any way in projecting your

6   pay-per-view numbers for the plaintiff; right?

7   A     No.  I did not have access to those.

8   Q     Well, you know that it sold about 5,000 buys

9   total and only ended up generating $9,000 for WWL;

10  don't you?

11  A     That's what I've been informed by you.

12  Q     And you don't have any reason to --

13        COURT REPORTER:  I'm sorry.  Slow down,

14  please.

15  BY MR. HERBERT:

16  Q     I'm sorry.  And you don't have any information

17  that would contradict that?

18  A     No.  Given the -- the lack of marketing, the

19  six week time lag and everything that went on in

20  between, I would -- I'm actually surprised that

21  anybody knew it was there to watch it at all.

22  Q     So the answer to my question is no?

23  A     No.

24  Q     And just going back to the Heroes of Wrestling

25  event that we mentioned, that was a pay-per-view

1      that received 29,000 buys; correct?

2      A      That's correct.

3      Q      And it didn't even break even; correct?

4      A      That's what I've been told.  But you can see I

5      didn't take the 29,000 buys for that, and that's a

6      one off pay-per-view.  I could have just looked at

7      that and said, oh, a one off pay-per-view with no

8      promotion, no media backing, no Clear Channel, no

9      anything, and here is 29,000 buys.

10     Q      Okay.  So then your pay-per-view numbers are

11     also in part based on the assumption that Clear

12     Channel Entertainment Television would be able to

13     rely on its affiliation with the other aspects of

14     the Clear Channel empire, so to speak?

15     A      Not for pay-per-view.  I mean, pay-per-view --

16     clearly in Mr. Sterling's deposition, he has a

17     relationship with InDemand.  InDemand have been the

18     provider for various wrestling pay-per-views, small,

19     huge, you know.  They aren't the WWL one.  They have

20     the experience and, you know, they have deals with

21     people at Ring of Honor where Ring of Honor just

22     sends in a tape and no obligation to produce any

23     buys and the shows get taken.

24             So the show, in my opinion, even the first

25     one -- another way they could have test marketed

1    this would have been to produce it and offer it to

2    the pay-per-view company and see where it lands.

3    Q     So you referred to Ring of Honor.  And you're

4    aware that Ring of Honor is losing money as we

5    speak?

6    A     The data has not been published.  Again, it's

7    an industry speculation.

8    Q     But you don't have any information to

9    contradict that; right?

10   A     I don't.

11   Q     How about Night of the Legends Wrestling Fan

12   Convention in Charleston, South Carolina?  You're

13   familiar with that event?

14   A     I'm not familiar with it.  I probably know of

15   it and if I looked at the card I would be, you know,

16   there's -- I've been in this industry for many,

17   many, many years.  I've attended many shows.  I've

18   watched thousands and thousands and thousands of

19   hours of matches.  I've reported in my years from

20   the UK till coming here on wrestling events all over

21   the place, industry stats and figures.  I can't

22   possibly remember every single one of them in my

23   head.

24   Q     But you were hired in this case to employ the

25   yardstick methodology in projecting the plaintiff's

 1    revenues.

 2    A      Yes, I did.  And I examined many, many

 3    organizations, many events, and I came up with the

 4    ones that I thought were most comparable, given the

 5    Wrestlereunion concept and the Clear Channel --

 6    Clear Channel Entertainment Television backing.

 7    Q      Okay.  Now, the Night of the Legends Wrestling

 8    Fan Convention in Charleston, South Carolina was

 9    also a legends-related fan convention that also

10    included live wrestling matches; correct?

11    A      That's correct.

12    Q      And just so the record is clear, you did not

13    research or refer to any financial information

14    regarding profits or loss in connection with the

15    Night of the Legends Wrestling Fan Convention in

16    your report; correct?

17    A      Sir, in some way you're trying to imply that

18    all these little --

19          THE COURT:  Let's get an answer first before

20    arguing with him.  Just yes or no.

21          THE WITNESS:  Sorry.  No, sir.

22          THE COURT:  You can certainly explain your

23    answer.

24          THE WITNESS:  Okay.  You're trying to -- you

25    can sit there and refer to all these legend shows

1    that have a fan convention element and a wrestling

2    element and make it seem like they're the same as

3    Wrestlereunion without quoting specifics, who's

4    involved, what was involved, you know, where it was

5    held.

6          I've just attended the NWA Legends Fanfest,

7    which is similar to all these events, had about

8    maybe 60 wrestlers on there.  The wrestling

9    component of that involved eight matches with barely

10   three people that I had heard of.

11         So it's not the same thing where you're trying

12   to produce something that's going to sizzle and

13   something that's going to have, you know, people of

14   the caliber of Wrestlereunion on a wrestling show

15   that these people have already been established in

16   the industry for over 30 years.

17         Lots of money, WWE money, WWF money, WCW money

18   has gone into developing these characters, these

19   wrestlers, as you said earlier yourself, so that

20   they could demand huge licensing fees for their

21   likenesses.

22   Q     All right.  Now, but the NWA Legends event in

23   August of 2004 featured Mick Foley; correct?

24   A     Correct.

25   Q     Featured Tony Blanchard; correct?

1      A      Yes.

2      Q      J. J. Dillon?

3      A      Yes.

4      Q      Ivan Kolov?

5      A      It would be easier if I had the list to refer

6      to just so I could --

7      Q      I'm only going to ask about a couple more.

8      A      Okay.

9      Q      Larry Zabisco?

10     A      Yes.

11     Q      And it also featured Sting; right?

12     A      If you're telling me it did, then I would

13     agree with you.

14     Q      All right.  And aside from Sting, all those

15     other names that I mentioned, those were all talent

16     that were featured at Wrestlereunion events, also;

17     correct?

18     A      They were part of the mix.  Yes, sir.

19     Q      Let's talk about the Cauliflower Alley Club

20     Reunion.  That is a fan -- wrestling fan convention

21     that features legends of sorts; correct?

22     A      Not exactly.  The Cauliflower Alley Club is

23     set up to honor old wrestlers, vintage wrestlers and

24     to appreciate people that have given service in the

25     wrestling community.  It's not specifically a fan

1    convention.  It's basically a get-together reunion

2    of wrestlers.  And, you know, fans can attend, but

3    it's to raise money to help the organization and to,

4    you know, help the wrestlers.

5    Q     All right.  But fans who wanted to have an up

6    close, personal experience with the famous

7    wrestlers might buy a ticket to that similar to

8    Wrestlereunion in that respect; right?

9    A     Yes.

10   Q     And in 2001 that event featured Roddy Piper;

11   correct?

12   A     Yes.

13   Q     Mick Foley?

14   A     It's more a banquet than it is a, you know,

15   convention.

16   Q     Okay.  But my question is some of the talent,

17   Roddy Piper, Mick Foley, Harley Race, Nick

18   Bockwinkel, those are all talent that appeared at

19   the Wrestlereunion events, also; correct?

20   A     That's correct.

21   Q     Okay.  And how about the Fan Slam in August

22   2003?  That is also a wrestling fan convention that

23   features legends; correct?

24   A     Correct.

25   Q     All right.  And you did not use any data from

1      the Fan Slam in making your projections for

2      convention numbers in your report; correct?

3      A      Again, it wasn't -- I didn't consider them

4      comparable.

5      Q      So the answer to my question is no?

6      A      No.

7      Q      And I forgot to ask you that question for the

8      Cauliflower Alley Club Reunion.  Since you think

9      they're not comparable, you didn't use any data from

10     that wrestling event in coming to your projections;

11     correct?

12     A      No.

13     Q      Okay.  How about the Mid Atlantic Wrestling

14     Reunion Fan Fest in 2003?  You're familiar with that

15     event?

16     A      Yes.

17     Q      All right.  And that was also a wrestling fan

18     convention or fan fest event that featured legends

19     of wrestling; right?

20     A      Yes.

21     Q      And that featured Jimmy Valiant; right?

22     A      That's correct.

23     Q      And he was in the Wrestlereunion events;

24     correct?

25     A      Yes, he was.

1    Q      And you didn't -- and it also featured Hulk

2    Hogan; right?

3    A      Well, I haven't been able to verify that or

4    not.  I'm -- I'm at a loss.

5    Q      I'll withdraw that question.

6    A      Okay.

7    Q      But you didn't use any data, financial or

8    otherwise, from the Mid Atlantic Wrestling Legends

9    Reunion and Fan Fest in coming to the projections in

10   your report; correct?

11   A      No.  I used general data regarding the prices

12   that I felt were fair for charging for admission and

13   keeping an attendance level that was sustainable for

14   the Wrestlereunion model.

15          I didn't use -- for example, if I had used --

16   I could have used Wrestlereunion's own data for what

17   they did at Wrestlereunion II for the fan convention

18   component where they had the 400 people at $149.

19   That would still have generated more revenue than my

20   projection of a thousand people at 49.95.

21          So I'm not saying that, you know -- what I'm

22   actually saying is I didn't just pull figures out

23   for the reason of pulling figures, and I didn't just

24   take figures that were presented to me.  I

25   researched, and using my own experience, attendance

1      of events and what companies were charging for

2      conventions and what I had seen in my experience

3      with autographs as to how many could be signed and

4      how much enjoyment could be derived by fans, that's

5      how I came to my conclusions on the cost per person

6      to attend the Wrestlereunion fan conventions.

7      Q       Okay.  But just so the record is clear, you

8      didn't use any of these entities I've mentioned in

9      calculating or projecting fan convention attendance

10     in your report; right?

11     A       No.

12     Q       And you did use data from -- or you made a

13     comment about data from the Wrestlereunion II event

14     which lost at least $150,000; right?

15     A       I said I didn't use that.  But if I had have

16     used the income projection from there, or the actual

17     income derived, that would have been a higher

18     projection than I did actually use in my report.

19     Q       It was still a loss on a per customer basis;

20     wasn't it?

21             THE COURT:  It doesn't matter.

22             MR. HERBERT:  Okay.

23             THE COURT:  You're losing focus.  The question

24     is his methodology and whether he has properly

25     applied the yardstick method.  Whether

1    Wrestlereunion II lost money or not is not the

2    issue.

3            MR. HERBERT:  Okay.

4            THE COURT:  You'd better zero in on the

5    decision -- the issues that I have to address.  It's

6    not what he didn't use, it's what he used.  Correct?

7            MR. HERBERT:  Well, I think if --

8            THE COURT:  If he -- what he used wasn't

9    sufficient, his opinions are not reliable.

10           MR. HERBERT:  Okay.

11           THE COURT:  So what he didn't use doesn't

12   matter.

13           MR. HERBERT:  Except if he admits that things

14   that he didn't use are actually more comparable to

15   the things that he did use.

16           THE COURT:  But he's saying they're not

17   comparable.

18           MR. HERBERT:  Okay.

19           THE COURT:  And I can't decide if that's true

20   or not.  That's his opinion and I accept that.  So I

21   think we need to focus on what we did use.

22           MR. HERBERT:  Okay, Your Honor.

23           THE COURT:  And if what he did use doesn't

24   pass the test, then it's not his fault.  It's just

25   what it is.

1       BY MR. HERBERT:

2       Q       Okay.  Okay.  Turning to your projections for

3       fan conventions, one of the bases of your

4       projections was you projected a thousand attendees

5       at fan conventions four times a year generally for

6       the Wrestlereunion fan convention that you

7       projected; correct?

8       A       Correct.

9       Q       But you're not aware of any other fan

10      convention that draws a thousand attendees four

11      times a year; are you?

12      A       The TNA interaction, first one they did back

13      in 2005 with much less talent and very little

14      advertising drew over a thousand people and in

15      subsequent years has drawn over a thousand people.

16      I've attended legends component shows in Tampa put

17      on by Mr. Brody, Howard Brody, NWA promoter, and

18      their attendances were 800 to a thousand people.

19              THE COURT:  What was the name of that show?

20      I'm sorry, I just missed it.

21              THE WITNESS:  It was a legends show.  It

22      didn't have a -- it was just an NWA legends show at

23      the Hesterly Armory that had 800 to a thousand

24      people.  I myself have had wrestlers at my

25      convention booths and have sold over a thousand

1        autographs of each of them a day.

2             The price point of these conventions is much

3        higher than the 49.95.  And for it -- you know, NWA

4        Legends, $155 for a ticket for the two-day,

5        three-day event, over 527 people attending that.

6        The year before, same figures.  So at 49.95 with the

7        level of talent that Wrestlereunion were offering,

8        and the up close, personal, I have no problem and

9        have lots of data to suggest that 1000 people is

10       doable.

11       BY MR. HERBERT:

12       Q     Okay.  So you relied on the TNA conventions to

13       some extent in coming to those figures?

14       A     Based on their level of talent and where they

15       were at the beginning of their, you know, company.

16       Q     And you also relied on the NWA Legends events

17       that I had asked you about when I first started

18       questioning; right?

19       A     For looking at attendances and events that I

20       had attended previously, yes.

21       Q     All right.  But you didn't use any financial

22       data from the NWA Legends events?

23       A     Well, no.  Because if I had used their price

24       point of $155, I would have projected three times

25       the amount of revenue.  I've tried to be

1    conservative in everything I've done here with the

2    figures.

3    Q      You don't know what the revenue is because you

4    didn't research it or write it in your report;

5    right?

6    A      I know how much these fan conventions are

7    charging.

8    Q      But you don't know whether they made a profit

9    or a loss; right?

10   A      Well, I know how many people have attended and

11   I know how much the -- I mean, how much they are

12   expending on talent doesn't seem to come into this

13   equation because I already know how much

14   Wrestlereunion are expending on talent.  The

15   figures are there.  I know how they've adjusted

16   their figures.  They've given me numbers showing how

17   much they were prepared to pay the talent, how they

18   were going to reduce the talent levels over the

19   coming events, so I know what Wrestlereunion's costs

20   are.

21   Q      Okay.  So the answer to my question is, no,

22   you don't know whether the NWA Legends events were

23   profitable or not?

24   A      No.  I know the one I just attended was very

25   profitable, but that's after my report but --

```
 1   Q      And the TNA connection you talked about, those

 2   were not held four times a year; were they?

 3   A      They're held once a year and they're, again,

 4   to help promote a pay-per-view.

 5   Q      So you're not aware of any legends wrestling

 6   fan convention that is held four times a year, but

 7   you base your data on conventions that were held

 8   once a year, which is the norm for fan convention

 9   events for an organization; fair enough?

10   A      Yes.  But these are not normal fan

11   conventions.  Wrestlereunion is a whole concept

12   based around the two components.

13   Q      And you also in your direct testimony with

14   Mr. Rodems indicated that in part for the attendance

15   figures for the fan conventions, you relied on a WWE

16   Legends event that involved Jimmy Hart and Hillbilly

17   Jim; correct?

18   A      No.  I was just showing how popular legends

19   are all over the country, and that if you have a

20   couple of legends, you know, that 10,000, 12,000,

21   15,000 people will come out to meet them.

22   Q      In your direct testimony when Mr. Rodems was

23   asking you about what the basis for your attendance

24   figures were, you responded by saying that a WWE

25   Legends convention held in Ohio with Mr. Hart and
```

1    Hillbilly Jim, and you used those data to help

2    support your answer.  Isn't that true?

3    A     Yes.  But I didn't say that I referred to

4    that.  I mean, if I had referred to that directly,

5    then wouldn't I have said 10,000 attendees?  I was

6    looking at that as the popularity of legends

7    wrestlers.

8    Q     And in projecting your profit or loss for

9    convention events, you also said that the fact that

10   CCETV was affiliated with the other aspects of Clear

11   Channel would help reduce its advertising and

12   promotional costs; right?

13   A     That's correct.

14   Q     Okay.  So your fan convention projections are

15   also, in part, based on the relationship between

16   CCETV and the entire Clear Channel empire; correct?

17   A     They are in part, but the figures do not

18   reflect that.  The advertising rates supplied to me

19   by Wrestlereunion are at the full market rate they

20   expect to pay.  They are not discounted.  If they

21   were getting a discounted rate, then the profits

22   would be higher.

23   Q     Well, why did you say that in your answer when

24   you were asked about the costs that go into --

25         THE COURT:  Mr. Herbert, let's not argue with

 1       the witness, please.

 2            MR. HERBERT:  I'm sorry.  I'll move on.

 3       BY MR. HERBERT:

 4       Q     All right.  Let's look at DVD sales.  In your

 5       projections of DVD sales, you say you looked at the

 6       organization Ring of Honor; correct?

 7       A     Yes, sir.

 8       Q     All right.  You know that Ring of Honor has

 9       never sold more than 10,000 DVDs of any title;

10       correct?

11       A     That's correct.

12       Q     But your projections for Wrestlereunion far

13       exceed those numbers; right?

14       A     Yes, sir.

15       Q     And you also looked at some WWE titles such as

16       the Greatest Stars of the Eighties and the Greatest

17       Managers; correct?

18       A     Yes.

19       Q     And that was part of the basis of your

20       projections for the DVD sales in this case; fair

21       enough?

22       A     I didn't apply those numbers, if that's what

23       you're saying.

24       Q     But you used them as part of the basis for

25       your projections?

1      A      I've used them to ascertain whether or not

2      DVDs in the marketplace currently featuring the

3      legends are selling as well as DVDs not featuring

4      the legends.  And basically the only titles that

5      have sold over a hundred thousand units for the WWE

6      are titles with defunct organizations like ECW or

7      legends.  Currently Starcade and the Best of

8      Saturday Nights Main Event, featuring all these

9      stars have crossed the hundred thousand thresholds;

10     whereas, other titles, you know, in the top -- I've

11     got the data somewhere.  But even on Amazon at the

12     moment when you go to WWE titles and wrestling

13     titles, the top selling ones are the stars that

14     aren't wrestling currently for the WWE.  So there is

15     a market interest in these names.

16     Q      Okay.  And you also used the XWF as a basis

17     for your DVD sales; correct?

18     A      That's correct.  Which had no television, had

19     been out of business for over a year, maybe two

20     years, alls it had was the internet and word of

21     mouth.  It didn't have an ongoing TV show, it didn't

22     have any pay-per-view, it didn't have any media

23     presence whatsoever.

24     Q      And the company that financed and backed XWF

25     is bankrupt; correct?

1        A      I -- I've no idea.  I mean, Reliant is still

2    in business.  Their owner, Kevin Harrington, is on

3    the Dragon's Den show on TV.

4        Q      I'm sorry.  I was speaking of the WWL that you

5    were involved with.  That organization went

6    bankrupt; right?

7        A      He went to federal prison.

8        Q      And -- but the financiers of XWF pulled out

9    and that organization lost hundreds of thousands of

10   dollars, as far as you know; right?

11       A      It's possible.  I really don't know.  I don't

12   know the ends and outs.  I don't know what they sold

13   the rights for at the end.  I don't know what the

14   final figures were.

15       Q      But you know that the XWF only lasted for

16   about six months; correct?

17       A      I think it was nine.

18       Q      And you don't know how many DVDs XWF sold?

19       A      I've -- there's a -- currently a potential

20   lawsuit as to fraud, but I've been told by

21   principles that they know at least 22,000 to 24,000

22   were sold.

23       Q      Well, you projected far in excess of that for

24   DVD sales for Wrestlereunion; right?

25       A      Well, that's correct.  But Wrestlereunion

1    would have an ongoing business, would still be in

2    business.  And as I said, the lifetime of a DVD,

3    even projected by Clear Channel, is at least five

4    years.  The WWE are still selling titles here and

5    across the world that they produced back in 1989,

6    1990.

7    Q     But you know that the XWF did not make a

8    profit on its DVD sales; fair enough?

9    A     I don't know how we can ascertain that because

10   the XWF DVDs were put out by a different

11   organization than the XWF.

12   Q     In other words, piracy occurred that --

13   A     No.  No.  The XWF sold the rights or whatever

14   was left to a Dr. Singh, I believe.  And Dr. Singh

15   then took that footage, had it recut and through

16   Rick Durand, who I think was someone that turns up

17   in various testimonies for this case, he got into

18   Wal-Marts and various places.

19         And so whether it lost money or didn't lose

20   money, I have no idea.  Dr. Singh is a private

21   individual.  But we can't just say, oh, the XWF lost

22   money on its DVDs based on what the performance of

23   the XWF was because the two were done at separate

24   times.

25   Q     But as far as you know, the XWF was not a

1    profitable organization and it has failed and it is

2    now defunct, for all intents and purposes?

3    A      Yes, sir.  For numerous reasons which I think

4    I've answered many times.

5    Q      Okay.  I'm sorry.  Are you finished?  I didn't

6    mean to interrupt you.

7    A      Okay.

8    Q      Okay.  The XWF ended up -- after they lost

9    their financial backing, they ended up selling the

10   rights to the footage that they had in order to

11   obtain some revenues; correct?

12   A      I guess.  It just came down to the fact that

13   it was footage sitting doing nothing and just lying

14   there and they weren't actively trying to sell it.

15   I think just somebody came along and they, you know,

16   made an offer and it came out in DVD.

17   Q      But because the company was defunct and they

18   had no other revenue opportunities, they decided to

19   take their footage and try to make some money off of

20   that, at least, and they sold it to Mr. Singh?

21   A      Yes.  Whoever -- yes.  Whoever at that time

22   was left.

23   Q      And you're aware that in this case the

24   plaintiff has never attempted to get back the rights

25   to its footage?

```
 1     A      I --

 2            MR. RODEMS:  Objection, Your Honor, relevance.

 3            THE COURT:  I tend to agree, although I'm not

 4     particularly concerned with evidentiary matters at

 5     this point.  I just hope that counsel will focus in

 6     on the issues that are important to my decision.

 7            MR. HERBERT:  Okay.

 8     BY MR. HERBERT:

 9     Q      Let's move on.  Also in your DVD predictions

10     in your answers to Mr. Rodems' questions mentioned

11     the WWE library that it has and the DVD sales for

12     the WWE library in your testimony; correct?

13     A      Yes.

14     Q      All right.  And in relying on Clear Channel's

15     projections of DVD sales, you did not take into

16     consideration the inhouse production fee; did you?

17     A      It was -- I took into account their whole --

18     their cash flow -- not cash flow projection, but

19     they had a projection for all costs.

20     Q      What is the industry average for an inhouse

21     production fee for a television production company?

22     A      It varies.  I mean, I'd have to go look at

23     data.  But, you know, I took Clear Channel's whereby

24     they were going to be left with 40 percent, I

25     believe.  So 60 percent would be the costs for the
```

1      in production of the DVD.

2      Q      What's the industry average for an inhouse

3      production fee as opposed to outsourcing the

4      production?

5      A      I have no idea.  It doesn't seem relevant

6      because Clear Channel were going to be doing it.

7      Q      Well, they --

8      A      Produce the figures for us.

9      Q      But Clear Channel's projections incorporated

10     an in-house production fee; right?  And they could

11     have -- all of those expenses would have been

12     different if they had outsourced the production

13     component.

14     A      I imagine -- when I've outsourced production

15     components of any other things I've done, like CDs,

16     audio CDs or anything like that in my current jobs,

17     I've outsourced it because the costs are so much

18     cheaper.

19     Q      But you're not aware what the industry average

20     is for this type of business?

21     A      No.  Particularly not from 2005.

22     Q      Let's move on to your pay-per-view

23     projections.  Now, in your pay-per-view projections,

24     the -- the key component of your pay-per-view

25     projections is based on the number that is the

1      percentage of the television viewing audience that

2      you project would buy pay-per-views?

3      A      That's correct.

4      Q      All right.  And in your first report, you used

5      the number of 5.9 percent?

6      A      Not for the pay-per-view.  4.4 percent of the

7      audience.  The 5.9 component was the percentage of

8      watching Memphis television.

9      Q      I understand.  Okay.  I had that, but -- now,

10     the 4.4 percent number comes from generally the data

11     that's available relating to WWE and TNA; right?

12     A      That's correct.  They were the only two

13     companies producing regular pay-per-views in much

14     the same manner as Wrestlereunion would have done.

15         The wrestling industry isn't like any other

16     industry.  There isn't 10 million -- you know, it's

17     not like hamburgers where I can to McDonald's,

18     Wendy's, Dairy Queen.  It's not like vacation homes

19     which I have to do reports on every week.  In

20     Central Florida there's not 200 vacation home

21     management companies that I can go and look at and

22     take all the data.

23         All that's out there is WWE and TNA doing a

24     pay-per-view.  WWE are doing their pay-per-views

25     with their stars, TNA are doing theirs with their --

1    you know, trying to build the talent.  And

2    somewhere in the middle there's a whole bunch of

3    guys that have valuable name recognition that

4    Wrestlereunion were using that would have filled a

5    void there.

6    Q     But you used the numbers for WWE and TNA

7    without modifying that 4.4 percent number; correct?

8    A     I took -- the WWE's figure was 4.5 percent,

9    TNA's figure was 4.3 percent.  I took a median

10   figure.  Now, I didn't suggest for any minute that

11   WWE -- that Wrestlereunion on TV would generate the

12   same amount of millions of people.

13         I didn't say six million people are going to

14   be watching WWE -- watching Wrestlereunion the same

15   as they are.  I took a relative percentage of the

16   viewership that watches wrestling on TV and buys

17   pay-per-views.

18   Q     But we'll get to your TV viewing numbers in a

19   minute.  But just so the record is clear, the 4.4

20   percent number forms the core basis of all of your

21   pay-per-view projections; fair enough?

22   A     Yes, sir.

23   Q     And that 4.4 percent number comes from two

24   companies that you've already admitted are in no way

25   comparable to the plaintiff in this case; fair

Bowman — Cross

1      enough?

2      A      But they are doing the same business as the --

3      as the -- as the plaintiff.  The -- you know,

4      that's -- that's the whole point.  There isn't a

5      bunch of companies out there doing wrestling on

6      pay-per-views.  That's why I can't do a direct

7      yardstick comparison.  I have to use what is out

8      there in the industry.  And those are the two that

9      are out there in the industry where there is

10     published data.

11     Q      So then they are comparable to some extent is

12     what you're saying?

13     A      Well, they're wrestling companies.

14     Q      And how about -- you mentioned Florida

15     Championship Wrestling in talking about your

16     pay-per-view projections.  But you did not use the

17     pay-per-view numbers from Florida Championship

18     Wrestling in coming to your -- either the 4.4

19     percent number or the ultimate projection number for

20     pay-per-views; right?

21     A      No, because there wasn't a TV component and

22     enough published data.  I also didn't use the 30,000

23     figure for pay-per-views that Todd Okerlund was

24     getting for -- O-k-e-r-l-u-n-d -- was using for his

25     shows running -- using old footage from various

1    companies.

2    Q       And you also testified that in coming to your

3    pay-per-view numbers, you looked at the early TNA

4    pay-per-view numbers; correct?

5    A       That's correct.

6    Q       Now, you're aware that Wrestlereunion does not

7    have access to tens of millions of dollars in

8    financing; correct?

9    A       I'm not aware.  I've never seen the financial

10   statements of the principals involved.

11   Q       But you're aware that the only financing that

12   Wrestlereunion ever obtained was from Sal Corrente's

13   personal finances and Mr. Attanasio's personal

14   finances?

15   A       Yes, I am.

16   Q       And you're not aware of the plaintiff ever

17   obtaining or even seeking financing from any

18   financial institution?

19   A       I'm not aware of any.

20   Q       And you're aware that Mr. Attanasio withdrew

21   his financial backing after Wrestlereunion II;

22   correct?

23   A       I take that that that's been discovered in

24   depositions.  I thought Mr. Attanasio was still

25   involved at Wrestlereunion III.

1     Q       And in your -- in your response to Mr. Rodems'

2     questions on your pay-per-view numbers, you also

3     made a reference to WrestleMania's pay-per-view

4     numbers as an illustration or partial consideration.

5     Do you remember that testimony?

6     A       Yes, I do.

7     Q       All right.  And WrestleMania is a WWE product;

8     right?

9     A       Yes, it is.

10    Q       And, again, Wrestle Mania pay-per-views are in

11    no way comparable to the plaintiff's pay-per-views;

12    fair enough?

13    A       As far as the viewership that they derive

14    based on their viewership that they draw from, no.

15    But the percentages still stand up.

16    Q       Let's go to the -- your television advertising

17    numbers.

18           THE COURT:  When you say the percentages still

19    stand up, what are you saying exactly?

20           THE WITNESS:  Well, what I'm saying, sir, is

21    if I take a period of time on the WWE's main show,

22    Monday Night Raw, and I factor in those ratings and

23    I convert the ratings to the viewership numbers,

24    when I then take the buy rate that bought the

25    pay-per-view and I calculate them, the percentage

1        that I've projected of how many people are watching

2        the television show a week and then buying the

3        pay-per-view in the month, those percentages are

4        consistent.

5               THE COURT:  With that 4.4 figure you

6        concluded?

7               THE WITNESS:  That's right, sir.

8               THE COURT:  All right.  We're going to stop,

9        take a five-minute break, and then we'll bring the

10       jury in.  We'll resume this at some later time.

11              (Recess was taken at 8:57 until 9:06 AM.)

12              (Back on the record.)

13              COURTROOM SECURITY OFFICER:  All rise.  This

14       Honorable Court is again in session.

15              Please be seated.

16              THE COURT:  Bring the jury in, please.

17              COURTROOM SECURITY OFFICER:  Please rise for

18       the jury.

19              (Jury in at 9:07 AM.)

20              COURTROOM SECURITY OFFICER:  Please be seated.

21              THE COURT:  Good morning.  We are ready to

22       resume cross-examination.

23              MS. MILLNER:  Thank you, Your Honor.

24

25

1                            CROSS-EXAMINATION

2       BY MS. MILLNER

3       Q       Good morning, Mr. Russen.

4       A       Good morning.

5       Q       Yesterday we were discussing the attendance at

6       Wrestlereunion III, and I showed you a video and you

7       pointed out that apparently that video was taken

8       during the pre show since Mr. Hart was in the ring

9       essentially warming up the crowd.  Do you recall

10      that?

11      A       Yes, I do.

12      Q       I'd like to show some video from the wrestling

13      match of Wrestlereunion III to get a sense as to the

14      amount of folks in the audience at that time.

15              MS. MILLNER:  Mr. Brown.

16      BY MS. MILLNER:

17      Q       Do you agree that this is Wrestlereunion III?

18      A       Yes.

19      Q       And that's a famous wrestler, Mr. Funk;

20      correct?

21      A       Terry Funk.

22      Q       And is he a hall of fame legend?

23      A       Yes, he is.

24              THE COURT:  Counsel, hang on a second.

25              MS. MILLNER:  That would be great.

1          THE COURT:  If it goes dark in here, we'll get

2     it back.

3          (DVD playing.)

4     BY MS. MILLNER:

5     Q     Do you see the -- those are bleachers in the

6     back of Mr. Funk there?

7     A     I see nothing but darkness behind Mr. Funk.

8     Q     Okay.  Let's keep looking.  I think it will

9     become obvious.  You don't see the bleachers that

10    are back there empty, sir?

11    A     As I said yesterday, I couldn't tell if they

12    were bleachers or the actual bullpen gates from the

13    rodeo.

14    Q     Let's keep looking.

15    A     Looks like a lot of people there.  That's the

16    production table.

17    Q     Right.  And you don't see the back?  There's

18    bleachers in the back there?  It's hard to see that.

19    It's a little dark.

20          Do you recall -- do you recall the Clear

21    Channel folks having to bring audience members from

22    the empty bleachers down to ringside so it looked

23    like there were actual -- actually more people at

24    the event than there truly was?

25    A     I'm glad you pointed that out.  That's part of

1      the normal production of any facility, whether it's

2      the WWE or HBO or boxing or wrestling or MMA,

3      anything with a ring.  Camera, unlike the human eye,

4      does not have peripheral vision.  It can only see

5      straight ahead.

6           Once the cameras are in place, the producers

7      usually then go and relocate the audience into that

8      area to make it appear full, whether it's the WWE,

9      HBO, Don King or whoever.  It's common practice and

10     it's done prior to the start of the show.

11     Q      And with Wrestlereunion III, they had to take

12     people from the bleachers, the empty bleachers and

13     bring them down ringside so it looked like there

14     were more people at the event than there actually

15     were; correct?

16     A      I didn't see them do that.  I didn't hear them

17     do that.  They did not discuss that with me.  I did

18     the calculation yesterday on the ticket prices and

19     the gross revenue to determine the number of people

20     who were there.

21     Q      All right.  So you don't know one way or the

22     other; fair enough?

23     A      Fair enough.

24     Q      Now, you talked yesterday about A&E and A&E's

25     interest in doing a wrestling program featuring the

```
 1      top 10 legend -- legendary wrestlers of all time.

 2      Do you recall that?

 3      A      Yes.

 4      Q      Okay.  And that was something that was

 5      discussed with you during your first contact with

 6      the Clear Channel folks; correct?

 7      A      Mr. Eric Poulen, yes.

 8             COURT REPORTER:  I'm sorry, Eric who?

 9             THE WITNESS:  Poulen, P-o-u-l-e-n.

10      BY MS. MILLNER:

11      Q      So there was no effort to hide A&E's possible

12      involvement in this project by Clear Channel;

13      correct?

14      A      Not at that point.

15      Q      All right.  And you knew -- you knew that some

16      of the shoot interviews, for example, that were

17      taken at Wrestlereunion I and II were possibly going

18      to be featured on this A&E event; correct?

19      A      Correct.

20      Q      All right.  And, in fact, Mr. Sterling was

21      hopeful that he could market the Wrestlereunion

22      footage in conjunction with the A&E episode;

23      correct?

24      A      I have no idea what his hopes were.

25      Q      Okay.  Now, the Wrestlereunion concept, you
```

1    would agree with me, was a new concept in the

2    wrestling world; correct?

3    A      In what regard?

4    Q      In the regard that it had never been done

5    before.

6    A      We heard.

7    Q      My -- my understanding was that it was

8    Mr. Corrente's hope to create the biggest and best

9    wrestling fan convention ever created; correct?

10   A      In that respect, yes, it was unique.  However,

11   there have been many other similar legends shows.

12   Q      Sure.  But not on the scale of the

13   Wrestlereunion?

14   A      Correct.

15   Q      All right.  And you would agree with me that

16   Wrestlereunion at that point did not have a

17   developed brand name; correct?

18   A      Correct.

19   Q      And you would also agree that no one can

20   accurately predict how a new idea in the

21   entertainment world will be accepted by the

22   marketplace; isn't that right?

23   A      To predict it with accurate certainty, there's

24   no such thing as certainty.  But based on other

25   experiences, other comparable products, other

1        similar experiences, yes.  That's how insurance

2        companies make their money, based on averages.

3        Q     Well, there's no way to reasonably predict how

4        a new -- a brand new idea in the entertainment field

5        will be accepted by the marketplace?

6        A     Well, I think reasonably is what we did.

7        Certainty is not what we did.

8        Q     Well, actually that's not what you did because

9        in reality you predicted that there would be a --

10       far more interest in the marketplace in the folks

11       attending the live shows that Wrestlereunion put on;

12       isn't that right?

13       A     We anticipated a thousand.

14       Q     So you did not reasonably anticipate how this

15       new brand would be accepted in the marketplace;

16       correct?

17       A     As a startup company, no one starts out at

18       max, so you build.  And we built by having the grand

19       launch that we did.

20       Q     Well, you didn't even start out at 50 percent

21       of capacity; correct?

22       A     Correct.  We made adjustments accordingly.

23       Q     So, again, you were unable to accurately or

24       reasonably predict how the marketplace would accept

25       this Wrestlereunion concept; fair enough?

 1    A       We predicted it.  It didn't happen the way we

 2    predicted it.

 3    Q       Now, you're aware that Wrestlereunion

 4    initially contracted with a company called Highspots

 5    to film the Wrestlereunion events; correct?

 6    A       Correct.

 7    Q       All right.  And Highspots is a small internet

 8    vendor of wrestling memorabilia and videos; correct?

 9    A       I'm not sure what your definition of small is.

10    They're prominent in the industry.

11    Q       Okay.  And Highspots was not willing or not

12    able to film the Wrestlereunion events in high

13    definition; correct?

14    A       At that time no one was doing wrestling in

15    high definition.

16    Q       Well, Clear Channel did film these events in

17    high definition; correct?

18    A       First time it was done.  Correct.

19    Q       And you would agree with me that high

20    definition is at that time and at this time the --

21    A       State of the art.

22    Q       State of the art.  Thank you.  Now, there was

23    no signed agreement between Wrestlereunion and

24    Highspots; was there, sir?

25    A       No.

1    Q      No firm plans in place with Highspots as to

2    how and what they would shoot of these

3    Wrestlereunion events; correct?

4    A      They were going to shoot everything.

5    Q      Per what?

6    A      Per Mr. Bochicchio's understanding of what

7    would be marketable.

8    Q      Okay.  Are you testifying that Highspots had

9    agreed to film all the Wrestlereunion events at that

10   point?

11   A      At Wrestlereunion I.  We're talking about the

12   first one.  They were going to shoot the matches,

13   the shoot interviews and the question and answer

14   sessions.

15   Q      Okay.  But there was no agreement in place

16   that they would film all the Wrestlereunion live

17   events; isn't that right?

18   A      Correct.

19   Q      All right.  And you had no -- or you,

20   Wrestlereunion had no other -- or had not spoken to

21   any other potential companies about filming the

22   Wrestlereunion events other than Highspots; correct?

23   A      Correct.

24   Q      All right.  For example, no one from

25   Wrestlereunion approached Comcast about doing the

1    audio-visual production of the Wrestlereunion

2    events; correct?

3    A      There was no need.  We had a production

4    company.

5    Q      All right.  And I believe you mentioned

6    yesterday about Sunshine Network.  No one had

7    approached Sunshine Network about doing the

8    audio-visual production of Wrestlereunion; correct?

9    A      Again, there was no need.

10   Q      Okay.  And the same question for Direct TV.

11   No one had entered into any discussions with anyone

12   from Direct TV about doing the audio-visual

13   production of Wrestlereunion?

14   A      Not for the production, no.

15   Q      All right.  Now, you mentioned on direct, I

16   believe I heard you say, that -- that Wrestlereunion

17   had entered into some sort of discussions with

18   InDemand.  Did I hear you correctly?

19   A      Yes, you did.

20   Q      First of all, you would agree with me that

21   there was no commitment from InDemand to -- made to

22   Wrestlereunion; correct?

23   A      The verbal agreement was if the video quality

24   was sufficient, they would use the program on a

25   regular basis.

1      Q      There was no signed contract with InDemand,

2      sir.

3      A      No.

4      Q      They didn't even send you an expression of

5      interest like you received from Clear Channel;

6      correct?

7      A      Correct.

8      Q      All right.  And you are aware, are you not,

9      that Mr. Sterling approached InDemand the day after

10     the first Wrestlereunion event; correct?

11     A      I don't know that.

12     Q      Okay.  You didn't know that?

13     A      No.

14     Q      All right.  So you're not aware that InDemand

15     was not interested in -- in airing the

16     Wrestlereunion product?

17            MR. RODEMS:  Objection, Your Honor.

18     Argumentative based on the testimony that he --

19            THE COURT:  Overruled.

20            THE WITNESS:  I don't know who Mr. Sterling

21     spoke to.  I had a direct contact resource through

22     Mike Graham who had an ongoing relationship with

23     InDemand, so I didn't go through any gatekeepers or

24     any people who were not interested in the product.

25     And I was given a very strong interest that they

Russell — Cross

1   were interested in the product.

2   BY MS. MILLNER:

3   Q       Sir, is it your testimony that you were

4   unaware that Mr. Sterling had made contact with

5   InDemand?

6   A       I heard that he did.  I've seen some

7   paperwork, but at that time I certainly did not

8   know.

9   Q       Okay.  When did you hear that he did?

10  A       Probably during the chance to review these

11  documents.

12  Q       During the litigation?

13  A       Yes.

14  Q       Well, in fact, Mr. Sterling had let you know

15  that he had made contact with InDemand prior -- or

16  rather during the Wrestlereunion period; isn't that

17  right?

18  A       He may have.

19  Q       Okay.

20  A       To make contact -- if I wanted to contact

21  Mr. Sterling at Clear Channel prior to us developing

22  a relationship, I would have never gotten past his

23  secretary.  So I don't know who he contacted, what

24  influence or reputation he may have had with them,

25  what sort of reception they would give someone

Russell - Cross                                                            56

1      giving a cold call.

2      Q      All right.  Sir, can I ask you to --

3             MS. MILLNER:  Your Honor, may I approach the

4      witness?

5             THE COURT:  Yes, ma'am.

6             MS. MILLNER:  Thank you.

7             THE WITNESS:  What do you want me to look at?

8      BY MS. MILLNER:

9      Q      Sir, I've handed you what's been marked as

10     Defendant's Exhibit 91.  Do you recognize that?

11     A      Yes.

12     Q      All right.  You agree with me that this is an

13     e-mail that Mr. Sterling sent to you on August 23rd,

14     2005?

15     A      Yes.

16            MS. MILLNER:  Move to admit, Your Honor.

17            THE COURT:  Any objection?

18            MR. RODEMS:  No objection, Your Honor.

19            THE COURT:  91 is received.

20            (Whereupon, Defendant's Exhibit Number 91 is

21     received into evidence.)

22     BY MS. MILLNER:

23     Q      All right.  And this is Mr. Sterling updating

24     the folks at Wrestlereunion about his marketing

25     efforts; correct?

```
1    A       Well, I'd like to point out to you --

2    Q       Well, just answer my question and we'll get to

3    your --

4    A       Yes.

5    Q       And do you see under the first heading, it

6    says TV?

7    A       Yes.

8    Q       All right.

9            MS. MILLNER:  If we can go to that first

10   paragraph, Mr. Brown.

11   BY MS. MILLNER:

12   Q       All right.  Do you see where he's telling you

13   that he had presented the Wrestlereunion series to

14   several TV outlets and one we expect to hear back

15   from in the next two weeks is InDemand?

16   A       I see that.  But this is August 23rd, not the

17   day after Wrestlereunion, as you said earlier.

18   Q       Right.

19   A       This is nine months later, eight months later.

20   Q       So you're not -- but you don't know when prior

21   to August he presented that concept to InDemand;

22   correct?

23   A       It doesn't say here.

24   Q       All right.  Well, let's see if I can refresh

25   your recollection.
```

Russell - Cross

```
 1    A       Events (inaudible).

 2            COURT REPORTER:  I'm sorry.  I didn't hear

 3    your answer.

 4            THE WITNESS:  Sporting events are time

 5    sensitive.  Once an event happens, it becomes old

 6    news.  People are not going to pay top dollar to see

 7    something eight or nine months later from when it

 8    actually occurred.

 9    BY MS. MILLNER:

10    Q       I'm going to see if I can refresh your

11    recollection.  Just give me a minute, sir.

12    A       Sure.

13    Q       Can you turn, sir, to Exhibit 38 or tab 38 in

14    that folder.

15    A       Okay.

16    Q       You see this is an e-mail from Mr. Sterling to

17    InDemand on January 31st, 2005?

18    A       The date is --

19    Q       Bottom e-mail, the first e-mail.

20    A       Well, it's to Nancy McKenna.  I --

21            THE COURT:  Wait just a second.  Without

22    addressing what it is, it's not in evidence so --

23            THE WITNESS:  Okay.  Yes.

24    BY MS. MILLNER:

25    Q       All right.  Does this refresh your
```

1    recollection as to the date on which Mr. Sterling

2    approached InDemand about the Wrestlereunion

3    project?

4    A      No.  I don't know who Nancy McKenna is.  It

5    doesn't say what company she's with.  And I did not

6    receive a copy of this document, so I would not have

7    had an original impression to be refreshed.

8    Q      Okay.  That's fine, sir.  We'll move on.

9           Now, focusing back on Exhibit 91 for a minute,

10   Mr. Sterling also indicates they had also

11   approached --

12   A      Can I see that, the enlarged --

13   Q      Of course.  Go to the first paragraph.

14   A      Okay.

15   Q      The second one says, we've raised the

16   opportunity with a number of TV programmers and

17   interest is not as immediate as we all would like.

18   Do you see that?

19   A      I would need to see specific individuals who

20   they raised it with before I would accept a broad

21   statement like that.  That's what it says, but it

22   doesn't say who, when, where.

23   Q      You're not suggesting that you have

24   information that suggests that Mr. Sterling was --

25   did not approach the TV programmers as indicated in

 1        this e-mail; do you, sir?

 2        A       I'm suggesting that I've never seen proof that

 3        he has.

 4        Q       All right.  Or never seen proof that he

 5        didn't; correct?

 6        A       It's his burden to prove that he did.

 7        Q       You just don't know one way or the other; fair

 8        enough?

 9        A       I'm not going to accept that as proof that he

10        did.

11        Q       Well, you certainly, after receiving this

12        e-mail on August 23rd, 2005, did not raise concerns

13        about the voracity of the statements made by

14        Mr. Sterling in that e-mail; correct?

15        A       At this point -- correct.  But at this point

16        we were days away from Wrestlereunion II, probably

17        already in Valley Forge and we were to meet with

18        Mr. Sterling for an update in person sometime during

19        Wrestlereunion II.

20        Q       All right.  The next paragraph reads, our

21        international TV distribution sales team is also

22        presenting Wrestlereunion as a TV series to foreign

23        programmers worldwide, as well.

24               Do you recall being updated by Mr. Sterling in

25        August of 2005 about the efforts by Clear Channel to

1    pitch this project on a worldwide basis?

2    A     That's a general statement.  I don't -- I've

3    never seen any sales tools that Clear Channel

4    created or generated to help market the product, a

5    demo tape, a slick presentation of any sort.  To

6    make a statement like that that I sent an e-mail or

7    a fax or a one sheet is not a sufficient effort to

8    get to the decision makers in that industry.  I'm

9    sorry.

10   Q     Well, you certainly -- I'm sorry.  You

11   certainly don't have any evidence to show that

12   Mr. Sterling was not truthful when he made this

13   statement to you in August of 2005; correct?

14   A     There's no evidence that he did.  The burden

15   is on him to prove to us that he did.

16   Q     Well, actually, sir, you understand that as

17   the plaintiff in this case it is the burden --

18         THE COURT:  All right.  No.  We're not going

19   there.  Ask another question, please.  I'll instruct

20   the jury on the burden of proof, counsel.

21         MS. MILLNER:  That's fine.

22   BY MS. MILLNER:

23   Q     Mr. Sterling also updates the folks at

24   Wrestlereunion about his efforts to pitch this as a

25   DVD product; correct?  Do you see the first

1      paragraph?

2      A      I'm -- I'm reading it now.

3      Q      Oh, please take your time.

4      A      I'll make two points.

5      Q      Well --

6      A      Yes, I see what you say.  First, Highspots was

7      already our account, so he did not solicit or sell

8      or make any effort to do anything with them.

9      There's only one other name mentioned in this

10     paragraph, Image Entertainment.  To contact one

11     person or one company does not constitute a

12     legitimate effort, in my opinion.

13     Q      Well, you don't know the number of companies

14     that Mr. Sterling actually contacted; do you, sir?

15     A      Mr. Sterling went on record by spelling them

16     out and defining them in this document.  He named

17     one.  He didn't name 10, 20, 30.  He named one.

18     Q      Have you reviewed the production in this case

19     with the -- which contains the contacts that

20     Mr. Sterling made to various folks in the industry

21     to try and pitch the Wrestlereunion project?

22     A      I don't understand the question.

23     Q      Have you reviewed the documents provided in

24     this case --

25     A      You said production.  I'm sorry.

1    Q      Produced in this case by the -- by Clear

2    Channel which contains documents showing the

3    solicitation efforts that Mr. Sterling made to pitch

4    the Wrestlereunion project?

5    A      I don't believe I've seen that document --

6    those documents.

7    Q      So you haven't looked at that?

8    A      Pardon me?

9    Q      You haven't -- you haven't looked at that

10   before coming to testify today; is that fair enough?

11   A      I believe I've not seen a defined effort of

12   names, contacts and results of any effort made by

13   Mr. Sterling.

14   Q      All right.  Now, let's talk about the

15   Highspots involvement.  First, am I correct that

16   when Mr. Sterling first discussed this project with

17   you back in December -- late December, either New

18   Year's Eve or early January 2005, you told him that

19   you had already lined up a distributor for the

20   Wrestlereunion DVDs; isn't that right?

21   A      No.  I don't recall that as being part of the

22   conversation I had with him New Year's Eve.

23   Q      Well, how about in early January?  Do you

24   recall telling him that Highspots had already

25   committed to distributing --

Russen — Cross

```
 1    A       Yes.

 2    Q       -- the product?

 3    A       Yes.

 4    Q       And, in fact, you told him that you wanted --

 5    or rather that Highspots wanted to get shoot videos

 6    out in the marketplace right away; correct?

 7    A       Four titles, yes.

 8    Q       All right.  And those four titles were Bruno

 9    Sammartini, the gentleman who testified in this

10    courtroom on Monday; correct?

11    A       His name is Sammartino.

12    Q       I apologize.  But he was one of the shoot

13    interviews that you were interested in; correct?

14    A       Correct.

15    Q       And Clear Channel actually created the shoot

16    interview for Mr. Bruno Sammartino and shrink

17    wrapped it, put it on the marketplace; correct?

18    A       Rather tardily but, yes, they did.  Certainly

19    not promptly.

20    Q       They provided it to clear spots -- I mean, to

21    Highspots for sale; correct?

22    A       In May or June.

23    Q       But they provided it; would you agree with me?

24    A       Yes.

25    Q       All right.  And another one that Clear Channel
```

Russen – Cross

1    had put together for sale was the shoot interview of

2    Kevin Nash; correct?

3    A       Kevin Nash, Windy Richter and Diamond Dallas

4    Page, along with Bruno Sammartino were the four

5    titles.

6    Q       And those are the four titles that you

7    suggested they start with; correct?

8    A       Yes.

9    Q       And those are legends of the wrestling world;

10   isn't that right?

11   A       Yes.

12   Q       And you've reviewed those shoot videos;

13   correct?

14   A       Yes.

15   Q       And you thought the quality of those shoot

16   interviews were great; isn't that right?

17   A       Yes, they were.

18   Q       All right.  And you'd also agree that

19   Highspots was unable to sell out of those shoot

20   videos; isn't that right?

21   A       I personally have never had any contact with

22   Michael Bochicchio regarding that at all.

23   Mr. Corrente may have, but I did not.

24   Q       Well, let's look at what Mr. Sterling is

25   telling you in August, first paragraph under DVD.

1    As you well know, Highspots was sold and shipped

2    product for sale on their website.  We have not

3    received any report of sales nor further requests

4    for additional product.  We assume that it is not

5    running out the door with Highspots.  We sent them

6    250 units of each of the four titles.  Isn't that

7    what he's telling you in August of 2005?

8    A      That's not what's on the screen.

9    Q      Should we read it again?  As you well know,

10   Highspots was sold and shipped product for sale on

11   their website.  We have not received any report of

12   sales nor further requests for additional product.

13   We assume that it is not running out the door with

14   Highspots.  We sent them 250 of each of the four --

15   first four titles.  Isn't that what Mr. Sterling is

16   reporting to you --

17   A      Yes.

18   Q      -- in August of 2005?

19   A      Correct.

20   Q      So the four shoot interviews that Mr. -- that

21   you targeted for Clear Channel to create and provide

22   to a distributor never sold -- never sold out; isn't

23   that right?

24   A      Let me clarify this.  Mr. Bochicchio picked

25   those titles.  I passed the message along.  I did

```
 1     not personally select those titles.

 2     Q     All right.  Do you disagree that those are --

 3     that Mr. Nash and Mr. Sammartino --

 4     A     They're legends.

 5           COURT REPORTER:  I'm sorry?

 6           THE COURT:  Try not to interrupt the question.

 7     Just a moment.  Let her finish her question, please.

 8           THE WITNESS:  I'm sorry.

 9     BY MS. MILLNER:

10     Q     I'll start over.  Do you agree that those four

11     titles are legitimate legends in the wrestling

12     world?

13     A     Yes.

14     Q     And by the way, you talk about delay.  We're

15     talking about legends in the wrestling world;

16     correct?

17     A     Yes.

18     Q     Legends are -- legends live forever; isn't

19     that right?

20     A     Yes, they do.

21     Q     In fact, that's the motto of Wrestlereunion,

22     that legends live forever; isn't that right?

23     A     I came up with the motto, legends are forever.

24     Q     Legends are forever.  Okay.  Now, you did --

25     you spoke on direct about some suggestions you made
```

1    to the Clear Channel folks to help them find a

2    distributor for the Wrestlereunion product.  Do you

3    recall that?

4    A    Yes.

5    Q    And I believe you mentioned on direct if I'm

6    recollecting you correctly that -- that you

7    suggested they contact Spike TV?

8    A    Yes.

9         MS. MILLNER:  Mr. Brown, do we have

10    Plaintiff's 143?  No?  Okay.  I'll use the ELMO.

11    Madam clerk, can we switch to the ELMO, please.

12    Thanks.

13    BY MS. MILLNER:

14    Q    Can you see that on the screen, sir?  Oops, I

15    made it go the wrong way.  Do you see right there

16    where you're writing him an e-mail that's suggesting

17    that Clear Channel approach Spike TV?

18    A    Yes.

19    Q    All right.  And Mr. Sterling is -- is

20    responding or at least sending your e-mail on to

21    Mr. Townley who's with Clear Channel; correct?

22    A    Yes.

23    Q    Embracing the thought and the idea; correct?

24    A    Asking the question "what do you think", is

25    that embracing it?

Russen - Cross

```
1    Q      Well, he says interesting thought.  Could be

2    anything from a legends series of matches to even

3    developing a reality based show where X or

4    want-to-be athletes step in to compete with WWE

5    stars or legends and give it a go.  What do you

6    think, Steve; correct?

7    A      It's an internal memo.  It's not any

8    indication that they contacted Spike TV at all.

9    Q      Well, in fact, Clear Channel did contact Spike

10   TV; didn't they?

11   A      I've never seen a document from Steve Sterling

12   to Spike TV.

13   Q      Did you review Mr. Sterling's deposition

14   before coming to testify today?

15   A      Yes.  I was there when he did it.

16   Q      And you recall him testifying that he, in

17   fact, approached Spike TV; don't you, sir?

18   A      I recall him saying lots of things that I have

19   questions about.

20   Q      Another person that you suggested that Clear

21   Channel contact was a fellow by the name of Martin

22   Goldstein at Event Merchandising in the UK; correct?

23   A      I said that?  I don't know Mr. Goldstein

24   personally.

25   Q      Could I ask you to turn to tab number 44 in
```

 1      that book.

 2      A      In your book?

 3      Q      Yes.

 4      A      Okay.

 5      Q      Do you recognize this as an e-mail you sent to

 6      Mr. Sterling on March 21st, 2005, concerning

 7      Mr. Goldstein?

 8      A      I'd like you to take a look at what I have

 9      here.  There's this one page and --

10      Q      No, it's 44.

11      A      Oh, you said 144.  I'm sorry.

12      Q      I realize the books are a bit hard to get

13      through.

14      A      44; right?

15      Q      Correct.

16      A      Okay.

17      Q      Do you recognize Defendant's Exhibit 44 as an

18      e-mail you sent to Mr. Sterling on March 21st, 2005?

19      A      Yes.

20      Q      All right.

21             MS. MILLNER:  Move to admit, Your Honor.

22             THE COURT:  Is there any objection?

23             MR. RODEMS:  No objection, Your Honor.

24             THE COURT:  44 is received.

25             (Whereupon, Defendant's Exhibit Number 44 was

1        received into evidence.)

2              MS. MILLNER:  Again, can we switch -- madam

3        clerk, can we switch back to the -- thank you.

4        BY MS. MILLNER:

5        Q     All right.  Let's focus on the e-mail you

6        sent -- the first paragraph that you sent to

7        Mr. Sterling.  You're writing Mr. Sterling, Jimmy

8        Hart had called me -- had me call a gentlemen named

9        Martin Goldstein from Event Merchandising in the UK

10       in reference to the possibility -- in reference --

11       in reference to them possibly being interested in

12       hosting a Wrestlereunion event there.  Do you see

13       that?

14       A     The name is Martin Goldsmith.

15       Q     Oh, I'm sorry, Goldsmith.

16       A     That's where I was a little confused because

17       you had been saying Goldstein.

18       Q     You know, my fault.  I'm sorry.

19       A     Okay.  I recognize and remember this.

20       Q     Okay.  And, in fact, Mr. -- let's go to

21       Mr. Sterling's e-mail on the top.  And, in fact,

22       Mr. Sterling is instructing his staff to schedule a

23       call with Mr. Goldsmith; isn't that right?

24       A     That's what the instructions are, yes.

25       Q     Okay.

1    A       Do we have any evidence that it was done?

2    Q       Well, are you doubting that Mr. Sterling

3    contacted Mr. Goldsmith?

4    A       Yes.

5    Q       All right.  You certainly have no evidence to

6    show that, though; correct?

7    A       No evidence either way.

8    Q       Mr. Goldsmith isn't going to come testify in

9    this courtroom as far as you know and say no one

10   contacted me from Clear Channel about this?

11   A       We have all this --

12           MR. RODEMS:  Objection, Your Honor.  Calls for

13   the witness to speculate.

14           THE COURT:  You don't know one way or the

15   other; do you, sir?

16           THE WITNESS:  No, Your Honor.  I do not know

17   one way or the other.

18   BY MS. MILLNER:

19   Q       You also referred Mr. Sterling to a fellow by

20   the name of Rich Durand; correct?

21   A       Correct.

22   Q       And Mr. -- well, why don't I have you turn to

23   Exhibit 145 so we can get --

24   A       145?

25   Q       Correct.  I'm sorry.  It's I think -- I think

Russen — Cross

```
 1      it's plaintiff's exhibit.

 2      A      Are you sure it's 145?

 3      Q      Plaintiff's Exhibit 145.  Do you recognize

 4      this as an e-mail that you sent Mr. Gallarello of

 5      Clear Channel concerning Mr. Durand on July 15,

 6      2005?

 7      A      Sent to Johnny Gallarello, yes.  Correct.

 8             MS. MILLNER:  Do we have this, Mr. Brown?

 9      Okay.  Let's put this up.

10      BY MS. MILLNER:

11      Q      And let's focus on the e-mail from

12      Mr. Gallarello to Mr. Sterling.  Do you see that?

13      A      Yes.

14      Q      And Mr. Gallarello is indicating that

15      Mr. Durand will be in touch with Mr. Sterling on

16      Monday about Wrestlereunion; correct?

17      A      Correct.

18      Q      And you certainly have no evidence to suggest

19      that that contact didn't occur?

20      A      I don't know either way.

21      Q      All right.  And you don't know what the --

22      what response, then, there was from these two

23      entities that you referred to Clear Channel

24      concerning their interest in distributing the

25      Wrestlereunion product; correct?
```

1      A      I have no way of knowing.

2      Q      All right.  Now, you would agree with me that

3      Wrestlereunion was going to proceed as a live event

4      with or without Clear Channel being onboard;

5      correct?

6      A      Correct.

7      Q      According to your reality check memo, and we

8      can bring it back up, 159, before the contract was

9      ever signed by Clear Channel, Wrestlereunion had

10     already committed to 90 wrestlers, paragraph one.

11     A      Yes, we had.

12     Q      All right.  And you would agree with me that

13     the failure of the live events were not the

14     responsibility or fault of Clear Channel; correct?

15     A      Correct.

16     Q      Now, you, I believe, testified that you --

17     that Steve Sterling at some point said that money

18     would be coming in the door for 60 -- or in 60 or 90

19     days; correct?

20     A      His exact timeframe was 90 days to six months.

21     Q      All right.  I'm sorry, 90 days to six months.

22     And you knew at that point that he had not yet

23     contracted with a distributor for the product;

24     correct?

25     A      Correct.

```
 1      Q       All right.  So there's certainly no way that

 2      Mr. Sterling could make a guarantee that the product

 3      would, number one, be distributed by anyone and,

 4      number two, be on shelves in six months or 90 days;

 5      correct?

 6      A       We were taking him at his word.

 7      Q       But you understood there was no distributor

 8      yet lined up; correct?

 9      A       Correct.

10      Q       Now, sir, am I also correct that you are --

11      you have contracted with Mr. Corrente to receive 10

12      percent of whatever it is that this jury decides to

13      award to Wrestlereunion in this trial; correct?

14      A       Not specifically.  I receive 10 percent of the

15      net proceeds of Wrestlereunion activities.

16      Q       Well --

17      A       It wasn't designed specifically for anything

18      to do with this trial.

19      Q       Nothing to do with the litigation?

20      A       It was in general for 10 percent of the net

21      proceeds for Wrestlereunion.

22      Q       Turn to Exhibit 134 of the defendant's book,

23      please.

24      A       Oh, defendant's book?  That's your book.  All

25      right.
```

1       Q      Do you recognize Exhibit 134 as an agreement

2    that you signed with Mr. Corrente on April 7th,

3    2007?

4       A      I recognize this as a reconfirmation of the

5    original agreement.  But, yes, I signed it.

6       Q      Is that your signature on the document, sir?

7       A      Yes, it is.

8              MS. MILLNER:  Move to admit, Your Honor.

9              THE COURT:  Is there any objection?  Is that

10   plaintiff's or defendant's?

11             MS. MILLNER:  Defendant's.  I'm sorry.

12             THE COURT:  Defendant's 134.

13             MR. RODEMS:  No objection, Your Honor.

14             THE COURT:  All right.  134 is received.

15             (Whereupon, Defendant's Exhibit Number 134

16   was received into evidence.)

17             MS. MILLNER:  First paragraph, Mr. Brown.

18   BY MS. MILLNER:

19       Q      Let's read it together, Mr. Russen.  Perhaps

20   it will refresh your recollection.  This agreement

21   by and between Robert Russen -- that's you; correct?

22       A      Correct.

23       Q      And Sal Corrente d/b/a Wrestlereunion, LLC,

24   hereby confirms the original agreement between the

25   parties?

1      A      Excuse me.  It says hereby reconfirms.

2      Q      Reconfirms the original agreement between the

3      parties hereto created in September 2004 wherein

4      Mr. -- wherein Mr. -- wherein Rob Russen is to

5      receive -- is to receive 10 percent of the net

6      revenues from all Wrestlereunion proceeds in

7      perpetuity, shall include but not be limited to

8      lawsuit settlement versus Clear Channel slash

9      Nationwide.  So, in fact, sir --

10     A      Clear Channel slash Live Nation.

11     Q      Live Nation.  It's been a long week for me,

12     sir.  I'm sorry.

13            In any event, you would agree with me that you

14     are contracted to receive 10 percent of the proceeds

15     of whatever it is that this jury chooses to award

16     Wrestlereunion in this case; isn't that right?

17     A      That's part of the agreement.  I'm contracted

18     to receive 10 percent of the net proceeds of

19     everything and anything that Wrestlereunion does for

20     perpetuity.  That's what it clearly says.

21     Q      Well, a minute ago you said it didn't involve

22     any proceeds necessarily from this litigation.

23     A      No, no, no.  Don't put words in my mouth.  I

24     said it did not apply specifically to this

25     litigation.  And what it says is it reconfirms an

1    agreement originally made in 2004.  This litigation

2    was not a part of anything on the drawing board in

3    2004.

4    Q    Sir, this agreement that you signed

5    specifically, to use your term, indicates that you

6    are to receive 10 percent of any proceeds from a

7    lawsuit or the lawsuit between the plaintiff and

8    Clear Channel slash Live Nation; isn't that right?

9         MR. RODEMS:  Objection, Your Honor.  It's

10   argumentative and repetitive.

11        THE COURT:  The document speaks for itself.

12   Let's move on, please.

13        MS. MILLNER:  No further questions.  Thank

14   you.

15        THE COURT:  Redirect?

16        MR. RODEMS:  Thank you, Your Honor.  Could we

17   put that exhibit back up, please, sir.

18                REDIRECT EXAMINATION

19   BY MR. RODEMS:

20   Q    Mr. Russen, this document -- this document was

21   written on April 7th of 2005?

22   A    Correct.

23   Q    Was it clear at that point that Clear Channel

24   was not getting the job done and that litigation was

25   going to ensue?

1      A      Yes, it was.

2      Q      Okay.  Now, Mr. Russen, the price for

3      Wrestlereunion I for the VIP attendance was as much

4      as $299; correct?

5      A      Correct.

6      Q      Okay.  And fans came from how many different

7      countries?

8      A      Eight different foreign countries.

9      Q      And how many different states?

10     A      Thirty-nine states.

11     Q      Now, did that $299 include the hotel room?

12     A      No, it did not.

13     Q      Or the airfare?

14     A      No.

15     Q      Okay.  So this was a very expensive

16     proposition to attend?

17     A      Especially if they brought their families.

18     Q      Okay.  And Wrestlereunion was not a name that

19     was established in the marketplace like WWE or NWA

20     or even TNA?

21     A      Correct.

22     Q      Okay.  Did you have some feelings that maybe

23     people would not have trust in flying across the

24     country to an event by a promoter named

25     Wrestlereunion who had never been established?

 1     A      Yes.

 2     Q      Have there been other fan conventions that

 3     you're aware of in the history of wrestling where

 4     talent was promised but then didn't show up?

 5     A      Yes.

 6     Q      Okay.  And so what you and Mr. Corrente were

 7     advertising on your website wasn't just 10 or 20

 8     people, it was 90 -- it was in the nineties;

 9     correct?

10     A      Correct.

11     Q      And was there skepticism that you're aware of

12     as to whether this could actually come off or

13     actually happen?

14     A      Quite a bit.

15     Q      Okay.  All right.  But even despite that price

16     of $299, which, by the way, have -- are you aware of

17     any single wrestling event other than Wrestlereunion

18     that charges $299 to attend a match or something

19     like that?

20     A      No.

21     Q      Okay.  Even despite that high price at

22     Wrestlereunion I, you had some 300 and something

23     people attend?

24     A      Correct.

25     Q      And then at Wrestlereunion II you more than

1          doubled the attendance?

2     A       Correct.

3     Q       And then at Wrestlereunion III it was a

4     wrestling only show and so the ticket price was much

5     more reduced?

6     A       Yes.

7     Q       And the attendance was even greater?

8     A       More than doubled.

9     Q       And what happened on the day -- weather-wise

10    on the day of Wrestlereunion III?

11    A       A tremendous typical Florida thunderstorms.

12    Q       It was in September of 2005?

13    A       Yes.  Thunder, lightning, wind.

14    Q       The Davie rodeo grounds is covered; correct?

15    A       Yes.  But open on the sides.

16    Q       Okay.  I'd like to show you again Exhibit 117.

17    This was the document that summarized the

18    Wrestlereunion expenses for Wrestlereunion I.  There

19    were also ticket prices for 249; correct?

20    A       Correct.

21    Q       I don't see the listing for how many you sold

22    at 299.  Do you know why that's not on this sheet?

23    A       I don't remember who made this sheet.  I don't

24    think that I did.

25    Q       Okay.  This is more or less a summary of the

Russen - Redirect

```
 1    expenses and the income?

 2    A      Yes.

 3    Q      Okay.  By the way, I have a question.  You

 4    were asked, well, there's no sales tax demonstrated

 5    on here.  With a ticket price, would the person pay

 6    the amount of the ticket and then pay an additional

 7    amount for sales tax?

 8    A      Yes, absolutely.  And the sales tax would not

 9    be included in the extension of those calculations.

10    Q      Sales tax would go right to the state?

11    A      Correct.

12    Q      Now, you were asked about the broadcast

13    quality of footage from Wrestlereunion I.

14    A      Yes.

15    Q      Did you see every moment of the footage?

16    A      No.

17    Q      Okay.  Have you seen the line cut?

18    A      Yes, I have.

19    Q      Would you describe what a line cut is.

20    A      A line cut is the multiple combination of

21    various cameras combined into what would be going

22    out as a broadcast signal, what the audience would

23    see on TV.

24    Q      Now, you talked in your direct examination

25    that there was filming of the action on a big orange
```

1       stepladder.

2       A       Correct.

3       Q       Okay.  If there were handheld cameras on the

4       other side of the ring and the camera picked up the

5       big orange stepladder, would footage with the big

6       orange stepladder be something that should be put on

7       a commercial package for sale?

8       A       It would stick out like a sore thumb.

9       Q       And at the Wrestlereunion I event, the

10      announcers had no monitors?

11      A       Correct.

12      Q       So the announcers were calling the action as

13      they saw it in the ring?

14      A       Yes.  Which was not necessarily the same as

15      what would be sent out to the audience.

16      Q       So if one camera angle was edited in, and it

17      was from a different angle than the announcers were

18      seeing as they sat there, would there be continuity

19      gaps in what the commentators were describing and

20      what the action was showing?

21      A       Yes, there would be.  And it would also

22      eliminate the common practice of showing replays,

23      which is real important in explaining what happened.

24      Q       And you saw the Dusty Rhodes, Terry Funk match

25      from Davie, the line cut?

1       A       Yes, I did.

2       Q       And did you notice the crowd in that footage?

3       A       Yes, I sure did.

4       Q       How did it appear to you?

5       A       They were very excited, very into it.

6       Q       Okay.  Now, you also saw the Ring of Honor

7       footage that we played?

8       A       Yes.

9       Q       Appearance-wise, does it compare in terms of

10      the camera angles on the ring for what was intended

11      for Wrestlereunion?

12              MS. MILLNER:  Objection, Your Honor.  Calls

13      for improper expert opinion.

14              THE COURT:  Overruled.

15              THE WITNESS:  It compares in some ways, but in

16      many ways ours was much better.

17      BY MR. RODEMS:

18      Q       Okay.  As far as the crowd noise and things

19      with the Ring of Honor, did you notice whether that

20      had been sweetened?

21      A       It's common practice and is the case with the

22      Ring of Honor video and the AWA video we showed the

23      other day to sweeten or enhance the audio by

24      over-dubbing an enthusiastic, loud audience

25      soundtrack to make -- and the WWE does this still

1      today -- to make the audience sound louder, fuller

2      and more excited.

3      Q      Sort of like a laugh track to a comedy?

4      A      Exactly.

5      Q      And the footage you saw of Terry Funk, had

6      that sweetener been added into that?

7      A      No.

8      Q      Now, you were asked whether Clear Channel hid

9      the fact that they were doing the -- the biography

10     with A&E?

11     A      Yes.

12     Q      Okay.

13     A      I was asked if they were hiding it at that

14     stage of things, January.

15     Q      Okay.

16            MR. RODEMS:  Your Honor, at this point

17     plaintiff would move Exhibit 123 -- Plaintiff's

18     Exhibit 123 into evidence.

19            MS. MILLNER:  No objection, Your Honor.

20            THE COURT:  123 is received.  Thank you.

21            (Whereupon, Plaintiff's Exhibit Number 123 is

22     received into evidence.)

23            MR. RODEMS:  May I publish, Your Honor?

24            THE COURT:  Yes, sir.

25     BY MR. RODEMS:

Russen - Redirect

1    Q       Mr. Russen, this is an e-mail from Steve

2    Sterling to Joe Townley dated March 9, 2005.

3    A       Yes.

4    Q       Regarding WWE, Vince i-n-t-v-u.

5    A       Yes.

6    Q       What do you think the timing might be for

7    getting this in the bag.  As discussed, I just want

8    to be able to keep the Wrestlereunion dist plan

9    low-key until Vince is in the can for the A&E show.

10           Were you ever told by Mr. Sterling that the

11   distribution plan from Wrestlereunion was being kept

12   low-key because of a need to try to get Vince

13   McMahon to agree to the A&E biography?

14   A       Never.

15   Q       What were you being told about the

16   distribution plan for Wrestlereunion?

17   A       Well, we were being give lip service that he

18   was trying to contact all these different companies

19   and -- to make deals, but we were never given any

20   evidence that that was the case.

21   Q       You were asked some questions about startup

22   companies and the risks involved with that.  What

23   was the value in your mind, having been involved in

24   the professional wrestling industry for as long as

25   you were, of having a roster of people, including

1        Bruno Sammartino, Dusty Rhodes, 19 of the 63 living

2        members of the WWE Hall of Fame as part of your

3        startup?

4             MS. MILLNER:  Objection, Your Honor.  Expert

5        opinion.

6             THE COURT:  Overruled.

7             THE WITNESS:  Each of those names had specific

8        appeal to the public.  But at the same time, their

9        participation added credibility.

10       BY MR. RODEMS:

11       Q    Do you think that it made the prospect of

12       success more likely or less likely?

13       A    More likely.

14            MR. RODEMS:  Your Honor, at this time

15       plaintiff would move Plaintiff's Exhibit 121 into

16       evidence.

17            MS. MILLNER:  No objection, Your Honor.

18            THE COURT:  121 is received.  Thank you.

19            (Whereupon, Plaintiff's Exhibit Number 121 is

20       received into evidence.)

21            MR. RODEMS:  May I publish, Your Honor?

22            THE COURT:  Yes, sir.

23       BY MR. RODEMS:

24       Q    Mr. Russen, do you recall meeting with me

25       before the trial began where we went over some of

1       the documents in this case?

2       A       Approximately 10 days ago.  Yes.

3       Q       And one of the things that we went over was

4       the profit and loss statement that Clear Channel had

5       prepared in this case.

6               MS. MILLNER:  Objection, Your Honor.  Outside

7       the scope of cross.

8               THE COURT:  Tie it up, please.

9               MR. RODEMS:  Yes, sir.  This relates to the

10      purported financial failure of Wrestlereunion and

11      what these documents show --

12              THE COURT:  Don't tell me what they show.

13      You're not a witness.

14              MR. RODEMS:  I'm sorry.

15              THE COURT:  Just lay a foundation for the

16      cross-examination.

17              MR. RODEMS:  Yes, sir.

18      BY MR. RODEMS:

19      Q       Mr. Russen, Wrestlereunion was never designed

20      for the only source of revenue to be from the live

21      gate; was it?

22      A       No.  There were multiple sources of revenue

23      projected from the very beginning.

24      Q       Including sales of DVDs?

25      A       Yes.

1    Q      Okay.  And have you seen the projection of the

2    amount of money that Clear Channel anticipated

3    Wrestlereunion would receive from the sale of DVDs

4    for Wrestlereunion I?

5    A      Yes.

6    Q      Mr. Russen, do you recognize the initials P

7    and L?

8    A      Profit and loss.  Yes.

9    Q      And do you see at the top where it says

10   Wrestlereunion?

11   A      Yes.

12   Q      Okay.  And if we look at the first page, which

13   we'll come back to in a moment, that was an e-mail

14   from Matthew Hecktor to Dawn Olejar?

15   A      Correct.

16   Q      I'm sorry, yes.  Who is Dawn Olejar?

17   A      Dawn was one of the two production directors

18   that Clear Channel sent out to supervise our TV

19   tapings.

20   Q      Okay.  And do you see where revenues are

21   projected?

22   A      Yes.

23   Q      Okay.

24          MS. MILLNER:  Judge, again, I just want to

25   renew my objection, outside the scope of cross.

```
 1              THE COURT:  Overruled.
 2     BY MR. RODEMS:
 3     Q      Do you see down where it says partner share,
 4     50 percent?
 5     A      Yes.
 6     Q      Let me expand that just a little bit.  Look in
 7     the right-hand column.  What was the total estimated
 8     partner share for Wrestlereunion?
 9     A      $58,913.
10     Q      Now, did Clear Channel ever produce that
11     revenue for Wrestlereunion?
12     A      No.
13     Q      Mr. Russen, you were asked questions on
14     cross-examination about the marketing efforts of
15     Clear Channel.
16              MR. RODEMS:  Your Honor, at this time
17     plaintiff would move Plaintiff's Exhibit 92 into
18     evidence.
19              MS. MILLNER:  No objection, Your Honor.
20              THE COURT:  92 is received.
21              (Whereupon, Plaintiff's Exhibit Number 92 is
22     received into evidence.)
23              MR. RODEMS:  May I publish, Your Honor?
24              THE COURT:  Yes, sir.
25     BY MR. RODEMS:
```

Russen - Redirect

```
 1    Q      Mr. Russen, this is an e-mail to Kate McDonald

 2    dated Thursday, October 27th, 2000 --

 3    A      Tuesday, October -- oh, I'm sorry.

 4    Q      Thursday, at 9:19 AM.  Do you know what was

 5    occurring on that day, October 27, 2005?

 6    A      Yes.  A meeting was scheduled between

 7    Mr. Corrente, Mr. Attanasio and Jimmy Hart.

 8    Q      Okay.  Ms. McDonald writes, please be reminded

 9    that we have not pushed this series before MIPCOM

10    due to the quality of the original footage.  As

11    you're fully aware, we only get one chance to make

12    an impact on buyers so we've wanted to wait until

13    the new footage is ready for us to send out with the

14    hope that it's an improvement on the last.  And

15    we've also needed clarification on the content of

16    each episode.  Our one concern is how we inform the

17    Wrestlereunion guys why we've not started pushing it

18    before now.

19           Were you ever told by anyone at Clear Channel

20    that there were problems with the video from

21    Wrestlereunion I and that's why it had not been

22    marketed?

23    A      No.

24    Q      Were you at any time ever told by anyone at

25    Clear Channel that there were problems with the
```

1      audio at Wrestlereunion I?

2      A      No.

3      Q      Did anyone ever describe it to you as a train

4      wreck, the audio?

5      A      No.  I've seen it.  I totally disagree.

6      Q      Who was responsible for the video footage

7      quality and the audio quality?

8      A      Clear Channel.

9      Q      All right.  Now, of all the events that took

10     place at Wrestlereunion I, what was the most

11     marketable, what had the most market interest?

12     A      The live matches.

13     Q      Did you tell Mr. Sterling that?

14     A      From the very beginning.

15     Q      Have you ever seen any fully edited, finally

16     ready-for-market footage of the matches, any of the

17     wrestling matches from any of the Wrestlereunion

18     events?

19     A      No, I have not.

20     Q      Was there ever any revenue paid to

21     Wrestlereunion from Clear Channel?

22     A      No.

23     Q      Thank you.

24            MR. RODEMS:  No further questions, Your Honor.

25            THE COURT:  Thank you, sir.  You may step

 1          down.  Please watch your step.

 2              You guys doing all right?  Call your next

 3      witness, please.

 4              MR. RODEMS:  Your Honor, at this time the

 5      plaintiff would present the deposition testimony of

 6      Eric Paulen.

 7              MS. MILLNER:  Your Honor, there's an objection

 8      that needs to be ruled on before that takes place.

 9              THE COURT:  All right.  Come forward, please.

10      Why don't we just take a short comfort break.  Let

11      me address that with counsel.  Let you guys go to

12      the jury room for a few minutes.  Thank you.

13              COURTROOM SECURITY OFFICER:  Please rise for

14      the jury.

15              (Jury out at 10:07 AM.)

16              THE COURT:  All right.  Is there a motion in

17      limine I need to address?

18              MS. MILLNER:  No, Your Honor.  There were

19      objections that were filed.

20              THE COURT:  About what?

21              MS. MILLNER:  To the designations of Mr. -- to

22      some of the designations of Mr. --

23              THE COURT:  Evidentiary objections or what?

24              MS. MILLNER:  Objections -- specifically, Your

25      Honor, Mr. Paulen --

1              THE COURT:  You'd better stand up.  You're

2      going to hurt your back.

3              MS. MILLNER:  Mr. Paulen --

4              THE COURT:  You don't need to do that.  You're

5      fine.

6              MS. MILLNER:  Mr. Paulen refers to

7      Mr. Sterling in this deposition as a quote, asshole.

8      And he has designated that as part of the testimony

9      to be read.  And I see no relevance to that

10     whatsoever.  It's prejudicial and, you know, quite

11     frankly, I believe that there's been a discussion

12     about assailing the character of witnesses in this

13     case, a motion in limine brought by the plaintiff,

14     as a matter of fact, and I don't see how he should

15     be permitted to play Mr. Paulen's opinion about

16     Mr. Sterling.

17             MR. RODEMS:  Your Honor, may -- may I have the

18     page and lines you're referring to specifically?

19             MS. MILLNER:  Yeah.  I'm looking for it.  Page

20     107, if I can read it for the record.

21             THE COURT:  This is a wrestling case.  Do you

22     think the jury is going to be offended by somebody

23     calling another person an asshole?

24             MS. MILLNER:  Well, I'm not sure if the jury

25     will be offended.  I think Mr. Sterling would be

```
1        offended, and I don't think it's relevant.

2             THE COURT:  Is that just a descriptive thing

3        explaining the relationship or what context?

4             MS. MILLNER:  The question is:

5             "QUESTION:  You personally don't like Steve

6        Sterling very much?

7             ANSWER:  I don't like Steve.

8             QUESTION:  Did you ever refer to him as an

9        ass -- I'm sorry, not an asshole but an ass?

10            ANSWER:  It's possible.

11            QUESTION:  Do you think he's an ass?

12            ANSWER:  Because I referred to him as an ass,

13       maybe at the time I thought he was an ass."

14            THE COURT:  Who's asking these questions?

15            MS. MILLNER:  This is Mr. Rodems.

16            MR. RODEMS:  No.  No, sir.

17            MS. MILLNER:  No?

18            MR. RODEMS:  No.

19            THE COURT:  So it's the lawyer's fault for

20       bringing the term into the context of the

21       deposition; right?

22            MR. RODEMS:  Your Honor, I didn't ask this

23       question.

24            THE COURT:  It doesn't matter who.  I'm just

25       saying it's a lawyer.
```

1          MS. MILLNER:  I thought it was Mr. Rodems.  If

2     I'm wrong, I stand corrected.

3          THE COURT:  In other words, it's not the

4     witness who volunteered the descriptive terminology,

5     it's the lawyer.

6          MS. MILLNER:  It appears to me, based on the

7     transcript that it was Mr. Rodems that brought it

8     up.  I don't see --

9          THE COURT:  Look.  My point is --

10         MS. MILLNER:  Yes, it's a lawyer.

11         THE COURT:  -- a lawyer used the term before

12     the witness did.

13         MS. MILLNER:  Correct.  But apparently there

14     was an --

15         THE COURT:  I can't even imagine a lawyer

16     doing that unless it's highly relevant.

17         MS. MILLNER:  Your Honor, apparently there was

18     an instant message that was an exhibit to the

19     deposition that -- between Mr. Corrente and

20     Mr. Paulen where that term was used and that's why

21     it was introduced into the deposition by

22     Mr. Herbert.  And you're right, it was Mr. Herbert.

23     I see that now.

24         MR. RODEMS:  Your Honor, may I be heard?

25         THE COURT:  You're going to take it out or

1    what are you going to do with it?

2         MR. RODEMS:  Let me tell you the only reason,

3    if I may -- the only reason I included it is because

4    I was afraid that if I did not read that, that would

5    be cross designated and then it would be appearing

6    that he had some bias against him.  So I only

7    included it for that purpose.  If they want it out,

8    we'll leave it out.  That just shortens the process

9    and --

10        THE COURT:  The fact that he doesn't like the

11   other gentleman is probably something the jury

12   should consider in the context of credibility.  But

13   descriptive phrases, you know, if we can avoid that,

14   I think we should.  Can we just stop, then, at a

15   point where Herbert asked him whether he called him

16   an ass?

17        MS. MILLNER:  Right here's the --

18        MR. RODEMS:  Oh, yes, sir.  Yes, sir.

19        THE COURT:  How long did you guys mediate this

20   case?  Seriously.

21        MR. RODEMS:  Come again?

22        THE COURT:  When did it get mediated, how long

23   ago?

24        MR. RODEMS:  Probably --

25        MR. BARKER:  Last June, Your Honor, June of

1     last year.

2           THE COURT:  Who was the mediator?

3           MR. RODEMS:  Peter Greely.  We hadn't done any

4     discovery, we didn't have expert reports.

5           THE COURT:  All right.  Go ahead.  Just

6     curious.

7           MR. RODEMS:  I don't have any problem with

8     taking out "do you think he's an ass".

9           THE COURT:  Can you get the dislike in there

10    for credibility purposes but avoid the expression?

11          MR. RODEMS:  Well, the final question before

12    that is, you personally don't like Steve Sterling

13    very much, and the answer is, I don't dislike Steve

14    Sterling.  And I think that may have been what

15    precipitated the question.

16          As I said, Your Honor, I only included it

17    because I didn't want it to be cross designated and

18    make it look like I left that out.  If they don't

19    wish --

20          THE COURT:  All right.  They're objecting to

21    it so I guess that means they're not going to cross

22    designate.

23          MR. RODEMS:  We'll take that out, Your Honor.

24          THE COURT:  Is that it?  We had to stop the

25    trial to talk about the use of the word ass?

1              MS. MILLNER:  That's it, Your Honor.

2              THE COURT:  I'm sorry?

3              MS. MILLNER:  That's it, Your Honor.  I just

4    wanted to bring it up before it was read to the

5    jury.

6              THE COURT:  I hope we're all sufficiently

7    sanitized now.  Take a comfort break.  Be ready to

8    go in about seven minutes.

9              MR. BARKER:  Your Honor?

10             THE COURT:  Yes, sir.

11             MR. BARKER:  May Mr. Russen remain now that

12   his testimony is concluded?

13             THE COURT:  Ms. Millner, any objection?

14             MS. MILLNER:  Oh, no, of course not.

15             THE COURT:  Yes, sir, he may.

16             MR. BARKER:  Thank you, Your Honor.

17             THE COURT:  All right.  Take a comfort break.

18   Be ready to go.

19             (Recess was taken at 10:12 until 10:22 AM.)

20             (Back on the record.)

21             COURTROOM SECURITY OFFICER:  All rise.  This

22   Honorable Court is again in session.

23             Please be seated.

24             THE COURT:  Are we ready?  Bring the jury in,

25   please.

```
 1              COURTROOM SECURITY OFFICER:  Rise for the

 2      jury.

 3              (Jury in at 10:22 AM.)

 4              THE COURT:  Call your next witness, please.

 5              MR. RODEMS:  We're going to call Eric Paulen

 6      by deposition at this point.

 7              THE COURT:  Spell his last name.

 8              MR. RODEMS:  Yes, sir.  P-a-u-l-e-n.

 9              THE COURT:  And again, ladies and gentlemen,

10      please consider this testimony as if the witness

11      were here live testifying.  And remember, gentlemen,

12      to read slowly.

13              MR. RODEMS:  Yes, sir.

14              MR. BARKER:  May I proceed, Your Honor?

15              THE COURT:  Yes, sir.

16              (The deposition designations of Eric Paulen

17      were read as follows:)

18      Q       Would you tell us your name and address,

19      please.

20      A       Eric Paulen, Montville, New Jersey.

21      Q       Mr. Paulen, where are you currently employed?

22      A       I'm employed by myself -- for myself.  I'm a

23      freelance television producer.

24      Q       Why don't you run through for me, if you will,

25      your employment history for the last 10 years,
```

```
 1    starting with what you're doing now and working

 2    backwards, if you don't mind.

 3    A      For the last three years I've been

 4    freelancing, knock on wood, very busy.  Bouncing

 5    around from job to job over the course of three

 6    years, probably have worked for about 15 to 20

 7    different clients.  And before that I was employed

 8    by Clear Channel, I guess it was, for six years.

 9    Q      When you worked for Clear Channel, did you

10    have a title?

11    A      I was a senior producer.

12    Q      And just so it's clear to me, what years were

13    you with Clear Channel?

14    A      I guess it was -- I'm trying to remember when

15    we were acquired.  I think it was either May of 2000

16    or May of 1999, I'm trying to remember, until

17    December 20, 2005.

18    Q      What happened on December 20, 2005?

19    A      We were -- our jobs were terminated.  We were

20    laid off.  Our jobs were -- we became obsolete, I

21    guess.

22           MR. BARKER:  And beginning on page 12.

23    Q      Now, what was your feeling about the way your

24    employment ended at Clear Channel?

25    A      I wasn't happy about it.
```

```
 1      Q      Can you tell me why?

 2      A      You know, just that it was a scary thing.  I

 3   had a family and wanted to be able to go out and

 4   support them.  And I had the same job for pretty

 5   much 17 years, and it was just a scary time.

 6      Q      Did you have any feelings that anyone in your

 7   chain of command had not done everything they could

 8   for you in that process of being let go?

 9      A      No.

10      Q      What was your relationship with Joe Townley at

11   the time you left the company?

12      A      You know, we hugged goodbye, and it was a very

13   business-like relationship.  We didn't really have

14   that much contact.  He was doing his thing, I was

15   doing my thing and --

16      Q      What about Steve Sterling?  What was your

17   relationship with him when you left?

18      A      Same type of thing, very similar, you know.

19   Those guys were business associates.  Well, Steve

20   Stern was a friend.

21      Q      When is the last time you spoke to Steve

22   Sterling?

23      A      I saw Steve Sterling in an elevator at some

24   point within the last year.

25      Q      What is you understanding of why there was a
```

```
1     layoff at Clear Channel that involved you and other

2     people?

3     A      Just that they were going in a different

4     direction with their business, that they were

5     divesting themselves of all the things that they had

6     bought over the previous four or five years, and

7     they were becoming basically a music promotion

8     company.

9            MR. BARKER:  Okay.  Page 22.

10    Q      When did you first hear about the

11    Wrestlereunion project, approximately, date-wise?

12    A      Approximately around December, mid December

13    2004.

14    Q      Okay.  Would you explain to me what you would

15    do as a senior producer?  What would your duties be?

16    A      When we got -- I would be assigned a show, a

17    DVD, whatever, and usually it went from -- it was

18    basically, Eric, you're now doing a show on Rod

19    Stewart.  We'll see you in six months.  It's due

20    March 5th.  And that's how it worked.  Call so and

21    so who is his manager.  He is expecting you,

22    etcetera, etcetera.

23           It was pillar to post, you know, from research

24    to ideas to conducting the interviews to going

25    through the interviews, putting the interviews
```

1    together and putting the show together, editing the

2    show.

3    Q      Do you have the technical training to do

4    things like the editing?

5    A      I edit on a very basic level.  When I say on a

6    basic level, compared to, you know, very computer

7    savvy guys.  I'm reasonably proficient at it but,

8    you know, I don't know all the bells and whistles,

9    so to speak.

10   Q      What was Dawn Olejar's title?  If you don't

11   know her title, that's okay.

12   A      I know at one point she became a vice

13   president.  She was the production coordinator.

14   Q      How did what she was assigned to do differ

15   from what you did?

16   A      She set up the crews.  She set up the live

17   trucks.  It was totally different.  And really,

18   until Wrestlereunion, I had only been in a live

19   truck for one other assignment.  And even at the

20   Wrestlereunion shows, I wasn't in the trucks.

21   Q      How did you hear about the prospect of a

22   biography with A&E?  Did they contact you?

23   A      Steve Stern -- yeah, Steve Stern.  I guess

24   Steve Stern told me about it.

25   Q      When did the initial conversation take place?

Paulen                                                                            105

1     A       Right around December of 2004, mid December.

2     Q       What do you recall Mr. Stern telling you about

3     the A&E biography?

4     A       That the Andre the Giant biography did very

5     well, no matter what time it was on and the ratings

6     -- in the ratings I believe it was either the

7     highest rated or the second highest rated biography

8     ever.  And they wanted to jump on that train and do

9     the 10 greatest wrestlers.

10    Q       When you say they --

11    A       They, A&E.  So Steve knew I was a wrestling

12    fan and was very excited about the prospect of doing

13    that.  Did some research and --

14    Q       Well, let's fast forward to the end, then well

15    come back.

16            Did the A&E biography on the 10 greatest

17    wrestlers ever occur?

18    A       No.

19            MR. BARKER:  Page 30.

20    Q       When Mr. Stern bought -- brought this idea of

21    an A&E biography on the 10 greatest wrestlers to

22    you, what were the initial things that you did?

23    A       Well, I went to my -- you know, I always -- I

24    was always a big wrestling fan and knew immediately

25    who to start writing down and start doing research

1    on.  And then I got on the internet and pretty soon

2    after, you know, I came -- I found the guys from

3    Wrestlereunion.  And I thought it was a good

4    opportunity to -- they had a website, and I think --

5    I believe it was 75 wrestlers they were supposed to

6    have at the first event.  And I thought it was a

7    great opportunity to try and get bang for your buck

8    and go down and spend a weekend and get as many

9    interviews as possible, you know, in one location.

10   Q     Once you were doing your research on the

11   internet and you came across Wrestlereunion and saw

12   that there was an event scheduled in Tampa and there

13   was approximately 75 wrestlers or so that would be

14   there, what was your next step once you found that

15   information?

16   A     If I remember correctly, I believe there was

17   an e-mail, you know, a contact us e-mail that I

18   believe went to Bill Apter.  Bill, I think, e-mailed

19   me back pretty quickly, if I remember correctly, and

20   gave me Rob Russen's contact information.

21         And I don't know if I called Rob first or Rob

22   called.  I don't remember.  But soon after, Rob and

23   I spoke on the phone, and I told him what I wanted

24   to do.

25   Q     And what was that?

1       A       That I would like to interview a bunch of

2    these guys and -- for this A&E biography and that we

3    would give them a credit.  And Rob said, well, you

4    guys -- I believe Rob said, do you guys make DVDs?

5    And I said yes.  And I told him about Steve

6    Sterling.  And I got those two in contact with each

7    other, if I remember correctly, and they started

8    talking soon after.

9            This was -- by now it was close to

10   Christmastime of 2004.  If I -- if the timeline is

11   right in my mind.  And I believe soon after they

12   spoke, I don't know exactly when.

13   Q       So your initial contact and interest with

14   Wrestlereunion was for the A&E biography?

15   A       Yes.

16   Q       Did that change at some point?

17   A       For me it became -- I don't remember, the end

18   of January it was.  And I didn't know if I was going

19   until probably maybe a week to three days before,

20   officially going.  And I think Steve had said

21   we're -- Steve Sterling had said that, yeah, we're

22   going to do this.

23           I guess I had been in touch with Rob.  I had

24   never spoke to Sal until I -- I don't think, I don't

25   remember -- until I had gotten down to Tampa.  And

1    then it became sort of -- they brought in another

2    producer to go with me and an associate producer.

3    And Dawn and I spoke and we booked three camera

4    crews.

5         You know, I didn't understand the scope of

6    what we were doing.  I was sort of interested in

7    the -- I was interested in doing my interviews,

8    quote, unquote, for the A&E biography, which Sal and

9    Rob were great.  I think we did 21 interviews that

10   weekend, very helpful in bringing us guys.

11        And then we did something called shoot

12   interviews which I didn't understand until we got

13   down there which were, you know, the real deal of

14   what happened within the business.  A guy named Ron

15   Reggio helped produce those.  I helped produce some

16   of those when I wasn't doing interviews.

17        And we filmed the wrestling card on that

18   Saturday night, whatever date that was.  And we

19   would film these question and answer sessions, as

20   well, and film some footage around the reunion

21   itself.

22   Q    Did anyone at Clear Channel Entertainment at

23   any time say, Eric, when you go to Tampa, this is

24   what we want you to do, and give you a list or a

25   series of tasks that you were to complete while you

1    were there?

2    A      I don't remember.  Sal and I spoke when we got

3    there almost immediately.  Rob made the

4    introduction.  We spoke in the lobby and we talked.

5    I'm trying to remember if Steve Sterling came in

6    late that night.  He came in one night very late and

7    we discussed it further in the lobby.  I believe it

8    was just the three of us.  I can't remember who else

9    was there.

10    Q      During the actual event Mr. Sterling came in?

11    A      Came in and wasn't there very long.  Flew in.

12    I don't remember if he was there more than a day.

13    Was that -- was not for the wrestling event on

14    Saturday night, that I know.  I think it was Friday,

15    Saturday and Sunday, Friday night, Saturday night

16    and Sunday.  And I don't know if by Saturday morning

17    he was gone.

18    Q      Let me think of all the tasks and duties and

19    responsibilities you had in Tampa for Wrestlereunion

20    and compare that to your wrestling assignments at

21    Clear Channel.  What's different?

22    A      Not really, no.  I had another producer and I

23    had an associate producer.  When things were going

24    on simultaneously, I couldn't be in two places at

25    once.  The other producer was very, very capable, as

1    was the associate producer.   And we were busy.

2    There was a lot going on.   Between the shoot

3    interviews, I don't remember how many we did down

4    there, if I remember correctly maybe nine or ten

5    that weekend.   And I sat in on a few of them and

6    they were great.   I mean, they were -- they looked

7    good.

8         I had seen some other ones that these guys had

9    sent me and they were amateur looking.   Ours were

10   shot on high definition.   They sounded good, they

11   looked good, their talents -- the guys conducting

12   the interviews were very professional, very

13   knowledgeable and did a very good job.   We had a lot

14   of fun in those ones that I sat in on.

15        And then I was doing the interviews with the

16   talent, the other talent.   A whole bunch of A level

17   wrestlers from Roddy Piper to Kevin Nash to Diamond

18   Dallas Page.   And, really, the guys couldn't have

19   been more helpful bringing talent in and helping out

20   with the A&E side of things.

21   Q    When you say the guys couldn't have been more

22   helpful, who are you referring to?

23   A    They were very helpful.   Rob and Sal and their

24   crew, everybody.   I mean, there wasn't a person on

25   the crew on Sal's team, Wrestlereunion team who

1    wasn't helpful.  They went out of their way to help

2    out the production side of things, our side of

3    things.

4            MR. BARKER:  Okay.  Move to 43.

5    Q    When you got involved in Wrestlereunion and

6    you were down in Tampa and actually conducting these

7    shoot interviews and other things, did you draw back

8    on your years of being a fan and model what you were

9    doing after what you grew up watching?  Did you have

10   a vision for what you wanted these things to look

11   like?

12   A    Yeah, I did.  I mean, I wanted the guys to be

13   in character on camera.  I wanted -- it was like,

14   you know, a kid in a candy story.  It was -- you'd

15   turn around and you would see Jimmy Snuka was

16   walking around and you would see in the corner --

17   you would see -- what was his name?  He died.  What

18   was the guy's name?  Not the warlord, the guy with

19   the hair on the back of his head, the guy who -- the

20   Missing Link, he was there, out of his makeup.

21           And in the corner was Abdul the Butcher

22   sitting, talking, the Missing Link.  They were

23   discussing politics and they were sitting in the

24   lobby discussing politics and arguing about

25   politics.  And it was like -- it was -- Dusty Rhodes

Pauen                                                                              112

1    was there and it was like, oh, my god, and I was in

2    heaven.

3         I mean, it was really incredible, it was fun,

4    you know.  It was sort of like when I first went to

5    CNN.  Wow, this is great, this is fantastic.  They

6    brought Roddy Piper in.  Sal brought Roddy Piper in

7    to do the interview.

8         And I sat there and, you know, I had chills

9    going up and down my spine as I sat and spoke to

10   him.  And he spent an hour together doing an

11   interview with me, and one of the fondest memories

12   of doing an interview that I've ever had.

13   Q    Since you're doing these interviews and it's

14   basically a one-take thing, how do you determine

15   that you're getting good sound, good lighting, good

16   photo?

17   A    There's a monitor down in front of me.  So

18   when we sit the guy down, I would see how it looked.

19   And in terms of getting good sound, I would ask a

20   question until I got what I thought was good sound.

21   When the wrestlers -- you know, with the wrestlers

22   you didn't have to worry about getting good sound.

23        You turned the light on and they got it.  They

24   understood when to get into character, they

25   understood when to get out of character.  Some guys,

1    as Sal told me, were always in character.  Jimmy

2    Hart was one of those guys.  It's the same guy that

3    it is on TV, it's the same guy that is off TV.  Some

4    guys weren't like that.  Some guys were very, you

5    know, but they would tell us the stories that, you

6    know, that I wanted to hear based on, you know, who

7    I felt the 10 wrestlers were.

8         I don't know if I ever got a definitive list,

9    but we had an idea of maybe 10 to 15 guys, maybe

10   even a little more of who the guys were going to be.

11   Q    At some point after the event, did you go back

12   and look at the footage that you had obtained?

13   A    Yeah.  Yeah.  Because I edited the first set

14   of shoot interviews and I edited and produced the

15   actual first match.

16   Q    What was your impression of the quality of

17   what you captured?

18   A    It was pretty good considering, you know, we

19   got lights at the last minute, which was totally out

20   of my realm.  You know, they came up and put

21   lights -- put up lights along the -- I don't even

22   know what they're called, in the ballroom, which was

23   just out of my realm.

24        I was more of a documentary producer, and the

25   closest thing I had done to that was the Final Four

1    films where, you know, the action went on in front

2    of you and you just captured it.  So we set up, we

3    had one camera high up on a -- I don't know even

4    what it's called.

5    Q      A boom, a tripod?

6    A      It was a platform; right?  He was on a ladder,

7    he was on the ladder.  One cameraman was on a ladder

8    and stayed stationary and two cameramen ran around.

9    It's called ENG.  It stands for electronic news

10   gathering and trying to capture the events as they

11   are happening.

12   Q      Did you ever have, while the Wrestlereunion

13   event in Tampa was going on, a vision in your mind

14   of we're going to produce DVDs and sell them in the

15   marketplace at this event because people who

16   couldn't attend live might want to watch this and

17   see what happened and we can have a combination of

18   matches and interviews and that sort of thing?  Did

19   you have a vision for that or did you have a

20   different vision of what went on in Tampa?

21   A      Both.

22   Q      So in terms of the wrestling matches, that

23   portion of the event, who determined things like

24   where to have the cameras and things of that nature?

25   A      I did in combination with the Wrestlereunion

1       guys.  We had talked about it beforehand, and the

2       other producer.

3       Q       Okay.  Give me your assessment of the event

4       itself that the Wrestlereunion crew put on.  By that

5       I mean, let's start with what -- was it something

6       that you found to be good or bad, and then let's

7       talk about your observations.

8       A       Well, I found it to be good, very good.  But I

9       was also, you know, concerned with the production

10      side of things.

11      Q       When you say the production side of things,

12      what are you referring to?

13      A       Well, we had to make sure that the announcers

14      were miked, and that was sort of -- if it wasn't for

15      Jimmy Hart, none of that would have ever happened.

16      Jimmy Hart was invaluable in terms of helping us as

17      a guy who knew wrestling television, helping set

18      things up for us, in terms of getting the announcers

19      miked and getting them fed to the cameras.

20              You know, we didn't have a production truck

21      that night.  We just had an ENG crew, an E-N-G crew.

22      Q       Was there a reason you didn't have a

23      production truck?

24      A       I don't know.

25      Q       When did you first meet Jimmy Hart; in Tampa

1       or before?

2       A       In Tampa, I believe Saturday morning.

3       Q       You said Jimmy Hart was invaluable.  Tell me

4       what your recollection is of what Jimmy Hart did

5       that gave you the license to say that he was

6       invaluable.

7       A       I think I did an A&E interview with Jimmy on

8       Saturday morning, and then we sat in the hotel room

9       waiting for other people.  And we talked about, you

10      know, what needed to be done and some of the things

11      that we had an understanding of, some of which we

12      didn't.  And Jimmy really helped set things up for

13      us.  I don't think a lot of things would have gotten

14      done without him, without his help that night.

15      Q       Were there any particular issues or problems

16      with the entire Wrestlereunion event that you recall

17      as you sit here today?

18      A       In Tampa?

19      Q       Yes, sir.

20      A       No, not that I recall.

21      Q       What was your impression of the venue?

22      A       I thought it was fine, but I wouldn't have

23      known any better.  I wouldn't have known -- it

24      wasn't in the realm of what I did, so I wouldn't

25      have known a great venue from a bad venue.

1       Q       Well, you grew up watching televised

2       wrestling.

3       A       Yeah.

4       Q       So did you have anything to draw on from your

5       experience as a wrestling fan now that you are

6       standing in front of the camera at this venue?

7       A       You know, it wasn't Madison Square Garden

8       but --

9       Q       Okay.

10      A       I thought the ring looked great.  I thought --

11      then it got better as -- the second one to me was

12      the best looking one.  Everything looked great at

13      the second one, the Valley Forge, the second

14      Wrestlereunion.

15      Q       Did you ever have any involvement in selling

16      any of the Wrestlereunion project to anyone?

17      A       No.

18      Q       Not your bailiwick?

19      A       No.

20      Q       Did you ever have any involvement in trying to

21      project how much revenue might be derived from the

22      Wrestlereunion project for Clear Channel?

23      A       No.

24      Q       Did you have -- ever have any involvement in

25      projecting how much in costs would be incurred for

Paulen                                                              118

1    putting on any of the Wrestlereunion I, II or III

2    events?

3    A       No.

4    Q       During the event I understand you were busy.

5    But were you reporting to anyone on how things were

6    going?  Were you talking to Mr. Stern, Mr. Sterling

7    or Mr. Townley?

8    A       Other than afterwards I called Steve Sterling

9    to tell him that I thought it went off very well,

10   and I was proud, I was proud of these guys because I

11   thought that the Wrestlereunion crew -- that we all

12   did a very good job.

13   Q       From the time you got back after

14   Wrestlereunion I until Wrestlereunion II in Valley

15   Forge, which was several months later, what was your

16   involvement with the Wrestlereunion project?

17   A       I put together the overall -- the wrestling

18   event, the wrestling card, the wrestling matches as

19   a DVD.  I put together most of the -- most of the

20   shoot interviews.  I believe there were four titles,

21   I believe there were four the first round.  Somebody

22   might have stepped in at the end and finished one of

23   them.

24          I know that I did two to two and a half to

25   three of them myself, producing, editing, putting it

1    altogether.

2    Q      What was your impression of the quality of the

3    final product?

4    A      I thought that they were -- I thought that

5    they were very good.  The Wrestlereunion guys seemed

6    pretty happy with them.  Rob -- Sal said he didn't

7    watch them, as far as I remember.  I created a promo

8    tape for them at one point, like a minute or two

9    minute that we called a sizzle reel, I think, if I

10   remember correctly.  I don't remember when that was.

11   Q      The Valley Forge event was August -- towards

12   the end of August of 2005.

13   A      Yes, sir.

14          MR. BARKER:  Oops, I'm sorry.  I think I read

15   the wrong line there.  That is my fault.  Forgive

16   me.  I'm sorry.  That should be your line.

17   A      I know we went down there to scout at one

18   point, to look at the place.  Dawn and I went down,

19   Dawn Olejar and I went down.

20   Q      How did that come about?

21   A      I guess Sal set it up, if I remember

22   correctly.  I don't know if he spoke to me directly

23   or Dawn directly.  I don't remember how the chain of

24   events went.  But whatever it was, we figured out a

25   date and we went down there one weekday morning.

Paulen

```
 1    Q      And what was your impression of the venue site
 2    for Valley Forge?
 3    A      Again, you know, I didn't know any better, but
 4    it looked better than the Tampa hotel.  It was a
 5    convention center.  It looked like, you know, it
 6    could fit a lot more people.  And then Dawn -- I was
 7    sort of along for the ride, sort or a liaison, I
 8    guess, because I had the relationship with these
 9    guys.  I didn't know anything about that kind of
10    production, where the trucks went, where the lights
11    went, I didn't know anything.  That's not my --
12    that's not my wheelhouse.  That's not what I do.
13    Q      Was that Dawn's wheelhouse?
14    A      Yes, I think so.
15    Q      Tell me what your involvement was in the
16    Valley Forge event.  Just walk me through what you
17    did with the Valley Forge event.
18    A      It was very much the same type of thing that
19    we did with -- by that point I believe the A&E
20    project was dead, I believe.  It may have been still
21    hanging on, but we didn't do any of the A&E
22    interviews down there.  So we were filming the
23    question and answer sessions, we were filming the
24    shoot interviews which were two camera, high
25    definition shoot interviews.  I don't remember how
```

1      many.

2             I was not there on Sunday.  I had left after

3      the event very late Saturday night to drive home.  I

4      went away with my family the next day, so I wasn't

5      there Sunday for the shoot interviews.  There was a

6      tribute dinner to Bruno Sammartino.

7      Q      What was your impression of the Valley Forge

8      event in terms of the organization and the things

9      that the Wrestlereunion crew was working on?

10     A      The same as I felt in Tampa.  But, again, I

11     was more concentrating on -- they did a very good

12     job in terms of -- and we were more involved in

13     terms of sitting down and discussing the card.  We

14     had the truck there, the production truck there, the

15     high definition production truck, and it was much

16     more involved.

17            I probably had less of a production role in

18     the wrestling card, the wrestling event that

19     Saturday night.  I think that I dealt -- but we were

20     move involved.  Like we were on the headsets and we

21     knew things were -- when things were going to

22     happen, so we could get our cameras in place.

23     Q      And --

24     A      Afa would point out that the fall was coming

25     up.  He had gotten the signal, Afa.  The -- I don't

```
1    know his last name, Afa, A-f-a, the Samoan, was on

2    Sal's crew.  And he would say, guys, get ready, here

3    comes the fall.

4    Q      And Ms. Olejar, were you working closely with

5    her?

6    A      Yeah.  Dawn was -- you know, I couldn't tell

7    you specifically what her role was.  But she was the

8    production coordinator making sure that everything

9    came together from the technical standpoint, I would

10   say.  And I was sort of the wrestling liaison

11   production guy, you know, production person.

12   Q      Those things that Ms. Olejar was in charge of,

13   what was your impression of how those things went?

14   A      I was really impressed.  J. J. Dillon who was

15   on Sal's crew sat in the truck with them, and I

16   spoke to him after the show.  He was impressed with

17   the way things looked.  It looked like a very -- it

18   looked like a high level show from the way that the

19   lights came on and the entryway when the guys came

20   in.  It looked great.

21          You know, it looked -- that one I went home

22   and I watched.  I watched.  There's a line cut.

23   What comes out of the truck from the director and

24   something like this, you'll go back and you'll take

25   the line cut as your guide and then you'll edit
```

1    things that got missed.  Because I don't remember

2    how many cameras we had.  I think it was four

3    recordings.  And you would go back and you could

4    edit it.  If you missed something, you would have it

5    on another camera or you could put a cutaway in

6    there, you know.

7         So I watched that line cut and I was impressed

8    by it.  I watched it with my neighbor who -- you

9    know, my neighbor's son who was really impressed

10   with it.  And the last match was incredible.  I

11   mean, it was -- it was a lot of fun.  And I thought

12   it looked good.  I thought that -- I thought we had

13   all taken it to another level, both Wrestlereunion

14   and Clear Channel on that night.

15   Q    I realize the amount of time between

16   Wrestlereunion II and Wrestlereunion III was

17   relatively short.  I think it was a period of a few

18   weeks.

19   A    Yes.

20   Q    Do you go to Davie, Florida for the

21   Wrestlereunion III event?

22   A    Yes.

23   Q    Tell me what you recall about the

24   Wrestlereunion III event and your involvement in it.

25   A    When I got to Davie?

Paulen                                                                          124

```
 1    Q      Yes.  I'm trying -- I just want you to go

 2   through what you recall about the Davie event, how

 3   things went, your involvement, what you did, those

 4   types of things.

 5    A      When I got to Davie, the venue was very

 6   different than -- it was outside.  It was -- it

 7   wasn't up to the standard of the second event.

 8    Q      The venue, you mean?

 9    A      Now, that's not saying -- and, again, this is

10   just my thought.  It was pretty cool.  I mean, it

11   looked like a cool place, but different.  That's it.

12    Q      Were there any issues or problems that you

13   were aware of?

14    A      The issues were, as far as I know, that we had

15   cancelled going down there beforehand, and Sal had

16   said -- I don't remember if this was a phone

17   conversation, I believe it was -- that, you know,

18   you guys had a contract.  And I really didn't know

19   much about it other than what I was told.  And the

20   event came back on and I went to Davie.

21          Sal was busy dealing with a lot of things.  I

22   believe some of the wrestlers had gotten in trouble,

23   which prevented us having a production meeting until

24   Sal came.  That threw things off a little bit.  I

25   believe that was a Saturday morning.
```

1            And that was frustrating.  And I was

2       frustrated with Sal and I think he was frustrated

3       with me.  And we aired it out and discussed it and,

4       you know, shook hands and agreed to disagree.  And

5       that was that.  And the show went off and the show

6       was great.

7            Again, there were, you know, a lot of great

8       things going on.  There was a point in the match

9       where I guess they didn't tell anyone, but Terry

10      Funk had come and hit Joey Styles who was the

11      announcer, if I remember correctly, and he passed

12      out.  And I was sitting next to him and my heart was

13      racing because I didn't know that this was

14      happening.  No one had told me.

15           And the doctor came to Joey and the doctor

16      said to him, if you're okay squeeze my hand.  I

17      don't think he did.  So we were all sort of -- and

18      this was happening, you know, five feet away from

19      me, seven feet away from me right here.  And I

20      didn't know what the heck was going on.  And I think

21      I was on the headset calling, is this real?  Is this

22      really happening, because Terry was crazy.

23           Terry Funk, you know, you didn't know if he

24      was in character.  I didn't know him as a person.  I

25      was going -- I was worried he was going to hurt the

Paulen                                                                        126

1    cameraman.  He was so good in his character that I

2    didn't know what was going on.  I didn't know that.

3    And the producers in the truck and the director were

4    calling, follow him, follow him.

5         And there was a female camerawoman, if I'm

6    remember, and I was worried that Terry was going to

7    hurt her.  And I was worried -- I mean, this -- this

8    is -- at a certain point it just got out of control.

9    But the match was great.  I mean, it was great

10   because you felt like, wow, this is incredible.

11        When everything settled, I remember saying

12   that to -- I remember talking to Terry after that

13   and saying, you know, he was incredible on that

14   night.  I thought it was a good show.  Joey Styles

15   got up and quit, I think, and walked off and that's

16   it, I'm done, if I remember correctly.

17        Jimmy Hart had to handle the broadcast, and

18   that was at the end.  It was fun.  It was great, you

19   know, we had some laughs.  And, again, it looked

20   pretty good.  We had the monitors in front of us.

21   It looked good.  I don't remember if J. J. was in

22   the truck that night.  I don't remember.  I don't

23   remember.  I don't remember that.  There was a lot

24   going on after in terms of people cleaning up, and I

25   don't remember.

```
1    Q      What was your involvement with Wrestlereunion

2    after the Davie event concluded with the project?

3    What did you do after that?

4    A      Not much.

5    Q      Were you involved with the editing?

6    A      No.  Somebody else was editing, and I would

7    look in from time to time.  I was involved with a

8    Paul Shaffer concert in terms of the day-to-day

9    production.

10   Q      Did you ever get a chance to look at any of

11   the versions, edited or unedited versions of the

12   Davie Wrestlereunion event?

13   A      I went back and looked at some of the -- I

14   mean, just for me I went back and looked at some of

15   the -- the Joey Styles, Terry Funk stuff, if I

16   remember.  I'm trying to remember.  I always would

17   like to zip through the show afterwards.  I'm trying

18   to remember if I did -- I'm trying to remember if I

19   had a line cut of that show.  I probably did, and I

20   probably went right to the Joey and Terry stuff just

21   to see how that looked.

22   Q      What was your impression of it?

23   A      I thought it looked great.  I thought it

24   looked great.  I thought the Valley Forge show was

25   the best.
```

1      Q      Despite having all this thrown at you and your

2      crew within a matter of days, did you feel that you

3      and Clear Channel did a very good job in bringing

4      things together in taping this event?

5      A      Yeah, I thought so.  I was very proud of what

6      we had done.  I -- I liked these guys a lot, I liked

7      them.  I felt like I immediately connected with

8      them, the Wrestlereunion guys.

9      Q      You mean Sal and Rob?

10     A      Sal and Rob and everybody on their crew.

11     Q      Jimmy Hart?

12     A      Jimmy, I don't think he was working for them

13     at that point.  I loved Jimmy.  He was great.

14     Q      Did Sal tell you he thought you did a good

15     job?

16     A      Yeah, I think so, as far as I remember, and

17     Rob, too.  I just thought that for what we had -- in

18     the timeframe that we had, you know, we did a good

19     job.  I sent them rough cuts of things and they

20     seemed to like them, you know, as far as I remember.

21            Rob would say that he looked at them and Sal

22     said he didn't watch, as far as I remember.

23     Q      So Rob Russen looked at what you shot and said

24     that he approved it, he thought it was a good

25     quality product?

1    A        Yeah.  Yeah.  For what it was and the

2    timeframe, yes.  Did it look like the WWE?  No.

3    Q        How was it different?

4    A        From the production level of the WWE, I mean,

5    that's -- to me that's as high level a production as

6    you get in television.  You know, that's on any

7    level.  They do as good a job as they do at the

8    Super Bowl, I think, so -- and I'm sure it cost them

9    a fortune.  I don't know, but they do a great job.

10   It didn't look anything like that.  I believe the

11   second show was making progress towards starting to

12   look like that.

13           I remember sitting there and Joey Styles when

14   the monitors came out, he said, oh, my god, he said,

15   look at these monitors.  I've never seen anything

16   like it.  They were the high def, beautiful

17   monitors.  He was impressed at that point as we were

18   setting up that night.  That was the second show in

19   Valley Forge.

20   Q        And you had a lot more time to prepare?

21   A        A lot more time, a lot more thought, a lot

22   more preproduction, a lot more interaction between

23   Clear Channel and Wrestlereunion.

24   Q        For the Wrestlereunion II, is there anything

25   that you can say that Clear Channel failed to do or

1      did wrong or really should have done a much better

2      job on, or overall do you think that they did a good

3      job on their end of it for Wrestlereunion II?

4      A      It's just opinion, but I thought we did a good

5      job.  I thought that we did -- you know, we went and

6      filmed a one-man show with Mick Foley, F-o-l-e-y,

7      and worked until -- the crew worked until after

8      midnight that night, and they had had a long day.

9      Q      This is the Clear Channel crew?

10     A      This is this Clear Channel crew.  I don't

11     remember if that was the same night as the Bruno

12     Sammartino dinner but, you know, the guys, the

13     cameramen busted their butts.  We as producers

14     busted our butts all weekend.  I think Dawn was

15     there all weekend, if I remember correctly.  I don't

16     remember that well, but --

17     Q      Do you feel like Dawn gave her all?

18     A      Always, always.  Dawn is as good as it gets

19     when it comes to production.

20     Q      Do you feel Dawn was totally committed to

21     making the best product she could for Clear Channel

22     for this product?

23     A      Yes.

24     Q      Any questions in your mind about that?

25     A      No.

1    Q       We talked a little bit about the trailer, you

2    called it a sizzle piece?

3    A       Sizzle reel.

4    Q       There's some documents regarding a trailer

5    that was done, and I think that Johnny Gallarello

6    was involved in the trailer.  I just want to

7    understand if the sizzle reel you're talking about

8    was ultimately what they referred to as a trailer.

9    A       I guess.  And I don't know if we went back --

10   I know we had conversations about certain things in

11   the trailer later on down the road that, you know,

12   weren't that -- that didn't look real good, you

13   know.  They said they -- Dusty Rhodes was their

14   biggest star, or one of their bigger stars.  And we

15   wanted him in the trailer.

16           And there was -- he didn't wrestle much in the

17   match and he was there.  And there was one shot of

18   him giving his elbow, and it didn't look good.  He

19   missed the guy.  So I remember having a conversation

20   with Sal about that, and this was later.  I don't

21   remember the timeline but he said, you know, that

22   looks awful.

23   Q       Let me ask you something about the trailer.

24   Do you remember a dispute about the photos that were

25   used in the trailer?

Paulen                                                                                              132

1       A       I don't know anything about that.

2       Q       About a conflict with WWE and Wrestlereunion

3    being contacted by WWE's legal department?

4       A       No.   The only thing I remember about that at

5    the Valley Forge, Sal said to each of the

6    wrestlers -- we were gathered backstage and we were

7    getting ready to shoot some interviews beforehand

8    that we could use before the matches.   And Sal said,

9    make sure that you get your photograph taken with

10   our photographer so we can use it for promotional

11   purposes.   But that's it.   I mean, he didn't --

12      Q       Sal said, get your photo taken so we can use

13   it to each of the talent that appeared at that

14   event?

15      A       As far as I remember.

16      Q       Do you remember any conflict coming up over

17   the use of one of the character's names from one of

18   the old WWE days with Sal?

19      A       Yes.   That happened at -- that happened at

20   Valley Forge.   I guess they were called the Dudleys.

21   And this was all just -- you know, I was not really

22   involved, just wanting to know how we were going to

23   introduce guys.   But they weren't allowed to use the

24   name, the Dudleys.   I believe it was the Dudley

25   Boys.   And they had to come up with another name for

```
 1    them for that weekend.  And Sal was dealing with

 2    that a lot -- dealing with that a lot that weekend.

 3            MR. BARKER:  Okay.  Skip ahead to 106.

 4    Q      You mentioned that you were laid off from

 5    Clear Channel, Live Nation.  I guess it was Live

 6    Nation by that point on December 20th, 2005?

 7    A      Yes.

 8    Q      You have some hard feelings about the way that

 9    was done; fair enough?

10    A      Yes.

11    Q      You felt that it wasn't very fair or

12    professionally handled?

13    A      No.  I thought it was handled very

14    professionally.  I didn't like the decision.

15    Q      Did you think it was unfair that others in

16    your division kept their jobs while you were laid

17    off?

18    A      Yes.

19    Q      Who in particular?

20    A      I would rather not answer.

21    Q      Do you think Steve Sterling shouldn't have

22    kept his job while you --

23    A      No.  It wasn't Steve Sterling.  It's not

24    pertinent to this case.

25    Q      It wasn't Dawn Olejar?
```

1    A       No.

2    Q       Eroc7, that's your personal e-mail address or

3    screen name?

4    A       Yes.

5    Q       And all of the testimony that you've given

6    here today has been truthful?

7    A       As far as I can recall.  And based on that

8    question, you know, I did have a conversation, I

9    believe, with Rob after this and Sal saying that,

10   you know, I would prefer to be left out of this.  I

11   really have nothing to gain.  And those are my

12   opinions, that's all they are.

13   Q       Is there any testimony that you've given today

14   that was not truthful but you gave it because you

15   are mad that you got laid off?

16   A       No.  No.

17   Q       Are there comments you would like to make

18   about those two documents?

19   A       I've gotten over that.  I've been out in the

20   freelance world for over three years.  I've worked

21   for 20, 30 different people, 20, 30 different people

22   and it wound up being a better situation for me, so

23   I'm not mad about it.  I was mad about it at the

24   time.

25   Q       Even if your deposition had been taken at the

1    moment when you were the maddest, would you ever

2    testify untruthfully because you were mad at Clear

3    Channel?

4    A       No.

5            MR. BARKER:  And I believe that concludes our

6    portion, Your Honor.

7            THE COURT:  Ms. Millner, do you have some

8    other designations to read?

9            MS. MILLNER:  Just a couple questions, Your

10   Honor.

11           THE COURT:  Go right ahead.

12           MS. MILLNER:  Page 20, line 12.

13   Q       Now, you said there were layoffs -- now, you

14   said that when the layoffs came, you felt that the

15   business was going in a different direction.  Do you

16   mean that they were going away from things like the

17   Wrestlereunion project?

18   A       I don't know.

19           MS. MILLNER:  Page 71, line eight.

20   Q       What about the wrestlers getting in trouble,

21   what do you mean by that?

22   A       I think wrestlers were arrested coming into

23   town.  Sal had to deal with that.  And I didn't

24   understand that because I cared about the production

25   and I felt Sal should be there for the production

1    meeting because he was the guy in charge.  It was

2    his boat and he was the guy who made all the

3    decisions.  And we couldn't really do anything

4    without him there.  And, you know, our crew was

5    sitting around waiting for him and, you know, it was

6    frustrating.

7    Q     Were you -- when I say you, I mean the Clear

8    Channel team that was there, were you able to

9    capture everything you wanted to capture or were

10   there things you missed?

11   A     At the Davie show?

12   Q     Yes, sir.

13   A     I believe that we captured -- I believe that

14   we captured everything.  I didn't go back and look

15   at all the cameras.

16         MS. MILLNER:  That's it, Your Honor.

17         THE COURT:  Thank you.  Call your next

18   witness, please.

19         MR. BARKER:  Your Honor, we would now like to

20   read the deposition of Steve Sterling.

21         THE COURT:  And for the record, just spell his

22   last name please.

23         MR. BARKER:  S-t-e-r-l-i-n-g.

24         THE COURT:  All right.  You may proceed.

25         MR. BARKER:  Thank you, Your Honor.

Sterling                                                                    137

```
 1              (The deposition designations of Steve Sterling

 2      were read as follows:)

 3      Q       Please state your name and business address

 4      for the record.

 5      A       Steve Sterling, 915 Broadway, Suite 1109, New

 6      York, New York, 10010.

 7      Q       And prior to April 2008, what was your last

 8      employment?

 9      A       I was at Live Nation.

10      Q       Now, when did your employment end at Live

11      Nation?

12      A       I resigned I believe it was mid April and left

13      the company -- transitioned the various projects out

14      and left the company over a 90-day period of

15      transition.

16      Q       When you were hired by Clear Channel

17      Entertainment Television Holdings, what was your

18      initial title?

19      A       I think it was senior vice president of

20      programming and production.

21      Q       When you left Live Nation, what was your

22      title?

23      A       The same.

24      Q       Now, to your knowledge, has someone been hired

25      to replace you in your title as senior vice
```

1      president at Live Nation?

2      A      To my knowledge, no.

3      Q      When Joe Townley left, was his position

4      eliminated, to your knowledge?

5      A      Yes.

6      Q      Mr. Sterling, what I'm showing you is the

7      amended complaint for damages which, for the record,

8      is document four filed in the courtroom.  But what I

9      want to show you is Exhibit 1, which is a four-page

10     document.  So I'm just going to hand it to you like

11     this and ask you if you can take a look at that and

12     tell me if you recognize what that is and if that is

13     your signature on the final page.  Do you recognize

14     that document?

15             MR. RODEMS:  Your Honor, we were referring --

16     may we approach.

17             THE COURT:  Sure.  Is that the --

18             MS. MILLNER:  I don't mind him providing

19     context, if he wants, Your Honor.

20             THE COURT:  Is that the exhibit that's number

21     one?

22             MR. RODEMS:  Yes, sir, it's Exhibit 1.

23             THE COURT:  That's fine.  I think with

24     agreement we're now referring to Exhibit 1 that's in

25     evidence.

Sterling

139

```
1              MS. MILLNER:  Correct, Your Honor.

2              THE COURT:  Thank you.

3              MR. BARKER:  I'm sorry.  Now on page 79.

4    Q    Do you recognize that document?

5    A    Yes.

6    Q    Is that your signature on the last page?

7    A    Yes, it is.

8    Q    What is that document?

9    A    This document is an outline of terms for the

10   worldwide TV and DVD production and distribution

11   rights of Wrestlereunion.

12   Q    Do you know who wrote that document?

13   A    Well, when you say who wrote it, my

14   recollection is that it was a document sort of

15   created, I would think, between myself, Joe Townley

16   and our counsel at that time, Lee Galkin,

17   G-a-l-k-i-n.

18   Q    Would Clear Channel Entertainment Television

19   have gone forward with this Wrestlereunion event

20   that was scheduled if this document had not been

21   signed by someone from Wrestlereunion?

22   A    I can't imagine we would have.

23   Q    Why wouldn't you?

24   A    Why wouldn't we?

25   Q    Go forward with the videotaping and audio
```

Sterling

1    taping of the project if that outline of terms was

2    not signed by someone from Wrestlereunion.

3    A       Why would we?

4    Q       Well, I guess that's really the seminal

5    question.  Did you feel a signed agreement between

6    Clear Channel Entertainment Television and

7    Wrestlereunion was necessary for Clear Channel

8    Entertainment to go toward and do its part?

9    A       On a very fundamental basis in our business,

10   you know, you get to know people who have a guide as

11   we talked about before.  Yes.  You absolutely want

12   to have something, some basic, as we call it, an

13   outline of terms that somebody is saying, yeah,

14   these are sort of the terms we were talking about.

15   This is what we were generally comfortable with.

16   Then we will sign to say that we are.

17   Q       Okay.

18   A       And we expect somebody to do that and I can't

19   imagine why we would ever spend any money on

20   something with anybody that we weren't asking to

21   sign something in some sort of letter form or, you

22   know, simple fundamental form.

23   Q       What is your understanding of what is

24   contained in the outline of terms?

25   A       Well, what we do is we --

1    Q       If you don't mind, hand me that one back, the

2    bad one, and I'd look at that.

3    A       That will be great.  This looks like it's been

4    through a few copy machines.  In this case, we

5    outlined the program.  There's basically, you know,

6    14 points that we just want to highlight again, just

7    sort of an outline of terms and we talk about what

8    the program is.  It's sort of the definition of what

9    it is we will all say we're going to put together

10   here.

11           In this case, it talks about an audio-visual

12   production.  It is a series of live events because

13   it was always represented to us that these guys in

14   the Wrestlereunion business were in the business of

15   putting together a number of events, which they were

16   going to do.  So it was, again, highlighted as an

17   outline with a series of events that we were going

18   to use sort of the living legends of wrestling.

19   They were going to assemble them and they were going

20   to put together competitive events, you know, we

21   wanted to highlight.

22           There were going to be some other special

23   events and appearances there and there was going to

24   be a predetermined schedule so we knew, you know,

25   when things were happening and we were reliant on

1     them and their expertise and professionalism.  We

2     state that we will, you know, produce the programs

3     in the audio-visual medium -- that's what we do.  We

4     don't do live events -- that we would, you know, in

5     that originate personality profiles and do exclusive

6     interviews and behind the scenes footage.  It would

7     be, you know, documentary footage.  And then we

8     would shoot the schedule events and these

9     personality profiles and turn them into programs

10    that were going to be at least 90 minutes long for

11    national and international television distribution

12    and at least 120 minutes for home video purposes,

13    which, again, usually gave you an extra 30 minutes

14    of bonus material for anybody who saw it on TV and

15    then wanted to have the home video.  They would get

16    a little extra for buying it.

17    Q     Did you intend for this to be an agreement

18    between Clear Channel Entertainment Television and

19    Wrestlereunion that could be enforced if there was

20    ever a dispute between the parties as to who owned

21    the property or what could be done with it?

22    A     We intended this would be an outline of terms

23    that would represent what the parties would do.

24    Q     And does this four-page document identify what

25    Clear Channel Entertainment Television's

Sterling                                                                    143

```
 1      responsibilities were?

 2      A       I think it outlines what our

 3      responsibilities -- our scope of work and

 4      responsibilities would be.   Yes.

 5      Q       Does it outline what Clear Channel

 6      Entertainment Television's rights were in terms of

 7      any audio or visual recordings?

 8      A       Yes.   In point two it speaks to the rights

 9      that we were securing as part of the outline of

10      terms that we were agreeing to do with them, putting

11      together with them.

12      Q       And does it discuss how any revenue generated

13      from this project would be split or divided between

14      Wrestlereunion, LLC and Clear Channel Entertainment

15      Television?

16      A       Well, it provides for a commitment for us to

17      fund the audio-visual production, and then it

18      provides for the distribution fees or what would be

19      called royalty rates, the revenue shares of the

20      parties.   Yes.

21      Q       And does it provide for how long this

22      agreement will be in place?

23      A       I can look at that; right?

24      Q       Paragraph five on page two, term.

25      A       Yes, it does.
```

1    Q        And then there was a place for each of the

2    parties to this outline of terms to sign it?

3    A        Correct.

4    Q        If there was a dispute at some point in the

5    future about the revenue split, do you believe that

6    paragraph seven, in paren, capital A, closed paren,

7    was an enforceable term between the parties when you

8    wrote this agreement?

9    A        Yes.  I would think that it would be.

10    Q        Was a deal with A&E ever reached on a

11    documentary about professional wrestling?

12    A        No.  As I said before, Vince McMahon would not

13    grant the interview and, therefore, the project

14    couldn't be done.

15    Q        Before this Wrestlereunion I event in Tampa,

16    had you ever had any involvement with the

17    professional wrestling industry before in a

18    professional capacity?

19    A        No.

20    Q        Do you know if Joe Townley had?

21    A        I don't know.

22    Q        Do you know if Dawn Olejar had?

23    A        I don't.

24    Q        What about Steve Stern?

25    A        I don't.

Sterling                                                                    145

1    Q      What about Eric Paulen?

2    A      I don't.  I know Eric was a fan, but I don't

3    know if he had any professional relationship with

4    wrestling prior to.

5    Q      When did the spinoff or the transition from

6    Clear Channel Entertainment to Live Nation -- when

7    did that process begin?

8    A      My recollection is -- and it's really, you

9    know, it's a -- it was such an unfamiliar and

10   somewhat traumatic time.  My recollection is that it

11   was really happening in the November, December

12   timeframe.

13   Q      What do you mean, it was traumatic?

14   A      Well, I had never -- you know, I had never

15   been -- listen, my -- I had not been with the

16   company before.  I had been in and out of companies

17   large and small.  I have worked for major big

18   corporations and I have gone off and worked with

19   independent companies and sort of gone back and

20   forth.  So it's sort of a range of experience that

21   I'm happy to have.

22          In this case, it was something where there

23   wasn't a lot of communication or understanding of

24   what was going on.  There was, you know, a lot of

25   restructuring going on.  There was a lot of, you

1    know, everybody keep doing what we are doing but we

2    are making some big changes.

3        Then it was going to be a spinoff.  I didn't

4    frankly even know what a spinoff was.  I had no idea

5    how to do a spinoff.  So for a few of us who weren't

6    so familiar with how that goes it was, you know,

7    just sort of, okay.  Somebody will tell us what the

8    end result is and we will know.

9        And a couple of different names were rumored

10   to be -- they were consolidating.  They were

11   consolidating people as far as basically reducing

12   head count, as they call it.  But all of us were

13   trying to make our numbers because at the end of the

14   day, you didn't want to be caught in the machinery,

15   oh, my God, we got distracted from this and we

16   didn't make our numbers and now we are dead.

17       But it seemed to me that it actually went

18   quite quickly from this sort of, you know, moment of

19   uncertainty to, oh, my gosh, what is going to happen

20   to, oh, there is a new name for the company, oh,

21   they're spinning it off, oh, they're working with a

22   newly traded company.  So it didn't --

23   Q    Were there a lot of people leaving the

24   organization as a result of the transition?

25   A    Head count reduction is what they call it in

1        the corporate world, I learned.

2        Q       Were you ever concerned that your position

3        might be eliminated?

4        A       Yes.  Absolutely.

5        Q       Going back to when you were still an employee

6        of Live Nation, was there ever a time when

7        Wrestlereunion was considered ended or over?

8        A       Well, you're asking the wrong guy because I'm

9        in the intellectual property business, and they last

10       longer than we are all going to be alive.  Nothing

11       is ever over.  You know, if there was ever somebody

12       to -- you know, was I hard selling it?  Was it in

13       the front of my mind all the time?  No.  But was I

14       wondering and reading or hearing something from

15       somebody, hey, wow, maybe they would be interested

16       in this?

17               It is an ongoing sort of thing.  Once an

18       intellectual property comes into existence, any of

19       us are ready to go into a conversation about trying

20       to do some business off of it.

21               MR. BARKER:  And that concludes our portion,

22       Your Honor.

23               THE COURT:  Ms. Millner, any portions you'd

24       like to read?

25               MS. MILLNER:  No, Your Honor.

```
 1              THE COURT:  All right.  Thank you, sir.  Call

 2    your next witness, please.

 3              (Brief pause.)

 4              MR. RODEMS:  Your Honor, at this time we would

 5    call Michael Bochicchio, but that is also by

 6    deposition.

 7              THE COURT:  All right.  Spell the last name

 8    for the record, please.

 9              MR. RODEMS:  Yes, sir.  According to the

10    deposition, it is spelled B-o-c-h-i-c-c-h-i-o.

11              THE COURT:  V as in victor?

12              MR. RODEMS:  I'm sorry, Your Honor.  B as in

13    boy.

14              THE COURT:  All right.  Thank you.

15              MR. RODEMS:  May I proceed?

16              THE COURT:  Yes, sir.  And again, members of

17    the jury, these witnesses are testifying by

18    deposition.  You are to receive and consider them as

19    if they were here live testifying.

20              (The deposition designations of Michael

21    Bochicchio were read as follows:)

22    Q       Please tell us your full legal name for the

23    record and your place of business.

24    A       Michael Bochicchio.

25    Q       And are you employed by Highspots?
```

1        A        Yes, I am.

2        Q        But you do business as Highspots.com, Inc.?

3        A        Yes, I do.

4        Q        What does Highspots do?  How does it make its

5        money?

6        A        We sell on the internet products that are

7        related to wrestling and mixed marshal arts, things

8        like DVDs, videotapes back when people had -- had

9        videotape machines, t-shirts, action figures.

10       Any -- any wrestling-related merchandise that we

11       feel there's a market for we -- we promote and sell

12       on our website.

13       Q        Any other lines of business that -- that you

14       were engaged in at that time, '04, '05?

15       A        Related to the pro wrestling and mixed martial

16       arts, we did take a lot of jobs as, like,

17       videography for these events.  So we would film --

18       sometimes film and distribute to assist the promoter

19       of the event.

20       Q        You had some type of arrangement with the

21       plaintiff in this case, Wrestlereunion, LLC in --

22       A        Um-hum.

23       Q        -- in late 2004; correct?

24       A        Correct.

25       Q        And that agreement in terms of categorizing it

1    along the lines that you just testified about, that

2    arrangement was an arrangement whereby you didn't

3    charge them a fee and you were going to film it,

4    sell it and split whatever revenues might come from

5    that?

6    A      I don't remember the specifics of the

7    agreement with Wrestlereunion, but I would -- I

8    would safely guess, based on my past agreements and

9    specifically the agreements that were -- I was

10   making at the time, that I would have agreed to film

11   the events, all the events, do all the -- all the

12   editing work, all the post production work, as you

13   call it, and then distribute it through our website

14   and our affiliate network that we have set up in

15   exchange for 50 percent kickback to the promoter.

16   Q      Okay.  And that 50 percent split of

17   revenues --

18   A      Uh-huh.

19   Q      -- that was based on gross sales or was that

20   based on some sort of net?

21   A      Typically it's based on gross sales.  We

22   absorb the cost of post production and filming out

23   of our 50 percent.

24   Q      Okay.  And in terms of the Wrestlereunion

25   project, you were -- is that you -- your

1        distribution of that at the time was going to be

2        limited through sales through the internet?

3        A        Correct.

4        Q        Okay.  So at what point in the discussions did

5        it -- did it get to a point where Sal on behalf of

6        Wrestlereunion and you were discussing, you know,

7        were actually coming close to some type of

8        arrangements by which Highspots was going to do

9        something?

10       A        I want to be clear that there was never a

11       written agreement.  All of this stuff was discussed

12       on the phone, just bouncing ideas back and forth.  I

13       had verbally agreed to film everything that was

14       going on, and at that time we would -- after filming

15       everything and seeing what we had, we would sit down

16       and discuss together what the best route to take

17       would be for distributing products, because

18       sometimes these question and answer sessions turn

19       out to be pretty dull.

20               Rather than create a product off of something

21       like that, sometimes you -- you'll just can it or

22       clip it.  And then there's others that turn out to

23       be great and they're great standalone products.

24       Sometimes they're shorter.  You have to combine

25       them.  So I would say to answer your question

1    specifically, in the -- in the fall of '04 would

2    probably be the time where we kind of made the

3    decision that I would -- I would be doing this.

4        And I do remember after we made the decision

5    that I would film it and that he was -- either he

6    had just started his negotiations with Clear Channel

7    or he had just informed me of his negotiations and

8    the agreement was, well, if we can get a company

9    like Clear Channel to get involved, you know, our

10   agreement will basically be off the table because of

11   what they could do.  They can provide, you know, a

12   much larger distribution than I could ever offer,

13   could still offer.

14   Q    Okay.  So the understanding was that if a big

15   company like Clear Channel came along, then your

16   arrangements or discussions with Wrestlereunion

17   would be put on hold or go by the wayside?

18   A    Correct.

19   Q    Was it your understanding that whether or not

20   Sal had somebody to film this and try to sell it

21   that he was going to do it as a live event

22   convention, anyway, that the business model was

23   going to be first and foremost the live event?

24   A    No.  No.  What -- I think I said the opposite.

25   I think with the way that he was overbooking talent,

 1    it would have been impossible for him to make the

 2    money back from the live event, so the video would

 3    have to have been factored into this.

 4    Q       Let me ask you today, you may or may not know,

 5    Clear Channel has over 250 tapes.  They're called

 6    beta cam tapes or some specialized term for them

 7    that I -- I don't recall now of the matches.

 8    A       Um-hum.

 9    Q       That took place at Wrestlereunion I, II and

10    III.  If those were presented to you, if those were

11    edited, cut and then put into a final package, would

12    Highspots have any interest in attempting to sell

13    these on your website today?

14    A       Yeah.  Absolutely.

15    Q       Okay.  Has -- did Wrestlereunion ever contact

16    you about attempting to do that?

17    A       The -- the only correspondence I had with them

18    is when I would talk to Sal.  It was pretty frequent

19    when I talked to Sal.  I'd check in with him every

20    couple of months.  But he just said he didn't

21    have -- he didn't have the footage or it wasn't

22    available yet.  So I would call and check in and

23    say, hey, is there any status or news?

24            But, you know, quite honestly, I mean, this

25    footage doesn't -- just because it's older doesn't

1    make it more valuable now, because a lot of these

2    things have been -- have been seen subsequently,

3    particularly with these interviews, you know.  These

4    interviews are now dated, so most of the value of

5    the interviews are, I would say, a complete wash.

6            You know, the live events I think still have

7    value -- sort of value to it.  But, again, it's a

8    lot lower than it would have been if it had gotten

9    out closer to the event.

10   Q       Okay.  So --

11   A       It would have been the same thing as if I --

12   if you were recording an NBA game or something, you

13   know.

14   Q       Okay.

15   A       What kind of market is it to see it four or

16   five years later, you know.

17   Q       Right.  So the value decreases over time?

18   A       Absolutely.

19   Q       The marketability decreases over time?

20   A       Yes.

21   Q       You've attended in your career with Highspots

22   hundreds of live wrestling events; is that correct?

23   A       Yes.

24   Q       And many of them have been billed as fan

25   conventions, too; haven't they?

1    A      Yes, they have.

2    Q      Were there ever any that you attended that

3    were bigger than Wrestlereunion?

4    A      No.

5    Q      Wrestlereunion by far had the largest number

6    of wrestling legends; didn't it?

7    A      By far.

8    Q      Who were some of the people that attended

9    Wrestlereunion I who were superstars that you

10   thought had a wide following?

11   A      Bruno Sammartino, that -- that -- it was a

12   really big deal to get him because he had never done

13   a convention before.  I remember both Terry and Dory

14   Funk were there.  They had the matches -- the

15   matches that they had, they had a retirement match

16   with Jimmy Valiant that was pretty well noted.

17          They had, let's see, Tully Blanchard

18   wrestling, which was very, very unique.

19   Q      Mick Foley was there, too.

20   A      Was.  Yeah, you're right, he was.

21   Q      How about Dusty Rhodes?

22   A      Yes, he was there.

23   Q      Is there any wrestler in the Florida market

24   that's bigger than Dusty Rhodes, that you know of?

25   A      Probably not.  He's the biggest in Florida.

```
1    Q       Superfly Jimmy Snuka, he was there, too,

2    wasn't he?

3    A       Yes.

4    Q       Harley Race?

5    A       Yes.

6    Q       Kevin Nash?

7    A       Yes.

8    Q       Kevin Nash spent some time in the WWE?

9    A       Yes, he did.

10   Q       He was very successful there?

11   A       Yes.

12   Q       Kevin Von Eric, was he involved?

13   A       Yes, he was at Wrestlereunion I.

14   Q       How about the Von Eric family, is that a

15   famous family in the wrestling industry?

16   A       Yes, it is.

17   Q       Jeff Jarrett, do you recognize that name?

18   A       Yes.

19   Q       Who's Jeff Jarrett?

20   A       He's a coowner of a company called TNA and his

21   family is noted for basically running wrestling in

22   Tennessee for the last 30 years.

23   Q       Okay.  Mike Graham?

24   A       Yes.

25   Q       Do you know Mike Graham?
```

1    A      Yes.  His father is more famous than he is but

2    he --

3    Q      His father was Eddie Graham; right?

4    A      Yeah.  He promoted Florida Championship

5    Wrestling.

6    Q      And all these people were involved in

7    Wrestlereunion I?

8    A      Correct.

9    Q      Now, you've been to some poorly organized

10   events, also; haven't you?

11   A      Yes.

12   Q      Some events that were billed as fan

13   conventions, too; correct?

14   A      Correct.

15   Q      What were the problems in some of the poorly

16   organized events that you can share with us?

17   A      Well, there's a lot -- I mean, this could be a

18   conversation that could go on for an hour.  But

19   there are some that are poorly run in terms of

20   getting people, the logistics of carrying people

21   through the convention like to meet everybody.

22          There's others that are just poorly promoted

23   where there's not enough people for the talent.

24   There's problems of not delivering the talent, which

25   is a big issue among people in our industry.  They

1    promise some really big names and then a couple of

2    days before the convention they magically can't be

3    there.

4    Q      Well, let's talk about that as far as

5    Wrestlereunion was concerned, Wrestlereunion I, that

6    is.

7    A      Okay.

8    Q      Did they promise a lot of talent?

9    A      Yes.

10   Q      Did they deliver on that?

11   A      They did.

12   Q      Has there been any convention that you've been

13   affiliated with or attended that has ever delivered

14   on the promise of talent the way that Wrestlereunion

15   I did?

16   A      Well, if you measure it on the scope of the

17   talent, nobody has ever booked that much talent on

18   one event and they -- everybody that was advertised

19   did show up.

20   Q      And Wrestlereunion I, in addition to having

21   question answer sessions also had interviews with

22   wrestlers and also opportunities for the fans to

23   meet wrestlers and get autographs; right?

24   A      Yes.

25   Q      And it also had actual matches?

1      A        Correct.

2      Q        How did that compare to other wrestling fan

3      conventions that you had seen?

4      A        Most other conventions don't have a wrestling

5      show connected to it or, if it does, it doesn't have

6      as many famous people in the wrestling matches that

7      they did have at Wrestlereunion I.

8      Q        Now, after the event, did your company hear

9      from fans interested in buying DVDs of

10     Wrestlereunion?

11     A        Yes.  Particularly the live event was what

12     people wanted.

13     Q        When you called it the live event, what are

14     you referring to, the wrestling matches?

15     A        I'm sorry.  The wrestling matches, yes.

16     That's what I mean.

17     Q        Did you say earlier that the wrestling matches

18     had the greatest value of everything that went on at

19     Wrestlereunion?

20     A        By far.

21     Q        And you talked earlier in the deposition about

22     lighting problems at Wrestlereunion I; didn't you?

23     A        I was asked about them.

24     Q        Yes.  You noticed lighting problems at

25     Wrestlereunion I with the videotaping of some --

1        some of the interviews.

2        A        I think what I said was is that some things

3        with the question and answer sessions were not

4        filmed because of stated lighting issues.   I

5        didn't -- I did not visually see it, but I remember

6        being very frustrated about one particular question

7        and answer session that got rave reviews that was

8        never filmed, and they --

9        Q        And what was that?

10       A        It was the one with Bill Watts and Mick Foley.

11       Q        Didn't you at some point have a discussion

12       with Mr. Corrente and tell him that there was a lot

13       of good opportunity for marketable footage that was

14       lost because it was not videotaped?

15       A        Oh, absolutely.   Yeah.   Specifically the Mick

16       Foley, Bill Watts would have done better than any of

17       these DVDs that they did produce.

18       Q        Now, you never received from Clear Channel

19       Entertainment Television finished, edited versions

20       of the wrestling matches to sell; did you?

21       A        I've never seen the wrestling matches in any

22       form, no.   I've never received any -- anything from

23       Clear Channel other than the four DVDs that we have

24       discussed earlier.

25       Q        Okay.   You would agree with me,

```
1     Mr. Bochicchio, that delay in getting the wrestling

2     matches to the fans on DVD was damaging to the

3     potential sales?

4     A     Yes.  I think not releasing the -- what I call

5     the crown jewel of this event severely limits the

6     amount of money you'd make off an event like this.

7     You -- an event like that in my -- in my opinion

8     does not go up in value, it goes down.  For the

9     further you wait to release any of this footage,

10    you're -- you're -- you know, it's -- it's -- the

11    value of it's decreasing.

12    Q     You base that on your experience in selling

13    DVDs of other events?

14    A     Yes.

15    Q     Now, the wrestling -- now, the Wrestlereunion

16    concept of bringing together these aging superstars

17    and having some wrestling matches, is that a concept

18    that had appealed to the fans that were purchasing

19    DVDs from your website?

20    A     Yes.  I think there are a lot of people who

21    prefer the nostalgia and older wrestlers than the

22    current product.

23    Q     Mr. Bochicchio, have you seen event rough cuts

24    of the wrestling matches from any of the three

25    Wrestlereunion events?
```

1       A       No, I have not.

2       Q       If those wrestling matches were fully and

3       finally edited, would your company have an interest

4       in distributing them?

5       A       We would have an interest.  But I think the

6       important part is -- is like what I could have

7       offered on a product like that back in 2005 is

8       significantly more than I would offer today.

9       Q       And why is that?

10      A       Well, I used the analogy of let's say you

11      filmed an NBA All Star game and you wanted to watch

12      it four years later.  Do you think it would be more

13      valuable right after the event or four years later?

14      Q       Mr. Bochicchio, to your knowledge, Sal

15      Corrente had never done an event nearly as big as

16      Wrestlereunion prior to Wrestlereunion; fair enough?

17      A       I don't think anyone has ever done an event

18      that had that much talent.

19              MR. RODEMS:  Your Honor, that concludes our

20      designations.

21              THE COURT:  Ms. Millner, anything you like to

22      add?

23              MS. MILLNER:  Yes, Your Honor.  Page 30, line

24      21.

25              MR. BARKER:  Okay.  I got it.

 1    Q       I'm going to ask you a little bit just about

 2    your background and how you got into the business so

 3    I have a better understanding of you and your

 4    company.

 5    A       Okay.

 6    Q       I will try and keep that very brief.  But

 7    before I do, let me ask you, do you remember in this

 8    case placing an order for a thousand units of shoot

 9    interviews that were taken at the Wrestlereunion I

10    event in January in Tampa?

11    A       I remember placing an order and I -- I could

12    not find the invoice to determine what size that

13    order was.

14    Q       Okay.

15    A       But I do remember placing an order and paying

16    directly to --

17    Q       Is that -- is it Clear Channel?

18    A       Clear Channel.  I believe it was a check that

19    was written to Clear Channel.  It may have been

20    payment with a credit card, but I do remember that

21    there was four different interviews that they

22    produced and we purchased.

23            MS. MILLNER:  Page 33, line 25.

24    Q       Okay.  Do you recall generally or roughly or

25    specifically, if you recall, how well those sold,

1    that first order that you placed?

2    A      I know that the Kevin Nash sold out completely

3    of the order and I think Bruno Sammartino sold out.

4    I do not believe Windy Richter or Diamond Dallas

5    Page sold out.

6    Q      Do you remember if Windy Richter was the

7    lowest seller?

8    A      Yes, it was.

9    Q      Do you have a rough idea of how many you're

10   still left with of those?

11   A      I can tell you exactly how many I have.

12   Unfortunately, I can't tell you how many of those

13   are from the 250 and how many of those are from

14   inventory that I had to transport from

15   Wrestlereunion to my warehouse.  But I don't have

16   any Kevin Nash remaining, so I know I sold out of my

17   250, if that was, in fact, how may I ordered.

18   Q      Um-hum.

19   A      I have 96 remaining Bruno Sammartino DVDs.  I

20   have 302 remaining Windy Richter CDs DVDs.  And I

21   have 263 Diamond Dallas Page DVDs.  And I can tell

22   you how many I've sold of each of those from

23   December of '06 to now.  Unfortunately, because of a

24   database crash, I can't tell you the specific

25   products that we sold before that time, which is

1          probably what -- when we sold most of them.

2          Q        Okay.  Why don't you tell me from -- from

3          December of '06 until now.  Let me just ask you

4          before I ask you that --

5          A        Uh-huh.

6          Q        If someone wanted to purchase one of those

7          shoot interviews, they're still available for

8          purchase from your website?

9          A        The Kevin Nash is not.

10         Q        Okay.  But it's -- because it sold out; right?

11         A        But the other three we still have available.

12         Q        Okay.  And if -- and so if anyone were

13         interested and they went on your website and they

14         searched for it or sent an e-mail to your company,

15         they could place an order and buy these?

16         A        Yes, they can.

17                  MS. MILLNER:  Page 44.

18                  MR. BARKER:  Okay.

19                  MS. MILLNER:  Line 19.

20         Q        Before I get into a little about your

21         background and how you first came into contact with

22         these Wrestlereunion folks, I just wanted to ask you

23         a follow-up on something that you mentioned, and

24         that was the inventory that you took back from the

25         Wrestlereunion II.  Can you explain that to me a

1    little bit.  I've just read a little bit about it --

2    about that, but I'd like to hear your -- from your

3    perspective on how that came about and what happened

4    and what transpired in connection with those DVDs.

5    A      The four DVDs that we're talking about, the

6    Kevin Nash, Windy Richter, Bruno Sammartino and

7    Diamond Dallas Page, the big release date for those

8    was at Wrestlereunion II convention.  So that was

9    the first time that they hit the market.  And I

10   don't know if it was Wrestlereunion or if it was

11   Clear Channel that sold those DVDs at a booth.  But

12   those four DVDs were sold at a booth.  It was, you

13   know, the hot item, so to speak, of that convention

14   because it was the first opportunity to buy these

15   products.

16        And for some reason, they didn't have a system

17   of transporting unsold material back to wherever it

18   was supposed to go.  I had a truck since I had

19   brought the wrestling ring and my own inventory, and

20   they asked me if I could bring it back to Charlotte

21   and they would contact me about picking it up at a

22   later date, which that later date is -- I'm still

23   waiting for.

24   Q      Okay.  Okay.  So you didn't take any of those

25   DVDs down there?  In other words, they were the --

Bocchicchio

1    in other words, they were there, Wrestlereunion had

2    them there and was trying to sell them, and whatever

3    they didn't sell, they just asked you to take it

4    back?

5    A       Correct.  But I'm not sure it was

6    Wrestlereunion who asked me.  I don't know who

7    specifically asked me to take it back.  I just know

8    whoever it was did not have a way to transport back

9    to where this stuff was supposed to go.  I assume it

10   was Wrestlereunion product, but I can't say that for

11   certain.

12           MS. MILLNER:  Page 47, line 16.

13   Q       And just so I'm clear with you, you were just

14   transporting those, they weren't giving those to you

15   for you to go and sell on your website or anything;

16   were they?

17   A       No.  Nothing was ever discussed other than

18   transporting and they would get back in touch with

19   me so --

20   Q       Okay.  So that was -- so that -- so that would

21   have been -- the second Wrestlereunion was in August

22   2005.  So since that time no one from Wrestlereunion

23   has called and asked you about those DVDs?

24   A       No.  Nobody has called.

25   Q       Okay.  So -- so then those are -- those are

1    still sitting in your -- whatever, warehouse or

2    storage or whatever?

3    A    On a shelf in a box clearly marked.

4    Q    Okay.  So if someone wanted to get those back

5    from you, all they would have to do is call and

6    maybe pay for the shipping?

7    A    Absolutely.

8         MS. MILLNER:  Page 7, line 22.

9    Q    Do you recall if you took any preorders for

10   anything in connection with the Wrestlereunion

11   project at any time?

12   A    I don't remember taking any preorders other

13   than advertising that we would be filming for

14   interviews that would be sold later.

15        MS. MILLNER:  Page 152, line 13.

16        MR. BARKER:  Okay.

17        MS. MILLNER:  You got there faster than me.

18   Q    Do you recall if your company had an exclusive

19   arrangement for selling DVDs from Wrestlereunion I?

20   A    No, I don't.  That's the first I've ever -- I

21   can even remember about it.

22   Q    Okay.

23   A    I know that if we typically kick in some money

24   on these type of things, I usually ask for a window

25   of exclusivity, but that would be a window against

1    people like R. F. Video, people I consider my direct

2    competitors, not someone who promoted the event

3    itself so --

4    Q    So, I mean, in that case, do you think maybe

5    because you provided the ring, other services, that

6    you asked for an exclusive or --

7    A    It's possible but I don't remember ever asking

8    for an exclusive or getting an exclusive.

9         MS. MILLNER:  Page 169, line 23.

10   Q    Do you know -- again, I know we've kind of

11   went through this before.  Do you recall any

12   discussions or any directions from anyone that you

13   were going to have any type of exclusive

14   distribution arrangement with these DVDs?

15   A    I don't remember any type of discussion about

16   exclusivity.

17        MS. MILLNER:  Page 183, line 23.  I'm sorry,

18   I'm sorry.  Page 184, line four.

19   Q    Okay.  Was there a lot of fan interest from

20   what you could tell in Wrestlereunion?

21   A    I -- I was actually -- by Wrestlereunion I, if

22   we're talking about, I was very surprised by the

23   lack of attendance because I thought considering how

24   great the talent was, and I thought they did a good

25   job of advertising on the internet, that I was

1    shocked how many people appeared at the live event.

2         The second one was -- was better attended and

3    I thought actually had less advertising.  So it may

4    be -- maybe choosing Tampa was a mistake in

5    retrospect.

6         MS. MILLNER:  Thank you, Your Honor.  No

7    further questions.

8         THE COURT:  Thank you.  Call your next

9    witness, please.

10        MR. RODEMS:  Your Honor, we have another

11   witness by deposition, Dawn Olejar.

12        THE COURT:  All right.  Spell that last name

13   for the record, please.

14        MR. BARKER:  Okay.  I'm sorry, Your Honor.

15   It's Olejar, O-l-e-j-a-r.

16        (The deposition designations of Dawn Olejar

17   was read as follows:)

18   Q    Please state your name for the record.

19   A    Dawn Olejar.

20   Q    Good afternoon.  Who are you currently

21   employed by?

22   A    Media Push Entertainment.

23   Q    That's the same outfit that Mr. Sterling is

24   employed by?

25   A    Correct.

1    Q      Do you now work with Mr. Sterling on a regular

2    basis?

3    A      Yes.

4    Q      Were you at one time employed by Clear Channel

5    Entertainment Television Holdings?

6    A      Yes.

7    Q      When did that end?

8    A      That -- Clear Channel was turned into Live

9    Nation.  Clear Channel Entertainment spun off,

10   became Live Nation.  So I left Live Nation in June

11   of this past year and consulted with them until the

12   end of July of this past year.

13   Q      When did you get hired by Clear Channel

14   Entertainment Television?

15   A      I was actually hired by SFX Entertainment in

16   January of 2002.

17   Q      Did that somehow become a part of Clear

18   Channel?

19   A      SFX Entertainment was purchased by Clear

20   Channel maybe a month or two after I was hired.

21   Q      When you were hired by SFX Entertainment was

22   Joe Townley employed by SFX Entertainment?

23   A      He was.

24   Q      Was Steve Sterling employed by SFX

25   Entertainment?

```
1     A       He was.  Oh, I'm sorry, the answer is no.

2     Q       What was your job when you were hired at S --

3     I'm sorry, forgive me -- SFX Entertainment?

4     A       Production manager.

5     Q       Was that your title?

6     A       It was.

7     Q       When SFX entertainment was purchased by Clear

8     Channel did your title remain the same?

9     A       Yes.

10    Q       And when Clear Channel Entertainment

11    Television became Live Nation Television Holdings,

12    was your title the same?

13    A       I think my title changed right before Clear

14    Channel Entertainment Television became Live Nation

15    to vice president.

16    Q       Any particular area?

17    A       Production.

18    Q       Would you describe for me what your job duties

19    were as a production manager once SFX Entertainment

20    was purchased by Clear Channel Entertainment

21    Television.

22    A       As a production manager, I was responsible for

23    organizing all of the productions of the events that

24    we shot for television broadcast, so basically that

25    means hiring all the trucks, hiring all the
```

```
 1    personality -- personnel, hiring all the below the

 2    line, basically organizing the live events coverage

 3    for television, working with vendors for equipment,

 4    for catering, hotels, airfare, that kind of stuff.

 5    Q       When you refer to below the line, what are you

 6    referring to specifically?

 7    A       Below the line actually just means the

 8    equipment, the cameramen, the actual people that

 9    were operating the equipment in the truck, stuff

10    like that.

11    Q       When your title changed to vice president of

12    production, did your duties change?

13    A       My duties were increased.  I kept doing the

14    production manager duties, but at that point I was

15    also handling some of the budgeting for our

16    division.

17    Q       You are familiar with Wrestlereunion?

18    A       Yes.

19    Q       Prior to any involvement with Wrestlereunion,

20    had you ever worked in the professional wrestling

21    industry or been involved in production of wrestling

22    events?

23    A       No.

24    Q       How did you first hear about Wrestlereunion?

25    A       I think I first heard about Wrestlereunion
```

1    when we were talking about doing a show for A&E on

2    the top 10 wrestlers, top 10 professional wrestlers.

3    And I think that one of our producers found

4    Wrestlereunion, I don't know if it was through the

5    internet or how, and that it would be a good place

6    to go and do some research and do some interviews

7    for this documentary we were looking to do with A&E.

8    Q       Approximately when was this?

9    A       Maybe this was 2004.

10   Q       And who was this producer you are referring

11   to?

12   A       Eric Paulen.

13   Q       Did Mr. Paulen report to you?

14   A       No.

15   Q       What was Mr. Paulen's title, if you recall?

16   A       I think he was a senior producer at the time.

17   Q       What is the difference between a producer and

18   a production manager?

19   A       The producer actually handles the creative,

20   they actually develop the show from a creative

21   standpoint.  They're the ones guiding the story

22   lines.

23           A production manager is facilitating what the

24   producer envisions the show to be from a technical

25   standpoint, operation standpoint.

1    Q      Once you heard about the Wrestlereunion

2    project, when did it become clear to you that you

3    were going to become involved in the project?

4    A      I think it first was prior to the first event

5    in Tampa where I had a couple of conversations with

6    both Eric and I guess their lighting vendor just

7    about setting up for that event.

8    Q      When is the first time that you recall having

9    any direct conversations either by telephone or in

10   person with Sal Corrente or Rob Russen?

11   A      It was definitely after Tampa, right before --

12   well, before Valley Forge, which was the second

13   event.  I don't remember exactly what timeframe that

14   was.

15   Q      Were you the production manager for the Tampa

16   event?

17   A      I was not.  No, I was not.  I did not go to

18   the Tampa event.

19   Q      Did someone at Clear Channel Entertainment

20   Television serve as a production manager for the

21   Tampa event?

22   A      I think Eric served as that person.

23   Q      Is that something that he did for other

24   projects, as well?

25   A      Not really.

1    Q      Did you find it unusual that you would not be

2    involved with that particular event?

3    A      No, because I think the initial idea of the

4    Tampa event was to go get interviews.  And it

5    changed within days of the actual event.

6    Q      What changed within days of the actual event?

7    A      Moving from just shooting interviews and

8    shooting B roll of the convention to shooting the

9    matches live.

10   Q      What does that phrase mean, B roll?

11   A      B roll, behind the scenes footage, you know,

12   just no interviews, real capturing what is going on

13   at a location, shots of people, video footage.  No

14   audio footage.

15   Q      You were the production manager for

16   Wrestlereunion II in Valley Forge, Pennsylvania?

17   A      Correct.

18   Q      And also Wrestlereunion III which was in

19   Davie, Florida?

20   A      Correct.

21   Q      Now, do you know why for Wrestlereunion II you

22   were the production manager instead of Mr. Paulen

23   serving that role again?

24   A      I think because at that point after Tampa it

25   was determined that we were going forward to shoot

1      the events as we would have shot any other event.

2      Q      Did you have any role at all in Wrestlereunion

3      I in Tampa?

4      A      No.  Outside of a couple conversations, no.

5      Q      As to production manager for Wrestlereunion

6      II, I could ask you exactly what you did and you

7      could tell me all the duties and tasks you did, I'm

8      sure; correct?

9      A      Yes.

10     Q      Did you talk with Mr. Paulen at all while

11     Wrestlereunion I in Tampa was going on?

12     A      Yes.

13     Q      What kinds of -- how often?  It was a two or

14     three day event, I believe?

15     A      Yes.  Maybe once or twice, not often.

16     Q      Would there be anything specifically that you

17     talked to him about that you can recall?  In other

18     words, did he call you because he was having a

19     problem or did he call you just to chat, or did he

20     call you because he needed advice or input or

21     guidance?

22     A      I think he -- from what I can recall, it was

23     just to say everything was fine.  There were no

24     problems or anything that I had heard about.

25     Q      At any time were you called upon by anyone at

1      Clear Channel Entertainment Television to assist in

2      the preparation of revenue projections for the

3      Wrestlereunion project?

4      A      Yes.

5      Q      At any time were you called upon in connection

6      with the Wrestlereunion projects at Clear Channel

7      Entertainment Television to project the amount of

8      costs that would be associated with videotaping and

9      audio-taping Wrestlereunion II?

10     A      Yes.

11     Q      And how about Wrestlereunion III?

12     A      Yes.

13     Q      Did you have any involvement in selling, if

14     you will, the final product of Wrestlereunion to

15     buyers, or was that someone else at Clear Channel

16     Entertainment Television?

17     A      That was someone else at Clear Channel

18     Entertainment Television.

19     Q      And you did not participate in trying to

20     market or sell Wrestlereunion for Clear Channel

21     Entertainment Television?

22     A      No.

23     Q      Is that correct?

24     A      That's correct.

25     Q      Tell me in your own words, then, what your

1    involvement in the Wrestlereunion project was for

2    Clear Channel Entertainment Television.

3    A        My involvement was to be the production

4    manager for the live event, to hire the producers,

5    to hire the lighting team, to hire the cameramen,

6    the tape guys, to hire the truck, to bring in

7    catering for our crew, to bring in any additional

8    vendors necessary in order to fulfill the taping of

9    a preexisting event.

10   Q        Ms. Olejar, I'm showing you documents that

11   have numbers down at the bottom right-hand corner.

12   Do you see those?

13   A        Down here?

14   Q        LNWR.

15   A        Yes.

16   Q        How I'm referring to these documents are just

17   basically by the four digit numbers and then the

18   page numbering.  So, for instance, the first one

19   you're looking at, LNWR, and then a series of

20   numbers, 6460_1, I'm going to refer to that as, for

21   instance, 6460-1.  If you look at the next document

22   behind that, it would be 6461-1, and that's a

23   two-page document.  So if you look at the final page

24   of that you will see 6461 and then a two at the very

25   bottom.  Do you see that?

1    A       Yes.

2    Q       Have you ever seen these three pages before

3    that you have been handed?

4    A       I did not see the first page, the e-mail, but

5    I have -- yes, I have seen the actual P and L.

6    Q       What is a P and L?

7    A       Profit and loss statement.

8    Q       And when I have asked you previously if you

9    participated in revenue projections, more or less

10   what I was asking you is if you participated in the

11   creation of this P and L that we're looking at.

12   A       Yes.

13   Q       Who else participated in the creation of this?

14   A       It seems to me from this e-mail, Steve

15   Sterling, Joe Townley and Matthew Hecktor.

16   Q       What was your role in the creation of this

17   P and L?

18   A       Matthew Hecktor actually created the P and L

19   because Matthew was our financial person based out

20   of Houston.  So my conversations were just with him

21   and he would actually input everything into the

22   document.

23   Q       Let's just take a look at this for a minute.

24   If you look at 6461-1, and you look in the line that

25   says revenues, it's got 2005 through 2009.  Do you

```
 1      see that?

 2              MR. RODEMS:  Your Honor?

 3              THE COURT:  Yes, sir.

 4              MR. RODEMS:  For illustrative purposes, may we

 5      put this Exhibit up?  It's 102.

 6              THE COURT:  102?

 7              MR. RODEMS:  Yes, sir.

 8              THE COURT:  All right.  Thank you.

 9              MR. BARKER:  You want the cover page or the

10      actual --

11              MR. RODEMS:  The one that's Bates stamped

12      number 6461, or it could be 1434, 1428.

13              MR. BARKER:  Yeah.

14              MR. RODEMS:  Did I say -- Your Honor, could I

15      have a minute to go back and refer to my notes?

16              THE COURT:  Yes, sir.

17              (Brief pause.)

18              MR. BARKER:  Sorry, Your Honor.  We determined

19      it was number 121, which is in evidence.

20              THE COURT:  All right.  121.  Thank you.

21              MR. BARKER:  Okay.  I'll go back to the top of

22      page 29, start there.

23      Q       Let's just take a look at this for a minute.

24      If you look at 6461-1 and you look in the line that

25      says revenues, it's got 2005 through 2009.  Do you
```

1    see that?

2    A      Yes.

3    Q      And then in the column to the left it lists

4    production fee, TV license, video on demand, Rest of

5    World catalog, revenues, DVD sales, and then total

6    revenues.  Do you see that?

7    A      Yes.

8    Q      And then there are some numbers filled in at

9    various spots on this document.  Do you see that?

10    A      Yes.

11    Q      What was your role in estimating the various

12    revenues that might be generated from this project?

13    A      It was probably more based on the DVD side

14    than anything else, in just helping to configure the

15    yearly breakout of the revenue.

16    Q      What information did you rely on to assist in

17    creating these documents?

18    A      What information?

19    Q      Yes.

20    A      Can you explain what you're looking --

21    Q      For instance, in 2005 DVD sales is listed as

22    appears to me 46,813.

23    A      Yes.

24    Q      Is that dollars?

25    A      Yes.

1   Q       Is that a number that you came up with or

2   somebody else came up with?

3   A       I don't recall.

4   Q       Do you know how that number was derived?

5   A       It's probably derived from the estimated gross

6   profit per unit times the number of units forecasted

7   for sale.

8   Q       How did somebody, whoever it was, come up with

9   these numbers?

10  A       Previous experience, I would assume.

11  Q       And what was the purpose of creating this

12  document that's 6416-1 and 2?

13  A       The purpose of creating a P and L?

14  Q       Yes.

15  A       Is to determine whether a project will be

16  profitable or not.

17  Q       Okay.  Based on your experience at Clear

18  Channel Entertainment Television, was this P and L

19  an indication that there was an expectation the

20  project would be successful?

21  A       From looking at the P and L, yes.

22  Q       Were you able to tell by looking at this

23  document how many DVDs someone expected to sell in

24  2005 in order to derive revenue of $46,813?

25  A       Yes.

1    Q      How many units would have to be sold for that?

2    A      Five thousand.

3    Q      And how do you know that?

4    A      It's what it says on the 02 document.

5    Q      Up at the top of the 02 document where it says

6    production, the first line is production hard costs,

7    75,000?

8    A      Yes.

9    Q      What are production hard costs?

10   A      Production hard costs would actually be the

11   production costs to actually shoot the live event,

12   the truck, the producers, the camera people, the

13   equipment.

14   Q      Did you have any role in estimating that

15   number?

16   A      Yes.

17   Q      And what did you do to estimate that number?

18   A      Assumed -- well, basically, I don't recall

19   exactly which project, which show this is for, this

20   P and L, in terms of one, two or three.  But it

21   would have been an assessment on what the actual

22   production would have been in terms of costs per

23   hotel, airfare, travel, trucks, crew, producers,

24   tape machines, equipment in order to shoot the live

25   event.

1      Q      If you look at 01, this e-mail was sent to

2      Mr. Townley by Mr. Sterling on August 8th of 2005;

3      okay?

4      A      Okay.

5      Q      And it does say in the body of that e-mail,

6      here's the WR one P and L draft?

7      A      Okay.

8      Q      And I will represent to you that

9      Wrestlereunion II did not take place until the last

10     week of August 2005.

11     A      Wrestlereunion II?

12     Q      Yes, ma'am, in Valley Forge.

13     A      Valley Forge was in August?  I thought it was

14     June, June or July.

15     Q      By August 8th of 2005, would all the expenses

16     for Wrestlereunion I have been totaled up?

17     A      They might have been, depending on the edit.

18     Q      And estimating the production hard costs of

19     75,000, would you have access to the data to show

20     what the production hard costs were for

21     Wrestlereunion I?

22     A      Yes.  For those costs that would have actually

23     occurred prior to that.

24     Q      What is a production fee?

25     A      A production fee is a fee that a production

1    company takes on doing the actual production of the

2    event.

3    Q      So if a production fee of $11,250 was

4    estimated for Wrestlereunion I, as reflected on

5    6461-2, who would have received that production fee?

6    A      Clear Channel Entertainment Television.

7    Q      So built into the cost of this project is a

8    fee to Clear Channel Entertainment Television for

9    actually producing the event?

10    A      Correct.

11    Q      Ultimately, after all the costs are deducted

12    from the revenue, what would be left would be

13    profit?

14    A      After all the costs are deducted from the

15    revenue, yes.

16    Q      And who would the profit go to in connection

17    with Wrestlereunion?

18    A      The profit would go to both Clear Channel

19    Entertainment Television and Wrestlereunion.

20    Q      So Clear Channel Entertainment Television

21    would get paid a production fee; correct?

22    A      Correct.   Yes.

23    Q      And then with the profit that was left over,

24    Clear Channel Entertainment Television would get

25    whatever proportion of profit it was supposed to get

1     under whatever agreement there was between Clear

2     Channel Entertainment Television and Wrestlereunion,

3     LLC; is that correct?

4     A     Correct.

5     Q     How did -- well, did you determine what the

6     production fees would be?

7     A     No.

8     Q     Do you know who did?

9     A     I think it was a combination of Joe and --

10    Joe Townley and Steve Sterling.  But a percentage of

11    the production, it is a certain percentage.  It is a

12    standard procedure in our business, entertainment

13    business, production business, that a production

14    company that produces an event takes a production

15    fee on that event.

16    Q     And the production fee is based on a

17    percentage of what?

18    A     It ranges between 10 percent up to as high as

19    25 percent.

20    Q     Ten percent up to 25 percent of what?

21    A     Of the production, of the actual production

22    costs.

23    Q     So then let's just assume the production fee

24    was 10 percent for a moment.  This is a

25    hypothetical.

1       A       Yes.

2       Q       And let's assume the production costs were

3       $100,000, again, just for hypothetical, then the

4       production fee would be $10,000?

5       A       Yes.

6       Q       Who would pay the production costs of $100,000

7       in this hypothetical situation?

8       A       Clear Channel Entertainment Television.

9       Q       If there was a profit and loss for

10      Wrestlereunion II and III, who would have those

11      documents?

12      A       Matthew Hecktor.

13      Q       Do you recall the meeting with Mr. Corrente

14      and Mr. Russen in New York City with Mr. Townley and

15      Mr. Sterling?

16      A       I recall a meeting in New York.  I don't

17      recall that specific meeting.  I recall meeting

18      Jimmy -- meeting with Jimmy Hart.  That's the

19      meeting I recall.

20      Q       All right.  So the meeting that you do recall

21      with Mr. Hart and Mr. Corrente, what do you recall

22      being discussed at that meeting?

23      A       I recall sitting in our conference room

24      talking about the project.  What we specifically

25      discussed I can't tell you.  I don't remember.

1          MR. BARKER:  That concludes our portion, Your

2     Honor.

3          THE COURT:  Any -- Ms. Millner, anything on

4     behalf of the defendant?

5          MS. MILLNER:  No, Your Honor.

6          THE COURT:  All right.  Thank you.  You may

7     step down.

8          Let's take our lunch break at this time.

9     We'll return at 1:15 by the courtroom clock.

10          COURTROOM SECURITY OFFICER:  Please rise for

11     the jury.

12          (Jury out at 12:01 PM.)

13          (Recess was taken at 12:01 until 1:14 PM.)

14          (Back on the record.)

15          COURTROOM SECURITY OFFICER:  All rise.  This

16     Honorable Court is again in session.

17          Please be seated.

18          MS. MILLNER:  Your Honor, I entered an exhibit

19     by the wrong number.  I don't know if you want to do

20     the --

21          THE COURT:  Wait for your counterparts.

22          MS. MILLNER:  Oh, sorry.

23          THE COURT:  All right.  Go ahead.

24          MS. MILLNER:  I entered an exhibit in by the

25     wrong number.  I entered it by the Bates number

1      instead of the exhibit number.

2              THE COURT:  Which one?

3              MS. MILLNER:  It's -- I entered it as 6-73.

4              THE COURT:  That was yesterday, then?

5              MS. MILLNER:  Right.  Correct.  And in reality

6      it's 6-38.  I don't know if we need to do this in

7      front of the jury.

8              THE COURT:  Well, I'll just make a -- gosh.

9              MS. MILLNER:  It was the Jimmy Hart contract.

10             THE COURT:  Yeah.  It was during your cross.

11     So it should be what?

12             MS. MILLNER:  It should be 6-38.

13             THE COURT:  We can handle it two ways.  Either

14     I can just announce it or you can announce it.

15     Makes no difference.  But just in case the jury

16     wrote down 6-73.

17             MS. MILLNER:  Okay.  Why don't Your Honor just

18     announce it.

19             MR. BARKER:  We have no objection, Your Honor.

20             THE COURT:  All right?  Are we ready to go?

21     Bring the jury in, please.  Where did Herbert go?

22             MS. MILLNER:  He's hopefully contacting our

23     witnesses who will hopefully get to testify one day.

24             THE COURT:  I thought maybe you had chased him

25     back home or something.

1          MS. MILLNER:  No, no.  I'm second chair this

2     game.

3          COURTROOM SECURITY OFFICER:  Rise for the

4     jury.

5          (Jury in at 1:17 PM.)

6          COURTROOM SECURITY OFFICER:  Please be seated.

7          THE COURT:  Members of the jury, during the

8     cross-examination of Mr. Hart, the defendant

9     introduced an exhibit that was identified and

10     received as Defendant's Exhibit 6-73.  That should

11     be 6-38.  What was that, Ms. Millner, by

12     description?

13          MS. MILLNER:  It's the contract between

14     Wrestlereunion and Jimmy Hart for the appearance at

15     Wrestlereunion I, dated November 28, 2004.

16          THE COURT:  All right.  Thank you.

17          MR. RODEMS:  Your Honor, at this time we wish

18     to offer the balance of our exhibits.

19          THE COURT:  All right.  Go right ahead.

20          MR. RODEMS:  Exhibits 2 -- Plaintiff's

21     Exhibit, Your Honor -- 2, 3, 4, 31, 35, 36, 37, 38,

22     39, 40, 41, 43, 44, 45, 46, 47, 49, 92, 96, 100,

23     104, 106, 109, 110, 111, 112, 120, 121, 122, 123,

24     124, 126, 127, 128, 129, 131, 132, 133, 135, 136,

25     141, 142, 143, 150, 153 and 157.

```
 1              MS. MILLNER:  No objection, Your Honor.

 2              THE COURT:  All right.  Those exhibits are now

 3         received.  Thank you.

 4              (Whereupon, Plaintiff's Exhibit Numbers 2, 3,

 5         4, 31, 35, 36, 37, 38, 39, 40, 41, 43, 44, 45, 46,

 6         47, 49, 92, 96, 100, 104, 106, 109, 110, 111, 112,

 7         120, 121, 122, 123, 124, 126, 127, 128, 129, 131,

 8         132, 133, 135, 136, 141, 142, 143, 150, 153 and 157

 9         are received into evidence.)

10              THE COURT:  Call your next witness, please.

11              MR. BARKER:  Thank you, Your Honor.  We call

12         Anthony Attanasio.

13              THE COURT:  That exercise of putting those

14         exhibits in that manner, members of the jury,

15         actually is a reflection of the lawyers cooperating

16         after hours and going through those exhibits, so it

17         saves quite a bit of time.

18              COURTROOM DEPUTY CLERK:  Please raise your

19         right hand.

20              (Witness complied.)

21              COURTROOM DEPUTY CLERK:  Do you swear or

22         affirm the testimony that you give in this case will

23         be the truth, the whole truth and nothing but the

24         truth?

25              THE WITNESS:  I do.
```

Attanasio - Direct                                                      193

```
1              COURTROOM DEPUTY CLERK:  Please be seated.

2              (Witness complied.)

3              COURTROOM DEPUTY CLERK:  Please state your

4    name and spell your last name for the record.

5              THE WITNESS:  Anthony Attanasio,

6    A-t-t-a-n-a-s-i-o.

7                        DIRECT EXAMINATION

8    BY MR. BARKER:

9    Q      Good afternoon, sir.

10   A      Good afternoon.

11   Q      Can you please tell the jury, what is your

12   occupation?

13   A      I have an appliance repair business for 29

14   years, going on 30 years March 2010.

15   Q      And where is that located?

16   A      That's in Yonkers, New York.

17   Q      How long have you known Sal Corrente?

18   A      Probably about 32 years, around there.

19   Q      Are you friends?

20   A      Yes.

21   Q      And have you had other business dealings with

22   him?

23   A      We did a few real estate deals.

24   Q      At some point were you asked to become

25   involved in Wrestlereunion?
```

1      A      Yes, I was.

2      Q      Okay.  And can you tell us why you decided to

3      do that?

4      A      Well, one reason why, because it was Sal and

5      we were very close.  But the main reason that I

6      would even think as a business decision would have

7      been because Clear Channel was involved in it, in

8      the convention.

9      Q      And why was that important to you?

10     A      Well, I mean, I saw it as a business

11     opportunity.

12     Q      And I guess at some point after Wrestlereunion

13     II, you decided to withdraw; is that correct?

14     A      Yes.  After many months of -- of phone calls

15     not being returned, it's not the way that I'm used

16     to doing business, and I was very uncomfortable with

17     the way they were treating us.

18     Q      When you say they, who do you mean?

19     A      Clear Channel and Steve Sterling and the way

20     they -- you know, to be a partner of theirs and to

21     be, you know, phone calls never returned and to be

22     disrespected like that, I just saw that what I

23     thought I was getting involved in was, you know, as

24     being the second largest entertainment company I

25     think at the time behind Warner Brothers was -- was

1       a disaster.  And nobody there was taking charge.

2              So I was just very uncomfortable.  And I had

3       told Sal at that point that I -- I could not invest

4       no more money for the simple reason that they're not

5       doing nothing with the product.

6       Q      Okay.  Were there any specific conversations

7       that you had with Mr. Sterling about this issue?

8       A      Well, there was, of course, many promises.

9       But the -- leading up to the August show, we sat

10      down with him for two and a half hours in our suite,

11      and he promised us within two weeks that he would

12      have somebody who was taking on the DVD section of

13      it.

14             So we thought that was -- you know, that was

15      great.  We waited long enough.  I did feel that it

16      was a little late because the tapes should have been

17      out a month or two after the event if they wanted to

18      really hit the market and be -- you know, and be

19      able to sell when the buzz was out.  But, you know,

20      later is better than never.

21             So I would say when that -- when three weeks

22      went by, two, two and a half weeks, three weeks went

23      by and still we got the same treatment as we had

24      gotten before that August meeting, it very -- the

25      thing about Mr. Sterling is that when you talked to

Attanasio - Direct

1    him face to face, he's very accommodating, he's very

2    forthcoming, he's very, you know, I'm going to do

3    this, I'm going to do that, we're going to do it.

4    And then when you try to call him two days later,

5    you can forget it.  Your calls are never being

6    returned.

7    Q    So at any point did what Mr. Sterling said to

8    you ever happen?

9    A    I'm sorry, sir?

10    Q    What Mr. Sterling said to you in the meeting,

11    did that ever happen?

12    A    Never happened.

13    Q    So is that why you decided not to continue?

14    A    Well, listen, I'm a small businessman.  That's

15    it.  I have seven to nine, 10 employees at any time

16    during the 30 years.  I -- I look at it from -- from

17    a -- you know, I looked at it like this.  Clear

18    Channel had to do three things.  One is they had to

19    shoot the event.  Two is they had to edit the tapes.

20    And three, they had to put it on the market.

21         Well, it was already August and they didn't

22    edit the tapes from January.  Maybe they edit two

23    tapes, but they didn't edit the live matches.  So

24    obviously any normal person would think that, you

25    know, the ship is sinking and they don't care, you

1    know.  This is my life, this is my money, you know,

2    that -- and they really don't care.  And that's the

3    sense I got and I wasn't going no further.  That was

4    the only reason.  I still believed in the

5    Wrestlereunion.  And the only reason why, you know,

6    I expected some money back at this point of the

7    partnership.

8    Q      Okay.  Thank you, sir.

9           MR. BARKER:  I have nothing further, Your

10   Honor.

11          THE COURT:  Cross-examination?

12          MS. MILLNER:  Yes, sir.

13                        CROSS-EXAMINATION

14   BY MS. MILLNER:

15   Q      Good afternoon, Mr. Attanasio.

16   A      Good afternoon.

17   Q      We've not met before.  I'm Dawn Millner.

18   A      How you doing.

19   Q      Good.  Am I correct that you agreed to loan

20   Mr. Corrente, Sal Corrente the money for

21   Wrestlereunion about two and a half weeks before the

22   show?

23   A      Yes, ma'am.

24   Q      All right.  And that would have been -- the

25   show was, of course, January 28th; correct?

Attanasio - Cross                                                    198

```
 1      A       Right.

 2      Q       So it was around the 12th or 13th of January

 3      that you agreed to loan him the money; correct?

 4      A       I would think around that time.  I can't --

 5      you know, two weeks, two and a half weeks.

 6      Q       Two to two and a half weeks?

 7      A       Yes.

 8      Q       And, of course, Clear Channel's contract had

 9      not been signed yet; correct?

10      A       The -- it had not been signed because there

11      was, of course, the -- the conversation from New

12      Year's Eve, I knew all about that.  And it was close

13      to being signed.  And it was only an ability to

14      deliver the contract.  That's the reason why it

15      wasn't signed at that point.  But they were already

16      committed.  Like Steve Sterling said on New Year's

17      Eve, we're in.

18      Q       But there was no contract signed yet; correct?

19      A       I saw an unsigned contract.  Yes.

20      Q       All right.  And have you ever reviewed the

21      Clear Channel contract?

22      A       I'm not a lawyer but, no.  They didn't give us

23      enough time to really review it.

24      Q       Well, at any point in time.

25      A       No.
```

1    Q       All right.  You've testified before this jury

2    that the contract required Clear Channel to do three

3    things.  But you've not read the contract to see

4    exactly what was -- what Clear Channel committed to

5    in that contract; isn't that right?

6    A       They were supposed to have developed DVDs.  I

7    would imagine they were doing all of that.  Yes.

8    Q       You don't know --

9    A       Well, I read part of the contract.

10   Q       You've read part of the contract?

11   A       Parts of the contract.  Yes.

12   Q       And it's your testimony that the contract --

13   in the contract Clear Channel committed to editing a

14   film and distributing a film?

15   A       Distributing a film.

16   Q       It doesn't say when the editing will occur;

17   correct?

18   A       It doesn't say when the editing would occur.

19   I think if they wanted to make money, they would do

20   it in a timely fashion so --

21   Q       I'm just asking you what the contract says,

22   sir.

23   A       I'm not -- I'm not -- I'm not -- I haven't

24   read the contract that closely to tell you what it

25   says.

1    Q       Okay.  So when you just testified on direct to

2    the jury about what Clear Channel's obligations were

3    under the contract, you're basing that just based on

4    your assumptions on what Clear Channel was supposed

5    to do; isn't that right?

6    A       What I was told they were going to do.  Yes.

7    Q       By Mr. Corrente?

8    A       By Mr. Sterling.  Yes.

9    Q       All right.  Mr. Sterling said that he was

10   contractually committed to editing the contract --

11   editing the --

12   A       No.  But we spoke to them and they were

13   editing and they were supposed to edit it and they

14   never did it so --

15   Q       So, again, you're not basing any of your

16   testimony concerning Clear Channel's obligations on

17   what the contract actually says; is that right?

18   A       Maybe to what I thought it said.

19   Q       To what you thought it said.  But you're

20   certainly not representing to this jury that that's

21   what the contract says; is that right?

22   A       I don't know how to answer that.

23   Q       Because you're not familiar with the contract,

24   you can't testify to what the contract says; is that

25   fair?

1      A       I could testify to what they were supposed to

2      do.

3      Q       Are you basing that on your review and

4      analysis of the contract, sir?

5      A       I'm basing it on conversations I had with

6      your -- with the members of Clear Channel.

7      Q       So the answer to my question is, no, you're

8      not basing that on your review of what the contract

9      says?

10     A       I can't answer that.

11     Q       Now, two and a half weeks before the show, did

12     Mr. Corrente describe to you the concerns that they

13     were having about the ticket -- the lack of response

14     in the marketplace?

15     A       Not the lack of response.  I think that he --

16     he realized that the market -- the -- the -- I think

17     he was having problems with a partner, if I'm not

18     mistaken.

19     Q       My question, though, is did Mr. Corrente tell

20     you --

21     A       No, he did not.

22     Q       All right.

23             MS. MILLNER:  Could we put up Exhibit 159,

24     Mr. Brown.

25     BY MS. MILLNER:

1    Q      Mr. Attanasio, there is a document that was

2    received into evidence, I believe it was yesterday.

3    The days are running together for me a bit.

4    A      Hum.

5           MS. MILLNER:  Can we go, Mr. Brown, to the

6    second paragraph.

7    BY MS. MILLNER:

8    Q      All right.  Now, did Mr. Brown -- I mean,

9    Mr. Corrente tell you that his partner had given him

10   what this document describes as a reality check

11   about the Wrestlereunion I event?

12   A      No.  I never saw the document.

13   Q      Okay.  For example, this document which as

14   indicated here was written around 21 days out, so it

15   would have been around the time Mr. Corrente

16   approached you for money; correct?

17   A      Mr. Corrente approached me for money a few

18   days before I ended up giving it to him.

19   Q      Okay.  So --

20   A      So this was probably before he approached me

21   for money.

22   Q      Right.  He would have gotten this reality

23   check before he approached you for money; correct?

24   A      Yes.

25   Q      And when he approached you for money, he did

1      not tell you that the fans have, as it says there,

2      failed to respond in the kind of numbers anticipated

3      and needed to make the event a success; did he?

4      A      He may have told me something about that, but

5      I wasn't looking at my investment as just how many

6      people are going to be in the audience.

7      Q      Well, but did he tell you that the audience --

8      that the event was not going to make money?

9      A      No.  He didn't tell me that it was not going

10     to make money.

11     Q      Okay.  And did he tell you that, for example,

12     they were going to have to move the event to a

13     smaller venue because of the lack of response from

14     the marketplace?

15     A      I don't know nothing about that.

16     Q      All right.  And did he tell you -- if we can

17     go to the second page, second paragraph from the

18     end -- that not only had the fans not responded as

19     anticipated, but sponsors and vendors also have not

20     responded?

21     A      No, he did not.

22     Q      Did he tell you that the anticipated revenues

23     from those sources is not there to be used for such

24     things as advertising and promotion?

25     A      Well, I -- I had to think that if he's

1    contacting me at this particular late time that

2    things were not going as well as he thought it would

3    be.  Yet still, I thought with Clear Channel behind

4    it that, you know, the amount of money that we're

5    looking at losing would be minimum to what we could

6    recoup and that the investment that I was making

7    could be a good investment.

8    Q      But my question was he did not share any of

9    this information with you; correct?

10   A      I don't remember that far back.  I know he

11   was -- he -- he obviously needed money for a reason.

12   Q      Now, this is the second time that you've

13   helped Sal out or invested with Sal; isn't that

14   correct?  I believe you described some real estate

15   transactions on direct; correct?

16   A      I wasn't helping him out.  We were partners in

17   that.

18   Q      You say you were partners.  But you're the one

19   who put the money up; correct?

20   A      He found two -- he found deals and I put the

21   money up.  Yes.

22   Q      And you lost money on that transaction;

23   correct?

24   A      We made about 15 thousand on one and lost

25   about 30 thousand on the second.

1    Q       At the end of the day, cumulative, you lost

2    money on the transaction?

3    A       I lost about 15 thousand, yes.

4    Q       All right.  And Mr. Corrente didn't share in

5    that loss, it was your financial loss; correct?

6    A       Yes, ma'am.

7    Q       And you don't have any firm agreement with

8    Mr. Corrente as to when he will pay you back; isn't

9    that right?

10   A       No, I don't.

11   Q       In fact, you have not even demanded that he

12   pay the money back; correct?

13   A       Not at this point.

14   Q       Now, you did continue to invest in

15   Wrestlereunion II; correct?

16   A       Yes, ma'am.

17   Q       And at no time or -- or -- strike that.

18           Mr. Corrente also did not tell you that Clear

19   Channel had committed only to invest $235,000 or

20   less, maximum I should say of $235,000 in this

21   project until after he loaned -- you loaned him the

22   money; correct?

23   A       I don't know that to be true, anyway, about

24   the 235.

25   Q       Okay.  Assuming that's the case per the

1        contract, he never told you that Clear Channel had

2        committed to invest a maximum of $235,000 into this

3        project; did he?

4        A        My understanding it would be 235,000 per

5        event.

6        Q        He never told you about the 235,000 numbers --

7        dollar number before the -- before he asked you for

8        money; correct?  Before you loaned him the money?

9        A        No.  He mentioned it.

10       Q        It's your testimony that Mr. Attanasio told

11       you that Clear Channel had committed to invest only

12       $235,000 in this project before you loaned him the

13       money?

14       A        I'm sorry?

15       Q        Is it your testimony that Clear Channel -- I

16       mean, that Mr. Corrente told you that Clear Channel

17       had committed only $235,000 to this project before

18       you loaned him the money?

19       A        I saw that part in the contract.

20       Q        But my question was did Mr. Corrente tell you

21       about --

22       A        I don't remember.  That's 2005.  I'm sorry.

23       Q        Okay.  Now, you were obviously disappointed

24       when you went to Wrestlereunion I and saw the low

25       turnout; isn't that correct?

1    A       As a businessman, I guess I would have to say

2    I was a little disappointed with the turnout.  I was

3    very happy with the way the fans responded, the way

4    everybody seemed to have a great time, the way the

5    wrestlers interacted with -- with -- and, also, I

6    understood that this was a -- the first sizzle and

7    this was the first getting out of Wrestlereunion.

8           And then I guess I was a little unhappy right

9    after the event, but very happy when I seen the

10   articles in the Wall Street Journal and many other

11   places and many other wrestling magazines of how

12   successful Wrestlereunion was.

13   Q       And so you decided to continue with

14   Mr. Corrente and invest in Wrestlereunion II;

15   correct?

16   A       Of course, because of Clear Channel's backing.

17   Q       And you were -- you encouraged Sal to --

18   Mr. Corrente, that is, to step up promotion and

19   advertising for Wrestlereunion II; correct?

20   A       I encouraged Mr. Corrente, yes, to let's do

21   some more advertisement.  Yes.

22   Q       And, in fact, that occurred; isn't that right?

23   You hired a special PR firm for the Wrestlereunion

24   II event; correct?

25   A       Yes.

1    Q      And you were surprised and disappointed that

2    Wrestlereunion II lost money, as well; correct?

3    A      I guess I would have to be disappointed.  I

4    was disappointed that the tapes weren't out at that

5    time.

6    Q      You were surprised and disappointed that the

7    live event of Wrestlereunion II lost money; weren't

8    you, sir?

9    A      Again, it made a big slash.  And, of course,

10   I'm disappointed in losing money, especially when

11   I'm such a small guy.  Yeah, I was disappointed.

12   Q      Right.  So you expected the live event to make

13   money and were disappointed when it didn't; fair

14   enough?

15   A      I didn't expect the live event to make money,

16   no.  I was disappointed that we lost what we lost

17   but I thought it would be a little less.  I thought,

18   you know -- but I wasn't -- I didn't think we were

19   going to make money on the live event.

20          We were putting the product together and we

21   were putting -- like Steve Sterling wanted hours of

22   wrestling for him to build a library.  And that's

23   what we were doing and that's what we thought we --

24   you know, we were doing.

25          So we didn't cut no wrestlers because we were

1    losing money.  We stayed true to our word because

2    that's how we are and -- and we paid every wrestler.

3    And you see, you got to realize these people were

4    wrestlers.  They're very -- they have been beat so

5    many times going to events and performing, and then

6    after that the promoter says, you know, we don't

7    have the money.

8         We stood by our word.  We thought in the end

9    that Clear Channel was going to do what they did.

10   We happened to be the ones who could have pulled out

11   and not paid the wrestlers and walked away from the

12   event.  I stood there and I paid everyone of them

13   guys knowing that on the other side, Clear Channel

14   wasn't doing what they said they would do.  But I

15   stood there and paid them all.

16        MS. MILLNER:  Move to strike, unresponsive,

17   Your Honor.

18        THE COURT:  That's denied.

19   BY MS. MILLNER:

20   Q     Mr. Attanasio, do you remember having your

21   deposition taken on April 21st, 2009?

22   A     Yes.

23   Q     Do you remember taking an oath to tell the

24   truth at that deposition just like you took an oath

25   to tell the truth in front of this jury?

1       A       Yes.

2       Q       Do you remember being asked this question and

3       providing this answer at page 137.

4               "Question:  So for Wrestlereunion II, then,

5       you loaned the plaintiff's corporation about another

6       $150,000 or so?

7               Answer:  Yes.

8               Question:  Okay.  Were you surprised, then, to

9       learn that Wrestlereunion II lost about $150,000 as

10      a live event?

11              Answer:  Yes.

12              Question:  Were you disappointed in that?

13              Answer:  Yes."

14              MR. BARKER:  Your Honor, objection, improper

15      impeachment.

16              MS. MILLNER:  Your Honor --

17              THE COURT:  I'll allow it to stand.

18      Overruled.

19              MS. MILLNER:  Thank you.

20              THE COURT:  Don't thank me.  I'm just making

21      my rulings.  Thank you, though.

22      BY MS. MILLNER:

23      Q       Now, Mr. Corrente hasn't cut a deal with you

24      like he did with Mr. Russen to allow you to take any

25      part in the proceeds of this litigation; correct?

Attanasio - Cross

```
 1    A      No.

 2    Q      And he -- in fact, you don't even have a --

 3    a -- a signed document indicating the full amount of

 4    the money that you've loaned the corporation and how

 5    much interest you're due on that loan; isn't that

 6    right?

 7    A      Sal's like a brother.  I don't need -- I don't

 8    need a document.

 9    Q      And he has not paid you any of that money

10    back; correct?

11    A      No, he has not.

12    Q      You knew that this investment would be a risky

13    venture; didn't you, sir?

14    A      I -- I did not really think that with Clear

15    Channel's backing and with their -- with Clear

16    Channel throwing a hundred million dollars to

17    Madonna and 150 million dollars to J.Z., that a

18    hundred or $200,000 that I lost, $300,000 would be

19    risky.

20           I thought that they were what they said they

21    were, the second largest entertainment company in

22    the world with 25 stations that could promote this.

23    I did not know that the -- the -- this guy don't

24    speak to that guy and this department don't speak to

25    that department.  I'd never been in the corporate
```

1    world and I didn't know that that exists.  I thought

2    we were dealing with the second largest

3    entertainment company, and I didn't realize that in

4    a little while they were going to do away with that

5    whole department.

6    Q      Back to your deposition, sir, page 26.

7           "Question:  But you understood that this would

8    be a somewhat risky venture, I imagine?

9           Answer:  It would of -- it would of.  Yes, of

10   course.  It's the money that I didn't have -- it's

11   money that I did not have to lose."

12          Now, you've invested in the past in

13   entertainment type ventures; isn't that right?

14          MR. BARKER:  Objection, relevance.

15          THE COURT:  Overruled.

16          THE WITNESS:  Maybe -- maybe one thing.

17   BY MS. MILLNER:

18   Q      You loaned some money to a secretary or the

19   daughter of a secretary whose friend was making some

20   sort of independent film; do you recall that?

21   A      Right.

22   Q      And you lost some money on that transaction,

23   as well?

24   A      Right.

25   Q      So you would agree with me that investing in

1    entertainment is a risky proposition?

2    A     I -- my track record shows it but I -- I --

3    you know, I can't agree that every entertainment is.

4    Q     Well, certainly when you -- when you invested

5    in this project you understood that; fair enough?

6    A     I knew there was a certain degree of risk.  Of

7    course.

8    Q     And Mr. Corrente never guaranteed you that

9    you'd get your money back; isn't that right?

10   A     He said that when he makes money, I would get

11   about eight to ten percent on what I gave him.

12   Q     Mr. Corrente never guaranteed that

13   Wrestlereunion would make money; did he, sir?

14   A     Not in writing.

15   Q     He never guaranteed it, period?

16   A     Not in writing.

17   Q     But my question was he never guaranteed it in

18   writing or orally; isn't that true?

19   A     Of course.  We all thought we were going to

20   make money at one point or another with Clear

21   Channel.  So he did think he was going to make

22   money.  We did not go into this thinking we were

23   going to lose money.  He thought he was going to

24   make money.

25   Q     My question, though, sir, is Mr. Corrente

1    never guaranteed you that Wrestlereunion would make

2    money; isn't that the case?

3    A     I wouldn't know how to answer that.

4    Q     Do you know if Mr. Corrente guaranteed that

5    Wrestlereunion would --

6    A     He thought we would make money, yes.

7    Q     But he never guaranteed you that you would

8    make -- that Wrestlereunion would make money?  Yes

9    or no?

10   A     Yes, he did.

11   Q     Back to your deposition.  Again, you were

12   under oath when you gave this testimony; correct?

13   A     I --

14   Q     Question -- page 23.

15         "Question:  Let me just interrupt you there if

16   you don't mind.  I assume at no time did

17   Mr. Corrente ever guarantee that you were -- that

18   this venture was going to make money; right?

19         Answer:  No.  What he said to me is I'll give

20   you ten percent interest on your money, and that was

21   it.  Then I said, Sal, if I do this, it's really not

22   for the ten percent, it's because I want to help you

23   out."

24         Thank you, sir.  I've no further questions.

25         THE COURT:  Was that your testimony?

```
 1              THE WITNESS:  I guess it must have been, but

 2    who remembers back then.

 3              THE COURT:  All right.  Redirect?

 4              MR. BARKER:  Thank you, Your Honor.

 5                    REDIRECT EXAMINATION

 6    BY MR. BARKER:

 7    Q     Did Mr. Corrente ever say to you at any time

 8    that the live gate was the sole and only source of

 9    income that Wrestlereunion was expecting?

10    A     No, he hasn't -- he did not.

11    Q     Was that your understanding when you first got

12    involved?

13    A     No, it was not.

14    Q     Did you believe you were going to get money

15    from the DVD and television that Clear Channel was

16    going to provide?

17    A     Of course.  That's the second -- you know, the

18    main reason I put that much money into this -- this

19    event.

20    Q     So it's clear that you would have liked the

21    live event to do better, so would everyone.  But did

22    you at this point expect that was the only source of

23    income and, therefore, it was a failure because it

24    didn't?

25    A     No.  No.  Not at all.
```

```
 1     Q      Thank you.

 2            MR. BARKER:  That's all I have, Your Honor.

 3            THE COURT:  Thank you, sir.  You may step

 4     down.

 5            Members of the jury, my question to the

 6     witness was not intended to draw any attention to

 7     the answer, simply that is the customary follow-up

 8     when one is asked about prior sworn testimony, was

 9     that your testimony, yes or no.  That's all.

10            Call your next witness, please.

11            MR. RODEMS:  Your Honor, the plaintiff calls

12     Sal Corrente.  Your Honor, may we approach?

13            THE COURT:  Yes, sir.

14            (At sidebar, on the record.)

15            MR. RODEMS:  Is Mr. Attanasio permitted to

16     stay in the courtroom?

17            MS. MILLNER:  Yes.

18            THE COURT:  Okay.  That's fine.

19            MS. MILLNER:  Yes.  Sure.

20            MR. RODEMS:  You're the boss.

21            MS. MILLNER:  Oh, I'm sorry.  I don't --

22            THE COURT:  He can stay unless you're going to

23     call him back.

24            MS. MILLNER:  I'm not going to call him back,

25     in other words.
```

1          THE COURT:  It's okay, then?

2          MS. MILLNER:  Yeah.

3          THE COURT:  All right.

4          COURTROOM DEPUTY CLERK:  Please raise your

5    right hand.

6          (Witness complied.)

7          COURTROOM DEPUTY CLERK:  Do you swear or

8    affirm the testimony that you give in this case will

9    be the truth, the whole truth and nothing but the

10   truth?

11         THE WITNESS:  I do.

12         COURTROOM DEPUTY CLERK:  Please be seated.

13         (Witness complied.)

14         COURTROOM DEPUTY CLERK:  Please state your

15   name and spell your last name for the record.

16         THE WITNESS:  Sal Corrente, C-o-r-r-e-n-t-e.

17         MR. RODEMS:  May I proceed, Your Honor?

18         THE COURT:  Yes, sir.

19                   DIRECT EXAMINATION

20   BY MR. RODEMS:

21   Q     Mr. Corrente, where do you live?

22   A     Ocean Ridge, Florida.

23   Q     And how long have you lived there?

24   A     Since July of 2001.

25   Q     Are you the owner of Wrestlereunion, LLC?

1    A    Yes, sir.

2    Q    Tell us about your nonprofessional wrestling

3    career, your career before you became involved with

4    professional wrestling.

5    A    Well, I worked for Mr. Attanasio approximately

6    30 years ago.  Then I had various positions with

7    Westchester County, New York and the City of

8    Yonkers.  And I worked for friends in their deli and

9    operated an airport service that my family owned for

10   quite awhile.  So I've done a few -- a few different

11   things, and then owned health clubs.

12   Q    And you are 30 years -- you've worked for

13   Mr. Attanasio 30 years ago, so how old are you

14   today?

15   A    I'll be 46 next month.

16   Q    Okay.  And how long have you known

17   Mr. Attanasio?

18   A    I want to say -- I mean, we grew up on the

19   same street.  Probably since I was about 14, 13,

20   somewhere in there.

21   Q    How did you meet him?

22   A    Well, he was one of the more high profile high

23   school and rec league athletes in our area at the

24   time.  And like I said, he grew up on the street

25   and -- that I grew up on and he had the biggest dog

1    on the street that barked the loudest, so

2    everybody -- everybody knew him.  Even though I was

3    younger, we had some mutual friends.

4    Q     And did you have any other occupations?  Did

5    you leave the state of New York for awhile?

6    A     Yes.  I was -- in 1987 I was a police officer

7    in Denver, Colorado, and I worked for a short time

8    for the postal service, as well.

9    Q     And we saw some video of you yesterday in the

10   AWA.  Do you recall when that was played?

11   A     Yes, sir, I do.

12   Q     Wasn't that also 1987?

13   A     Yes, it was.  The filming was done in Las

14   Vegas, so it was easy for Verne Gagne to get me to

15   Las Vegas from Colorado Springs, I believe.

16   Q     And that was you wearing the striped shirt?

17   A     Yes, it was.

18   Q     The stripes make you look thinner, I take it?

19   A     Yes, sir.

20   Q     Now, when did you first become involved in the

21   professional wrestling industry?

22   A     1981.

23   Q     Okay.  How old were you at the time?

24   A     Depending on exactly when it was, I know it

25   was sometime after I graduated high school, which

1    was in 1981.  So it would have been somewhere in

2    between July and maybe my birthday in 1981.  So I

3    could have been 18, I could have been just on the

4    tail end of 17.

5    Q      Okay.  Well, tell us about how you got

6    involved in the professional wrestling business.

7    A      Well, Mr. Attanasio owned a refrigerator

8    repair company.  And I don't remember if I was still

9    working for him on and off at the time, but he

10   visited the home to repair a refrigerator of a

11   wrestling photographer, a gentleman named Dominic

12   Marcello, M-a-r-c-e-l-l-o.

13          And they got to talking about wrestling, and

14   Tony told him about me.  And he started showing him

15   all the pictures that he had, all the backstage

16   pictures and things, guys without their masks on.

17   And Tony asked if he could bring me to the house.

18   And --

19   Q      What do you mean -- oh, to his own house?

20   A      To this gentleman, Dominic Marcello's house

21   so I could look at the pictures.  And he told him

22   that he could.  So he took me there.

23          And then I started asking him where these

24   pictures were taken, and he told me at the TV

25   tapings that used to air on WOR TV out of New York

1    on Saturdays at midnight.  And he told me that every

2    three weeks they went there.

3         And I asked if I could go along.  I had -- at

4    the time I had really never been away from home

5    overnight by myself, you know, without my mother and

6    father.  And I asked them for permission, they said

7    yes, and I went down there with those guys.

8         And, you know, since they already knew

9    everybody, they started introducing me to the people

10   who ran the building.  This was in Allentown,

11   Pennsylvania.  In those days it took about an hour

12   and a half or so to get there.

13        And that was it.  Right from the beginning I

14   was pretty much accepted because I was with Dominic

15   and another guy named Mike Devan, so they both had

16   all the contacts already.

17   Q    So your first introduction was through a

18   photographer?

19   A    Yes.  Well, you know, I really credit Tony.  I

20   mean, if he hadn't just stumbled upon this guy, I

21   don't know if I -- I might have never gotten in the

22   wrestling business to begin with.

23   Q    Okay.  Well, how did you go from accompanying

24   a photographer to having more of an involvement in

25   the business?  What was the next thing you did?

1      A      Well, there was -- there was a gentleman named

2      Tony -- not Tony Attanasio -- somebody named Tony in

3      Pennsylvania who kind of was in charge of the

4      building for Vince McMahon.  And he gave me the job.

5      I guess he a took a liking to me.  It was up to me

6      to guard the back door and make sure no fans came

7      in, open the door for the wrestlers, let the

8      wrestlers out when they wanted to go out.

9          COURT REPORTER:  Mr. Corrente, please slow

10     down.

11         THE WITNESS:  I'm sorry.  So I was basically

12     guarding the back door.  If a wrestler wanted to go

13     out, I'd let him out.  If they wanted to come back

14     in, I'd let them in and I'd make sure the fans

15     didn't come.

16     BY MR. RODEMS:

17     Q      And what year are we talking about?

18     A      All of 1981.

19     Q      Okay.

20     A      It all happened, you know, very, very quickly.

21     So I, you know, had free entrance to the matches.  I

22     was happy.  I was getting to meet everybody.

23     Shortly sometime thereafter, I decided that I wanted

24     to promote an event for the WWE.  So the guys took

25     me and introduced me to Howard Finkle.

Corrente - Direct

1    Q       And who is he?

2    A       He's probably the longest term WWE employee I

3    know outside of the McMahon family.  He's -- he was

4    an employee before 1981 and is still an employee

5    currently to this day.  He introduced me to a

6    gentleman at the time named Ed Cohen.  Ed was in

7    charge of live events.  I told him I wanted to

8    promote an event for charity.  He told me I could.

9    And I promoted an event at a high school, the high

10   school that I attended and Tony Attanasio had

11   attended years before.

12   Q       What was the name of it?

13   A       Saunders Trade and Technical High School in

14   Yonkers, New York.

15   Q       And how old were you at this time?

16   A       By the time the show ran, 19, maybe, 20.  You

17   know, I mean, I can't be sure.

18   Q       And this was in New York State?

19   A       Yes.

20   Q       In order to be a promoter even for a charity

21   event, did you need some sort of licensure from the

22   State of New York?

23   A       The way the McMahons do it, they were actually

24   the upfront promoter, but it was -- it was my event.

25   So the answer to your question is yes, but the

1    McMahons were the ones that stood up with -- I

2    believe in those days Arnold Scolan was the license

3    New York promoter that represented the McMahons

4    because they were not New York residents, and the

5    rules in those days is you had to be a New York

6    resident to be a New York promoter.

7    Q    Okay.  So you had a promoter in name but you

8    served as the onsite promoter for the event?

9    A    Right.  I was the local event coordinator, all

10   responsibility was on me.

11   Q    And tell us about promoting that event.  What

12   did you have to do?

13   A    Well, in those days things were a lot

14   different.  There certainly was no internet to

15   promote.  The WWE sent you, I don't know, maybe a

16   hundred posters, so you'd have to go run all over

17   town and ask shopkeepers to put posters in windows

18   and things like that.

19   Q    What about scheduling the wrestlers, finding

20   the location, making sure you had a ring?  What were

21   the other things that were involved in the

22   promotion?

23   A    Well, certainly we had to secure the site.

24   That absolutely had to be done.  As far as who's

25   going to wrestle, those things, that was more of a,

1    you know, this is who we have in the area at the

2    time, this is who we're going to have wrestle at

3    your -- who we're going to have wrestle at your

4    building.  Certainly you could give some input, but

5    if it didn't work out scheduling-wise, then, it

6    didn't -- it didn't work out.

7    Q      Okay.  Were tickets sold for the event?

8    A      Yes.

9    Q      And how were they sold?  Ticket Master didn't

10   exist back then.

11   A      I can't speak to that, but we didn't -- we did

12   not use Ticket Master.  The WWE had a company

13   somewhere in New England that printed their live

14   event tickets at the time.  And they sent them to us

15   and we would distribute them to -- to local outlets

16   in the -- in the city.

17   Q      And were the -- you mentioned this was a

18   charity event.  But were the wrestlers wrestling for

19   free or were they being paid for their --

20   A      No.  The wrestlers were being paid.  The

21   wrestling industry has numerous charity events.  But

22   like in most events when you hear a singer or

23   somebody entertaining, it's very rare that that

24   person is not being paid.  It's just that there's a

25   portion of the proceeds that are going to charity.

1    Q      Okay.  And how did the event go?

2    A      We had ten tickets left when the door opened

3    and we turned away hundreds.

4    Q      Okay.  What was the next thing that you did in

5    the wrestling business after that?

6    A      Well, the WWE had promised me if I was

7    successful with the first event that I could run a

8    second event.  So I called them to say, okay, you

9    know, we did -- you know, we couldn't get anymore

10   people in so can we have our second event, and they

11   said no.

12          And I said, but, you know, Ed, you told me

13   point blank that -- he said, listen, your building

14   is too small.  All we have is something called

15   WrestleMania that's coming up.  I really can't tell

16   you anything about it, it's a new thing that we're

17   developing.  I can tell you Hulk Hogan and Mr. T

18   are going to be involved.  But other than that, I

19   can't share any information with you but you're

20   going to have to find a building that holds 2500

21   people.

22   Q      By the way, the high school where you put on

23   this WWE event, how many people did it hold?

24   A      Fourteen hundred.

25   Q      Okay.

Corrente - Direct

1       A       So we set out to find a building that held

2       2500 people.  And this was going to be -- what we

3       were going to do is show the event on closed circuit

4       television.  In those days pay-per-view had not

5       existed yet.

6       Q       Let me stop you there.  You've used the term

7       we.  Who are you referring to when you say we?

8       A       Well, the organization that I was raising the

9       money for, certainly, you know, if needed they could

10      give some assistance in deciding on a building and

11      if there were any details that needed to be worked

12      out.

13      Q       Okay.  And so did you find an appropriate

14      building with 2500 and stage a second event?

15      A       Yes.  It was held at the Westchester County

16      Community College in Valhalla, New York.

17      Q       How many people did that facility hold?

18      A       Just about 2500.

19      Q       And this was for the WWE?

20      A       WWE's first edition of WrestleMania I believe

21      took place at Madison Square Garden on a Sunday

22      afternoon, maybe around 1 o'clock.

23      Q       What year?

24      A       I guess I can't be sure, 1984 -- well, they

25      just had the 25th anniversary of WrestleMania.  So

1       if we deduct back 1999, 1989 -- I guess 1984.

2       Q       Okay.  By the way, we saw a DVD during this

3       trial of the 25th anniversary of WrestleMania.

4       A       Yes, sir.

5       Q       And that was held in Houston?

6       A       I believe so, yes.

7       Q       And when was that event held?

8       A       I would say the very beginning of April if not

9       the last day of March.  I think it was more the

10      beginning of April.

11      Q       Of 2009?

12      A       2009, yes.

13      Q       And it's now September, and we had the fully

14      edited, fully packaged DVD to play in this

15      courtroom?

16      A       Yes.  It would appear that way, yes.

17      Q       Do you know when that DVD actually hit the

18      marketplace?

19      A       No, but I would say pretty quickly.  The WWE

20      understands the importance of getting to the

21      marketplace quickly.

22      Q       All right.  Tell us a little bit about the

23      second promotion you had.  Did you sell out the --

24      all the seats?

25      A       Yes.  And actually Mr. Attanasio was with

1        his -- he had an appliance store at the time and he

2        was one of the ticket outlets.  He was still getting

3        calls at 3:00 AM, people begging for tickets.  We

4        had nothing left.  When we got there at 8 o'clock in

5        the morning, there were already people in line with

6        lunch in their hand.

7        Q       Do you remember what they were selling ticket

8        prices for wrestling shows back then?

9        A       No.  I can't say that I do, quite honestly.

10       It is a -- it was a long time ago and they were just

11       watching it on television.  Let's say $20.  I mean,

12       anywhere from 15 to $20.

13       Q       All right.  And following that event, what was

14       the next thing you did in the wrestling industry?

15       A       Well, over -- over time I became very close

16       friends with the Wild Samoans.

17       Q       Okay.  Who are the Wild Samoans?

18       A       Well, they have a tremendous history in the

19       business.

20       Q       What are their names?

21       A       Afa --

22               COURT REPORTER:  You need to spell that,

23       please.

24               THE COURT:  Spell the last name for the court

25       reporter.

1          THE WITNESS:  Okay.  Well, the first name is

2     Afa, A-f-a, and the last name is A-n-o-a-i.  And the

3     other gentleman's name would be Sika, S-i-k-a, with

4     the same last name.  They come from a very long line

5     of wrestling family.  They're uncle is High Chief

6     Peter Maivia, who is also the grandfather to The

7     Rock.  Rocky Johnson was like an inlaw to them.  And

8     they have several children and nephews that are big

9     wrestling stars today besides The Rock.  And they

10    were the first time -- you know, three time holders

11    of the WWF tag team championship.

12    BY MR. RODEMS:

13    Q    Okay.  And just so that we're clear, we've

14    heard throughout this trial WWWF, WWF and WWE.  Are

15    those just different acronyms for what is basically

16    today WWE, the World Wrestling Entertainment?

17    A    Yes.  In the fifties and sixties there was the

18    Worldwide Wrestling Federation.  At some point they

19    decided to drop a W.  That was just on them.  But in

20    the Bruno Sammartino area it was WWWF.  When I

21    finally started watching wrestling on television

22    around 1978 or so, it became the -- it was already

23    the WWF for a short time.  And then through an

24    ongoing legal battle they were forced to change

25    their name to WWE.  There was World Wildlife

1       Foundation or something.

2       Q       There was some sort of problem with using the

3       acronym WWF?

4       A       Right.  They were challenged, I guess, and

5       lost.  But ultimately it's the same company.  It's

6       been in the McMahon family since its inception.

7       Q       Okay.  And so when you met the Wild Samoans,

8       what happened from that point?

9       A       Well, I got lucky.  They took a liking to me

10      and started teaching me the -- the wrestling

11      business.

12      Q       Now, at that time were they strictly

13      wrestlers, talent, or did they also have a role in

14      promoting the business or the business side of

15      wrestling?

16      A       Well, when I first met them they were pretty

17      much just talent, but they had tremendous

18      understandings of the inner workings of the business

19      and over time they left the World Wrestling

20      Federation and decided to -- well, Afa did, anyway.

21      They both left, but Afa decided to start promoting

22      his own shows and have his own wrestling company.

23      Q       Okay.  So did the Wild Samoans actually hire

24      you to work for them?

25      A       Yes, they did.

1    Q      Okay.  Explain how that worked.  Was it a

2    formal contract or was it just, come along, Sal, and

3    here's 50 dollars?  How did it work?

4    A      Well, it was on a per event basis.  But I

5    would basically run the events, tell the wrestlers

6    what to do and, you know, who was going to -- who's

7    going to win today, who's going to lose.  Maybe I

8    would help contact the talent since I was very

9    friendly with them and things like that.  But the

10   aspects of the live event that the people saw, that

11   was pretty much run by me.

12   Q      And what years now are we talking about?

13   A      Well, we pretty much started off, I'd say, mid

14   eighties we took a tour to Qatar in the United Arab

15   Emirates.  Then we went to Dubai.  I'm sorry.

16   Dubai, I guess, is in the United Arab Emirates.

17   Qatar is somewhere near Saudi Arabia.  Then we came

18   back for a short time.

19          Then we went to Egypt and stayed in Cairo for

20   10 days.  And the day before we left, the WWE got

21   there with a tour.  And then we went back to the

22   States and started running live events there.

23   Q      And where when you returned to the United

24   States did you run live events?

25   A      Mostly in New England.

Corrente - Direct                                        233

1    Q      Okay.  And were you -- did the Wild Samoans

2    have a company and you were an employee or how were

3    you paid?

4    A      Again, I was paid on a per diem basis like any

5    other -- like any other talent.  But, yes, they had

6    a company.  I believe at the time it was called the

7    Trans World Wrestling Federation, so TWWF.

8    Q      Okay.  All right.  And are you able to tell us

9    how you eventually ended up at the AWA refereeing

10   matches?

11   A      Yeah.  That was through my relationship

12   with -- well, I had moved to Denver, Colorado to

13   begin with.

14   Q      Okay.

15   A      That was part of the Verne Gagne territory.  I

16   mean, the AWA, the NWA and the WWF were the three

17   major wrestling companies in this country for many,

18   many years.  And they each had a gentleman's

19   agreement about who would promote where.  Denver

20   belonged to Verne Gagne.

21          I called Sherry Martell who was a friend of

22   mine.  Afa had used her on shows and we had a good

23   relationship.  So I asked if she could get me in

24   to -- at least get a tryout in Denver.  So the AWA

25   tried me out in Denver.  They were happy.

1    Q       For what role?

2    A       Referee.

3    Q       Had you ever refereed before?

4    A       Oh, yes.

5    Q       Okay.

6    A       Yes.  And then eventually Ray Stevens called

7    and said, we need you in Las Vegas, and I said okay.

8    Q       Who is Ray Stevens?

9    A       He's a wrestling legend who passed on, but he

10   was very big on the west coast.  But he was the

11   talent coordinator at the time for Verne Gagne.

12   Q       Okay.

13   A       So that was -- that was how I got to that

14   phase of the AWA.

15   Q       And the video we saw yesterday was taped in

16   Las Vegas?

17   A       Yes.  I believe that was my initial television

18   appearance for Verne Gagne, if I remember correctly.

19   Q       And were you actually an employee of Verne

20   Gagne's or, again, paid per event?

21   A       Again, paid per event.

22   Q       Okay.  And throughout your early career in

23   professional wrestling, is that how people were

24   paid?

25   A       Yeah.  Everyone is pretty much paid per event

1    in those days.  Now, you may have a contract that

2    seemed to lock you -- lock you down or tie you up

3    if you're with one of the big companies.  But the

4    contracts really were not solid contracts.  They

5    guaranteed you almost nothing.  You certainly

6    couldn't make a living off of them.  So, you know,

7    you pretty much got paid when you appeared.

8    Q      Okay.  And how did the payment work in those

9    days during the times that you were the promoter?

10   Were you -- when you appeared as a wrestler or a

11   referee or other talent, did you fulfill your duties

12   and then wait until the cash box was counted at the

13   end of the night or how did it work?

14   A      If you promote a WWE event, they're, you know,

15   they're settling with you at the time.  Everybody

16   does a count in front of the Athletic Commission and

17   verifying, you know, tickets sold, tickets not sold.

18   And then the WWE paid their talent whenever.  They

19   just took the money and they paid the talent.

20   Q      But with the independent promotions such as

21   the Trans World Wrestling Federation that the Wild

22   Samoans were running, how did it work with paying

23   the talent in those?

24   A      Well, Afa was responsible for paying the

25   talent.  I basically coordinated the show.  So, you

1    know, at the end I was in line like anybody else to

2    get paid.

3    Q    Okay.  And how long did you stay with the AWA

4    in Las Vegas?

5    A    I did several events for the AWA, maybe three

6    televisions, and then eventually Mr. Russen went to

7    work for the AWA.  And he had a series of house

8    shows as things were starting to -- to change and

9    the predetermined lines had been erased.  He ran a

10   series of shows and he used me on those and those

11   were all AWA events.

12   Q    So is that the first time you met Mr. Russen,

13   back in the late eighties?

14   A    No.  I met him -- well, it would have been

15   probably late eighties, late to middle, probably

16   more in '86, something like that.  He had a group

17   that he used to run with a couple of guys and I

18   would be with the Samoans, and they used the Samoans

19   on many of the events.  So I met him there and he

20   remembered me and I remembered him.

21   Q    Okay.  And you mentioned that lines were

22   blurred or things had changed.  What are you

23   referring to?

24   A    Well, the wrestling industry really for many,

25   many years worked on a gentleman's agreement.  There

Corrente - Direct

1        were many different promoters, maybe there were 40.

2        And they all agreed to stay in their little area.

3        That peace was never broken while Vince McMahon,

4        Sr. was alive.

5             Once Vince McMahon, Sr. passed on, then his

6        son decided to forget all the promises he made to

7        everybody else and just erase the lines and just go

8        start trying to run in other people's backyards.

9        Q     Okay.  And when you're talking about the 40

10       promoters, you're talking about the entire United

11       States?

12       A     The entire United States.

13       Q     Okay.  So what was your next venture in

14       professional wrestling after the AWA?

15       A     You know, some things were happening

16       simultaneously.

17       Q     Okay.

18       A     All right.  You know, somewhere in there I was

19       a referee, also, for the New York State Athletic

20       Commission.  And I worked for various independent

21       promotions and the WWE.  But I wasn't a WWE employee

22       or WWF employee.  I was assigned by the New York

23       State Athletic Commission.  They had very limited

24       control over that.  WWF really couldn't tell those

25       guys what to do.

1    Q       Okay.   And so what was the next thing that you

2    did in professional wrestling?   We must be into the

3    late eighties or early nineties by this point.

4    A       Right.   We're into the late eighties.   A

5    gentleman name Nikita Koloff who I met basically

6    because the wrestling lines had been erased came to

7    the northeast to wrestle.   And I knew his television

8    uncle, Ivan Koloff, through the Samoans.

9           I met Nikita, and we became friends very

10   quickly.   He recommended me to a gentleman named

11   Nelson Royal who was starting his own wrestling

12   promotion in the Carolinas.   I went there for a

13   tryout.   They were doing their first television

14   tapings.   I went there for a tryout.   They gave me

15   the job, so I moved to Charlotte, North Carolina,

16   and started working for promotions there, and at the

17   same time started purchasing health clubs.

18   Q       Okay.   What type of health clubs?

19   A       You know, regular workout facilities.   They're

20   a lot different today than they were in those days.

21   I mean, gyms were still -- I don't know if you want

22   to say a new business, but certainly had not

23   developed to what they are today.   You walk into a

24   health club today, it could have cost $4 million to

25   open.   In those days if you had $50,000, you could

Corrente - Direct

1    open up a gym easily, if you wanted to.

2    Q       By the way, today you work for a company

3    called ABC Financial?

4    A       Yes.

5    Q       What is ABC Financial?

6    A       Well, they're a company that collects

7    membership dues for billing.  And when I was in the

8    health club business, they collected my members'

9    dues, so that's how I discovered them.

10   Q       Okay.  So you have some experience in the

11   health club industry?

12   A       Yes.

13   Q       All right.  So while you were in North

14   Carolina, what types of things were you doing for

15   the organization that you worked for there in

16   professional wrestling?

17   A       In those days mostly just refereeing.

18   Q       Okay.  And did there come a point where you

19   began working again with Mr. Russen?

20   A       I had always worked with Rob again on and off.

21   Since I was under contract to nobody, you know, if

22   somebody had something going, it was fine.  Rob

23   would have events from time to time and it would

24   always be my job to get the talent, you know.

25   Q       Okay.

1    A      So, you know, whether we flew up or drove up,

2    if we had to go a long distance that was on us but,

3    you know, the expenses were covered for that.

4    Q      So you had to have knowledge of who the talent

5    was in the industry?

6    A      Absolutely.

7    Q      I mean the wrestlers?

8    A      Absolutely.

9    Q      How did you keep up with who was current and

10   who was recognized and important?

11   A      Well, I mean, you see what's going on in

12   the -- on television.  Plus, you know, you have

13   relationships with people.  Some people had a

14   reputation that was good enough.

15          You needed to know, though, if someone

16   wrestled in a certain market, if he said, I'm

17   running shows in New Jersey, he really wouldn't want

18   me to bring up someone -- let's say Paul Jones who

19   was a legend in Charlotte but really maybe hadn't

20   done a whole lot in New Jersey.  So, you know, you

21   wanted to make sure you bring the right people to

22   the right place.

23   Q      And your role in working with Mr. Russen in

24   those time periods was to arrange for the talent?

25   A      Yes.  Arrange the talent, completely run the

1       live event.

2       Q       And describe the types of live events that

3       Mr. Russen was running at that time.  First off,

4       what banner was he operating under?

5       A       I believe by that time it was the IWA.

6       Q       Which stands for?

7       A       International Wrestling Association, I

8       believe.

9       Q       Okay.  And where would you -- where would

10      Mr. Russen promote these events, what kinds of

11      places?

12      A       High schools, maybe fairgrounds.  We did some

13      outside events at race tracks, things like that, to

14      the best of my recollection.  I apologize, but it's

15      going back a long time.

16      Q       How important was television to the promotion

17      of house shows during that time period?

18      A       Well, you know, we -- the IWA would always

19      advertise its house shows while it was on

20      television.  And, of course, that's important to any

21      event.  I mean, I don't care what you're doing in

22      this world, if you can advertise it on television,

23      that's generally what people are wanting to do.

24              So, you know, your television wrestling

25      program is always a vehicle to advertise your house

1    shows.

2    Q    Okay.  So what timeframe, what years are we

3    talking about that you were working with Mr. Russen

4    on promoting shows that he was holding or promoting

5    under the IWA banner?

6    A    Well, once I started I never stopped.  I mean,

7    to my knowledge he's never run a show that I wasn't

8    involved in from the time that we actually made a

9    relationship to start working together.  So I'd say

10   1986, '87, you know, I don't remember when the last

11   one was.  He was responsible for the tour of

12   Australia.

13   Q    When was the tour of Australia?

14   A    I believe it was in 1991, '92.  I'd say it was

15   probably '91.

16   Q    Okay.  And that was the tour of Australia with

17   15 to 20 wrestlers and lasting a period of 30 days?

18   A    Yes.  That was a big deal at the time.  I

19   mean, it was real big deal.

20   Q    I asked Mr. Russen -- you were here.  I asked

21   Mr. Russen how he compared that to Wrestlereunion.

22   But how do you compare what was involved in the

23   Australia tour with what was involved with setting

24   up the Wrestlereunions?

25   A    Well, the Australia tour -- first of all,

```
 1      Australia had been a very successful wrestling

 2      territory back in the sixties and seventies run by a

 3      guy named Jim Barnett.  For some reason the United

 4      States wrestlers had not been back there in a long

 5      time.

 6          Rob Russen was able to open that back up.  We

 7      were the very first ones to go back.  And all the

 8      media throughout the country -- when they were

 9      promoting us, all they were showing was wrestling

10      from the sixties and the seventies because that's

11      all they had, you know.

12          But it was a big deal.  It was the Rock and

13      Roll Wrestling Tour and they had us on every major

14      television broadcast in the country from a show

15      called Hey, Hey, it's Sat Day, which was 25 years on

16      the air, and good morning -- I personally appeared

17      myself, I believe, on Australia's version of Wild

18      World of Sports, Good Morning Australia, a version

19      of The Today Show from Australia.  I mean, we really

20      had it going on.  It was a really good thing.

21  Q       Now, was -- during this time period was

22      professional wrestling the only thing that you did

23      for a career or for income?

24  A       No.  I had the health clubs, but I was able to

25      take off and go wrestle and then come back.
```

1    Q      Were you ever participating in these

2    promotions as talent?

3    A      I -- on that event I was talent as well as

4    running the event.  I was actually -- I had three

5    different roles.  I ran the entire event, I was the

6    referee and I managed Kamala the Ugandan Giant

7    wearing a hood.  I was in a mask.  So if I wasn't

8    refereeing, I was managing him and coordinating the

9    event.

10   Q      What was the reason for the mask?

11   A      Well, Kamala's manager in the WWF always had a

12   mask.

13   Q      Okay.  Now, let's talk about the time period

14   immediately before the planning of the first

15   Wrestlereunion, so let's go to the 2000 to 2004

16   timeframe.  What was your connection in the

17   professional wrestling business at that time?

18   A      You know, I'm sure I appeared on some events

19   here and there, you know, probably independent

20   events in the Carolinas and things like that.  But I

21   had not necessarily had a major role.  But, you

22   know, my contacts and connections had been affirmed

23   many years before, you know.

24          But if an event came near us, we would go

25   over, you know, go visit with our friends and things

1    like that.  I may not have been actively pursuing --

2    and I certainly could not quote you any event that I

3    appeared on for sure in that timeframe.

4    Q       Okay.  Have you -- had you in that timeframe

5    of 2000, had you attended any type of fan

6    conventions in the entertainment business?

7    A       Oh, I attended fan conventions in the

8    entertainment business.  I had not attended any

9    wrestling fan conventions.

10   Q       All right.  But we're talking about now prior

11   to Wrestlereunion.

12   A       Correct.

13   Q       Okay.  What fan convention had you attended

14   before Wrestlereunion?

15   A       The Hollywood Collectors Show in -- first it

16   was in North Hollywood, California.  It's since

17   moved to Burbank.  I was a regular attendee there

18   four times a year.

19   Q       That event ran four times a year?

20   A       Still does.

21   Q       Okay.  And who owns that event?

22   A       Well, now it's owned by a gentleman -- two

23   gentlemen, one named Kevin Martin and the other one

24   is a man named David Elkouby.  And I believe that's

25   E-l-k-o-u-b-y.

1    Q       What is the theme of the Hollywood Collectors

2    Show?

3    A       It's television and movie legends.

4    Q       Okay.

5    A       You know, some current stars.  It's limited on

6    current stars.  It's mostly you can go there and see

7    anyone from the Happy Days cast to the Little

8    Rascals to Mr. -- the guys from Mr. Ed.  I mean, you

9    name it, they're there.

10   Q       And did you have a chance to observe how these

11   events were run?

12   A       Absolutely.

13   Q       And when did you come up with the idea or

14   concept for Wrestlereunion?

15   A       It was mid 2004.

16   Q       Okay.

17           MR. RODEMS:  Your Honor, may I approach?

18           THE COURT:  Yes, sir.

19           (At sidebar, on the record.)

20           MR. RODEMS:  May I suggest now is a time to

21   take a break because we're about to go into a major

22   transition.

23           THE COURT:  No.  It's too early.

24           MR. RODEMS:  Okay.  Thank you.

25           (End of sidebar discussion.)

1    BY MR. RODEMS:

2    Q       When did you start thinking about the concept

3    of Wrestlereunion?  When did it come to you?

4    A       Around June 2004, some -- some -- sometime

5    in -- in there.

6    Q       And how did the idea come to you?  What

7    happened?

8    A       Well, I had heard that there were other fan

9    conventions that had existed in the wrestling

10   business.  I was more involved with the celebrity

11   side of it at the time.  But when I heard about

12   these conventions, I just felt like there was

13   something missing.

14   Q       What was it that you felt was missing?

15   A       That the ones that I had heard about did not

16   have any live wrestling matches.  And I felt like I

17   had the power and the influence to put a lot of

18   these people back in the ring.

19   Q       What do you mean, to put these people back in

20   the ring?

21   A       Well, many of these guys were -- that I wanted

22   to appear were retired.  They had determined they

23   weren't going to wrestle again.

24   Q       Okay.  Okay.  And what were some of the fan

25   conventions that you were familiar with, wrestling

1        fan conventions?

2        A        There was one in New Jersey, and I'll be

3        honest with you, I don't remember the name of it.  I

4        think a gentleman named Tommy Fierro ran it.  But it

5        was just a bunch of guys getting together for a few

6        hours I think on a Saturday afternoon signing

7        autographs.  And then there was the NWA legends

8        event.

9        Q        And had you attended either one of those?

10       A        No, I did not.

11       Q        How did you -- did you become acquainted with

12       what was going on at that event or how they were

13       run?

14       A        Yeah.  Someone who attended -- someone who

15       attended told me and just, you know, what the basic

16       layout and format was.

17       Q        So when you started thinking about

18       Wrestlereunion, what did you envision?  What was --

19       what were you thinking of doing?  What was your

20       concept?

21       A        Well, the first thing that I thought was that

22       anybody who shows up has to get what they're

23       promised.  I had been told that the conventions were

24       not necessarily planned as well as they should have

25       been.  Wrestlers were not committed to stay for a

1      long enough period of time, so some of them would

2      just get up and leave before everyone who had

3      purchased a ticket got their autograph or a chance

4      to say hello to them, which was not going to be

5      acceptable.  You know, we would have to make sure

6      that that didn't happen.  And then just to put the

7      matches -- just try to put together the best

8      independent wrestling card that could be put

9      together.

10     Q      What kind of experience did you envision

11     giving the fans?

12     A      Well, you wanted to give the fans a chance to

13     see something at Wrestlereunion that they really

14     couldn't see anywhere else.  That was my goal.  I

15     didn't want to just give them something that --

16     depending on what regional part of the country they

17     lived in, they could go see it, you know, maybe four

18     times a year at some small, independent show.

19             So I really tried to put together special

20     match-ups, things that, you know, maybe had taken

21     place over the last 20 years or so.  And if it was

22     not the most unique thing, definitely put a special

23     spin to it so, you know, nobody could look at it and

24     say, eh, big deal.  You can see that anywhere.  You

25     couldn't see what Wrestlereunion was giving you

1      anywhere.

2      Q      Was Wrestlereunion always anticipated to be a

3      fan convention with a wrestling show?

4      A      Absolutely.

5      Q      Did you have -- did you have a feeling about

6      how many fans you should have at these types of fan

7      conventions?

8      A      Well, again, you had to have enough -- I mean,

9      you couldn't have so many that they couldn't get

10     what they were promised in the time that the stars

11     were there.  So we calculated, you know, how many

12     can you get through a line in a weekend.

13            I mean, that was the -- that was the most

14     critical thing because it wasn't an ala carte

15     pricing at the time.  It was if you buy this ticket

16     you're going to meet every one of these guys or

17     girls, and you're going to get signatures from every

18     one of them.

19            So, you know, a thousand certainly would have

20     been, you know, the -- a maximum number.  I don't

21     think realistically you could get more people than

22     that through the line on the weekend.

23     Q      Okay.  And how many wrestlers had appeared at

24     the largest fan convention that you were aware of

25     before Wrestlereunion ever came to pass?

1    A      Of what I'm personally aware of, I'd say 40

2    maximum, and I'm not sure that that's right.  But

3    that would be the maximum.  No less than 30, no more

4    than 40.

5    Q      Were there some conventions that were run with

6    much less fan --

7    A      Oh, yes.  Absolutely.  There still are to this

8    day.  The Wrestling Reunion Company is having a

9    convention I believe the first week of November and

10   they've got six people on a Friday night from 6:00

11   PM till midnight.

12   Q      Do you envision how many -- was yours intended

13   to be a one-day event?

14   A      No, sir.  It was going to be a weekend event.

15   Q      Where did you envision holding the

16   Wrestlereunion events?

17   A      Well, I mean, certainly there were several

18   places in consideration.  Tampa, you know, ended up

19   winning out, one, we were holding it in January.  We

20   certainly didn't want to have it in a place where we

21   could have encountered snow.

22   Q      Okay.

23   A      I personally -- I live in Florida, I love the

24   warm weather, and I don't like flying into snow and

25   I certainly didn't want to try to be getting people

1    from all over the country with potential snow issues

2    at least on the final end.

3    Q       Okay.

4    A       So based -- I'm already in Florida, Florida

5    Championship Wrestling was a big deal.  So we

6    figured let's -- let's go for Tampa and, you know,

7    people may consider it a vacation spot at the same

8    time.

9    Q       When you were conceiving Wrestlereunion, did

10   you have an idea of how you would generate revenue

11   from it?

12   A       Well, sure.  There was, you know, obviously

13   the live gate.  And then we were planning on filming

14   the matches for -- you know, for sale.  I knew that

15   the show that I was putting together was going to be

16   very unique.  There's really not been anything like

17   it since.

18   Q       Once you came up with the concept, what was

19   the next thing that you did to start putting this

20   into place?

21   A       Well, I started to sketch out in my mind, you

22   know, how I wanted the wrestling card to go.  I

23   mean, signing autographs is fairly easy.  I mean,

24   almost anybody can sign autographs.  If you're not

25   disabled, you can sign.

1          But I had to start putting together in my mind

2     who the talent would be that I would want to get in

3     the ring.  Some of them still wrestled, so that was

4     no problem.  But the ones that didn't, I needed to

5     work that out in my mind.

6          Then, you know, I had to decide how I would

7     present to these guys what I wanted them to do

8     because it wasn't going to be something that they

9     were probably prepared to do.

10    Q     Well, let's talk about from an organizational

11    standpoint.  Once -- once you came up with this

12    dream and you said, now I need to put it into gear,

13    I need to get going, who did you bring in to help

14    you?

15    A     Well, I got Mr. Russen to help.

16    Q     And why did you go to Mr. Russen?

17    A     I worked with him a long time.  He had good

18    relationships in the industry, as well.  You know, I

19    knew what he was capable of because I worked for him

20    for so long, so it was an easy -- easy thing for me

21    to put in place.  I was already in communication

22    with him on an almost daily basis.

23    Q     Okay.  And what was your understanding of his

24    background in terms of television wrestling and

25    selling wrestling shows?

1      A      Well, I mean, keep in mind I had worked for

2      him.  I had watched him, you know, produce shows,

3      edit shows.  You know, we were on -- you know, I

4      know personally myself I appeared on Sports Channel

5      America for him maybe as a referee.  I appeared on

6      the Sunshine Network here as a manager.  I don't

7      remember some of the other places.

8           But, you know, I had already seen him.  He

9      told me he refereed once or twice.  I had never seen

10     that, but he told me he had.  And I certainly didn't

11     need him to do anything like that.  He had always

12     sold the shows and ran the back end of the show as I

13     was running the front end.

14     Q      So at what point did you actually go forward

15     and create the company Wrestlereunion, LLC?

16     A      It was sometime after June 2004.  I contacted

17     a law firm to put it together legally.  I like to do

18     things right.

19     Q      And at what point did you reach the conclusion

20     that this is more than just a concept, I'm actually

21     going to get this event scheduled and make it

22     happen?

23     A      I'm going to tell you around June of 2004, I

24     mean, I was pretty comfortable with what I was

25     doing.  It wasn't like it was a month-long process.

1      You know, we were pretty much ready to go.

2            Now, if I had started calling all the talent

3      and they had no interest, obviously I might have had

4      a change of plan, but that didn't happen.

5      Q     What did happen when you started calling the

6      talent?

7      A     One by one they mostly said yes.  They had

8      some input.  You know, who didn't want to wrestle

9      this guy because he didn't like him.  And, you know,

10     I wanted no -- no problems with anyone.  I wanted no

11     surprises.

12           At an event like this where you're going to

13     have so many people, I knew we couldn't have any

14     trouble or conflict, so I was very clear.  I want

15     you to wrestle this guy, and when you get there,

16     there's not going to be really any need for us to

17     discuss anything because this is what you're going

18     to do.

19           Now, I'm going to call him up and I'm going to

20     tell him exactly what he needs to do.  And if we

21     can't agree with that, then let me know and we'll

22     move on to the next -- you know, to the next choice.

23           We -- we were pretty much okay with that.  We

24     had a few guys who adamantly refused.  They

25     absolutely did not want to wrestle again.  And then,

1        you know, I just asked them for five minutes of

2        their time to explain the concept.  And after I did

3        that, you know what?  Okay.  I'll do it.

4        Q      At what point did you select the venue or the

5        hotel that it was held at?

6        A      Well, we started making calls, I think, a

7        month or so later checking on different places in

8        the -- in the Tampa market.

9        Q      Why did you end up at the grand ballroom of

10       the Westshore Doubletree?

11       A      Well, in speaking to the people, they

12       certainly wanted the event.  You know, they had had

13       events there before.  Whenever I'm involved in any

14       building, you always want to have some

15       understanding, are these people -- has anyone used

16       their facility for an event like this.  And they

17       said that it had.

18             The other thing is, quite honestly, the

19       proximity to the airport.  You know, you're talking

20       about -- and at the time, you know, I knew it was

21       going to be 50 to 60 people for sure.

22       Q      Wrestlers?

23       A      Wrestlers.  And then that doesn't include any

24       other talent or out-of-town people.  How can you

25       shuttle that many people back and forth?  It sounds

1     like it could be simple, but it's really not, you

2     know.  But the hotel, though, had a shuttle and, you

3     know, the wrestlers were told, if there's nobody

4     there to pick you up, hop on the shuttle.

5            And, you know, in most cases there wasn't

6     going to be anybody there to pick them up, but they

7     were there two minutes later, so it was a great deal

8     for us.  So we didn't have to worry about who had a

9     6:00 AM flight back and things like that.

10    Q     Was the plan always to have this at a hotel

11    with a ballroom?

12    A     Yes, it was.  And there's only one reason for

13    that.  The logistical nightmare of having to take

14    the wrestlers back and forth from the location to

15    wherever the wrestling was going to be just doesn't

16    work out very well.  I mean, it's kind of a tough

17    deal.

18    Q     And since this was going to be a three-day

19    event, you would need to have the wrestlers stay in

20    the hotels?

21    A     Absolutely.

22    Q     And the fans would be -- some of them would be

23    coming from out of town?

24    A     Yeah.  We -- we felt like many would be coming

25    from out of town.

1    Q      So did it make sense, then, to have it at a

2    hotel so the fans and the wrestlers could stay at

3    the hotel?

4    A      Absolutely.  And, you know, when you do that,

5    the benefit to the hotel is they have the rooms

6    rented so expenses for the ballroom are almost

7    non-existent.

8    Q      Okay.  And what about the grand ballroom?  Did

9    you survey it before you went in?

10   A      Well, we went and --

11   Q      Signed a contract?

12   A      -- did a site inspection, if that's what

13   you're asking.

14   Q      Yes, it is.

15   A      Yeah, we did.

16   Q      Okay.  And what -- what was important to you

17   about the site for the Wrestlereunion, first

18   Wrestlereunion?

19   A      Well, I mean, the room had to be big enough.

20   I think it was 10,000, 11,000 square feet, something

21   like that.  They had said they had other events of

22   this type there before.  And, again, the proximity

23   to the airport was really a big deal for me.

24   Q      Okay.  Are you aware of whether the grand

25   ballroom at the Westshore Doubletree had been the

1      site of televised boxing?

2      A       Yes.  It think it was and it still is.

3      Q       And your intentions, of course, from the

4      beginning were to have the event videotaped?

5      A       Absolutely.

6      Q       Okay.  Did you have any discussions with a

7      company to come in and videotape the event?

8      A       Yes, sir, I did, Highspots.

9      Q       Highspots.com?

10     A       Highspots.com.

11     Q       How did you know about Highspots.com as a

12     potential videographer, if you will, or production

13     company for the event?

14     A       Well, I lived in Charlotte, North Carolina

15     from 1989 to 2001.  Highspots is based out of there.

16     They're very prominent in the wrestling industry.  I

17     was just aware of who they were and -- and might

18     have met Michael Bochicchio from time to time at

19     different, various events.

20     Q       So how did it come about -- was there a

21     discussion with Mr. Bochicchio about videotaping the

22     event for you?

23     A       Absolutely.

24     Q       Okay.  And when was the discussion -- when did

25     the discussions begin with Mr. Bochicchio of

Corrente - Direct

1      Highspots.com about that?

2      A      Well, it certainly would have been sometime in

3      2004.  I don't -- I don't have an exact timeline for

4      you.  I apologize.

5      Q      Okay.  What is your recollection about the

6      agreement that was reached with Highspots.com to

7      videotape this event?

8      A      Well, they were going to come in.  They were

9      going to film all aspects of the convention.  And

10     when I say all aspects, you know, they might have

11     gotten some B roll, but I -- certainly, that was not

12     going to be a critical piece for them or for us.

13     They were going to film all the QA sessions, all of

14     the shoot interviews and all the matches.

15     Q      And then who was going to own the rights to

16     the footage?

17     A      Well, we were going to split 50/50.

18     Q      He was going to, as you understand it, sell

19     the DVDs through his website?

20     A      Correct.

21     Q      Would you be able to market some of the

22     footage in your own way?

23     A      Oh, sure.

24     Q      And was anybody looking into that prospect of

25     marketing the footage outside of Highspots.com's

1    website?

2    A     Well, those are things that Mr. Russen would

3    be doing.

4    Q     Okay.  And were you aware generally of what he

5    was doing?

6    A     Generally, yes, I mean.  But, again, we worked

7    together for 20 years.  I mean, he certainly knew

8    how this went.  And when I worked for him, he pretty

9    much told me this is what you got, just get the job

10   done.

11         Well, it's pretty much the same way.  You

12   know, he would certainly bring anything to my

13   attention that might not be considered standard and

14   traditional business.

15   Q     Were you originally going to have a partner in

16   this venture?

17   A     Yes.

18   Q     And who was that?

19   A     A gentleman named Tony Hunter.

20   Q     And is this somebody that you had known for

21   awhile?

22   A     He's a gentleman that lived in the Charlotte,

23   Concord, North Carolina area near where I lived.

24   Q     Was he going to contribute financially to the

25   venture?

1    A      Yes.  He certainly indicated that he was.

2    Q      And did there come a point where he dropped

3    out?

4    A      Yes.

5    Q      And did you replace the financing that he was

6    supposed to put in?

7    A      Well, that's -- that's when I went to Tony

8    Attanasio and asked him to get involved in the

9    project.

10   Q      Okay.  And he agreed to do that?

11   A      Yes.

12   Q      And along this time -- well, I'll come back to

13   that in a moment.

14          What did you do to promote the Wrestlereunion

15   event?

16   A      Well, we mostly -- the Wrestlereunion I we

17   mostly promoted through the internet.

18   Q      Okay.

19   A      You have to understand, the event we were

20   putting together, you know, in some ways took on a

21   life of its own.  It was -- it was beyond anyone's

22   comprehension in the wrestling industry.

23   Q      Is that what you wanted?

24   A      Absolutely.

25   Q      Okay.  You formed Wrestlereunion.com?

1      A      Yes.

2      Q      And what was that?

3      A      A website where people could go to find out

4      who was going to appear.  And we did something a

5      little unique, also.  I went to different

6      independent wrestling events, and with the help of

7      Michael Bochicchio, actually, filmed video promos.

8             We wanted to do everything we could to ensure

9      that folks would believe that these wrestlers were

10     coming because there were -- some of them, we were

11     not able to get all of them, but we did get several

12     to say, Wrestlereunion, Tampa, Florida, I'll be

13     there, you know, just -- we knew that we were

14     telling people that we were going to do something

15     that had never been done before.  And it's -- it's

16     very tough to ask people to believe in you when

17     you're telling them something that they couldn't

18     possibly see themselves doing.

19     Q      With a lot of the people that you were

20     signing, had you worked directly with them?

21     A      I had worked with most.

22     Q      But not all of them?

23     A      Not all.  And certainly not in the capacity

24     where they would even -- maybe I had refereed their

25     match for the WWF 25 years ago and I was just some

1    young kid in referee stripes who they would have

2    paid no attention to.

3    Q     And now here you are in 2004 and you're

4    talking about having a fan convention with an

5    enormous number of wrestlers in it?

6    A     Right.

7    Q     Were some of the people skeptical, some of the

8    wrestlers?

9    A     Many.

10   Q     For what reason?

11   A     Well, I think mostly because when something's

12   never been done before, people question whether or

13   not it can be done.  I think that's the same in

14   everyday life.

15   Q     All right.  What was your strategy for

16   assigning talent?  Did you have a theme or an idea?

17   A     Well, the theme was old feuds from -- from

18   different territories in the country, and match

19   those people up in the best way possible.  You know,

20   we took Kamala and we had him wrestle Hacksaw Jim

21   Duggan.  You know, Hacksaw is a big WWF star and so

22   was Kamala.  But, you know, these guys started their

23   original feud in the New Orleans, Louisiana area.

24   Q     With these wrestlers that were going to appear

25   at Wrestlereunion, had most of them appeared on TV

1        in the past?

2        A       I'm going to say that almost everyone, if not

3        every single one, had appeared on television in some

4        way, shape or form.  The majority of them with the

5        WWF, some with the NWA, some with the AWA, some with

6        all of the above.

7        Q       Now, when we hear these terms, AWA, NWA, WWF,

8        those are what you would call recognizing bodies.

9        But the individual owner of, for instance,

10       Championship Wrestling from Florida, Incorporated,

11       who was that?  It wasn't the NWA; was it?

12       A       No.  No.  It fell under the banner of the NWA,

13       but it was owned by a gentleman named Eddie -- his

14       wrestling name was Eddie Graham and, you know, he's

15       probably the most popular wrestler ever in the state

16       of Florida, but he's been deceased for many years.

17       Q       Okay.  And he had a television show?

18       A       Absolutely.

19       Q       And do you remember where that television show

20       was filmed at?

21       A       Well, I've been told since that it was -- this

22       Florida Sportorium, which I don't believe exists

23       anymore, somebody said 106 North Albany Street.

24       What I do remember is that as a kid growing up in

25       New York, we used to get that on -- the Spanish

1    station was in English, but the Spanish television

2    station showed it.  I grew up in Florida -- I mean,

3    I'm sorry, I grew up in New York, but I was watching

4    Dusty Rhodes every week from Tampa.

5    Q      How many people were at the Sportorium, from

6    the TV tapings?

7    A      Very few.  I couldn't count because I don't

8    even think you could get a clear view of how many

9    were there.  But it didn't look like more than a

10   couple of rows.  And Georgia Championship Wrestling

11   was basically the same way.  It continued that way

12   for many years.

13   Q      How about the Memphis show, the same way?

14   A      Yes.  The old tapes you see of the Memphis

15   show, there are very few people.  And still to this

16   day when they film fresh product.  In 2006, maybe,

17   in Memphis the same, 40, 50 people, something like

18   that.

19   Q      Okay.  Do you have a theme for Wrestlereunion?

20   Why was it called Wrestlereunion?  Was there a

21   significance to the second half of that name,

22   reunion.

23   A      Well, sure.  It was to gather together, you

24   know, again all tied into the old feuds, you know.

25   That's more of a friendly term, but getting together

1    guys that had interacted in the past.  We didn't

2    match up somebody really if they were legends.  They

3    got matched with somebody they had an issue with or

4    a connection to over the years.

5    Q      Okay.  When you reached an agreement with

6    someone to appear at Wrestlereunion, did you send

7    them a contract?

8    A      Absolutely.

9    Q      Did you require a signed contract from

10   everyone?

11   A      Yes.

12   Q      And did that contract give Wrestlereunion the

13   rights to exploit those wrestlers through the media?

14   In other words, did those contracts give you the

15   right to take videotape footage and then sell the

16   events?

17   A      Yes.

18   Q      Okay.  Were there going to be any royalties

19   paid to the wrestlers who appeared in

20   Wrestlereunion?

21   A      No.

22   Q      So with the agreement that you had the

23   wrestlers sign, they were paid a set fee?

24   A      Yes.

25   Q      Was every wrestler that appeared at

Corrente - Direct

1       Wrestlereunion paid the same amount?

2       A      No.

3       Q      How did you go about determining how much to

4       pay the wrestlers who were going to appear at

5       Wrestlereunion?

6       A      Well, you have to have some feel if you've

7       been doing this for 30 years.  You know what people

8       are getting on a normal independent wrestling event.

9       You'd somehow take into consideration how many days

10      they're tying up with you, then also determine how

11      much you're asking them to do with -- within that

12      timeframe.

13             You know, there may be somebody who goes and

14      wrestles some place for 750 or a thousand dollars.

15      He's going to show up over there, going to get to

16      the building around 7:00, he's going to be in the

17      building till 8:00 and not asked to do anything and

18      maybe be in the ring for ten minutes then go home.

19             Obviously, that's not what we were asking

20      people to do.  We were asking them to sit and visit

21      with fans, be as cordial to the fans as they could

22      possibly be, sign autographs, listen to the stories,

23      you know.  Whether they were or they were not, to

24      appear interested, make the fans feel special.

25             I mean, that's what they needed to do.  In

Corrente - Direct

1    some cases they needed to do that for two or three

2    days, somebody else might come in for a very short

3    time, appear and leave, so -- and they would be paid

4    less than if they were wrestling.

5         Of course, they would be paid for more than

6    somebody who -- pretty much anybody who was

7    physically able to wrestle could wrestle at

8    Wrestlereunion, but there some folks that were just

9    not physically able anymore.

10   Q    Okay.  Did you have a plan to bring in some

11   wrestlers who weren't at that point established

12   legends but maybe were young wrestlers who had some

13   future in the business?

14   A    Yes, we did.  We brought in a couple of girls,

15   Chris Vain and Amber O'Neal and C. M. Punk.  I'm

16   trying to think if there were any other young

17   people.  I assume you're talking about

18   Wrestlereunion I; correct?

19   Q    Yes.

20   A    Yeah.

21        MR. RODEMS:  Your Honor, may we go to the

22   overhead, please?

23        THE COURT:  Why don't we take our break before

24   we do that.  We'll return at 3 o'clock.

25        COURTROOM SECURITY OFFICER:  Rise for the

1    jury.

2              (Jury out at 2:47 PM.)

3              (Recess was taken at 2:47 until 3:05 PM.)

4              (Back on the record.)

5              COURTROOM SECURITY OFFICER:  All rise.  This

6    Honorable Court is again in session.  Please be

7    seated.

8              MR. RODEMS:  Your Honor?

9              THE COURT:  Yes, sir.

10             MR. RODEMS:  I think an issue has emerged

11   while we had a break, a small issue.  But I didn't

12   want the jury to come in before we brought this to

13   your attention.  If you would like us to come up at

14   sidebar, we can do that.

15             THE COURT:  All right.  We can do it now.

16   Does it have to be done at sidebar?

17             MR. RODEMS:  No, sir.

18             THE COURT:  Okay.  Go ahead.

19             MR. RODEMS:  Well, it's not mine, it was

20   Ms. Millner.

21             MS. MILLNER:  Yes, Your Honor.  Apparently --

22             THE COURT:  Use the mic, please.

23             MS. MILLNER:  Mr. Rodems informed me that he

24   wants to admit a photograph from Wrestlereunion I

25   into evidence, which I'm not necessarily concerned

1    with.  The problem is is the photograph is of a

2    wrestler, I've forgotten the name, and a politician,

3    a local politician in town or a former politician in

4    town.  And we never asked the jury about this --

5    it's 75.

6          THE COURT:  Who is it?

7          MS. MILLNER:  Commissioner Blair.

8          MR. RODEMS:  It's a picture of Diamond Dallas

9    Page with Brian Blair.

10          THE COURT:  That could be good or bad.

11          MS. MILLNER:  Exactly.

12          THE COURT:  I don't know the man.  He's just

13    been in the press lately.  He doesn't have anything

14    to do with the production, does he, just a former

15    wrestler?

16          MR. RODEMS:  He appeared at Wrestlereunion I.

17          MS. MILLNER:  The only concern I have is that

18    the jurors may know him and they weren't inquired,

19    you know, to --

20          THE COURT:  He's not going to testify, though;

21    right?

22          MR. RODEMS:  No, sir.  He's not on the witness

23    list.

24          THE COURT:  I don't see a problem.  Is anybody

25    going to point him out?

1          MS. MILLNER:  I'll show -- I have a --

2          THE COURT:  No.  I mean, I know who he is.

3     But is anybody going to say, hey, isn't that Brian

4     Blair or -- I don't know.

5          MR. RODEMS:  Well, I mean, that --

6          THE COURT:  It is what it is.  I don't see a

7     problem.  I don't see any prejudice to anybody if

8     he's not going to be a witness.  He was simply

9     someone who appeared; is that right?

10         MR. RODEMS:  Yes, sir.  He appeared and -- he

11    didn't wrestle, he just signed autographs and, you

12    know, met with the fans and did that kind of thing.

13         THE COURT:  This was before all the publicity.

14         MR. RODEMS:  I think it was in the middle of

15    some earlier publicity in another matter that I

16    represented him on and before all the recent stuff

17    that I didn't represent him on attending a case that

18    I do represent him on.

19         THE COURT:  All right.

20         MR. RODEMS:  You can see why I'm losing my

21    hair, Your Honor.

22         THE COURT:  Well, I'm losing mine because I

23    sit in here for eight hours every day.  I intend to

24    stop at 4:00 and finish the *Daubert* hearing by 4:30.

25         MR. RODEMS:  We have sent Mr. Attanasio out to

1       go bring Mr. Bowman back.  We anticipated that there

2       would be something --

3               THE COURT:  And hopefully I can make a ruling

4       and then you'll know what to do tomorrow.  Are we

5       ready to go or are they getting organized?

6               MR. RODEMS:  Yes, sir.

7               THE COURT:  And the record should reflect that

8       I have thanked Mr. Brown for his assistance in the

9       technology.  He's been helpful.  Thank you.

10              COURTROOM SECURITY OFFICER:  Rise for the

11      jury.

12              (Jury in at 3:08 PM.)

13              COURTROOM SECURITY OFFICER:  Please be seated.

14              THE COURT:  You may proceed.

15              MR. RODEMS:  Thank you, Your Honor.

16      BY MR. RODEMS:

17      Q       Mr. Corrente, before this trial, did you have

18      a chance to look at the photographs that we wished

19      to offer into evidence relating to Wrestlereunion I

20      and II?

21      A       Yes.

22      Q       Okay.  Did those photographs that you looked

23      at accurately depict the scene or the picture or the

24      image that's represented in those pictures?

25      A       Yes.

1    Q      Okay.

2           MR. RODEMS:  Your Honor, I would move at this

3    time into evidence Plaintiff's Exhibits 66, 67, 68,

4    69, 73, 74, 75, 76, 77, 78 and 79.

5           THE COURT:  Is there any objection?

6           MS. MILLNER:  No objection, Your Honor.

7           THE COURT:  Those exhibits are received.

8           (Whereupon, Plaintiff's Exhibit Numbers 66,

9    67, 68, 69, 73, 74, 75, 76, 77, 78 and 79 are

10   received into evidence.)

11          MR. RODEMS:  Thank you, Your Honor.  Your

12   Honor, may I publish as the next series of questions

13   unfold?

14          THE COURT:  Yes, sir.

15          MR. RODEMS:  Okay.  Thank you, sir.  Exhibit

16   number 77, please.

17   BY MR. RODEMS:

18   Q      Mr. Corrente, was this photograph taken at

19   Wrestlereunion I?

20   A      Yes, it was.

21   Q      Okay.  Who is depicted in the photo?

22   A      Well, the gentleman in the plaid shirt on the

23   far left is Mick Foley.  The gentleman with the

24   turbine on his head is Abdulla the Butcher.  In

25   front of him with the wrap around his hand with the

1        X on it is C. M. Punk.  Next to them is Kevin

2        Sullivan, and next to Kevin is Abdulla's manager,

3        Honest John Cheatham.

4        Q       Okay.  Is that his real name?

5        A       No, sir.  I don't believe that it is.

6        Q       Okay.  C. M. Punk, who is he?

7        A       C. M. Punk is a gentleman that we picked to be

8        a future star in the business.  Since shortly after

9        Wrestlereunion I, he signed with the WWE and is

10       currently one of their main event stars and they

11       seem to have extremely high hopes for him being one

12       of the leaders of the company into the next

13       generation.

14       Q       And is Mr. C. M. Punk currently a champion in

15       the WWE?

16       A       Yes, I believe that he is.

17       Q       And one of the pay-per-view events recently,

18       SummerSlam, was he featured in that?

19       A       Yes, he was.

20       Q       Okay.

21               MR. RODEMS:  And can we look at number 62, Mr.

22       Brown.

23       BY MR. RODEMS:

24       Q       Mr. Corrente, is this taken at Wrestlereunion

25       I or II?

1      A       This is Wrestlereunion II at the Valley Forge

2    Convention Center.

3      Q       And who is the gentleman on the left with the

4    dark hair and the black elbow pad?

5      A       That's Matt Hardy.

6      Q       Okay.  And who is the gentleman on the right

7    that appears to be falling or leaning back?

8      A       That's D-Von Dudley.

9      Q       Okay.  Now, D-Von Dudley was one of the Dudley

10   Boys?

11     A       Correct.

12     Q       Okay.  And the Dudley Boys did both sign

13   talent agreements to appear at the Wrestlereunion

14   events?

15     A       Yes, they did.

16     Q       Okay.  And did there -- did something come up

17   with the right of the Dudley Boys to use the name,

18   the Dudley boys?

19     A       We were contacted by WWE in regards to the

20   Dudley Boys.  They indicated that the Dudleys were

21   acting outside of the way -- they claimed that the

22   Dudleys did not have the rights to take the name

23   with them when they left.

24             They left the WWE, I believe, on August 26.

25   They let their contract expire.  They were not fired

1    or terminated in any way, so the next day they were

2    able to go to work for somebody else, and that

3    somebody was us.

4        Rather than get into any kind of an argument

5    with the WWE, I went to these guys, I told them what

6    happened.  They made some phone calls, determined

7    that they didn't want to fight whether they were

8    right or wrong, that they were moving on to a new

9    phase of their career, and they were willing to just

10   come up with a name change.  So we sat around until

11   we came up with something that they were comfortable

12   with.

13       MR. RODEMS:  I'm sorry, Your Honor.  I would

14   move Exhibit 62 into evidence.

15       MS. MILLNER:  No objection.

16       THE COURT:  62 is received.

17       (Whereupon, Plaintiff's Exhibit Number 62 was

18   received into evidence.)

19       MR. RODEMS:  Okay.  I would also move in

20   Exhibit 50, Your Honor, and 53, 54, 55, 56 and 58.

21       THE COURT:  Those are all photographs?

22       MR. RODEMS:  Yes, sir.  And 59, 60, 61, we

23   just did 62, 63, 64 and 65.  I believe that covers

24   it, Your Honor.

25       THE COURT:  Any objection?

Corrente - Direct                                                                278

```
 1              MS. MILLNER:  No objection, Your Honor.

 2              THE COURT:  All right.  Those exhibits are now

 3      received.  Thank you.

 4              (Whereupon, Plaintiff's Exhibit Numbers 50,

 5      53, 54, 55, 56, 58, 59, 60, 61, 63, 64 and 65 were

 6      received into evidence.)

 7              MR. RODEMS:  Okay.  Now we're just going to go

 8      to Exhibit 50, please.

 9      BY MR. RODEMS:

10      Q       Mr. Corrente, do you recognize the gentleman

11      in Exhibit 50?

12      A       Yes, sir.

13      Q       Is that Jimmy Hart?

14      A       Yes, it is.

15      Q       Okay.  Did you bring Jimmy Hart in originally

16      to be an advisor to Wrestlereunion?

17      A       No, sir, not originally.

18      Q       Is that what he became?

19      A       Yes, it is.

20      Q       Okay.  And in what way was he an advisor to

21      Wrestlereunion?

22      A       Really, in all aspects.  I did not have a

23      relationship with Jimmy Hart.  I had met Jimmy Hart

24      one time in the -- in the middle 1980s for about two

25      seconds.  And then I refereed one of two matches
```

1      that he was involved in over the years.  He

2      certainly would have had no recollection of that.

3      These guys were wrestling seven days a week,

4      different referees in every city.

5           And I was really turned on to Jimmy Hart and

6      what his skills and abilities might be through

7      Diamond Dallas Page.  He was the host of our event

8      and he was quite honestly, literally driving me

9      crazy until I attempted to contact Jimmy Hart.

10     Q      Why?  What do you mean, driving you crazy?

11     A      Just constant phone calls and saying, you

12     know, you need this guy, you need this guy and on

13     top of that he lives in Tampa, anyway, you know, so

14     it's not even like he has to be flown there.  And

15     finally, you know, I said okay.

16          But, also, we had contacted Lance Russell who

17     was a legend in the wrestling business to do the

18     commentating.  And quite honestly, Lance Russell

19     wanted Jimmy Hart as his broadcast partner and

20     wouldn't commit to the event until Jimmy did.  So,

21     you know, I finally said, well, I'd better get on my

22     bicycle and find Jimmy Hart.

23          MR. RODEMS:  Can we look at Exhibit 56.

24     BY MR. RODEMS:

25     Q      Is that Lance Russell?

Corrente - Direct                                                                    280

1    A      Yes, it is.

2    Q      Okay.  Can you tell by looking at this photo

3    what event we're talking about?

4    A      Yes, sir.  This would be Wrestlereunion II.

5    Q      And how are you certain of that?

6    A      Well, the announcers have monitors.

7    Q      Okay.  Now, at various stages along the way

8    did you offer to Clear Channel Entertainment

9    Television to have Jimmy Hart and Rob Russen assist

10   with the editing of footage?

11   A      Absolutely.  It was Jimmy Hart or Rob Russen

12   or both, whatever -- whatever they needed we were

13   willing to do to get the product to market.

14   Q      And as far as promoting the product, did you

15   offer Jimmy Hart or anybody else?

16   A      I offered anybody else that we had access to

17   on our dime to help them in any way, shape or form

18   that they needed.

19   Q      Were those ever -- were those offers of

20   assistance ever accepted?

21   A      Absolutely not.

22          MR. RODEMS:  Can we go to Exhibit 53.

23   BY MR. RODEMS:

24   Q      Can you tell us who's in this photograph?

25   A      Yes.  I'm going to tell you that on the very

Corrente - Direct

1        far left where you just see his left arm, I believe

2        that's Tom Pritchard.   Next to him is D'lo Brown.

3        Next to him is the Blue Meanie and next to him is

4        the American Dream, Dusty Rhodes.

5        Q       Okay.   And D'lo Brown, does he currently

6        wrestle?

7        A       Yes, he does.

8        Q       Who does he wrestle for?

9        A       He wrestles here in the states for Ring of

10       Honor, and I believe he competes on a regular basis

11       in Japan, as well.

12       Q       Okay.   And Dusty Rhodes on the far right, what

13       has he most recently been involved with?

14       A       Dusty Rhodes was the guest host on Monday

15       Night Raw and featured on the broadcast this Monday.

16       And also he runs the -- or certainly is one of the

17       top people at the World Wrestling Federation

18       training camp here off of Gandy Boulevard in Tampa.

19       Q       And why are these gentleman in this picture

20       holding their hands up?

21       A       I guess, you know, Dusty is always very

22       charismatic and they were doing a little dance

23       there, that pushing up the ceiling dance that was

24       popular a little while back before their match -- or

25       after their match.

1          MR. RODEMS:  Exhibit 55.

2     BY MR. RODEMS:

3     Q     Who is this gentleman in this photograph?

4     A     That's Mick Foley, a gentleman who I helped

5     get started in the wrestling business.

6     Q     And what does Mr. Foley -- what do you mean,

7     you helped him get started in the wrestling

8     business?

9     A     Well, he was just a young kid like I was

10    knocking around the wrestling business.  And I knew

11    that he had all the talent and ability to be a

12    superstar in the business.  So I contacted Rob

13    Russen who was running a series of shows and he was

14    using Jerry the King Lawler who was the owner of

15    Memphis Wrestling along with Jerry Jarrett.

16          And I said, Rob, I've got this kid, you know.

17    I know the kid can be a star.  I need you to put him

18    on these shows so Jerry Lawler can see him.  If

19    Jerry Lawler sees him, he'll be booked in Memphis

20    almost immediately.

21          So, you know, Rob generally would, you know,

22    take my advice on things like that.  We put him on

23    the shows.  Jerry Lawler saw him, and I think within

24    30 days he was wrestling on a regular basis in

25    Memphis, moved onto a couple other territories and

1    eventually became a major main event star in the

2    World Wrestling Federation.

3    Q       He's also an author?

4    A       Yes.   Best selling author.

5    Q       And at the Wrestlereunion II event in Valley

6    Forge, there was a special event featuring him?

7    A       Yes.   I -- this is one of the times I wanted

8    to use my -- my influence to get people to maybe do

9    things that they, you know, may not normally do.

10   And really everything that Mick did at

11   Wrestlereunion II was special.

12        We had the comedy show that -- that he

13   performed and we filmed and we hoped would be

14   marketed.   You know, Mick is still doing comedy

15   today.   I believe he appeared at the Improv Club in

16   Los Angeles just last week doing his standup comedy.

17        Also, Mick wrestled for us on that event.

18   Now, that may not sound like a big deal, but until

19   recently when Mick joined TNA, he had not wrestled

20   for any other company other than the WWE, that I'm

21   aware of, other than a one-time event for a very

22   close friend of his to raise money.   The guy was

23   either dying of cancer or had already died of

24   cancer.   So for him to do a non-WWE event and

25   actually wrestle on the event, that was a big deal.

1      Q      Okay.

2             MR. RODEMS:   And if we would look at Exhibit

3      65.

4      BY MR. RODEMS:

5      Q      Mr. Corrente, can you tell if this is

6      Wrestlereunion I, II or III?

7      A      That's Wrestlereunion II.

8      Q      Okay.   Look at the crowd and compare that to

9      what you used to observe on Championship Wrestling

10     from Florida, Incorporated, which was broadcast in

11     English on your Spanish station.   How does that

12     compare?

13     A      It's definitely a much larger crowd than

14     Florida Championship Wrestling.

15     Q      At Wrestlereunion?

16     A      Yes.

17     Q      Okay.

18            MR. RODEMS:   And if we could go to Exhibit 66.

19     BY MR. RODEMS:

20     Q      Unfortunately, this is the best resolution we

21     have for this picture.   But can you tell me, what

22     event is this from?

23     A      This is the Wrestlereunion I here in Tampa.

24     Q      Okay.   And how does the crowd appear in this

25     picture to you compared to what you recall at the

1    event?  Is this an accurate description?

2    A      Yes.  I would say that it is.

3    Q      All right.

4           MR. RODEMS:  And if we could go to Exhibit 68,

5    please.

6    BY MR. RODEMS:

7    Q      What do you see in this picture?

8    A      Well, that's the -- it's the crowd at

9    Wrestlereunion I with a young boy there with a mask.

10   Maybe that's a Ray Mysterio mask or something.  I'm

11   not sure.

12   Q      Did you have -- was your crowd at the

13   Wrestlereunion I and II fan conventions, was it just

14   adults or were there kids?

15   A      Well, clearly there were some children.  I

16   could not give you a specific count on how many

17   children were there.  But you've got to realize that

18   something like this, a father might want to bring

19   their son and say, hey, this is Dusty Rhodes, this

20   is Bruno Sammartino, these are the guys that I

21   watched growing up.  And maybe a young boy like this

22   is used to watching a Ray Mysterio or somebody like

23   that.

24          MR. RODEMS:  And can we take a look at Exhibit

25   69.

1    BY MR. RODEMS:

2    Q     Mr. Corrente, what do you see in this photo?

3    A     Well, it looks like the crowd at

4    Wrestlereunion I at a QA session.

5    Q     What's a QA session?

6    A     Where the audience gets to suggest questions.

7    And I'm not a hundred percent sure, Mr. Rodems, but

8    I believe that that's Bill Apter potentially talking

9    to Ricky Steamboat and Ted DiBiase, but the picture

10   is so small of the stars that I'm not a hundred

11   percent sure.

12   Q     All right.

13         MR. RODEMS:  And can we look at Exhibit 73,

14   please.

15   BY MR. RODEMS:

16   Q     Who is seated in this picture?

17   A     That's Mike Graham.

18   Q     Okay.  Do you see the person in front of him

19   that's wearing the -- what appears to be a pink

20   robe?

21   A     Yes, I do.

22   Q     Is that a fan?

23   A     Yes, it is.

24   Q     And what is on the back of his robe?

25   A     Those are autographs.

1    Q      Okay.   Is this -- your ticket price for the

2    event in Tampa was how much for the VIP?

3    A      Anywhere from 249 to 299.

4    Q      Is this typical of the people that showed up

5    to this event, people that would come with a pink

6    robe on signed by the wrestlers?

7    A      Well, I don't want to say that's the typical

8    customer.  But certainly there are fans who do this

9    type of thing, they'll bring shirts and -- I'm sure

10   this guy's goal was to go home with 94 signatures.

11   He may have come there with that robe being brand

12   new or he may, you know, have had a couple

13   autographs on it already, who knows.  But, you know,

14   sooner or later that robe is probably E-bay bound.

15   Q      Okay.   Whose picture is on the left in this

16   picture?

17   A      That's Dusty Rhodes.

18   Q      And what does he have in his hand?

19   A      It looks like it's an issue of The Wrestler.

20   Q      A magazine?

21   A      Yes.

22   Q      Okay.   And is this how Wrestlereunion worked

23   where the fans would have this type of access with

24   the wrestlers?

25   A      Yes, it is.

1    Q       Okay.   Now, dusty Rhodes wrestled at

2    Wrestlereunion I?

3    A       Yes, he did.

4    Q       Okay.   So this is obviously before the

5    wrestling match?

6    A       Yes.

7    Q       Okay.

8            MR. RODEMS:   And 75, can we go to Exhibit 75.

9    BY MR. RODEMS:

10   Q       On the left is Diamond Dallas Page?

11   A       Yes, it is.

12   Q       And on the right?

13   A       That's Brian Blair.

14   Q       What was his professional name?

15   A       Bee Brian Blair.   He's one of the Killer Bees.

16   Q       And what organization did he wrestle in?

17   A       Well, he certainly wrestled in the WWF for

18   many years, but he wrestled in Florida Championship

19   Wrestling, wrestled in the NWA for a long time.   He

20   had quite a lengthy career and wrestled in most

21   states.

22   Q       Who is pictured in Exhibit 79?

23   A       On the left that's Jimmy Superfly Snuka, and

24   that's S-n-u-k-a, and Rowdy Roddy Piper.

25   Q       Now, did these two have a feud?

1    A        These two had one of the hottest feuds in the

2    World Wrestling Federation for a number of years.

3    Q        What years?

4    A        It would have been the pre Hulk Hogan years.

5    Probably -- let me see.  I first met Jimmy in 1981.

6    I'm going to tell you maybe '82 to maybe '84.  Jimmy

7    Snuka was the biggest thing in New York wrestling,

8    other than at that time Bruno Sammartino was making

9    very limited appearances.  Snuka was really carrying

10   the company on his back.

11   Q        Now, if these two had a feud in the eighties,

12   did you have a special match scheduled between these

13   two to resume their feud?

14   A        No.  This is the one case where I went --

15   where I went a little bit different.  I talked to

16   Roddy.  I actually flew to Portland and sat down

17   with Roddy across the table one on one.  I had known

18   him on and off over the years, but I wanted to look

19   him in the eye and tell him what I wanted him to do,

20   because I knew it would be a big deal to him.  And I

21   knew that I was going to need him to help sell Snuka

22   on the idea.  And basically I talked them into

23   teaming up together.

24            Again, Wrestlereunion was about giving people

25   stuff that they really weren't going to see anywhere

1    else.  So Piper agreed.  And then he talked to Jimmy

2    and Jimmy agreed.  So we were able to take two guys

3    that, you know, had not teamed up together in 20 or

4    25 years.  And that was going to be more special

5    than seeing them fight again.  The healing of the

6    wounds.

7    Q      Now, did the fans attending have any idea that

8    these two were going to be tag team partners?

9    A      No.  That was kind of a -- that was more of

10   a -- of a kind of last minute surprise type of

11   thing.

12   Q      Now, since Wrestlereunion, have Jimmy Snuka --

13   Jimmy Superly Snuka and Rowdy Roddy Piper appeared

14   in WWE events again?

15   A      Yes, they have.

16   Q      And to your knowledge, was the first time that

17   they ever teamed together at Wrestlereunion?

18   A      It was certainly to my knowledge the first

19   time that they ever teamed together after their feud

20   began.  I can't tell you what they might have done

21   in their younger days, maybe in -- they both started

22   in Portland wrestling, so there could have been

23   things then.

24          But from the time the feud started in New York

25   in the eighties, I'm going to tell you I have no

1     knowledge of them wrestling together.

2     Q      And have you seen them on WWE together?

3     A      Recently?

4     Q      Well, after Wrestlereunion.

5     A      Yes.  Yes, I have.  I've seen them separately,

6     I've seen them together.  But the last time was

7     WrestleMania 25 where the WWE made them tag team

8     partners.

9     Q      And that clip that we saw earlier in the trial

10    that you talked about earlier, that's the

11    WrestleMania 25th edition?

12    A      Yes.

13    Q      So if we played through that long enough, and

14    we're not going to do that, but if we played that

15    long enough, we would see a tag team match where

16    Jimmy Superfly Snuka and Rowdy Roddy Piper were

17    actually tag team partners?

18    A      What you would actually see is Ricky the

19    Dragon Steamboat, who was part of Wrestlereunion and

20    Jimmy Snuka's old tag team partner, Jimmy Snuka and

21    Roddy Piper, all three of them being tag team

22    partners.

23    Q      Okay.  Now, we've sort of fast-forwarded and

24    gotten into the actual events.  But what I want to

25    talk to you about now is before the event, the first

1       Wrestlereunion took place, did you know going in

2       that the revenue received from the live gate would

3       not cover all the expenses of Wrestlereunion I?

4       A       Well, it was never the plan for it to.  The

5       plan was always to be marketing, you know, the

6       videos to bring in revenues.  So, you know, whether

7       it did or it didn't, I mean, it certainly could have

8       or it might not have.  But it was not the sole

9       source of income.

10      Q       Okay.  So when you hear constantly that

11      Wrestlereunion I was a financial failure, if we just

12      measure the revenue from the live gate alone, was

13      there any revenue derived from the DVD sales or from

14      televised programming or from pay-per-view?

15      A       No, sir, there was not.

16      Q       Had there been revenue from those sources,

17      would it have been a profitable event?

18      A       Yes, sir.

19      Q       Okay.  Now, when is the first time that you

20      heard anything about Clear Channel Entertainment

21      Television having an interest in this project?

22      A       I believe the first time we heard about it was

23      through Bill Apter.

24      Q       Now, who is the first person you spoke to at

25      Clear Channel Entertainment Television?

1      A       I believe it was Steve Sterling.

2      Q       And when did you speak to him?

3      A       I couldn't quote you an exact date.  It was

4      sometime after his conversation with Mr. Russen.

5      But I couldn't -- it certainly was not the same day,

6      I can promise you that.  So -- and since that was on

7      New Year's Eve, it would have been sometime maybe

8      the first week or 10 days of January, maybe the

9      first few days of January.

10     Q       Did you at that time before your first

11     conversation with Mr. Sterling have a deal in place

12     with Highspots to come in and videotape the events?

13     A       Yes, I did.

14     Q       Okay.  And was there a written agreement?

15     A       No, there was not.

16     Q       Why not?

17     A       Well, you know, Michael's reputation in this

18     business is impeccable.  So, you know, we just felt

19     like the old school way of a gentleman's agreement

20     was going to be -- was going to be good enough.  I

21     mean, Michael made it very clear he wanted to come

22     down there, he wanted to film the events.  You know,

23     there was no concern on my part that he was going to

24     show up and that he was a fair and honest guy.

25     Q       Mr. Corrente, could you turn to Exhibit 1.

```
1    A       Okay.  I have it.

2    Q       What is -- this has already been admitted into

3    evidence.  What is this document?

4    A       This is the agreement between my company and

5    Clear Channel Entertainment Television.

6    Q       Now, did you draw up this agreement?

7    A       No, sir, I did not.

8    Q       Did you sign this agreement?

9    A       Yes, sir, I certainly did.

10   Q       And what day did you sign it on?

11   A       I signed it on January 21st of 2005.

12   Q       What day did you receive it on?

13   A       Let's see.  Well, according to this, January

14   21st, 2005.

15   Q       And did you -- this appears -- would you agree

16   that this appears to be a facsimile copy?

17   A       Yes, I would.

18   Q       Okay.  Did you transmit the signed agreement

19   back to Clear Channel Entertainment Television by

20   facsimile?

21   A       Yes, I did.

22   Q       The same day you received it?

23   A       Yes.

24   Q       Okay.  Did you get a call from Steve Sterling

25   before you signed this document?
```

1    A       Yes, I did.

2    Q       All right.  Tell us about that conversation.

3    What did he tell you?

4    A       He told me -- you know, well, I indicated to

5    him that I wanted somebody to review the agreement

6    and -- like I would assume he would have expected.

7    And he told me that that was not an option.  And so

8    I said, well, why not?  He had already been delayed

9    in getting the agreement to us, and he was very

10   apologetic.  Steve is a very cordial man.

11          But, you know, his opinion was that if he

12   didn't have the agreement today, that people in his

13   company would think that nobody was -- how did he

14   say it -- that there's not going to be anyone there.

15   And I said, well, Steve, what do you mean?

16   Certainly there are going to be people there.

17          And he said, no, no, Sal, you're

18   misunderstanding.  And I said, okay, could you

19   explain it.  And he said --

20          MS. MILLNER:  Judge, objection.  May we

21   approach?

22          THE COURT:  No need to.  What's the objection?

23   Legal grounds, please.

24          MS. MILLNER:  Relevance and prejudicial.

25          THE COURT:  Overruled.

1          THE WITNESS:  He said my company is going to

2     think that you're not going to be there.  And I

3     said, well, why would you think that?

4          And he said, our company has shown up many

5     times to empty parking lots.  And if you're not

6     willing to sign this, you know, and they make large

7     commitments of money, they're going to think that

8     you're not going to be there.

9          So I had no choice but to sign it and send it

10    back.  I mean, obviously, you know, it's a week

11    before the event.

12    BY MR. RODEMS:

13    Q     Now, you're not contesting that it's your

14    signature on that, it's your agreement?

15    A     Absolutely not.

16    Q     Okay.  Did you consider this to be a contract?

17    A     Absolutely.

18    Q     Okay.  Did you read the contract before you

19    signed it?

20    A     Yes, I read it.

21    Q     Okay.  Did the contract state what

22    Wrestlereunion was supposed to do?

23    A     Yes.

24    Q     Did the contract state what Clear Channel was

25    supposed to do?

Corrente - Direct

```
 1    A      Yes.

 2    Q      Did the contract give Clear Channel rights to

 3    any videotape that may be taken?

 4    A      Yes.

 5    Q      How would you describe the rights?

 6    A      Well, they were over a 15-year term.  They

 7    were going to -- they would be the ones having the

 8    tape.  They would be editing and distributing and

 9    ultimately, as I recall, we could have an

10    opportunity to approve something.  But even if we

11    didn't approve it, they could do whatever they

12    wanted with it, anyway.

13    Q      And would you have the rights to the tapes

14    during that 15-year term so that you could go out

15    and sell them on your own?

16    A      No, sir.  No, sir.

17    Q      Would anyone other than Clear Channel have the

18    rights during that 15-year term?

19    A      No, sir.  Steve Sterling made it very clear to

20    me in a phone conversation that Clear Channel did

21    not want anyone other than Clear Channel putting out

22    a Wrestlereunion product.

23    Q      And did the contract detail how revenue would

24    be divided?

25    A      Yes.
```

1    Q      Okay.  Did you make any changes to this

2    document before you signed it?  Did you cross out

3    anything you didn't like or change the terms?

4    A      No, sir.

5    Q      Okay.  Where were you when you faxed that

6    contract back to New York?

7    A      In my residence in Florida.

8    Q      At the time you signed this contract, was

9    Wrestlereunion II scheduled and on the books?

10   A      No, sir.

11   Q      Okay.  Did you and Mr. Sterling talk about the

12   all-in commitment of 235,000 or approximately

13   235,000?

14   A      Yes.

15   Q      Okay.  What did you talk about?

16          MS. MILLNER:  Objection, Your Honor, parole

17   evidence.

18          THE COURT:  Overruled.

19          THE WITNESS:  Just that, you know, that was

20   their maximum number that they would spend on

21   producing Wrestlereunion I.

22   BY MR. RODEMS:

23   Q      Okay.  Was there a discussion about future

24   events?

25   A      Well, yes.  Steve clearly knew that our

1    intention -- you know, there was no firm or set

2    schedule.  But he clearly knew that our intention

3    was to put on more events.

4    Q      And what was the plan in terms of the number

5    of events that you wanted to schedule on an annual

6    basis?

7    A      Well, we had a plan to basically attempt to do

8    four events a year.  I mean, certainly, that could

9    have went to six, it could have, you know, dropped

10   to whatever need be.  We had the ability to put on

11   one of these as often as we -- as often as we needed

12   to do and that would have been basically driven by

13   the need for film.

14   Q      Were you planning to do all of your events in

15   Tampa?

16   A      No, sir.

17   Q      What was the plan when you first envisioned

18   Wrestlereunion and you were planning to do four a

19   year?

20   A      We were going to look at the different

21   wrestling territories and things like that.  But

22   certainly the same things that went in mind in Tampa

23   would have had to go in mind.  What was the

24   logistical situation, where would the airport be

25   and, you know, you might not want to go to a city

1    like St. Louis in the middle of the summer because

2    they have such a short summer that maybe people

3    don't want to come indoors.  You take a lot of

4    different things into -- into account.

5         But certainly you wouldn't want to go to the

6    middle of Iowa that really didn't have a strong

7    professional wrestling history.  So you might have

8    overlooked a place like that for a St. Louis or

9    Chicago or Minneapolis.

10   Q    Do you actually consider Atlanta?

11   A    Yes.  Yeah.  We talked about Atlanta.

12   Certainly Georgia Championship Wrestling was on a

13   par really and eventually over time became a bigger

14   deal that wrestling in Florida.  And the reason for

15   that was Ted Turner's TBS Super Station.  Once the

16   Super Station started carrying Georgia Championship

17   Wrestling, it became a nationwide thing.

18   Q    Now, by the time you signed and sent back the

19   contract to Clear Channel Entertainment Television

20   on January 21st of 2005, had the grand ballroom at

21   the Doubletree -- Westshore Doubletree been selected

22   for the venue?

23   A    Oh, yes, it had.

24   Q    And had all the talent been signed?

25   A    Let me say that if not all, 99 percent, 98

Corrente - Direct

```
 1    percent.  I mean, I don't want to sit up here and

 2    suggest something that I'm not a hundred percent

 3    sure of.  There may have been somebody who came

 4    onboard at the very last minute.

 5    Q      But the vast majority of the --

 6    A      Oh, absolutely.

 7    Q      Okay.

 8    A      I mean I'm talking about maybe one person.

 9    Q      Once you signed the contract with

10    Wrestlereunion, what did you do about your handshake

11    agreement with Mr. Bochicchio at Highspots.com?

12    A      I called him on the phone and I explained the

13    situation to him.  And, you know, Michael's a guy

14    who just tries to treat people fairly.  He knew that

15    getting involved with a company like Clear Channel

16    could lead to major success, so he was happy for us.

17    The only thing that he asked was -- he had made --

18           MS. MILLNER:  Objection, Your Honor, hearsay.

19           THE COURT:  Let's try not to get into what he

20    said other than mere description, so let's ask

21    another question, please.

22           MR. RODEMS:  Yes, sir.

23    BY MR. RODEMS:

24    Q      When Wrestlereunion signed the contract with

25    Clear Channel Entertainment Television, did you and
```

1      Mr. Russen continue to look for pay-per-view

2      opportunities?

3      A      I certainly did not.

4      Q      Why not?

5      A      Well, all of that was going to be handled

6      through Clear Channel and Steve Sterling and his

7      team.  They were going to distribute the product.

8      Q      Let's talk about the first Wrestlereunion.

9      Was there any superstar or legend promised to the

10     fans who did not show up?

11     A      Only one, A. J. Styles.

12     Q      What happened with A. J. Styles?

13     A      Well, it was a situation where his -- we

14     requested that he come in on Friday night.

15     Q      Let's just -- can we -- he could not make it

16     for a reason.  Can you tell us the reason?

17     A      Oh, there was an ice storm in Atlanta.  It was

18     reported on CNN and everywhere else.  When Atlanta

19     gets ice, that's big news.

20     Q      Okay.  And so Mr. Styles could not make it?

21     A      Correct.

22     Q      Did you pay each and every one of the talent

23     that appeared what you agreed to pay them?

24     A      Yes.

25     Q      Okay.  You have seen -- you were sitting here

1       today.  You have seen the reality check memorandum

2       from Mr. Russen?

3       A      Yes.

4       Q      Okay.  Was there a point in time before

5       Mr. Attanasio agreed to help finance Wrestlereunion

6       but after Tony Hunter had departed where you were

7       basically on your own in terms of financing

8       Wrestlereunion?

9       A      You know, there may have been a brief time.

10      But it's not a time period that I could give you,

11      whether it was hours, minutes, days.

12      Q      Okay.  Did you receive that reality check

13      memorandum from Mr. Russen?

14      A      It was e-mailed to me.  I'm going to have to

15      assume that I did.

16      Q      Okay.  He had some suggestions including

17      cutting the talent roster?

18      A      Yes.

19      Q      Now, by the time he sent you this memo or --

20      this reality check memo, had you already made

21      agreements to these wrestlers?

22      A      Yes.

23      Q      And the reason that you wanted 90 plus legends

24      at the first Wrestlereunion was what?

25      A      Well, I wanted to make an impression on the

1    wrestling world.  And in my mind, if you're going to

2    do something, the first thing you have to do is get

3    people's attention.  And I knew what I was doing was

4    going to get attention, and that was the goal.

5    Q       Establish the brand name?

6    A       Establish the brand name.

7    Q       Now, Mr. Russen suggested that you basically

8    take a third of your roster and cut it.  Did you do

9    that?

10   A       No, sir.

11   Q       Why not?

12   A       Well, I already had commitments to people.  I

13   would have -- I would have never done that, you

14   know.  I find that in life it's very easy to find

15   people to tell you that you shouldn't follow your

16   dream or follow your beliefs.  And, I mean, you can

17   find one on every street corner.

18           And even though Mr. Russen and myself are

19   friends and have been for many years, I knew what I

20   wanted to do.  I had my goals in mind.  I wanted to

21   establish the brand, and everything that I had

22   planned would have come to an end if I'd have cut

23   those 25 or 30 wrestlers.

24   Q       Did you have concern about what -- doing

25   something like that would have done to your

1       reputation?

2       A       Absolutely.

3       Q       What did you feel it would have done to your

4       reputation?

5       A       Those 25 or 30 wrestlers would have talked to

6       many of the other wrestlers who would have been

7       wondering when the call was coming that they would

8       have been cut.

9       Q       Now, so you -- full steam ahead, everyone got

10      paid?

11      A       Yes.

12      Q       Everyone except A. J. Styles appeared?

13      A       Yes.

14      Q       How did the Wrestlereunion I go?  What was

15      your impression of it?  Were you pleased?

16      A       Yes, I was.  And I do -- if you don't mind, I

17      want to just address the A. J. Styles situation for

18      a second.  The thing about that is even though he

19      didn't appear, we were really blessed.  Many times

20      promoters promise people who don't show up.

21              But because everyone was staying in the hotel,

22      they were all watching the news, everyone knew about

23      this ice storm.  It wasn't some phony story that was

24      made up.  They clearly saw the drama going on at the

25      Atlanta airport.  This guy is a very recognizable

Corrente - Direct

1    name in our industry.  The hard core fans know this

2    guy lives in Atlanta.

3         We received no problems, no complaints of any

4    kind.  Luckily a friend of Mr. Russen's, a former

5    AWA star was on hand and he stepped in for A. J. at

6    the -- at the last second.  That could have been a

7    problem for our credibility.  But, you know, with

8    CNN supporting the damage in Atlanta, we had no

9    concern.

10   Q    And who was it that stepped in at the last

11   moment from the AWA?

12   A    Pat Tanaca.

13   Q    Okay.

14   A    A long time associate of Mr. Russen's.

15   Q    All right.  Did Steve Sterling attend the

16   show?

17   A    Steve Sterling did show up at the hotel.  I

18   believe Friday night at midnight I got a phone call

19   in my room to come downstairs and meet Steve for the

20   first time.  He explained that he couldn't stay.  He

21   had briefly visited with his people, was told

22   everything was fine, but he had to get on a plane at

23   6 o'clock in the morning and go back to New York.

24   Q    All right.  Now, you -- were there some

25   problems with the Clear Channel videotaping and

1      audio-taping of Wrestlereunion I?

2      A      Well, certainly, things did not progress in

3      the traditional manner.  They had no -- they had no

4      truck, they had no headsets, they had no monitors

5      for the announcers.  The ladder that's been talked

6      about certainly would be in shots.  And I don't know

7      that anybody could consider that the most

8      professional thing in the world.

9             If you take into consideration all the

10     barriers and hurdles that had to be overcome, I'd

11     say that they did a good job with what they had.

12     Now, why they didn't have what they should have had

13     is certainly a different question.

14     Q      Were you surprised by this?

15     A      Absolutely.

16     Q      Did they even have a PA system?

17     A      No, sir, they did not.

18     Q      All right.  Now, can you take a look at

19     Exhibit 16.

20     A      Okay.

21            MR. RODEMS:  May I publish, Your Honor?

22            THE COURT:  Yes, sir.

23     BY MR. RODEMS:

24     Q      Coming out of Wrestlereunion I, what was your

25     expectation of what Clear Channel Entertainment

1    Television would be doing with the footage that had

2    been captured?

3    A      Well, my expectation was they would start to

4    work on the editing.  You know, they didn't have a

5    truck so they didn't have a line cut, so they really

6    needed to get to work.

7    Q      And in terms of what Wrestlereunion was going

8    to do, this e-mail of February 10th, 2005, indicates

9    that you had made your selection for the next

10   location for the next Wrestlereunion.  You can just

11   look at your monitor.

12   A      I apologize.  I had been on the wrong -- yes.

13   Q      Okay.  Why was it that you were already

14   planning the next Wrestlereunion event literally 10

15   days after Wrestlereunion I finished?

16   A      That was based on input from Steve Sterling.

17   Q      And what was that input?

18   A      That he needed a library.

19   Q      A what?

20   A      A library of footage.

21   Q      Why did he need a library of footage?  Did he

22   tell you?

23   A      Yes, for -- to have more flexibility in what

24   he could attempt to sell, you know.  He talked many

25   times about syndication, and for syndication he

1    needed to either put together, I think it was, 16

2    weeks or 32 weeks, depending on what the syndicator

3    would buy, get enough footage, build enough programs

4    to have -- to have that many hours available.

5    Q       Now, by the time Clear Channel was onboard for

6    Wrestlereunion I, it was too late to review -- for

7    them to review and approve the venue; correct?  The

8    venue had already selected?

9    A       The venue certainly had already been selected.

10   I don't know that it was too late for them to have

11   gotten somebody on a plane, come down to the site

12   inspection and just see, you know, what they were

13   dealing with.  But certainly at that point we were

14   committed to the building already.

15   Q       By the way, you saw earlier in this reality

16   check some indication that a portion of

17   Wrestlereunion was supposed to be held at a high

18   school gymnasium?

19   A       Yes, sir.  That's not an accurate statement.

20   Q       Okay.

21   A       There was some discussion about a high school

22   directly across the street.  We just -- we

23   determined that moving fans from the hotel to the

24   building was just something that was not in our best

25   interest.  It was going to be dark, people would be

Corrente - Direct

1      crossing the street, no idea what kind of liability

2      we might incur.  It just didn't make sense to do

3      that, and I certainly never had any signed

4      commitment of any kind with the -- with the school.

5      Q      Okay.  But -- by the way, during this time

6      period, Mr. Russen was not your -- your house mate,

7      if you will, or somebody that lived in your house;

8      was he?

9      A      No, he was not.

10     Q      Okay.  So your communication with him was by

11     e-mail and telephone?

12     A      Yes.

13     Q      Okay.  Had there been any discussions with

14     Mr. Sterling about how soon after Wrestlereunion I

15     you were expecting to see video hit the marketplace?

16     A      Well, I wouldn't address it that way.  The

17     input from Mr. Sterling was that you will see

18     revenue coming in within 90 days to six months.  So

19     in our minds, you know, just piecing something

20     together, you'd have to assume it would have been in

21     the -- in the stores in less than 90 days and

22     probably less than that.  But if you want to go to

23     the far end, how would you get revenue before it's

24     really out and available?

25     Q      Within a few days after Wrestlereunion I, did

1    you become aware of the media coverage of it?

2    A      Yes.

3    Q      And what type of media coverage did you

4    receive?

5    A      Well, let me even -- let me go back before

6    that and say that, you know, through the internet we

7    were able to monitor the internet press coverage

8    over the weekend of the event.  And that was the

9    same weekend that the WWE was running their Royal

10   Rumble in Fresno, California.  That's one of their

11   four major pay-per-views of the year.

12          The internet was way more focused on

13   Wrestlereunion than it was on the WWE event because

14   it was such an anomaly, it was such a strange thing

15   to see.  And, you know, they knew that people were

16   going to want to know what's happening, especially

17   did Wrestlereunion get all of those guys to Tampa

18   like they said that they would.

19          Then after that, of course, the press, the

20   Wall Street Journal and the Tampa paper and the

21   Miami paper and who knows where else.

22   Q      Did you ask for assistance with marketing or

23   promoting Wrestlereunion II in Valley Forge from

24   Clear Channel?

25   A      Absolutely.

1      Q      What type of help did you ask for?

2             MS. MILLNER:  Objection, Your Honor,

3      relevance.

4             THE COURT:  Overruled.

5             THE WITNESS:  Well, I mean, Clear Channel is

6      the second largest media company, third, whatever it

7      is.  They had access to billboards, radio, all kinds

8      of things.  We certainly would have taken spots on

9      the radio, provided our talent for interviews,

10     whether in studio or over the phone, you know.  I'm

11     kind of a big believer in billboards, so we

12     certainly thought that would have helped.

13            You know, anything that -- any assistance that

14     Clear Channel could have given we certainly would

15     have considered and more than likely accepted.

16     BY MR. RODEMS:

17     Q      Now, here's an e-mail that's been admitted

18     into evidence, Exhibit 22.  By the way, let's look

19     at this.  Do you recognize that e-mail address?

20     A      Yes, sir.  That's my e-mail address.

21     Q      Okay.  There's a lot of consonants there.  Can

22     you tell us what this e-mail is supposed to -- where

23     did you get that?

24     A      Well, when I wrestle or manage, I'm the Big

25     Cheese.  So the B-G and the C-H are the Big Cheese.

1       And the wrestling group that I had when I was a

2       manager was called the Rat Patrol, so that's where

3       the R-A-T and the P-A-T come from.

4       Q       All right.  And you've used this e-mail

5       address from time in memoriam?

6       A       A very long time.

7       Q       Okay.  And Wrestlereunion II was in Valley

8       Forge; correct?

9       A       Correct.

10      Q       And you were looking to get a billboard near

11      the Philadelphia airport?

12      A       Correct.

13      Q       One that Clear Channel could provide?

14      A       Yes.

15      Q       Okay.  Did you receive a response to the

16      request?

17      A       Yes.

18      Q       And what did Mr. Sterling say?

19      A       Don't know for sure, will check into it.  But

20      we didn't get any intracompany promotional resources

21      for free -- we don't get any intracompany

22      promotional resources for free.  Generally at about

23      one-seventh of cost.

24      Q       And your response to Mr. Sterling was?

25      A       We can live with one-seventh, and thank you

1        very much.

2        Q        And did you get that billboard?

3        A        No, sir.

4        Q        Were there occasions when you asked for an

5        opportunity to promote Wrestlereunion by announcing

6        the contractual relationship with Clear Channel

7        Entertainment Television?

8        A        Yes.

9        Q        Let me show you what's been admitted as

10       Exhibit 25.  This is an e-mail dated June 1st, 2005,

11       from you to Johnny Gallarello?

12       A        Yes, it is.

13       Q        Who's Johnny Gallarello?

14       A        Johnny worked for Steve Sterling.  He seemed

15       to be someone that was going to have and had some

16       involvement in preparing the DVDs whenever they

17       were -- they were done.  I believe he had input into

18       the four shoot interviews that were actually

19       released.

20       Q        Why were you asking permission to make an

21       official announcement?  Why didn't you just go ahead

22       and make the announcement?

23       A        Well, I mean, we were partners in the event

24       and I was going to be sending out a press release

25       with their company name in it.  I didn't think it

1    was proper to -- to just send out without their

2    permission.  Generally I don't do things like that.

3    Q      And had you asked for permission in the past?

4    A      Yes, I had.

5    Q      And had it been approved?

6    A      No, sir, it had been denied.

7    Q      Okay.  And Mr. Gallarello wrote an e-mail to

8    Mr. Sterling the same day and asked him about this.

9    Let me ask you, was any press release permitted

10   prior to Wrestlereunion II announcing their

11   partnership?

12   A      No.  There's never been press release

13   permitted.

14   Q      Now, did you feel that the -- the connection

15   between Wrestlereunion and Clear Channel

16   Entertainment Television would enhance the name

17   brand of Wrestlereunion?

18   A      Of course.

19   Q      Okay.  You were trying to promote

20   Wrestlereunion II and have as many people attend as

21   possible; correct?

22   A      Absolutely.

23   Q      Okay.  Did you ask -- let me show you what's

24   been marked as Exhibit 25.  This is an e-mail from

25   you to Johnny Gallarello and it's copied on Steve

1      Sterling, dated July 18th, 2005.

2      A      Yes.

3      Q      It says, hello.  We would like to start using

4      informercials to promote Wrestlereunion.

5             Can you explain what you meant by using

6      informercials to promote Wrestlereunion?

7      A      Well, the informercials like we see so many of

8      them today, they're mostly just for specific

9      products.  But they certainly could have had a dual

10     purpose for us to help promote any sort of media

11     sales and promote live events in whatever market we

12     took the convention to next or just a plain, live

13     wrestling event.

14     Q      And now July 18th of 2005 was about five weeks

15     out from the second Wrestlereunion; correct?

16     A      Correct.

17     Q      And were you trying to promote the event in

18     the Philadelphia, Valley Forge area?

19     A      Yes.

20     Q      And what kind of response did you get to this

21     e-mail?

22     A      I'm not sure if I got a response to this

23     e-mail, to be quite honest with you.

24     Q      Were you able to ever use infomercials to

25     promote Wrestlereunion?

1    A      No, sir.

2    Q      Wrestlereunion II was announced on April 11th

3    of 2005?

4    A      Yes.

5    Q      Okay.  For August 26th through the 28th of,

6    2005?

7    A      Yes.

8    Q      Okay.  Now, this is now several months after

9    the first Wrestlereunion.

10   A      Yes.

11   Q      Were you getting inquiries about where the

12   DVDs were for the Wrestlereunion events?

13   A      Well, inquiries started almost immediately,

14   but they continued to come, you know, all along.

15   Q      Let me show you, Mr. Corrente, Exhibit 27

16   which has been admitted into evidence.  Is this an

17   e-mail that you sent to Mr. Sterling on August 4th?

18   A      Yes, it is.

19   Q      Okay.  I notice that the e-mail address in

20   this one is Wrestlereunion sales.  Did you use that

21   e-mail address?

22   A      Yes.

23   Q      Through the Wrestlereunion website?

24   A      Yes.

25   Q      Okay.  This e-mail below, did you receive this

1    e-mail saying I was watching the highlights of the

2    first Wrestlereunion?

3    A     Yes.

4    Q     Okay.  Now, that's dated August 3rd, 2005?

5    A     Yes.

6    Q     What highlights could she have been watching?

7    A     The only thing I could think of is -- is she

8    was watching the videos that we told you we filmed

9    as -- you know, to show people that the stars had

10   really committed to be there.  I mean, there was

11   nothing else to see.  So I can only imagine that

12   that's what she's meaning.

13   Q     Okay.  And September 29th, 2005, again, this

14   is still part of Exhibit 27.  You sent another

15   e-mail after receiving an inquiry about the

16   Wrestlereunion events?

17   A     Yes.

18   Q     Okay.  And then September 18th, 2005, did you

19   forward this e-mail to Mr. Sterling?

20   A     Yes.

21   Q     And Mr. Townley?

22   A     Yes.

23   Q     And, again, was this from a fan wanting to

24   know where the DVDs were?

25   A     Yes.

Corrente - Direct

```
1     Q       Had any of the DVDs of the matches been

2     released?

3     A       No.

4     Q       In fact, they've never been released?

5     A       No, sir.

6     Q       Okay.  And then did you forward this e-mail

7     from markeethesquirrel@aol.com to Mr. Sterling?

8     A       Yes.

9     Q       Okay.  And apparently markeethesquirrel was

10    also looking for the videos?

11    A       Yes.

12    Q       Okay.  And Scott Swensburg also wrote an

13    e-mail?

14    A       Yes.

15    Q       Did you forward that to Mr. Sterling?

16    A       I believe I did.

17    Q       Okay.  Did there reach a point at which

18    Mr. Sterling asked you to stop sending him these

19    e-mails?

20    A       Yes, he did.

21    Q       What happened?

22    A       He just said, enough, we get it.

23    Q       What did -- do you have an understanding of

24    what he meant, enough, we get it?

25    A       Yes.  Stop forwarding me these e-mail
```

```
 1     requests.

 2     Q      Okay.  Now --

 3            THE COURT:  We're going to have to stop for

 4     the day.  It's just after 4:00 so --

 5            MR. RODEMS:  Yes, sir.  Thank you.

 6            THE COURT:  Hold that thought.  Members of the

 7     jury, we will recess until tomorrow morning at 9:00

 8     AM.

 9            COURTROOM SECURITY OFFICER:  Please rise for

10     the jury.

11            (Jury out at 4:03 PM.)

12            COURTROOM SECURITY OFFICER:  Please be seated.

13            THE COURT:  You may step down, sir.  Okay.

14     Just a short comfort break.

15            (Recess was taken at 4:03 until 4:05 PM.)

16            (Back on the record.)

17            THE COURT:  Mr. Herbert, you may inquire.

18            MR. HERBERT:  Thank you, Your Honor.

19     BY MR. HERBERT:

20     Q      Okay.  So, Mr. Bowman, I think where we left

21     off was with pay-per-view extrapolations from the TV

22     audience.

23     A      That's correct.

24     Q      Okay.  And the -- you calculated the

25     television audience for Wrestlereunion in your first
```

1    report based on the Memphis, Tennessee television

2    market figures; correct?

3    A    That's correct.

4    Q    And that was for a limited period of time;

5    correct?

6    A    It was around the 2005, 2006 area.

7    Q    Okay.  And you used a rating of 5.9 percent

8    for Memphis -- the wrestling show on Memphis

9    television there?

10   A    That's correct.

11   Q    And you took that 5.9 percent number and you

12   extrapolated that number for television viewing

13   nationally, correct, in your first report?

14   A    Not nationally, just across 25 markets.

15   Q    Okay.  Across 25 television markets in the

16   United States?

17   A    That's correct.

18   Q    Okay.  And that was all based on the data from

19   Memphis; is that correct?

20   A    That's correct.

21   Q    And then in your -- let me ask you, did you

22   ever make a comparison in -- you did not make a

23   comparison between the popularity of wrestling

24   television in Memphis as compared with, let's say,

25   New York City or Chicago in your first report; did

1    you?

2    A      Well, New York and Chicago weren't on my list

3    of 25 stations.  But the 25 stations I looked at

4    when I was with WCW, we had done wrestling shows in

5    those towns so I knew that there is an audience for

6    wrestling.

7    Q      Okay.  So then did you use WCW as -- the data

8    from WCW television viewership in calculating your

9    projections for television viewing in either of your

10   reports?

11   A      No.  I used the fact that those towns had had

12   wrestling events in them.

13   Q      Okay.  But you did not research or cite in

14   your report any wrestling viewing television ship --

15   television viewership numbers in either of your

16   reports for -- related to WCW?

17   A      No.  They were on cable TV.  They didn't do

18   this regional barter system that is so favorable in

19   the wrestling industry when you don't have a

20   national wrestling organization like the WWE.

21   Q      All right.  And that 5.9 percent is based

22   on -- which television show was it that was on the

23   Memphis market?

24   A      Memphis Wrestling Rhythm and Blues.

25   Q      Okay.  And that show has never aired

1    nationally or has not aired in the 25 markets that

2    you reference in your report; right?

3    A      No, it hasn't.  But the Memphis Wrestling Show

4    is considered the benchmark against all other

5    independent wrestling TV shows.  If you like, in its

6    heyday, the Memphis Wrestling Show was watched by

7    between 20 to 25 percent of the households in the

8    area.  I, of course, did not take that as a figure.

9    It has frequently done nine percent, eight percent.

10   I looked at a figure that it was sustaining, and the

11   5.9 when he was doing fresh television programming

12   is -- in my opinion is a reasonable number.

13   Q      Now, the Memphis market is a very special

14   market in the wrestling world; isn't it?

15   A      No, it is not.  And I have been told that by

16   Mr. Jerry Jarrett who created that wrestling market.

17   Q      And so by the guy who is in Memphis, he told

18   you that it's not unique to other markets?

19   A      No, it's not unique, no.

20   Q      That's what -- that's what your conclusion is

21   based on that that -- that it's reasonable to take

22   the television viewership in one city and

23   extrapolate that to 25 different markets across the

24   United States?

25   A      Yes, it is.

1    Q       Okay.  And isn't it true that the ratings for

2    TNA just recently have been a 0.0 rating nationally?

3    A       For TNA?  No, sir.

4    Q       How about for WWE?  The WWE has achieved a

5    rating of 1.1 --

6            THE COURT:  You need to slow down.

7            MR. HERBERT:  I'm sorry.

8    BY MR. HERBERT:

9    Q       And in the ones and the twos within the last

10   couple of years?

11   A       Not on its major shows.

12   Q       But on its smaller shows; right?  WWE Raw has

13   gotten a 1.0 rating recently; hasn't it?

14   A       Monday Night Raw does not get a 1.0 rating.

15   Q       Okay.  The Andy Griffith Show is -- gets a

16   very high rating in North Carolina; doesn't it?

17   A       I -- I'm sorry.  I can't answer that question.

18   Q       All right.  But it doesn't get that high of a

19   rating in the upstate New York area; does it?

20   A       Again, I -- I can't answer these questions.

21   Q       Isn't Memphis -- isn't using the television

22   data from Memphis Wrestling similar to using the

23   television data for Gator football in Gainesville?

24   A       No, sir.

25   Q       But in your second report you revised the 5.9

1    percent number down to 4.4; correct?

2    A    Yes, I did.

3    Q    So you concede that the 5.9 percent number is

4    not a reliable number?

5    A    No, I do not.  I believe the 5.9 number can be

6    achieved.  I just revised it down because it

7    reflected the advertising figure and, therefore, it

8    wasn't -- it's not like I was damaging Clear Channel

9    or anybody by making that revision.  I was just

10   showing the point that you could still be making

11   money at the lower level.  I believe the 5.9 figure

12   is the achievable figure.

13   Q    What other television show other than the

14   Memphis television show achieves a 5.9 percent

15   rating figure on a regular basis over a four-year

16   period?

17   A    There is no wrestling show like Memphis

18   that -- there's no other wrestling shows out there

19   that have the longevity or the established track

20   record.

21   Q    Okay.  But that Memphis show doesn't get that

22   rating in any other market other than Memphis; fair

23   enough?

24   A    It only airs in Memphis.

25   Q    But are you arguing that it would get a 5.9

Bowman - Cross

1    percent market in California if it aired in

2    California?

3    A      If it was fresh, original programming and it

4    was on the right channel with the right amount of

5    advertising, yes, it would.

6    Q      All right.  But you have no comparable TV show

7    to base that conclusion on?

8    A      No, sir.

9    Q      Okay.  And what you just said about reducing

10   the 5.9 percent number to the 4.4 percent number,

11   you said that -- maybe you can explain that for me

12   again, that the -- that you can achieve the same

13   advertising revenue with a lower rating number.  Is

14   that -- that's essentially what you're saying?

15   A      That's correct.

16   Q      Okay.  So then that 4.4 percent number is not

17   based on any data or research you did, it's just a

18   lower number that you say will get you the same

19   result as the 5.9 percent number?

20   A      That's right.  But by reducing that 4.4

21   number, I'm effectively reducing pay-per-view buy

22   rates which I've based all my other projections on

23   the TV rating comparable to the people that buy the

24   pay-per-views.

25   Q      But if the 5.9 percent number is a good and

 1    valid number for --

 2          COURT REPORTER:  Counsel, please repeat that.

 3          MR. HERBERT:  I'm sorry.

 4    BY MR. HERBERT:

 5    Q     If the 5.9 percent number is a good and

 6    valuable number for all 25 television markets, why

 7    in the world would you go ahead and reduce it by 1.5

 8    points just to show that you can achieve the same

 9    result with a different number?

10    A     It was new data that came to light, and I

11    believed it showed how conservative I've been with

12    every number I've calculated in my whole report.

13    Q     So what's the right number for Wrestlereunion;

14    is it 4.4 or is it 5.9?

15    A     I believe 5.9 is achievable.

16    Q     Okay.  So then we wouldn't even need to look

17    at your 4.4 percent number.  We could look at your

18    first report and decide whether those calculations

19    are reliable?

20    A     It has been said to me that the burden on my

21    Rule 26 report is that any new information that

22    comes to light I should -- you know, I should bring

23    it forward.

24    Q     But you -- you said that the 5.9 is achievable

25    so you didn't need to revise that number.

1          THE COURT:  All right.  Let's move on.

2          MR. HERBERT:  All right.

3     BY MR. HERBERT:

4     Q     Now, your report also calculates projections

5     for live events.  And that's live events as opposed

6     to conventions; correct?

7     A     That's correct.

8     Q     Okay.  So the live event, I assume you're

9     saying, would be just a wrestling match event?

10    A     A spot show.  Yes.

11    Q     I'm sorry?

12    A     A spot show.  A show done in an area where you

13    have television and promotion so that you're giving

14    the fans in that area something to whet their

15    appetite about and to evaluate whether or not you're

16    going to come back there with one of your

17    conventions.

18    Q     Okay.  So your projections separate out the

19    live events that Wrestlereunion did into projecting

20    a separate fan convention and a separate live event

21    and -- as two continuous multi-recurring events

22    during each year that you projected; right?

23    A     Yes.  As you move forward, you can expand, you

24    know, and you grow.  You can expand, you can take

25    your wrestlers -- you want to give the wrestlers as

1    much work as possible.  That way you can keep your

2    costs down because the wrestlers are under contract,

3    they're working.  And so you take them to various

4    regions and you put on shows.

5    Q      But there is -- you'll agree with me, wouldn't

6    you, that there is no other legends-theme wrestling

7    event that holds multiple fan conventions during the

8    year and also holds separate multiple live events

9    during the year; fair enough?

10   A      First of all, I haven't projected several,

11   multiple live events throughout the year.  Secondly,

12   there is no other legends wrestling convention group

13   that covers every single wrestling league, if you

14   like, that was ever across the United States.

15   Q      But we're just talking about legends of

16   wrestling, though; right?  We're not talking about

17   every single league; right?

18   A      Well, these legends of wrestling cover every

19   single league.  When I was putting on the World

20   Wrestling Legends Show, one of the things for me was

21   the fact that Dory Funk, Jr. and Bruno Sammartino

22   had never appeared on a television screen at the

23   same time, even though they were both respected

24   world champions in 1969 when the super stations came

25   about.

1          So, you know, you couldn't ever have done that

2     before.  You didn't have the NWA wrestlers

3     interacting with the WWWF wrestlers.  Now people are

4     getting a chance to see wrestlers from all

5     promotions, all generations all in one place.  And

6     you can take that across the country.  You're not

7     talking about a show that was just based in

8     Charlotte so you're going to take wrestlers from

9     that Charlotte area.

10    Q     Now, you said that you weren't projecting

11    multiple live events and multiple conventions, but

12    you were -- all of your projections generally

13    include -- incorporate four live events a year,

14    correct, and --

15    A     No, I don't think so.

16    Q     All right.  Let's look at 2007.  Let's start

17    with -- with the fan conventions you projected four

18    fan conventions a year getting a thousand people

19    each; right?

20    A     The four fan conventions are part of the four

21    wrestling pay-per-views.  Yes.

22    Q     All right.  And now with the live events, I

23    mean, I'm looking at your backup spreadsheet for

24    2007, and there are four different months in which

25    you are predicting a live gate number.  Does that

1      not --

2      A      I only see three.

3      Q      I'm looking at the spreadsheet that says

4      Wrestlereunion live events, fiscal year begins

5      January '07.

6      A      And I see live gate non-USA, non-TV three.

7      Q      No.  I'm looking at -- live gate USA

8      pay-per-view is the first line on the top.

9      A      Yes.  I thought we covered that.  Yes, four

10     pay-per-views.

11     Q      All right.  So your live events pay-per-views

12     are different than standard live events?

13     A      Yes, sir.

14     Q      Okay.  So you're predict -- you're projecting

15     four fan conventions, which would turn into

16     pay-per-views?

17     A      The four fan conventions and the pay-per-view

18     all take place over the same weekend.

19     Q      Okay.  And then you're projecting three

20     additional live events in the same year?

21     A      That's correct.

22     Q      Okay.  So seven total events of which the fan

23     conventions would draw 4,000 people and then these

24     live events, the live gate would draw a total of

25     13,500 people?

1      A      That's correct.

2      Q      Okay.  And it's true, isn't it, that there is

3      no other wrestling organization in the world that

4      draws that many people for that many events, and

5      there never has been in the history of the world; is

6      that right?

7      A      Really?  I think the WWE, TNA, WCW, Memphis,

8      all these organizations would differ with you.

9      Q      All right.  So the WWE draws maybe -- so the

10     WWE is your -- is your comparable that you're using

11     for that?

12     A      No.  Memphis Wrestling is frequently drawing

13     8,000 to 10,000 people in the Mid South Coliseum.

14     Q      For seven events a year?

15     A      We're not talking about seven events a year.

16     You've got to start differentiating between the

17     pay-per-view and convention center of this, and

18     we're talking about just basic house shows here.

19     Q      Well, I mean --

20     A      In the USA in any weekend alone there can be

21     up to 10 or 12 wrestling shows take place.  I've

22     checked through Power Slam Magazine, Wrestling

23     Observers, On Line, the Pro Wrestling Torch, all

24     those publications frequently point to attendances

25     more than 4000, particularly if you have the caliber

1    of wrestlers on there that Wrestlereunion would

2    have.

3    Q     Well, what are some of those organizations and

4    what are their profitability?

5    A     I don't know what their profitability is.  But

6    I'm just telling you that an attendance of 4,500

7    people at $20 a ticket is very achievable.

8    Q     All right.  But you didn't base that on any

9    research and you didn't cite any of those

10   organizations with similar numbers in your report?

11   A     I believe if you look at all my different 200

12   and something, you know, magazines and sources that

13   I cite in the -- in the report and all the documents

14   you took copies of, all The Wrestling Observers, you

15   can go through there and you can find attendances

16   all over the world in excess of 4,500 per show.

17   Q     Well, we're just talking about the US and I'm

18   just asking for an example of one other organization

19   that --

20   A     Memphis Wrestling had over 8,000 people for

21   shows.  The PMG Show with Hulk Hogan, the final

22   numbers inside that building were over 4,500.

23   Q     Hulk Hogan is a WWE celebrity and probably the

24   most famous celebrity for WWE; correct?

25   A     Yes.

1    Q       He's under a long term exclusive contract with

2    WWE; correct?

3    A       No.

4    Q       All right.  But he's -- he's -- there's nobody

5    in Wrestlereunion who has a similar -- has the

6    similar draw numbers or contract value that Hulk

7    Hogan has; is there?

8    A       No, there isn't.  But there are various

9    circumstances that have to go together when you're

10   putting together wrestling shows, particularly in

11   the regions.

12   Q       So your numbers are based in part on the

13   numbers that Hulk Hogan of the WWE --

14   A       No.  My numbers are based in part on

15   independent shows, TNA shows, house shows without

16   television that have people like Mick Foley, Kevin

17   Nash on them, people that were at Wrestlereunion.

18   Q       You're aware of the attendance of the

19   Wrestlereunion III show that took place in 2005;

20   correct?

21   A       Yes, sir.

22   Q       And you understand that these numbers are

23   multiple of more than 10 to 20 times that amount?

24   A       Yeah.  And I believe that if Wrestlereunion

25   was only charging $20 a ticket to see the caliber of

1    stars that they had at Wrestlereunion, you couldn't

2    have fit all the people into the building.

3    Q      All right.  So you're saying that if

4    Wrestlereunion totally changed their business plan

5    and their pricing structure, then maybe they could

6    achieve these type of results?

7    A      We've already gone through this on several

8    times that Wrestlereunion were already modifying

9    their business plan with each event.  We're now

10   talking at 2007 the -- you know, for the purposes of

11   these reports, Wrestlereunion has been on television

12   in 25 markets.

13          Wrestlereunion has also been on cable

14   television, it has pay-per-views, it has established

15   its brand name.  So it could be doing the same

16   numbers as any other wrestling organization at a

17   house show in the USA.

18   Q      But if they lowered their ticket price to $20

19   a ticket, their revenues go down as we saw in the

20   progression from Wrestlereunion I, II and III; fair

21   enough?

22   A      That's correct.  But, again, you're blurring

23   the lines between each of the different types of

24   show and why the shows are being produced.

25   Q      Let's move to the -- to your internet

1    advertising numbers.  You project several hundred

2    thousand dollars in internet advertising numbers

3    over the course of the five years in your

4    projections; correct?

5    A      That's correct.

6    Q      And you're aware that the -- Wrestlereunion

7    claims that they had one million hits per month on

8    their website in 2005; correct?

9    A      That's correct.

10   Q      And you're also aware that they did not

11   achieve a dollar in revenue from that one million --

12   alleged one million hits per month in 2005; right?

13   A      I don't think at the time when they were

14   organizing the event that that was really a priority

15   of theirs.

16   Q      So the answer to my question is, yes, you're

17   aware that they were not achieving any revenue from

18   their website in 2005?

19   A      Yes.

20   Q      All right.  And you're aware that their

21   website is up and running today; right?

22   A      Recently I believe it has come back on.  Yes.

23   Q      The Wrestlereunion website is up.  If you go

24   to wrestlereunion.com, you'll find their website,

25   you'll see them advertising as we sit here today;

1      right?

2      A      If you tell me so, yeah.

3      Q      You don't know that?

4      A      Well, I know that there's talk of a convention

5      coming up in the end -- you know, the beginning of

6      the year, but I'm not privy to what their plans are.

7      I don't work for Wrestlereunion.

8      Q      You haven't visited their website?

9      A      I might have the day it came online and saw

10     the green sign but, you know, I haven't been there

11     and, you know, looked at it.

12     Q      They don't have any banner ads on their

13     website now; do they?

14     A      I can't recall.  But if you're telling me

15     there's not then, obviously, you do know.

16     Q      You have no data that shows any revenue ever

17     being generated or even a plan for any revenue being

18     generated from internet advertising from

19     Wrestlereunion; fair enough?

20     A      No.

21     Q      Now, let's go to overseas live events which is

22     yet another category of live events that you're

23     projecting starting in 2007?

24     A      That's correct.

25     Q      All right.  Now, ultimately you project

Bowman - Cross

1    live -- overseas live events, revenue of -- the

2    total is over six million dollars, roughly a third

3    or so of your total projections?

4            THE COURT:  Mr. Herbert, you have got to slow

5    down.  If I can't understand it, I know the court

6    reporter can't and she can't type what she can't

7    understand.

8            MR. HERBERT:  I apologize.

9            THE COURT:  Take a breath and speak more

10   slowly.  I feel like I'm fussing at my son, and I'm

11   sorry.  But he talks the same way and he's an agent.

12   I said, you go in court and you're going to have a

13   judge chew you out.  You've got to slow down.

14           MR. HERBERT:  All right.

15           THE COURT:  I'm going to cut you off in three

16   minutes.  I realize you're hurrying, but doesn't

17   matter if I can't understand what you're saying.

18           MR. HERBERT:  Okay.  Okay.

19   BY MR. HERBERT:

20   Q    All right.  So you have projected --

21           THE COURT:  What did you use as a model or

22   standard to project internet -- excuse me --

23   international live events?  Tell me in a nutshell.

24           THE WITNESS:  Okay, sir.  For the

25   international live events I looked at events that

1      were taking place overseas by organizations that

2      didn't necessarily have television, they were just

3      runnings shows in conjunction occasionally with

4      conventions, occasionally just bringing people over.

5      TNA taking stars over who were the same stars as

6      Wrestlereunion had, Mick Foley, Kevin Nash, people

7      of that caliber.

8            They were drawing attendances -- non-TNA shows

9      were drawing attendances of between 4,500 people

10     upwards for IFW, I believe was one of the

11     organizations.  And TNA were averaging 8,000 people

12     per show.  I looked at their ticket prices they were

13     charging, and that's what I based my numbers on.  I

14     looked in Wrestling Observers, Pro Wrestling

15     Torches, Power Slams, and I took the audiences that

16     were being -- were attending the shows over there.

17           THE COURT:  Did you analyze their expenses in

18     putting on those performances?

19           THE WITNESS:  I used the expenses provided to

20     me by Wrestlereunion as to what it would cost them

21     to take their talent over there.

22           THE COURT:  So the answer is no.

23           THE WITNESS:  No, sir.

24           THE COURT:  You didn't have access to that

25     information.

1              THE WITNESS:  That's right.

2              THE COURT:  In fairness to you.

3              THE WITNESS:  Nobody gives -- you know, the

4    wrestling industry is very secretive and protective.

5              THE COURT:  I didn't ask that, sir.

6              THE WITNESS:  Sorry.

7              THE COURT:  This is why we're spinning our

8    wheels.

9              THE WITNESS:  Okay.

10             THE COURT:  If you didn't have access to

11   information, that's fine, but I need to know that.

12             THE WITNESS:  No.  I didn't have access to

13   that.

14             THE COURT:  How did you obtain access to the

15   attendance and the ticket prices?

16             THE WITNESS:  The ticket prices are advertised

17   on the websites, and the attendances are reported

18   through various magazines and publications.

19             THE COURT:  And you feel that these shows are

20   sufficiently comparable to use as a model, if you

21   will?

22             THE WITNESS:  Yes, I do.  I believe the talent

23   from Wrestlereunion is actually stronger.

24             THE COURT:  So essentially, though, you have

25   the revenue projection but not the expense

1    projection, therefore, you don't know what the

2    bottom line profit or loss would be.

3         THE WITNESS:  No.  But the fact that they

4    continue -- for example, TNA are going back for

5    another 10 days and have cited it as their most

6    successful, you know, tours ever.  And, you know,

7    again, I hate to use the WWE as benchmarks, but in

8    2008 on two tours they generated an income of almost

9    $30 million.  And, again, they've, you know,

10   trumped -- trumpeted those figures from the high,

11   you know, heavens.

12        THE COURT:  All right.  Mr. Herbert, is there

13   anything that you need from Mr. Bowman that you

14   don't already have by virtue of his two reports and

15   his lengthy deposition settings that you can't

16   respond to if there are questions I have?

17        MR. HERBERT:  No.  I -- I think we have

18   covered most of the ground, Your Honor.

19        THE COURT:  Mr. Rodems, how about you?

20        MR. RODEMS:  There are about two questions I'd

21   like to ask.

22        THE COURT:  Ask them.  You have two questions.

23   Go.

24

25

1                        <u>REDIRECT EXAMINATION</u>

2       <u>BY MR. RODEMS:</u>

3       Q       Mr. Bowman, is the data regarding the expenses

4       that would be put on for an overseas convention or a

5       domestic convention, is the data from Wrestlereunion

6       more relevant to you in calculating net lost profits

7       than what TNA or somebody else did?

8       A       Yes.

9       Q       Why?

10      A       Because that's who is hiring the wrestlers,

11      booking the hotels.  That's who's going to be paying

12      the bills.

13              THE COURT:  That was two.

14              MR. RODEMS:  Yes, sir.  I was just going to

15      say I used my two.

16              THE COURT:  All right.  Thank you, sir.

17              MR. HERBERT:  Your Honor, I'm sorry, may I --

18              THE COURT:  Thank you, sir.  You may step

19      down.  Please watch your step.

20              I have a list of potential revenue sources

21      identified by Mr. Bowman in his report.  Let me go

22      through these with you and see if you agree that

23      this is an exhaustive list, and not in any

24      particular order.

25              First of all, pay-per-view; second,

1    television, DVD sales, fan conventions, live events,

2    including international events, internet sales,

3    training camps, merchandise and licensing.

4    Mr. Rodems, is that exhaustive?

5            MR. RODEMS:  Yes, sir.

6            THE COURT:  Mr. Herbert?

7            MR. HERBERT:  I believe so.  Although

8    internet I think is internet advertising is what's

9    identified in the report.

10           THE COURT:  Well, sales subscription,

11   advertising sources from internet activities,

12   website hits, he's talked about that.

13           Now, do I understand correctly, Mr. Rodems,

14   that Mr. Bowman's methodology is the traditional

15   yardstick approach to determining or calculating net

16   profit?

17           MR. RODEMS:  No, sir, that is not correct.

18           THE COURT:  What is not correct about it since

19   that's exactly what he said he was using?  But go

20   ahead.

21           MR. RODEMS:  Okay.  What he said was he used a

22   form of the yardstick.  The other day when I was

23   attempting to provide the definitions to Mr. Bowman

24   so that we could examine what his methodology was,

25   you asked me to stop doing that and I --

1              THE COURT:  Because you were reading from a

2       case.  That's not appropriate examination of an

3       expert.  That's why I stopped you.

4              MR. RODEMS:  Okay.  In any --

5              THE COURT:  It's also leading and it's not

6       going to help you, whatever his answer is.

7              MR. RODEMS:  Okay.  In any event, what

8       Mr. Bowman did was to use the methodology that was

9       recognized by the First District Court of Appeals

10      and the Florida Supreme Court in *W. W. Gay*, also

11      recognized by the *Billett* court from the Eastern

12      District of Pennsylvania, recognized by the Southern

13      District of New York in the *Island Def Jam* case,

14      recognized by the Southern District of Florida in

15      the TVT slippery slide or something case, and I can

16      get you all of these cites, Your Honor.

17             The premise of his -- his opinion is that

18      there is no comparable company to Wrestlereunion,

19      and because of that, the classic yardstick method

20      that the *Lehrman* court talks about is not a vehicle

21      to determine net lost profits.  The before and after

22      methodology that the *Lehrman* court also talks about

23      is not appropriate because there is no after here.

24             So what he did was he did an analysis using

25      the data from Wrestlereunion, the actual data, and

1    made projections based on other actual data on other

2    similar events considering the talent, the towns,

3    the charges for fees and other things.

4        So using all that information, he projected

5    what he believed the reasonable revenues would be

6    from these various sources and the reasonable

7    expenses.  And the reason I asked the final two

8    questions, Your Honor, is because it really doesn't

9    matter how well TNA is able to manage their fan

10   conventions, if Wrestlereunion has the ability to

11   use a certain amount of expenses in a fan

12   convention, but could go into the same markets with

13   talent that is similar and charge a similar ticket

14   price and achieve a similar attendance level, if

15   Wrestlereunion is able to do it at a lower expense

16   level, then, of course, taking into account TNA's

17   expense model would be inappropriate.

18       And that's why instead of using the classic

19   yardstick method he used a form of the yardstick

20   method which, again, the Florida Supreme Court made

21   clear that it does not have to be a particular

22   methodology that an experts relies on, which was

23   also stated quite clearly in the TVT case that I was

24   talking about.  There is no --

25       THE COURT:  I understand what you're saying,

1    and that's what he has explained, as well.  But it's

2    a form of the yardstick method which presumes that

3    the expert will use reliable data from a reliable

4    source.

5         MR. RODEMS:  Yes, sir.

6         THE COURT:  All right.  Let's go through each

7    of these items.  If I determine that Mr. Bowman's

8    opinion of lost net profits is deficient in any step

9    along the way, that opinion is inadmissible.  Would

10   you agree with that?

11        MR. RODEMS:  Yes, sir.

12        THE COURT:  All right.  Mr. Herbert, I assume

13   you agree since you argued that.

14        MR. HERBERT:  Yes, sir.

15        THE COURT:  All right.  It seems to me, then,

16   based on the cases I've read that I have to look at

17   the components of his opinion, i.e., those revenue

18   sources that I just enumerated, and determine for

19   each one whether or not there is a sufficiently

20   reliable methodology used by the witness, you can

21   call it a form of the yardstick, the bottom line is

22   it has to be a reliable standard.  Whether we call

23   it yardstick or form of the yardstick, it can't just

24   be numbers he makes up.  It has to be something

25   based in data, some history, some source that's

1          reliable; correct?

2               MR. RODEMS:  Yes, sir.

3               THE COURT:  All right.  Let's look, then, at

4     pay-per-view.  Tell me in a nutshell, we've got to

5     keep this brief, what was the data or is the data

6     that Mr. Bowman relies on in projecting revenue from

7     pay-per-view sales, both the revenue and the

8     expenses, of course, Mr. Rodems.

9               MR. RODEMS:  Mr. Bowman projected pay-per-view

10    buys based on the historical figures of what fans

11    who followed WWE and fans who followed TNA did, what

12    their behavior was in connection with those events.

13    And what Mr. Bowman determined by studying the

14    available data is that those fans who watched the

15    WWE on television, about 4.5 percent of those will

16    purchase a pay-per-view event.

17              So, therefore, if there's a million people

18    that watch Raw, and I'm pulling that number out of

19    the sky, they should expect a pay-per-view buy level

20    of around 40,000, if my math is correct, 45,000.  He

21    looked at TNA, also, and TNA showed a similar

22    phenomenon or history, if you will, of about 4.3

23    percent.  So he was not comparing Wrestlereunion in

24    volume to those, but he was determining that if you

25    looked at what those fans responded to, that a 4.4

1    percent rate or the median or the middle, if you

2    will, was an appropriate percentage.

3          THE COURT:  I understand where he got the

4    percentages.

5          MR. RODEMS:  Okay.

6          THE COURT:  He took a median of those two

7    percentages which, for purposes of our discussion,

8    is 4.5, 4.3 comes out to 4.4.  Moving past that, he

9    applied that percentage to what?

10         MR. RODEMS:  He determined what he believed

11   the ratings would be of television shows in the

12   market and also on a cable station such as PAX which

13   now has a new name that begins with an I, projecting

14   that there was an available and viable market for

15   Clear Channel to get this station broadcast based on

16   the response in the cable industry to wrestling

17   shows over the last four years.

18         THE COURT:  Based on what data?

19         MR. RODEMS:  The data that was -- well, the

20   anecdotal data of the fact that Ring of Honor is on

21   HD Net, etcetera, etcetera, etcetera, and I can go

22   through all those specific examples.

23         THE COURT:  Well, you'd better give me

24   something very specific because this is where his

25   calculation, if you will, on pay-per-view either

1        survives or doesn't.

2            MR. RODEMS:  Okay.

3            THE COURT:  I think the percentages he's

4    arrived at appropriately through reliable sources.

5    But that's just a number.  It's using that number

6    against the TV viewers, the watchers, if you will,

7    that determines the dollar amount.

8            MR. RODEMS:  Very quickly, Mr. Bowman's

9    opinion is that properly marketed, Clear Channel

10   would have been able to place a Wrestlereunion

11   program on one of the cable networks, and he based

12   that on the fact that HD Net had no wrestling

13   program in 2005 and today broadcasts Ring of Honor,

14   which we've seen video in the courtroom and for

15   comparison purposes compared it with Wrestlereunion.

16           THE COURT:  How does he calculate the number

17   of viewers?

18           MR. RODEMS:  He bases that on using the rate

19   of viewership for the Memphis Wrestling television

20   program, which he used that because that was the

21   available data, the only available data that he

22   could find about broadcast TV in the marketplace.

23   And it was his conclusion that that was not a unique

24   situation and also his conclusion based on the

25   ability to buy air time in the markets.

1              So getting the wrestling program on the

2     stations in the 25 markets would not be difficult

3     because of the fact that programming time can be

4     purchased under the barter system.  He believed

5     that -- his opinion and conclusion was that it would

6     achieve a 5.9 percent rating based on the experience

7     of Memphis -- the program in Memphis.

8              And if you read his deposition and his

9     reports, there is no Nielsen ratings data for

10    broadcast stations in the 25 markets that he was

11    able to obtain.  It simply doesn't exist in that

12    format.  So he used the best available data that was

13    out there, which was the experience of the Memphis

14    Wrestling in consultation with Jerry Jarrett and

15    Corey Maclin.

16             THE COURT:  He assumes, therefore, that those

17    figures, those numbers from the Memphis market would

18    be similar to those generated if Clear Channel

19    placed the product in the 25 markets?

20             MR. RODEMS:  Yes, sir.  And the other thing --

21             THE COURT:  How does he arrive at that

22    assumption?

23             MR. RODEMS:  Because of the experience of the

24    Memphis television programming.  But what -- the

25    further step that he took in the supplemental

1    report, and this is where the issue of 5.9 versus

2    4.4 is important, by obtaining additional data about

3    the advertising rates per minute in these 25

4    markets, which he obtained from SRDS, he was able to

5    go back and plug those numbers in and show that even

6    at a rating as low as 4.4 percent, the number -- the

7    dollar amount that he projected still held true.

8         In other words, he believes a 5.9 percent

9    rating is achievable based on the Memphis

10   experience.  But his revenue model would still work

11   based on the actual data of per minute advertising

12   applied at a 4.4 percent viewer rate.

13        THE COURT:  How does he take the Memphis

14   market and apply it to 25 other markets around the

15   country for purposes of comparable --

16        MR. RODEMS:  In two ways.

17        THE COURT:  -- viewings?

18        MR. RODEMS:  In two ways.  He looks at the

19   ability to get programming on TV.

20        THE COURT:  The nature of the programming is

21   somewhat essential; isn't it?

22        MR. RODEMS:  Yes, sir, it certainly is.  I

23   won't disagree with you there.

24        THE COURT:  Well, if he doesn't have that kind

25   of programming in those 25 markets to look at, how

1    can he use the Memphis market as representative or

2    as a comparable market?

3         MR. RODEMS:  Because it's the only and best

4    available data.  And what I could suggest to Your

5    Honor is that the case law holds that when an expert

6    uses the only and best available data, and the

7    reason that there's not --

8         THE COURT:  You've bored all the law students.

9    See, they're leaving.  That's the new generation.

10   It's close to 5:00, they've got to go home.

11        MR. RODEMS:  I was young once, too, Your

12   Honor.  The case law holds that when the plaintiff's

13   expert is put in the position of not being able to

14   prove the damages because of the actions of the

15   defendant that there is a relaxation of the

16   standard.  Now --

17        THE COURT:  Well, but it also says that the

18   expert still cannot engage in purely speculative

19   analyses.

20        MR. RODEMS:  Yes, sir.  And if there was not

21   Memphis data available, he would have nothing to

22   base it on.  Now, this is the type of thing, Your

23   Honor, that the jury -- that cross-examination --

24   this goes to the weight and not --

25        THE COURT:  You've got to satisfy me it's

1    reliable before the jury even hears it.

2        MR. RODEMS:  Well, it's --

3        THE COURT:  Don't worry about what the jury's

4    going to do or not do.

5        MR. RODEMS:  Yes, sir.  But the case law also

6    suggests that, you know, with the methodology, once

7    you establish that the method, not the actual number

8    crunching outcome, but the method is reliable, at

9    that point if there are deficiencies --

10       THE COURT:  I don't know how he can assume the

11   rating from Memphis to be consistent throughout

12   these 25 markets.  I don't know that he's explained

13   that.  He assumed it, of course.

14       MR. RODEMS:  With the additional data from the

15   advertising sources -- and because again, the -- the

16   original assumption was a 5.9 rating and that per

17   minute in Memphis $75 is paid for advertising.  So

18   when he found the SRDS data and applied it across

19   these 25 markets, what it showed is the average

20   across those 25 markets was actually $96.

21       So in other words, if you plug in 96 instead

22   of 75, the percentage of viewership could drop to as

23   low as -- I believe it was 4.4, it may have been

24   4.1, and still yield the same overall revenue

25   projections.

1          Now, he has said, candidly, that he believes

2     the Memphis experience was not unique based on his

3     conversations with people in the industry.  But at

4     the same time, Your Honor, I have to be candid with

5     the Court.  He searched high and low for any other

6     data that he could find on a similar situation

7     around the country, and it just simply does not

8     exist in a format that he could come in and express

9     it.

10          He was able to find data on the advertising

11    rates in the individual markets because that data

12    was available.  So I -- I -- I hear loud and clear

13    what you're saying, Your Honor.  The point I would

14    make is that he's done the best he can with the best

15    available data.  And the absence of anymore certain

16    data is not because of him not doing a thorough job.

17    I think hopefully, if anything has satisfied you,

18    that he has put a lot of effort into his report and

19    his conclusion.

20          THE COURT:  Well, there's no doubt he's put a

21    lot of effort but, you know, that doesn't make him

22    an expert.

23          MR. RODEMS:  Well, yes, sir, I --

24          THE COURT:  He can't bootstrap his expertise

25    by just working hard.

1          All right.  Let's give Mr. Herbert a chance to

2      respond solely on pay-per-view, please.

3          MR. HERBERT:  Sure, Your Honor.  I guess first

4      off, on the last point, the conversion of the 5.9 to

5      the 4.4, that really just makes no sense whatsoever.

6      All he's saying is that assume a 5.9 based on his

7      very unusual market in Memphis and then you achieve

8      that same advertising revenue number if you just

9      drop it down to an arbitrary 4.4.  That says nothing

10     about, you know, how many viewers would watch the

11     show.

12         What we're talking about here in more simple

13     terms is what is the demand for wrestling

14     television.  What's the number of people who watch

15     the show compared with the number of people who

16     would buy a pay-per-view.

17         THE COURT:  What do you think is the flaw in

18     his methodology, or flaws?

19         MR. HERBERT:  The biggest flaw is that he uses

20     no data for any other markets.  He takes one market

21     at one time period, and it's a very special and

22     unusual market, it's way above the average and the

23     norm, and he extrapolates that and multiples that to

24     25 other markets.  That's one flaw.

25         Another flaw is that, obviously, after

1       December of 2005, Clear Channel didn't even have any

2       -- Clear Channel Entertainment Television was spun

3       off and had no relationship whatsoever with those 25

4       markets.  So there's no basis for even applying it

5       to 25 other markets.  The corporations had no

6       relationship.

7              The whole underlying assumption is that, oh,

8       it's all part of the Clear Channel empire.  It was

9       Live Nation after December of 2005.  But more

10      importantly, there is plenty of data available that

11      he could have used.  He sat there telling us again

12      and again and again about television shows all over

13      the country, national shows, cable shows, HD Net,

14      there is plenty of television data in other markets

15      he could have used.

16             He selectively picked the most watched

17      wrestling city in the country.  Like I said, it's --

18      and our expert has said that it's like, you know,

19      checking Gator football in Gainesville.  Gainesville

20      is one of the markets that Clear Channel has a

21      television -- had a television station in, it's one

22      of the 25 --

23             THE COURT:  What else could he have done?

24             MR. HERBERT:  He could have gotten data on

25      television -- wrestling television shows from the 25

1    other markets.  He could have researched that.  He

2    could have applied it.  He could have taken a more

3    reasonable number.  The numbers for WWE and other

4    programs --

5         THE COURT:  So you think if he had found data

6    on wrestling programs in the 25 other markets, that

7    would have been a more reliable basis to make his

8    projections?

9         MR. HERBERT:  Yes.  And --

10        THE COURT:  Was that data available?

11        MR. HERBERT:  I think he testified about that

12   data on other areas.  He testified about so many

13   different television shows that are national shows.

14   There's national -- a national data -- a national

15   rating -- a national Nielsen rating is a much more

16   reliable number than picking one market.  And

17   there's clearly national Nielsen ratings available.

18        And WWE and other -- and TNA have achieved

19   1.1 -- actually, Memphis Wrestling, another thing

20   that he omitted to incorporate is that it recently

21   achieved a 0.0 rating.  That was within the last --

22        THE COURT:  He didn't confirm that.  You said

23   that but you're not an expert.

24        MR. HERBERT:  I understand, Your Honor.  But

25   he did say that he picked it from a very limited

1    time.  So it's not only a limited market, it's one

2    point in time that he couldn't quantify.  And in his

3    deposition, he said he believed it was a period of

4    several months.  So several months in 2005

5    extrapolated over 25 markets and five years is

6    certainly --

7         THE COURT:  So do I understand the primary

8    flaw that you're trying to point out is that he used

9    an artificially inflated wrestling market in

10   Memphis, took that and applied the rating across the

11   board to the 25 other markets to create a rating,

12   and then he applied it to a listening audience, if

13   you will, from the Memphis market?

14        MR. HERBERT:  Yes.  That's -- that's part of

15   the fundamental flaw of his calculation, and there's

16   more.

17        THE COURT:  Let's move on, then, to

18   television.  It's somewhat related, Mr. Rodems; is

19   it not?

20        MR. RODEMS:  Yes, sir.  And on that note,

21   rather than repeating what we've already gone

22   through, I would like to add this point to it for

23   your consideration.  The national ratings that

24   Mr. Herbert was talking about relate to cable

25   stations only.  They don't relate to broadcast

1    stations, and Mr. Bowman testified in his deposition

2    that cable only covers 60 percent of the United

3    States.

4         So in addition, he did not feel like it would

5    be a fair comparison.  And I think had he done so,

6    it would have been open to attack to say, well, if

7    WWE could do this rating, then -- nationally, then

8    Wrestlereunion could do this rating.  So what he

9    picked was the available data for a local show that

10   was not necessarily on broadcast cable.

11        And I would like to make this point.

12   Mr. Bowman made it clear in his deposition that the

13   data that he relied on was the only available data.

14   So to the extent that Mr. Herbert is suggesting that

15   there is data out there on local markets relating to

16   wrestling on broadcast TV that Mr. Bowman did not

17   find, I would like to know what that is because

18   Mr. Bowman could not find that.

19        THE COURT:  Anything else on television,

20   Mr. Herbert?

21        MR. HERBERT:  Well, yes, Your Honor.  I just

22   would like to read one question and one answer from

23   his deposition that I located.  It's on his

24   deposition of April 22nd -- I'm sorry, June 22nd,

25   2009, starts on page 92 and goes into page 90 -- I'm

1    sorry, page 92, line 25, and goes through page 93,

2    line five.  And the question was, quote:

3         "Question:  And you are aware that lately

4    Memphis Wrestling television show has hit a rating

5    of 0.0?

6         Answer:  Yes.  And that explains that they're

7    just -- I don't think he's half interested.  I mean,

8    they're just rehashing and rehashing of -- there's

9    no fresh content."

10        THE COURT:  Well, is that relevant to his five

11   year projection or is it relevant to his initial

12   numbers?

13        MR. HERBERT:  I think it's relevant to both

14   because that's a 2009 number and he's projecting for

15   2009.  And it -- so that shows that he picked the

16   highest peak time period in a peak market.

17        THE COURT:  Well, doesn't the case law say if

18   the numbers don't make sense, I have to look at the

19   methodology, not his conclusions?  Isn't the more

20   fundamental flaw, from your perspective, that he

21   used a market that was not -- or the Memphis

22   Wrestling program to project this revenue, and that

23   that program was not sufficiently comparable to what

24   Wrestlereunion was going to be putting out?

25        MR. HERBERT:  Yes, Your Honor.

1          THE COURT:  All right.

2          MR. HERBERT:  And one other point on that is

3     that he clearly used the pay-per-view buy rate from

4     WWE and TNA when he said repeatedly from my

5     questioning this morning that, you know, there's no

6     way at all that WWE and TNA are comparables.

7          And then he also -- Mr. Rodems said it again

8     today that -- just now that they looked at Ring of

9     Honor being on HD Net.  And he also said Ring of

10    Honor is in no way comparable and Ring of Honor is a

11    failing organization that has not shown a profit.

12         THE COURT:  Now, there's also a contention

13    you've made about a revenue source not being within

14    the contemplation of the agreement.  I've left those

15    to the end.  So you would concede, would you not,

16    that pay-per-view, television and we're about to

17    talk about DVD sales, those are the kinds of things

18    that the parties actually were talking about in the

19    agreement?

20         MR. HERBERT:  Yes, Your Honor.

21         THE COURT:  When I say talking about, that's

22    colloquial.

23         MR. HERBERT:  It was contemplated by the

24    parties.  Right.

25         THE COURT:  All right.  Let me get my notes on

1    DVD sales.  Just a moment.  It is my impression,

2    almost a finding, that the one area where Mr. Bowman

3    has satisfied my scrutiny or at least met my

4    concerns about methodology is in the area of DVD

5    sales, because he -- he actually used similar events

6    and had some projected sales information which he

7    thought was high, and he adjusted his sales

8    projections accordingly.  I still don't know what

9    expenses he used.

10        So the question, Mr. Rodems, is how am I to

11   take these projections, assuming that he bases those

12   projections of sales on reliable data, how does that

13   turn into an acceptable calculation component, that

14   is, of net profits?

15        MR. RODEMS:  Okay.  As far as the expense from

16   DVD sales, there is, of course, the expenses in

17   staging the event in order for it to be filmed and

18   broadcast.  But as to the actual DVD production,

19   Clear Channel in its profit and loss statement --

20   I'd have to find the exhibit right now and I want to

21   answer your question -- in its profit and loss

22   statement, Clear Channel projected what its costs

23   would be for producing the individual DVDs --

24        THE COURT:  Did he consider that when he made

25   his calculations?

1          MR. RODEMS:  Yes, sir, he did.

2          THE COURT:  All right.

3          MR. RODEMS:  Is there something else?

4          THE COURT:  Well, that's the first step.

5    That's what he had available.  Did he verify and

6    confirm those expense figures based on data out

7    there in the market, information out in the market?

8          MR. RODEMS:  Yes, sir.  He -- he did not

9    accept at face value anything from Wrestlereunion or

10   anything from Clear Channel.  Where he had data

11   presented to him, he went and verified it.  That's

12   why he rejected the sales volume level that Clear

13   Channel had projected, and that's why he went out

14   and looked for other costs.

15        And if you recall from his testimony this

16   morning, he says that when the cost is cheaper for

17   DVD production or whatever, that's when you

18   outsource.  But he felt that if Clear Channel,

19   because they do have at least the expertise in being

20   able to say how much it cost them to physically

21   produce a DVD, that he felt that that was a reliable

22   basis.

23        Now, their projections for numbers, he didn't

24   like that.  But in terms of them saying, this is how

25   much it cost for the, you know, folding, licking the

1    envelope, wrapping the package, making the DVD

2    itself, if they figured out that this is their

3    profit margin, that to him was acceptable.  He

4    didn't find any data in the marketplace that showed

5    that they were inflating that or underreporting

6    that.

7        THE COURT:  All right.  Mr. Herbert, what

8    flaws do you believe exist in his methodology when

9    he considered DVD sales in those projections?

10       MR. HERBERT:  Okay.  Well, first, again, under

11   the yardstick method, he did not use appropriate

12   comparables.  He said on at least three occasions

13   that he looked at sales of WWE titles in order to

14   verify his data; the WWE Greatest Stars of the

15   Eighties, WWE Greatest Managers.  He looked at WWE

16   DVD library sales.  And he admitted repeatedly that

17   WWE is not an appropriate comparable.

18       He also said that, again, in this case he

19   looked at DVD sales of Ring of Honor, which he,

20   again, admitted that Ring of Honor was not an

21   appropriate comparable, and admitted that to the

22   best of his knowledge, they're losing money on a

23   dramatic scale.

24       He also mentioned that he used the XWF, his

25   own organization to -- as a comparable to measure

 1      the data for DVD sales.  And he has testified

 2      repeatedly that XWF is not in any way comparable to

 3      Wrestlereunion.

 4           He did not mention one other title or

 5      organization or company that he used to compare his

 6      DVD data with or to base his DVD numbers on.  Every

 7      single company that he used, he admitted very

 8      clearly that they are not comparable.

 9           So under the *River Bridge versus Somax* case

10      that I sent in and on all the other cases that talk

11      about using a comparable and what you have to prove

12      to show that something is comparable and they say

13      that something has to be as nearly identical as

14      possible, he has not satisfied that standard

15      because --

16           THE COURT:  Well, Mr. Rodems argues that in

17      this situation there are no comparables, so

18      Mr. Bowman used the best information he could find

19      and made adjustments when the comparables that he

20      did find warranted those adjustments.  What about

21      that methodology do you find fault with?

22           MR. HERBERT:  I'm sorry?

23           THE COURT:  What about that methodology do you

24      find fault with?

25           MR. HERBERT:  Well, I believe the case law

1        says that no matter what data is available --

2        there's a very limited case law that says that

3        there's something that is so unique that it's not a

4        comparable, so the expert has to justify that with

5        reliable -- logical, reliable and rational

6        information.

7            And he -- you know, he repeatedly admitted

8        that there were multiple, multiple other entities in

9        the wrestling world that featured live wrestling

10       matches and fan conventions.  And one thing that's

11       important, Your Honor, is that in his very first

12       deposition when I asked him, why is Wrestlereunion

13       unique, you say that it's unique --

14           THE COURT:  Why is it unique?

15           MR. HERBERT:  Yes.  I asked him, why is it

16       unique.  And what he said was that it's because

17       nobody had done wrestling fan conventions with live

18       matches.  So then in his second deposition I went

19       through that list that I went through with him this

20       morning of NWA Legends and of multiple other

21       wrestling events where they had fan conventions and

22       live wrestling matches, and he changed his position

23       completely and said, no, Wrestlereunion is unique

24       because it had the backing of a huge,

25       publicly-traded entertainment company.

1          And then I said, well, XWF had the backing

2     of -- large financial backing of other entities.

3     WWL had large financial backing.  And he said, no,

4     those were completely different from -- he said that

5     today in his testimony that those were completely

6     different from Wrestlereunion.

7          So I think the cases -- I mean, if you look at

8     that *River Bridge versus American Somax* case, it

9     very clears says the expert must prove that what is

10    a comparable, what the revenues are, what the

11    expenses are.  And there are very few cases that let

12    an expert get away with saying that something is

13    unique to avoid being able to prove the expenses and

14    the revenues of a comparable entity.

15         And I think in this case he did not cite one

16    company that -- all the companies he -- if it were

17    unique, he shouldn't have cited any of those

18    companies that aren't comparable.  He specifically

19    cited companies that he admitted were not

20    comparable.

21         In addition, on the expenses in connection

22    with the DVDs, he claims to be using, you know, the

23    defendant's expense numbers.  But he didn't even

24    know what the production fee was or what an average

25    production fee, that's one of the line items in the

1    expense numbers.  There's an industry average for

2    production fees and depending on who's doing the

3    production, that's one of the expenses.

4        He admitted he had no idea what the industry

5    average was, so how can he be qualified to give

6    opinions on what the expenses are for DVD sales,

7    even if, you know, gross number of sales come from

8    us.

9        THE COURT:  Response, Mr. Rodems.

10        MR. RODEMS:  Well, yes.  First of all, Your

11    Honor, those kinds of arguments are the classic, you

12    know, weight versus admissibility.  We think you

13    should have used this, you used that.  But what

14    Mr. Herbert's arguing, that case is the classic

15    yardstick method.  And in the classic yardstick

16    method, you look for the nearly identical

17    comparable.

18        That works if you've got a McDonald's

19    franchisee whose restaurant burns down and you say,

20    well, what would he have earned this year.  He's on

21    Bloomingdale, so we're going to go look at the

22    McDonald's franchisee on Highway 60.

23        But that's not this case.  And Mr. Herbert's

24    citing the classic yardstick case and saying, well,

25    we don't fit our square peg in that round hole.

1       Well, the *Lehrman* case which is Fifth Circuit, and

2       the Florida Supreme Court case which adopted and

3       affirmed the first DCA in *W. W. Gay* talks about a

4       standard.

5              Also, in the TVT case, the court says there is

6       no prescribed or one methodology.  So we can't argue

7       the classic yardstick because Wrestlereunion does

8       not look exactly the same as another company.

9              So what Mr. Bowman did was he looked for

10      similar talent on similar DVDs and looked for the

11      rates on those.  And that is appropriate under the

12      Fifth Circuit's holding in *Lehrman* and all the other

13      cases that I've cited in my response, Your Honor,

14      which I'm -- you know, it's -- the hour is getting

15      late and I'm not going to repeat the -- the argument

16      in my memorandum, unless you wish me to, and then

17      I'll be happy to.

18             But suffice it to say this is not the classic

19      yardstick analysis.

20             THE COURT:  All right.  We'll pick up at 8:15

21      tomorrow with the conventions.  Thank you,

22      gentlemen, ladies.

23             (Proceedings concluded at 5:06 PM.)

24

25

```
1

2                       C E R T I F I C A T E

3

4        STATE OF FLORIDA              )

5        COUNTY OF HILLSBOROUGH        )

6            I, Linda Starr, RPR, Official Court Reporter for

7        the United States District Court, Middle District,

8        Tampa Division,

9            DO HEREBY CERTIFY, that I was authorized to and

10       did, through use of Computer Aided Transcription,

11       report in machine shorthand the proceedings and

12       evidence in the above-styled cause, as stated in the

13       caption hereto, and that the foregoing pages,

14       numbered 1 through 370, inclusive, constitute a true

15       and correct transcription of my machine shorthand

16       report of said proceedings and evidence.

17           IN WITNESS WHEREOF, I have hereunto set my hand in

18       the City of Tampa, County of Hillsborough, State of

19       Florida, this 21st day of March 2010.

20

21

22            /s/ Linda Starr
              _____
              Linda Starr, RPR, Official Court Reporter
23

24

25
```