1                    UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
2                          TAMPA DIVISION

3        WRESTLEREUNION, INC.,

4            Plaintiff,

5                vs.             CASE NO. 8:07-CV-2093-T-27MAP
                                3 SEPTEMBER 2009
6                               TAMPA, FLORIDA
                                PAGES 1 - 252
7                               VOLUME IV

8
         LIVE NATION TELEVISION
9        HOLDINGS, INC.,

10           Defendant.

11       _____/

12               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               BEFORE THE HONORABLE JAMES D. WHITTEMORE
13                  UNITED STATES DISTRICT JUDGE

14       APPEARANCES:

15       For the Plaintiff:    **Ryan Christopher Rodems**
                               Barker, Rodems & Cook, PA
16                             Suite 2100
                               400 N. Ashley Drive
17                             Tampa, Florida 33602

18                             **Chris A. Barker**
                               Barker, Rodems & Cook, PA
19                             Suite 2100
                               400 N. Ashley Drive
20                             Tampa, Florida 33602

21

22

23

24        Proceedings recorded and transcribed by
         computer-aided stenography.
25

```
 1    For the Defendant:        Gregory W. Herbert
                                Greenberg Traurig, LLP
 2                              450 S. Orange Avenue
                                Suite 650
 3                              Post Office Box 4923
                                Orlando, Florida 32802-4923
 4
                                Dawn Giebler-Millner
 5                              Greenberg Traurig, LLP
                                450 S. Orange Avenue
 6                              Suite 650
                                Post Office Box 4923
 7                              Orlando, Florida 32802-4923

 8                              Richard A. Munisteri
                                Paula Castro
 9                              Matthew Brown

10    Court Reporter:           Linda Starr, RPR
                                Official Court Reporter
11                              801 N. Florida Avenue
                                Suite 13B
12                              Tampa, Florida 33602

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

                          I N D E X

2

        Witness                              Page Number

3

        **Sal Corrente**

4

        Direct Examination by Mr. Rodems........   25
5       Cross Examination by Ms. Millner........   95

6       Plaintiff's Exhibit Number 33...........   42
        Defendant's Exhibit Number 28...........   217
7       Defendant's Exhibit Number 29...........   218
        Defendant's Exhibit Number 115..........   230
8       Defendant's Exhibit Number 121 and 123..   234

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           COURTROOM SECURITY OFFICER:  All rise.  This

2      Honorable Court is in session, The Honorable James

3      D. Whittemore presiding.

4           Please be seated.

5           THE COURT:  I've kept you waiting.  We've been

6      working on the *Daubert* motion.  Any final comments

7      or thoughts, Mr. Rodems?

8           MR. RODEMS:  Your Honor, if there's something

9      specific that you would like comment on, I'll be

10     happy to address that.  Otherwise, I don't want to

11     take up anymore of the Court's time on just me

12     reiterating what's been said in my response and in

13     the hearing previously.

14          THE COURT:  Thank you.  Mr. Herbert?

15          MR. HERBERT:  Yes, Your Honor, very briefly.

16     On the DVD productions -- the DVD projections by

17     Mr. Bowman, if you look at the spreadsheets, they

18     clearly incorporate the flawed pay-per-view and TV

19     data.  In fact, that's the largest component of the

20     DVD productions listed on the spreadsheets.  So

21     that's -- I think it's been established that the

22     pay-per-view numbers and the TV numbers are flawed

23     and based on unreliable data.

24          THE COURT:  What do you mean, they clearly --

25          MR. HERBERT:  If you look at his spreadsheets,

1          the first -- if you look at 2005 on the DVD

2          spreadsheet, which is the third spreadsheet attached

3          to his report, which is entitled Wrestlereunion DVD

4          sales fiscal year begins January '05, you see at the

5          very bottom the grand total for that spreadsheet is

6          a projection of $173,944 for the entire year for DVD

7          sales for 2005.  And you see that he's got it broken

8          down into -- the very first category is pay-per-view

9          DVDs.

10              Then the next category is, you know, TV show,

11         which in this year he doesn't show any revenue from

12         but in the following years he shows substantial

13         revenue.  And then it's broken down into shoot

14         interviews, documentaries, specials.  But every year

15         there is that separate breakdown of pay-per-view

16         DVD, so he's projecting sales of DVDs not only of,

17         like, the shoot interviews or the matches, which

18         we've heard testimony about, but based on the

19         pay-per-views and on television shows, which we know

20         is projected with or our position is it's projected

21         with the flawed methodology.

22              THE COURT:  I thought -- maybe I stand to be

23         corrected, but I thought that he distinguished in

24         his projections between DVD sales and then

25         pay-per-view buyers.

1          MR. HERBERT:  Well, if you look at the

2     numbers, though, the total clearly incorporates the

3     pay-per-view numbers, the total that is included in

4     the DVD sales number.

5          THE COURT:  Isn't he able to distinguish,

6     however, from the numbers with those categories?

7          MR. HERBERT:  Well, it looks like he's double

8     counting them because there are -- my understanding

9     of his testimony is that there would be a

10    pay-per-view special and that he would sell DVDs

11    based on the pay-per-view special.  And the

12    projections of DVDs sold from the pay-per-view

13    special are clearly based on the number of

14    pay-per-view buys that he projected, and the same

15    thing with the TV show.

16         THE COURT:  You're talking about, then, sales

17    of DVDs after a pay-per-view event is broadcast?

18         MR. HERBERT:  Yes.

19         THE COURT:  Mr. Rodems, is there --

20         MR. RODEMS:  That's just simply not correct,

21    Your Honor.  The DVDs would be created from the live

22    events that were at the conventions.  Now, initially

23    some footage from the live conventions could be

24    shown on pay-per-view, but in terms of his

25    projection for DVD sales, it was completely

1        independent of anything to do with TV or

2        pay-per-view.

3              His projections for TV and pay-per-view were

4        based on those percentages in the Memphis market.

5        His projections for the sales of DVDs were based on

6        the actual data that's in the marketplace about

7        similar talent with similar DVDs.  So the projection

8        of sales volumes for DVDs has nothing to do

9        whatsoever with pay-per-view or TV.

10            THE COURT:  That's my understanding.

11            MR. HERBERT:  Well, if you look at the

12       spreadsheets, though --

13            THE COURT:  I'm not going to argue with you.

14       That's my understanding and that's what the

15       plaintiff is suggesting his testimony is and I'm

16       going to accept that at face value.  I understand

17       your concerns.  But my ruling, if and when I

18       announce it, will clearly distinguish between these

19       separate categories, and the witness will be

20       instructed, of course, to make calculations based on

21       my ruling.

22            MR. HERBERT:  Okay.  Well, then, I just had --

23            THE COURT:  I understand the concern, though.

24       It may or may not be valid.  Once he gets on the

25       stand, he can certainly differentiate between the

1    two.

2         MR. HERBERT:  Okay.  I just have one other

3    final comment on that.

4         THE COURT:  Sure.

5         MR. HERBERT:  In Mr. Bowman's report, it's on

6    page 12, he says, as Mr. Rodems just said, that his

7    projections of DVD sales are based on, you know, A,

8    his knowledge of the industry and, B, looking at

9    sales of similar products.

10        And he testified on direct and confirmed on

11   cross that the sales of the similar products that he

12   was looking at were only WWE or Ring of Honor, which

13   are both products that he specifically stated were

14   not comparable at all to the Wrestlereunion product;

15   WWE because it's so popular and sells so much and

16   they spend so much, and then Ring of Honor because

17   they're so small and they don't sell much at all.

18        So he's basically trying to have it both ways

19   and say that they are not comparable in the case of

20   Ring of Honor because he doesn't want to be stuck

21   with Ring of Honor's poor financial performance,

22   then when he has to base his sales data on something

23   from the market he uses something like Ring of Honor

24   or WWE.  So he shouldn't be allowed to have it both

25   ways.

1            And then he also ignored the actual data in

2       this case that has come out in the testimony, which

3       is that Highspots actually did sell some DVDs and,

4       in fact, they only sold less than the 1000 DVDs that

5       they ordered and Wrestlereunion itself sold less

6       than the 1000 DVDs that it ordered, which were left

7       with Highspots.  So that actual data wasn't used and

8       instead he used data from non-comparable sources and

9       I would believe that's deficient under the yardstick

10      method.

11           THE COURT:  I don't think you need to address

12      that, Mr. Rodems.  Thank you.

13           Well, let me first acknowledge -- is

14      Mr. Bowman present?  No, he's not.

15           MR. RODEMS:  He's in the waiting room, Your

16      Honor.

17           THE COURT:  He probably should hear my ruling

18      for guidance.

19           (Brief pause.)

20           THE COURT:  Thank you.  You may have a seat,

21      Mr. Bowman.  I wanted you to be here while I

22      announced my ruling, for your guidance.  You will be

23      testifying in a somewhat limited capacity, I will

24      tell you, so I wanted you to hear my ruling as I

25      announce it.

1           First, let me acknowledge that this gentleman

2    has spent considerable time and effort analyzing,

3    projecting and concluding on matters that he is

4    generally familiar with by virtue of his familiarity

5    with the industry, so I do not want my ruling to in

6    any way denigrate his effort.  It's commendable.

7    And I suspect that if the plaintiffs were discussing

8    embarking on a business venture, the information and

9    input would be something they would consider to be

10   valuable, meaning the input from Mr. Bowman and his

11   analysis.

12          In that setting, entrepreneurs and people such

13   as Mr. Corrente are certainly entitled to engage in

14   somewhat speculative foresight, including their

15   optimistic expectations of success in deciding

16   whether to invest in a venture, and I would think

17   someone like Mr. Bowman would be invaluable to that

18   type of decision.

19          In a courtroom, however, the Court is charged

20   with the responsibility of ensuring that opinions

21   offered through one who is identified or named as an

22   expert is reliable.  That is, that in a gatekeeping

23   function of the Court, under *Daubert*, I must

24   determine, among other things, whether the witness

25   is qualified to express the opinions, whether his

1    methodology is sound and reliable and whether his

2    opinions would be helpful to the jury in

3    understanding an issue in the case.

4         I have already determined that Mr. Bowman

5    possesses the requisite experience in accounting to

6    testify under 702 concerning profit and loss

7    calculations, including projections.  While he does

8    not have advanced degrees in those areas, such as a

9    CPA or PhD in economics, he certainly has a decade

10   and a half experience in accounting and understands

11   profit and loss analyses.

12        With respect to his methodology, let me first

13   acknowledge that he is using what I will call a

14   version or modified yardstick methodology.  It is

15   certainly not the classic yardstick methodology.

16   Understandably so, because in this industry the

17   nature of the venture that plaintiff engaged in just

18   simply doesn't lend itself to comparing what the

19   plaintiff intended to do with the track record of

20   other comparable entities.  They're just aren't any,

21   as Mr. Bowman acknowledges.

22        It is not necessary that the classic yardstick

23   theory be applied by Mr. Bowman.  *W. W. Gay versus*

24   *Wharfside*, a Florida Supreme Court decision at 545

25   So.2d, recognizes that.  The reliability implicit in

1        the methodology should be based on some standard,

2        quote, unquote, by which prospective lost profits

3        can be determined.

4              The Fifth Circuit in *Lehrman*, L-e-h-r-m-a-n,

5        *versus Gulf Oil Corporation*, 500 F. 2d 659, in its

6        discussion on pages 677 -- I'm sorry, 667 through

7        669, and specifically 668, discusses a modified

8        yardstick methodology and cautions that a variation

9        from the classic yardstick theory is acceptable so

10       long as the evidence shows damages, quote, "as a

11       matter of just and reasonable inference," closed

12       quote, and that the evidence or proof may include

13       estimates based on assumptions so long as those

14       assumptions rest on adequate data.

15             Implicit in that comment is that the data must

16       be reliable and not a matter of speculation or

17       simply the expert's opinion.

18             What I have done is taken each of the revenue

19       sources identified by Mr. Bowman in his reports and

20       determined whether or not his methodology satisfies

21       that threshold reliability contemplated by *Daubert*,

22       *W. W. Gay, Lehrman* and virtually all of the cases

23       discussing projection of lost profits on a startup

24       business.

25             One of the cases even acknowledged -- and I

 1    can't quote it or cite it -- that the application of

 2    *Daubert* is exceedingly difficult in an economic

 3    analysis because you don't have peer review and all

 4    of those things that give the Court some comfort in

 5    an expert's methodology.

 6        Counsel have done a good job on both sides in

 7    explaining their representative positions and

 8    arguments and contentions.  We've spent an awful lot

 9    of time together, and I have in chambers, analyzing

10    this because of the importance of Mr. Bowman's

11    testimony in the plaintiff's case, as well as the

12    overall case.

13        With respect to the first source of revenue,

14    DVD sales, I find that Mr. Bowman's projections are

15    based on sufficiently reliable data, including a

16    consideration of the defendant's own projected sales

17    of 60,000 units, the XWF sales, the WWE sales, the

18    Ring of Honor sales and the Greater Stars of the

19    Eighties sales, among others.

20        Some of those he didn't consider, for good

21    reasons.  For example, he thought the defendant's

22    own projections were too high, he thought the Ring

23    of Honor sales were too low, he thought the Greater

24    Stars of the Eighties sales were too high, based on

25    all of the data and information that he had

1       available to him.

2            And he differentiated between those business

3       ventures who were not -- whose activities were not

4       similar to the plaintiff's.  He considered the

5       variables and the dissimilarities, and he made

6       appropriate adjustments for those dissimilarities.

7       And that's the essence of this variation of the

8       yardstick method that I think he's entitled to

9       engage in, because there simply isn't an

10      apple-to-apple comparison.

11           His opinions and projections on DVD sales are

12      sufficiently reliable to satisfy my threshold

13      responsibilities, and I find that he may testify in

14      the form of opinions on those projections.  That is,

15      as I understand it, the essence of the agreement

16      between the parties, the defendant's exclusive right

17      to video, edit and distribute the events, and we've

18      heard a lot of testimony about that.

19           The next category of revenue source as

20      identified by Mr. Bowman is television.  I find that

21      his methodology with regard to projecting

22      television-related revenue, such as advertising, is

23      not sufficiently reliable to allow him to express

24      opinions.  He has made certain assumptions which are

25      not supported by reliable data.  He has engaged in,

1    and this is not a criticism, this is an observation,

2    he has engaged in some significant speculation,

3    perhaps premised on optimistic expectations of the

4    plaintiff.

5         Bottom line is these assumptions I'm about to

6    go through are not based on sufficiently reliable

7    data.  And consistent with *Lehrman versus Gulf Oil*

8    his opinions are not, therefore, admissible.

9         First of all, he assumes -- and this is my

10   paraphrasing so I'm sure he will take issue with my

11   verbiage, but that's not the point.  He assumes that

12   the Memphis, which is a regional market, the Memphis

13   market is representative and can be, therefore,

14   applied to the 25 markets he considered across the

15   nation.  That assumption is not supported by

16   reliable data.

17        Secondly, he assumes that the 5.9 percent

18   viewership derived from the Memphis regional market

19   is likewise representative of the 25 markets he

20   analyzed.  Again, there's no reliable data

21   supporting this assumption.

22        Thirdly, he assumes that the defendant could

23   place programming in the 25 markets ostensibly

24   controlled by Clear Channel Entertainment.

25   Specifically, on page two of his supplemental

1    report, he discusses the relationship between the

2    entities.

3         His opinions necessarily assume a corporate

4    relationship allowing the placing of the programming

5    that would last for the duration of his five-year

6    projections.  That assumption is not based on

7    sufficiently reliable data.  Is it a logical

8    assumption?  Perhaps.  But that is not the test.  It

9    must be based on adequate reliable data.  It is not.

10         I also note that the Memphis wrestling 5.9

11   viewership that he found was drawn from a very

12   limited time period and he assumed a continuation of

13   that percentage for the duration of his projections.

14   In his own testimony he acknowledges that that has

15   not proven to be true, so that assumption is not

16   based on sufficiently reliable data.

17         He reduced the 5.9 viewership percentage from

18   the Memphis data to 4.3 percent as he applied it

19   across the country.  I understand his explanation.

20   But it is to me a somewhat arbitrary reduction;

21   although to the benefit, as he says, to the

22   defendants, perhaps, but there's no support for that

23   reduction, no reliable support.

24         He also assumed in his projections that the

25   programming would air on the PAX or adjacent to or

1    after or during the PAX broadcast and would reach

2    the same number of viewers that a markedly different

3    program would, and I do not find sufficiently

4    reliable data to support that assumption.

5        Likewise, the advertising revenue that he

6    projects is premised on the Memphis viewership,

7    again, and there's no reliable data to support this

8    assumption as he projects the advertising revenue

9    from those 25 markets.

10       Lastly, he allowed a $275,000 projection for a

11   comedy special.  On page five of his supplemental

12   report he explains this.  He says something to the

13   effect that, quote, "It is not conceivable," closed

14   quote, that a show -- and again, I'm not quoting,

15   perhaps I should.

16       Rather than misquote him, let me just read

17   from the report at page five.  Quote, "Based on the

18   success of various other ventures, it is

19   inconceivable that Mick Foley's comedy special could

20   not have generated at least $500,000 in first run

21   and repeat income.  Our projections were drawn from

22   a report in 2000 and costs have not decreased since

23   then.  I have allowed a figure of only 275,000 for

24   the sale of this show," end quote.

25       I find that that opinion is premised on

 1    certain assumptions and that it is not based on

 2    reliable data.  Is it something that an entrepreneur

 3    might consider?  Of course.  But it does not rest on

 4    reliable and adequate data to support that projected

 5    revenue.  Therefore, I am disallowing his opinions

 6    on television-related revenue.

 7        With respect to pay-per-view, Mr. Bowman

 8    acknowledges that a key number for his projections

 9    is the percentage of viewers who would have

10    purchased or would purchase pay-per-view.  First he

11    derives a 4.4 percentage of viewership from looking

12    at the WWE and TNA viewership of 4.5 and 4.3 percent

13    respectively, the only companies he found that

14    offered pay-per-view products.

15        Dissimilarities aside, and which he

16    acknowledged and considered, I don't find his

17    conclusion or extrapolation, if you will, I think he

18    called it a median, of 4.4 percent to be

19    problematic.  I do, however, find that as applied to

20    pay-per-view, his methodology is not sufficiently

21    reliable.

22        He essentially took the 4.4 percent, as I

23    understand it, from the television viewing audience.

24    He calculated it for Wrestlereunion and applied that

25    4.4 percent to the same viewership in the 25 markets

1       that he extrapolated from the Memphis viewership of

2       5.9 percent for the same reasons that television

3       projections are not reliable.  The pay-per-view

4       projections are likewise unreliable, because they're

5       premised on that Memphis regional market, and I find

6       that he is not able to, under 702, express opinions

7       or testify as to opinions concerning projections for

8       pay-per-view.

9            We have six other categories of revenue

10      identified by Mr. Bowman:  Internet sales, live

11      gate, convention attendance, essentially the same,

12      training camps, got some international convention

13      attendance, merchandise sales and licensing, all

14      projected sources of revenue for this venue had it

15      succeeded and lasted for the period over which he

16      projected profits and expenses.

17           I find that his projections for these six

18      areas of revenue or sources of revenue are too

19      speculative to quantify based on his explanations

20      and methodology.  I have read *TVT Records* versus

21      *Island Def Jam Music Group* cited by the plaintiff,

22      250 F. Supp. 2nd 341 at page 349, which I think

23      supports my finding.

24           I also have read the Florida decisions in

25      *Florida Sunrise* at 942 So.2d 421 and *Haliburton* at

1    672 So.2d 844.  All of these cases are instructive

2    on the requirement that proof be sufficiently reliable

3    and that there be a reasonable degree of certainty

4    involved in projecting lost income.

5        Mr. Bowman assumes in his projections not only

6    that the plaintiff's business venture would be

7    successful with respect to its conventions and live

8    shows, but that there was some correlation between

9    Clear Channel's involvement and the plaintiff's

10   success.

11       I have listened carefully to the testimony,

12   and I understand that that was an expectation, perhaps

13   not an illogical expectation, on the part of the

14   plaintiff.  But for an expert to make that assumption

15   crosses into that area of speculativeness that I find

16   makes his opinions unreliable.  It simply is not based

17   on reliable data.

18       Some of the cases talk about a wish list of

19   success, and that's essentially what we've got here.

20   Certainly, the plaintiff is entitled to consider

21   these sources of revenue in making business

22   decisions and investment decisions, but an expert

23   cannot make the assumptions that are necessarily

24   made in predicting net profits than an entrepreneur

25   is entitled to make.

1              An expert must base those projections on

2       reliable data and cannot assume something for which

3       there's not a factual basis in support for, and I

4       find that his assumptions are not premised on

5       reliable data.

6              Parenthetically, I would also add that these

7       areas of projected profits are not contemplated in

8       the party's agreement, and there are a number of

9       cases really addressing causation that preclude the

10      recovery of net profits premised on sources that are

11      not contemplated by the agreement of the parties.

12      For example, *Douglas Fertilizers* versus *McClung* at

13      459 So.2d 335, a Florida decision from the Fifth

14      District Court of Appeals, 1984; *Haliburton* talks

15      about that, I think.  There are a lot -- a number of

16      cases that discuss that premise.

17             So I find that Mr. Bowman, although his effort

18      is commendable and certainly would have been

19      something the plaintiff would benefit by in making

20      investment decisions, is not able to testify under

21      702 as an expert with respect to these other sources

22      of revenue.

23             That concludes my ruling on the defendant's

24      *Daubert* motion, which, for the record, is Docket

25      Number 66.  I have granted it in part and,

1    therefore, denied it in part by virtue of my ruling

2    today.  I do not intend to reduce this part of my

3    ruling to writing, but I certainly wanted the

4    parties and Mr. Bowman to have the benefit of my

5    findings and I will not revisit them.

6         That should assist you, Mr. Rodems, in

7    tailoring your testimony.  He's going to have to go

8    back and recompute his numbers based on the DVD

9    sales, which I think he could probably do fairly

10   easily.  But he'll have enough time, I would think,

11   during the continuation of Mr. Corrente's testimony

12   to do that, if you intend to call him after

13   Mr. Corrente.

14        Now, I don't know what that does with respect

15   to the defendant's proposed expert, Mr. Durham.

16   Mr. Gregory -- I'm sorry, Mr. Herbert.  Mr. Gregory

17   Herbert.  I'll start calling you by your full name.

18        MR. HERBERT:  That's fine.  No.  We would --

19   no need for Dr. Durham to testify under the Court's

20   ruling.

21        THE COURT:  That moots, then, the plaintiff's

22   motion to strike Mr. Durham from the defendant's

23   witness list.

24        All right.  Take a short comfort break, let's

25   get the jury in here, maybe five minutes.

1              (Recess was taken at 9:20 until 9:32 AM.)

2              (Back on the record.)

3              COURTROOM SECURITY OFFICER:  All rise.  This

4     Honorable Court is again in session.

5              Please be seated.

6              THE COURT:  Are we ready?

7              MR. RODEMS:  Your Honor, would it be possible

8     if we could have an additional five minutes?  We're

9     talking.

10             THE COURT:  Certainly.  Just tell the jury --

11    don't tell the jury that, but tell them we'll be

12    with them in about five minutes.  That's fine.  Yes,

13    sir?

14             MR. RODEMS:  Mr. Herbert and I would like to

15    approach at sidebar off-the-record, if we may.

16             THE COURT:  Hum.  The off-the-record part is

17    what bothers me.  Sidebar is fine.

18             MR. RODEMS:  On-the-record.

19             THE COURT:  Come on up.

20             (At sidebar, on the record.)

21             THE COURT:  Do you all stipulate to be

22    off-the-record?

23             MR. RODEMS:  Yes.

24             MR. HERBERT:  Yes, sir.

25             (Discussion was held off the record.)

```
 1                    (End of sidebar discussion.)

 2                    (Recess was taken at 9:43 until 9:50 AM.)

 3                    (Back on the record.)

 4              COURTROOM SECURITY OFFICER:  All rise.  This

 5     Honorable Court is again in session.

 6              Please be seated.

 7              THE COURT:  Are we ready?

 8              MR. RODEMS:  I think the marshal went to find

 9     Mr. Herbert.

10              MS. MILLNER:  He's gone back to the hotel.

11     You're stuck with me today.

12              MR. RODEMS:  Okay.

13              THE COURT:  All right.  Let's bring the jury

14     in, please.

15              MS. MILLNER:  Your Honor, I have an expert in

16     the courtroom.  Can he stay for Mr. Corrente and

17     Mr. Behrens?

18              THE COURT:  Any objection?

19              COURTROOM SECURITY OFFICER:  Rise for the

20     jury.

21              MR. RODEMS:  No, Your Honor.

22              (Jury in at 9:50 AM.)

23              COURTROOM SECURITY OFFICER:  Please be seated.

24              THE COURT:  Well, good morning.  We've been

25     waiting on y'all.  Where've you been?
```

1          Let me explain a couple of things.  Number

2     one, the lawyers and I have met the last two

3     mornings at 8:00 in the morning discussing

4     evidentiary issues and matters, and we likewise met

5     again this morning.  I was actually here about 7:35

6     with my staff.

7          But we've had to address some fairly

8     substantial issues, and I needed to announce some

9     rulings on those issues and that's what's caused the

10    delay this morning.  I apologize for that, but it's

11    one of those things that is required as a trial

12    progresses.  We can't always anticipate and get

13    these evidentiary issues resolved before we start

14    the trial.  So I apologize and please bear with us

15    and certainly don't hold that against either of the

16    parties.

17         You may resume direct examination.

18         MR. RODEMS:  Thank you, Your Honor.

19              DIRECT EXAMINATION (Continued)

20    BY MR. RODEMS:

21    Q     Mr. Corrente, the first time that you spoke

22    to Steve Sterling before the contract was signed,

23    did he tell you or were you aware about the A&E

24    biography that Clear Channel was contemplating?

25    A     I became aware of the A&E biography.  I can't

1    a hundred percent tell you when, but we absolutely

2    knew about it before the agreement was signed.

3    Q      Did Mr. Sterling tell you that there was a

4    deal in place with A&E?

5    A      My company was under the impression that there

6    was a firm deal in place with A&E.

7    Q      And where did that information come from?

8    A      I would assume that it came from Steve

9    Sterling.  The only other person it could have

10   possibly come from would have been Eric Paulen, but

11   that's the assumption that we were all working

12   under.

13   Q      Okay.  Focusing on that first conversation

14   with Mr. Sterling, was there a discussion about what

15   your intentions were for the Wrestlereunion concept?

16   A      Yes, sir.

17   Q      What was that discussion?

18   A      Well, he knew we were going to be a

19   multi-event company looking to appeal domestically

20   and internationally.  That was one of the reasons

21   that we put the Funks back together as a team, for

22   the international appeal of that.  These guys had

23   worldwide appeal and hadn't teamed together in 10

24   years.  We knew there would be interest in that.

25   Q      So he understood that this was a fan

 1      convention business?

 2      A       Absolutely.

 3      Q       And was there some discussion at all about

 4      doing what you did for what's been called

 5      Wrestlereunion III, the day of the event where you

 6      have a wrestling-only show?

 7      A       Yes.

 8      Q       Okay.  When you finally received the contract,

 9      did you and Mr. Sterling discuss the all-in

10      commitment of 235 -- 235,000?

11      A       Yes, sir.

12      Q       What did he tell you?

13              MS. MILLNER:  Objection, Your Honor, parole

14      evidence.

15              THE COURT:  Response?

16              MR. RODEMS:  Your Honor, this goes to what the

17      discussion was about the first event and then --

18              THE COURT:  Not intended to vary the terms of

19      the agreement?

20              MR. RODEMS:  No, sir.

21              THE COURT:  All right.  I'll overrule the

22      objection.

23              THE WITNESS:  He told us we had a budget of

24      around $235,000 to put on the event.

25      BY MR. RODEMS:

1    Q      Was there any --

2    A      When I say we, their budget was $235,000 to

3    produce the event.

4    Q      Which event?

5           MS. MILLNER:   Same objection, Your Honor, it's

6    contrary to the terms.

7           THE COURT:   Overruled.

8    BY MR. RODEMS:

9    Q      Which event are you talking about?

10   A      Wrestlereunion I.

11   Q      Okay.  Now, did Wrestlereunion have any

12   responsibility for the audio or videotaping of

13   events?

14   A      No, sir.

15   Q      If Clear Channel Entertainment Television

16   wanted music for the audio recording of the event,

17   who was supposed to provide it?

18   A      They were, the production company.

19   Q      Did anyone from Clear Channel ask you, and I

20   mean Wrestlereunion, LLC, to provide music for the

21   event?

22   A      No, sir.

23   Q      Okay.  Did you become aware that it was

24   brought to Mr. Paulen's attention that there was no

25   music for the first Wrestlereunion event?

1        A       At some point I guess I became aware of it,

2       but I was busy running around focusing on the live

3       event.

4        Q       Okay.  You are aware that eventually Mr. Hart

5       was requested to provide some music and he did so?

6        A       Yes.

7        Q       Okay.  Now, you know -- after the event did

8       you receive -- strike that.

9                After Wrestlereunion I, did you call

10      Mr. Sterling regarding the music that Mr. Hart had

11      provided and the payment for that?

12       A       Yes.

13       Q       How many times?

14       A       Numerous times.  I wouldn't have an exact

15      count but I'm sure it was more than five.

16       Q       What was the nature of your calls?  What were

17      you calling him about?

18       A       So they could take care of the arrangements

19      with Jimmy Hart as far as securing his music rights.

20       Q       Okay.  After Wrestlereunion I, when were you

21      expecting the DVDs that would be made of the event

22      to hit the marketplace?

23               MS. MILLNER:  Objection, Your Honor,

24      relevance.

25               THE COURT:  Overruled.

1          THE WITNESS:  Well, again, Mr. Sterling had

2    guaranteed us within 90 days to six months the

3    revenue would start flowing in.  I was certainly

4    expecting the DVDs in the market before 90 days.

5    That would be the absolute maximum.  I'm not even

6    sure how you could say 90 days, but in his own words

7    that would have been the furthest time.

8    BY MR. RODEMS:

9    Q     Let me show you what's been admitted into

10   evidence as Plaintiff's Exhibit 123.  This is an

11   e-mail from Mr. Sterling to Mr. Townley dated March

12   9 of 2005.  And it says, what do you think the

13   timing might be for getting this in the bag?  And it

14   refers to the WWE events interview.  As discussed, I

15   just want to be able to keep the Wrestlereunion dist

16   plan low-key until Vince is in the can on the A&E

17   show.

18          Were you ever told at any time by Mr. Sterling

19   that the Wrestlereunion distribution plan was being

20   kept low-key because Clear Channel was trying to

21   secure Mr. Vince McMahon to participate in the A&E

22   show?

23   A     No, I was not.

24   Q     Mr. Sterling also writes, obviously, many of

25   the best outlets/distributions are the ones who

1    already handle WWE, so we need to keep the timing

2    straight.

3         Were you aware of the distribution outlets

4    that he was talking about that WWE also operated in?

5    A    No, sir.

6    Q    Okay.  Did he ever at any time tell you that,

7    that we need to keep the timing straight so that we

8    can get Vince signed up, Mr. McMahon?

9    A    No, sir.  There was never any discussion

10   between myself and Steve Sterling or anyone else at

11   Clear Channel regarding any WWE efforts that would

12   affect my company.

13   Q    And this e-mail was issued on March 9th of

14   2005.  Let me show you what's been entered into

15   evidence as Exhibit 124.  This is an e-mail from

16   Mr. Paulen to Mr. Sterling and there was discussion

17   about the cover art.  At this stage, around May 5th

18   of 2005, were the -- was Clear Channel in the

19   process of finally issuing the four shoot

20   interviews?

21   A    Yes.

22   Q    Okay.  Were you given any copies of things

23   like cover art to review?

24   A    That would have been something that Mr. Russen

25   would have probably done if we were.

1    Q      Okay.  Were you aware that as late as May 5th

2    of 2005, Clear Channel was still debating whether it

3    should keep its relationship with Wrestlereunion

4    secret in contemplation of getting Mr. McMahon from

5    the WWE to agree to the interview?

6    A      No, sir.

7    Q      Let me show you what's been admitted into

8    evidence as Exhibit 126.  This is an e-mail from

9    Mr. Sterling dated June 6th, 2005, to Mr. Gallarello

10   and Paulen with a copy to Joe Townley, subject

11   Wrestlereunion.  Were you aware that the original

12   approach is that Clear Channel would come out of the

13   first event and have an entire product line in this

14   genre from one production outing and ride on the

15   coattails of the A&E telecast while being clear of

16   any WWE turbulence by then?

17   A      No, I was not.

18   Q      Were you aware that there was a concern at

19   Clear Channel as late as June 6th, that if the A&E

20   project was not going to come about, they needed to

21   move ahead and try to do something with the

22   Wrestlereunion project?

23   A      No, sir.

24   Q      During this time period, now we're talking

25   June of 2005, were you in the midst of planning

1      Wrestlereunion II?

2      A      Yes, I was.

3      Q      Did you have any idea that the matches from

4      Wrestlereunion and the remaining shoot interviews

5      were not being processed and readied to be entered

6      into the market for sale?

7      A      No, sir.

8      Q      By the way, what was the most valuable part of

9      the Wrestlereunion events?  What had the most market

10     value?

11     A      Well, the matches, certainly.

12     Q      Okay.  Did you make Mr. Sterling aware of

13     this?

14     A      Yes.

15     Q      Okay.  Let me show you what's been admitted

16     into evidence as Plaintiff's Exhibit 41.  This is an

17     e-mail dated March 7, 2005.  Mr. Sterling said, I

18     had not heard from anyone before that they were

19     getting preorders and also that the Sat events were

20     one of key sales.  I thought they told us it was all

21     about the shoot interviews.

22            Were you aware that as late as March 7, 2005,

23     that Mr. Sterling didn't understand that the most

24     valuable component was the wrestling matches?

25     A      No, sir.  It's very surprising to me.

1    Q      Mr. Corrente, let me show you what's been

2    admitted into evidence as Exhibit 43, Plaintiff's

3    Exhibit 43.   This is an e-mail from Mr. Paulen to

4    Johnny Gallarello dated June 1st, 2005.   Now, this

5    is how long after the first Wrestlereunion event?

6    A      Well, certainly five months, I guess.

7    Q      Were you aware as late as June 1st, 2005, that

8    Clear Channel had not edited or cut any of these

9    Wrestlereunion matches?

10   A      No, sir.

11   Q      Were you under the impression that they were

12   in the process of moving forward with getting the

13   product into the marketplace during this time period

14   when you were planning Wrestlereunion II?

15   A      The only thing that someone at Clear Channel

16   explained to us, and it may have been Eric Paulen,

17   it may have been Steve Sterling, that due to the

18   fact that they didn't bring a truck to

19   Wrestlereunion I, the editing was taking them more

20   time than they had estimated, but we had no idea

21   that that meant nobody was working on it at all.

22   Q      Now, the Valley Forge event was on August 26

23   through 28, 2005?

24   A      Yes, sir.

25   Q      Okay.   Let me show you what's been marked and

1    admitted into evidence as Plaintiff's Exhibit 28.

2    The Valley Forge show was announced on April 11th of

3    2005; is that correct?

4    A       Yes, it is.

5    Q       Okay.  Four days before the event you received

6    this e-mail from Mr. Sterling?

7    A       Yes, I did.

8    Q       Okay.  Now, the agreement that you signed on

9    January 21st, 2005, just prior to Wrestlereunion I,

10   you understood that that applied to Wrestlereunion

11   I; correct?

12   A       Yes.

13   Q       Okay.  And here Mr. Sterling is asking you to

14   confirm that for Wrestlereunion II, the parties will

15   conduct themselves in connection with the same terms

16   as the first agreement?

17   A       Yes, he is.

18   Q       Okay.  Now, the language is, all terms and

19   conditions are the same, including the program

20   budget as provided for.  What was the program budget

21   provided for, for Wrestlereunion I?

22   A       $235,000 or approximately $235,000.

23   Q       Okay.  Was there any discussion between you

24   and Mr. Sterling about the fact that for

25   Wrestlereunion II they were planning on bringing a

1    full scale live-to-tape high definition mobile unit

2    and crew?

3    A      Yes, which was their intention for

4    Wrestlereunion I.  They just never did it.

5    Q      Okay.  And did you have an understanding that

6    there was a significant cost for that full scale

7    live-to-tape high definition mobile unit?

8    A      Well, I didn't know the specific cost of it

9    but, again, they were planning it for Wrestlereunion

10   I.  My assumption was that it was in the $235,000

11   number and that whatever the cost is it would be

12   covered by the $235,000 number for Wrestlereunion

13   II.

14   Q      Okay.  And did you respond to this e-mail?

15   A      Yes, I did.

16   Q      When you received the e-mail on August 23rd,

17   2005, were you aware that distribution had been

18   delayed because of the WWE issue with Vince McMahon?

19   A      No, I was not.

20   Q      Were you aware at that time when Mr. Sterling

21   wanted you to confirm that the January 21st terms

22   would apply to the second Wrestlereunion, were you

23   aware that Mr. Sterling did not understand that the

24   matches were the most important part of the program?

25          MS. MILLNER:  Objection, Your Honor, calling

1    for speculation, what Mr. Sterling knew or didn't

2    know.

3           THE COURT:  Rephrase it, please.  Sustained.

4    BY MR. RODEMS:

5    Q      Mr. Corrente, you saw the exhibit earlier in

6    which Mr. Sterling said he thought the shoot

7    interviews were the key buy?

8    A      Yes, I did.

9    Q      When Mr. Sterling presented this e-mail to you

10   on August 23rd, 2005, did you know that that was

11   what he thought?

12   A      No, sir, I did not.

13   Q      Okay.  Did you know on August 23rd, 2005, that

14   as late as June 1st they had not started editing the

15   Wrestlereunion I matches?

16   A      No, sir, I did not.

17   Q      Let me show you what's been marked and

18   admitted into evidence as Plaintiff's Exhibit 29.

19   This is an e-mail from you to Mr. Sterling dated

20   August 24th?

21   A      Yes.

22   Q      2005?

23   A      Yes.

24   Q      And it says, Wrestlereunion confirmation?

25   A      Yes.

1      Q      Did you confirm we are operating under the

2      terms of the original agreement?

3      A      Yes, I did.

4      Q      Okay.  Did you also raise to his attention

5      that you were looking for event sponsors but there

6      was a problem with that?

7      A      Yes, I did.

8      Q      Okay.  Explain what the problem was.

9      A      Well, event sponsors are looking for some sort

10     of a production schedule from you that gives them an

11     understanding of what they might be getting for

12     their money and when they would be getting it.

13     Q      When you say, an event sponsor, why would the

14     event sponsor have any concern about when the DVDs

15     would be hitting the marketplace?

16     A      Well, depending on how their name is branded

17     throughout the event, maybe it's on a ring cover,

18     maybe it's around the ring, things like that they

19     want to know when that's going to be distributed in

20     the marketplace.

21     Q      For example, if you had reached a sponsorship

22     deal with Anheuser-Busch you might have had the

23     Budweiser logo in the ring?

24     A      Correct.

25     Q      And then every time somebody watched the DVD,

1      they would see the Budweiser logo?

2      A      Correct.

3      Q      Is that the type sponsorships you were seeking

4      for Wrestlereunion II?

5      A      Yes, those types of things.

6      Q      And when you talked to sponsors, were there

7      questions raised about, well, when is the product

8      going to hit the market?

9             MS. MILLNER:   Objection, Your Honor, calls for

10     hearsay.

11     BY MR. RODEMS:

12     Q      Were you able to make revenues off of

13     sponsorships for Wrestlereunion II for things like

14     the logo on the ring?

15     A      No.  We were really not able to get into any

16     real discussion with sponsors because, you know, it

17     came to our attention quickly they wanted a release

18     schedule of things, whether that be television,

19     DVDs.  Anything that you were doing they wanted a

20     predetermined release schedule, so we really had no

21     discussions.

22     Q      Okay.  Had you been promised by Clear Channel

23     that you would be allowed to sell DVDs of the

24     matches from Wrestlereunion I at the Wrestlereunion

25     II event?

1    A      Yes.  We were under the understanding that all

2    media that was to be put on DVD would be available

3    for Wrestlereunion II.

4    Q      Did you receive them?

5    A      Well, we received some is my understanding.

6    Q      Of the matches?

7    A      Of the matches, no, nothing.

8    Q      Okay.

9    A      No.  Only the four shoot interviews that have

10   been talked about were brought down there.

11   Q      But to this day there's no matches that have

12   ever been put on sale?

13   A      Absolutely not.

14   Q      Mr. Sterling, (sic) let me show you Exhibit

15   31, Plaintiff's Exhibit 31 that's been put into

16   evidence.  This is dated August 19th, 2005.  Had you

17   had discussions with Mr. Paulen about a release date

18   for Wrestlereunion products so that you could come

19   up with a strategy?

20   A      Yes.  Mr. Paulen, I mean, eventually became

21   more communicative with us and, you know, the

22   struggles to get Mr. Sterling on the phone became

23   exhaustive so, you know, we would have to try and

24   transmit messages through him with the hopes that he

25   could deliver them to Mr. Sterling.

1        Q      All right.  Let's talk about the

2    Wrestlereunion II and Valley Forge.  How did the

3    attendance compare to Wrestlereunion I?  Was it

4    better?

5        A      Yeah.

6        Q      Okay.  Would you take a look at Exhibit 33.

7    Do you recognize that?

8        A      Am I supposed to be going into the book?

9        Q      Yes, sir.

10       A      Oh, I'm sorry.

11       Q      I'm sorry, I didn't make that clear.  I

12   apologize.

13       A      Do you have this publicity piece here, is that

14   right?

15       Q      Yes, sir.  Do you recognize Exhibit 33?

16       A      Yes.

17       Q      What is it?

18       A      It's an advertising -- advertising slick or

19   piece for Wrestlereunion II.

20       Q      And does that accurately reflect the poster

21   size of that event?

22       A      We had this, I think, in a couple different

23   forms.  This is certainly one form.

24       Q      Okay.

25              MR. RODEMS:  Your Honor, I'd move Exhibit 33

1      into evidence.

2              THE COURT:  Any objection?

3              MS. MILLNER:  No, Your Honor.  I thought it

4      was in evidence.

5              THE COURT:  I'm sorry?

6              MS. MILLNER:  I thought it was in evidence.

7              THE COURT:  33?  Is it 133 or 33?

8              MR. RODEMS:  33, Your Honor.

9              THE COURT:  Well, I'll go ahead and receive

10     it.

11             COURTROOM DEPUTY CLERK:  Your Honor, it's not

12     in evidence.

13             THE COURT:  All right.  Plaintiff's 33 is

14     received.

15             (Whereupon, Plaintiff's Exhibit Number 33 was

16     received into evidence.)

17             MS. MILLNER:  Can we not display things before

18     it's in evidence?  Is this in?  Is this in?  Okay.

19     BY MR. RODEMS:

20     Q     Now, Mr. Corrente, this was a full-size

21     poster.  And was this used to promote the Valley

22     Forge event?

23     A     Yes, it was.

24     Q     And you didn't have a billboard available to

25     promote the Valley Forge event; did you?

1     A      No, sir.

2     Q      You did ask for one?

3     A      Yes, sir.

4     Q      You were offered one at one-seventh?

5     A      Yes, I was.

6     Q      And was that ever provided for you?

7     A      No, sir, it was not.

8     Q      Did Mr. Sterling attend the second

9     Wrestlereunion?

10    A      Yes, he did.

11    Q      How did the event you staged turn out?  Let's

12    start with the Bruno dinner, Bruno Sammartino

13    tribute dinner.

14    A      I felt it was a very good event.

15    Q      And there's been some discussion about the

16    Mick Foley comedy special.  Did you attend that?

17    A      Yes, I was there for some of it.  I was not

18    there for the entire event.

19    Q      Okay.  Those were two things that you did not

20    have at the first Wrestlereunion?

21    A      That's correct, sir.

22    Q      Okay.  But you did have the full fan

23    convention?

24    A      Yes, sir.

25    Q      Okay.  Did you have a chance to talk with

1    Steve Sterling after the Wrestlereunion II event?

2    A       Yes, sir.  We had a lengthy conversation.

3    Q       Okay.  Did Mr. Sterling express anything

4    negative about Wrestlereunion?

5    A       No, sir, he did not.

6    Q       About the event?

7    A       No, sir, he did not.

8    Q       Were you happier with the attendance at

9    Wrestlereunion II?

10   A       The attention -- the attendance had more than

11   doubled so, sure, we were very happy with that.

12   Q       All right.  Now, even before Wrestlereunion II

13   took place, there were efforts under way to schedule

14   what's been called Wrestlereunion III, the Davie

15   event, Legends Collide; is that correct?

16   A       Yes, sir, it is.

17   Q       Let me show you what's been entered into

18   evidence as Plaintiff's Exhibit 32.  This is an

19   e-mail dated July 19th, 2005, from Mr. Russen to

20   Mr. Gallarello?

21   A       Yes, it is.

22   Q       And it confirms that you and Mr. Gallarello

23   have been talking back and forth about filming the

24   September 10th wrestling card in Davie, Florida?

25   A       Yes.

1    Q      Why was the wrestling card in Davie, Florida

2    scheduled?

3    A      Mr. Sterling had advised us that he needed to

4    build a library of stuff because he was pursuing

5    television syndication and, you know, that he needed

6    either 16 weeks or 32 weeks, something like that,

7    depending on what syndicators purchased.

8    Q      Okay.  And let me show you what's been

9    admitted into evidence as Plaintiff's Exhibit 35.

10   As of July 21st, 2005, Mr. Sterling was of the

11   opinion, based on this e-mail, no question -- strike

12   that.

13          Mr. Sterling wrote on July 21st, 2005, no

14   question that the thing we are most short of is more

15   actual wrestling.  Every TV/DVD outlet I am talking

16   to wants to know how much wrestling there will be."

17          Had Mr. Sterling said to you at any time

18   around the July period that we're not going to cover

19   Wrestlereunion III because of low attendance or any

20   other problems with either of the first two events?

21   A      Absolutely not.

22   Q      Was it your understanding that Clear Channel

23   Entertainment was, in fact, going to cover the

24   event?

25   A      Yes, it was.

Corrente - Direct

```
 1    Q      Did you have conversations with Mr. Paulen

 2    about that?

 3    A      Yes.  I had conversations with Mr. Paulen

 4    about that.

 5    Q      Let me show you what's been marked as

 6    Plaintiff's Exhibit 36.  This is an e-mail from

 7    Mr. Paulen to Dawn Olejar dated August 9th.  P.S.

 8    We're really going to film the wrestling show in

 9    Davie?  Response, yes.

10           That was as of August 9th, 2005.  That was

11    three or four weeks before Wrestlereunion II was

12    scheduled in Valley Forge; correct?

13    A      Approximately, yes.

14    Q      Okay.  Now, with the Wrestlereunion III show

15    in Davie, the wrestling only show, did

16    Wrestlereunion offer Clear Channel the opportunity

17    to come and view the venue as had been done for

18    Wrestlereunion II?

19    A      Yes, we did.

20    Q      And did someone come and inspect it?

21    A      Yes.  Dawn Olejar.  And there may have been

22    somebody else, but absolutely Dawn Olejar was there

23    and it was her responsibility.

24    Q      Where was the venue for Wrestlereunion III?

25    A      Davie, Florida.
```

1       Q       But where specifically?

2       A       Davie Rodeo Arena.

3       Q       Was there any significance to the Rodeo Arena?

4       A       The Rodeo Arena had held many Florida

5       Championship wrestling matches, things like that in

6       the past.

7       Q       Did Ms. Olejar express any reservations about

8       the facility?

9       A       No, sir, she did not.

10      Q       Now, did there come a point at which you

11      became aware that Clear Channel was trying to back

12      out of its responsibility to film this event?

13      A       Yes.

14      Q       And when did you become aware of that?

15      A       Maybe 48 hours before the event.

16      Q       Let me show you Exhibit 38, Plaintiff's

17      Exhibit 38, which has been moved into evidence.

18      This is an e-mail from Mr. Townley to Dawn Olejar

19      and Steve Sterling dated August 31st, 2005.  And he

20      writes:  I did not realize we had a third wrestling

21      shoot coming up.  Do we really need to shoot this

22      one?  Have we done a P and L on this project?  Do we

23      not have enough of this material going out to the

24      market now?

25              There was no footage of matches going out to

1    the market; was there?

2    A       No, sir.

3    Q       Were you aware at the time that you were

4    planning Wrestlereunion II and Wrestlereunion III

5    that Clear Channel Entertainment Television was

6    going through a corporate spinoff?

7    A       No, sir.  Steve Sterling didn't mention it in

8    the meeting.

9    Q       And Mr. Townley was the president of Clear

10   Channel Entertainment Television?

11   A       Yes.

12   Q       When you learned that he was planning not to

13   cover Wrestlereunion III, did you speak to him?

14   A       Yes, I did.

15   Q       Did he ever tell you why they wanted to not

16   cover Wrestlereunion III?

17   A       He made a reference to things like getting --

18   you know, let's get what we got out in the

19   marketplace and, you know, things like that.  But,

20   you know, it was 48 hours before.

21   Q       Did he ever say to you that the quality of the

22   Wrestlereunion events was low?

23   A       No.

24   Q       Did he ever say to you that there was a

25   problem with the venue?

1    A       No, sir.

2    Q       Did he say to you that the attendance at the

3    previous events was too low?

4    A       No, sir.

5    Q       Okay.  And by the way, from the beginning was

6    it made clear to Mr. Sterling that this was a fan

7    convention that would be limited to a maximum of a

8    thousand fans?

9    A       I would say that we certainly had -- we

10   certainly had some discussions about crowd.

11   Q       In the first occasion that you spoke with

12   Mr. Sterling, did you discuss what the concept of

13   Wrestlereunion was?

14   A       Oh, absolutely.

15   Q       What was the concept of Wrestlereunion?

16   A       Well, a fan gathering where the wrestlers and

17   the fans could interact and bring back old feuds and

18   things, things like that.

19   Q       And you told him that it was scheduled at the

20   grand ballroom at the Westshore Doubletree?

21   A       Absolutely.

22   Q       Was there any impression that it was going to

23   be a crowd the size of the Wrestle Mania DVD that

24   was shown?

25   A       Absolutely not.

1    Q      Okay.

2    A      Quite honestly, he didn't put a huge emphasis

3    on that at all.

4    Q      All right.  Let me show you -- who didn't put

5    an emphasis on that?

6    A      Mr. Sterling.

7    Q      At any time?

8    A      At any time.

9    Q      All right.  Let me show you what's been marked

10   as Plaintiff's Exhibit 40.  This is an e-mail,

11   series of e-mails, beginning with Mr. Townley's

12   dated September 1st, stating that they will not be

13   proceeding.  And then the e-mail from Mr. Paulen to

14   Mr. Sterling, what happened, can you give me some

15   details?

16         And then Mr. Sterling reports, got a call from

17   Joe last night who told me that unless I told him

18   the Davie shoot was imperative he did not want to do

19   it because he needs to see revenue in on this

20   property and feels very deep in.  He told me he was

21   pulling the plug.  That's the short and sweet of it.

22         Now, during this time period, did anybody say

23   to you, look, we're going through a spinoff, we've

24   got to control costs?

25   A      No, sir.

1    Q      You finally had a telephone conversation with

2    Mr. Townley about this issue?

3    A      Yes, sir.

4    Q      Tell us what was discussed in that

5    conversation.

6    A      Well, from his perspective he was calling to

7    tell me that they weren't coming and, you know, I

8    explained to him that they needed to come.

9    Q      Why?

10   A      We had an obligation, we had a commitment, we

11   had tickets sold, we had, you know, plans.  Where

12   would we get another crew on two day's notice to

13   film?  And quite honestly, they had been crystal

14   clear that no one was going to put out a

15   Wrestlereunion product other than Clear Channel,

16   anyway.  So whether we got another production

17   company or not, they weren't going to be able to put

18   it out.

19   Q      So what was in -- how many conversations total

20   did you have with Mr. Townley?

21   A      On this particular topic?

22   Q      Yes.

23   A      I would say two.

24   Q      Okay.  What was the outcome at the end of the

25   first conversation with Mr. Townley?

1      A       He was going to consult with his legal

2      department.

3      Q       And did you have a second conversation with

4      Mr. Townley?

5      A       Yes.

6      Q       And was that just between you and Mr. Townley?

7      A       No, sir, it was not.  He had located Steve

8      Sterling.  I believe Steve was in California at the

9      time, and he had Steve on the phone with him.

10     Q       Okay.  And what was that discussion?

11     A       He was basically trying to get Steve to settle

12     the dispute.  You know, Joe certainly had his

13     opinion, Mr. Townley, and I had my opinion, and he

14     asked Steve for his opinion.  And what I can tell

15     you is that Steve said, Joe, Sal's interpretation is

16     the right one and we need to -- we need to do this.

17     And they basically said that they were coming and

18     they did come and film the event.

19     Q       Okay.  And the event took place on September

20     10th?

21     A       2005.  Yes, sir.

22     Q       In Davie?

23     A       Yes, sir.

24     Q       And you were, of course, in the courtroom

25     earlier in the trial when we played footage of the

1      Dusty Rhodes/Terry Funk portion of that event?

2      A      Yes, sir.

3      Q      That was a match that was on that card?

4      A      Yes, sir.

5      Q      Okay.  And you don't have to give me all the

6      names, but were there other people that were on the

7      card that night?

8      A      Yes.

9      Q      Who were they?  Just give me a few.

10     A      The Midnight Express, the team 3-D, which were

11     the former Dudley Boys, Mike Graham, Tully

12     Blanchard, J. J. Dillon, Ron Bass, all these names

13     that competed in the state of Florida.

14     Q      Mick Foley?

15     A      Yes, Mick Foley.

16     Q      Okay.  And what was the attendance at this

17     event?

18     A      Somewhere in the thousand range.

19     Q      Okay.  After Wrestlereunion III in Davie, did

20     Clear Channel Entertainment Television keep you

21     informed of where things stood with getting the

22     product into the marketplace?

23     A      Not necessarily.  We had to finally request a

24     meeting of some kind face-to-face to feel -- you

25     know, communication was very weak, besides, outside

1        of Mr. Paulen.  You could certainly count on a

2        return call from him, but it wasn't his thing.  He

3        didn't really have information.  The best he could

4        be was an intermediary.  So we finally sent e-mails

5        asking for an onsite meeting.

6        Q       Did you ever learn whether anyone at Clear

7        Channel Entertainment Television had experience in

8        editing professional wrestling matches?

9        A       To my knowledge no one there had experience

10       editing professional wrestling.

11       Q       Did you ever offer Clear Channel any

12       assistance with the editing function?

13       A       On numerous occasions.

14       Q       What did you offer?

15       A       Jimmy Hart and/or Rob Russen or both to go up

16       there and sit with them.  I mean, we knew that the

17       editing, if somebody would just sit down and do it,

18       wouldn't take all that long.

19       Q       Did you find out whether anyone at Clear

20       Channel Entertainment Television was familiar with

21       selling wrestling programming?

22       A       We had no knowledge that they were.  I think

23       to this day they would tell you themselves that they

24       didn't have any expertise with it.

25       Q       Did you offer any assistance in the marketing

1       of the Wrestlereunion products?

2       A       Yes, sir.   We offered any assistance to Clear

3       Channel in any matter involving our project.   And

4       quite honestly, if they had asked us for anything,

5       if it was within the realm of my company to be able

6       to do it, if they were a partner with us, we would

7       have been glad to do it.

8       Q       You requested a meeting in New York?

9       A       Yes.

10      Q       When did you start requesting that meeting?

11      A       I think it was sometime in mid-September.   I

12      don't have a specific day, but I remember it wasn't

13      like we talked on a Monday and we were flying up

14      there on a Thursday.   It was planned out weeks in

15      advance.   They had numerous people on their side

16      that they wanted to be at the meeting, so they had

17      to coordinate schedules for everything.

18      Q       And the meeting was eventually scheduled for

19      what date?

20      A       It was the end of October, 27th, 28th,

21      somewhere in there.   It was a Thursday.

22      Q       Okay.   Let me show you what's been marked as

23      Exhibit 44.   The bottom e-mail is an e-mail from

24      Darren Chiappetta to Eric Paulen dated October 5,

25      2005.   Do you know who Darren Chiappetta was?

1    A      I believe I've been told he was somebody on

2    the production crew, but I didn't know him at the

3    time.  We dealt with Dawn Olejar.

4    Q      Okay.  Did anyone ever tell you around the

5    time period of October 5, 2005, that the audio was a

6    nightmare?

7    A      No, sir, they did not.

8    Q      Did anyone tell you that they had the opinion

9    that the person running the AV had probably flunked

10   the training in high school, make any comments like

11   that?

12   A      No, sir.  I mean, our assumption is when

13   you're dealing with a company the size of Clear

14   Channel, everyone is competent.

15   Q      Did they ever tell you that Wrestlereunion I

16   was a train wreck?

17   A      No, sir, they certainly did not.

18   Q      Did anyone ever tell you at any time that they

19   had had problems finishing the editing because of

20   problems with the audio at Wrestlereunion I?

21   A      No, sir, they did not.

22   Q      Let me show you what's been marked as

23   Plaintiff's Exhibit 45.  Mr. Paulen wrote to Mr. --

24   this is an e-mail from Darren Chiappetta to Eric

25   Paulen.  Is the audio okay on the Valley Forge show?

1      I thought I remember you saying you were only able

2      to digitize two channels.  And Mr. Paulen responded,

3      I'm only able to digitize two channels.  And then

4      Mr. Chiappetta wrote, so then the Valley Forge show

5      has to be completely re-digitized with the other two

6      channels.  And Mr. Paulen said, we don't really have

7      the capacity to do that.  I don't remember that

8      there were that many audio issues.  If there are,

9      we'll have to figure out a way to do that.  You

10     should cut the show and worry about the audio after.

11           Did anybody tell you around this time period

12     of September 28th that this was a problem with

13     Wrestlereunion II and Valley Forge?

14     A      No, sir.

15     Q      How was the delay in getting the

16     Wrestlereunion product to the market affecting your

17     company?

18     A      Well, there was no revenue coming in from any

19     media product, so it was a huge effect.  Keep in

20     mind, we were operating under the premise that

21     revenue would start coming in 90 days to six months.

22     Q      Let me show you what's been marked as

23     Plaintiff's Exhibit Number 89.  This an e-mail from

24     Steve Sterling to Todd Everstein and Johnny

25     Gallarello dated March 21st of 2005.  It states, we

1    need to meet and strategize all the places we could

2    distribute this stuff.  DVDs, of course, TV, sure,

3    web, question mark, downloads, question mark, et

4    cetera.

5         Were you aware on March 21st of 2005 that that

6    was Mr. Sterling's desire, was to meet to strategize

7    these places?

8    A     No, sir.  My expectation would have been that

9    that would have happened even before the event took

10   place, that they would have already had a target

11   list of where they were going to go.

12   Q     You certainly would have expected it by June

13   6th of 2005?

14   A     Absolutely.

15   Q     Well, let me show you what's been marked as

16   Plaintiff's Exhibit 126.  Again, we've looked at

17   this earlier, but this is June 6th, 2005,

18   Mr. Sterling to Mr. Gallarello.  This is an e-mail

19   from Mr. Sterling dated June 6th, 2005 to

20   Mr. Gallarello and Mr. Paulen, again reiterating

21   that the original approach was to ride on the

22   coattails of the A&E telecast.  But then it

23   discusses that, if there is any chance that the A&E

24   project is not happening at all, we're in the

25   timeframe originally intended and we need to

1    demonstrate how we can capitalize on this content.

2    If we need to have a good old-fashioned product

3    program development head bang to get it all fully

4    defined and outlined, let's do it real soon.  So

5    this was as late as June 6th of 2005?

6    A     Yes.  No, I was not aware of any of this at

7    the time.

8    Q     You certainly would have expected the head

9    bang or the product development plan to have

10   occurred shortly after that e-mail; would you not?

11   A     Yes, sir, I would have.

12   Q     Were you aware as you were scheduling and

13   investing your money and Mr. Attanasio's money into

14   Wrestlereunion II and III, that they still hadn't

15   had that head bang product discussion on how they

16   were going to market it as late as September 12th of

17   2005?

18   A     No, sir, I was not.

19   Q     All right.  Let's take a look at what's been

20   marked in evidence as Exhibit 49.  This is an e-mail

21   from Mr. Sterling dated September 12th, 2005, to

22   Mr. Townley.  He talks about, it would be a good

23   idea if we could sched a working, all-players

24   programming and marketing meeting with them.  And

25   then he says in this paragraph, what we are lacking,

1       and I can certainly take some of the lead on this if

2       necessary, is an overall plan for putting this stuff

3       together in a through-line of a programming package

4       which for both TV and DVD can be looked at as a

5       series of programs which can be programmed for TV as

6       a series and can be distributed on DVD as a product

7       line.

8               And were you aware as late as September 12th,

9       2005, that this marketing plan had not been put into

10      place?

11      A       No, sir.

12      Q       Now, by this time the shoot interviews for

13      Mr. Sammartino, Wendy Richter, Diamond Dallas Page

14      and Kevin Nash had been finished?

15      A       Yes, sir.

16      Q       And they had been sent to Highspots for

17      Highspots to sell?

18      A       Yes, sir.

19      Q       Now, does Highspots have a promotional arm to

20      its business?  Do they go out and promote their

21      products?

22      A       No, sir.

23      Q       It's a website known to hard core wrestling

24      fans?

25      A       Yes, sir.

1    Q      Okay.  Do you recall Mr. Sterling having some

2    perplex or surprise at the fact that those shoot

3    interviews were not selling?

4    A      I do recall seeing an e-mail at some point

5    stating that.

6    Q      Okay.  Let me show you what's been marked and

7    admitted into evidence as Plaintiff's Exhibit 90.

8    This is an e-mail from Mr. Sterling to you dated

9    October 10, 2005.  So this is a few weeks before

10   your meeting in New York; correct?

11   A      Correct.

12   Q      Okay.  And apparently what precipitated this

13   was that you had sent to Mr. Sterling more questions

14   from fans about the releases of the DVD.  And his

15   response was, thanks, this remind me.  Even though

16   DVDs were delivered later than we would have liked

17   to Highspots, we have not seen any compelling

18   reorders on any of this that I know of.  What can be

19   done to get more out of that niche marketing from

20   them?  Is that level of unit sales by them about

21   what should be anticipated?  Thanks so much.  Best

22   regards, Steve.  And did you respond to him?

23   A      I would say that maybe I did.  I don't have a

24   specific recollection.

25   Q      Well, let me show you what's been marked as

1        Exhibit 91.  Now, his e-mail to you was dated

2        October 10th and your e-mail is dated October 11,

3        2005.

4        A      Yes.  I remember these -- I remember these

5        words.

6        Q      Okay.  You wrote:  Steve, I believe that due

7        to a combination of things sales may not be what you

8        you're expecting.  The first one -- I'm not going to

9        read the entire memo, but let me just read this

10       first sentence and ask you.  We could not get

11       clearance from you folks to let anyone other than

12       Highspots e-tail this product.

13       A      That's absolutely correct.

14       Q      Let me ask you, what does that statement mean?

15       A      We had -- we had other companies like

16       Highspots looking for copies of the DVDs between

17       myself and Mr. Russen both.  And every time we tried

18       to get in touch with Steve, he would say no one

19       other than Highspots can sell this stuff.  So, you

20       know, that was a problem but we went along.  We

21       didn't -- we didn't understand why, but he was

22       insistent.

23              We figured they were trying to market these

24       things and didn't want to have them hit all these

25       other websites and stuff or that it might hurt their

1    marketing, so we just said okay and went along.

2    Q     Would you agree that selling it only through

3    Highspots was a low-key distribution plan?

4    A     It was certainly extremely, extremely limiting

5    and we were upsetting the market.  I mean, people

6    did want this stuff.

7    Q     Okay.  The next thing, you wrote three points,

8    There is nothing being done to promote the product

9    at all that I can see.  We have still not even

10   gotten a press release from your company that we

11   could go public announcing our partnership.

12         So as late as October 11th, 2005,

13   Mr. Corrente, Wrestlereunion was not allowed to

14   issue a press release announcing its relationship

15   with Clear Channel?

16         MS. MILLNER:  Your Honor, objection.  He's

17   been leading the witness.

18         THE COURT:  Rephrase it, please.

19   BY MR. RODEMS:

20   Q     Were you allowed prior to October 11th, 2005,

21   to issue a press release announcing your

22   relationship, your company's relationship with Clear

23   Channel?

24   A     No.  Not only were we not allowed, we were

25   told specifically not to do it.

```
 1    Q      Okay.  Now, let's turn to the meeting in New

 2    York.  Do you remember what time of day it was

 3    scheduled?

 4    A      I believe late morning, 11:00, sometime in

 5    between 10:30 and 11:00, something along there.

 6    Q      Let me show you what's been marked as Exhibit

 7    92.  This is an e-mail from Kate McDonald dated

 8    Thursday, October 27th, 2005, at 9:19 AM.  Was your

 9    meeting scheduled before or after 9:19 AM?

10    A      After.

11    Q      Okay.  On October 27th?

12    A      Yes, it was.

13    Q      Okay.  And who was Ms. McDonald?

14    A      Kate McDonald is a Clear Channel employee that

15    worked on overseas sales.

16    Q      She wrote, please be reminded that we have not

17    pushed this series before MIPCOM due to the quality

18    of the original footage.  What was MIPCOM?

19    A      It's a convention for overseas television, to

20    the best of my understanding.

21    Q      Okay.  Had you ever heard that prior to

22    October 27th, 2005?

23    A      That they had not been pushing the series due

24    to the quality or MIPCOM?

25    Q      To the quality of the original footage.
```

1    A       No, sir, I did not.

2    Q       Okay.  As you're aware, we only get one chance

3    to make an impact on buyers so we've wanted to wait

4    until the new footage is ready for us to send out

5    with the hope that it's an improvement on the last.

6            Now, you did not receive a copy of this

7    e-mail, did you, Mr. Corrente?

8    A       No, sir, I did.

9    Q       Okay.  Ms. McDonald continues, our one concern

10   is how we inform the Wrestlereunion guys why we've

11   not started pushing it before now.  Please advise.

12           Now, you had a meeting less than two hours

13   later?

14   A       Yes.

15   Q       Did Ms. McDonald tell you, look, we haven't

16   been pushing this series because of problems with

17   the original footage?

18   A       No, sir, she did not.  She was present at the

19   meeting.  She didn't do a whole -- a whole lot of

20   talking, but she was there and certainly did speak

21   at times.

22   Q       Did anyone at the meeting say, look, we just

23   want you to know we haven't pushed this series

24   because there's a problem with the original footage?

25   A       No, sir, they did not.

1    Q      Where was the meeting actually held?

2    A      In the Clear Channel offices.  I don't know

3    the address, but basically in Steve Sterling's

4    office, in a conference room right near his office.

5    Q      And who all attended it for your side from

6    Wrestlereunion?

7    A      It was myself, Anthony Attanasio and Jimmy

8    Hart.

9    Q      And who all attended on behalf of Clear

10   Channel?

11   A      I want to tell you it was Joe Townley, Kate

12   McDonald, Dawn Olejar, Johnny Gallarello, Steve

13   Sterling, and Eric Paulen was there very, very

14   briefly.

15   Q      Was there any discussion during that meeting

16   by anyone from Clear Channel of any problems with

17   the audio or the video?

18   A      Absolutely not.

19   Q      How long did the meeting last?

20   A      Well, I don't know, 90 minutes, two hours.  I

21   mean, it wasn't a very quick thing, but it wasn't an

22   all-day affair, either.

23   Q      Was there a demo tape or a presentation tape

24   there available to show you of what the

25   Wrestlereunion project looked like?

1    A      No, sir, there was not.

2    Q      Was there a discussion of that?

3    A      Yes, there was.

4    Q      What was the discussion?

5    A      Well, just that, you know, one could be put

6    together, and they showed us an example of something

7    they had done for Motley Crue, the rock group.  And,

8    you know, they said, we're going to put together

9    something like this.

10   Q      So ten months after, or approximately ten

11   months after the first Wrestlereunion, there was not

12   even a demo tape?

13   A      That's correct.

14   Q      What was your understanding following that

15   meeting?  Was the Wrestlereunion project going to

16   move forward or did they say to you, we're not going

17   to do anything?

18   A      No.  Joe Townley said after -- after this

19   meeting, we're fully committed to go full steam

20   ahead with the project.

21   Q      No discussion about problems with attendance

22   or venue problems?

23          MS. MILLNER:  Objection, Your Honor, leading

24   again.

25          THE COURT:  Overruled.

1          THE WITNESS:  No, sir.  The only feedback that

2     we ever got from Steve Sterling or Clear Channel was

3     that they would have liked a different venue than

4     the one we had at Wrestlereunion I.  We said okay.

5          We went out and got the Valley Forge

6     Convention Center, invited them down to approve the

7     site and get any information they needed to put on

8     the very best possible production that they could.

9     That is the only criticism that I recall us ever

10    getting, and we immediately did what they asked us

11    to do.

12    BY MR. RODEMS:

13    Q     But before you ever signed up for the grand

14    ballroom at the Westshore Doubletree, you had looked

15    into whether it had ever been used for filming

16    boxing?

17    A     Yes.

18    Q     Okay.  Now, were you expecting the demo tape

19    at any particular time after the meeting of October

20    27, 2005?

21    A     I can't specifically give you a date, but I'm

22    going to tell you I believe they indicated something

23    like that would just take a few weeks to put

24    together.

25    Q     Okay.  Let me show you what's been marked as

1      Exhibit 115.  And this is an e-mail from you dated

2      November 29, 2005 to Johnny Gallarello, a copy to

3      Steve Sterling, and it extends to the next page.

4      Okay.  Johnny, thank you for making some changes.

5      Since this audio doesn't fit our specific needs, I

6      do look forward to the video that we can cut our own

7      audio so we can use it for our marketing purposes as

8      well.  Do you recall sending that to Mr. Gallarello?

9      A      Yes, sir.

10     Q      Okay.  And do you recall Mr. Sterling's

11     response to you?

12     A      Yes, sir, it's right here.

13     Q      Can you just read that?

14     A      Sal, can you just hold up here for a little

15     longer?  As discussed in our meeting, our number one

16     first objective is to get a kick-ass presentation

17     tape for TV, DVD, media outlets, not make a live

18     event promotional spot.  We are needing to get the

19     media property rolled out ASAP.

20     Q      So more than a month after the meeting in New

21     York you still didn't have the demo tape?

22     A      Yes, sir, that's correct.

23     Q      Let me show you what's been marked as

24     Plaintiff's Exhibit 100.  This is an e-mail from

25     Mr. Chiappetta to Steve Sterling, Wrestling Update.

1    Guys, just wanted to let you know where we stand.

2    And then he says two things.  Let's look at the

3    second one first and then we'll come back to the

4    first one.  I know there's a lot of A&E stuff that

5    needs to be delivered right now and all the

6    wrestling stuff needs to be online before we have a

7    finished product.  I spoke to Jack this morning and

8    he said he probably wasn't going to have a chance to

9    get to the wrestling until all the A&E stuff is done

10   around the middle of December.

11        Was that statement made to you during the

12   October 27th meeting that the Wrestlereunion project

13   was going to be further delayed because of A&E

14   stuff?

15   A       No.  No, sir.

16   Q       Let's look at the previous portion.  "One

17   thing that needs to be addressed as well on show

18   two, the original Midnight Express music was used as

19   they entered the ring.  This is commercial music and

20   needs to either be eliminated or cleared and

21   factored into the budgets.  It runs when they enter

22   and when they leave."

23        Now, during the Wrestlereunion shows, who made

24   the decisions about what songs to play while the

25   wrestlers were entering the ring, Wrestlereunion or

1        Clear Channel?

2        A       Well, Clear Channel.  Eric Paulen was handling

3        all of that.

4        Q       Let's take a look at Plaintiff's Exhibit

5        Number 97.  This is an e-mail from Eric Paulen to

6        Lisa Miller dated August 19, 2005.  "Can you look

7        into clearing the theme from the movie Midnight

8        Express for less than one minute for a DVD and give

9        me a quote?  It is for Wrestlereunion II."

10               Was it your responsibility to clear the

11       Midnight Express theme music that Clear Channel

12       elected to use?

13       A       No, sir, it was not.

14       Q       Let me show you what's been marked and

15       admitted into evidence as Plaintiff's Exhibit 101.

16       This is an e-mail from Kate McDonald to you dated

17       December 7, 2005.  Is this when you finally received

18       the promo or the demo tape?

19       A       Yes, it is.

20       Q       Okay.  Had you asked Ms. McDonald about the

21       status of NATPE, N-A-T-P-E?

22       A       Yes.  We were wanting to know how that was

23       going because we had volunteered to send Jimmy Hart

24       out there to stand at the booth and, you know, he's

25       an extremely recognizable face and those things

1       always helped.   Companies, when they have stars,

2       they'll put them in the booth and get purchasers to

3       come by and generally talk to stars, and that helps

4       start conversation.

5       Q       And what is NATPE?

6       A       It's the biggest television trade show in

7       the -- in the country.   It happens every year I

8       believe in Las Vegas in January sometime.

9       Q       Is this the first time that you had heard that

10      Clear Channel was uncertain as to whether it would

11      participate in NATPE due to the spinoff?

12      A       Due to the spinoff, yes.   Now, they did

13      mention in the October meeting that they were not a

14      hundred percent sure they were going to NATPE.   And

15      I did find that to be strange, but they said that

16      they would commit soon.

17      Q       Did they tell you during the October 27, 2005

18      meeting that they were going through a spinoff?

19      A       No, sir, they did not.

20      Q       Did you find out subsequent to that meeting

21      that they were going through the spinoff?

22      A       Yes.   This e-mail would have been the first --

23      first mention of it.

24      Q       Okay.   Let me show you what's been marked and

25      admitted into evidence as Plaintiff's Exhibit 98.

1      This is an e-mail from Steve Sterling to an e-mail

2      address, Bvenezia@Imagine-Entertainment.com dated

3      January 26, 2006.  Do you see that?

4      A      Yes, sir.

5      Q      Okay.  Were you aware at any time around this

6      period that Clear Channel was just getting settled

7      back down from three months of major upheaval?

8      A      No, sir, I was not.

9      Q      Were you aware that they had been spun off and

10     changed to Live Nation?

11     A      No, sir.

12     Q      Were you aware that they had consolidation of

13     the company from 14 business units to six, reduced

14     staff by almost a thousand people?

15     A      No, sir, I don't believe I was.

16     Q      During this time period after the meeting of

17     October 27, 2005, did you think that Clear Channel

18     was working hard to market your product from

19     Wrestlereunion?

20     A      Yes, sir.  Well, we certainly hoped.  They had

21     told us that they were.

22     Q      Let me show you an e-mail you wrote to

23     Mr. Sterling on December 19th of 2005, which has

24     been admitted into evidence as Plaintiff's Exhibit

25     99.  By the way, Mr. Townley was no longer with the

1    company by this point.  Did you know that?

2    A    No, sir.

3         MS. MILLNER:  Objection, Your Honor.  Assumes

4    facts not in evidence.

5         THE COURT:  Sustained.  Rephrase it, please.

6    BY MR. RODEMS:

7    Q    Did you send this e-mail to Mr. Townley?

8    A    Yes, I did.

9    Q    Did you think he was still employed with Clear

10   Channel at that point?

11   A    Yes, I did.

12   Q    Okay.  You wrote, "Steve, I understand that

13   there are many changes at Clear Channel, including a

14   name change for your division."

15        Where did you come across this information,

16   Mr. Corrente?

17   A    I don't have an exact recollection.  It may

18   have come from -- it may have come from Sam Coplin.

19   I don't know for sure.

20   Q    Did it come from anybody at Clear Channel?

21   A    No.

22   Q    Okay.  You asked, "Is there anything changing

23   that has to do with Wrestlereunion that I should be

24   aware of?  Please advise."

25        Did you ever get a response to this e-mail?

1    A      Not that I recollect at this time.

2           THE COURT:  Would this be a good time to take

3    a comfort break?

4           MR. RODEMS:  Yes, sir.

5           THE COURT:  Let's take a comfort break,

6    members of the jury, call it about ten minutes,

7    please.

8           COURTROOM SECURITY OFFICER:  Rise for the

9    jury.

10          (Recess was taken at 10:54 until 11:08.)

11          (Back on the record.)

12          COURTROOM SECURITY OFFICER:  All rise.  This

13   Honorable Court is again in session.

14          Please be seated.

15          THE COURT:  Ready?

16          MR. RODEMS:  Yes, sir.

17          THE COURT:  Bring the jury in, please.

18          COURTROOM SECURITY OFFICER:  Rise for the

19   jury.

20          (Jury in at 11:08 AM.)

21          COURTROOM SECURITY OFFICER:  Please be seated.

22          THE COURT:  Mr. Rodems, you may proceed.

23          MR. RODEMS:  Thank you, Your Honor.

24   BY MR. RODEMS:

25   Q      Mr. Corrente, you were here when the

1    deposition testimony of Mr. Gallarello was read

2    yesterday?

3    A      Yes, sir, I was.

4    Q      Okay.  Do you recall the testimony about

5    photos being used in the demo tape or trailer that

6    were not licensed?

7    A      Yes, sir, I do.

8    Q      Okay.  Did you at any time give Johnny

9    Gallarello any unlicensed photos that were used in

10   that demo tape?

11   A      No, sir, I did not.

12   Q      Okay.  I want you to take a look at Exhibit 96

13   that's been admitted into evidence.  This is an

14   e-mail from Kate McDonald to Eric Paulen.  It's

15   responding to an earlier one, but this is what I

16   want to focus on.  "Also, do you know if there are

17   any images, photos, logos, we can use for a sales

18   brochure or poster?"

19         And Mr. Paulen's response was, "Kate, Johnny's

20   friend Vinnie shot all the images."

21         What I'd like to ask you, Mr. Corrente, do you

22   know if Johnny's friend Vinnie gave Johnny

23   unlicensed photos?

24   A      I don't know, sir, but I know I did not.

25   Q      Okay.  Now, I want to be clear on something.

1       With the Dudley Boys, did you have an understanding

2       at Wrestlereunion II that they were allowed to use

3       the name, Dudley Boys?

4       A       Yes, I did, sir.

5       Q       Okay.  Did you later find out that WWE was

6       challenging their right to use the Dudley Boys name?

7       A       Yes, I did.

8       Q       Okay.  And did you have an understanding,

9       based on your experience in life or in your history

10      in the business that, in order to use a photograph

11      or to use a name, you had to have the rights to do

12      so?

13      A       Yes, sir, I did.

14      Q       Okay.  And knowing that, would you have ever

15      sent to Mr. Gallarello photographs that he could use

16      that there was no license for?

17      A       No, sir.

18      Q       Okay.  And by the way, there's one other point

19      that came up yesterday.  Mr. Paulen -- do you recall

20      when Mr. Paulen's testimony was read?

21      A       I was here for that.  Yes.

22      Q       Okay.  Do you recall that testimony about some

23      wrestlers being arrested before Wrestlereunion III

24      and, therefore, there was no production meeting?

25      A       Yes, sir.

1    Q      What happened?

2    A      Well, one of the Midnight Express was trying

3    to board a plane in Charlotte.  And as he was going

4    through security, I guess he had knife in his bag or

5    something that he had forgotten to remove and he

6    was -- he was held there in Charlotte.

7           I had to deal with trying to make some sort of

8    arrangements to see if somebody was getting him out,

9    would get him on the plane and down there, because

10   as I testified to yesterday, Wrestlereunion was

11   about providing exactly what we said to the fans.

12   And they were in a very high profile match that day

13   and, of course, we did get him down there, but that

14   was my concern.

15   Q      So it wasn't a series of wrestlers that got

16   arrested?

17   A      No, sir.  I don't even quite -- I don't know

18   if he was actually arrested or not.  He was

19   certainly detained.  There's no question about that.

20   And, you know, somebody had to go over there and

21   pick him up and get things straightened out.

22   Whether he was actually arrested, I can't say.

23   Q      Okay.  But that was what that issue was?

24   A      Yes, that was it.  That's the sole issue.

25   Q      By the way, I want to come back to the meeting

1       in October of 2005 for just a moment at the Clear

2       Channel headquarters.  Was there a discussion about

3       the expenses that had been incurred in the

4       Wrestlereunion projects?

5       A       Yes, there was.

6       Q       Were you given any data or any information

7       about the amount of money that had been expended by

8       Clear Channel?

9       A       Yes.  There was some sheet given to us with

10      some sort of a breakdown of expenses with a total.

11      Q       Do you remember what that total was?

12      A       It was just above $600,000.

13      Q       Okay.  Mr. Corrente, let me show you what's

14      been marked as Plaintiff's Exhibit 131.  At the

15      meeting on October 27, 2005, were you given a copy

16      of this e-mail?

17      A       No, sir, I was not.

18      Q       Okay.  This is an e-mail from Dawn Olejar to

19      Joe Townley.  Wrestlereunion finances.  It says,

20      "Attached are the Wrestlereunion finances.  Page

21      one, final budgets, is what we will show at the

22      meeting Thursday.  Page two, actuals, is for

23      internal use only."

24              Were you told that there were two sets of

25      numbers?

1    A       No, sir.

2    Q       Were you shown this page?

3    A       I don't -- I don't believe so.  I think the

4    page we saw was more detailed than that, I believe.

5    Q       Okay.  Were you shown this page?

6    A       Absolutely not.

7    Q       Was it ever explained to you in the meeting of

8    October 2005 that the numbers they were showing you

9    was what they thought they might spend or were you

10   told that this is what they had spent?

11   A       No, sir.  We were told that this is what had

12   been spent.

13   Q       Have you held any Wrestlereunion conventions

14   since 2005?

15   A       No, sir.

16   Q       Why not?

17   A       I was in a devastated position, no -- no

18   revenue coming in from the media.  You know, no way

19   to -- no way to do anything to run another

20   convention.

21   Q       So no conventions occurred in 2006?

22   A       No, sir.

23   Q       Or anytime before this trial?

24   A       No, sir.

25   Q       But there has been a Wrestlereunion IV now

1      scheduled for January of 2010?

2      A      Yes, sir.

3      Q      And where is that going to be held?

4      A      Los Angeles.

5      Q      And where at in Los Angeles?

6      A      At the Hilton at the LAX Airport.

7      Q      And it is being held under the banner,

8      Wrestlereunion?

9      A      Yes, sir, it is.

10     Q      And it's being styled as Wrestlereunion IV?

11     A      Yes, sir.

12     Q      Okay.  Are you contributing financially to

13     Wrestlereunion IV?

14             MS. MILLNER:  Your Honor, relevance.

15             THE COURT:  Overruled.

16             THE WITNESS:  No, sir.  I don't have any funds

17     to contribute.

18     BY MR. RODEMS:

19     Q      Who is backing Wrestlereunion IV?

20     A      Michael Bochicchio from Hotspots.

21     Q      Tell us how it came about that Wrestlereunion

22     IV got scheduled and Wrestlereunion's name got

23     attached to it.

24             MS. MILLNER:  Objection, relevance.

25             THE COURT:  I'll allow it.  It's overruled.

1          THE WITNESS:  Well, Michael, as part of his

2     business as he did with Wrestlereunion I, he attends

3     conventions all over the country and sells his

4     merchandise, wrestling belts, dolls, DVDs.  All the

5     different things that he sells on his website he

6     carries those around.  And I guess after all these

7     years he decided that, you know, he wanted to get

8     into the convention business.

9          I don't think he necessarily wanted to be the

10    person in the forefront, though, because he was

11    going to be competing with people, and it was the

12    same events that he actually makes money at.

13    BY MR. RODEMS:

14    Q     Okay.  So how did that come to you, then?

15    A     Oh, well, he contacted me and said, listen, I

16    think I want to get in the convention business.  You

17    know, can you -- can you run it, can you be kind of

18    the out-front person.  And, you know, I'm just going

19    to stay in the background, but I'll be responsible

20    for all the expense, just, you know, do the things

21    that I know that you know how to do.

22    Q     Why call it Wrestlereunion IV?

23    A     Well, he knew the name was established.  He

24    was -- he was comfortable with it.  He had attended

25    the first two Wrestlereunions, the ones that were

1    actually fan conventions, and he felt the name had

2    more of a global appeal than NWA Legends.  The other

3    names just seemed much more regionalized to him.

4    Q      So what is -- if Wrestlereunion, LLC is not

5    contributing financially to this project, what is

6    Wrestlereunion, LLC contributing at all to this

7    project?

8    A      Name recognition, expertise, contacts, you

9    know, negotiating with the different parties, things

10   like that, and the availability of

11   Wrestlereunion.com.

12   Q      Is Wrestlereunion, LLC going to be compensated

13   for this?

14   A      Yes, sir.

15   Q      In what way?

16   A      I'll receive 50 percent of the profits from

17   the convention.

18   Q      Okay.  Have you been out to the LAX Hilton to

19   see the site of Wrestlereunion IV?

20   A      Yes, sir.  I was able -- I travel from time to

21   time, and I was able to go out there and see it.

22   Q      Is the plan for Wrestlereunion IV, in terms of

23   the number of fans that will attend, any different

24   than the first two Wrestlereunion conventions?

25   A      No, sir.

1     Q      So the maximum amount of fans will be?

2     A      It'll be about a thousand.

3     Q      Okay.  And what will -- have the ticket prices

4     been established yet?

5     A      I believe they're on the -- I believe they're

6     on the website.  It's not something that I'm very

7     involved in because it's not -- it's not my

8     responsibility.  It's Michael's.  It's his money.

9     He's determining the schedule of events and those

10    things.

11    Q      Okay.  Let me show you now what's been marked

12    as Exhibit 117.  Do you recognize this document?

13    A      Yes.  I believe it's been shown here before.

14    Q      Okay.  Well, this isn't the first time you've

15    seen it at this trial; is it?

16    A      No, sir.

17    Q      Okay.  Do you know who created this?

18    A      I believe Rob Russen.

19    Q      Okay.  And the purpose of this is to list the

20    expenses and the income from Wrestlereunion I?

21    A      Yes.

22    Q      Okay.  Then we have a second page which covers

23    Wrestlereunion number two?

24    A      Yes, sir.

25    Q      Okay.  And, I'm sorry, let me reduce this.

1        And, again, does it show the expenses and the

2        income?

3        A       Yes, sir.

4        Q       For Wrestlereunion II?

5        A       Yes, sir.

6        Q       Okay.  And then the third sheet of this

7        exhibit, Wrestlereunion Davie, 2010, expenses,

8        income?

9        A       Yes, sir.

10       Q       Okay.  This shows that the total VIP tickets

11       sold for Wrestlereunion I were 240 at $249?

12       A       Yes, sir.

13       Q       Weren't tickets also sold at $299?

14       A       Yes, sir, I believe that they were.

15       Q       Okay.  And in any event, if we assume from

16       this exhibit that a total of 310 tickets were sold

17       for Wrestlereunion I, that would be about 30 percent

18       of the capacity?

19       A       Yes, sir.

20       Q       Okay.  And if we look at Wrestlereunion II, we

21       can see a total attendance.  If we add all of these

22       up -- I didn't bring a calculator, but we're looking

23       at around 600 or 700 attendees?

24       A       Yes, sir.  Do you want me to add it up?

25       Q       No, sir.

1    A        Okay.

2    Q        But you did have a substantial increase in the

3    VIP tickets?

4    A        Yes, sir.

5    Q        And you did drop the price?

6    A        Yes, sir.

7    Q        Okay.  Now, I notice for Wrestlereunion I, you

8    listed 94 wrestlers at $194,540.  And then for

9    Wrestlereunion II, you've reduced it to 59 wrestlers

10   and you cut the expenses there by about $60,000.

11   A        Yes, sir.

12   Q        Why for Wrestlereunion II did you come in with

13   less wrestlers?

14   A        Well, we had -- we had done what we wanted to

15   do as far as getting the name recognition.  People

16   now knew who Wrestlereunion was.  We had walked 10

17   pink elephants down through Times Square and gotten

18   everyone's attention.  So there was really no need

19   to bring that large of a crew again.

20   Q        Was it your plan with future conventions to

21   continue to decrease the wrestlers so that the

22   expenses would be more in line with the revenue

23   generated?

24   A        Yes.  It was going to be easy to do.  We were

25   cutting down tag team matches and, you know, going

1    more into single matches.  Not cutting them out but

2    certainly cutting them down drastically, things like

3    that.

4    Q    Now, let me show you what's been admitted into

5    evidence as Exhibit 118.  Was this document prepared

6    to estimate what the budget might be for a single

7    show for expenses and income in years 2006 and 2007?

8    A    Yes, sir.

9    Q    And you've reviewed this?

10   A    Yes, sir.

11   Q    And you adopt this?

12   A    Yes, sir.

13   Q    Okay.  And let me show you what's been marked

14   as Exhibit 119.  This is an estimate of

15   Wrestlereunion for 2006 and 2007, estimated budget

16   for the two-day convention with matches on Saturday

17   night?

18   A    Yes, sir.

19   Q    Okay.  And it goes through the expenses that

20   would be incurred, projected expenses?

21   A    Yes, sir.

22   Q    And then the projected income?

23   A    Yes, sir.

24   Q    Okay.  And do you adopt this, as well?

25   A    Yes, sir, I certainly do.

1    Q    Okay.  Now, let me show you what has been

2    admitted as Exhibit 120.  This is the Wrestlereunion

3    profit and loss.  And if we look at the first page,

4    we'll see that it was sent on August 8th, 2005, by

5    Steve Sterling to Joe Townley.

6    A    Well, I don't see that, but I'm taking your

7    word for it.  You have it off the screen.  I can't

8    see it.

9    Q    Yes, sir.  It's so difficult to get it back in

10   place.  Let me just have you look in your exhibit

11   book and you can confirm that.

12   A    Which number am I looking at?

13   Q    120, and you're looking at the first page.

14   A    Yes, August 8th, 2005, at 6:58 PM.

15   Q    Okay.  So that was before Wrestlereunion II?

16   A    Yes.

17   Q    Okay.  Now, this profit and loss statement

18   showed a partner share, and you were the partner;

19   correct?

20   A    Yes.  Wrestlereunion, LLC was the partner.

21   Yes.

22   Q    This shows a partner share from DVD sales of

23   about 58,913; correct?

24   A    Yes, sir, that's correct.

25   Q    And it also estimates a production fee, TV

1    license, video on demand, rest of world, catalog

2    revenues?

3    A      Yes, sir.

4    Q      Okay.  And you didn't prepare this profit and

5    loss statement; did you?

6    A      No, sir.

7    Q      Okay.  And did anyone call and ask you for

8    your input into the profit and loss statement?

9    A      No, sir.

10   Q      Okay.  Now, it lists as a royalty certain

11   expenses, royalties.  You were not paying royalties

12   to the Wrestlereunion talent; were you?

13   A      No, sir.

14   Q      Okay.  If we could take a look at your

15   contract with Clear Channel, and this is part of

16   Exhibit 2, this is the clean copy of the contract.

17   It says on home video product, with respect to

18   promoter's royalty, and you're the promoter,

19   correct?

20   A      Correct.

21   Q      Okay.  In lieu of a royalty, Clear Channel and

22   promoter shall share net revenues 50 percent, 50

23   percent between the parties; correct?

24   A      Yes, sir, that's correct.

25   Q      So you would not be paid a royalty as the

1    promoter under this agreement; correct?

2    A       I would not be paid a royalty.  No, sir.

3    Q       Okay.  Now, if the partnership profits were to

4    be split 50/50 and Clear Channel deducted $187,800

5    -- I can blow this up -- for royalties from the

6    revenue, would you agree with me that that should

7    not have been deducted?

8    A       Yes, I would.

9           MS. MILLNER:  Objection, Your Honor.  May we

10   approach?

11          THE COURT:  Give your legal objection, please.

12          MS. MILLNER:  Speculative.  He did not prepare

13   this document.

14          THE COURT:  Overruled.

15   BY MR. RODEMS:

16   Q       Now, Mr. Corrente, if we take $187,900 -- do

17   you have a calculator?

18   A       Yes, sir, there's one here.  Let me just --

19   okay, it's on.

20   Q       If you would take 187,800, which is -- which

21   is the amount of royalty?

22   A       Yes, sir.

23   Q       And divide that by two for 50/50?

24   A       It would be $93,900.

25   Q       Okay.  So the partner share should not be

1        $58,913, it should be $58,913 plus one-half of the

2        royalties; correct?

3        A       Yes, sir.

4        Q       What does that number come to?

5        A       $152,813 is what I came up with.  Well, that's

6        obviously not right.

7        Q       Yes, sir, it is.  If you add --

8        A       Oh, yes, sir.  I'm sorry, yes.  That's

9        correct.

10       Q       You added $58,913?

11       A       Yes, sir.

12       Q       Which was this number and half of 187,800?

13       A       Yes, sir.

14       Q       Okay.  So that would be the partner share

15       under the P and L?

16       A       Yes, sir.

17       Q       Okay.  Now, what I want to do is I want to go

18       back to 117 for a moment.  Excuse me.  These, again,

19       are your actual expenses from Wrestlereunion number

20       one and your actual income?

21       A       Yes, sir.

22       Q       There it is.  Okay.  What I've done for

23       illustrative purposes, I've made a photocopy of this

24       and I'll lay it over the top now.  All right.  For

25       Wrestlereunion number one, your expenses were

1    236,540?

2    A       Correct, sir.

3    Q       Your live gate income was 55,740?

4    A       Yes, sir.

5    Q       If Clear Channel had delivered on the

6    projected profits in the amount of $152,813, and you

7    add that to 55,740, you'd come up with a total

8    revenue live gate and money from Clear Channel of

9    208,553; correct?

10   A       Yes, sir.  That's correct.

11   Q       If you take that as your total revenue for

12   Wrestlereunion I and you deduct the expenses, you

13   show a loss of how much?

14   A       27,987.

15   Q       Okay.  Now, let's look at Wrestlereunion

16   number two.  Your expenses for Wrestlereunion number

17   two actually decreased?

18   A       Yes.

19   Q       243,385.  You had live gate income of 93,029;

20   correct?

21   A       Yes, sir.  That increased.

22   Q       Okay.  If you add the expected profit from

23   Clear Channel partner share of 152,813, you show a

24   total revenue live gate and, again, the money that

25   would be earned from Clear Channel of 245,842;

1      correct?

2      A      Yes, sir.  That's correct.

3      Q      Now, if we take the total expenses and deduct

4      the combined revenue from the live gate and the

5      money that Clear Channel would have paid to you, you

6      show actually a profit on Wrestlereunion II;

7      correct?

8      A      Yes, sir.

9      Q      Now, let's take a look at Wrestlereunion

10     number three.  Your expenses for Wrestlereunion

11     number three were only 45,950; correct?

12     A      Yes, sir.

13     Q      And the reason is that it wasn't a full

14     fledged fan convention?

15     A      Correct.

16     Q      It was a one-night wrestling card only?

17     A      Right.  Basically a house show, as it has been

18     referred to in other testimony.

19     Q      Okay.  And your ticket sales produced revenue

20     of 22,300?

21     A      Yes, sir.

22     Q      Okay.  And if you had received the partner

23     share from the defendant, the sales of this event,

24     the third event of 152,813, your total revenue, live

25     gate and income derived from Clear Channel would

1    have totaled 175,113; is that correct?

2    A      Yes, sir.

3    Q      And if you take the total revenue, live gate

4    and income from -- or revenue from Clear Channel and

5    you deduct the expenses of Wrestlereunion I, would

6    the profit for Wrestlereunion III have been 129,163?

7    A      Yes, sir.

8    Q      Okay.  So I don't know if I can do this, but

9    I'm superimposing -- let's see if I can do this.

10    You would have had a 27,987-dollar loss for number

11    one, a 2,457-dollar profit for two and then a

12    129,163-dollar profit for Wrestlereunion number

13    three?

14    A      Yes, sir.

15    Q      If that situation had been developed, would

16    you have been able to continue putting on fan

17    conventions and live wrestling shows?

18    A      Absolutely.

19    Q      But that did not happen; did it?

20    A      No, sir, it did not.

21    Q      And Clear Channel Entertainment Television

22    never produced any revenue for Wrestlereunion; did

23    it?

24    A      No, sir, it did not.

25           MR. RODEMS:  That's all I have, Your Honor.

1      Thank you.

2             THE COURT:  Cross-examination, Ms. Millner?

3             MS. MILLNER:  Yes, Your Honor.

4                       CROSS-EXAMINATION

5      BY MS. MILLNER:

6      Q      Good morning, Mr. Corrente.

7      A      Good morning.

8      Q      Let me see if we can come to some sort of

9      agreement on some basic understandings.

10            First, am I correct that you agree that the

11     terms of the memorandum of understanding, which is

12     marked as Plaintiff's Exhibit 1, contains the terms

13     that you and Clear Channel reached in this matter?

14            MR. RODEMS:  Objection, Your Honor,

15     mischaracterizes the --

16            THE COURT:  Overruled unless you have a legal

17     objection.

18            MS. MILLNER:  You know what?  Let me withdraw.

19     BY MS. MILLNER:

20     Q      Am I correct that the agreement identified as

21     the outline of terms contains the terms set forth or

22     that you and Clear Channel agreed upon?

23     A      You are talking about the agreement that I

24     signed; correct?

25     Q      Yes, Exhibit 1.  You're welcome to look at it

1       if you'd like, Plaintiff's Exhibit 1.

2       A       No, ma'am.  We can agree to that.

3       Q       All right.  And that outline of terms that

4       your counsel has put into evidence as Exhibit 1,

5       Plaintiff's Exhibit 1, contains the entire agreement

6       between Clear Channel and Wrestlereunion; isn't that

7       right?

8       A       Yes, ma'am.

9       Q       All right.  And you would agree with me that

10      Clear Channel Entertainment paid all the expenses

11      associated with the filming of all three

12      Wrestlereunion events; correct?

13      A       Yes, ma'am.  The filming costs, absolutely.

14      Q       They paid for all the equipment and crew and

15      the lighting used in the filming; correct?

16      A       Well, I can't speak to what they paid for.

17      They're responsibile for it and they haven't asked

18      me to pay any bills, so I'm assuming that they've

19      paid them.

20      Q       All right.  So you are not out of pocket one

21      penny for that filming; correct?

22      A       No, ma'am.

23      Q       That's not right?

24      A       No, that is right.

25      Q       All right.  Now, you'd also agree with me that

1    Clear Channel paid all expenses associated with the

2    distribution effort of the Wrestlereunion footage;

3    correct?

4    A    I wouldn't be able to agree or disagree,

5    ma'am.  I'm not even aware of any expense that they

6    incurred in that.

7    Q    Well, you certainly haven't been asked to

8    contribute to any distribution effort that Clear

9    Channel undertook to distribute the Wrestlereunion

10   footage; correct?

11   A    No, ma'am.  I can agree to that, yes.

12   Q    Okay.  Now, you told this jury that

13   Wrestlereunion has lost money on this project; isn't

14   that right?

15   A    Well, Wrestlereunion didn't receive the

16   revenue that it was supposed to receive.

17   Q    All right.  And you would agree with me that

18   Clear Channel, likewise, has lost money on the

19   Wrestlereunion project; correct?

20   A    Well, I would -- based on the numbers they're

21   providing and the fact that we got no revenue, I

22   would assume they got revenue, so, sure.

23   Q    You didn't make a profit on this and Clear

24   Channel didn't make a profit on this; correct?

25   A    As of now, no one has made a profit.

1    Q      Now, the entertainment industry is a risky

2    industry.  Would you agree with that, sir?

3    A      I don't believe I'm necessarily qualified to

4    make a blanket statement about the entertainment

5    industry.

6    Q      All right.  Let's narrow it down a bit.  The

7    wrestling industry is a risky business; isn't it?

8    A      Well, I can only speak to my company.  What I

9    did was put together a company of legitimate stars

10   that, you know, basically legends is the term we've

11   been using.  It's an accurate term in the wrestling

12   business.

13          And, you know, the one thing about my company,

14   I set up my company to where the WWE was my minor

15   league.  Vince McMahon is spending hundreds and

16   thousands if not millions of dollars promoting these

17   people worldwide, and when either he's done with

18   them or they're done with him, they're given to me

19   and my company is able to make that benefit.  I

20   don't know that there are too many business

21   structures that are actually set up that way where

22   you've got a publically-traded, multimillion dollar

23   worldwide company providing you your assets.

24   Q      Sir, my question, though is, would you agree

25   with me that the wrestling industry in general is a

1      risky business?

2      A       No, ma'am.  I guess I wouldn't.

3      Q       All right.  Do you recall Mr. Hart who came

4      and testified in this courtroom a couple of days

5      ago?

6      A       Yes, I remember Jimmy Hart testifying.

7      Absolutely.

8      Q       Do you remember him telling you about -- or

9      telling this jury about the various wrestling

10     organizations that he's aware of that lost

11     substantial amounts of money?

12     A       I know you questioned him.  I don't remember

13     his specific answers, and I guess I certainly didn't

14     hear him saying the companies made money.  But to be

15     quite honest with you, ma'am, I guess I question or

16     wonder how anyone, Jimmy Hart included, could speak

17     to these companies that have lost money.

18             They're not publicly-traded companies.  Their

19     financials are not available anywhere that I'm aware

20     of, and I've been in this business since 1981.

21     They're all privately-held companies who don't

22     publish any data on profit or loss.  So I'm just not

23     sure how anyone can stand here and be so sure that

24     these companies have lost money, especially the ones

25     that are still in business today.

1    Q      Sir, XWF was a wrestling organization that

2    Mr. Hart was involved with; correct?

3    A      That's my understanding, that he was involved

4    with it.

5    Q      And so he should at least be able to speak to

6    that organization.  Can we agree on that?

7    A      I'm not aware that -- he was involved with it,

8    there's no question about that.  I have no idea what

9    his role was, if he was an owner, if he was just

10   talent, if he just worked for the promoter.  I have

11   no knowledge of that.

12   Q      Did you listen to him testify when he was

13   here?

14   A      Well, ma'am, he testified quite a while.  If

15   you want to read back to me something that he said,

16   you know, I'll believe you that he said it.  But I

17   don't recall specifically what his role was in that

18   company.

19   Q      So you don't know of the existence of numerous

20   wrestling organizations that have lost money or gone

21   out of business?  You just don't know any of that?

22   A      Ma'am, what I'm suggesting to you is that you

23   cannot speculate on any privately-held company.

24   Now, if you had some sort of a statement here from

25   some company who says, I was in business for X

1      number of years and lost money, I would have to

2      accept that.  But I know it's very easy to start

3      rumors.

4           Two people say that a company is losing money,

5      and it's losing money.  I mean, sure, you did

6      mention in here that -- a couple of times yourself

7      and I believe Mr. Herbert, that TNA is losing

8      millions and millions of dollars, but they've been

9      in business for years.  They've just signed a new

10     three-year deal.  I just don't know where this data

11     or information is coming from.

12     Q     Well, did you do any research on the wrestling

13     industry at all, sir, before you decided to start

14     the Wrestlereunion venture?

15     A     I'm on the inside of the wrestling industry,

16     ma'am, and I'm telling you that I don't know any

17     promoter who stands up profitable, unprofitable or

18     in between and says this is how much I made, this is

19     how much I lost.  Any statements of that, other than

20     WWE, which is publicly traded and the information is

21     widely available, is pure speculation based on

22     somebody who decided they want to have an opinion on

23     someone else's business.

24     Q     So you have no knowledge about the

25     profitability of other wrestling organizations?  You

1      simply don't know; is that fair?

2            MR. RODEMS:  Objection, Your Honor,

3      repetitive.

4            THE COURT:  Sustained.  Let's move on, please.

5      BY MS. MILLNER:

6      Q     Now, would you agree with me that the

7      marketplace -- it's the marketplace that determines

8      whether a certain form of entertainment will

9      succeed?

10     A     Well, I would agree with you that the

11     marketplace dictates, you know, pretty much any

12     business, whether it succeeds or not.

13     Q     And by the way, we can agree that wrestling is

14     a form of entertainment; correct?

15     A     Yes, ma'am.  We can agree.

16     Q     I mean, they determine -- the matches are

17     scripted and the -- you know, the wrestlers know

18     exactly what's going to be happening in the ring and

19     who's going to win and so forth; correct?

20     A     I would have to slightly disagree with you.  I

21     would stipulate that winners of the matches are

22     predetermined.  We don't have scripted matches, I

23     never have.  I couldn't imagine having that.  But

24     the winners are predetermined.  That's what I'll

25     agree to.

Corrente - Cross

```
1    Q       So these WWF legend hall of fame folks,

2    essentially they became hall of fame folks because

3    the folks at WWF wrote scripts that said this one

4    wins or the other one wins; correct?

5    A       I don't -- I don't know that a one-loss record

6    necessarily gets you in the hall of fame.  As a

7    matter of fact, I can tell you that it definitely is

8    not the deciding factor.

9    Q       Well, the WWF decides who's going to win all

10   the matches that are -- that take place in their

11   events; isn't that right?

12   A       Yes, for their events, absolutely.

13   Q       All right.  Now, you would agree with me that

14   you and Wrestlereunion could not control how the

15   marketplace would accept the Wrestlereunion live

16   events that you were hosting; correct?

17   A       Couldn't control it -- I mean, I can't get

18   inside someone's mind, but I certainly could do

19   everything I can to present my company in the most

20   positive light and get it out there as much as

21   possible for people to become aware of it.

22   Q       And you did everything you can for the

23   Wrestlingreunion live events to be a success; isn't

24   that right?

25   A       Yes.  It's Wrestlereunion, ma'am.  I just
```

Corrente - Cross

```
 1    don't want any confusion with the Wrestlereunion

 2    company.

 3    Q      Wrestlereunion, right.  Did I say something

 4    different?  I'm sorry.

 5    A      Yes, a few times you've said wrestling reunion

 6    with I-N-G.

 7    Q      All right.  In any event, I'll ask the

 8    question again.  You'd agree with me that

 9    Wrestlereunion did everything possible to make these

10    live events a success; correct?

11    A      Yes.  We did everything we could to match our

12    business plan, which was to get the name

13    Wrestlereunion out there in the public.

14    Q      And so, therefore, the fact that there was

15    disappointing ticket sales is not the fault of

16    Wrestlereunion; correct?

17    A      Again, I'm -- I don't -- I don't remember

18    being disappointed at all at Wrestlereunion.  What I

19    wanted to do was attract the -- the attention of the

20    wrestling industry, and I can assure you, ma'am,

21    that I clearly did that.

22           We out-shadowed WWE's Royal Rumble that

23    weekend.  We got major press.  We were written up in

24    the Wall Street Journal.  I don't believe there's

25    any wrestling company, outside of WWE, which may
```

1    have only been in there because they're publicly

2    traded, that's ever gotten that type of coverage.

3    Q       Are you telling this jury that you were not

4    disappointed in the ticket sales for the

5    Wrestlereunion live events?

6    A       Yes.  Yes, ma'am, that I am.  That was not my

7    focus.

8    Q       So you were not disappointed in those sales?

9    You were satisfied with them?

10   A       No, ma'am, I was not disappointed.

11   Q       All right.  Now, likewise, Clear Channel has

12   no control over the marketplace for wrestling

13   videos.  Can we agree on that?

14   A       Well, they can't force somebody to write them

15   a check, I guess.

16   Q       And they can't force a distributor to take the

17   product and put it on the marketplace; can they?

18   A       No, they can't force them.  But they certainly

19   had the responsibility to do the same thing I did,

20   which is make a credible presentation, something

21   that could stand up, something that somebody could

22   have responded and said, you know, we've seen the

23   footage, we've seen, you know, numerous one sheets,

24   we've seen promotional sales materials or, you know,

25   based on our meeting of February 10th, you know,

1    everything you've had to say sounded legitimate, but

2    this is just a product we're not interested in.

3    They certainly had that -- had that responsibility.

4    Q      Well, the reality is, sir, you don't have any

5    idea what marketing efforts Clear Channel undertook;

6    isn't that right?

7    A      Yes, ma'am.  I guess that is right other than

8    what's minimally been suggested here in the trial.

9    But wouldn't you suggest that that is part of the

10   ultimate problem?  We're supposed to be their

11   partner and four years later, no, we don't have

12   really any idea what they did.  They certainly never

13   advised us.  They never asked us for input.  They

14   never took any of the help we offered them.  So I

15   would say you're probably getting right to the

16   source of the problem, that we don't know.

17   Q      In fact, Clear Channel did update you

18   periodically on their marketing efforts; didn't

19   they?

20   A      There were some e-mails in there and we had

21   Steve Sterling's meeting, but to be honest with you,

22   ma'am, at this point they can't be substantiated

23   anywhere.

24   Q      Well, you certainly have no evidence to show

25   that what he was reporting to you was not correct or

1    truthful; isn't that right?

2    A      No, ma'am, that's correct.  I don't have

3    anything to the contrary.

4    Q      All right.  And we'll get into that issue down

5    the road, the marketing.  I just want to move on.

6           Now, as a result of this, would you agree with

7    me that no matter how much effort is put into a

8    product or a live event, if it's rejected into --

9    rejected by the marketplace, it will not be a

10   financial success?

11   A      Yes, ma'am.  I would agree with that.

12   Q      All right.  Try as you might, sometimes things

13   just don't sell; agree?

14   A      Yes, ma'am.

15   Q      Now, you were promoting -- or rather you would

16   agree that the promotion of the live events was

17   Wrestlereunion's responsibility, not Clear

18   Channel's; correct?

19   A      Yes, ma'am.

20   Q      We saw some e-mails, I'm not going to pull

21   them up now, where you're asking about billboards

22   and radio spots and so forth to promote the

23   Wrestlereunion events.  But that was your

24   responsibility, Wrestlereunion's responsibility, not

25   Clear Channel's; correct?

1      A       Yes, ma'am.  But you would certainly agree

2      with me that if you have a business partner, it

3      would certainly be okay to inquire about any help

4      they might be able to offer.  Like with the A&E

5      biography, Wrestlereunion gave a tremendous amount

6      of its time running wrestlers up for them to film

7      for them, and we had no financial interest in the

8      A&E biography.  That was their responsibility to do

9      that, but we did it for them because they asked.

10     Q       You had these wrestler -- you were the one who

11     contracted these wrestlers.  Clear Channel did not

12     contract these wrestlers; correct?  They were there?

13     A       There's no question, but we were the ones that

14     had -- they didn't -- they said, look, we don't even

15     know what these wrestlers look like, all we have is

16     a bunch of names.  We couldn't possibly go find them

17     and bring them to the other end of the hotel.  We

18     had to do that.  Every time they were done they

19     would say, okay, get so-and-so.  There was a lot of

20     time involved in that, ma'am.  I believe someone

21     testified here they filmed 20 or 30 interviews.

22     Q       Okay.  But sticking to my question, if we

23     could.  I was asking about promotional

24     responsibilities.  You would agree with me that the

25     contract that you agreed to with Clear Channel does

1      not require Clear Channel to provide any assistance

2      with the promotion of the live events?

3      A      Yes.  Best I can recollect, yes, ma'am.

4      Q      So these e-mails about, you know, or the

5      testimony about whether they did or not provide you

6      with a billboard -- by the way, do you even know if

7      a billboard was available outside the Philadelphia

8      airport?

9      A      No, ma'am, I don't.  I don't believe we ever

10     got any response.  When we accepted the price of

11     one-seventh, I don't know that anything was said

12     that there's a billboard at X Street, or you know

13     what, we've investigated and even though that is the

14     right price, there is no availability.

15     Q      So you don't know; isn't that right?

16     A      That's right.  There was, unfortunately, a

17     very constant and consistent lack of communication

18     by Mr. Sterling.

19     Q      All right.  And Clear Channel -- so you're not

20     claiming or telling this jury that the fact that

21     Clear Channel did not provide some billboard or help

22     make an infomercial, or whatever the other thing is

23     that you've stuck up on this screen concerning

24     requests to help them promote or help you promote

25     the live events, is part of your claim that's being

1    presented to this jury, correct?

2    A      No, ma'am.  It would have been certainly nice

3    for them to be a part of the success of the event,

4    but we're not -- that's not the claim we're making.

5    Q      And by the way, you are aware, are you not,

6    that Clear Channel Entertainment, the division you

7    were dealing with, had nothing whatsoever to do with

8    the billboard or the radio stations or even the

9    local TV stations; isn't that right?

10   A      I'm not sure I could agree with that, ma'am.

11   How do you get a one-seventh price -- I mean, that's

12   almost -- I mean, I don't -- I guess I could figure

13   it out, but that's a very serious reduction in price

14   for something that you have nothing to do with.

15   Q      But you understand that those were separate

16   divisions of the company; correct?

17   A      It's been talked about here and testified to.

18   I don't have an intimate knowledge of the structure,

19   but, again, very, very good pricing on expensive

20   media.

21   Q      And you don't know what Mr. Sterling or anyone

22   else at Clear Channel Entertainment's abilities were

23   to assist with the various requests that you were

24   making to them to assist with the promotion of the

25   live events; isn't that right?

1    A        No, ma'am.  I don't believe that was ever

2    communicated to me.

3    Q        Okay.  Now, I believe it's been established

4    that Wrestlereunion certainly put a lot of effort

5    into the promotion of the Wrestlereunion live

6    events; isn't that right?

7    A        We feel like we did.

8    Q        All right.  You feel like your efforts were

9    reasonable, certainly, if not extraordinary;

10   correct?

11   A        Yes.  I certainly, certainly would agree.

12   Q        And despite those efforts that Wrestlereunion

13   put forth, the Wrestlereunion shows were all

14   financial failures; isn't that right?

15   A        Ma'am, again, I don't guess we're going to

16   come to an agreement.  My events were financial

17   failures because Clear Channel did not live up to

18   their part of the arrangement.  My part of the

19   arrangement was to produce a live event.  I produced

20   one.  I never got any feedback of any kind that I

21   produced a poor live event.

22            Mr. Sterling sat with us into the wee hours of

23   the morning after the second event and told us how

24   great it was and, I mean, that was what I was

25   responsible for doing and I did it.

1    Q      Is it your testimony to this jury under oath

2    that the Wrestlereunion events were not financial

3    failures?  And I'm just talking about the live

4    events.

5    A      Well, if you're saying to take this one aspect

6    of the revenue expected and match it up against the

7    expenses then, yeah, you're going to come out with a

8    negative number.  My testimony is that we don't have

9    the ability to look at all the revenue streams

10   because Clear Channel did not do what it was

11   supposed to do.

12   Q      Well, you were certainly intending to make

13   money on the live events in addition to any media

14   distribution effort; isn't that right?

15   A      Ma'am, wrestling doesn't necessarily make

16   money off of live events.

17   Q      Sir, if you could just answer my question.

18   You were looking to make money on the live events as

19   well as any media distribution that could occur from

20   that; isn't that right?

21   A      Any money that came in from the live events

22   would have been a positive thing.  If there had been

23   more money come in, that would have been wonderful.

24   It was not a major source of concern to me because

25   we were going to have revenue coming in from the

1    media.

2    Q       I'm going to try one more time, sir.  You were

3    intending to make money off of these live events in

4    addition to any media distribution?  Yes or no?

5    A       Ma'am, I'm certainly not going to sit here and

6    tell you that I was hoping that we would sell less

7    tickets than expenses.  But I wasn't focused on I've

8    got to make money on this live event or I'm going to

9    jump off a building.  I had other revenue streams.

10   I mean, I think I'm being clear.  I'm not trying to

11   suggest that my goal was to spend $100 and bring in

12   $25.

13   Q       So you agree with me you were intending to

14   make money off of the live events?

15   A       I will agree with you that it would have been

16   nice if the live event revenue on its own matched

17   the other -- matched the amount gone out.

18   Q       Well, you certainly didn't enter into this

19   venture and put together these live shows for the

20   purpose of losing money; were you, sir?

21   A       No, ma'am.  But you keep going to the fact

22   that the live shows were not -- were done with no

23   other sources of income in mind, and that's not the

24   case.

25   Q       That's not what I'm asking.  I'm asking you

1        about the live events.

2                MR. RODEMS:  Objection, Your Honor,

3        interrupted the witness from giving an answer.

4                MS. MILLNER:  He's not being responsive, Your

5        Honor.

6                THE COURT:  Well, that's for the jury to

7        determine, counsel.  Wait for the answer to be

8        completed before asking the question.

9                THE WITNESS:  Ma'am, you do understand that

10       Wrestlereunion was put together as a live event and

11       a media property?  Do we agree to that?

12       BY MS. MILLNER:

13       Q      Sir, the way this works is I ask you the

14       questions.

15               THE COURT:  All right, counsel.  You are not

16       to instruct a witness.  I will do that if you ask me

17       to.

18               MS. MILLNER:  Your Honor, would you please

19       instruct the witness to answer the question?

20               THE COURT:  Just answer the question, sir.

21               THE WITNESS:  Yes, Your Honor.  Wrestlereunion

22       was put together as a live event and a media

23       property.

24       BY MS. MILLNER:

25       Q      All right.

1    A      That indicates multiple streams of revenue.

2    Based on the one stream of revenue versus the

3    expenses, it lost money and, certainly, I'm not glad

4    about that.  But the expectation was that there

5    would be a second revenue stream at a minimum to

6    counteract or add on to any profit that had been

7    received.

8    Q      And the expectation was you would make money

9    on both the live event and the media distribution;

10   correct?

11   A      No, ma'am.

12   Q      All right.  Do you recall having your

13   deposition taken on December 10, 2008?

14   A      If you say that's when it was.

15   Q      Page 223 -- I'm sorry, 198.  Do you recall

16   giving this response -- oh, well, first of all, do

17   you recall having taken an oath at that deposition

18   just like you took an oath here to testify

19   truthfully before this jury?

20   A      Yes, ma'am.

21   Q      All right.  Do you recall providing this

22   testimony in response to this question, page 198,

23   line eight.

24         "Question:  In terms of -- in terms of the --

25   of when you came up with the idea, when you talked

Corrente - Cross

1          to Mr. Russen and you started signing talent and

2          booking the facility, in this time frame, summer of

3          2004 to the fall of 2004, what were the revenue

4          sources for this project that you anticipated?  How

5          did you plan to make money on this concept?

6                  Answer:  The live event and media

7          distribution.

8                  Question:  Live event.  Let's break that down.

9          You've got one that's going to be ticket sales at

10         the event; isn't that right?

11                 Answer:  Correct."

12                 Was that your testimony given at your

13         deposition on December 10th?

14         A       Yes, ma'am, I guess.  Well, you're reading it

15         to me.  I certainly don't recall those specific

16         words, but you're reading it.  I assume that it is.

17         I'm not sure that it differs from the testimony I'm

18         giving here today.  As a matter of fact, I think it

19         sounds like exactly what I'm saying.

20         Q       Okay.  Now, you claim that there is a market

21         for vintage wrestling matches or videotapes of

22         vintage wrestling matches; correct?

23         A       Sure.

24         Q       Okay.  And I believe that you talked about

25         some matches done by old wrestling legends that

1    have, you know, gone down in history, if you will;

2    correct?

3    A      I spoke about those?

4    Q      Yes.  I mean, isn't the concept of

5    Wrestlereunion to try and revisit old feuds, for

6    example?

7    A      Yes.

8    Q      And those old feuds are remembered throughout

9    the wrestling industry; correct?

10   A      In many cases they're -- the original feuds

11   are released by WWE and maybe TNA, probably not, but

12   released on DVD now.  There could be one released

13   tomorrow or yesterday.

14   Q      So you agree with me that there's -- or at

15   least you believe that there's still a market for

16   some of these old vintage wrestling matches that

17   have gone down in history; correct?

18   A      Yes.

19   Q      All right.  So the fact that it's been four

20   years since Wrestlereunion doesn't render the

21   footage taken at the Wrestlereunion events

22   unmarketable; correct?

23   A      No.  I will agree with you that it doesn't

24   make it unmarketable, but certainly time does erode

25   the value.  But I'll certainly agree with you that

1    it's not unmarketable.

2    Q       And, I mean, I believe you compared this to a

3    basketball game and that if the basketball game is

4    released years later there's just no market for it.

5    Do you recall that testimony?

6    A       Not specifically.

7            MR. RODEMS:  Objection, Your Honor, that

8    misstates the witness's --

9            THE COURT:  Legal objection, please.

10           MR. RODEMS:  Misstates the witness's direct

11   examination.

12           THE COURT:  I'm not going to comment on the

13   evidence.  If you don't have a legal objection,

14   overruled.

15           THE WITNESS:  Ma'am, do you mind repeating to

16   me what you're suggesting that I said?

17   BY MS. MILLNER:

18   Q       I believe your testimony was that you compared

19   the passage of time for the Wrestlereunion footage

20   to releasing a basketball game that was played four

21   years earlier into the marketplace.  Do you recall

22   that testimony?

23   A       That would sound right.

24   Q       But in wrestling there's actually -- wrestling

25   is not the same as basketball; can we agree on that?

1    A       In -- just tell me in what way it's not the

2    same.

3    Q       Well, in basketball there's a league and a

4    sport and no one knows what the outcome is going to

5    be; isn't that right?

6    A       Well, in this day and age and even in 2005,

7    you know, the outcome is given -- whether the

8    outcome is predetermined or not, it's not like

9    there's an advertisement on the marquee that says,

10   Hulk Hogan is going to wrestle Randy Savage and, by

11   the way, know before you walk in the door that Hulk

12   Hogan is going to win.  So there's still an outcome,

13   whether it's predetermined or not.

14          So in that way if you're a wrestling fan,

15   you're certainly interested in the outcome, and many

16   wrestling fans know that if it's a WWE show that

17   Vince McMahon has determined who's going to win.

18   Q       Well, I mean, unlike wrestling, basketball --

19   or, I'm sorry, unlike basketball, wrestling has a

20   marketplace for these vintage feuds that live on in

21   history; correct?

22   A       I believe wrestling has the -- when you say a

23   market, maybe I don't understand your question.

24   Q       Well, the whole concept of Wrestlereunion was

25   to bring these legends from the past and revisit

1      some of these vintage feuds; correct?

2      A      Yes, ma'am.

3      Q      Because you believed there was a market there?

4      A      Yes, ma'am.

5      Q      Now, you've told -- let's focus a little bit

6      on your background.  You've told the jury you've

7      been in wrestling for several -- what, 20 some-odd

8      years; correct?

9      A      Since 1981, however long ago that is.

10     Q      You also told the folks at Clear Channel that

11     you and Mr. Russen had a lot of experience in the

12     wrestling industry; isn't that right?

13     A      Absolutely, correct.

14     Q      And you knew that the folks you were dealing

15     with at Clear Channel didn't have that experience in

16     the wrestling industry; correct?

17     A      Correct.

18     Q      They were relying on your expertise in that

19     regard; correct?

20     A      You mean in regards to putting on the live

21     event?

22     Q      Correct.

23     A      Absolutely.  They were very clear about that

24     and we understood that.

25     Q      All right.  And most -- am I correct that most

1    of your time spent in the wrestling industry has

2    been as a referee; correct?

3    A      No, ma'am.  I haven't refereed -- let me see.

4    I don't know that I've refereed a match since -- and

5    if I have, it's been a stray match here or there,

6    since 1991 when I started managing in Australia.  I

7    stopped refereeing pretty much at that point.

8    Q      All right.  Mr. Sammartino I believe testified

9    that he knew you as a referee.  Is that because you

10   haven't had contact with him for quite some time?

11   A      No.  I believe when he was being questioned he

12   was asked how he knew of me, how we got together.  I

13   refereed some matches that his son David

14   participated in where he managed him.  That was his

15   first time becoming aware of me, and I'm sure that's

16   what he was referring to.

17   Q      But regardless, you would agree with me that

18   you're not a licensed promoter in the state of

19   Florida; correct?

20   A      That's correct.

21   Q      And you're not a licensed talent agent; are

22   you?

23   A      No, ma'am.

24   Q      All right.  And by the way, this Australia

25   show that you talked about, am I correct that what

1    occurred there is that you and Mr. Russen went to

2    Australia to put on some wrestling shows at a theme

3    park; correct?

4    A       That's correct.

5    Q       All right.   The people who went to this event

6    were people who were in the theme park; correct?

7    A       There were people in the theme park, but they

8    certainly were not in the tent where we put on the

9    shows.   And I can assure you that the people that

10   ran the theme park were very clear that the majority

11   of people, if not all the people in the theme park,

12   attended the wrestling.   I asked them that myself.

13   Q       Right.   But my point is that you weren't

14   selling -- you were not selling tickets for the

15   wrestling event.   People were purchasing tickets --

16   purchasing tickets to enter the theme park in

17   Australia; correct?

18   A       Yes, ma'am.   You could look at it that way.

19   But, again, I questioned the ownership and the

20   management group of the park, and they say the way

21   these things are judged is when they have special

22   events in the park, if the people are there strictly

23   for the park, they will not end up in the tent or

24   wherever that event is, and they were very clear.

25   The tent was sold out every day.   Those people were

1    there to see the wrestling, and that was twice a

2    day.

3    Q      Well, you say your tent was sold out every

4    day.  There were no tickets sold to enter the tent.

5    If you happened to be in the theme park, you got to

6    go into the tent; correct?

7    A      I'll be glad to rephrase, ma'am.  The tent was

8    completely full and I don't know that people would

9    go in there just because they were in the park.

10   They had to be interested in what they were seeing

11   or why wouldn't they just go ride the rides?

12   Q      Isn't it a fact, sir, that most of the -- for

13   the most part you've never worked full-time in the

14   wrestling industry, you've always had another job;

15   correct?

16   A      For the most part, yes, ma'am.

17   Q      All right.  And, in fact, when you were

18   planning and organizing these wrestling --

19   Wrestlereunion events, you had a full-time job at

20   ABC Financial; correct?

21   A      Yes, ma'am, that's correct.

22   Q      All right.  You didn't want to give up your

23   full-time job because you knew there was no

24   guarantee that Wrestlereunion would be financially

25   successful; correct?

1       A       No, ma'am.  There was no necessity to give up

2       my full-time job.  Why would I have a need?  There

3       was no need.  Mr. Russen was taking care of the

4       day-to-day and I was taking care of everything else

5       I needed to.  My job afforded me that flexibility.

6       Q       All right.  So is it your testimony that there

7       was a guarantee that Wrestlereunion would be

8       financially successful?

9       A       A guarantee from who?

10      Q       From anyone.

11      A       No.  No, ma'am.

12      Q       So it's just prudent to hang onto your

13      full-time job that's supplying you income rather

14      than give that up to essentially throw yourself at a

15      venture that may or may not be successful

16      financially; correct?

17      A       I would say if you want to ask was that

18      prudent, yes, I guess so.  Why give up income that

19      there's no need to give up?

20      Q       And Wrestlereunion by far is the largest

21      project or program that you've ever organized;

22      correct?

23      A       Ma'am, in the wrestling industry, other than

24      Vince McMahon, I'd say it's the largest program that

25      anyone has ever organized.

1    Q       You're not comparing yourself to the WWE; are

2    you, sir?

3    A       No.  I said other than Vince McMahon, it's the

4    largest program that anyone has ever organized.

5    Q       Well, how do you know that, sir?

6    A       Ma'am, do you have anywhere where there were

7    94 wrestlers gathered?  I tell you, it's never

8    happened.  It's not even come close to happening.

9    Q       Well, sir, you've never been to another -- I

10   believe you testified on direct that you've never

11   been to another fan convention before the

12   Wrestlingreunion I event; correct?

13   A       Well, again, ma'am, it's Wrestlereunion and,

14   no, ma'am, I was not.

15   Q       All right.  So you have no idea what happened

16   at those prior fan conventions; correct?

17   A       Well, you read about them on the internet, and

18   I can assure you that there haven't been any that

19   advertised 94 wrestlers.  I don't even know of any

20   that advertised 50 wrestlers.

21   Q       You've reviewed all the internet publications

22   concerning prior wrestling fan conventions prior to

23   entering into this venture for Wrestlereunion I; is

24   that what you're testifying to, sir?

25   A       I will testify that I read the major internet

1    wrestling sites, PWInsider, WrestlingFigs,

2    OneWrestling.com.  Those are the major sites that --

3    in the internet wrestling world that would be your

4    New York Times, your Wall Street Journal, and I'm

5    not aware of any events that ever held that large of

6    a crowd of talent.

7    Q      But nevertheless, you never felt the need to

8    attend, actually go in person to a wrestling fan

9    convention before putting on what you considered was

10   the biggest fan -- wrestling fan convention ever

11   held; correct?

12   A      No, ma'am, I did not.

13   Q      All right.  Now, you would agree with me that

14   Wrestlereunion was the first time that you ever had

15   primary responsibility for the financing of a

16   wrestling project; correct?

17   A      Yes, ma'am.

18   Q      All right.  And, in fact, Wrestlereunion is

19   the first event that you were ever placed in charge

20   of the finances; correct?

21   A      Well, you know, I spoke about the events that,

22   you know, I ran with the WWE.  At the beginning of

23   my career, it was our organization that collected

24   the money and had the money, if that's what you

25   mean.  And then, you know, we are the ones that got

1    together with the WWE and split the money.  So, I

2    mean, I was in charge of the revenue right at the

3    beginning, if that's what you're talking about, just

4    collecting the money at the door.

5    Q       Okay.  You would agree with me that

6    Wrestlereunion is the highest dollar event that

7    you've ever personally promoted; isn't that right?

8    A       Oh, absolutely.

9    Q       You've not been involved in any event on the

10   same scale as the Wrestlereunion event; correct?

11   A       Yes, ma'am.  There are no events on the scale

12   of the Wrestlereunion event.

13   Q       And when you say, scale, you mean because of

14   the number of wrestlers, certainly not because of

15   the amount of people that attended; correct?

16   A       The number of wrestlers, the -- you know, the

17   scope of the entire thing, the amount of wrestlers

18   that appeared on the independent card itself.

19   Q       And Wrestlereunion had only one employee,

20   Mr. Russen; is that right?

21   A       Yes, ma'am.

22   Q       And he was running the day-to-day operations

23   of the company?

24   A       Yes, ma'am.

25   Q       And as I understand it, you claim that you've

1        invested money into Wrestlereunion; correct?

2        A      Yes, ma'am.

3        Q      You've invested around $100,000 to $125,000

4        into this?

5        A      Yes, ma'am.

6        Q      Do you know what the number is?  Is it 100,000

7        or 125,000?

8        A      I don't have a specific number.  I'm going to

9        tell you it's closer to 125,000 than 100,000.

10       Q      Okay.  That's the sum total of your financial

11       contribution to Wrestlereunion; correct?

12       A      Yes, ma'am.

13       Q      And you're asking this jury to award you

14       millions of dollars in damages as a result of this;

15       correct?

16       A      Yes, ma'am.

17       Q      All right.  So that's quite a return on your

18       investment; fair enough?

19       A      Well, I feel like my company momentum was

20       destroyed.  You know, momentum is very important in

21       any business.  We spent the money that we spent, and

22       we certainly spent more than $125,000 to get that

23       momentum and to get that attention, and that was

24       stopped due to Clear Channel's lack of keeping their

25       promise.

1     Q        You're asking this jury to award you more than

2     ten times the amount that you've invested in

3     Wrestlereunion; isn't that right?

4     A        Me personally?

5     Q        Wrestlereunion, LLC, your company.

6     A        I guess I'm not sure that I 100 percent

7     understand the question.

8     Q        All right.  I'll ask it again.

9     Wrestlereunion, LLC, is asking this jury to award it

10    more than ten times more than it's -- than the

11    investment that you put into the company?

12    A        Can you tell me ten times what number?

13    Q        The $125,000.

14    A        That's what I didn't understand.  Because

15    Wrestlereunion, LLC, has spent more than $125,000.

16    That's what I was trying to clarify.  I'm sorry.

17    Q        All right.  Fair enough.

18    A        Yes, ma'am.

19    Q        All right.  Now, you came up with the idea for

20    Wrestlereunion in the summer of 2004; is that right?

21    A        Yes, ma'am.

22    Q        And Wrestlereunion was first announced to the

23    world at large in the summer of 2004; correct?

24    A        Yes, ma'am, sometime -- sometime there.

25    Q        And I believe you testified yesterday that by

1       June of 2004, you were going forward with

2       Wrestlereunion I as a live event; correct?

3       A       Yes, ma'am.

4       Q       All right.  And certainly you had no knowledge

5       of any interest that Clear Channel may have had in

6       June of 2004; correct?

7       A       No, ma'am.  I did not have any knowledge in

8       June of 2004.

9       Q       So certainly you're not suggesting to this

10      jury that Clear Channel had anything to do with you

11      proceeding with Wrestlereunion I; correct?

12      A       No, ma'am.  I don't believe I've tried to

13      suggest that.

14      Q       Okay.  And the idea was to make money off not

15      only the live events, but tickets, sponsorships and

16      merchandise, as well; correct?

17      A       Yes, ma'am.

18      Q       All right.  And you've never made money off of

19      ticket sales, sponsorships or merchandise; correct?

20      A       Well, not anything to speak of.  I mean, we

21      certainly had some -- you know, we may have saved

22      some money on some sponsorships.

23              THE COURT:  Why don't we take our lunch break.

24      I'm sorry to stop you mid-sentence, but it's 12:15.

25      Let's return at 1:30 by the courtroom clock.

1              COURTROOM SECURITY OFFICER:  Please rise for

2      the jury.

3              (Recess was taken from 12:15 to 1:33 PM).

4              (Back on the record.)

5              COURTROOM SECURITY OFFICER:  All rise.

6              THE COURT:  Ready?

7              MR. RODEMS:  Yes, Your Honor.

8              THE COURT:  Bring the jury in, please.

9              COURTROOM SECURITY OFFICER:  Please rise for

10     the jury.

11             (Jury in at 1:33 PM.)

12             COURTROOM SECURITY OFFICER:  Please be seated.

13             THE COURT:  Ms. Millner, you may resume

14     direct -- or cross, excuse me.

15             MS. MILLNER:  Thank you, Your Honor.

16     BY MS. MILLNER:

17     Q      Welcome back, Mr. Corrente.

18     A      Thank you.

19     Q      Now, Mr. Corrente, you said several times

20     during your examination that Wrestlereunion was the

21     biggest event ever -- or fan convention ever held;

22     correct?

23     A      Largest, biggest, sure.

24     Q      Right.  And the reason why it's the biggest

25     fan convention ever held is because you whipped out

Corrente - Cross

1    your checkbook and paid 94 wrestlers to come to it;

2    correct?

3    A      Yes, ma'am.

4    Q      All right.  These wrestlers didn't come for

5    free, they came because you paid them; correct?

6    A      Yes, ma'am.

7    Q      Am I to understand, also, that it's your

8    testimony that the interest generated by the live

9    event bears no -- or lack of interest generated by

10   the live event bears no relationship to future DVD

11   sales?  Is that your belief, sir?

12   A      Yes, ma'am, it is.

13   Q      Okay.  So you believe that even failed live

14   events -- or live events where few people come still

15   are capable of generating hundreds of thousands if

16   not millions of dollars in DVD sales; correct?

17   A      Yes, ma'am.  I would say that if the event is

18   reviewed favorably, that would certainly go a long

19   way towards it, and our event was certainly reviewed

20   favorably.

21   Q      Okay.  It was reviewed favorably by the Wall

22   Street Journal and a few wrestling magazines;

23   correct?

24   A      Wrestling internet sites, I believe the Tampa

25   Tribune, the Miami Herald.  I can't speak to any

 1    other specific names.  But everywhere it was

 2    reviewed, it was reviewed positively, to the best of

 3    my knowledge.

 4    Q     All right.  Now, before Clear Channel came

 5    into the picture, you had struck a deal with

 6    Highspots to do the filming of Wrestlereunion I;

 7    correct?

 8    A     Yes, ma'am, that's correct.

 9    Q     You didn't have a written contract with

10    Highspots?

11    A     That's correct.

12    Q     And really what you had was a general

13    understanding that they would come and film the

14    first event; is that right?

15    A     No, ma'am.  I would consider it a firm

16    agreement.  I wouldn't consider it just because it

17    wasn't a written contract, it was a firm agreement.

18    Q     Well, the only specific details that you

19    really knew about what Highspots would do in terms

20    of its production or filming was that they would not

21    film the event in high definition; correct?

22    A     Well, they -- yes, they would not film the

23    event in high definition.  But they were going to

24    film, edit and distribute and we were going to get a

25    50 percent share.

1    Q      Okay.  Now, other than Highspots, you had no

2    agreement with any other distributor or production

3    company concerning the filming of any Wrestlereunion

4    event; correct?

5    A      That's correct.

6    Q      And Highspots had only committed to do the

7    first Wrestlereunion event?

8    A      Yes, ma'am.  That's correct.

9    Q      And Highspots typically films smaller events,

10   not big events like Wrestlereunion; is that right?

11   A      They wouldn't have had any opportunity to make

12   that decision.  As I've indicated, there are no

13   events like Wrestlereunion.

14   Q      But they typically film only small events;

15   would you agree with that?

16   A      Well, events that are normally out there are

17   smaller in stature, so, yes, I guess I would agree

18   with that.

19   Q      Now, I want to talk a bit about the reason why

20   we're here, and that's the contract between

21   Wrestlereunion and Clear Channel.

22   A      Okay.

23   Q      Now, first of all, you would agree with me

24   that you had an opportunity to review the terms of

25   that contract; correct?

1       A       I read the contract.

2       Q       Okay.  And you had the ability to comment or

3    make revisions as part of the negotiation for the

4    contract; correct?

5       A       No, ma'am, not really.

6       Q       You had no ability to make comments to the

7    contract?

8       A       Ma'am, when I spoke to Steve Sterling, he was

9    very, very clear, this contract needs to be signed

10   and I need to have it back now.  My company is not

11   going to believe that you're going to be there

12   without this signed agreement back.

13      Q       All right.  Are you suggesting you didn't have

14   time to review this contract?

15      A       I had time to read it.  There was no time to

16   make alterations, changes of anything.  I was told

17   to sign and send it back or my company is not going

18   to believe you're going to be there.

19      Q       You had a couple of weeks to look at a draft

20   of this contract; isn't that the case?

21      A       Ma'am, the -- the item that I signed I got and

22   signed and sent back on the exact same day.

23      Q       But you had received a draft contract

24   containing the essential terms weeks before; isn't

25   that right?

1    A      I received an e-mail on January 7th.  It's not

2    the same thing that we signed.

3    Q      But essentially it contained the same terms,

4    correct, the same key provisions?

5    A      I couldn't speak to that.  If you're saying it

6    is --

7    Q      Why don't we look at it together.

8           MS. MILLNER:  Mr. Brown, can you pull up

9    Plaintiff's Exhibit 136, as well as the contract in

10   this case.  All right.  Now -- hum.  Let's focus in

11   on the first key provision in both contracts.  Can

12   we do that?  Well, no, no, paragraph one, I mean,

13   not the introductory language.

14          MR. BROWN:  Down here?

15          MS. MILLNER:  Yeah.  All right.

16   BY MS. MILLNER:

17   Q      And maybe this would be easier, sir, if you

18   could just go to your exhibit book, Plaintiff's

19   Exhibit 136, and you can compare it with us.

20          Now, first of all, you would agree that

21   Plaintiff's Exhibit 136 you received on January 7th;

22   correct?

23   A      Yes, ma'am.  I believe that's the date.

24   Q      All right.  And you signed the contract that

25   is at issue in this case on January 21st; right?

1    A      That's correct.

2    Q      All right.  And the first paragraph, the

3    programs, when we -- the top one is the actual

4    contract because you can tell the faxed copy isn't

5    that good.

6          MS. MILLNER:  Let's pull that up a little

7    more, Mr. Brown.

8    BY MS. MILLNER:

9    Q      Now, looking at your screen and looking at

10   136, would you agree with me that essentially the

11   same terms are in the draft contract from January

12   7th as is in the final contract that you signed on

13   the 21st?

14         MR. RODEMS:  Objection, Your Honor.

15         THE COURT:  Legal grounds?

16         MR. RODEMS:  The exhibit that she's referring

17   to as 136 is not Exhibit 136.

18         MS. MILLNER:  Plaintiff's Exhibit 136.

19         THE COURT:  Confer with each other, please,

20   and see if you're talking about two different

21   things.

22         (Discussion was held off the record.)

23         MS. MILLNER:  Okay.  Mr. Brown, just -- let's

24   just have -- thank you, Mr. Rodems.  Mr. Brown,

25   let's just put the contract in the case, Defendant's

1      37, up on the screen.  Let's forget about the --

2      BY MS. MILLNER:

3      Q      So, sir, if you can turn to your exhibit book

4      Plaintiff's Exhibit 136.  Are you with me?

5      A      Yes, that's where I am.

6      Q      All right.  Let's look at the language from

7      the actual contract signed and compare paragraph one

8      and ask you if you would agree with me that the

9      essential terms in paragraph one are in both the

10     draft contract that you were provided on the 7th and

11     as well as the contract you ultimately signed on the

12     21st.

13     A      Well, it seems to be.  I mean, without

14     comparing every word, it seems to resemble the one

15     here.

16     Q      And you made no edits or requested no

17     additions or changes be made to that paragraph;

18     correct?

19     A      No.  No, ma'am.  What I recall is Steve

20     Sterling sending this and then saying, let me get

21     this to my legal department and get it sent back

22     over to you.  I was not prepared to have something

23     analyzed by an attorney representing me until I had

24     what they were proposing to be the actual agreement.

25     Q      What Mr. Sterling said is, take a look at our

1    draft and while I crunch some numbers I will give

2    you the final version; isn't that right?

3    A      No, ma'am, it's not.  Mr. Sterling said what I

4    said that he said, which was let me get this down to

5    my legal department and we'll get it back to you.

6    And when he did, he brought it back with an apology

7    about it taking so long.

8    Q      Sir, you certainly had the opportunity to

9    review this -- you understood this was a working

10   copy or a draft of the agreement that Steve was --

11   Mr. Sterling was looking to have entered in this

12   relationship; correct?

13   A      I understood it was the draft, ma'am.  I would

14   have been looking for my attorney to review a final

15   product or at least what they were suggesting was a

16   final product.  This is not that.

17   Q      He told you, sir, that this was the outline

18   of -- or an outline or a draft of an agreement that

19   he was looking to have entered between the parties;

20   correct?  Yes or no?

21   A      Well, yes, I believe I've already said that

22   it's an outline or a draft.  It is not a final

23   product, and that's what I was waiting for.  And

24   quite honestly, ma'am, the timeframe that Steve

25   Sterling laid out when he got this back to us, he

1    failed to meet that timeline.  If he'd got it back

2    to us when he said he would, we would have had time,

3    if January 21st was the drop dead date.

4    Q     All right.  But you would agree with me, and

5    maybe we can cut this short, that essentially the

6    draft contract that you were provided on January

7    7th, 2005, contains essentially the same terms as

8    the contract that was ultimately signed in this

9    matter; correct?

10   A     It looks at a very quick glance to be -- to be

11   something of the same -- of the same nature, yes.

12   Q     All right.  And you would agree with me that

13   you had the ability, therefore, to review at least

14   the draft and make comments on it; correct?

15   A     Again, I read the letter and I waited for

16   Steve to provide me a final version.  I guess I

17   could have said something.  I don't know.  I don't

18   remember being asked for any input.  What I remember

19   was, let me get this to legal and get it back to

20   you.  That's what I recall.

21   Q     Sir -- sir, you understand -- you're a

22   businessman, you understand that contracts are --

23   involve negotiation; correct?

24   A     Yes.  And I also understand that they come

25   with a place for two people to sign, and that's

1    something that I would want my attorney to review.

2    This was nothing.  This to me was not a contract.

3    It was -- it was what you say, an outline or a

4    working draft.  When I got the agreement, I planned

5    on giving it to someone to review, an attorney.  I

6    was given no time to do that.

7    Q      Well, did you -- you certainly had a couple of

8    days between -- didn't Mr. Sterling ask you to

9    review it and return it to him in a few days from

10   when he sent it to you?

11   A      No, ma'am, he did not.  I received it on

12   January 21st, spoke to Steve, he told me he had to

13   have it back immediately or else Clear Channel would

14   feel they were going to show up to an empty parking

15   lot.  I said, what does that mean?  He said, we

16   don't believe -- they will not believe that you'll

17   be there if you're not willing to sign this.

18   Q      Please turn to Plaintiff's Exhibit 138, sir.

19   Are you with me?

20   A      Yes, ma'am.

21   Q      This is the e-mail that Mr. Sterling sent to

22   you on January 21st, enclosing or attaching the

23   contract; correct?

24   A      I would say so.

25   Q      All right.  And, in fact, he says to you to --

1    and this is a Friday, January 21st; correct?

2    A      Yes.

3    Q      And he asked you to return the agreement on

4    Monday.

5    A      Well, ma'am, I'm sorry.  But in the business

6    world, Friday, it might as well be Monday.  There

7    are no attorneys working on Saturday and Sunday.

8    Q      You couldn't -- if you chose to, you could

9    have reviewed it over the weekend, provided a copy

10   of it to your attorney on Monday morning to look at

11   it and sent in comments to Mr. Sterling; isn't that

12   right?

13   A      I'm sorry, ma'am.  I was not in a position to

14   do that and have an attorney drop everything to

15   review a contract based on Steve Sterling not living

16   up to the timelines that he suggested.  We put no

17   time restrictions on this at all.  He called us on

18   December 31st, and it took him until January 21st to

19   get us a 14-paragraph agreement that he was

20   satisfied with.

21   Q      It took him a week to get you a draft contract

22   that contains essentially the same terms as the

23   contract that you signed; correct?

24   A      A week?  January 7th to January 21st is two

25   weeks.

Corrente - Cross                                                    143

1    Q      No.  From the December 31st call to the

2    January 7th contract or draft contract, that's a

3    week; correct?

4    A      Okay.  But that wasn't a contract, ma'am.  It

5    was an outline, as you called it, or a working

6    draft.  I'll accept either one of those terms.

7    Q      And you didn't make comments to either the

8    working draft or you didn't make comments to the

9    final contract, can we agree on that?

10   A      Ma'am, I spoke to Steve about -- about this.

11   Steve, I really want to have time to go through

12   this.  Sal, there is no time for that.  We need to

13   have it back.  That's what I was told.

14   Q      Can we agree that you did not make comments to

15   the draft contract and you did not make comments to

16   the final contract; fair enough?

17   A      I will stipulate that I did not make revisions

18   to the items sent to me on January 7th, and I was

19   not given any time to make comments to the one sent

20   to me on January 21st.

21   Q      All right.  So it's Clear Channel's fault that

22   you didn't review the contract?

23          THE COURT:  Let's move on.

24          MS. MILLNER:  All right.

25   BY MS. MILLNER:

1    Q      Now, the contract -- or rather the e-mail that

2    Mr. Sterling sent to you on January 21st actually

3    contained two versions of the contract; isn't that

4    right?

5    A      Yes, ma'am.

6    Q      The first version provided for an upfront

7    payment by Clear Channel to you to help you defray

8    some of the costs that it would take for you to put

9    on these live events; correct?

10   A      Yes, ma'am.

11   Q      And that upfront cost, or rather the split,

12   therefore, of any profit would be, I believe, a

13   35/65 percent split; correct?

14   A      Yes, ma'am.

15   Q      And you rejected that version; correct?

16   A      We initially talked about accepting that

17   offer, and Steve said, Sal, if that's what you want,

18   that's what we'll do.  But I'm telling you, it's a

19   bad move for you.  This is like a bad interest loan

20   and I'm telling you it is not in your best interest

21   to do it.  If you want to do it, go ahead and sign

22   it and we'll accept it, but I'm telling you it is

23   absolutely not in your company's best interest.

24   Q      Sir, you understood that Mr. Sterling was not

25   your representative.  He was on the other side of

1        the table on this contract negotiation; correct?

2        A       Yes, ma'am, I understand that.  But you're

3        asking me to tell you what he said, right?

4        Q       I asked you if he sent two alternative

5        versions.

6        A       I said he did that.

7        Q       Okay.  And it was your choice, your ultimate

8        decision to sign the version that did not provide

9        for the upfront cash; correct?

10       A       Ultimately I made that choice based on advice

11       from Steve Sterling.

12       Q       All right.  Now, let's take a look at the

13       contract -- well, you're not suggesting to this jury

14       that somehow you were forced or pressured by Clear

15       Channel to sign this contract against your will; are

16       you, sir?

17       A       You mean one of the two?

18       Q       You weren't forced into signing this contract

19       against your will by Clear Channel; were you, sir?

20       A       I was advised -- I was going to sign one of

21       them, and I was advised that option number one, the

22       50/50, would have been in the best interest of my

23       company.

24       Q       By the person sitting on the other side of the

25       contract negotiation?

1    A      Sure.  Who explained how the calculations

2    worked and how the advance money worked.  And he

3    said, I'm telling you, this is a very high interest

4    loan, you don't want to do this.  There is going to

5    be money coming in from this and there's no sense in

6    you paying this high interest.

7    Q      Well, let's be clear.  This was not a loan.

8    It was actually a payment that Clear Channel was

9    making to you; correct?

10   A      Ma'am, it was absolutely described to me as

11   basically a loan against future -- future profits.

12   Q      They weren't -- the money that they were going

13   to provide you upfront they weren't asking for you

14   to pay that back; correct?  You would just have to

15   take a lesser percent of any proceeds from the DVD

16   sales; correct?

17   A      Well, I guess I can't speak to the absolute

18   specifics of the mathematics.  I know how he

19   described it to me.  Maybe he described it in a way,

20   being that I'm not an accountant, that I would have

21   understood.  He described it as a high interest

22   loan.

23   Q      Did you read that contract, the alternative

24   version?

25   A      I'm sure I read it at some point.

Corrente - Cross

1    Q       All right.  Well, why don't we look at the

2    contract actually that you did sign.

3    A       Okay.

4    Q       Okay.  Now, first of all, you -- I think we

5    can agree that Clear Channel had no responsibilities

6    relating to the staging of the live events; isn't

7    that right?

8    A       Yes, ma'am.

9    Q       It was up to you to decide how many

10   Wrestlereunion events would occur; correct?

11   A       Yes, ma'am.

12   Q       It was up to you when these events would take

13   place; correct?

14   A       Ultimately, yes.

15   Q       It was up to you as to who -- what talent

16   would appear at these events; correct?

17   A       Yes, ma'am.  We did ask them if they had any

18   input on that, we'd be willing to listen to it.  We

19   didn't get any, but we did ask for it.

20   Q       It's up to you how much to charge for the

21   tickets to these events; correct?

22   A       Yes, ma'am.

23   Q       And there is no language in the contract that

24   requires you to actually put on any events beyond

25   the Wrestlereunion I; correct?

1    A       I guess I'd have to read through every detail

2    of it.  I don't -- I don't recollect that.

3    Q       And at the time this contract was signed, you

4    would agree with me that only Wrestlereunion I was

5    planned; correct?

6    A       Well, Wrestlereunion I was the only event

7    booked.  We certainly -- we certainly had plans as

8    they were discussed with Steve, but as far as a

9    facility rented and things like that, yes.

10   Q       And there's nothing in this contract that

11   required Clear Channel to film each and every live

12   event that you in your discretion chose to put on;

13   correct?

14   A       Well, my -- my agreement with Steve was that

15   they were going to film every event that we put on.

16   Q       It doesn't say that in the contract, though;

17   correct?

18   A       We certainly accepted it as that.

19   Q       But my question was it doesn't say that in the

20   contract; correct?

21   A       Where do I need to look to see that?

22   Q       I don't believe it's there, but if you can

23   find some language --

24           THE COURT:  Counsel will not make a comment in

25   front of the jury.  You're not a witness, ma'am.

1      Ask a question.

2      BY MS. MILLNER:

3      Q      Do you know --

4      A      I was asking what the exhibit is I'm supposed

5      to be looking at.

6      Q      I'm sorry.  It would be Plaintiff's Exhibit 1.

7      A      Okay.  Well, to me where it says, "The

8      programs will be derived."  Wrestlereunion I was a

9      program.

10     Q      Could you highlight that?  All right.  It says

11     programs, with the S in parenthesis, which would

12     mean one or more programs; correct?

13     A      Correct.

14     Q      All right.  And it doesn't state in there that

15     -- and it talks about the programs being derived and

16     programs is the videotaping; correct?

17     A      Well, the programs is the live events that

18     they videotaped, yes.

19     Q      No.  Actually, the program is --

20            THE COURT:  Ms. Millner, ask a question,

21     please.

22            MS. MILLNER:  All right.

23     BY MS. MILLNER:

24     Q      Can you identify the language, however, for

25     the jury that requires, in your mind, that Clear

1    Channel film each and every live event that you

2    chose to put on?

3    A      Yes, ma'am.  This first line here.  "The

4    programs will be derived from CCETV, audio/visual

5    productions from a series of live events called

6    Wrestlereunion."  A series of live events,

7    Wrestlereunion I, Wrestlereunion II, Wrestlereunion

8    III.  That's my interpretation.

9    Q      So it's your interpretation that that sentence

10   that you just read for the jury requires that Clear

11   Channel come out and film every single

12   Wrestlereunion event that you in your discretion

13   chose to put on?

14   A      Yes, ma'am.  And I explained that to

15   Mr. Townley, as well.

16   Q      All right.  Now, would you also agree with me

17   that there's no language in the contract that

18   requires that Clear Channel edit the footage shot at

19   these live events?

20   A      Ma'am, we gave them -- we gave them exclusive

21   rights.  If they were going to do nothing with them,

22   why would we give them exclusive rights if there was

23   no requirement on their side to do anything?  I

24   mean, we wouldn't just say, go ahead and film it and

25   do nothing with it.  I mean, that wouldn't be

1    reasonable.

2    Q      Well, actually, you gave them exclusive rights

3    to the footage that they took; correct?

4    A      Okay.  Then we were supposed to share 50

5    percent of the revenue.  If they had said, listen,

6    once we get it, we may choose to do absolutely

7    nothing with it, we would have never proceeded

8    forward with that.

9    Q      Well, let's just go back to my original

10   question.  Can you identify the language in the

11   contract that requires that Clear Channel edit the

12   footage that they took at these events?

13   A      CCETV shall edit the programs --

14   Q      Hold on.  Tell me what paragraph you're

15   reading from so we can highlight it for the jury.

16   A      Oh, I'm sorry.

17   Q      What paragraph?

18   A      Six.

19   Q      Six.

20          MS. MILLNER:  Mr. Brown, can you go to six?

21   Paragraph six, second page?  Second page.

22   BY MS. MILLNER:

23   Q      All right.  Here we go.  So please identify

24   the language in that paragraph that you say requires

25   Clear Channel to edit the footage.

1      A      Oh, I'm sorry, I'm under six.  Then there's,

2      A, costs and then one, two, I guess two under, under

3      costs, under number six.

4      Q      On the second page or third page?

5      A      The second page.

6      Q      All right.

7             MS. MILLNER:  Can you go to that, Mr. Brown.

8             THE WITNESS:  The beginning of the costs or

9      other costs.

10     BY MS. MILLNER:

11     Q      Production costs, is that it on the screen?

12     A      Well, what I have here --

13     Q      Or is it the second, is it II, is it this one?

14     A      Yes, number two, II.

15     Q      I got it.  So tell us where --

16     A      I apologize, that's not what I'm looking at.

17     If you want to come here and look at what I'm

18     looking at, maybe you can help me.

19            MS. MILLNER:  May I approach, Your Honor?

20            THE COURT:  Yes, ma'am.

21            THE WITNESS:  This section here.  And then if

22     you come --

23            MS. MILLNER:  Oh, it's on the third page,

24     then.  Third page, third page, Mr. Brown.

25     BY MS. MILLNER:

1    Q     All right.  So I think we're all on the same

2    page now.  Can you tell the jury what language you

3    believe requires Clear Channel to edit the programs?

4    A     All right.  Where it says, by the promoter

5    and/or talent/wrestlers shall be provided" --

6          THE COURT:  I'm sorry.  Slow down just a

7    little bit for the court reporter.

8          THE WITNESS:  I'm sorry.  By the promoter

9    and/or talent/wrestlers shall be provided for use in

10   the programs at no additional cost to the budget.

11   CCETV shall edit the programs as part of the

12   production budget.  CCETV shall not be responsibile

13   for any unapproved overages incurred by promoter.

14   BY MS. MILLNER:

15   Q     All right.  That's indicating -- that's

16   discussing who pays for the editing; isn't that --

17   isn't that the fact?

18   A     Well, I mean it says, they shall edit.

19   Q     As part of their production budget; correct?

20   A     Okay.

21   Q     All right.  But you believe that language

22   means they have to edit all the footage that they

23   took; is that your testimony?

24   A     Yes, ma'am.

25   Q     All right.  So -- and there's no other

1    language you rely on in the contract for that

2    position; correct?

3    A       I would have to continue -- I would have to

4    continue to read.  Yes, ma'am, that would be

5    correct.

6    Q       All right.  The contract does not provide a

7    deadline or a timeframe as to when this footage

8    needs to be edited; correct?

9    A       Well, no, ma'am, I guess it doesn't.  But

10   again, if we go by Steve Sterling's commitment of 90

11   days to six months revenue coming in, it certainly

12   suggests it would have to be edited.

13   Q       You've previously testified that this contract

14   contains your entire agreement with Clear Channel;

15   do you recall that?

16   A       Yes, ma'am.

17   Q       Okay.  Now, let's talk about distribution.

18   First of all, it does not -- the contract does not

19   discuss how distribution will occur of the

20   videotaped footage; isn't that right?

21   A       It tells who's responsible to distribute.

22   Q       It doesn't provide any details as to how that

23   distribution will occur; correct?

24   A       When you -- could you be more clear about what

25   you mean by that?

1    Q      In other words, it doesn't say how Clear

2    Channel is to distribute the product; correct?

3    A      Well, my understanding is Clear Channel is

4    supposed to make a sale to someone who's going to

5    put it someplace where the marketplace could choose

6    to purchase it.

7    Q      All right.  There's no -- that's not language

8    in the contract though, correct, that's your

9    understanding?

10   A      That's my understanding of the word

11   distribute.

12   Q      All right.  Now, there's no deadline as to

13   when Clear Channel would distribute the product;

14   correct?

15   A      There's no formal deadline, no.

16   Q      There's certainly no guarantee in the contract

17   that the product will be distributed; correct?

18   A      Again, ma'am, they accepted exclusive rights

19   and exclusive rights means that they're going to do

20   something with it.

21   Q      There's no guarantee in the contract that the

22   product would be distributed; correct?

23   A      The -- well, again, I would have to read it,

24   ma'am.

25   Q      Please take a look, sir.  This is important.

1    This is the contract we're here on, so please review

2    it.

3         THE COURT:  Counsel, no more remarks.  Ask a

4    question, get an answer.

5         THE WITNESS:  I guess it would be open for

6    interpretation, ma'am, but to me, in section

7    eight --

8         MS. MILLNER:  Let's go to section eight,

9    Mr. Brown.

10   BY MS. MILLNER:

11   Q    Okay.  And CCETV, by the way, is Clear Channel

12   Entertainment Television; correct?

13   A    Yes, ma'am.

14   Q    All right.  And this reads, "CCETV's rights to

15   secure worldwide television and home video

16   distribution deals for the programs in all forms

17   will be exclusive."  Is that the language you're

18   relying on to test -- that Clear Channel had

19   guaranteed that they would distribute the product?

20   A    Yes, ma'am.

21   Q    Nothing -- nothing else in the contract

22   supports that position; correct?

23   A    No, ma'am.

24   Q    And certainly, sir, you understood that there

25   was no guarantee that the marketplace would accept

1       these Wrestlereunion videotapes; correct?

2       A       What I know is that Steve Sterling said we

3       would have revenue in 90 days to six months.  That's

4       what I know.  That's what I went by.

5       Q       That's not what's in this contract; correct?

6       A       I don't see that quote from Steve Sterling in

7       here, but I can assure you that he made it.

8       Q       Mr. Sterling told you after you had signed the

9       contract that he had hoped that you would -- he

10      would find a distribution deal in 90 days to six

11      months; correct?

12      A       Absolutely incorrect.  I don't know that Steve

13      Sterling has ever used the word "hope" in my -- in

14      my presence or on the telephone.

15      Q       So it's your testimony -- and when

16      Mr. Sterling made this comment, by the way, you knew

17      he had not yet found a buyer for these videos;

18      correct?

19      A       Ma'am, what I know is we were dealing with a

20      very, very large media company with a gentleman who

21      said that we had a great idea that was going to

22      outlive long past him, me and Rob Russen, and we

23      would be making money.  Certainly it would trail off

24      as years went by, but there would be constant

25      revenue coming in for the rest of our lives off this

1      product.  That's what I know.

2      Q     Mr. Sterling -- you know when Mr. Sterling

3      allegedly made this comment that he had not yet

4      secured a distributor for your product; correct?

5      A     I'd have to say -- I would have to say no.  I

6      mean, when you make a statement to the power of what

7      he made, he would have had to have an idea where he

8      was selling this.

9      Q     All right.  Did he tell you, I found a

10     distributor for your product who's going to put it

11     on the marketplace?  Did he tell you that?

12     A     No, ma'am.

13     Q     All right.  So you knew when he made this

14     statement about 90 days to six months that he had

15     not yet secured a distributor for the Wrestlereunion

16     footage; correct?

17     A     No, ma'am.  I can't say that I asked him to

18     tell me who his distributor was.  What I asked him

19     is, when do you anticipate us getting revenue?

20     Ninety days to six months.  That was the question

21     that I asked.

22           He's the expert.  He's the professional.

23     However he was going to make that -- I told him

24     there was going to be wrestling on January 28th.  He

25     didn't ask me how I was going to do that.  I didn't

1    ask him how he was going to do what he was telling

2    me.

3    Q    Okay.  So I see now.  So what you said, if I

4    understand you, is you asked Steve, when do you

5    anticipate there being revenue, and he said 90 days

6    to six months?

7    A    Correct.

8    Q    And you interpreted that as a guarantee that

9    you'd have revenue in 90 days to six months;

10   correct?

11   A    Yes, ma'am.

12   Q    All right.  Now, the contract also discusses

13   the payment of -- or the splitting, I should say, of

14   any proceeds from the distribution of the footage;

15   correct?

16   A    Yes, ma'am.

17   Q    Let's go to paragraph seven.

18   A    I'm at paragraph seven.

19   Q    Oh, great.  Now, you would agree with me that,

20   according to the contract that you signed, if Clear

21   Channel was to distribute the product, it would

22   first take a 25 percent distribution fee from those

23   proceeds; correct?

24   A    Yes, ma'am.

25   Q    And then it would subtract out their

1      out-of-pocket expenses that were associated with the

2      distribution; correct?

3      A      Yes, ma'am.

4      Q      And then whatever the net of that is would be

5      split by you 50/50; correct?

6      A      Yes, ma'am.

7      Q      So, for example, just to keep the math easy,

8      if, hypothetically, Clear Channel had earned a

9      hundred dollars of revenue on the distribution of

10     this footage, they would take $25 for its

11     distribution fee; correct?

12     A      Yes, ma'am.

13     Q      And if it had $10 in production costs, it

14     would take that $10 out; correct?

15     A      By production costs, you're talking about

16     actual out-of-pocket distribution expenses?

17     Q      Yes.

18     A      Yeah.  I asked Steve about that.  He indicated

19     that that would have -- would cover things like

20     travel to make a sales pitch, things like that.  If

21     that's what you're suggesting, then, yes.

22     Q      So whatever it is, if it's $10 of out-of-

23     pocket distribution expenses, that would bring us

24     down to $65 in my hypothetical situation; correct?

25     A      Yes, ma'am.

1    Q      And at that point you would split the proceeds

2    50/50 or 32.50 each; correct?

3    A      Yes, ma'am.

4    Q      Now, you would agree that, according to this

5    contract, Wrestlereunion is only entitled to any

6    money if there are, in fact, proceeds; correct?

7    A      Yes, ma'am.

8    Q      And there hasn't been, to your knowledge, any

9    proceeds from the sale of any Wrestlereunion

10   videotapes; correct?

11   A      Correct.  Well, I guess somebody testified

12   that they sent a thousand to Highspots and got paid

13   for that.

14   Q      Okay.  Other than that Highspots sale, there's

15   been no other proceeds from the sale of these

16   videotapes; correct?

17   A      None to my knowledge.

18   Q      Do you know how much that Highspots sale was?

19   A      No, ma'am.

20   Q      It was about -- okay.  Now, you're aware, sir,

21   are you not, that Clear Channel has spent just over

22   $359,000 on out-of-pocket distribution expenses;

23   correct?

24   A      At this point I'm not a hundred percent sure

25   of any numbers.  I don't know that anything they

1    spent is on distribution.  It was on production.

2    Q      Okay.  So you view the distribution fee as

3    different from the production fee; is that your

4    testimony?

5    A      Well, they didn't edit or distribute.  I guess

6    I'm -- that's my thing is produce, edit and

7    distribute.  They did produce, they filmed it.

8    Q      Do you know -- but you would agree with me

9    that you were being kept up to date as to how much

10   Clear Channel was spending to film the

11   Wrestlereunion footage; correct?

12   A      I was given a sheet that said $602,000 when I

13   was in their office.

14   Q      Actually, you were given budgets prior to that

15   as the filming was going on; isn't that the case?

16   A      I mean, maybe your -- which event are you

17   referencing?

18   Q      All right.  Well, let's start with

19   Wrestlereunion I.  Were you not provided with

20   information as to how much Clear Channel had spent

21   filming Wrestlereunion I?

22   A      I don't recall.  If you have something that --

23   Q      Let's see if we can --

24   A      I'll look at it.

25          MS. MILLNER:  Can I approach, Your Honor?

1          THE COURT:  Yes, ma'am.

2     BY MS. MILLNER:

3     Q       Mr. Corrente, I've handed you what's been

4     marked as Defendant's Exhibit 20.  Do you see that?

5     A       Yes, ma'am.

6     Q       And you see on the bottom there it's got the

7     Wrestlereunion Bates Number on it, or stamp on it?

8     A       Yes, ma'am.

9     Q       All right.  Do you recall receiving a copy of

10    the expenses from Clear Channel related to its

11    filming of Wrestlereunion I?

12    A       Are you -- the date on here is 9/25/2006.  Is

13    that when you're suggesting I got this?

14    Q       I don't know when you got it.  I'm just asking

15    if you recall receiving this.

16    A       Well, I can't say that I recall getting the

17    specific document.  The documents I was talking to

18    you about I got October 27th, 2005, with the numbers

19    on them.  Those are the ones I was referencing.

20    Q       When you're saying the date, that's actually

21    the date you faxed it to your attorney in Texas;

22    correct?

23          MR. RODEMS:  Objection, Your Honor.  May we

24    approach?

25          THE COURT:  Come forward, please.

1          (At sidebar, on the record.)

2          MR. RODEMS:  Your Honor, she's not seriously

3     going to get into what he said to his attorney or

4     what --

5          MS. MILLNER:  No, no.  Because he said there

6     was a date.  There's a fax banner to a Texas -- to

7     Sam Coplin.  I can just ask about Sam Coplin.  I

8     don't have to identify him as an attorney.  I didn't

9     want the jury to be left with the impression that

10     the date of this document is 9/25/06 because that's

11     just a fax banner that's on the document.

12          MR. RODEMS:  That's what you say.  I want what

13     he says.  He says he doesn't understand, and now

14     she's making references to an attorney.

15          THE COURT:  Ask the man a question, live with

16     his answer and move on.  Okay?

17          (End of sidebar discussion.)

18     BY MS. MILLNER:

19     Q     All right.  Sir?

20     A     Yes, ma'am.

21     Q     Do you recall receiving Defendant's Exhibit 20

22     from Clear Channel?

23     A     No, ma'am, I have to say I don't.  What I see

24     is a phone number here from Dallas, Texas, so they

25     probably sent it to Dallas, Texas and then someone

1    in Dallas, Texas faxed it to me.  Because when you

2    have a fax number on the top of something like this,

3    that's the number it's coming from, not the number

4    it's going to.

5    Q     All right.  And you see the Wrestlereunion

6    stamp on it, but you still don't recall having

7    received it; is that your testimony?

8    A     Wrestlereunion stamp on it?

9    Q     On the bottom there.

10   A     I'm not denying I received it.  You asked me

11   if I recall getting it and, no, ma'am, I don't.  But

12   again, that was a long time after the meeting and

13   when we received numbers originally.

14   Q     And you don't recall receiving information

15   from Clear Channel concerning expenses associated

16   with any of the production of the Wrestlereunion

17   events; is that your testimony?

18   A     Yes, ma'am, I do, but I don't recall it

19   looking like this.

20   Q     Okay.  Now, while we're on the subject of

21   financial equipment -- the finance commitment of

22   Clear Channel, let's go to paragraph six of the

23   contract, if we could.

24         Am I correct, sir, that you were told that

25   Clear Channel's overall all-in financial commitment

1    to this project would be $235,000?  It would be a

2    maximum, I should say, of $235,000?

3    A      Per event.

4    Q      Well, that's not what it says, though.  What

5    it says is --

6           THE COURT:  All right.  Counsel, you will not

7    comment on what it says or doesn't say.  You're not

8    a witness.  That's the third time I've reminded you

9    of that.  Please ask him questions.

10   BY MS. MILLNER:

11   Q      It says, sir, "Clear Channel will make an

12   overall all-in financial commitment in respect of

13   the audio/visual planning, production and completion

14   of the programs" -- with the S in parenthesis --

15   "and the budgeted amount not to exceed approximately

16   $235,000."  Correct?

17   A      The words you read I'll agree are the words on

18   the paper.  I guess we're interpreting them

19   differently.

20   Q      All right.  You interpret this to say that

21   Clear Channel had budgeted $235,000 per program?

22   A      Yes, ma'am.

23   Q      In reality, Clear Channel didn't commit to

24   spend any money on this program.  It's just a

25   maximum amount; correct?

 1    A      I guess somewhere -- unless they were going to

 2    get all their equipment and stuff for free, I mean,

 3    there has to be some expectation that they were

 4    going to spend some money.

 5    Q      But in the contract, the contract does not

 6    contain a minimum amount as to what they would

 7    spend; correct?

 8    A      Oh, no, ma'am, it does not.

 9    Q      All right.  Now, nowhere in the contract is

10    Clear Channel committed to film every single minute

11    of every single event that they attend; correct?

12    A      They were to film everything at Wrestlereunion

13    I that Highspots was going to film.  They made it

14    very clear to me that no one else was to come there

15    and film anything.

16    Q      Where in the contract does it require that

17    Clear Channel film every single minute of every

18    single Wrestlereunion or of whatever happens at

19    Wrestlereunion I?

20    A      Well, this was what Steve Sterling and I spoke

21    about.  I'm sure there's probably not language that

22    says that.  But we certainly wouldn't have

23    contracted them to replace Highspots if they were

24    going to film two-thirds of what Highspots was going

25    to film and, on top of that, not allow anyone else

1      to come in and film what they were refusing to film.

2      Q      Well, in reality, Clear Channel came in and

3      filmed everything that happened at Wrestlereunion I,

4      with the exception of about 10 hours of questions

5      and answers; correct?

6      A      Well, yes, ma'am.  But if you've got about 40

7      hours worth of product, that's about 25 percent.

8      Q      I thought this was a -- was it a three-day

9      event?

10     A      Well, yes, ma'am.  But no one expected anybody

11     to stand around with a camera and just film people

12     milling around the hall.  They were filming specific

13     scheduled events over the three days.  I want to

14     tell you that would have come to about 40 hours

15     worth of filming.

16     Q      Nowhere in the contract though does it require

17     that Clear Channel film every single minute of

18     Wrestlereunion I; can we agree on that?

19     A      Yes, ma'am.  We can agree.

20     Q      Okay, good.  Now, let's talk a minute about

21     Wrestlereunion I.  First of all, you would agree

22     that the folks at Clear Channel showed up at the

23     event and filmed it with high definition equipment;

24     correct?

25     A      To my understanding, it's high definition

1    equipment.

2    Q     And the contract doesn't specifically require

3    that Clear Channel film these events in high def;

4    does it?

5    A     There is high definition language in here.   I

6    do recall that.  I can't quote it to you

7    specifically.  Can you suggest to me which section

8    it's in?

9    Q     Sure.  Section one, page two.  It's the second

10   to last sentence.  See where it says, "The programs

11   will typically be shot in high definition video and

12   will conform to top quality broadcast and home video

13   production standards and will be in a multi-track

14   format"?  Do you see that?

15   A     Yes, ma'am.

16   Q     So it's not required that -- Clear Channel

17   wasn't required to film this in high definition;

18   correct?

19   A     Well, my definition of typically certainly

20   means, you know, that that should be the

21   expectation.

22   Q     But it's not necessarily required to film all

23   of the Wrestlereunion events in high definition;

24   correct?

25   A     Well, I guess "typically" would not be the

1    same as the word "required."

2    Q       But nevertheless, Wrestlereunion I, you would

3    agree, was in high def; correct?

4    A       To my knowledge and understanding, yes, it

5    was.

6    Q       And you have not seen that footage; correct?

7    A       No, ma'am, not really.

8    Q       I'm not correct or have you seen it?

9    A       No, you're -- basically, you're correct.

10   Q       All right.  And you heard Mr. Russen, your

11   business partner's -- or employee, I guess I should

12   say -- testimony that he reviewed it and found that

13   it was state of the art; correct?

14   A       I did hear that testimony, yes.

15   Q       So, you know, you testified again about -- you

16   showed some e-mails to the jury about some audio

17   problems and things being a train wreck and so on

18   and so forth.  But as far as Wrestlereunion's

19   concerned, the quality of the video is state of the

20   art; correct?

21   A       Well, as near as we can tell from our

22   perspective.  But Clear Channel wrote those e-mails

23   calling it a train wreck and stuff.  We didn't.  I

24   mean, I assume they're the experts.  They should

25   know if the stuff is good, bad or indifferent.

1    Q       And you don't know if those audio problems

2    were corrected through the editing process; do you,

3    sir?

4    A       To my knowledge there really hasn't been an

5    editing process.  If you're asking me could they be

6    corrected through the editing process, I really

7    wouldn't know.

8    Q       So you just don't know one way or the other,

9    because you've never seen these videos; correct?

10   A       Well, I've never seen the videos.  I don't

11   know that seeing the videos would get you --

12   Mr. Russen has seen the videos, and he's actually

13   done editing.  But, you know, he's not in the studio

14   with the equipment or whatever it is that they're

15   using.

16   Q       You are not making a claim in this lawsuit to

17   this jury that you've been damaged because of the

18   quality of the footage taken at any of the -- taken

19   at any of the Wrestlereunion events; correct?

20   A       No.  It's the lack to distribute, whatever

21   reason they haven't distributed that I can't speak

22   to.  These problems could be a part of that.  Maybe

23   it's not.

24   Q       This lawsuit is about what you claim to be

25   Clear Channel's failure to distribute, or at least

1   use reasonable efforts to distribute the

2   Wrestlereunion videos; correct?

3   A      Yes, ma'am.  And after seeing these e-mails,

4   I'm wondering if they didn't use reasonable efforts

5   because they didn't feel they had something they

6   could actually give to the marketplace.

7   Q      You're wondering, but you have no evidence of

8   that; correct?

9   A      Well, the e-mails describe a train wreck and

10  the audio problems and incompetent employees.  So, I

11  mean, those e-mails have been admitted into

12  evidence; correct?

13  Q      Sir, you don't know if any of those problems

14  were ultimately corrected through the editing

15  process.  You simply do not know; correct?

16  A      I'm not aware that there's been an editing

17  process, ma'am.

18  Q      So you don't know one way or the other?

19  A      Yes, ma'am.

20  Q      Okay.  Again, back to my question, then, you

21  are not claiming in this lawsuit that Clear Channel

22  failed to properly videotape or film the

23  Wrestlereunion events; correct?

24         MR. RODEMS:  Objection, Your Honor,

25  repetitive.

1          THE COURT:  Yes.  We're getting a bit

2     repetitive.  Please move on.

3          MS. MILLNER:  Okay.

4     <u>BY MS. MILLNER:</u>

5     Q     Now, are you aware that Clear Channel spent

6     nearly $122,000 filming this event?

7     A     Well, that thing you had me looking at before,

8     I think it said 121,000 something, 121,457.

9     Q     Okay.  And you don't dispute that; do you,

10    sir?

11    A     I guess I'm not sure on the numbers what to

12    believe or not to believe.  I've been given two sets

13    of numbers.  I don't know which ones are right or

14    which ones are wrong.

15    Q     Well, let's talk about these two sets of

16    numbers, since you brought it up.  You're talking

17    about the P and L.  Do you have Plaintiff's Exhibit

18    120?

19    A     The P and L that Clear Channel created?

20    Q     No, the --

21    A     No.  I'm certainly not talking about that.

22         MS. MILLNER:  No.  Plaintiff's Exhibit,

23    Mr. Brown.

24         MR. BROWN:  Plaintiff's Exhibit 120?

25         MS. MILLNER:  121.  No, it's 120.  No, that's

1    defense exhibits.  No?  All right.  Let me just show

2    it to you on the -- do you have the --

3          THE WITNESS:  Ma'am, I've never seen the P and

4    L until this -- until this trial, so I wouldn't have

5    been referring to that.

6    BY MS. MILLNER:

7    Q    Can you turn to your book, Exhibit 120, the

8    plaintiff's exhibits.  Is this the P and L you're

9    saying was provided to you?

10   A    I'm absolutely not saying that.

11   Q    Okay.

12   A    There's an expense sheet we were shown at the

13   October 27th meeting, and I can assure you it did

14   not look anything like this.

15   Q    Oh, you're talking about the expense sheet

16   that had the estimated cost and the actual cost;

17   correct?

18   A    Well, I'm talking about -- it had one set of

19   costs and we were told that it was over $600,000

20   that -- well, that was the number.  It wasn't until

21   much later we understood that there might have been

22   a different number.

23   Q    All right.  You're talking about Plaintiff's

24   Exhibit 131, then.  Can we turn to that?  Do we have

25   Plaintiff's Exhibit 131?  Second page.  There we go.

1        Is this the document you're referring to?

2        A      Let me say that I can't say that it is, but I

3        will be willing to say that these total numbers

4        would be the numbers that I'm referencing.  I don't

5        remember it being on such a plain white piece of

6        paper like this, but I'll certainly agree that those

7        numbers are the numbers I'm referring to.

8        Q      Well, this is a plaintiff's exhibit.  This is

9        your Exhibit 131 that you admitted into evidence;

10       correct?

11       A      I would assume so.  But I'm speaking to what I

12       saw the day I was sitting in the Clear Channel

13       office October 27.

14       Q      Okay.  Because you would agree with me that

15       the numbers indicate that they're estimated;

16       correct?

17       A      Well, these, the last two numbers suggest that

18       they're estimated.

19       Q      Right.  And that's because Clear Channel had

20       informed you that they weren't yet finished with the

21       production, the editing and the distribution of II

22       and III; correct?

23       A      Well, they weren't finished with I, either,

24       and it doesn't say estimated.

25       Q      Did they tell you or didn't they tell you that

1      these estimated numbers that they were providing you

2      included estimates for how much it would cost to

3      finish the production, the editing, as well as the

4      distribution of this product; correct?

5      A      What I can tell you is that my understanding

6      was these were the numbers associated with the

7      different events.  In other words, based on the

8      agreement, they would have to get these dollars back

9      before revenue split occurred.

10     Q      They in no way told you that this estimated

11     number, as referenced on this document, was their

12     current out-of-pocket cost?  They didn't represent

13     that to you; did you, sir -- did they, sir?

14     A      Ma'am, I don't know that we went into great

15     detail, to be quite honest.  In all due respect, I

16     was at the meeting and this was the number

17     represented to us that Clear Channel was going to

18     have to recoup before there would be a revenue

19     split.

20     Q      All right.  But you suggested to the jury on

21     direct that somehow they misled you by providing

22     these inflated numbers; do you recall that?

23     A      Yes, ma'am.

24     Q      And then you admitted this document into

25     evidence to show the inflated numbers; correct?

1    A       Yes, ma'am.

2    Q       And, in fact, what the document shows is that

3    they're estimated numbers; isn't that right?

4    A       Well, it does say on Wrestlereunion II and III

5    that they're estimates.  It doesn't say that on

6    Wrestlereunion I.  And I guess somewhere in good

7    faith estimated to what extent?  50 percent?  I

8    mean, I would think any reasonable person would

9    suggest that 10 percent might be a reasonable

10   number, maybe, maybe five.  I mean, these are

11   professionals that should have some understanding of

12   what it takes -- I knew what it took to put on my

13   Wrestlereunion live event.

14   Q       Sir, what I'm asking you, though, is in no way

15   did Clear Channel represent to you at this meeting

16   that these costs on -- at least with Wrestlereunion

17   II and Wrestlereunion III, were actual out-of-pocket

18   expenses.  Instead, what they said was they were

19   estimated expenses; isn't that right?

20   A       I can only answer the way I know how, ma'am.

21   It was accepted by me that this was the number Clear

22   Channel was going to have to recoup.  That's the

23   best I can answer you.  I'm sorry.

24   Q       All right.  Now, you said a minute ago, I

25   think, that you had a sense as to how much it would

1    cost you to put on these Wrestlereunion events;

2    correct?

3    A       When I had my event I knew what it was going

4    to cost based on -- I mean, I had expenses.

5    Q       Let's go to Plaintiff's Exhibit 117.  So you

6    based your ticket price, therefore, on what you

7    incurred or estimated you would incur to put on

8    these Wrestlereunion events; correct?

9    A       Somewhat.  As we've discussed, Wrestlereunion

10   I was a grand opening of our business and

11   introduction to the world, and we knew and

12   understood that we were going to have to spend and

13   invest money to get the attention that we wanted to

14   get.  Branding has become a very, very critical

15   thing in the world today, and we wanted to develop

16   the brand.

17   Q       And you also wanted to make sure that your

18   ticket price was set at a level which would allow

19   you to recoup your costs; correct?

20   A       My ticket price was based on providing the

21   consumer an equivalent value for the dollar spent.

22   Q       Did you take -- are you testifying, sir, that

23   you did not take into account at all how much it

24   would cost you to put on this Wrestlereunion I event

25   when you set your ticket price?

1        A      I believe that I just shared with you that my

2    concern was creating a value for the consumer.  The

3    last thing in the world I would have wanted was to

4    have people come there and say that they felt ripped

5    off or they didn't get what they paid for.  That

6    would be counteractive to what I was trying to do,

7    to get credibility and name recognition.

8        Q      Okay.  Because there's been some discussion,

9    some testimony from you that these ticket prices

10   were quite high; correct?

11       A      I said the ticket prices were quite high?

12       Q      Well, you certainly went down in price from

13   Wrestlereunion I to Wrestlereunion II; correct?

14       A      We gave the people a lot less value.  We gave

15   them less wrestlers.

16       Q      So maybe I misunderstood you, then.  You

17   believe the ticket prices you've charged were fair

18   for the events; correct?

19       A      Absolutely.

20       Q      And you -- and you believed at the time that

21   the ticket prices would allow you to recoup your

22   investment in Wrestlereunion I; correct?

23       A      Ma'am, I believe I answered this question

24   before a few different times.  We have -- I'm sorry,

25   we had a goal of creating a brand.  This was a grand

1    opening, the live event was not, and the ticket

2    sales from it was not the only source of revenue

3    considered in that.

4    Q     All right.  And we don't have to belabor the

5    point.  You certainly agree with me that there is --

6    in terms of finances, Wrestlereunion I lost

7    approximately a hundred -- or just over $180,000;

8    correct?

9    A     Based on the numbers available to us, which

10   include none of the revenue we were promised from

11   Clear Channel, we did not.  There was not enough

12   income to offset the expenses.

13   Q     It wasn't -- you filled about 30 percent

14   capacity of the arena or the Doubletree Hotel where

15   you held this at; correct?

16   A     Yes, ma'am.  That's an accurate statement.

17   Q     And you were hoping to sell about 1200

18   tickets, or at least 1200 VIP tickets, and you only

19   sold about 10 percent of that, or just over 10

20   percent of that; correct?

21   A     Well, I -- 240 is probably more than 10

22   percent.

23   Q     Just over 10 percent; correct?

24   A     Closer to 20 percent; isn't it?

25   Q     Twenty percent.  Okay.

1    A      Yes, ma'am.  That would be correct.

2    Q      All right.  And then these are -- you're not

3    disputing that these are the number of tickets that

4    you sold for Wrestlereunion I; are you, sir?

5    A      No, ma'am.  That's an approximate that, you

6    know, I could go along with.  I do believe we sold

7    some at 299, but they're not listed on there.  But

8    you know, you're not going to find me telling you

9    that it was really 255,000.

10   Q      All right.  And you made no money from any

11   sponsorship packages; correct?

12   A      Not that I can recollect right now, no.

13   Q      It's not shown on this exhibit; correct?

14   A      That would be correct, ma'am.

15   Q      All right.  And you made no money on any

16   vendors tables; correct?

17   A      Well, it's not shown on there.

18   Q      All right.  Now, you mentioned that you wanted

19   to establish a brand through this Wrestlereunion I;

20   correct?

21   A      Yes, ma'am.

22   Q      And so, therefore, you're using that to

23   explain why, perhaps, the ticket sales weren't what

24   you were hoping it would be; correct?

25   A      Well, I don't think that's what I said.  What

1    I said was, that was our main, our main goal.

2    Establishing -- trying to establish the brand didn't

3    impede people.

4    Q     Well, let me rephrase, then.  You were looking

5    at Wrestlereunion I, I think you said, as your grand

6    opening to the world, essentially to introduce the

7    brand of Wrestlereunion to the world; correct?

8    A     Yes, ma'am.  I did say that.

9    Q     Okay.  And so you have your grand opening in

10    January of 2005, and you consider it, at least, a

11    success; correct?

12    A     Yes, ma'am.

13    Q     And you claim that there's been media coverage

14    or accolades from the media about the results of

15    that event; correct?

16    A     There certainly was.

17    Q     All right.  So let's look at the next page of

18    this exhibit and see how we did with Wrestlereunion

19    II.  Now, Wrestlereunion II, you agree by this

20    point, according to you, the brand has been somewhat

21    established; correct?

22    A     Well, yes, ma'am.

23    Q     All right.  And you lost $150,000 on this

24    event?

25    A     Approximately.

1    Q      Okay.  And by the way, I note that in this

2    summary of expenses, you had things such as

3    insurance and taxes that weren't on the summary

4    sheet for Wrestlereunion I.  Did you not have any

5    costs associated with insurance or taxes for

6    Wrestlereunion I?

7    A      I believe Mr. Russen testified that he felt

8    that those things were covered in the miscellaneous

9    expense.

10   Q      All right.  So the Wrestlereunion II, the

11   expenses are 243,385; correct?

12   A      Yes, ma'am.

13   Q      And you have $28,000 on promotion and

14   advertising and PR man.  Do you see that?

15   A      Yes, ma'am.

16   Q      And you had no money for the expenses for

17   promotion on Wrestlereunion I; correct?

18   A      I didn't see any on the sheet, ma'am.

19   Q      That's because you did that promotion inhouse;

20   correct?

21   A      Yes, ma'am.

22   Q      All right.  And you're not disappointed with

23   the job that the PR man did up in Pennsylvania for

24   Wrestlereunion II; are you?

25   A      No.  I would say he was -- he -- he attempted

Corrente - Cross

1    to do a good job.

2    Q       He did a good job trying to promote your

3    event; correct?

4    A       He certainly made reasonable efforts.

5    Q       And, certainly, you did not get the results,

6    again, that you were hoping for; isn't that right?

7    A       Well, we were going in the right direction.

8    Q       Well, actually, you were -- your capacity for

9    the convention center was about 7,000 people; is

10   that right?

11   A       I don't know.  If you say so.

12   Q       Do you recall -- you would agree with me that

13   it was a much bigger location at the convention

14   center than at the Doubletree?

15   A       Yes.  I just didn't remember 7,000 as being

16   the number.

17   Q       Would you agree with me it's a significantly

18   bigger capacity than the Doubletree Hotel?

19   A       Yes, ma'am.

20   Q       Okay.  Does 7,000 sound reasonable to you?

21   A       No, I don't think so, but I'd certainly agree

22   that it's more.  I guess, ma'am, are you saying --

23   suggesting to watch the wrestling matches or just

24   people walking around the -- walking around in the

25   convention center and things like that?

1    Q      Do you know what the capacity was for the

2    Valley Forge convention center?

3    A      I don't recall, ma'am.

4    Q      Do you know if it was at least twice the size

5    of the Doubletree?

6           MR. RODEMS:  Objection, Your Honor, asked and

7    answered.

8           THE COURT:  I'll allow it.  Overruled.

9           THE WITNESS:  I would be willing to say it was

10   twice the size.

11   BY MS. MILLNER:

12   Q      All right.  And so you still are at around 30

13   percent capacity with Wrestlereunion II; correct?

14   A      Ma'am, would it be possible to go back to the

15   previous?

16   Q      Sure.

17   A      Okay.  If you notice, ma'am, the hotel rental

18   hall for the Doubletree was $4500.

19   Q      Okay.

20   A      Okay.  We can go back now to the other one.

21   Q      Let's go to the next page.

22   A      At the request of Clear Channel to get a

23   different type of building, you see our building

24   rental went up to $27,500.  So we incurred extra

25   expense based on -- based on them in a facility that

1     they more wanted.  If we're going to ultimately get

2     to a place where it's still 30 percent of capacity,

3     okay, but we would have never booked a building on

4     our own to hold -- let's just say it was 7000, if

5     that's the number you're suggesting to me, we would

6     not have booked a building for ourselves.  We did

7     that to assist Clear Channel in making a better

8     media product.  As I told you, that was the one

9     input that they gave us, and we didn't question it,

10    we just did it.

11    Q     Sir, by the way, let me correct myself.  I

12    don't mean to suggest it was 7000.  It was -- I

13    don't want to put evidence in the record.  So I

14    think what we've agreed upon is that there was -- it

15    was at least twice the size of the Doubletree;

16    correct?

17    A     I would -- I would be comfortable with that.

18    Q     And the Doubletree capacity was about 1200; is

19    that right?

20    A     Yes, ma'am.

21    Q     Okay.  So we're at the 2000 range, just over

22    2000; correct?

23    A     Yes, ma'am.

24    Q     And so you were hoping, were you not, to

25    substantially increase the numbers of tickets that

1    you sold; correct?

2    A     Well, I would have liked to have done that,

3    but my main goal was to be able to spend less and

4    bring in more money.

5    Q     And, in fact, that's why you upped your

6    advertising budget to $28,000.  That's a substantial

7    increase over the advertising budget from

8    Wrestlereunion I; correct?

9    A     Yes, ma'am.

10   Q     And that's because you were hoping to make

11   money on Wrestlereunion II now that the brand has

12   been established and Wrestlereunion has been

13   critically acclaimed; correct?

14   A     Ma'am, there's always a hope to make money.

15   Q     And that didn't happen; correct?

16   A     Well, again, without the revenue from the

17   media product, we have less in income than we did in

18   expense.

19   Q     Well, I'm just talking about the live event.

20   You were hoping to make money on the ticket sales

21   from the live event for Wrestlereunion II; correct?

22   A     Ma'am, I feel like I've answered this question

23   seven times.

24   Q     Well, we were talking about Wrestlereunion I

25   before.  Now that the brand is established, we're

1      talking about Wrestlereunion II.

2      A      My answer -- my company answer is that all of

3      our events are live events to produce a media

4      product.  My answer will be the same for

5      Wrestlereunion II and Wrestlereunion III.

6      Q      So yes or no, were you looking -- expecting to

7      make money on the ticket sales for the live event

8      for Wrestlereunion II?

9      A      What I was looking to do was generate a media

10     product.  So I guess the way you're asking the

11     question I would have to answer -- um, make sure I

12     understand.  Could you ask it again, please?

13     Q      I'm hoping to get a yes or no to this

14     question.  Were you expecting to make a profit off

15     of ticket sales to Wrestlereunion II?

16     A      No.

17     Q      Okay.  So you went ahead and spent the extra

18     28,000 and change on advertising for what?

19     A      We got more people in the building.  If you

20     look at the video that has been shown here, I don't

21     remember if you showed it or if Mr. Rodems did, but

22     it certainly looked like substantially more people

23     there.

24     Q      Okay.  So you spent $28,000 because you wanted

25     to sell more tickets; correct?

Corrente - Cross

1    A       Yes, ma'am.

2    Q       All right.  And so is it your testimony to

3    this jury that your business model was that you

4    would lose hundreds of thousands of dollars on the

5    production of these live events?

6    A       My testimony would be that with the revenue

7    from the live gate mixed in with the media revenue,

8    my company would be a profitable company.  Ring of

9    Honor has been mentioned in this courtroom many

10   times.  For many, many years that was the Ring of

11   Honor business model.

12   Q       Currently Ring of Honor is losing money;

13   correct?

14   A       I have no idea.

15   Q       Okay.  All right.  Do you know how much was

16   spent by Clear Channel on filming Wrestlereunion II?

17   A       Well, let's go back to the -- based on the

18   602,000 figure?

19   Q       No.  I'm asking do you know how much they

20   spent in production costs on Wrestlereunion II?

21   A       Well, again, I've been given two sets of

22   numbers.  Which sheet are we looking at?

23   Q       Take a look at Defendant's Exhibit 21.  It's

24   in the notebook behind you, sir.

25   A       It says here 138,315.

1    Q       Does that sound about right to you as to how

2    much Clear Channel spent on filming that event?

3    A       Again, I don't know which set of numbers are

4    right, ma'am.

5    Q       Now, a couple of weeks later you decided to

6    hold Wrestlereunion III; correct?

7    A       Well, we held Wrestlereunion III two weeks or

8    so after Wrestlereunion II.

9    Q       And did I understand your testimony on direct

10   that you held Wrestlereunion III at the request of

11   Clear Channel?

12   A       At the request of -- Steve needed a library

13   for syndication.  He talked extensively about

14   syndication at the meeting after Wrestlereunion II.

15   Q       So it's your testimony to this jury that you

16   held Wrestlereunion III at the request or to

17   satisfy -- at the request of Mr. Sterling because he

18   needed more footage?  Is that your testimony?

19   A       Oh, yes, ma'am.

20   Q       Let's take a look at Plaintiff's Exhibit 32,

21   if you could.  Are you with me?

22   A       Yes, ma'am.

23           MS. MILLNER:  Could you put this up,

24   Mr. Brown.

25   BY MS. MILLNER:

1    Q      Now, this is an e-mail your lawyer put in

2    evidence I think it was this morning.  And you agree

3    with me that this is an e-mail from Mr. Russen to

4    Johnny Gallarello at Clear Channel, with a copy to

5    you; correct?

6    A      Well, I don't -- I don't recall ever seeing

7    this and I don't see that it's an e-mail.

8    Q      It's plaintiff's exhibits, sir.  I'm sorry,

9    back to your exhibits in your exhibit book.  I'm

10   sorry.

11   A      Okay.  32?

12   Q      Correct.  Do you recognize this as an e-mail

13   that Mr. Russen sent to John Gallarello at Clear

14   Channel?

15   A      Yes.

16   Q      And it's discussing the --

17          MS. MILLNER:  Can we go up to the header,

18   Mr. Brown?

19   BY MS. MILLNER:

20   Q      And the subject line is Davie, Florida,

21   September 10, which is the date of Wrestlereunion

22   III; correct?

23   A      Yes.

24   Q      And the date is July 19th, 2005; isn't that

25   right?

1    A      Yes, ma'am.

2    Q      So this is actually before Wrestlereunion II

3    even occurred; correct?

4    A      Absolutely.

5    Q      And your -- Mr. Russen is writing Clear

6    Channel and encouraging them, is he not, or

7    suggesting to them that they film as many live

8    events as possible; correct?

9    A      It would appear that way.  I don't know why he

10   did that.

11   Q      And he's asking Clear Channel if they are

12   interested in filming the Davie event; correct?

13   A      Yes, that's what's in the e-mail.

14   Q      Now, previously you said that, at least

15   according to you, the contract requires Clear

16   Channel to go out and film every single event;

17   correct?

18   A      Yes.

19   Q      But you were uncertain -- I'm sorry,

20   Wrestlereunion was uncertain on July 19th whether or

21   not, in fact, Clear Channel would have an interest

22   in shooting the Davie event; correct?

23   A      No, ma'am.  This would indicate to me Rob

24   Russen for some reason had some concern.  My

25   conversations were with Steve Sterling, and he was

1    very clear and had been clear since shortly after

2    Wrestlereunion I that for syndication he would need

3    more content.  Steve, I'm willing to give you more

4    content.

5    Q      Okay.  You don't have any documentation to

6    that regard documenting that conversation; do you,

7    sir?

8    A      No, ma'am.  I would only have the people that

9    were in the -- in the meeting in August.  And you

10   certainly could not syndicate with Wrestlereunion I

11   and Wrestlereunion II only.  You need a certain

12   amount of weeks of television to be able to

13   syndicate.

14   Q      All right.  So it's your testimony that you

15   disagree with the e-mail written by Mr. Russen

16   inquiring as to whether or not Clear Channel would

17   have an interest in filming the Davie event;

18   correct?

19   A      Absolutely.  I have no idea why he sent it.

20   Q      Did you respond?  Since you're copied on it,

21   did you respond in any way to this e-mail?

22   A      I don't believe I responded.  If I did, I

23   don't know why I responded by e-mail.  The truth of

24   the matter is this.  Johnny Gallarello has no

25   authority to make these decisions, anyway.  These

1    things were worked out between myself and

2    Mr. Sterling.

3    Q    All right.  So you have no idea why Mr. Russen

4    would have sent this; correct?

5    A    No, ma'am, I really don't.

6    Q    All right.  Well, let's look at an e-mail from

7    you, then, Plaintiff's Exhibit 34, the bottom

8    e-mail.  Now, this is, you're The Big Cheese;

9    correct?  That's your e-mail address?

10   A    Yes.

11   Q    All right.  And this is, let's see, a couple

12   of days after Mr. Russen's e-mail; isn't that right?

13   A    Yes.

14   Q    And you're asked, "Can we get a response on

15   this?  It does make sense to get a show of this

16   magnitude filmed.  Having another actual show with

17   some of the stars can only be a plus to whoever our

18   distributor ends up being."  Correct?

19   A    That's what it says, yes.

20   Q    So you don't respond by saying, I don't know

21   what Mr. Russen's discussing here because,

22   obviously, you have a contractual requirement to do

23   that.  You, too, are making inquiries of Clear

24   Channel as to whether or not they have an interest

25   in filming the Davie event; correct?

1      A       I guess it clearly says that.  I mean, I don't

2      recall it.  I do know this, that I was told Steve

3      Sterling needed content.  That's what I know.

4      Q       Okay.  And the reason why you and Mr. Russen

5      were writing this in July of 2005 is because you

6      understood that Clear Channel would more than likely

7      exhaust its $235,000 maximum once it finished

8      shooting the August Wrestlereunion II event;

9      correct?

10     A       No, ma'am.  That couldn't be further from the

11     truth.

12     Q       All right.  Now, on direct you were talking

13     about the fact that Clear Channel didn't let you

14     know until days before Wrestlereunion III as to

15     whether or not they were going to film or not;

16     correct?

17     A       No, ma'am.  I don't believe that's correct.

18     Q       Actually, you're right.  What you said was

19     Clear Channel told you days before Wrestlereunion

20     III that they did not want to film it; correct?

21     A       Yes, ma'am.  That's what I said.

22     Q       All right.  My apologies.  Am I correct that

23     you never got in response to those July e-mails any

24     commitment from Clear Channel to film those events?

25     A       When you say "those events" --

1    Q       Wrestlereunion III, I apologize.

2    A       I don't recall.  What we did get was Dawn

3    Olejar coming down and approving the site.

4    Q       Well, after you sent those e-mails -- she did

5    that shortly before the Wrestlereunion III event;

6    correct?

7    A       I don't have a specific date.

8    Q       It was days before; correct?

9    A       I really don't have a date.  If there's one

10   available, I'll be happy to look at it.

11   Q       Well, you would agree with me that those July

12   e-mails that we just looked at where you and

13   Mr. Russen are asking Clear Channel if they're

14   interested in filming Wrestlereunion III, you never

15   received a commitment from Clear Channel after

16   sending those e-mails; correct?

17   A       I don't see a response here from John

18   Gallarello, so I guess not.

19   Q       All right.  So, you know, when you met with

20   Mr. Sterling at the August event, Wrestlereunion II,

21   he never made any commitment to you that he would go

22   film Wrestlereunion III; correct?

23   A       When we met with him at -- when we met with

24   him after Wrestlereunion II in the hotel suite?

25   Q       Correct.

1    A       Oh, absolutely.

2    Q       So it's your testimony to this jury that at

3    Wrestlereunion III, in August, Mr. Sterling told you

4    that he wanted you to film -- I mean, to put on

5    another live event because they needed to film it?

6    Is that your testimony?

7    A       At Wrestlereunion II, yes, ma'am, it is my

8    testimony.

9    Q       And that's in August; correct?

10   A       That was August 27th.

11   Q       All right.

12   A       28th, you know.

13   Q       Now, ultimately Clear Channel did film

14   Wrestlereunion II; correct?

15   A       Wrestlereunion II in Valley Forge.  Yes,

16   ma'am.

17   Q       And going back now to the conversation that

18   you had with Mr. Sterling at the Wrestlereunion II

19   event in August, isn't it a fact that Mr. Sterling

20   told you that they were very concerned, they being

21   Clear Channel, about continuing with Wrestlereunion

22   and the filming of these live events?

23   A       Absolutely not.  The discussion mainly focused

24   on getting product in the store by the holidays and

25   working out a deal with the syndicator.

Corrente - Cross

1    Q       Now, it's your testimony that Mr. Sterling did

2    not speak to you about the concerns they were having

3    about Clear Channel's ability to recoup its

4    investment on Wrestlereunion?

5    A       Yes, ma'am, that would be my testimony.   And

6    please keep in mind that I was not in the room by

7    myself.   There were three other people in the room.

8    Q       All right.   Why don't we take a look at

9    Plaintiff's Exhibit 42.   Oh, could we switch it?

10   I'm sorry.   No, you're in the defendant's book.

11   We're still in the plaintiff's book, sir.

12   A       Oh, I'm sorry.

13   Q       Okay.   Do you recognize this as an e-mail you

14   sent to Mr. Sterling on September 4th, 2005,

15   correct?

16   A       Yes, ma'am.

17   Q       And this is days after Wrestlereunion II,

18   correct?

19   A       Yes, ma'am.

20   Q       And it states, and these are your words,

21   "After the phone calls of last week, it is obvious

22   that your company has concerns about recouping your

23   investment as obviously we do."   Do you see that?

24   A       Yes, ma'am.   I apologize if I misunderstood.

25   I thought that you asked me what Steve Sterling said

1    in the hotel room after Wrestlereunion II.

2    Q       Okay.  So in phone calls after Wrestlereunion

3    II, he then told you that they had concerns about

4    recouping their investments?

5    A       He must have.  If I wrote that, he must have.

6    I don't really specifically -- I'm obviously not

7    suggesting that I didn't write this e-mail.

8    Q       Okay.  So you were well aware prior to

9    Wrestlereunion III taking place that Clear Channel

10   had concerns about recouping their investments;

11   isn't that right?

12   A       Yes, ma'am, I guess by Sunday, September 4th.

13   Q       Now, let's talk about the footage first from

14   Wrestlereunion II.  That footage you haven't looked

15   at, either; correct?

16   A       That's correct.

17   Q       All right.  And so you have no basis to

18   disagree with Mr. Russen's testimony that in his

19   mind it was top quality; correct?

20   A       No, ma'am.  I mean, I've seen the little bit

21   that's shown here, obviously.

22   Q       Well, this is not in high def; correct?

23   A       Wrestlereunion II?

24   Q       No.  But what's shown in the courtroom, you

25   understand that that's not in high def; correct?

1      A      Yes, ma'am.

2      Q      Now, let's focus on Wrestlereunion III.

3      Wrestlereunion III was also filmed by Clear Channel

4      at the end of the day; correct?

5      A      Yes, ma'am.

6      Q      So while Clear Channel certainly had some

7      concerns that they told you about; correct?

8      A      Correct.

9      Q      And had doubts that they would go film

10     Wrestlereunion III, at the end of the day, they

11     showed up and filmed everything; correct?

12     A      Yes, ma'am.  That's correct.

13     Q      And they filmed every minute of Wrestlereunion

14     II, as well; correct?

15     A      The scheduled events, yes.

16     Q      And that's what you expected them to do;

17     correct?

18     A      Yes, ma'am, it is.

19     Q      So no complaints about that?

20     A      No, ma'am.

21     Q      Okay.  Now, Wrestlereunion III, one of the --

22     one of the reasons why you were encouraging -- you

23     and Mr. Russen were encouraging Clear Channel to

24     film this event in July is because in your mind, or

25     at least as you represented to Clear Channel, the

1    talent that you had lined up for Wrestlereunion III

2    was exceptional; correct?

3    A      Yes, ma'am.

4    Q      But, in fact, the talent that you had lined up

5    for Wrestlereunion III wasn't really exceptional;

6    correct?

7    A      That wouldn't be my opinion.  We had some very

8    strong -- we had some very strong matches, Dusty

9    Rhodes, Terry Funk.

10   Q      Some of the talent that you had lined up was

11   not quite exceptional; isn't that right?

12   A      I guess you would have to share with me more

13   of what you're talking about, ma'am.  Anybody that

14   we put on the event was qualified to be there, has

15   been in the wrestling business a long time.  The

16   most least known personality that we had on there

17   has become a high ranking member of the WWE.

18   Q      All right.  Turn to Defendant's Exhibit 147,

19   would you?  It's in the book behind you, sir.  Are

20   you with me, sir?

21   A      Yes, ma'am.

22   Q      All right.  Do you recognize this as an

23   instant message chat that you're having with

24   Mr. Bowman, the expert you've retained in this case?

25   A      Okay.  I guess.  I apologize.  Let me just

1      move this.  Yes, ma'am.

2              MS. MILLNER:  Okay.  Move to admit, Your

3      Honor.

4              THE COURT:  What number, please?

5              MS. MILLNER:  147.

6              THE COURT:  Is there any objection?

7              MR. RODEMS:  Yes, Your Honor.  May we

8      approach?

9              THE COURT:  Well, let's take a comfort break,

10     afternoon comfort break and come back at 10 after.

11             COURTROOM SECURITY OFFICER:  Rise for the

12     jury.

13             (Jury out at 2:58 PM)

14             MR. RODEMS:  Your Honor, this document is a

15     document that the defendants typed up.  This is not

16     a document that Mr. Corrente typed.  This is not a

17     document from Mr. Corrente.

18             MS. MILLNER:  Can Mr. Herbert address that,

19     Your Honor?

20             THE COURT:  No.

21             MS. MILLNER:  I can show you the document,

22     Your Honor.

23             THE COURT:  I don't need to see it.

24             MS. MILLNER:  This is an instant message chat,

25     as Mr. Corrente just identified from -- that was

1        taken --

2            THE COURT:  I don't think he identified it,

3        you did.

4            MS. MILLNER:  I asked him --

5            THE COURT:  Don't argue with me, counsel.

6        You've asked him so many questions with the word

7        "correct" in it that he's not even testifying, you

8        are.

9            MS. MILLNER:  Well, it's taken from his

10       computer from ABC Financial, Your Honor.  This was

11       printed out from his computer at ABC Financial.

12           THE COURT:  Your question.  "All right.  Do

13       you read this as an instant message that you were

14       having with Mr. Bowman?"

15           MS. MILLNER:  And he said, yes, I believe.

16           THE COURT:  He said, "Okay.  I guess."

17           MS. MILLNER:  No, I believe --

18           THE COURT:  Don't tell me no, counsel.  I've

19       listened to it.  So when you say he said something,

20       he didn't say it, you did.  Is it a document that is

21       an instant message from his computer?  Yes or no.

22           MR. RODEMS:  No, Your Honor.

23           THE COURT:  I didn't ask you, I asked her.  If

24       you don't know, that's fine.

25           MS. MILLNER:  Me?  All I know is this was

1      taken from his computer at ABC Financial.  It's his

2      web -- it's his e-mail address, The Big Cheese.  And

3      the WCW Mag is Mr. Bowman's instant message address.

4          THE COURT:  How was it taken from his

5      computer?

6          MS. MILLNER:  It was subpoenaed from ABC

7      Financial and ABC Financial produced this to us

8      after having downloaded his documents from his

9      computer and printed -- and we printed this out and

10     this is what was taken.  You can see the Bates

11     Number, ABC, at the bottom there.

12         THE COURT:  Mr. Rodems?

13         MR. RODEMS:  Your Honor, what this is, is they

14     pulled off an HTML file, which is a series of

15     characters and things.  They took it to somebody

16     they say was a computer expert.  He stripped it all

17     out.  He typed it on his page like this and now

18     they're trying to pass it off as an actual document

19     from that computer and that is --

20         THE COURT:  The objection is sustained.

21     There's no foundation for the document.  There could

22     be, perhaps, but not with this witness, unless he

23     can confirm he sent an instant message.

24         All right.  What's the status of your

25     discussions?

1          MS. MILLNER:  I believe the ball is in

2     plaintiff's court, Your Honor.

3          THE COURT:  All right.

4          MR. RODEMS:  There's a proposal we're waiting

5     to hear back on.

6          THE COURT:  Oh, you're still waiting.  All

7     right.  I'm sorry, I just wanted to know.  All

8     right.  Take a comfort break and we'll return at 10

9     after.

10         (Recess was taken at 3:01 until 3:15 PM).

11         (Back on the record.)

12         COURTROOM SECURITY OFFICER:  All rise.

13         THE COURT:  Bring the jury in, please.

14         COURTROOM SECURITY OFFICER:  Rise for the

15     jury.

16          (Jury in at 3:15 PM)

17         COURTROOM SECURITY OFFICER:  Please be seated.

18         THE COURT:  You may resume cross-examination.

19     BY MS. MILLNER:

20     Q    Mr. Corrente, do you recognize Exhibit 147 as

21     an instant message communication you had with your

22     expert, Mr. Bowman, the day after the Davie event?

23     A    No, ma'am.

24     Q    All right.  Do you recall telling Mr. Bowman

25     that you were not happy with the quality of some of

1        the wrestlers at Wrestlereunion III?

2        A       No, ma'am.

3        Q       Okay.  We'll move on.

4                Now, am I correct that Clear Channel filmed

5        all of Wrestlereunion III; correct?

6        A       Yes, ma'am.  But I'll be honest with you, what

7        is it that you're speaking of?  You're saying that I

8        wasn't happy with the wrestlers that I hired?

9        Q       I'm asking you if you recall being concerned

10       or being unhappy with the wrestlers that were

11       wrestling at Wrestlereunion III.

12       A       Absolutely not.  Why would I be unhappy with

13       the people that I hired?  I mean, these are all

14       people that I've known for years personally.

15       Q       That's fine.  We'll move on.  Now, Clear

16       Channel came out and filmed Wrestlereunion III in

17       Davie, Florida; correct?

18       A       Yes.

19       Q       All right.  And they filmed every minute of

20       it; right?

21       A       Yes, ma'am.

22       Q       And you haven't reviewed that footage, either;

23       correct?

24       A       Well, I've seen some of it here.

25       Q       Beyond a few minutes here, you haven't seen

1    anything else; correct?

2    A      No, ma'am.

3    Q      And could you take a look at Exhibit 24 of

4    that same booklet you're in, sir.

5           Are you aware that Clear Channel spent just

6    under $100,000 to film Wrestlereunion III?

7    A      Well, that's what it says here, 99,963.

8    Q      Do you recall?  Does that sound about what you

9    were told at the time?

10   A      At what time?  Again, I got my numbers, the

11   numbers that I was going by in the meeting of

12   October 27th.  And, clearly, the three numbers for

13   the three events don't add up anywhere near

14   $602,000.

15   Q      So you don't know what they spent; fair

16   enough?

17   A      Yes, ma'am.  That's correct.

18   Q      Now, let's go to 117, Plaintiff's Exhibit 117.

19          MS. MILLNER:  Third page, Mr. Brown.

20   BY MS. MILLNER:

21   Q      Now, first of all, I noticed this document

22   doesn't have the number of tickets sold; correct?

23   A      Yes, ma'am.  Doesn't look like it does.

24   Q      Do you have any documentation anywhere that

25   shows the number of tickets sold to Wrestlereunion

1        III?

2        A       Not to my knowledge.

3        Q       But the -- so you have no way of accurately

4        determining how many people were at Wrestlereunion

5        III; is that right?

6        A       Well, I know the tickets were $15 and $25.  So

7        on an average ticket price of $20, that would put us

8        somewhere over 1000 people.

9        Q       You would agree with me that Wrestlereunion

10       III was nowhere near capacity, 100 percent capacity;

11       correct?

12       A       Of the rodeo arena?

13       Q       Correct.

14       A       No, ma'am -- I mean, yes, ma'am.

15       Q       You would agree that it was not near the

16       capacity?

17       A       It was not at capacity.

18       Q       It was at about 30 percent again, sir?

19       A       Well, I don't know what the capacity was.

20       Q       Okay.  If you don't know, that's fine.

21       A       It was not at capacity.

22       Q       All right.  Now, you were obviously hoping to

23       sell more tickets than you actually did; isn't that

24       fair?

25       A       Well, again, ma'am, I was encouraged.  We were

1    going in the right direction.  We had more people at

2    the third event than we had at the second event and

3    more people at the second than we had at the first.

4    Q      So this is the third event and Wrestlereunion

5    now is branded, and you still haven't sold enough

6    tickets to meet your expenses; correct?

7    A      Well, again, as we've visited on the first two

8    events, if you just take the live event ticket sales

9    it does not equal the expenses.  But once again, we

10   still don't have any media revenue.

11   Q      You significantly reduced your cost on this

12   one.  You were just under 46,000; correct?

13   A      Because it was a different structure of an

14   event.  Yes.  The answer to your question is

15   certainly, yes.  But it was, it was not akin to the

16   first two-day --

17   Q      All right.  And Wrestlereunion, at least when

18   it was initially conceptualized, was going to be a

19   multi-day event; correct?

20   A      Well, Wrestlereunion fan conventions were --

21   this was not a fan convention.  This was strictly

22   what we call a house show.

23   Q      Okay.  But the conception for Wrestlereunion,

24   when it was developed by you in mid-2004, was for it

25   to be the largest fan convention in the world;

1      correct?

2      A       Yes, ma'am.  But I -- I don't know that we had

3      any limits on that.

4      Q       And you don't know if Clear Channel actually

5      spent more than double than you spent on putting on

6      Wrestlereunion III?

7      A       No, ma'am, I don't.

8      Q       Okay.  Now, in addition -- you do know,

9      however, that Clear Channel paid for the security

10     for this event; correct?

11     A       If they hired security, that was their

12     decision.

13     Q       Well, you don't show any expenses relating to

14     security up there; correct?

15     A       No, I don't see any.  What I know is that I

16     rented the building and whatever I needed to provide

17     the building under the agreement that I signed, I

18     provided.  I certainly had no complaints from the

19     building.

20     Q       All right.  And you would agree with me that

21     Clear Channel was not obligated to provide security

22     for this event; correct?

23     A       No, ma'am.  They were not obligated or asked.

24     Q       All right.  And are you aware that they, in

25     fact, paid for security for this building -- for the

1    event, rather?

2    A      I don't have anything showing me that.  Do you

3    have something that I can look at?

4    Q      Why don't you take a look at -- let me see.

5    Give me a second.  Exhibit 171 in the defendant's

6    booklet.  Are you with me, sir?

7    A      Yes.

8    Q      All right.  Does this document refresh your

9    recollection as to whether or not Clear Channel, in

10   fact, paid for security for the event?

11   A      Well, it wouldn't refresh my recollection.

12   I'm seeing it, and it certainly seems like it's a

13   bill for security.  I don't know why it says Dawn

14   Olejar's name on here, why she ordered security.  I

15   have no idea.

16          The only thing that I could even remotely tie

17   to this would be that they were going to come and

18   load in the night before.  They were going to come

19   load in on Friday.  And perhaps they were coming in

20   a day early and they were hiring security to guard

21   their truck and equipment.  That's the only thing

22   that I could even directly relate to.

23          As you're aware, they certainly did not

24   provide security at Wrestlereunion I or

25   Wrestlereunion II.  So why they would take on a new

1    responsibility with no request from us?  I'm not

2    sure.

3    Q    You provided security for those events; didn't

4    you, sir?

5    A    Yes, ma'am.  And basically whatever security

6    we provided would have been the same for

7    Wrestlereunion III, what our landlord, the person we

8    rented the building from, would have asked for.

9    Again, I really don't know what this is.  And I'm

10   sure you don't have anything from me requesting that

11   they hire it because I have no recollection of this.

12   Q    You hired security for Wrestlereunion I and II

13   and paid for it; correct?

14   A    Well, yes, ma'am, whatever we hired.  Whatever

15   we hired we paid for.

16   Q    And you didn't hire any security for

17   Wrestlereunion III, Wrestlereunion didn't; correct?

18   A    I do not have that information, ma'am.

19   Q    Okay.  That's fine.  Do you recall security

20   being there, sir?

21   A    Ma'am, I was running a pretty large event.

22   Q    If you don't recall, that's fine.

23   A    Yeah, and --

24   Q    All right.  Now, you showed on direct

25   Plaintiff's Exhibit 118, which is -- well, let's get

1    to it.  118, Plaintiff's Exhibit 118.  Do you have

2    it?  That's it.  All right.  Are you with me?

3    A       I don't believe I am, ma'am.

4    Q       Plaintiff's exhibit?

5    A       Now, wait a minute.  No.  What I have here, if

6    I'm looking at it right, says total expenses,

7    46,700.

8    Q       Plaintiff's Exhibit 118, are you in the right

9    book?

10   A       Plaintiff, yeah, it's this book here; right?

11           MS. MILLNER:  Can I approach, Your Honor?

12           THE COURT:  Yes, ma'am.

13           THE WITNESS:  118?

14   BY MS. MILLNER:

15   Q       Yeah, that's it.

16   A       That's not what he has here.

17   Q       I'm sorry, 119.  No, wait a minute.  You're

18   right.  You're right.  You're right.  It is the

19   wrong document.

20   A       Okay.

21   Q       I'll use the ELMO.

22           MS. MILLNER:  Can we put it on the ELMO?

23   BY MS. MILLNER:

24   Q       All right.  This is a budget you prepared

25   for -- or it's an estimated budget, I should say,

1    you prepared for a single show should one occur or

2    should one have occurred in 2006 or 2007; correct?

3    A    Yes, ma'am.

4    Q    And you prepared this in February of 2009; is

5    that right?

6    A    Well, I believe that's right.

7    Q    You prepared this to assist your expert in

8    calculating his numbers for you; correct?

9    A    Yes, ma'am.  I believe that's right.

10    Q    And according to this exhibit, at 100 percent

11    capacity, Wrestlereunion on the single shows would

12    make roughly $14,000 or $15,000; correct?

13    A    Yes, ma'am.  I believe that's correct.

14    Q    Okay.  And that assumes, of course, 100

15    percent capacity; correct?

16    A    Yes, ma'am.  Based on this, that's right.

17    Q    You've never had anywhere near 100 percent

18    capacity at any show that you put on; correct?

19    A    Are you talking about the three

20    Wrestlereunions?

21    Q    Correct.

22    A    That would be -- that would be correct.

23    Q    All right.  And the 100 percent capacity

24    requires that you sell 3650 tickets; correct?

25    Roughly.  I'm not -- I don't mean to put you on the

1    spot with math.

2    A     I believe this says projected sales 75

3    percent.  If you look at the income, projected is 75

4    percent there; correct?

5    Q     Okay.  So is it 75 percent or 100 percent; do

6    you know?

7    A     In this particular case it would be -- it

8    would be 75 percent.

9    Q     Do you know what that 100 percent cap, then,

10   means on this document?

11   A     No, ma'am.

12   Q     All right.  That's fine.  Regardless, you've

13   never had anywhere near 75 percent capacity;

14   correct?

15   A     On the three Wrestlereunions, if that's --

16   again --

17   Q     That's all we're talking about, sir.

18   A     Then, yes, ma'am, that would be correct.

19   Q     And it assumes that you'd sell -- well, the

20   100 percent is about 3600 tickets, so 75 would be

21   about 3000 tickets or so; correct?

22   A     Give or take.  If we need an exact number,

23   I'll go to the calculator.

24   Q     All right.  You've never -- Wrestlereunion has

25   never sold anywhere near 3000 tickets to a single

1    event; correct?

2    A       No, ma'am.

3    Q       Now, this is not the only budget you prepared

4    in February 2009; am I correct?

5    A       I believe you're correct.  When you say "you"

6    are you asking if I personally typed this up?

7    Q       Well, you prepared this budget; did you not,

8    sir?

9    A       No, ma'am.  I believe this was prepared by Rob

10   Russen and Tony Attanasio.  I certainly had some

11   input.  I'm asking if you're asking me if I typed

12   this.

13   Q       No.  Wrestlereunion prepared it; fair enough?

14   A       Yes, ma'am.  That's fair enough.

15   Q       All right.  Why don't you turn in the

16   defendant's book to the other -- to Exhibits 28 and

17   29.  We can start with 28.

18   A       Okay.

19   Q       Now, this is another budget.  Well, do you

20   recognize this as another budget that you prepared

21   in February 2009 for this litigation?

22   A       Yes, ma'am.  This one says projected sales, 65

23   percent.  Right.

24   Q       I just want to know if you recognize it for

25   now.

1    A      Yes, ma'am.

2            MS. MILLNER:  Move to admit, Your Honor?

3            THE COURT:  Any objection?

4            MR. RODEMS:  It's a duplicate of the

5    plaintiff's exhibit, but other than that I don't

6    have -- if that's an objection or --

7            THE COURT:  What's the number, please?  What's

8    the number, please?

9            MR. RODEMS:  Plaintiff's exhibit?

10           THE COURT:  No, defendant's exhibit.

11           MS. MILLNER:  28.

12           THE COURT:  I'll receive it.  It may be a

13   duplicate, but that's --

14           MS. MILLNER:  I apologize.  I didn't realize

15   it.

16           THE COURT:  That's all right.  Defendant's 28

17   is in evidence.

18           (Whereupon, Defendant's Exhibit Number 28 is

19   received into evidence.)

20   BY MS. MILLNER:

21   Q      Why don't we go to Defendant's 29, as well.

22   Do you recognize Defendant's Exhibit 29 as a third

23   budget prepared by you or Wrestlereunion in February

24   2009?

25   A      Yes.

1    Q      All right.  Why don't we start with that.

2           MS. MILLNER:  Oh, well, first of all, move to

3    admit, Your Honor?

4           THE COURT:  I need a number, please.

5           MS. MILLNER:  29.

6           THE COURT:  Any objection?

7           MR. RODEMS:  No objection, Your Honor.

8           THE COURT:  29 is received.

9           (Whereupon, Defendant's Exhibit Number 29 is

10   received into evidence.)

11   BY MS. MILLNER:

12   Q      Can we put 29 up, sir?  Now, if we'd go to the

13   top, you'd agree with me that this Exhibit 29 is an

14   estimated budget that Wrestlereunion prepared for

15   outlining costs and income or estimated costs and

16   income for two-day convention matches that it was

17   hoping to have or might have had in 2006 and 2007;

18   correct?

19   A      Yes.

20   Q      All right.  And you prepared this to assist

21   your expert in calculating damages in this case;

22   isn't that right?

23   A      Yes.

24   Q      And going back to my previous question, I

25   believe you agreed that Wrestlereunion's concept was

1    to hold these two-day fan convention events; isn't

2    that right?

3    A       It was certainly the core of business.

4    Q       All right.  And according to your estimate --

5    and you tried to be as accurate as possible,

6    correct, when you created this document?

7    A       Well, I would certainly hope so.

8    Q       All right.  And according to this, your total

9    expenses were estimated at being about $168,650;

10   correct?

11   A       Yes.

12   Q       All right.  Then if we can go down and focus

13   in on income, you had two different calculations

14   there, 50 percent capacity and 100 percent capacity?

15   A       Yes.

16   Q       All right.  And 700 tickets, it says 700 VIP

17   tickets.  That's the 50 percent capacity number;

18   correct?

19   A       Yes.

20   Q       All right.  And so --

21           MS. MILLNER:  Well, focusing back up,

22   Mr. Brown, if we can go to the full document.

23   BY MS. MILLNER:

24   Q       According to this estimated budget,

25   Wrestlereunion would have to sell -- let me do my

1    math real fast -- nearly 3000 tickets or 2900

2    tickets in order to achieve 100 percent capacity;

3    correct?

4    A       Approximately.

5    Q       All right.  And if it only did 50 percent, or

6    half of that, so about 1500 tickets, you would make

7    about -- about, again, a $15,000 profit; correct?

8    I'm sorry.  You'd have a $15,000 loss.

9    A       At 50 percent capacity, yes.

10   Q       At 50 percent capacity, which is 1400 seats;

11   correct?

12   A       Correct.

13   Q       All right.  And so, therefore -- oh, and you

14   agree you've never sold anywhere near that number;

15   correct?

16   A       I believe we've been discussing -- I mean,

17   without me calculating out, the number you've been

18   using is 35 percent.

19   Q       And it's only when you get to the 100 percent

20   capacity number and sell about 3000 tickets that you

21   actually make a profit; is that right?

22   A       Well, no, ma'am.  I don't think that would be

23   anywhere near right.  It doesn't take doubling

24   ticket sales to make up $15,000.

25   Q       Well, do you know what number you need to sell

1    in order to make a profit?  Have you done that

2    calculation?

3    A      Well, no.  But, I mean, we can certainly sit

4    here and go through it.  But I can promise you it's

5    not going to go from 1400 to 3000.  It's not going

6    to be anywhere near that.

7    Q      You assumed, also, that you would have about

8    $7500 in vendors table sales; correct?

9    A      Yes, ma'am.

10   Q      That's never happened at a Wrestlereunion

11   event; correct?

12   A      We certainly have had vendor tables.  I can't

13   speak to the specific income.  That's something

14   Mr. Russen handled, and vendor tables are a very

15   large part of conventions.

16   Q      Are you testifying that you -- that

17   Wrestlereunion received income from the sale of

18   vendor tables at its live shows?

19   A      I am testifying that we had vendor tables at

20   live -- not in Davie.  We didn't have any in Davie.

21   Q      Well, why don't we go back, then, to

22   Plaintiff's Exhibit 117 and see if that's reflected

23   on your documents.  Here's Wrestlereunion I.  You

24   don't see any income for vendor tables listed there;

25   do you, sir?

1    A      No, I do not.  And I wouldn't be able to speak

2    intelligently to it.  It was Mr. Russen's

3    responsibility to deal with the vendors.

4    Q      Do you know whether or not you received any

5    vendor income at Wrestlereunion II or Wrestlereunion I?

6    A      That is not information that I -- that I have.

7    Q      Let's go down to -- this is Wrestlereunion II.

8    Let's see what it shows here.  Certainly, no vendor

9    tables are listed here as generating income;

10   correct?

11   A      Well, there's nothing on that list, no.

12   Q      All right.

13          MS. MILLNER:  Let's go back to 29, Mr. Brown.

14   BY MS. MILLNER:

15   Q      And then this -- this also estimates or

16   assumes that Wrestlereunion would have $10,000 of

17   sponsorship income; correct?

18   A      Yes, it does.

19   Q      And Wrestlereunion has never generated a dime

20   in sponsorship revenue; correct?

21   A      I don't believe there was any indicated on

22   those previous sheets.

23   Q      Okay.  So you would agree with me that this

24   estimated budget you created is significantly more

25   optimistic than what you have actually produced when

Corrente - Cross

1    you put on the Wrestlereunion live events; correct?

2    A      Well, the numbers are certainly different, but

3    we were -- we would have been in a more established

4    business.  And I'm -- really and truthfully in the

5    second year of business, I guess you're not

6    necessarily a startup anymore, but you're certainly

7    not a long tenured business.  But with our

8    visibility, newspapers and internet and -- you know,

9    I would say that the numbers are fair.

10   Q      Okay.  Even though they bear no resemblance to

11   what has actually occurred when you put on the

12   Wrestlingreunion events; correct?

13   A      Wrestlereunion.

14   Q      Wrestlereunion events; correct?

15   A      Well, the expenses are -- are, you know,

16   somewhat, somewhat in line with what's occurred.

17   You're just referring to the income?

18   Q      Yes, sir.

19   A      Well, at 100 percent cap, no, it's not.  But

20   the 50 percent cap, I think we're somewhere in

21   there.

22   Q      So at least when it comes to the -- well, 50

23   percent cap you've never generated income anywhere

24   near that amount at any Wrestlereunion event that

25   you put on; correct?

1    A        I guess we have to go back and look at this

2    point.  I've looked at so many numbers.

3    Q        Do you want to go back, sir?

4    A        To Wrestlereunion II, I guess, yeah.

5    Q        All right.  Let's look at the second page of

6    117.  So you have $93,000 in total income for

7    Wrestlereunion II; correct?

8    A        So you're saying that's nowhere near?  Okay.

9    Q        All right.  Now -- and you certainly have

10   never had anywhere near 50 percent capacity;

11   correct?

12   A        Well, again, I thought I just answered that a

13   few minutes ago.

14   Q        That's fine.  We'll move on, sir.  Now, would

15   you agree with me that as the promoter of these

16   Wrestlereunion events, you're responsibile for the

17   financial success or failure of them; correct?

18   A        No.  No, ma'am, I wouldn't agree.  I had a

19   partner who promised to generate revenue.

20   Q        Okay.  But I'm talking about the live events.

21   I'm just talking about the live events.  Would you

22   agree as the promoter of live events you're

23   responsibile for the financial success or failure of

24   those events?

25   A        Well, no, ma'am, because the live events were

1       done with a media property in mind.  The media

2       property partner completely failed in living up to

3       any of the promises they made other than filming the

4       event.

5       Q     So it's Clear Channel's fault that the live

6       events were financial failures; correct?

7       A     Well, you know, our revenue for Wrestlereunion

8       II was 93,000.  I don't see Clear Channel's portion

9       of the revenue anywhere there.

10      Q     My question, though, is, is it your contention

11      that it is Clear Channel's fault that these three

12      live events were financial failures?

13      A     Yes, ma'am.  I guess it would be.

14      Q     Okay.  Even though they had no responsibility

15      whatsoever to put on these live events; correct?

16      A     No.  It was not their job to put on the live

17      event.  I even accepted full responsibility for that

18      and lived up to my responsibility.

19      Q     Now, I want to skip, if we could, to this

20      whole discussion about clearance issues.  Do you

21      recall that on direct examination?

22      A     Oh, yes.

23      Q     Okay.  And you would agree that under the

24      contract -- and we can go to it, if you'd like.

25      Let's go to Plaintiff's Exhibit 1, paragraph three.

1    And you're welcome to look to the screen or in the

2    book, Plaintiff's Exhibit 1.

3    A      I'll just look on the screen up there.

4    Q      That's fine.  Paragraph three.  It reads,

5    promoter, and that's you, correct?

6    A      Yes, ma'am.

7    Q      "Shall be responsible for and will exercise

8    his best efforts in negotiating and securing all

9    releases, clearances, consents and/or releases from

10   all third parties, including without limitation

11   talents, agents or other necessary parties."  Do you

12   see that?

13   A      Yes, ma'am.  I see it.

14   Q      It goes on to say, "If any materials of any

15   kind used in the programs are controlled by the

16   talent or promoter, then such materials will be

17   provided to Clear Channel for use in the programs at

18   no additional cost," correct?

19   A      That's what it says, yes.

20   Q      So we're in agreement that that was your job

21   to provide clearances for things used at the live

22   events or people appearing at the live events;

23   correct?

24   A      I certainly understand that it was my job to

25   get the clearances for the wrestlers.

1    Q      All right.

2    A      And any of their likenesses, things like that.

3    Q      All right.  And it was also your job to get

4    clearance for any music that was played at the live

5    events?

6    A      No, ma'am.  I would strongly disagree with

7    that.

8    Q      Okay.  Where in the contract does it require

9    that Clear Channel provide clearances for the music

10   used at the live events?

11   A      Ma'am, I didn't need -- I didn't need music at

12   the live events.

13   Q      But wasn't it Mr. Hart's suggestion that you

14   have music at the live events?

15   A      Mr. Hart worked out something with Mr. Paulen.

16   It had nothing to do with me.

17   Q      Do you recall Mr. Hart's testimony that he was

18   shocked that there was no music at the events?

19   A      Well, I guess when he saw all the cameras and

20   all the video, I guess he was shocked when he asked

21   Clear Channel.  I had no -- I had no music prepared

22   to bring there.  I wasn't planning on it.  Highspots

23   would've brought any music that they were going to

24   use in the -- in the filming of the event.

25   Q      It certainly wasn't Clear Channel's job to

1      bring music to play at the live event.  Could we

2      agree on that?

3      A      To play at the live event?  Yeah.  I guess we

4      could agree with that.  If I had wanted music played

5      then, I would have brought music.

6      Q      All right.  And you recall -- and we don't

7      have to belabor this, but you recall that Mr. Hart

8      was paid $2500 for that music by Clear Channel;

9      correct?

10     A      Yes, ma'am.  That's what I believe the -- what

11     I believe the deal was.  And certainly at no time

12     did they indicate to me that I needed to pay him for

13     it.

14     Q      All right.  Now, another clearance issue that

15     came up with regard to Wrestlereunion I was the

16     wrestling team Dudley Boys, which, apparently, at

17     least according to WWE, you did not have clearance

18     for the use of that name; correct?

19     A      That was an allegation that they made, yes.

20     Q      All right.  And that was -- we can agree that

21     that was your responsibility to provide clearance to

22     Clear Channel for the Dudley Boys name; correct?

23     A      Well, yes, if we ended up using the Dudley

24     Boys name, and we didn't.

25     Q      Well, you didn't inform Clear Channel of any

1    problems with the Dudley Boys name until November

2    2005; isn't that correct?

3    A      Well, no, I would have to say that would be

4    incorrect, ma'am.  Clear Channel was there.  They

5    filmed the event.  They called them Team 3-D at the

6    event.  Why would they -- I mean, they -- they were

7    there.  I mean, certainly, they were referred to as

8    Team 3-D beginning August 27th, I believe, 2005.

9    Q      But that team had been previously known as the

10   Dudley Boys; correct?

11   A      Okay.  But Clear Channel wasn't involved with

12   them previously.  They were under contract to World

13   Wrestling Entertainment until August 26th.  August

14   27th they came to work for me and they became Team

15   3-D on that day.

16   Q      Why don't you take a look at Exhibit 115.

17   This is in the defendant's book.  Do you recognize

18   -- are you with me, sir?

19   A      Yes, ma'am.

20   Q      Do you recognize exhibit -- Defendant's

21   Exhibit 115 as an e-mail exchange between you and

22   Mr. Gallarello concerning --

23   A      Oh, sorry, I was on the wrong page.  I

24   apologize.

25   Q      Defendant's Exhibit 115.

1       A       I think I have what you're asking me about

2       now.

3       Q       Do you recognize this e-mail as an e-mail

4       exchange dated November 24th with Mr. Gallarello?

5       A       Yes.

6               MS. MILLNER:  All right.  Move to admit, Your

7       Honor.

8               THE COURT:  Any objection?

9               MR. RODEMS:  No objection, Your Honor.

10              THE COURT:  The exhibit will be received.

11      Number 115?

12              MS. MILLNER:  No, 124, Your Honor.

13              THE COURT:  124?

14              MS. MILLNER:  Oh, 115, you're right.

15              THE COURT:  115 is received.

16              (Whereupon, Defendant's Exhibit Number 115 is

17      received into evidence.)

18      BY MS. MILLNER:

19      Q       All right.  Let's go to the bottom.  And this

20      is dated November 24, 2005?

21      A       Yes, it is.

22      Q       And again, you're bringing to Clear Channel's

23      attention that the Dudley Boys name cannot be used

24      since you didn't have clearance for it; correct?

25      A       Well, yes, ma'am.  That's what this e-mail

Corrente - Cross

1     refers to.  But clearly there's a communication

2     problem at Clear Channel.  Clear Channel filmed an

3     event on August 27th.  The two gentlemen that you're

4     talking about, Avon Hughes and Mark Lemonica, were

5     referred to as Team 3-D on that day.  This is two

6     months later.  I mean, Johnny Gallarello obviously

7     made a mistake or someone at Clear Channel failed to

8     communicate on an issue.

9     Q     This Team 3-D, I'm not a wrestling fan,

10    whatever their names are, they're known in the

11    public as the Dudley Boys, though; correct?

12    A     Ma'am, they have not wrestled as the Dudley

13    Boys since before August 26, 2005.  At

14    Wrestlereunion, Team 3-D debuted to the world the

15    main event, pay-per-views and matches for TNA and

16    have been for several years now.

17    Q     But at this time period that we're talking

18    about, that's what they would have been known to

19    wrestling fans; correct?  They were known as the

20    Dudley Boys, not as Team 3-D; correct?

21    A     Well, not starting August 27th.  I'm going to

22    tell you not only did they appear there as Team 3-D,

23    but that was all written up.  That was all covered.

24    Certainly Ms. Olejar was in charge of the

25    production.  She was running the truck.  She would

1        have known what the team was referred to.

2        Q      Okay.  So it's Clear Channel's fault that this

3        issue came up; is that your testimony?

4        A      My testimony would be that obviously Dawn

5        Olejar did not communicate with Johnny Gallarello.

6        I can promise you this.  He did not contact me and

7        say, hey, we're going with the Dudley Boys name,

8        regardless.  These guys changed their name August

9        27th.  Why he didn't know that, I have no idea.

10       Q      All right.  Now, do you recall there being an

11       issue with clearance rights involving the music for

12       Midnight Express?

13       A      I believe something was brought to my

14       attention.  Eric Paulen said he was going to handle

15       it and deal with it.

16       Q      And did you bring that music to the event?

17       A      Did I bring it?

18       Q      Yes.

19       A      No.

20       Q      All right.  Why don't you take a look at --

21       well, never mind.  We'll just move on.

22              Now, you talked on direct about these

23       photographs that appeared on your promotional

24       trailer -- on the promotional trailer; correct?

25       A      Yes, ma'am.

1    Q    All right.  And is it your testimony that you

2    did not provide those photographs to Clear Channel?

3    A    Yes, ma'am, it is.

4    Q    All right.  You understand that that's not

5    Mr. Gallarello's position; correct?

6    A    Oh, I understand.  I think I saw something or

7    was told that he said that I sent it.  But why would

8    I send him pictures and then immediately turn around

9    and say, no, those pictures -- I mean, it just

10   doesn't make sense to me.  I'm the one who knew what

11   could be used and what couldn't, and I immediately

12   pointed it out.  Why would I send him pictures to

13   use that I knew that he couldn't use?

14   Q    Why don't you take a look at Exhibits 121 and

15   123 of the defendant's exhibits.

16   A    Okay.  I believe I have it.

17   Q    All right.  Do you recognize Exhibits 121 and

18   123 as correspondence you've had with Mr. Gallarello

19   on this issue?

20   A    Yes.

21        MS. MILLNER:  Move to admit, Your Honor?

22        THE COURT:  Any objection?

23        MR. RODEMS:  No, Your Honor.

24        THE COURT:  123 is received.

25        MS. MILLNER:  And 121, Your Honor.

1          THE COURT:  121, as well.

2          MS. MILLNER:  Okay.

3          (Whereupon, Defendant's Exhibit Numbers 121 and

4    123 are received into evidence.

5    BY MS. MILLNER:

6    Q     Let's start with 121.  You agree with me that

7    this -- Mr. Gallarello is communicating a problem

8    he's having with photos or obtaining of photos on a

9    disc that they did not have clearance for; correct?

10   A     On 121?

11   Q     Correct.

12   A     Maybe I'm missing something.  It seems like

13   I'm the one doing all the talking.

14   Q     Well, Mr. Gallarello's e-mail at the top there

15   talks about, "The photos on the disc that were sent

16   to me I understand were cleared;" correct?

17   A     Then I must have the wrong page.  I'm on 121.

18   Q     Of the defendant's book?  The top e-mail,

19   Mr. Gallarello to you?

20   A     Oh, I apologize, I was on page two of that.

21   Q     No problem.  All right.  So you agree that

22   Mr. Gallarello's pointing out that some photos that

23   were used in the -- some photos that he used were

24   not cleared; correct?

25   A     Yes.  He's addressed, I guess, what I said to

1    him, I guess is what it looks like to me.

2    Q       And then the second message from him, the one

3    down below, he writes that, "Just getting around to

4    reading the entire e-mail.  I'm halting production

5    and you can let me know what photos are cleared and

6    which are not as all photos were from the disc you

7    gave me."  Do you see that?

8    A       Yeah.  That's what he says.

9    Q       All right.  And you never responded back to

10   him, did you, sir, that, in fact, he was mistaken in

11   that belief?

12   A       I guess -- I guess not.

13   Q       Okay.  Like, for example, if you turn to

14   Exhibit 123, you're still communicating with him a

15   couple of days later; correct?

16   A       When he says "you guys," I mean, you -- let's

17   say this, ma'am, that, you know, I'm not really in a

18   stationary position very much.  I travel quite

19   often.  You know, I don't recall sending anything,

20   especially going to the post office, putting a disc

21   in an envelope, mailing it over there, calling Fed

22   Ex.  I have no recollection of that.

23           I can't tell you what Mr. Russen may or may

24   not have done.  I know certainly when I saw what

25   they did I quickly turned around and said, what are

1    you doing.  I don't think this was knowledge I would

2    have gotten between December 12th and 15th, that

3    these photos were not -- I mean, these were clearly

4    WWE licensed photos.

5    Q     So Mr. Russen might have provided these photos

6    to Mr. Gallarello, you just don't know?

7          MR. RODEMS:  Objection, Your Honor, calls for

8    speculation.

9          THE COURT:  Overruled.

10         THE WITNESS:  He's saying somebody at my

11   company did it.  I guess the only other person would

12   be Mr. Russen.  I can plainly tell you that I have

13   no recollection whatsoever of doing it.

14   BY MS. MILLNER:

15   Q     And did you ever confer with Mr. Russen to

16   determine whether or not he, in fact, sent those

17   photos?

18   A     Yes, I believe that I did.  And, you know,

19   ultimately this was deemed to be a very, very small

20   issue, and I think Johnny's e-mail indicates that.

21   Well, okay, it would have been a little easier if we

22   had already known that.  I mean, this certainly

23   didn't seem like -- and we're talking about 11

24   months after the fact on the promotional trailer.

25   Q     Now, sir, let's talk about the four shoot

1    videos that you would agree were completed and put

2    on the marketplace; correct?

3    A    Yes.  Not in a timely manner, but they were

4    completed and put in the marketplace.

5    Q    Well, you're not claiming this delay somehow

6    caused you any damages; are you, sir?

7    A    I'm certainly -- what I will tell you is this.

8    The first promise that Wrestlereunion made to the

9    public that was not kept was that these videos would

10   be released on a certain day.  As a matter of fact,

11   it was only after a lengthy conversation with Joe

12   Townley that anything got done about putting these

13   DVDs out at all.  There was -- if it was just left

14   up to the commitment that Clear Channel made with no

15   intervention from me, they would have probably never

16   got out.

17   Q    Sir, yes or no, are you claiming in this

18   lawsuit any breach associated with Clear Channel's

19   distribution of those shoot videos?

20   A    I guess I can't speak -- I'm not an attorney.

21   I can't speak to the very technical aspects.  But

22   I'm absolutely saying that Clear Channel promised to

23   deliver them on a certain day and did not do that.

24   Q    But my question is, sir, is that among the

25   claims that you're making in this lawsuit?

1       A       I don't know, ma'am.

2       Q       Do you recall having your deposition taken on

3       December 9th, 2008?

4       A       Yes, ma'am.

5       Q       All right.  Page 25, line three.

6               "Question:  So with respect to those four

7       shoot interviews, those were completed.  So what

8       you're saying was a breach doesn't apply at least to

9       those four shoot interviews?"

10              Answer:  Correct."

11              Was that your testimony on that day?

12      A       I guess it was.  So then I guess the answer to

13      your question would be no.  But they were definitely

14      not delivered to the marketplace in a timely manner.

15      Q       Now, Highspots, you understand and you were

16      here for the testimony, was unable sell all of those

17      shoot videos; isn't that correct?

18      A       That's what I believe you mentioned.

19      Q       Well, were you here for Mr. -- what's Mr. --

20      A       Oh, that's right.  Okay.

21      Q       What's the fellow's name from Highspots?

22      A       Michael Bochicchio.

23      Q       Okay.  Do you recall his testimony yesterday?

24      A       Yes, ma'am.

25      Q       So you agree that those four -- that

1      Mr. Bochicchio was unable to sell the thousand

2      copies of those shoot videos that he ordered;

3      correct?

4      A      Yes, ma'am.

5      Q      And you, too, also ordered shoot videos; am I

6      correct?

7      A      We had videos that were brought to the

8      Wrestlereunion II event.  They were supposed to be

9      accompanied by the wrestling matches and all the

10     other shoot videos.

11     Q      But certainly those four shoot videos -- in

12     fact, Clear Channel drove them down so you'd have

13     those at the Wrestlereunion II event; isn't that

14     right?

15     A      I don't want to say yes, they drove them down

16     on a special trip, ma'am.  They were coming from New

17     York to Philadelphia.  They weren't flying.  I'm

18     sure they just put them in the trunk of the car as

19     they were coming.

20     Q      They hand-delivered the videos so they were

21     sure you would have them to sell at Wrestlereunion

22     II; correct?

23     A      Yes, ma'am.

24     Q      Because you were telling them that these

25     videos were going to be a hot commodity at

1        Wrestlereunion II; correct?

2        A       Ma'am, what we wanted was what we asked for,

3        which was all of the videos.  And our fans

4        complained.  They wanted -- they wanted the matches

5        from Wrestlereunion I.  It's, you know, tough to

6        explain.  Videos generally come out in a four-to-six

7        week period.  It's pretty hard to explain seven or

8        eight months no product and no projected date for

9        release.

10       Q       Sir, weren't you telling the folks at Clear

11       Channel that you needed to get these shoot videos

12       because they would be in demand at the

13       Wrestlereunion II event?

14       A       I don't know, ma'am.  Do you have an e-mail

15       that suggests that I said that?  I mean --

16       Q       Do you recall one way or the other?

17       A       No, ma'am, I don't.  I apologize, but I can't

18       remember every conversation or every e-mail.

19       Q       Let me see if I can find it.  If not, we'll

20       move on.

21              All right.  Well, would you agree with me that

22       you were unable to sell out of those shoot videos

23       that you had available for sale at Wrestlereunion

24       II?

25       A       Yes, ma'am.

1    Q     All right.  And, in fact, aren't I correct

2    that you never -- you being Wrestlereunion never

3    even bothered to pick up the unsold shoot interviews

4    and take them with you?  You just left them at

5    Wrestlereunion II; isn't that right?

6    A     My understanding is Michael Bochicchio was

7    carrying them back to Charlotte.

8    Q     And you never asked Mr. Bochicchio to return

9    those videos to you so you could have them available

10   to sell; correct?

11   A     No.  It was my understanding he had them and

12   that he would sell them.  I believe in his testimony

13   the other day -- I'm assuming in those 1000 videos

14   some of the Kevin Nash videos are there.  It sounds

15   like his testimony was he removed it from sale from

16   his website.  I'm not sure why he would do that if

17   he had some sitting there, but maybe there was a

18   miscommunication somewhere or he had a

19   misunderstanding.

20   Q     But you never followed up with Mr. Bochicchio

21   to see what the status of these shoot videos were

22   that Clear Channel delivered for you to sell at

23   Wrestlereunion II; correct?

24   A     No, ma'am, I don't have any recollection of

25   doing that.

1    Q      And Highspots put these videos on their

2    website and attempted to sell them at Wrestlereunion

3    II; isn't that right?

4    A      They put them on their website I believe

5    before Wrestlereunion II.

6    Q      And also had them available for sale at the

7    event; correct?

8    A      I guess it could have been the Highspots table

9    that was selling.  I don't recall if they did or

10   didn't at the actual event itself.  Certainly, it

11   was available on their website.

12   Q      You're not suggesting that Highspots didn't

13   use reasonable efforts to sell these completed shoot

14   interviews; correct?

15   A      Well, ma'am, the Highspots company has a lot

16   of merchandise.  I don't know what they brought on

17   the table.  I don't know what arraignment Rob Russen

18   worked out with them, if he asked them not to try to

19   sell our product at Wrestlereunion.  I just don't

20   recall.  I'm not really suggesting anything other

21   than I don't have information on that subject.

22   Q      Do you think Mr. Russen told Highspots not to

23   try and sell those shoot interviews?

24   A      Well, if he would have done that, it would

25   have been because he had somebody else lined up to

1       sell our particular product.

2       Q       Are you speculating or do you know that he did

3       that?

4       A       No, that was pure speculation.  I pretty much

5       indicated I don't have information on this topic for

6       you.  I apologize.

7       Q       All right.  So going back to my question,

8       then, you're not suggesting that the fact that these

9       shoot interviews did not sell out was a result of

10      Highspots not using reasonable efforts to sell them;

11      correct?

12              MR. RODEMS:  Objection, Your Honor,

13      repetitive.

14              THE COURT:  Sustained.  We'll break for the

15      day and resume at 9:00 AM, members of the jury.

16              COURTROOM SECURITY OFFICER:  Please rise for

17      the jury.

18              (Jury out at 4:02 PM)

19              THE COURT:  What's your plan, Mr. Rodems, when

20      we get finished with Mr. Corrente?

21              MR. RODEMS:  Your Honor, we would be calling

22      Mr. Colin Bowman.

23              THE COURT:  And that would be it?

24              MR. RODEMS:  Unfortunately, Your Honor, I

25      think I may have to recall Mr. Russen to address

1    this issue about the photos because -- but it would

2    be two questions.

3         THE COURT:  When are you guys going to finish

4    this trial?

5         MS. MILLNER:  I can tell you that we will not

6    be resting on Friday at five o'clock.

7         THE COURT:  Then you may not be resting at

8    all.  I told you that you had one week to try this

9    case.

10        MS. MILLNER:  Well, Your Honor, we're still on

11   the plaintiff's case.

12        THE COURT:  Yeah.  And you've been on

13   cross-examination for about three hours asking

14   repetitive questions.  So, you know, wrap it up.

15   Get to the point.  Let's move on.  This jury is not

16   entertained, I can tell you that.  Their heads are

17   back, they may not be listening, I don't know.

18        MS. MILLNER:  Well, I don't have much more

19   with Mr. Corrente, I can tell you that.

20        THE COURT:  It's frustrating that you guys are

21   oblivious that you've got a live audience here being

22   asked to make a very difficult decision and you plow

23   and plow and plow.  You're not helping them.

24        All right.  What's the status -- you can step

25   down, Mr. Corrente.  I'm sorry.  What's the status

1          of these discussions?

2              MR. RODEMS:  Your Honor, we have expressed to

3          defendant where our situation is, and it was my

4          understanding that there needed to be additional

5          discussions as things unfolded, and my understanding

6          is that the settlement discussions were not

7          completely over.  If I've misrepresented something,

8          please say so.

9              THE COURT:  Are you talking dollars or what?

10             MR. RODEMS:  Yes, sir.

11             THE COURT:  Well, make an offer, accept it or

12         reject it.  It's real simple.

13             MR. RODEMS:  We have done so, Your Honor.

14             THE COURT:  Well, then, where are we?  She

15         said something about it being in your court.  I

16         don't want to know dollars.

17             MS. MILLNER:  It was the last time I knew, but

18         I may not have been involved in all the discussions

19         so --

20             THE COURT:  What about your partner, does he

21         know?

22             MR. HERBERT:  The ball is in the Plaintiff's

23         court.

24             THE COURT:  So you made an offer to them?

25             MR. HERBERT:  Yes, sir.

1              THE COURT:  You got an offer?

2              MR. RODEMS:  Yes, sir.

3              THE COURT:  Who makes the decision?

4              MR. RODEMS:  Mr. Corrente does.

5              THE COURT:  How long is it going to take him

6      to make a decision?

7              MR. RODEMS:  Half a second.

8              THE COURT:  I don't know if he's even aware of

9      the offer.

10             MR. RODEMS:  We've had discussion about it.

11             THE COURT:  Well, make it clear to the

12     parties.  It doesn't matter to me whether you settle

13     or not, it's your case.  But if you're going to

14     settle, let's get it done so we don't put

15     yourselves, your lawyers, the court staff and the

16     jury through anxiety tomorrow.

17             I can't help you settle your case.  I

18     certainly would like to.  In my former capacity I

19     certainly would, but's that's frowned upon for some

20     reason.  And when I say "for some reason", that just

21     means I have some question about that.  There are

22     times --

23             MS. MILLNER:  I actually think you would be

24     helpful, Judge.

25             THE COURT:  There are times when a judge can

1    assist, but I certainly don't want to

2    inappropriately influence.  I'm not going to mis-try

3    this case, but I will tell you this.  My criminal

4    matters will not take a second chair to this case.

5    I've got a fairly substantial hearing scheduled for

6    Tuesday.  I will not move it.  In fact, it involves

7    a speedy trial issue.  So you're looking at telling

8    this jury to come back for the better part of next

9    week after telling them they'd be here a week.

10        Something in this case said something about

11    reality check.  I think everybody needs to have one.

12    There's been a lot of time spent that didn't need to

13    be spent on a lot of things and, of course, we had a

14    very significant *Daubert* issue, and I'm not talking

15    about that.  We all worked very hard on that, but

16    we've got to move through this evidence a little

17    better.

18        In any event, do you think, Mr. Rodems, that

19    that's something that you guys can discuss while

20    you're still here?

21        MR. RODEMS:  Your Honor, I will do whatever

22    the Court wishes, but I promise you that I'll be

23    available, and I'm available by cell phone.  We've

24    been in the office until midnight most nights and,

25    you know, I'm committed to the defendants and I'll

1    talk at any time.

2        THE COURT:  Well, I'm talking about whatever

3    the offer is now.

4        MR. RODEMS:  Well, I mean, I don't know how

5    much you want me to tell you.  That offer -- we have

6    a proposal to the defendant which is more or less a

7    number that we must reach.

8        THE COURT:  Who are the decision makers?  I

9    know Mr. Corrente is and I assume his partner.

10       MR. RODEMS:  Yes, sir.  Obviously

11   Mr. Attanasio has been here the whole time.

12       THE COURT:  What about on this side of the

13   room?

14       MS. MUNISTERI:  I have a certain level of

15   authority, Your Honor.

16       THE COURT:  Well, it's time, then, for you

17   guys to spend some quiet time with your lawyers and

18   see where you agree or disagree and try to exhaust

19   that in good faith.  It's not fair to this jury to,

20   you know, suddenly tomorrow morning they come in

21   and, well, guess what, we settled.  I mean, if that

22   happens, I'm sure they won't complain.  But, you

23   know, they go home Friday disappointed and upset

24   because we haven't finished this case.

25       I guess what I'm trying to say to you is if

1    you're going to get it settled, get it done.  It's

2    your case, it's your lives, your business.  It's

3    costing you money to try this case.  There's just so

4    much I can do.  I can't tell the lawyers how to

5    talk, how to ask questions.  Although, I have some

6    authority that I may share with the lawyers about

7    how to ask questions, at least discussion in some

8    authority.

9         But it's a simple case.  I said that at

10    pretrial, I say it again.  It's not an insignificant

11    case, by any means, but it's a simple case.  It's a

12    straightforward breach of contract.  And I suspect

13    this jury is way ahead of the parties in the case,

14    even though the defense hasn't put on its defense.

15         MS. MILLNER:  I was going to say, I hope not.

16         THE COURT:  Well, I mean, that's reality.  And

17    if you don't think otherwise, you're being naive.

18    They know what this case is about.  They get a

19    pretty good sense of what the defense is and, you

20    know, I just think sometimes we don't give them

21    enough credit.

22         But when I see a jury's reaction to lengthy

23    examinations and they're fidgeting and looking at me

24    and -- it's not uncommon, I see it a lot.  And all I

25    can do is tell the lawyers, you have to remember,

1    those are the people making the decision in the case

2    and don't forget.

3         So let me ask that you take some time, and I

4    mean removed from all these interested people like

5    experts and everybody else.  We have lawyers and

6    parties in a decision-making capacity that need to

7    discuss whether this case can get resolved.  If you

8    exhaust those discussions in good faith and it

9    cannot be resolved, then, fine.  That's all I can

10   ask you to do.  I'm certainly not going to try to

11   influence either side, other than to encourage you

12   to take the opportunity as it presents itself, which

13   is right now.

14        We have a way to contact these jurors

15   telephonically so they wouldn't have to return

16   tomorrow, but we can't wait too late because the

17   staff will be gone.  So take a few minutes and let

18   the courtroom security officer know where we're

19   going or not going.  Anything else?

20        MR. RODEMS:  No, Your Honor.  Are we

21   adjourned?

22        THE COURT:  Yes.  Thank you.

23        (Recess was taken from 4:12 to 4:24 PM.)

24        COURTROOM SECURITY OFFICER:  All rise.

25        MR. HERBERT:  Your Honor, are you expecting to

1      get a report?

2            THE COURT:  If it's good news, yeah.

3            MR. HERBERT:  Well, then, maybe we won't give

4      you the report.  It's bad news, Your Honor.  We're

5      at an impasse.

6            THE COURT:  All right.  Have a good evening.

7            MR. HERBERT:  Thank you.

8            (Proceedings concluded at 4:25 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3      STATE OF FLORIDA              )

4      COUNTY OF HILLSBOROUGH   )

5          I, Linda Starr, RPR, Official Court Reporter for

6      the United States District Court, Middle District,

7      Tampa Division,

8          DO HEREBY CERTIFY, that I was authorized to and

9      did, through use of Computer Aided Transcription,

10     report in machine shorthand the proceedings and

11     evidence in the above-styled cause, as stated in the

12     caption hereto, and that the foregoing pages,

13     numbered 1 through 252, inclusive, constitute a true

14     and correct transcription of my machine shorthand

15     report of said proceedings and evidence.

16         IN WITNESS WHEREOF, I have hereunto set my hand in

17     the City of Tampa, County of Hillsborough, State of

18     Florida, this 2nd day of April 2010.

19

20

21          _____*/s/ Linda Starr*_____
            Linda Starr, RPR, Official Court Reporter
22

23

24

25